## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS OF
THE NAACP; VOTERS OF TOMORROW
ACTION, INC.; DISABILITY RIGHTS
FLORIDA; ALIANZA FOR PROGRESS;
ALIANZA CENTER; UNIDOSUS;
FLORIDA ALLIANCE FOR RETIRED
AMERICANS; SANTIAGO MAYER
ARTASANCHEZ; and ESPERANZA
SÁNCHEZ,

     *Plaintiffs*,

v.

CORD BYRD, in his official capacity as
Secretary of State of Florida; et al.,

     *Defendants*.

Case No. 4:23-cv-00215-MW-MAF

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF EMERGENCY
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

EMERGENCY STATUS ..............................................................................1

INTRODUCTION .....................................................................................1

ARGUMENT ...........................................................................................4

I.   Legal Standard ................................................................................4

II.  Plaintiffs have standing to pursue preliminary relief barring enforcement of the Citizenship Requirement and Information Retention Ban. ......................5

   A.   The Citizenship Requirement injures Plaintiffs. ....................................6

   B.   The Information Retention Ban injures Plaintiffs. .................................11

   C.   The injuries imposed by the Citizenship Requirement and Information Retention Ban are traceable to Defendants Byrd and Moody's enforcement of SB 7050. ...........................................................................12

   D.   Injunctive relief will redress Plaintiffs' harms. ....................................14

III. Plaintiffs are substantially likely to succeed on the merits of their challenge to the Citizenship Requirement. ...................................................15

   A.   The Citizenship Requirement facially violates the Equal Protection Clause. ................................................................................15

      1.   Noncitizens are similarly situated to citizens who handle voter registration applications. .................................................17

      2.   Strict scrutiny applies because the Citizenship Requirement targets a suspect class and impedes a fundamental right. ................................18

      3.   The Citizenship Requirement is not necessary to serve any state interest. ...............................................................19

   B.   The Citizenship Requirement violates Plaintiffs' First Amendment Rights. ................................................................................21

      1.   The Citizenship Requirement burdens core political speech. ...........21

      2.   The Citizenship Requirement is a content-based restriction on

i

protected speech. ..............................................................................25

    3.   The Citizenship Requirement severely restricts Plaintiffs' associational rights. ...........................................................27

  C.  The Citizenship Requirement conflicts with Plaintiffs' right to contract under 42 U.S.C. § 1981 and is thus preempted under the Supremacy Clause. ...........................................................................30

  D.  The Citizenship Requirement is impermissibly vague. ..........................32

IV.  Plaintiffs are substantially likely to succeed on the merits of their challenges to the Information Retention Ban. ..................................................34

  A.  The Information Retention Ban violates Plaintiffs' First Amendment rights. .........................................................................................35

    1.   The Information Retention Ban burdens core political speech.........35

    2.   The Information Retention Ban severely burdens associational rights. ..................................................................................36

    3.   The Information Retention Ban cannot satisfy strict scrutiny. .........38

    4.   The Information Retention Ban is overbroad. ..................................39

  B.  The Information Retention Ban is impermissibly vague. .......................41

V.  Plaintiffs will suffer irreparable harm absent emergency relief. ...................42

  A.  The Citizenship Requirement will cause Plaintiffs irreparable harm. ....42

  B.  The Information Retention Ban will cause Plaintiffs irreparable harm. .45

VI.  The remaining preliminary injunction factors weigh in favor of granting the requested relief. ............................................................................46

CONCLUSION ....................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ass'n of People with Disabilities v. Herrera*,
   580 F. Supp. 2d 1195 (D.N.M. 2008) ................................................. 27

*Am. Ass'n of People with Disabilities v. Herrera*,
   690 F. Supp. 2d 1183 (D.N.M. 2010) ................................................. 29

*Arcia v. Fla. Sec'y of State*,
   772 F.3d 1335 (11th Cir. 2014) ........................................................ 10

*Arizona v. United States*,
   567 U.S. 387 (2012) ........................................................................ 32

*Barrett v. Walker Cnty. Sch. Dist.*,
   872 F.3d 1209 (11th Cir. 2017) ........................................................ 47

*Bonner v. City of Prichard*,
   661 F.2d 1206 (11th Cir. 1981) (en banc) ........................................... 5

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000) ........................................................................ 28

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ........................................................................ 40

*Brooklyn Branch of the NAACP v. Kosinski*,
   --- F. Supp. 3d ----, No. 21-cv-7667 (KPF), 2023 WL 2185901
   (S.D.N.Y. Feb. 23, 2023) ................................................................ 26

*Buckley v. Am. Const. Law Found., Inc.*,
   525 U.S. 182 (1999) ........................................................................ 23

*Butler v. Ala. Jud. Inquiry Comm'n*,
   111 F. Supp. 2d 1224 (M.D. Ala. 2000) ........................................... 46

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
   451 F.3d 1257 (11th Cir. 2006) ......................................................... 5

iii

*Campbell v. Buckley*,
　203 F.3d 738 (10th Cir. 2000) ....................................................23, 24

*Carillon Imp., Ltd. v. Frank Pesce Int'l. Grp. Ltd.*,
　112 F.3d 1125 (11th Cir. 1997) ............................................................4

*Chang v. Glynn Cnty. Sch. Dist.*,
　457 F. Supp. 2d 1378 (S.D. Ga. 2006) ...............................................43

*Chicago v. Morales*,
　527 U.S. 41 (1999).......................................................................32, 42

*Citizens United v. FEC*,
　558 U.S. 310 (2010).............................................................................30

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
　142 S. Ct. 1464 (2022).........................................................................25

*Clingman v. Beaver*,
　544 U.S. 581 (2005).............................................................................28

*Democratic Exec. Comm. of Fla. v. Lee*,
　915 F.3d 1312 (11th Cir. 2019) ...........................................................47

*Dream Defs. v. DeSantis*,
　559 F. Supp. 3d 1238 (N.D. Fla. 2021) .........................................40, 47

*Duffy v. Bates*,
　No. 1:15-cv-37-MW/GRJ, 2015 WL 1346196 (N.D. Fla. Mar. 24,
　2015) ....................................................................................................17

*Duke Power Co. v. Env't Study Grp.*,
　438 U.S. 59 (1978).........................................................................13, 14

*Elrod v. Burns*,
　427 U.S. 347 (1976).............................................................................44

*Estrada v. Becker*,
　917 F.3d 1298 (11th Cir. 2019) .....................................................18, 19

*Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*,
　426 U.S. 572 (1976).................................................................16, 18, 19

*Falls v. DeSantis*,
609 F. Supp. 3d 1273 (N.D. Fla. 2022) ............................................... 8

*Falls v. DeSantis*,
No. 4:22-cv-166-MW/MJF, 2022 WL 19333279 (N.D. Fla. Sept.
8, 2022) ............................................................................................. 5

*Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*,
601 F.2d 199 (5th Cir. 1979) ............................................................. 5

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) ........................................................... 46

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ....................................................... 20

*Graham v. Richardson*,
403 U.S. 365 (1971) .................................................................. 18, 31

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ........................................................................ 32

*Greater Birmingham Ministries v. Sec'y of State of Ala.*,
992 F.3d 1299 (11th Cir. 2021) ......................................................... 7

*Griffin Indus., Inc. v. Irvin*,
496 F.3d 1189 (11th Cir. 2007) ....................................................... 17

*Hadnott v. Amos*,
394 U.S. 358 (1969) ........................................................................ 27

*Harrell v. Fla. Bar*,
608 F.3d 1241 (11th Cir. 2010) ......................................................... 6

*Hetherington v. Madden*,
558 F. Supp. 3d 1187 (N.D. Fla. 2021) ............................................ 24

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......................................................................... 8

*Int'l Ass'n of Firefighters, Loc. 2069 v. City of Sylacauga*,
436 F. Supp. 482 (N.D. Ala. 1977) .................................................. 43

*KH Outdoor, LLC v. City of Trussville,*
 458 F.3d 1261 (11th Cir. 2006) ..................................................44, 47

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State,*
 66 F.4th 905 (11th Cir. 2023) ..........................................................42

*League of Women Voters of Fla., Inc. v. Lee,*
 595 F. Supp. 3d 1042 (N.D. Fla. 2022) ...........................................22

*League of Women Voters of Fla. v. Browning,*
 863 F. Supp. 2d 1155 (N.D. Fla. 2012) .......................................27, 47

*League of Women Voters of Fla. v. Cobb,*
 447 F. Supp. 2d 1314 (S.D. Fla. 2006) ............................................24

*League of Women Voters v. Hargett,*
 400 F. Supp. 3d 706 (M.D. Tenn. 2019) .....................................22, 23

*Link v. Diaz,*
 No. 4:21-cv-271-MW/MAF, 2023 WL 2984726 (N.D. Fla. Apr.
 17, 2023) ............................................................................................6

*Lujan v. Defs. of Wildlife,*
 504 U.S. 555 (1992)........................................................................5, 13

*Mass. Bd. of Retirement v. Murgia,*
 427 U.S. 307 (1976).......................................................................16, 19

*McCullen v. Coakley,*
 573 U.S. 464 (2014)............................................................................26

*Meyer v. Grant,*
 486 U.S. 414 (1988)................................................................22, 23, 36

*Moody v. Holman,*
 887 F.3d 1281 (11th Cir. 2018) ........................................................14

