**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
FLORIDA STATE CONFERENCE OF    )
BRANCHES AND YOUTH UNITS OF    )
THE NAACP, et al.,             )
                               )
          Plaintiffs,          ) Case No: 4:23cv215
                               )
       v.                      ) Tallahassee, Florida
                               ) June 28, 2023
                               ) 9:00 AM
CORD BYRD, in his official     )
capacity as Secretary of the   )
State of Florida, et al.,      )
                               )
          Defendants.          )
_____)
                               )
LEAGUE OF WOMEN VOTERS OF      )
FLORIDA INC., et al.           )
                               )
          Plaintiffs,          ) Case No: 4:23cv216
                               )
       v.                      )
                               )
ASHLEY MOODY, in her official  )
capacity as attorney general of)
Florida, et al.,               )
                               )
          Defendants.          )
_____)
                               )
HISPANIC FEDERATION,et al.,    )
                               )
          Plaintiffs,          ) Case No: 4:23cv218
                               )
       v.                      )
                               )
CORD BYRD, in his official     )
capacity as Secretary of the   )
State of Florida, et al.,      )
                               )
          Defendants.          )
_____)
```

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**CHIEF UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 112)**

Court Reporter:                    MEGAN A. HAGUE, RPR, FCRR, CSR
                                   111 North Adams Street
                                   Tallahassee, Florida 32301
                                   megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

```
 1    (Only parties seated at counsel tables are listed below.)

 2    APPEARANCES:

 3    For Plaintiff Florida State Conference of Branches and Youth
      Units of the NAACP, et al.,
 4
                              King Blackwell Zehnder & Wermuth PA
 5                            By:  FREDERICK STANTON WERMUTH
                                   Attorney at Law
 6                                 fwermuth@kbzwlaw.com
                              25 East Pine Street
 7                            Orlando, Florida 32801

 8                            Elias Law Group
                              By:  ABHA KHANNA
 9                                 MELINDA K. JOHNSON
                                   Attorneys at Law
10                                 akhanna@elias.law
                                   mjohnson@elias.law
11                            250 Massachusetts Avenue
                              Suite 400
12                            Washington, DC 20001

13
      For Plaintiff League of Women Voters of Florida, Inc., et al.:
14
                              Campaign Legal Center
15                            By:  ROBERT BRENT FERGUSON
                                   JONATHAN DIAZ
16                                 ALLISON MARIE WALTER
                                   Attorneys at Law
17                                 bferguson@campaignlegalcenter.org
                                   allisonmariewalter@gmail.com
18                            1101 14th Street NW
                              Suite 400
19                            Washington, DC 20005

20
      For Plaintiff Hispanic Federation, et al.:
21
                              American Civil Liberties
22                            Union Foundation
                              By:  ADRIEL I. CEPEDA DERIEUX
23                                 Attorney at Law
                                   acepedaderieux@aclu.org
24                            125 Broad Street
                              18th Floor
25                            New York, New York 10004
```

```
 1   For Plaintiff Hispanic Federation, et al. (continued):

 2                           Latino Justice Prldef
                             By:  CESAR Z. RUIZ
 3                               Attorney at Law
                                 cruiz@latinojustice.org
 4                           475 Riverside Drive
                             Suite 1901
 5                           New York, New York 10115

 6

 7   For Defendant Cord Byrd:
                             Holtzman Vogel Baran, et al.
 8                           By:  MOHAMMAD OMAR JAZIL
                                 JOSHUA E. PRATT
 9                               MICHAEL R. BEATO
                                 Attorneys at Law
10                               mjazil@holtzmanvogel.com
                                 jpratt@holtzmanvogel.com
11                               mbeato@holtzmanvogel.com
                             119 South Monroe Street, Suite 500
12                           Tallahassee, Florida 32301

13

14   For Defendant Ashley Moody:

15                           Office of the Attorney General
                             By:  STEPHANIE A. MORSE
16                               Attorney at Law
                                 stephanie.morse@myfloridalegal.com
17                           PL-01 The Capitol
                             Tallahassee, Florida 32399
18
                             Office of the Attorney General
19                           By:  NOAH T. SJOSTROM
                                 Attorney at Law
20                               noah.sjostrom@myfloridalegal.com
                             107 West Gaines Street
21                           Suite 401F
                             Tallahassee, Florida 32399
22

23

24

25
```

 1               **P R O C E E D I N G S**

 2        (Call to Order of the Court at 9:00 a.m. on Wednesday,

 3    June 28, 2023.)

 4             THE COURT:  Please take your seats.

 5             We are here in Case No. 4:23cv215, 4:23cv216, and

 6    4:23cv218 for three pending motions for preliminary injunction.

 7    The parties agreed to consolidation for purposes of the

 8    preliminary injunctions only.  We'll address consolidation as it

 9    relates to the balance of the case at some other point.

10             In response to this Court's initial order requiring

11    the parties to confer, the parties submitted a status report,

12    which in ECF No. 4:23cv216 is ECF No. 30.  The parties submitted

13    a proposed schedule, indicated they would submit declarations

14    and did not intend to call live witnesses.  That was the choice

15    of the parties.  It was not imposed upon them by the Court.

16             Further, they requested a schedule, which I adopted

17    with one minor change.  I had the response due 12 hours earlier

18    on a Friday at noon rather than midnight.  It's important that

19    that was done.  Otherwise, I would not have been able to read

20    the defendants' responses over the weekend because ECF down --

21    was shut down for changes and updates over the weekend, and so I

22    was able to have the entire weekend to digest the defendants'

23    responses to the three preliminary injunctions.  That's an

24    additional reason why it was important that we did that.

25             As I mentioned at the hearing setting this matter for

 1   hearing today, I'm going to give the parties a chance to

 2   supplement their arguments before I ask any questions.  I want

 3   to make sure everyone has a full and fair opportunity to make

 4   their record.

 5           I'm not shifting the burden, as I noted on the record,

 6   as well as through the order setting this matter, but inasmuch

 7   as the last thing that was filed and the last group that I've

 8   heard from was the plaintiffs' reply, we are going to start with

 9   the defense.  Defendants would not have had an opportunity to

10   file a surreply because we're so jammed up as it relates to how

11   much time we had prior to the hearing, so we're going to start

12   off with, essentially, an oral surreply by the defendants.  I'll

13   then have the plaintiffs have an opportunity for a sur-surreply.

14           As I indicated at the hearing on setting this matter,

15   we're also going to deal with all the issues that are common to

16   all the preliminary injunctions first.  We'll then take a break,

17   and then we'll come back and follow up with the additional

18   provisions that are being challenged that are not common to all

19   three motions.

20           The parties asked for four and a half hours.  I will

21   give you four and a half hours, and I'm not going to

22   artificially cut anyone off.  Again, you'll have a full and fair

23   opportunity to make your record today.

24           We'll start with the defendants.  I believe,

25   Mr. Jazil, you indicated that you were going to take the lead?

```
 1            MR. JAZIL:  Yes, Your Honor.

 2            Your Honor, I don't know if you have a preference

 3   for --

 4            THE COURT:  I think my court reporter would prefer you

 5   to come to the podium.  It's easier for her to hear.

 6            MR. JAZIL:  Yes, Your Honor.

 7        (Pause in the proceedings.)

 8            THE COURT:  My apologies.  We had a technical error.

 9            Mr. Jazil, you may proceed.

10            MR. JAZIL:  Thank you, Your Honor.  And, Your Honor, I

11   welcome the Court's questions at any time.  I'm happy to address

12   them in any order.

13            As it relates to the surreply that my friends filed

14   for the other side, I'd like to pose three questions to align

15   the analysis for the Court.

16            Number one, Your Honor, I ask this:  Where is the

17   credible, reliable evidence for a noncitizen or a felon

18   collecting or handling voter registration applications in a

19   manner that we, as the defendants, read and intend to enforce

20   that statute?

21            Number two, where is the reliable, credible evidence

22   of a 3PVRO needing to retain personal private information, like

23   a driver's license number, a social security number, or a

24   signature, as we read the statute?

25            Number three, where is the reliable, credible evidence
```

1  that the receipt requirement, the receipt that a 3PVRO is free

2  to keep a copy of, would impede the 3PVRO's efforts?  The idea

3  is that the voter should not know who from the 3PVRO helped them

4  sign up.

5          Your Honor, those three questions frame both the

6  burden analysis and also frame the standing analysis.  We had a

7  footnote in our response, and given the time constraints, we

8  couldn't go through all the declarations in all the cases to

9  make a thorough standing argument.  Nor should we, Your Honor.

10          The plaintiffs are trying to serve us a standing stew.

11  They want us to figure out the ingredients, but it's not our

12  burden; it's not the Court's burden.  It's for them to tell us

13  how they have standing, and when we look at the materials that's

14  been provided, neither the League plaintiffs or the

15  Hispanic Federation plaintiffs or the NAACP plaintiffs have

16  given the kind of information one would need to clearly

17  establish standing.

18          And, again, at the preliminary injunction stage, as I

19  read the case law, there has to be a substantial likelihood for

20  success on the merits, which by necessity is -- I think

21  Your Honor mentioned in some of your prior orders this month

22  requires some substantial likelihood that the plaintiffs are

23  going to establish standing.  There is a common thread in all

24  the declarations which begins with a disciplined reading of

25  "collect and handle."  Then there is "self-inflicted harm" that

1  courses through the affidavits.

2       The League plaintiffs, for example, intend to shut

3  things down.  No one is saying that you shut things down

4  completely.  The League plaintiffs intend to go to an entirely

5  electronic system, and no one is asking them to do that.

6       When we look at the individual plaintiffs, Your Honor,

7  there, too, there are problems.  You've got the Poder Latinx

8  plaintiffs who have got declarations.  Number one, under Rule of

9  Evidence 604, you need some kind of translation that's

10 certified.  I don't know who translated those materials for

11 them.  I don't know whether they have standing.

12      Number two, there is, again, a bit of speculation

13 about how is it that the rule is going to be implemented and how

14 it is they're going to be harmed.

15      Number three, Your Honor, self-injury isn't enough to

16 establish standing.  And much of what the declarations discuss

17 is self-harm, and that, as *Jacobson* teaches us, isn't enough for

18 someone to have standing to sue.

19      Your Honor, I will note that the person who comes

20 closest to establish this standing, based on my review, is

21 Johana Florez.  She is someone who works for the Alianza group

22 of plaintiffs.  Her affidavit -- or declaration is in

23 Case No. 215, and it's Docket Entry 54-11, paragraphs 8 and 10.

24 And there, Your Honor, the declarant discusses how she -- I

25 believe it's a she -- who works to collect information and how

1    she would be impeded because she is a permanent resident alien.

2    The only rub I have with her declaration is I think her

3    understanding of what the word "collect" means is different than

4    what our understanding of what the word "collect" means.

5          Your Honor, moving on to the *Burford* abstention

6    arguments, my friends make the point the *Burford* abstention does

7    not apply because we're dealing with a constitutional issue

8    here, and because we're dealing with constitutional issues and

9    constitutional harms that abstention cannot possibly be

10   applicable.  There's no case directly on point that says that.

11   There's no case that says it either applies in that instance or

12   it doesn't apply in that instance.  I think that's for good

13   reason.  It's a discretionary doctrine.

14         What isn't discretionary is the *Pennhurst* implications

15   of it.  And, Your Honor, I note that, in my mind, the abstention

16   issue and the *Pennhurst* issue are connected, and here's why.  At

17   the end of the day, what my friends are asking the Court to do

18   is to enjoin a state official from doing something that he is

19   not doing based on what my friends for the plaintiffs say is the

20   appropriate interpretation of state law, and there we run into

21   *Pennhurst* issues, and I think it would be inappropriate for the

22   Court to enter an injunction under those circumstances.

23         Your Honor, those are the issues I'd like to address

24   from a sureply perspective.  I'll save the substantive issues

25   on the equal protection, First Amendment, and other grounds for

```
 1   the remainder of our argument, unless the Court has any
 2   questions.
 3            THE COURT:  I have no questions at this time.
 4            MR. JAZIL:  Thank you, Your Honor.
 5            THE COURT:  And I have no particular preference for
 6   the -- in terms of what order the plaintiffs wish to go.
 7            Let me note, though, that I'm not going to -- we can
 8   do some -- I was trying to avoid going back and forth.  What I
 9   am going to let y'all do is at the end of this exchange on these
10   points, I'm going to let y'all take a break and then come back
11   if there is things you want to add big picture, both sides.
12   I'll certainly allow you to do that.
13            So what I'd like to do now -- I'm not going to
14   artificially cut you off.  Let's stick to responding to what the
15   defense has said now, and then I also am going to allow y'all to
16   make a separate presentation.  Okay.  And that way it's -- what
17   I don't want to do is -- otherwise, it becomes really
18   complicated with people going back and forth, back and forth 15
19   times.  So we'll respond; we'll take a break, and then we'll
20   come back and give everybody a time to sum up whatever
21   additional arguments they want to make.  Okay?
22            MR. CEPEDA DERIEUX:  Mr. Cepeda Derieux for the
23   plaintiff.  If I may ask for just a couple of minutes for
24   co-counsel to --
25            THE COURT:  Actually, I think it would be efficient --
```

```
 1    I appreciate that because you, obviously, didn't know exactly
 2    what Mr. Jazil was going to raise, for example, the deficiency
 3    of your affidavit since they have made absolutely no response to
 4    standing in their response.  So I understand.  Why don't we take
 5    a break.  Y'all can confer.
 6              How long would you like?
 7              MR. CEPEDA DERIEUX:  Five minutes.
 8              THE COURT:  Why don't we take ten so you have enough
 9    time.  We'll come back in ten minutes.
10              Court is in recess.
11         (Recess taken at 9:12 a.m.)
12         (Resumed at 9:24 a.m.)
13              THE COURT:  Please take your seats.
14              And who is going to go first?
15              MS. KHANNA:  Ms. Khanna for the Florida NAACP
16    plaintiffs, Your Honor.
17              THE COURT:  Yes, ma'am.
18              MS. KHANNA:  Thank you, Your Honor.
19              I'll -- I think we are just briefly going to address
20    the standing issues raised by Mr. Jazil by each plaintiff group,
21    and I will be very brief, I promise.
22              THE COURT:  I want everyone to know that my silence
23    isn't necessarily agreement with anything that anybody says on
24    either side of the aisle.  So, for example, I know that the
25    Hispanic Federation's declaration isn't translated.  Not every
```

1    declaration is translated.  So I'm not going to interrupt y'all

2    and correct factual misstatements and so forth, but y'all can --

3    each side can put whatever you want on the record because I want

4    to make sure you aren't interrupted and can put whatever you

5    want to add for the record.

6              MS. KHANNA:  Thank you, Your Honor.

7              Mr. Jazil mentioned that -- or argued that what we

8    have provided is --

9              THE COURT:  I'm sorry.  I forgot one thing.

10             Mr. Sjostrom, I should have asked the Attorney

11   General's Office -- you had put that you were going to -- you

12   would address the Court if the Court had questions.  I assume,

13   since you didn't ask to speak after Mr. Jazil, you didn't have

14   anything to add.

15             MR. SJOSTROM:  Yes, Your Honor.

16             THE COURT:  Okay.  Very good.

17             MS. KHANNA:  Thank you, Your Honor.

18             Counsel mentioned that plaintiffs have provided only

19   "standing soup."  That was the term that he used, as if we've

20   kind of provided a blob of issues for them -- for the defendants

21   to figure out.  But I would point --

22             THE COURT:  He actually said "standing stew," but go

23   ahead.

24             MS. KHANNA:  Did he say "stew"?  My apologies,

25   Your Honor.  I misheard.

```
 1              THE COURT:  No worries.

 2         MS. KHANNA:  I would point the Court and counsel to

 3    the Florida NAACP's brief on preliminary injunction where we

 4    spend ten pages specifically addressing point by point why each

 5    and every one of our plaintiffs has standing to challenge the

 6    citizenship requirement, the information retention ban or both.

 7              In response, I won't review all of those.  I won't

 8    read that into the record right now, Your Honor, but I believe

 9    that largely answers Mr. Jazil's questions of where is the

10    evidence that he poses, but let's be more specific.

11              Question No. 1, he said:  Where is the evidence that

12    noncitizens are handling voter registration applications?  Now,

13    Mr. Jazil acknowledged that Johana Florez provided a declaration

14    on behalf of the Florida NAACP plaintiffs as an Alianza

15    canvasser and that that did provide her standing -- or that did

16    show he was injured by that.

17              Now, Alianza -- among the many various categories of

18    injury that we've asserted there, we've asserted that Alianza

19    has associational standing on behalf of individuals like

20    Ms. Florez.

21              Importantly, Your Honor, Ms. Florez's declaration is

22    substantially similar to Esperanza Sanchez's declaration, also

23    an individual plaintiff in the Florida NAACP matter.

