```
                   11th Circuit
                 Atlanta, Georgia


Florida State Conference of
Branches & Youth Units of the
NAACP, Voters of Tomorrow Action,
Inc., Disability Rights Florida,
Alianza for Progress, Alianza
Center, et al.,

vs.                             Case No. 23-12308
                                Lower Tribunal Case No:
                                4:23-cv-215 (NDFL)


Florida Secretary of State, et al.
Consolidated with:
Hispanic Federation, et al.,

vs.                             Case No.: 23-12313
                                Lower Tribunal Case No:
                                4:23-cv-218 (NDFL)


Florida Secretary of State, et al.
_____/
```

**TRANSCRIPTION OF PROCEEDINGS**

Oral Argument

```
Before:   Honorable Charles R. Wilson
          Honorable Britt C. Grant
          Honorable Barbara Lagoa



                    PAGES 1 - 64




        Stenographically Transcribed Remotely By:

                    TRACY BROWN
```

1    **APPEARANCES:**

2

3    For the Florida Secretary of State:

4    Mohammad O. Jazil, Esquire
     Holtzman Vogel Baran Torchinsky & Josefiak PLLC
5    119 S. Monroe Street, Suite 500
     Tallahassee, Florida 32301

6

7    For NAACP Group, Plaintiffs:

8    Abha Khanna, Esquire
     Elias Law Group LLP
9    1700 Seventh Ave., Suite 2100
     Seattle, Washington 98101
10   (206) 656-0177

11   For Hispanic Federation Group, Plaintiffs:

12   Adriel I. Cepeda Derieux, Esquire
     American Civil Liberties Union Foundation
13   125 Broad Street, 18th Floor
     New York, New York 10004
14   (212) 549-2500

15   For League of Women Voters (Amicus):

16   Brent Ferguson, Esquire
     Campaign Legal Center
17   1101 14th Street NW, Suite 400
     Washington, D.C. 20005
18   (202)736-2200

19

20

21

22   CERTIFICATE OF REPORTER                              64

23

24

25

1    Thereupon,

2         **JUDGE WILSON:**  The next case is the

3    Florida State Conference Branches versus the

4    Florida Secretary of State.  The League of

5    Women Voters of Florida is here as amicus.

6    Mohammed O. Jazil is here for the appellant,

7    the Florida Secretary of State.  Adriel Cepeda

8    Derieux is here for the appellees, Florida

9    State Conference of Branches, along with Abha

10   Khanna.  And Robert B. Ferguson is for the

11   amicus.

12        And, Mr. Jazil, you may begin your

13   argument.

14        **MR. JAZIL:**  Thank you, Your Honor.  May it

15   please the Court, Mohammad O. Jazil for the

16   Florida Secretary of State and the Attorney

17   General.

18        Your Honor, 3PVROs are one of the many

19   ways by which Florida voters can register to

20   vote.  3PVROs in common parlance are the folks

21   who are out in the community as canvassers with

22   a clipboard and a registration form trying to

23   get people to register to vote.

24        Now Florida's experience has been that

25   there are some problems with 3PVROs.  In 2022

1      alone, three thousand -- 3,077 voter

2      registration forms were untimely delivered.  In

3      the report that the Florida Secretary of

4      State's Office shared with the legislature in

5      2022, there were third-party voter registration

6      groups who were committing fraud.  They were

7      hiring felons without appropriate checks,

8      et cetera.

9           So the Florida legislature, in response,

10     passed a series of reforms directed at

11     third-party voter registration groups.  Two of

12     those reforms are the subject of this appeal in

13     a preliminary injunction context.  It's the

14     requirement that folks who are collecting

15     third-party voter registration forms for 3PDROs

16     be citizens of the United States.  And second

17     issue concerns what information can be retained

18     from the forms.

19           The first issue is an equal protection

20     issue.  The second one is in the vagueness

21     context.

22           Your Honors, on the citizenship provision,

23     the State's argument is this, that when we're

24     looking at citizenship, it's sui generis.  When

25     we're looking at the equal protection analysis

1    in a facial constitutional challenge context,

2    alienage is unlike race, alienage is unlike

3    religion, alienage is unlike natural origin.

4    Whereas with race, if you're white or black,

5    strict scrutiny applies.  National origin,

6    Irish, Italians, strict scrutiny applies.  With

7    race, the level of scrutiny varies depending on

8    the kind of alien that you are.

9        So for legal permanent residents, strict

10    scrutiny applies.  For everyone else, rational

11    basis is the appropriate test.  And so --

12        **JUDGE GRANT:**  Are you conceding that this

13    rule is invalid for legal permanent residents?

14        **MR. JAZIL:**  I'm not, Your Honor.  I'm not

15    conceding that.  I'm saying that for everyone

16    but the legal permanent resident, rational

17    basis should apply.  And for the legal

18    permanent residents, there's political function

19    exception based on supreme court case law.  And

20    here, what we're contending for the legal

21    permanent residents, the political function

22    exception would apply which then in itself

23    triggers rational basis review.

24        And the political function exception, Your

25    Honor, if we look at the conciliation of our

1    alienage cases, you've got Yick Wo, which is --

2    **JUDGE WILSON:**  What's the origin of this

3    argument?  Because the way I read the statute,

4    the statute itself doesn't make any distinction

5    between lawful and unlawful citizens.

6    **MR. JAZIL:**  Your Honor, it's inherent in

7    the word "citizen."  When you have the word

8    "citizen," included within that word are all

9    the various classes of citizens.  So if, for

10   example, we have a law that says black school

11   children can't use a water fountain, there,

12   you've got a very specific designation that's

13   based on race.  And we know that strict

14   scrutiny applies --

15   **JUDGE WILSON:**  And what's your authority

16   for that, for this bifurcated approach?

17   **MR. JAZIL:**  Your Honor, there is no

18   authority one way or the other on this

19   bifurcated approach for alienage.  My point is

20   this, that the alienage cases make sense and

21   you have to consider in a facial context, the

22   word "citizen" to include all the subclasses of

23   different --

24   **JUDGE LAGOA:**  Well, I guess the -- I guess

25   what Judge Wilson is trying to ask is, there is

1          not a supreme court case that addresses a

2          classification where it involves both

3          noncitizens who are here lawfully and

4          noncitizens who are here unlawfully.

5               **MR. JAZIL:**  That's correct, Your Honor.

6               **JUDGE LAGOA:**  So the way I understand the

7          alienage cases is from Graham on is that

8          they're alienage cases that deal with

9          noncitizens who are in the country lawfully,

10         that they're lawful permanent residents or they

11         have some kind of VISA, but they normally --

12         that's why they have the strict scrutiny

13         analysis.

14              **MR. JAZIL:**  Yes, Your Honor.  And I think

15         the key point there is when we look at these

16         cases, it's legal permanent residents who are

17         bringing them.  It's legal permanent residents

18         who are challenging them.  And these cases

19         exist -- the most recent one is 1984, Bernal,

20         three years before Salerno, before we started

21         carving out a clear distinction between facial

22         and as-applied challenges.  And these cases

23         make sense if you consider them as as-applied

24         challenges that are being filed by legal

25         permanent residents.

 1            Cabell, which is a 1982 case, there was a
 2     certified class of legal permanent residents.
 3            **JUDGE LAGOA:**  So here what we're talking
 4     about is solely a facial constitutional
 5     challenge, right?
 6            **MR. JAZIL:**  Yes, Your Honor.
 7            **JUDGE LAGOA:**  They're not -- it's not an
 8     as-applied.
 9            **MR. JAZIL:**  It is not an as-applied
10     challenge.
11            **JUDGE LAGOA:**  And so my understanding now
12     is that under, at least I think Scotis
13     (phonetic) at this point has really clarified
14     that there's a strict standard for facial
15     constitutional challenges.
16            **MR. JAZIL:**  Precisely, Your Honor.
17            **JUDGE LAGOA:**  And that's Salerno.
18            **MR. JAZIL:**  Yes, sir (sic).
19            **JUDGE LAGOA:**  And so I guess the question
20     is do we apply Salerno -- does it apply even
21     though you have citizens -- noncitizens who are
22     here -- so you do have two different standards
23     of review.
24            **MR. JAZIL:**  Your Honor, so if we're using
25     Salerno as the framework and we're assessing

1       this as a facial challenge, it's not brought by

2       legal permanent residents as an as-applied

3       class unlike Cabell, for example.  And we're

4       trying to figure out, okay, in this facial

5       challenge, who's the in-group, who's the

6       out-group?  The in-group is US Citizens.  The

7       out-group is noncitizens.  The out-group, the

8       noncitizen group is then by definition, based

9       on the US Supreme Court case law, divided into

10      different subcategories.  For legal permanent

11      residents, strict scrutiny applies.  For

12      everyone else, rational basis applies.

