No. 23-12308

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP, et al.,

*Plaintiffs-Appellees,*

v.

CORD BYRD, et al.,

*Defendants-Appellants.*

Appeal from the U.S. District Court for the Northern District of Florida,
No. 4:23-cv-215 (Walker, C.J.)

## APPELLANTS' INITIAL BRIEF

Bradley R. McVay
 *Deputy Secretary of State*
Joseph S. Van de Bogart
 *General Counsel*
Ashley Davis
 *Chief Deputy General Counsel*
Florida Department of State
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

Mohammad O. Jazil*
Michael Beato
Joshua E. Pratt
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690
*Counsel for Defendant-Appellant Secretary of State Byrd*

Ashley Moody
 *Attorney General*

Henry C. Whitaker*
 *Solicitor General*
Daniel W. Bell
 *Chief Deputy Solicitor General*
Robert S. Schenck
 *Assistant Solicitor General*
W. David Chappell
 *Senior Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
(850) 414-3300
*Counsel for Defendant-Appellant Attorney General Moody*

*Designates lead counsel

*NAACP, et al. v Cord Byrd, et al.*
*No. 23-12308*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Per Rule 26.1 and Circuit Rule 26.1, Defendants-Appellants certify that the following have an interest in the outcome of this case:

1. Adkins, Janet, *Defendant*

2. Alianza Center, *Plaintiff*

3. Alianza for Progress, *Plaintiff*

4. Andersen, Mark, *Defendant*

5. Anderson, Chris, *Defendant*

6. Anderson, Shirley, *Defendant*

7. Arnold, Melissa, *Defendant*

8. Arrington, Mary, *Defendant*

9. Artasanchez, Santiago, *Former Plaintiff*

10. Babis, Olivia, *Declarant for Plaintiffs*

11. Baird, Maureen, *Defendant*

12. Bardos, Andy, *Counsel for Defendants*

13. Barton, Kim, *Defendant*

14. Beato, Michael, *Counsel for Defendant*

15. Bell, Daniel, *Counsel for Defendant*

16. Benda, Kyle, *Counsel for Defendant*

17. Bennett, Michael, *Defendant*

18. Blazier, Melissa, *Defendant*

*NAACP, et al. v Cord Byrd, et al.*
*No. 23-12308*

19. Bledsoe, William, *Counsel for Defendant*

20. Bobanic, Tim, *Defendant*

21. Boltrek, William, III, *Counsel for Defendant*s

22. Brown, Tomi, *Defendant*

23. Byrd, Cord, *Defendant*

24. Cannon, Starlet, *Defendant*

25. Chambless, Chris, *Defendant*

26. Chappell, W. David, *Counsel for Defendant*

27. Chason, Sharon, *Defendant*

28. Conyers, Grant, *Defendant*

29. Corley, Brian, *Defendant*

30. Cowles, Bill, *Defendant*

31. Darlington, Andrew, *Declarant for Defendants*

32. Davis, Ashley, *Counsel for Defendant,*

33. Davis, Vicky, *Defendant*

34. Disability Rights Florida, *Plaintiff*

35. Doe, A, *Former Plaintiff*

36. Doe, B, *Former Plaintiff*

37. Doyle, Tommy, *Defendant*

38. Driggers, Heath, *Defendant*

39. Dunaway, Carol, *Defendant*

*NAACP, et al. v Cord Byrd, et al.*
*No. 23-12308*

40.    Earley, Mark, *Defendant*

41.    Edwards, Jennifer, *Defendant*

42.    Edwards, Lori, *Defendant*

43.    Equal Ground Education Fund, *Former Plaintiff*

44.    Erdelyi, Susan, *Counsel for Defendants*

45.    Farnam, Aletris, *Defendant*

46.    Feiser, Craig, *Counsel for Defendants*

47.    Florez, Johana, *Declarant for Plaintiffs*

48.    Florida Alliance for Retired Americans, *Plaintiff*

49.    Florida State Conference of Branches and Youth Units of the NAACP,

       *Plaintiff*

50.    Glickman, Jessica, *Counsel for Defendant*

51.    Griffin, Joyce, *Defendant*

52.    Guzzo, Sophia, *Counsel for Defendant*

53.    Hankins, Christi, *Counsel for Defendant*

54.    Hanlon, John, *Defendant*

55.    Hart, Travis, *Defendant*

56.    Hays, Alan, *Defendant*

57.    Healy, Karen, *Defendant*

58.    Herrera-Lucha, Veronica, *Former Plaintiff*

59.    Herron, Mark, *Counsel for Defendant*

*NAACP, et al. v Cord Byrd, et al.*
*No. 23-12308*

60.  Hispanic Federation, *Former Plaintiff*

61.  Hogan, Mike, *Defendant*

62.  Hoots, Brenda, *Defendant*

63.  Hutto, Laura, *Defendant*

64.  Jarone, Joseph, *Counsel for Defendant*

65.  Jazil, Mohammad, *Counsel for Defendant*

66.  Johnson, Diana, *Counsel for Defendant*

67.  Johnson, Melinda, *Counsel for Plaintiffs*

68.  Jonas, Sarah, *Counsel for Defendant*

69.  Jones, Tammy, *Defendant*

70.  Joshi, Raghav Vikas, *Declarant for Plaintiffs*

71.  Kahn, Jared, *Counsel for Defendant*

72.  Keen, William, *Defendant*

73.  Khanna, Abha, *Counsel for Plaintiffs*

74.  Kinsey, Jennifer, *Defendant*

75.  Klitsberg, Nathaniel, *Counsel for Defendant*

76.  Knight, Shirley, *Defendant*

77.  Latimer, Craig, *Defendant*

78.  Lavia, John, III, *Counsel for Defendants*

79.  Lenhart, Kaiti, *Defendant*

80.  Lewis, Lisa, *Defendant*

*NAACP, et al. v Cord Byrd, et al.*
*No. 23-12308*

81.   Link, Wendy, *Defendant*

82.   Lux, Paul, *Defendant*

83.   Madduri, Lalitha, *Counsel for Plaintiffs*

84.   Marcus, Julie, *Defendant*

85.   Mari, Frank, *Counsel for Defendants*

86.   Markarian, David, *Counsel for Defendant*

87.   Martinez, Norka, *Former Plaintiff*

88.   McVay, Bradley R., *Counsel for Defendant*

89.   Meadows, Therisa, *Defendant*

90.   Messer, Ryan, *Defendant*

91.   Milligan, Michelle, *Defendant*

92.   Milton, Christopher, *Defendant*

93.   Moody, Ashley, *Defendant*

94.   Morgan, Joseph, *Defendant*

95.   Morse, Stephanie, *Counsel for Defendant*

96.   Negley, Mark, *Defendant*

97.   Nordlund, Jared, *Declarant for Plaintiffs*

98.   Nweze, Adora Obi, *Declarant for Plaintiffs*

99.   O'Donnell, Renata, *Counsel for Plaintiffs*

100.   Oakes, Vicky, *Defendant*

101.   Osborne, Deborah, *Defendant*

*NAACP, et al. v Cord Byrd, et al.*
*No. 23-12308*

102.  Overturf, Charles, *Defendant*

103.  Perez, Devona, *Counsel for Defendant*

104.  Poder Latinx, *Former Plaintiff*

105.  Pratt, Joshua, *Counsel for Defendant*

106.  Riley, Heather, *Defendant*

107.  Rudd, Carol, *Defendant*

108.  Rutahindurwa, Makeba, *Counsel for Plaintiffs*

109.  Sanchez, Connie, *Defendant*

110.  Sanchez, Esperanza, *Former Plaintiff*

111.  Schenck, Robert S., *Counsel for Defendant*

112.  Scott, Dale, *Counsel for Defendant*

113.  Scott, Joe, *Defendant*

114.  Seyfang, Amanda, *Defendant*

115.  Shannin, Nicholas, *Counsel for Defendant*

116.  Shaud, Matthew, *Counsel for Defendant*

117.  Sjostrom, Noah, *Counsel for Defendant*

118.  Slater, Cynthia, *Declarant for Plaintiffs*

119.  Smith, Diane, *Defendant*

120.  Southerland, Dana, *Defendant*

121.  Stafford, David, *Defendant*

122.  Stewart, Gregory, *Counsel for Defendant*

*NAACP, et al. v Cord Byrd, et al.*
*No. 23-12308*

123.   Swain, Robert, *Counsel for Defendant*

124.   Swan, Leslie, *Defendant*

125.   Todd, Stephen, *Counsel for Defendant*

126.   Turner, Ron, *Defendant*

127.   UnidosUS, *Plaintiff*

128.   Valdes, Michael, *Counsel for Defendant*

129.   Valenti, Leah, *Defendant*

130.   Van De Bogart, Joseph, *Counsel for Defendant*

131.   Vilar, Marcos, *Declarant for Plaintiffs*

132.   Villane, Tappie, *Defendant*

133.   Voters of Tomorrow Action, Inc., *Plaintiff*

134.   Walker, Gertrude, *Defendant*

135.   Walker, Mark E., *U.S. District Court Judge*

136.   Wermuth, Frederick, *Counsel for Plaintiffs*

