IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS OF
THE NAACP, et al.,

    *Plaintiffs*,

    v.                                      Case No. 4:23-cv-215-MW/MAF

CORD BYRD, in his official capacity as
Florida Secretary of State, et al.,

    *Defendants*.
_____/

**THE SECRETARY'S RESPONSE TO**
**<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

    Secretary of State Cord Byrd responds to Plaintiffs' summary-judgment motion. Exhibits in the following memorandum are contained in Doc.219. Page numbers in docket citations refer to the upper-right, blue page numbers, not the center-middle, black page numbers.

1

**Introduction**

The Secretary agrees with Plaintiffs: the Equal Protection Clause challenge to the Citizen Restriction, the § 1981 challenge to the Citizen Restriction, and the § 208 challenge to the Mail-In Ballot Request Restriction should be decided at summary judgment. Material facts aren't in dispute, and the issues are legal ones. In fact, the Secretary already moved for summary judgment on the § 1981 challenge and the § 208 challenge, Doc.201, something that Plaintiffs' motion doesn't mention or acknowledge.

As for the Equal Protection Clause challenge, the Secretary slightly parts ways with Plaintiffs. While the challenge should be decided at summary judgment, the Secretary urges this Court to wait until the Eleventh Circuit decides his preliminary-injunction appeal. Waiting a few extra weeks for an appellate opinion will lead to a more efficient resolution of this issue.

If this Court decides not to wait, summary judgment on the Equal Protection Clause challenge to the Citizen Restriction should be nevertheless granted *in the Secretary's favor*. Plaintiffs' facial challenge fails as a matter of law, and the restriction satisfies even strict scrutiny and falls under the political-function exception.

Summary judgment is also appropriate for the § 1981 challenge: the statute is an improper vehicle to invalidate or preempt the Citizen Restriction. The same is true for the § 208 challenge. Plaintiffs allege that the Mail-In Ballot Request Restriction violates the right of a voter who requires assistance to vote by reason of blindness, disability, or inability to read or write to be assisted by a person of the voter's choice under § 208 of

2

the Voting Rights Act. But the Mail-In Ballot Request Restriction does no such thing when properly read together with other provisions of Florida law that expressly allow such assistance.

## Argument

I. **The Equal Protection Clause challenge to the Citizenship Restriction.**

   A. **This Court should wait until the Eleventh Circuit resolves the pending appeal.**

As a prudential matter, this Court should wait until the Eleventh Circuit resolves the Secretary's preliminary-injunction appeal before resolving the Equal Protection Clause challenge. The appellate court heard oral arguments on January 25, 2024, and during oral arguments, Doc.219-1 at 62, as well as in a motion to expedite, 23-12308 (Oct. 10, 2023), counsel asked the court to expeditiously resolve the appeal, noting the April 2024 trial and the upcoming presidential election.

Waiting would be beneficial. Instead of resolving the issue, then reviewing the appellate decision, then considering a motion for reconsideration, then considering a response (and with leave, a reply) to the motion for reconsideration, and reacting to the parties' potentially changed legal (or maybe factual) positions based on the appellate decision, this Court should simply wait until the Eleventh Circuit renders an opinion and then order the parties to file a brief that responds to the opinion. This would be a more efficient resolution of this issue—which the Secretary agrees should be decided at summary judgment, before trial.

3

### B. In the alternative, this Court should grant summary judgment in the Secretary's favor.

If this Court decides to resolve the Equal Protection Clause challenge now, as opposed to later, it should invoke its authority under Rule 56(f)(1) and grant summary judgment in favor of the Secretary. *See Storm Damage Sols., LLC v. Indian Harbor Ins. Co.*, No. 3:21cv901-TKW-HTC, 2022 U.S. Dist. LEXIS 239535, at *5 (N.D. Fla. Sep. 27, 2022) (explaining that a court may grant summary judgment in favor of a non-movant under Rule 56(f)(1) if warranted by the facts and the law). Material facts aren't in dispute, and the Secretary is entitled to judgment as a matter of law.

