*Florida State Conference of Branches and Youth Units of the NAACP, et al. v. Cord Byrd, et al*. Case No. 4:23-cv-00215-MW/MAF

United States District Court for the Northern District of Florida, Tallahassee Division

EXPERT REPORT OF ALLAN J. LICHTMAN, PH.D.

_____

Allan J. Lichtman

_____

October 13, 2023

**TABLE OF CONTENTS**

I.    STATEMENT OF PURPOSE ................................................................ 1

II.   SUMMARY OF OPINIONS ................................................................. 1

III.  QUALIFICATIONS ............................................................................. 3

IV.   EVIDENCE AND METHODOLOGY ................................................. 5

V.    DISCRIMINATORY IMPACT OF S.B. 7050 ON MINORITIES ................................. 6

      A.   The ban on noncitizens collecting or handling registration materials has a
           discriminatory impact on minority noncitizen employees of 3PVROs. ...................... 7

      B.   Provisions of S.B. 7050 concerning noncitizens collecting or handling registration
           materials and the escalated fine structure for 3PVROs have a discriminatory impact
           on the ability of Black and Hispanic citizens of Florida to register and vote. ............ 10

      C.   The criminalization, including potential fines and imprisonment, of the retention of
           voter information for any purpose other than registration, including get-out-the-vote
           efforts and other voter assistance efforts, has a discriminatory impact on Black and
           Hispanic voters. Fla. Stat. § 97.0575(7). ................................................................ 14

      D.   Conclusions. ............................................................................................................. 15

VI.   THE DISCRIMINATORY IMPACTS OF CHALLENGED PROVISIONS OF S.B.
      7050 WERE FORESEEABLE AND KNOWN TO DECISION-MAKERS IN
      FLORIDA ........................................................................................... 16

      A.   Presentations to the state legislature. .................................................................... 17

      B.   Letters sent to legislative leaders and committee members. .................................. 18

      C.   Conclusions. ............................................................................................................ 21

VII.  HISTORICAL BACKGROUND FOR THE DECISION: RACIAL
      DISCRIMINATION IN FLORIDA ................................................. 22

      A.   Racial discrimination in voting. ............................................................................. 22

           1.   Racial discrimination in redistricting. ............................................................ 23

                a.   2002 redistricting preclearance ............................................................... 23

                b.   2010 proposed redistricting amendments .............................................. 24

                c.   The post-2010 redistricting ..................................................................... 26

                d.   2022 redistricting and CD 5 .................................................................... 29

           2.   Racially discriminatory actions of the Office of Election Crimes and Integrity
                and the Governor. ......................................................................................... 31

           3.   Multiple racially discriminatory voter purges. ............................................... 34

           4.   Conclusions. ................................................................................................. 38

      B.   Racial discrimination in education. ........................................................................ 39

           1.   Governor DeSantis and the legislature worked with white collaborators to
                revamp education in Florida according to their racial ideology. ...................... 39

i

2. Governor DeSantis and the legislature removed the ongoing history of racial discrimination from its public educational curriculum. ...................................... 44

3. The Florida legislature and governor banned "critical race theory" and other teachings on race. .................................................................................. 45

4. Florida banned books in schools and libraries based on race. .......................... 51

5. Conclusions. .............................................................................................. 55

C. Racial discrimination regarding immigrants. ........................................................ 56

1. Decision-makers in Florida promulgated a false immigrant threat narrative. ... 56

2. The same legislature that enacted S.B. 7050 enacted a harsh anti-immigration law…............................................................................................................ 61

3. Governor DeSantis deported Hispanic migrants to other states. ...................... 63

4. Conclusions. .............................................................................................. 64

**VIII. SEQUENCE OF EVENTS** ............................................................................ **65**

A. Governor DeSantis and the Florida legislature gain power in the state to pursue their racial ideology. ........................................................................................ 65

B. Increased regulation and financial penalization of third-party voter registration organizations. ........................................................................................... 69

C. Conclusions. .......................................................................................... 69

**IX. SUBSTANTIVE AND PROCEDURAL DEVIATIONS** .................................................. **70**

A. Florida decision-makers rushed the adoption of S.B. 7050. ....................................... 71

B. Decision-makers in the legislature reneged on their promise for an inclusive procedure. ............................................................................................... 75

C. The flawed process for enacting S.B. 7050 left sponsors confused about their own bill. .................................................................................................... 76

D. Conclusions. .......................................................................................... 77

**X. CONTEMPORARY STATEMENTS BY DECISION-MAKERS/RATIONALES FOR S.B. 7050** ............................................................................................... **77**

A. The prohibition, with associated fines, on lawful noncitizens from conducting voter registration activities. Fla. Stat. § 97.0575(1)(f). ................................................. 78

1. Decision-makers fail to justify having the noncitizen prohibition sweep in immigrants legally authorized to work in the United States. .......................... 78

2. State officials failed to offer credible post hoc rationales for banning noncitizens authorized to work in the U.S. ................................................................ 86

3. Conclusions. .............................................................................................. 89

B. The substantial increase in fines for late-returned voter registration applications and applications inadvertently submitted to the wrong county and the increase in the yearly maximum fine from $50,000 to $250,000. Fla. Stat. § 97.0575(5)(a)............. 90

    1. Legislative decision-makers fail to justify fines on applications returned after ten days, reduced from 14 days.......................................................................... 90

    2. Legislative decision-makers failed to justify fines on applications returned to the wrong county. .................................................................................................. 93

    3. Legislative decision-makers attempted but failed to justify sharply escalated fines on applications returned after book closing. ............................................. 95

    4. Legislative decision-makers failed to justify fines as high as $250,000 per year, five times greater than previously assessed. ...................................................... 98

    5. Conclusions.......................................................................................................... 99

C. The criminalization, including potential fines and imprisonment, of the retention of voter information for any purpose other than registration, including get-out-the-vote efforts and other voter assistance efforts. Fla. Stat. § 97.0575(7). .......................... 100

    1. Attempts by legislative decision-makers to justify this provision to avoid identity theft are unavailing. ........................................................................... 100

    2. Legislative decision-makers failed to understand how 3PVROs use retained information................................................................................................... 103

    3. Legislative decision-makers and the Secretary of State post-hoc failed to clarify the information retention provision. ...................................................... 105

D. Decision-maker's claims in defense of S.B. 7050 are self-defeating and contradictory. ........................................................................................................................... 108

E. Conclusions............................................................................................................ 108

**XI. THERE ARE LESS DISCRIMINATORY ALTERNATIVES TO CHALLENGED PROVISIONS OF S.B. 7050 .......................................................................... 109**

A. There is a less discriminatory alternative to a blanket ban on noncitizens collecting or handling registration information for 3PVRO......................................................... 110

B. There are less discriminatory alternatives to the severe fines for applications received after book closing, after 10 days, or in the wrong county......................................... 110

C. There is a less discriminatory alternative to the vague data retention provision. ..... 112

D. Maintaining the status quo on challenged provisions. ............................................. 113

E. Conclusions............................................................................................................ 113

## I.      STATEMENT OF PURPOSE

I have been asked by Plaintiffs' counsel in this case to consider and offer my opinions on whether Florida Senate Bill 7050, passed by Florida's legislature and signed by Governor Ron DeSantis in May 2023, was adopted with the intent to discriminate against minority voters, specifically Black and Hispanic voters in Florida. My analyses and opinions in this litigation are based on historical, political, and statistical information gathered and reviewed by me as an expert in political history, social science, and historical and statistical methodology. My analyses and opinions are not intended to offer a legal conclusion, but rather to provide the Court with facts and context for the ultimate legal determination on intent that it must make.

I have enclosed an updated CV, which fairly and accurately describes my training, education, and experience. My fee in this matter is $600 per hour. No part of my compensation depends upon my conclusions or opinions.

My analysis focuses on the following challenged provisions of S.B. 7050:

- The prohibition, with associated fines, on noncitizens from conducting voter registration activities on behalf of Third-Party Voter Registration Organizations (3PVROs).

- The substantial increase in fines for late-returned voter registration applications and applications submitted to the wrong county, both on a per-day basis and in aggregate.

- The criminalization, including potential fines and imprisonment, of the retention of voter information for any purpose other than registration, including get-out-the-vote efforts and other voter assistance efforts.

## II.     SUMMARY OF OPINIONS

Based on my experience and the evidence, methodology, and analyses discussed below, I have reached the following opinions:

- S.B. 7050 has multiple discriminatory impacts on Black and Hispanic people in Florida.

- The ban on noncitizens collecting or handling registration materials has a discriminatory impact on minority noncitizen employees of 3PVROs.

- Provisions of S.B. 7050 on noncitizens collecting or handling registration materials and the escalated fine structure for 3PVROs have a discriminatory impact on the ability of Black and Hispanic citizens of Florida to register and vote.

- The criminalization of record retention by 3PVROs has a discriminatory effect on the Black and Hispanic citizens that they primarily serve. These minorities will be deprived of helpful follow-up civic engagement, including information on how and where to vote once registered.

- The discriminatory impact of the challenged provisions of S.B. 7050 was foreseeable and known to decision-makers in Florida, through testimony of representatives of civic organizations (including specific and detailed analyses of the discriminatory impact of S.B. 7050 on the minority communities that 3PVROs serve in Florida), letters from civic organizations detailing the discriminatory impact of S.B. 7050 on Black and Hispanic people in Florida, and the failure of any outside organization or proponent of S.B. 7050 in the legislature to refute specifically the information and analyses in these testimonies and communications.

- Florida has a recent history of racial discrimination in voting, education, and immigration, which relates to the adoption of S.B. 7050.

- The sequence of events leading to the enactment of S.B. 7050 includes Governor DeSantis and the Florida legislature gaining power in the state to pursue their racial ideology.

- The Florida legislature adopted this significant legislation through a rushed and flawed process that departed from the process for enacting seven prior election bills.

- Contemporary statements by decision-makers fail to demonstrate non-discriminatory, good-government, non-racial rationales for the provisions of S.B. 7050 that impact 3PVROs.

- There are other less discriminatory alternatives to the challenged provisions of S.B. 7050, with collateral good-government benefits that are not present in the bill, which focuses only on punishment, including same-day registration or allowing registration applications to be returned closer to election day and specifying categories of sensitive information that 3PVROs may not retain.

- Given the lack of justification for the challenged restrictions in S.B. 7050, a less discriminatory alternative is retaining the status quo, which already substantially regulates 3PVROs.

III.    **QUALIFICATIONS**

This report draws on my expertise in political history, political analysis, historical and statistical methodology, my writings on voting rights, and my experience as a voting rights litigation expert. I am a Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 50 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data.

I am the author of numerous scholarly works on quantitative methodology in social science. This scholarship includes articles in such academic journals as *Political Methodology*, *Journal of Interdisciplinary History*, *International Journal of Forecasting*, and *Social Science History*. Additionally, I have coauthored *Ecological Inference* with Dr. Laura Langbein, a standard text on analyzing social science data, including political information. I have published articles on applying social science analysis to civil rights issues. This work includes articles in such journals as the *Journal of Law and Politics*, *La Raza Law Journal*, *Evaluation Review*, *Journal of Legal Studies*, and *National Law Journal*. My scholarship also includes using quantitative and qualitative methods to conduct contemporary and historical studies published in such academic journals as *Proceedings of the National Academy of Sciences*, *American Historical Review*, *International Journal of Forecasting*, *International Journal of Information Systems & Social Change*, and *Journal of Social History*.

Quantitative and historical analyses also ground my books, including *Prejudice and the Old Politics: The Presidential Election of 1928*, *The Thirteen Keys to the Presidency* (co-authored with Ken DeCell), *The Keys to the White House*, *White Protestant Nation: The Rise of the*

*American Conservative Movement*, and *FDR and the Jews* (co-authored with Richard Breitman). My most recent books are *The Case for Impeachment* (2017), *The Embattled Vote in America: From the Founding to the Present* (2018)*, and *13 Cracks: Repairing American Democracy After Trump* (2021). *The Embattled Vote*, published by Harvard University Press, examines the history and current status of voting rights in America.

I have worked as a consultant or expert witness for plaintiffs and defendants in more than one hundred voting and civil rights cases. My work includes cases for the United States Department of Justice and many civil rights organizations. I have also been a consultant or expert witness for state and local jurisdictions. Retired Associate Justice Anthony Kennedy authoritatively cited my statistical analysis in his majority opinion in *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006).

I have testified numerous times for both plaintiffs and defendants on issues pertaining to racial discrimination by legislative bodies. For example, I testified on behalf of plaintiffs challenging the post-1980 redistricting plan for the Los Angeles County Board of Supervisors (*Garza v. County of Los Angeles*, 756 F. Supp. 1298 (C.D. Cal. 1991)). I also testified on behalf of plaintiffs challenging North Carolina's Voter Information and Verification Act (VIVA) (*North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016)). I also testified on behalf of plaintiffs in the Section 2 litigation challenging Louisiana's congressional redistricting plan (*Robinson v. Ardoin*, 605 F. Supp. 3d. 759 (M.D. La. 2022)).

I testified on behalf of defendants in challenges to the state of Illinois's post-2010 congressional redistricting plan (*Committee for a Fair and Balanced Map v. Illinois State Board of Elections*, 835 F. Supp. 2d 563 (N.D. Ill. 2011)). I also testified on behalf of defendants in

challenges to Illinois's post-2020 state legislative redistricting plans (*McConchie v. Scholz*, 577 F. Supp. 3d 842 (N.D. Ill. 2021)).

I testified in state court on behalf of plaintiffs in the litigation challenging the city of Santa Monica's at-large system for electing city council members (*Pico Neighborhood Association v. City of Santa Monica*, 265 Cal. Rptr. 3d 530 (Ct. App. 2020)).

I have also testified in recent litigation in Florida. I testified as an expert for the state of Florida defendants in litigation challenging the Black voting age percentage of Congressional District 5 in 2015 (*Brown v. Detzner*, 895 F. Supp. 2d 1236 (M.D. Fla. 2012)). I testified as an expert for plaintiffs in litigation challenging Florida's so-called "sanctuary city" law (*City of South Miami v. DeSantis*, 408 F. Supp. 3d 1266 (S.D. Fla. 2019)), and its higher education bill H.B. 233 (*Link v. Diaz*, No. 4:21CV271-MW/MAF, 2023 WL 2984726 (N.D. Fla. Apr. 17, 2023)).

A full list of my recent testifying experience is included with my CV.

## IV.    EVIDENCE AND METHODOLOGY

This report draws upon sources standard in historical and social scientific analysis. Those sources include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic information; election returns; court opinions, briefs, and reports; government documents; hearing and legislative debate records; and scientific surveys. In a few instances, I will be referring to court opinions for their factual findings, not to present to this court a legal analysis.

In assessing intentional discrimination, the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corporation* set forth a non-exhaustive list of guidelines. 429 U.S. 252 (1977). This report employs those guidelines, which are standard in my field of study. In *Arlington Heights*, the Court focused on five factors to ascertain intentional discrimination: (1) the historical background for the decision, (2) discriminatory impact, (3) the

sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decision-making process, and (5) legislative history, including contemporaneous viewpoints expressed by the decision-makers. This report considers three additional guidelines that derive from guidance in *Arlington Heights* and that the Eleventh Circuit has relied on: (6) the foreseeability of the discriminatory impact, (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir. 2023).

This report will consider the factors in the following order. First, discriminatory impact. Second, the foreseeability and knowledge of the discriminatory impact. Third, historical background. Fourth, the sequence of events. Fifth, substantive and procedural deviations. Sixth, contemporary statements. Seventh, less discriminatory alternatives.

## V.    DISCRIMINATORY IMPACT OF S.B. 7050 ON MINORITIES

**"[I]n 2022, Alianza Center registered approximately 8,000 new voters . . . The Citizenship Requirement will diminish the organizations' missions and overall impact in third-party voter registration and GOTV work. Alianza Center's noncitizen employees and canvassers are outstanding and irreplaceable . . . Unfortunately, we are currently planning to suspend voter registration activities on June 30th due to the risk of exorbitant fines should S.B. 7050 go into effect."**

Marcos Vilar, the executive director of Alianza for Progress and president and founder of the associated Alianza Center[1]

Vilar explained that the noncitizen ban combined with the escalated fine structure devastate 3PVROs. The discriminatory impact is so severe that organizations such as Alianza have considered suspending their registration activities. The discriminatory impact will fall upon minority noncitizens authorized to work in the U.S. who currently work for 3PVROs and may seek future work in these organizations. In addition, the discriminatory impact of curtailed registration

---

[1] Decl. of Marcos Vilar at 3, 5, 7, ECF No. 54-10.

activities by 3PVROs falls upon minority residents of Florida. As demonstrated below, 3PVROs primarily register hard-to-reach Hispanic and Black communities. In its 2023 decision on S.B. 90, the Eleventh Circuit Court of Appeals recognized that the impact of curtailing 3PVROs will fall disproportionately on Black voters: "Sufficient evidence exists in the record to uphold the finding, on clear-error review, that the [registration-delivery] provision will have a disparate impact on black voters."[2] As the evidence presented below further demonstrates, S.B. 7050 will additionally deprive minorities disproportionately of follow-up civic engagement that provides information to registrants, informing them about issues and how to turn out to vote in elections.

### A. The ban on noncitizens collecting or handling registration materials has a discriminatory impact on minority noncitizen employees of 3PVROs.

The restrictions that ban noncitizens and escalate the fine structure for 3PVROs have multiple discriminatory impacts. First, noncitizens, who are lawfully working with the 3PVROs as Lawful Permanent Residents (LPRs), including those eligible for citizenship, persons under Temporary Protected Status and Deferred Action for Childhood Arrival (DACA), and persons with student visas, are overtly discriminated against. This discrimination is based on alienage and race. The vast majority of LPRs in Florida are non-white or from overwhelmingly non-white countries of origin. In addition, the testimony of persons and 3PVROs affected by this restriction indicates that the affected noncitizens are overwhelmingly minority.

According to 2021 data from the U.S. Census Bureau American Community Survey (ACS), 1,834,175 noncitizens reside in Florida. Of these noncitizens, 1,445,555 were born in Latin America (78.8%). In addition, of the noncitizens, 169,755 were born in Asia (9.3%), and 20,322 were born in Africa (1.1%), for a combined percentage of 89.2% of Florida's noncitizens from Latin America, Asia, or Africa. Thus, by prohibiting this class of Florida residents working with

---

[2] *League of Women Voters of Fla. Inc.*, 66 F.4th at 942.

3PVROs from collecting and handling voter registration information, S.B. 7050 discriminates on the basis of both alienage and race.

A quantitative analysis of Florida's LPRs yields similar demographic results. The Department of Homeland Security analyzed the country of origin for 1.1 million LPRs who arrived in Florida from fiscal year 2013 to 2022. The researchers found that 91% of the arrivals originated from Latin America, Africa, and Asia.[3] An analysis by the Equity Research Institute at the University of Southern California examined the 880,000 LPRs in Florida who are eligible for citizenship (two-thirds of all LPRs) and found a similar racial profile.[4] Of this group, 61% were Latino, 14% Black, 6% Asian/Pacific Islander, and 1% others, for a combined 82% non-white.[5] The study found that 40% of LPRs eligible to naturalize in Florida have a high probability of naturalization, and 39% have a medium probability.[6]

Although only national data is available, analysis of other groups lawfully eligible to work in the U.S. yields even higher percentages from Latin America, Africa, and Asia. For persons under Temporary Protected Status, the National Immigration Forum reported that 96% came from Latin America, Africa, and Asia.[7] The only exception was 22,480 from Ukraine.[8] For persons under DACA, the U.S. Citizen and Immigration Services reported that nationally, 99% were from Latin

---

[3] Off. Immigr. Stat., *Lawful Permanent Residents (LPR)*, U.S. Dep't of Homeland Sec., at 2022 Data Tables (Including Supplementary Tables), https://www.dhs.gov/immigration-statistics/lawful-permanent-residents (Aug. 21, 2023). A breakdown of the category "North America" shows a small component from Canada and the remainder from Mexico and other Latin American countries north of South America.

[4] Kim, Sabrina, *Interactive Map: Eligible to Naturalize Adults by Probability of Naturalization – by State*, Equity Rsch. Inst., Univ. of S. Calif. Dornsife, https://dornsife.usc.edu/csii/map-eligible-to-naturalize-state (hover cursor over Florida on map) (last visited Oct. 4, 2023).

[5] *Id.*

[6] *Id.*

[7] *Fact Sheet: Temporary Protected Status (TPS)*, Nat'l Immigr. F., https://immigrationforum.org/article/fact-sheet-temporary-protected-status/ (Oct. 3, 2023).

[8] *Id.*

America, Asia, and Africa.[9] For international students, Open Doors reported that for the academic year 2021-2022, 92% nationally were from Latin America, Asia, and Africa.[10]

Critically, the S.B. 7050 prohibition on the employment of noncitizens encompasses immigrants lawfully eligible to work in the U.S. As documented below in the section on the contemporary statements/justifications for S.B. 7050, some of the most active 3PVROs in the Latino community work with substantial numbers of noncitizens, lawfully authorized to work in the U.S., as canvassers and staffers. These noncitizens working with and for 3PVROs will likely be dismissed and barred from future employment, as 3PVROs cannot risk $50,000 fines that would cripple their operations. These are good jobs that not only allow these individuals to earn a paycheck but also serve the public interest in making it easier for eligible Floridians to register to vote.

LPRs depend upon their well-paid jobs with 3PVROs. Marcos Vilar, the Executive Director of Alianza for Progress, Inc., testified in his declaration in support of the preliminary injunction that "[i]n addition to being passionate about the work, our canvassers also depend on Alianza for employment and rely on the salaries Alianza provides them. Canvassers make almost double the minimum wage."[11] Johana Florez, the canvassing manager for Alianza testified in the declaration that she submitted in support of the motion for the preliminary injunction that "[m]y position is paid and it is my main source of income. We also pay canvassers between $15 to $25 per hour, which I understand is a significant source of income for all of them."[12] Esperanza

---

[9] U.S. Citizenship & Immigr. Servs., *Count of Active DACA Recipients By Country of Birth as of September 30, 2022*, U.S. Dep't of Homeland Sec. (Sept. 30, 2023), https://www.uscis.gov/sites/default/files/document/data/Active_DACA_Recipients_Sept_FY22_qtr4.pdf (table located at page 2 of linked document).
[10] *2022 Fast Facts*, Open Doors, at 1, https://opendoorsdata.org/wp-content/uploads/2022/11/Open-Doors-2022_Fast-Facts.pdf (last visited Oct. 6, 2023) (table titled "Places of Origin of International Students").
[11] Vilar Decl. at 5-6.
[12] Decl. of Johana Florez at 8, ECF No. 54-11.

Sánchez, an organizer for UnidosUS, testified in her declaration that UnidosUS paid her $24 an hour for her registration work.[13] "I don't want to lose a job that I care about a lot, my income and the important personal connections that I have gained in UnidosUS," she testified.[14] Veronica Herrera-Lucha, of Mi Vida, who is authorized to work under her Temporary Protected Status, testified in her declaration in support of the preliminary injunction that "I am paid a salary of $55,000 a year by my employer. I am the only member of my family with a steady income. My income supports three (3) family members living in Florida and one (1) family member in El Salvador."[15]

Norka Martínez testified that she is not a lawful permanent resident, but "I have had Temporary Protected Status in the United States since 2022. I am authorized to work in the United States."[16] She testified that she has physical disabilities that preclude her from working many jobs, but not as a registration canvasser.[17] She added, "My job as a canvasser is my sole source of income and if I lose it, I will have trouble covering bills, medical costs, and other household expenses. I will also be less able to provide support for my family, including my sisters, niece, and their children, all of whom are in my home country Venezuela and who I currently help support financially."[18]

**B. Provisions of S.B. 7050 concerning noncitizens collecting or handling registration materials and the escalated fine structure for 3PVROs have a discriminatory impact on the ability of Black and Hispanic citizens of Florida to register and vote.**

The restrictions on noncitizens and the extreme penalties would also cripple the ability of

---

[13] Decl. of Esperanza Sanchez at 7, ECF No. 54-8.
[14] *Id.* at 9.
[15] Decl. of Veronica Herrera-Lucha at 4, *Hispanic Federation v. Byrd,* No. 4:23-cv-00218-MW-MAF (N.D. Fla. June 8, 2023) ("*Hispanic Federation*"), ECF No. 32-3.
[16] Decl. of Norka Martínez at 1, *Hispanic Federation*, ECF No. 32-4.
[17] *Id.* at 3-4.
[18] *Id.* at 4.

the 3PVROs to register voters, as indicated in the Vilar declaration,[19] with a discriminatory impact on Black and Hispanic voters that these organizations primarily serve. Other spokespersons for 3PVROs provided similar testimony in their declarations.

Frederick Vélez III Burgos, the National Civic Engagement Director for the Hispanic Federation, testified in his declaration that "[b]ecause Hispanic Federation will no longer let individuals assist with voter registration efforts unless they can demonstrate proof of citizenship, we will have to turn down even U.S.-citizen staff who cannot (or do not wish to) furnish the requisite proof," and "[t]he real threat of significant financial penalties to Hispanic Federation will meaningfully limit our voter registration efforts."[20] Consequently, "[i]n response to threat of financial risks, Hispanic Federation [was] considering imposing a moratorium on all voter registration activities after July 1, 2023" if the preliminary injunction did not take effect.[21]

Jared Nordlund, the State Advocacy Director of UnidosUS, testified in his declaration that "[f]rom 2008 to 2022 we registered 406,005 Floridia voters. Of those registrations, 370,181 were registered through community canvassing."[22] He further testified that the noncitizen prohibition and fines would devastate his organization, and even if UnidosUS revamps their operations in response to S.B. 7050, "UnidosUS does not know how well this program will work if we relaunch it. We will still face the difficulty of finding canvassers to staff this program, which will be very difficult if not impossible if we cannot hire noncitizens. UnidosUS could not withstand the $50,000 fine associated with the Citizenship Requirement. A $50,000 fine is a large part of UnidosUS's budget."[23]

---

[19] Vilar Decl. at 5-6.
[20] Decl. of Frederick Vélez III Burgos at 9-10, *Hispanic Federation*, ECF No. 32-1.
[21] *Id.* at 11.
[22] Decl. of Jared Nordlund at 3, ECF No. 54-5.
[23] *Id.* at 9.

Nancy Batista, the co-founder of Poder Latinx, testified in her declaration in support of the preliminary injunction that "[S.B. 7050] will result in Poder Latinx losing the majority of its workforce—approximately 90 percent of its staff, and approximately 70 percent of its volunteers. . . . Losing these staff members and volunteers will make it difficult for Poder Latinx to continue registering voters, and impossible to continue registering voters at the same rates we have done in past election cycles."[24] She added, "because the Law imposes fines for even the unknowing use of noncitizen staff and volunteers, to impose a fine, self reporting or anything short of proof of citizenship would create too much risk for Poder Latinx to continue operating, especially with a $50,000 fine per head for any noncitizen who assists our organization," and "Plaintiffs will register substantially fewer eligible citizens to vote than they could absent the Law."[25]

Adora Obi Nweze, president of the Florida State Conference of Branches and Youth Units of the NAACP, testified in her declaration in support of the preliminary injunction that "[j]ust one $50,000 fine, for example, will severely diminish our organization's budget because Florida NAACP and local branches rely almost exclusively on membership dues to fund their work."[26] She added, "[t]here are also no assurances that Florida NAACP will be able to replace these noncitizen canvassers. . . . It is an intense and difficult job, requiring dedication, patience, and the ability to connect one-on-one with strangers—often in hot and humid weather or in extremely rural areas where individuals are underserved."[27]

A study for this litigation by Michael C. Herron, Professor of Quantitative Social Science at Dartmouth College, found a strong relationship between race and 3PVRO registrations. Professor Herron examined the registration sources in the September 2023 voter file. Professor

---

[24] Decl. of Nancy Batista at 6, *Hispanic Federation*, ECF No. 32-2.
[25] *Id.* at 10, 14.
[26] Decl. of Adora Obi Nweze at 4-5, ECF No. 54-12.
[27] *Id.* at 5-6.

Herron found that 10.13% of Black registrants registered with a 3PVRO, 9.44% of Hispanic registrants, and 1.54% of white registrants. [28] Thus, the Black percentage of 3PVRO registrants is 6.6 times higher than the white percentage, and the Hispanic percentage is 6.1 times higher.

Professor Herron extended his analysis to examine only those who registered after January 2012. He found that 12.84% of Black registrants registered with a 3PVRO, 10.3% of Hispanic registrants, and 1.97% of white registrants.[29] Thus, the Black percentage of 3PVRO registrants is 6.5 times higher than the white percentage, and the Hispanic percentage is 5.2 times higher. In addition, Professor Herron conducted a multiple regression analysis designed to isolate the independent effect of 3PVRO registrations by race. He found that the results for Black registrants and Hispanic registrants were statistically significant at less than 0.0001, indicating a very low probability of obtaining the results under chance.[30] This level of statistical significance is far beyond the stringent level used in social science of 0.01.