*NAACP v. Alabama,*
 357 U.S. 449 (1958)............................................................................27

*NAACP v. Button,*
 371 U.S. 415 (1963)................................................................33, 37, 38

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
 138 S. Ct. 2361 (2018)..................................................................26

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
 896 F.2d 1283 (11th Cir. 1990) ...................................................46

*NetChoice, LLC v. Attorney General, Fla.*,
 34 F.4th 1196 (11th Cir. 2022) ...............................26, 44, 46, 47

*Nordlinger v. Hahn*,
 505 U.S. 1 (1992)..........................................................................17

*Otto v. City of Boca Raton, Fla.*,
 981 F.3d 854 (11th Cir. 2020) ...............................................30, 47

*Papachristou v. Jacksonville*,
 405 U.S. 156 (1972)......................................................................32

*Piercy v. Maketa*,
 480 F.3d 1192 (10th Cir. 2007) .....................................................7

*Pleasant v. Lovell*,
 876 F.2d 787 (10th Cir. 1989) .....................................................37

*Roberts v. U.S. Jaycees*,
 468 U.S. 609 (1984)......................................................................37

*Speech First, Inc. v. Cartwright*,
 32 F.4th 1110 (11th Cir. 2022) ..................................................6, 7

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
 554 U.S. 269 (2008)......................................................................14

*Support Working Animals, Inc. v. DeSantis*,
 457 F. Supp. 3d 1193 (N.D. Fla. 2020) ..................................16, 19

*Support Working Animals, Inc. v. Gov. of Fla.*,
 8 F.4th 1198 (11th Cir. 2021) ..................................................13, 15

*Takahashi v. Fish & Game Comm'n*,
 334 U.S. 410 (1948)......................................................................30

*United States v. Davis*,
    139 S. Ct. 2319 (2019)....................................................................32

*United States v. Virginia*,
    518 U.S. 515 (1996)........................................................................20

*Virginia v. Hicks*,
    539 U.S. 113 (2003)........................................................................40

*VoteAmerica v. Schwab*,
    576 F. Supp. 3d 862 (D. Kan. 2021)..............................................29

*VoteAmerica v. Schwab*,
    No. 21-2253-KHV, 2023 WL 3251009 (D. Kan. May 4, 2023) ...............*passim*

*Walters v. Fast AC, LLC*,
    60 F.4th 642 (11th Cir. 2023) ........................................................13

*Weaver v. Bonner*,
    309 F.3d 1312 (11th Cir. 2002) .....................................................24

*Wilding v. DNC Servs. Corp.*,
    941 F.3d 1116 (11th Cir. 2019) .....................................................13

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) (en banc) .........................6, 33, 41, 42

**Statutes**

18 U.S.C. § 1028 .................................................................................39

18 U.S.C. § 2725 .................................................................................41

42 U.S.C. § 1981 .........................................................................*passim*

52 U.S.C. § 20507(i)(1) .......................................................................39

Fla. Stat. § 16.56(1)(c)5 .....................................................................14

Fla. Stat. § 97.012 ..............................................................................13

Fla. Stat. § 97.022 ..............................................................................14

Fla. Stat. § 97.0575 ...................................................................*passim*

Fla. Stat. § 112.181(1)(d)2 ....................................................................33

Fla. Stat. § 119.0712(2)(b) ....................................................................41

Fla. Stat. § 219.06(1) ............................................................................33

Fla. Stat. § 501.171(1)(g) ......................................................................41

Fla. Stat. § 600.041 ..............................................................................33

Fla. Stat. § 817.568 ..............................................................................18

## Other Authorities

Fla. Dep't of State, *Office of Election Crimes and Security Report*
(Jan. 15, 2023), https://files.floridados.gov/media/706232/dos-
oecs-report-2022.pdf ........................................................................14

Handle, *Merriam-Webster's New Collegiate Dictionary* (7th ed.) ........................33

U.S. Const. amend. XIV ........................................................................16

U.S. Const., art. VI, cl. 2........................................................................31

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 7.1, Plaintiffs seek a preliminary injunction prohibiting Defendants Cord Byrd in his official capacity as Secretary of State of Florida and Ashley Moody in her official capacity as Attorney General of Florida ("Defendants")[1] from enforcing Fla. Stat. § 97.0575(1)(f) ("Citizenship Requirement") and Fla. Stat. § 97.0575(7) ("Information Retention Ban"). In support, Plaintiffs state as follows:

## EMERGENCY STATUS

Plaintiffs seek emergency injunctive relief under L.R. 7.1(L) because irreparable harm will occur on July 1, 2023, when the challenged provisions of Senate Bill 7050 take effect.

\*   \*   \*

## INTRODUCTION

This case arises from Florida's latest assault on the franchise: Senate Bill 7050 ("SB 7050") levies a host of sweeping and significant penalties and proscriptions on third-party voter registration organizations ("3PVROs") and the individuals they represent and register to vote. It is no secret that 3PVROs primarily serve minority and other marginalized Floridians. Yet over strenuous objections from lawmakers,

---

[1] Plaintiffs also named Florida's 67 county supervisors of elections as defendants for Plaintiffs' 3PVRO Fines Provision claims (Counts I, II, and V) and Mail-In Ballot Request Restriction claim (Count VII). *See* ECF No. 52 (Amended Complaint). Because Plaintiffs do not move for injunctive relief on those provisions at this time, this motion is directed only at the Secretary and Attorney General.

1

community leaders, and 3PVRO representatives about the discriminatory impact that the bill would have on these communities and the dearth of evidence demonstrating a legitimate purpose behind any of the enacted changes, the Florida Legislature pushed SB 7050 through each chamber and Governor DeSantis signed it into law on May 24, 2023. Minutes later, Plaintiffs Florida State Conference of Branches and Youth units of the NAACP ("Florida NAACP"), Voters of Tomorrow Action, Inc. ("VOT"), Disability Rights Florida, Inc. ("DRF"), Florida Alliance for Retired Americans ("Florida Alliance"), Alianza for Progress and Alianza Center (together "Alianza"), and UnidosUS filed suit challenging multiple provisions under the U.S. Constitution and Voting Rights Act.

Plaintiffs now seek a preliminary injunction enjoining Defendants from enforcing two of SB 7050's provisions that will impose immediate and irreparable harm to Plaintiffs the moment the bill goes into effect on July 1: (1) the prohibition on noncitizens conducting voter registration, Fla. Stat. § 97.0575(1)(f) (the "Citizenship Requirement"), and (2) the ban on 3PVRO retention of voter contact information, Fla. Stat. § 97.0575(7) (the "Information Retention Ban"). Both provisions threaten to diminish or even decimate Plaintiffs' ability to engage in core political speech and association through voter registration.

The Citizenship Requirement prohibits noncitizens from "collecting or handling voter registration applications on behalf of" 3PVROs. Fla. Stat.

2

§ 97.0575(1)(f). Any violation renders a 3PVRO "liable for a fine in the amount of $50,000 for each such person," without any cap on the total fines that may be assessed. *Id.* This facially discriminatory provision's impact on noncitizens engaging in voter registration activity is self-evident. Their work is not only constitutionally protected, it is vital to the operations of Plaintiff 3PVROs, in which noncitizens form an integral part of the organizations' members, canvassers, and employees. The Citizenship Requirement violates equal protection, infringes on Plaintiffs' First Amendment rights to free speech and association, interferes with their right to contract, and employs vague terminology to impose harsh penalties. Each of these claims leads to the same conclusion: the Citizenship Requirement cannot stand.

The Information Retention Ban prohibits copying or retaining "a voter's personal information" for any purpose "other than to provide such application or information to the [3PVRO] in compliance with this section." Fla. Stat. § 97.0575(7). Doing so is a felony of the third degree. *Id.* But retaining voter contact information is essential to Plaintiff 3PVROs' civic engagement, particularly their get-out-the-vote ("GOTV") work. The threat of criminal penalties all but assures that these organizations will be unable to engage with the voters they register to promote their pro-voting message, in violation of their First Amendments rights.

3

Without this Court's immediate intervention, the Citizenship Requirement and Information Retention Ban will severely stifle—and in some cases suspend—Plaintiff 3PVROs' ability to conduct voter registration and communicate their pro-voting message to turn out more voters, to the detriment of Plaintiffs, the historically marginalized populations they serve, and the public interest. There is no countervailing harm to the state from a preliminary injunction preserving the status quo; indeed, the challenged provisions serve no identifiable state interests. The equities thus weigh overwhelmingly in favor of preserving Plaintiffs' constitutional rights. This Court should preliminarily enjoin enforcement of the Citizenship Requirement and Information Retention Ban.

## ARGUMENT

### I.    Legal Standard

Plaintiffs seeking preliminary injunctive relief must establish: (1) a substantial likelihood of success on the merits; (2) they will suffer irreparable harm absent emergency relief; (3) any harm Defendants may face is outweighed by Plaintiffs' harm; and (4) the injunction will not disserve the public interest. *Carillon Imp., Ltd. v. Frank Pesce Int'l. Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997). No one factor controls; courts must consider the factors jointly, and a strong showing on one may

compensate for a weaker showing on another. *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).[2]

Plaintiffs satisfy each of the factors, entitling them to preliminary injunctive relief against the enforcement of SB 7050's Citizenship Requirement and Information Retention Ban, both of which will immediately and significantly disrupt Plaintiffs' ability to engage in vital voter registration and engagement upon taking effect on July 1, in violation of Plaintiffs' First and Fourteenth Amendment rights.