24              Ms. Sanchez is a Unidos canvasser, and she provides in

25    Exhibit 8 to our preliminary injunction motion, paragraph 8,
```

1  paragraph 19, the exact same information that Ms. Florez

2  provides which is that she is a noncitizen who handles voter

3  registration applications as part of her job.

4          Santiago Mayer, Exhibit 7, paragraph 11 to our

5  preliminary injunction motion, also a named plaintiff, also

6  establishes that he is a noncitizen who oversees voter

7  registration activities and intends to continue to do so, as

8  becoming a part of his organization, Voters of Tomorrow becomes

9  a 3PVRO, a registered 3PVRO.

10         So the evidence is right there in black and white.

11 And we're not -- we've not put forward a mountain of evidence

12 for opposing counsel.  We've really laid it out to make sure we

13 address our burden point by point, and I'm happy to answer any

14 questions about anything that the Court or Mr. Jazil might have

15 in that explanation.

16         Very quickly, Your Honor, on the information retention

17 ban, where is the evidence?  Again, it's pointed to in our

18 brief.  On pages 11 to 12 of our brief, we march through point

19 by point why each of the organizations has organizational

20 standing, the specific declarations that support those

21 statements and the paragraphs within them.

22         In all of these declarations, as reflected in our

23 briefs, we establish associational standing, individual

24 standing, organizational standing, and so I think -- I think

25 that there should be no question left about whether we have

```
 1    established our burden and really no confusion on behalf of the

 2    defendants on where our plaintiffs stand.

 3              Thank you, Your Honor.

 4              THE COURT:  Thank you.

 5              This is Mr. Derieux?

 6              MR. CEPEDA DERIEUX:  Derieux, yes, Your Honor.

 7              Good morning.  I'm speaking on behalf of the

 8    Hispanic Federation plaintiffs.  Your Honor, I'd like to start

 9    addressing the issue of the certified translations that

10    Mr. Jazil addressed, and I'll start by pointing to the general

11    principle that the Rules of Evidence in a preliminary injunction

12    posture don't necessarily need to be as formal and as rigid.

13              I'd point the Court to the case of *Levi Strauss versus*

14    *Sunrise* at 51 F.3d 982 for that proposition.  In any event, we

15    believe that the issue of certification is immaterial for

16    immediate purpose and even further we would be very happy to

17    provide certified copies as soon as possible to the Court.

18              Going to the issue of standing for the

19    Hispanic Federation plaintiffs, we believe that that -- this is

20    a straightforward issue as -- and I join some of what Ms. Khanna

21    just addressed.  We will point the Court to our preliminary

22    injunction brief at pages 23 through 25 where we detailed

23    specifically the standing that our plaintiffs have.

24              The Hispanic Federation plaintiffs are being harmed

25    because they have to plan and are making changes and will be
```

```
1   affected by this law, and that is at paragraphs 21 through 45 of
2   the Hispanic Federation declaration.  Poder Latinx has similar
3   injuries, and those are addressed at paragraphs 21 through 47 of
4   the declaration.
5              And to the issue of --
6              THE COURT:  Counsel, let me just interject.
7              MR. CEPEDA DERIEUX:  Sure.  Go ahead.
8              THE COURT:  I want to make sure that I had it
9   correctly -- correct.  And I understand -- I'm familiar with
10  Levi Strauss, the case and that holding, but I'm correct,
11  though, it's not every declaration?  For example, Mr. Burgos'
12  declaration is originally in English; correct?
13             MR. CEPEDA DERIEUX:  I believe that's correct,
14  Your Honor, but we'd be happy to check and make sure that we
15  have certified declarations for all of these.
16             THE COURT:  I just want to make plain what I was
17  referring to earlier when I said not every declaration that you
18  filed was translated from Spanish to English, and that, I think,
19  is an example of one that was not.
20             MR. CEPEDA DERIEUX:  Understood.
21             And the individual plaintiffs, Your Honor, are being
22  harmed by virtue of the fact that they are noncitizens who
23  engage in voter registration activities for third-party voter
24  organizations because the law imposes an explicit facial
25  classification that bans them from doing this sort of activity.
```

1    They automatically have standing.

2              As to the issue of whether this is a self-harm

3    injuries that are being alleged either for the organizational

4    plaintiffs or the individual plaintiffs, injuries resulting from

5    the predictable responses of third parties in response to

6    government action are properly traceable in a standing analysis

7    to injuries that the government is causing, as the case law lays

8    out.

9              So if Your Honor has any further questions, I'd be

10   happy to address them, but those are the Hispanic Federation's

11   points on standing and the issue of the certification at this

12   point.

13             THE COURT:  So it's clear, I've reviewed the papers.

14   That's why I interject things.  Like, I believe also Nancy

15   Batista's declaration was also originally in English.  I do that

16   so it's hopefully clear that I've reviewed the materials prior

17   to today, and I've outlined and have about a ten-page outline of

18   what the parties' positions -- your positions are, meaning the

19   three groups of plaintiffs for purposes of standing.  That

20   doesn't mean you have standing.  That doesn't mean I've reached

21   a conclusion.  That means I've gone through your papers, and

22   I've outlined what you put on the record.  So thank you.

23             MR. CEPEDA DERIEUX:  Thank you, Your Honor.

24             MR. FERGUSON:  Good morning, Your Honor.  Brent

25   Ferguson for the League of Women Voters of Florida.

1           Your Honor, Mr. Jazil asked three questions at the

2    top, and I'll answer those in turn and then briefly address the

3    standing issue more generally.  His first question was, Where is

4    the evidence of people with felony convictions or noncitizens

5    that are taking part in voter registration activities on behalf

6    of the plaintiffs?

7           I'd like to point you first to the declaration of

8    Debra Chandler which addresses both of those issues.  In

9    paragraph 3 of Ms. Chandler's declaration, she mentions specific

10   people in Palm Beach County who have felony convictions that

11   would prevent them from registering voters under the law.

12          In that same declaration in paragraph 10, she mentions

13   members of the League in Miami-Dade County who have legal

14   residency in Florida but are not U.S. citizens.  I think that

15   right there answers Mr. Jazil's first question.

16          His second question was about retaining information

17   regarding the voter information restriction.  He asked where was

18   the evidence that members of the League retain information after

19   a registration transaction.  I would like to point you to the

20   Monica Bustinza declaration at paragraph 9 where she says:

21   *Collecting such information is an essential way for the*

22   *Miami-Dade League to remind registrants about upcoming elections*

23   *and recruit new volunteers.*

24          Your Honor, on the third question, it was about the

25   receipt requirement.  And I believe Mr. Jazil asked where was

1    the evidence that there are members of the League or other

2    affected plaintiffs who were less likely to register voters

3    because of that requirement that they give a receipt with their

4    name on it.  And I'll point you there to the Monica Elliott

5    declaration at paragraphs 5 to 7, and the Cecile Scoon

6    declaration at paragraphs 26 to 28.

7             Now, I don't want to get too deep into the other

8    standing issues -- that's covered in our brief at pages 15 to

9    20 -- but Mr. Jazil also mentioned a switch to online

10   registration.  As you've seen in our briefs and the

11   declarations, the League, because of SB 7050, has decided to

12   move from their normal practice of helping people with voter

13   registration forms in a paper format, helping them fill them

14   out, and then, of course, collecting them at the end.

15            Because of the burdens that the law creates, they've

16   decided, if a preliminary injunction is not granted here, to

17   move to an online system that will involve buying iPads and

18   laptops, and that means lessening some of the burdens of the law

19   because they wouldn't be collecting those applications and

20   wouldn't be classified as a third-party voter registration

21   organization.

22            Your Honor, I think what cases like *Meyer* teach us

23   very clearly is that you can't require the plaintiffs to do

24   another kind of burdensome speech in place of the speech that

25   they'd like to do.  And certainly moving to this online

1    registration system is less effective, and there's a good reason

2    for doing that.

3            The penalties under SB 7050 for 3PVROs are very stiff.

4    They involve $50,000 fines on strict liability basis if the

5    League even inadvertently works with a noncitizen or someone

6    with one of these felony convictions.  They also might involve

7    felony prosecution of a League member if they inadvertently

8    retain the voter information that they're not allowed to retain.

9    It's not clear on the face of the law exactly what that

10   information is, as we'll get into later.  So Mr. Jazil portrays

11   this as some kind of choice that the League is making on their

12   own, but, of course, they're forced into that choice by the law.

13           And then very briefly, Your Honor, by switching to the

14   online method, the League has clearly established organizational

15   standing and associational standing.  These are a couple of the

16   steps that they'll have to take right now if a PI is not

17   granted.  They'll decertify all of their members who register

18   agents.  That's around a thousand people at this point.  Then

19   they'll pause all registration, so that means for the coming

20   weeks or months until they're able to retrain people, no one

21   will be registered by the League, so that right there is a very

22   clear harm.

23           After that pause, they'll have set up a new training

24   system.  They'll train a lot of members to do this again, but

25   after -- so they'll spend a lot of money doing that, and time.

1   And then after they do that, the registration that'll happen

2   after that will be more burdensome because members won't be able

3   to use paper application forms.  They'll have to buy a certain

4   number of iPads, spend that money.  And then they won't have an

5   unlimited number of iPads like they have an unlimited number of

6   forms.  They'll have to use a few iPads and go around these

7   events to a limited number of people.

8          They also won't be able to register as many people

9   because the online registration process requires an extra form

10  of ID that the paper form doesn't.  So these are just a few

11  examples, Your Honor, of the very clear harms that the League

12  will face if this law goes into effect.

13         I'm happy to take any of your questions.

14         THE COURT:  I don't have any questions at this time.

15         MR. FERGUSON:  Thank you, Your Honor.

16         THE COURT:  We're going to sum up at the end.  We're

17  not going to go back and forth, back and forth.  The record will

18  reflect Mr. Jazil stood up -- and, like I said, I'm going to let

19  everybody be heard.  This is the initial surreply, sur-surreply

20  to all the issues, anything anybody wants to add, and then we're

21  going to take a break, and then I'll let y'all add additional

22  information to the record, including circling back and

23  responding to anything you want to respond to.

24         And I'll make plain, as I think all the lawyers here

25  know, I'm not shy about asking questions.  In fact, Mr. Jazil

```
 1    was here last week where I spent about three hours peppering the
 2    lawyers with questions in another matter.  It's just the parties
 3    hadn't briefed at all the issue that was the critical issue in
 4    the case, which is why I was peppering them with questions.  So
 5    I will, if I have questions, ask them at the end, fear not.
 6          Let's go now, Mr. Jazil, to any additional issues, and
 7    you sort of touched on the other categories.  Anything that was
 8    not common to all three cases that you wanted to add?  And you
 9    may have already done that, but I didn't know if you had
10    anything additional.
11          MR. JAZIL:  Your Honor, other than standing, I have
12    nothing that I can't parse through as part of a broader
13    presentation.  And, Your Honor, I apologize to the extent that I
14    suggested to the Court that every single translation from the
15    Hispanic Federation wasn't a certified translation.  I was
16    trying to describe the stew generally.  Herrera-Lucha, Martinez
17    and Doe are the three plaintiffs --
18        (Reporter requested clarification.)
19          MR. JAZIL:  Herrera-Lucha -- it's a hyphenated last
20    name -- Martinez and Doe are the three.
21          THE COURT:  And, Mr. Jazil, I didn't -- if I thought
22    you were misrepresenting the record or doing something, I would
23    have said something.  I didn't -- I just -- I do that because I
24    want to make it clear to any appellate court that I've actually
25    reviewed the record; I'm familiar with the record.  Because,
```

1  unfortunately, occasionally I read in appellate briefs where

2  Judge Walker effectively was smoking crack and had no idea what

3  was in the record.  So I pepper the record with that so it's

4  clear I have read the record.

5        In any event, so it sounds to me like, Judge, we want

6  to be able to make any additional general presentation as well

7  as respond.  Would you rather do that as one presentation, or do

8  you want to quickly address anything that just came up in the

9  sur-surreply and then come back and address anything additional?

10        MR. JAZIL:  Whatever works for the Court is fine by

11  me, Your Honor.

12        THE COURT:  It doesn't -- it's really what's easier

13  for your presentation.

14        MR. JAZIL:  Your Honor, I can just quickly address

15  what came up, and we can go from there.

16        THE COURT:  Certainly.

17        MR. JAZIL:  Your Honor, we already discussed how there

18  are three individual plaintiffs in the Hispanic Federation whose

19  declarations were not translated through a certified

20  translation.  My friend for the plaintiffs brought up the *Levi*

21  *Strauss* case.  Yes, it does make it easier to present evidence

22  at the preliminary injunction stage, but it's not a

23  free-for-all.  Hearsay is allowed, but there needs to be some

24  indicia of reliability that attaches to the evidence that's

25  being submitted, and a translation from someone, somewhere,

1    doesn't provide that.

2           You contrast that --

3           THE COURT:  How about I think they're officers of the

4    court and they didn't commit a fraud on the Court?  Why isn't

5    that sufficient corroboration that I don't believe Ms. Khanna

6    risked her bar license, or any of the other lawyers sitting over

7    at the other table risked their bar license, by fobbing off a

8    false translation.

9           MR. JAZIL:  Your Honor, I'm not saying it's a false

10   translation.  For the record, Ms. Khanna's clients did have a

11   certification for the translation.

12          THE COURT:  Let's move -- I didn't mean Ms. Khanna.

13   Any lawyer, pick any lawyer, any of those lawyers.  She's the

14   first one seated in the first seat.  I just called her name out.

15          MR. JAZIL:  And here's why, Your Honor.  The Spanish

16   spoken in Cuba is different than the Spanish spoken in

17   Puerto Rico, which is different than the Spanish spoken in

18   Venezuela.  If you don't have a certified translator, how do you

19   know that when we're talking about parsing through a statute,

20   and whether or not someone is collecting or handling, that the

21   person who's doing the translation actually knows what it is

22   that the declarant is saying.

23          A certified translator allows for that possibility.

24   An uncertified translator, someone somewhere, does not.  And if

25   we're talking about the specifics of statutes and how it is that

1    statutes might affect someone, I do not think that something

2    that is not certified, despite the best intentions of officers

3    of the court, satisfies the *Levi Strauss* test.

4            THE COURT:  I would understand your argument if these

5    were folks that were from the Yucatan speaking some odd related

6    Spanish dialect, so the suggestion is is that the nuances as

7    between a -- somebody from Mexico and somebody from Colombia are

8    such that somebody who's fluent in Spanish, those nuances would

9    be lost on them.

10           MR. JAZIL:  That's one.  How is the translation done?

11   Are we doing it over a poor phone connection?  Are we doing it

12   over Zoom?  I don't know.  A certified translator tends to get

13   things right.  There are innumerable gaps there in what it is

14   this translation actually represents.

15           THE COURT:  I understand your argument.

16           MR. JAZIL:  So that's for that issue.

17           And, Your Honor, the Hispanic Federation and

18   Poder Latinx do provide declarations.  The underlying premise of

19   their declarations is, We read the statute as requiring X, Y,

20   and Z, and because we read the statute as requiring X, Y, and Z,

21   we will not do A, B, and C.  Their premise that the statute

22   requires them to do X, Y, and Z is flawed.  This is the common

23   theme I was alluding to.

24           There are discussions about diversion of resources.  I

25   point you to the Poder Latinx affidavit, page 40 -- paragraph

40.   Pardon me.   Poder Latinx has not yet decided what it's going to do when faced with this dilemma.   It's considering doing things, has not made any decision, paragraph 42.

My friend Ms. Khanna spoke about how some of the other declarations are closer to the declaration from Johana Florez for Alianza.   She pointed to the Voters of Tomorrow.   There are two declarations from Voters of Tomorrow.

Here's the critical fact.   Voters of Tomorrow is not a registered 3PVRO.   The individuals who are making these declarations on behalf of Voters of Tomorrow are not in Florida, and so we are left with a bald assertion that "I intend to go back to Florida at some point this year, and now I can't go to do the thing I want to do in Florida if and when I and my organization get registered as a 3PVRO."   Your Honor, at the end of the day, the statute is concerned about the 3PVROs of today, not the Voters of Tomorrow.   That's the problem in part of the reliance with the Voters of Tomorrow affidavit.

We have discussions from our friends about the League of Women Voters and how the League of Women Voters' declarations talk about felons who have certain fears about being registered. These are the Sheerin declaration, the Elliott declaration.   And there, Your Honor, it's someone from the League talking to some unnamed members about their fears and relaying them back to the Court.

Again, I go back to the *Levi Strauss* question:   Is

```
 1    that enough to satisfy the burden for a preliminary injunction
 2    even if the evidentiary standard is lower?  Hearsay is allowed,
 3    but if it's hearsay embedded within hearsay, is that allowed?  I
 4    would suggest not.
 5              I've got nothing further on standing, Your Honor.
 6    Thank you.
 7              THE COURT:  Thank you.
 8              How long -- Mr. Sjostrom, do you have anything to add
 9    on behalf of the Attorney General's Office?
10              MR. SJOSTROM:  Nothing to add, Your Honor.
11              THE COURT:  How long would the defendants like
12    general -- summing up any additional points you wish to make
13    generally, aside from those you've already made?
14              MR. JAZIL:  Your Honor, the remaining arguments in our
15    papers, we're happy to answer any questions.  No additional
16    time.
17              THE COURT:  For plaintiffs, I'm going to let y'all
18    take a break.  You can gather and I'll -- certainly, Mr. Jazil
19    and Mr. Sjostrom and his colleagues can huddle up again as well.
20              But do y'all have any idea how long you'd like or,
21    Judge, we'd really like to gather and talk about what we'd like
22    to do before we give you an estimate?
23              MS. KHANNA:  Your Honor, the plaintiff groups have
24    conferred and tried to divvy up the subject matter of the common
25    issues so that we are not duplicating efforts.  I think the way
```

```
 1   we've done it would give us about 15, 20 minutes apiece just

 2   with our general presentations and then, of course, time to

 3   answer any questions the Court may have.