13           So if we're going through a Salerno

14      analysis, then the question becomes, okay, for

15      the out-group, what level of scrutiny should we

16      apply.  And --

17           **JUDGE LAGOA:**  But does -- I guess the

18      question is:  Does it -- does it matter what

19      the level of scrutiny is?  Because don't you

20      have to -- to survive Salerno, the Salerno

21      challenge -- constitutional test, you have to

22      meet every set of circumstances in order for

23      the facial challenge to prevail.

24           **MR. JAZIL:**  Yes, Your Honor.  And so for

25      the plaintiffs to then prevail based on that

1  test, they have to show that the statute would

2  be unconstitutional when applied to the

3  temporary worker, the illegal alien, et cetera.

4  And they can't do that.

5      **JUDGE GRANT:**  I think that's a very

6  reasonable argument based on Salerno.  But the

7  problem is, it seems like we've already

8  addressed that in Club Madonna.  And I didn't

9  see in your briefs where you really dealt with

10  the problem for you presented by Club Madonna.

11      **MR. JAZIL:**  Thank you, Your Honor.  And

12  I'd like to do that.

13      Club Madonna should be viewed together

14  with the other cases that Club Madonna cites.

15  Club Madonna cites, for example, the DOAH case

16  in the Tenth Circuit.  Club Madonna does not

17  cite Patel, but it's cited in my friend's

18  papers.  And I think what Club Madonna is

19  saying is that when you're looking at a facial

20  challenge and you're assessing whether or not

21  the defendant is trying to put forward a

22  hypothetical, the hypothetical must be relevant

23  to the prohibition that's being applied.

24      In Club Madonna, the argument that was

25  being made by the local government was that,

1    hey, our provision concerning the need to check

2    the immigration status of your independent

3    contractors is not relevant because the club

4    has employees.  And the -- I think the way that

5    Club Madonna should be read is the way Patel,

6    Justice Sotomayor described the distinction is

7    the provision that's at issue is not concerned

8    employees.  So having a hypothetical that does

9    not fall within the ambit of the ordinance

10   doesn't make sense.

11        And I think the example is clear if we

12   consider the facts of Patel.  In Patel, it was

13   the City of Los Angeles saying that police

14   officers can go ahead and look at the

15   information for anyone staying at a motel.  And

16   the City defended by say, whoa, look, that's

17   not a problem.  Because in instances where

18   there's a search warrant, not at issue.

19   Perfectly fine.  In instances where the motel

20   consents, not at issue.  Perfectly fine.  And

21   Justice Sotomayor writing for the court said,

22   well, that's a hypothetical.  That's irrelevant

23   to the analysis because the person with the

24   search warrant doesn't fall within its ambit.

25   The person who has consented doesn't fall

1      within its ambit.

2           And so that, to me, is how you look at

3      Club Madonna, Patel, and --

4           **JUDGE GRANT:**  If your statute had separate

5      provisions for legally present immigrants or

6      people and illegally present people, then I

7      think that might be closer.  But the law

8      doesn't distinguish between the two.

9           And I have a little bit of trouble

10     understanding your argument.  Maybe you can

11     help me.  If you say that even the LPR group of

12     people satisfies strict scrutiny because of the

13     public function exception, then why didn't you

14     just rely on that?

15          **MR. JAZIL:**  Your Honor, I'm making a

16     two-part argument.  The public function

17     exception for -- and we've said this in our

18     brief.  It's difficult to sometimes reconcile

19     all the public function cases.  The public

20     function cases -- I might lose on that issue

21     which is why I'm pushing the Salerno argument

22     as well because this is, at its core, a facial

23     challenge.

24          **JUDGE GRANT:**  Are you saying that we --

25     are you wanting us to say because the law would

1      be upheld for LPRs -- for illegal immigrants,

2      that we should also uphold it for LPRs?  I'm

3      not sure what relief you're seeking.

4           **MR. JAZIL:**  Your Honor, the Court can do

5      two things.  The Court can say, look, the law

6      covers within this ambit all kinds of

7      noncitizens, from the illegal alien to the

8      legal permanent resident.  But we know that

9      even for the legal permanent resident, the

10     public -- the political function exception

11     applies, so rational basis the appropriate test

12     and the state prevails.  If the Court concludes

13     that the political function exception does not

14     apply for the legal permanent residents, what

15     the Court can do is say that for everyone but

16     the legal permanent resident, rational basis

17     applies is met.  For the legal permanent

18     residents, the Court can construe their

19     challenges, an as-applied challenge brought by

20     the named legal permanent residents.  Strict

21     scrutiny applies.  The political function

22     exception does not.  And the State loses with

23     respect to the legal permanent residents.

24           So, Your Honor, there's --

25           **JUDGE WILSON:**  That's a pretty novel

1    argument.  The problem is that there's no real

2    authority that I see anywhere for the

3    application of such a bifurcated approach.

4         **MR. JAZIL:**  With respect, Your Honor, the

5    authority for the bifurcated approach is

6    inherent in the cases that talk about the

7    political function exception.  Because in every

8    one of those instances, it was a legal

9    permanent resident who was bringing the action.

10        I'd ask the Court to consider this, if in

11   those cases an illegal alien had been the

12   challenger, how would those cases have turned

13   out?  The political function exception --

14        **JUDGE LAGOA:**  Right.  But then if you have

15   an as-applied challenge by someone who's

16   unlawfully in the country, they're not going to

17   prevail.

18        **MR. JAZIL:**  Exactly.  Or if you have an

19   as-applied challenge from a temporary worker

20   who has temporary work authorization, for that

21   person rational basis would still apply and

22   they wouldn't prevail.

23        **JUDGE GRANT:**  What rationales did you

24   offer us for applying the political function

25   exception?

1          **MR. JAZIL:** Sure, Your Honor.

2      For the political function exception,

3   there is a two-part case that's discussed in

4   the cases.  It's not exhaustive, as we say.

5   And so the argument we make for the political

6   function exception applying is this is a

7   targeted provision, so it's not overinclusive

8   or underinclusive.  Let's focus on third-party

9   voter registration groups.  And for this

10  targeted provision, it goes to something that

11  is critical to the election administration

12  process, elections being critical to the

13  functioning of a representative democracy.

14  This is the language from some of the cases,

15  Your Honor.  And so the political function

16  exception should apply.

17      The argument boils down to this, 3PVROs

18  are fiduciaries of the voter.  They're

19  extensions of the elections officials who help

20  people register to vote.  So the 3PVROs are

21  doing an inherently political function.  They

22  are unlike, for example, the Japanese fishermen

23  who were excluded from fishing three miles off

24  the coast of California shortly after World

25  War II.  They are unlike the laundrymen and

1    women in Yick Wo who were pursuing an economic

2    interest.  They're unlike notaries even.

3    Notaries, the alpha and omega for a notary is

4    not to do something that furthers the

5    sovereigns election administration process.