137.   Whitaker, Henry, *Counsel for Defendant*

138.   White, Christina, *Defendant*

139.   Wilcox, Wesley, *Defendant*

*NAACP, et al. v Cord Byrd, et al.*
*No. 23-12308*

Per Circuit Rule 26.1-2(c), Defendants-Appellants certify that the CIP contained herein is complete.

Dated: August 21, 2023

*/s/ Mohammad O. Jazil*
Counsel for Defendant-Appellant Secretary of State Byrd

*/s/ Henry C. Whitaker*
Counsel for Defendant-Appellant Attorney General Moody

## STATEMENT REGARDING ORAL ARGUMENT

This appeal of a preliminary injunction raises significant constitutional questions, namely, the application of the Equal Protection Clause of the Fourteenth Amendment to a State's regulation of its electoral process and the contours of the void for vagueness doctrine. Both questions require this Court to draw important lines that impact the State Legislatures within the Circuit. Plaintiffs-Appellants respectfully maintain that oral argument would materially assist the Court in this case. FED. R. APP. P. 34(a).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT.................................................................. C1

STATEMENT REGARDING ORAL ARGUMENT .............................. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION.................................................................................. 1

JURISDICTIONAL STATEMENT...................................................... 2

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ............................................................. 2

   I.   The Trouble with 3PVROs ...................................................... 2

   II.  Florida's 2023 Legislative Reforms ...................................... 6

   III.   Florida's 2023 Rulemaking .................................................. 8

   IV. The 2023 Litigation ............................................................... 9

STANDARD OF REVIEW................................................................... 12

SUMMARY OF THE ARGUMENT .................................................... 12

ARGUMENT ........................................................................................ 13

   I.   The citizenship provision is *facially* constitutional................ 13

   II.  Florida's retention provision has an understandable core; it isn't void for
vagueness. ................................................................................ 21

CONCLUSION ..................................................................................... 29

CERTIFICATE OF COMPLIANCE .................................................... 32

CERTIFICATE OF SERVICE ............................................................ 32

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*AFSCME Council 79 v. Scott,*
717 F.3d 851 (11th Cir. 2013) ...................................................... 14

*Ambach v. Norwick,*
441 U.S. 68 (1979) ...................................................... 19

*Bernal v. Fainter,*
467 U.S. 216 (1984) .............................................. 17, 18, 19, 20

*Bluman v. FEC,*
800 F. Supp. 2d 281 (D.D.C. 2011) ...................................... 21

*Bonner v. Prichard,*
661 F.2d 1206 (11th Cir. 1981) ...................................... 19

*Cabell v. Chavez-Salido,*
454 U.S. 432 (1982) .............................................. 12, 17, 18, 19

*Cervantes v. Guerra,*
651 F.2d 974 (5th Cir. 1981) ...................................... 19, 20, 21

*Charles W. Virgin Ins. Agency, Inc. v. Ala. Gen. Ins. Co.,*
114 So. 2d 524 (Fla. Dist. Ct. App. 1959) ............................ 7

*City of Chi. v. Morales,*
527 U.S. 41 (1999) ...................................................... 14

*Doe v. Evans,*
814 So. 2d 370 (Fla. 2002) ........................................... 7

*Estrada v. Becker,*
917 F.3d 1298 (11th Cir. 2019) ................................ 1614, 16

*Foley v. Connelie,*
435 U.S. 291 (1978) .............................................. 14, 18, 19

*Gonzalez v. Governor of Ga.,*
978 F.3d 1266 (11th Cir. 2020) ...................................... 12

iii

*Hand v. Scott,*
888 F.3d 1206 (11th Cir. 2018) ............................................................... 11

*Hill v. Colo.,*
530 U.S. 703 (2000) ................................................................................. 22

*In re Griffiths,*
413 U.S. 717 (1973) ........................................................................... 17, 19

*Larson v. Valente,*
456 U.S. 228 (1982) ................................................................................ 16

*League of Women Voters v. Byrd,*
66 F.4th 905 (11th Cir. 2023) .............................................................. 3, 22

*LeClerc v. Webb,*
419 F.3d 405 (5th Cir. 2005) ....................................................... 14, 15, 17

*Maryland v. King,*
567 U.S. 1301 (2012) .............................................................................. 11

*McGuire v. Marshall,*
50 F.4th 986 (11th Cir. 2022) .................................................................. 17

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
551 U.S. 701 (2007) ................................................................................ 16

*Pennhurst State Sch. & Hosp. v. Halderman ,*
465 U.S. 89 (1984) .................................................................................. 29

*Perkins v. Smith,*
426 U.S. 913 (1976) ................................................................................ 19

*Planned Parenthood v. Casey,*
505 U.S. 833 (1992) ................................................................................ 14

*Poe & Assocs. v. Estate of Vogler ,*
559 So. 2d 1235 (Fla. 3d DCA 1990) ........................................................ 8

*Sessions v. Dimaya,*
138 S. Ct. 1204 (2018) ............................................................................ 22

*SisterSong Women of Color Reprod. Just. Collective v. Gov. of Ga.,*
40 F.4th 1320 (11th Cir. 2022) ......................................................... 12-13, 28

*Skafte v. Rorex,*
    430 U.S. 961 (1977) .................................................................... 19

*Sugarman v. Dougall,*
    413 U.S. 634 (1973) ............................................................. 17, 19

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................................. 14, 15

*United States v. Virginia,*
    518 U.S. 515 (1996) .................................................................... 16

**Statutes**

28 U.S.C. § 4 ............................................................................ 7, 9, 11

28 U.S.C. § 10 ................................................................................... 7

28 U.S.C. § 1292 .............................................................................. 2

Fla. Stat. § 20.10 ............................................................................. 8

Fla. Stat. § 97.012 ..................................................................... 8, 29

Fla. Stat. § 97.022 .................................................................... 5-6, 6