Instead of largely repeating the arguments made in his response in opposition to Plaintiffs' preliminary-injunction motion, Doc.92, and in his appellate briefs, Doc.219-2, Doc.219-3, the Secretary incorporates and adopts those arguments here. He now clarifies and adds to those arguments.

**1.** Plaintiffs continue to raise a facial challenge to the Citizen Restriction. Doc.205-1 at 20; Doc.184 at 55. Thus they "must establish that no set of circumstances exists under which" the Citizen Restriction "would be valid" under *United States v. Salerno*, 481 U.S. 739, 745 (1987). Put differently, Plaintiffs must show that the restriction "is unconstitutional in all of its applications." *Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 22-11787, slip op. at 25 (11th Cir. Jan. 10, 2024). They can't. *See, e.g.*, Doc.219-2 at 28-30.

4

True, the restriction applies to all categories of noncitizens: legal residents, temporary residents, and illegal aliens. But in order to prevail on their *facial* challenge, Plaintiffs must show—putting aside permanent residents—that the restriction is *facially* unconstitutional as to temporary residents and illegal aliens. In other words, Plaintiffs must show it's categorically unconstitutional for a State to prohibit both temporary residents and illegal aliens from collecting and handling a potential voter's voter-registration form, a document that contains the potential voter's name, address, part of his social security number, driver's license number, and date of birth. Because they can't, Doc.92 at 18-20, Plaintiffs must admit that the Citizen Restriction is constitutional—at the very least—in some circumstances.

Although not mentioned in their summary-judgment motion, Plaintiffs can't rely on *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231 (11th Cir. 2022). *See also* Doc.219-3 3 at 9-11 (providing additional arguments as to why *Club Madonna* doesn't help Plaintiffs). In that case, the Eleventh Circuit stated that "*Salerno* is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." 42 F.4th at 1256 (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012)). The court relied heavily on *Doe v. City of Albuquerque*, a case that rejected the argument that, in deciding a facial challenge, a court "must simply determine whether it can imagine possible hypothetical situations in which the ban could possibly be constitutionally applied." 667 F.3d at 1123.

5

That's not what we have here. Instead of conjuring hypothetical situations, a court must consider "only applications of the" law at issue "in which it actually authorizes or prohibits conduct." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015). Here, the Citizen Restriction applies to temporary residents and illegal aliens—not just permanent residents. It's not a hypothetical situation; it's a direct application of the law. Plaintiffs must thus explain how the restriction is unconstitutional in all these applications. That makes sense: in opting against an as-applied challenge, and in seeking broad facial relief, Plaintiffs must explain how the Citizen Restriction is unconstitutional as to *all* classes of aliens.

**2.** Regardless, even strict scrutiny is satisfied. Plaintiffs are wrong in suggesting that "Defendants have effectively conceded that enforcing the Citizenship Requirement against *all* noncitizens, including legal permanent residents, would fail strict scrutiny." Doc.205-1 at 23-24 (emphasis in the original). The Secretary has never affirmatively made that representation. Plaintiffs' invocations of "effective" or implicit arguments are insufficient.

Plaintiffs are also wrong in concluding that "the Legislature could not come up with *any* state interest in support of the Citizenship Requirement, let alone a compelling interest." Doc.205-1 at 24 (emphasis in the original). The legislative record refutes Plaintiffs' contention: legislators explained that SB7050, including the Citizen Restriction, was justified by safeguarding election integrity, preventing fraud, ensuring

6

timely submissions of voter-registration forms, and promoting uniformity and fairness, promoting voter confidence, and protecting sensitive information.[1]

Those are compelling governmental interests. A State has a compelling governmental interest in preventing election-related fraud and in promoting confidence in "our electoral processes." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). So too with maintaining fair election processes. *Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998).