The restrictions posed by S.B. 7050 already have had the effect of substantially diminishing the registrations signed up by 3PVROs. In recent years, 3PVROs have geared up their efforts in the summer, likely because of the availability of volunteers and temporary workers. During the five years from 2018 through 2022, 3PVROs in Florida registered an average of 5,222 voters in July. Excluding the outlier 14,754 in July 2018, the average is 2,840 for July.[31] S.B. 7050 became

---

[28] Expert Report of Michael C. Herron, at Table 15 (Oct. 13, 2023).

[29] *Id.*

[30] *Id.* at Table 17.

[31] Fla. Div. of Elections, *Voter Registration Reports: Archived Monthly Reports*, Fla. Dep't of State, at 2018-2022 https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/ (Oct. 3, 2023) (for each year 2018-2022, download zip folder and open spreadsheet entitled "Voter Registration Applications Received by Source and County" and navigate to "July" tab).

effective on July 1, 2023.[32] In July 2023, 3PVROs registered only 238 Floridians.[33] Thus, on average, the 3PVRO registration total for July 2018 to 2022 is 21.9 times higher than the total for July 2023 and 11.9 times higher with the outlier removed. The July 2022 3PVRO registration total of 4,743 was 19.9 times more than the July 2023 total.[34]

### C.   The criminalization, including potential fines and imprisonment, of the retention of voter information for any purpose other than registration, including get-out-the-vote efforts and other voter assistance efforts, has a discriminatory impact on Black and Hispanic voters. Fla. Stat. § 97.0575(7).

As explained by Vilar, *supra*, and other statements from representatives of 3PVROs in the section on contemporary statements/rationales for S.B. 7050, these organizations retain information for vital follow-up work. The 3PVROs provide follow-up civic engagement that provides registrants with information about issues, candidates, and where and how to vote in elections. The vague provisions prohibiting retained information and the criminalization of violations serve as a deterrent to this good-government civic engagement.

As explained by the League of Women Voters in its lawsuit challenging S.B. 7050, 3PVRO canvassers face criminal prosecution "whether the voter consents to the League's retention of their contact information for continued political communications and association[] . . . [t]he challenged provisions of SB 7050 contain steep criminal and civil sanctions for even a single inadvertent

---

[32] Fla. Stat. § 97.0575. This court later enjoined parts of S.B. 7050 as pertaining to 3PVROs on July 3, 2023, leaving intact the fine structures for violations other than the bans on noncitizens and retaining voter information. *See* Prelim. Inj. Order 56-58, ECF No. 101.

[33] Fla. Div. of Elections, *Voter Registration Reports: Current Voter Registration Data*, Fla. Dep't of State, at "Monthly Report by Source & County," https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/ (Oct. 3, 2023) (click link to download and navigate to "July" tab).

[34] Fla. Div. of Elections, *Voter Registration Reports: Archived Monthly Reports*, Fla. Dep't of State, at 2022, https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/ (for year 2022, download zip folder and open spreadsheet entitled "Voter Registration Applications Received by Source and County" and navigate to "July" tab); Fla. Div. of Elections, *Voter Registration Reports: Current Voter Registration Data*, Fla. Dep't of State, at "Monthly Report by Source & County," https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/ (click link to download and navigate to "July" tab).

violation."[35] Additionally, "SB 7050 does not define 'personal information,' nor does it elaborate on what uses of personal information by 3PVROs would be 'in compliance' with this statute."[36]

The chilling effects of the vague retention provision have a discriminatory impact on Black and Hispanic citizens of Florida who register with 3PVROs in much greater percentages than white citizens. These disproportionately Black and Hispanic citizens registered by 3PVROs will be deprived of the helpful follow-up civic engagement and voter information that 3PVROs could previously engage in without concern for criminal prosecution.

### D. Conclusions.

By incorporating the harshest restrictions on 3PVROs of any state, S.B. 7050 has several discriminatory impacts on Black and Hispanic Floridians. The provision banning noncitizens from collecting and handling registration materials denies employment to minority noncitizens who are otherwise authorized to work in the United States. This burdened group includes 880,000 lawful permanent residents in Florida who are eligible for naturalization as U.S. citizens. The effects on 3PVROs of the noncitizen ban combined with a potentially devastating fine structure crimp their registration activities. These provisions of S.B. 7050 thus have a discriminatory impact on the Black and Hispanic citizens that these organizations mainly serve. Additionally, the vague criminalization of information retention deprives these same minorities of valuable civic engagement, including follow-up information to facilitate voting.

---

[35] Compl. at 43, *League of Women Voters of Fla., Inc. v. Moody*, No. 4:23-cv-00216 (N.D. Fla. May 24, 2023), ECF No. 1.
[36] *Id.* at 45.

## VI.    THE DISCRIMINATORY IMPACTS OF CHALLENGED PROVISIONS OF S.B. 7050 WERE FORESEEABLE AND KNOWN TO DECISION-MAKERS IN FLORIDA

**"By further disenfranchising returning citizens negatively and stigmatizing immigrants and subjecting third-party voter registration organizations to restrictive rules and excessive fines, it is evident that you have used this opportunity to score political points at the expense of Floridians who desire more access to the ballot box. One out of every 10 black and brown voters are registered by third-party voter registration organizations as well as two out of every white — two out of every 100 white voters. These organizations are essential for engaging black and brown communities."**

Genesis Robinson, Equal Ground Action Fund, April 2023[37]

This statement by Genesis Robinson during the hearings on S.B. 7050 typifies presentations to decision-makers about the foreseeable discriminatory impact of the legislation on registration efforts that disproportionately engage Black and Hispanic citizens in Florida. While Democrats made similar arguments in debates, this section will not recount claims by political opponents of those sponsoring S.B. 7050. It focuses on analyses of discriminatory impact presented to the legislature by representatives of non-profit Florida civic organizations with expertise and interest in registration and 3PVROs. The first set of examples relates to testimony before State Senate and House committees. The second set of examples relates to letters sent to legislative leaders and committee members. Even before the presentations to the legislature on the discriminatory impact of S.B. 7050, the Eleventh Circuit Court of Appeals acknowledged that during the debate on S.B. 90 "some legislators" already knew that 3PVROs disproportionately registered Black as compared to white voters.[38]

---

[37] *Meeting of the Fla. State House Comm. on State Affairs*, 2023 Leg., Reg. Sess., at 57:14-25 (Apr. 19, 2023) (statement of Genesis Robinson, Political Director, Equal Ground Action Fund).
[38] *League of Women Voters of Fla. Inc.*, 66 F.4th at 942.

## A.  Presentations to the state legislature.

The following are examples of presentations to the state legislature, including both House and Senate committees reviewing the bill, on the discriminatory impact of S.B. 7050 by representatives of civic organizations. These analyses establish the link between S.B. 7050's crippling impact on 3PVROs and the Black and Hispanic Floridians who will be burdened disproportionately.

- **Amy Keith, Common Cause of Florida**: And we're not seeing an added investment in that community outreach while we're cracking down on the organizations, the community organizations who do it. This bill makes it harder for organizations to recruit volunteers and harder for immigrants, including legal residents to support their communities by banning all noncitizens from even touching voter registration forms.[39] [T]his legislator [sic] attacks the very community-based organizations who are out there supporting and educating voters. If that isn't voter suppression through confusion, I don't know what is. . . . It tells voter registration groups that they have to improve accountability and give receipts but then it appears to prohibit them from collecting the very information necessary to ensure accountability to voters.[40]

- **Jonathan Webber, SPLC Action Fund**: We are concerned that the extreme regulations and penalties proposed in this bill on community-based voter registration organizations will have a chilling effect on registration efforts across the state. To be clear, eligible black and Hispanic voters are roughly five times more likely than white voters to rely on community-based voter registration organizations like the ones targeted in this bill. These organizations are vital for black and brown communities across the state to participate fully in our democracy. We are also uncomfortable with the section of the bill [] related to prohibiting noncitizens from collecting or handling voter registration applications on line 393 to 400. Not only is this discriminatory towards a certain group of people, especially people of color from work or volunteer opportunities, but we feel this could have a chilling effect on voters from reaching out to the individuals of their choice to help them with the voting and registration process.[41]

- **Brad Ashville, Voting U. S. Local [sic]**[42]: We focus on eliminating discriminatory barriers to voting before we – before they happen . . . These groups do huge service by engaging a lot of voters in the process. One in 10 black and Hispanic voters are registered by third-party voter registration groups. The aggregate annual fines being raised in [sic] $250,000. This alone will discourage these groups and have a chilling effect.[43]

---

[39] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y*, 2023 Leg., Reg. Sess., at 68:6-13 (Apr. 20, 2023).
[40] *Meeting of the Fla. State House Comm. on State Affairs* at 62:5-9, 62:15-19 (Apr. 19, 2023).
[41] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 81:15-82:9 (Apr. 20, 2023).
[42] The speaker was Brad Ashwell, All Voting Is Local.
[43] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 90:13-14, 90:22-91:2 (Apr. 20, 2023).

- **Abdullah Shkir, ACLU of Florida**: It directly harms community-based groups that conduct voter registration continuing to significantly raise the financial penalties by such a significant amount, will all but squeeze them out of performing this service altogether. And it's a vital service because most – because a lot of these communities that they reach are no offense to you all, but communities that political campaigns just traditionally don't reach. Some other speakers mentioned some statistics, one out of every 10 black voters and one out of every 10 Hispanic voters are registered by a third-party voter registration organization. That's just not a number that's coming out of thin air, that was done after a statistical analysis by Dr. Daniel Smith during the SB90 Federal litigation.[44]

- **Jason Oberlink, Florida Rising**: This bill raises the fines and penalties on third-party voter registration groups who are just trying to increase civic engagement. These increased restrictions will just dissuade well-meaning organizations from helping to register voters out of fear of the potential financial burden. . . . Ultimately, we know that increase[d] barriers to participate in elections will disproportionately impact black and brown Floridians.[45]

- **Cecile Scoon, League of Women Voters of Florida**: [T]his whole scheme, 7050, is actually going to hurt hundreds of thousands of voters by dissuading them, by not allowing them to vote. What about those people? I mean, . . . this is going to have such a negative impact. It's been testified to and established in the . . . Senate Bill 90 litigation that the, the impacts of limiting things on third-party border registrants has [sic] a bigger impact on black and brown that has been brought out before. . . . To raise those – those fines and fees like that, I think is simply telling third-party voter registration organizations to go away.[46]

**B. Letters sent to legislative leaders and committee members.**

In addition to this testimony, on April 19, 2023, in anticipation of the April 20 hearing of the State Senate Committee on Fiscal Affairs, the NAACP Legal Defense Fund (LDF) sent a letter to "Chair Hutson, Vice Chair Stewart, and Committee Members."[47] LDF said, "Because several of S.B. 7050['s] measures would likely diminish this right [to participate in the electoral process and elect chosen candidates] for voters of color, we urge you to oppose it."[48] It stated, "[T]he bill would double the aggregate cap on fines that can be levied against community-based voter

---

[44] *Id.* at 99:16-100:6.
[45] *Meeting of the Fla. State House Comm. on State Affairs* at 75:14-20, 76:14-16 (Apr. 19, 2023).
[46] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 103:7-17, 104:13-15 (Apr. 20, 2023).
[47] Letter from LDF to Fla. State Sen. Comm. on Fiscal Pol'y at 1 (Apr. 19, 2023), https://www.naacpldf.org/wp-content/uploads/LDF-Opposition-to-SB-7050.pdf.
[48] *Id.*

registration organizations for minor errors or other violations with respect to voter registration applications within a calendar year. This change could expose such groups—who provide a critical service to Florida voters, and especially for voters of color—to exorbitant fines, chilling their engagement in constitutionally protected activities."[49] It objected to a bill that "doubles the already elevated fine from $50,000 to $100,000."[50] Thus, the bill would impose exorbitant fines, LDF noted, even if a 3PVRO "made a harmless error."[51] Thus, "[b]y chilling community-based voter registration organizations' activities, and thereby likely reducing the availability of voter-registration drives, S.B. 7050 will likely further diminish access to the franchise for Black and Latino voters in Florida."[52]

At the time of this letter, the current version of S.B. 7050 would double the maximum aggregate yearly fine from $50,000 to $100,000, which LDF noted above would have a chilling effect on 3PVROs. However, in its final version, S.B. 7050 increased the existing fine five-fold to $250,000.[53]

On April 25, 2023, a coalition of 35 civic groups sent a letter to the State Senate President and Speaker of the House, likewise objecting to challenged provisions of S.B. 7050 regarding 3PVROs.[54] Signatories included such 3PVRO stakeholders as the Florida NAACP, Alianza for Progress, UnidosUS, Hispanic Federation, Florida Rising, Poder Latinx, Mi Familia Vota Florida,

---

[49] *Id.* At the time, LDF believed that S.B. 7050 would double the maximum yearly fine for 3PVROs from $50,000 to $100,000. Ultimately, the bill quintupled the yearly fine to $250,000.

[50] *Id.* at 2.

[51] *Id.*

[52] *Id.* at 3.

[53] *Compare* Fla. S.B. 7050 Filed, 2023 Leg., Reg. Sess. (Apr. 5, 2023), https://www.flsenate.gov/Session/Bill/2023/7050/BillText/Filed/PDF, *with* Fla. S.B. 7050 er, 2023 Leg., Reg. Sess. (Apr. 28, 2023), https://www.flsenate.gov/Session/Bill/2023/7050/BillText/er/PDF.

[54] Letter from Coalition to Kathleen Passidomo, President, Fla. State Senate & Paul Renner, Speaker of the House, Fla. State House of Representatives (Apr. 25, 2023), https://lwvfl.org/lwv-of-florida-other-voting-civil-rights-organizations-pen-letter-to-legislature-on-senate-bill-7050-house-bill-7067/.

Mi Vecino, Harriet Tubman Freedom Fighters, and the League of Women Voters of Florida.[55]

The Coalition stated, "We have serious concerns that the requirements, deadlines, and fines for voter registration organizations these bills would establish are so harsh that the impact would be a gutting of community-based voter registration in Florida. Taken together, these changes create a framework that would make it extremely difficult for nonprofit voter registration organizations to operate. We believe this framework would have the harshest impacts on smaller organizations who are closest to the communities they serve."[56]

The Coalition critiqued both the citizenship requirement for workers handling and collecting registration material and the new fine structures for 3PVROs. "This legislation would make it difficult and expensive for organizations to engage volunteers as well as employees," the Coalition stated.[57] "It would prohibit all noncitizens, including lawful permanent residents and others, from handling voter registration forms. This is discriminatory on its face, implying that noncitizens are untrustworthy purely on the basis of their immigration status, and would also force organizations to check the citizenship status of every single voter registration volunteer."[58] Consequently, S.B. 7050 would "essentially require even small community organizations to conduct full background checks on potential volunteers or cease operations if they cannot afford such checks. If found to be in violation of this language, groups face a fine of $50,000 per person."[59]

The increase in "the annual amount of fines that may be assessed against third-party voter registration organizations from $50,000 to $250,000 per year," the Coalition said, "is well beyond

---

[55] *Id.* at 1.
[56] *Id.*
[57] *Id.* at 2.
[58] *Id.*
[59] *Id.* (emphasis omitted).

an amount that community-based organizations, many of whom rely on volunteers, can even begin to afford."[60] The Coalition concluded that "[t]ogether [the citizenship restrictions and new fine structures] will create an overwhelming chilling effect, and groups will have to decide between risking fines of a magnitude they cannot shoulder, or simply cease undertaking voter registration activities altogether."[61] Finally, "[i]t must be noted that this legislation will have a disproportionate impact on Black and Hispanic voters — one out of every 10 of whom are registered by these organizations, along with one out of every 50 white voters."[62]

### C. Conclusions.

No witness and no legislator in any hearing came forth to refute with evidence or analysis that 1) S.B. 7050 would curtail the operations of 3PVROs; 2) 3PVROs predominantly register minorities in Florida; and 3) any curtailment of their operations would disproportionately diminish opportunities for minorities in Florida to register and vote.

Dozens of civic organizations with knowledge and expertise in registration, voting, and 3PVROs, including stakeholders, warned the legislature in detail of the foreseeable discriminatory impact of S.B. 7050. Despite assurances from key decision-makers of an inclusive process that included stakeholders, the decision-makers ignored all warnings. Rather than making the bill less discriminatory, decision-makers in the legislature increased the burdens on 3PVROs through a late escalation of maximum yearly fines from $100,000 to $250,000. Stakeholders and civic representatives had already apprised legislators that even lower fines could be crippling to their 3PVROs.

---

[60] *Id.*
[61] *Id.*
[62] *Id.* (citing Smith Rep.).

## VII.   HISTORICAL   BACKGROUND   FOR   THE   DECISION:   RACIAL DISCRIMINATION IN FLORIDA

This section of the report examines racial discrimination in voting and two other areas of discrimination that bear upon S.B. 7050: racial discrimination in education and against immigrants. Racial discrimination in education discloses decision-makers' views on race. It further reveals their commitment to enshrining racially discriminatory viewpoints into law, foreshadowing S.B. 7050's crackdown on the 3PVROs that primarily serve minority communities. Racial discrimination against immigrants further reveals decision-makers' views on race and helps to explain S.B. 7050's prohibition on employing noncitizens in voter registration efforts. This report will not recount the more distant history of Florida's official racial discrimination in voting that is well-established and recognized by courts. It will consider only twenty-first-century discrimination.

### A.  Racial discrimination in voting.

There are multiple twenty-first-century instances in which the state of Florida has acted to discriminate against minority voters. Official acts of racial discrimination by the state of Florida include redistricting plans, voter purges, and actions related to other election legislation. Few cases resulted in judicial assessments of intentional discrimination, but in most cases, the evidence is still indicative of discriminatory intent, as analyzed below.

**1. Racial discrimination in redistricting.**

**In the court-ordered plan, "Black voters had the ability to elect the candidate of their choice in the district," in Congressional District 5 in North Florida.**

**"None of the Enacted [2022] districts in North Florida are districts in which Black voters have the ability to elect their preferred candidates."**

Stipulations of Florida State Defendants in litigation on the State's 2022 congressional redistricting plan.[63]

In these stipulations, Florida decision-makers admitted that Black voters could elect candidates of their choice in North Florida Congressional District 5 under the court-ordered prior congressional plan. They further stipulated that in the 2022 plan, they knowingly dismantled this district and deprived Black voters in Northern Florida of the opportunity to elect their preferred candidates to Congress.[64] Florida's 2022 congressional redistricting plan, which the Office of Governor Ron DeSantis drafted and the state legislature then enacted, submerged North Florida's Black voters into white-dominated congressional districts. This discriminatory redistricting by the Governor and the legislature followed a recent history of Florida decision-makers acting to restrict minority opportunities to register and vote, including earlier redistricting. The enactment of the discriminatory provisions of S.B. 7050 is a continuation of this contemporary historical precedent. In Florida, the recent past is prologue.

**a. 2002 redistricting preclearance**

The passage of the Voting Rights Act did not end voting discrimination against minorities in Florida. Since the mid-1970s, Section 5 of the Act covered five counties in Florida, which required preclearance by the U.S. Department of Justice (DOJ) or a declaratory judgment by the

---

[63] Final Order After Hearing & Final Judgement at 12-13, *Black Voters Matter Capacity Bldg. Institute, Inc. v. Fee*, No. 2022-CA-666 (Fla. Cir. Ct. Sept. 2, 2023), Filing No. 181045906.
[64] *Id.*

D.C. District Court for any changes in voting laws, rules, and regulations. These counties included Collier, Hardee, Hendry, Hillsborough, and Monroe.[65]

Under the preclearance provision, before its invalidation by the U.S. Supreme Court in June 2013, the DOJ objected to Florida's 2002 statewide redistricting plan for the State House of Representatives as retrogressive of Hispanic voter opportunities in the covered Collier County.[66] The DOJ found that less discriminatory alternatives were available to the Florida state legislature: "Within the context of electoral behavior in the district and the availability of alternative redistricting plans, the state has not met its burden that this reduction will not result in a retrogression in Hispanic voters' effective exercise of their electoral franchise, or that any retrogression was unavoidable."[67]

Given its findings under Section 5, the DOJ did not need to examine decision-makers' intent in adopting the State House of Representatives' plan. However, the DOJ objection, which Florida did not contest in the D.C. District Court, bears upon three elements of the expanded *Arlington Heights* factors: discriminatory impact, the foreseeable impact, and the availability of less discriminatory alternatives.

### b. 2010 proposed redistricting amendments

In 2010, voting rights advocates put Constitutional Amendments 5 and 6 on the state ballot to restrict partisan gerrymandering and racially discriminatory redistricting for Congress and the state legislature.[68] On the last day of the 2010 legislative session, the state legislature voted to put

---

[65] C.R. Div., *Jurisdictions Previously Covered by Section 5*, U.S. Dep't of Just., https://www.justice.gov/crt/jurisdictions-previously-covered-section-5 (May 17, 2023).
[66] Letter from Ralph F. Boyd, Jr., Assistant Att'y Gen. to John M. McKay, President, Fla. State Senate & Tom Feeney, Speaker of House, Fla. State H.R., at 2 (July 1, 2002), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/FL-1040.pdf.
[67] *Id.*
[68] Michael Peltier, *Amendment 7 and 8 on Ballot*, Sunshine State News (May 18, 2010) http://www.sunshinestatenews.com/story/amendments-7-and-8-ballot.

another amendment, Amendment 7, on the November 2010 ballot.[69] A Florida reporter wrote Amendment 7 "is the Legislature[']s response" to the anti-gerrymandering Amendments 5 and 6, put on the ballot by Fair Districts Florida.[70] He explained that Amendment 7 was "asking voters to put certain requirements for redrawing districts in the constitution, regardless of what is required by two other amendments, 5 and 6, which were put on the ballot through the signature process."[71]

In May 2010, the Florida State Conference of the NAACP, the League of Women Voters, and other plaintiffs filed suit, claiming that Amendment 7 was a transparent attempt to confuse voters about the anti-gerrymandering and anti-racial discrimination amendments and engineer their defeat.[72] In July 2010, Florida Circuit Court Judge James Shefler struck Amendment 7 from the November ballot. He ruled that the Amendment "would allow this or any future legislature, if it chose to do so, to gerrymander districts guided by no mandatory requirements or standards and subject to no effective accountability so long as its decisions were rationally related to, and balanced with, the aspirational goals set out in Amendment 7 and the subordinate goal of contiguity."[73] The Florida State Supreme Court affirmed this ruling.[74] The Court concluded that "we agree with the well-reasoned judgment of the circuit court and affirm the judgment striking proposed Amendment 7 from the ballot because the ballot language fails to inform the voter of the chief purpose of Amendment 7 and the effect it will have on the existing, mandatory constitutional provisions in article III."[75]

---

[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *See* Compl., *Fla. State Conf. of NAACP Branches v. Fla. Dep't of State*, No. 2010-CA-1803 (Fla. Cir. Ct. May 21, 2010).
[73] Order Granting Summary Final Judgment at 5, *Fla. State Conf. of NAACP Branches v. Fla. Dep't of State*, No. 2010-CA-1803 (Fla. Cir. Ct. July 12, 2010).
[74] *Fla. Dep't of State v. Fla. State Conf. of NAACP Branches*, 43 So. 3d 662 (Fla. 2010).
[75] *Id.* at 669.

A supermajority of 63% of Florida voters then ratified Amendments 5 and 6. Tier 1 of the amendments prohibits redistricting plans drawn with the intent to achieve a partisan advantage or "with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice."[76] The secondary Tier 2 requirements stipulate that "[u]nless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries."[77] These Tier 1 and Tier 2 requirements are identical for state legislative districts (Amendment 5) and congressional districts (Amendment 6).

### c.   The post-2010 redistricting

The redistricting process that followed the enactment of Amendments 5 and 6 led to considerable litigation, including several Florida Supreme Court decisions. One issue that reached the Court involved the state legislature's redistricting plan for Congressional District 5 in Northern Florida. In 2014, State Circuit Court Judge Terry Lewis rejected the state legislature's plan for Congressional District 5, which he found needlessly packed Black voters beyond 50% Black voting age population (BVAP).[78] The judge rejected the state's race-based claim that such packing was necessary to provide Black voters the ability to elect candidates of their choice in the district: "The Defendants' argument that the vote dilution provision of Article III Section 20 and Section 2 of the Voting Rights Act required a majority BVAP district, and that this configuration was necessary to achieve that end, is not supported by the evidence."[79] The court additionally found

---

[76] Fla. Const., art. III, § 21(a).
[77] Fla. Const., art. III, § 21(b).
[78] *Romo v. Detzner*, No. 2012-CA-000412, 2014 WL 3797315, at *3, 15 (Fla. Cir. Ct. July 10, 2014)
[79] *Id.* at *9.

that Republican legislators and consultants had drawn the plan for CD 5 in secret,[80] a foreshadowing of the secretive process of drafting S.B. 7050.

After the legislature redrew CD 5, the case reached the Florida Supreme Court. The Court found that even in the redrawn district, the legislature had intentionally packed the Black population of Congressional District 5 in North Florida beyond what was needed to enable Black voters to elect a candidate of their choice in CD 5.[81] Unlike the redistricting before Amendment 6 on congressional districts, the state could not justify the packing of Black voters by claiming it was seeking partisan advantage and not discriminating against minorities. Instead, the state defended the district according to race, as disingenuously necessary to protect Black voter opportunities.[82]

The Florida Supreme Court rejected this claim: "After redrawing the district, the BVAP of remedial District 5 is 48.11%. The Legislature continues to argue that any additional diminishment in the BVAP would prevent black voters from electing a candidate of their choice. But neither the evidence, nor the case law, bears this out."[83] The Court ordered the adoption of an alternative plan, with an East/West configuration rather than the North/South configuration in the legislative plan.[84] The Court found that the BVAP of the new CD 5 "is well within the range of the 42.7%, 46.7%, and 46.9% BVAP percentages that were addressed by the federal court in *Martinez* and considered to be sufficient to 'afford black voters a reasonable opportunity to elect candidates of choice,' and to 'in fact perform for black candidates of choice.'"[85] The East/West CD 5 withstood a vote

---

[80] *Id.* at *11.
[81] *League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 403-04 (Fla. 2015).
[82] *Id.*
[83] *Id.*
[84] *Id.* at 406.
[85] *Id.* at 404.

dilution challenge in federal court,[86] and as noted below, this district has stood the test of time in enabling Black voters to elect the candidate of their choice to Congress in every subsequent election held in the district.

For the drawing of the post-2010 State Senate plan under Amendment 5, the Senate stipulated that the plan failed to comply with the new state constitutional intent requirements, prohibiting redistricting plans drawn with the intent to attain partisan advantage or with the intent or result of impacting the equal opportunity of racial or language minorities to elect the candidates of their choosing. The legislature, however, failed to pass a remedial plan, although the Senate submitted Senate Plan 1 to the trial court that was also reviewing a plan submitted by the plaintiffs in the case. Senate Plan 1, like the legislature's congressional plan, violated the intent requirements by intentionally diminishing the influence of Black voters through packing. Senate Plan 1 needlessly packed Black voters into this district, thereby diminishing their influence in other districts. The Circuit Court of the Second Judicial Circuit, Leon County, rejected the opinion of the Senate's expert, who criticized plaintiffs' District 31, as "not persuasive," and "the court instead accept[ed] the opinion and analysis of Dr. Lichtman, and f[ound] that Plaintiff's proposed District 31 effectively performs for African American candidates of choice without retrogression."[87]

Senate Plan 1 also reduced opportunities for Hispanic voters to elect candidates of their choice by packing South Florida Hispanic voters into three majority-Hispanic districts. In contrast, the plaintiffs' plan created four less-packed Hispanic State Senate districts in South Florida. The Court agreed with plaintiffs and held that "a fourth Hispanic-performing district not only can, but

---

[86] Amended Order at 16, *Brown v. Detzner*, No. 4:15-cv-00398-MW/CAS (N.D. Fla., Apr. 18, 2016), ECF No. 77. I was the expert witness for the Florida state defendant in this litigation.
[87] Final Judgement Adopting Remedial Senate Plan at 29, *League of Women Voters v. Detzner*, No. 2012-CA-2842, (Fla. Cir. Ct. Dec. 30, 2015).

should, be drawn in South Florida."[88] The Court concluded that it "is also convinced that the Senate has failed to carry its burden of demonstrating that Senate Map 1 does not result in vote dilution," which violated the intent requirements.[89] It found that the Senate had failed to show "that it is necessary to confine Hispanics in South Florida into three districts of 75% or greater."[90] By rejecting Senate Plan 1 and adopting the plaintiffs' plan, the Court remedied intentional efforts by the state legislature to diminish Hispanic voting opportunities.