## II.   Plaintiffs have standing to pursue preliminary relief barring enforcement of the Citizenship Requirement and Information Retention Ban.

Each Plaintiff has standing to challenge the Citizenship Requirement, the Information Retention Ban, or both. To establish standing for each claim, Plaintiffs must show a likelihood that (1) they have suffered an injury-in-fact that is (2) traceable to Defendants and that (3) can be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006); *Falls v. DeSantis*, No. 4:22-cv-166-MW/MJF, 2022 WL 19333279, at *2 (N.D. Fla. Sept. 8, 2022) (citation omitted) (explaining that plaintiffs' "affirmative burden of showing a likelihood of success on the merits . . . depends on a likelihood that [a] plaintiff has standing").

---

[2] Fifth Circuit decisions issued prior to 1981 are controlling on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

The injury-in-fact requirement applies "most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). A plaintiff "can bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc) (quoting *Susan B. Anthony List v. Driehau*s, 573 U.S. 149, 159 (2014) (cleaned up)). And where "a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." *Harrell*, 608 F.3d at 1257. "Ultimately, for self-censorship injuries, '[t]he fundamental question . . . is whether the challenged policy 'objectively chills' protected expression.'" *Link v. Diaz*, No. 4:21-cv-271-MW/MAF, 2023 WL 2984726, at *6 (N.D. Fla. Apr. 17, 2023) (citing *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022)). In fact, "litigants who are being chilled from engaging in constitutional activity suffer a discrete harm independent of enforcement, and that harm creates the basis for our jurisdiction." *Cartwright*, 32 F.4th at 1120 (cleaned up).

### A. The Citizenship Requirement injures Plaintiffs.

Plaintiffs will suffer both direct and associational injury from the Citizenship

Requirement. *First*, Santiago Mayer Artasanchez ("Santiago Mayer") and Esperanza Sánchez are injured by the Citizenship Requirement because as noncitizens they are expressly targeted by the provision and entirely prohibited from engaging in voter registration on behalf of 3PVROs. *See, e.g.*, *Piercy v. Maketa*, 480 F.3d 1192, 1204 (10th Cir. 2007) ("Once facial discrimination has been established . . . we review only to see . . . if the affected person is a member of the discriminated class for purposes of standing"); Ex. 8 ("Sánchez Decl.") ¶ 18; Ex. 7 ("Mayer Decl.") ¶ 11.[3] The impact to these individual Plaintiffs' ability to engage in core protected speech—and, in some instances, to do their jobs and contract with their employers—will be immediate and absolute.

*Second*, organizational Plaintiffs Alianza, UnidosUS, Florida NAACP, and VOT have associational standing to challenge the Citizenship Requirement on behalf of their members. An organization may sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) ("*GBM*"). As set forth above, Plaintiffs'

---

[3] All exhibits are attached to the Notice of Filing Exhibits to the Declaration of Abha Khanna, ECF No. 54, and are referenced in the Declaration filed herewith.

noncitizen members and canvassers are directly injured by the facially discriminatory Citizenship Requirement. The Citizenship Requirement strikes at the heart of the voter registration process, which is critical to the core mission of each organization. Ex. 6 ("VOT Decl.") ¶ 5; Ex. 5 ("Unidos Decl.") ¶¶ 5, 10. And neither the claims asserted nor the relief requested "requires individualized proof and both are thus properly resolved in a group context." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).

*Third*, Plaintiffs Alianza and UnidosUS also have employer standing on behalf of their noncitizen employees. An employer may sue on behalf of its employees when "they have (1) a 'close relationship with the person who possesses the right,' and (2) 'there is a hindrance to the possessor's ability to protect his own interests.'" *Falls v. DeSantis*, 609 F. Supp. 3d 1273, 1285 (N.D. Fla. 2022) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). Alianza and UnidosUS's noncitizen employees have a close relationship with the organizations themselves, sharing the same mission, purpose, and community. Ex. 10 ("Alianza Decl.") ¶ 19; Sánchez Decl. ¶ 4. And noncitizen canvassers are hindered in their own ability to protect their interests given their increased vulnerability as noncitizens, particularly in light of Florida's recent history. *See* Ex. 14 (LA Times, *Florida's anti-immigrant bill continues DeSantis' campaign of cruelty* (April 13, 2023)). In fact, several noncitizen canvassers who work with Alianza and UnidosUS have expressed

concerns about coming forward and participating in the lawsuit for fear of retribution and further restrictions on their livelihoods. Alianza Decl. ¶ 21; Unidos Decl. ¶ 15.

*Fourth*, the Citizenship Requirement directly injures Alianza, UnidosUS, Florida NAACP, and VOT by reducing the number of canvassers who may register voters on their behalf. These organizations routinely deploy noncitizen canvassers to register voters, but will no longer be able to do so once the Citizenship Requirement goes into effect. Alianza Decl. ¶¶ 8, 14–15, 19–20; Unidos Decl. ¶¶ 14, 26; VOT Decl. ¶¶ 10, 17; Ex. 12 ("FL NAACP Decl.") ¶ 22; Ex. 13 ("Volusia NAACP Decl.") ¶¶ 7, 10–12. And because Alianza and UnidosUS rely so heavily on noncitizen canvassers, their voter registration efforts in particular will be severely curtailed. Alianza Decl. ¶¶ 19, 22; Unidos Decl. ¶¶ 26–41. Losing access to these noncitizen canvassers who have built longstanding community connections will also diminish Plaintiffs' ability to accomplish their missions effectively. Alianza Decl. ¶¶ 19, 22; VOT Decl. ¶ 4; Unidos Decl. ¶ 40; FL NAACP Decl. ¶¶ 23–24. Indeed, because they cannot take the risk of a $50,000 penalty if just *one* noncitizen canvasser "collect[s] or handl[es]" a voter registration application, VOT and Alianza have determined that they may no longer engage in voter registration at all once the law goes into effect. Alianza Decl. ¶ 25; VOT Decl. ¶ 7. By prohibiting noncitizens from participating in voter registration, the Citizenship Requirement forces these organizations to self-censor, chills protected speech and associational activities, and

9

severely reduces—and in some cases will even end—their ability to engage in the voter registration work that is central to their missions.

*Fifth*, Florida NAACP, VOT, Alianza, and UnidosUS will also be forced to divert their limited resources in response to the Citizenship Requirement. "Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). The Citizenship Requirement will force these organizations to divert resources away from voter registration, education, and outreach toward more stringent means of verifying and investigating canvassers' citizenship status. Alianza Decl. ¶ 14; VOT Decl. ¶ 17; Unidos Decl. ¶¶ 26, 28; FL NAACP Decl. ¶ 20; Volusia NAACP Decl. ¶¶ 7, 10. And regardless of how robust a program Plaintiffs build to verify canvassers' identities, they may have no definitive way to confirm citizenship status, and, as such, may have to pay $50,000 for *each* noncitizen who inadvertently participates in voter registration work, diverting significant funds away from mission-aligned activities. For some of these Plaintiffs, such a hefty fine would force them to opt out of voter registration activities completely. Alianza Decl. ¶ 25; VOT Decl. ¶¶ 7, 19. Volusia NAACP Decl. ¶ 12. Florida NAACP, Alianza, VOT, and UnidosUS will also need to divert resources to finding and training new canvassers to replace their existing noncitizen canvassers

who can no longer assist in the voter registration process. FL NAACP Decl. ¶¶ 20, 22–23; Alianza Decl. ¶ 14; VOT Decl. ¶ 17; Unidos Decl. ¶¶ 28–30, 35; Volusia NAACP Decl. ¶ 11.

## B. The Information Retention Ban injures Plaintiffs.

The Information Retention Ban directly injures Florida NAACP, VOT, DRF, Alianza, and UnidosUS because it will reduce their ability to engage in protected speech and associational activities by criminalizing routine voter information retention. The Ban will prevent these Plaintiffs from retaining information essential for contacting voters after they register through Plaintiffs' services, thereby preventing Plaintiffs from engaging in a central part of their GOTV efforts. Plaintiff 3PVROs routinely retain voter information from registration forms to engage with the voters they register to, for example, encourage them to vote, assist them with voting, or provide polling place and other information about upcoming election-related activities. Alianza Decl. ¶¶ 12–13; Unidos Decl. ¶¶ 20–22. Ex. 9 ("DRF Decl.") ¶¶ 5–8; FL NAACP Decl. ¶ 11; Volusia NAACP Decl. ¶¶ 13–14. And VOT is deterred from becoming a 3PVRO if they are unable to maintain voter information to be able to contact voters close to the election and encourage them to exercise their right to vote—follow-up that is especially important with young voters, who are often first-time voters and more likely to vote with encouragement from their peers. *See* VOT Decl. ¶ 20.