 4           THE COURT:  Okay.  So maybe what we'll do is we'll

 5   have you do that.

 6           And then, Mr. Jazil, obviously, we can take a break

 7   after that, and then you can respond, if you don't have anything

 8   additional you want to add right now.  That way I'll give you

 9   again time to take a break, review your notes, and confer.

10           MR. JAZIL:  Thank you, Your Honor.

11           THE COURT:  All right.

12           MR. FERGUSON:  Your Honor, can I ask one more

13   question?  Is this just the first portion we talked about and

14   then --

15           THE COURT:  No, this will be --

16           MR. FERGUSON:  Okay.

17           THE COURT:  Right now there was -- Mr. Jazil had

18   nothing he wanted to --

19           MR. FERGUSON:  Okay.

20           THE COURT:  -- add that was -- although he sort of did

21   in his initial comments, but he didn't have anything additional

22   additional to add to the issues that were not in all -- the

23   provisions that were not implicated in all three cases.  So this

24   is anything else the plaintiffs want to add.

25           MR. FERGUSON:  Sure, Your Honor.  Since the League has
```

1    all four issues, we might be a little bit longer if we're

2    combining that into one presentation.

3              THE COURT:  I'm not going to cut anybody off.

4              What I do encourage everybody to do, though, is to --

5    I have a decent command of the King's English, and so I did read

6    the papers.  So I don't need anybody to read their papers into

7    the record.

8              MR. FERGUSON:  Sure.

9              THE COURT:  What would be helpful is, in light of

10   everything that's been filed, to say, Judge, these are the

11   points we want to make that we want to flesh out.  So let's make

12   good use of our time.

13             And circle backing, you know, I want to add one point

14   that y'all can address later, although I think both sides have

15   made their point so far as it relates to the affidavits.  I sit

16   as a fact finder all the time in criminal matters, for example,

17   in violation of probation hearings and so forth, and the case

18   law is a bit more fleshed out in that context.  But you just

19   don't, for example, look at a declaration standing alone.  You

20   look at the other declarations that were filed.  You look to see

21   if there's other things that corroborate what is in the

22   declarations and been challenged.

23             So it's not as simple as you look at the declaration

24   alone and does the declaration alone give you trouble because

25   it's not -- wasn't translated by a certified translator.  You

1    have to look at it in context and consider it with the other

2    affidavits that were filed and so forth, which is not some

3    remarkable, earth-shattering proposition.  It happens every day

4    with fact finders.

5            All right.  So what we are going to do is take a

6    ten-minute break for the benefit of the court reporter since we

7    all talk real fast.  We'll come back at 10:00 o'clock, and the

8    plaintiffs can go in whichever order you chose to go.  We'll

9    then take another break, and then I'll let Mr. Jazil and

10   Mr. Sjostrom respond with anything they wish to raise by the

11   plaintiffs in their presentation.

12           Court is in recess.

13       (Recess taken at 9:51 AM.)

14       (Resumed at 10:09 AM.)

15           THE COURT:  Please take your seats.

16           And who wishes to go first?

17           MR. CEPEDA DERIEUX:  Good morning, Your Honor.

18           Once again, Adriel Cepeda Derieux for the plaintiffs,

19   specifically the Hispanic Federation organizational plaintiffs.

20   I also represent Poder Latinx, which is represented here today

21   by Ms. Carolina Wassmer, who is over there.  She's

22   Poder Latinx's state director.  I also represent three

23   individual plaintiffs, one of which, Ms. Veronica Herrera-Lucha,

24   is sitting over there.

25           I just briefly wanted to, very briefly, touch back on

1    the certification and translation issue and represent to the

2    Court that these translations were, in fact, done by officers of

3    the court, by members of the legal team.  I myself am a native

4    Spanish speaker.  We have others.  Mr. Roberto Cruz over there

5    is not only a native Spanish speaker but barred in Puerto Rico.

6            In any event, out of an abundance of caution, we will

7    be -- we will file certified translations to the Court as early

8    as tomorrow, unless the Court says otherwise.

9            Your Honor --

10            THE COURT:  Well, let me -- we are going to address

11    this, because the evidence is closed --

12            MR. CEPEDA DERIEUX:  Okay.

13            THE COURT:  -- and I -- so nobody has asked to strike

14    them.  The question is what weight, if any, I should give them,

15    and Mr. Jazil says none.  You say I should and for the reasons

16    you've articulated.

17            But in terms of what I'm going to allow and to make

18    that determination, applying the standards under *Levi Strauss* --

19    and I alluded to, you know, what I consider and whether there's

20    other things that corroborate it or make it trustworthy -- what

21    I'm left with is what's on the record and what's before me, not

22    representations of counsel or not something that could be filed.

23            MR. CEPEDA DERIEUX:  Understood.

24            THE COURT:  Unless there is a motion to -- which I

25    could hear from opposing counsel.  If you wish to move to

1  supplement the record, you can make an *ore tenus* motion, and

2  I'll hear from Mr. Jazil on that point.  But right now what I've

3  got is what I've got.

4       MR. CEPEDA DERIEUX:  Understood.  And we may discuss

5  that with Mr. Jazil later.

6       Your Honor, plaintiffs across the three docketed

7  actions have consulted, as we've represented, and have tried to

8  work together to be as efficient as possible today.  So with

9  that in mind, my goals for the next 15 to 20 minutes are to

10  address defendants' arguments going to *Burford* abstention, the

11  notion that there is a 90-day safe harbor of sorts under which

12  plaintiffs shouldn't worry about the challenged 7050 provisions

13  until September 30th or October 1st, and then the severe and

14  irreparable harm and injury that the plaintiffs stand to suffer

15  as early as Saturday, on July 1st.

16       After that, Ms. Khanna will address the parties'

17  Fourteenth Amendment claims, and Mr. Ferguson will address the

18  substance of the First Amendment claims.

19       So turning to *Burford* abstention, Your Honor, it

20  doesn't apply here for two simple reasons, and the first is that

21  this case doesn't ask the Court to intrude in the kind of

22  hyperlocal process or procedure that *Burford* safeguards against.

23       The second is that First Amendment cases involving

24  voting associational rights are particularly bad candidates for

25  abstention, as the Eleventh Circuit explained in the *Siegel*

```
 1   case.
 2            I'll focus a little more on that first reason.
 3   Burford protects complex administrative processes from intrusion
 4   by the federal courts, but that is just simply not this case.
 5   Plaintiffs have brought narrow, targeted challenges against
 6   specific state laws because that -- those state laws injure
 7   plaintiffs and encroach on their rights.  What plaintiffs
 8   haven't done is ask the Court to intrude into local rulemaking
 9   or illegal framework of the kind that Burford safeguards.
10            So, for example, the cases that call upon the federal
11   courts to adjudicate the substance of corporate dissolution
12   claims or divorce proceedings, those have been the matter of
13   Burford debate, but that's just not the case in challenges to
14   voting laws, even if those voting laws are to be interpreted or
15   implemented by executive officers.  And that's unremarkable.
16   Voting laws are often the subject of constitutional challenges
17   under the federal laws, as this Court is well aware.
18            What's not common is for a federal court to sit those
19   cases out.  Courts see those cases through, and courts in
20   Florida have seen plenty of those cases through the years, and
21   not one of them has gone the way of a Burford abstention.  The
22   defendants don't cite you to any of those cases, and it's easy
23   to see why, because questions going to plaintiffs' fundamental
24   constitutional rights or federal statutory voting rights rarely
25   involve issues of state law that control a litigation.  It's
```

1    impossible for the State to channel them to a state forum, for

2    example, as the *Burford* case itself did, or to regulate them

3    away through rulemaking, as defendants suggest that it can.

4         And the claims here prove that point, Your Honor.

5    Whether or not the citizenship requirement violates the

6    Fourteenth Amendment is clearly a federal question that can be

7    decided on the four corners of the papers.  The State can't

8    regulate it away.

9         So is the question of whether plaintiffs' First

10   Amendment rights are violated and, indeed, all the questions

11   that go along with it -- whether it's expressive conduct that's

12   at issue, whether or not the statute is overbroad or vague --

13   those are all questions that go to plaintiffs' federal right,

14   not the hyperlocal stuff that *Burford* is made of.

15        Now, setting abstention aside, the Court should also

16   not stay its hand or in any way defer judgment on these motions.

17   The notion that this law won't affect anything until 90 days

18   from now is, frankly, a bit of a red herring.  The law just

19   isn't that generous to the plaintiffs on its face.  It says

20   clearly that the requirements of the section are retroactive as

21   of July 1st, as defendants explain in their papers.  So even if

22   the law isn't enforced on July 1st, plaintiffs are for sure on

23   the hook for it then.  It's, frankly, cold comfort for the

24   plaintiffs to hear, Don't worry.  You don't owe me money next

25   week or the month after that or the month after that, but on

1    October 1st or on September 30th -- pick one -- you may owe me a

2    lot of money.  Of course, that's going to chill plaintiffs'

3    protected speech and protected activity.

4            Second, Your Honor, even if the State guaranteed

5    plaintiffs couldn't be harmed for -- in that period for 90 days,

6    that would be enough for the Court to act.  Defendants try to

7    suggest that September 30th is just too remote a date for there

8    to be immediate or irreparable harm, but they don't suggest or

9    even try to argue that this case will be wrapped up by

10   September 30th.  That would be a very tall order.  And the cases

11   say --

12           THE COURT:  To the contrary.  It's suggested I rush

13   these proceedings, even though I adopted the schedule voted by

14   the parties; right?  Didn't I hear earlier that the reason why

15   the entire Attorney General's Office in the state of Florida

16   couldn't file one sentence addressing standing is because they

17   were so jammed up in terms of time, yet now we're going to

18   magically get this entire case wrapped up in 90 days?  I thought

19   the suggestion was earlier that we should draw it out and take

20   more time; right?

21           MR. CEPEDA DERIEUX:  I'm sorry, Your Honor?

22           THE COURT:  I'm getting a little bit of whiplash

23   between I've done as I'm required to do by law, which is move a

24   preliminary injunction quickly; I've adopted the parties'

25   schedule, and now I'm told, Well, 90 days we can wrap up the

1   case.  I'm confused.

2           MR. CEPEDA DERIEUX:  No, Your Honor.

3           THE COURT:  Not you.  I meant from the defense.

4           MR. CEPEDA DERIEUX:  Okay.  That is precisely our

5   point, Your Honor.  It's the harm can be immediate so long as

6   it's beyond the reasonableness that the litigation itself will

7   be resolved on the merits before the irreparable harm accrues.

8   So even if we're talking about 90 days from now, that's just not

9   going to be done, and that's -- we cite cases to that effect at

10  page 5 of the Hispanic Federation reply.

11          On this point, I also -- actually, Your Honor, in any

12  event, the proposed rulemaking -- and this is maybe the most

13  important point -- can't cure the constitutional defects that

14  plaintiffs challenge.  To start, the proposed rulemaking is a

15  draft, at best.  The plaintiffs can't conform their conduct on

16  something that is not binding, that is not final.  The State

17  shouldn't be able to workshop its way around federal court

18  review.

19          But just as importantly, rulemaking can't change the

20  meaning of the statute.  It can only serve in service of that

21  statute.  And here the legislature has spoken clearly.  It has

22  facially classified against people based on their alienage, and

23  that goes to the Fourteenth Amendment violations we're here

24  about.  The defendants don't suggest that that regulation can

25  cure that classification.

1          On the First Amendment point, the law, again, facially

2    bans individuals from engaging in protected activity and

3    expressive conduct, and the rulemaking can't make that go away.

4          And another -- one thing, Your Honor, that actually I

5    feel has been lost in the briefing that the rulemaking can't go

6    away, if you look to the section that defendants cite for that

7    retroactivity point, the next sentence in that -- and I believe

8    it is at Section 4, subsection (12) -- actually says that after

9    those 90 days, failure of the third-party voter registration

10   organization to comply with the requirements within 90 days

11   shall automatically result in the cancellation of the

12   third-party voter registration organization's registration.

13         So there has been a lot of talk in the papers about

14   this fine, and it made -- the $50,000 fine for each violation.

15   And as I said, it's clear that as of July 1st, the

16   organizational plaintiffs will certainly be on the hook

17   retroactively for conduct that happened as early as July 1st,

18   even if they don't get fined until October 1st.  But when those

19   90 days kick in, as the statute says, cancellation is automatic

20   in cases of violation.  So that's another reason for -- for the

21   Court not staying its hand.

22         On the issue of the irreparable harm to the --

23         THE COURT:  You are referring to the last sentence of

24   Section 97.0575, sub (12); correct?

25         MR. CEPEDA DERIEUX:  That's correct, Your Honor, yes.

1          On the issue of irreparable harm to the plaintiffs,

2    which is one of the preliminary injunction factors, obviously,

3    here are the undisputed facts, at least for the

4    Hispanic Federation plaintiffs, but I believe they are

5    emblematic of the stakes for the plaintiffs across the three

6    actions before the Court:

7          Approximately 70 percent of Hispanic Federation's

8    canvassers who work voter registration are noncitizens, as are

9    90 percent of the Poder Latinx's staff and 70 percent of its

10   volunteers.  None of those staff or volunteers would be able to

11   register voters as of July 1st.  Even under the proposed

12   regulation, the overwhelming majority of both groups' workforce

13   can only speak to would-be voters.  They wouldn't be able to

14   take completed registrations, which is, of course, a part of the

15   organization's mission.  So as of July 1st, there is no way that

16   these organizations can continue their work in anything that

17   even remotely resembles what they do right now.

18          The message that goes along with their activity that

19   voting is important, that it matters to the community, that will

20   be silenced, and fewer staff and fewer volunteers means that

21   fewer voters will be registered, which is in and of itself

22   irreparable harm, and the *Browning* cases laid that out.

23          So these groups are really between a rock and a very

24   hard place.  The best-case scenario that the State offers still

25   drastically means rearranging operations so that the majority --