6    Notaries do all kinds of things.

7         3PVROs, the alpha and the omega.  The only

8    thing that they are tasked with doing is taking

9    a form from a voter and giving it to the

10   appropriate elections official.  That's a

11   critical part of the election machinery.  And

12   so --

13        **JUDGE GRANT:**  For what it's worth, I think

14   that's a pretty good argument.  I don't know,

15   maybe I need to reread your briefs.  I found

16   your briefs a little thin on that point.  It

17   seemed to me that the main argument you were

18   making was that maybe people who are not

19   citizens would suddenly leave the country

20   before handing over the voter registration

21   documents.  That doesn't seem to quite carry

22   the day with me.  I didn't necessarily hear you

23   making these argument you're making now.  Where

24   did I miss those?

25        **MR. JAZIL:**  Your Honor, they're in the

1     papers.  I apologize for not making them in a

2     crisper way.  But the argument about the

3     fiduciary duties that these 3PVROs have is in

4     our initial briefs.  It's -- if you look at the

5     discussions of the Servontis (phonetic) case

6     from the former Fifth Circuit, we talk about

7     how the election administration function is

8     important and it's critical.  And that's in our

9     papers.

10          Yes, Your Honor.

11          **JUDGE WILSON:**  You're about out of time,

12     but this is an important case.  I'd like to

13     give you two more minutes to address the

14     retention provision.

15          **MR. JAZIL:**  Thank you, Your Honor.

16          And for the retention provision, we cite

17     in our briefs a link to the voter registration

18     form.  The voter registration form gives us the

19     ambit of the information that is being

20     exchanged from the voter, the purported

21     potential future vote to the 3PVROs.  And that

22     form says that all the information, your phone

23     number and email address that's provided become

24     public record except for the following:  The

25     Florida driver's license number, Florida ID

1    number and your Social Security number.  We

2    look at the statute that the Florida

3    legislature passed, it said you can retain --

4    pardon me.  That you cannot copy certain

5    information, which is the Florida driver's

6    license number, Florida ID number and the

7    Social Security number.

8         **JUDGE LAGOA:**  And just so, since I had to

9    submit a lot of documents in my time as an

10   official in Florida, that information, though,

11   because it is public, it's still uploaded but

12   it's blacked out, that information, is my

13   understanding of how that works.

14        **MR. JAZIL:**  Your Honor, it is not blacked

15   out for ordinary Floridians.  If you are a

16   judge, for example, or you're a prosecutor,

17   that information is blacked out for other

18   reasons.

19        **JUDGE LAGOA:**  So that information -- so if

20   someone wanted to see the registration

21   information of this individual, that

22   information would be available or it's not

23   available?

24        **MR. JAZIL:**  So, Your Honor, here's the

25   information that's available.  We've got the

1   voter registration form.  It's got the date of

2   birth.  The date of birth is available.  It's

3   got your Florida driver's license number,

4   Social Security number, that is not available.

5        **JUDGE GRANT:**  Okay.  Does it have your

6   mother's maiden name, too?  I mean --

7        **MR. JAZIL:**  It does not, Your Honor.  The

8   form is one page.  The back page is just the

9   addresses for the supervisors of elections.  So

10   the information, the entire universe of

11   information that is included and excluded

12   exists on one side of one piece of paper.  And

13   the Florida statute discusses which things are

14   actually excluded.

15        Now the arguments being made, we don't

16   know what information's excluded, we've got a

17   pretty good list.  And that list is not

18   exclusive because it's got the "such as"

19   showing that it's illustrative.  However, the

20   form, which can be changed through rule

21   making --

22        **JUDGE WILSON:**  Would the statute apply to

23   the mailman who delivers a ballot?

24        **MR. JAZIL:**  It would not apply to the

25   mailman who delivers the ballot.  And, Your

1     Honor, here's the distinction.  It does not

2     apply to the mailman.  It does not apply to the

3     person who is working in --

4         **JUDGE WILSON:**  It's clear from the

5     statute?

6         **MR. JAZIL:**  Yes, Your Honor, it is.

7     Because third-party voter registration

8     organizations is defined elsewhere in the

9     statute.  So the statute would not apply to the

10    postal service.  But, again, Your Honor, postal

11    services are government agencies.  The postal

12    service has its own police force.  3PVROs, we

13    have no oversight over.  We don't know who's

14    training them, how they're being trained, what

15    measures they have.  So it's appropriate to

16    make a distinction between --

17        **JUDGE WILSON:**  Supervisor and the --

18        **MR. JAZIL:**  Precisely, Your Honor.  We

19    have a rule, a security rule, for supervisors,

20    for other election administration officials.

21    The postal service has their own police force.

22    For 3PVROs, what do we have?  None of that.  So

23    I think it's appropriate to make a distinction

24    between 3PVROs and others.

25        **JUDGE LAGOA:**  And for the retention issue,

1    the challenge is a vagueness challenge?

2       **MR. JAZIL:**  It is a facial vagueness

3    challenge, yes, Your Honor.

4       **JUDGE WILSON:**  Resulting in criminal

5    penalties.  You can go to jail.

6       **MR. JAZIL:**  Yes, Your Honor, you can go to

7    jail.  But regardless of whether or not

8    criminal penalties are triggered, the test is

9    the same.  The question comes down to is there

10    an understandable core.

11       **JUDGE WILSON:**  We, of course, give less

12    tolerance to statutes carrying criminal

13    penalties if there's a constitutional

14    objection, don't we?

15       **MR. JAZIL:**  That is correct, Your Honor.

16    So I guess one way to consider this -- and,

17    Your Honor, I've lost track of time, but is

18    that --

19       **JUDGE WILSON:**  Answer the question.

20       **MR. JAZIL:**  Yes, Your Honor.  For criminal

21    penalties, we do look at the statutes harder

22    but the test is the same.  So the question

23    still comes down to is there an understandable

24    core.

25       **JUDGE WILSON:**  Got you.  Thank you.  All

1       right.

2           All right.  Mr. Cepeda Derieux.  Am I

3       pronouncing your last name correctly?

4           **MR. CEPEDA DERIEUX:**  Derieux, Your Honor.

5       Cepeda Derieux.

6           Good morning, Your Honors.  And may it

7       please the Court, Adriel Cepeda Derieux for the

8       Hispanic Federation Plaintiffs.  The plaintiffs

9       are splitting their time this morning.  As my

10      clients only bring the equal protection

11      challenge, I'll be speaking to that issue.  And

12      then I'll yield to Ms. Khanna.

13          Your Honors, the defendants ask this Court

14      to blaze a new trail.  And for the first time

15      ever, apply something less than strict scrutiny

16      to a blanket classification based on alienage.

17      But the law here is clear, as the panel just

18      said.  Categorical lines drawn on alienage are

19      inherently suspect.  That's from the Bernal

20      case.  And the supreme court has kept that line

21      each time it has considered a blanket

22      classification that targets alienage starting

23      with Takahashi.  But then through Graham,

24      through Nyquist, Sugarman.  Each of the laws at

25      issue in those cases facially discriminated

1    against all aliens as a class without

2    differentiation as the law here does.  And the

3    court said that they were presumptively

4    unconstitutional and struck them down in full

5    without differentiation as to the aliens that

6    could be subclassified under that blanket

7    classification.

8        The State, Mr. Jazil, cannot change that

9    precedent.  Instead, the State looks to the

10   no-set-of-circumstances test or framework that

11   Salerno applies.  But, Judge Grant, you're

12   absolutely right, Judge Marcus' discussion for

13   the court in Club Madonna gives us the best way

14   to look at Salerno.  Salerno asks us to look at

15   the proper constitutional test, the

16   constitutional framework.  Once that test is

17   satisfied or once the Court is satisfied that

18   that is the applicable test, it applies it.

19   And here, that test is strict scrutiny.  Again,

20   those cases, Bernal, Nyquist, a line of at

21   least six cases --

22        **JUDGE LAGOA:**  But do you agree or not?  I

23   mean, I'm interested in hearing your answer.

24   Do you agree that strict scrutiny is not

25   applied if you consider a noncitizen who is

1   unlawfully in the country?