Fla. Stat. § 97.052 ...................................................................... 3, 7

Fla. Stat. § 97.053 ........................................................................... 3

Fla. Stat. § 97.055 ...................................................................... 3, 4

Fla. Stat. § 97.0575 ................................................................. *passim*

Fla. Stat. § 97.0585 ................................................................ 25, 26

Fla. Stat. § 98.111 ........................................................................... 7

Fla. Stat. § 98.271 ........................................................................... 7

Fla. Stat. § 101.68 ......................................................................... 26

Fla. Stat. § 104.011(2) ..................................................................... 4

Fla. Stat. § 119.01 .................................................................... 25, 26

Fla. Stat. § 120.536 ....................................................................... 29

Fla. Stat. § 607.0830 ....................................................................... 7

Fla. Stat. § 744.446 ......................................................................... 7

Fla. Stat. § 817.568(2)(a) ................................................................. 4

Fla. Stat. § 474.01 ........................................................................... 7

Fla. Stat. § 474.278 ......................................................................... 7

**Rules**

Fed. R. App. P. 32 ................................................................ 31

Fed. R. App. P. 34 ................................................................ i

**Constitutional Provisions**

Fla. Const. art. VI, § 2 ........................................................ 21

U.S. Const. amend. XV, § 1 ................................................ 21

**Other**

Fla. Admin. Code r. 1S-2.042(2)(f) .................................. 8, 9

Fla. Admin. Code r. 1S-2.042(5)(f) .................................. 27

Fla. Admin. Code r. 1S-2.042(5)(g) .................................. 28

# INTRODUCTION

Late-returned applications, questionable hiring practices, and felony charges for the fraudulent use of personal information. These are just some of the complaints with third-party voter registration groups ("3PVROs"). The Florida Legislature enacted reforms directed at these groups. Chief Judge Walker preliminarily enjoined two of those reforms. The first prohibits non-citizens from "collecting or handling" voter registration applications. Fla. Stat. § 97.0575(1)(f). The second makes it a felony to retain "a voter's personal information." *Id.* § 97.0575(7). Both are *facially* constitutional.

The citizenship provision undoubtedly passes the rational basis test when applied to illegal aliens, student visa holders, temporary workers, asylum seekers, and other non-resident aliens collecting and handling time-sensitive voter registration applications. For resident aliens, the political function exception applies, thereby triggering rational basis review, because the State is exercising its prerogative to say that only a citizen can "serve[] as a fiduciary" for another citizen registering to vote. *Id.* § 97.0575(1)(f), (5)(a).

Nor can Plaintiffs show that the retention provision lacks an understandable core. That provision prohibits a person "collecting" applications for a 3PVRO from retaining "a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature." *Id.* § 97.0575(7). This personal information, exempt from Florida's otherwise broad public records laws, is private and should be protected. There's nothing vague about that.

The district court thus erred. Its decision should be reversed.

1

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1292(a). The district court issued its preliminary injunction orders on July 3, 2023. Doc.101 (Case No.215); Doc.68 (Case No.218). Timely notices of appeal were filed on July 11, 2023. Doc.102 (Case No.215); Doc.71 (Case No.218). This Court has jurisdiction to consider the appeal.

## STATEMENT OF THE ISSUES

On appeal, this Court must decide the following issues:

1.      Whether Florida's decision to limit the "collecting or handling" of "voter registration applications on behalf of a third-party voter registration organization" to "a citizen of the United States of America" violates, on its face, the Equal Protection Clause of the Fourteenth Amendment. Fla. Stat. § 97.0575(1)(f).

2.      Whether it's unconstitutionally vague, on its face, to prohibit "a person collecting voter registration applications on behalf of a third-party voter registration organization" to "cop[y] a voter application" or "retain[] a voter's personal information, such as the voter's Florida's driver license number, Florida identification card number, social security number, or signature" for a purpose "other than to provide such application or information to the third-party voter registration organization in compliance" with § 97.0575 of the Florida Statutes. *Id.* § 97.0575(7).

## STATEMENT OF THE CASE

### I.      The Trouble with 3PVROs

"In recent decades, the Florida Legislature has amended the election code to

2

make voting more convenient for eligible voters." *League of Women Voters v. Byrd*, 66 F.4th 905, 919 (11th Cir. 2023). Floridians can register to vote through an online portal, the federal postcard application, or by picking up blank forms available at their local supervisor of elections office, libraries, and even the local Walmart. Fla. Stat. §§ 97.052(1)(b), 97.052, 97.053, 97.057, 97.0575, 97.058, 97.0583, 97.05831. Registered 3PVROs can also help applicants fill out the state form, Fla. Stat. §§ 97.0575(1), (3), though 3PVROs must then deliver every form in their possession to the Division of Elections or the requisite Supervisor of Elections "within 10 days after" it's completed or before "registration closes for the next ensuing election," whichever is sooner. *Id.* § 97.0575(5)(a).

Timing is critical. If a 3PVRO misses the deadline and registration closes for the next ensuing election, then the applicant can't vote in that election. *Id.* § 97.053(2); *see also id.* § 97.055 (establishing registration deadline). In 2022 alone, the Office of Election Crimes and Security "reviewed approximately 3,077 voter registration applications that were collected and submitted untimely by 3PVROs." Doc.92-1 at 93 (Case No.215).[1] 3PVROs affiliated with the Republican Party, the Democratic Party, *and* Plaintiffs were fined for late-delivered forms. Doc.92-1 at 377-79 (Poder Latinx), 383 (Democratic Party), 384-85 (Republican Party), 401-03 (Mi Familia Vota), 407-09 (Alianza), 410-12

---

[1] The pin citations throughout this brief refer to the page number generated by CM/ECF and reflected on the top right of the page. Citations are also to the docket in Case No. 215, the lower numbered case, unless otherwise specified.

(UnidosUS), 415-17 (Harriet Tubman).

One group—Hard Knocks—received "four total letters" "in less than one year" with its actions "hav[ing] caused harm to 2,911 voter registrants." Doc.92-1 at 365-66. Fines in two of the four letters totaled $33,400 but "could have been as high as $191,500 but for a statutory cap." *Id.* at 365. With the statutory caps, the fines across the four letters totaled a little over $45,000. *Id.* at 365-68; *see also* Doc.92-3 at 133-35. And the fines were assessed for harms that included the untimely submission of applications and much worse. *See* Doc.92-1 at 365-66.

A local state attorney's investigation found that Hard Knocks "conducts no or limited background checks" for workers "who are asked to handle sensitive infor-mation," Doc.92-1 at 487, such as the "full name, date of birth, the last four digits of [one's] social security number, and a signature." *Id.* at 483-84. Workers with access to sensitive information included "a fifteen-time convicted felon" who "was out on bond on two cases." *Id.* at 487. Some workers "use[d] the personal identity information" sup-plied by an acquaintance to "fraudulent[ly] fill out and later submit applications." *Id.* The investigations ultimately resulted in charges being brought against multiple individ-uals. *See* Doc. 92-3 at 134. For example, the state attorney's office charged one worker, Roderica Cody, with the willful submission of false voter registration information and the criminal use of personal identification information. Doc.92-1 at 473. Both charges are third-degree felonies under Florida law. *Id.* (referencing §§ 104.011(2), 817.568(2)(a) of the Florida Statutes).