As for narrow tailoring, a dearth of evidence involving noncitizens and 3PVRO issues doesn't defeat the Citizen Restriction. When it comes to election-related issues,

---

[1] *E.g.*, Doc.219-4 26:2-3 ("safeguarding voter confidence"); 26:7-11 ("This bill strengthens requirements for third-party voter registration organizations to protect individuals who entrust their personal information and voter registration applications to them."); 34:22 – 35:4 (explaining that in 2022 alone, over 3,000 voter-registration forms were untimely submitted by 3PVROs); 61:6-10 ("we are legislating to protect the voter, and that's the sole purpose of all the provisions within this and the guiding light behind all the third-party voter registration organization provisions"); Doc.219-5 3:13-24 ("You are having folks that are handling, collecting . . . registration information . . . and I think the legislature has shown that we believe that voters information is sacred . . . [and is] personal information."); Doc.219-10 25:24 – 26:3 (a voter-registration form has "an immense amount of personal information," and a 3PVRO "become[s] a fiduciary and [is] now basically in charge of that person's ability to be registered to vote in elections in this state and our country"); 111:18-24 ("This bill makes it harder for bad actors to be bad actors. . . . They are the ones . . . denying people the right to vote by taking that right [to vote] and not delivering on that fiduciary promise"); Doc.219-6 15:8-16 ("[W]e wanted to make sure you . . . were a legal citizen handling this and you weren't an illegal doing third party voter registration. Again, that data is pretty private and sensitive."); Doc.219-7 7:23 – 8:2 ("We're just simply saying in an abundance of caution for that potential voter's personal information, that at the time they hand over that sacred information, that it goes to a U.S. citizen for collection and handling purposes only.").

a State need not wait until bad actors act, or an illegal alien fails to timely submit a voter-registration form and disenfranchises a voter. *Brnovich v. DNC*, 141 S. Ct. 2321, 2348 (2021). It's enough that there have been well-documented issues with 3PVROs, including 3PVROs untimely submitting voter-registration forms and misusing information contained on those forms. *See generally* Doc.92-1, 92-2, 92-3. It's enough that noncitizens, as a whole, may not have ties to communities and may pose a flight risk, making it difficult to, among other things, investigate the reasons for an untimely submission of forms or accusations of fraud. That's certainly a consideration in the pretrial-detention context. *See, e.g.*, *Alcazar v. State*, 349 So. 3d 930, 933 (Fla. 3d DCA 2022); Fla. Stat. § 907.041(5)(d). That's relevant here, too.

What's more, it's true that noncitizens work at the Department of State, supervisor of elections' offices, and the Department of Highway Safety and Motor Vehicles. Noncitizens can also be notaries. But comparing 3PVRO collectors and handlers with notaries and governmental employees isn't a fair comparison.

Not anyone can be a notary, and it's a remarkably highly regulated profession. *See, e.g.*, Fla. Stat. ch. 117. Anyone, however, can be an employee of or volunteer for Hard Knocks. As one of its supervisor-employees stated, "he was instructed to hire just about anyone who walked into the office seeking a job." Doc.219-8 at 14.

Not anyone can be an employee for a governmental agency, either. Background checks and a citizenship screening may be required. *See, e.g.*, Fla. Stat. § 448.09. But any illegal alien can volunteer for Hard Knocks or the League of Women Voters. Hard

Knocks "conducts no or limited background checks on their canvassers who" were "asked to handle sensitive" voter "information." Doc.219-8 at 15. Same with the League. Doc.219-9 at 24. Even SB7050's bill sponsors recognize these distinctions.[2] Thus a fair comparison can't be made here.

As such, the Citizen Restriction survives constitutional scrutiny.

**3.** The restriction also falls under the political-function exception to the Equal Protection Clause. The function's two-part test is met—even though the test isn't exhaustive and merely "focus[es]" the constitutional "inquiry." *Bernal v. Fainter*, 467 U.S. 216, 224 (1984). *See also* Doc.219-2 at 32-36; Doc.219-3 at 11-12. The Citizen Restriction isn't overinclusive. "[I]t applies narrowly to only one category of persons," those who collect and handle voter-registration forms. *Bernal*, 467 U.S. at 222. And as explained above, the restriction isn't underinclusive. Plaintiffs can't properly compare 3PVRO employee and volunteer collectors and handlers with notaries and governmental employees.