### d.  2022 redistricting and CD 5

In the congressional redistricting that followed the 2020 Census, the legislature enacted a bill with a primary plan that significantly modified CD 5, which the Florida Supreme Court had mandated in 2015 but which legislators maintained would still enable Black voters to elect candidates of their choice. The legislature also included a secondary plan in case the courts invalidated the primary plan under the diminishment standard. The secondary plan largely preserved the performing status quo for Black voters in CD 5. However, Governor DeSantis vetoed the bill, and legislators took the extraordinary step of relinquishing congressional redistricting to the Governor.[91] DeSantis responded in April 2022 by imposing on the legislature a congressional redistricting plan drafted by DeSantis's office that defied the state's constitutional ban on racial diminishment and destroyed performing black opportunity CD 5, a seat that Black Democrat Al Lawson had held since 2016.[92] Ironically, instead of packing CD 5 as legislators had proposed in 2015, the 2022 plan embodied the other standard mechanism for diminishing minority voter

---

[88] *Id*. at 37.

[89] *Id.*

[90] *Id*.

[91] Mary Ellen Klas, *DeSantis Takes Over Redistricting. Outcome Could Reshape Florida Political Landscape*, Miami Herald, https://www.miamiherald.com/article260383342.html (Apr. 19, 2023).

[92] *Id.*

opportunities. It cracked the Black community and submerged Black voters in white-dominated districts.[93]

A lawsuit filed by a coalition of civil rights groups charged that the 2022 congressional plan violated the intent requirements of Amendment 6 on racial diminishment. Under a compromise agreement to facilitate the litigation in state circuit court, the state defendants – Cord Byrd, in his official capacity as Secretary of State, the Florida House of Representatives, and the Florida Senate – agreed to stipulations conceding that the 2022 plan knowingly eliminated CD 5 as a previously performing Black opportunity district. Specifically, the defendants agreed to stipulate that "Black voters had the opportunity to elect their candidate of choice" in benchmark CD 5; that Lawson was the candidate of choice of Black but not white voters in CD 5; and that benchmark CD 5 was splintered into four districts with BVAPs of "23.1%, 15.9%, 31.7%, and 12.8%, respectively."[94] Defendants further stipulated that "[n]one of the Enacted districts in North Florida are districts in which Black voters have the ability to elect their preferred candidates."[95]

Based on these stipulations, the circuit court found that "Plaintiffs have shown that (1) the Benchmark district (in this case, Benchmark CD-5) allowed Black voters the ability to elect the candidate of their choice, and (2) the Enacted Plan weakens (or in this case, actually eliminates) Black voters' ability to elect the candidate of their choice. Under the standard set out by the Florida Supreme Court in Apportionment I, Plaintiffs have proven their diminishment claim."[96]

By its own binding stipulation, the legislature knowingly diminished Black voting opportunities in northern Florida by dismantling Black opportunity CD 5. Although it is difficult

---

[93] *Id.*
[94] Final Order After Hearing & Final Judgement at 11-12, *Black Voters Matter Capacity Bldg. Institute, Inc. v. Fee*, No. 2022-CA-666 (Fla. Cir. Ct. Sept. 2, 2022), Filing No. 181045906.
[95] *Id.* at 13.
[96] *Id.* at 18.

to prove a negative, I am unaware of any other state that dismantled an effective Black opportunity district that consistently had elected a Black candidate of choice of Black voters in any twenty-first-century congressional redistricting.[97]

### 2. Racially discriminatory actions of the Office of Election Crimes and Integrity and the Governor.

On August 18, 2022, Governor Ron DeSantis called a press conference to announce arrests by his Office of Election Crimes and Integrity.[98] This unit is essentially a special fraud police, the first in the nation,[99] that the Governor proposed and the legislature adopted in 2022. Even though the office was set up after suggestions of sweeping and widespread election fraud, the police arrested 20 isolated individuals who allegedly voted illegally.[100] They were all apparently former felons who failed to navigate Florida's convoluted system of felon disenfranchisement.[101] Florida has no central database for ex-felons to learn if they are eligible for reenfranchisement. The arrests included persons who stated in affidavits that they had registered to vote, were given voter ID cards, and were cleared to vote.[102] Historically, white decision-makers used felon disenfranchisement in the south during the post-Civil War era to target Black people.[103] It still falls

---

[97] *Redistricting Litigation Roundup*, Brennan Center for Justice (July 7, 2023), https://www.brennancenter.org/our-work/research-reports/redistricting-litigation-roundup-0.

[98] WPLG via Fla. Channel, *Governor Ron DeSantis Announces 20 Arrests for Voter Fraud in Florida [Video]*, Miami Herald (Aug. 18, 2022), https://www.miamiherald.com/news/politics-government/state-politics/article264654564.html.

[99] Ryan Teague Beckwith, *DeSantis's Election Fraud Police Spurs Copycats in GOP-Led States*, Bloomberg, (March 22, 2023), https://www.bloomberg.com/news/articles/2023-03-21/desantis-s-election-cops-spur-copycat-efforts-in-gop-led-states#xj4y7vzkg.

[100] *Id.*

[101] *Id.*

[102] Monivette Cordeiro, *Arrested Orange County Voters Dais They Were Told Rights Had Been Restored, Affidavits Show*, Orlando Sentinel, (Aug. 18, 2020), https://www.orlandosentinel.com/news/crime/os-ne-orange-felons-illegal-voting-believed-rights-restored-20220819-twbxrqzpuvawrn6hox5xyl5qoa-story.html.

[103] Angela Behrens, *et al.*, *Ballot Manipulation and the 'Menace of Negro Domination': Racial Threat and Felon Disenfranchisement in the United States, 1850–2002,* 109 Am. J. of Socio., 559 (2003).

most heavily on Black people in Florida.[104] Of the 19 arrested with racial identification, 14 (74%) were Black.[105]

According to a report in the *Miami Herald*, those arrested came from Broward, Hillsborough, Miami-Dade, Orange, and Palm Beach counties.[106] According to the 2020 U.S. Census, Broward is 67% minority, Hillsborough, 54%, Miami-Dade, 87%, Orange, 54%, and Palm Beach, 48%. Florida, statewide, is 48% minority. Most of those referenced in the press conference as committing criminal voter fraud received voter cards, which they reasonably assumed was official recognition of their right to vote.[107]

DeSantis did not call a press conference to announce the arrests of four white persons from The Villages, a heavily white retirement community.[108] Authorities arrested those individuals for attempting to cast multiple ballots.[109] Multiple voting is a crime in every state, unlike voting by former felons.[110]

---

[104] Dyjuan Tatro, *Felony Disenfranchisement Suppresses the Votes of Black and Latinx Americans*, Vera Inst. of Just. (Oct. 26, 2020), https://www.vera.org/news/felony-disenfranchisement-suppresses-the-votes-of-black-and-latinx-americans; *see also* Romy Ellenbogen & Bianca Padro Ocasio, *'How Did I Commit Voter Fraud?' Ex-Felon Voters Confused by Arrests, DeSantis' Announcement*, Miami Herald (Aug. 19, 2022), https://www.miamiherald.com/news/politics-government/article264698334.html; Nazgol Ghadnoosh, *Voting Rights in the Era of Mass Incarceration: A Primer*, The Sentencing Project (July 28, 2021), https://www.sentencingproject.org/policy-brief/voting-rights-in-the-era-of-mass-incarceration-a-primer/.

[105] Sam Levine, *Man Arrested at Gunpoint in DeSantis Voter Fraud Crackdown, Video Shows*, The Guardian, (Jan. 12, 2023), https://www.theguardian.com/us-news/2023/jan/12/florida-police-man-arrest-voter-fraud-body-camera.

[106] Romy Ellenbogen & Bianca Padro Ocasio, *'How Did I Commit Voter Fraud?' Ex-Felon Voters Confused by Arrests, DeSantis' Announcement*, Miami Herald (Aug. 19, 2022), https://www.miamiherald.com/news/politics-government/article264698334.html

[107] Gerard Albert III, *Questions Grow Over Gov. DeSantis' Voter Fraud Arrests*, WGCU News, (Sept. 22, 2022), https://news.wgcu.org/2022-09-06/questions-grow-over-gov-desantis-voter-fraud-arrests.

[108] U.S. Census Bureau, *The Villages CDP, Florida*, https://www.census.gov/quickfacts/fact/table/thevillagescdpflorida/https://www.census.gov/quickfacts/fact/table/thevillagescdpflorida/PST045219 (last visited Oct. 5, 2023).

[109] Miami Herald Editorial Board, D*eSantis' voter-fraud arrests have a conveniently beneficial side effect for GOP: intimidation*, Miami Herald (Aug. 22, 2022), https://www.miamiherald.com/opinion/editorials/article264763999.html.

[110] *Felony Disenfranchisement Laws (MAP)*, ACLU, https://www.aclu.org/issues/voting-rights/felony-disenfranchisement-laws-map (last visited Oct. 4, 2023).

By mid-2023, many of the fraud cases touted by DeSantis had begun to fall apart. [111] Some were dismissed, or local prosecutors declined to bring them to trial. Per a report in the *Washington Post*, six have been dismissed, and five have resulted in plea deals carrying no jail time.[112] The only defendant to go to trial was convicted of lying on his voter registration application but acquitted of voting illegally.[113]

The legislature had established the Office of Election Crimes and Security despite only de minimis fraud in Florida's elections. DeSantis lauded the 2020 elections in Florida as the "gold standard" for elections.[114] The one-year experience of the Office substantiates the lack of voter fraud as a problem in Florida. According to a July 14, 2023 DeSantis press release, referrals by the Office had resulted in only thirteen felony convictions, not all for voter fraud, and thirty-two "arrests or warrants being issued."[115] Florida has 13.9 million registered voters;[116] 11.1 million voted in 2020, and 7.8 million in the midterm elections of 2022.[117] None of the voter fraud cases DeSantis cited in the press release involved organized, systematic fraud rather than individual violations. The number of fraud convictions was less than one-ten thousandth of one percent (0.0001) of voters in 2020 and 2022.

---

[111] Isabel Rupp, *DeSantis Fraud Prosecutions are Already Falling Apart*, Daily Beast (Sept. 1, 2022), https://www.thedailybeast.com/florida-gov-ron-desantis-voter-fraud-arrests-are-already-falling-apart.

[112] Lori Rozsa, *The first arrests from DeSantis's election police take extensive toll*, Washington Post (May 1, 2023), https://www.washingtonpost.com/nation/2023/04/30/desantis-election-police-arrests-florida/.

[113] *Id.*

[114] Lori Rozsa & Time Craig, *DeSantis' New Election Crimes Unit Makes Its First Arrests*, Washington Post (Aug. 18, 2022), https://www.washingtonpost.com/politics/2022/08/18/desantis-florida-election-arrests/.

[115] Staff, *Governor Ron DeSantis Highlights Accomplishments During First Year of Office of Election Integrity Office* (July 14, 2023), https://www.flgov.com/2023/07/14/governor-ron-desantis-highlights-accomplishments-during-first-year-of-election-integrity-office/.

[116] Fla. Div. of Elections *Voter Registration – By County and Party*, Fla. Dep't of State, https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/voter-registration-by-county-and-party/ (Oct. 3, 2023).

[117] Fla. Div. of Elections, *November 3, 2020 General Election Official Results*: *Voter Registration and Turnout*," Fla. Dep't of State, https://results.elections.myflorida.com/Index.asp?ElectionDate=11/3/2020&DATAMODE= (select 'Voter Turnout' in sidebar); Fla. Div. of Elections, *November 8, 2022 General Election Official Results: Voter Registration and Turnout*, Fla. Dep't of State, https://results.elections.myflorida.com/Index.asp?ElectionDate=11/8/2022&DATAMODE=.

The state legislature in 2023 intervened to strengthen this Office of Election Crimes. Under state law, DeSantis's statewide election integrity office could only prosecute certain crimes that affected or occurred in 2 or more of Florida's 20 judicial circuits. The Florida legislature enacted, and DeSantis signed on February 15, 2023, S.B. 4-B, to keep DeSantis's current and future prosecutions alive. The legislation authorizes statewide prosecutors to prosecute alleged voter fraud identified by the state's election police. Unlike local elected district attorneys, the governor appoints statewide prosecutors. In early May, the state legislature increased the budget for the fraud police by a quarter, from $1.1 million to $1.4 million.[118]

### 3.  Multiple racially discriminatory voter purges.

Florida engaged in three flawed attempted purges of the voter rolls that discriminated against minorities from 2000 to 2012. The state legislature was deeply implicated in these purge efforts. The state legislature initiated the process for purging voters in 1998 when it enacted Senate Bill 1402, Florida Statutes section 98.0975 3(a)-(b), "Central voter file; periodic list maintenance." The legislation ordered that the "division [of elections] shall annually contract with a private entity to compare information in the central voter file with available information in other computer databases, including, without limitation, databases containing reliable criminal records and records of deceased persons. The entity contracted by the division is designated as an agent of the division for purposes of administering the contract."[119] The legislation provided that "[u]pon receiving the [purge] list from the division, the supervisor must attempt to verify the information provided."[120] It did not explain how such verification would take place, which opened the door to discriminatory

---

[118] Adam Edelman and Matt Dixon, *Florida Republicans Increase Budget for Ron DeSantis' Election Police Effort*, NBC News (May 5, 2023), https://www.nbcnews.com/politics/politics-news/florida-gop-raise-budget-ron-desantis-election-police-effort-rcna82487.
[119] Fla. S.B. 1402 er, 1998 Leg., at 12, https://www.flsenate.gov/Session/Bill/1998/1402/BillText/er/PDF.
[120] *Id.*

purges through the unusual process of designating an outside agency for voter list verification. Florida was the only state to hire an outside firm to purge voter rolls at the time.[121]

Before the 2000 elections, pursuant to statute, Florida hired an outside firm, Database Technologies, Inc., which became a subsidiary of ChoicePoint, to provide it with a list of allegedly ineligible former felons on the registration rolls.[122] However, state officials intervened to loosen criteria in ways that would expand the list inaccurately, as demonstrated by the following email exchange reported by the *Los Angeles Times*.[123] In March 1999, Emmet "Bucky" Mitchell, a lawyer supervising the purge for Florida's Division of Elections, sent an e-mail to Marlene Thorogood, the Database Technologies project manager, urging her to loosen the criteria as far as possible for purging.[124] "Obviously, we want to capture more names that possibly aren't matches and let [county election] supervisors make a final determination rather than exclude certain matches altogether," Mitchell wrote.[125] "Unfortunately, programming in this fashion may supply you with false positives," or misidentifications, Thorogood replied.[126] When county officials complained of the flawed list, Thorogood responded, "Tell them, she wrote, that 'this is THEIR duty to research–not shift blame to [Database Technologies]. . . . We were not contracted for that.'"[127]

According to the *Palm Beach Post*'s analysis, the list was so flawed that "officials in 20

---

[121] Gregory Palast, *Florida's Flawed 'Voter Cleansing' Program*, Salon (Dec. 4, 2000), https://www.salon.com/2000/12/04/voter_file/.

[122] *Id.*

[123] Lisa Getter, *Florida Net Too Wide in Purge of Voter Rolls*, L.A. Times (May 21, 2001), https://www.latimes.com/archives/la-xpm-2001-may-21-mn-620-story.html.

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Id.*

counties [of 67] rejected the list."[128] Still, the *Palm Beach Post* study found that in other counties, "at least 1,100 eligible voters wrongly purged from the rolls before last year's [2000] election."[129] The list vastly overrepresented Black voters. According to the *Palm Beach Post*'s analysis, 88% of those wrongly removed from the rolls through this list were Black, compared to 11% of Black voters on the registration rolls.[130] The email cited above indicates an intent to expand the flawed list to include "non-matches." Such inaccuracies provide an opening to maximize the discriminatory impact on minorities as compared to an accurate and balanced list. Despite widespread publicity about the flawed purge list, neither the legislature nor then-Florida Governor Jeb Bush acted to remedy the problem.

In 2001, the state legislature further inserted itself into the purge controversy, making it more challenging to discover a racially biased purge process. The legislature enacted Florida Statutes section 98.0979(1)(a), which carved out exceptions for registration from constitutional transparency requirements. Article 1, Section 24 of the Florida Constitution stipulates that "Every person has the right to inspect or copy any public record made or received in connection with the official business of any public body, officer, or employee of the state, or persons acting on their behalf," with limited specified exceptions, not including registration data. Nonetheless, with Section 98.0979(1)(a), the state legislature provided that "Any citizen shall be allowed to examine the voter registration records but may not make any copies or extract therefrom except as provided by this section." The exceptions included only municipalities and other government agencies, political candidates and committees, and incumbent officeholders. In the next purge, just three

---

[128] Scott Hiaasen, et al., *Felon Purge Sacrificed Innocent Voters*, Palm Beach Post (May 27, 2001), https://web.archive.org/web/20041010061949/http://www.palmbeachpost.com/news/content/news/election2000/election2000_felons2.html.

[129] *Id.*

[130] *Id.*; Lisa Getter, *Florida Net Too Wide in Purge of Voter Rolls*, L.A. Times (May 21, 2001), https://www.latimes.com/archives/la-xpm-2001-may-21-mn-620-story.html.

years after the legislature passed this shield law, Florida officials relied on 98.0979(1)(a) to conceal their purge list from press and public scrutiny until a state judge ruled it unconstitutional.[131]

In 2004, Florida's then-Governor Jeb Bush initiated another purge of registration rolls with a flawed list of allegedly ineligible voters that again disproportionately included Black voters. A July 2004 *New York Times* report headlined "Florida List for Purge of Voters Proves Flawed" found that "of nearly 48,000 Florida residents on the felon list, . . . more than 22,000 are African American." — 46% compared to 15% of Black voters on the registration rolls.[132]

Despite these two flawed efforts, in 2012, then-Governor Rick Scott launched yet another systematic voter purging program. This time, the state shifted from removing allegedly ineligible felons to removing alleged noncitizens from the registration rolls.[133] According to an analysis by the *Miami Herald*, 58% of registrants on the Secretary's inaccurate list of 2,600 possible noncitizens were Hispanic, despite comprising only 13% of all registrants.[134]

In a June 2012 letter, the U.S. Department of Justice informed then-Secretary of State Ken Detzner that the purge violated the Voting Rights Act and the National Voter Registration Act.[135] After the Secretary defied the DOJ and continued the purge, the DOJ and private plaintiffs filed

---

[131] *See* Robert Yoon, *County Boards Reviewing Lists for Accuracy*, CNN (July 4, 2004), https://www.cnn.com/2004/ALLPOLITICS/05/28/fla.vote/; Final Declaratory and Summary Judgment, *Cable News Network, et al. v. Florida Department of State, et al.*, No. 2004-CA-1259 (Fla. Cir. Ct. July 1, 2004).
[132] Ford Fessenden, *Florida List for Purge of Voters Proves Flawed*, N.Y. Times (July 10, 2004), https://www.nytimes.com/2004/07/10/us/florida-list-for-purge-of-voters-proves-flawed.html; Fla. Div. of Elections, *Book Closing Reports: Archive Download*, Fla. Dep't of State (Oct. 19, 2021), https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/bookclosing/ (download file named "Presidential Preference Primary/General/Primary Archive Download (1994 - 2014)," then open zip folder named "2004_Gen" and open file named "2004genRace").
[133] Mackenzie Weinger, *Secretary Defies DOJ on Voter Purge*, Politico (June 7, 2002), https://www.politico.com/story/2012/06/florida-defies-doj-on-voter-purge-077164.
[134] Marc Caputo, *58 Percent Of Voters Targeted In Noncitizen Hunt Are Hispanic. Whites, GOP Least Likely To Face Purge*, Miami Herald (May 13, 2012), https://miamiherald.typepad.com/nakedpolitics/2012/05/58-percent-of-voters-targeted-in-noncitizen-hunt-are-hispanic-whites-gop-least-likely-to-face-purge.html.
[135] Mackenzie Weinger, *Secretary Defies DOJ on Voter Purge*, Politico (June 7, 2002), https://www.politico.com/story/2012/06/florida-defies-doj-on-voter-purge-077164.

suit.[136] They charged that the Secretary had conducted voter purges within 90 days of an upcoming election, violating the National Voter Registration Act.[137] The Eleventh Circuit Court of Appeals ruled against the Secretary's purge. It noted, "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote. This is why the 90 Day Provision strikes a careful balance: It permits systematic removal programs at any time except for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest."[138]

Again, the abandoned purge effort did not result in litigation on discriminatory intent. However, given that this was the third consecutive racially biased purge attempt since 2000 in Florida, Florida officials in the governor's administration and the legislature were well advised of the clear discriminatory impact of the flawed purge and did not adopt the less discriminatory alternative of developing accurate and non-biased methodology.

### 4. Conclusions.

Florida's recent history of racial discrimination in voting is unique compared to the nation in several ways. It was one of only three states where the U.S. Department of Justice objected to a 2000 legislative redistricting plan. It was the only state in recent history that dismantled a performing Black congressional district that had consistently elected a Black candidate of choice and submerged Black voters in white-dominated districts. It was the first state to establish a fraud police and target Black alleged violators at higher rates. It was the first state to require through legislation that an outside firm purge voter registration lists. It was the only state that launched

---

[136] Rachel Weiner, *Florida's Voter Purge Explained*, Washington Post (June 18, 2002), https://www.washingtonpost.com/blogs/the-fix/post/floridas-voter-purge-explained/2012/06/18/gJQAhvcNlV_blog.html.
[137] *Id.*
[138] *Arcia v. Florida. Secretary of State*, 772 F.3d 1335, 1346 (11th Cir. 2014).

three flawed, racially discriminatory voter purges in just a dozen years. These recent precedents provide the backdrop to Florida's adoption of the most onerous restrictions on 3PVROs anywhere in the nation.

### B.  Racial discrimination in education.

**"The institution of slavery really sets up a racial paradigm that really has implications and consequences that come all the way down to the present. When you begin to tell young people in particular that African Americans benefited from slavery in any way, that begins to undermine what those of us who study the institution know."**

Bernard Powers, Director for the Center for the Study of Slavery at the College of Charleston, July 2023.[139]

Powers refers to the new African American History Curriculum adopted for public schools in Florida. Consistent with the racial ideology of Florida decision-makers, the curriculum downplays the evils of slavery and largely ignores the lingering and present-day discrimination faced by Black people in Florida. Consistent with this ideology, Florida adopted other policies that disregard recent scholarship to diminish the ongoing history and current status of racial discrimination. Florida policies generally restrict the teaching about race and ban texts authored by prominent minority writers, as discussed below.

### 1.  Governor DeSantis and the legislature worked with white collaborators to revamp education in Florida according to their racial ideology.

Over the last few years, the state of Florida—specifically the majority of its legislature and Governor—has been dedicated to rewriting and minimizing the well-documented and indisputable ongoing history of racial discrimination in the United States and Florida.

In one of his first acts as Governor, Ron DeSantis issued an executive order calling for the Commissioner of Education, Richard Corcoran, to "comprehensively review Florida's

---

[139] Itzel Luna, *New Slavery Curriculum in Florida is Latest in Century of 'Undermining History'*, USA Today (July 27, 2023), https://www.usatoday.com/story/news/nation/2023/07/27/historian-warns-against-floridas-slavery-curriculum/70463676007/.

Kindergarten through grade twelve academic standards and provide recommended revisions to the Governor."[140]

DeSantis chose Corcoran in spite of, or maybe because of, Cocoran's history of divisionary racist propaganda. As a candidate for the Republican gubernatorial nomination in 2018, Corcoran released a blatantly racist video. The video showed a terrified-looking, young white girl deliberately gunned down by a Hispanic male.[141] "This could have happened to any family, anywhere," Corcoran narrates.[142] The ad references the shooting of Kate Steinle by an undocumented immigrant, Garcia Zarate, three years earlier in San Francisco, California—not Florida, where Corcoran was running for office.[143] Corcoran's ad does not mention that Zarate was acquitted of murder and manslaughter charges because, unlike the fictional video, the shooting was found to be accidental.[144] The winning candidate for governor of Florida, Ron DeSantis, disseminated a more subtle anti-immigrant ad. It showed DeSantis teaching his toddler child how to build a wall using blocks to protect the child from dangerous immigrants.[145]

In June 2019, the state legislature gave its imprimatur to DeSantis's executive order calling for a comprehensive review of Florida's education system by enacting H.B. 807, which mandated a review of standards for civics education in consultation with outside groups.[146] The required consulting groups explicitly listed in the legislation included no Black- or minority-led

---

[140] *Executive Order 19-32*, Fla. Off. of the Governor (Jan. 31 2019), https://www.flgov.com/wp-content/uploads/orders/2019/EO_19-32.pdf.
[141] Monivette Cordeiro, *Corcoran Runs 'Sanctuary Cities' Ad in Sad Attempt to be Most Racist Candidate*, Orlando Weekly (Jan. 31, 2018) (includes YouTube video of ad), https://www.orlandoweekly.com/news/corcoran-runs-sanctuary-cities-ad-in-sad-attempt-to-be-floridas-most-racist-candidate-10386010.
[142] *Id.*
[143] *Id.*
[144] *Id.*
[145] Guardian News, *Ron DeSantis has released an ad indoctrinating his children into Trumpism*, YouTube (Aug. 2, 2018), https://www.youtube.com/watch?v=z1YP_zZJFXs.
[146] *CS/HB 807 (2019) - Civics Education*, Fla. House of Representatives, https://www.myfloridahouse.gov/Sections/Bills/billsdetail.aspx?BillId=64592 (last visited Oct. 12, 2023).

organizations or professional associations of academics or teachers.[147] White people currently head all of these selected institutions.[148]

Among academic institutions, the legislature singled out only Hillsdale College, among thousands of colleges and universities in Florida and the United States, many more highly rated than Hillsdale.[149] Hillsdale is a small, predominantly white, conservative Christian college in Michigan.[150] It is at the forefront of opposing the alleged dangers of pursuing social justice for minorities, advancing racial diversity in education, and recognizing the contributions of non-white cultures. Hillsdale's official mission statement reads: "The college values the merit of each unique individual, rather than succumbing to the dehumanizing, discriminatory trend of so-called 'social justice' and 'multicultural diversity.'"[151]

*Imprimis*, the official publication of Hillsdale College, featured an article based on a Hillsdale talk by Christopher Caldwell that criticized the civil rights laws of the 1960s: "the civil rights laws of the 1960s, and particularly the Civil Rights Act of 1964, divided the country," he said.[152] "They did so by giving birth to what was, in effect, a second constitution, which would eventually cause Americans to peel off into two different and incompatible constitutional cultures."[153] *Imprimis* also disseminated an article by Christopher Rufo entitled "Critical Race

---

[147] The "Florida Joint Center for Citizenship, the Bill of Rights, Institute, Hillsdale College, the Gilder Lehrman Institute of American History, iCivics, and the Constitutional Sources Project." Fla. H.B. 807, 2019 Leg., Reg. Sess., https://www.flsenate.gov/Session/Bill/2019/807/BillText/er/PDF.

[148] Leadership obtained from the websites of each organization.

[149] According to U.S. News, in 2022 Hillsdale ranked 39th among national liberal arts colleges, a ranking that does not include any of the nation's distinguished universities. *Hillsdale College Profile*, U.S. News & World Report, https://www.usnews.com/best-colleges/hillsdale-college-2272 (last visited Oct. 5, 2023).

[150] *Id.*

[151] *Mission: Aims*, Hillsdale College, https://www.hillsdale.edu/about/mission/#:~:text=The%20College%20values%20the%20merit,other%20competing%20groups%20in%20divisive (last visited Oct. 6, 2023).

[152] Christopher Caldwell, *The Roots of Our Partisan Divide*, Imprimis (Feb. 2020), https://imprimis.hillsdale.edu/roots-partisan-divide/.

[153] *Id.*

Theory: What It Is and How to Fight It."[154] Rufo, a political operative, not an academic or scholar, turned "critical race theory" into a salient political issue with alleged race-based politics as a clear villain.