These organizations will also have to divert resources away from their missions to comply with the Information Retention Ban in at least three ways. First, Plaintiffs will have to change their GOTV strategies, costing the organization precious staff time. Alianza Decl. ¶ 23; DRF Decl. ¶¶ 7–8; Unidos Decl. ¶¶ 25, 42; FL NAACP Decl. ¶¶ 17, 25, 27. Second, Plaintiffs will be forced to train and educate their canvassers, volunteers, and staff on the Information Retention Ban to ensure that those individuals implement necessary changes to avoid the harsh civil and criminal penalties that could result from their previous practice of documenting the voters they register. Alianza Decl. ¶ 23; DRF Decl. ¶ 12; Unidos Decl. ¶ 16; FL NAACP Decl. ¶ 28. Third, Plaintiffs will almost certainly lose volunteers who do not want to risk a felony charge for the sake of helping register voters, Alianza Decl. ¶ 23, which will also force Plaintiffs to divert resources away from other work to recruit new canvassers, *id*. Indeed, Plaintiff DRF may not continue as a 3PVRO at all if it cannot retain voters' information. DRF Decl. ¶¶ 11, 14.

### C. The injuries imposed by the Citizenship Requirement and Information Retention Ban are traceable to Defendants Byrd and Moody's enforcement of SB 7050.

Plaintiffs' injuries are "fairly traceable to" Defendants' enforcement of the penalties associated with SB 7050's Citizenship Requirement and Information Retention Ban.

Plaintiffs establish causation by showing that "their injuries are connected

12

with" Defendants' conduct under the challenged law. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)). Article III standing "require[s] no more than a showing that there is a substantial likelihood" of causation, *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 75 n.20 (1978), by demonstrating injuries are "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. "[W]here, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged." *Support Working Animals*, *Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) ("*SWA*"). "Traceability is not an exacting standard" and is "less stringent than the tort-law concept of proximate cause," *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) (quotations marks and citation omitted).

Secretary Byrd is Florida's chief elections officer and, in that capacity, is responsible for the administration and enforcement of state laws affecting voting. Fla. Stat. § 97.012. The Secretary also oversees the Office of Election Crimes and Security, a division within the Department of State, which is tasked with assisting the Department in investigating allegations of election law violations, referring findings to the Attorney General or state attorneys for prosecution, and imposing

fines on 3PVROs for violations of Florida's Election Code, including the challenged provisions. Fla. Stat. § 97.022; *see also* Florida Dep't of State, *Office of Election Crimes and Security Report* (Jan. 15, 2023) at 5 ("The OECS assessed statutory fines in the amount of $41,600.00 against those 3PVROs that did not comply with the statutory requirements.").[4]

Attorney General Moody is also charged with enforcing the challenged provisions. The Attorney General oversees the Office of the Florida Statewide Prosecutor, which has responsibility to "[i]nvestigate and prosecute any crime involving" "voter registration." Fla. Stat. § 16.56(1)(c)5. The Attorney General is also specifically tasked with enforcing SB 7050's new civil and criminal penalties against 3PVROs, *see* Fla. Stat. § 97.0575(8), including for violations of the Citizenship Requirement and Information Retention Ban, *id.* §§ 97.0575(1)(f), (7).

### D. Injunctive relief will redress Plaintiffs' harms.

Finally, Plaintiffs' injuries are "likely to be redressed" by the requested injunction. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc*., 554 U.S. 269, 287 (2008). Plaintiffs' redress need not be total, *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018), and a "substantial likelihood" of redressability will satisfy this prong. *Duke Power*, 438 U.S. at 79, 98. Where plaintiffs have sued to enjoin a government official from enforcing the law, they must show only "that an injunction

---

[4] Available at https://files.floridados.gov/media/706232/dos-oecs-report-2022.pdf.

prohibiting enforcement would be effectual." *SWA*, 8 F.4th at 1201.

Because Defendants have "the authority to enforce" the penalties associated with the Citizenship Requirement and Information Retention Ban as explained above, an "injunction prohibiting enforcement would be effectual" in remedying Plaintiffs' injuries by ensuring Secretary Byrd and Attorney General Moody—along with the offices, employees, and agents under their supervision—will not levy such penalties against them. *See SWA*, 8 F.4th at 1201.

### III.   Plaintiffs are substantially likely to succeed on the merits of their challenge to the Citizenship Requirement.

Plaintiffs Mayer, Sánchez, Alianza, UnidosUS, Florida NAACP, and VOT are substantially likely to succeed on the merits of their challenge to the Citizenship Requirement. Rarely are laws enacted that so expressly target a suspect class of residents, in blatant violation of the Equal Protection Clause. But the legal deficiencies don't end there: The Requirement also violates Plaintiffs' rights under the First Amendment, 42 U.S.C. § 1981, and the Due Process Clause. Under any and all of these provisions, the Citizenship Requirement must be enjoined.

### A. The Citizenship Requirement facially violates the Equal Protection Clause.

Plaintiffs are substantially likely to succeed on the merits of their equal-protection challenge to the Citizenship Requirement because the provision facially discriminates based on alienage without a compelling state interest.

The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. This constitutional guarantee "requires that the government treat similarly situated persons in a similar manner." *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1220 (N.D. Fla. 2020) (citing *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1305 (11th Cir. 2009)). "When legislation classifies [similarly situated] persons in such a way that they receive different treatment under the law, the degree of scrutiny the court applies depends on the basis for the classification." *Id.* (quoting *Gary v. City of Warner Robins*, 311 F.3d 1334, 1337 (11th Cir. 2002)). If the basis for the classification involves "a fundamental right or a suspect class," the court must apply strict scrutiny when reviewing the law. *Id.*; *see also Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976) (same). Such a classification can survive strict scrutiny only if the state can show that the law's "purpose or interest is both constitutionally permissible and substantial," and the classification is "necessary" to achieve that purpose or protect that interest. *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 602 (1976).

Here, the Citizenship Requirement triggers strict scrutiny both because it classifies similarly situated individuals differently based on their citizenship status, and because it restricts fundamental First Amendment speech and associational

rights. Because legislators articulated *no* state interest served by the Citizenship Requirement, the discriminatory classification cannot survive.

> **1. Noncitizens are similarly situated to citizens who handle voter registration applications.**

Noncitizens and citizens are similarly situated in all relevant aspects when "collecting or handling" voter registration applications on behalf of 3PVROs. Under the Equal Protection Clause, persons are "similarly situated" when they are "in all relevant aspects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "Similarly situated does not mean identical, but a 'reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's situations.'" *Duffy v. Bates*, No. 1:15-cv-37-MW/GRJ, 2015 WL 1346196, at *4 (N.D. Fla. Mar. 24, 2015) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000), and citing *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007)). The question of whether people or entities are similarly situated is fact dependent. *See, e.g.*, *Griffin*, 496 F.3d at 1206.

Here, there is no practical distinction between citizens and noncitizens when it comes to registering voters. Citizens and noncitizens engage in the same speech and conduct in the same way when they register voters on behalf of 3PVROs. 3PVROs provide the same training and supervision to citizens and noncitizens who collect voter registration applications. Unidos Decl. ¶ 16; Sánchez Decl. ¶ 17; Ex. 11 ("Florez Decl.") ¶ 16 (discussing training *all* canvassers on the relevant

17

regulations). And citizens and noncitizens alike are subject to criminal penalties for illegally handling voter information. *See, e.g.*, Fla. Stat. § 817.568.

> **2.  Strict scrutiny applies because the Citizenship Requirement targets a suspect class and impedes a fundamental right.**

Under the equal-protection analysis, the Citizenship Requirement is subject to strict scrutiny twice over, because it is based on a suspect classification and involves a fundamental right.

The Citizenship Requirement on its face creates a classification based on alienage by prohibiting any person "who is not a citizen [from] collecting or handling voter registration applications on behalf of the [3PVRO]." Fla. Stat. § 97.0575(1)(f). The Supreme Court has held that "[c]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate." *Graham v. Richardson*, 403 U.S. 365, 372 (1971); *see also Examining Bd. v. Flores de Otero*, 426 U.S. at 602 (citations omitted). While the Eleventh Circuit has carved out two narrow exceptions to strict scrutiny when evaluating alienage classifications—(1) laws that differently classify "illegal aliens" and (2) laws that are unrelated to resident noncitizens' "ability to exist in the community," *Estrada v. Becker*, 917 F.3d 1298, 1309–10 (11th Cir. 2019)—neither applies here. The Citizenship

Requirement bars *all* noncitizens from "collecting or handling" voter registration applications, regardless of whether they are in the United States legally or not. Fla. Stat. § 97.0575(1)(f); *see also infra* Section III.D. And the Requirement directly impacts noncitizens' "ability to exist in the community" by preventing them from engaging in the democratic process and, in many instances, doing their jobs. *See Estrada*, 917 F.3d at 1309–10; *see also, e.g.*, *Examining Bd.*, 426 U.S. at 604 ("It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the (Fourteenth) Amendment to secure.").

Strict scrutiny also applies because the differential classification affects "a fundamental right." *Support Working Animals*, 457 F. Supp. 3d at 1220. The "rights guaranteed by the First Amendment" are fundamental rights subject to strict scrutiny. *See Murgia*, 427 U.S. at 312, 312 n.3 (citing *Williams v. Rhodes*, 393 U.S. 23 (1968)). As explained below, the Citizenship Requirement restricts noncitizens' First Amendment rights to free speech and association. *See infra* Section III.B.