```
 1   the vast majority of their staff don't do so much as touch
 2   completed applications.  They would have to hire an entire new
 3   pool of citizen-only staff, hope that citizen volunteers walk
 4   through their doors.  They would have to reconfigure operations,
 5   change office arrangements to make sure -- sure, it's possible
 6   that only U.S. citizens ever have physical possession over these
 7   applications.
 8            And here I'd like to point out, Your Honor, that these
 9   canvassers are just -- they're not interchangeable.  They're not
10   fungible.  They are -- the people who work for Poder Latinx, for
11   Hispanic Federations, they are integrated to their communities.
12   They are trusted in many ways.  In many cases, it's specific
13   canvassers that, for example, a business elder will allow to
14   work that specific location.
15            But in the worst-case scenario, if they really want to
16   play it safe -- and they will, because no one wants to get fined
17   $50,000 for every violation -- they'd have to fire virtually
18   their entire workforce in the next three days.  It's really the
19   only way to ensure they don't get hit with these penalties.  And
20   these harms are happening now because plaintiffs are treating
21   the law as the serious threat that it is.  $50,000 is almost
22   8 percent of Hispanic Federation's entire annual budget for
23   programs in Florida.  Already Poder Latinx has been unable to
24   fill positions because the law is already -- they are already
25   staying their hand and freezing their operations and not
```

1   bringing other people on board.  So these vacancies are open as

2   we go into an election cycle where they planned to register even

3   more voters than they have in the past.

4          And, lastly, speaking specifically to the individual

5   plaintiffs, Your Honor, the law will have a devastating

6   consequences, to the three individual plaintiffs who are

7   resident noncitizens and whom the law facially discriminates

8   against.  And that includes, for example, Veronica

9   Herrera-Lucha, who is sitting here today.

10         Ms. Herrera-Lucha is a trained lawyer.  She first

11  traveled to this country as an election observer.  She settled

12  in the Orlando area and has been a lawful resident for almost 14

13  years.  She serves her community and makes her living by

14  registering eligible voters and helping others to do the same.

15  She has registered neighbors.  She has registered friends.  She

16  is part of the fabric of her community.

17         And on its terms, on its face, this law will silence

18  her protected activity and threaten her livelihood as of this

19  Saturday.

20         Your Honor, I'm happy to answer any questions you may

21  have.  If not, I can turn it over to Ms. Khanna.

22         THE COURT:  Thank you for your presentation.

23         Ms. Khanna.

24         MS. KHANNA:  Thank you, Your Honor.  Good morning,

25  again.  May it please the Court, Abha Khanna on behalf of the

Florida NAACP, Voters of Tomorrow, Disability Rights Florida.
Alianza plaintiffs, UnidosUS, the Florida Alliance for Retired
Americans, Santiago Mayer, and Esperanza Sanchez.  Collectively
I'm going to refer to all of these plaintiffs as the Florida
NAACP plaintiffs.

I'll be focusing my portion of the presentation,
Your Honor, on the Fourteenth Amendment challenges that we have
brought to the citizenship requirement and the information
retention ban, both under the equal protection clause and the
due process clause.  I'll start with the citizenship requirement
and the equal protection analysis there.

First and foremost, there is no dispute, and there can
be no dispute, that SB 7050's citizenship requirement on its
face singles out noncitizens for disparate treatment.  The text
of the provision expressly prohibits any person, quote:  *...who
is not a citizen from collecting or handling voter registration
applications on behalf of a third-party voter registration
organization.*  The classification of noncitizens in the statute,
Your Honor, is clear and it is categorical.

Second, the statute's classification based on alienage
targets a suspect class.  Now, while there is -- this is the
subject of some discussion in the Secretary's brief, I would
argue that there's really no dispute here either.

The Secretary states on page 18 of his brief, quote:
*The category of alien matters.*  On this point, Your Honor, we

agree.  Courts have held that laws that classify certain types of noncitizens for certain types of activities are not always subject to strict scrutiny.  But SB 7050 is not one of those laws.

Now, the Secretary may choose to distinguish between, say, undocumented immigrants and legal permanent residents, but the law itself does no such thing.  Contrary to the Secretary's suggestion, the Court cannot carve the law into its own preferred categories and then apply different levels of review to each.  It must take the law and evaluate the law as it is, and the law as it is treats all noncitizens uniformly.

Third, laws that target a suspect class trigger strict scrutiny.  The Secretary does not appear to dispute this general rule.  Instead, he argues for a singular narrow exception to strict scrutiny in this instance under the political function exception, but that exception does not apply here.

The Supreme Court spelled out the contours of the political function exception in a case called *Bernal v. Fainter*, and there it employed a two-part test for determining whether a given restriction fits within this narrow exception to strict scrutiny.

The first part -- I'll quote this from *Bernal*, 467 U.S. 216 page 221.  *First the specificity of the classification will be examined.  Classification that is substantially over-inclusive or under-inclusive tends to undercut the*

1  *governmental claim that the classification serves legitimate*

2  *political ends.*

3          Here, Your Honor, the citizenship requirement fails at

4  step one, before we even get to the second part of the test, for

5  the same reasons I've already discussed.  The requirement is

6  broad; it is undifferentiated, and it is sweeping.

7          But for the sake of argument, let's assume that we

8  even make it to the second part of the test.  Again I'm going to

9  quote directly from *Bernal*, this time page 222:  *Second, even if*

10  *the classification is sufficiently tailored, it may be applied*

11  *in the particular case only to persons holding state elective or*

12  *important nonelective executive, legislative and judicial*

13  *positions, those officers who participate directly in the*

14  *formulation, execution or review of broad public policy and*

15  *hence perform functions that go to the heart of representative*

16  *government.*

17          What does this mean?  The Court goes on to tell us

18  precisely on page 226*:  The political function exception is*

19  *properly applied to those who are*, quote, *invested either with*

20  *policymaking responsibility or broad discretion in the execution*

21  *of public policy that requires the routine exercise of authority*

22  *over individuals.*

23          So ultimately, Your Honor, the public -- the political

24  function exception applies to people in positions of authority

25  that involve policymaking and broad discretion.

1          Now, let's line that quote up from *Bernal* next to the

2    quote from the Secretary's brief on the bottom of page 20 where

3    the Secretary states, quote:  *To be sure, those who collect and*

4    *handle completed applications aren't vested with discretion or*

5    *do they -- nor do they engage in policymaking.*

6          The Secretary thus concedes, Your Honor, that the

7    functions actually prohibited by the citizenship requirement do

8    not align with the functions carved out by the political

9    function exception.  Instead, the Secretary argues that voter

10   registration applications must be collected and handled

11   properly.  But, of course, the political function exception says

12   nothing about that.

13         In fact, *Bernal* tells us that the importance of

14   getting the job done right, doing it correctly and with

15   integrity has no bearing on whether it qualifies for the

16   political function exception.  Accordingly, contrary to the

17   Secretary's suggestion, no exception to strict scrutiny applies.

18   So that takes us to the last step of the equal protection

19   analysis.

20         Fourth, the citizenship requirement fails strict

21   scrutiny.  And here, Your Honor, I also believe there is no

22   dispute and certainly no reasonable dispute.  At no point in the

23   Secretary's brief do I read it to argue that the requirement has

24   any hope of surviving strict scrutiny.  But just in case, let me

25   touch briefly upon why that is the case, because ultimately

1    there is no compelling state interest to justify the citizenship

2    requirement.

3            And here, Your Honor, I think is best to turn to the

4    declaration of Andrew Darlington submitted alongside the

5    Secretary's brief.

6            Now, on page 4 of that declaration there's a section

7    that's neatly entitled state interests.  And page 5 of that

8    declaration addresses the state interests for the citizenship

9    requirement.

10           This portion of the declaration includes just four

11   paragraphs.  Let's walk through each of them.

12           THE COURT:  You're talking about paragraphs 15 through

13   18 on pages 5 and 6?

14           MS. KHANNA:  Exactly, Your Honor.

15           THE COURT:  I have it in front of me.

16           MS. KHANNA:  Thank you, Your Honor.  And I will read

17   them into the record.

18           The first paragraph, paragraph 15, simply quotes the

19   text of the citizenship requirement provision.  Fair enough.

20           The next paragraph, paragraph 16, says that:  *Those*

21   *who handle voter registration applications act as a fiduciary*

22   *for the applicant,* and that*, The Florida Legislature has*

23   *determined that only those individuals who are U.S. citizens can*

24   *occupy that position of trust*, again citing back to the text of

25   the provision.

1          To be sure, we don't dispute either of these facts.

2     We don't dispute, certainly, that these positions -- these

3     individuals act as a fiduciary, and we certainly don't dispute

4     that the Florida Legislature determined that only individuals

5     who are U.S. citizens can occupy these roles.

6          So let's go to the next paragraph, paragraph 17, which

7     starts with:  *With noncitizens there's an issue of whether*

8     *collected and handled applications will be submitted to election*

9     *officials on time.*  Mr. Darlington then goes on to discuss three

10    different categories of noncitizens, first those he calls

11    illegal aliens, who he says are actively breaking the law and

12    subject to deportation at any time.

13         Next, he says, quote:  *Even those here on a temporary*

14    *basis, such as those on student visas, pose similar risks.  The*

15    *temporary visitors might leave the country or the state without*

16    *first delivering the completed voter registration applications*

17    *in their custody.*

18         Let's pause here, Your Honor.  Not only does

19    Mr. Darlington cite nothing whatsoever for this wholly

20    speculative statement, it also defies all logic.

21         Before SB 7050, 3PVROs had 14 days to submit completed

22    voter registration applications.  SB 7050 has shortened that

23    time frame to ten days.  So the concern here is apparently that

24    a lawful temporary resident might unexpectedly disappear within

25    the ten days between collecting the application and submitting

1   it.

2            Students pursuing higher education here for four, six

3   or eight years at a time, just disappearing, no process, no

4   notice, nothing, just gone; it simply defies all reason to think

5   that this could be a genuine concern.

6            Mr. Darlington then moves on to resident aliens, but

7   there all he says, twice, is that:  *The Florida Legislature*

8   *determined that they shouldn't be trusted with ensuring that*

9   *applications are submitted on time.*  No citation, no rhyme, no

10   reason, just that the legislature determined it so that it must

11   be so.

12            And, finally, Your Honor, we get to paragraph 18,

13   grand finale on State interests for the citizenship requirement,

14   and here Mr. Darlington states:  *It is my understanding that*

15   *keeping non-U.S. citizens from collecting or handling completed*

16   *voter registration applications furthers the State interests in*

17   *safeguarding election integrity, preventing voter fraud,*

18   *ensuring voter registration applications are timely processed*

19   *and promoting confidence in the election system as a whole,* end

20   quote.

21            That's it; a laundry list of Mr. Darlington's

22   understanding of the State interests, with no explanation

23   whatsoever of how or why or what any of those things have to do

24   with the citizenship requirement, a list that could just as well

25   have included ending child poverty or solving and achieving

 1    world peace, and those would have made just as much sense.

 2              THE COURT:  But isn't -- isn't the reference to voter

 3    integrity and preventing fraud some talisman that renders all

 4    laws not subject to review?

 5              MS. KHANNA:  It is not, Your Honor, and that is

 6    exactly -- exactly what I believe defendants have tried to do by

 7    submitting this declaration but woefully failed.  Simply

 8    submitting a laundry list of catch phrases of even legitimate

 9    State interests does not actually meet any standard whatsoever,

10    let alone the strict scrutiny standard.

11              THE COURT:  Setting aside my snark, the idea of a

12    talisman, you'd agree, though, that they -- if they explained

13    why there was a concern and connected that requirement to fraud

14    and so forth, that it would be a harder question; correct?

15              MS. KHANNA:  I agree that that would present some

16    argument of a State interest.  I do not believe it would be a

17    hard question that that would be -- that would satisfy State

18    strict scrutiny since it is --

19              THE COURT:  And that was going to be my follow-up

20    question.  So there's something to argue about, Had they

21    connected it up, Judge, and if they had, this is why it would

22    fail.  That's really my question to you.

23              MS. KHANNA:  Exactly.  And the reason why it would

24    fail is that all of these in purported interests are post hoc.

25    They are invented in this declaration.  They are invented in the

1   Secretary's brief.  There -- I mean, these are some important

2   State interests, right?  When you say voter fraud, election

3   integrity, these are big deals.  You would think that the

4   legislature would have wanted to address them on the record and

5   yet they seem to be afterthoughts here in the course of

6   litigation.

7          These purported State interests are unsupported;

8   they're speculative; they're subjective, apparently just to

9   Mr. Darlington, just his understanding, and they're entirely

10  post hoc.

11         So at the end of the day, Your Honor, the equal

12  protection analysis is straightforward and largely beyond

13  dispute.  The citizenship requirement facially discriminates

14  against a suspect class based on alienage and cannot avoid or

15  satisfy strict scrutiny.  It, therefore, violates the equal

16  protection clause, plain and simple.

17         Briefly, Your Honor, I'll turn to our other Fourteenth

18  Amendment claim against the citizenship requirement, and that is

19  that it's impermissibly vague in violation of the due process

20  clause.  And here I am left utterly confused by the Secretary's

21  attempt to argue how clear the statute is.  The citizenship

22  requirement prohibits noncitizens from collecting or handling

23  voter registration applications.

24         Now, in our brief we note that the verb "handle" has

25  multiple definitions, both in the dictionary and under Florida

1  law, but the Secretary appears to choose just one of those

2  definitions, those requiring physical custody as the ordinary

3  meaning.  In support, the Secretary argues that we've got to

4  consider the two words together, collecting and handling.  And

5  he draws on the analogy of a postman who collects letters from a

6  mailbox and then continues to handle those letters until he

7  gives them to another person.

8         Now, setting aside for the moment, Your Honor, that

9  the statute actually says "collecting or handling," not

10  "collecting and handling," implying that there are two different

11  kinds of activities that are prohibited, not just two different

12  steps of one continuous activity, also let's set aside,

13  Your Honor, that under Florida law a postman collecting voter

14  registration applications in the mail and delivering them to

15  supervisors need not be a citizen under Florida law.

16         But even setting these points aside, we don't even

17  necessarily dispute that the Secretary's preferred postman

18  analogy and interpretation of the statute is a reasonable way of

19  trying to interpret what the legislature might mean here.  It's

20  just not the only reasonable interpretation of the statute, and

21  a person of ordinary intelligence, reading the statute's plain

22  language, has no way of knowing what it prohibits.

23         The Secretary similarly assumes that the term "voter

24  registration applications" obviously means completed voter

25  registration applications, but there's nothing in the statute

1    that would even hint at that kind of limitation.

2           Here, Your Honor, I will pivot to the information

3    retention ban, which is also unconstitutionally vague under the

4    Fourteenth Amendment.  And I'll note that this is the only claim

5    that the Secretary's brief even addresses when it comes to the

6    Florida NAACP plaintiffs, the only claim that the Secretary even

7    addresses when it comes to the information retention ban.

8           Our brief included five pages outlining why we are

9    likely to succeed on our First Amendment challenges to the ban,

10   freedom of speech, freedom of association.  In response, the

11   Secretary does not dispute that the ban burdens core political

12   speech, severely burdens plaintiffs' associational rights,

13   triggers strict scrutiny and fails strict scrutiny.  All he

14   argued is that the phrase "voter's personal information" means

15   private nonpublic information.

16          For all the reasons we stated in our reply brief,

17   Your Honor, the Secretary's preferred interpretation as

18   articulated in his brief has absolutely no grounding in the text

19   of the statute and ultimately clarifies nothing.

20          And as to the second overly broad phrase in the voter

21   information retention ban, in compliance with this section, the

22   Secretary doesn't even pretend to offer a reasonable

23   interpretation of that term, instead promising that the

24   department's pending rulemaking will address the meaning of that

25   phrase.  Until then, we are left to wonder what it prohibits and

 1   whether the activities that plaintiffs routinely and currently

 2   engage in will subject them to a felony conviction.

 3          Ultimately, Your Honor, a vague statute cannot be

 4   cured by a specific rule.  Neither the Secretary nor the Court

 5   has the power to redline edit the legislature's language to make

 6   it constitutional.

 7          Similarly, the State cannot establish that a statute

 8   is narrowly tailored by gesturing at the broad cloth cut by the

 9   legislature and promising to tailor it later.

10          At the end of the day, plaintiffs simply cannot afford

11   to risk the very fate of their organizations, of their missions,

12   of their livelihoods in the hopes that maybe the same State

13   actors who defend the legislature's wrongs will ultimately make

14   them right.

15          I want to make one final point, Your Honor, on

16   standing in response to what Your Honor mentioned previously, we

17   have to look at these declarations in context.  And in context,

18   I want to note that when it comes to the Florida NAACP

19   plaintiffs, every single organizational plaintiff submitted a

20   declaration outlining the harms that they face from one or both

21   of these provisions.  Every single organizational plaintiff

22   challenging the citizenship requirement submitted another

23   declaration of a member or employee who is harmed -- who is

24   harmed immediately in concrete ways by the challenged

25   provisions, and where this -- individuals or Spanish speakers

1    who provided certified copies of the translations.  The

2    organizational plaintiffs in these declarations thus establish

3    organizational standing and associational standing.

4         And then each of the two individual plaintiffs

5    submitted their own declarations -- Santiago Mayer, Esperanza

6    Sanchez -- outlining the ways in which they are individually

7    harmed by the challenged provisions, and there we have

8    established individual standing.

9         Viewing all of these declarations in context,

10   Your Honor, layered on top of one another, we have demonstrated

11   how our plaintiffs are injured now in multiple cognizable and

12   irreparable ways, and we'd ask that the Court enjoin enforcement

13   of the challenged provisions.

14        I'm happy to answer any other questions, Your Honor.

15        THE COURT:  Thank you.

16        MS. KHANNA:  Thank you, Your Honor.

17        MR. FERGUSON:  Your Honor, Brent Ferguson once again

18   for the League of Women Voters of Florida.

19        As you can tell, Your Honor, the League is largely

20   aligned with the arguments made by the other plaintiff groups,

21   and I'll try not to retread most of those today.  I won't

22   address standing for now, unless you have additional questions,

23   but I would like to hit some points on our First Amendment

24   arguments on all four of the provisions that we've challenged in

25   this motion.

1          At the outset, I'd like to discuss the level of First

2   Amendment scrutiny.  So I think the core of defendants' argument

3   is that despite these restrictions on their activities, the

4   plaintiffs retain some kind of speech rights and that what they

5   are doing by collecting and handling voter registrations or by

6   giving these receipts is just nonexpressive conduct, but the

7   clear weight of the case law goes against defendants' argument.

8          We draw these lessons from *Meyer* and *Schaumburg,* which

9   essentially say that these activities that all the plaintiff

10  groups are engaging in when they're discussing political issues,

11  when they're handing out voter registration forms, and when

12  they're collecting them and encouraging people to register,

13  these are intertwined issues that can't be separated out.  And

14  that lesson comes from *Meyer* and *Schaumburg*, but it's been

15  applied by the clear related cases that have been decided since

16  then.  You've seen all those in our briefs, cases like *Cobb* and

17  like *Hargett* and like *Schwab* that say you can't slice and dice

18  these activities.

19         Now, the defendants have cited a few cases that they

20  argue support their position.  One case is *Steen* from the Fifth

21  Circuit.  That was a divided panel opinion, Your Honor.  I'd

22  like to say a couple of things about *Steen*.  I think, first of

23  all*, Steen* was wrongly decided.  It did exactly what *Meyer* said

24  shouldn't be done, and it pulled out the different types of

25  First Amendment activity when it came to the ban on noncounty

1    residents from collecting voter registration applications.

2           I'd like to say also with *Steen*, that differs from

3    this case because there was evidence in that case that there is

4    a lower burden on the plaintiff groups because they testified

5    that they used county residents to do most of that actual

6    physical activity, and they only used noncounty residents to do

7    overall supervision, which wasn't covered by that law.  So

8    that's one way that *Steen* differs here.

9           They've also cited *Browning* -- the first *Browning* case

10   from 2008.  The difference there is that -- one is the Court in

11   *Browning* actually recognized that this kind of activity, when

12   it's all put together, preserves First Amendment harm.  It did

13   say if you separate out that conduct and just talk about taking

14   an application, then maybe that's not expressive, but that's not

15   what it applied to the case.

16          I'd also like to mention briefly -- I'm talking about

17   all four of these issues today -- defendants' argument on the

18   level of scrutiny for First Amendment purposes really only hits

19   the two volunteer restrictions that we've been discussing.  It

20   doesn't talk about receipt requirement or the voter information

21   restriction, and that's important because that's another step of

22   the process that involves what the League and the other

23   plaintiffs do to retain information from applicants, keep their

24   contact information so they can talk to them, recruit them to

25   become members, or encourage them to vote.

1          Your Honor, I will briefly talk about how the

2     defendants' definition of this collecting and handling and their

3     view of this law would affect the League in practice, so I'd

4     just like to give an example.

5          The League often has cookouts and events at

6     naturalization ceremonies to try to register new voters, and

7     often those are newly naturalized voters.  And the State argues,

8     essentially, that it's fine and it won't create a First

9     Amendment burden on the League because its members, even if

10    they're noncitizens or even if they've been convicted of certain

11    felonies, can go up to someone and have a political discussion

12    and encourage them to register; they just can't physically

13    handle the forms.

14         While there are several issues with their definition

15    of collect and handle that Ms. Khanna mentioned -- but even

16    granting them that just for the moment, this is essentially how

17    it would go at a League function.  A member would, you know, see

18    a newly naturalized citizen and approach them and try to ask

19    them about political issues, ask them if they'd consider

20    registering to vote.  If that person was interested and they

21    wanted to fill out an application, the League member would then

22    hand them a blank paper application.

23         Now, everything is fine so far, but as soon as that

24    person starts filling out the application, the League member is

25    not allowed to touch it anymore.  So it creates this kind of

1  ridiculous situation where they have to call over another League

2  member who is a citizen and who has been previously vetted by

3  the League and ask them to take the paper, or they can ask the

4  person filling it out to go over to the tent and put it down on

5  the table, as long as this member doesn't touch it.

6         I think it goes without saying that burdens the League

7  member's speech.  It burdens the right to association, and it

8  decreases the effectiveness.  It certainly won't allow that

9  League member to continue a conversation and talk about

10 political issues or encourage that person to vote or become a

11 League member if they've told the person, I'm not allowed to

12 touch this application because I'm disqualified by Florida law.

13        Now, Your Honor, I'd like to touch on the First

14 Amendment aspects of the two issues that my colleagues have

15 already discussed, the noncitizen restriction and the voter

16 information restriction, kind of talk about how this level of

17 scrutiny applies there.

18        The important thing with the noncitizen restriction --

19 I think that Ms. Khanna touched on this as well -- is the State

20 cannot put their finger on a specific interest in the noncitizen

21 restriction.  Now, it lists a handful of them, just like it does

22 with the felony restriction.  One interesting point about that

23 is in the State's brief they list about five State interests

24 that support the felony restriction and about three that support

25 the noncitizen restriction.  Those aren't all the same, even