2       **MR. CEPEDA DERIEUX:**  Your Honor, the

3   supreme court has applied a lower tier of

4   scrutiny for undocumented noncitizens.  For

5   example, in the Plyer case.  But the first step

6   is always to look at the law.  Black Letter

7   equal protection law says you look at the

8   classification that the statute draws.  And

9   here, there is no subclassification between

10  undocumented noncitizens.  The law, as written,

11  divides between US Citizens and everyone else.

12      **JUDGE GRANT:**  What about the public

13  function exception, though?  Because it seems

14  that the cases where those laws are found to be

15  equal protection violations were cases where

16  noncitizens were being excluded for more, you

17  know, reason -- intending to exclude those

18  people because they were not citizens, rather

19  than intending to keep the political core

20  function limited to citizens.  I know it can

21  seem like a fine distinction, but I think it's

22  an important one.

23      And it seems to me that there might be

24  some tension in your argument that this is such

25  a -- these third-party voter registration

1      organizations are so crucial for our democracy

2      and crucial for voters and really important to

3      having the people be heard in our democratic

4      process but also there should be, you know,

5      nothing about the kind of political community

6      of citizenship in terms of who gets to be so

7      deeply involved in that process.  Can you sort

8      out that tension for me?

9            **MR. CEPEDA DERIEUX:**  Of course, Your

10     Honor.  And I agree, it's an important

11     distinction.  Things can be two things

12     sometimes.  The 3PVROs can be doing incredibly

13     important work for their communities and to

14     ensure that the voters of Florida are able to

15     register.  But the political function cases,

16     the political function cases are specific and

17     speak to the right of citizens to be governed

18     by other citizens.  They speak to control.

19     That is why it is a very narrow exception that

20     has only been applied by the supreme court in

21     cases like Foley, involving police officers

22     walking the beat.  In cases like Cable,

23     involving probation officers that have control

24     over whether someone is detained or not.  And

25     Ombach which related to public school teachers.

1              And --

2              **JUDGE GRANT:**  And do you think -- I don't

3       necessarily think that today you and your

4       organization would be likely to argue that LPRs

5       should not be able to be public school teachers

6       because that's too central to guiding our

7       children, right?  I mean, it seems that the

8       language of some of these cases maybe runs up

9       against some tension with what they actually

10      do.  I mean, I suspect that many states have

11      allowed a wide variety of people besides

12      citizens to serve as public school teachers.

13             **MR. CEPEDA DERIEUX:**  I would assume so,

14      Your Honor.  I don't know off the top of my

15      head and I would not be making --

16             **JUDGE GRANT:**  No reason -- there would be

17      no reason for you to look into that, but --

18             **MR. CEPEDA DERIEUX:**  But I would point the

19      Court to the very case that the defendants cite

20      for their argument.  The Servontis case from

21      the old Fifth Circuit here makes the point.

22      The exception is so narrow because the -- the

23      board in Servontis was a great example.  That

24      board had power to allocate between 5- to

25      $10 million in 1981, so we're talking over

1       $30 million in today's money, and the court in

2       Servontis said that that level of discretion

3       surpassed even that of a police officer or a

4       public school teacher.

5            So it, again, boils to the fact that the

6       political function exception is about

7       discretion.  It is about the rights to be

8       governed and controlled by other citizens, the

9       issues here are about coercive control in the

10      case of police officers and probation officers.

11           This case, Your Honors, is like Bernal.

12      The notaries at issue in Bernal handled very

13      sensitive matters and had discretion to even

14      refuse to take them on.  Notaries in Bernal had

15      discretion to refuse to notarize deeds, to

16      notarize mortgages, sensitive matters that

17      affect the daily lives of citizens much like

18      police officers, much like public school

19      teachers.  And the supreme court still said

20      that those roles were ministerial and clerical

21      because they were so highly regulated.  The

22      State has been adamant on this, 3PVROs are

23      highly regulated.  They are cogs in the

24      machine.  The State has called them in their

25      briefs.

1          **JUDGE GRANT:**  But notaries, I can't resist

2     asking if you are familiar with the Georgia

3     Hero three-year letterman who is often tweeting

4     about his notary status and how crucial it is.

5     Your face says no.

6          **MR. CEPEDA DERIEUX:**  I'm not familiar,

7     Your Honor.

8          **JUDGE GRANT:**  Anyway, he would definitely

9     agree that notaries are a crucial part of our

10    democracy.

11         **JUDGE LAGOA:**  But notaries have licenses,

12    correct?  I mean, they normally have -- are

13    regulated by -- the State of Florida has -- I'm

14    sure they're part of Department of Business

15    Regulation where they have a business license

16    and they can get their business license

17    suspended.  But here, I mean, if someone is --

18    how is it ministerial for someone to collect

19    registrations?  I mean, there's no -- there's

20    nothing in the state of Florida that says that

21    they regulate these individuals.

22         **MR. CEPEDA DERIEUX:**  Your Honor, I would

23    disagree.  I believe Mr. Jazil explained how

24    highly regulated 3PVROs are in the state of

25    Florida.  And the appellate record that they

1   have submitted has several violations that they

2   have assessed against or levied against 3PVROs.

3        The problem here is that none of those

4   violations go to the problem that they have

5   purportedly identified in saying that by

6   denying all noncitizens the chance to help

7   register other voters, they are somehow

8   furthering the purpose of having timely

9   delivered applications.

10        To borrow from Chief Judge Walker's

11   opinion, they have not married the two at all

12   whatsoever.  And because they have drawn a

13   classic alienage classification, we are in

14   strict scrutiny land and the State can -- just

15   can't meet that test.

16        I see my time is up, Your Honor.

17        **JUDGE WILSON:**  All right.  Thank you,

18   Counsel.

19        Ms. Khanna.

20        **MS. KHANNA:**  Thank you, Your Honors.  Good

21   morning.  May it please the Court, Abha Khanna

22   on behalf of the Florida NAACP Plaintiffs.

23        I'll be addressing both the provisions at

24   issue today.  But I'll quickly pick up where my

25   colleague left off on the political function

1      exception.  I understand the confusion but I

2      think that we can distill it down to a few key

3      factors as set forth very clearly in the Bernal

4      test.

5           In Bernal at page 226, the court raises

6      the same questions Your Honor has raised, Your

7      Honors have raised about, well, isn't this an

8      important exception?  Is this an important

9      function where failure can have really serious

10     consequences?  And what the court says is what

11     distinguishes personnel from those to whom the

12     political function exception applies is that

13     the latter are invested either with

14     policy-making responsibility, broad discretion

15     in the execution of public policy, or the

16     routine exercise of authority over individuals.

17          **JUDGE GRANT:**  But does Bernal really set

18     that up as a test or is that one of many things

19     that describe the exception in that case?  For

20     instance, I see the exception has -- that has

21     been labeled the political function exception

22     applies to laws that exclude aliens from

23     positions intimately related to the process of

24     democratic self-government.  Why isn't

25     registering voters intimately related to the

1      process of democratic self-government?

2          **MS. KHANNA:**  Bernal does establish it as a

3      test.  It's a very clear two-factor test.  And

4      when it uses that phrase, it uses it as a

5      modifier for the broad discretion and

6      policy-making authority that defines the

7      function, that separates the function from

8      other things.

9          And here, the very language that my --

10     that my opposing counsel relied on to suggest

11     that the political function exception should

12     apply actually just says the opposite.

13     Defendants have conceded below that canvassers

14     are not vested with discretion and do not

15     engage in policy-making authority.  Those are

16     the two key portions of the Bernal

17     second-factor test.

18         And here in their brief before this Court,

19     they say, again, just as my colleague said

20     today, that the alpha and omega of a 3PVROs'

21     authority is to deliver a form from one place

22     to another.  That's it.  That is not

23     policy-making authority.  That is not broad

24     discretion.  And that has no authority over any

25     other individual.