Hard Knocks isn't alone. Among others, the Department of State referred to the state attorney's office a fraud complaint against Royal Shepherd. Doc.92-1 at 433. Mr. Shepherd was collecting voter registration applications on behalf of two 3PVROs, the Florida Democratic Party and Florida Rising Together. *Id.* The referral was based on information compiled by the Leon County Supervisor of Elections, Mark Earley, whose office stated that Mr. Shepherd "submitted 1,460 forms" to them "between 01/08/2022 and 04/07/2022." *Id.* at 437. Supervisor Earley "suspected" that the applications were "fraudulent" based on a comparison of personal information on the forms with that on file with his office. *Id.* at 438-41. For example, a voter named Brittnay Wright's name was "slightly off," there was a "new phone number," her social security number was "one digit off," and her "street name [was] wrong." *Id.* at 438. The signatures didn't match for voters Dee Dawson and Danielle Milledge. *Id.* at 439-440. And the social security numbers didn't match for several voters. *Id.* at 441.

3PVROs have even collected forms for deceased voters. Complaints about deceased registrants came from election officials in north Florida, *id.* at 442, south Florida, *id.* at 453, and central Florida, *id.* at 462. And, again, a comparison of personal information on file with the election officials, such as a voter's signature, was used to identify and investigate the fraud. *Id.* at 464.

The Department of State shared 3PVRO-related information with the Florida Legislature. The Department did so before the 2023 legislative session consistent with its statutory duty and past practice. *See generally* Fla. Stat. § 97.022(7) (imposing statutory

duty); Doc.92-1 at 92-93 (noting compliance with duty); *id.* at 99-362 (report).

## II.    Florida's 2023 Legislative Reforms

It's no surprise then that 3PVROs were the subject of Florida's most recent changes to its election code. But 3PVROs weren't the only subject.

The bill that became SB7050 was, as in years past, an omnibus election reform package that builds on the State's hard-earned success in administering elections. Ch. 2023-120, pp. 1-5, Laws of Fla. (summarizing the amended provisions), http://laws.flrules.org/2023/120. SB7050's various sections addressed everything from signature-match training, *id.* § 1, and the need for updated precinct information on voter registration cards, *id.* § 5, to ethics reforms, *id.* § 15, 43, and closing the "ghost candidate" loophole in primary and general elections, *id.* § 23.

Concerning 3PVROs, SB7050's sponsor explained that "[i]n every election cycle, there are issues with certain actors within these organizations." Fla. S. Floor, Debate Regarding SB 7050 – Part 2, at 1:43:18-1:43:53 (April 26, 2023) (Bill Sponsor Senator Burgess), https://thefloridachannel.org/videos/4-26-23-senate-session-part-2/. Because "voting is a sacred part of our democracy," the "bill holds those who are custodians of a person's access to voting to a very high standard." *Id.* It does so by requiring 3PVROs to re-register every election cycle, affirm that certain felons aren't "collecting or handling applications," affirm that only citizens are "collecting or handling applications," provide a receipt to those using the 3PVROs, pay higher fines for noncompliance with the statute, and collect or retain personal information only to help someone

register to vote. *See* Ch. 2023-120, § 4, Laws of Fla. And it does so consistent with Florida's nearly two-decade-old stance that every "third-party voter registration organization that collects voter registration applications serves as a fiduciary to the applicant." Fla. Stat. § 97.0575(5)(a); *see* Ch. 2005-277, Laws of Fla. (adding provision).[2]

"A fiduciary relation exists between two persons" under Florida law "when one of them is under a duty to act for or give advice for the benefit of another upon matters within the scope of that relation." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (citations omitted). Just as with the fiduciary relationship a broker owes to an investor (Fla. Stat. §§ 474.01, 474.278), a corporate director owes to a shareholder (Fla. Stat. § 607.0830), or a guardian owes to a ward (Fla. Stat. § 744.446), a 3PVRO "is forbidden to take an unfair personal advantage of the opportunities of [its] position in the use of things entrusted to [it] in the capacity of a fiduciary." *Charles W. Virgin Ins. Agency, Inc. v. Ala. Gen. Ins. Co.*, 114 So. 2d 524, 526 (Fla. 1st DCA 1959). Nor can a 3PVRO "proceed without

---

[2] 3PVROs are themselves of recent vintage; prior to 1995, only state officials and individuals deputized by supervisors of elections as registrars could collect voter registration applications in Florida. *Compare* Fla. Stat. § 98.111(3) (1994) (requiring most individuals seeking to register to vote to take an oath and sign an affidavit before "the supervisor of elections, a deputy supervisor, or a voluntary deputy voter registrar"), *and* Fla. Stat. § 98.271(2)(a) (1994) ("The supervisor of elections may appoint as a volunteer deputy voter registrar, for the purpose of registering voters and accepting changes in registration, any registered elector of the state who resides in or is employed in the county, who seeks such appointment, and who completes a training session" and who "before entering office" "make[s] an oath in writing that he will faithfully perform the duties of his office"), *with* Ch. 94-224, § 10, Laws of Fla. (transferring and renumbering § 98.111 as § 97.052 and amending § 97.052, among other things, to require the Department to distribute voter registration applications, upon request, to "[i]ndividuals or groups conducting voter registration programs"), *and id.* at § 42 (repealing § 98.271).

or beyond [its] authority." *Poe & Assocs. v. Estate of Vogler*, 559 So. 2d 1235, 1236 (Fla. 3d DCA 1990) (citations omitted). The alpha and the omega of a 3PVRO's authority is to take the steps necessary to deliver a prospective voter's registration application—the thing entrusted to it—to the relevant election official in time for that prospective voter to get on the voter rolls and cast a ballot. That's it.

### III.    Florida's 2023 Rulemaking

The Department began and is in the process of finalizing rulemaking to implement SB7050. Among other things, the Department has rulemaking authority under Florida law "to administer the provisions of law conferring duties upon the department," Fla. Stat. § 20.10(3), "obtain and maintain uniformity in the interpretation and implementation of the election laws," *id.* § 97.012(1), provide "uniform standards for the" "registration laws," *id.* § 97.012(2), prescribe rules furthering its duty to "[c]onduct preliminary investigations into any irregularities or fraud involving voter registration," *id.* § 97.012(15), and to oversee the 3PVRO process, *id.* § 97.0575(1), (2), (5). SB7050 itself mandates that the Department "adopt by rule a uniform format for the receipt" that 3PVROs "shall provide a receipt to an applicant upon accepting possession of his or her application." Fla. Stat. § 97.0575(4). That rulemaking must be complete "by October 1, 2023." *Id.* So said the Florida Legislature.

The receipt form is part of the Department's proposed changes to the pre-existing rule directed at 3PVROs. Fla. Admin. Code 1S-2.042(2)(f). The proposed rule language also creates forms requiring those working for a 3PVRO to affirm that they are

8

citizens of the United States and have not been convicted of the disqualifying felonies. *Id.* 1S-2.042(2)(e). Collecting these worker-specific forms serves as a safe harbor for the 3PVROs—it shields the 3PVRO from fines assessed for using non-citizens or felons to collect or handle voter registration forms. *Id.* 1S-2.042(6)(e). The rule goes on to define the phrase "[c]ollecting or handling" to mean "physically exercising custody over voter registration applications containing a voter's personal information," not "blank" forms. *Id.* 1S-2.042(3)(c). A "[v]oter's personal information," in turn, is defined as "a voter's private information that is not generally available to the public such as the voter's Florida driver's license number, Florida identification card number, social security number, or signature." *Id.* 1S-2.042(3)(h). Personal information "does not include information contained in a voter registration application receipt." *Id.* And the rule specifically says that 3PVROs can keep a copy of the receipt—the one *without* a voter's personal information. *Id.* 1S-2.042(5)(e).