---

[2] Doc.219-6 20:7-16 ("So I think that what we're drawing now is the distinction between an employee who has been vetted and obviously hired, probably gone through different background checks and official channel situations, whereas we're talking about with a third-party voter registration organization, it's just that. It's an organization and it's a volunteer organization, assuming. And so I think there's a distinction there between official employment and being a volunteer for a group."); Doc.219-7 11:11-19 ("What I would say is I think in those specific instances that you referred to, whether at the Department of State or the DMV, et cetera, there's processes, procedures, sometimes background checks. There's clear operating procedures on how you are to comport yourself when handling that sensitive information in contrast with a third-party voter organization.").

And collectors' and handlers' duties go to the very heart of representative democracy. At its most basic level, the political-function exception "applies to laws that exclude aliens from positions intimately related to the process of democratic self-government." *Id.* at 220.

> The rationale behind the political-function exception is that within broad boundaries a State may establish its own form of government and limit the right to govern to those who are full-fledged members of the political community. Some public positions are so closely bound up with the formulation and implementation of self-government that the State is permitted to exclude from those positions persons outside the political community, hence persons who have not become part of the process of democratic self-determination.

*Id.* at 221. What's more basic to the process of democratic self-government than ensuring that a voter-registration form is submitted on time, and with form information protected? *Id.* The most major consequence of *failing* to do that is voter disenfranchisement.

Plaintiffs have argued that the political-function exception applies only to those with discretionary and policymaking functions. But this unduly exacting interpretation of the exception would preclude all ministerial tasks from the exception. That would leave no room for the Department of Homeland Security to mandate that only citizens serve as TSA screeners, as it already does, 49 C.F.R. § 1544.405(c), or for the Department of Defense to decide that the military officer carrying the President's nuclear football must be a citizen. The exception would become so narrow that it would

10

bar the government from passing laws to relegate certain important tasks to citizens even when doing so is critical to public confidence.

In sum, the exception applies.

## II. The § 1981 Challenge to the Citizen Restriction.

In *his* summary-judgment motion, the Secretary has already explained why he is entitled to summary judgment on the § 1981 challenge to the Citizen Restriction. Doc.201 at 15-19. He incorporates and adopts by reference those arguments here. Oddly enough, Plaintiffs don't mention his motion or respond to his arguments.

Again, as a general matter, § 1981 is an improper vehicle to invalidate a State statute, including a State election regulation. As mentioned in the Secretary's summary-judgment motion, § 1981 turns on, and was enacted to remedy issues with, race. Doc.201 at 16-17. To the extent that circuit precedent has interpreted § 1981 to also concern alienage, the Secretary preserves his right to argue to the contrary on appeal. *Compare Wright v. Southland Corp.*, 187 F.3d 1287, 1297 n.12 (11th Cir. 1999) ("Refusing to hire an individual on the basis of alienage is illegal under 42 U.S.C. § 1981."), *with Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1016 (2019) ("When it first inferred a private cause of action under §1981, this Court described it as affording a federal remedy against discrimination *on the basis of race*." (cleaned up and emphasis in original)), *and St. Francis College v. Al-Khazraji*, 481 U.S. 604, 606, 613 (1987) (noting that the district court concluded that "§ 1981 did not cover" "discrimination on the basis of national origin and religion" but that discrimination based on "ancestry or

11

ethnic characteristics" "is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory").

In their response, Plaintiffs also fail to acknowledge that § 1981 cases are business-to-business negotiation cases, employment-discrimination cases, and union-related cases. Doc.205-1 at 26-28. Plaintiffs' arguments would lead to the conclusion that Title VII—which is interpreted like § 1981 in employment-discrimination cases, *Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.5 (11th Cir. 2019) (en banc)—can invalidate a State statute, including an election regulation. That can't be right.