There is a feedback loop connecting white conservative personnel from Hillsdale College, the Commission that produced Donald Trump's 1776 Report — analyzed below — and the development of educational policies in Florida. Hillsdale was formally consulted for the state's K-12 curriculum reform efforts and touted by the Governor.[155] And two representatives from Hillsdale College were the only reviewers from outside Florida that the state chose to participate in its first textbook review.[156] Hillsdale College leaders led the 1776 Commission that produced the 1776 Report. Hillsdale College President Arnn headed the Commission that produced the report, and Matthew Spalding, Hillsdale's vice president of American Studies, served as the Commission's Executive Director. "I have known Governor DeSantis since he was a congressman and have been working with the Florida Department of Education on his civic literacy initiative," Spalding said.[157]

Academic and scholarly organizations have condemned the 1776 Report for distorting racial history and present-day reality in America. The American Historical Association issued a statement noting: "Ironically, the report erases whole swaths of the American population—

---

[154] Christopher F. Rufo, *Critical Race Theory: What It Is and How to Fight It*, 50 Imprimis 1 (March 2021), https://imprimis.hillsdale.edu/wp-content/uploads/2021/04/Imprimis_Mar_3-21_6pgNM.pdf?utm_campaign=imprimis&utm_medium=email&_hsmi=153372939&_hsenc=p2ANqtz-8sljsylkx0hys0nfITGCvK43xhxiK_VoK1JK9fMBcZvgSXDp6Kshp0_B3Dy-wch6_Epz0p4RVj7m436ZDiWHHdAEU8NA&utm_content=153372939&utm_source=hs_automation.

[155] *See Governor Ron DeSantis Speaks at Moms for Liberty Convention*, C-SPAN (June 30, 2023), https://www.c-span.org/video/?529023-101/governor-ron-desantis-speaks-moms-liberty-convention; Maddy Welsh, *Hillsdale Asked To Advise on Florida Public School* Curriculum, The Collegian (Sept. 17, 2020), https://hillsdalecollegian.com/2020/09/hillsdale-asked-to-advise-on-florida-public-school-curriculum/.

[156] *See* Ana Ceballos & Sommer Brugal, *Only 3 Reviewers Said Florida Math Textbooks Violated 'Critical Election Theory' Rules. Yet the State Rejected Dozens*, Miami Herald (May 13, 2022), https://www.miamiherald.com/news/local/education/article261354647.html.

[157] Haley Strack, *DeSantis Appoints Spalding to Board of Public College*, The Collegian (Feb. 2, 2023), https://hillsdalecollegian.com/2023/02/desantis-appoints-spalding-to-board-of-florida-public-college/.

enslaved people, Indigenous communities, and women—the way the founders excluded those groups from the body politic in a wide variety of founding documents as well as actual public practice. In listing threats to the ideals of the nation, the report ignores the [largely white] Confederate States of America, whose leaders, many clearly guilty of treason, initiated a civil war that claimed more than 700,000 lives—more American lives than all other conflicts in the history of the country combined."[158] "It's very hard to find anything in here that stands as a historical claim, or as the work of a historian. Almost everything in it is wrong, just as a matter of fact," said Eric Rauchway, Professor of History at the University of California at Davis.[159] James Grossman, the executive director of the American Historical Association, said "To say that the racial divisions that have existed for the last half century are due to insistence by African Americans on 'group rights' rather than to the depth and breadth of racism, to say that on a page where you have a photograph of Dr. King is offensive to Dr. King's legacy."[160] Grossman concluded, "This is written as if no historical scholarship has been produced in nearly 70 years, so it's bereft of any professional historical sensibility at all."[161]

DeSantis appointed Spalding, along with Rufo and other conservatives, to the Board of New College, seemingly in an effort to remake the institution on the model of Hillsdale College. All the appointees were white, and all but one was male.[162] The new Board voted to abolish

---

[158] *AHA Condemns Report of the Advisory 1776 Commission*, Am. Historical Assoc. (Jan. 2021), https://www.historians.org/news-and-advocacy/aha-advocacy/aha-statement-condemning-report-of-advisory-1776-commission-(january-2021).

[159] Gillian Brockell, *'A hack job,' 'outright lies': Trump commission's '1776 Report' outrages historians*, Washington Post (Jan. 20, 2021), https://www.washingtonpost.com/history/2021/01/19/1776-report-historians-trump/.

[160] *Id.*

[161] *Id.*

[162] Staff, *Governor Ron DeSantis Appoints Six to the New College of Florida Board of Trustees*, Ron DeSantis 46th Governor of Fla. (Jan. 6, 2023), https://www.flgov.com/2023/01/06/governor-ron-desantis-appoints-six-to-the-new-college-of-florida-board-of-trustees/.

diversity, equity, and inclusion initiatives at the college.[163]

### 2. Governor DeSantis and the legislature removed the ongoing history of racial discrimination from its public educational curriculum.

Like the 1776 Report, DeSantis and the legislature, advised by personnel from Hillsdale College, imposed on education a racial ideology disconnected from the overwhelming consensus of recent scholarship.

As discussed below, in July 2021, under the Governor's executive order and the legislature's enactment of H.B. 807, the State Board of Education adopted new standards for civics education in K-12 public schools. In policing instruction, the B.E.S.T. Standards on social studies, like the 1776 Report, imposed on teachers a distorted and sanitized vision of American history, politics, and society, which bears little relationship to history and social science scholarship.

The hundreds of standards for teaching and study fail to recount more than superficially the history of Latinos or Hispanics in Florida, including the discrimination they experienced.[164] Yet, Hispanics comprise over a quarter of the state's population.[165] The standards briefly mention Jim Crow laws but pass over the full impact of Jim Crow discrimination on every aspect of Black life in Florida and nationally.[166] The standards do not consider its long-term history and ongoing impact on minorities, specifically Black Floridians. The lynching of Black people in Florida or

---

[163] Sabrina Clay & Nicquel Terry Ellis, *New College of Florida Trustees Vote to Abolish DEI Programs, Even as Students Protest Against Conservative Overhaul of School*, CNN (Mar. 1, 2023), https://www.cnn.com/2023/02/28/us/new-college-florida-board-meeting-reaj/index.html.

[164] For this history and ongoing reality of discrimination against Hispanics in Florida, *see, e.g.,* Elizabeth Aranda & Ferdinand I. Rivera, *Puerto Rican Families in Central Florida, Prejudice, Discrimination and Their Implications for Successful Integration*, 4 Women, Gender, & Families of Color 57 (2016); Off. of Public Affairs, *Justice Department Obtains Relief in Lawsuit Alleging Discriminatory Targeting of Hispanic Homeowners*, U.S. Dep't of Just. (June 10, 2022), https://www.justice.gov/opa/pr/justice-department-obtains-relief-lawsuit-alleging-discriminatory-targeting-hispanic; Amy Martinez, *Segregation in Florida Schools 2020*, Florida Trend (Sept. 5, 2020), https://www.floridatrend.com/article/29950/segregation-in-florida-schools-in-2020.

[165] U.S. Census Bureau, *Florida*, https://www.census.gov/quickfacts/fact/table/FL/BZA210221 (last visited Oct 5, 2023).

[166] *See Florida State Academic Standards – Social Studies, 2023*, Fla. Dep't of Educ., at 39, 47, 55, https://www.fldoe.org/core/fileparse.php/20578/urlt/5-3.pdf (last visited Oct. 4, 2023).

elsewhere is omitted, and segregation is mentioned only once in the context of Truman's desegregation of the armed forces.[167] Students would not know that Florida maintained segregated schools and public facilities for nearly a century. They would not know that 11 of 12 Florida U.S. House members and both U.S. Senators voted against the Civil Rights Act of 1964.[168] Although the legislature had earlier mandated instruction in the Ocoee massacre of Black people,[169] the guidelines omit mention of Ocoee or the Rosewood massacre in Florida.[170] The guidelines provide no information regarding historic and current racial disparities in socio-economic standing in Florida or elsewhere and no insight into their causation through past and ongoing discrimination.[171]

### 3. The Florida legislature and governor banned "critical race theory" and other teachings on race.

Florida banned public educators from teaching about so-called "critical race theory" and other race-related issues in American history and contemporary life.[172] Again, like the members of Trump's 1776 Commission, the Governor and legislature based these prohibitions on racial ideology, not prevailing scholarship. Decision-makers in Florida have refined their racial politics to focus on the so-called "critical race theory" as an allegedly poisonous ideology used to indoctrinate students about racial dynamics.

---

[167] *Id.* at 54.
[168] *House Vote #182 in 1964 (88th Cong.): H.R. 7152. Civil Rights Act of 1964. Adoption of a Resolution (H. Res. 789) Providing for House Approval of the Bill as Amended by the Senate* (July 2, 1964), https://www.govtrack.us/congress/votes/88-1964/h182 (last visited Oct. 4, 2023); *Senate Vote #409 in 1964 (88th Cong.): HR. 7152. Passage.*, GovTrack (June 19, 1964) https://www.govtrack.us/congress/votes/88-1964/s409 (last visited Oct. 4, 2023).
[169] Robert Stevens, *The Truth Laid Bare: The Ocoee Massacre*, Pegasus Mag. of Univ. of S. Fla. (Fall 2020), https://www.ucf.edu/pegasus/the-truth-laid-bare/.
[170] *See Florida State Academic Standards – Social Studies, 2023*, Fla. Dep't of Educ., at 39, 47, 55, https://www.fldoe.org/core/fileparse.php/20578/urlt/5-3.pdf.
[171] *Id.*
[172] Matt Papaycik & Forrest Saunders, *Florida's Governor Signs Controversial Bill Banning Critical Race Theory*, WPTV (Apr. 22, 2022), https://www.wptv.com/news/education/floridas-governor-to-sign-critical-race-theory-education-bill-into-law.

Contrary to the political narrative in Florida, critical race theory is not about creating greater racial divides. Loyola Law Professor Priscilla Ocen further explains, "Critical race theory ultimately is calling for a society that is egalitarian, a society that is just, and a society that is inclusive, and in order to get there, we have to name the barriers to achieving a society that is inclusive."[173] She added, "Our government at the moment is essentially afraid of addressing our history of inequality and if we can't address it, then we can't change it."[174]

The finding that minorities bear the burden of systemic racism that is historic and ongoing is not a fringe theory. Instead, it represents the consensus findings of scholarship in history, social science, and journalism, as illustrated by the examples of ten recent national prize-winning books listed in the footnote below.[175] The ongoing existence of systemic, structural racial discrimination is also well-documented in scholarly articles.[176]

---

[173] Candy Lang, *President Trump Has Attacked Critical Race Theory. Here's What to Know About the Intellectual Movement*, Time (Sept. 29, 2020), https://time.com/5891138/critical-race-theory-explained/.
[174] *Id.*
[175] James Forman Jr., *et al.*, *Locking Up Our Own: Crime and Punishment in Black America* (Farrar, Straus & Giroux, 2016) (Pulitzer Prize); Douglas A. Blackmon, *Slavery by Another Name: The Re-Enslavement of Black Americans from the Civil War to World War II* (Doubleday, 2006) (Pulitzer Prize); Carol Anderson, *White Rage: The Unspoken Truth of Our Racial Divide* (Bloomsbury, Reprint, 2017) (National Book Critics Circle Award); Ibram X. Kendi, *Stamped from the Beginning: The Definitive History of Racist Ideas in America* (Nation Books, 2016) (National Book Award); Isabel Wilkerson, *Caste: The Origins of Our Discontent* (Random House, 2020) (Longlisted National Book Award, Time # 1 Nonfiction Book of the Year); Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (New Press, 2012) (Constitution Project's 2010 Constitutional Commentary Award, Chronicle of Higher Education, one of one of the 11 best scholarly books of the 2010s); Eduardo Bonilla-Silva, *Racism without Racists: Colorblind Racism and the Persistence of Racial Inequality in the United States*, 5th ed. (Rowman & Littlefield, 2017) (American Library Association Book Award); Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government Segregated America* (Liveright, 2018) (Longlisted National Book Award, Hillman Prize for Nonfiction); Imani Perry, *South to America* (Ecco, 2022) (National Book Award Winner, Nonfiction).
[176] *See, e.g.*, Paula A. Braverman, *et al.*, *Systematic and Structural Racism: Definitions, Examples, Health Damages, Strategies for Dismantling*, 41 Health Affairs 171 (2022); Steven O. Roberts & Michael T. Rizzo, *The Psychology of American Racism*, 76 American Psychologist 475 (2021); Mahzarin R. Banaji, *et al.*, *Systematic Racism: Individuals and Interactions, Institutions and Society*, 6 Cognitive Rsch.: Principles & Interactions 82 (2021); M. Krysan, *et al.*, *Does race matter in neighborhood preferences? Results from a video experiment*, 115 Am. J. of Socio. 527 (2009); Douglas S. Massey, *Review: Inheritance of Poverty or Inheritance of Place? The Emerging Consensus on Neighborhoods and Stratification*, 42 Contemporary Socio. 690 (2013); Douglas S. Massey, *Still the Lynchpin: Segregation and Stratification in the USA Today*, 12 Race and Social Problems 1 (2020); Reed DeAngelis, *Systematic Racism in Police Killings, New Evidence From the Mapping Police Violence Database, 2013-2021*, Race & Just. (Oct. 19, 2021), https://journals.sagepub.com/doi/full/10.1177/21533687211047943; Marcus D. Rushing, *et*

Proponents of banning critical race theory in Florida have cited no body of scholarship supporting their claims because no such body of scholarship exists. By erasing from consideration the proven effects of historical and ongoing discrimination, Florida authorities have defaulted to the position that the substantial socioeconomic disparities between Black and white residents in their state are due to the individual failings of Black people. In other words, Florida decision-makers' targeting of critical race theory highlights their discriminatory racial ideology.

Also, in April 2022, Governor DeSantis signed H.B. 7,[177] legislation that imposed strict controls on teaching racial issues in Florida public K-12 schools, colleges, and universities.[178] The bill also applied to conditions of employment in Florida. It imposes hefty financial penalties on institutions of higher education that fail to conform to the law's prohibitions.[179] The prohibitions of H.B. 7 include critical race theory but are more comprehensive. The bill prohibits "[s]ubjecting any individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination, to training, instruction, or any other required activity that espouses, promotes, advances, inculcates, or compels such individual to believe any of the following concepts constitutes discrimination based on race, color, sex, or national origin under this section."[180] These concepts include that "[a] person, by virtue of his or her race, color, national

---

al., *Law Enforcement Violence in the Black Community, A Catalyst for Clinical Engagement in Social Justice*, 62 Am. J. of Preventive Medicine, 122 (2022); Xia Wang, *Undocumented Immigrants as Perceived Criminal Threat: A Test of the Minority Threat Perspective*, 50 Criminology 743, 744, 763 (2012); Zoltan Hajnal, *Immigration and the Origins of the White Backlash*, 50 Daedalus 23 (2021); Joel R. Fagin & Bernice McNair Barnett, *Success and Failure: How Systematic Racism Trumped the* Brown v. Board of Education *Decision*, 5 Univ. of Ill. L. Rev. 1099 (2004); Barbara Reskin, *The Race Discrimination System*, 38 Ann. Rev. of Socio. 17 (2014); Ruqaiijah Yearby, *et al.*, *Structural Racism in Historical and Modern U.S. Health Care Policy*, 41 Health Affairs 187 (2022); Jordan Gemelas, *et al.*, *Inequities in Employment by Race, Ethnicity, and Sector During COVID-19*, 9 J. of Racial & Ethnic Health Disparities 350 (2022); Devah Prager & Hannah Shepard, *The Sociology of Discrimination, Racial Discrimination in Employment, Housing, and Credit Markets*, 34 Ann. Rev. of Socio. 181 (2008).

[177] Staff, *Governor Ron DeSantis Signs Legislation to Protect Floridians from Discrimination and Woke Indoctrination*, Ron DeSantis 46th Governor of Fla. (Apr. 22, 2022), https://www.flgov.com/2022/04/22/governor-ron-desantis-signs-legislation-to-protect-floridians-from-discrimination-and-woke-indoctrination/.

[178] Fla H.B. 7 er, 2022 Leg., Reg. Sess., https://www.flsenate.gov/Session/Bill/2022/7/BillText/er/PDF.

[179] *Id.*

[180] *Id.* at 3.

origin, or sex is inherently racist, sexist or oppressive, whether consciously or unconsciously" and that "[a] person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin or sex."[181]

In minimizing the history of race and the relationship between racial discrimination and current racial inequities, this legislation inculcates falsehoods rejected by scholars. In November 2022, this court issued a partial preliminary injunction against the enforcement of H.B. 7 in education.[182] Still, decision-makers in Florida moved forward in 2023 by enacting S.B. 266, signed by the governor in May 2023.[183] This legislation, another law based on race, banned minority race studies and some elements of gender studies.[184]

In 2023, Governor DeSantis created a new oversight district for Disney and appointed a board.[185] One of the board members, Ron Peri, falsely claimed that white people were enslaved in the U.S. and that Black people held significant numbers of slaves according to the U.S. Census of 1830.[186] Peri's advocacy contained egregious errors, such as claiming that King James II, who was not born until 1633, issued a 1625 proclamation that led to the enslavement of hundreds of thousands of white Irish.[187] The Census of 1830 also shows that approximately 0.006% of slaves in the 19th century were owned by free Blacks rather than a significant number.[188] Most of these were family members, held for protection in the slave-holding South, and eventually freed.[189]

---

[181] *Id.* at 10.
[182] *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1230, 1291-92 (N.D. Fla. 2022).
[183] Staff, *Governor Ron DeSantis Signs Legislation to Strengthen Florida's Position as National Leader in Higher Education*, Ron DeSantis 46th Governor of Fla. (May 15, 2022), https://www.flgov.com/2023/05/15/governor-ron-desantis-signs-legislation-to-strengthen-floridas-position-as-national-leader-in-higher-education/.
[184] Fla. S.B. 266 er, 2023 Leg., Reg. Sess., https://www.flsenate.gov/Session/Bill/2023/266/BillText/er/PDF.
[185] Andrew Kaczynski *et al.*, *DeSantis appointee to Disney board taught seminar using discredited research claiming White people were slaves in America*, CNN (Aug. 4, 2023), https://www.cnn.com/2023/08/04/politics/kfile-desantis-appointee-discredited-research-white-slaves/index.html.
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] *Id.*

The lack of outrage from Republicans in Florida for Peri's fabrications about race is notable. State officials adopted a curriculum on African American history dictated by racial ideology that distorts the past. "Apparently, Board members don't know anything about — or want to erase — the actual history of slavery and racism in their state," said Glenn C. Altschuler, the Thomas and Dorothy Litwin Professor of American Studies at Cornell University and legal scholar David Wippman, the president of Hamilton University and the former dean of the University of Minnesota Law School.[190] An investigation by NBC News found that most of Florida's working group on the new standards for African American history did not agree with controversial sections.[191] Still, the Board adopted the Standards unanimously, without providing any transparency on the working group.[192]

Florida's 2023 Standards for African American History pass over Florida's long and ongoing history of discrimination against Black people.[193] The Standards fail to mention that Florida officials arrested and jailed civil rights protestors or that both Florida Senators and 11 of 12 Florida representatives voted against the Civil Rights Act of 1964.[194] They include little information on the lengthy history of lynching in Florida or the Jim Crow discrimination in Florida

---

[190] Glen C. Altschuler & David Wippman, *Florida's New Black History Standards are Misleading and Offensive*, The Hill (July 30, 2023), https://thehill.com/opinion/education/4125611-floridas-new-black-history-standards-are-misleading-and-offensive/.

[191] Janelle Griffith, *Most of Florida Work Group Did Not Agree With Controversial Parts of State's New Standards for Black History, Members Say*, NBC News (July 28, 2023), https://www.nbcnews.com/news/us-news/florida-work-group-not-agree-controversial-parts-states-new-standards-rcna96490.

[192] *Id.*

[193] *See Florida's State Academic Standards – Social Studies, 2023*, Fla. Dep't of Educ., https://www.fldoe.org/core/fileparse.php/20653/urlt/6-4.pdf (last visited Oct. 11, 2023) (African American History (2023) (AA) strand).

[194] *House Vote #182 in 1964 (88th Congress): H.R. 7152. Civil Rights Act of 1964. Adoption of a Resolution (H. Res. 789) Providing for House Approval of the Bill as Amended by the Senate* (July 2, 1964), https://www.govtrack.us/congress/votes/88-1964/h182 (last visited Oct. 4, 2023); *Senate Vote #409 in 1964 (88th Cong.): HR. 7152. Passage.*, GovTrack (June 19, 1964) https://www.govtrack.us/congress/votes/88-1964/s409 (last visited Oct. 4, 2023).

that impacted education, housing, medical care, law enforcement, travel, lodging, and employment.[195] From 1882 to 1968, 257 Black people were lynched in Florida.[196]

The Standards portray the horrific, white-perpetrated massacres of Black people, including in Ocoee and Rosewood, Florida, as "acts of violence perpetrated against and *by African Americans*."[197] The Standards say that "slaves developed skills which, in some instances, could be applied for their personal benefit," even though as the property of white masters, slaves could not sell their labor for wages, accumulate wealth, buy property, travel freely, start a business or create a better life for their enslaved children.[198] Regardless of the skills developed, slaves were still considered less than human, (see, for example, the three-fifths clause of the original U.S. Constitution, Article 1, Section 2), and subject to whippings, rapes, confinement, brutal agricultural labor, and family breakups.[199]

This distorted view of slavery reflects the current racial attitudes of Florida decision-makers. A joint statement by the president of the American Federation of Teachers, Randi Weingarten, and retired teacher Leon Casey noted, "Normally publishing a grievously racist notion like 'slaves benefited from slavery' would be considered an embarrassment and quickly

---

[195] The standards mention using Census data to assess some racial socio-economic disparities, but do not link these disparities to historic or ongoing discrimination in Florida or elsewhere. *Florida's State Academic Standards – Social Studies, 2023*, Fla. Dep't of Educ., at SS.912.AA.4.12, https://www.fldoe.org/core/fileparse.php/20653/urlt/6-4.pdf (last visited Oct. 11, 2023).

[196] *Lynchings by State and Race, 1882-1968*, Tuskegee Inst., http://law2.umkc.edu/faculty/projects/ftrials/shipp/lynchingsstate.html (last visited Oct. 9, 2023).

[197] *Florida's State Academic Standards – Social Studies, 2023*, Fla. Dep't of Educ., at SS.912.AA.3.6, https://www.fldoe.org/core/fileparse.php/20653/urlt/6-4.pdf (emphasis added) (last visited Oct. 11, 2023).

[198] *Id.* at SS.68.AA.2.3.

[199] Advisors to the DeSantis administration cited, out of millions of enslaved people, 16 examples of slaves who developed useful skills, presumably their best examples. These examples are "factual and well documented," the advisor officials assured critics, backed by DeSantis. However, examination of the examples demonstrates that at most two or three fit the description in the Standards. Janelle Griffith, *Most of Florida Work Group Did Not Agree With Controversial Parts of State's New Standards for Black History, Members Say*, NBC News (July 28, 2023), https://www.nbcnews.com/news/us-news/florida-work-group-not-agree-controversial-parts-states-new-standards-rcna96490. Two of the most egregiously flawed examples are Betty Washington Lewis, who was the white sister of President George Washington and a slave owner, and Ned Cobb, who was born in 1885, twenty years after the end of slavery. John Fea, *Did the Enslaved 'Benefit' From Slavery*, Current (July 22, 2023), https://currentpub.com/2023/07/22/did-the-enslaved-benefit-from-slavery/.

withdrawn. But not for Gov. Ron DeSantis of Florida, where doubling down on this noxious claim is seen as a badge of honor."[200]

The Standards fail to reveal much about the long and horrific history of slavery. As Altschuler and Wippman noted, "Between the 16th and 19th centuries, about 12.5 million Africans were transported against their will to the Americas. About 1.8 million of them did not survive the journey, or have an opportunity to become 'unpaid interns' and develop skills that could be applied to their personal benefit."[201] Moreover, the Florida Constitution forbade the passage of laws for emancipation and banished free Black people from the state.[202] The Standards fail to explore the roots in discrimination of vast disparities in education, wealth, income, housing, and health between whites and Blacks that have persisted in Florida since the end of slavery.[203] These many efforts to impose a whitewashed view of history in Florida are significant evidence of Florida's leaders' racial attitudes.

### 4. Florida banned books in schools and libraries based on race.

In a speaking engagement at Hillsdale College, Education Commissioner Corcoran said, "You have to police [teachers] on a daily basis. It's 185,000 teachers in a classroom with anywhere from 18 to 25 kids," he said.[204] He noted that,"[w]e're passing a rule this coming month that says,

---

[200] Jeffrey S. Solochek, *Critics Cite Historical Inaccuracies in Florida Defense of Slave 'Job Skills' Narrative*, Miami Herald (July 24, 2023), https://www.miamiherald.com/news/local/education/article277595898.html.
[201] Glen C. Altschuler & David Wippman, *Florida's New Black History Standards are Misleading and Offensive*, The Hill (July 30, 2023), https://thehill.com/opinion/education/4125611-floridas-new-black-history-standards-are-misleading-and-offensive/.
[202] *Id.*
[203] *Id.*; *Florida's State Academic Standards – Social Studies, 2023*, Fla. Dep't of Educ., at SS.912.AA.3.6, https://www.fldoe.org/core/fileparse.php/20653/urlt/6-4.pdf (emphasis added) (last visited Oct. 11, 2023) (refers to Census data on some socio-economic characteristics of Blacks and whites, but does not include any examination of the connection to past and ongoing discrimination).
[204] Ryan Dailey, *Florida's Anti-Indoctrination Proposal is Tailormade to Indoctrinate Children*, Orlando Weekly (May 21, 2021), https://www.orlandoweekly.com/news/floridas-anti-indoctrination-proposal-is-tailormade-to-indoctrinate-children-29353198.

for the 185,000 (Florida) teachers, you can't indoctrinate students with stuff that's not based on our standards, the new B.E.S.T. standards."[205]

The book adoption process quickly became a book banning, consistent with the racial ideology of Florida decision-makers. To align with laws passed by the state legislature, the state banned texts for references, direct or indirect, to critical race theory or mention of minority protests against discrimination and social or racial justice. In Florida's first textbook review in April 2022, the state added two reviewers from outside Florida, both from Hillsdale College.[206] The state banned 54 textbooks from inclusion in Florida's public elementary and secondary schools, amounting to 41% of submitted texts.[207] These were not history, civics, or race relations books but mathematics textbooks.[208] State censors rejected about half the banned books for alleged references to critical race theory.[209] The Department of Education rejected others for references to "unsolicited strategies, such as social-emotional learning and culturally responsive teaching."[210] Eventually, the state restored some of the banned texts after publishers scrubbed away objectionable material.[211]

The state began reviewing social studies texts a year later, with publishers on notice about the banned content. The state initially rejected 82 of 101 (81.2%) for content "that was not aligned

---

[205] *Id.*

[206] Ana Ceballos & Sommer Brugal, *Only 3 Reviewers Said Florida Math Textbooks Violated 'Critical Election Theory' Rules. Yet the State Rejected Dozens*, Miami Herald (May 13, 2022), https://www.miamiherald.com/news/local/education/article261354647.html.

[207] *See the 54 Math Textbooks Rejected by Florida Department of Education*, NBC Miami (Apr. 18, 2022), https://www.nbcmiami.com/news/local/see-the-54-math-textbooks-rejected-by-florida-department-of-education/2738681/#:~:text=The%20Florida%20Department%20of%20Education%20on%20Friday%20announced%20that%20they,132%20submitted%2C%20about%2041%25.

[208] *Id.*

[209] Anders Hagstrom, *Florida Rejects 41% of Math Textbooks for Including CRT, Most Aimed at K-5 Students: 'Impermissible'*, Fox News (Apr. 17, 2022), https://news.yahoo.com/florida-rejects-41-math-textbooks-014047285.html.

[210] *Id.*

[211] Chrisopher Hutton, *Florida Reinstates Nine Math Textbooks After Removal of 'Wake Content'*, Washington Examiner (Apr. 29, 2022), https://www.washingtonexaminer.com/policy/education/florida-reinstates-nine-math-textbooks-after-removal-of-woke-content.

with Florida law."[212] After publishers scrubbed objectionable material, the state still rejected 35 of 101 (34.7%) submitted texts.[213] The following is among examples of rejected material provided by the Florida Department of Education:

> Talk to your child about the National Anthem. According to the United States Code, we should stand at attention and face the flag, or face toward the music, with your right hand over your heart. You can use this as an opportunity to talk about why some citizens are choosing to 'Take a Knee' to protest racism and police brutality.[214]

Apparently, students in Florida should not learn about constitutionally protected protests about racism and police brutality, since neither of these injustices exist in the State's preferred version of American life. The revised, approved text version erases the paragraph and refers only to reverence for the flag.[215]

In another example, the Department compelled a publisher to scrap in its entirety the following discussion of protest movements that followed the murder of George Floyd:[216]

> In 2020, bystanders captured video footage of a white Minneapolis police officer killing George Floyd, an unarmed Black American accused of using a counterfeit $20 bill. Floyd's brutal killing horrified many Americans, and protests broke out in cities across the country.
>
> While many Americans sympathized with the Black Lives Matter movement, others were critical. Critics blamed the movement for incidences of violence or looting at protests. Others charged that the movement was anti-police, especially after some in the movement called for local governments to cut or eliminate funding for the police.