### 3. The Citizenship Requirement is not necessary to serve any state interest.

Defendants have no justification for the Citizenship Requirement, let alone one that is "necessary" to serve a "constitutionally permissible and substantial interest." *Examining Bd.*, 426 U.S. at 602. Indeed, during the hearings on SB 7050,

legislators offered *no* justification for this provision. When directly asked what purpose the Requirement serves, SB 7050's sponsor responded only that "there are certain rights in our country that only citizens get to enjoy." Ex. 3, Florida State Senate Committee on Fiscal Policy hearing ("Fiscal Policy hr'g") at 112:9–10; Ex. 4, Florida State Senate Legislative Session hearing ("Senate Session hr'g") at 16:18–24. And tellingly, legislators failed to identify *any* evidence of noncitizens mishandling voter registration applications. *See* Senate Session hr'g at 6:9–7:13; Ex. 2, Florida State House State Affairs Committee hearing ("House Affairs Committee hr'g") at 36:9–15 (Rep. Eskamani noting there was "no evidence . . . that the individuals outlined in the current bill are dangerous or untrustworthy"). Instead, the Legislature described the law as nothing more than a "policy call," Senate Session hr'g at 15:22–17:2, 18:2-16, but the only apparent basis for this "policy" is naked discrimination against noncitizens.

Post hoc justifications cannot save the Citizenship Requirement. State justifications for such suspect classifications must be "genuine" and not "hypothesized or invented *post hoc* in response to litigation." *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Further, a state's purported interest "must not rely on overbroad generalizations" about the group in question. *Virginia*, 518 U.S. at 533. Given that the Citizenship Requirement applies to *all* noncitizens regardless of legal status,

20

criminal history, or any other factor, any justification that Defendants may offer to attempt to defend the law necessarily relies on overbroad generalizations about noncitizens.

Ultimately, the Legislature's silence on the purpose behind the provision speaks volumes: There is no conceivable rationale for prohibiting noncitizens from handling voter registration applications. And without any justification for the Citizenship Requirement, it is impossible for Defendants to demonstrate that the classification is "necessary."

## B. The Citizenship Requirement violates Plaintiffs' First Amendment Rights.

The Citizenship Requirement also violates the First Amendment by unlawfully restricting Plaintiffs Mayer, Sánchez, Alianza, UnidosUS, VOT, and Florida NAACP's fundamental political speech and associational activities. The Citizenship Requirement is subject to strict scrutiny under the First Amendment on three independent bases: it burdens core political speech, it is a content-based restriction, and it severely restricts protected associational activities. And as set forth above, *supra* Section III.A.3, it falls far short of that exacting standard.

### 1. The Citizenship Requirement burdens core political speech.

Voter registration efforts conducted by 3PVROs are precisely "the type of interactive communication concerning political change that is appropriately

21

described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). When Plaintiffs Alianza, UnidosUS, Florida NAACP, and VOT and their members and canvassers register voters, including through voter registration drives and community outreach events, they communicate a pro-voting message about the importance of political participation and other issues central to their missions. Alianza Decl. ¶¶ 10–11; Unidos Decl. ¶ 19; VOT Decl. ¶¶ 8–9; FL NAACP Decl. ¶ 9. "A voter registration drive . . . as the term is ordinarily used, involves encouraging citizens to register to vote." *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (quoting *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 698 (N.D. Ohio 2006)). At such events, Plaintiffs engage in protected political speech regarding, for instance, the importance of voting, issues specific to a voter's community, how the organizations advocate on behalf of voters, and how voters can get involved in the organizations. Alianza Decl. ¶¶ 10–11, 13, 19; Unidos Decl. ¶¶ 19, 22; FL NAACP Decl. ¶ 9; *see also* VOT Decl. ¶ 5.

Courts have routinely recognized that "[e]ncouraging others to register to vote is pure speech, and, because that speech is political in nature, it is a core First Amendment activity." *Hargett*, 400 F. Supp. 3d at 720 (quoting *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012)). "A discussion of whether or not a person should register to vote . . . inherently 'implicates political thought and expression.'" *League of Women Voters of Fla., Inc.*

*v. Lee*, 595 F. Supp. 3d 1042, 1152 (N.D. Fla. 2022), *rev'd on other grounds*, 66 F.4th 905 (11th Cir. 2023) (quoting *Hargett*, 400 F. Supp. 3d at 720).

Indeed, Plaintiffs' voter registration efforts closely mirror the type of petitioning activity that the Supreme Court held was "core political speech" in *Meyer* and *Buckley*. In *Meyer*, the Supreme Court considered Colorado's ban on the use of paid petition circulators. 486 U.S. at 428. And in *Buckley v. American Constitutional Law Foundation, Inc.*, the Court addressed among other things, the requirement that initiative-petition circulators be registered voters. 525 U.S. 182, 186 (1999). In both cases, the Court applied strict scrutiny and struck down the challenged laws. To explain why these bans burdened core political speech, the Court noted that the "circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Meyer*, 486 U.S. at 421. Like the petitioning activity of the plaintiffs in *Meyer* and *Buckley*, Plaintiffs' voter registration activities involve "interactive communication concerning political change." *Id.* at 422; *see* Alianza Decl. ¶¶ 10–11, 13, 19; VOT Decl. ¶¶ 5–6; Unidos Decl. ¶¶ 19, 22; FL NAACP Decl. ¶ 9. "[T]he creation of a new voter *is* a political change—no less so than the inauguration of a new mayor or the swearing-in of a new Senator." *Hargett*, 400 F. Supp. 3d at 723.

The Citizenship Requirement not only burdens but outright *prohibits* individual Plaintiffs' core political speech, and therefore is subject to strict scrutiny.

*See Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002); *see also Buckley*, 525 U.S. at 207 (Thomas, J., concurring in the judgment) ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest."); *Hetherington v. Madden*, 558 F. Supp. 3d 1187, 1193 (N.D. Fla. 2021) (same). By preventing noncitizens from even handling voter registration applications, the Requirement "has reduced the total quantum of speech." *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1332 (S.D. Fla. 2006); *see also Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000) (courts must apply strict scrutiny "where the government restricts the overall quantum of speech available to the election or voting process").

Moreover, the Citizenship Requirement burdens the core political speech of Plaintiffs Alianza, UnidosUS, Florida NAACP, and VOT because it makes it harder for them to successfully engage in voter registration efforts. Alianza, for example, relies on noncitizen volunteers to assist with its voter registration efforts, particularly in Florida's Puerto Rican and Latinx communities, where voters are at an increased risk of disenfranchisement due to language barriers. Alianza Decl. ¶¶ 15–20. Without these individuals' help, Alianza will be unable to continue their operations at full capacity and their voter registration work will be severely diminished. *Id.* ¶ 22. The same is true for UnidosUS, whose canvassers are primarily comprised of

24

noncitizens. Unidos Decl. ¶ 14. Florida NAACP and VOT also utilize noncitizen canvassers. FL NAACP Decl. ¶ 22; VOT Decl. ¶ 10. The Requirement will also force these organizations to divert their limited resources away from voter registration efforts toward (1) trying to verify and investigate their canvassers' backgrounds, and (2) finding and training additional staff and volunteers to replace their robust and professional group of noncitizen canvassers. VOT Decl. ¶ 17; Unidos Decl. ¶¶ 26–30; FL NAACP Decl. ¶¶ 20, 23; Volusia NAACP Decl. ¶ 11. The Requirement will thereby "reduce the total quantum of speech on this important public issue." *VoteAmerica v. Schwab*, --- F. Supp. 3d at ---, No. 21-2253-KHV, 2023 WL 3251009, at *13, *14 (D. Kan. May 4, 2023).

### 2. The Citizenship Requirement is a content-based restriction on protected speech.

Strict scrutiny also applies to the Citizenship Requirement because it is a content-based restriction on protected speech.

It is "well established that the First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1472 (2022) (quotations omitted). Accordingly, "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.*

(quotation omitted). A law is "content-based," and thus subject to strict scrutiny, "if it suppresses, disadvantages, or imposes differential burdens on speech because of its content—*i.e.*, if it applies to particular speech because of the topic discussed or the idea or message expressed." *NetChoice, LLC v. Attorney General, Fla.*, 34 F.4th 1196, 1223 (11th Cir. 2022) (cleaned up). The Supreme Court has cautioned courts to be "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (quotation marks omitted). Such laws "run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Id.* (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)).

The Citizenship Requirement is content-based on its face. It prohibits certain disfavored speakers (noncitizens) from a particular form of expression (voter registration). *See Brooklyn Branch of the NAACP v. Kosinski*, --- F. Supp. 3d ----, No. 21-cv-7667 (KPF), 2023 WL 2185901, at *14 (S.D.N.Y. Feb. 23, 2023) (finding a line warming prohibition is content-based because it "prohibits only a certain category of expression"). The Constitution does not abide such disfavored treatment unless it is the least restrictive means to further a compelling governmental interest. *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

### 3. The Citizenship Requirement severely restricts Plaintiffs' associational rights.

The Citizenship Requirement also triggers strict scrutiny because it severely restricts constitutionally protected associational activities. When individuals or groups "wish to speak and act collectively with others," it "implicat[es] the First Amendment right of association." *Browning*, 863 F. Supp. 2d at 1158. The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces [First Amendment] freedom of speech." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); *see also Hadnott v. Amos,* 394 U.S. 358, 364 (1969).