```
 1    though the two restrictions are identical other than who they
 2    disqualify.  I think when we're talking about this high level of
 3    First Amendment scrutiny, the State needs to be more exact to
 4    support their argument.  So this is just a telling way that the
 5    State hasn't tried to tie this specific State interest with the
 6    restriction at issue.
 7              Now, the other important point with the noncitizen
 8    restriction, Your Honor, is that there's absolutely no evidence
 9    of noncitizens creating the problems that the State says exist.
10    So they talk about voter confidence and election integrity, but
11    they don't tie anything to any specific incidents that were
12    perpetrated by noncitizens legally present in Florida, and that
13    right there defeats the law under the First Amendment.
14              On the voter information restriction, Your Honor, I'd
15    like to add just a couple of points.  The State's argument is
16    very narrow and very short on the voter information restriction,
17    and it's essentially all based on the claim that the voter
18    information restriction does not prevent the League or other
19    plaintiff groups from retaining someone's name and email address
20    and phone number and residential address.  So it only prevents
21    sensitive information like a social security number.
22              Now, in making that argument, they essentially concede
23    that under the First Amendment if the League was prevented from
24    taking name and contact information to follow up, then that
25    would violate the First Amendment.  And I think that makes a lot
```

1  of sense to concede that, but it's an important point just

2  because the State's interpretation of the law is gravely wrong.

3          So when we're talking about the interpretation of that

4  law, as I said, the State believes that it only applies to

5  personal sensitive information, and the first thing that I want

6  to mention here is point out that the State's usage of that term

7  "personal information" actually differs within it's own

8  argument.

9          So I would point you to page 28 of the State's brief.

10  In here they're talking about the felony volunteer restriction,

11  and they're trying to argue that they want to keep people

12  convicted of certain felonies from having voters' information.

13  They use the phrase "personal voter information," and that

14  includes information such as home addresses.  Now, five pages

15  later when they're talking about the definition of "personal

16  information," they say that it's clear based on the law that

17  that does not include residential addresses.  So if the State

18  can't come up with the same definition when it's using this term

19  in one brief, then I don't think a reasonable person -- I don't

20  think a League member should be expected to do so.

21          Your Honor, the final point I'd make on the voter

22  information restriction is that even if defendants were correct

23  that the law was limited in this way and only prevented

24  sensitive information, the penalty is so high that it still

25  creates unacceptable First Amendment burdens.

1          So we're talking about a felony prosecution of a

2    League member who mistakenly makes a copy of a voter

3    registration application or takes down someone's driver's

4    license number.  So there certainly are valid reasons to protect

5    sensitive information, but in this circumstance, it's possible

6    that a League member or anyone registering voters would make a

7    mistake not for a nefarious purpose but just because they forgot

8    their training or wasn't carrying it out well.

9          Certainly -- perhaps you could say that's illegal, but

10   I think saying that someone is going to be prosecuted for a

11   felony for doing that by accident is problematic, and the

12   penalty is so high that the provision should be struck down

13   under the First Amendment.

14         Your Honor, if you don't have any questions on those

15   two points, I'll hit the other two issues that are included in

16   our motion that are separate from the other plaintiff groups.

17   That's the felony volunteer restriction and the receipt

18   requirement.

19         THE COURT:  I do have a quick question --

20         MR. FERGUSON:  Sure.

21         THE COURT:  -- about standing.  I took time on the

22   break, because I only had it in digital form, to copy the

23   Chandler declaration.

24         MR. FERGUSON:  Sure.

25         THE COURT:  And I'm looking on page 4, and

1    Ms. Chandler says she's aware of members who have legal

2    residency in Florida but are not U.S. citizens, and they

3    participated in registration activities, which is written in the

4    past tense.   Paragraph 11 then says the law would prohibit them.

5    That's her conclusion.

6         She doesn't say that, We have members that have done

7    it in the past, would continue to do it, but are not U.S.

8    citizens but lawful residents, and because of this law they

9    won't do it.   She says that that's her view that it would

10   prohibit them from doing it.

11        What do I make of that, and does that matter for

12   purposes of paragraphs 10 and 11 as it relates to her

13   declaration, as it relates to, again, non-U.S. citizens who are

14   legal residents?

15        MR. FERGUSON:   Sure, Your Honor.   As I said, under the

16   *Levi Strauss* standard I think this is enough, and I want to

17   address two separate bases that --

18        THE COURT:   Hold on.   Let me ask you about that.   I

19   can't let that pass.

20        It seems to me *Levi Strauss* -- that's just like the --

21   saying fraud doesn't magically protect federal law from judicial

22   review, notwithstanding assertions to the contrary.   Also,

23   invoking *Levi Strauss* doesn't magically fix any defect in a

24   declaration.

25        I thought what *Levi Strauss* teaches us is that I'm not

```
 1    going to strictly apply the Rules of Evidence and that I can

 2    hear and consider, for example, hearsay and other things that

 3    might otherwise be inadmissible if I find that it's otherwise

 4    corroborated or otherwise I would give weight to it for the

 5    reasons I would articulate.

 6         I don't understand -- how does the fact that it would

 7    require me to assume something based on the statement made by

 8    the declarant -- why would that fall within the ambit of Levi

 9    Strauss?  We're not talking -- I'm not -- you're talking about

10    an issue with its admissibility.  I'm talking about whether or

11    not a critical fact is missing.

12         MR. FERGUSON:  Sure.

13         THE COURT:  So I understand that you could have, for

14    example, double hearsay, and I could consider double hearsay if

15    there is indicia of reliability that I might not otherwise

16    strictly apply in the Rules of Evidence.  That's Levi Strauss.

17    It seems to me that's different from what I asked, which is is

18    there a fact missing as opposed to focusing on the fact that

19    it's double hearsay, if that makes sense.

20         MR. FERGUSON:  It does, Your Honor, and I agree those

21    are two separate issues, and I wasn't trying to cite Levi

22    Strauss for the specific question you asked.  I do think that

23    the Chandler declaration should be given weight for reasons

24    under Levi Strauss, but I'll address the separate question about

25    the specific U.S. citizens.
```

1          So Ms. Chandler is the copresident of the League, and

2    she has a lot of experience working with returning citizens,

3    some of whom are League members, and these certainly are

4    examples of members who have participated in this activity.  And

5    I would argue that it's a natural reading of this that they will

6    continue to do so.

7          And I don't think there's a standing problem there for

8    a second reason, and the second reason is that if you see

9    from --

10          THE COURT:  Let me -- and here's my sort of

11    fundamental problem with what you are saying right now.

12          MR. FERGUSON:  Sure.

13          THE COURT:  If this were at a motion to dismiss stage,

14    I accept the statement and all reasonable inferences drawn

15    therefrom in your favor, but at this stage, it's effectively --

16    and the case law teaches us -- it's evaluating it as I would at

17    the motion for summary judgment stage.  I mean, is it -- at what

18    point would it be permissible for this Court -- and I suspect

19    you'd be asked the same question by the Eleventh Circuit, which

20    is why I'm asking it now.  At what point does Judge Walker not

21    get to infer or assume something --

22          MR. FERGUSON:  Sure.

23          THE COURT:  -- that's not explicit on the face of an

24    affidavit at a preliminary injunction stage where you're trying

25    to establish standing subject to, essentially, a summary

 1   judgment review?

 2           MR. FERGUSON:  Sure.  I think that's fair, Your Honor.

 3   I'll make two points in response to that.

 4           I think that if there -- that one sentence standing

 5   alone, there would be a harder question.  I think if you look at

 6   paragraphs 10 and 11 and 12 together -- so Ms. Chandler mentions

 7   the Miami-Dade County residents who are still members, and, by

 8   virtue of that, that means they have been -- they have been

 9   trained as the League trains.  It's about a thousand members who

10   do these services, and they are qualified as registration agents

11   for the League.  So it says -- so we know that -- based on the

12   declarations in the case, we know that they have participated.

13           And if you'll look at paragraph 11, the declaration

14   says the law would prohibit them in the future, and I think what

15   Ms. Chandler is trying to say is that the active members who are

16   noncitizens who are qualified to do this -- and the law, if it's

17   not enjoined, would prohibit them from doing that.

18           So I think that's strong enough, Your Honor, but I

19   do -- I don't want to miss -- the second point here is that the

20   League is harmed in multiple ways by the noncitizen restriction,

21   and one is that members who are noncitizens are not able to do

22   this.  So that's going to be these members discussed here and

23   more.

24           But then there's a couple of other harms here.  One

25   harm is that the League has to investigate all of its members to

1    figure out if they're citizens, and that means violating their

2    own values, which are expressed and noted in the Scoon

3    declaration.  That also means spending money to do that and

4    losing the opportunity to register voters while they're doing

5    it.

6          And then a third form of harm is at these

7    naturalization ceremonies and other events, the League is not

8    always aware of members that -- other people that may be around

9    and volunteers who might not be citizens.  So what it's going to

10   do there -- even let's grant for a moment -- which isn't true --

11   but let's grant that there were no noncitizen members of the

12   League.

13         They would be at a naturalization ceremony and their

14   speech and association would be burdened because they would have

15   no way of interacting with people who might want to help out and

16   collect registration applications or things like that.  And

17   that's certainly a harm, and it would probably prevent them from

18   working at naturalization ceremonies completely.  So I think we

19   have those three separate bases for standing, and I think

20   they're all met.

21         Your Honor, so, as I said, I'll move on to the two

22   final restrictions, and that's the felony volunteer restriction

23   and the receipt requirement.  So as I mentioned before, the

24   felony volunteer restriction, all of the words of it are the

25   same except for the noncitizen restriction.  The State puts

```
 1   forth five separate interests for the felony volunteer
 2   restriction, which include the general things we've already
 3   discussed, election integrity and voter fraud; certainly
 4   compelling interests, but they also mention things like
 5   timeliness of returning applications.
 6          It's not clear, Your Honor, how that restriction
 7   itself or some of the other general ones that the states
 8   mention -- that the State has mentioned are tied to the felony
 9   volunteer restriction.  There is no -- nothing in the brief,
10   nothing in the evidence in this case showing that people who've
11   been convicted of these specific felonies are somehow going to
12   be less likely to turn in applications on time, so it's very
13   unclear where the State's argument is coming from on that point.
14          I'd like to say as a broader matter -- and we've cited
15   case law to this effect -- the State is not allowed to conclude
16   that people who have been convicted of felonies are just more
17   likely to commit certain harms or crimes in the future.  And
18   that's drawn from cases like *Freenor* out of Georgia about tour
19   guides.  It's drawn out of *Johnson* from the Sixth Circuit as
20   well.
21          The State -- and even if the State -- even if that
22   wasn't a barrier for the State's argument, that general bar, I'm
23   assuming things about people convicted of felonies, the statute
24   isn't tailored at all, and it's extremely overbroad.
25          THE COURT:  The cases you're talking about are they
```

 1    limited to any felony or any crime?  Because here -- I know

 2    there's some other issues related to it -- but I thought the

 3    suggestion was that if you create -- if you commit a crime

 4    involving fraud or dishonesty or an election-type violation --

 5    so it's not just any felony; correct?  And would that take it

 6    outside -- I'm not saying that's determinative of the ultimate

 7    question, but doesn't that matter for purposes of the cases you

 8    were talking about?

 9            MR. FERGUSON:  Yeah, it does matter, Your Honor, and I

10    will address that point in a minute and how this law is

11    tailored.

12            THE COURT:  I mean, I tell every jury that if you

13    commit a crime involving dishonesty or deceit, you can assume

14    the person's lying and factor that in in evaluating their

15    credibility.  So is it really farfetched for the -- and

16    impermissible for the State to say, We're here trying to get

17    this done right.  We've got a bunch of complaints.  We're trying

18    to prevent voter fraud, so we don't want folks that have been

19    convicted of fraud or fraud-type claims from being involved in

20    this process?

21            MR. FERGUSON:  Your Honor, I think that is permissible

22    in a certain narrow set of circumstances, and the First

23    Amendment requires a lot there, and I will address that.

24            In response to your first question about these cases

25    that I mentioned, *Freenor* and *Johnson*, *Freenor* is a case that

1    does, as you said, involve all kinds of felonies and just a

2    broad band, but *Johnson* is not a case like that.  It involved

3    drug convictions and then the freedom to travel to certain areas

4    of a city after a drug conviction and, of course, those areas of

5    the city were ones seen to have a higher rate of drug crime.

6          So that is -- that case is about whether the State as

7    a general matter is allowed to assume that someone convicted of

8    a certain crime is, therefore, more likely to commit that type

9    of crime in the future, and I think *Johnson* certainly supports

10   us on that.

11         But then let's move to the next point about this list

12   of felonies and whether it's specifically tailored.  I agree,

13   Your Honor -- let's say so -- let's say that the State presented

14   identity theft or financial fraud as the number one reason

15   supporting this law -- which I think it's curious that they

16   haven't done that.  They've talked about timeliness and election

17   integrity.

18         These lists of statutes do -- the State does mention

19   one time -- do seem to be targeted toward people who have

20   committed fraud, but it's hundreds of felonies on this list.

21   It's not a few identity theft crimes.  It includes way, way too

22   many to have any tie to the specific interests that the State

23   presumably could claim but has not, and so we've listed a few of

24   the examples in our brief.

25         One example is there's the State of Florida has a $50