1      **JUDGE GRANT:**  Then I'll go back to the
2    question I asked your friend at your table,
3    why -- if all it is is dropping things in the
4    mail, then why do your organizations conceive
5    of it as so crucial to the political process to
6    have this -- have this going on?
7      **MS. KHANNA:**  We believe that it is vital,
8    important work.  Is it crucial to the election
9    administration process?  No.  Is it important
10   to the First Amendment rights of our clients?
11   Yes.
12     **JUDGE GRANT:**  But is it vital to the
13   democratic process and political community in
14   our country?
15     **MS. KHANNA:**  I mean, I don't think it is a
16   sine qua non of election administration the way
17   other, you know, political functions would be.
18   This is something that our clients are
19   exercising, we believe, important rights in
20   performing an important service in a private
21   setting, in a private nonprofit setting that is
22   highly regulated.  They have to register with
23   the State of Florida.  And the State of Florida
24   has told them they have no discretion.  They've
25   got no policy-making authority.  They've got no

1    authority whatsoever.

2        **JUDGE WILSON:**  So they're not registering

3    voters, they're just collecting or handling

4    applications, is that my understanding?

5        **MS. KHANNA:**  I think by defendants'

6    concession, they viewed these -- this function

7    as basically a delivery mechanism.

8        **JUDGE LAGOA:**  Why --

9        **MS. KHANNA:**  Not as a political function.

10       **JUDGE LAGOA:**  But the form that they're

11   handing out is a voter registration form, no?

12       **MS. KHANNA:**  Yes, Your Honor.

13       **JUDGE LAGOA:**  Am I correct about that?

14       **MS. KHANNA:**  Absolutely.

15       **JUDGE LAGOA:**  It's not like just

16   collecting general information, it's a voter

17   registration form and then they're supposed to

18   turn that in to the secretary of state or

19   whoever the election official is in the area

20   that they're collecting the materials.

21       **MS. KHANNA:**  Yes.  And you're right, the

22   voter registration form is an important form.

23   Just like the things that notaries document

24   are -- can be highly important.  In fact,

25   notaries often document things that are related

1   to elections.  And in Bernal, the court
2   addressed this --
3        **JUDGE WILSON:**  But they're not
4   contributing anything that forms are -- they're
5   not -- they're just handling, collecting, and
6   sending it back to the supervisor of elections.
7   Is that all they're doing?
8        **MS. KHANNA:**  Exactly.  It's the function,
9   Your Honor.  The importance of the form, the
10   importance of the service is not --
11        **JUDGE LAGOA:**  -- don't have to sign?  They
12   don't have to sign and witness the form or do
13   anything like that?
14        **MS. KHANNA:**  I mean, they don't serve as
15   notaries to be sure.  And while the State makes
16   much of the fact that they serve as
17   fiduciaries, all that basically means is they
18   are -- it's important that the voter
19   registration form --
20        **JUDGE LAGOA:**  I saw a form in the record,
21   but I guess maybe that's just a timesheet
22   maybe.  Do you have like -- it looked like
23   there was a form where it had five hours and
24   then it had a number for the number forms
25   collected.

 1          **MS. KHANNA:**  So certainly --

 2          **JUDGE LAGOA:**  Maybe that must be like a

 3     form that's individual to the organizations?

 4          **MS. KHANNA:**  Yeah.  I think that's right,

 5     Your Honor.  I think that they keep a number of

 6     documents to make sure that they're tracking

 7     who they've registered.  Precisely to defend

 8     against potential alleged violations here.  But

 9     that -- again, the importance of the form is

10     not the key factor.

11          In Bernal, the court said that the notary

12     function is extremely important.  I mean, if

13     we're talking about the -- you know, an

14     examining board on in other cases, the courts

15     have said that members of the State Bar, right,

16     these are -- I mean, a lawyer is as fiduciary

17     to a client like nothing else and these are

18     very important functions.  But the importance

19     of the function is not the same as saying it is

20     a political function exception.  That requires

21     policy-making, that requires broad discretion,

22     and it requires authority.

23          **JUDGE GRANT:**  But do you think teachers

24     make policy?

25          **MS. KHANNA:**  I think teachers exercise

1       broad discretion in the classroom and that is

2       exactly what the Ombach case says is that

3       when -- you know, they're not following a

4       script.  They're not doing a road to activity,

5       they are deciding what curriculum and how to

6       deliver that curriculum.  And it is that

7       discretion, that broad discretion that makes it

8       fall clearly within the Bernal test for

9       political function exception.

10          In my remaining time, I'd like to turn to

11      the information retention ban and make clear

12      that the due process violation is inherent in

13      the vagueness of the terms of the statute.

14          The statute prohibits retention of

15      personal information.  But personal information

16      is not a term with a singular meaning, not as a

17      matter of Florida law --

18          **JUDGE LAGOA:**  Right.  But doesn't the

19      statute specifically say that the information

20      that is -- the problematic information that the

21      State does not want to be retained is the

22      voter's Florida driver's license, the number --

23      the Florida identification card number, or the

24      Social Security number or signature?  I mean,

25      those are all very personal, private

1         information that individuals possess.

2              **MS. KHANNA:**  Those are types of

3         information that are prohibited here.  But that

4         is not an exhaustive list.  It is "such as."

5         And so the question remains, what else is

6         possibly included in that?  Florida statutes

7         typically define personal information when they

8         use that term, and they define it in different

9         ways.  Sometimes it is about that most

10        sensitive information that you just outlined.

11        Sometimes it is about personal contact

12        information.  Even as a matter of common

13        understanding, when I go to the doctor's office

14        and they ask for my personal information, what

15        do they usually mean by that?  My contact

16        information?  Probably.  My driver's license

17        information?  Probably not.  There is no

18        uniform definition.  And the fact that they

19        provide this non-exhaustive list, if anything,

20        only doubles down on the confusion.  Sitting

21        here --

22              **JUDGE GRANT:**  Why doesn't it just mean

23        anything about that person, right?  That seems

24        fairly straightforward.

25              **MS. KHANNA:**  And if that's true, Your

1     Honor, then I -- then I, sitting here today, do
2     not know what information is considered
3     personal information.  Is it just
4     highly-sensitive information?  Is my cell phone
5     number and my email address considered my
6     personal information?
7          **JUDGE GRANT:**  I would think of all of it.
8          **MS. KHANNA:**  If that is clear, Your
9     Honor -- that is not at all clear from the
10    statute.  The statute says information like the
11    driver's license number, like Social Security
12    number.  It says nothing about whether or not
13    it sweeps that broadly.  Right.  There are some
14    people for whom my cell phone number, email
15    address feels personal.  It's personal to them.
16    But I believe that the State has argued that it
17    actually doesn't have that broad an ambit --
18         **JUDGE LAGOA:**  But what the statute says is
19    really you can -- it says you can -- you cannot
20    copy.  So just like here, this application that
21    someone filled out, you can't copy it for any
22    other reason other than to provide it to the
23    third-party voter registration organization in
24    compliance with this section.  So basically
25    you're saying, you can't make a copy of this

1    and keep it for your personal benefit.  You can

2    copy it and give it to the voter -- to the

3    third-party voter organization, but you can't

4    collect it and copy it for your own reason,

5    your own purpose.  So I'm like, how is that not

6    clear?

7         **MS. KHANNA:**  Respectfully, Your Honor,

8    there's so many questions inherent to that.

9    The term (sic) says both "copy" and "retain."

10   3PVROs typically get contact information so

11   that they can follow up with these registered

12   voters.  Can they still do that under this

13   provision?  It's unclear.

14        If you read the State's own briefs, what

15   can they do with the -- let's assume that we

16   even do understand what personal information

17   is, and I don't think that is clear at all.

18        **JUDGE LAGOA:**  I mean it says if a person.

19   It doesn't say an organization.  It says a

20   person.  I mean, the third-party voter

21   organizations are not persons, are they?

22        **MS. KHANNA:**  I would say not.  However, in

23   the State's brief, they make clear that at some

24   point a person is bound by the information

25   retention ban, such as when a plaintiff is

1    collecting.  But they are otherwise not bound

2    by the information retention ban when they're

3    just handling it.  So if they're up the chain

4    of command, then what?  Can they use the

5    personal information for any purpose

6    whatsoever?