## IV.     The 2023 Litigation

Minutes after the Governor of Florida signed SB7050 into law, litigation followed. Dozens of Plaintiffs across three consolidated cases challenge a handful of provisions, seeking a preliminary injunction against the citizenship provision, the retention provision, and the felon provision. This despite SB7050 saying that 3PVROs had to comply "90 days after the department provide[d] notice to the third-party voter registration organizations of the requirements" contained in SB7050. Ch. 2023-120, § 4, Laws of Fla. (renumbering and amending § 97.0575(12) of the Florida Statutes).

The district court denied the preliminary injunction concerning the felon provision, finding that Plaintiffs lacked standing. Doc.46 (Case No.216). The court did, however, grant a preliminary injunction concerning the citizenship and retention provisions. Doc.68 (Case No.218) and Doc.101 (Case No.215).

The now enjoined citizenship provision provides:

> (1) Before engaging in any voter registration activities, a third-party voter registration organization must register and provide to the division, in an electronic format, the following information:
> . . .

> (f) An affirmation that each person collecting or handling voter registration applications on behalf of the third-party voter registration organization is a citizen of the United States of America. A third-party voter registration organization is liable for a fine in the amount of $50,000 for each such person who is not a citizen and is collecting or handling voter registration applications on behalf of the third-party voter registration organization.

Fla. Stat. § 97.0575(1)(f). The district court agreed with Plaintiffs that "this provision amounts to a facially discriminatory law in violation of the Equal Protection Clause of the Fourteenth Amendment, as it impermissibly discriminates based on alienage." Doc.101 at 27. The court then applied strict scrutiny to the provision and found the provision likely to be unconstitutional. *Id.* at 33-37. It did so even though non-resident aliens of all kinds fall within the provision's ambit and after concluding that the political function exception to strict scrutiny doesn't apply in this instance. *Id.* at 28-33.

The now enjoined retention provision provides that:

> If a person collecting voter registration applications on behalf of a third-party voter registration organization copies a voter's application or retains

> a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section, the person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 97.0575(7). The district court found this provision to likely be unconstitutionally vague because "the Florida Legislature has drafted a criminal statute that contemplates *some* individuals retaining *some* information for *some* undefined purpose," Doc.101 at 49, and the State's "gloss," its rulemaking, can't save the provision. *Id.* at 44.

Defendants filed a timely notice of appeal but did not seek a stay of the preliminary injunction. This is because, for existing 3PVROs, the relevant provision doesn't go into effect until September 30, 2023, i.e., 90 days after the July 1, 2023 notice the Department of State provided to the 3PVROs. *See* Ch. 2023-120, § 4, Laws of Fla. (renumbering and amending § 97.0575(12) of the Florida Statutes). That said, a ruling sooner rather than later is best because any time the State of Florida is enjoined from enforcing its statutes, the State suffers irreparable harm. *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (the State is "harmed" when it can't "apply its own laws"); *see also Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating" its laws, "it suffers a form of irreparable injury.") (cleaned up).

11

## STANDARD OF REVIEW

This Court "review[s] the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020). The issues on appeal are legal conclusions subject to *de novo* review.

## SUMMARY OF THE ARGUMENT

Broadly speaking, nothing in the Equal Protection Clause mandates that states "obliterate all the distinctions between citizens and aliens" and "depreciate the historic value of citizenship." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982). With respect to the citizenship provision's application to illegal aliens, student visa holders, and anyone who's not a permanent resident alien, rational basis clearly applies and is met. People who might leave the country at any moment should not be responsible for the delivery of time-sensitive voter-registration applications. For permanent resident aliens, the political-function exception applies. "[T]he State's broad power to define its political community" surely extends to those who would serve as fiduciaries to citizen voters. *Id.* at 440. The inequities of singling out resident aliens simply aren't applicable when registering voters just as they aren't applicable when teachers and cops are concerned. The district court thus erred in subjecting the citizenship provision to strict scrutiny and concluding that the provision is likely to be facially unconstitutional. Doc.101 at 27-37.

And if a statute is unconstitutionally vague only when it "is utterly devoid of a standard of conduct so that it simply has no core," *SisterSong Women of Color Reproductive*

*Justice Collective v. Gov. of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022) (citations omitted), then the district court erred in finding the retention-related prohibition is likely to be unconstitutionally vague. Doc.101 at 38-50. At its core, the provision prohibits someone "collecting" applications for a 3PVRO from keeping "personal information"—private voter-specific information—"such as the voter's Florida driver license number" and "social security number." Fla. Stat. § 97.0575(7). This core isn't vague especially when considered together with Florida's broad public records laws. The public records laws exclude from disclosure the same kind of voter-specific personal information at issue in the retention provision. That voter-specific personal information is also the kind of hard-to-obtain information that election officials have previously relied on to spot election fraud.

This Court should thus reverse the district court's decision to grant a preliminary injunction. It should do so expeditiously so that the State of Florida can implement provisions of its election code.

## ARGUMENT

### I.  The citizenship provision is *facially* constitutional.

**A.** Plaintiffs say—and the district court agreed—that the citizenship "provision amounts to a *facially* discriminatory law" that "impermissibly discriminates based on alienage." Doc.101 at 27 (emphasis added). In 1987, three years after the Supreme Court decided its last alienage case, the Court said in *United States v. Salerno* that a "facial challenge to a legislative Act" requires the challenger to "establish that no set of

13

circumstances exists under which the Act would be valid." 481 U.S. 739, 745 (1987).

Though criticized, *see City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (Stevens, J.,

concurring with two others), and not applied in the context of facial challenges to abor-

tion laws, *Planned Parenthood v. Casey*, 505 U.S. 833, 895 (1992), *Salerno*'s no-set-of-cir-

cumstances test still applies in alienage cases. And Plaintiffs can't pass this "most diffi-

cult" test for facial challenges to Florida's provision. *Salerno*, 481 U.S. at 746; *see also Am.*

*Fed. of State, Cnty., & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013)

("[T]he strict 'no set of circumstances' test is the proper standard for evaluating a facial

challenge.") (collecting cases).

Florida's citizenship provision limits the "collecting or handling" of "voter reg-

istration applications on behalf of a third-party voter registration organization" to "a

citizen of the United States of America." Fla. Stat. § 97.0575(1)(f). All noncitizens are

excluded from collecting or handling applications regardless of their alienage status.

That includes the illegal alien, the student visa holder, the temporary worker, the asylum

seeker, and anyone else for whom there's been no "congressional determination to ad-

mit the alien to permanent residence" as a member of "the community." *Foley v. Connelie*,

435 U.S. 291, 295 (1978). Yet every time the government excludes a non-permanent

resident from collecting or handling a voter registration application, the government

must only provide a rational basis for that exclusion. *See Estrada v. Becker*, 917 F.3d 1298,

1310 (11th Cir. 2019) (discussing and analyzing Supreme Court cases); *LeClerc v. Webb*,

419 F.3d 405, 415 (5th Cir. 2005) (same).

14

Florida has a rational basis, tied to a legitimate purpose, for its exclusion. The State has a compelling interest in ensuring that the voter registration applications of every voter are delivered in a timely manner. Putting the applications in the hands of those with illegal or temporary status, who may leave the country voluntarily or involuntarily any day and without warning, increases the odds of a registration application being delivered after the statutory deadlines—after the date by which a voter must get on the rolls to cast a ballot in the next election. It follows that the Plaintiffs can't show that Florida's citizenship requirement is unconstitutional in every circumstance, namely its application to non-permanent residents like illegal aliens. *Salerno*, 481 U.S. at 746; *see also LeClerc*, 419 F.3d at 416 ("The [Supreme] Court has never applied strict scrutiny review to a state law affecting" alienage classifications such as those for "illegal aliens, the children of illegal aliens, or nonimmigrant aliens."); *id.* at 421 n.50 ("The Louisiana Bar's concern that the temporary status of student and H-1B temporary worker visa holders might frustrate its ability to carry out these functions is legitimate.").