Even so, Plaintiffs raise a preemption challenge. Doc.205-1 at 26. And Plaintiffs continue to rely on *Takahashi v. Fish & Game Commission*, which, again, isn't a preemption case. Doc.205-1 at 27 (citing 334 U.S. 410, 419 (1948)). Plaintiffs (in another summary-judgment filing) also rely on *Toll v. Moreno*, a preemption case. Doc.218 at 22 (citing 458 U.S. 1 (1982)). There, Maryland offered preferential tuition and fees to "in state" students, which disadvantaged nonimmigrant aliens. *Id.* at 3. The U.S. Supreme Court held that such a policy was preempted by the federal government's immigration laws. *Id.* at 13-16. Far from hurting the Secretary, *Toll* helps him.

*Toll* recognized that "a State, in the course of defining its political community, may, in appropriate circumstances, limit the participation of noncitizens in the States' political and governmental functions." *Id.* at 12 n.17. The Court then cited *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982), *Ambach v. Norwick*, 441 U.S. 68 (1979), *Foley v. Connelie*, 435 U.S. 291 (1978), and *Sugarman v. Dougall*, 413 U.S. 634 (1973), for this

12

proposition. This suggests that in a preemption case involving alienage, the political-function exception should apply: if noncitizens are properly excluded from performing certain functions under the Equal Protection Clause, then it makes little sense to afford the race-based protections of § 1981 to them. The Secretary has already briefed this Court on how the Citizen Restriction satisfies the exception. The exception applies, and it eliminates any conflict between the State and federal statute. Plaintiffs' § 1981 preemption claim thus fails. "To the extent there is a paucity of case law applying" the political-function exception to a § 1981 claim, "this Court is fully empowered to apply straightforward" "principles to the laws at issue here." Doc.218 at 7. Those principles tilt in the Secretary's favor.

As such, Plaintiffs' § 1981 arguments fail; summary judgment should be granted in the Secretary's favor.

### III. The Mail-In Ballot Request Restriction.

The Secretary has already explained why he is entitled to summary judgment on the § 208 challenge to the Mail-In Ballot Request Restriction in his summary judgment motion. Doc.201 at 9-14. He incorporates and adopts by reference those arguments here. Plaintiffs neither mention his motion nor respond to his arguments.

The Secretary acknowledges that federal law provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C.

§ 10508 (also known as § 208 of the VRA). Plaintiffs, however, fail to acknowledge that another provision of Florida law—consistent with § 208—expressly authorizes voters who require assistance to choose their preferred helper. Section 101.051(3) states that "[*a*]*ny elector applying* to cast a vote-by-mail ballot . . . , in any election, *who requires assistance to vote by reason of blindness, disability, or inability to read or write may request the assistance of some person of his or her own choice, other than the elector's employer, an agent of the employer, or an officer or agent of his or her union*, in casting his or her vote-by-mail ballot." Fla. Stat. § 101.051(3) (emphasis added).

As the Secretary explains in his summary-judgment motion, section 101.051(3)—just like § 208 of the VRA—allows a voter who needs assistance "in casting his or her vote-by-mail ballot" to get assistance in requesting that ballot. Doc.201 at 11 (referring to the ordinary definition of "apply," common sense, and context); *see also Wakulla Cnty. Absentee Voter Intervenors v. Flack*, 419 So. 2d 1124, 1126 (Fla. 1st DCA 1982) (broadly interpreting section 101.051(3) as being "directed to all electors who seek assistance voting absentee" and "not limited to those who appear personally in the supervisor's office to execute and deposit their ballots"). The Secretary's in-pari-materia reading of the Mail-In Ballot Request Restriction and section 101.051(3) avoids a conflict between state-law provisions (the former being a general restriction and the latter carving out an

14

exception for voters who need assistance). It also avoids the issue of federal-law preemption. Summary judgment should thus be granted in the Secretary's favor.[3]

The proposed rule implementing the Mail-In Ballot Request Restriction (section 101.62(1)(a)) takes as a belt-and-suspenders approach to the issue. Rule 1S-2.055—which the Secretary has authority to promulgate pursuant to Florida law—is poised to codify a plain reading of the law, allaying any concerns, through an express statement that "[a] voter who requires assistance to request a vote-by-mail ballot because of his or her disability or inability to read or write" may "directly instruct a person of the voter's choice (other than the voter's employer or agent of that employer or officer or agent of the voter's union) to request a vote-by-mail ballot for the voter." Doc.200-4 (Fla. Admin. Code. R. 1S-2.055) (proposed).