---

[212] Chandelis Duster, *et al.*, *Florida Rejects Social Studies Textbooks That Mention Social Justice Taking a Knee and Other Content of 'Concern'*, CNN (May 10, 2023), https://www.cnn.com/2023/05/10/us/florida-social-studies-textbooks-education-department/index.html#:~:text=Florida%20rejected%20nearly%2035%25%20of,Department%20of%20Education%20announced%20Tuesday.

[213] *Id.*

[214] *2022-2023, K-12, Social Studies Examples of Rejected Materials*, Fla. Dep't of Educ., https://www.fldoe.org/academics/standards/instructional-materials/2223-k12-ss-examples.stml (last visited Oct. 4, 2023).

[215] *Id.*

[216] *Id.*

Even a balanced and nuanced discussion of social protest that references supporters and critics runs counter to Florida's laws on teaching about race. Under Florida law, students must be shielded from even the existence of racial protest, no matter how circumspect the presentation.

In addition to these textbook reviews by the Department of Education, Florida enacted multiple laws that make it easier than before for local school boards to ban or sequester books in response to even a single complaint from a parent or Florida resident.[217]

In the first six months of the 2022-2023 (July-December 2022) school year, 13 school districts in Florida banned 357 books, second only to Texas's 438 and comprising 24.2% of 1,477 books prohibited nationwide.[218] In addition, districts banned some 300 books during the prior school year, according to the Florida Department of Education. Banned books by non-white authors included, among others, two novels by Nobel Prize winner Toni Morrison, *Beloved* and *The Bluest Eye*.[219] They included *Antiracist Baby*, by National Book Award winner Boston University professor Ibram X. Kendi, a book designed to empower parents and children to uproot racism.[220] They included the essay, *The Fire Next Time*,[221] by iconic author James Baldwin, dubbed by prominent conservative literary critic Harold Bloom as "the most considerable moral

---

[217] Fla. H.B. 1557, 2022 Leg., Reg. Sess. https://www.flsenate.gov/Session/Bill/2022/1557; Fla. H.B. 1467, 2022 Leg., Reg. Sess. https://www.flsenate.gov/Session/Bill/2022/1467; *Memorandum to School District Superintendents*, Fla. Dep't of Educ. (June 3, 2023), https://info.fldoe.org/docushare/dsweb/Get/Document-9557/dps-2022-83.pdf.

[218] Kasey Meehan & Jonathan Friedman, *Banned in the USA: State Laws Supercharge Book Suppression in Schools*, PEN America (Apr. 20, 2023), https://pen.org/report/banned-in-the-usa-state-laws-supercharge-book-suppression-in-schools/.

[219] Examples of banned books are obtained from Florida Department of Education. *2022-2023 School District Reporting Pursuant to Section 1006.28(2) Fla. Stat.*, Fla. Dep't of Educ., https://www.fldoe.org/core/fileparse.php/5574/urlt/2223ObjectionList.pdf (last visited Oct. 4, 2023). The list does not include books banned in 2023.

[220] *Id.*

[221] *Id.*

essayist now writing in the United States."[222] Although critical of white America, the essay envisions a path for ending racial divisions.

The banned books included Cristina Garcia's novel, *Dreaming in Cuban*,[223] which followed the story of three generations of Cuban women and was a finalist for the National Book Award. A review in the *New York Times* called the novel "[a] work that possesses the intimacy of a Chekhov story and the hallucinatory magic of a novel by Gabriel García Márquez," who is "blessed with a poet's ear for language, a historian's fascination with the past, and a musician's intuitive understanding of the ebb and flow of emotion."[224] They included a novel by acclaimed Muslim author Tahereh Mafi, *Unravel Me*, the story of a woman with extraordinary powers who battles tyranny.[225] In response to a complaint by one parent, a Florida school restricted access to the poem "The Hill We Climb," that National Youth Poet Laurette Amanda Gorman read to the world at President Joe Biden's inauguration.[226]

### 5. Conclusions.

Through the combination of restrictions on teaching, distorted curricula, and book banning, lawmakers and administrators in Florida impose their racial ideology on teachers and students, contrary to the overwhelming weight of scholarship. Similar racial ideology helps account for the adoption of S.B. 7050.

---

[222] Oana Cogeanu, *Travels in Black and White: James Baldwin's Equal in Paris*, 5 Int'l J. of Soc. Science 422, 422 (2015), https://www.academia.edu/8851098/Travel_in_Black_and_White_James_Baldwin_s_Equal_in_Paris.
[223] *2022-2023 School District Reporting Pursuant to Section 1006.28(2) Fla. Stat.*, Fla. Dep't of Educ., https://www.fldoe.org/core/fileparse.php/5574/urlt/2223ObjectionList.pdf.
[224] Michiko Kakutani, *The Dreams and Yearnings of a Family in Exile*, N.Y. Times (Feb. 25, 1992), https://www.nytimes.com/1992/02/25/books/books-of-the-times-the-dreams-and-yearnings-of-a-family-of-exiles.html; *1992 Winners, Fiction: Finalists*, Nat'l Book Found., https://www.nationalbook.org/awards-prizes/national-book-awards-1992/?cat=fiction (last visited Oct. 12, 2023).
[225] *2022-2023 School District Reporting Pursuant to Section 1006.28(2) Fla. Stat.*, Fla. Dep't of Educ., https://www.fldoe.org/core/fileparse.php/5574/urlt/2223ObjectionList.pdf.
[226] Bill Chappell, *1 Complaint Led a Florida School to Restrict Access to Amanda Gorman's Famous Poem*, NPR (May 23, 2023), https://www.npr.org/2023/05/24/1177877340/amanda-gorman-poem-restricted-miami-school.

### C.  Racial discrimination regarding immigrants.

**"I think that there is a good bet that somebody that's come across that [Southern] border will commit an act of terrorism."**

Governor Ron DeSantis, September 11, 2023[227]

DeSantis's warning of terrorist acts by immigrants represents the continuation of a false immigrant threat narrative that decision-makers in Florida have perpetuated since DeSantis's first election in 2018. Yet, as noted by a CATO Institute study, there is no truth to this claim about the dangers of terrorism by immigrants.[228] CATO, a libertarian institution, studied terrorist attacks on U.S. soil from 1975 to 2022. It found that "[t]he chance of a person perishing in a terrorist attack committed by a foreigner on U.S. soil over the 48-year period studied here is 1 in 4.3 million per year.[229] The hazard posed by foreigners who entered on different visa categories varies considerably. For instance, the annual chance of an American being murdered in a terrorist attack by a refugee is about 1 in 3.3 *billion*, while the annual chance of being murdered in an attack committed by an illegal immigrant is zero."[230]

### 1.  Decision-makers in Florida promulgated a false immigrant threat narrative.

The immigrant threat narrative advanced by Governor DeSantis and other decision-makers in Florida ignores the fact that rightwing extremists, not immigrants, pose the most significant domestic terror threat in the U.S. A study by the New America Foundation found that the far right accounted for 133 deaths in terrorist attacks since 9/11, Jihadists accounted for 107,

---

[227] Andrew Stanton, *DeSantis Blames Immigration 'in Part' for September 11 Attacks*, Newsweek (Sept. 11, 2023), https://www.newsweek.com/ron-desantis-blames-immigration-september-11-attacks-1826160.
[228] Alex Nowrasteh, *Terrorism and Immigration: A Risk Analysis, 1975-2022*, CATO Institute (Aug. 22, 2023), https://www.cato.org/policy-analysis/terrorism-immigration.
[229] *Id.*
[230] *Id.*

misogynists accounted for 17, Black separatist groups accounted for 12, and the far left accounted for 1.[231] None were attributable to immigrants coming across the southern border.[232]

This immigrant threat narrative promulgated by decision-makers in Florida has led to discrimination against immigrants, negatively affecting every aspect of immigrant life. The threat narrative emerged again with S.B. 7050's prohibition against noncitizens, including Florida residents authorized to work in the U.S., associated with 3PVROs from collecting or handling registration materials.

In the spring of 2019, the legislature was debating S.B. 168, legislation that would compel local law enforcement officials to cooperate with the detention practices of Immigration Customs Enforcement (ICE) for alleged undocumented immigration. On April 19, 2019, the House sponsor of the bill, then-Representative and current Secretary of State Cord Byrd, and the Senate sponsor, Joe Gruters, held a public event to dramatize the dangers allegedly posed by undocumented immigrants.[233] This event illustrates how decision-makers in Florida used the immigrant threat narrative to demonize immigrants and justify punitive legislation. In a moment of candor at the event, then-Representative Byrd made it clear that backers of S.B. 168 were concerned not just about "illegal" undocumented immigrants but all immigrants in Florida. He said the legislation is "about not putting either legal or illegal immigrants over American citizens . . . It is about public safety."[234] While the Florida legislature was considering S.B. 168, the Federation for American Immigration Reform (FAIR), one of the groups that worked with members in adopting S.B. 168, published a list of "Examples of Serious Crimes by Illegal Aliens." Every alleged offender on the

---

[231] Peter Bergen & David Sterman, *What is the Threat to the United States Today*, New America Foundation, https://www.newamerica.org/future-security/reports/terrorism-in-america/what-is-the-threat-to-the-united-states-today (Sept. 10, 2021).
[232] *Id.*
[233] *4/17/19 Press Conference on H.B. 527 [the House equivalent of S.B. 168] Sanctuary Cities [Video]*, Fla. Channel (Apr. 17, 2019) https://thefloridachannel.org/videos/4-17-19-press-conference-on-hb-527-sanctuary-cities/.
[234] *Id.*

list was identified as coming from a Latin American or African nation or had a Hispanic surname; the group had not provided examples of any crimes committed by Anglo immigrants.[235]

Florida decision-makers and their anti-immigrant allies have fabricated the immigrant threat narrative. The data shows that immigrants—documented or undocumented—commit crimes at lower rates than native-born citizens. A 2019 study by the CATO Institute used data from the U.S. Census American Community Survey to examine incarceration rates in the United States for 2017. CATO found, "The incarceration rate for native-born Americans was 1,471 per 100,000; 756 per 100,000 for undocumented immigrants; and 364 per 100,000 for legal immigrants in 2017."[236] This means that "illegal immigrants are *49 percent less likely* to be incarcerated than native-born Americans. Legal immigrants are 75 percent less likely to be incarcerated than natives. If native-born Americans were incarcerated at the same rate as illegal immigrants, about 943,000 fewer natives would be incarcerated."[237]

CATO further noted that the incarceration rate for undocumented immigrants is overstated because substantial numbers are incarcerated only for immigration offenses, which do not apply to other groups.[238] They are in prison for being undocumented immigrants, not because they are criminals. "Removing the immigration offenders by subtracting the 13,000 convicted for immigration offenses and the 38,000 in ICE detention facilities on any given day lowers the illegal

---

[235] *Examples of Serious Crimes by Illegal Aliens*, Fed'n for Am. Immigr. Reform (FAIR), https://www.fairus.org/issue/border-security/examples-serious-crimes-illegal-aliens#:~:text=The%20crimes%20do%20not%20include,sexual%20crimes%20related%20to%20minors (scroll down and select the 2019 drop-down menu) (last visited Oct. 6, 2023).
[236] Michelangelo Landgrave & Alex Nowrasteh, *Criminal Immigrants in 2017: Their Numbers, Demographics, and Countries of Origin*, Cato Inst. (Mar. 4, 2019) https://www.cato.org/publications/immigration-research-policy-brief/criminal-immigrants-2017-their-numbers-demographics.
[237] *Id.* (emphasis added).
[238] *Id.*

immigrant incarceration rate to 397 per 100,000," less than a third of the rate for native-born Americans and nearly equal (9 percent higher) to the rate for legal immigrants.[239]

A 2018 study in *Criminology* found that across "every model" of statistical control, "[i]ncreased concentrations of undocumented immigrants are associated with statistically significant decreases in violent crime."[240] The researchers further found that "[d]espite substantial differences in official reporting rates across these offenses, as undocumented immigration increased in recent decades, there was a significant, concomitant decrease in each measure of violent crime," including murder, rape, robbery, and assault.[241]

Further evidence debunking the immigrant threat narrative comes from the negative relationship in Florida between rates of undocumented immigrants and rates of crime. Crime was falling in Florida at the same time that undocumented immigration was rising from just an estimated 240,000 in 1990 to an estimated peak of 1,050,000 in 2007.[242] Whereas the Florida crime rate fell substantially during a similar timeframe.[243] A similar pattern applies to violent crime in Florida.[244]

Thus, multiple analyses based on several different bases of data demonstrate that undocumented immigrants and immigrants in general are less of a crime threat than U.S.-born citizens, despite decision-makers' immigrant threat narratives to the contrary. The reason is simple.

---

[239] *Id.*
[240] Michael T. Light & Ty Miller, *Does Undocumented Immigration Increase Violent Crime*, 76 Criminology 370 (2018).
[241] *Id.*
[242] *Unauthorized Immigrant Population Trends for States, Birth Countries and Regions*, Pew Rsch. Center (June 12, 2019), https://www.pewresearch.org/hispanic/interactives/unauthorized-trends/ (under "State of Residence" tab, select Florida from dropdown menu).
[243] All Florida crime statistics are from reports of the Florida Department of Law Enforcement. *Uniform Crime Reports (UCR) Annual Archives*, Fla. Dep't L. Enf't, https://www.fdle.state.fl.us/CJAB/UCR/Annual-Reports/UCR-Annual-Archives (last visited Oct. 4, 2023).
[244] *Id.*

Vulnerable undocumented immigrants and documented immigrants seeking naturalization have additional incentives to succeed in America and avoid engagement with law enforcement.

The false immigrant threat narrative in Florida has two discriminatory impacts on immigrants. First, it demonizes and marginalizes immigrants, with the stigma falling on both documented and undocumented immigrants and primarily on Hispanics. Professor Amada Armenta of the UCLA Luskin School of Public Affairs notes in her 2015 book on policing and immigration enforcement the broad-brush effects of the immigrant threat narrative that conflate immigrant, Latino, and illegal: "The terms *Latino, immigrant,* and *undocumented immigrant* are often treated as interchangeable social categories. In the popular imagery to be *Mexican* or *Latino* is to be 'illegal.'"[245] In turn, this demonization of immigrants leads to punitive measures like S.B. 168 and S.B. 7050 in Florida.

Another study by professors at Princeton University analyzed the rise of the immigrant "threat narrative" focused on Hispanics and "associated over time with the passage of increasingly restrictionist immigration legislation and the implementation of ever more stringent enforcement policies."[246] Professor Zoltan Hajnal of the University of California, San Diego found that "the heightened anxiety that the immigrant threat narrative has produced has led to significant regression in terms of immigration policy."[247] He found that the anti-immigrant backlash is not only a national level phenomenon. "[S]tates have done everything from reducing or eliminating immigrants' access to public services in education, health, and welfare, to allowing the police to target individuals suspected of being undocumented."[248] Manifestations of such policies in Florida

---

[245] Amada Armenta, *Protect, Serve, and Deport: The Rise of Policing as Immigration Enforcement* 6-7 (Univ. of Calif. Press, 2017) (emphasis in original).
[246] Douglas R. Massey & Karen A. Pren, *Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin America*, 38 Population Dev. Rev. 1, 6, 8-9 (2012).
[247] Zoltan Hajnal, *Immigration and the Origins of the White Backlash*, 150(2) Daedalus 23, 31 (Spring 2021).
[248] *Id.*

are found in both the anti-sanctuary cities legislation and in S.B. 1718 analyzed below. In addition, "[t]he immigrant threat narrative has been so pervasive that it has crept into debates about policy issues that are ostensibly not about immigration," such as the employment of noncitizens by 3PVROs discussed below.[249]

> ## 2.  The same legislature that enacted S.B. 7050 enacted a harsh anti-immigration law.

The immigrant threat narrative in Florida has since led to another harsh measure, S.B. 1718, enacted and signed into law in May of 2023 by the same legislature and Governor and at about the same time as the challenged legislation. Upon signing the bill, Governor DeSantis said, "The Biden Border Crisis has wreaked havoc across the United States and has put Americans in danger. In Florida, we will not stand idly by while the federal government abandons its lawful duties to protect our country. The legislation I signed today gives Florida the most ambitious anti-illegal immigration laws in the country."[250]

The law's provisions:

- Invalidate licenses issued lawfully in other states to undocumented immigrants and licenses that have markings indicating a person did not exercise the option of providing proof of lawful presence in the U.S. Police officers who stop a person in Florida with such a license are required to issue the person a criminal traffic citation, which could result in ICE detention and deportation under Florida's anti-sanctuary city law;

- Mandate that hospitals that accept Medicaid are required to include questions related to a person's immigration status on registration or admission forms. Patients may refuse to answer these questions and answers provided are prohibited from impacting patient care. Hospitals must collect data on the answered questions, including the costs of care and report this data to the state regularly;

- Mandate that employers with over 25 employees and public agencies are required to use the E-Verify system to check their employees' immigration status. Public agencies

---

[249] *Id.*

[250] Staff, *Governor Ron DeSantis Signs Strongest anti-Illegal Immigration Legislation in the County to Combat Biden's Border Crisis*, Ron DeSantis 46th Governor of Fla. (May 10, 2023), https://www.flgov.com/2023/05/10/governor-ron-desantis-signs-strongest-anti-illegal-immigration-legislation-in-the-country-to-combat-bidens-border-crisis/.

are authorized to terminate contracts with contractors and subcontractors if they have "a good faith belief" they employ undocumented people;

- Mandate that local governments cannot provide funds to any person or organization for issuing an identification card or similar document without proof of lawful presence in the U.S.

- As of November 1, 2028, repeal Florida Statutes section 454.021(3) which allows the Florida Bar to certify certain noncitizens, including DACA recipients;

- Add immigration enforcement to the responsibilities of Florida's Domestic Security Oversight Council. The new scope of action includes immigration "incidents" within and outside the state but that "affect the State"; and

- Appropriate $12 million for the Unauthorized Alien Transport Program for the 2023-2024 fiscal year, to expel migrants from the state.[251]

Representative Rick Roth candidly said of S.B. 1718, "This is more of a political bill than it is policy."[252] He added in another statement that "This bill is 100% supposed to scare you [immigrant residents]. I'm a farmer, and I'm mad as hell. We are losing employees."[253] Representative Alina Garcia, a staunch supporter of the bill, admitted that it was designed "basically to scare people from coming into the state of Florida, and I think that it's done its purpose."[254]

Despite these many provisions targeting "undocumented" immigrants, the law does not define what it means by undocumented and provides no means for reliably identifying such persons. Even Immigration and Customs Enforcement has difficulty distinguishing undocumented immigrants from U.S. citizens. According to a Government Accountability Report, ICE arrested 674 potential U.S. citizens, detained 121, and removed 70 from 2015 to 2020, although the actual

---

[251] Fla. S.B. 1718, 2023 Leg., Reg. Sess., https://www.flsenate.gov/Committees/BillSummaries/2023/html/3092.
[252] Nicole Acevedo, *Republican Legislators Who Backed DeSantis' Immigration Law Appear to Downplay Its Political Impact*, NBC News (June 6, 2023), https://www.nbcnews.com/news/latino/republican-lawmakers-backed-desantis-immigration-law-appear-downplay-p-rcna88000.
[253] *Id.*
[254] *Id.*

number is likely higher due to incomplete data.[255] The Report concluded, "ICE does not know the extent to which its officers are encountering and taking enforcement actions against individuals who could be U.S. citizens."[256] The nation's largest Hispanic organization, LULAC, found the law sufficiently alarming to post a travel warning for Florida.[257] It is only the second time in its history that LULAC has issued such a warning.[258]

### 3. Governor DeSantis deported Hispanic migrants to other states.

Governor DeSantis further advanced the immigrant threat narrative by deporting alleged undocumented Hispanic migrants to other states. In September 2022, DeSantis used Florida funds to charter private planes to fly some 50 migrants to Martha's Vineyard in Massachusetts.[259] The migrants did not come from Florida but from Texas.[260] DeSantis then falsely claimed that the migrants were deported from Massachusetts. "We even were able to deliver 50 illegal aliens to beautiful Martha's Vineyard. They said they were a sanctuary area. They had signs saying nobody is illegal. They said all the refugees and the illegals are welcome and then they deported them the next day. Are you kidding me?"[261]

However, according to FactCheck.org, "That did not happen." "None of the 49 have been deported from the United States," Rachel Self, an immigration and criminal defense attorney, told FactCheck.org by phone. Self, whose office is in Boston, has been working with several of the

---

[255] Government Accountability Office, *Immigration Enforcement: Action Needed to Better Track Cases Involving U.S. Citizenship Investigations* at Highlights, U.S. Gov't Accountability Off. (July 2021), https://www.gao.gov/assets/gao-21-487.pdf.

[256] *Id.*

[257] *LULAC's Historic Warning Against Latinos Traveling to Florida is a Reminder of Arizona Following SB1070*, League of United Latin Am. Citizens (May 17, 2023), https://lulac.org/news/pr/LULACS_HISTORIC_WARNING_AGAINST_LATINOS_TRAVELING_TO_FLORID A_IS_A_REMINDER_OF_ARIZONA_FOLLOWING_SB1070/.

[258] *Id.*

[259] D'Angelo Gore, *Migrants DeSantis Flew to Martha's Vineyard Were Not 'Deported the Next Day,' as He Claimed*, FactCheck.org, (Mar. 23, 2023), https://www.factcheck.org/2023/03/migrants-desantis-flew-to-marthas-vineyard-were-not-deported-the-next-day-as-he-claimed/.

[260] *Id.*

[261] *Id.*

migrants since they were taken to the island last year.[262] Further, FactCheck.org noted, "Because of the methods used to get the migrants from Texas to Massachusetts, DeSantis may have helped protect them from deportation" because their counsel were able to argue "that the migrants were manipulated into flying to Martha's Vineyard with false promises of jobs and housing — making them victims of a crime."[263] Crime victims have separate grounds for a visa. In addition, "[t]he migrants, who Self said also have applied for asylum, are unlikely to be deported while their U visa applications are being processed. And due to a backlog of more than 300,000 such petitions, it could be a while before their applications even come up for review."[264] Thus, "[i]f their U visa applications are approved, the migrants would be able to lawfully stay in the U.S. for at least four years, get work authorization, and eventually apply for legal permanent resident status."[265]

The Florida legislature is deeply implicated in this effort. DeSantis used state funds to send the migrants from Texas to Massachusetts. In 2022, the legislature appropriated $12 million for the Governor to transport migrants from Florida out of state.[266] Then, in response to DeSantis's request, the legislature appropriated another $12 million for this purpose in S.B. 1718.[267]

### 4.  Conclusions.

The anti-immigrant animus and threat narrative perpetrated by the Governor and the state legislature emerges again in S.B. 7050. Decision-makers presumed that all noncitizens, including legal permanent residents eligible for naturalization, are too dangerous to collect or handle registration material. As with other elements of the anti-immigrant threat narrative, decision-

---

[262] *Id.*

[263] *Id.*

[264] *Id.*

[265] *Id.*

[266] Valerie Crowder, *DeSantis Proposes Another $12 Million to Transport Migrants*, WSFU (Feb. 2, 2023), https://news.wfsu.org/state-news/2023-02-02/desantis-proposes-another-12-million-to-transport-migrants.

[267] Fla. S.B. 1718, 2023 Leg., Reg. Sess., https://www.flsenate.gov/Committees/BillSummaries/2023/html/3092.

makers in Florida offered no evidence supporting this claim, as documented in the section on contemporary statements below.

## VIII.   SEQUENCE OF EVENTS

> **The Governor, House Speaker, and Senate President "still do horse trade.**
> **But there really is just one guy running the show between them."**

John Hallman, Legislative Director of the Republican Liberty Caucus of Florida, 2023.[268]

The election of Governor Ron DeSantis in 2018 began the sequence of events that culminated in the adoption of S.B. 7050. As Hallman explained, DeSantis emerged as a uniquely aggressive and powerful governor with sway over the state legislature, which became increasingly conservative in subsequent elections. The Governor and the legislature advanced a white racial ideology in Florida that guided the adoption of S.B. 7050.

### A.   Governor DeSantis and the Florida legislature gain power in the state to pursue their racial ideology.

The sequence of events leading to the adoption of S.B. 7050 begins with the 2018 Florida elections. After his 2018 victory, Ron DeSantis said, "I may have earned a mere 50% of the vote [in 2018], but that entitled me to wield 100% of the executive power and I intended to do that and deliver for the people of Florida."[269] "I had an agenda I needed to get through."[270] Governor DeSantis wrote in his 2023 book, *The Courage to Be Free*, that "[w]hen working with legislative bodies there are times for the executive to take an adversarial approach. But by and large, the

---

[268] Tom Craig & Lori Rozsa, *How Ron DeSantis Became Florida's Most Powerful Governor in a Generation*, Washington Post (Apr. 16, 2023), https://www.washingtonpost.com/nation/2023/04/16/florida-ron-desantis-governor-legislature-power/.
[269] Corey Murray, *Governor Ron DeSantis Visits Hillsdale College*, Hillsdale Daily News (Apr. 7, 2023), https://www.hillsdale.net/story/news/politics/elections/presidential/2023/04/07/florida-gov-ron-desantis-visits-hillsdale-college/70088451007/.
[270] *Id.*

smarter approach is to get legislators invested in the success of the agenda. The key is to get legislators to see that supporting the agenda is in their best interests."[271]

DeSantis became the driving force behind politics and policy in the state. Gary Fineout, who has covered Florida politics for over two decades, wrote, "Gov. Ron DeSantis has become arguably the most powerful governor in Florida's history."[272] Underscoring DeSantis's power and influence, Anthony Verdugo, executive director of the Miami-based Christian Family Coalition, a conservative political advocacy group, compared DeSantis to "a kingmaker" in Florida.[273]

Independent political analysts in Florida similarly recognized DeSantis's extraordinary control over policy in Florida, legislative and administrative. "This is unprecedented that we have a governor with so much power over every level of government in Florida," said Sean Foreman, a professor of political science at Barry University, a private institution in Florida.[274] "The office of the governor has gotten stronger over the years and DeSantis is reaping the benefits by using the statutory authority and the bully pulpit to maximum effort…. People have ceded the checks and balances to the governor's political preferences," said Foreman.[275] Bob Jarvis, a law professor at Nova Southeastern University, said, "DeSantis has a blank check. There is no part of the constitution now that is protecting democracy because the checks and balances on him have been completely eviscerated."[276]

---

[271] Ron DeSantis *The Courage to be Free* 116 (2023).

[272] Gary Fineout, *'If you cross him once, you're dead': DeSantis keeps tight grip on Florida Lawmakers*, Politico (Jan. 11, 2022), https://www.politico.com/states/florida/story/2022/01/11/1-100-pound-gorilla-in-state-government-desantis-starts-2022-session-with-tight-hold-on-power-1404915.

[273] Tom Craig & Lori Rozsa, *DeSantis Flexes Influence With 'Anti-Woke' School Board Victories*, Washington Post (Aug. 24, 2022), https://www.washingtonpost.com/nation/2022/08/24/florida-desantis-schools-election/.

[274] Anthony Man, *Anyone Contemplating Crossing Gov. Ron DeSantis Needs to be Prepared to Pay a Price*, S. Fla. Sun Sentinel (Apr. 20, 2022), https://www.sun-sentinel.com/2022/04/20/anyone-contemplating-crossing-gov-ron-desantis-needs-to-be-prepared-to-pay-a-price/.

[275] *Id.*

[276] Steve Contorno, *Ron DeSantis, Unconstrained By Constitutional Checks, Is Flexing His Power In Florida Ahead Of 2024 Decision*, CNN (Aug. 10, 2022), https://www.cnn.com/2022/08/10/politics/ron-desantis-florida-political-power-2024-election/index.html.

DeSantis has attempted to expand his power in other ways that demonstrate he wields his authority in any way he sees fit to accomplish his agenda and is willing to exercise that power in a racially discriminatory manner, as illustrated above by his imposition of a racially discriminatory 2022 congressional redistricting plan.

In early August 2022, Governor DeSantis exercised a rarely used executive power to summarily suspend twice-elected Democratic District Attorney of Hillsborough County, Andrew Warren, based on his position on prosecuting abortion and gender-affirming care.[277] Warren signed a letter with 88 other prosecutors who collectively represent more than 91.5 million people from 30 states, territories, and DC, indicating "we decline to use our offices' resources to criminalize reproductive health decisions and commit to exercise our well-settled discretion and refrain from prosecuting those who seek, provide, or support abortions."[278] Warren had also indicated that he would use his discretion not to prosecute those providing gender-affirming care.[279] No other prosecutor who signed the letter was suspended. Then, in August 2023, during his campaign for the Republican presidential nomination, DeSantis suspended another elected District Attorney, Monique Worrell, in Orlando.[280] Worell, the only Black woman DA in the state, won the election in 2020 with 67% of the vote.[281] DeSantis charged that Worrell was too lenient

---

[277] Alexandra Berzon & Ken Bensinger, *Inside Ron DeSantis's Politicized Removal of an Elected Prosecutor*, N.Y. Times (March 11, 2023), https://www.nytimes.com/2023/03/11/us/politics/desantis-andrew-warren-liberal-prosecutor.html.

[278] *Joint Statement From Elected Prosecutors*, Fair and Just Prosecution, (June 24 2022), https://fairandjustprosecution.org/wp-content/uploads/2022/06/FJP-Post-Dobbs-Abortion-Joint-Statement.pdf (updated May 9, 2023).

[279] Steve Contorno, *DeSantis suspends Tampa prosecutor who took stance against criminalizing abortion providers*, CNN (Aug. 4, 2022), https://www.cnn.com/2022/08/04/politics/desantis-suspends-prosecutor/index.html#:~:text=Florida%20Gov.,affirming%20care%20to%20transgender%20people.

[280] Brendan Farrington & Freida Frisaro, *Florida Gov. DeSantis suspends another Democratic prosecutor as he seeks GOP presidential nomination*, AP (Aug. 9, 2023), https://apnews.com/article/desantis-suspends-florida-prosecutor-monique-worrell-45d2f5955b87fb5c0e817d9da9133393.

[281] Stewart Moore, *Gov. DeSantis suspends State Attorney Monique H. Worrell, citing neglect of duty*, WESH (Aug. 10, 2023), https://www.wesh.com/article/worrell-suspended-desantis/44772137; Jessica Bryce Young, *Election 2020: Monique Worrell wins Orange-Osceola State Attorney in a landslide*, Orlando Weekly (Nov. 3, 2020),

with criminals, a charge she vehemently denied.[282]

DeSantis did not suspend or reprimand Jack Campbell, District Attorney for the 2nd Judicial District. A whistleblower disclosed an authentic memorandum by one his subordinates directing employees to dole out harsher punishments to Hispanic people for driving without a valid driver's license.[283] The memo read: "*IF EXTENSIVE CRIMINAL HISTORY and/or HISPANIC > ADJUDICATED GUILTY _ Costs.*"[284] Such treatment based solely on race could profoundly affect the accused, including losing the right to vote.[285] Campbell speculated without evidence that the memo could be a mistake and should specify "undocumented immigrant" not Hispanic.[286] That change would remain problematic since the DA's office had no reliable means for the complex determination of who was undocumented and what their criminal history might be.[287] It also opens the door to racial profiling. "A lot of the undocumented immigrants that we're dealing with in this part are of Hispanic heritage," Campbell said.[288] "And so, he wrongfully superimposed one for the other because he often was dealing with a Hispanic population."[289] The whistleblower claimed that other employees in the office also talked negatively about Hispanic people.[290]

https://www.orlandoweekly.com/news/election-2020-monique-worrell-wins-orange-osceola-state-attorney-in-a-landslide-28225681.

[282] Gary Fineout, *DeSantis Suspends Another Elected DA in Move Derided as 'Politically Motivated'*, Politico (Aug. 9, 2023), https://www.politico.com/news/2023/08/09/desantis-suspends-state-attorney-worrell-00110445.

[283] Savannah Kelly & Chasity Maynard, *Whistleblower Accuses State Attorney's Office of Racism, Harsher Punishments for Hispanic People*, WCTV (Apr. 20, 2023), https://www.wctv.tv/2023/04/20/whistleblower-accuses-state-attorneys-office-racism-harsher-punishments-hispanic-people/.

[284] *Id.*

[285] Ashley Lopez, *Advocates in Florida clamor for a fix for the formerly incarcerated who want to vote*, NPR (May 4, 2023), https://www.npr.org/2023/05/04/1173786694/felon-voting-database-florida-registration-card-disclaimer.

[286] Savannah Kelly & Chasity Maynard, *Whistleblower Accuses State Attorney's Office of Racism, Harsher Punishments for Hispanic People*, WCTV (Apr. 20, 2023), https://www.wctv.tv/2023/04/20/whistleblower-accuses-state-attorneys-office-racism-harsher-punishments-hispanic-people/.

[287] *Id.*

[288] *Id.*

[289] *Id.*

[290] *Id.*

**B. Increased regulation and financial penalization of third-party voter registration organizations.**

Another element in the sequence of events was prior restrictions on 3PVROs that culminated with the enactment of S.B. 7050. In 2005, the legislature enacted H.B. 1567, which initiated the fining of 3PVROs.[291] It set fines for late returned applications. In 2011, the legislature set the maximum fine of $1,000 in a calendar year.[292]

In 2021, the legislature enacted S.B. 90, which modified the fine structure. It changed the deadline from 48 hours to 14 days to return voter registration applications and stipulated that 3PVROs must return applications to the county in which the applicant lives.[293] This new requirement created liability beyond the 3PVROs' control if the applicant put the wrong county in the application. The legislation continued to set the maximum fine for a 3PVRO at $1,000 in a calendar year.[294] Then, in 2022, the year proximate to the enactment of S.B. 7050, the legislature substantially increased the potential liability of 3PVROs. The legislation raised the aggregate fine imposed on 3PVROs in a calendar year 50-fold, from $1,000 to $50,000.[295] The 2022 law also created the Office of Election Crimes and Security, dedicated to enforcing the election code, under which DeSantis had highlighted isolated cases overwhelmingly involving Black Floridians.[296]

**C. Conclusions.**

The sequence of events leading to the adoption of S.B. 7050 follows the election of an aggressive and powerful Governor and a conservative state legislature that followed his priorities, including and particularly with respect to race. As demonstrated in the section on recent racial discrimination in Florida, the Governor and legislature imposed upon Florida their racial ideology

---

[291] Fla. H.B. 1567 er, 2005 Leg., Reg. Sess., https://www.flsenate.gov/Session/Bill/2005/1567/BillText/er/PDF.
[292] Fla. H.B. 1355 er, 2011 Leg., Reg. Sess., https://www.flsenate.gov/Session/Bill/2011/1355/BillText/er/PDF.
[293] Fla. S.B. 90 er, 2021 Leg., Reg. Sess., https://www.flsenate.gov/Session/Bill/2021/90/BillText/er/PDF.
[294] *Id.*
[295] Fla. S.B. 524 er, 2022 Leg., Reg. Sess., https://www.flsenate.gov/Session/Bill/2022/524/BillText/er/PDF.
[296] *Id.*

that became manifest in S.B. 7050. This bill was preceded by earlier restrictions on 3PVROs, notably the proximate legislation in 2022.

## IX.       SUBSTANTIVE AND PROCEDURAL DEVIATIONS

> **"Giving Floridians less than 24 hours to read, analyze, and dissect a 98-page bill makes it clear that this is another attempt to silence Floridians, which is effectively what this bill will do to voters if it passes."**

> Jason Oberlink of Florida Rising, Hearing, Senate Committee on Ethics and Elections, April 4, 2023[297]

Oberlink's comments highlight the onset of procedural deviations that marked the process for adopting S.B. 7050, a complex bill with significant substantive changes. Sponsors released the bill on April 3, just a day before the hearing when the public would have an opportunity to offer comments. The bill was 98 pages in length with numerous separate provisions.[298]

The provisions of S.B. 7050 that regulate 3PVROs represent a significant substantive deviation, not just from past practices in Florida but from practices in every other state. In S.B. 7050, Florida adopted the most stringent restrictions on 3PVROs of any state in the nation. No other state combines penalties for having noncitizens collecting or handling registration information; penalties for applications received after a state-imposed deadline, in the wrong county, and after book closing; and penalties for retained personal information of voters 3PVROs help to register.[299] The imposition of these penalties, even for non-willful action, further sets Florida apart from most other states, especially with fines now totaling $250,000 in a calendar year, 250 times the fines that Florida imposed before 2022 and 5 times the fines imposed that year. The 98-page bill included many other provisions unrelated to the restrictions on 3PVROs. Despite

---

[297] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 102:6-11, 2023 Leg., Reg. Sess. (Apr. 4, 2023).
[298] *Id.* at 30:12-31:6.
[299] *Voter Registration Drive Guides*, Fair Elections Center, https://www.fairelectionscenter.org/voter-registration-drive-guides (last visited Oct. 4, 2023). New Hampshire and Wyoming do not authorize third party registration drives but provide same-day registration for all voters.

its substantive impact, length, and complexity, legislators rushed the bill to enactment along party lines in a process that did not allow for adequate public comment, expert analysis, or a complete understanding of the bill by its primary legislative advocates, as discussed below.

### A. Florida decision-makers rushed the adoption of S.B. 7050.

Republicans introduced the bill on April 3, just a day before the Senate Committee on Ethics and Elections took up the bill, as noted by Democratic Senator Tina Polsky.[300] She asked the logical question as to why sponsors hadn't filed the bill by the proper deadline with opportunities for consideration and analysis rather than just receiving it the day before the hearing: "I just wanted to kind of start with the process questions. As I think everyone knows, we received this 98-page bill yesterday. I had the pleasure of reading through it last night, but, you know, I'm wondering why this bill wasn't filed when, you know, bill deadlines were so we had more time to work with our local supervisors and get more information than, you know, halfway through the session."[301] By presenting S.B. 7050 as a committee bill, Republicans bypassed the rule to file bills on the first day of the session.[302]

Senator Burgess, the Committee Chair, did not dispute this characterization of the bill's timing and complexity. Instead, he responded that "I think to sum it up in one word I would say prudence."[303] He admitted that "There is a lot of components that we're addressing. There's different provisions, some of them more substantial or technical than others."[304] Given that length and complexity, he said, "[c]ollectively, that, I think, enhanced our responsibility to try to get it right. We wanted to when we released the product to have it as close to right as we possibly could,

---

[300] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 30:12-20 (Apr. 4, 2023).

[301] *Id.*

[302] Fla. Senate, R. 3.7 (2022-2024), https://www.flsenate.gov/UserContent/Publications/SenateRules/2022-2024_Rules.pdf.

[303] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 30:24-25 (Apr. 4, 2023).

[304] *Id.* at 31:1-4.

fully understanding out the gate — and based on some feedback we've already received from supervisors of elections." [305] He added that he had been "working with some stakeholders" to get the bill right. [306]

There are multiple problems with these procedural responses. Legislators could have done their due diligence on the bill and timely presented it with an opportunity for review and analysis. Critically, the effort, as noted above, to "have it as close to right as possible," and "work[] with some stakeholders" was disingenuous. Republican legislators crafted the bill in secret with no opportunity for input from 3PVROs or civic organizations representing minorities and disabled Floridians, who testified that they saw the bill for the first time the day before the hearing. On that same day the Committee considered the bill, it voted to refer it along party lines. [307] However, the Chair did not indicate what committee the bill would be assigned to. And there was no companion House bill for members to review and analyze. [308]

As discussed above in the sections concerning foreseeability and impact of S.B. 7050, contrary to what S.B. 7050's backers claimed, they did not revise the bill in response to the many comments from representatives of stakeholders impacted by the bill who testified and/or communicated in writing to decision-makers. Instead, between the initial submission of the 98-page bill on April 3, 2023 and its enactment 25 days later, decision-makers in the legislature increased the maximum yearly fine for 3PVROs by 2.5 times, from $100,000 to $250,000. [309] Senator Burgess announced this escalation as a fait accompli at the April 20, 2023 Senate Committee on Ethics and Elections hearing, the last hearing on the bill, which left critics no time

---

[305] *Id.* at 31:5-11.
[306] *Id.* at 54:8-12.
[307] *CS/SB 7050: Vote History*, Fla. Senate https://www.flsenate.gov/Session/Bill/2023/7050/?Tab=VoteHistory.
[308] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 7:20-8:11 (Apr. 4, 2023).
[309] *Compare* Fla. S.B. 7050 pb, 2023 Leg., Reg. Sess., https://www.flsenate.gov/Session/Bill/2023/7050/BillText/pb/PDF *with* Fla. S.B. 7050 er, 2023 Leg., Reg. Sess., https://www.flsenate.gov/Session/Bill/2023/7050/BillText/er/PDF.

to analyze and comment on this change.[310] Sponsors did not mention this change the previous day at the April 19, 2023 State House Affairs Committee hearing.[311]

Individuals and representatives of organizations who testified to the Committee on April 4 similarly noted the lack of time for review and assessment. In addition to Oberlink, Cecile Scoon, President of the League of Women Voters of Florida, protested the lack of time for review: "I would agree that we did not have enough information. The citizens did not have enough time to review an almost 100-page bill."[312] Of those who testified on April 4 or waived with a designation of for or against, the tally was 54 to 0 against.[313]

The legislature held the first of only two hearings on S.B. 7050 after April 4 in the House Committee on State Affairs on April 19. Even before the Committee heard testimony, Republican Representative Caruso, the Committee's Vice Chair, warned of limited time and discouraged testimony: "If we have — we have less than three hours. We have a significant agenda to go through today. And so, if — if you are presenting publicly and — and you want to oppose, you know, say something that's already been addressed or stated, we'd ask you to just stand and waive in opposition or in favor of — of — of that."[314] After hearing from a few witnesses, Vice Chair Caruso declared a two-minute time limit on testimony: "[A]nd Mr. Skhir," the next witness, he said, "we're going to limit — start limiting to two minutes. We've got a big agenda. So please try to squeeze it in."[315] After a warning from Caruso that he had but 15 seconds left, Skhir, representing the ACLU of Florida, said, "I could go on and on but the Chair's already looking [at] me to — to end."[316] Shortly after that, as Oberlink of Florida Rising was about to testify, Caruso

---

[310] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 5:6-7, (Apr. 20, 2023).
[311] *See generally, Meeting of the Fla. State House Comm. on State Affairs* (Apr. 19, 2023).
[312] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 98:22-24 (Apr. 4, 2023).
[313] *Id.* at 11:14-23, 105:1-106:25.
[314] *Meeting of the Fla. State House Comm. on State Affairs* at 56:12-19 (Apr. 19, 2023).
[315] *Id.* at 64:0-12.
[316] *Id.* at 66:11-12.

cut witness time to one minute: "And we're going to have to limit you, Sir, to one minute and the rest of the public testimony to one minute," Caruso said.[317] During his testimony, Oberlink said, "Not done," but Caruso cut him off: "Sorry. Got a big agenda today."[318]

The full Senate took up the bill on April 26 and completed both the second and third readings on that day so the bill could be quickly passed on to the House with the close of session looming on May 5.[319] The third reading resulted from a motion by Senator Burgess to suspend the rule for second and third readings on separate days[320] and instead commence with the third reading on the same day.

It passed with the requisite two-thirds vote.[321] When the full House took up the bill on April 28, it too voted to waive its rules[322] by a two-thirds party line vote so that it could have the second and third readings on that day and move the bill to final passage.[323] The state legislature enacted the bill on April 28, 2023, just 25 days after its filing on April 3.[324] The rushed enactment gave no time for expert analysis and little time for public testimony. None of the seven other election bills enacted from 2001 to 2022 in the Florida legislature were rushed to enactment less than 45 days after the initial filing. These include S.B. 1118 (2001), S.B. 2566 (2004), H.B. 1567 (2005), H.B. 1355 (2011), S.B. 7066 (2019), S.B. 90 (2021), and S.B. 524 (2022).

---

[317] *Id.* at 75:9-11.
[318] *Id.* at 76:22-23.
[319] *CS/SB 7050: Bill History*, Fla. Senate, https://www.flsenate.gov/Session/Bill/2023/7050/?Tab=BillHistory.
[320] Fla. Senate, R. 4.12 (2022-2024), https://www.flsenate.gov/UserContent/Publications/SenateRules/2022-2024_Rules.pdf.
[321] Fla. Senate J., 20 Regular Sess. 469, 500 (Apr. 26, 2023)
https://1.next.westlaw.com/Link/Document/Blob/Iefd57e00e4ab11edb345dbd12ad315b2.pdf?targetType=inline&originationContext=document&vr=3.0&rs=cblt1.0&transitionType=DocumentImage&contextData=(sc.Keycite)&__lrTS=20231009191126420.
[322] Fla. H.R., R. 10.7 (2022-2024),
https://www.myfloridahouse.gov/Sections/Documents/loaddoc.aspx?PublicationType=Reference&CommitteeId=&Session=2024&DocumentType=The+Rules+Of+The+House+of+Representatives&FileName=2022-2024+House+Rules+-+Edition+1.pdf.
[323] *Floor Session of the Fla. State House of Representatives (S.B. 7050 Excerpt),* 2023 Leg., Reg. Sess., at 103:7-22 (Apr. 28, 2023).
[324] *FL S7050 | 2023 | Regular Session*, Legiscan, https://legiscan.com/FL/bill/S7050/2023 (last visited Oct. 9, 2023).

**B. Decision-makers in the legislature reneged on their promise for an inclusive procedure.**

When his committee voted to refer the bill on April 4, 2023, Senator Burgess promised that it was just the beginning of a process to improve the bill with input from stakeholders. He said, "I look forward to taking this product and working with every single one of you to try to have a very good bill that has a lot of input from a lot of stakeholders that we rely and trust on in this process."[325] This promise proved illusory, particularly with respect to provisions implicating 3PVROs and the marginalized communities in Florida that they serve. Republican decision-makers disregarded the criticisms by 3PVROs, Democrats, and advocates for minority and disabled Floridians.

The legislature, controlled by Republicans, rejected every amendment to S.B. 7050 that represented the views and interests of these stakeholders.[326] These included, among others, the following amendments:

- To establish same day registration (Amendment 516227)[327];

- To modify the sections imposing fines on noncitizens handling or collecting voter registration material to situations where "the third-party voter registration organization has actual knowledge that the person is not a citizen and who is collecting or handling voter registration applications on behalf of the third-party voter registration organization with the third-party voter registration organization's actual knowledge." The same modification of actual knowledge would apply to fines imposed for felons handling or collecting registration information (Amendment 210825)[328];

- To eliminate the $50,000 fine as it relates to noncitizens (Amendment 947595)[329];

- To modify the noncitizen prohibition to exempt those "authorized to work in the United States" (Amendment 003387)[330];

---

[325] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 111:23-112:2 (Apr. 4, 2023).

[326] *FL S7050 | 2023 | Regular Session*, Legiscan, https://legiscan.com/FL/bill/S7050/2023 (last visited Oct. 9, 2023).

[327] *CS/SB 7050: Elections: Amendments*, Fla. Senate, https://www.flsenate.gov/Session/Bill/2023/7050/?Tab=Amendments (last visited Oct. 9, 2023) (click "Amendments (64)" tab).

[328] *Id.*

[329] *Id.*

[330] *Id.*

- To reduce the fine for submissions later than 10 days from $50 to $20 per day and from a maximum of $2,500 to $1,000 (Amendment 385157)[331]; and

- To postpone the effective date of the act until after the November 2023 elections in Florida (Amendment 822721)[332]

## C. The flawed process for enacting S.B. 7050 left sponsors confused about their own bill.

Ironically, the rushed and inadequate process for consideration of S.B. 7050 left its primary legislative advocates confused about the bill and the 3PVROs it severely regulates. This misunderstanding applies to the most fundamental substantive deviation in the bill, the ban on noncitizens collecting or handling registration materials for 3PVROs. To give some examples:

- Senator Travis Hutson, the bill's primary sponsor said, "[w]e wanted to make sure you were — if I remember correctly, that you were a legal citizen handling this and you weren't an illegal doing third party voter registration." [333] However, lawful permanent residents and other noncitizens with work authorizations in 3PVROs are not "illegal" and are included in S.B. 7050's prohibitions and fines on noncitizens.

- Senator Burgess said the 3PVRO 10-day deadline for delivering registration applications "is current law"[334] and the provision "would be getting us in line with if you were to go and register to vote at say a library or another governmental entity. That . . . makes it consistent with that timeframe."[335] There is no such 10-day rule for registration at government entities, which are governed by statute and differ fundamentally in process from registrations through 3PVROs.[336]

- Senator Danny Burgess said he can't think of any reason why 3PVROs would retain personal information from registrants: "Any need to copy it or retain or jot something down is — I can't think of a good reason for that."[337] In fact, 3PVROs use retained information for civic engagement, voter information, and assistance.[338]

---

[331] *Id.*
[332] *Id.*
[333] *Floor Session of the Fla. State Senate (S.B. 7050 Excerpt),* 2023 Leg., Reg. Sess., at 15:9-12 (Apr. 26, 2023).
[334] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 12:15-16 (Apr. 20, 2023).
[335] *Meeting of the Fla. State House Comm. on State Affairs* at 24:22-25 (Apr. 19, 2023).
[336] Fla. Stat. §§ 97.057(1), 97.058(1), (6).
[337] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 66:19-21 (Apr. 4, 2023).
[338] Nordlund Decl. at 4-5; Vilar Decl. at 6-7; Nweze Decl. at 3.

### D. Conclusions.

Republican legislators, with their supermajorities in the Florida House and Senate and backed by Governor DeSantis, did not need procedural deviations to enact S.B. 7050. They control outcomes in the legislature. But the rushed and inadequate procedures served two purposes: (1) S.B. 7050 was passed before the end of the legislative session, and (2) avoided the backlash of a more protracted and thorough process with real input from stakeholders.

## X. CONTEMPORARY STATEMENTS BY DECISION-MAKERS/RATIONALES FOR S.B. 7050

**"[W]e wanted to make sure you were -- if I remember correctly, that you were a legal citizen handling this and you weren't an illegal doing third party voter registration."**

Senator Travis Hutson, Primary Sponsor of S.B. 7050, April 2023[339]

Given Florida's experience with numerous recent lawsuits alleging racial discrimination, decision-makers would not admit any such motivation in the adoption of S.B. 7050. However, misleading statements like that of Senator Hutson — the bill bans all noncitizens, including those legally authorized to work in the U.S. — cannot stand without scrutiny. The question is whether contemporary statements by decision-makers establish non-discriminatory, good-government rationales for the provisions of S.B. 7050 that impact 3PVROs. The analysis below demonstrates that legislative decision-makers failed to provide credible rationales. This failure is another crucial element of the circumstantial evidence that points to racially discriminatory intent.

---

[339] *Floor Session of the Fla. State Senate (S.B. 7050 Excerpt)* at 15:9-12 (Apr. 26, 2023).

**A. The prohibition, with associated fines, on lawful noncitizens from conducting voter registration activities. Fla. Stat. § 97.0575(1)(f).**

**1. Decision-makers fail to justify having the noncitizen prohibition sweep in immigrants legally authorized to work in the United States.**

S.B. 7050 prohibits noncitizens from "collecting or handling voter registration applications on behalf of" 3PVROs, with crippling fines of $50,000 for each violation meted out against the organizations, regardless of intent.[340] This provision, unlike the employment provisions of S.B. 1718, enacted at approximately the same time, does not just apply to undocumented immigrants but sweeps in an estimated 1.3 million Legal Permanent Residents (LPRs) — Green Card holders in Florida, according to data provided by the Department of Homeland Security.[341] As discussed below, these LPRs are legally authorized to work in the United States and are eligible to seek U.S. citizenship once they fulfill certain conditions. As potential citizens, they also have close ties to their adopted country and state. Decision-makers in Florida did not even attempt to seriously explain their employment ban and fines for this group that comprises about two-thirds of Florida's noncitizens.

The U.S. Citizenship and Immigration Service (USCIS) notes that "[h]aving a Green Card (officially known as a Permanent Resident Card) allows you to live and work permanently in the United States."[342] In addition to employment eligibility, lawful permanent residents can apply for a Social Security card and state driver's licenses.[343] They can own property, attend or teach at

---

[340] Fla. Stat. § 97.0575(1)(f).

[341] Bryan Baker, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2015-2019* at 6, U.S. Dep't Homeland Sec., https://www.dhs.gov/sites/default/files/publications/lpr_population_estimates_january_2015_-_2019.pdf (last visited Oct. 4, 2023).

[342] U.S. Citizenship & Immigr. Servs., *Green Card*, U.S. Dep't of Homeland Sec., https://www.uscis.gov/green-card (last visited Oct. 12, 2023); Irene Gibson, *Annual Flow Report, 2021, U.S. Lawful Permanent Residents* at 1, U.S. Dep't of Homeland Sec., https://www.dhs.gov/sites/default/files/2023-02/2022_0405_plcy_lawful_permanent_residents_fy2021v2.pdf (last visited Oct. 4, 2023).

[343] U.S. Citizenship & Immigr. Servs., *Welcome to the United States*, U.S. Dep't of Homeland Sec., at 14 (Sept. 2015), https://www.uscis.gov/sites/default/files/document/guides/M-618.pdf.

schools, colleges, and universities, join the armed forces, and apply to be U.S. citizens.[344] They are protected "by all laws of the United States, your state of residence and local jurisdictions" and are mostly eligible to apply for U.S. citizenship.[345]

Green Card holders are readily identifiable to the 3PVROs. Per USCIS, "We issue a Permanent Resident Card (Green Card) to all permanent residents as proof that they are authorized to live and work in the United States. If you are a permanent resident age 18 or older, you are required to have a valid Green Card in your possession at all times."[346] As this Court has recognized, "the individual Plaintiffs in these cases are legally permitted to work in the United States, and that the 3PVROs in these two cases who employ noncitizens to work as canvassers employ only those who are legally permitted to work in the United States."[347]

LPRs are actively employed in canvassing work for Florida's 3PVROs. For example, the spokesperson for Plaintiff UnidosUS, testified by declaration during the preliminary injunction proceedings that "[t]he vast majority of our canvassers—75% or more each year—are noncitizens. In 2022, 66% of our temporary staff members were noncitizens who were permitted to work in the United States."[348] The declaration added, "UnidosUS conducts background checks on its canvassers and only hires canvassers who are U.S. citizens or legal permanent residents in the United States."[349] The Executive Director of the Plaintiff Alianza for Progress testified by declaration in the preliminary injunction proceedings that both of their "two full time employees running the organization's voter registration program" are noncitizens with legal status to work in

---

[344] *Id.*
[345] U.S. Citizenship & Immigr. Servs., *Green Card*, U.S. Dep't of Homeland Sec., https://www.uscis.gov/green-card.
[346] *Id.*
[347] Prelim. Inj. Order 4 n.4, ECF No. 101.
[348] Nordlund Decl. at 3.
[349] *Id.* at 4.

the U.S.[350] He further testified that he "estimate[s] that 60-75% of our employed canvassers are noncitizens," which "increases to roughly 90-100%" in the slower off-season.[351] "Alianza conducts background checks on canvassers and only hires canvassers who are legally able to work in the United States."[352] Burgos of the Hispanic Federation testified by declaration during the preliminary injunction proceedings that "[m]any of Hispanic Federation's canvassers are noncitizens. Canvassers are citizens of Venezuela, the Dominican Republic, Colombia, or Mexico, but all our employees are authorized to work in the United States."[353] Nancy Batista of Poder Latinx testified by declaration during the preliminary injunction proceedings that "[t]he majority of Poder Latinx's canvassers are noncitizens. Many of our canvassers are citizens of Venezuela or Colombia, but all of our employees are authorized to work in the United States."[354]

According to 2019 data from the United States Department of Homeland Security, among the 1.3 million LPRs in Florida, an estimated 880,00 are "LPRs Potentially Eligible to Naturalize," the third largest among the states, behind only New York and Texas.[355] These are LPRs who have resided in the U.S. for at least five years or are married to a U.S. citizen and have at least three years of residence.[356] LPRs who are eligible for citizenship frequently succeed in becoming U.S. citizens. According to Homeland Security, "Nearly 34.9 million immigrants who entered the United States in 1980 or later became LPRs by January 1, 2019. About 45 percent of that total naturalized, and another five percent derived citizenship from a parent before becoming 18 years

---

[350] Vilar Decl. at 4.
[351] *Id.*
[352] *Id.*
[353] Burgos Decl. at 5-6.
[354] Batista Decl. at 6.
[355] Bryan Baker, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2015-2019* at 3, 6, U.S. Dep't Homeland Sec., https://www.dhs.gov/sites/default/files/publications/lpr_population_estimates_january_2015_-_2019.pdf (last visited Oct. 4, 2023).
[356] *Id.* at 5.

old. Of the remaining 17.0 million LPRs, about 4.8 million are estimated to have died and/or emigrated, leaving a stock of 12.4 million."[357] Of those 12.4 million, 9.13 million became eligible for naturalization in 2019, including the 880,000 in Florida.[358] Those in Florida not yet eligible for citizenship will become eligible once they satisfy the eligibility requirements. In Florida, for the fiscal year 2022, 106,000 immigrants became U.S. citizens.[359]

The prohibition against noncitizens in S.B. 7050 also sweeps in smaller numbers of persons who are eligible to work lawfully in the U.S. under three federal programs. Persons on Temporary Protected Status (TPS) cannot safely return to their homeland.[360] TPS persons who have obtained an "eligible for an employment authorization document (EAD)" from the government are authorized to work lawfully in the U.S.[361] There are 197,485 TPS persons in Florida, although not all will have an EAD.[362] An additional 27,991 international students in Florida who do not qualify for the Deferred Action for Childhood Arrival (DACA) program can be eligible for lawful work after a year's residence.[363] There are also 68,903 Florida residents eligible under DACA.[364] Persons who register under DACA are eligible to work lawfully in the United States.[365] Although these other persons lawfully authorized to work in the U.S. do not have a Green Card, they are issued "Employment Authorization Document (Form I-766/EAD)" which they must present to

---

[357] *Id.* at 1.

[358] *Id.* at 3, 6.

[359] U.S. Citizenship and Immigr. Servs., *Naturalization Statistics*, U.S. Dep't of Homeland Sec., https://www.uscis.gov/citizenship-resource-center/naturalization-statistics (last visited Oct. 4, 2023).

[360] *Fact Sheet: Temporary Protected Status (TPS)*, Nat'l Immigr. F., https://immigrationforum.org/article/fact-sheet-temporary-protected-status/ (Oct. 3, 2023).

[361] *Id.*

[362] *Temporary Protected Status and Deferred Enforced Departure* at 23, Cong. Rsch. Serv. (July 28, 2023), https://crsreports.congress.gov/product/pdf/RS/RS20844.

[363] *Florida: State Data*, Higher Educ. Immigr. Portal, https://www.higheredimmigrationportal.org/state/florida/ (last visited Oct. 12, 2023).

[364] *State Data*, Higher Educ. Immigr. Portal (Aug. 2023), https://www.higheredimmigrationportal.org/state/florida/.

[365] *Id.*

prospective employers.[366]

Immigrants lawfully authorized to work in the U.S. have a compelling incentive to conform to the law for fear of punishment, ranging from loss of the ability to naturalize to possible deportation. As demonstrated in the section on discrimination in immigration, immigrants, both documented and undocumented, commit crimes at substantially lower rates than native-born citizens. As further explained by Michael Tonry, the McKnight Presidential Professor of Criminal Law and Policy at the University of Minnesota Law School, "First-generation immigrants are self-selected risk takers who leave their homes, families, and languages to move to a new country to improve their and their children's lives. They have good reasons to work hard, defer gratifications, and stay out of trouble."[367]

As explained by Burgos of the Hispanic Federation, noncitizen canvassers are especially suited to register naturalized, minority citizens in otherwise hard-to-reach communities. "Hispanic Federation's non-citizen canvassers often had skills that made them especially capable of forming relationship [sic] in the community and assisting eligible citizens to register to vote. For example, non-citizens can speak to naturalized U.S. citizens in the naturalized citizen's native language, and can explain how the U.S. voter registration process differs from the process in their native country, all of which helps eligible citizens better understand the registration process and participate in American democracy. Without our noncitizen workforce, we will have a more difficult time reaching these communities of eligible citizens."[368]

---

[366] U.S. Citizenship and Immigr. Servs., *Documents for Verifying Employment Authorization and Identity*, U.S. Dep't of Homeland Sec., https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/130-acceptable-documents-for-verifying-employment-authorization-and-identity (last visited Oct. 4, 2023).

[367] Michael Tonry, "Race, Ethnicity, Crime, and Immigration," at 2, in Sandra M. Bucerius and Michael Tonry, eds., *The Oxford Handbook of Ethnicity, Crime, and Immigration* (Oxford University Press, 2014).

[368] Burgos Decl. at 6-7.

According to Vilar of Alianza for Progress, noncitizen canvassers "are very effective at forming relationships with individuals in the community, particularly as native Spanish speakers who can speak about the importance of participating in democracy — a right not guaranteed to many, including citizens of some of our canvassers' countries of origin."[369]

During the legislative debates, the sponsors of S.B. 7050 failed to tie any of the alleged issues with 3PVROs to the work of noncitizen legal canvassers, staffers, or executives. They offered no examples of any noncitizens mishandling registration materials. In justification of the ban and fines, as noted above, the primary sponsor, Senator Hutson, had said that the sponsors wanted to make sure that "you weren't an illegal doing third party voter registration."[370] However, this claim does not apply to lawful permanent residents and other noncitizens who are not "illegal" and who work extensively with the 3PVROs.

Senator Danny Burgess, who led the Senate debates on S.B. 7050, said, "regarding noncitizens, there are certain rights in our country that only citizens get to enjoy. That includes serving on a jury, running for office and voting."[371] This claim is a non-sequitur. It does not follow from these exclusions that LPRs and others authorized to work lawfully in America should not be dealing with registration materials. It refers generically to noncitizens.

LPRs have every incentive to do this job as well as possible and avoid transgressions. Further, our nation and the state of Florida already trust LPRs with important duties. For instance, some LPRs put their lives on the line and defend American democracy by joining the American armed forces.[372] Advocates for S.B. 7050 did not dispute that LPRs are eligible to serve on the

---

[369] Vilar Decl. at 5.

[370] *Floor Session of the Fla. State Senate (S.B. 7050 Excerpt)* at 15:9-12 (Apr. 26, 2023).

[371] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 112:9-12 (Apr. 20, 2023).

[372] *Requirements to join the military*, Usa.gov, https://www.usa.gov/military-requirements#:~:text=Citizenship%20and%20residency,read%2C%20and%20write%20English%20fluently (last visited Oct. 9, 2023).

Florida Election Commission, work in the Division of Elections, and work in the postal service, handling and delivering registration forms, applications for mail-in ballots, and completed ballots.[373] In addition, LPRs are eligible to teach young people and work in many Florida state and county offices, including the State Department of Financial Services and county offices of election supervisors, which deal with registration and voting at a higher level than canvassers.[374] Statements by decision-makers and proponents of S.B. 7050 contain no evidence that LPRs perform their jobs with any less diligence, efficiency, and honesty than citizens.

Senator Shevrin D. "Shev" Jones asked why LPRs who, as admitted by Senator Burgess, are employed in the Division of Elections and other state agencies where they would be dealing with registration information should be excluded from work with 3PVROs.[375] Senator Burgess responded, "So I think that what we're drawing now is the distinction between an employee who has been vetted and obviously hired, probably gone through different background checks and official channel situations, whereas we're talking about with a third-party voter registration organization, it's just that. It's an organization and it's a volunteer organization, assuming. And so I think there's a distinction there between official employment and being a volunteer for a group."[376]

This answer is doubly problematic. First, it shows that Senator Burgess, who is proposing drastic restrictions on 3PVROs, has little understanding of these organizations. They are not

---

[373] *Floor Session of the Fla. State Senate (S.B. 7050 Excerpt)* at 182:9-24 (Apr. 26, 2023); Prelim. Inj. Order 31, ECF No. 101.

[374] *See, e.g., Career Opportunities*, Fla. Dep't of Fin. Servs., https://www.myfloridacfo.com/division/receiver/career-opportunitiesekiruda (last visited Oct. 4, 2023); *Employment Opportunities*, Hernando Cnty. Supervisor of Elections https://www.hernandovotes.gov/Resources/Employment; *Election Worker Information*, Indian River Cnty., https://www.voteindianriver.com/Election-Workers/Election-Worker-Information.; *Apply to Work for the Coming Miami-Dade County Elections*, Miami-Dade County (July 1, 2022), https://www.miamidade.gov/global/news-item.page?Mduid_news=news165816521456560. All of these offices require proof of legal eligibility to work in the U.S., but not of U.S. citizenship.

[375] *Floor Session of the Fla. State Senate (S.B. 7050 Excerpt)* at 19:12-20:1 (Apr. 26, 2023).

[376] *Id.* at 20:7-16.

strictly volunteer organizations. As demonstrated above, some 3PVROs employ and pay both canvassers and staff members who are impacted by the ban against work by noncitizens. Second, the Senator presented an alleged distinction between vetted and non-vetted workers without evidence or examples. Third, this distinction is not specific to legal immigrant workers but would apply to all workers regardless of their citizenship status. Fourth, S.B. 7050 includes a ban on work by former felons, which would apply to citizens and noncitizens alike. Senator Jones further pressed proponents of S.B. 7050 to "explain why the bill makes this distinction based simply on whether someone is a U.S. citizen."[377] Senator Burgess responded by falling back on the claim that "it was a policy call, and that's where we landed," an empty claim lacking a substantive rationale.[378]

Similarly, when Representative McClure was asked directly why noncitizens, especially those authorized to work in the U.S., should be considered unfit to collect and handle registration materials, he answered with another empty nonresponse. Representative Bracy Davis asked: "Regarding third-party voter registration group fine, the $50,000 penalty for voter registration organizations who have noncitizen volunteer as canvassers, what evidence is there that noncitizens, including permanent legal residents, are any less honest or more likely to misuse information than U.S. citizens?"[379] Representative McClure responded, "The purpose of that doesn't contemplate the premise of your question. Instead, as it relates to the fines, we are emphasizing and prioritizing that voter's information."[380]

---

[377] *Id.* at 20:21-23.
[378] *Id.* at 21:17-18.
[379] *Floor Session of the Fla. State House of Representatives (S.B. 7050 Excerpt)* at 25:9-15 (Apr. 28, 2023).
[380] *Id.* at 25:19-22.

**2.   State officials failed to offer credible post hoc rationales for banning noncitizens authorized to work in the U.S.**

In the "Secretary of State's Response in Opposition to Motion for Preliminary Injunction and Incorporated Memorandum of Law," post hoc claims are made in support of the noncitizen prohibition and fines. The Secretary's after-the-fact arguments that are not part of the process leading to the enactment of S.B. 7050 have no bearing on the intent in adopting S.B. 7050. However, even taking them into consideration, they are also unavailing, despite the Secretary's office having nearly two months to study S.B. 7050 and its implications when the Secretary filed his motion on June 23, 2023.

- The Secretary said, "Florida's Non-U.S. Citizen Volunteer Restriction passes constitutional muster. Illegal aliens should not be in the country. They are subject to deportation at any time. Allowing these illegal aliens to collect and handle completed applications risks the applications never making it to an election official. Similar risks apply to those here legally, but temporarily; someone on a student visa might leave shortly before the expiration of the visa and before ensuring that a voter registration application they collected gets to the relevant election official. Rational basis is thus satisfied."[381]

This central rationale from the Secretary of State encapsulates the disconnect between justifications for the provision of S.B. 7050 on 3PVROs and what is in the bill. Like S.B. 7050 sponsor Senator Hutson, the Secretary focuses on "illegal" immigrants, even though the bill includes a much larger group of immigrants authorized to work lawfully in the United States, including, among others, 880,000 Green Card holders eligible for naturalization, as discussed above. For those legally authorized to work in the U.S., the Secretary focuses only on immigrants with student visas, the smallest of this group of noncitizens in Florida, comprising 27,991 students,

---

[381] Sec'y of State's Resp. in Opp'n to Mot. for Prelim. Inj. 20, ECF No 92.

as shown above, compared to 1.3 million lawful permanent residents, 197,485 persons under Temporary Protected Status, and 68,903 DACA recipients.[382]

Moreover, the Secretary presents a far-fetched scenario—that a student would suddenly and abruptly leave while transmitting a registration application. The state has provided no example of such an improbable turn of events. Any employee, including a U.S. citizen, could leave anytime for any reason. U.S. citizens in Florida frequently move out of county and state. Data from the 2021 ACS shows considerable geographic mobility among native-born Florida citizens. Per the ACS, during the past year, 7.3% of native-born Floridians have moved into their home from a different county or state or from abroad.[383]

The Secretary's remaining after-the-fact arguments are equally unpersuasive.

- "For the resident aliens—those who reside in the United States and can work in the United States but remain citizens of another country, the political-function exception applies."[384]

This claim is a legal defense, not a positive rationale for the blanket noncitizen ban.

- "Citizens have the most direct *stake in the results of the elections for* which the forms are being collected."[385]

The state asserts this claim without any supporting evidence. It fails to consider that Green Card holders, who are eligible for citizenship, have a significant stake in elections, particularly in Florida, where state policy significantly impacts immigrants, as discussed in the section concerning the Florida legislature's governing of immigrants. LPRs permanently enjoy the rights

---

[382] *Temporary Protected Status and Deferred Enforced Departure* at 23, Cong. Rsch. Serv. (July 28, 2023), https://crsreports.congress.gov/product/pdf/RS/RS20844; *State Data*, Higher Educ. Immigr. Portal (Aug. 2023), https://www.higheredimmigrationportal.org/state/florida/.

[383] U.S. Census Bureau, *American Community Survey: B07007 Geographical Mobility in the Past Year by Citizenship Status for Current Residence in the United States*, https://data.census.gov/table/ACSDT1Y2022.B07007?q=B07007:+Geographical+Mobility+in+the+Past+Year+by+Citizenship+Status+for+Current+Residence+in+the+United+States&g=040XX00US12 (last visited Oct. 12, 2023).

[384] Sec'y of State's Resp. in Opp'n to Mot. for Prelim. Inj. 20, ECF No. 92.

[385] *Id.* at 21 (emphasis added).

and protection of the U.S. and are employed in other capacities that impact elections, as discussed above. As demonstrated above, Green Card holders and other immigrants authorized to work in the U.S. have more incentive than citizens to avoid unlawful actions. They may lose their ability to gain U.S. citizenship and fear revocation of status and deportation. In addition, a 56% majority of lawful permanent residents were sponsored by close family members who are U.S. citizens.[386] Further, immigrant households in Florida are mixed, not limited to citizens living together.[387]

- "The Non-U.S. Citizen Volunteer Restriction safeguards election integrity and prevents voter fraud by prohibiting ineligible-to-vote noncitizens from collecting and handling voter registration applications. It also promotes voter confidence by reasonably ensuring that applicants' voter registration applications are not collected or handled by such persons."[388]

This claim is a differently worded but equally evidence-free generalization like the previous rationale and exhibits the same flaws. The state has not post hoc supplemented the legislative record with evidence that LPRs are more likely than U.S. citizens to commit election fraud and undermine election integrity, a supposition contradicted by the lower crime rates for immigrants than native-born citizens and immigrants' incentive to follow rules and laws, as discussed above. The state has presented no evidence that any voter's confidence is lowered by the presence of LPRs as registration workers or that voters are even aware of such employment. They have presented no evidence that the alleged problems with 3PVROs, such as turning in registration forms late or to the wrong county are in any way tied to the use of noncitizens.

Even Andrew Darlington, the Director of the Office of Election Crimes and Security since March 2023, mirrors the Secretary's mistake of failing to analyze immigrants legally authorized

---

[386] Irene Gibson, *Annual Flow Report, 2021, U.S. Lawful Permanent Residents* at 6, U.S. Dep't of Homeland Sec., https://www.dhs.gov/sites/default/files/2023-02/2022_0405_plcy_lawful_permanent_residents_fy2021v2.pdf (last visited Oct. 4, 2023).
[387] *Immigrants in Florida*, Am. Immigr. Council (Aug. 6, 2020), https://www.americanimmigrationcouncil.org/research/immigrants-florida#:~:text=More%20than%20425%2C000%20U.S.%20citizens,total%20state%20population%20in%202016.
[388] Sec'y of State's Resp. in Opp'n to Mot. for Prelim. Inj. 28-29, ECF No. 92.

to work in the U.S., including those eligible for naturalization. He makes in his declaration the same claim as the Secretary that "Noncitizens include illegal aliens, who are actively breaking the law and are subject to deportation at any time. Even those here on a temporary basis, such as those on student visas, pose similar risks; the temporary visitors might leave the country."[389] For legal permanent residents and others authorized the work in the U.S., Darlington only indirectly makes the empty, evidence-free statement that "[f]or resident aliens, the Florida Legislature made the determination that only U.S. citizens—those who can vote—can conduct the most critical aspect of the voter-registration process: ensuring that a completed application gets properly submitted on time."[390]

I have also reviewed the many complaints that Director Darlington attached to his declaration. Not a single complaint alleges that a 3PVRO worker was deported or left the country while collecting or processing registration applications. Not a single complaint even references noncitizen workers in any context.[391]

### 3. Conclusions.

In a variant of the immigrant threat narrative, defenders of S.B. 7050 have presumed without evidence or logic that noncitizens, including 880,000 Green Card holders eligible for naturalization, corrupt the registration process. Rationales for this imposition on 3PVROs offered during debates by legislative sponsors, post hoc by the Secretary of State, and Director Darlington lead to the same conclusion: They are either empty or misleading.

---

[389] Decl. of Andrew Darlington at 95, ECF No. 92-1, Tab F (June 23, 2023).
[390] *Id.* at 95-96.
[391] Attachment to Darlington Decl. of Andrew at 10-90, ECF No. 92-1, Tab G.

**B. The substantial increase in fines for late-returned voter registration applications and applications inadvertently submitted to the wrong county and the increase in the yearly maximum fine from $50,000 to $250,000. Fla. Stat. § 97.0575(5)(a).**

The provisions in S.B. 7050 fining 3PVROs for late returned applications or applications submitted to the wrong county heavily burden 3PVROs. S.B. 7050 reduced the required period for the return of applications from 14 to 10 days and then imposed hefty fines for non-compliance. For late returned applications, 3PVROs are liable for fines of $50 per each day late, up to $2,500, and $2,500 (increased from $250) for each such application if the 3PVRO "acted willfully."[392] They are further liable, $100 per each day late, up to $5,000, for each late returned application received after the voter registration deadline and an additional $5,000 fine (up from $500) per each such application if the 3PVRO "acted willfully"; and a $5,000 fine (up from $1,000) for any application willfully not submitted to the right county.[393] 3PVROs are subject to a maximum yearly fine of $250,000.[394]

**1. Legislative decision-makers fail to justify fines on applications returned after ten days, reduced from 14 days.**

The first penalized act that does not affect anyone's registration is the failure to turn in registration applications according to a deadline that the legislation reduced from 14 to 10 days. S.B. 7050 thus makes it more difficult for 3PVROs to comply while also hiking up fines. Senator Burgess claimed that the 10-day requirement "actually that is — that is current law, or I'm sorry, current rule."[395] But any previous version of a 10-day requirement was an administrative rule the Secretary of State allegedly set and was not required by statute as Senator Burgess subsequently admitted.[396] Representative McClure offered a further elaboration of this justification. The 10-day

---

[392] Fla. Stat. § 97.0575(5)(a).
[393] *Id.*
[394] *Id.*
[395] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 12:15-16 (Apr. 20, 2023).
[396] *Id.* at 12:24-13:1.

deadline for 3PVROs, he said in debates, "would be getting us in line with if you were to go and register to vote at say a library or another governmental entity. That . . . makes it consistent with that timeframe."[397]

Critically, these lead legislative advocates for S.B. 7050 misstate the rule for mail-in registration applications. Republican decision-makers also created a double-standard for mailed-in applications by 3PVROs. Under S.B. 7050, to avoid penalties, registered applications collected by 3PVROs must be "promptly *delivered* to the division or the supervisor of elections in the county in which the applicant resides within 10 days after the application is completed by the applicant."[398] However, under Florida law, mailed-in registrations are considered valid, not when they reach the election office, but when they are *postmarked*.[399]

The Pasco County Supervisor of Election explains: "The Book Closing Date is the statewide deadline to register to vote or change your political party for any election if you are already registered. For first time voters in Florida, a completed voter registration form must be in the Supervisor of Elections' office, or *postmarked*, by the book closing date."[400] Similarly, the Lake County Supervisor of Elections informs citizens that the registration deadline "by mail" must be "p*ostmarked* 29 days before Election Day."[401] A missive from all supervisors of elections also refers to postmarked applications: "Registration Deadlines: If this is a 'new registration', the date a signed voter registration application is postmarked or hand-delivered to your county Supervisor of Elections office will be your registration date."[402]

---

[397] *Meeting of the Fla. State House Comm. on State Affairs* at 24:22-24 (Apr. 19, 2023).
[398] Fla. Stat. § 97.0575(5)(a) (emphasis added).
[399] Fla. Stat. § 97.053(3)(4).
[400] *Election Dates*, Pasco Cnty. Supervisor of Elections, https://www.pascovotes.gov/Elections/Election-Dates (emphasis added).
[401] *Registration Deadlines*, Lake Cnty. Supervisor of Elections, https://www.lakevotes.com/Register-to-Vote (emphasis added).
[402] *Register to Vote*, Fla. Supervisors of Elections, https://www.myfloridaelections.com/Voting-Elections/Register-To-Vote.

If S.B. 7050 were consistent with the existing rule as decision-makers claim, the deadline for mail-in 3PVRO applications should be when the mail is postmarked, not when it arrives at the election office. Rather than conforming to existing standards, as proponents profess, S.B. 7050 uniquely puts 3PVROs in jeopardy from any vagaries of the postal delivery system, which is not a trivial matter, especially considering that the 10-day deadline is calendar, not business days.[403]

The decision-makers in the legislature also rely on a critically misleading apples to oranges comparison when equating registration through a 3PVRO with registration at a government office. No Secretary's 10-day rule applies to registration at government offices. Florida statutes governing the registration process differ fundamentally from registration through 3PVROs. The Florida statutes make clear that if a voter registers in person at an authorized government office, the voter does not need to submit an application by mail.[404]

According to the Florida Division of Elections, in 2022, Florida processed 813,085 new registrants, including pre-registrants (not yet 18).[405] "Registrations submitted directly to Supervisor of Elections office" accounted for 46,439, (5.7%).[406] By far, the largest source of registrations was "submitted through Florida Department of Highway Safety and Motor Vehicles or County Tax Collectors' Office," which accounted for 596,206 registrations (73.5%).[407] Other government agencies combined only accounted for 2,886 registrations (0.35%).[408] Given that most registrations come through Motor Vehicles,[409] the Florida statutes describe in more than 1,100

---

[403]*Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 12:17-23 (Apr. 20, 2023).
[404] Fla. Stat. § 97.053(1).
[405] Fla. Div. of Elections, *Voter Registration – Method and Location, 2018-Present*, Fla. Dep't of State, (Aug. 22, 2023), https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/voter-registration-method-and-location/.
[406] *Id.*
[407] *Id.*
[408] *Id.*
[409] *See also*, *Election Administration and Voting Survey: 2022 Comprehensive Report* at 168-171, U.S. Election Assistance Comm'n (June 2023), https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf.

words the detailed processes for registering in person at the Department of Highway Safety and Motor Vehicles.[410] The registration process is conducted online, and the Department transmits the application electronically within 24 hours.[411]

No one loses their ability to vote in an upcoming election simply because a 3PVRO falls short of the 10 calendar days deadline if the application is still received before book closing. The 3PVROs are fined for later returned applications even if the act is not willful or deliberate, but part of the organization's due diligence.[412]

### 2. Legislative decision-makers failed to justify fines on applications returned to the wrong county.

The second penalized act is submitting applications to a county where the applicant does not reside. However, officials in any county are authorized to process registration applications from any other county in the state. Again, no one loses their ability to vote.[413] The claim that 3PVROs could swamp county offices with applications sent to the wrong county is unavailing. In 2021-2022, election officials in Florida processed 1,493,778 new registrations, with only 53,186 submitted by 3PVROs, equal to 3.6%.[414] The applications documented as submitted by 3PVROs to the wrong county amount to a small fraction of this small fraction, comprising a small fraction

---

[410] *See* Fla. Stat. § 97.057.

[411] Fla. Stat. § 97.057(4)

[412] According to a report in the Guardian, "Rosemary McCoy, who runs a small non-profit called Harriet Tubman Freedom Fighters, was fined $600 for turning in a dozen applications late. She said her group does quality control on the applications it collects, reviewing the forms to make sure that they are complete and don't have errors. If there's a problem it can take a while to track down the applicant." She said that the lost money would have gone to pay stipends and gas money for registration canvassers. Sam Levine & Andrew Witherspoon, *Revealed: Florida Republicans Target Voter Registration Groups With Thousands in Fines*, Guardian, (July 13, 2023), https://www.theguardian.com/us-news/2023/jul/13/florida-fines-voter-registration-groups.

[413] Fla. Stat. § 97.053 (1); Sam Levine & Andrew Witherspoon, *Revealed: Florida Republicans Target Voter Registration Groups With Thousands in Fines*, Guardian, (July 13, 2023), https://www.theguardian.com/us-news/2023/jul/13/florida-fines-voter-registration-groups.

[414] Fla. Div. of Elections, *Voter Registration – Method and Location*, Fla. Dep't of State, https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/voter-registration-method-and-location/.

of one percent of processed applications.[415]

Moreover, the sending of applications to the wrong county may not be the fault of the 3PVROs if the applicant mistakenly puts the wrong county on the registration form. The 3PVROs challenging this provision work with marginalized minorities with education and English proficiency challenges. *The Guardian* investigated $7,500 in fines levied against the Hispanic Federation for 15 applications submitted in error to Polk County when voters lived in another county.[416] It found that in nearly all of them, "the voter incorrectly wrote on their own applications that they lived in Polk county. In many cases, the address they listed was just over the county line in Osceola County," including as close as 300 and 600 feet.[417]

*The Guardian* pointed out that the state had not claimed that the Hispanic Federation had deliberately sent applications to the wrong county.[418] The Hispanic Federation said that $7,500 would pay for about a dozen canvassers over a week's time who could register some 350 to 400 voters.[419] In a letter to authorities, the Hispanic Federation said, "Despite our good faith efforts, professionalism, and due diligence, we cannot eliminate some applications from being processed with errors as we have not been given access to an official mechanism to verify the information of each applicant — which is, in any case, not our role."[420] So, an error that the 3PVRO could not control cost the registration of hundreds of voters.[421]

---

[415] Appendix, Vol. 1, ECF No. 92-01; Appendix, Vol. 2, ECF No. 92-02.
[416] Sam Levine & Andrew Witherspoon, *Revealed: Florida Republicans Target Voter Registration Groups With Thousands in Fines*, Guardian, (July 13, 2023), https://www.theguardian.com/us-news/2023/jul/13/florida-fines-voter-registration-groups.
[417] *Id.*
[418] *Id.*
[419] *Id.*
[420] *Id.*
[421] *Id.*

### 3. Legislative decision-makers attempted but failed to justify sharply escalated fines on applications returned after book closing.

Republican legislators did attempt to justify the escalated fines for applications turned in after book closing. Senator Burgess said, "[w]e're upping those fines in certain areas based on — based on data and information that we have and — and some of the feedback and we're uncovering with some bad actors."[422] However, the fines are based on when the application is "received" at the election office, not when it is postmarked.[423]

Secretary of State Cord Byrd cited one "bad actor" (Hard Knocks) that had turned in 116 applications past book closing—out of close to 2,000 3PVROs in Florida.[424] Yet, he used this one example to justify sharply escalated fines for all nearly 2,000 3PVROs in Florida. He never explained why the existing fine structure was insufficient. Hard Knocks had already been fined more than $46,000 under prior law.[425] Byrd also noted that the organization was under criminal investigation,[426] which, combined with the fines, is certainly deterrence enough without severely penalizing all 3PVROs who are not "bad actors."

Senator Geraldine Fortenberry Thompson asked Senator Burgess in the final debate: "What is the percentage of the bad actors out of the total third-party voter registration organizations?"[427] He responded, "I don't have that percentage offhand but one disenfranchised voter is one too many,"[428] hardly a rationale for a blanket escalation of fines and the reduction of deadlines on all 3PVROs, especially considering that, by imposing these fines, the legislature will be

---

[422] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 10:4-7 (Apr. 20, 2023).
[423] Fla. S.B. 7050 er, at line 470, 2023 Leg., Reg. Sess.,
https://www.flsenate.gov/Session/Bill/2023/7050/BillText/er/PDF.
[424] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 54:1-16 (Apr. 20, 2023); *Meeting of the Fla. State House Comm. on State Affairs* at 69:21-70:1 (Apr. 19, 2023).
[425] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 54:1-5 (Apr. 20, 2023).
[426] *Id.* at 54:11-16.
[427] *Floor Session of the Fla. State Senate (S.B. 7050 Excerpt)* at 34:7-9 (Apr. 26, 2023).
[428] *Id.* at 34:14-15.

disenfranchising voters who would otherwise register through these organizations. During the hearings on S.B. 7050, Brad Ashwell, the state director of All Voting is Local, testified that there are alternatives to dealing with late-submitted registrations that do not involve S.B. 7050's exorbitant fines (see also the section below on less discriminatory alternatives). He testified first that Florida's book closing deadline for registration is an unnecessary holdover from past times. "The book closing deadline is outdated and antiquated and unnecessary at this point with electronic poll books." He added that the deadline would not be a problem if "we had same-day registration."[429]

But the legislature rejected a proposed amendment to S.B. 7050 for same-day registration.[430] Yet, it would solve the problem of registration for anyone whose application reached election officials after book closing for whatever reason. Representative Ashley Viola Gantt asked Secretary of State Byrd, "[w]ould you be amiable or supportive of same-day registration in those cases?" He responded, "[n]o. That would be a terrible idea because it undermines our very ability to verify whether or not those individuals are eligible to register to vote. We would not be able to process that information with same-day voter registration."[431]

Yet, according to the National Conference of State Legislatures (NCSL), 22 states and the District of Columbia had already adopted same-day voter registration, including states led by Republicans and Democrats.[432] Regarding Byrd's objection, NCSL notes that "the prospective voter must present proof of residency at the time of registration or soon after registering."[433] The

---

[429] *Meeting of the Fla. State House Comm. on State Affairs* at 78:17-23 (Apr. 19, 2023).
[430] *CS/SB 7050: Elections: Amendments*, Fla. Senate, https://www.flsenate.gov/Session/Bill/2023/7050/?Tab=Amendments (last visited Oct. 9, 2023) (click "Amendments (64)" tab).
[431] *Id.* at 69:11-18.
[432] *Same-Day Voter Registration*, Nat'l Conf. of State Legislatures, https://www.ncsl.org/elections-and-campaigns/same-day-voter-registration (Jan. 31, 2023).
[433] *Id.*

NCSL lists nine safeguards used by states to ensure accurate same-day registration information.[434]

"Same-day registration," which has the voter appear in person, said Rachel Orey, an elections expert at the Bipartisan Policy Center, "has a higher threshold for identity verification than other registration methods."[435] PolitiFact fact checked a claim by Florida Senator Rick Scott that mirrored Bryd's response to Gantt, contending that same-day registration "does not allow election officials to verify the validity and accuracy of voter information."[436] PolitiFact rated this assertion as "false," their second lowest rating, exceeded only by "pants on fire."[437]

Seven states have authorized same-day registration for more than 25 years.[438] The Heritage Foundation maintains a voter fraud database for each state. For these seven states combined since the 1990s, Heritage established that cases of registration fraud involved only 44 persons.[439] Of these cases, 27 can be ruled out as unrelated to a person's same-day registration; 24 involved an accused falsely registering other persons; two involved absentee voting; and one involved bribing registrants.[440] That leaves just 17 isolated persons in seven states over more than 25 years whose charges *might* arise from same-day registration. However, Heritage does not identify any cases related to same-day registration.[441]

---

[434] *Id.*

[435] Amy Sherman, *Fact Check: Can Election Officials Verify Addresses During Same-Day Voter Registration?*, WRAL News (Feb. 7, 2023), https://www.wral.com/story/fact-check-can-election-officials-verify-addresses-during-same-day-voter-registration/20725658/.

[436] *Id.*

[437] *Id.*

[438] Idaho, Me., Minn., Mont., N.H., Wis. & Wyo. *See Same-Day Voter Registration*, Nat'l Conf. of State Legislatures, https://www.ncsl.org/elections-and-campaigns/same-day-voter-registration (Jan. 31, 2023).

[439] *A Sampling of Recent Election Fraud Cases from Across the United States*, Heritage Found. https://www.heritage.org/voterfraud/#choose-a-state (data for Idaho, Me., Minn., Mont., N.H., Wis. & Wyo.) (last visited Oct. 4, 2023).

[440] *Id.*

[441] *Id.*

**4.   Legislative decision-makers failed to justify fines as high as $250,000 per year, five times greater than previously assessed.**

Decision-makers in Florida failed to provide credible good-government justifications for such punitive fines, which increased five-fold in just a year from 2022 and 250-fold from the pre-2022 fines. During debates, Representative Lawrence McClure, the State Affairs Chair, was asked to explain the rationale for increasing the maximum year fines. Like the answers to questions on the noncitizen ban, McClure came up empty, never explaining why the heightened fines were necessary and why they would outweigh their chilling effect. He said,

> "I can't speak to the — the previous years. I didn't run that legislation. But what I can say is to the extent that there haven't been any problems and forecasted amongst these third-party organizations not to have problems in the future. . . . We want to make sure it is collected, handled in a responsible manner and we believe that also you have the right to vote in this country. And we want to make sure that that registration gets in so that you can vote on that election that you're registering for."[442]

This generic comment admits there have not been past problems with the fine structure of prior law and no forecasting of future issues.

In an attempt to justify the increased maximum yearly fine, Senator Burgess claimed, "the fines already exist. We're putting some more teeth there to make sure that again it's not just the cost of doing business."[443] However, neither Senator Burgess nor any other proponent of S.B. 7050 offered any evidence that 3PVROs, especially low-budget operations like several Plaintiff organizations, regarded existing fines that could run into six figures as "just the cost of doing business." These are not wealthy organizations with multiple millions to spend on voter registration, as explained below. Fines up to $250,000 can be crushing.

---

[442] *Meeting of the Fla. State House Comm. on State Affairs* at 28:23-29:2, 29:12-165 (Apr. 19, 2023).
[443] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 54:21-24 (Apr. 4, 2023).

Their presumption, moreover, is contradicted by leaders of the 3PVROs. Marcos Vilar testified in his declaration for Alianza for Progress that his organization "relies on limited resources from members' donations and grants to effectuate its mission."[444] Their "voter registration program budget for 2022 was around $300,000."[445] Frederick Velez III Burgos testified that "[l]ast year, Hispanic Federation's budget for Florida voter registration programming comprised just over $650,000. This budget is comparable to what we have received in previous cycles, however; the costs associated with running the voter registration program and complying with all rules and regulations have increased, effectively lowering the number of forms we can collect compared to years prior."[446] Veronica Herrera-Lucha of Mi Vida testified that she is only "one of Mi Vecino's seven (7) current permanent employees," another small operation. [447] See also the statements from the Hispanic Federation and the Harriet Tubman Freedom Fighters quoted above, that even a small fine diminishes their capacity to register voters. The League of Women Voters of Florida said in its complaint challenging S.B. 7050 that $250,000 "is nearly the entirety of LWVFL's average annual budget."[448]

### 5. **Conclusions.**

In short, the legislature adopted, and Governor DeSantis signed, a punitive, crippling restriction on 3PVROs that, for two of three sub-parts, covered actions that did not harm anyone's right to vote and were not necessarily the fault of the organizations. It imposed severe penalties on returns after the book closings for registration on all 3PVROs based on a single example from one "bad actor" involving a vanishingly small percentage of voters registered by the 3PVROs. It

---

[444] Vilar Decl., ECF 54-10 at 1-2.
[445] *Id.* at 7.
[446] Burgos Decl. at 3-4.
[447] Herrera-Lucha Decl. at 4, *Hispanic Federation,* ECF No. 32-3
[448] Compl. at 29, *League of Women Voters of Fla., Inc.,* No. 4:23-cv-00216 (N.D. Fla. May 24, 2023), ECF No. 1. I cite the complaint here and *supra* at note 35 only for the information that the League presents about its organization and the effects of S.B. 7050, not for its legal arguments.

misleadingly dismissed a well-established, non-punitive, and more effective remedy. Senator Burgess said, "one disenfranchised voter is one too many," failing to recognize that crippling restrictions on 3PVROs in this provision and the noncitizen ban analyzed above, could cost thousands of Florida citizens their opportunity to register and vote.

**C. The criminalization, including potential fines and imprisonment, of the retention of voter information for any purpose other than registration, including get-out-the-vote efforts and other voter assistance efforts. Fla. Stat. § 97.0575(7).**

Under this provision, decision-makers in Florida established, "If a person collecting voter registration applications on behalf of a third-party voter registration organization copies a voter's application or retains a voter's personal information, a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section, the person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."[449]

**1. Attempts by legislative decision-makers to justify this provision to avoid identity theft are unavailing.**

In the Senate Committee on Fiscal Policy, Senator Burgess offered the following rationale for the provision related to alleged identity theft. He said, "instead of just returning [voter registration applications] within the required timeframe of 10 days, you know, they're making copies or retaining specific information, which there's no purpose for and there — and obviously we run into situations with identity theft and other various instances. And so we're speaking to — to that as a new third degree felony."[450]

Senator Burgess made similar claims in the Senate Committee on Ethics and Elections.

---

[449] Fla. Stat. § 97.0575(7).
[450] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 14:9-15 (Apr. 20, 2023).

He said, "We also want to protect against identity theft since there is a lot of personal information on these applications. So, if you were to make copies and retain specific information for any reason other than providing the application to the supervisor of elections, then we would treat it like a third-degree felony."[451]

Senator Burgess later said in Committee, "Social Security — the last four of the Social Security number could be on there as one of the options for information, but I think my default answer would be that there is no reason why a third party registration organization should be copying this information." He concluded, "[a]ny need to copy it or retain or jot something down is — I can't think of a good reason for that."[452]

Concerning Burgess's charge that "obviously we run into situations with identity theft and other various instances," voter registration applications do not have the personal information needed for identity theft. Although S.B. 7050 refers specifically to social security numbers, which if known, could facilitate identify theft, voter application forms contain no such information. As shown in Figure 2, the form only asks for the last four digits of the Social Security number, not the full nine digits.[453]

---

[451] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 37:4-10 (Apr. 4, 2023).

[452] *Id.*, 66:4-9, 19-21.

[453] Adam Bakst, *National Voter Registration Day Encourages the Practice of Democracy*, WUSF Pub. Media, (Sept. 24, 2019), https://wusfnews.wusf.usf.edu/news/2019-09-24/national-voter-registration-day-encourages-the-practice-of-democracy.

**FIGURE 2: FLORIDA VOTER REGISTRATION APPLICATION**



As indicated above, Senator Burgess admitted that the applications contain only this limited Social Security information, thus contradicting the wording of the bill. Further, identity theft is already a felony under Florida law.[454] So anyone associated with a 3PVRO who attempted to use retained information for identity theft would risk prosecution and prison time. Proponents of S.B. 7050 have cited no examples of any such identity theft efforts by an employee or volunteer for any of the nearly 2,000 3PVROs in Florida.

---

[454] Fla. Stat. § 817.568.

**2. Legislative decision-makers failed to understand how 3PVROs use retained information.**

The rationale advanced by Senator Burgess, who guided S.B. 7050 through the Senate, indicates that he lacks an understanding of 3PVROs. He said, regarding 3PVROs retaining voter information, "[m]y default answer here would be there's no reason for a third-party voter registration organization to be copying this information" on the registration form.[455] "Any need to copy it or retain it, or jot something down, I can't think of a good reason for that."[456] The truth is that 3PVROs routinely use retained personal information for sound, legal, and ethical civic engagement, voter assistance, and information purposes. As explained below, they use it, for example, to encourage persons to vote, provide information about the days, times, and locations of elections, inform voters about issues and ballot measures, inform voters of options such as mail-in and early voting, and make sure that officials properly processed applications and issued voter ID cards to the registrants.[457]

For example, Jared Nordlund of UnidosUS testified as follows in his declaration: "UnidosUS also retains contact and other identifying information for every person who registers through UnidosUS. Once registered, each one of those persons is sent a mailer from UnidosUS with get out the vote information, gets called multiple times with a reminder to go vote, and gets emailed multiple times with similar information. We also go door-to-door to canvass any voter who registered through UnidosUS this cycle or in past cycles."[458] In addition, UnidosUS may also follow up with voters, for example, "if we notice that certain portions of the form are illegible or to follow up and ensure that voters received their voter identification card."[459]

---

[455] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 66:6-9 (Apr. 4, 2023).
[456] *Id.* at 66:19-21.
[457] *See* declarations from spokespersons for 3PVROs cited *infra* notes 458-63.
[458] Nordlund Decl. at 5-6.
[459] *Id.* at 5.

Marcos Vilar testified in his declaration for Alianza for Progress that "[a]s a result of the Information Retention Ban, Alianza … will not be able to contact an applicant if there is an issue with a [voter registration] application and will not be able to follow up with the voters to educate them about important voting dates and issues on the ballot or to simply encourage them to vote."[460]

Nweze of the NAACP testified in her declaration that, through retained voter contact information from registration applications, "[w]e inform them about important issues and key election dates, and we encourage them to make sure they go out and vote."[461]

Nancy Batista, the co-founder and field director of Poder Latinx testified that "Poder Latinx's civic engagement work is focused on educating voters on how to exercise their right to vote, the accepted types of identification necessary to vote, how to request vote-by mail ballots, and how to return their ballots."[462] Frederick Vélez III Burgos, the National Civic Engagement Director of the Hispanic Federation, testified in his declaration that "Hispanic Federation's voter engagement work assists the Hispanic electorate to register to vote," and also assists in post-registration to "apply for vote-by-mail ballots, and vote on election day and during early voting."[463]

It is telling that of nearly 2,000 organizations certified for 3PVRO registration in Florida and at least 763,000 voters registered through 3PVROs as of 2021,[464] legislative decision-makers failed to cite a single example of identity theft or any other crime committed by these organizations through the retention of personal information. Nor did they cite any complaints from registrants whose information was retained.

---

[460] Vilar Decl. at 6-7.
[461] Nweze Decl. at 3.
[462] Batista Decl. at 2-3.
[463] Burgos Decl. at 2.
[464] Smith Rep. ¶ 40 ("5 percent of the 15,160,576 voters registered in Florida [in 2021], some 763,240 individuals, registered to vote with a 3PVRO. This total is an undercount of voters who initially registered with 3PVROs." (emphasis omitted)).

### 3. Legislative decision-makers and the Secretary of State post-hoc failed to clarify the information retention provision.

In addition, the legislative decision-makers did not clarify the vagueness of their provision. The provision is unclear about whether retention covers information voluntarily provided by a registrant to a 3PVRO. Senator Burgess was asked during debates about the situation where "someone voluntarily gives their information."[465] Senator Burgess never answered the question but deflected in lengthy but unresponsive comments.[466]

Further, S.B. 7050 does not define "personal information" but only provides examples under the "such as" clause. It does not clarify whether the ban includes only information on the registration application or information voluntarily provided by the registrant. The statute is further ambiguous because it fails to clarify whether the prohibition and criminal penalties cover only the canvassers who initially collect the information or others up the chain who examine, verify, and transmit applications. Further, does it apply to the organization itself?

Again, the Secretary of State's memo sought to deal post hoc with this ambiguity but only creates more confusion. The Secretary's construction of the statute is based upon a critical misreading. The memo says, "The Voter Information Retention Restriction prevents 3PVROs" from "retaining a voter's personal information. Fla. Stat. § 97.0575(7). 'Personal information' *includes* a voter's 'Florida driver license number, Florida identification card number, social security number, or signature.'"[467] The memo uses the word *includes*, which implies that the following list encompasses all prohibited information. However, the statute does not use the word *includes*, but instead uses the phrase *such as*. This phrase indicates that the listed items are examples of prohibited information but not the full universe thereof.

---

[465] *Meeting of the Fla. State Senate Comm. on Fiscal Pol'y* at 14:1-2 (Apr. 20, 2023).
[466] *Id.* at 14:3-15.
[467] Sec'y of State's Resp. in Opp'n to Mot. for Prelim. Inj. 32, ECF No. 92 (emphasis added).

The memo further states that "under the Secretary's interpretation, the Voter Information Retention Restriction doesn't prevent Plaintiffs from retaining (and using) voters' email addresses, telephone numbers, or mail or residential addresses."[468] But the statute provides no such distinction. Does the statute cover all information voluntarily provided by a contacted person, whether required for registration or not? The inclusion of emails and phone numbers certainly implies the latter (they are optional on the application), which would cover the operations of every candidate and political organization in the state. It would cover previously registered as well as newly registered voters, essentially shutting down civic engagement and voter assistance in Florida if equally applied.

In the argument on this Court's consideration of a preliminary injunction, the Secretary further claimed that "personal information" means "'private,' non-public information."[469] This definition is nowhere in the statute and lacks clear meaning. Is information private and non-public only if it is nowhere to be found by a member of the public? Does it mean that a member of the public would have to diligently search for the information using one of the many search engines that retain personal information?[470] What then counts as prohibited under this construction? Why not telephone numbers and email addresses, which are personal and not readily available to the public? What about date of birth? Place of Birth? Criminal record? Former name? Information about family members? Native-born or naturalized citizen? Job and employer? Social media activity? Organizational memberships? Most proficient language? Gender? Party affiliation? Race? Disability?

---

[468] *Id*.

[469] Sec'y of State's Resp. in Opp'n to Mot. for Prelim. Inj. 31, ECF No. 92.

[470] Ahad Waseem, *8 Best People Searches Online: Complete Guide for 2023*, Miami Herald (July 2, 2023), https://www.miamiherald.com/software-business/article259723310.html#storylink=cpy.

The point is that those associated with 3PVROs must know with crystal clarity what is permitted and what is not under S.B. 7050. If they get it wrong, even unintentionally, they face felony charges from the Office of Election Crimes and Security, a new office pushed by Governor DeSantis, who has made a point of cracking down on alleged election code violations, especially as they involve minorities (see the section on historical background above).

In sum, the justification for the retention provision by legislators is based on the false idea that 3PVROs have no use for retained personal information when such information grounds their civic engagement and voter assistance and information programs. Legislators failed to clear up any of the ambiguities inherent in the statute and efforts to do so by the Secretary of State only created more confusion. Under this statute, all members and associates of 3PVROs would remain at risk, with critical operations chilled.

Finally, it is important to note again that the Secretary's after-the-fact constructions of S.B. 7050 have no bearing on the intent of the legislators who crafted and voted for the bill, and the Governor who signed it. They have no bearing on the tenuousness of the rationale the legislators and Governor offered for the retention provision when it mattered during the legislative deliberations that led to the adoption of S.B. 7050 with this provision.

Thus, the decision-makers in the state legislature enacted and Governor DeSantis signed S.B. 7050, which criminalized data retention based upon a fundamental misunderstanding of how 3PVROs used retained personal information for civic engagement and voter information. They enacted a provision so vague that those associated with 3PVROs would not be able to know with clarity when they violated the restriction and became subject to criminal penalties. Even the post hoc explanations by the Secretary of State only created more of a muddle. They enacted the provision without citing a single example of any misuse of retained personal information by any

3PVRO at any time. They did not explain why, in light of this history, the matter should become

a problem in the future.

### D. Decision-maker's claims in defense of S.B. 7050 are self-defeating and contradictory.

As a general matter, self-defeating comments by Representative Tyler I. Sirois, a backer of

S.B. 7050, during the final House debates, expose the contradictions inherent in decision-makers'

advocacy for this bill. He said:

> The other thing that I want to touch on is one of the comments made in the chamber today. I think somebody said, you know, the government has to help people get registered to vote. The government has to do this. If the government doesn't do it, if the government doesn't step in, who's going to be involved here? And I would argue back it's not the government's role to register people to vote. It's a citizen's responsibility to go and to register to vote.[471]

Yet S.B. 7050 does not target government agencies. Instead, the bill allows the government

to intrude on and restrict the activities of private organizations, the 3PVROs, who are engaged in

the positive civic function of helping persons to register.

Moreover, as Representative Anna Eskamani noted, the private 3PVROs are doing what

the government does not adequately do: registering Florida citizens in hard-to-reach communities.

She said:

> And as a reminder, third-party border [sic] reg. organizations, they do what government doesn't do, what government won't do. They go into churches. They go into college campuses. They go into community events, farmers markets. They meet folks belly to belly and encourage them and get them activated to register to vote. Government doesn't do that.[472]

### E. Conclusions.

Decision-makers in the state legislature enacted S.B. 7050 with the challenged provisions,

and the Governor signed the legislation with only empty or absent rationales. These decision-

---

[471] *Floor Session of the Fla. State House of Representatives (S.B. 7050 Excerpt)* at 140:12-21 (Apr. 28, 2023).
[472] *Id.* at 118:23-119:5.

makers in the legislature enacted S.B. 7050 because they could, not because they demonstrated that it served the public interest or any state purpose. That is, they failed to offer race-neutral, good government rationales for adopting the nation's most stringent restrictions on 3PVROs. The following section examines less discriminatory alternatives to the challenged provisions of S.B. 7050.

## XI.    THERE ARE LESS DISCRIMINATORY ALTERNATIVES TO CHALLENGED PROVISIONS OF S.B. 7050

**"Multiple studies place the effect [of same-day registration] between an increase of 3% to 7%, with an average of a 5% increase."**

National Conference of State Legislatures (NCSL), January 2023[473]

Same-day registration, already adopted by 22 states, is a less discriminatory alternative for assuring that no citizen of Florida loses the opportunity to register and vote because of actions by 3PVROs. Unlike S.B. 7050, this alternative does not jeopardize efforts by the 3PVROs to register thousands of Floridians, predominantly those who are Black and Hispanic. It also has collateral benefits not limited to but including a likely increase in the opportunity for Florida citizens to register and vote. As shown above, this less discriminatory alternative was presented to Florida decision-makers during legislative debates and rejected by Secretary of State Byrd for reasons that do not withstand scrutiny. As further explained below, there are also less discriminatory alternatives to S.B. 7050's blanket restriction on noncitizens collecting and handling registration materials for 3PVROs. There is also a less discriminatory alternative to S.B. 7050's ban on retaining registration information.

---

[473] *Same-Day Voter Registration*, Nat'l Conf. of State Legislatures (Jan. 31, 2023), https://www.ncsl.org/elections-and-campaigns/same-day-voter-registration.

**A. There is a less discriminatory alternative to a blanket ban on noncitizens collecting or handling registration information for 3PVROs.**

There are less discriminatory alternatives than a ban on all non-U.S. citizens to resolve issues that the state may have with workers at the 3PVROs. The bill's primary sponsor, Senator Travis Hutson, said the bill made sure "you weren't an illegal doing third party voter registration."[474] A less discriminatory alternative than banning all non-U.S. citizens is to ban persons not authorized to work in the U.S. from handling and collecting voter registration materials. This alternative would guard against work by undocumented noncitizens and avoid stripping the 3PVROs of essential hard-to-replace workers who are permanent legal residents of the United States or authorized to work legally under other programs. These persons are readily identifiable through government-issued cards proving their eligibility to work in the U.S. As explained above, they currently serve in the armed forces, and they work in the postal service, the Florida Division of Elections, the Florida Financial Office, and county election offices.

**B. There are less discriminatory alternatives to the severe fines for applications received after book closing, after 10 days, or in the wrong county.**

There are several less discriminatory alternatives than imposing severe fines for registration applications returned after book closing. The first alternative is authorization to register on the day a person votes so that a late-returned application would not result in disenfranchisement for an upcoming election. This alternative has collateral good-government benefits not currently present in S.B. 7050, which poses only punishment. This alternative would bring Florida in line with 22 other states. States deploy multiple methods to ensure against fraud in this process, and the prospect of severe felony charges deters persons from attempting to fraudulently register to cast just a single vote out of many millions cast in Florida elections. Seven

---

[474] *Floor Session of the Fla. State Senate (S.B. 7050 Excerpt)* at 15:9-12 (Apr. 26, 2023).

states have used same-day registration for over 25 years with no consequential problems, if any, of fraudulent registrations resulting from the practice.

In addition to not threatening 3PVROs with crippling fines and risking the registration of thousands of Floridians, especially minorities, same-day registration cures late returned ballots, which S.B. 7050 does not. As Secretary of State Byrd recognized, "what happens is after book close, meaning there's no more time to register to vote, there is no cure for that."[475] The less discriminatory alternative would have several additional collateral benefits. It would protect the right to vote of individuals who did not register with 3PVROs but submitted their applications after book closing or registered late online or with a government agency. It would give all citizens of Florida greater opportunity to register and vote, which has positively impacted turnout. As noted above, "[m]ultiple studies place the effect [of same-day registration] between an increase of 3% to 7%, with an average of a 5% increase."[476] Another study demonstrates that the adoption of same-day registration does not impose significant costs on states.[477]

Another less discriminatory alternative would be to follow the North Carolina model and allow same-day registration only during the early voting period, which closes in Florida on the third day before the election.[478] When North Carolina instituted same-day registration for early voting in 2007, nearly 253,000 citizens used this option to vote in the presidential election year of 2008, with no issues.[479] The Heritage Foundation Fraud Database did not identify cases of registration fraud in North Carolina that could be tied to its policy of same day registration from

---

[475] *Meeting of the Fla. State Senate Comm. on Ethics & Elections* at 58:5-7 (Apr. 4, 2023).
[476] *Same-Day Voter Registration*, Nat'l Conf. of State Legislatures, https://www.ncsl.org/elections-and-campaigns/same-day-voter-registration (Jan. 31, 2023).
[477] Laura Rokoff & Emma Stokking, *Small Investments: High Yield: A Study of Same Day Registration in Iowa and North Carolina*, Demos (Feb. 2012), at 3, https://www.demos.org/sites/default/files/publications/SDR-CostStudy-Final.pdf.
[478] Fla. Dep't of State, *Early Voting and Secure Ballot Intake Stations*, Fla. Div. of Elections (March 27, 2023), https://dos.fl.gov/elections/for-voters/voting/early-voting-and-secure-ballot-intake-stations/.
[479] *Id.* at 1.

2008 to the present.[480] From 2004 to 2008, voter turnout of eligible voters in North Carolina rose from 58.7% to 66.1%, far exceeding the nationwide increase from 60.7% to 62.2%. North Carolina led all states in its expansion of turnout from 2004 to 2008.[481]

Another less discriminatory alternative that would also aid individuals who submitted registration applications late from any source is moving book closing closer to election day. The National Voter Registration Act stipulates that the book closing deadline for federal elections cannot extend beyond thirty days before an election. Florida is at the edge of this requirement with a book closing deadline of 29 days before an election. Thirty-five states have a book closing deadline closer to Election Day than 29 days.[482]

Still another less discriminatory alternative is the pre-S.B. 7050 status quo, in which 3PVROs had 14 (instead of 10) days to deliver registrations.

### C. There is a less discriminatory alternative to the vague data retention provision.

For the confusing prohibition on retaining personal information by 3PVROs, a less discriminatory alternative would be to eliminate the "such as" clause in the law and specify precisely that the sensitive information included in this clause constitutes all of the information that could not be retained: the Florida driver license number, Florida identification card number, social security number, and signature. This alternative would protect voter privacy while enabling 3PVROs to perform their good-government functions of civic engagement and voter information, targeted especially to minority voters.

---

[480] *Election Fraud Cases: North Carolina*, Heritage Found., https://www.heritage.org/voterfraud/search?state=NC&combine=&year=&case_type=All&fraud_type=All&page=2 (last visited Oct. 13, 2023).
[481] Michael P. McDonald, *National and State Turnout Rates*, U.S. Election Project, https://www.electproject.org/election-data/voter-turnout-data (open spreadsheet for entire series) (last visited Oct. 4, 2023).
[482] *Voter Registration Deadlines*, Nat'l Conf. of State Legislatures, https://www.ncsl.org/elections-and-campaigns/voter-registration-deadlines (Feb. 10, 2023).

### D.  Maintaining the status quo on challenged provisions.

Given the lack of justification by decision-makers for the heightened restrictions on 3PVROs under S.B. 7050, another non-discriminatory option is to maintain the prior status quo on challenged provisions. Even before the enactment of S.B. 7050, Florida had one of the most stringent sets of regulations for 3PVROs in the nation,[483] enforced by the Office of Election Crimes and Integrity. Under prior law — S.B. 90 — there are already fines for late returned applications, applications returned after book closing, and applications sent to the wrong county. There is also in place a maximum yearly fine of $50,000. As noted by the LDF letter cited above, raising the maximum to just $100,000, much less $250,000, would substantially burden 3PVROs. In addition, it is currently illegal under the Immigration Reform and Control Act of 1986 for employers to knowingly employ undocumented workers.[484] The status quo thus already regulates 3PVROs and their employees.

### E.  Conclusions.

In sum, decision-makers in the legislatures could have crafted less discriminatory legislation that kept undocumented immigrants from collecting or handling registration information without undermining the livelihood of noncitizens authorized to work in the United States. The state could have adopted forms of same-day registration that are far more effective than punitive measures in ensuring that late registrants, from whatever source, don't lose their right to vote while carrying with it collateral benefits absent in S.B. 7050. Finally, through a simple change, it would be possible to clarify the vague retention of information ban in S.B. 7050 so that 3PVROs and individuals affiliated with them will not be inadvertently subject to criminal

---

[483] *Voter Registration Drive Guides*, Fair Elections Center, https://www.fairelectionscenter.org/voter-registration-drive-guides.
[484] *Immigration Reform and Control Act of 1986*, Library of Cong. Rsch Guides, https://guides.loc.gov/latinx-civil-rights/irca (last visited Oct. 4, 2023).

penalties. As another alternative, Florida could maintain the status quo that already strictly regulates 3PVROs.