Plaintiffs Mayer, Sánchez, Alianza, UnidosUS, Florida NAACP, and VOT and their canvassers "wish to speak and act collectively with others" through their voter registration efforts, including the solicitation, completion, collection, and submission of voter registration applications. *Browning*, 863 F. Supp. 2d at 1158; Sánchez Decl. ¶ 7; Mayer Decl. ¶ 6; Alianza Decl. ¶¶ 10–11, 24; VOT Decl. ¶ 12; Unidos Decl. ¶ 10; FL NAACP Decl. ¶ 9. "Organized voter-registration activities," like those Plaintiffs engage in, "necessarily involve political association, both within the voter-registration organizations and with the citizens they seek to register." *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1229 (D.N.M.

2008); *see also VoteAmerica*, 2023 WL 3251009, at *10 ("Public endeavors which 'assist people with voter registration are intended to convey a message that voting is important.'") (quoting *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 223 (M.D.N.C. 2020)).

The Citizenship Requirement restricts and chills Plaintiffs' associational activities with voters, and in some cases, eliminates their associations enabled by voter registration altogether. These severe associational burdens are subject to strict scrutiny. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000). As discussed *supra* Section II.A., the vast majority of Alianza's and UnidosUS's canvassers are noncitizens, and Florida NAACP and VOT also utilize noncitizen canvassers. And many of these noncitizen canvassers have engaged in voter registration and GOTV work for years, connecting with the organization's target constituencies through shared language and experiences. The Citizenship Requirement outright prohibits noncitizen canvassers' voter registration work, and even jeopardizes their association with Plaintiff organizations, which may no longer engage them for any voter registration activities. *See* Alianza Decl. ¶¶ 14–16, 19, 21; Unidos Decl. ¶¶ 14, 18–19, 26; VOT Decl. ¶¶ 7, 10, 19; FL NAACP Decl. ¶ 22; Volusia NAACP Decl. ¶¶ 7, 12.

Plaintiffs Alianza, UnidosUS, Florida NAACP, and VOT will also lose association with essential canvassers. Recruiting canvassers for voter registration is

an onerous task, and canvassers will be deterred from participating if they are forced to undergo background checks or provide records of their citizenship status. Alianza Decl. ¶ 22; VOT Decl. ¶ 17; FL NAACP Decl. ¶ 23. Noncitizen canvassers and employees will also worry about exposing the organization to catastrophic fines and may choose to stay away from the organization entirely. Alianza Decl. ¶ 21; VOT Decl. ¶¶ 17, 19; FL NAACP Decl. ¶ 24. Without these noncitizen volunteers and canvassers, Plaintiffs will no longer be able to connect with certain communities of prospective voters and members, impairing Plaintiffs' rights of association with these volunteers and the community connections they facilitate. Alianza Decl. ¶¶ 19, 22; Unidos Decl. ¶¶ 22, 40. VOT Decl. ¶ 4; FL NAACP Decl. ¶¶ 23–24.[5]

*     *     *

Each of these burdens on Plaintiffs' First Amendment rights, independently and collectively, triggers strict scrutiny. Thus, this Court must enjoin the Citizenship

---

[5] The fact that Plaintiffs conduct some of their voter registration with the assistance of citizens does not undermine Plaintiffs' position. An "organization's attempt to *broaden* the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'" *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986)) (emphasis added). Plaintiffs' right to associate encompasses "the right to *choose* how [they] associate[] with others." *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 875 (D. Kan. 2021) (quoting *Boy Scouts of Am.,* 530 U.S. at 653 ("As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression.")).

Requirement's enforcement unless the state can show it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010); *see also Otto v. City of Boca Raton, Fla*., 981 F.3d 854, 868 n.6 (11th Cir. 2020) ("Cases where this standard is met are few and far between."). For the reasons articulated in Section III.A.3., there is absolutely no justification for the Citizenship Requirement, let alone one narrowly tailored to serve a compelling state interest. This Court should therefore preliminarily enjoin the Citizenship Requirement's enforcement as a violation of Plaintiffs' First Amendment rights.

### C. The Citizenship Requirement conflicts with Plaintiffs' right to contract under 42 U.S.C. § 1981 and is thus preempted under the Supremacy Clause.

Plaintiffs Sánchez and Mayer are also substantially likely to succeed on the merits of their claim that the Citizenship Requirement interferes with their and other noncitizens' right "to make and enforce contracts," in direct conflict with 42 U.S.C. § 1981.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens" and "shall be subject to like punishment, pains, penalties, . . . and to no other." 42 U.S.C. § 1981(a). "The protection of this section has been held to extend to aliens as well as to citizens." *Takahashi v. Fish & Game Comm'n*, 334

U.S. 410, 419 (1948). In *Takahashi*, for instance, the Court invalidated a California statute that precluded certain noncitizens from obtaining commercial fishing licenses. *Id.* Later, in *Graham*, 403 U.S. at 378, the Court held that "state laws that restrict the eligibility of aliens for welfare benefits merely because of their alienage conflict with . . . federal policy that lawfully admitted resident aliens . . . are entitled to the full and equal benefit of all state laws[.]"

The Citizenship Requirement conflicts with the guarantees provided by Section 1981. By cutting off noncitizens from the ability to collect and handle voter registration applications on behalf of 3PVROs, the Requirement interferes with noncitizens' right to "make and enforce" contracts with 3PVROs. For instance, Plaintiff Sánchez has worked for UnidosUS as a canvasser and organizer since 2015; she relies on that income to support herself and will be unable to continue her chosen work because of the law's prohibition on her handling of voter registration applications. Sánchez Decl. ¶¶ 2, 7, 18. As a result, the Citizenship Requirement uniquely restricts noncitizens' ability to pursue a livelihood by obtaining and maintaining employment with 3PVROs.

The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. State law must give way to federal law where they conflict, including where "the challenged state

31

law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks and citation omitted). The Citizenship Requirement directly conflicts with, and stands as an obstacle to, the purpose of Section 1981 because it denies noncitizens the same rights enjoyed by other Floridians, including the right to enter into employment contracts with 3PVROs to engage in voter registration. Because the Citizenship Requirement interferes with Congress's express intent to give legal noncitizens equal rights under federal law, it is preempted under the Supremacy Clause and this Court must enjoin its enforcement.

### D. The Citizenship Requirement is impermissibly vague.

Finally, Plaintiffs are also substantially likely to succeed on the merits of their vagueness challenge to the Citizenship Requirement, which broadly prohibits noncitizens from "handling" "voter registration applications" without defining either term. Am. Compl. Count VI.

Vague laws are "no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Laws can be vague either because they (1) fail to inform people of what they prohibit or (2) lend themselves to arbitrary and discriminatory enforcement. *See Chicago v. Morales*, 527 U.S. 41, 58 (1999); *Papachristou v.*

*Jacksonville*, 405 U.S. 156, 162 (1972). Vague laws are especially pernicious in the First Amendment context, as they "force potential speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Wollschlaeger*, 848 F.3d at 1320 (en banc) (Marcus, J.) (cleaned up). In this way, vague laws have a wide-ranging chilling effect on disfavored speech without expressly banning it. Thus, "standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432 (1963).

SB 7050's prohibition on non-citizens "handling" "voter registration applications" fails to define either term. Merriam-Webster identifies several different definitions of the verb "handle," including "to try or examine . . . with the hand," "to have overall responsibility for supervising or directing," and "to engage in the . . . distributing" of something. Handle, *Merriam-Webster's New Collegiate Dictionary* (7th ed.). Florida statutes similarly employ varying definitions of the term. *See, e.g.*, Fla. Stat. § 112.181(1)(d)2 (regarding emergency personnel who "handle[] needles or other sharp instruments exposed to body fluids"); Fla. Stat. § 219.06(1) (regarding how certain officers must "handle" fees, commissions, and other public money); Fla. Stat. § 600.041(6), (9) (defining "to handle" as "to engage" "as a distributor in the business of handling and distributing citrus fruit in fresh fruit form in the primary channel of trade"). Here, SB 7050 leaves it far from clear whether "handle" means to physically touch any application, to possess the

application, transport the application, supervise the voter registration process, or participate in the process of soliciting voter registrations at all.

The law also fails to make clear what it means by "voter registration application." That is, does the law prohibit non-citizens from "handling" only completed applications or even blank applications? If SB 7050 encompasses the latter definition, a 3PVRO would be on the hook for a $50,000 fine every time a noncitizen helps transport blank registration forms to an event. Which definition the law encompasses is anyone's guess. And if a 3PVRO guesses wrong—or worse, at the Secretary's unbound discretion—that guess could cost $50,000 for each inadvertent misstep.

*     *     *

The Citizenship Requirement thus fails at every level. As a facially discriminatory law that vaguely prohibits noncitizens from contracting to work for 3PVROs and imposes content-based restrictions on core speech and associational activities without any justification, the Citizenship Requirement sets off nearly every constitutional alarm bell and warrants an immediate injunction.

## IV. Plaintiffs are substantially likely to succeed on the merits of their challenges to the Information Retention Ban.

The Information Retention Ban violates the First Amendment because it severely obstructs Plaintiffs Florida NAACP, VOT, DRF, Alianza, and UnidosUS's

34

ability to engage in protected speech and associational activities with the voters they register, without being narrowly tailored to a compelling state interest. The Ban's expansive and undefined scope is also overbroad, in violation of the First Amendment, and impermissibly vague, in violation of the Fourteenth Amendment.

## A. The Information Retention Ban violates Plaintiffs' First Amendment rights.

### 1. The Information Retention Ban burdens core political speech.

Like the Citizenship Requirement, the Information Retention Ban imposes unjustifiable burdens on Plaintiffs' core political speech and can be upheld only if it is narrowly tailored to further a compelling state interest.

The Information Retention Ban severely limits 3PVROs' ability to communicate a pro-voting message by eliminating the most organic way to obtain and retain voters' contact information. Plaintiffs reach out to voters after registering them for three primary reasons: (1) to help correct any errors on their registration application, Unidos Decl. ¶ 20; Alianza Decl. ¶ 23; (2) to encourage them to get out and vote and provide information about voting, DRF Decl. ¶ 7; Alianza Decl. ¶¶ 12–13, 23; VOT Decl. ¶ 20; Unidos Decl. ¶ 21; FL NAACP Decl. ¶¶ 11, 26; and (3) to invite them to community and civic events orchestrated by the organization and partners. DRF Decl. ¶ 7; Alianza Decl. ¶¶ 12–13, 23; VOT Decl. ¶ 20; FL NAACP Decl. ¶¶ 11, 25–26. These "interactive communications"—made possible by

retaining voter information from registration applications—are all about "political change." *See Meyer*, 486 U.S. at 421–22.

The Ban impermissibly restricts Plaintiffs' ability to continue to communicate with the voters they register as part of their pro-voting missions. If Plaintiffs cannot retain a voter's information, they will have no way to track whether the voter actually votes or whether they can do anything to assist the voter in casting their ballot. The Information Retention Ban thwarts Plaintiffs' efforts to use voter registration drives as a way to expand membership and discuss policy issues more broadly because they can no longer use voters' readily-available contact information on their applications to contact them. The Ban, therefore, "reduce[s] the total quantum of speech on [] important public issue[s]," and must be subject to strict scrutiny. *VoteAmerica*, 2023 WL 3251009, at *13, *14.

## 2. The Information Retention Ban severely burdens associational rights.

The Information Retention Ban also infringes Plaintiffs' associational rights. Plaintiffs and their canvassers' post-registration activities—such as phone banking, door knocking, informational mailers, and other GOTV—interactions implicate associational rights. *See, e.g.*, *id*. at *10 ("[P]ublic endeavors which expend resources 'to broaden the electorate to include allegedly under-served communities' qualify as expressive conduct which implicates the First Amendment freedom of

association.") (quoting *Democracy N.C.*, 476 F. Supp. 3d at 223); Alianza Decl. ¶ 13; VOT Decl. ¶ 20; Unidos Decl. ¶ 21; FL NAACP Decl. ¶ 25; *see also* DRF Decl. ¶ 7 (discussing accessible outreach programs to reach disability community). And Plaintiffs' non-voting related events—including membership meetings, policy discussions, fundraising, summits and conferences, and other community programming—are also squarely protected associations. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) ("when the State interferes with [] selection of those with whom [organizations] wish to join in a common endeavor, freedom of association" is "implicated"); *Pleasant v. Lovell*, 876 F.2d 787, 795 (10th Cir. 1989) (noting that the First Amendment protects political advocacy by an association and its members); *see also* Alianza Decl. ¶¶ 10–13, 23–24; VOT Decl. ¶ 6; Unidos Decl. ¶ 9; FL NAACP Decl. ¶ 25.

It is well established that political organizing is protected by the First Amendment. In *NAACP v. Button*, 371 U.S. 415 (1963), the Supreme Court struck down a state law that prevented NAACP from soliciting and representing clients in defense of their constitutional rights. *Id*. The Court found that the law violated the NAACP's associational rights because civil rights litigation is a form of protected "political expression and association" that serves NAACP's target community. *Id.* at 431. And just recently, a federal court in Kansas relied on *Button* to strike down a law infringing an organization's associational right to distribute personalized

absentee ballot applications to voters. *VoteAmerica*, 2023 WL 3251009, at *10. Like the protected activities at issue in *Button* and *VoteAmerica*, the Information Retention Ban severely restricts Plaintiffs' ability "to engage in association for the advancement of beliefs and ideas" to "persuade [its audience] to action." *Id.*; *Button*, 471 U.S. at 430, 437. Plaintiffs use the contact information they collect through voter registration applications as their chosen "means for achieving" their desired result: persuading their constituency to vote and assisting them in that process. *VoteAmerica*, 2023 WL 3251009, at *10; *Button*, 371 U.S. at 429. And Plaintiffs rely on that voter contact information to build relationships and increase voter turnout in Florida. *VoteAmerica*, 2023 WL 3251009, at *10. The Information Retention Ban entirely eliminates all of these protected associational activities and can only survive it if passes muster under strict scrutiny.

### 3. The Information Retention Ban cannot satisfy strict scrutiny.

The Information Retention Ban fails to withstand strict scrutiny. Defendants cannot demonstrate that it serves a compelling state interest. During the hearings on SB 7050, legislators broadly identified information security as the reason for banning organizations from retaining any voter contact information. Fiscal Policy hr'g at 14:3–15; Ex. 1, Florida State Senate Committee on Ethics and Elections hearing ("Ethics Committee hr'g") at 37:4-10, 66:2–21. But legislators failed to

identify a single instance where a 3PVRO misused a voter's information. Indeed, misuses of voter information, such as identity theft and voter fraud, are already criminalized—18 U.S.C. § 1028; Florida Election Code Chapter 104—begging the question of what additional state interest the Ban actually serves. And there can be no legitimate basis to prevent 3PVROs from retaining voter information—which is required to be publicly available under the National Voter Registration Act, 52 U.S.C. § 20507(i)(1).

Moreover, while keeping some subsets of voter information secure may be legitimate, the sweep of the Information Retention Ban is not a sufficiently tailored approach. The Legislature had many less restrictive and more tailored options to achieve its stated goal. For example, it could have prohibited retention of sensitive "personal information," defined in the same code section as social security numbers, Florida ID numbers, and signatures. Fla. Stat. § 97.0575(7). Instead, the Legislature chose to ban retention of *any* "personal information." The Ban entirely fails to distinguish between sensitive information that may create security risks if misused and contact information that voters willingly provide.

The Information Retention Ban is an unconstitutional, sweeping solution in search of a problem, and it cannot survive strict scrutiny.

### 4. The Information Retention Ban is overbroad.

The Information Retention Ban runs afoul of the First Amendment in an

additional way: its overbreadth. An overbroad law is one that "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quotations omitted). The Ban does exactly that: it "punishes" Plaintiffs' established method of communication with voters. Any legitimate sweep (for example, prohibiting retention of social security numbers) is outsized by the complete eradication of Plaintiffs' protected speech.

The Information Retention Ban is also impermissibly overbroad because it "consumes vast swaths of core First Amendment" associational activity in the name of protecting voters' information. *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1283 (N.D. Fla. 2021); *see also id*. at 1284 (noting that when state "interest[s] collides with rights guaranteed by the First Amendment, the 'government may regulate in the area only with narrow specificity' because otherwise, those rights, which 'are delicate and vulnerable, as well as supremely precious in our society,' may be suffocated") (quoting *Button*, 371 U.S. at 433)). This is an additional basis to conclude that the Ban violates the First Amendment. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations.").

## B.  The Information Retention Ban is impermissibly vague.

Finally, Plaintiffs are also substantially likely to succeed on the merits of their vagueness challenge to the Information Retention Ban, which broadly prohibits "retain[ing] a voter's personal information" "for any reason other than to provide such application or information to the [3PVRO] in compliance with this section." Both the phrases "personal information" and "in compliance with this section" are unconstitutionally vague because they "fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct [is] prohibit[ed]," and they enable "arbitrary and discriminatory enforcement." *Wollschlaeger*, 848 F.3d at 1319 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see supra* Section III.D; Am. Compl. Count VI. Inadvertently running afoul of the Ban is a third-degree felony.

It is unclear what the provision means by "personal information." Typically, under Florida law the meaning of "personal information" is defined in each statute using the term. *See, e.g.*, Fla. Stat. § 501.171(1)(g); *id.* §§ 119.0712(2)(b) (referencing 18 U.S.C. § 2725), 322.143(1)(a). Plaintiffs and their canvassers are left to guess what the term encompasses here. And if they guess wrong—or if the state chooses to target them—they risk a felony conviction.

It is equally unclear what it means for personal information to be retained or copied "in compliance with this section." Can voters' personal information only be

41

copied and retained until the voter registration form is submitted? Or can it be used

for any purpose related to a 3VPRO's registration and GOTV work more broadly?

Can a 3PVRO copy and retain personal information to track whether voter

registration forms have been accepted? To defend itself from allegations of

misconduct like late-returned applications? Again, Plaintiffs and their canvassers are

left to guess, and the state has unfettered discretion to impose arbitrary and

inconsistent punishments. *See Morales*, 527 U.S. at 58. And because vague laws in

the First Amendment context "force potential speakers to steer far wider of the

unlawful zone than if the boundaries of the forbidden areas were clearly marked,"

*Wollschlaeger*, 848 F.3d at 1320, many Plaintiffs may self-censor to avoid risking

capricious felony punishments. *See* DRF Decl. ¶ 11; Alianza Decl. ¶ 25; Unidos

Decl. ¶ 42. The Retention Ban is thus "vague to the point of unconstitutionality."