```
 1    statutory cap on the amount you're allowed to charge for debt
 2    consulting services in the first meeting, and it can be a felony
 3    if you violate that.  So that's just one example of the type of
 4    law if you violate that --
 5         THE COURT:  Is your basic point that they cast the net
 6    so broad to connective tissue they'd have to establish fails
 7    because they've cast the net so broad.
 8         MR. FERGUSON:  Exactly, Your Honor.  There's so many
 9    lawyers here, and they've just listed chapters of the criminal
10    code, some of which involve some kind of identity theft, but, as
11    I've said, most of them do not, and the First Amendment just
12    requires a lot more right here.
13         So, Your Honor, I will say, in addition on that point,
14    even -- I want to grant for the moment, let's say that the State
15    was right about the lower level of scrutiny that the First
16    Amendment requires and *Steen* were correct, which it's not.  But
17    even those cases have some level of evidence produced by the
18    State to show why the law in question is valid or is tied to the
19    restriction, and that's just not the case here.  There's
20    absolutely no evidence that people with felony convictions in
21    general are at risk of doing this and certainly not of the
22    felony convictions at issue in this statute.
23         Your Honor, of course we agree with Ms. Khanna on her
24    discussion of the phrase "collecting and handling."  There's
25    certainly -- the State reads in the physical custody requirement
```

1    of the statute which isn't there.  I think the fact that the

2    State is wrong on this is shown by their example about a member

3    driving around completed applications in his car.  That doesn't

4    involve managing with the hands or collecting, but the State

5    claims that that's clearly covered by the statute, and it's

6    certainly not.

7            On that point, the State mentioned in their argument

8    that it would be very easy for the legislature to add more

9    things to show that this law also covered people supervising

10   voter registration events.  We agree that it would have been

11   easy for the legislature to add things like the physical custody

12   requirement the State reads into it, but they simply haven't

13   done so.

14           Your Honor, I'd like to now address the receipt

15   requirement which requires that every League member after an

16   interaction, after getting someone's voter registration

17   application, they give a detailed receipt that includes the name

18   of the volunteer who assisted along with the 3PVRO information

19   and information about the applicant.

20           Now, our vagueness claim on the receipt requirement,

21   the State has pointed this out and they're correct.  The

22   vagueness does not come from the text of that part of the

23   statute but the interplay between the voter information ban and

24   the receipt requirement.

25           Now, under these two laws together.  A League member

 1   is required to provide a receipt to every person who applies and

 2   there -- and then they're banned from taking any information

 3   from that applicant, any personal information.  And so under

 4   that -- under the statute, they're not allowed to keep a copy of

 5   the receipt.  And given the fact that the League itself could be

 6   disqualified as a 3PVRO for violating this statute, those two

 7   things just don't fit together, and that's a big problem for the

 8   State here.

 9           The League's members have already expressed, as we've

10   noted in our declarations, that they're unsure how they can

11   comply with this.  They're afraid that if they keep a copy of

12   that receipt, just so the League can make sure that it's

13   following the law, then they will be prosecuted for a

14   third-degree felony for doing so.

15           Now, I want to get to the core of the defendant's

16   argument about the receipt requirement.  They essentially argue

17   that it's necessary to require that League members or other

18   volunteers include their full name on the receipt before

19   returning it, and that's because they say that it's a problem

20   that League members or other plaintiffs or other volunteers are

21   mishandling these voter registration applications and turning

22   them in late.

23           I'll say, once again, the State doesn't have any

24   substantiated evidence on this.  The thing they've talked about

25   most in their briefs are late-submitted applications.  Now,

1    certainly late-submitted applications are a problem.  I don't

2    think the receipt requirement or any of the provisions in this

3    law are really closely tied to lateness of application.  But a

4    lot of those claims are unsubstantiated, and if you compare that

5    to the huge numbers of people that the League registers and that

6    other plaintiff groups register, it's simply not enough to

7    create a big enough harm for First Amendment purposes.

8           So as we've noted here, the League is registering

9    about 40,000 people every year.  And if you want to say that a

10   few late-filed applications are cause to require League members

11   to expose their names on these receipts, I don't think that

12   meets the First Amendment burden.  It's not enough to tip the

13   balance there.

14          The -- sorry.  The State has also failed to show why a

15   specific person's full name is needed on these receipts.  So I

16   think what they're trying to say is that the full name is needed

17   because if a voter wants to apply through a 3PVRO and then they

18   don't end up getting registered, or there's some problem, that

19   they can follow up.

20          But the problem there is that the League's name and

21   specific number is already included on all of its forms and on

22   this receipt requirement.  So if someone's registering at a

23   Bay County cookout, and they get that receipt, the League's

24   3PVRO information is going to be on there.  And if something

25   happens and they want to contact them, they'll be able to do it

1   with that, not with just someone's full name without any contact

2   information or anything like that.

3          And, certainly, I think what the State is trying to

4   say is that an applicant should be able to take it into their

5   own hands and hunt down the specific person, but I don't think

6   that's necessary to serve the interest the State is arguing for.

7   And I also don't think there's a reason to believe that the

8   specific person that has collected an application and provided a

9   receipt has created the problem.

10         So if there's a -- this Bay County cookout where some

11   application ends up getting lost, I don't think a voter has any

12   reason really to believe that that League member who provided

13   the receipt is going to be the same person who might have, you

14   know, mailed the applications and it got lost in the mail or

15   maybe it got lost in their car or -- later, something like that.

16         So I don't think the name requirement is going to help

17   that, and I think that kind of demonstrates that what the State

18   is really trying to do here is make it more burdensome to

19   register voters, make people expose themselves in situations

20   that could be problematic and certainly make it less likely that

21   people want to register voters.  And that's been made very

22   clear, I think, out of all the declarations we've submitted.

23         Out of all of the provisions that are at issue in this

24   case, the most people that have objected to it is the receipt

25   requirement because of that fear.  And that's the kind of fear

1    that cases like *Buckley* and *McIntyre* support.  So there's been a

2    lot of discussion of the *Buckley* case in the briefing.

3          And essentially what that case says, as Your Honor

4    knows, is that it's impermissible to require people to wear a

5    name badge when they're going on -- to circulate petitions door

6    to door, and that's because people have -- people discussing

7    political issues have an interest in anonymity.  And when we're

8    having those discussions, it's a protected right under the First

9    Amendment not to reveal your name, but that's exactly what the

10   law would require here.

11         Now, the State comes back and says this isn't quite

12   the same as *Buckley* because there's no name badge and this

13   receipt is only given after the transaction.  But I think, once

14   again, going back to the example I mentioned about how these

15   interactions happened in practice, the receipt is not

16   necessarily going to be given at the end of the exchange.  It's

17   going to be given after an application is submitted.

18         And what often happens is that a League member is just

19   engaging in a conversation and talking about the importance of

20   local issues, the importance of an upcoming election, and those

21   conversations can last a long time.  And so that name can be

22   provided partway through that conversation, and it can expose

23   the League member just as the plaintiffs were exposed in

24   *Buckley*.

25         I will also note that *McIntyre* supports this as well.

1   *McIntyre* was not -- *McIntyre* is about handbills, of course, and

2   whether those have to be signed.  And in *McIntyre* there's no

3   question of that face-to-face interaction.  It's about the right

4   to speak on an anonymous basis, and certainly *McIntyre* very

5   directly supports that right here.

6           So I'll say altogether, Your Honor, all four of these

7   provisions burden the plaintiffs' speech.  They all make it less

8   likely that members will continue registering voters.  They all

9   mean that fewer voters will be registered in Florida, and so we

10  ask you to grant the preliminary injunction.

11          THE COURT:  Thank you.

12          MR. FERGUSON:  Thank you.

13          THE COURT:  We're going to take a break.  It's been an

14  hour and 15 minutes, slightly less than that, but we'll round

15  up.

16          Before we take that break, let me find out -- I don't

17  want to forget.  We've a pending motion for leave to proceed

18  under a pseudonym, ECF No. 33 in 4:23cv218, the

19  Hispanic Federation case.

20          Mr. Jazil, what says you in terms of a deadline to

21  respond to that motion?

22          MR. JAZIL:  Your Honor --

23          THE COURT:  It doesn't have to be -- let me make

24  plain, I'm not rushing anybody.  I'm not particularly wed to any

25  time.  I'm just -- so I'm going to be working on the order based

```
 1  on this hearing.  I'm not going to be immediately jumping on
 2  that.
 3          MR. JAZIL:  Your Honor, I have a couple of other
 4  deadlines.  July 10th might work for us, if that's not too late
 5  for the Court.
 6          THE COURT:  July 10th is fine.
 7          Let me turn to counsel, for purposes of filing a
 8  reply, so I don't get a motion asking to file a reply, if they
 9  file their response on July 10th, when do you want to file the
10  reply?
11          MR. CEPEDA DERIEUX:  July 13th would be fine.
12          THE COURT:  All right.
13          Then let me turn to -- the other deadline we needed to
14  set, I guess, was a -- we had said that you didn't have to file
15  a response to the complaint because we're going to focus on the
16  preliminary injunction motions, and I granted that request made
17  by counsel for the defendants.
18          What kind of time frame to file responsive pleadings
19  to the complaints?
20          MR. JAZIL:  Your Honor, if possible, perhaps if we get
21  21 days from whenever the Court issues the order, to the extent
22  the Court resolves certain issues --
23          THE COURT:  Oh, I'm sorry.  We may have already put
24  that in our order.  It was 21 days.
25          So everybody will know, I've got, like, five pending
```

```
 1   preliminary injunctions.  I just ruled on one last week.  I
 2   forgot we had already set that deadline.  So it's going to be
 3   20 -- we had not set a deadline on the pseudonym, I know that,
 4   but everybody's shaking their head "yes," but it is going to be
 5   21 days from my order for a responsive pleading, and we've
 6   already said that, and I'll reaffirm that in an order since I
 7   just complicated it.
 8            I believe the other issue was set a deadline to
 9   address the issue of consolidation.
10            MR. JAZIL:  Yes, Your Honor.  My understanding is my
11   friends were going to discuss among themselves, and they would
12   discuss with me and we'd come back to the Court on consolidation
13   and whether or not it makes sense.
14            THE COURT:  Just give me a date.  I'm not rushing
15   anybody.  You have other responsibilities.  I'm not going to be
16   sitting on the edge of my chair in chambers waiting for it.  I
17   just -- I want to go ahead and give y'all a date so that way you
18   know we need to confer and file some notice.  And if I have to
19   rule on something, I can.
20            So you can also alternatively say, Judge, we disagree,
21   and here's our proposed schedule to address it.  That's fine,
22   too.  But I just want to set a deadline to trigger your
23   responsibility to confer.  So you just give me a date by which
24   you're going to file a notice of the parties' general position
25   on consolidation.
```

1          MR. JAZIL:  Yes, Your Honor, perhaps 21 days from

2     whenever the PI order is --

3          THE COURT:  All right.  So the same deadline as

4     responsive pleadings.  We'll do that as well.  I just -- I

5     didn't want to forget.

6          Are there other deadlines we need to address?

7          MR. WERMUTH:  Yes, Your Honor.  There's a deadline on

8     this coming Monday, the 3rd, for a meeting of counsel for the

9     Rule 26(f) conference.

10          THE COURT:  I'm happy to extend that to 21 days after

11     my order as well.

12          MR. WERMUTH:  Okay.

13          THE COURT:  All right.  And that gives everybody

14     plenty of time and you're not jammed up.

15          So I'm going to enter a separate order today, because

16     I can assure you I'm not going to issue an order on the

17     preliminary injunction today, but we'll enter an order by the

18     end of the day confirming all of those deadlines and

19     reconfirming the deadline that I forgot that we had already

20     imposed, which was the responsive pleading to the complaint.

21          MR. JAZIL:  Thank you, Your Honor.

22          THE COURT:  Any other deadlines we need to address?

23          All right.  Mr. Jazil, it's 11:25.  I don't want you

24     to be jammed up.  I want you to have enough time to make

25     whatever presentation you want to make, and I don't want you to

1  be hangry.  So I'm happy to take, for the court reporter's

2  benefit, a brief break and come back and immediately have you

3  respond.  I'm happy to take an hour and break for lunch and have

4  you come back.  I'm going to -- it's ultimately up to me, and

5  this is not a democracy, and we're not taking a vote, but I

6  will -- I'm interested because I'd rather do it in the most

7  efficient way.

8          What's your preference?

9          MR. JAZIL:  Your Honor, if I could just have five

10  minutes to use the restroom, I can soldier on.

11          THE COURT:  You can use the five minutes however you

12  wish.  I don't need to know the particulars, but we'll take a

13  ten-minute break.  When we come back, you can proceed with your

14  argument.

15          Thank you.

16      (Recess taken at 11:25 AM.)

17      (Resumed at 11:41 AM.)

18          THE COURT:  Please take your seats.

19          Mr. Jazil.

20          MR. JAZIL:  Thank you, Your Honor.  And may it please

21  the Court.

22          I would like to talk about our evidence generally that

23  we submitted to the Court for consideration because it is common

24  for all the arguments that are being made.  Then I'd like to

25  move on to the First Amendment issues, the equal protection

1   issues, and conclude with a discussion of *Burford*, *Pennhurst*,

2   the 90-day issue.

3         Your Honor, first our evidence.  Mr. Darlington's

4   declaration was referenced and specific paragraphs in that

5   declaration were referenced but not all of the relevant

6   paragraphs.  We are not using election integrity as a talisman.

7   We are actually providing the Court with specific examples, as

8   the best we can, to substantiate our concerns about election

9   integrity from the 3PVROs.

10        Your Honor, I point the Court first to paragraph 5 of

11  Mr. Darlington's declaration where he talks about 3PVROs being

12  fiduciaries.

13        I then point the Court to paragraph 7 of

14  Mr. Darlington's declaration which talks about how the office

15  that he oversees reviewed 3,077 voter registration applications

16  that were collected and submitted untimely by 3PVROs.  This is

17  in 2022.

18        Mr. Darlington also notes that, as part of his

19  statutory responsibilities for the office, he had to submit a

20  report to the Florida Legislature, the Speaker of the House, the

21  Florida Senate, and the Governor's office detailing complaints

22  received by his office and the Secretary of State which oversees

23  his office.  That report was provided to the legislature.  It's

24  been provided to the Court as an attachment to Mr. Darlington's

25  declaration.  That report includes, in the form of an Excel

```
 1    sheet, all of the complaints that were provided.

 2              THE COURT:  And connecting the complaints up, then, to

 3    the restrictions at issue.

 4              MR. JAZIL:  Yes, Your Honor.

 5              And here I'd first note that we don't have an

 6    obligation to have a perfect fit for a restriction.

 7              THE COURT:  You are required to have a fit.  So let me

 8    repeat -- reiterate my question.  What is the fit, which I think

 9    is a pretty direct question because I urged you -- you're right.

10    There is something on the record.  Looking at the reports, what

11    is the fit, for example, between restrictions on noncitizen

12    residents and the complaints?

13              MR. JAZIL:  Yes, Your Honor.  Thank you.

14              And here I point the Court to -- and Mr. Darlington's

15    report is not the only piece of evidence that was provided to

16    the Court, and it's not the only piece of evidence that was

17    shared with the Florida Legislature.

18              We include also in our submissions, Your Honor --

19              THE COURT:  It's over a thousand pages I'm aware of.

20              MR. JAZIL:  Yes, Your Honor.  And all that information

21    went to the Florida Legislature as well prior to the legislative

22    session.

23              So I point the Court to the appendix at page 225,

24    which is an FDLE press release from the report that

25    Mr. Darlington submitted.  This press release talks about an
```

1    illegal alien in Fort Lauderdale who was convicted of 11

2    felonies also voting illegally.  That is not specific to the

3    issue of a 3PVRO having someone who is not a U.S. citizen --

4            THE COURT:  I'm going to ask the question straight up,

5    Mr. Jazil.  In the thousand pages you filed, which I'm going to

6    review again this weekend, point me to a single sentence or

7    paragraph that talks about resident aliens engaged in some kind

8    of bad acts that undermine the voter registration process.

9            MR. JAZIL:  I do not have an example in the thousand

10   pages that were submitted of a resident alien who was

11   specifically charged with doing something improper in the voter

12   registration process.  Your Honor, again, without conceding the

13   point, I'd like to underscore that nor am I required to provide

14   a specific example of a resident alien.

15           THE COURT:  I'm not asking for an example.  I was

16   saying what's the justification?  And so -- I mean, we can keep

17   slicing the bread differently.  I asked the question I asked

18   because of the way you presented the argument:  Judge, we have

19   this mountain of evidence that we're relying on.  The plaintiffs

20   are absolutely -- we have this mountain, to which I say to that

21   mountain of evidence, what's the nexus?  What's the connective

22   tissue?  How is it related to resident noncitizens?  There can

23   be some other fact you're relying on, but I just -- it can't be

24   a constant moving target.

25           I was asking you that question because you pointed to

1    the thousand pages.  So if there is not specific examples -- and

2    I did not ask, nor did my question suggest, that you had to have

3    a specific example.  It was that -- the question was based on

4    your statements.

5            So then what are you relying on in the record to

6    support that there's a problem with resident noncitizens engaged

7    in the -- or could be or there is a concern that would prompt a

8    restriction on nonresident citizens?

9            MR. JAZIL:  Thank you, Your Honor.

10           THE COURT:  I mean, resident noncitizens.

11           MR. JAZIL:  And timeliness is the bucket under which

12   it falls, and that's how we detail it in our papers.  Timeliness

13   is a concern for 3PVROs, and timeliness we try to tie to the

14   issues that come with resident alien and illegal alien, someone

15   here on a temporary basis.  If timeliness of submission or

16   untimeliness of submission is a concern, then, as we make a

17   point in our papers, it's more likely that someone who is not

18   bound to the community, as a U.S. citizen would be, is going to

19   be more prone to submitting something in an untimely basis.

20   Timeliness is a broad heading.

21           THE COURT:  I understand.

22           MR. JAZIL:  And, Your Honor, under the other voter

23   integrity broad heading, we have concerns with people who are

24   not U.S. citizens voting, and that was evidence that was before

25   the legislature, and the legislature then took action to curtail

the involvement of noncitizens in the process.  Was it a perfect fit?  No.  This is something that we'll address as we talk about the equal protection issue, Your Honor.  If I'm correct on the equal protection issue, then that should be good enough because rational basis applies.  That's our perspective, and I'll detail that in a moment.

Your Honor, the League of Women Voters plaintiffs also made the point that where is the evidence of the felons doing something that's nefarious, and, Your Honor, here I point you to the referral that was made from the Secretary of State's Office to State Attorney Jack Campbell, which appears on page 431, 432 of the record -- the appendix, not the record.  Pardon me, Your Honor.  There is a referral to Andrew Warren which appears on page 448, 449 of the record.  There is the referral to Phil Archer which appears on page 460 of the appendix.

And, Your Honor, a couple of points about that.  If we take a look at the referral to Mr. Campbell, that referral was the Secretary of State forwarding complaints that Mark Earley and his team had with an individual who submitted over 1,400 voter registration applications that Mr. Earley and his team thought to be fraudulent.  This gentleman was working for two 3PVROs, the Florida Democratic Party and Florida Rising Together groups.  If we take a look at the appendix, 436 through 439, we have a spreadsheet from Mr. Earley and his team about how it is they figured out that these registrations were fraudulent, and