7         And if you look at the -- what the -- the

8    supposed regulation that's meant to clarify, it

9    only, again, doubles down on the confusion

10    because there, the State says, actually it does

11    apply to people who -- to the 3PVROs generally.

12    There's several times in the State's brief --

13    on page 24 of the State's brief --

14    **JUDGE LAGOA:**  But it says -- so this

15    really says if a -- it's about the information

16    that you collect with your voter registration

17    applications.  I mean, there's nothing in there

18    that says that at the time that you're

19    registering people, that you can't have a

20    separate thing saying, would you like to

21    become -- would you like to have information

22    collected so that we can contact you for other

23    things?

24    **MS. KHANNA:**  Your Honor, I mean, I think

25    that reasonable minds could be very varied.  I

1        mean, I think that's -- I think that's fair.  I

2        think it's a fair reading of the statute.  But

3        all I know is if I -- sitting here as a lawyer

4        whose job it is to parse the language and spent

5        days doing that, I don't really understand what

6        is prohibited and what is not.

7             And so if -- and that's not just a matter

8        of idle curiosity.  Here we have ordinary

9        people who can accidentally, with no sign-to

10       requirement, stumble into a felony conviction

11       because they don't understand what line

12       distinguishes lawful from unlawful.  I would

13       submit that even the State does not understand

14       what line distinguishes lawful from unlawful.

15       And there's nothing in the State's brief,

16       nothing in the statute and nothing in the

17       regulations that clarifies that line for a

18       reasonable person to know, I can do this but I

19       can't do that.  I can do this when I'm acting

20       as a collector.  I can't do this when I'm

21       acting as a handler.  I can collect some

22       personal information but not all personal

23       information.  I can retain it for some purposes

24       and not others.

25            All of these questions remain outstanding.

1    And all of these questions remain unanswered by

2    the statute at issue and therefore it is

3    unconstitutionally vague.

4        **JUDGE WILSON:**  All right.  Thank you,

5    Ms. Khanna.

6        **MS. KHANNA:**  Thank you, Your Honors.

7        **JUDGE WILSON:**  Mr. Ferguson, on behalf of

8    the League of Women Voters.

9        **MR. FERGUSON:**  Good morning, Your Honors,

10   Brent Ferguson representing the League of Women

11   Voters of Florida as amicus.

12       May it please the Court.  I'd like to

13   address both points today, the personal

14   information restriction and add a brief point

15   on the citizenship end.  I'd like to start by

16   addressing a question that Judge Lagoa just

17   asked about focusing on who the statute applies

18   to and what they can do with the information.

19       Judge Lagoa, I believe you asked

20   Ms. Khanna if someone is collecting voter

21   registration applications as a volunteer, are

22   they allowed to separately take someone's

23   information and retain that?  And I would argue

24   that by the terms of the statute, that's

25   clearly not allowed, although the State may

1　　　argue it is.  The statute by its terms, applies

2　　　to a person collecting voter registration

3　　　applications on behalf of a 3PVRO and says they

4　　　can't retain any of the voter's personal

5　　　information.

6　　　　　　**JUDGE LAGOA:**  Well, I asked that question

7　　　because obviously like the League of Women

8　　　Voters, they're not just in the business of

9　　　registering voters, you're also -- you also do

10　　　candidate forms, you also do forms involving

11　　　particular policy issues.  So I guess the

12　　　question I have is, I mean, there isn't

13　　　anything that precludes an individual to say,

14　　　hey, we have a candidate form coming up on, I

15　　　don't know, a school board and, you know, would

16　　　you like us to contact you so that you can

17　　　attend?

18　　　　　　**MR. FERGUSON:**  Your Honor, I would say by

19　　　the terms of the statute, if you do that as

20　　　part of collecting a voter registration

21　　　application, it would likely violate the law.

22　　　I agree that you could separately do that,

23　　　certainly.  But by the terms of this statute,

24　　　that wouldn't be allowed and that creates a big

25　　　problem for the League as you point out.

1      **JUDGE GRANT:**  Isn't it -- couldn't the

2      purpose of that be to keep third-party voter

3      registration organizations to what it is that

4      they say they're doing, which is registering

5      voters rather than kind of reaching these

6      people for other purposes?

7      **MR. FERGUSON:**  Your Honor, that very well

8      may be the purpose, but I think the focus here

9      is on the vagueness of this law and the

10     organizations not knowing what they're allowed

11     to do.

12          Now, of course, there's a First Amendment

13     issue with regard to this provision as well.  I

14     believe the State's making a narrowness

15     argument in response to that.  I do think that

16     there's First Amendment interests that the

17     League and other organizations have in

18     retaining someone's information to ask them to

19     be a member.  That's not at issue right here.

20          But what I'd like to drill down on a

21     little bit that we haven't addressed yet is

22     what I think is the real core problem and the

23     real core vagueness of this statute, and that's

24     who it applies to.

25          So the statute as I just said, applies to

1    anyone who's collecting voter registration

2    applications as a part of a 3PVRO.  And the

3    State argues in its briefing that this only

4    applies to volunteers who directly collect an

5    application from a voter.  But, of course, by

6    the terms of the statute, it would also apply

7    to anyone who's a supervisor, supervising

8    several volunteers, and that's because it uses

9    the term "collecting."

10       And if you -- let's start with the text,

11   the first reason that this is unclear.  The

12   State uses Miriam Webster to define the term

13   "collecting" as gathering from a number of

14   persons.  Now clearly, of course, that applies

15   to someone who's a volunteer gathering directly

16   from voters, but it also applies, of course, to

17   someone who's a supervisor, supervising five

18   volunteers who then bring their applications

19   together and the supervisor collects it.

20       And so the State's narrowness argument is

21   simply a textural.  And that creates a problem.

22   The legislature clearly could have written the

23   law to say it only applies to people who are

24   collecting directly from voters and it doesn't

25   do that.

1       **JUDGE GRANT:**  What would be the purpose of

2       such a -- I've got questions for them about why

3       they would narrow that it way.  Because if your

4       goal is to avoid these organizations retaining

5       the forms, I don't know why you would intend

6       for it only to be the person who receives it in

7       the first place.

8       **MR. FERGUSON:**  That's exactly my next

9       point, Your Honor.  It's nonsensical to make

10      that argument because it creates such a narrow

11      statute that it doesn't serve their purposes.

12      Now the State argues that its purpose is to, as

13      you said, Your Honor, protect people's private

14      information.  But if it can be completely

15      avoided by simply handing the application to

16      anyone else that works at your organization or

17      really anyone else in the world, then there's

18      no reason to have that statute.

19          And I'll move on to the --

20      **JUDGE LAGOA:**  May I --

21      **MR. FERGUSON:**  Yes, of course.

22      **JUDGE LAGOA:**  -- ask a question?  I'm just

23      kind of curious about the -- sort of the -- how

24      it works.  So when you get this voter

25      registration application, it says you have to

1       provide a valid driver's license or a Florida

2       ID number.  And if you don't have one, then

3       that's when you give the Social Security.

4       card -- your Social Security number.  But do

5       you -- does the person who is registering, do

6       they have to provide the Florida ID to the

7       person who's collecting the information?  I'm

8       just curious.

9           **MR. FERGUSON:**  Do they have to provide

10      their actual ID?

11          **JUDGE LAGOA:**  Like, do they have to -- so

12      the person confirms that this is who the person

13      is or --

14          **MR. FERGUSON:**  I believe, Your Honor, if

15      they're doing the registration online, they do.

16      I don't think they have to -- I don't think

17      there's any rule that they have to hand their

18      ID while they're doing a paper registration but

19      I'm not a hundred percent sure about that.

20          **JUDGE LAGOA:**  Okay.  Thank you.

21          **MR. FERGUSON:**  Very quickly.  The third

22      reason that the State's interpretation doesn't

23      make sense is because it conflicts with the

24      rule they promulgated in this case.  Now the

25      State is arguing on appeal that, as I said,

1    this statute only applies to people directly

2    collecting applications from voters.  But the

3    rule is much broader.  And it says 3PRVOs as a

4    whole aren't allowed to do this.