**B.** The district court refused to employ rational basis review for any application of the statute because that, the court said, would require it to "parse the text" of the citizen provision "into two subgroups to determine the applicable standard of review." Doc.101 at 28. The court reasoned that the statutory text limits the "collecting or handling" of "voter registration applications" to "citizen of the United States," Fla. Stat. § 97.0575(1)(f), "noncitizens" include permanent resident aliens, and so strict scrutiny applies, proving fatal for the Florida provision. Doc.101 at 28.

15

The analysis isn't quite so simple. Any statute that makes a distinction based on race—regardless of a specific race—triggers strict scrutiny. *E.g.*, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). Any statute that "makes explicit and deliberate distinctions between different religious organizations" also triggers strict scrutiny. *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982). And any distinction based on sex—whether it benefits men or women—triggers intermediate scrutiny. *E.g.*, *United States v. Virginia*, 518 U.S. 515, 555 (1996). For *Salerno*'s no-set-of-circumstances test, that means strict scrutiny applies to any facial classifications based on race and religion, and intermediate scrutiny applies to any facial classifications based on sex.

Alienage is different, however. Unlike race, religion, or sex, the level of scrutiny ebbs and flows based on the kind of alien; rational basis applies for all but the permanent resident aliens. *See Estrada*, 917 F.3d at 1310 (illegal aliens); *LeClerc*, 419 at 415 (temporary workers and students). Choosing one, and only one, level of scrutiny for *Salerno*'s no-set-of-circumstances test isn't appropriate when a statute speaks in terms of citizens and noncitizens.[3] Rational basis applies to most subcategories of noncitizens (like illegal aliens, student visa holders, and asylum seekers) and strict scrutiny usually applies to one subcategory of noncitizens (the permanent resident alien). On its face, then, a statute with a citizen-noncitizen distinction can pass the rational-basis test.

---

[3] The task is easier if a statute were to specifically state that permanent residents cannot do something or to limit its reach to illegal aliens only. *See, e.g.*, *Estrada*, 917 F.3d at 1301. But that is not the case here.

Florida's citizenship provision clearly does just that when the appropriate level of scrutiny is applied for the subcategories of noncitizens. In other words, Plaintiffs can't show that the provision is unconstitutional in all its applications as *Salerno* requires.

Applied to permanent resident aliens, such a statute might well fail strict scrutiny, as did the statutes in *Sugarman v. Dougall*, 413 U.S. 634 (1973), when applied to permanent resident civil servants; in *In re Griffiths*, 413 U.S. 717 (1973), when applied to permanent resident lawyers; and *Bernal v. Fainter*, 467 U.S. 216, 224 (1984), when applied to permanent resident notaries. But, again, the fact that some applications may be invalid does not mean that Plaintiffs have met their "burden of proving that the law could never be applied in a constitutional manner." *McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022). The as-applied challenge is different than the facial challenge.

**C.** Regardless, for all aliens, even for permanent resident aliens, the political function exception to strict scrutiny applies to Florida's citizenship provision and allows it to pass constitutional muster. To be sure, "[b]eginning in 1971, the [Supreme] Court has applied some variation of strict scrutiny to invalidate state laws affecting 'resident aliens' or 'permanent resident aliens.'" *LeClerc*, 419 F.3d at 416 (collecting cases). This is because "restrictions on lawfully resident aliens that *primarily affect economic interests* are subject to heightened judicial scrutiny," but "strict scrutiny is out of place when the restriction primarily serves a *political function*." *Cabell*, 454 U.S. at 439 (emphasis added). Applying strict scrutiny to political functions would result in the "abandon[ment] [of] the general principle that some state functions are so bound up with the operation of

the State as a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self-government." *Id.* at 439. It would "obliterate all the distinctions between citizens and aliens, and thus depreciate the historic value of citizenship." *Id.* (quoting *Foley*, 435 U.S. at 295) (internal quotations omitted). But determining whether an exclusion primarily affects economic interests or political functions is "difficult to apply in particular cases." *Id.* at 440.

There's a test, sort of. "First, the specificity of the classification will be examined: a classification that is substantially overinclusive or underinclusive *tends* to undercut the governmental claim that the classification serves legitimate political ends." *Id.* (emphasis added). "Second, even if the classification is sufficiently tailored, it may be applied in the particular case only to persons holding state elective or important nonelective executive, legislative, and judicial positions"—to "those officers who participate directly in the formulation, execution, or review of broad public policy and hence perform functions that go to the heart of representative government." *Id.* (citations omitted). For this second step, the "language is far reaching and no limits on it were suggested by [prior Supreme Court precedent]." *Id.* at 441 n.7. "Rather," the courts must "look to the importance of the function as a factor giving substance to the concept of democratic self-government." *Id.* While the most recent alienage case, *Bernal*, did say that the exception's "ambit" is "narrow," it repeated the two-part test and said that the test merely "focus[es]" the "inquiry"—that the test isn't exhaustive. 467 U.S. at 224.

18

Applied to specific cases, the results of the political function test are these: Excluding permanent resident aliens from being teachers serves a political function. *Ambach v. Norwick*, 441 U.S. 68, 80-81 (1979). So does excluding them from being cops. *Foley*, 435 U.S. at 299-300. From being probation officers. *Cabell*, 454 U.S. at 447. From serving on petit or grand juries. *Cervantes v. Guerra*, 651 F.2d 974, 980-81 (5th Cir. Unit A July 1981) (citing *Perkins v. Smith*, 426 U.S. 913 (1976)).[4] And, most significantly, from voting in any election, including local elections. *Id.* (citing *Skafte v. Rorex*, 430 U.S. 961 (1977)). Not so from being notaries. *Bernal*, 467 U.S. at 227-28. Or lawyers. *In re Griffiths*, 413 U.S. 717, 719-20 (1973). Or members of the New York civil service. *Sugarman*, 413 U.S. at 641-42.

In this case, the Supreme Court's non-exhaustive, two-part test is easily met. The first part asks whether the citizenship provision is "substantially overinclusive or underinclusive." *Cabell*, 454 U.S. at 440. It's neither. The provision isn't substantially overinclusive because it applies only to those collecting or handling a U.S. citizen's voter registration application. Nor is it substantially underinclusive. True, postal workers and state employees can handle voter registration forms without every postal worker or state employee being a citizen. Doc.101 at 31-32. But 3PVROs are the only *non-governmental* entities authorized to collect and handle these important *governmental* forms once someone completes them. No federal, state, or local government has any day-to-day insights

---

[4] *Cervantes* is binding precedent on this Court under *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

into a 3PVRO's hiring or firing practices, its training, or other safeguards when handling a voter registration form. Treating those working for 3PVROs differently than those working for the postal service, the DMV, or even the Department of State makes sense; the provision isn't "fatally underinclusive." *Bernal*, 467 U.S. at 222.