Plaintiffs do not dispute that Rule 1S-2.055 is consistent with § 208 or the Florida Statutes. Instead, they point out that the proposed rule is not yet final. That is of course true. But it misses the point: the rule is consistent with the statutes.

Regardless, the sole hurdle to Rule 1S-2.055 taking effect is a challenge to the proposed rule in DOAH. *See* Fla. Stat. § 120.54(3)(e)6. ("The proposed rule shall be adopted on being filed with the Department of State and become effective 20 days after

---

[3] Relatedly, Plaintiffs lack standing (associational or otherwise) to challenge the Mail-In Ballot Request Restriction because their § 208 challenge cannot show any injury-in-fact fairly traceable to the Mail-In Ballot Request Restriction that a favorable ruling may redress. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). No conflict between federal and state law means no cognizable injury.

being filed . . . ."); *id.* at 120.54(3)(e)3. ("At the time the rule is filed, the agency shall certify . . . that there is no administrative determination pending on the rule."). And the Department recently filed a Motion for Summary Final Order in DOAH explaining why that challenge must fail, and the Department anticipates that the administrative law judge will rule on the Department's motion soon, as a hearing on the Department's motion is currently scheduled for February 14, 2024 at DOAH.

Plaintiffs further assert that even if Rule 1S-2.055 becomes final, courts may not defer to the Department's interpretation of the Mail-In Ballot Request Restriction and must instead interpret it de novo under Florida law. That is of course true as to *state* courts. Fla. Const. art. V, § 21. But that too misses the point. The question that Plaintiffs (and the petitioner before DOAH) must answer is whether the Department's interpretation is consistent with the State's rules of statutory construction. It is for all the reasons explained in the Secretary's motion for summary judgment (and in the Department's briefing at DOAH). Doc.201 at 13-14; *see also* Doc.200-4 (Fla. Admin. Code. R. 1S-2.055) (proposed) (referencing as the Department's rulemaking authority Fla. Stat. §§ 97.012(1)-(2), (9), 101.62(1)(a), 101.62(6), 101.662, and citing the laws implemented by the Department as Fla. Stat. §§ 97.061, 101.051(3), 101.62(1)(a), 101.62(6), 101.662).

\*   \*   \*

Finally, Plaintiffs contend that a permanent injunction is warranted. Doc.205-1 at 37-39. It's not, for the reasons expressed above and for the reasons expressed in previous filings. *E.g.*, Doc.92 at 33-34.

## Conclusion

The Secretary asks this Court—as to the § 1981 challenge to the Citizen Restriction and the § 208 challenge to the Mail-In Ballot Request Restriction—to grant summary judgment in his favor. As for the Equal Protection Clause challenge to the Citizen Restriction, he asks this Court to either (1) delay resolving the challenge until the Eleventh Circuit resolves his preliminary-injunction appeal or (2) invoke its authority under Rule 26(f)(1) and grant summary judgment in his favor.

Dated: February 13, 2024

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Joseph Van de Bogart (FBN 84764)
joseph.vandebogart@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

Respectfully submitted,

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Joshua E. Pratt (FB 119347)
jpratt@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

John J. Cycon (NYBN 5261912)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
15405 John Marshall Hwy
Haymarket, VA 20169
Telephone: (212) 701-3402
jcycon@holtzmanvogel.com

*Counsel for Secretary Byrd*

*\*Admitted pro hac vice*

## Certificate of Compliance

I certify that the summary-judgment memorandum is 4,106 words, which is under the 8,000-word limit in Local Rule 56.1(C). I also certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil

## Certificate of Service

I certify that on February 13, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil