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 947 (11th

Cir. 2023).

## V.  **Plaintiffs will suffer irreparable harm absent emergency relief.**

The second factor—a showing that Plaintiffs will suffer irreparable injury

unless the Court issues an injunction—weighs heavily in Plaintiffs' favor.

### A.  **The Citizenship Requirement will cause Plaintiffs irreparable harm.**

Absent the requested relief, Plaintiffs Mayer, Sánchez, Alianza, UnidosUS,

Florida NAACP, and VOT will suffer irreparable harm. Starting July 1, 2023,

noncitizens will immediately be prohibited from working with 3PVROs to help register voters. As one legislator explained, if he were a noncitizen, he would not even risk touching a voter registration application once the Requirement takes effect. House Affairs Committee hr'g at 5:16–23.

This drastic change will harm Plaintiffs in at least three irreparable ways. First, Mayer, Sánchez, and the canvassers whom Alianza, UnidosUS, Florida NAACP, and VOT represent will suffer irreparable harm to their right to equal protection if this Court does not grant the requested relief. *See Chang v. Glynn Cnty. Sch. Dist.*, 457 F. Supp. 2d 1378, 1382 (S.D. Ga. 2006) (finding that the plaintiffs—lawful residents who "will not be able to continue to work in their chosen professions, for a reason that is at odds with their federally-protected constitutional rights"— demonstrated irreparable harm from a law prohibiting noncitizens from being teachers); *see also Int'l Ass'n of Firefighters, Loc. 2069 v. City of Sylacauga*, 436 F. Supp. 482, 492 (N.D. Ala. 1977) ("Deprivations of constitutional rights are usually held to constitute irreparable injury as a matter of law.").

Second, organizational Plaintiffs will lose many employees and canvassers who execute their voter registration programs. VOT Decl. ¶¶ 16–17; Alianza Decl. ¶¶ 14–15, 19; Unidos Decl. ¶ 26; FL NAACP Decl. ¶ 22. For instance, 66% of UnidosUS's canvassers in 2022 were noncitizens. Unidos Decl. ¶ 14. And approximately 60-75% of Alianza's canvassers during an election cycle are legal

noncitizen residents, supervised and trained by two noncitizen employees; that number increases to 90-100% during the off season, where voter registration activity slows. Alianza Decl. ¶¶ 14–15. The loss of these employees and canvassers will weaken—or decimate—these organizations' ability to maintain voter registration programs. Unidos Decl. ¶¶ 26–41; Alianza Decl. ¶¶ 19, 22; VOT Decl. ¶¶ 16, 19. And every day that organizational Plaintiffs cannot utilize their noncitizen canvassers or are unable to replace them is a day of lost First Amendment speech and associational activities that cannot be recovered. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). "[A]n ongoing violation of the First Amendment—as [Plaintiffs] here would suffer in the absence of an injunction—constitutes an irreparable injury." *NetChoice*, 34 F.4th at 1231 (quotation marks omitted); *see KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("[E]ven a temporary infringement of First Amendment rights constitutes a serious and substantial injury.").

Third, some Plaintiffs lack the capacity and resources to verify the citizenship status of every person who is involved with their voter registration efforts. VOT Decl. ¶ 17; FL NAACP Decl. ¶¶ 20–21; Volusia NAACP Decl. ¶ 10. The Citizenship Requirement instructs 3PVROs to submit a sworn affirmation that "each person collecting or handling voter registration applications" on its behalf is a citizen, but

44

many Plaintiffs' affirmations will be based on the word of their volunteers. Fla. Stat. § 97.0575(1)(f); FL NAACP Decl. ¶¶ 19–21. Thus, Plaintiffs may face a $50,000 fine for each volunteer who misrepresents their citizenship status, and there is no limit to the fines that may be assessed. Even a single $50,000 fine has huge consequences for Plaintiffs' work. VOT Decl. ¶ 18; Alianza Decl. ¶ 25; Unidos Decl. ¶ 39; Volusia NAACP Decl. ¶ 12; FL NAACP Decl. ¶ 18.

> **B.   The Information Retention Ban will cause Plaintiffs irreparable harm.**

Absent the requested relief, Plaintiffs Florida NAACP, VOT, DRF, Alianza, and UnidosUS will suffer irreparable harm in at least two ways when the Information Retention Ban takes effect. First, each of these groups retains voters' information as part of their constitutionally-protected GOTV and organizing work. As explained above, such activities further Plaintiffs' speech and association, and a deprivation of these First Amendment freedoms, even temporarily, constitutes an irreparable harm.

Second, the Ban mandates that 3PVROs issue "a receipt to an applicant upon accepting possession of his or her application" that includes various information regarding the voter's application. Fla. Stat. § 97.0575(4). If the Information Retention Ban takes effect on July 1—just as 3PVROs are registering voters for the fall 2023 elections—Plaintiffs will be forced to provide these receipts but will not even be able to retain a copy for themselves to demonstrate compliance with the

statute, opening them up to unwarranted fines and liability.

## VI.   The remaining preliminary injunction factors weigh in favor of granting the requested relief.

"The third and fourth factors—damage to the opposing party and the public interest—can be consolidated because the nonmovant is the government." *NetChoice*, 34 F.4th at 1231. These factors weigh in Plaintiffs' favor—Defendants will suffer no harm if these provisions are temporarily enjoined, and the public interest is served when courts protect constitutional rights.

Defendants are not harmed by the "issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted)). And a preliminary injunction here merely maintains the status quo; Defendants will not have to expend additional resources or change any processes with respect to monitoring and regulating 3PVROs. This is precisely the type of case warranting temporary relief "to protect the movant from irreparable injury and to preserve the status quo until the district court renders a meaningful decision on the merits." *Butler v. Ala. Jud. Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1229 (M.D. Ala. 2000) (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)); *accord Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). Particularly where the state

lacks any legitimate interest in the challenged provisions, *see supra* Sections II.A.3,

IV.A.3., Defendants' risk of harm is minimal.

Further, "the public interest is served when constitutional rights are

protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir.

2019); *Browning*, 863 F. Supp. 2d at 1167 (The "vindication of constitutional rights

. . . serve[s] the public interest almost by definition."). This is especially true when

as here, a law violates First Amendment liberties. *See KH Outdoor*, 458 F.3d at 1272

("[I]t is always in the public interest to protect First Amendment liberties.")

(quotation omitted); *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1230 (11th

Cir. 2017) (same). Moreover, "it is clear that neither the government nor the public

has any legitimate interest in enforcing an unconstitutional [law]." *Otto*, 981 F.3d at

870; *see also NetChoice*, 34 F.4th at 1231; *Dream Defs.*, 559 F. Supp. 3d at 1287.

"Balancing, on one hand, the fact that Defendants may still protect" elections

"using the numerous tools at their disposal, and, on the other hand, the state and the

public's lack of interest in enforcing a statute that is likely unconstitutional," this

Court should find that "the final two factors weigh[] in favor of granting a

preliminary injunction." *Dream Defs.*, 559. F. Supp. 3d at 1287.

                                *     *     *

Because each factor weighs in Plaintiffs' favor, this Court should

preliminarily enjoin Defendants from enforcing the Citizenship Requirement and the

47

Information Retention Ban.

## CONCLUSION

For the reasons stated, the Court should grant Plaintiffs' motion.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a preliminary injunction enjoining Defendants Byrd and Moody, their officers, employees, and agents, all persons acting in active concert or participation with Defendants Byrd and Moody, or under Defendants' supervision, direction, or control, and all other persons within the scope of Federal Rule of Civil Procedure 65, from taking any steps to enforce the Citizenship Requirement, Fla. Stat. § 97.0575(1)(f), and the Information Retention Ban, Fla. Stat. § 97.0575(7).

## LOCAL RULE 7.1(B) CERTIFICATION

Plaintiffs' counsel notified Defendants' counsel of Plaintiffs' intent to seek the requested injunctive relief on an emergency basis, and Plaintiffs' counsel requested Defendants' position.  Defendants' counsel indicated that they oppose this motion.

## LOCAL RULE 7.1(F) CERTIFICATION

The undersigned, Frederick Wermuth, certifies that this motion contains 10,871 words, excluding the case style and certifications.

Dated: June 9, 2023

Abha Khanna*
Makeba Rutahindurwa*
**ELIAS LAW GROUP LLP**
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
akhanna@elias.law
mrutahindurwa@elias.law

Lalitha D. Madduri*
Melinda Johnson*
Renata O'Donnell*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
mjohnson@elias.law
rodonnell@elias.law

*Admitted Pro Hac Vice*

Respectfully submitted,

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111
**KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.**
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

*Counsel for Plaintiffs Florida State Conference of Branches of Youth Units of the NAACP, Voters of Tomorrow Action, Inc., Disability Rights Florida, Alianza for Progress, Alianza Center, UnidosUS, Florida Alliance for Retired Americans, Santiago Mayer, and Esperanza Sánchez*

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2023 I filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such

filing to all counsel of record.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No.: 0184111