```
1   his team matched up personal information that we're saying
2   should not be kept by the 3PVROs -- social security numbers,
3   signatures -- to see who was being fraudulently registered, and
4   that's how they caught this fella.
5           The same is true of Supervisor Anderson in
6   Seminole County.  His team also matched the signatures that they
7   had on file with the signatures that someone was putting on a
8   voter registration form to match up things and send referrals to
9   the state attorney.
10          Your Honor, I also point the Court to the criminal
11  prosecution, Roderica Cody, and this begins on the appendix,
12  page 417 [sic] onwards.  I note for the Court, on page 485
13  there's an investigator's report who was dealing with the Hard
14  Knocks group, and he notes that the Hard Knocks group used
15  felons for its work and, quote:  The group conducts no or
16  limited backgrounds checks on their canvassers who are asked to
17  handle sensitive information.  One canvassers was a 15-time
18  convicted felon.  Another canvasser was, quote, "a habitual
19  felony offender who was employed while out on bond in two
20  cases."  One person supplied personal voter information that he
21  obtained to others in the group to then fill out that
22  information on voter registration forms.
23          This is the information, Your Honor, that the State
24  had.  This is the information that was provided to the
25  legislature.  So to suggest that we --
```

```
 1              THE COURT:  I understand that, and I understand why
 2    you were pivoting and you said that to a different question,
 3    because I don't think you're saying -- I didn't understand you
 4    to say that resident aliens are equal to felons.  I think you
 5    were pivoting to a new topic; correct?
 6              MR. JAZIL:  Yes, Your Honor, I was pivoting to a new
 7    topic.
 8              THE COURT:  And the evidence -- it was the timing
 9    issue as it relates to resident aliens, and you said that you
10    believe that they're more likely to have a problem with
11    delivering things timely for the reasons you articulated.
12              You were then pivoting to felons to explain two
13    things, Judge, what's in the record to suggest we are concerned
14    about felons being involved in the process, one.  And you cited,
15    for example, Earley, not limited to that, but that's an example.
16    And, two, you were also providing that to suggest why we don't
17    want people retaining personal identification information,
18    because it can be used to perpetrate a crime.
19              MR. JAZIL:  Precisely, Your Honor.
20              THE COURT:  I understand.
21              MR. JAZIL:  Your Honor, I'd like --
22              THE COURT:  What says you -- and you've done this in
23    your papers, but address the issue of how -- on what basis are
24    we -- I put that gloss on the no retention requirement, that it
25    only includes social security numbers and that type of
```

1   information.

2          MR. JAZIL:  So, Your Honor, here's what we did with

3   the retention of information.  There are things that are on a

4   voter registration application and in a voter registration file

5   that are matters of public record.  So the idea and the basis

6   for the Secretary's interpretation of the rulemaking is simply

7   there is certain information which is public information; you

8   can get it, so that's the information that you can retain.

9   That's also going to be the information that would be on a

10  receipt.  So the receipt and the retention information will

11  match up.  That information will be information --

12         THE COURT:  What's the -- and I understand that, but

13  I -- and that's the rationale for why the Secretary would put

14  the gloss the Secretary is going to put on it.

15         But what's the legal basis for this Court to say I'm

16  not going to review it because I'm going to let the Secretary

17  effectively redraft the statute?  That's what I'm hung up on.

18         MR. JAZIL:  I understand, Your Honor, and the

19  Secretary's position is he's not redrafting the statute.  He's

20  interpreting the statute in the best possible way to -- part of

21  it is to avoid constitutional issues; part of it is to give the

22  words what he believes to be their meaning in the appropriate

23  context, and that's what he's doing.

24         THE COURT:  I thought -- I thought the way this works

25  is I have to give the words their ordinary meaning, and if I

1  can't, then there's -- Houston, we have a problem, not the

2  legislature passes a law, and then we have the deep state of

3  Florida fixing whatever it decides that the Florida Legislature

4  should have done that it didn't do.  I don't really quite grasp

5  that rule of statutory construction.

6          MR. JAZIL:  Sure, Your Honor.  The argument that's

7  being made from the other side is that the law is both vague and

8  clear, and the law is both vague and clear in such a way that

9  the Secretary can't interpret it and can't provide the

10 Secretary's perspective.  I would submit that the law provides

11 the four corners within which the Secretary's interpretation --

12         THE COURT:  I thought Florida law says the Secretary

13 can't do that, which is a separate issue; right?

14         MR. JAZIL:  Your Honor, Florida law says that the

15 Secretary's interpretation is not owed deference, which I think

16 is a little different.  I think the Secretary's interpretation

17 is still important and should be given weight, because at the

18 end of the day it's the Secretary and the Attorney General whose

19 office shares in our interpretation who are responsible for

20 enforcing the statute.  So it's our interpretation that matters

21 for purposes of --

22         THE COURT:  So if I can commit a felony, I should take

23 comfort from the fact that the Secretary of State is going to

24 put a gloss on it that wouldn't subject me to committing a

25 felony.  So I'll go out and do what I'm going to do, and I'm

```
 1    comfortable that I'm shielded by that -- the Secretary of

 2    State's gloss; right?

 3           MR. JAZIL:  Well, if the Secretary of State is not

 4    assessing fines and the Attorney General is not enforcing

 5    anything, I think you are, as a practical matter, shielded from

 6    the conduct that you --

 7           THE COURT:  I thought some of these things were also a

 8    felony.  I didn't realize -- your client also prosecutes folks?

 9           MR. JAZIL:  No, Your Honor.  Our client forwards

10    issues to the --

11           THE COURT:  Well, I guess they do.  There's a -- but

12    go ahead.

13           MR. JAZIL:  Our client forwards issues to the Attorney

14    General's Office, et cetera.

15           But, Your Honor, another point.  If someone believes

16    that our interpretation of these statutes is ultra vires, that

17    our interpretation conflicts with the plain language of the

18    statute, well, that's a pretty good basis for a rule challenge.

19    That's a pretty good basis for a Florida court to tell the

20    Florida election official that his interpretation of the Florida

21    Statutes is flawed, and I think that is the way it should be

22    done if someone is maintaining that our interpretation is

23    critically flawed, that our interpretation and the gloss that

24    we're putting --

25           THE COURT:  So I subject myself to being arrested and
```

 1   prosecuted under the theory that I may be able to latch onto

 2   something the Secretary of State has said?

 3          It seems to me that completely turns the concept of

 4   why we -- especially in the context of a penal statute, why we

 5   worry about vagueness, because of arbitrary enforcement.  And

 6   it's not just a question that you could ultimately win.  It's

 7   also a question of not being arrested and subject to

 8   prosecution, even if you ultimately can prevail.  I mean, it

 9   just -- it seems to me there's a bunch of layers to why this is

10   problematic to say, Oh, well, the Secretary can just fix this.

11          MR. JAZIL:  Fair enough, Your Honor.  And I'll concede

12   that someone who is subject to arrest, that's a pretty big deal.

13   A conviction is in and of itself the thing that chills the

14   speech that is at issue; right?  And I think that's a pretty

15   obvious notion, and I'll concede that point.

16          But then the question becomes, okay, what's the penal

17   statute we're looking at?  It's subsection (7), and it says:  *If*

18   *a person collecting voter information on behalf of the*

19   *third-party voter registration organization copies a voter's*

20   *application or retains a voter's personal information* -- and

21   then it gives examples of what that information would be,

22   driver's license number, identification number, social security

23   number, or signature -- *for any reason other than to provide*

24   *such application or information to the third-party voter*

25   *registration organization...the person commits a felony of the*

1    *third degree.*

2           And this is the statute that I suppose Your Honor is

3    focusing on and why it is the Secretary's gloss would be

4    inappropriate.  Here, Your Honor, the Secretary's gloss, I

5    maintain, is perfectly appropriate.  We're talking about a

6    voter's personal information.  There's a comma.  Then it gives

7    an example of driver's license information, voter identification

8    information, social security number, signature.  That's the kind

9    of private information that you're not meant to keep.

10          I think the Secretary's interpretation that, look, if

11   it's something that you already have access to in the public

12   records, that is not personal information of the type of a

13   driver's license, identification number, social security number

14   or signature, you're fine.  I think that's a perfectly fine

15   interpretation.  And if you're Jack Campbell or Phil Archer or

16   Andrew Warren or whomever else who are the state attorneys --

17          THE COURT:  It wouldn't be an issue with Mr. Warren

18   anymore.

19          MR. JAZIL:  I stand corrected, Your Honor.

20          But the point remains the Secretary's interpretation,

21   the Secretary's rulemaking in an attempt to promote uniformity

22   on the interpretation of these issues, the Attorney General's

23   perspective on these issues, which is in line with the

24   Secretary, I believe, is enough to shield folks, and we get back

25   to his interpretation as a state official of state law.

1           And, Your Honor, moving on to the First Amendment

2    issues -- and the arguments are in our papers, Your Honor, and

3    I'm not going to regurgitate those arguments.  To me, my friends

4    for the plaintiffs seem to think that the State simply can't

5    draw a line between the activities that precede getting a

6    completed ballot and the collection of the completed ballot

7    itself, that we can't draw a line between expressive conduct and

8    speech on the one hand and nonexpressive conduct on the other.

9           And here, Your Honor, again, rather than talk through

10   the cases that we've already discussed in our papers, I'd like

11   to point the Court to Judge Hinkle's opinion in *League of Women*

12   *Voters of Florida versus Browning*, 863 F.Supp.2d 1155, and go to

13   a section on page 1163.

14          And here Judge Hinkle writes for the Court:  *The state*

15   *has a substantial interest in seeing that those who collect*

16   *voter-registration applications actually get them to an*

17   *appropriate voter-registration office.  This interest is*

18   *sufficient to uphold a requirement to provide the state the*

19   *identity of those who run a voter-registration organization and*

20   *the identity of any employee or volunteer who collects*

21   *voter-registration applications.  The interest is not sufficient*

22   *to justify a requirement to provide the state the identity of a*

23   *person who only solicits an application but does not collect it.*

24          Your Honor, I highlight that to note that Judge Hinkle

25   drew a line between the protected activity that precedes the

```
 1   collection and the collection itself, and that line is the same
 2   as the one that the Southern District of Florida drew
 3   Judge Altonaga.  It's the same as the line that the Fifth
 4   Circuit drew, Judge Edith Jones, and it's the line that the
 5   Ninth Circuit drew in its opinion concerning ballot collection.
 6   And that line, I think, is perfectly appropriate, that
 7   everything that precedes the collection of the ballot process is
 8   subject to the First Amendment.
 9           The collection itself is not.  The collection itself
10   is not subject to the First Amendment, because, unlike petition
11   gathering, you're not rallying someone to your cause and saying,
12   Look, you've got to sign this petition.  Get it in the
13   constitution so that we can all together benefit from the good
14   things that will happen from this constitutional amendment.
15           Here what we are talking about is a voter registration
16   form that is individual and unique to the voter.  It's the
17   voter's associational rights.  It's the voter's right to vote.
18   It's, I believe, separate and distinct from the solicitation
19   that precedes the collection.
20           Your Honor, for the equal protection issues, my
21   friend, Ms. Khanna, discussed the *Varnel* [sic] case.  I'd like
22   to give that to you.  To me, the equal protection issue -- and
23   just since I set the stage for the discussion -- comes down to
24   this.  If you are anyone but a permanent resident, rational
25   basis applies.  If you are a permanent resident, strict scrutiny
```

1    applies, unless you qualify for the political function

2    exception.  If you qualify for the political function exception,

3    then rational basis should apply.  And I think that's been made

4    clear in the *En Banc* [sic] case and the *Plyler* case from the

5    Supreme Court that dealt with this line.

6                   So then the question becomes --

7                   THE COURT:  Hold on one second.

8                   Madam Court Reporter, it's *Bernal*.  It's B-e-r-n-a-l.

9              MR. JAZIL:  I apologize, Your Honor.  I don't have my

10   usual sticky note to slow down.

11                  THE COURT REPORTER:  You've got the eyes.

12             MR. JAZIL:  Your Honor --

13                  THE COURT:  So the issue is whether or not you fall

14   within the exception.  I understood that was her argument, and

15   you think -- she said no; you say it does.  So your best

16   argument that it falls within the exception is -- and I know

17   this because it's in your papers.  But what's your best argument

18   now to highlight that?

19             MR. JAZIL:  Sure, Your Honor.  And there I'd like to

20   talk through a test that *Bernal* uses.  Bernal -- on page 224, my

21   friend talked about the language discussing ...*whether a*

22   *position was such that the officeholder would necessarily*

23   *exercise broad discretion...*

24                  Your Honor, preceding that, *The focus of our inquiry*

25   *has been* -- the focus.  This is not an absolute test.  And then

when we look at the second clause of that test, it says:

...*power of the sort that a self-governing community could*
*properly entrust only to full-fledged members of that community.*
*We look to the importance of the function as a factor giving*
*substance to the concept of democratic self-government.*

          So that's *Bernal* distilling the cases and laying
out --

          THE COURT:  What's your best case and your closest
analogue to what we have here where someone -- another court
found that fell within that exception?  Because it's not a
police officer; it's not a member of a commission; it's not
somebody who is passing law.  What's your best analogue and your
best case that would suggest I should apply the exception here?

          Because I'm less interested in you and Ms. Khanna
cherry-picking language out of that opinion, and I'm far more
interested in how it's been applied, because it seems to me it
speaks volumes about how it's applied.  So when I start lining
up cases about where courts have found it falls within the
exception or it doesn't, I'm interested from both sides what's
the best case for each side in terms of helping to define the
parameters of that exception.

          MR. JAZIL:  Fair enough, Your Honor.  And that's a
difficult question because I think lining up the cases where the
civil service was found to not be within the exception, notaries
were not within the exception, engineers weren't within the

1   exception, lawyers weren't within the exception, but teachers,

2   peace officers, and police officers were --

3            THE COURT:  Because they have an enormous amount of

4   discretion; right?  Isn't that what the cases say?

5            MR. JAZIL:  For the police officers, yes.  For the

6   peace officers and the teacher, I'm not entirely sure that that

7   is a -- the language is there.  I'm not entirely sure that's a

8   fair distillation of what the record in those cases highlighted,

9   though.

10           And, Your Honor, I go back to the *En Banc* case.  I

11  think that it's --

12           THE COURT:  I guess the problem is -- because I've

13  heard this ad nauseam.  I mean, your friend Mr. Cooper -- where

14  the word "friend" probably actually applies as opposed to in

15  this setting.  I've heard there is no daylight between the State

16  and teachers.  They're executing State policy.  I mean, they

17  are -- there's case after case, argument after argument that

18  there's no daylight.  They are State actors.  Surely -- and

19  they're public employees.  I mean, surely that's a difference --

20           MR. JAZIL:  Your Honor.

21           THE COURT:  -- for purposes of applying this

22  exception?

23           MR. JAZIL:  Sure, Your Honor.  If the point is the

24  teachers -- for teachers that there is no daylight because all

25  they're doing is implementing State policy and that's it, that