5         Now as Your Honor, Judge Grant, said, that

6    would make more sense with regard to the

7    purpose of the statute but that's not what the

8    State is arguing here.  And the rule certainly

9    goes far beyond that.

10        Now I'd like to --

11   **JUDGE GRANT:**  By the way, what do we do if

12   the -- if the rule is -- if we think the plain

13   reading of the rule is broader than the State

14   says it is, what does that do?  If I think it

15   just covers everything obviously and the

16   State's saying it covers less, is that still

17   vague or are they just arguing for a too narrow

18   approach to the statute and it can stand

19   because obviously it just covers what it

20   covers?

21   **MR. FERGUSON:**  Of course, the rule isn't

22   being challenged here right now.  And I would

23   say the purpose of this argument here is just

24   to lay bare how the State's narrowness argument

25   doesn't align with their actual belief as to

1        the coverage of the statute.  That's what I --
2        how -- the simplist way to think about it, I
3        think.
4             And I see my time is almost out.
5             I'd like to say very quickly on the
6        citizenship end, the State makes -- mainly
7        makes the Salerno argument arguing the rational
8        basis applies.  The State also gave you the
9        option today of severing the statute and saying
10       that if the statute is unconstitutional as
11       applied to legal permanent residents, then it
12       can be partially struck down.  Now that
13       argument is abandoned.
14            And if, Your Honor, if I could take 30
15       more seconds to go into that.
16            **JUDGE WILSON:**  All right.
17            **MR. FERGUSON:**  Now that argument has been
18       abandoned on appeal.  And the important point
19       here is that if the State wants to argue that a
20       statute should be severed, then that's a
21       complex argument.  Because the supreme court
22       has said in cases like Reno versus ACLU that
23       judges shouldn't rewrite statutes.  They should
24       allow the legislature to do that.  Very rarely
25       does a court go into a statute and strike down

1        part of it and not strike down another.  Now

2        the State could argue that this is an

3        appropriate case and they have not done so on

4        appeal.  And so I think it would be

5        inappropriate at this point on appeal to do

6        that severing.

7                **JUDGE WILSON:**  All right.  Thank you --

8                **MR. FERGUSON:**  Thank you.

9                **JUDGE WILSON:**  -- Mr. Ferguson.

10               Mr. Jazil, you reserved some time for

11       rebuttal.

12               **MR. JAZIL:**  Thank you, Your Honors.

13               I'd like to talk --

14               **JUDGE LAGOA:**  Can you talk about the

15       last -- the last argument made by counsel for

16       the League which is accurate, which is that we

17       do not rewrite statutes?

18               **MR. JAZIL:**  That is entirely correct, Your

19       Honor.  And my friend may be misconstruing my

20       argument.  My argument is this, they bring a

21       facial challenge.  The Court can construe a

22       facial challenge as an as-applied challenge.

23       And it would be an as-applied challenge brought

24       by the legal permanent residents who are the

25       named plaintiffs in this case.  If they later

1        certify a class of legal permanent residents,

2        that's another issue.  That brings us into the

3        Cabell territory because there, there was a

4        certified class of legal permanent residents

5        who were challenging something.  So my friend

6        seems to be misconstruing that argument.

7            JUDGE GRANT:  So you would want us to say

8        that it is -- the statute is valid as applied

9        to their one plaintiff?

10           MR. JAZIL:  Well, Your Honor, I would like

11       you to say that the statute --

12           JUDGE GRANT:  Well, sure, but --

13           MR. JAZIL:  -- constitutional, but if Your

14       Honor does not believe that the political

15       function exception applies, then Your Honor can

16       construe the plaintiff -- plaintiffs -- I don't

17       remember off the top of my head, Your Honor,

18       how many of them are legal permanent residents,

19       but there is at least one.  That as applied to

20       them, this statute is unconstitutional.  If

21       later they wish to certify a class of legal

22       permanent residents, that would be the

23       appropriate way to get the kind of class-wide

24       relief they're seeking.  But that hasn't

25       happened.

1      **JUDGE GRANT:**  Wouldn't the rules of

2      precedent end up giving them the kind of

3      class-wide relief they're seeking anyway?  I

4      mean, it's different if a district court does

5      it.  But once the circuit court that has

6      authority over Florida says that, then why

7      would they need a class?

8      **MR. JAZIL:**  Fair question, Your Honor.

9      And as a practical matter, the State would

10     abide by the published opinion of the 11th

11     Circuit.

12     Your Honor, I would also like to focus on

13     a couple of other things that were said about

14     the political function exception.  My friends

15     tried to read a rigid formalism into the

16     political function exception's two-part test.

17     That does not exist.

18     Your Honors, as I point you to the Bernal

19     case, which is the one they rely on, Bernal

20     says on page 225 the task under the second

21     prong, which is the discretion, et cetera, is

22     whether or not the exclusion implicates

23     responsibilities that go to the heart of the

24     democratic government.  It talks about how the

25     test is not exclusive.  And then it talks about

1      how the actual function of the position is

2      dispositive.

3          If we look at Servontis, the function

4      prong is what Judge Wisdom, writing for the

5      former Fifth Circuit, focused on.  The function

6      is what's critical.  When we're looking at the

7      function, we know that folks who are sitting on

8      juries can be citizens.  Votes who vote can be

9      citizens.  Lawyers who appear in front of those

10     juries, Griffiths, the United States Supreme

11     Court said they don't need to be citizens.  And

12     so the function is a critical issue.

13         And then my friends --

14         **JUDGE GRANT:**  What about the fact that

15     this is all very rote?  They are supposed to

16     get the form, have the person fill it out,

17     encourage them to fill it out and then turn it

18     in?

19         **MR. JAZIL:**  And as I understand that

20     argument, Your Honor, is that it's rote and

21     therefore there's nothing to see here.  It's

22     not a part of the election administration

23     process.  I vehemently disagree.  If someone

24     turns in a form to one of these organizations

25     and they do not deliver it, the person cannot

1    vote.  The person misses their registration

2    deadline, they are not on the voter rolls, they

3    cannot vote.  How does that not go to the very

4    heart of the democratic process?  If you have

5    someone who is responsible for delivering a

6    form and their failure to abide by that one

7    sole task can have this consequence of you

8    being excluded from the political community and

9    having a chance to say what's what, that is a

10   crucial function that goes to the very heart of

11   the democratic process.  And therefore I submit

12   that the political function exception is met,

13   Your Honor.

14        Your Honor, we also talked a bit about

15   Club Madonna and I'd like to hit that point

16   once more.  The argument that's being made that

17   Club Madonna does not -- Club Madonna says that

18   Salerno does not lay out a test for facial

19   challenges.  True.  Facial challenges are

20   assessed based on what the underlying argument

21   is.  So if it's a Fourth Amendment issue, you

22   consider what the Fourth Amendment tests are.

23   If it's a First Amendment issue, you consider

24   what the first Amendment tests are.

25        Here we have an equal protection issue.

```
 1          So what is the equal protection test?  The
 2     equal protection test requires us to figure out
 3     what level of scrutiny applies.  And for
 4     citizens, it is unlike race, it is unlike
 5     natural origin, it is unlike sex.  For
 6     citizens, there are a series of tests, series
 7     of levels of scrutiny that could apply.  And
 8     that's our Salerno point in a nutshell because
 9     when you look at citizens, citizens do not
10     trigger one level of scrutiny.  Different
11     levels of scrutiny are triggered based on --
12          JUDGE LAGOA:  Right.  But that's -- that's
13     really -- that's truly a case of first
14     impression for anyone.
15          MR. JAZIL:  Precisely, Your Honor.  It is
16     case of first impression.
17          JUDGE LAGOA:  I mean, that is an -- it's
18     an alienage case that involves both LPRs,
19     people lawfully in the country, and people
20     unlawfully in the country.  And there clearly
21     are two different standards of review for both.
22          MR. JAZIL:  Precisely, Your Honor.  And I
23     ask the Court to consider this, if in the
24     alienage cases from the United States Supreme
25     Court, someone other than a legal permanent
```

1   resident had filed the lawsuit, how would those

2   cases have turned out?  They would have turned

3   out differently.