The second prong is met too. It asks whether an exclusion "implicate[s] responsibilities that go to the heart of representative government." *Id.* at 225. Considerations include an assessment of whether the "nonelective" position at issue is "important" and whether its holders "participate directly in the formulation, execution, or review of broad public policy," but "the actual *function* of the position" serves "as the dispositive factor." *Id.* at 222-23 (emphasis in original). It's the actual function that mattered most to the former Fifth Circuit in *Cervantes* when permanent resident aliens challenged the exclusion of noncitizens from serving on or voting for the board of a local nonprofit. *Cervantes*, 651 F.2d at 975. The nonprofit had a localized focus, wasn't exactly a state or federal entity, though it did receive federal funding and had local officials on its board, and its board performed the government-like function of alleviating poverty in the area. *Id.* at 976-77. The public function exception was still met because "voting in a public election is always within the political functions exception." *Id.* at 981.

The one and only function at issue here is this: a 3PVRO "serves as a fiduciary to the [citizen] applicant, ensuring that any voter registration application entrusted to the organization, irrespective of party affiliation, race, ethnicity, or gender" is "delivered to the [Department of State] or the supervisor of elections in the county in which the

applicant resides" within a specified timeframe so that the citizen can qualify to cast a ballot. Fla. Stat. § 97.0575(5)(a). 3PVROs (and those who work for them) are thus cogs in the wheel of the election administration process. They are extensions of local election officials, making it possible for eligible citizens to register to vote for upcoming elections. And elections are how citizens elect representatives of their choice to set policy for the community. It follows that the State of Florida may require citizen-only fiduciaries for citizen-only applicants trying to register to vote. *See generally* U.S. Const., amend. XV, § 1 (securing only the "right of citizens of the United States to vote"); Fla. Const., art. VI, § 2 (same). Or, borrowing from the precedential Fifth Circuit, "if the premise of that doctrine is the right of the people to be governed by their citizen peers, arguably every elective office ipso facto within its purview," *Cervantes*, 651 F.2d at 981 (cleaned up), and every step along the way of helping citizens elect citizen peers falls within the political function exception as well. *See id.*; *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (three-judge panel) ("We read these cases to set forth a straightforward principle: It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government.").

## II.   Florida's retention provision has an understandable core and isn't void for vagueness.

**A.** The vagueness challenge to Florida's retention provision must also fail. "A statute can be impermissibly vague for either of two independent reasons. First, if it

fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). A vague statute involves not just points of imprecision or confusion, but "hopeless indeterminacy" and "grave uncertainty." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213-14 (2018). "Courts should not lightly declare laws to be void for vagueness." *League of Women Voters*, 66 F.4th at 946. "Facial vagueness occurs when a statute is utterly devoid of a standard of conduct so that it simply has no core and cannot be validly applied to any conduct." *Id.* (citation omitted).

Florida's retention provision has an understandable core. It applies to any "person collecting voter registration applications on behalf of a third-party voter registration organization." Fla. Stat. § 97.0575(7). And it prohibits these agents of the 3PVRO from doing two things. The first is making "copies of a voter's application," which contains sensitive personal information such as the driver license number, Florida identification card number, last four digits of the social security number, and the voter's signature. *Id.*; *see also* Florida Voter Registration Form, https://files.floridados.gov/media/703131/dsde39-english-pre-7066-052120.pdf. The second, related prohibition is on otherwise "retain[ing] a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature." Fla. Stat. § 97.0575(7). But making copies of an application or retaining information is permissible to "provide such application or information to the third-party

voter registration organization in compliance with [§ 97.0575]," i.e., to allow for the 3PVRO's timely delivery of the application to the relevant election officials.

The district court even "acknowledge[d]" "up front" that the "provision prohibits individuals who engage directly with voters and collect completed applications from the voters from copying those completed applications for their own personal use." Doc.101 at 42. Still, the court went on to find the provision likely to be unconstitutional because it doesn't provide "a person of ordinary intelligence" the answers to three questions: "(1) to whom does the statute apply; (2) which information falls within its reach; and (3) what is the person prohibited from doing." *Id.* at 40. The district court got it wrong. Read in context, the words in Florida's retention provision provide ready answers for all three questions.

**B.** As to the first question, the provision applies to "a person collecting voter registration applications." Fla. Stat. § 97.0575(7). These are not people who merely solicit applications. We know this because the same statute, in another subsection, tells us that soliciting is different than collecting. 3PVROs must register and provide to the Department of State the "names, permanent addresses, and temporary addresses" "of each registration agent registering persons to vote in this state on behalf of organizations." Fla. Stat. § 97.0575(1)(c). But the registration requirement "does not apply to persons who only *solicit* applications and do not *collect or handle* voter registration applications." *Id.* (emphasis added) So a person who's merely asking a passerby to fill out an application—who's soliciting—isn't subject to the retention provision.

23

Nor is a person who's only *handling* a voter registration application subject to the retention provision once it's been *collected* from a prospective voter. The statute, in various subsections, references both collecting and handling. *Id.* § 97.0575(1)(c), (1)(e), (1)(f). In other instances, it refers to just collecting. *Id.* § 97.0575(4), (5)(a)3., (6), (7). The two words thus have different meanings. The commonly understood meaning of "collect" is "to gather" "from a number of persons." *Merriam-Webster's Collegiate Dictionary* 243 (11th ed. 2005). And the commonly understood meaning of "handle" is to "manage with the hands." *Id.* at 565. Read in the context within which it appears in § 97.0575, a person can "collect or handle voter registration applications," Fla. Stat. § 97.0575(1)(c), though the collecting happens when a person gathers an application from a prospective voter, and the handling happens when a person takes the steps necessary to deliver the completed application to the appropriate election official. *See id.* § 97.0575(5)(a).

Put another way, Florida's retention provision applies to Roderica Cody of Hard Knocks and Royal Sheperd of the Florida Democratic Party and Florida Rising when they are canvassing—when they are collecting voter registration applications with a prospective voter's driver license number, social security number, and signature on it. And it applies to Plaintiff, Esperanza Sanchez, when she's collecting applications, though not when she's handling applications collected by others (perhaps to sort them by the applicant's county of residence) before delivering the applications to the relevant supervisor of elections. *See* Doc.101 at 43 n.15 (discussing Plaintiff Sanchez).

24

**C.** The retention provision also reasonably defines the information that falls within its reach: (1) making "copies [of] a voter's application" and (2) "retain[ing] a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature." Fla. Stat. § 97.0575(7).

The first category is well-defined. It's a completed voter registration form. *See* Florida Voter Registration Form, https://files.floridados.gov/media/703131/dsde39-english-pre-7066-052120.pdf. Among other things, the completed form itself will have an applicant's driver license number or Florida identification card number, the last four digits of the applicant's social security number, and the applicant's signature. *Id.*

The second category refers to "personal information" and then provides a list preceded by "such as." Fla. Stat. § 97.0575(7). This means the list is illustrative. *See generally* Antonin Scalia & Bryan Garner, *Reading Law* 195 (2012) (discussing the associated-words canon). Only other, like items can be included. *Id.* And what's the common thread between the items included on the list? Each is exempt from disclosure under Florida's otherwise broad public records laws. *See* Fla. Stat. § 97.0585(1)(c), (2).

More specifically, under Chapter 119 of the Florida Statutes, an applicant's name, address, date of birth, party affiliation, phone number, and email address are all public records subject to disclosure. *See* Fla. Stat. §§ 119.01(1), 119.011(12); *Voter Information as a Public Record,* https://dos.myflorida.com/elections/for-voters/voter-registration/voter-information-as-a-public-record/. Anyone can request and obtain all this information because "[i]t is the policy of this state that all state, county, and municipal

25

records are open for personal inspection and copying by any person." Fla. Stat. § 119.01(1).