```
 1    would also mean that they have little to no discretion in how it
 2    is that that State policy is furthered, right?  Because if all
 3    they're doing is executing State policy, then that's it.  They
 4    serve a core political function, and they would satisfy, as *En*
 5    *Banc* said, the political function test.
 6              And that's why I think *En Banc* -- other than the fact
 7    that if I'm cherry-picking language that's got the best language
 8    for me and applies rational basis at the end, but to me,
 9    Your Honor, 3PVROs, one would argue, are in a role that is even
10    more of a political function than the teacher.
11              Because if we look at our statute, it talks about how
12    a 3PVRO is a fiduciary for the voter.  It's there to serve the
13    voter.  It's there to ensure that the voter can provide their
14    voter registration form to the Supervisor of Elections or the
15    Secretary of State on time.
16              And if you look at the Texas case that deals with
17    3PVROs, I think they refer to them as registrars, which is
18    consistent with Florida's Policy 395 where they're actually
19    deputized agents of the Supervisor of Elections.  So there
20    they're providing a core political function.  They're an
21    extension of the Supervisor of Elections and the elections
22    officials in the sense that they're going out there and making
23    sure that, you know, people get registered and they can do that
24    one condition precedent to getting on the voter rolls and
25    exercising the franchise.
```

1          Your Honor -- and I apologize I don't have a specific

2     case on point that deals with permanent residents in a voting

3     context when they're serving as 3PVRO agents.  That doesn't

4     exist, and so the Court would be creating new law one way or the

5     other.

6          Your Honor, we've discussed the *Pennhurst* and

7     *Burford*-related issues, unless the Court has any other

8     questions.  We've discussed abstention in other cases as well,

9     Your Honor, you and I.  We've gone through the *Siegel* analysis.

10    I'm not going to repeat things that Your Honor already knows.

11         I will note that the provision that my friend for

12    the --

13         THE COURT:  I think -- let me back up.  One thing that

14    would help me, I understand and understood your papers when

15    you're talking about the abstention.  Help me to understand --

16    because I think I know what you mean by *Pennhurst*, but if you

17    could put some meat on the bones, because I want to make sure

18    I'm not misapprehending your argument as it relates to

19    *Pennhurst*.

20         MR. JAZIL:  Sure, Your Honor.

21         One way to look at it is this:  The State, both

22    through the Secretary and the Attorney General's Office -- the

23    two folks against whom the PI is being sought -- have said that

24    they're not going to enforce these provisions for 90 days based

25    on their interpretation of these provisions, their gloss.

1          And if the Court is being asked to enjoin the

2  Secretary of State and the Attorney General from doing something

3  that they've already said they're not doing based on their

4  interpretation of state law, the plaintiffs would necessarily be

5  asking this Court to say, Look, state officials, your

6  interpretation of state law is erroneous.  Here's my

7  interpretation of state law.  Here's my interpretation of state

8  law with which you have a duty to comply, and because you have a

9  duty to comply with this interpretation of state law, and this

10  interpretation of state law is unconstitutional, I'm issuing the

11  injunction.  To me, that creates a *Pennhurst* issue, Your Honor.

12          THE COURT:  I'll just have -- I'll do *Pennhurst*

13  remedial 101.  That's not my understanding of what's happening

14  here, what's argued here or what that case stands for, but I

15  understand your argument.  You've now fleshed out what you mean

16  by it, and I'll take it under advisement.

17          MR. JAZIL:  Understood, Your Honor.

18          Your Honor, going back to the statutory text and what

19  is required of the 3PVROs at the end of the 90 days -- this is

20  subsection (12) -- there's emphasis placed on that last

21  sentence:  *Failure of the third-party voter registration*

22  *organization to comply with the requirements within 90 days*

23  *after receipt of the notice* -- this is a notice where we publish

24  on July 1 -- *shall automatically result in cancellation of the*

25  *third-party voter registration's -- third-party voter*

1   *registration organization's registration.*

2           So the question to ask is what exactly are the 3PVROs

3   being asked to do at the conclusion of the 90 days from July 1

4   to September 30th?  They're being asked to affirm that they

5   don't have a felon, they don't have a non-U.S. citizen handling

6   or collecting completed voter registration forms.  If you make

7   that affirmation, you fall within this safe harbor, and your

8   voter registration is not being canceled at the conclusion of

9   those 90 days.

10          The receipt requirement, the voter retention

11  requirement, as a practical matter, Your Honor, those get kicked

12  in once you're out in the field at the conclusion of the 90 days

13  and collecting voter registration forms.  So those provisions

14  aren't implicated.  The way the Secretary is structuring the

15  rulemaking, so long as someone attests on a form that they don't

16  have noncitizens or non -- felons working for them, their voter

17  registration will not be canceled; it's the new requirements

18  that matter and they've been met.

19          Your Honor, I have nothing further to add unless the

20  Court has additional questions.

21          THE COURT:  I do not.

22          Mr. Sjostrom?

23          MR. SJOSTROM:  Nothing to add, Your Honor.

24          THE COURT:  One moment, please.

25      (Pause in proceedings.)

 1          THE COURT:  Let me hear from the plaintiffs.  I know

 2   you disagree.  Is there anything that you believe is truly new

 3   that you need to address?  And, of course, if you interject

 4   something new, I certainly would let Mr. Jazil respond.

 5          MS. KHANNA:  Nothing new.  I think I have responses to

 6   Mr. Jazil's arguments that I've not already addressed but

 7   obviously just want to make sure I'm being responsive to the

 8   Court at the same time.

 9          THE COURT:  I'll let you clarify anything briefly so

10   it's clear that -- so that there's no ambiguity in the record.

11   And if Mr. Jazil believes you've interjected something that

12   creates an ambiguity as to his arguments to yours, I'll let him

13   briefly respond.

14          MS. KHANNA:  Thank you, Your Honor.  I'll keep my

15   remarks brief.

16          On the equal protection clause issue, Your Honor asked

17   both parties, I believe, what is the best case about resident

18   noncitizens.  I submit *Bernal* is the one that decides it.  I

19   won't requote all that.

20          But I think an important antecedent question to that

21   is what is the best case for my friend Mr. Jazil's slicing and

22   dicing of the term "noncitizens" to apply one standard of review

23   to one set of noncitizens and a different standard of review for

24   a different set of noncitizens.  In *Bernal* you do not see that.

25   You have all noncitizens are treated the same for the notary

 1    position and there's one standard applied to all of them, and

 2    I'm not aware --

 3              THE COURT:  You argued that before.

 4              MS. KHANNA:  Sorry, Your Honor.

 5              On the political function exception, I know I've

 6    walked through all of that, but I believe Mr. Jazil just said

 7    that he believes that 3PVROs exercise more political function

 8    than teachers and in fact are --

 9              THE COURT:  They're just not government employees or

10    government officials, and I'm aware of the language.

11              MS. KHANNA:  Fair enough, Your Honor.  I just wanted

12    to make one last point --

13              THE COURT:  Sure.

14              MS. KHANNA:  -- which is that the --

15              THE COURT:  And I didn't mean -- I shouldn't have cut

16    you off.  If it's something beyond that, you certainly can make

17    it.

18              MS. KHANNA:  I just wanted to note that Mr. Jazil

19    specifically said that he believes that 3PVROs are providing a

20    core political function.  But somehow several pages later in

21    response to the First Amendment argument, when we talk about

22    core protected political speech on page 29 of his brief, the

23    Secretary says that these individuals, they're simply regulating

24    an administrative aspect of the electoral process by handling

25    and delivering a voter registration application.  And I just --

1    I submit, Your Honor, you don't get to have it both ways.

2            My final point, Your Honor, and I think this is just

3    for -- really just stepping back and understanding what's going

4    on here.  As I understand the Secretary's argument, it is that,

5    Take comfort, plaintiffs, in the proposed rule -- not even an

6    actual rule, the proposed rule -- that the Secretary and the

7    Attorney General will not enforce it in a way that you don't

8    think is right, specifically, outside the rulemaking.  Says

9    nothing about the state attorneys who may enforce it for

10   whatever reason, but at least we won't; trust us.

11           And I just want to emphasize, Your Honor, that the

12   very nature and purpose of the 3PVROs, in this case and

13   generally, is to reach communities and exist in a space that is

14   outside of the government, that is to reach marginalized voters

15   who have traditionally lacked that kind of connection and access

16   to the state government and to say to them that, you know, you

17   can take cover under our wing, that the State of Florida, the

18   Secretary of State and the State Attorney General, who sit here

19   time and again, this case and others, defending the

20   legislature's statutes, We'll take care of you.

21           These 3PVROs exist precisely to address the voters who

22   do not feel taken care of by the government and who have been

23   marginalized by these traditional means, and it really provides

24   no comfort at all when it comes to any of the harms that we're

25   alleging, the chilling in the ability for these organizations

1    and these individuals to do the work that they are charged with

2    doing.

3              Thank you, Your Honor.

4              MR. CEPEDA DERIEUX:  Your Honor, I just have a very

5    quick point to make about what Mr. Jazil said about what's being

6    expected -- what he said at the end about what's being expected

7    out of the 3PVROs from the period of July to September.

8              I understood Mr. Jazil to make it clear that as of the

9    90 days after this notice, in September, the -- these

10   organizations will have to make an affirmation that they have

11   complied from that period, starting July 1st through

12   September 30th, into what he calls a safe harbor, and if they

13   have complied, then, you know, they are within that safe harbor.

14             I just wanted to clarify that is not a safe harbor.

15   That is just a three-month delayed fuse on a time bomb.  If

16   your -- if a fine is going to put you out of business in July or

17   August or September, it doesn't much matter that you're being

18   assessed it on October 1st.  It will still put you out of

19   business.

20             So just wanted to make that clear, and if Your Honor

21   doesn't have any more questions, I'll sit down.

22             THE COURT:  I do not, and I understand.

23             MR. CEPEDA DERIEUX:  Thank you.

24             THE COURT:  Yes, sir.

25             MR. FERGUSON:  I'll be brief as well, Your Honor.  I'd

just like to respond quickly to Mr. Jazil's points about the
appendix and the justification for the felony volunteer
restrictions.  Now, Mr. Jazil pointed to three page ranges in
the record, starting at page 431 and page -- going through
page 472.

        Now, from what we can tell, most of these instances
that are alleged problems with 3PVROs are about timeliness,
about turning in applications late.  Overall, the State has
shown no connection between having a prior felony conviction in
general, and certainly not the prior felony convictions listed
in the statute, and increased incidences of any voter
registration violations.  So, of course, I mention the
timeliness issue, which could be a problem, but it's not
addressed by the restrictions we're talking about today.

        Now, the two later instances in the record that
Mr. Jazil noted -- in one circumstance someone registered a
voter who appeared to be deceased, and the second one I believe
it was someone who was mentally incapacitated that didn't
voluntarily register -- now, of course, those are problematic
instances, but, once again, I'm not seeing anything in this
record that shows that those specific people were convicted of a
prior felony that's listed in this law.

        Mr. Jazil did reference one organization that employed
someone with prior felony convictions.  I'll note he didn't list
what those are -- I don't know what they are -- and certainly

```
 1    hasn't tied it to the list of felonies that are in this law.
 2              And, Your Honor, even if there was one person who
 3    committed one of these felonies on the list and then later
 4    committed a crime, the State certainly hasn't shown that that
 5    creates a tie.  As I mentioned before, there's 40,000 voter
 6    registration applications submitted by the League every year and
 7    many more from other organizations, and the fact that one person
 8    who's a committed felony -- who's committed a felony before has
 9    done this is certainly not enough under the First Amendment.
10              The only additional thing I'll say, Your Honor,
11    Mr. Jazil mentioned the second *Browning* case from Judge Hinkle
12    for the proposition that the State does have an interest in
13    requiring the organizations name the people who collect voter
14    registration applications to the State, and certainly that State
15    disclosure provision, which separately exists in Florida law, is
16    separate from the provisions we're talking about today.
17              I think Mr. Jazil might have been trying to get at the
18    receipt requirement, but for the reasons we've explained,
19    providing a receipt with someone's full name to an individual
20    private person during an exchange about voter registration is
21    much different than a disclosure requirement that goes to the
22    State.
23              I'm happy to answer any further questions; otherwise,
24    that's all.  Thank you.
25              THE COURT:  I have no further questions.
```

1        Mr. Jazil, anything you want to add in response to

2   those few brief remarks?

3        MR. JAZIL:  No, Your Honor.  Thank you.

4        THE COURT:  I think the only question that was left

5   open is there was some suggestion that, Judge, we -- and maybe

6   there wasn't.  I said somebody could move ore tenus if they

7   wanted to supplement the record.  I wasn't saying I would grant

8   the motion, but I would -- said that otherwise we were going to

9   be -- I was going to -- we're going to stick with the record we

10  have currently before me.  And, of course, what a lawyer says is

11  argument; it's not evidence on the record.

12       You may not believe it's necessary.  I'm not

13  encouraging you to do it.  That's just the -- I'm circling back.

14  I think that's the only other issue that we did not address that

15  came up during the course of these proceedings.

16       MR. CEPEDA DERIEUX:  Yes.  Thank you, Your Honor.  We

17  do intend to move to supplement.  We don't believe that this

18  would add additional evidence to the record.  It would just

19  verify evidence already in the record.

20       I did confer with Mr. Jazil.  He said he would --

21  well, I don't want to put words in Mr. Jazil's mouth.  I'll --

22       MR. JAZIL:  Sure, Your Honor.  I just need to touch

23  base with my client.

24       THE COURT:  Certainly.

25       MR. JAZIL:  This is my associate.  My client is

 1   somewhere in the back, and I'll get back to the Court, if that's

 2   okay.

 3            THE COURT:  Why don't y'all step out.  We'll take a

 4   break.  I'd rather address it now and entertain any legal

 5   argument so that I can take the matter under advisement and not

 6   spend days turning something into a bigger deal than it needs to

 7   be.

 8            MR. JAZIL:  Thank you, Your Honor.

 9            MR. CEPEDA DERIEUX:  Thank you, Your Honor.

10            THE COURT:  Court's in recess for five minutes, and

11   you can come back and tell me.

12            If you need more time, by the way, Mr. Jazil, if

13   you've got to phone a friend or something, that's fine.  So

14   there's nothing magical about five minutes.

15            MR. JAZIL:  Thank you, Your Honor.

16            THE COURT:  Y'all can go about your business.

17       (Recess taken at 12:24 PM.)

18       (Resumed at 12:31 PM.)

19            THE COURT:  Please take your seats.

20            Have you had time to confer?

21            MR. JAZIL:  Yes, Your Honor.

22            THE COURT:  What says you?

23            MR. JAZIL:  And, Your Honor, to the extent that the

24   translations are materially the same and there's an attestation,

25   we do not object.

```
1              MR. CEPEDA DERIEUX:  That sounds fine, Your Honor.

2              THE COURT:  All right.  When are you going to

3    supplement by?

4              MR. CEPEDA DERIEUX:  I believe we can get that tonight

5    or first thing tomorrow.

6              THE COURT:  How about we say by 5:00 p.m. on Friday?

7              MR. CEPEDA DERIEUX:  Absolutely.

8              THE COURT:  Okay.  Thank you.

9              And, Mr. Jazil, if you will -- I'm not going to jam

10   you up because I want to give you time.  I'm trying to think of

11   mechanically the best way to do this.  If you get something and

12   it's -- I can't imagine it's going to be something other than

13   that simple, but if you think it somehow injects some new

14   issue -- I'm going to take that back -- noon by Friday, and then

15   by 5:00 p.m. all I want you to say, Mr. Jazil, is file some kind

16   of notice, Judge, we think we need a hearing because it's more

17   complicated than what was filed, okay?

18             MR. JAZIL:  Thank you, Your Honor.

19             THE COURT:  All right.  And I'm not going to require

20   you to file a full briefing or anything, just that way it alerts

21   me, Judge, slow down on your drafting because we've got to take

22   up an issue.

23             MR. JAZIL:  Thank you.

24             THE COURT:  Okay.

25             MR. CEPEDA DERIEUX:  Thank you, Your Honor.
```

1              THE COURT:  Very good.

2              All right.  Let me also say, I understand the timing

3    of all this, but when I look at the deadlines I set for y'all,

4    I'm going to give me at least as much time.  I'd like to note

5    that 13 lawyers just sitting that are -- have been participating

6    in today's hearing.  We've got the largest law firm in Florida,

7    the Attorney General's Office, an army of folks on both sides,

8    and there's me and my merry little band.

9              And I will do my best to get out an order, but this is

10   not going to be an order that I'm going to get out in 48 hours.

11   So I will do my best to get it out as quickly as possible, but

12   it's going to take me some time to get out an order.  There's a

13   number of issues.  There's a number of layers to the issues, and

14   I'll do the best I can.

15             I'm not going to -- it won't be two months from now,

16   but I can't promise it's going to be four days from now.  So

17   that gives you a range, but I'll try to get it done sooner

18   rather than later, understanding the importance of getting an

19   order out so that people know what they can and cannot do.

20             Anything additional?  Let's start with the plaintiffs.

21             Ms. Khanna, anything additional from the plaintiffs at

22   this time?

23             MS. KHANNA:  Not for the Florida NAACP plaintiffs.

24   Thank you, Your Honor.

25             THE COURT:  Mr. Cepeda Derieux?

1          MR. CEPEDA DERIEUX:  None for the Hispanic Federation

2    plaintiffs, Your Honor.

3          THE COURT:  Mr. Ferguson?

4          MR. FERGUSON:  None for the League of Women Voters,

5    Your Honor.

6          THE COURT:  Mr. Jazil?

7          MR. JAZIL:  Nothing further, Your Honor.  Thank you.

8          THE COURT:  Mr. Sjostrom?

9          MR. SJOSTROM:  Nothing from the AG, Your Honor.

10         THE COURT:  All right.  Court's in recess.  Thank you.

11       (Proceedings concluded at 12:34 PM on Wednesday, June 28,

12   2023.)

13                      * * * * * * * *

14         I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
15   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy is noted within the
16   transcript.

17

18   /s/ Megan A. Hague                    6/29/2023

19   Megan A. Hague, RPR, FCRR, CSR              Date
     Official U.S. Court Reporter
20

21

22

23

24

25