4        So the alienage cases from the United

5   States Supreme Court, consider them in the

6   context within which they arose, with legal

7   permanent residents filing the challenges.

8   Here we have more than just the legal permanent

9   residents filing the challenges.

10       Your Honor, I'd like to move on to the

11   retention provision briefly.  The argument's

12   being made that we don't know what information

13   falls within its ambit.  I ask the Court to

14   look at the voter registration form.  The voter

15   registration form on the top left has a section

16   that says "public record."  It tells you that

17   all of the information in the form is a matter

18   of Florida public record.  Anyone can ask for

19   it with a few exceptions.  And those few

20   exceptions are then provided as illustrative

21   lists in the statute.  Why?  Because forms are

22   a product of rule.

23       **JUDGE WILSON:**  So the statute does apply

24   to supervisors who get the -- supervisors of

25   these third-party voter registration

 1     organizations as well as those who bring the

 2     applications in?

 3          **MR. JAZIL:**  Your Honor, the limitation on

 4     what information can be given out applies to

 5     the supervisors as well.  So if you go to

 6     supervisor of election and you ask for certain

 7     information --

 8          **JUDGE WILSON:**  What about a supervisor at

 9     a third-party voter registration organization?

10     Who brings -- who collects it when it comes

11     into the office?

12          **MR. JAZIL:**  Okay.  So if I understand Your

13     Honor's question, it's a third-party voter

14     registration organization giving a form to the

15     supervisor of elections?

16          **JUDGE WILSON:**  Right.

17          **MR. JAZIL:**  So the supervisor of elections

18     takes the form, because they have a statutory

19     obligation to take it and try to put the person

20     on the voter roll, they do actually put the

21     person on voter roll.  So they have this

22     information.  The supervisor's a part of the

23     election administration process and so they

24     must have this information.  The signature is

25     then a crucial component.  We put in our papers

1        about how the signature's used to, A, detect

2        fraud.  And, B, actually ensure the --

3            **JUDGE WILSON:**  If that person copies --

4        retains information from the application, that

5        person is also subject to a third degree

6        felony?

7            **MR. JAZIL:**  That person at the supervisor

8        of election's office?  No, Your Honor.  Because

9        the statute applies to the third-party voter

10       registration organization.

11           **JUDGE GRANT:**  No.  I think my -- perhaps I

12       misunderstood.  My -- I have a related question

13       if I did misunderstand which is if there's a

14       supervisor at the third-party voter

15       registration organizations.  So they send out

16       their five people who collect the applications

17       from people, they bring it back to the man or

18       woman at the head office and they say, here are

19       all these that I collected, and the supervisor

20       of them says, great, I'm going to go put these

21       in the mail.  Is that person subject also to

22       this requirement?

23           **MR. JAZIL:**  Oh, thank you, Your Honor.  I

24       misunderstood.  So it's a supervisor at the

25       third-party voter registration organization,

1       not a supervisor of elections?

2           So, Your Honor, that person would not be

3       liable under the statute.  That person would

4       violate the rule.  The rule applies to everyone

5       at the 3PVRO.  The statute talks about

6       collecting.  And the reason why we've taken the

7       position we have is because when you read the

8       3PVRO statute, it uses the words "solicit,

9       collect, handle."  They're used in the

10      different context.  And so we've taken the

11      position that they mean different things.

12          So to --

13      **JUDGE WILSON:**  What if I'm a college

14      student interning in the office?

15      **MR. JAZIL:**  Your Honor, if you're a

16      college student interning in the office --

17      **JUDGE WILSON:**  Am I subject to a third

18      degree felony if I handle or copy?

19      **MR. JAZIL:**  You are not -- you are not

20      subject to the third degree --

21      **JUDGE WILSON:**  That's clear from the

22      statute?

23      **MR. JAZIL:**  Yes, Your Honor, that is clear

24      from the statute.  Because the statute uses

25      three different words:  "Collect, handle,

 1      solicit."  If, for example, that college
 2      student is also engaging in the activities of
 3      the League of Women Voters, there are two
 4      booths, one's --
 5          JUDGE WILSON:  But if you're handling it,
 6      let's say college student interning in the
 7      office, take this down to the supervisor of
 8      elections office --
 9          MR. JAZIL:  That --
10          JUDGE WILSON:  Is that college student
11      subject to a third degree felony?
12          MR. JAZIL:  No, Your Honor, that college
13      student is not subject to a third degree
14      felony.
15          And, Your Honor, to take a step --
16          JUDGE WILSON:  That's clear from the
17      statute?
18          MR. JAZIL:  Yes, Your Honor, I believe it
19      is clear from the statute.  Because the words
20      "handle, collect and solicit" are used.
21          And, Your Honor, take a step back.  Here
22      is the problem we were having.  You had Rodrico
23      Cory who was arrested and convicted of taking
24      these forms and doing bad things with them.  So
25      if Rodrico Cory or Raul Shepherd, who was

1       collecting these forms out in Leon County, if

2       these people are collecting these forms,

3       copying them, taking that information and

4       committing some kind of other identity theft

5       issue, that would be prohibited by this.  This

6       is a check on them.  And 3PVROs, Your Honor,

7       again, they're made up of people.  The

8       collector's collecting the forms and giving

9       them to the 3PVRO.

10       **JUDGE GRANT:**  But aren't the supervisors

11       people, too?  I mean, I don't completely

12       understand -- I mean, I guess maybe you want to

13       avoid the risk of someone just collecting

14       applications and then copying them for their

15       own purposes and then turning them in.  But

16       couldn't the supervisor at the office do so

17       just as easily?

18       **MR. JAZIL:**  Your Honor --

19       **JUDGE GRANT:**  -- institutional trust on

20       the part of Florida for these organizations.

21       So that's an interesting distinction to draw in

22       the statute.

23       **MR. JAZIL:**  And there is a lot of trust of

24       these organizations.  But if you look at the

25       trust matrix, the person who's actually

```
 1        canvassing on the ground, the minimum wage
 2        worker who's collecting this thing, someone who
 3        has a past felony record because they're doing
 4        a minimum wage job, that's different than the
 5        supervisor who's a salaried employee who's
 6        responsible for making sure things are
 7        delivered on time so the organization isn't
 8        subject to fine.  If you're looking at the
 9        level of trust, the level of trust increases as
10        you move up the chain.  And as a practical
11        matter, the rule which does not trigger
12        criminal penalties, to Judge Wilson's earlier
13        questions because the Department of State can't
14        assess criminal penalties, applies to the
15        organization as a whole.  So the organization
16        as a whole is also covered.
17             And, Your Honors, I see my time is
18        expiring -- has expired.  At the risk of being
19        impertinent, I simply note that this case is
20        fast moving.  We're running into Bersell
21        territory soon.  And there are pending summary
22        judgment motions on the citizenship provision
23        which would benefit from this Court's --
24             JUDGE WILSON:  All right.
25             MR. JAZIL:  -- assessment.  Thank you,
```

1       Your Honor.

2            **JUDGE WILSON:**  Thank you, Mr. Jazil.

3            Mind if we take a break now?  Take a

4       break.

5            (End of audio.)

6                       *    *    *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>**CERTIFICATE OF REPORTER**</u>

2

3

4      **STATE OF FLORIDA**

5      **COUNTY OF LEON**

6              I, Tracy Brown, certify that I was

7           authorized to and did stenographically

8           transcribe the foregoing remote proceedings,

9           and that the transcript is a true and complete

10          record of my stenographic notes.

11

12              Dated this 9th day of February, 2024.

13

14

15      _____

16      TRACY L. BROWN
        1551 Forum Place, Suite 200-E
17      West Palm Beach, FL  33401
        888-811-3408
18

19

20

21

22

23

24

25