Not so for "[t]he social security number, driver license number, and Florida identification number of a voter registration applicant or voter," because they are "confidential and exempt" from Florida's public records laws. *Id.* § 97.0585(1)(c). And "[t]he signature of a voter registration applicant or a voter is exempt from copying requirements," *id.* § 97.0585(2), though it can and must be made available for viewing. This is because the signature serves as the means to assess whether a voter is who she says she is when submitting a vote-by-mail ballot; whether a voter's signature matches the outside of a vote-by-mail envelope is something that can be challenged in the canvassing process open to representatives of the public. *Id.* § 101.68.

In this way, Florida's retention provision makes sense: It prevents people working for a 3PVRO from copying or retaining voter information they couldn't ordinarily get, and it allows people working for a 3PVRO to retain voter information they would readily access under Florida's broad public records laws. Recent experience from supervisors up and down the State also confirms that jealously guarding this information serves a purpose. Signatures, social security numbers, and the like are how supervisors often identify suspected fraud from 3PVROs. *See supra.*

**D.** Finally, the provision is clear as to "what" a "person" is "prohibited from doing with" the personal information. Doc.101 at 40. Under the retention provision, "a person collecting voter registration applications on behalf of a third-party voter

26

registration organization" can't "*cop*[*y*] a voter's application or *retain*[] a voter's personal information" "for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section." Fla. Stat. § 97.0575(7) (emphasis added).

The district court didn't quibble with the meanings of "copy" and "retain." Doc.101 at 44-46. The court questioned the meaning of "to provide such application or information to the [3PVRO] in compliance with this section." *Id.* But then it provided an answer: "turning the applications over to the 3PVRO for delivery to the appropriate elections official within the time afforded by the statute." *Id.* at 44.

The Department of State shared the same interpretation; after all, the whole point of a 3PVRO is to deliver a prospective voter's registration application to the relevant election official in time for that prospective voter to get on the voter rolls and cast a ballot. That's the sum total of its fiduciary duty under Florida law. *See supra.* Confirming this understanding, the Department has proposed the following rule language:

> Each voter registration application contains a voter's personal information that is not generally available to the public. For purposes of section 97.0575(7), F.S., a person collecting a voter registration application on behalf of a 3PVRO for the reason of providing such application (including the voter's personal information contained therein) to the 3PVRO shall be deemed to be "in compliance with this section" with respect to providing such application to the 3PVRO if the person:
>
> 1. Provides such application to the 3PVRO and
>
> 2. Does not retain such application after providing it to the 3PVRO.

Fla. Admin. Code 1S-2.042(5)(f).

27

The district court and the Department of State agreed on the meaning of "in compliance with this section." So this isn't a situation where a "statute is so unclear as to what conduct" is prohibited. *Sistersong Women*, 40 F.4th at 1327. The court nevertheless held that the retention provision is likely to be facially vague.

**E.** The district court tried to find another ambiguity: The retention provision "applies to individuals" "who collect such" personal "information," but the provision, according to the court, doesn't appear to apply to individuals in the 3PVRO "chain of custody" who "work together in various ways to collect voter registration applications." Doc.101 at 45.

The district court then seized on other Department rule language; that proposed rule language prevents 3PVROs, as organizations, "from copying voter registration applications or retaining certain voter information after they have delivered the applications to the appropriate elections official," *id.* at 46:

> A 3PVRO serves as a fiduciary to an applicant whose voter registration application it collects. A 3PVRO may not retain an applicant's voter registration application (or the voter's personal information contained therein) after promptly delivering it to the Division of Elections or the Supervisor of Elections in the county in which the applicant resides, nor may a 3PVRO use such application (or the voter's personal information contained therein) for any purpose other than promptly delivering such application to the Division of Elections or the Supervisor of Elections in the county in which the applicant resides.

Fla. Admin. Code 1S-2.042(5)(g).

This doesn't change things. 3PVROs (and those who work for them) serve as "fiduciar[ies]" to applicants. Fla. Stat. § 97.0575(5)(a). The retention provision applies

to individuals who "engag[e] with voters in the community." Doc.101 at 46. The rule is a reasonable extension of both the retention provision and the fiduciary rule that applies to 3PVROs as an organization. *See, e.g.*, Fla. Stat. § 97.012(1), (2) (authorizing the Secretary to maintain uniformity over the election and registration laws of the State). The retention provision applies criminal penalties, while the rule only imposes administrative penalties; the Department of State can't prosecute offenses.

In the end, the district court conflated a rule challenge with a statutory challenge. The court didn't appreciate that a rule can do more than a statute. *See* Fla. Stat. § 120.536(1) ("An agency may adopt . . . rules that implement or interpret the specific powers and duties granted by the enabling statute."). If the "more" is inconsistent with the statute (which the district court suggests), the question becomes whether the agency action was ultra vires—whether it exceeded the agency's authority under Florida law. State courts should answer that question. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). But the answer to that state law question a state agency's authority says nothing about the constitutionality of the retention provision. That provision has an understandable core that's anything but vague.

## CONCLUSION

There are well-documented problems with 3PVROs. The Florida Legislature chose a mix of policy options to address those problems. One mandates that only citizens "collect" and "handle" voter registration for their citizen peers. True, this excludes noncitizens from one activity that serves as a step for citizens to participate in elections.

But that exclusion is constitutional. Also constitutional is the prohibition of copying or retaining information otherwise unavailable under Florida's broad public records laws. This prohibition has an understandable core—one that furthers the State's goal in election integrity. The district court's preliminary injunction to the contrary was thus in error. This Court should reverse.

Dated: August 21, 2023

Respectfully Submitted,

Bradley R. McVay (FBN 79034)
 *Deputy Secretary of State*
brad.mcvay@dos.myflorida.com
Joseph S. Van de Bogart (FBN 84764)
 *General Counsel*
joseph.vandebogart@dos.myflorida.com
Ashley Davis (FBN 84764)
 *Chief Deputy General Counsel*
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
Phone: (850) 245-6536

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil (FBN 72556)
Michael Beato (FBN 1017715)
Joshua E. Pratt (FBN 119347)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
Phone: (850) 391-0503
Facsimile: (850) 741-1023
mjazil@holtzmanvogel.com
mbeato@holtzmanvogel.com
jpratt@holtzmanvogel.com

*Counsel for Defendant-Appellant Secretary of State Cord Byrd*

Ashley Moody
 *Attorney General*

*/s/ Henry C. Whitaker*
Henry C. Whitaker (FBN 1031175)
 *Solicitor General*
Daniel W. Bell (FBN 1008587)
 *Chief Deputy Solicitor General*
Robert S. Schenck (FBN 1044532)
 *Assistant Solicitor General*
W. David Chappell (FBN 120449)
 *Senior Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
Phone: (850) 414-3300
Henry.whitaker@myfloridalegal.com
Daniel.bell@myfloridalegal.com
Robert.schenck@myfloridalegal.com
William.chappell@myfloridalegal.com

*Counsel for Defendant-Appellant Attorney General Moody*

31

## CERTIFICATE OF COMPLIANCE

This brief contains 7,714 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: August 21, 2023                              _/s/ Mohammad O. Jazil_____


## CERTIFICATE OF SERVICE

I e-filed this brief on ECF, which will email everyone requiring notice.

Dated: August 21, 2023                              _/s/ Mohammad O. Jazil_____