

# Transcript of Elizabeth Guzzo, Designated Representative

**Date:** December 19, 2023
**Case:** Florida State Conference of Branches, et al. -v- Byrd

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1     UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF FLORIDA

3      TALLAHASSEE DIVISION

4 --------------------------x

5 FLORIDA STATE CONFERENCE  :

6 OF BRANCHES AND YOUTH   :

7 UNITS OF THE NAACP, et al.,:

8     Plaintiffs,   :

9   v       : Case Nos.:

10 CORD BYRD, in his official : 4:23-cv-215-MW/MAF

11 capacity as Florida   : 4:23-cv-216-MW/MAF

12 Secretary of State, et al.,: 4:23-cv-218-MW/MAF

13     Defendants.  :

14 --------------------------x

15 (Caption continued on next page)

16     Videoconference Deposition of

17    OFFICE OF FLORIDA ATTORNEY GENERAL,

18  By and through its Designated Representative,

19      ELIZABETH GUZZO

20      Conducted Virtually

21     Tuesday, December 19, 2023

22      10:05 a.m. EST

23 Job No: 518700

24 Pages: 1- 151

25 Reported by: Suja Nair

```
1    (Caption continued from previous page)

2                 UNITED STATES DISTRICT COURT

3                NORTHERN DISTRICT OF FLORIDA

4                   TALLAHASSEE DIVISION

5    --------------------------x

6    LEAGUE OF WOMEN VOTERS OF  :

7    FLORIDA, INC., et al.,     :

8             Plaintiffs,       :

9       v                       : Case Nos.:

10   ASHLEY MOODY, in her       : 4:23-cv-215-MW/MAF

11   official capacity as       : 4:23-cv-216-MW/MAF

12   Attorney General of        : 4:23-cv-218-MW/MAF

13   Florida, et al.,           :

14            Defendants.       :

15   --------------------------x

16   HISPANIC FEDERATION,       :

17   et al.,                    :

18            Plaintiffs,       :

19       v                      :

20   CORD BYRD, in his official :

21   capacity as Secretary of   :

22   State of Florida, et al.,  :

23            Defendants.       :

24   --------------------------x

25
```

1          Videoconference deposition of

2    ELIZABETH GUZZO, conducted virtually.

3

4

5

6

7

8

9

10          Pursuant to Notice, before Suja Nair,

11    a Court Reporter and Notary Public in and for

12    the State of Maryland.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            A P P E A R A N C E

 2    ON BEHALF OF HISPANIC FEDERATION, ET AL.:

 3        MEGAN C. KEENAN, ESQUIRE

 4        DAYTON CAMPBELL-HARRIS, ESQUIRE

 5        AMERICAN CIVIL LIBERTIES

 6        UNION FOUNDATION

 7        125 Broad Street

 8        18th Floor

 9        New York, New York 10004

10        (212) 549-2500

11

12

13    ON BEHALF OF NAACP PLAINTIFFS:

14        MAKEBA RUTAHINDURWA, ESQUIRE

15        ELIAS LAW GROUP, LLP

16        1700 Seventh Avenue

17        Suite 2100

18        Seattle, Washington, 98101

19        (206) 656-0177

20

21

22

23

24

25
```

```
1    A P P E A R A N C E   C O N T I N U E D

2       ON BEHALF OF LEAGUE OF WOMEN VOTERS OF

3       FLORIDA:

4            BRENT FERGUSON, ESQUIRE

5            CAMPAIGN LEGAL CENTER

6            1101 14th Street, NW

7            Suite 400

8            Washington, DC 20005

9            (202) 266-5747

10

11

12       ON BEHALF OF NAACP PLAINTIFFS:

13            RENATA O'DONNELL, ESQUIRE

14            ELIAS LAW GROUP, LLP

15            250 Massachusetts Avenue, NW

16            Suite 400

17            Washington, DC 20001

18            (202) 498-8556

19

20

21

22

23

24

25
```

```
1   A P P E A R A N C E   C O N T I N U E D

2      ON BEHALF OF ALACHUA COUNTY SUPERVISOR OF

3      ELECTIONS:

4          BOB SWAIN, ESQUIRE

5          ALACHUA COUNTY ATTORNEY'S OFFICE

6          12 SE 1st Street

7          Gainesville, Florida 32601

8          (352) 374-5218

9

10

11      ON BEHALF OF JULIE MARCUS, PINELLAS

12      COUNTY SUPERVISOR OF ELECTIONS:

13          MATT SMITH, ESQUIRE

14          PINELLAS COUNTY SUPERVISOR OF

15          ELECTIONS

16          13001 Starkey Road

17          Largo, Florida 33773

18          (727) 464-5751

19

20

21

22

23

24

25
```

```
1    A P P E A R A N C E   C O N T I N U E D

2       ON BEHALF OF SUPERVISOR OF ELECTIONS

3       FOR BREVARD COUNTY, ET AL.:

4            FRANK MARI, ESQUIRE

5            ROPER, P.A.

6            2707 East Jefferson Street

7            Orlando, Florida 32803

8            (407) 897-5150

9

10

11      ON BEHALF OF PALM BEACH COUNTY

12      SUPERVISOR OF ELECTIONS:

13           BEN KOON, ESQUIRE

14           THE MARKARIAN GROUP

15           2925 PGA Boulevard

16           Suite 204

17           Palm Beach Gardens, Florida 33410

18           (561) 626-4700

19

20

21

22

23

24

25
```

```
1    A P P E A R A N C E   C O N T I N U E D

2       ON BEHALF OF SUPERVISOR OF ELECTIONS FOR

3       BAKER COUNTY, ET AL.:

4            LEIGH F. ROSENBLOOM, ESQUIRE

5            MARKS GRAY, P.A.

6            1200 Riverplace Boulevard

7            Suite 800

8            Jacksonville, Florida 32207

9            (904) 807-2127

10

11

12       ON BEHALF OF PINELLAS COUNTY SUPERVISOR

13       OF ELECTIONS:

14            JARED D. KAHN, ESQUIRE

15            PINELLAS COUNTY ATTORNEY'S OFFICE

16            315 Court Street

17            6th Floor

18            Clearwater, Florida 33756

19            (727) 464-3354

20

21

22

23

24

25
```

```
1   A P P E A R A N C E   C O N T I N U E D

2      ON BEHALF OF FLORIDA ATTORNEY GENERAL:

3          NOAH SJOSTROM, ESQUIRE

4          OFFICE OF THE FLORIDA ATTORNEY

5          GENERAL

6          PL-01 The Capitol

7          Tallahassee, Florida 32399

8          (850) 414-3635

9

10

11      ON BEHALF OF PAUL A. LUX, OKALOOSA

12      COUNTY SUPERVISOR OF ELECTIONS:

13          MATTHEW R. SHAUD, ESQUIRE

14          NABORS GIBLIN & NICKERSON, P.A.

15          1500 Mahan Drive

16          Suite 200

17          Tallahassee, Florida 32308

18          (850) 224-4070

19

20

21

22

23

24

25
```

```
1    A P P E A R A N C E    C O N T I N U E D

2        ON BEHALF OF SUPERVISOR OF ELECTIONS FOR

3        GLADES COUNTY, ET AL.:

4             JERRY OLIVO, ESQUIRE

5             HENDERSON, FRANKLIN, STARNES & HOLT,

6             P.A.

7             1715 Monroe Street

8             Fort Myers, Florida 33901

9             (239) 344-1168

10

11

12        ON BEHALF OF FLORIDA SECRETARY OF STATE:

13             JOSHUA PRATT, ESQUIRE

14             HOLTZMAN VOGEL BARAN

15             TORCHINSKY & JOSEFIAK, PLLC

16             119 S. Monroe Street

17             Suite 500

18             Tallahassee, Florida 32301

19             (850) 270-5938

20

21

22

23

24

25
```

```
1    A P P E A R A N C E    C O N T I N U E D

2       ON BEHALF OF SUPERVISOR OF ELECTIONS

3       FOR CITRUS COUNTY:

4           DALE A. SCOTT, ESQUIRE

5           ROPER, P.A.

6           2707 East Jefferson Street

7           Orlando, Florida 32803

8           (407) 897-5150

9

10

11       ON BEHALF OF HILLSBOROUGH COUNTY

12       SUPERVISOR OF ELECTIONS:

13           STEPHEN TODD, ESQUIRE

14           HILLSBOROUGH COUNTY ATTORNEY'S OFFICE

15           601 E. Kennedy Boulevard

16           FI 27

17           Tampa, Florida 33602

18           (813) 272-5670

19

20

21

22

23

24

25
```

1    A P P E A R A N C E   C O N T I N U E D

2        ON BEHALF OF FLORIDA OFFICE OF THE

3        ATTORNEY GENERAL:

4            STEPHANIE A. MORSE, ESQUIRE

5            FLORIDA OFFICE OF THE ATTORNEY

6            GENERAL

7            107 W. Gaines Street

8            Tallahassee, Florida 32399

9            (850) 414-3664

10

11

12        ALSO PRESENT:

13            Ms. Colleen O'Brien

14            Mr. Zack Bennington

15            Ms. Shilpa Jindia

16            Ms. Ashley Davis

17

18

19

20

21

22

23

24

25

```
 1                C O N T E N T S

 2    EXAMINATION OF ELIZABETH GUZZO              PAGE

 3       By Ms. Keenan                            15

 4       By Ms. Rutahindurwa                      80

 5       By Mr. Ferguson                          91

 6

 7

 8                E X H I B I T S

 9            (Attached to transcript)

10    GUZZO DEPOSITION EXHIBIT                    PAGE

11    Exhibit 1    Notice of Deposition            -

12    Exhibit 2    Answers to Interrogatories      -

13    Exhibit 3    Request for Production of

14                 Documents                       -

15    Exhibit 7    Bill Analysis                   -

16    Exhibit 8    Email                           -

17    Exhibit 9    Senate Amendment                -

18    Exhibit 10   Emails                          -

19    Exhibit 11   Emails                          -

20    Exhibit 36   3PVRO Registration Form         -

21    Exhibit 37   Enrolled SB 7050                -

22    Exhibit 33   Emails                          -

23    Exhibit 34   Letter                          -

24    Exhibit 35   Emails                          -

25    Exhibit 38   Article                         -
```

```
1    Exhibit 39   Voter Registration Receipt      -

2    Exhibit 40   Answers to Interrogatories      -

3    Exhibit 41   Overview for Supervisors of

4                 Elections' Offices              -

5    Exhibit 42   Answers to Interrogatories      -

6    (Exhibits not marked during deposition.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2    Whereupon,
 3                    ELIZABETH GUZZO,
 4    was called for examination by counsel and,
 5    after having been duly sworn, was examined and
 6    testified as follows:
 7                    DIRECT-EXAMINATION
 8    BY MS. KEENAN:
 9        Q.    Good morning.  So my name is Megan
10    Keenan.  I'm an attorney with the ACLU.  I'm
11    part of a team of attorneys who represent the
12    Plaintiffs in a case called Hispanic Federation
13    versus Byrd.  That's Case Number 4:23-cv-218,
14    in the Northern District of Florida.
15             Is it Ms. Guzzo or Guzza?  How do you
16    pronounce it?
17        A.    Guzzo.
18        Q.    Ms. Guzzo, have you ever been deposed
19    before?
20        A.    Yes.
21        Q.    Okay.  How many times?
22        A.    Three.
23        Q.    How many of those were on behalf of
24    the Florida AG's office?
25        A.    Three.
```

1      Q.    Okay.  What types of cases were

2  those?

3      A.    Prior legislative cases, as well.

4      Q.    And how long ago were those

5  depositions?

6      A.    Anywhere from, I mean, one to three

7  years ago.

8      Q.    Okay.  Have you ever given trial

9  testimony?

10      A.    No.

11      Q.    Okay.  To go back to the depositions

12  for a minute.  Did any of those involve

13  election-related cases?

14      A.    Yes.

15      Q.    And do you remember which case that

16  was?

17      A.    It was regarding Senate Bill 90.  So

18  I'm not sure exactly what the case title

19  specifically was.

20      Q.    Okay.  That's enough information for

21  me to -- to get it.

22            Did that case involve third-party

23  voter registration organizations?

24      A.    To the best of my knowledge, yes.

25      Q.    Okay.  I want to go over a couple of

1    deposition basics just before we get started

2    into the -- the bulk of the questions.

3              First, everything is being

4    transcribed here, so we need to speak clearly

5    and avoid speaking over each other.

6              Is that okay with you?

7        A.    Yes, ma'am.

8        Q.    All right.  We have a court reporter

9    participating today, who is transcribing the

10   conversation.  Please make sure your responses

11   are verbal because the court reporter can't

12   take down gestures, nods, or grunts.

13             Does that sound okay?

14       A.    Yes.

15       Q.    Okay.  There are a lot of lawyers

16   here attending for other parties.  Your

17   counsel, Ms. Morse, has the right to object

18   to -- to my questions as we go.  So if -- if

19   your lawyers or others on the Zoom start

20   speaking when I complete a question, please do

21   give them a moment to get any objections on the

22   record.  But once the objections are stated,

23   you should typically answer the question unless

24   I withdraw it, with the exception of any

25   objection related to privilege.

1               Does all of that make sense?

2      A.     Yes.

3      Q.     If at any point you don't understand

4   a question that I ask, please do tell me, and I

5   can try to explain or rephrase.

6               Is that all right with you?

7      A.     Yes.

8      Q.     Okay.  And if you don't ask me to

9   explain or rephrase, I will assume you've

10  understood the question as I've asked it.  So

11  please make sure that if there's any question

12  you have for me, you go ahead and ask.

13              If you -- if you need a break at any

14  point, also, please just say so.  We'll do our

15  best to accommodate that, as long as there's no

16  question pending.

17              And then, lastly, can you think of

18  any reason why you might not be able to

19  understand or respond accurately and truthfully

20  to my questions today?

21     A.     No.

22     Q.     Okay.  I'm noting for the record,

23  this is a remote deposition.  We're in separate

24  rooms.  I see Ms. Morse in the room with you

25  today.

1            Is there anybody else in the room

2    with you?

3         A.    No, ma'am.

4         Q.    Okay.  And it doesn't look like you

5    have any screens or documents in front of you;

6    is that right?

7         A.    No, I don't.

8         Q.    Okay.  And no smartphone, either?

9         A.    No.  I mean, it's in a bag behind me.

10        Q.    That's okay.  I can't see the table

11   in front of you, so I just wanted to check.

12        A.    Okay.

13        Q.    And then my last note --

14        A.    Do I need to --

15        Q.    No.  No.  You're fine.  You're fine.

16   I'd ask that you leave the smartphone aside

17   while we're on the record.  So I just wanted to

18   check.

19            And my last note, in light of this

20   being a virtual deposition, is if, for any

21   reason, our internet connection breaks up,

22   we'll all go off the record until we figure out

23   what the problem is, and then we'll just get

24   everybody back here in the session.

25            Does that sound okay with you?

1      A.    Yes.

2      Q.    Okay.  Ms. Guzzo, how long have you

3   worked with the Florida Attorney General's

4   office?

5      A.    A little over ten years.

6      Q.    And what is your job title?

7      A.    Currently, it is the director of

8   legislative affairs.

9      Q.    Has all of your work with the

10  attorney general's office been with the Office

11  of Legislative Affairs?

12     A.    Yes.

13     Q.    Can you describe the responsibilities

14  that you've held with the Office of Legislative

15  Affairs?

16     A.    I initially started as a assistant,

17  so clerical work, phones.  Then I became an

18  aide.  So I was assisting the director and the

19  special -- not the special -- the assistant

20  deputy.  And, then, a few years ago, I became

21  the director of legislative affairs.  So those

22  are the three roles.

23     Q.    And what is your -- what is your

24  day-to-day role as the director of the Office

25  of Legislative Affairs?

1      A.    I coordinate between the legislator

2   members' offices.  So any ideas that the

3   attorney general is interested in throughout

4   her office, I work with the legislature.  We're

5   situationally aware of things as they're

6   moving.

7      Q.    Can you tell me a little bit about

8   your educational background prior to joining

9   the Florida Attorney General's office?

10      A.    Sure.

11            I graduated from Florida State in

12   2010 with a Bachelor's in family and child

13   sciences.

14      Q.    Okay.  And is the Bachelor's degree

15   the last one that you completed?

16      A.    Yes.

17      Q.    Okay.  In your role with the Office

18   of Legislative Affairs, do you play any role in

19   investing -- investigating cases with the

20   attorney general's office?

21      A.    No.

22      Q.    And do you play any role in deciding

23   whether to prosecute a case?

24      A.    No.

25      Q.    Do you know about the processes

1  involved in deciding whether to prosecute a

2  case with the attorney general's office?

3      A.    No.

4      Q.    Okay.  So your work is limited to the

5  legislative side of the office; is that

6  correct?

7      A.    Yes.

8      Q.    Okay.  How many attorneys are

9  employed by the Office of Legislative Affairs?

10      A.    It's myself in the legislative

11  division, the chief of staff, his attorney, and

12  he oversees -- I -- I direct report to him,

13  so -- so one.

14      Q.    Okay.  And how many other staffers

15  are employed by the Office of Legislative

16  Affairs?

17      A.    Currently, it's just myself.

18      Q.    Okay.  You mentioned earlier that the

19  SB 90 case that you worked on involved

20  third-party voter registration organizations,

21  to the best of your recollection.

22          Are you generally familiar with

23  third-party voter registration organizations?

24          MS. MORSE:  Objection to form.

25      A.    I mean, generally, yes.  As it

1    relates to any questions that were previously

2    answered, I did say that.

3        Q.    Okay.  Would you know what I was

4    referring to if I called them 3PVROs throughout

5    this deposition today?

6        A.    Yes.

7        Q.    Okay.  And how much have you worked

8    on issues involving 3PVROs?

9              MS. MORSE:  Objection to form.

10       A.    I have not worked on that issue.

11       Q.    Okay.  So is -- have you consulted

12   personally on any legislative issues involving

13   3PVROs?

14       A.    No.

15       Q.    Okay.  I'm now going to share on the

16   screen the document that's been premarked as

17   Exhibit 1.

18             Okay.  Are you able to see the

19   document on my screen?

20       A.    Yes.

21       Q.    Okay.  I'm going to scroll down to

22   page 2.

23             MS. KEENAN:  And just for the record,

24   the documents are premarked by number.  I will

25   ask the court reporter to mark each of the

1    exhibits that I talk about consistent with the

2    number that the exhibit is premarked as.  So

3    I'll ask the court reporter to mark this as

4    Exhibit 1.

5        Q.    Can you see on page 2, the title of

6    this document is, Plaintiffs' Notice of Taking

7    Deposition of Office of Florida Attorney

8    General Pursuant to Federal Rule of Civil

9    Procedure 30(b)(6)?

10       A.    Yes.

11       Q.    Okay.  And if you scroll down to

12    page 6, you can see there are a series of

13    definitions and instructions, correct?

14       A.    Yes.

15       Q.    Okay.  And if we scroll down,

16    starting on page 9, you can see there are a

17    series of deposition topics, right?

18       A.    Yes.

19       Q.    Did you review the topics listed in

20    this notice for today?

21       A.    Yes.  I reviewed the ones that I was

22    designated for.

23       Q.    And do you recall which topics you

24    were designated to testify on behalf of the

25    Florida Attorney General's office about?

1      A.    Yes.  I don't -- I mean, the -- do

2  you want me to list the numbers?

3      Q.    I can walk through them, just to make

4  sure we're on the same page.  My understanding

5  is, it's topics 1, part of topic 2, and then

6  topics -- I'll scroll down to page 11 -- topics

7  12 through 15.

8          Does that -- does that match with

9  your understanding of what you've been

10 designated to testify about?

11     A.    Yes.

12     Q.    What, if anything, did you do to

13 prepare yourself to speak about these topics on

14 behalf of the Florida Attorney General's

15 office?

16     A.    I read through the topics.  I

17 referenced the documents provided that were

18 associated with my name, and -- so discovery --

19 and I spoke with my attorney.

20     Q.    Okay.  Did you speak with any other

21 staff of the Florida Attorney General's office?

22     A.    I asked the chief of staff one

23 question.

24     Q.    Okay.  I guess I'll ask what you

25 asked him, but I'll let your counsel object if

1  that's privileged.  I'm just not sure, given

2  the nature of the relationship.

3        MS. MORSE:  We are going to object to

4  the extent the work product -- any work product

5  is implicated.  And I'm going to instruct

6  the -- the witness not to reveal any work

7  product information.

8        MS. KEENAN:  Sure.

9     Q.    That's fine, if you don't think you

10  can answer it without revealing work product.

11        Other than the chief of staff, did

12  you speak with anybody else at the Florida

13  Attorney General's office in preparation for

14  this deposition?

15     A.    No, ma'am.

16     Q.    Now, you mentioned you reviewed some

17  documents produced in discovery.

18        Are you aware that the Florida

19  Attorney General's office has responded to some

20  written discovery responses -- or written

21  discovery requests in this case?

22     A.    Yes.

23     Q.    Did you, personally, assist counsel

24  in responding to those written discovery

25  responses?

1      A.    No.  I -- I discussed with the

2   attorney, but I did not write anything.  No.

3      Q.    Okay.  I'm now going to share on my

4   screen the document that's been premarked as

5   Exhibit 2.  These are the Florida Attorney

6   General's responses to the Plaintiffs' first

7   set of interrogatories in the Hispanic

8   Federation case.

9           MS. KEENAN:  I'll ask the court

10   reporter to mark that as Exhibit 2.

11      Q.    Have you see the responses provided

12   by the attorney general's office starting on

13   page 2 of this document?

14      A.    Yes.

15      Q.    Okay.  I'm going to scroll down to

16   page 3.  Interrogatory three says that John --

17   and I'm not sure I'm going to pronounce this

18   right -- but Bajger, B-A-J-G-E-R, was consulted

19   for the information on which the answers were

20   based.

21           Do you work with John Bajger?

22           MS. MORSE:  I'm going to object to

23   form, just generally, because this witness

24   didn't sign these interrogatories.

25           But you can answer.

1      A.    I do not work with John Bajger.

2      Q.    Okay.  Do you know which part of the

3 office he's in?

4      A.    He is an attorney for, I believe, the

5 civil division.

6      Q.    Okay.  I'm now going to share on my

7 screen what was premarked as Exhibit 3.  These

8 are the Florida Attorney General's response to

9 Hispanic Federation's first request for

10 production.

11           MS. KEENAN:  I'll ask the court

12 reporter to mark this as Exhibit 3.

13     Q.    Have you seen these responses before,

14 Ms. Guzzo?

15     A.    Yes.

16     Q.    Okay.  What role, if any, did you

17 play in preparing the document production in

18 this case?

19     A.    The document production?

20     Q.    Yes.

21           The -- the documents that were turned

22 over in discovery, what role, if any, did you

23 play in preparing those documents to be turned

24 over?

25     A.    The office has a discovery -- or a

1    public records division, and they did an

2    internal search.  So the attorneys handled it.

3    I know that there is a -- a process for the

4    search terms, et cetera.

5            So the attorneys produced the

6    documents.  I know there was litigation hold

7    for the documents.  I did not have anything

8    else that was responsive.

9        Q.    Okay.  Did you review the documents

10   produced by the Florida Attorney General's

11   office in this litigation?

12       A.    Not all of them.

13       Q.    Okay.  You mentioned earlier that you

14   reviewed the ones that had your name associated

15   with them.

16           Did you review any other documents

17   besides the ones that had your name on them?

18       A.    No.

19       Q.    Okay.  So let's go back to Exhibit 1,

20   the deposition notice.  We're going to walk

21   through some of those topics we just discussed,

22   but I want to go a bit out of order here.  So

23   I'm going to start with topic 13.  That's on

24   page 11 of the document.

25           Topic 13 says, The role of the

1    office, if any, in the enactment and passage of

2    the challenged provisions.

3           Did I read that correctly?

4    A.    Yes.

5    Q.    Okay.  Does the attorney general's

6    office represent the Florida State Legislature

7    or any individual legislator?

8           MS. MORSE:  Objection to form.

9    A.    No, not to my knowledge, are we

10   representing.

11   Q.    Okay.  And what about the Florida

12   Secretary of State?  Does OAG represent the

13   Florida Secretary of State?

14          MS. MORSE:  Objection to form.

15   A.    Not that I'm aware of.

16   Q.    Okay.  Going back in time to before

17   SB 7050 was passed.  Was the AG's office

18   consulted at all during the drafting of SB

19   7050?

20          MS. MORSE:  I'm going to object here

21   to the extent the question implicates the

22   deliberative process privilege.

23          To the extent you can answer without

24   revealing privileged information, you can

25   answer.

1      A.     No, not that I'm aware of, were we

2    consulted.

3      Q.     Okay.  And what about during the

4    drafting of any related predecessor bills that

5    came before SB 7050?

6             MS. MORSE:  Objection to form.

7      A.     Not that I'm aware of.

8      Q.     Okay.  Let's turn to after the bill

9    SB 7050 was proposed, then.  What, if any, role

10   did the AG's office play while SB 7050 was

11   being considered and debated by the

12   legislature?

13            MS. MORSE:  Objection to the extent

14   this implicates a deliberative process

15   privilege, but the witness can answer to the

16   extent she's able.

17     A.     We did not have a role.

18     Q.     Did any members of the legislature

19   consult the AG's office about 7050 while it was

20   being considered?

21     A.     No, not that I'm aware of.

22     Q.     What about any legislative staff?

23     A.     No, not that I'm aware of.

24     Q.     Did anyone from the Secretary of

25   State's office consult the attorney general's

1    office about SB 7050 while it was being

2    considered?

3            MS. MORSE:  Objection to form and

4    objection to the deliberative process privilege

5    regarding -- we -- we're asserting the

6    deliberative process privilege.

7            But you can answer.

8        A.    I'm sorry.  You asked did the

9    Secretary of State's office consult with us?

10       Q.    Yes.

11       A.    No, not that I'm aware of.

12       Q.    And what about any private parties?

13   Did they consult you about SB 7050?

14       A.    No, not that I'm aware of.

15       Q.    Okay.  Are you aware of whether the

16   AG's office provided any input to anybody about

17   SB 7050 while it was being considered?

18           MS. MORSE:  Objection to form.

19           And I do want to clarify.  Are you --

20   when you're referring to SB 7050, are you

21   referring mainly to the challenged provisions

22   or the entirety of the bill?

23           MS. KEENAN:  I'm referring mainly to

24   the challenged provisions.  Yeah.  I --

25           MS. MORSE:  Okay.

1          MS. KEENAN:  I can limit it to that.

2     And I -- I, more specifically going forward,

3     will talk about the citizenship requirement,

4     but right now my questions are focused on the

5     challenged provisions within SB 7050.

6          A.    Can you just state your question

7     again?

8          Q.    Sure.

9               Did the AG's office provide any input

10    to anybody about SB 7050 while it was being

11    considered by the legislature?

12               MS. MORSE:  Objection.

13          A.    No, not that I'm aware of.

14          Q.    Okay.  Did anyone from the AG's

15    office testify before the legislature about SB

16    7050?

17          A.    No.

18          Q.    Okay.  Did the AG's office take any

19    position either publicly -- well, I'll -- I'll

20    break that up.

21               Did the AG's office take any public

22    position on SB 7050 regarding its support for

23    the bill?

24               MS. MORSE:  Objection to form.

25          A.    No.

1        Q.      And did the AG's office support the

2    bill in any communications with other offices?

3        A.      No.

4        Q.      I'm now going to show you what's been

5    premarked as Exhibit 7, which the AG's office

6    produced as OAG_001069.

7                MS. KEENAN:  I'm going to ask the

8    court reporter to mark this as Exhibit 7.

9        Q.      Do you recognize this document, Ms.

10   Guzzo?

11       A.      Yes.  I know what it is.

12       Q.      Can you explain what it is?

13       A.      It is a bill analysis that the

14   legislature provides.  So this one is on Senate

15   Bill 7050.

16       Q.      Does the -- does the House staff

17   provide that analysis to the attorney general's

18   office?

19       A.      No.

20       Q.      Do you know how OAG received this

21   document?

22       A.      It's a public document.

23       Q.      Okay.  And I want to go to page 6 of

24   the document.  About halfway down, you can see

25   the phrase, Effect of the Bill.

1          Do you see that?

2     A.    Yes.

3     Q.    Okay.  In the second paragraph below,

4  Effect of the Bill, this memo says, The Bill

5  requires 3PVROs to submit certain affirmations

6  at the time of registration.  3PRVOs -- that's

7  a typo -- must affirm that each person

8  collecting or handling voter applications has

9  not been convicted of a felony violation of the

10  Florida election code, criminal use of personal

11  identifying information, or unlawfully

12  possessing the personal identification of

13  another person.

14          Do you see that sentence?

15     A.    Yes.

16     Q.    And the following sentence says,

17  3PVROs must also affirm that each person

18  collecting or handling voter applications is a

19  citizen of the United States.

20          Do you see that sentence?

21     A.    Yes.

22     Q.    Would you agree that the words,

23  Collecting, and, Handling, are italicized in

24  both of those sentences?

25     A.    Yes.  They are written italicized.

1      Q.    Okay.  You mentioned you're familiar

2   with these sorts of staff analysis.  Do you --

3   do you happen to know what italicizing words

4   typically means in this context?

5      A.    No.

6      Q.    Okay.  Do you have any idea whether

7   italicizing indicates that these are terms of

8   art being used by the staff?

9      A.    I'm sorry.  Can you repeat that?  If

10  they're used -- being used by who?  If the

11  staff is doing that?

12     Q.    Whether the staff is italicizing them

13  to use them as terms of art, is what I said.

14     A.    Oh.  No.  I don't -- I -- I'm not

15  aware of what the staff process is.

16     Q.    Okay.

17           MS. KEENAN:  I'm now going to show

18  the witness what's been premarked as Exhibit 8,

19  which the AG's office produced as OAG_001117.

20  I'll ask the court reporter to mark this as

21  Exhibit 8.

22     Q.    Do you recognize this email?

23     A.    Yes.

24     Q.    This is one of the ones you sent,

25  right?

1      A.     Correct.

2      Q.     Do you recall what the link is that

3   you sent here?

4      A.     Yes.  It was the link to the -- the

5   language.  You can -- I can see that it says,

6   7050.

7      Q.     Right.

8             And so if I -- if I represent that I

9   clicked the link, and it took me to Senator

10  Hutson's proposed amendment to SB 7050, which

11  was produced as OAG_001118, marked here as

12  Exhibit 9, would -- would that sound right to

13  you?

14            MS. MORSE:  Objection to form.

15     A.     Yes.  I would say that the link would

16  take you to the legislative language.

17     Q.     Okay.

18            MS. KEENAN:  I'm now showing the

19  witness what's been premarked as Exhibit 9,

20  which the AG's office produced as OAG_001118.

21     Q.     Ms. Guzzo, do you recall why you sent

22  this email containing Senator Hutson's

23  amendment here?

24     A.     Part of my job is to be situationally

25  aware as legislative proposals move through the

1  legislative process.  So it is part of my daily

2  role during the legislative session to sent

3  [sic] either language or amendments that have

4  either been proposed or notify -- if I get a

5  notification through LobbyTools that it has

6  certain words, then I would send that out.

7       Q.    And when you say, Certain words, what

8  kinds of words might trigger you sending it

9  out?

10      A.    You know, The Attorney General,

11 Department of Legal Affairs, Statewide

12 Prosecutor, anything that touches our office,

13 in that sense.  So even if it's already current

14 language in statute, I get a notification.  So

15 that would have been why I sent this.

16      Q.    Okay.  I'm going to go back to

17 Exhibit -- oops -- Exhibit 8 for a moment.

18           You sent this to James Percival and

19 John Guard.  Can you identify who those folks

20 are within the attorney general's office?

21      A.    Yes.

22           James Percival is the chief of staff,

23 and John Guard is the chief deputy attorney

24 general.

25      Q.    Okay.  So to focus on the draft

1    language that we were discussing for a moment,

2    did OAG identify any problems with the draft

3    language in SB 7050?

4                MS. MORSE:  Objection to form to the

5    extent it implicates the deliberative process

6    privilege.

7                You can answer.

8         A.    No, not that I'm aware of.  This was

9    just a situational awareness email.

10        Q.    Okay.  I'm going to show the witness

11   what's been marked as Exhibit 10, which the

12   AG's office produced as OAG_001376.

13                MS. KEENAN:  I'll ask the court

14   reporter to mark that as Exhibit 10.

15        Q.    Ms. Guzzo, do you work at all with

16   Timothy Vaccaro, who is in the, To, field here?

17        A.    No.

18        Q.    Okay.  You can see from his email

19   signature, if you scroll down to page 2 of the

20   document, that he's the executive director of

21   the Florida Elections Commission, right?

22        A.    Yes.

23        Q.    Do you know what the Florida

24   Elections Commission is?

25        A.    Yes.

1      Q.     And what is it?  What do you

2   understand that entity to be?

3      A.     It's -- the Florida Elections

4   Commission, they are housed under us in the

5   sense of a budgetary structure.  We do not

6   oversee them in any work or anything like that.

7      Q.     Okay.

8      A.     It is truly a -- a structural way

9   that they're just housed under our office.

10     Q.     Okay.  Do you work with Edward -- and

11  I'm not sure how to pronounce this.  Is it

12  Tellechea or Tellechia (phonetic)?

13     A.     Tellechea.

14     Q.     Tellechea.

15            Do you work with Edward Tellechea?

16     A.     I do sometimes.

17     Q.     Okay.  You know that Mr. Tellechea

18  works with the attorney general's office,

19  right?

20     A.     Yes.

21     Q.     He works for the Administrative Law

22  Bureau, as you can see in his signature block

23  here?

24     A.     Correct.

25     Q.     What is the role of that bureau in

1    the attorney general's office?

2         A.    I'm not sure of what their entire

3    role is.  The -- I don't work with him in any

4    sense of how he's connected to the elections

5    commission.  I know that any rule-making

6    authority that we have, that the admin law

7    section is over that.

8         Q.    Okay.  And so how does that -- how

9    does the admin law bureau interact with the

10   Office of Legislative Offers, to the extent

11   they interact at all?

12        A.    I work with Mr. Tellechea.  Part of

13   the attorney general's authority is emergency

14   scheduling certain substances, and so Ed

15   Tellechea is the one who helps us do the

16   emergency ruling.  He files it with the

17   registrar.  So he helps build out that for us.

18   And, then, part of my interaction with that is

19   then having to codify that within the

20   legislature.

21        Q.    Okay.  Do you know whether Stephanie

22   Cunningham -- going back to the, To, field --

23   also works with the attorney general's office?

24        A.    I don't know her, but her email

25   address is with the attorney general's office.

1      Q.    Okay.  But you don't know which

2   bureau or which office she's in within the

3   attorney general's office?

4      A.    No, ma'am.

5      Q.    Okay.  Looking at the first page of

6   this document -- and I can highlight it here --

7   Mr. Vaccaro indicates that he's -- it's unclear

8   what parts of SPB 7050 -- again, in the first

9   sentence here -- mean.

10         Do you agree with that?

11         MS. MORSE:  Objection to form.

12         And I'm going to ask if you could let

13   the witness see the entire document.

14         MS. KEENAN:  Sure.

15      Q.    I'll do that first.  So this is the

16   first page.  Let me know when you've had a

17   chance to skim it, and I will go ahead and move

18   to the next page.

19      A.    Okay.  Next page.

20      Q.    Okay.  Most of the top of this is

21   just email signatures, so I'm going to scroll

22   past that to give you a chance to see the next

23   part.

24         This is, again, from Timothy Vaccaro.

25   You can go ahead and read his email.

1    A.    Okay.

2    Q.    Okay.  And, then, down to the next

3    email.  I'm going to scroll down so you can see

4    the bottom email, but I won't be asking you

5    about this one.  So this is just for

6    situational awareness.

7          Let me know when you want me to

8    scroll.

9    A.    You can scroll.

10   Q.    Okay.  And that's the bottom.

11   A.    Okay.

12   Q.    Okay.  So we're going back up.  And

13   you can see this email from Timothy Vaccaro on

14   April 4th is about SPB 7050, right?

15   A.    Yes.  That's what it says.

16   Q.    You understand that to be Senate

17   Proposed Bill 7050, right?

18   A.    Yes.

19   Q.    And after reviewing SPB 7050, Mr.

20   Vaccaro sent an email that said, It is unclear

21   what the factor of three means.

22         Do you see that here in this email?

23   A.    Yes, I see it there.

24   Q.    Okay.  He drafts an email for the

25   attorney general's office to consider, to a

1   person named Dawn, right?

2       A.    That's what it says.

3       Q.    Okay.  And that email seeks

4   clarification of certain language in SB 7050,

5   right?

6       A.    That's what the email says.  Yes.

7       Q.    Okay.  Specifically, the last

8   sentences says, Clarification of these issues

9   will provide the Commission necessary guidance

10  for implementation, right?

11      A.    Yes.  That's what that says.

12      Q.    Okay.  And, then, going back up to

13  the top of this.  Mr. Tellechea says, Looks

14  good to me, in response to that draft email

15  sent by Mr. Vaccaro, right?

16      A.    Yes.  That's what that says.

17      Q.    Okay.  Next, we're going to take a

18  look at what's been premarked as Exhibit 11.

19            I'm going to scroll through the

20  entire document so you have a chance to take a

21  look at it.  Not a lot of text on this one, so

22  let me know when you're ready for me to scroll.

23      A.    You can scroll.

24      Q.    Okay.

25      A.    Okay.

1       Q.      Okay.   This is the bottom of that

2   email.  Have you had a chance to review it in

3   full?

4       A.      Yes.

5       Q.      Okay.  Have you seen this email

6   before?

7       A.      No.

8       Q.      Okay.  We see Mr. Vaccaro and

9   Mr. Tellechea again on this email, right?

10      A.      Yes.

11      Q.      And you can see that on page 2 of the

12  email thread, Mr. Vaccaro has contacted Dawn

13  Roberts from the Florida Senate's office,

14  right?

15      A.      Yes.

16      Q.      You recall that that last draft email

17  we saw was also directed to Dawn, right?

18      A.      Yes.

19      Q.      Okay.  And you can see that

20  Mr. Vaccaro is contacting Dawn Roberts at the

21  Florida Senate to propose an amendment to the

22  language of SB 7050, right?

23          MS. MORSE:  I'm going to object to

24  form, to the extent this appears to be beyond

25  the deposition topics for which this witness is

1    noticed.

2              MS. KEENAN:  I'm -- I'm happy to just

3    explain on the record.  She was noticed as

4    somebody who was going to talk -- was

5    designated to talk about the role of the

6    office, if any, and the enactment and passage

7    of the challenged provisions.

8              This is the AG's office commenting on

9    draft language of SB 7050 before it was passed,

10   so I think it's within the notice topics.

11             MS. MORSE:  No.  Those aren't the

12   challenged provisions.  The challenged

13   provisions are contained in a different statute

14   section.

15             MS. KEENAN:  This relates to the

16   challenged provisions in a -- in a way that

17   we'll get to in a couple of subsequent

18   questions regarding the type of amendment that

19   was requested and rejected and that doesn't

20   appear in the challenged provisions, either.

21   It relates to -- to the authority that the

22   state has with respect to the challenged

23   provisions, as well.

24             MS. MORSE:  I'm maintaining the

25   objection.  You know, the document appears to

1    speak for itself.  But if you have questions,

2    please, you know, go ahead.

3            MS. KEENAN:  Okay.

4       Q.    So are you aware of whether these

5    kinds of proposed edits to legislative language

6    are common practice from the AG's office?

7       A.    I'm not aware of these proposed

8    amendments.  This was not a legislative

9    priority.  If there would be an amendment

10   coming from our office, such as I mentioned

11   regarding, you know, the statutory authority we

12   have for the scheduling of drugs, for example,

13   if there was something that was incorrectly

14   drafted or proposed, then, yes, we would submit

15   an amendment in that sense.

16      Q.    Okay.  And you understand that you

17   were -- you were designated to talk not just

18   about the Office of Legislative Affairs, but

19   the attorney general's office's role in the

20   enactment and passage of statutes, right?

21      A.    Yes.

22      Q.    Okay.

23            MS. MORSE:  Objection to form.

24   Objection.  Form.  That statute is generally

25   7050 --

 1          MS. KEENAN:  Okay.

 2          MS. MORSE:  -- the challenged

 3   provisions.

 4          MS. KEENAN:  Sure.

 5      Q.    So if we go back up to page 1, you

 6   can see that Mr. Vaccaro says, FYI, they didn't

 7   add our suggested amendment, right?

 8      A.    Yes.

 9      Q.    When he says, Our amendment, he's

10   talking to Mr. Tellechea, again, from the OAG's

11   office?

12      A.    That's what the email says.

13      Q.    Okay.  In response to that,

14   Mr. Tellechea from OAG said, No bueno, right?

15      A.    Yes.  That's what the email says.

16      Q.    Okay.  Going back to page 2, the

17   amendment highlighted hear that was requested,

18   would have included the language, In accordance

19   with rules promulgated by the Commission,

20   right?

21      A.    Yes.  That's what the highlighted

22   portion says.

23      Q.    And you mentioned earlier that

24   Mr. Tellechea's office works about -- sorry --

25   works on rule-making issues; is that right?

1    A.    Yes.  I said that.

2    Q.    Okay.  And do you understand that

3  language to authorize the Elections Commission

4  to undertake rule-making?

5    A.    Can you restate that?

6    Q.    Sure.

7          Do you understand this highlighted

8  language to authorize the Commission to

9  undertake rule-making?

10   A.    It could either mean undertake or

11 rules that have already been in place.  Yes.

12   Q.    Okay.  And you'd agree that based on

13 this email exchange, that amendment was not

14 added to the thread -- or sorry -- added to the

15 bill, right?

16   A.    Yes.  That's what the email states.

17   Q.    Okay.  Are you aware of any other

18 concerns about the draft language of SB 7050

19 that the AG's office identified concerns about?

20   A.    No, not to my knowledge.

21   Q.    Okay.  I'm going to go back to what's

22 been marked as Exhibit 1, and I want to jump

23 now to topic 2.  That's on page 9.  Topic 2

24 says, The office's role in implementing and/or

25 enforcing SB 7050 and any guidance the office

1    has provided to anyone relating to the

2    challenged provisions.

3            Have I read that correctly?

4    A.    Yes.

5    Q.    Okay.  What, if any, role has the

6    attorney general's office had in implementing

7    the citizenship requirement contained in FL SB

8    7050?

9            MS. MORSE:  I'm going to object to

10   form here in that the witness was not disclosed

11   to respond to that portion of the -- of the

12   topic.

13           MS. KEENAN:  Can you please clarify

14   which portion of the topic the witness was

15   designated to talk about?

16           MS. MORSE:  Any guidance the office

17   provided regarding the draft challenged

18   provisions.

19           MS. KEENAN:  So it's -- you're -- I

20   just want to be clear for the record, because

21   we can save some of these questions for

22   tomorrow.

23           It's your position that Ms. Guzzo was

24   not designated to talk about the office's role

25   in implementing and/or enforcing SB 7050; is

1    that right?

2             MS. MORSE:  That's correct.  That's

3    the substance of my communication about this

4    deposition.

5             MS. KEENAN:  Okay.  So I'll skip to

6    my question about the guidance.

7        Q.    Are you aware of any guidance that

8    the AG's office has created concerning the

9    administration and enforcement of SB 7050's

10   prohibition on noncitizens handling or

11   collecting voter registration documents?

12       A.    No, not to my knowledge.

13       Q.    Do you know whether the AG's office

14   has conducted any search to determine whether

15   that guidance exists?

16       A.    I'm generally aware that there was

17   a -- a search done of, you know, records by the

18   office for search terms that were given.

19       Q.    Okay.  I'm going to move back to

20   Exhibit 2 momentarily, and I'm taking a look at

21   Interrogatory Number One.

22             Do you see that Interrogatory

23   Number One asks the attorney general's office

24   to identify all training materials, guidance

25   documents, advisories, and other formal or

1    informal instructions that have been provided

2    or will be provided to you and your agents

3    concerning the administration and enforcement

4    of SB 7050's prohibition on noncitizens

5    handling or collecting voter registration

6    documents?

7          Did I read that correctly?

8    A.    Yes.

9    Q.    And are you aware the attorney

10   general's office has turned over no documents

11   responsive to this interrogatory?

12   A.    That is what the response says.  Yes.

13   Q.    Are you aware of whether the attorney

14   general's office has provided any guidance

15   about what it means to collect voter

16   registration applications in the context of SB

17   7050?

18   A.    No.  I'm not aware of any guidance.

19   Q.    Okay.  And what about to handle voter

20   registration applications under SB 7050?

21   A.    No.  I'm not aware of any guidance.

22   Q.    Okay.

23          MS. KEENAN:  And just to be clear,

24   Ms. Morse, she won't -- she's not here to talk

25   about anything relating to the enforcement

1  authority of the attorney general's office; is

2  that right?  That will all be Mr. Cox tomorrow?

3          MS. MORSE:  True.  Mr. Cox is going

4  to cover criminal enforcement.

5          MS. KEENAN:  What about civil

6  enforcement?

7          MS. MORSE:  (No verbal response.)

8          MS. KEENAN:  I just want to make sure

9  that we don't miss the opportunity to ask this

10  witness questions that Mr. Cox won't be

11  prepared to answer tomorrow.

12          MS. MORSE:  You can ask her generally

13  about civil enforcement.  He may also have

14  information, but you can ask the witness about

15  civil matters.

16          MS. KEENAN:  Okay.

17      Q.    Are you familiar -- let me take one

18  step back.

19          Have you reviewed the text of Senate

20  Bill 7050?

21      A.    Not in preparation for this.  I was

22  not --

23      Q.    You --

24      A.    I'm --

25      Q.    Sorry.  You can answer.

1      A.     Yeah.   That wasn't one of the

2   documents that I read prior to this.

3      Q.     But you mentioned that in your role

4   with the Office of Legislative Affairs, part of

5   your job is to be at least situationally aware

6   of the provisions that implicate the attorney

7   general's office; is that right?

8      A.     Yes.

9      Q.     Okay.  Are you familiar with the

10  attorney general's office enforcement authority

11  under SB 7050 as it relates to the citizenship

12  requirement?

13     A.     I'm generally aware of it.  Yes.

14     Q.     Okay.  Are you familiar with the form

15  on which 3PVROs have to affirm that no

16  noncitizens are collecting or handling

17  applications on the organization's behalf?

18     A.     No.  It's not a -- a form I've seen.

19     Q.     Okay.

20            MS. KEENAN:  I'm going to show the

21  witness what's been premarked as Exhibit 36.

22     Q.     The title of this form reads, 3PVRO

23  Registration Form; is that right?

24     A.     That's what it says.

25     Q.     Okay.  And on page 2, Section 7,

1    there's a -- a box that includes the word,

2    Affirmations; is that right?

3        A.    Yes.  That's what it says.

4        Q.    Okay.  Take a moment to read to

5    yourself the two oaths that are included in

6    this document, and let me know when you're

7    finished.

8        A.    Okay.  I've read the two

9    affirmations.

10        Q.    Okay.  And just to refresh your

11    memory, I'm now going to show you what's been

12    premarked as Exhibit 37, which I'll ask the

13    court reporter to mark as Exhibit 37.

14             You can see that this is the enrolled

15    version of SB 7050, right?

16        A.    Yes.

17        Q.    Okay.  I'm going to go to page 13.

18    You can see that this page discusses Section

19    97.0575 of the Florida statutes, right?

20        A.    Yes.

21        Q.    Okay.  And, then, I'm going to scroll

22    down to Subsection 8 of that section.  You

23    agree that Subsection 8 provides the attorney

24    general with authority to institute a civil

25    action for a violation of this section or to

1    prevent a violation of this section, right?

2             MS. MORSE:  Objection to form.

3        A.    Yes.  I would -- that is what the

4    language that was in the current statute said.

5        Q.    Okay.  And, then, just to confirm,

6    I'm scrolling back up to Subsection 1F, down

7    here at the bottom of page 14.

8             Can you read 1F to yourself, and let

9    me know when you're finished?

10       A.    Okay.  I read Section F.

11       Q.    Okay.  Now, Section 1 -- Subsection

12   1F here in SB 7050 tracks with the affirmation

13   included in the 3PVRO registration form in

14   Exhibit 36; is that right?

15            MS. MORSE:  Objection to form.

16       A.    Yes.  It -- it reflects the -- the

17   two pieces there.

18       Q.    Okay.  And based on what you read in

19   Subsection 8 of 97.0575, you would agree that

20   if a 3PVRO violates one of these oaths, then

21   the attorney general's office can civilly --

22   can bring a civil enforcement action?

23            MS. MORSE:  Objection to form.

24       A.    I would say that, yes, in -- in

25   current law or as it was listed there, that we

1   already have the authority to bring that.  They

2   didn't amend that besides the re-referencing of

3   the number.

4        Q.    Right.

5              And so the -- the creation -- the --

6   what -- what the -- what SB 7050 did was add

7   this affirmation to the list of things that

8   counted as a violation, right?

9        A.    That's accurate of what this section

10  said.

11       Q.    Okay.  Nothing in this form indicates

12  that 3PVROs do not have to complete the second

13  oath about whether each person collecting or

14  handling voter registration applications on

15  behalf of the 3PVRO is a U.S. citizen, does it?

16            MS. MORSE:  Objection to form.

17       A.    Nothing in where?

18       Q.    Nothing in this form you're looking

19  at, nothing in point seven, or I'm happy to

20  scroll through the rest of the form if you'd

21  like.

22            MS. MORSE:  I'm going to ask you to

23  let her look at the entire form.  I don't know

24  if --

25            MS. KEENAN:  Yeah.  That's no

1   problem.

2        A.    There's, like, a -- (inaudible) --

3   that's showing.  Can --

4             MS. MORSE:  There's something --

5   there's something on our screen.  Hold on.

6   Okay.

7             THE WITNESS:  Okay.

8             MS. MORSE:  Our screen was covered.

9   Sorry.

10            MS. KEENAN:  No worries.

11       Q.    Let me know when you've had a chance

12  --

13            MS. MORSE:  Okay.

14       Q.    -- to read the first page here.

15       A.    I'm sorry.  Your question is that

16  nothing on this form says that they have to --

17       Q.    Can you --

18       A.    -- (inaudible) -- portions?

19       Q.    Sorry.

20            Nothing indicates that 3PVROs have --

21  do not have to complete that oath.  That is,

22  this form suggests that 3PVROs do have to

23  complete that second oath?

24       A.    I can't speak to the origination of

25  the form, but it -- there are no instructions,

1    I would say, that you would fill out a form in

2    its entirety.

3        Q.    Okay.  You would agree that this

4    form, at the bottom here, says, 9/26/2023; is

5    that right?

6        A.    Yes.  That's what it says.

7        Q.    Okay.  Okay.  I think those are all

8    the questions I have about this document.

9            Now I want to go back to Exhibit 1,

10   again.  So now let's take a look at topic

11   number one.  It says -- actually, I realize

12   we're at the hour.  Is it a good time to take a

13   quick break before I start into this next

14   topic?

15       A.    I'm fine.

16       Q.    Okay.  I'm -- I'm fine to keep going,

17   as well.  I just wanted to give you an

18   opportunity at the hour mark.  We can keep

19   going.

20           So the next topic is, Each state

21   interest, if any, that the office believes or

22   contends each of the challenged provisions

23   serves, promotes, or advance, and all facts and

24   evidence supporting a connection between the

25   challenged provisions and the state interests.

1    Have I read that correctly?

2    A.    That's what it says.

3    Q.    What, if any, state interest does the

4    AG's office believe is furthered by banning

5    noncitizens from handling or collecting voter

6    registration applications on behalf of 3PVROs?

7    MS. MORSE:  I'm going to object to

8    the extent the question implicates the work

9    product privilege, and instruct the witness not

10   to reveal any work product information.

11   But you can answer.

12   A.    Sure.

13   I would say that we don't have a

14   state interest in this; that we defer to the

15   legislature and other election officials to --

16   to relay what the state interest is, if there

17   is one, and that we defer to them because they

18   are the ones who write the laws.

19   Q.    Okay.  So the AG's office, itself, is

20   not supporting that there's any state interest

21   furthered by banning noncitizens from handling

22   or collecting voter registration applicants; is

23   that right?

24   MS. MORSE:  Objection to form.

25   That's a mischaracterization of her testimony.

1      Q.     I'm asking if it's right.  You can

2   tell me if it's not.

3      A.     No.  I said we -- you know, I

4   wouldn't say that we have a state interest;

5   that we defer to those who are in the

6   legislature and other election officials to let

7   us know what the state interest is, as they are

8   the ones who are crafting the legislation.

9      Q.     So the state interest that the AG's

10   office has identified is deference to the state

11   legislature; is that right?

12            MS. MORSE:  Objection to form.

13      A.     Yes.  Basically, we're not taking a

14   state interest; that they are the ones -- we

15   rely on the legislature and other elected

16   officials.  They are the ones who are writing

17   these laws.

18      Q.     Okay.  And so there's not any other

19   substantive interest that the AG believes this

20   law is furthered and necessary -- or sorry --

21   is necessary to further?

22            MS. MORSE:  Objection to the extent

23   it implicates work product.

24            Without -- if you can answer without

25   revealing the work product information, you can

1    answer.

2         A.    I would -- yes.  I would reference

3    back to my prior answer about not having a

4    state interest, and that we are deferring to

5    this legislator -- legislators and the

6    legislative process and elected officials.

7         Q.    And the AG's office --

8         A.    Elections --

9         Q.    Oh.  Go ahead.

10        A.    Sorry.  Elections officials.

11        Q.    Okay.  And the AG's office has not

12   identified any concerns about noncitizens

13   working for 3PVROs that it would put forward as

14   an independent state interest?

15             MS. MORSE:  Objection to the extent

16   it implicates work product privilege.

17        A.    I keep going back to my same answer

18   about the state interest.  I'm not aware of

19   anything else.

20        Q.    Okay.  I might come back to the state

21   interest question a little bit later, but for

22   now, I'm going to jump to -- to topic

23   number 12.  So I'm looking at Exhibit Number 1,

24   page 11.  And that topic says, The office's

25   tracking and/or awareness of the racial

1    breakdown of voters registered via 3PVROs in

2    Florida.

3              Did I read that correctly?

4        A.    Yes.  That's what it says.

5        Q.    Okay.  What, if anything, did the

6    AG's office do to track the racial breakdown of

7    voters registered by 3PVROs in Florida?

8        A.    I'm not aware of any tracking that

9    our office maintains.

10       Q.    Okay.  Does the AG's office have any

11   awareness of the racial breakdown of voters

12   registered by 3PVROs in Florida?

13             MS. MORSE:  Objection to form.

14       A.    No.  As I stated, I'm not aware of

15   any tracking that our office maintains or that

16   has been participated in.

17       Q.    Okay.  And so you're not aware of any

18   sort of estimate or ballparking that the AG's

19   office has done relating to the racial

20   breakdown of voters registered by 3PVROs in

21   Florida, right?

22       A.    No.

23       Q.    Okay.  We've already discussed topic

24   13, so I'm going to jump to topic number 14

25   next.  This topic says, Any communications

1    between the office and the Florida Governor,

2    the Florida Legislature, and/or the Florida

3    Secretary of State regarding the challenged

4    provisions from January '22 to present.

5              Did I read that correctly?

6         A.    Yes.

7         Q.    Okay.  What, if any, communications

8    did the AG's office have with the Florida

9    Governor or his staff regarding SB 7050 from

10   January of '22 to the present?

11             MS. MORSE:  Objection to -- to the

12   extent it implicates a deliberative process

13   privilege.  We're asserting that.

14             You can answer.

15        A.    No communications between us and the

16   governor's office, that I am aware of.

17        Q.    Okay.  And what did you do to confirm

18   whether any communications took place between

19   the AG's office and the Florida Governor or his

20   staff?

21        A.    There was -- as a -- I guess, when I

22   sent the email.  Like I said, it's a

23   situational awareness, so this was not

24   something that our office was involved in the

25   proposal of.  It was not a legislative priority

1   of our office, so we were not engaged in any

2   communications as the bill was being drafted or

3   moving through the legislator, that I'm aware

4   of.

5       Q.    Okay.  When -- when a bill is a

6   legislative priority for your office, is it

7   common for the Office of Legislative Affairs to

8   be in communication with other offices of

9   Florida government?

10      A.    Yes.

11      Q.    Okay.  Including the Florida

12  Governor?

13      A.    It can be.  Yes.

14      Q.    Okay.  And including members of the

15  Florida Legislature?

16      A.    Yes.

17      Q.    Okay.  I want to go to the

18  legislature next.

19           What, if any, communications did the

20  AG's office have with the Florida Legislature

21  or its staff regarding SB 7050 from January '22

22  to the present?

23      A.    I'd go back to my answers related

24  to -- with the governor's office, as well.  Not

25  that I'm aware of.  This was not a legislative

1    priority.  You know, we were situationally

2    aware as it was moving through the process,

3    so we were not engaged.

4        Q.    Okay.  And what, if any,

5    communications did the AG's office have with

6    the Florida Secretary of State or his staff

7    regarding SB 7050 from January 2022 to the

8    present?

9              MS. MORSE:  Objection to the extent

10   it implicates the deliberative -- deliberative

11   process privilege.  We're asserting that.  But

12   the witness can answer.

13       A.    Same as before.  We were not engaged.

14   We were -- no communications, that I'm aware

15   of.

16       Q.    Okay.

17             MS. KEENAN:  I am -- I'm going to

18   show the witness what's been premarked as

19   Exhibit 33, which was produced by the attorney

20   general's office as OAG_000594.  I'll ask the

21   court reporter to mark that as Exhibit 33.

22       Q.    Would you agree this is an email from

23   Brad McVay from the secretary of state's office

24   to Nick Cox at the AG's office?

25       A.    Yes.  Brad McVay -- McVay sent Nick

1    Cox an email.

2         Q.    Okay.  And this email references the

3    OECS annual report that was submitted to the

4    legislature last weekend; is that right?

5              MS. MORSE:  Objection to form.

6              Did you say last weekend?

7              MS. KEENAN:  I'm just reading the

8    quote.

9              MS. MORSE:  Oh.

10        A.    Yes.  That's what the email says.

11        Q.    When the email says, Last weekend,

12   the date the email was sent was January 20th of

13   2023, just to be clear for the record, right?

14        A.    Yes, ma'am.

15        Q.    Okay.  Are you familiar with what

16   OECS is?

17        A.    Yes.  It's Office of Elections

18   Crimes.

19        Q.    Have -- have you worked at all with

20   the Office of Election Crimes and Security?

21        A.    No, I have not.

22        Q.    Are you aware of OAG's interactions,

23   as a whole, with the Office of Election Crimes

24   and Security?

25        A.    I'm aware that the -- you know, the

1  statewide prosecutor has had conversations,

2  such as this email.  But as the -- as far as

3  the detailed interactions, I can't speak to

4  those.

5      Q.    Okay.  And I understand you're not

6  designated to talk about enforcement, so I'm --

7  I'm just asking about your awareness as it

8  relates to the topics you -- you are designated

9  to talk about.

10         Have you read the Office of Election

11  Crimes and Security annual report that's

12  referenced here?

13     A.    I have not.

14     Q.    Okay.

15         MS. KEENAN:  I now want to show the

16  witness what's been premarked as Exhibit 34,

17  which the AG's office produced as OAG_000859.

18  I'll ask the court reporter to mark that as

19  Exhibit 34.

20     Q.    Have you reviewed this letter before?

21     A.    No, not that I'm aware of.  Not that

22  I can recall.

23     Q.    Okay.  You'd agree this is a letter

24  from Brad McVay, again, from the secretary of

25  state's office to the Florida Attorney General,

1    right?

2        A.    Yes.

3        Q.    Okay.  Can you take a second to just

4    review -- the second page of the letter is just

5    a -- a list of who is copied on the letter.

6              Could you take a minute to review

7    this first page here?

8        A.    Okay.

9        Q.    And then I'm going to scroll.  The

10   second page includes who's copied.

11             And go ahead and take a look at this

12   page, and let me know when you've finished it.

13       A.    Okay.

14       Q.    Okay.  And one -- one last page here.

15   Let me know when you're ready.

16       A.    Okay.

17       Q.    Okay.  So I just want to make clear

18   what this letter is and isn't about.  This

19   letter talks about voter registration efforts

20   undertaken by the Voter Participation Center or

21   the Center for Voter Information.

22             Do you see that here?

23       A.    Yes, ma'am.

24       Q.    Okay.  Nowhere in the letters that

25   you just read do the Supervisors of Elections

1    discuss any issues relating to noncitizens

2    registering voters in Florida, do they?

3        A.    Not that I recall.

4        Q.    Okay.  The letter doesn't say

5    anything about problems with noncitizens

6    working on behalf of 3PVROs, right?

7        A.    Not that I saw.

8        Q.    Okay.

9              MS. KEENAN:  I'm now showing the

10   witness what's been premarked as Exhibit 35,

11   which the AG's office produced as

12   OAG_HF_1stRFP_000001.  I'll ask the court

13   reporter to mark that as Exhibit 35.

14       Q.     Thankfully, this one is a bit

15   shorter.  This is an email exchange between OAG

16   staff and Peter Antonacci at the secretary of

17   state's office, right?

18       A.    Yes.  That's what it says.

19       Q.    And Mr. Antonacci purports to be

20   providing a list of noncitizens who voted in

21   the 2020 general election; is that right?

22       A.    (No verbal response.)

23       Q.    You can take a minute to review the

24   email.

25       A.    Okay.

1      Q.     You'd agree this email purports to

2   provide a list of noncitizens who voted in the

3   2020 general election, right?

4      A.     Yes.  That's what it says.

5      Q.     Okay.  But, again, this email doesn't

6   contain any allegation tying those noncitizens

7   voting to noncitizens working at 3PVROs, right?

8          MS. MORSE:  I'm going to object to

9   questions related to this document, and that

10   it's beyond the scope of the topic she's

11   noticed for.

12      A.     Sorry.  Can you say the question

13   again?  It doesn't -- yeah.  Can you just say

14   it again?

15      Q.     Sure.

16          It doesn't tie any allegation about

17   the list of noncitizens who voted in the 2020

18   general election to noncitizens who worked for

19   3PVROs in Florida?

20      A.     The email just discusses noncitizens

21   voting.

22      Q.     Okay.  Now I'm going to move on to --

23   back to Exhibit 1 and topic 15 -- sorry --

24   which says, The office's process for producing

25   documents in response to Plaintiffs' request

1    for the production of documents, including but

2    not limited to the sources of documents that

3    were collected, the means by which such

4    documents were searched and reviewed, any

5    sources of potentially responsive documents

6    that were not collected, searched, and

7    reviewed.

8              Did I read that correctly?

9        A.    Yes, ma'am.

10       Q.    So you talked a little bit about this

11   earlier, about how there's a -- did you call it

12   a public records unit or can you remind me of

13   the name of that office?

14       A.    Yeah.  I believe it's the public

15   records division.

16       Q.    Okay.  Apart from that division, did

17   any staff at the Florida AG's office assist

18   with collecting documents for this litigation?

19             MS. MORSE:  Objection to -- to the

20   extent it implicates the work product

21   privilege.

22       A.    I can't speak as to who the specific

23   individuals were.  I -- I just am aware that

24   there is a process that there was a litigation

25   hold letter that was sent out, you know,

1   stating to not disregard any potential

2   documents we may have.

3         So who was -- for, you know,

4   litigation purposes, I -- I can't speak as to

5   who was in charge of that.  I know that there

6   is a general process, as I mentioned, as to the

7   search of agency emails.

8     Q.   Do you know how staff at the OAG's

9   office are instructed to maintain records in

10  the ordinary course?

11    A.   We're instructed to follow Florida's

12  Public Records Law.

13    Q.   Okay.  And do you know how long

14  Florida's Public Records Law requires retaining

15  documents?

16    A.   I can't speak to the specifics.  I

17  know there's different retention schedules for

18  items.  I can't -- off the top of my head, I'm

19  not sure what the -- the year threshold is

20  exactly, but --

21    Q.   That's okay.

22         How did the retention schedules

23  change whenever a litigation hold is in place

24  at the Florida Attorney General's office?

25    A.   I believe, as the litigation hold

1    says, we're -- we're instructed to not -- not

2    get rid of any documents.

3        Q.    Okay.  I want to talk about the

4    potential sources of documents.

5              Does the AG's office have an

6    electronic record system?

7        A.    Such as?  What would that include?

8        Q.    Does the AG's office store records

9    electronically in a database?  I -- I guess

10   I'm -- to give you an -- some context, records

11   can be stored electronically.  They can be

12   stored on disks or drives.  They can be stored

13   in paper copies.

14             I'm asking about the record retention

15   methods of the AG's office.

16       A.    Yeah.  We do have a -- a -- a data --

17   I guess, a database so that documents are

18   stored in there, or however long, you know,

19   any -- I guess when things are turned over or

20   that they have access to through the, you know,

21   IT division.

22       Q.    Okay.  And do you know when the

23   electronic database was created for storage of

24   records?

25       A.    I do not.

1      Q.     Do you know whether that electronic

2  database is searchable?

3      A.     Yes.  To the best of my knowledge,

4  they're -- all documents are able to be

5  searched.  You know, there's a -- through the

6  litigation division, so whether it's emails or

7  other documents that are stored in there.

8      Q.     And do you know how those documents

9  can be searched, for example, by -- by keyword,

10  by date, by document title?

11         To -- to your -- to the best of your

12  knowledge, do you know how those documents can

13  be searched?

14      A.     I mean, to the best of my knowledge,

15  I know that there, you know, generally was a

16  process of keyword terms that were provided to

17  our office to search through to help narrowly

18  tailor some of the discovery that was

19  potentially applicable so that it was down to

20  just things that were actually related to this

21  versus other common keywords that could have

22  been, you know, benign to this topic.

23      Q.     And so to the best of your knowledge,

24  the AG's office did conduct a search using

25  those keywords on the electronic database for

1    relevant documents?

2        A.    Yes.

3        Q.    Does the AG's office also maintain

4    copies of records on disks or flash drives that

5    cannot be searched through the electronic

6    database?

7             MS. MORSE:  Objection.  Form.

8        A.    Like, I can't speak to that, so not

9    that I'm aware of, if anybody individually has

10   that.

11       Q.    Okay.  What about paper copies of

12   records?  Does the AG's office maintain any

13   paper copies of records that cannot be accessed

14   through the electronic database?

15            MS. MORSE:  Objection to form.

16       A.    Not that I'm aware of, unless someone

17   had -- I can't speak to what an individual may

18   have printed out, but not that I'm aware of.

19       Q.    Sure.

20            But to -- to your knowledge, and as

21   the -- the designee for the Florida Attorney

22   General's office on this topic, is the only

23   place that the OAG searched for documents in

24   that electronic database?

25            MS. MORSE:  Objection to the extent

1    it implicates the work product privilege.

2         A.    It would be in the litigation, when

3    we were asked to keep any documents, whether

4    electronic or not, that was applicable to this.

5    So if someone had that, that would been

6    required to turn over for review of discovery.

7         Q.    And are you aware of any sources of

8    potentially responsive documents that the

9    Florida AG's office did not search?

10        A.    No.

11        Q.    Okay.  At this point, we are nearing

12   11:30.  I'm going to request a -- I'd request a

13   ten-minute break, because I think I'm nearing

14   the end of my questions.  I just want to go

15   through -- through my notes.

16             MS. KEENAN:  So can we go off the

17   record at 11:27 here and return at 11:37?

18             MS. MORSE:  Okay.  Returning at

19   11:37?  Okay.

20             MS. KEENAN:  Thanks.  Thanks, All.

21             (A recess was taken.)

22   BY MS. KEENAN:

23        Q.    I have a handful of follow-up

24   questions before I pass to my -- my co-counsel

25   in this case.

1          First, you explained earlier, as I

2    understood it, that the challenged provisions

3    of SB 7050 weren't a legislative priority for

4    the attorney general's office and that the

5    attorney general's office didn't communicate

6    with the offices of the governor, secretary of

7    state, or legislators about those challenged

8    provisions.  But I have a few follow-up

9    questions, just to make sure I understand what

10   you mean by that.

11         So, first, during the drafting of SB

12   7050, did OAG provide any of those offices with

13   examples of investigations or prosecutions of

14   noncitizens working with 3PVROs?

15         MS. MORSE:  Objection to the extent

16   it implicates the deliberative process

17   privilege.

18         But if you can answer without

19   divulging privileged information, please do.

20     A.    No.  I'm not aware of any guidance

21   that was provided.

22     Q.    And is the answer the same during the

23   legislators' consideration of SB 7050, that OAG

24   didn't provide any such examples during that

25   phase, either?

1           MS. MORSE:  Same objection.

2      A.    Same answer.

3      Q.    Okay.  Are you aware of any OAG

4  investigation or prosecution of noncitizens

5  working with 3PVROs that could support a state

6  interest that the citizenship requirement would

7  further?

8           MS. MORSE:  Objection to form.

9      A.    Am I aware of any OAG investigation

10 or -- please repeat the question.

11     Q.    Of noncitizens working with 3PVROs

12 that could support a state interest in a

13 citizenship requirement.

14          MS. MORSE:  Objection to form.

15     A.    No, I'm not, but that is also

16 something that the statewide prosecutor would

17 be able to address tomorrow.

18     Q.    Thanks.  I'll be sure to ask him more

19 about it tomorrow.

20          MS. KEENAN:  Nothing further for this

21 witness from me, but I'll pass the witness to

22 -- I can't remember which of my co-counsel is

23 going next.  So I'll just pass the witness for

24 the Hispanic Federation Plaintiffs.

25          MS. RUTAHINDURWA:  Brent, if you

1    don't mind, I think I'm going to jump in and

2    ask a couple questions.

3            MR. FERGUSON:  Yeah.  Go ahead.

4            MS. RUTAHINDURWA:  Okay.  Thanks.

5                    CROSS-EXAMINATION

6    BY MS. RUTAHINDURWA:

7        Q.    Hi.  My name is Makeba.  I represent

8    the NAACP Plaintiffs in this matter.  Thank you

9    so much for your time today.  I'm going to try

10   very hard not to repeat any of the questions

11   that has already been asked by counsel.

12            But I just want to circle back to the

13   beginning in terms of preparation for this

14   deposition.  You said you met with your

15   attorneys.

16            How many times did you meet with

17   them?

18       A.    We chat -- we met once, and we talked

19   twice.

20       Q.    And how long was the meeting?

21       A.    About an hour.

22       Q.    And, then, the talking two times

23   that you don't consider to be a meeting, how

24   long was that?

25       A.    To clarify, meeting in person.

1          Q.      Okay.

2          A.      You know, maybe 30 minutes each time.

3          Q.      And did you review the responses to

4     interrogatories that the AG produced in this

5     litigation?

6          A.      Yes.

7          Q.      And did you review the Third Amended

8     Complaint that's been filed in this litigation?

9          A.      Briefly.  It was provided.

10         Q.      I'm going to attempt to share my

11     screen and pull up the Third Amended Complaint.

12              Do you see that?  Am I screen sharing

13     the Third Amended Complaint here?  It's titled,

14     Document 184.

15         A.      Yes.

16         Q.      On page 6, it says, Third Amended

17     Complaint for Declaratory and Injunctive

18     Relief, right?

19         A.      Yes.  That's what it says.

20         Q.      I'm going to scroll down to paragraph

21     57.  And can you just read paragraph 57 for me?

22     And I'm happy to scroll when you need me to,

23     and then I'm going to ask you a couple of

24     questions.

25         A.      It says -- am I reading it out loud?

1      Q.    Nope.  You can read it to yourself,

2  and let me know --

3      A.    Okay.

4      Q.    -- when you're done.

5      A.    Can you scroll?

6            Okay.

7      Q.    So now, this paragraph about the

8  attorney general's responsibilities as it

9  relates to the challenged provisions that

10 Plaintiffs are challenging here, do you agree

11 with everything that's been stated in this

12 paragraph?

13           MS. MORSE:  Objection to form.  And

14 we're asserting the work product privilege, to

15 the extent this question implicates the work

16 product privilege, and objection that these are

17 allegations.  You're basically asking the

18 witness if she's agreeing with your

19 allegations.

20     A.    I would say that that -- you guys are

21 referencing portions of the legislation that

22 was enacted as it pertains to certain portions

23 that have actions within our office.

24     Q.    And so do you agree that the attorney

25 general is specifically tasked with enforcing

1  the newly created and amended civil and

2  criminal penalties against 3PVROs provided in

3  SB 7050?

4           MS. MORSE:  Objection to form.  The

5  document speaks for itself.

6      A.    That's what the document says, and,

7  you know, I would have to reference the end of

8  it or specific legislation to see if it matches

9  word for word.

10     Q.    In your own words, can you describe

11  what role the attorney general has in enforcing

12  the -- the provisions of SB 7050?

13          MS. MORSE:  Objection to form.

14     A.    I believe that would be something

15  that the statewide prosecutor is supposed to be

16  answering tomorrow.  His portion was of the

17  enforcement.

18     Q.    Do you know if the attorney general's

19  office tracks the racial breakdown of voters in

20  the state?

21          MS. MORSE:  Objection to form.  Asked

22  and answered.

23     A.    Yeah.  As I stated before, that is

24  not something that we track.

25     Q.    And you mentioned earlier that you

1    were deposed in SB 90, right?

2        A.    Yes.

3        Q.    And in that case, you were asked

4    about the racial breakdown and demographics

5    that 3PVROs serve.  Am I right?

6        A.    I don't recall every question that

7    was asked.

8        Q.    Okay.  You generally recall that in

9    that litigation, you were asked about the types

10   of communities that 3PVROs serve in the state?

11           MS. MORSE:  Objection to form.

12       A.    Yes.  I would say that was a -- a

13   general topic that would have been asked during

14   that deposition.

15       Q.    And since that deposition and since

16   the litigation in SB 90, has the AG's office

17   learned about what racial groups and

18   communities 3PVROs serve?

19           MS. MORSE:  Objection to form.

20       A.    Not that I'm aware of.  And as I

21   stated before, that's not something that our

22   office is -- that we track.

23       Q.    Do you think it would be important

24   information to learn, as the entity that's

25   tasked with enforcement of civil and criminal

1  penalties against 3PVROs?

2          MS. MORSE:  Objection to form.

3      A.    I can't speak as to what the office

4  should -- should or shouldn't learn because

5  that is not my role within the office.

6      Q.    You were asked some questions about

7  interrogatories.  I'm going to share my screen.

8          Are you able to see my screen?

9      A.    Yes.

10     Q.    So Ms. Keenan asked you if you knew

11 who Mr. Bajger was -- and I -- apologies if I'm

12 mispronouncing that name -- and you said that

13 you were aware of him and worked with him

14 generally, but -- but not closely.

15         Is that a good understanding of your

16 relationship?

17     A.    I said that, yeah, I knew that it

18 was, I believe, the civil division that he

19 works with.  I have not, you know, personally

20 engaged with him on this or, you know, many

21 other matters, and I don't know if I said I

22 work generally with someone else.

23     Q.    Do you know which division is

24 responsible for issuing civil penalties against

25 3PVROs?

1          A.      Our civil division.

2          Q.      Okay.  So that would be under Mr.

3     Bajger's role as part of the civil division, to

4     issue civil penalties?

5          A.      Like I said, I'm not exactly sure of

6     what his title is, so I can't speak to what his

7     role is.

8          Q.      Does the office of the statewide

9     prosecutor issue civil penalties at all?

10         A.      That is something you can ask Mr. Cox

11    about, but they are in charge of criminal

12    prosecutions.

13         Q.      And so you don't know one way or

14    another whether you were asked to be the

15    designee responsible for any interrogatory

16    responses that Mr. Bajger helped respond to in

17    this litigation?

18              MS. MORSE:  Objection to form.

19         A.      Yeah.  What -- what is the actual

20    question?

21         Q.      Yeah.

22              Do you know whether or not you were

23    designated as the attorney general's

24    representative to respond to the

25    interrogatories that Mr. Bajger helped respond

1  to?

2      A.   Yeah.  Like I said, I -- I work

3  generally with him.  I -- I did not sign these.

4  I would -- you know, they are part of the topic

5  of the depositions listed.

6      Q.   Going back to Interrogatory Number

7  One.  The answer about describing state

8  interests that you provided to the NAACP

9  Plaintiff was that SB 7050 was not a priority

10 legislation for the Office of the Attorney

11 General; is that right?

12     A.   Can you try and fix your screen?

13 When you scroll, it, like, cut the language

14 off.

15     Q.   Oh.  I'm sorry.

16     A.   That's okay.

17          There we go.

18     Q.   All right.  Can you see?

19     A.   Yes.

20          MS. MORSE:  She can't see the --

21 could you let her see the entire answer?

22     Q.   Is that good?

23     A.   Yes.

24     Q.   Great.

25          So the answer to Interrogatory Number

1   one is that SB 7050 was not a priority

2   legislation for the Office of the Attorney

3   General; is that right?

4           MS. MORSE:  Objection to form.

5       A.    Yes.  That's what we stated on this

6   document.

7       Q.    Can you identify what were priority

8   legislations for the attorney general in 2023?

9       A.    Sure.

10          We worked on some human trafficking

11  legislation; a drug scheduling legislation,

12  that I mentioned before.  I recall a child

13  deposition protections legislation.  I believe

14  those were our -- listed as our top three.

15      Q.    And how does the attorney general

16  make those determinations about what is and is

17  not a priority to the office?

18          MS. MORSE:  Objection to form to the

19  extent it implicates the thought processes of

20  the attorney general.

21      A.    I would say that we designate things

22  that are our priority legislation out of ideas

23  or topics that the office has -- you know,

24  either we have the authority to do within, such

25  as the drug scheduling.  We saw how it was

1  causing a rise in deaths, and that was within

2  our authority to scope.

3          Human trafficking is a -- a priority

4  issue that the attorney general has been

5  engaged in since the beginning.  The other one,

6  you know, related to the protection of

7  children, another issue that she has been

8  engaged in since the beginning.  So when I say,

9  Priority, it's ones that we were personally

10  engaged in.

11      Q.    And the bottom of the answer, it

12  says, The OAG's evaluation of the state's

13  interest in the 3PVRO -- 3PVRO canvasser

14  restrictions is ongoing.

15          And I'd like to just take a step

16  back, and I will represent to you that they

17  respond that way to all of the other challenged

18  provisions in the interrogatory responses, that

19  the evaluation of the state interest is

20  ongoing.

21          So sitting here today, does the

22  attorney general have any position or state

23  interest that it has not yet identified in this

24  litigation or at this deposition?

25          MS. MORSE:  Objection to the extent

1  it implicates the work product privilege.

2      A.    I mean, as you're aware, that we did

3  sign onto a brief.  Also, I think as I

4  mentioned before, you know, the legislative

5  intent is brought up from the legislators and

6  other election officials, and that's clearly

7  stated.

8          So we did not take a position during

9  the legislative process.  And I think, as the

10 answer says, that it's still ongoing.

11     Q.    Yeah.

12         I'm -- I'm -- I guess, I'm going to

13 rephrase the question.

14         Can you identify any state interests

15 in the challenged provisions that the attorney

16 general has yet to communicate with Plaintiffs

17 in this litigation?

18         MS. MORSE:  Objection to form to the

19 extent it implicates the work product

20 privilege.

21     A.    I'll just defer back to my answer

22 previously that, you know, we did not take a

23 position.  We have joined in the brief, as that

24 is stated, and, you know, the state interest is

25 clearly stated in the legislative intent from

1    the legislators and the other election

2    officials, and, then, with our brief, joining

3    on with the Secretary of State, as well.

4        Q.    I think those are all the questions I

5    have.  Thank you.

6                    CROSS-EXAMINATION

7    BY MR. FERGUSON:

8        Q.    Good morning, Ms. Guzzo.  My name is

9    Brent Ferguson.  I'm attorney representing the

10   League of Women Voters of Florida.  I'm going

11   to ask some questions, as well.

12            Are you good to keep going without

13   taking a break at this point?

14       A.    Yeah.  Thank you.

15       Q.    Excellent.  No problem.

16            You talked previously, some, about

17   the -- the citizenship provision of SB 7050.

18   I'd like to start by asking you some questions

19   about the felony volunteer restriction.

20            Do you know what I'm talking about

21   when I say the, Felony Volunteer Restriction?

22       A.    Yes.  From the form prior?

23       Q.    From SB 7050.  It's 97.0575, 1E, and

24   it's the provision relating to how 3PVROs might

25   -- may work with people with certain previous

1    felony convictions.

2            Is that -- are you aware of that

3    provision?

4        A.   I -- yes.  I'm generally aware of it.

5        Q.   Okay.  Can you give me, I guess, your

6    general understanding of what it prohibits?

7        A.   Is this -- I believe this is

8    something that Nick was designated for.  No?

9        Q.   So we'll certainly ask Mr. Cox

10   questions about this.  You're designated under

11   topic number one to talk about state interests

12   in each of the challenged provisions.  And so

13   we're going to talk some about that today, and

14   so I wanted to get a sense of your

15   understanding of what the provision covers

16   before we talk about that.

17           MS. MORSE:  Objection to form, if

18   there's a question.

19       Q.   I'm just asking, again, if you can

20   give me your awareness.  If -- if you're unable

21   to -- to explain the provision, that's fine,

22   and we can go into it.  I just want to

23   doublecheck.

24       A.   Yeah.  Let's just go into the

25   questions.

1      Q.    Sure.

2            Okay.  So let's move -- one moment --

3      and pull up what's been marked as Exhibit 37.

4      And I'm going to share my screen momentarily.

5            Okay.  Can you see that?

6      A.    Yes.

7      Q.    Okay.  So this is a document you've

8      seen before, an enrolled version of SB 7050.

9      And do you see about at the middle of the page,

10     line 390, where it says, Subdivision E, and it

11     starts, An affirmation?

12           I'll just give you a couple moments

13     to take a look at that.

14     A.    (No verbal response.)

15     Q.    Okay.  Have you had a chance to take

16     a look?

17     A.    Almost finished.

18     Q.    Sure.

19     A.    Okay.

20     Q.    Okay.  So this provision is one

21     that's been referred to as the felony volunteer

22     restriction, so that's how I'll refer to it

23     here today.

24           Essentially, what this is doing is

25     saying if a person has been convicted of one of

1      a certain number of underlying felonies, then

2      they're prohibited from working with a 3PVRO,

3      in certain situations.

4              Is that your understanding?

5          A.    That is what it states.  Yes.

6          Q.    Okay.  Before SB 7050 was enacted,

7      did your office provide the legislature or any

8      government officials with information about

9      people who had been convicted of one of these

10     underlying felonies here and then later

11     committed misconduct regarding voter

12     registration?

13             MS. MORSE:  Objection to form.  And

14     I'm going to object that I think it's outside

15     the scope of her topics.

16             MR. FERGUSON:  I'll just state for

17     the record, I believe this relates to topics 13

18     and 14, communications between the office and

19     the Florida Governor and the Florida

20     Legislature regarding the challenged

21     provisions.

22             MS. MORSE:  I believe your question

23     was about prior to the legislation, but if I

24     misremembered --

25             MR. FERGUSON:  That is my question.

1    Topic 13 talks about the role and enactment and

2    passage, as well, so -- and I believe the law

3    was also passed after January of 2022.  And

4    that's within the timeframe of topic 14.

5         A.    So the question -- can you state it

6    again, please?

7         Q.    Sure.  No problem.

8               So before the law was enacted, did

9    your office provide the legislature or any

10   government official with a list of persons who

11   had committed one of these underlying felonies

12   that we've been talking about and then

13   committed some type of misconduct with regard

14   to voter registration?

15              MS. MORSE:  Object to form.

16        A.    No, not that I'm aware of, did we

17   provide anything that you mentioned.

18        Q.    Okay.  Are you aware of any

19   information your office had with that same --

20   that same information that I described?

21        A.    No, I'm not.

22        Q.    Okay.  What are the state interests

23   in this provision, the felony volunteer

24   restriction?

25              MS. MORSE:  Objection to form.  Asked

1    and answered.

2         A.    Yeah.  I would defer back to what I

3    had said previously if -- that we didn't take a

4    position on this and that the legislative

5    intent was clearly listed out with the state

6    interests listed.  And, you know, the

7    legislature and other election officials are

8    the ones that have brought those forward, along

9    with the appeal that we have joined.

10        Q.    Okay.  We'll get to that appeal.  So

11   I think we've established that you've been

12   designated to talk about the state interest of

13   all of these provisions.

14              And you're aware, correct, that your

15   office has asserted state interests defending

16   this provision in this case, correct?

17              MS. MORSE:  Objection to form.  And

18   to the extent it implicates the work product

19   privilege, I object.

20        A.    Yes.

21        Q.    Okay.  And so I'm not asking this

22   question about the attorney general's office in

23   particular, but the state's interests in the

24   felony volunteer restriction.

25              And so can you tell me, is your

1    answer now that the state interests in the

2    felony volunteer restriction are simply those

3    that you've already answered in the briefing in

4    this case?

5            MS. MORSE:  Same objection.  And to

6    the extent it implicates the -- the question

7    implicates the work product privilege, I'll

8    object.

9        A.    So you're -- can you say that again,

10   please?  The -- the appeal is where the state

11   interests are listed?  Is that what you asked?

12       Q.    So I'm asking -- you've said

13   basically, you know, that there's -- there's an

14   appeal in this case and -- and a lawsuit going

15   on in which the state has asserted certain

16   interests.

17            Is your testimony today that the

18   interests -- the state's interests are exactly

19   those that have been included in the attorney

20   general's briefing in this case?

21            MS. MORSE:  Object to form.  I'm

22   going to object to the -- to the extent it

23   implicates the work product privilege and

24   instruct the witness not to answer to the

25   extent it involves -- the answer would involve

1    any work product.

2            If you can answer without revealing

3    work product, you may.

4        A.    I mean, as we have -- you know, I

5    think our answers are listed within the

6    interrogatories and within our brief and from

7    other things that have been asked and answered.

8    So that's what I would say, that --

9        Q.    Okay.

10       A.    -- we're representing --

11       Q.    Sorry.  Go ahead.

12       A.    No.  I was just saying that that's

13   what has been represented.

14       Q.    Sure.

15            Okay.  Does the state -- did the

16   state enact the felony volunteer restriction,

17   in part, to prevent fraud?

18            MS. MORSE:  Objection to form.

19       A.    Like I said before, we weren't

20   involved in -- in the enactment of this

21   legislation.  Whatever the legislative intent,

22   I guess, listed out that the legislature

23   provided, that's what I would defer to.

24       Q.    Okay.  Could you explain how the

25   felony volunteer restriction prevents fraud?

1          MS. MORSE:  Objection to form.

2      A.    I would say as it's listed, that's

3  what it is lined out to do.  And, once again, I

4  would defer to the legislative analysis.  We

5  were not involved in the creation or, you know,

6  passage and enactment of this.

7      Q.    I understand that.

8          This is a deposition topic notice for

9  today, and I'm not familiar with the -- I guess

10  the legislative intent that you're referring

11  to.  So I'm just asking you to give me your

12  understanding today of how the felony volunteer

13  restriction prevents fraud.

14          MS. MORSE:  Objection to form,

15  particularly to the extent that fraud is a

16  criminal matter and is not within her -- her

17  topics, and asked and answered.

18          MR. FERGUSON:  Counsel, I -- I

19  understand.  We're not talking about any kind

20  of criminal enforcement here.  I'm asking very

21  squarely about deposition topic one, which is

22  on state interests.

23          MS. MORSE:  Same objection.  Asked

24  and answered.

25      A.    The legislative intent, I would say,

1    is listed out in the analysis, which was one of

2    the documents.  And I'm going to keep repeating

3    the same thing, that we were not responsible

4    for the passage of this legislation.

5         Q.    Okay.  So just to be clear, you can't

6    explain for me today how the felony volunteer

7    restriction prevents fraud?

8              MS. MORSE:  Objection.  Objection to

9    form, and to the extent it involves the work

10   product privilege.

11             Subject to not providing privileged

12   information, you can answer.

13        A.    I mean, what -- what are you asking,

14   if -- can I explain -- explain it today?  I

15   think I've stated where it would come from or

16   if it's -- you have another opportunity to

17   speak to the statewide prosecutor tomorrow, as

18   well.

19        Q.    Are people who are convicted of

20   murder or sexual misconduct offenses more

21   likely to commit fraud in the future?

22        A.    I don't know that answer.

23        Q.    Are they more likely to commit other

24   kinds of election misconduct?

25        A.    I don't know.

1      Q.    Do you know if your office has any

2   information indicating that they would be more

3   likely to commit fraud or election misconduct?

4      A.    No.

5      Q.    So we took a look at the -- the

6   felony volunteer restriction a few moments ago.

7   Do you have a general understanding of the

8   underlying felonies that are listed there and

9   that you read?  I've mentioned murder and --

10  and sexual offenses.  There's a whole other

11  list of felonies.

12          Are -- do you have any understanding

13  of what kinds of felonies are included on that

14  list?

15     A.    I would have to see the statues that

16  are enumerated in the section to speak to them.

17     Q.    Sure.

18          So I'll represent to you that a lot

19  of -- there -- there's a long list of felonies,

20  and I wouldn't expect anyone to know all of

21  them.  A lot of them are related to fraud and

22  dishonesty.

23          My question is:  Are people who

24  commit those fraud and dishonesty felonies more

25  likely to turn voter registration applications

1   in late, beyond the statutory deadline?

2          MS. MORSE:  Objection to form.

3      A.    I don't know.

4      Q.    Okay.  Can you tell me, if someone

5   has committed one of these underlying felonies

6   that we're talking about here, what does the

7   law prevent them from doing with regard to

8   voter registration?

9      A.    I'm sorry.  What did you ask?  If

10  someone committed one of these felonies, what?

11     Q.    Right.

12          So they're covered -- they're covered

13  by law because they were convicted of one of

14  these felonies.  And, then, what's your

15  understanding of what that person is prevented

16  from doing because of that conviction?

17     A.    As listed on the page, it says that

18  they are not to be collecting or handling the

19  voter registration applications.

20     Q.    Okay.  Are they allowed to work for a

21  3PVRO and supervise other volunteers as long as

22  they don't touch any completed application

23  forms?

24          MS. MORSE:  Objection to form, and

25  objection to the extent the question implicates

1    the work product privilege.  I'm instructing

2    the witness not to reveal any work product

3    information.

4        A.    I would say what is laid out in the

5    statute would be what I would defer you back

6    to, but that is not something within my role.

7    So I cannot speak to that.

8        Q.    Okay.  So you don't know for sure?

9            MS. MORSE:  Objection to form.

10       A.    I don't.

11       Q.    Okay.  And do you know if it

12   matters -- in that situation that I just

13   described where a -- a volunteer is

14   supervising, but not touching forms, do you

15   know if it -- if it matters whether that

16   supervisor is having a conversation with people

17   who have completed voter registration

18   applications and encouraging them to vote and

19   things like that?

20       A.    I do not.  I would defer you back to

21   the statute.

22       Q.    Is the state's interest in the felony

23   voter registration to try to prevent people

24   with these underlying felony convictions from

25   having sole custody of the completed voter

1    registration forms?

2              MS. MORSE:   Objection to form.

3    Asked, answered.

4         A.    No.  I would refer back to previous

5    answers about the state interest.  I cannot

6    speak to that question.

7         Q.    What is your office's position on

8    what punishment is necessary to deter 3PVROs

9    from violating the felony volunteer

10   restriction?

11             MS. MORSE:   Objection to form to the

12   extent it implicates the work product privilege

13   or the deliberative process privilege.

14        A.    What is our position on what?

15        Q.    What punishment is necessary to deter

16   3PVROs from violating this provision.

17        A.    I -- that is not something that we

18   would have a -- a position on, not that I'm --

19        Q.    I'm sorry.  Go ahead.

20        A.    Not that I can answer anything on.

21   I'm not sure --

22        Q.    Do you know --

23        A.    -- what for.

24        Q.    Sorry to talk over you.  I apologize.

25             Did you have anything else to say?

1     A.    No.

2     Q.    Do you know what the fine is in SB

3  7050 for a 3PVRO failing to comply with this

4  provision?

5          MS. MORSE:  Do you want to let her --

6     A.    Yeah.  I was going to say I read it

7  earlier.  I don't want to misspeak to what the

8  actual number is.

9     Q.    Yeah.

10         I'll point out that it's on line 398

11  of --

12    A.    Oh.  I'm sorry.

13         Yeah.  So it's, as the paper states,

14  $50,000.

15    Q.    Okay.  Did your office play any role

16  in determining that amount?

17    A.    As stated before, we were not

18  involved with this legislation.

19    Q.    Okay.  Do you think that that $50,000

20  fine could discourage 3PVROs from doing voter

21  registration at all because of the risk of that

22  penalty?

23         MS. MORSE:  Objection.  Calls for a

24  legal conclusion.  I'm going to instruct the

25  witness not to answer to the extent it involves

1    the work product privilege.

2        A.    Yeah.  I would say, once again, we

3    were not involved with this legislation, so

4    nothing to speak on that provision.

5        Q.    Sure.

6            Well, I'm not asking, in this

7    question, about your involvement in the

8    provision.  I'm asking the -- in your capacity

9    as the representative for the attorney

10   general's office do you think that the $50,000

11   fine could discourage 3PVROs from doing voter

12   registration work?

13           MS. MORSE:  Same objection.

14   Objection to form.  It calls for a legal

15   conclusion.

16       A.    Yeah.  I have nothing else to add.

17       Q.    So you don't have any knowledge of

18   whether it could discourage them or not?  Is

19   that the answer?

20       A.    Yeah.  I'm not aware of anything that

21   would be applicable to this.

22       Q.    Are you familiar with a receipt

23   requirement in SB 7050?  Do you know what I'm

24   talking about when I say that?

25       A.    Could you put it up there?

1       Q.      Yeah.

2               Okay.  So it starts at line 432

3   there.  I'll give you a -- a few moments to

4   take a look.

5       A.      Okay.

6       Q.      Were you aware of that requirement

7   before you just read it?

8       A.      Yeah.  I was generally aware of the

9   provisions in the bill.

10      Q.      Okay.  Do you know what the receipt

11  has to contain that's referenced here?

12              MS. MORSE:  Objection to form.

13      A.      It must include what is listed on

14  page 16 of this document.

15      Q.      Okay.  And, again, what is the

16  state's interest in the receipt requirement?

17              MS. MORSE:  Objection to form.

18      A.      I would say that it's what has been

19  asserted prior to this, so anything that we

20  mentioned already.

21      Q.      Any of the interests we've already

22  talked about?

23      A.      Hm-mmm.

24      Q.      Okay.

25      A.      Yes.

1      Q.   Well, the one that we've talked about

2    thus far is fraud.  Are -- so --

3      A.   My answers that were provided saying

4    what the state's interests were.

5      Q.   Okay.  And does the state have -- is

6    the receipt requirement intended to prevent

7    fraud?

8           MS. MORSE:  Objection to form.

9      A.   We were not involved in the drafting

10    of this.  And as I mentioned prior, other parts

11    of the analysis from the legislature, it would

12    -- it would mention the intent and the

13    intentions of the legislature.  So if that was

14    listed, then that would be on there.

15      Q.   Does the state have an interest in

16    making sure that 3PVRO volunteers know that

17    they can be identified by a voter registration

18    applicant after they've helped someone register

19    to vote?

20           MS. MORSE:  Objection to form.

21      A.   Yeah.  Can you please say that again?

22      Q.   Yeah.  For sure.

23           Does the state have an interest in

24    making sure that a volunteer with a 3 -- 3PVRO

25    knows that they can be personally identified

1    after they help someone register to vote?

2            MS. MORSE:  Same objection.

3        A.    I would say same answer as to other

4    questions as it relates to the state interests.

5        Q.    So you're not sure, sitting here

6    today?

7            MS. MORSE:  Objection to form.

8    That's not her testimony.

9        Q.    Well, your testimony is --

10       A.    Deferring back --

11       Q.    Sorry.  Go ahead.

12       A.    Deferring back to the answers that

13   I've said prior of -- excuse me -- about what

14   the state interests were, and the legislature

15   and other election officials and our sign-on

16   with the secretary of state.

17       Q.    Yeah.  I understand that, and I don't

18   want to, you know, go over this many, many

19   times, for sure.

20           I'm just asking, without referencing

21   those other documents or briefs, if you can

22   answer today whether the state has an interest

23   in making sure those volunteers know that they

24   can be identified after they help someone

25   register.

1          MS. MORSE:  Objection to the extent

2     that question implicates the work product

3     privilege.

4          A.    Yes.  I can't speak to that.

5          Q.    If the state's interest is to allow a

6     voter registration applicant to follow up to

7     check on their application, if that's a state

8     interest in the receipt requirement, is it

9     necessary that the receipt contains the full

10    name of an individual volunteer?

11         MS. MORSE:  Objection to form.

12         A.    That's not something I can speak to.

13         Q.    You testified earlier that you have

14    some familiarity with 3PVROs; is that correct?

15         A.    Yes.  I'm generally aware.  Yes.

16         Q.    Okay.  And you're aware that some of

17    these are larger organizations and that in some

18    situations, like the one I described before,

19    there might be some volunteers who take voter

20    registration applications and, then, others who

21    are supervisors that might collect them and

22    might do quality control?

23              Are you aware of that?

24         A.    That is what you said, and, you know,

25    I don't know the structure of these

1    organizations always.

2        Q.    Sure.  Sure.

3            Is it true that in many instances, a

4    volunteer who collects an application and

5    writes a receipt, as required by this law,

6    won't be the one turning in the voter

7    registration application; is that correct?

8            MS. MORSE:  Objection to form.

9        A.    I can't speak to the process of those

10   organizations.

11       Q.    Are you aware of a concern in Florida

12   over instances of harassment or intimidation of

13   election workers?

14           MS. MORSE:  Objection to form.

15       A.    I'm sorry.  Am I aware of -- sorry.

16       Q.    Yeah.

17       A.    Can you say that again?

18       Q.    Yeah.

19           Are you aware of a -- a concern in

20   Florida about threats of violence or harassment

21   or intimidation of people who work in

22   elections?

23           MS. MORSE:  Objection to form.

24       A.    So that's not something I can speak

25   to, as well.

1      Q.    So you have -- you have not read any

2   news stories or ever heard someone in recent

3   years talk about those kinds of threats or

4   intimidation?

5      A.    I'd -- I'd say I don't recall the

6   details, so it's not something I can speak to.

7      Q.    Right.

8            I'm not asking about details.  I'm

9   just saying, is it something you've heard of

10  before?

11           MS. MORSE:  Objection to form.  Asked

12  and answered.

13     A.    Yeah.  It's -- generally aware of,

14  yes.

15     Q.    Okay.  I'm going to bring up a

16  document here, which we can mark as an exhibit.

17  If you'll give me just a moment.

18           MR. FERGUSON:  And I'll put it in the

19  chat so the court reporter has it.

20     Q.    Do you see that?

21     A.    Yes.

22     Q.    Could you just read the headline for

23  the record, please?

24     A.    Okay.

25     Q.    Would you mind reading just the --

1    the main headline out loud for the record?

2         A.    It's a Scary Time; Florida Election

3    Workers Deal with Threats and Harassment.

4         Q.    Okay.  And we don't need to go

5    through this whole news story.  I'll scroll

6    down, just so you're aware of --

7              MS. MORSE:  I'm sorry.

8         Q.    -- what's on here.

9              MS. MORSE:  Hold on, Brent.

10             MR. FERGUSON:  Yeah.

11             MS. MORSE:  I'm trying to change our

12   view.  I made it too small.  Oh.  Hold on.  Oh,

13   no.  Oh.  I disconnected.  Damn.

14             THE WITNESS:  I think you're still on

15   the thread.

16             MS. MORSE:  Hold on.  The cursor --

17   the mouse isn't working, and I think --

18             THE WITNESS:  Isn't that it down

19   there?

20             MS. MORSE:  Let me see.

21             THE WITNESS:  There you go.

22             MS. MORSE:  Hold on.  Hold on.  We're

23   having a technical --

24             THE WITNESS:  You just need to go up.

25             MS. MORSE:  -- issue here.

1          MR. FERGUSON:  You want to --

2          MS. MORSE:  Can we do --

3          MR. FERGUSON:  -- take a quick break

4    for --

5          MS. MORSE:  No.  The mouse -- I'm

6    just -- I'm trying to -- the mouse isn't

7    working.  I think we can scroll pretty soon.

8    Hold on.

9          I was trying to get it to a size that

10   she could see better on our end, and I think we

11   were close to getting that.

12         Okay.  I -- sorry.  I think we can --

13   I think she's able to scroll now or -- are you

14   handling the scrolling or are we --

15         MR. FERGUSON:  Yeah.  I --

16         MS. MORSE:  -- able to --

17         MR. FERGUSON:  I can scroll down.

18         MS. MORSE:  Oh.

19         MR. FERGUSON:  Are you seeing the

20   scroll here?

21         MS. MORSE:  Oh, yeah.

22         THE WITNESS:  Yeah.

23         MS. MORSE:  Yeah.  We're seeing it

24   now.

25         MR. FERGUSON:  Okay.

1          MS. MORSE:  Sorry, Brent.

2     Q.    So, again, I'm not asking you to read

3   this whole thing.  I'll read from the top up

4   here.  And I realize it's partially cut off, so

5   I apologize for that.

6          On the top of page 2 it says,

7   Election workers in Florida have faced an

8   increasing amount of harassment and threats

9   leading up to the 2022 election.  Some Florida

10   Supervisors of Elections fear the trend will

11   keep volunteers away and lead for nonpartisan

12   workers to quit, eroding trust in the election

13   system.

14          Do you see that?

15     A.    Yes.

16     Q.    Okay.  So I'm -- that's all I want to

17   read on this.  I'll just scroll slowly so you

18   have a chance to see the whole document.  And I

19   think it's done here.

20          So considering those concerns from

21   the Supervisors of Elections, do you think it's

22   reasonable for volunteers in -- working in

23   elections to have concerns about harassment?

24          MS. MORSE:  Objection to form.

25     A.    I would say I can't speak to what

1    concerns someone may or may not have.  I mean,

2    the article listed out the headline or, you

3    know, whatever quote is listed there from the

4    different supervisors.  I'd say they -- they

5    speak for it.

6        Q.    Yeah.

7              And I'm just asking about your

8    opinion here and asking whether that concern is

9    reasonable.

10             MS. MORSE:  Objection to form.

11       A.    I'd say, once again, it's listed on

12   the document.  I don't think that we take an

13   opinion on that matter.  We have deferred what

14   is stated in the article.

15       Q.    Right.

16             And I was showing you the article for

17   general awareness of concerns of the

18   supervisors, and I'm asking you not to --

19   I'm -- I'm not asking you to describe the

20   concerns of any particular volunteer or what

21   the supervisors think.  I'm asking whether you

22   think that such a concern is reasonable.

23             MS. MORSE:  Objection to form.

24             But you can answer.

25       A.    I mean, I would say if there are

1    valid instances, then potentially a reasonable

2    concern.  I'm not speaking to specifics,

3    either.

4        Q.    Certainly.

5              And following up on that.  In that

6    situation that you described where those

7    concerns could potentially be valid, do you

8    think it's reasonable for a volunteer to be

9    concerned about giving up their full name?

10             MS. MORSE:  Objection to form.  Calls

11   for speculation.

12       A.    Yeah.  I would say I'm not describing

13   any situations, either, so I can't guess on how

14   someone may or may not feel.

15       Q.    Do you agree that in -- in those

16   situations that you described where a concern

17   over harassment could be valid -- so I'm not,

18   again, asking for a specific situation or

19   anything, but in that subgroup of situations

20   that you mentioned, do you think it's

21   reasonable that a volunteer would not want to

22   disclose their name?

23             MS. MORSE:  Objection to form.

24       A.    I'm not sure.  I can't speak to that,

25   how they would feel or not.

1      Q.    Did your office provide anyone in the

2   Florida government with information about voter

3   registration applicants who sought to identify

4   specific 3PVRO volunteers?

5           MS. MORSE:  Objection to form to the

6   extent it implicates the work product

7   privilege.

8      A.    Yeah.  Not that I'm aware of.

9      Q.    Okay.  Do you know if your office has

10  any evidence that there are such applicants?

11     A.    Not that I'm aware of.

12     Q.    So we talked about the specific

13  receipt form.  Let's -- I'm going to bring it

14  up on the screen, just for ease of reference.

15          MR. FERGUSON:  And I'll, again, add

16  it to the chat for the court reporter.  And

17  could we mark this as the next exhibit?  I

18  don't know which exhibit number we're on right

19  now.

20          MS. MORSE:  I'm sorry.  I'm sorry

21  about that.  We were just talking about the

22  chat function --

23          MR. FERGUSON:  No problem.

24          MS. MORSE:  -- and how to --

25          MR. FERGUSON:  Yeah.  This -- I mean,

1    I'm going to share it on the screen.  I'm just

2    including it here for the court reporter so she

3    has it.  And I'm asking it to be marked as the

4    next exhibit after --

5              MS. MORSE:  Okay.

6              MR. FERGUSON:  -- the previous

7    document.  And I want to just doublecheck that

8    they've both been marked.

9              (A discussion was held off the

10   record.)

11      Q.    Okay.  So -- okay.

12            Can you see that document on the

13   screen now?

14      A.    Yes.

15      Q.    Okay.  Great.

16            And you see that it has applicant's

17   name and -- and other information, and then the

18   last blank is the name of the person who

19   collected the application?

20      A.    Yes, on the top portion.

21      Q.    And part of the reason for including

22   that is so someone who -- someone who puts in

23   an application with a 3PVRO gets this receipt,

24   and then they can have that person's name

25   afterwards; is that correct?

1              MS. MORSE:  Objection to form.

2      Objection to the form of the question, to the

3      extent, you know, you're familiar with this

4      document.

5          A.    Yeah.  I mean, I'm -- I'm not

6      familiar with it.  We didn't create it.  You

7      know, it's -- it says it's a receipt, so that

8      is what is listed there.

9          Q.    How -- so if an applicant has this

10     receipt with just someone's full name -- the

11     full name of the person who collected the

12     application, do you know how the applicant

13     would go about contacting or finding the

14     person, the volunteer?

15         A.    I don't.  Like I said, this was not

16     something that, you know, I created or that we

17     had an involvement in.

18         Q.    Right.

19             I'm not asking about your involvement

20     in creating the receipt.  I'm asking if you

21     know how someone would go about tracking down

22     the volunteer just based on a full name.

23         A.    No, I do not.

24         Q.    Okay.  Are you familiar with the

25     provision of law called the -- what's been

1  called the voter information restriction or the

2  information retention ban?

3      A.    I'm -- yes.  I'm generally aware of

4  it.

5      Q.    Okay.  Do you have an awareness of --

6  or I guess -- sorry.  Withdraw that.

7           Could you just give me your basic

8  understanding of -- of what it is?

9      A.    I mean, I'd prefer if you could put

10 it on the screen, and we could just discuss it

11 that way.

12     Q.    Yeah.  Sure.

13           Okay.  So it starts there at line

14 506.  Can you see that?

15     A.    Yes.

16     Q.    I'll give you a few moments.

17     A.    Okay.

18     Q.    So before SB 7050 was enacted, did

19 you ever provide anyone in Florida government

20 with information about instances in which a

21 3PVRO volunteer kept an applicant's personal

22 information so they could engage in some kind

23 of misconduct?

24           MS. MORSE:  Objection to form.

25     A.    No, not that I'm aware of.

1      Q.     And do you know if your office had

2   any of that information?

3          MS. MORSE:  I'm going to object to

4   form; object to this line of questioning to the

5   extent it relates to the criminal provision.

6   This is not within her topics for prior

7   criminal information.

8      A.     Yeah.  No.  I -- not something I can

9   speak to.  I would say the statewide

10  prosecutor's office would have a better idea.

11     Q.     Does this restriction here prevent a

12  3PVRO volunteer from keeping an applicant's

13  name or contact information?

14         MS. MORSE:  Again, the same

15  objection.  This is squarely outside of -- of

16  her listed topics.  She's not speaking to

17  criminal prosecution or investigation of

18  criminal matters.  This is a criminal

19  provision.

20     A.     I would defer to tomorrow's -- Nick

21  Cox tomorrow.

22     Q.     Sure.

23         MR. FERGUSON:  And I'll -- I'll just

24  say for the record, I'm asking here about the

25  state interests, as we've discussed before, and

1    certainly trying to clarify what is contained

2    in this provision as it relates to the state

3    interest.

4         Q.    So keeping it to that, you may be

5    aware that the -- the state has represented in

6    this case that this provision, the voter

7    information restriction, does not prevent from

8    retaining someone's name and contact

9    information.

10            Is it true that the state doesn't

11   have an interest in preventing 3PVROs from

12   retaining that information?

13            MS. MORSE:  Objection to form, again,

14   to the extent it implicates the work product

15   privilege.  But I disagree with your rationale.

16   I think you're asking her about a criminal

17   provision and trying, on the back end, to link

18   it to a state interest, which she's answered ad

19   nauseam.  I'm going to object to this question.

20            But to the extent you know, without

21   revealing privilege, you can answer.

22        A.    Yeah.  It's not something I can speak

23   to.  I would just defer back to the language on

24   -- I'm sorry -- on line 506, and also to, as

25   Stephanie said, the prior answers.

1     Q.     If the state has not -- so your prior

2    answers on state interests have wholly

3    incorporated previous answers from briefing; is

4    that correct?

5          MS. MORSE:  Objection to form.

6     A.     Yeah.  Can you clarify what you're

7    saying?  I don't want what --

8     Q.     Yeah.  Sure.

9     A.     -- I said to be mis-summarized.

10    Q.     Yeah.

11          So we've been -- with several

12   different provisions here, we've been talking

13   about the state interests.  And, in large part,

14   my understanding is that you have not talked

15   about specific interest, but instead referred

16   to the state's previous arguments and briefs in

17   this case.

18          Is that accurate?

19    A.     Yes.  I've referenced back to that,

20   and also, as I said, with the legislature and

21   other statewide -- or excuse me -- other

22   election officials and the -- you know,

23   relaying the legislative intent.  Those are all

24   things I mentioned multiple times.

25    Q.     And if that -- those things that

1  you've referenced just now, if the state has

2  not ever expressed an interest in or explained

3  an interest in preventing 3PVROs from retaining

4  someone's name and contact information, is it

5  correct that there is no state interest in

6  doing so?

7        MS. MORSE:  Objection to form.

8     A.     I would say that I -- what you just

9  paraphrased of my answers was not accurate,

10  that I never pointedly said that there is no

11  state interest.

12     Q.    And I'll represent to you that the

13  state has not put forth such an interest, and

14  so I'm asking you today if there is a state

15  interest.

16        MS. MORSE:  Objection to form.

17     A.     That is not something I can speak to.

18     Q.    Okay.  So just to clarify, one of the

19  deposition topics for today, number one, is

20  each state interest that the office believes

21  and contends supports the challenged

22  provisions.

23        Thus far, we have not received any

24  answer on the state interest in preventing

25  3PVROs from retaining someone's name and

1  contact information.  And your answer is that

2  you can't answer that today?

3          MS. MORSE:  Objection to form.  I

4  object to the characterization that you have

5  not received information on state interests.

6  I'm going to -- I object to the extent the

7  question implicates the work product privilege.

8      A.    Yes.  I said that's something I can't

9  speak to.

10     Q.    Okay.  We've been going for almost

11 another hour and a half.  I'm going to propose

12 a ten-minute break.

13         MR. FERGUSON:  Does that work for

14 everyone?

15         MS. MORSE:  How much longer do you

16 have?  I mean, is it -- should we just take a

17 longer lunch break, if you're going to continue

18 questioning?

19         MR. FERGUSON:  (No verbal response.)

20         MS. MORSE:  It's 1:00.

21         MR. FERGUSON:  Yeah.  I don't know

22 exactly how long; more than a few minutes.  And

23 assuming that others might have time on cross,

24 I'm happy to take a longer lunch break if

25 everyone is good with that.

1            MS. MORSE:  Well, what others are you

2    talking about?  Because you're the third

3    Plaintiff to ask questions, so --

4            MR. FERGUSON:  If that -- yeah.

5    Sorry.  I said on cross.  If -- I don't know if

6    the defense plans to ask questions or not.

7            MS. MORSE:  Yeah.  I'm interested in

8    taking just a little bit longer than the ten

9    minutes.  I, you know --

10            MR. FERGUSON:  Sure.

11            MS. MORSE:  But I don't want to keep

12    -- I don't want to keep -- (inaudible) -- and

13    take more than ten minutes.

14            THE WITNESS:  No.  No.  We can't.  I

15    don't want to take an hour.

16            MS. MORSE:  I don't want to take an

17    hour.

18            THE WITNESS:  Okay.  I have work to

19    get to.

20            MR. FERGUSON:  How about 30 minutes?

21    Does that work for everyone?

22            THE WITNESS:  Sure.

23            MS. MORSE:  Yeah.  That's fine.

24            MR. FERGUSON:  All right.  So I've

25    got 12:55 right now.  1:25?

1          MS. MORSE:  1:25.  Sure.

2          MR. FERGUSON:  And could we go off

3     the record now?

4               (A recess was taken.)

5     BY MR. FERGUSON:

6          Q.   Okay.  I'd like to move on to part of

7     70 -- sorry -- SB 7050 that shortened the

8     deadline for 3PVROs to turn in applications

9     from 14 to 10 days.

10              Ms. Guzzo, are you aware of -- of

11    that provision?

12         A.   Yeah.  But will you put it on the

13    screen, as well?

14         Q.   Yeah.  I will.  Just a moment.

15              Okay.  Okay.  This is a longer one.

16    The provision I'm talking about starts at 442,

17    but you can see at page -- at line 449, the --

18    the change to ten days.

19         A.   Okay.

20         Q.   So just confirming, as we have with

21    our other questions, your office didn't have

22    any communications with the legislature or

23    anyone else in government about that part of

24    7050; is that correct?

25              MS. MORSE:  Objection to the extent

1    it implicates the deliberative process

2    privilege -- deliberative process.

3            You can answer.

4    A.    Yes.  We were not engaged in the

5    legislative process with this.

6    Q.    Okay.  Can you tell me the state's

7    interest in changing the deadline from 14 days

8    to 10 days?

9            MS. MORSE:  Objection to form and

10   also -- oh.  Objection to form.

11   A.    Once again, we're repeating my same

12   response from before as to what the state's

13   interests are.

14   Q.    Sure.

15           Okay.  We -- I think you discussed a

16   little bit previously about your office's

17   answers to the interrogatories in this case.

18           Do you recall that?

19   A.    Yeah.  We discussed this.

20   Q.    Yeah.

21           Okay.  I'm going to put those up on

22   the screen, again.  And I'll just scroll to the

23   top.  And that says, Responses to Plaintiffs'

24   First Set of Interrogatories to the Attorney

25   General, and the case caption there is Florida

1    State Conference of the NAACP versus Byrd,

2    23-cv-215; is that correct?

3         A.    Yes.

4               MR. FERGUSON:  And I'm not sure if

5    this was marked as an exhibit before, but I

6    will add it to the chat just to make sure.

7         Q.    So I'm scrolling down to

8    Interrogatory Number 4.  And before we --

9    before I give you time to read it, I'll

10   represent that this provision that we just

11   looked at, which is codified at 97.0575 5A is

12   referred to in this litigation as the 3PVRO

13   fines provision or the delivery penalties.

14              So could you take a few moments just

15   to read Interrogatory Number 4 and the answer?

16        A.    Okay.

17        Q.    Okay.  And I think we discussed

18   something like this before, but in -- in your

19   office's answer it says -- I'm going to

20   highlight, just for ease of reference -- The

21   OAG has joined the initial brief filed by the

22   secretary of state in the 11th Circuit Court of

23   Appeals regarding the appeal of the preliminary

24   injunction entered in this case.  And it says,

25   Information on state interest can be gleaned

1    from that brief.

2              Do you see that?

3         A.    Yes.

4         Q.    Okay.  Are you aware that the

5    preliminary injunction entered in this case and

6    the resulting appeal on the 11th Circuit has

7    nothing to do with the fines provision that's

8    mentioned in this interrogatory?

9              MS. MORSE:  Objection to form.  I'm

10   going to assert the work product privilege to

11   the extent the question implicates that.

12        A.    So are you asking if I'm aware of the

13   different portions?

14        Q.    I'm asking are you aware that the

15   brief referenced does not contain anything

16   referencing the fines provision that's the

17   subject of this interrogatory?

18             MS. MORSE:  Objection to form.

19        A.    Yeah.  I would just say defer back to

20   the pleadings that -- I don't have them in

21   front of me.  I can't speak to the specifics of

22   it.

23        Q.    So you're not aware whether it

24   contains anything about that or not?

25        A.    No.  I said I'd just refer back to

1   what is listed, and I don't want to answer

2   something that's not up there.

3        Q.   Right.

4             So I'm not asking you to -- to answer

5   something that's not up there.  I'm saying, as

6   you sit here today, without looking, you're not

7   aware whether that brief mentions the fines

8   provision at all; is that correct?

9        A.   I'm not sure.

10       Q.   You're not sure if you know whether

11  it mentions that?

12       A.   No.  I -- I'm not sure what -- yeah,

13  the specifics of what is entailed.

14       Q.   You're not sure of the specifics in

15  that brief?

16            MS. MORSE:  Objection to form.  Asked

17  and answered.

18       Q.   I'm sorry.  I'm just trying to get

19  the answer to a simple question, if you know

20  whether the brief contains any material on the

21  fines provision.

22            MS. MORSE:  Same objection.

23       A.   Same answer.

24       Q.   And this answer below also says --

25  I'm going to highlight it -- The OAG's

1    evaluation of the state's interest in the 3PVRO

2    fines provision is currently ongoing.

3              Do you see that?

4         A.    Yes.

5         Q.    Okay.  And I believe this document

6    was submitted in September of this year, so

7    about three months ago.

8              Can you tell me how that evaluation

9    proceeded between the date that this was

10   submitted and today?

11             MS. MORSE:  Objection to form to the

12   extent it implicates the work product

13   privilege.  Discovery hasn't ended, and our

14   communications after this litigation started

15   are work product.

16        A.    Yeah.  So I can't speak to that.

17        Q.    Are you invoking the privilege or are

18   you saying that you don't have any information

19   outside the privilege?

20        A.    Yeah.  I don't have any additional

21   information.

22        Q.    Can you tell me what problem it

23   creates for the state if an application comes

24   in 11 days after it is completed by a voter?

25             MS. MORSE:  Objection to form and

1   object to the extent she's being asked about a

2   different agency's operations.

3        A.    Yeah.  I would say that's something

4   that would most likely be a role of the

5   secretary of state.  It's not something that

6   the Office of the Attorney General is involved

7   in.

8        Q.    Okay.

9             MR. FERGUSON:  I'm -- I'm adding

10  these documents right now to the chat for the

11  court reporter.

12       Q.    I'm going to pull up a -- one more

13  document here.

14             Okay.  Can you see that on the

15  screen?

16       A.    Yes.

17       Q.    Is that coming up?

18             Okay.  Let me -- we're going to look

19  at this page, but let me go to the beginning

20  just so you can see what it is.

21             This is from the Department of State,

22  and it says it's an overview for Supervisors of

23  Elections' offices.

24             Do you see that?

25             MS. MORSE:  Is there a Bates number

1    on this?

2              MR. FERGUSON:  Yeah.  It's pretty

3    small.  Can you see it?  It's right below the

4    --

5              MS. MORSE:  I can, but my eyesight is

6    not that great, so -- I think Elizabeth is

7    going to -- is closer to the -- can you see it?

8              THE WITNESS:  It's small, but I think

9    it says, what, SB7050, dash, what, SO, maybe?

10             MR. FERGUSON:  It says SO.  I think

11   there might be numbers cut off.  I'm not really

12   sure.  I can -- Stephanie, if you want, I can

13   get that full Bates number after this, if you'd

14   like.  I can represent this was -- sorry.  Go

15   ahead.

16             MS. MORSE:  Oh.  Yeah.  That -- you

17   probably were going to answer my next question.

18   I was just wondering -- yeah.  I would like to

19   get the full Bates number and know where it was

20   from.

21             MR. FERGUSON:  Yes.  Sorry.  I don't

22   know if it was cut off on our end or what, but

23   I will send that to you.

24        Q.   Okay.  So I'm -- we saw the first

25   page.  I'm going down to page 23 here, and that

1    says, Consequences For Voter.

2            Do you see that?

3    A.    Yes.

4    Q.    Okay.  And, then, the -- the first

5    bullet there is, If an application is untimely

6    submitted or never submitted by a 3PVRO.

7            Do you see that?

8    A.    Yes.

9    Q.    Okay.  And I'll give you just a

10   moment to take a look at the -- the list that's

11   there.

12   A.    Okay.

13   Q.    Okay.  And I'll read it for the

14   record.  So the -- the top bullet was, If

15   application is untimely submitted or never

16   submitted by a 3PVRO.  The sublets are --

17   there's four of them -- voter is not registered

18   for an election; voter cannot vote; voter is

19   not able to change party affiliation in time to

20   vote for party races in a primary election; and

21   the voter encounters problems at the polling

22   place during early voting or election day.

23            I'd just like to ask.  If -- if a

24   3PVRO turns in a registration application 11

25   days after it's completed by the applicant and

1  it's not near the voter registration deadline,

2  can you tell me which of these consequences

3  that's listed here would apply to that voter?

4          MS. MORSE:  Objection to form.

5          And I'm sorry.  Could you -- could

6  you scroll through the document and just let

7  her see the whole document?

8          MR. FERGUSON:  Yeah.  It's 40 pages

9  long, so it's going to be a little bit

10  difficult, but I'll go back up to the top.

11      Q.    And so it's an overview of voter

12  registration.  And so you can see here that

13  it's produced by the secretary of state.  And

14  I'll go down to the table of contents, which

15  maybe is helpful.

16      A.    I mean, I would just say that this

17  wasn't something that our office created or we

18  had a part in, so I can't speak to, you know --

19      Q.    Sure.

20      A.    -- what -- what applies or what, you

21  know, the actual contents are.  I've never seen

22  it before.

23      Q.    Sure.

24          Would you still like me to scroll

25  through the whole thing?

1          MS. MORSE:  Yeah.  I'd like to see

2     the whole thing before you question the witness

3     about it.

4          MR. FERGUSON:  I'll also just note,

5     if you can access the chat, the whole document

6     is there, if it's easier to look that way.

7      Q.    So I'll note on page 16 here is the

8     3PVRO section that I was talking --

9          MS. MORSE:  Okay.  We may try to do

10    it in the chat, but I think we had a little

11    disaster before when I tried to --

12         MR. FERGUSON:  Yeah.  Yeah.  Whatever

13    is --

14         MS. MORSE:  I -- I --

15         MR. FERGUSON:  Whatever is easier for

16    you.

17         MS. MORSE:  I disconnected the call.

18    Okay.

19     Q.    So this is the one we looked at.  And

20    I'll keep going just so you have a --

21         MS. MORSE:  That's it.

22     Q.    Okay.  So we're beyond the 3PVRO

23    section here.  I don't think this is going to

24    be relevant to us at all.  I'll go back to that

25    page.

1           And just for clarity, my question

2    here is about the state's interest in the

3    provision we just looked at, the fines

4    provision or delivery penalties.  And I'm

5    trying to get a sense of if an application is

6    turned in just beyond the ten-day deadline, if

7    it's not near a registration deadline, is it

8    true that that voter will not be registered for

9    the election?

10          MS. MORSE:  Objection to form.

11     A.    Like I said before, you know, this is

12   not a document that we created.  This is not an

13   OAG-related question.  I would, you know,

14   direct this towards the secretary of state.

15     Q.    And we certainly, likely, will do

16   that.  I'm just asking the more specific

17   question.

18          If someone -- if that application I

19   described comes in 11 days after it's signed,

20   is it correct, in your understanding, that the

21   voter will not be registered for the election?

22          MS. MORSE:  I'm going to object to

23   form and object to the number of times this has

24   been asked.

25          You can answer.

1      A.    I mean, I would say, you know,

2    whatever the statute says for the timeframe is

3    what would be applied.

4      Q.    Okay.  So -- and just briefly, you

5    discussed the citizenship requirement with Ms.

6    Keenan at the -- at the beginning of the

7    deposition.

8            Do you remember that?

9      A.    Yes.

10     Q.    And so just as a -- as a refresher,

11   that provision is one that says people who have

12   not -- who -- who are not U.S. citizens may not

13   collect or handle voter registration

14   applications on behalf of a 3PVRO.

15           Is that your general understanding?

16           MS. MORSE:  Objection to form.

17     A.    Yeah.  Yeah.  That's what I -- you

18   know, what the statute says about who can

19   handle it and who can't.  I would say that is

20   general understanding.

21     Q.    Okay.  And is that volunteer -- let's

22   say a person who's not a citizen is

23   volunteering with the 3PVRO at, let's say, a

24   booth at a parade where the 3PVRO is helping

25   people register.

1          In your understanding, is that
2    volunteer collecting people's forms, are they
3    part of the election administration process?
4          MS. MORSE:  Objection to form.  Asked
5    and answered.  And to the extent it implicates
6    the work product privilege, I object on those
7    grounds, but the witness can answer.
8       A.    I mean, I think I said -- as I said
9    before, you know, I can't speak to the
10   organizational structure of those organizations
11   as to who has what role.
12      Q.    Right.
13         So I'm not asking at all about the
14   organizational structure.  I'm asking about the
15   state's interest here and how the state has
16   described the 3PVRO and its volunteers.
17         I'll -- I'll just represent to you
18   that the state, on its website, describes
19   3PVROs as fiduciaries.  And I'm happy to look
20   at the website together if it's helpful.  So
21   I'm -- I'm not asking what the 3PVRO thinks or
22   anything like that.
23         I'm asking what the state thinks, and
24   I'm asking if that person is, in the state's
25   view, part of the election administration

1    process.

2        A.    If that is something that the

3    secretary of state has on there, maybe that's

4    more appropriately designated there.  I don't

5    believe the attorney general's office has that

6    on there.

7        Q.    The secretary of state doesn't say

8    that there -- doesn't answer the specific

9    question in describing the -- the state's

10   position taken in this litigation and briefing

11   by the attorney general and secretary of state

12   and, then, on the state website that describes

13   these volunteers as fiduciaries.

14            And so my question isn't about what's

15   on the website or anything like that.  My

16   question is whether that volunteer is part of

17   the election administration process.

18            MS. MORSE:  Objection to form.

19       A.    That's not something I can answer.

20       Q.    Okay.  And if someone is supervising

21   that volunteer and oversees the volunteer, is

22   that person part of the election administration

23   process?

24            MS. MORSE:  Objection to form.

25   Speculative.

1      A.    Yeah.  I'd say I can't answer that

2  question.

3      Q.    Okay.  I'm going to talk about one

4  final provision in the law that's referred to

5  as the re-registration requirement.  And I can

6  pull that up for you, as well, if you'd like.

7      A.    Yes, please.

8      Q.    Okay.  Can you see that?

9      A.    Yes.

10     Q.    Okay.  So the relevant provision here

11 is split up, unfortunately, but I can point you

12 to it.

13           We're at 9.0575 1D, so that's line

14 387.

15     A.    Okay.

16     Q.    And since it's -- this part is short,

17 I'll read it for the record.  Beginning

18 November 6, 2024, the specific general election

19 cycle for which the third-party voter

20 registration organization is registering

21 persons -- persons to vote.

22           Do you see that?

23     A.    Yes.

24     Q.    Okay.  And I'll scroll up for

25 context.  The precursor to that is on page 13,

1    subdivision one, where it says, Before engaging

2    in any voter registration activities, the 3PVRO

3    must register and provide to the division the

4    following information.

5              Do you see that?

6    A.    Yes.

7    Q.    Okay.  So we've read D, saying that

8    the 3PVRO has to say the specific election

9    cycle.

10             And then I'm scrolling down on page

11   15 to sub two, which starts at 413.  I'll read

12   it, again.  Beginning November 6, 2024, the

13   registration of a third-party voter

14   registration organization automatically expires

15   at the conclusion of the specific general

16   election cycle for which it is registered.

17             So to your understanding, does this

18   require 3PVROs to re-register every general

19   election cycle?

20             MS. MORSE:  Objection to form.

21   A.    I'd say the document on the page,

22   which is the current statute, gives an

23   expiration for the election cycle that they are

24   registered for.  So I'd say that lays it out.

25   Q.    And before -- before this provision

```
1    was enacted, your office didn't talk to anyone
2    in Florida government about this requirement;
3    is that correct?
4              MS. MORSE:  Objection.  Form.
5              You can answer.
6        A.    As stated, yes.  We were not engaged
7    in the -- in this legislation creation or
8    process.
9        Q.    Okay.  So I'd like to, once again,
10   ask a similar question on this that we just
11   went through with the previous requirement
12   about interrogatory answers and reference to
13   the 11th Circuit Brief.  Just in terms of
14   efficiency, I'll share my screen.
15             Can you see that?
16       A.    Yeah.
17       Q.    Okay.
18       A.    Yes.
19       Q.    And this is another set of Answers to
20   Interrogatories.  This one is to the -- in the
21   League of Women Voters case, 23-cv-216.
22             Do you see that at the top?
23       A.    Hm-mmm.
24       Q.    Okay.
25       A.    Yes.
```

1      Q.     Okay.  So I'm going to give you a

2    moment to read Interrogatory Number Two and

3    your office's response that's up here on page

4    3.

5      A.     Okay.

6      Q.     Okay.  And I don't want to go over

7    this in as much detail as we just did, but you

8    see the portion of the answer that refers to

9    that same 11th Circuit Brief that we talked

10   about a few minutes ago, correct?

11     A.     Correct.

12     Q.     And are you aware that that brief and

13   the appeal that it's referring to do not

14   involve the re-registration requirement that's

15   mentioned in this interrogatory?

16          MS. MORSE:  Objection to form.

17     A.     Yeah.  Can you re-ask that?

18     Q.     Are you aware that that 11th Circuit

19   Brief does not mention the re-registration

20   requirement at all?

21     A.     Yes.

22          And I'd say, you know, as we

23   mentioned in the prior discussion, same answers

24   would apply.

25     Q.     Okay.  Again, this answer also says

1   that your office's evaluation of the state's

2   interest is ongoing.

3           Can you tell me if that evaluation

4   has continued since these answers were

5   provided?

6           MS. MORSE:  Objection to form to the

7   extent -- or objection to the extent it

8   implicates the work product privilege, and I'm

9   going to caution the witness not to reveal any

10  work product information.

11      A.   Yeah.  There's -- I have no

12  additional information.

13      Q.   Okay.  I'll take that off the screen.

14          Does the -- does this re-registration

15  requirement that we've been discussing help

16  prevent fraud?

17      A.   That's not something that I can speak

18  to.

19      Q.   Okay.

20          MR. FERGUSON:  Those are all of my

21  questions, Counsel.  I don't know if any of the

22  other Plaintiffs' counsel has any follow up to

23  what we've discussed.

24          MS. MORSE:  Well, she's answered

25  every Plaintiff groups' question, so I think

1    we're done with Plaintiffs.

2            If the Secretary of State has

3    anything they want to -- in cross, they could

4    let us know on the record.  If not -- okay.

5            I don't have any questions for the

6    witness.

7            MR. FERGUSON:  Okay.  Sorry.  I'll

8    give a moment to see if anyone has anything

9    else.

10           I will say I think it's probably

11   necessary to keep the deposition open, giving

12   the -- given the lack -- inability to answer

13   questions, especially on deposition topic one.

14           I'll give some time for anyone else

15   to add to that, if they'd like.

16           MS. MORSE:  And we object to that.

17   Contrary to your assertion, this witness did

18   answer deposition topic number one multiple

19   times, over and over.  We object to leaving the

20   deposition open.

21           MS. RUTAHINDURWA:  This is Makeba

22   from Elias Law Group.  I join in Plaintiffs'

23   objection to the witness's inability to respond

24   to state interests, and so we join with -- with

25   that position.

1          MS. KEENAN:  And for the Hispanic

2   Federation Plaintiffs, I think we would just

3   say that if the Office of the Attorney General

4   intends to rely on any state interest,

5   independent of what the secretary highlights in

6   their briefing, then we would -- we would

7   request to keep the deposition open, as well.

8          MS. MORSE:  And, again, the Attorney

9   General objects to keeping this deposition

10  open.

11         And, Madam Court Reporter, this

12  witness is going to read the -- read the

13  deposition.  We are not waiving the reading.

14  We'll read and sign.

15         THE COURT REPORTER:  Okay.  Did you

16  want a copy of the transcript, Ms. Morse?

17         MS. MORSE:  If it's ordered by the

18  other parties, by whoever took the depo, but we

19  reserve the right to read it.

20         THE COURT REPORTER:  Ms. Keenan?

21         MS. KEENAN:  I think we need to talk

22  with co-counsel about what orders have already

23  been placed, but I can send you an email

24  afterwards with our order, if that works.

25         (Off the record at 1:58 p.m.)

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2          I, ELIZABETH GUZZO, do hereby

 3   acknowledge that I have read and examined the

 4   foregoing testimony, and the same is a true,

 5   correct, and complete transcription of the

 6   testimony given by me, and any corrections

 7   appear on the attached Errata sheet signed by

 8   me.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   _____        _____

25   DATE                   SIGNATURE CERTIFICATE
```

1   CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2

3          I, SUJA NAIR, the officer before whom

4   the foregoing deposition was taken, do hereby

5   certify that the foregoing transcript is a true

6   and correct record of the testimony given; that

7   said testimony was taken by me electronically

8   and thereafter reduced to typewriting under my

9   direction; that reading and signing was

10  requested; and that I am neither counsel for,

11  related to, nor employed by any of the parties

12  to this case and have no interest, financial or

13  otherwise, in its outcome.

14          IN WITNESS WHEREOF, I have hereunto

15  set my hand and affixed my notarial seal this

16  19th day of DECEMBER, 2023.

17  My commission expires:  April 21, 2027

18

19

20

21  _____

22

23

24

25

| A |
|---|

**able**
18:18, 23:18,
31:16, 75:4,
79:17, 85:8,
114:13, 114:16,
136:19
**access**
74:20, 138:5
**accessed**
76:13
**accommodate**
18:15
**accordance**
48:18
**accurate**
57:9, 124:18,
125:9
**accurately**
18:19
**acknowledge**
150:3
**acknowledgment**
150:1
**aclu**
15:10
**action**
55:25, 56:22
**actions**
82:23
**activities**
144:2
**actual**
86:19, 105:8,
137:21
**actually**
59:11, 75:20
**ad**
123:18
**add**
48:7, 57:6,
106:16, 118:15,
130:6, 148:15
**added**
49:14
**adding**
134:9

**additional**
133:20, 147:12
**address**
41:25, 79:17
**admin**
41:6, 41:9
**administration**
51:9, 52:3,
141:3, 141:25,
142:17, 142:22
**administrative**
40:21
**advance**
59:23
**advisories**
51:25
**affairs**
20:8, 20:11,
20:15, 20:21,
20:25, 21:18,
22:9, 22:16,
38:11, 47:18,
54:4, 65:7
**affiliation**
136:19
**affirm**
35:7, 35:17,
54:15
**affirmation**
56:12, 57:7,
93:11
**affirmations**
35:5, 55:2,
55:9
**affixed**
151:15
**after**
15:5, 31:8,
43:19, 95:3,
108:18, 109:1,
109:24, 119:4,
133:14, 133:24,
135:13, 136:25,
139:19
**afterwards**
119:25, 149:24
**ag**
61:19, 81:4

**ag's**
15:24, 30:17,
31:10, 31:19,
32:16, 33:9,
33:14, 33:18,
33:21, 34:1,
34:5, 36:19,
37:20, 39:12,
46:8, 47:6,
49:19, 51:8,
51:13, 60:4,
60:19, 61:9,
62:7, 62:11,
63:6, 63:10,
63:18, 64:8,
64:19, 65:20,
66:5, 66:24,
68:17, 70:11,
72:17, 74:5,
74:8, 74:15,
75:24, 76:3,
76:12, 77:9,
84:16
**again**
33:7, 42:8,
42:24, 45:9,
48:10, 59:10,
68:24, 71:5,
71:13, 71:14,
92:19, 95:6,
97:9, 99:3,
106:2, 107:15,
108:21, 111:17,
115:2, 116:11,
117:18, 118:15,
122:14, 123:13,
129:11, 129:22,
144:12, 145:9,
146:25, 149:8
**against**
83:2, 85:1,
85:24
**agency**
73:7
**agency's**
134:2
**agents**
52:2

**ago**
16:4, 16:7,
20:20, 101:6,
133:7, 146:10
**agree**
35:22, 42:10,
49:12, 55:23,
56:19, 59:3,
66:22, 68:23,
71:1, 82:10,
82:24, 117:15
**agreeing**
82:18
**ahead**
18:12, 42:17,
42:25, 47:2,
62:9, 69:11,
80:3, 98:11,
104:19, 109:11,
135:15
**aide**
20:18
**al**
1:7, 1:12, 2:7,
2:13, 2:17,
2:22, 4:2, 7:3,
8:3, 10:3
**alachua**
6:2, 6:5
**all**
17:8, 18:1,
18:6, 19:22,
20:9, 29:12,
30:18, 39:15,
41:11, 51:24,
53:2, 59:7,
59:23, 67:19,
75:4, 77:20,
86:9, 87:18,
89:17, 91:4,
96:13, 101:20,
105:21, 115:16,
124:23, 127:24,
132:8, 138:24,
141:13, 146:20,
147:20
**allegation**
71:6, 71:16

allegations
82:17, 82:19
allow
110:5
allowed
102:20
almost
93:17, 126:10
along
96:8
already
38:13, 49:11,
57:1, 63:23,
80:11, 97:3,
107:20, 107:21,
149:22
also
12:12, 18:14,
35:17, 41:23,
45:17, 53:13,
76:3, 79:15,
90:3, 95:3,
123:24, 124:20,
129:10, 132:24,
138:4, 146:25
always
111:1
amend
57:2
amended
81:7, 81:11,
81:13, 81:16,
83:1
amendment
13:17, 37:10,
37:23, 45:21,
46:18, 47:9,
47:15, 48:7,
48:9, 48:17,
49:13
amendments
38:3, 47:8
american
4:5
amount
105:16, 115:8
analysis
13:15, 34:13,

34:17, 36:2,
99:4, 100:1,
108:11
annual
67:3, 68:11
another
35:13, 86:14,
89:7, 100:16,
126:11, 145:19
answer
17:23, 26:10,
27:25, 30:23,
30:25, 31:15,
32:7, 39:7,
53:11, 53:25,
60:11, 61:24,
62:1, 62:3,
62:17, 64:14,
66:12, 78:18,
78:22, 79:2,
87:7, 87:21,
87:25, 89:11,
90:10, 90:21,
97:1, 97:24,
97:25, 98:2,
100:12, 100:22,
104:20, 105:25,
106:19, 109:3,
109:22, 116:24,
123:21, 125:24,
126:1, 126:2,
129:3, 130:15,
130:19, 132:1,
132:4, 132:19,
132:23, 132:24,
135:17, 139:25,
141:7, 142:8,
142:19, 143:1,
145:5, 146:8,
146:25, 148:12,
148:18
answered
23:2, 83:22,
96:1, 97:3,
98:7, 99:17,
99:24, 104:3,
112:12, 123:18,
132:17, 141:5,

147:24
answering
83:16
answers
13:12, 14:2,
14:5, 27:19,
65:23, 98:5,
104:5, 108:3,
109:12, 123:25,
124:2, 124:3,
125:9, 129:17,
145:12, 145:19,
146:23, 147:4
antonacci
70:16, 70:19
anybody
19:1, 26:12,
32:16, 33:10,
76:9
anyone
31:24, 33:14,
50:1, 101:20,
118:1, 121:19,
128:23, 145:1,
148:8, 148:14
anything
25:12, 27:2,
29:7, 38:12,
40:6, 52:25,
62:19, 63:5,
70:5, 95:17,
104:20, 104:25,
106:20, 107:19,
117:19, 131:15,
131:24, 141:22,
142:15, 148:3,
148:8
anywhere
16:6
apart
72:16
apologies
85:11
apologize
104:24, 115:5
appeal
96:9, 96:10,
97:10, 97:14,

130:23, 131:6,
146:13
appeals
130:23
appear
46:20, 150:7
appears
45:24, 46:25
applicable
75:19, 77:4,
106:21
applicant
108:18, 110:6,
120:9, 120:12,
136:25
applicant's
119:16, 121:21,
122:12
applicants
60:22, 118:3,
118:10
application
102:22, 110:7,
111:4, 111:7,
119:19, 119:23,
120:12, 133:23,
136:5, 136:15,
136:24, 139:5,
139:18
applications
35:8, 35:18,
52:16, 52:20,
54:17, 57:14,
60:6, 101:25,
102:19, 103:18,
110:20, 128:8,
140:14
applied
140:3
applies
137:20
apply
137:3, 146:24
appropriately
142:4
april
43:14, 151:17
aren't
46:11

arguments
124:16
art
36:8, 36:13
article
13:25, 116:2,
116:14, 116:16
ashley
2:10, 12:16
aside
19:16
asked
18:10, 25:22,
25:25, 32:8,
77:3, 80:11,
83:21, 84:3,
84:7, 84:9,
84:13, 85:6,
85:10, 86:14,
95:25, 97:11,
98:7, 99:17,
99:23, 104:3,
112:11, 132:16,
134:1, 139:24,
141:4
asking
43:4, 61:1,
68:7, 74:14,
82:17, 91:18,
92:19, 96:21,
97:12, 99:11,
99:20, 100:13,
106:6, 106:8,
109:20, 112:8,
115:2, 116:7,
116:8, 116:18,
116:19, 116:21,
117:18, 119:3,
120:19, 120:20,
122:24, 123:16,
125:14, 131:12,
131:14, 132:4,
139:16, 141:13,
141:14, 141:21,
141:23, 141:24
asks
51:23
assert
131:10

asserted
96:15, 97:15,
107:19
asserting
32:5, 64:13,
66:11, 82:14
assertion
148:17
assist
26:23, 72:17
assistant
20:16, 20:19
assisting
20:18
associated
25:18, 29:14
assume
18:9
assuming
126:23
attached
13:9, 150:7
attempt
81:10
attending
17:16
attorney
1:17, 2:12,
9:2, 9:4, 12:3,
12:5, 15:10,
20:3, 20:10,
21:3, 21:9,
21:20, 22:2,
22:11, 24:7,
24:25, 25:14,
25:19, 25:21,
26:13, 26:19,
27:2, 27:5,
27:12, 28:4,
28:8, 29:10,
30:5, 31:25,
34:17, 38:10,
38:20, 38:23,
40:18, 41:1,
41:13, 41:23,
41:25, 42:3,
43:25, 47:19,
50:6, 51:23,

52:9, 52:13,
53:1, 54:6,
54:10, 55:23,
56:21, 66:19,
68:25, 73:24,
76:1, 78:4,
78:5, 82:8,
82:24, 83:11,
83:18, 86:23,
87:10, 88:2,
88:8, 88:15,
88:20, 89:4,
89:22, 90:15,
91:9, 96:22,
97:19, 106:9,
129:24, 134:6,
142:5, 142:11,
149:3, 149:8
attorney's
6:5, 8:15,
11:14
attorneys
15:11, 22:8,
29:2, 29:5,
80:15
authority
41:6, 41:13,
46:21, 47:11,
53:1, 54:10,
55:24, 57:1,
88:24, 89:2
authorize
49:3, 49:8
automatically
144:14
avenue
4:16, 5:15
avoid
17:5
aware
21:5, 26:18,
30:15, 31:1,
31:7, 31:21,
31:23, 32:11,
32:14, 32:15,
33:13, 36:15,
37:25, 39:8,
47:4, 47:7,

49:17, 51:7,
51:16, 52:9,
52:13, 52:18,
52:21, 54:5,
54:13, 62:18,
63:8, 63:14,
63:17, 64:16,
65:3, 65:25,
66:2, 66:14,
67:22, 67:25,
68:21, 72:23,
76:9, 76:16,
76:18, 77:7,
78:20, 79:3,
79:9, 84:20,
85:13, 90:2,
92:2, 92:4,
95:16, 95:18,
96:14, 106:20,
107:6, 107:8,
110:15, 110:16,
110:23, 111:11,
111:15, 111:19,
112:13, 113:6,
118:8, 118:11,
121:3, 121:25,
123:5, 128:10,
131:4, 131:12,
131:14, 131:23,
132:7, 146:12,
146:18
awareness
39:9, 43:6,
62:25, 63:11,
64:23, 68:7,
92:20, 116:17,
121:5
away
115:11

**B**

b)(6
24:9
b-a-j-g-e-r
27:18
bachelor's
21:12, 21:14
back
16:11, 19:24,

29:19, 30:16,
38:16, 41:22,
43:12, 44:12,
48:5, 48:16,
49:21, 51:19,
53:18, 56:6,
59:9, 62:3,
62:17, 62:20,
65:23, 71:23,
80:12, 87:6,
89:16, 90:21,
96:2, 103:5,
103:20, 104:4,
109:10, 109:12,
123:17, 123:23,
124:19, 131:19,
131:25, 137:10,
138:24
**background**
21:8
**bag**
19:9
**bajger**
27:18, 27:21,
28:1, 85:11,
86:16, 86:25
**bajger's**
86:3
**baker**
8:3
**ballparking**
63:18
**ban**
121:2
**banning**
60:4, 60:21
**baran**
10:14
**based**
27:20, 49:12,
56:18, 120:22
**basic**
121:7
**basically**
61:13, 82:17,
97:13
**basics**
17:1

**bates**
134:25, 135:13,
135:19
**beach**
7:11, 7:17
**became**
20:17, 20:20
**because**
17:11, 27:23,
50:20, 60:17,
77:13, 85:4,
102:13, 102:16,
105:21, 127:2
**been**
15:5, 15:18,
20:10, 23:16,
25:9, 27:4,
34:4, 35:9,
36:18, 37:19,
38:4, 38:15,
39:11, 44:18,
49:11, 49:22,
52:1, 54:21,
55:11, 63:16,
66:18, 68:16,
70:10, 75:22,
77:5, 80:11,
81:8, 82:11,
84:13, 89:4,
89:7, 93:3,
93:21, 93:25,
94:9, 95:12,
96:11, 97:19,
98:7, 98:13,
107:18, 119:8,
120:25, 124:11,
124:12, 126:10,
139:24, 147:15,
149:23
**before**
3:10, 15:19,
17:1, 28:13,
30:16, 31:5,
33:15, 45:6,
46:9, 59:13,
66:13, 68:20,
77:24, 83:23,
84:21, 88:12,

90:4, 92:16,
93:8, 94:6,
95:8, 98:19,
105:17, 107:7,
110:18, 112:10,
121:18, 122:25,
129:12, 130:5,
130:8, 130:9,
130:18, 137:22,
138:2, 138:11,
139:11, 141:9,
144:1, 144:25,
151:3
**beginning**
80:13, 89:5,
89:8, 134:19,
140:6, 143:17,
144:12
**behalf**
4:2, 4:13, 5:2,
5:12, 6:2, 6:11,
7:2, 7:11, 8:2,
8:12, 9:2, 9:11,
10:2, 10:12,
11:2, 11:11,
12:2, 15:23,
24:24, 25:14,
54:17, 57:15,
60:6, 70:6,
140:14
**behind**
19:9
**being**
17:3, 19:20,
31:11, 31:20,
32:1, 32:17,
33:10, 36:8,
36:10, 65:2,
134:1
**believe**
28:4, 60:4,
72:14, 73:25,
83:14, 85:18,
88:13, 92:7,
94:17, 94:22,
95:2, 133:5,
142:5
**believes**
59:21, 61:19,

125:20
**below**
35:3, 132:24,
135:3
**ben**
7:13
**benign**
75:22
**bennington**
12:14
**besides**
29:17, 57:2
**best**
16:24, 18:15,
22:21, 75:3,
75:11, 75:14,
75:23
**better**
114:10, 122:10
**between**
21:1, 59:24,
64:1, 64:15,
64:18, 70:15,
94:18, 133:9
**beyond**
45:24, 71:10,
102:1, 138:22,
139:6
**bill**
13:15, 16:17,
31:8, 32:22,
33:23, 34:2,
34:13, 34:15,
34:25, 35:4,
43:17, 49:15,
53:20, 65:2,
65:5, 107:9
**bills**
31:4
**bit**
21:7, 29:22,
62:21, 70:14,
72:10, 127:8,
129:16, 137:9
**blank**
119:18
**block**
40:22

**bob**
6:4
**booth**
140:24
**both**
35:24, 119:8
**bottom**
43:4, 43:10,
45:1, 56:7,
59:4, 89:11
**boulevard**
7:15, 8:6,
11:15
**box**
55:1
**brad**
66:23, 66:25,
68:24
**branches**
1:6
**break**
18:13, 33:20,
59:13, 77:13,
91:13, 114:3,
126:12, 126:17,
126:24
**breakdown**
63:1, 63:6,
63:11, 63:20,
83:19, 84:4
**breaks**
19:21
**brent**
5:4, 79:25,
91:9, 113:9,
115:1
**brevard**
7:3
**brief**
90:3, 90:23,
91:2, 98:6,
130:21, 131:1,
131:15, 132:7,
132:15, 132:20,
145:13, 146:9,
146:12, 146:19
**briefing**
97:3, 97:20,

124:3, 142:10,
149:6
**briefly**
81:9, 140:4
**briefs**
109:21, 124:16
**bring**
56:22, 57:1,
112:15, 118:13
**broad**
4:7
**brought**
90:5, 96:8
**budgetary**
40:5
**bueno**
48:14
**build**
41:17
**bulk**
17:2
**bullet**
136:5, 136:14
**bureau**
40:22, 40:25,
41:9, 42:2
**byrd**
1:10, 2:20,
15:13, 130:1

### C

**call**
72:11, 138:17
**called**
15:4, 15:12,
23:4, 120:25,
121:1
**calls**
105:23, 106:14,
117:10
**came**
31:5
**campaign**
5:5
**campbell-harris**
4:4
**can't**
17:11, 19:10,

58:24, 68:3,
72:22, 73:4,
73:16, 73:18,
76:8, 76:17,
79:22, 85:3,
86:6, 87:20,
100:5, 110:4,
111:9, 115:25,
117:13, 117:24,
126:2, 126:8,
127:14, 131:21,
133:16, 137:18,
140:19, 141:9,
143:1
**cannot**
76:5, 76:13,
103:7, 104:5,
136:18
**canvasser**
89:13
**capacity**
1:11, 2:11,
2:21, 106:8
**capitol**
9:6
**caption**
1:15, 2:1,
129:25
**case**
1:9, 2:9,
15:12, 15:13,
16:15, 16:18,
16:22, 21:23,
22:2, 22:19,
26:21, 27:8,
28:18, 77:25,
84:3, 96:16,
97:4, 97:14,
97:20, 123:6,
124:17, 129:17,
129:25, 130:24,
131:5, 145:21,
151:12
**cases**
16:1, 16:3,
16:13, 21:19
**causing**
89:1

**caution**
147:9
**center**
5:5, 69:20,
69:21
**certain**
35:5, 38:6,
38:7, 41:14,
44:4, 82:22,
91:25, 94:1,
94:3, 97:15
**certainly**
92:9, 117:4,
123:1, 139:15
**certificate**
150:25, 151:1
**certify**
151:5
**cetera**
29:4
**challenged**
30:2, 32:21,
32:24, 33:5,
46:7, 46:12,
46:16, 46:20,
46:22, 48:2,
50:2, 50:17,
59:22, 59:25,
64:3, 78:2,
78:7, 82:9,
89:17, 90:15,
92:12, 94:20,
125:21
**challenging**
82:10
**chance**
42:17, 42:22,
44:20, 45:2,
58:11, 93:15,
115:18
**change**
73:23, 113:11,
128:18, 136:19
**changing**
129:7
**characterization**
126:4
**charge**
73:5, 86:11

**chat**
80:18, 112:19,
118:16, 118:22,
130:6, 134:10,
138:5, 138:10
**check**
19:11, 19:18,
110:7
**chief**
22:11, 25:22,
26:11, 38:22,
38:23
**child**
21:12, 88:12
**children**
89:7
**circle**
80:12
**circuit**
130:22, 131:6,
145:13, 146:9,
146:18
**citizen**
35:19, 57:15,
140:22
**citizens**
140:12
**citizenship**
33:3, 50:7,
54:11, 79:6,
79:13, 91:17,
140:5
**citrus**
11:3
**civil**
4:5, 24:8,
28:5, 53:5,
53:13, 53:15,
55:24, 56:22,
83:1, 84:25,
85:18, 85:24,
86:1, 86:3,
86:4, 86:9
**civilly**
56:21
**clarification**
44:4, 44:8
**clarify**
32:19, 50:13,

80:25, 123:1,
124:6, 125:18
**clarity**
139:1
**clear**
50:20, 52:23,
67:13, 69:17,
100:5
**clearly**
17:4, 90:6,
90:25, 96:5
**clearwater**
8:18
**clerical**
20:17
**clicked**
37:9
**close**
114:11
**closely**
85:14
**closer**
135:7
**co-counsel**
77:24, 79:22,
149:22
**code**
35:10
**codified**
130:11
**codify**
41:19
**collect**
52:15, 110:21,
140:13
**collected**
72:3, 72:6,
119:19, 120:11
**collecting**
35:8, 35:18,
35:23, 51:11,
52:5, 54:16,
57:13, 60:5,
60:22, 72:18,
102:18, 141:2
**collects**
111:4
**colleen**
12:13

**come**
62:20, 100:15
**comes**
133:23, 139:19
**coming**
47:10, 134:17
**commenting**
46:8
**commission**
39:21, 39:24,
40:4, 41:5,
44:9, 48:19,
49:3, 49:8,
151:17
**commit**
100:21, 100:23,
101:3, 101:24
**committed**
94:11, 95:11,
95:13, 102:5,
102:10
**common**
47:6, 65:7,
75:21
**communicate**
78:5, 90:16
**communication**
51:3, 65:8
**communications**
34:2, 63:25,
64:7, 64:15,
64:18, 65:2,
65:19, 66:5,
66:14, 94:18,
128:22, 133:14
**communities**
84:10, 84:18
**complaint**
81:8, 81:11,
81:13, 81:17
**complete**
17:20, 57:12,
58:21, 58:23,
150:5
**completed**
21:15, 102:22,
103:17, 103:25,
133:24, 136:25

**comply**
105:3
**concern**
111:11, 111:19,
116:8, 116:22,
117:2, 117:16
**concerned**
117:9
**concerning**
51:8, 52:3
**concerns**
49:18, 49:19,
62:12, 115:20,
115:23, 116:1,
116:17, 116:20,
117:7
**conclusion**
105:24, 106:15,
144:15
**conduct**
75:24
**conducted**
1:20, 3:2,
51:14
**conference**
1:5, 130:1
**confirm**
56:5, 64:17
**confirming**
128:20
**connected**
41:4
**connection**
19:21, 59:24
**consequences**
136:1, 137:2
**consider**
43:25, 80:23
**consideration**
78:23
**considered**
31:11, 31:20,
32:2, 32:17,
33:11
**considering**
115:20
**consistent**
24:1

consult
31:19, 31:25,
32:9, 32:13
consulted
23:11, 27:18,
30:18, 31:2
contact
122:13, 123:8,
125:4, 126:1
contacted
45:12
contacting
45:20, 120:13
contain
71:6, 107:11,
131:15
contained
46:13, 50:7,
123:1
containing
37:22
contains
110:9, 131:24,
132:20
contends
59:22, 125:21
contents
137:14, 137:21
context
36:4, 52:16,
74:10, 143:25
continue
126:17
continued
1:15, 2:1,
147:4
contrary
148:17
control
110:22
conversation
17:10, 103:16
conversations
68:1
convicted
35:9, 93:25,
94:9, 100:19,
102:13

conviction
102:16
convictions
92:1, 103:24
coordinate
21:1
copied
69:5, 69:10
copies
74:13, 76:4,
76:11, 76:13
copy
149:16
cord
1:10, 2:20
correct
22:6, 24:13,
37:1, 40:24,
51:2, 96:14,
96:16, 110:14,
111:7, 119:25,
124:4, 125:5,
128:24, 130:2,
132:8, 139:20,
145:3, 146:10,
146:11, 150:5,
151:6
corrections
150:6
correctly
30:3, 50:3,
52:7, 60:1,
63:3, 64:5, 72:8
could
42:12, 49:10,
69:6, 75:21,
79:5, 79:12,
87:21, 98:24,
105:20, 106:11,
106:18, 106:25,
112:22, 114:10,
117:7, 117:17,
118:17, 121:7,
121:9, 121:10,
121:22, 128:2,
130:14, 137:5,
148:3
counsel
15:4, 17:17,

25:25, 26:23,
80:11, 99:18,
147:21, 147:22,
151:10
counted
57:8
county
6:2, 6:5, 6:12,
6:14, 7:3, 7:11,
8:3, 8:12, 8:15,
9:12, 10:3,
11:3, 11:11,
11:14
couple
16:25, 46:17,
80:2, 81:23,
93:12
course
73:10
court
1:1, 2:2, 3:11,
8:16, 17:8,
17:11, 23:25,
24:3, 27:9,
28:11, 34:8,
36:20, 39:13,
55:13, 66:21,
68:18, 70:12,
112:19, 118:16,
119:2, 130:22,
134:11, 149:11,
149:15, 149:20
cover
53:4
covered
58:8, 102:12
covers
92:15
cox
53:2, 53:3,
53:10, 66:24,
67:1, 86:10,
92:9, 122:21
crafting
61:8
create
120:6
created
51:8, 74:23,

83:1, 120:16,
137:17, 139:12
creates
133:23
creating
120:20
creation
57:5, 99:5,
145:7
crimes
67:18, 67:20,
67:23, 68:11
criminal
35:10, 53:4,
83:2, 84:25,
86:11, 99:16,
99:20, 122:5,
122:7, 122:17,
122:18, 123:16
cross
126:23, 127:5,
148:3
cross-examination
80:5, 91:6
cunningham
41:22
current
38:13, 56:4,
56:25, 144:22
currently
20:7, 22:17,
133:2
cursor
113:16
custody
103:25
cut
87:13, 115:4,
135:11, 135:22
cv
145:21
cv-
130:2
cycle
143:19, 144:9,
144:16, 144:19,
144:23

**D**

daily
38:1

dale
11:4
damn
113:13
dash
135:9
data
74:16
database
74:9, 74:17,
74:23, 75:2,
75:25, 76:6,
76:14, 76:24
date
67:12, 75:10,
133:9, 150:25
davis
12:16
dawn
44:1, 45:12,
45:17, 45:20
day
136:22, 151:16
day-to-day
20:24
days
128:9, 128:18,
129:7, 129:8,
133:24, 136:25,
139:19
dayton
4:4
dc
5:8, 5:17
deadline
102:1, 128:8,
129:7, 137:1,
139:6, 139:7
deal
113:3
deaths
89:1
debated
31:11
december
1:21, 151:16
deciding
21:22, 22:1

declaratory
81:17
defendants
1:13, 2:14,
2:23
defending
96:15
defense
127:6
defer
60:14, 60:17,
61:5, 90:21,
96:2, 98:23,
99:4, 103:5,
103:20, 122:20,
123:23, 131:19
deference
61:10
deferred
116:13
deferring
62:4, 109:10,
109:12
definitions
24:13
degree
21:14
deliberative
30:22, 31:14,
32:4, 32:6,
39:5, 64:12,
66:10, 78:16,
104:13, 129:1,
129:2
delivery
130:13, 139:4
demographics
84:4
department
38:11, 134:21
depo
149:18
deponent
150:1
deposed
15:18, 84:1
deposition
1:16, 3:1,

13:10, 13:11,
14:6, 17:1,
18:23, 19:20,
23:5, 24:7,
24:17, 26:14,
29:20, 45:25,
51:4, 80:14,
84:14, 84:15,
88:13, 89:24,
99:8, 99:21,
125:19, 140:7,
148:11, 148:13,
148:18, 148:20,
149:7, 149:9,
149:13, 151:4
depositions
16:5, 16:11,
87:5
deputy
20:20, 38:23
describe
20:13, 83:10,
116:19
described
95:20, 103:13,
110:18, 117:6,
117:16, 139:19,
141:16
describes
141:18, 142:12
describing
87:7, 117:12,
142:9
designate
88:21
designated
1:18, 24:22,
24:24, 25:10,
46:5, 47:17,
50:15, 50:24,
68:6, 68:8,
86:23, 92:8,
92:10, 96:12,
142:4
designee
76:21, 86:15
detail
146:7

detailed
68:3
details
112:6, 112:8
deter
104:8, 104:15
determinations
88:16
determine
51:14
determining
105:16
different
46:13, 73:17,
116:4, 124:12,
131:13, 134:2
difficult
137:10
direct
22:12, 139:14
direct-examinati-
on
15:7
directed
45:17
direction
151:9
director
20:7, 20:18,
20:21, 20:24,
39:20
disagree
123:15
disaster
138:11
disclose
117:22
disclosed
50:10
disconnected
113:13, 138:17
discourage
105:20, 106:11,
106:18
discovery
25:18, 26:17,
26:20, 26:21,
26:24, 28:22,

28:25, 75:18,
77:6, 133:13
**discuss**
70:1, 121:10
**discussed**
27:1, 29:21,
63:23, 122:25,
129:15, 129:19,
130:17, 140:5,
147:23
**discusses**
55:18, 71:20
**discussing**
39:1, 147:15
**discussion**
119:9, 146:23
**dishonesty**
101:22, 101:24
**disks**
74:12, 76:4
**disregard**
73:1
**district**
1:1, 1:2, 2:2,
2:3, 15:14
**division**
1:3, 2:4,
22:11, 28:5,
29:1, 72:15,
72:16, 74:21,
75:6, 85:18,
85:23, 86:1,
86:3, 144:3
**divulging**
78:19
**document**
23:16, 23:19,
24:6, 27:4,
27:13, 28:17,
28:19, 29:24,
34:9, 34:21,
34:22, 34:24,
39:20, 42:6,
42:13, 44:20,
46:25, 55:6,
59:8, 71:9,
75:10, 81:14,
83:5, 83:6,

88:6, 93:7,
107:14, 112:16,
115:18, 116:12,
119:7, 119:12,
120:4, 133:5,
134:13, 137:6,
137:7, 138:5,
139:12, 144:21
**documents**
13:14, 19:5,
23:24, 25:17,
26:17, 28:21,
28:23, 29:6,
29:7, 29:9,
29:16, 51:11,
51:25, 52:6,
52:10, 54:2,
71:25, 72:1,
72:2, 72:4,
72:5, 72:18,
73:2, 73:15,
74:2, 74:4,
74:17, 75:4,
75:7, 75:8,
75:12, 76:1,
76:23, 77:3,
77:8, 100:2,
109:21, 134:10
**doing**
36:11, 93:24,
102:7, 102:16,
105:20, 106:11,
125:6
**done**
51:17, 63:19,
82:4, 115:19,
148:1
**doublecheck**
92:23, 119:7
**down**
17:12, 23:21,
24:11, 24:15,
25:6, 27:15,
34:24, 39:19,
43:2, 43:3,
55:22, 56:6,
75:19, 81:20,
113:6, 113:18,

114:17, 120:21,
130:7, 135:25,
137:14, 144:10
**draft**
38:25, 39:2,
44:14, 45:16,
46:9, 49:18,
50:17
**drafted**
47:14, 65:2
**drafting**
30:18, 31:4,
78:11, 108:9
**drafts**
43:24
**drive**
9:15
**drives**
74:12, 76:4
**drug**
88:11, 88:25
**drugs**
47:12
**duly**
15:5
**during**
14:6, 30:18,
31:3, 38:2,
78:11, 78:22,
78:24, 84:13,
90:8, 136:22

**E**

**each**
17:5, 23:25,
35:7, 35:17,
57:13, 59:20,
59:22, 81:2,
92:12, 125:20
**earlier**
22:18, 29:13,
48:23, 72:11,
78:1, 83:25,
105:7, 110:13
**early**
136:22
**ease**
118:14, 130:20

**easier**
138:6, 138:15
**east**
7:6, 11:6
**ed**
41:14
**edits**
47:5
**educational**
21:8
**edward**
40:10, 40:15
**effect**
34:25, 35:4
**efficiency**
145:14
**efforts**
69:19
**either**
19:8, 33:19,
38:3, 38:4,
46:20, 49:10,
78:25, 88:24,
117:3, 117:13
**elected**
61:15, 62:6
**election**
35:10, 60:15,
61:6, 67:20,
67:23, 68:10,
70:21, 71:3,
71:18, 90:6,
91:1, 96:7,
100:24, 101:3,
109:15, 111:13,
113:2, 115:7,
115:9, 115:12,
124:22, 136:18,
136:20, 136:22,
139:9, 139:21,
141:3, 141:25,
142:17, 142:22,
143:18, 144:8,
144:16, 144:19,
144:23
**election-related**
16:13
**elections**
6:3, 6:12,

6:15, 7:2, 7:12,
8:2, 8:13, 9:12,
10:2, 11:2,
11:12, 14:4,
39:21, 39:24,
40:3, 41:4,
49:3, 62:8,
62:10, 67:17,
69:25, 111:22,
115:10, 115:21,
115:23, 134:23
**electronic**
74:6, 74:23,
75:1, 75:25,
76:5, 76:14,
76:24, 77:4
**electronically**
74:9, 74:11,
151:7
**elias**
4:15, 5:14,
148:22
**elizabeth**
1:19, 3:2,
13:2, 15:3,
135:6, 150:2
**else**
19:1, 26:12,
29:8, 62:19,
85:22, 104:25,
106:16, 128:23,
148:9, 148:14
**email**
13:16, 36:22,
37:22, 39:9,
39:18, 41:24,
42:21, 42:25,
43:3, 43:4,
43:13, 43:20,
43:22, 43:24,
44:3, 44:6,
44:14, 45:2,
45:5, 45:9,
45:12, 45:16,
48:12, 48:15,
49:13, 49:16,
64:22, 66:22,
67:1, 67:2,

67:10, 67:11,
67:12, 68:2,
70:15, 70:24,
71:1, 71:5,
71:20, 149:23
**emails**
13:18, 13:19,
13:22, 13:24,
73:7, 75:6
**emergency**
41:13, 41:16
**employed**
22:9, 22:15,
151:11
**enact**
98:16
**enacted**
82:22, 94:6,
95:8, 121:18,
145:1
**enactment**
30:1, 46:6,
47:20, 95:1,
98:20, 99:6
**encounters**
136:21
**encouraging**
103:18
**end**
77:14, 83:7,
114:10, 123:17,
135:22
**ended**
133:13
**enforcement**
51:9, 52:3,
52:25, 53:4,
53:6, 53:13,
54:10, 56:22,
68:6, 83:17,
84:25, 99:20
**enforcing**
49:25, 50:25,
82:25, 83:11
**engage**
121:22
**engaged**
65:1, 66:3,

66:13, 85:20,
89:5, 89:8,
89:10, 129:4,
145:6
**engaging**
144:1
**enough**
16:20
**enrolled**
13:21, 55:14,
93:8
**entailed**
132:13
**entered**
130:24, 131:5
**entire**
41:2, 42:13,
44:20, 57:23,
87:21
**entirety**
32:22, 59:2
**entity**
40:2, 84:24
**enumerated**
101:16
**eroding**
115:12
**errata**
150:7
**especially**
148:13
**esquire**
4:3, 4:4, 4:14,
5:4, 5:13, 6:4,
6:13, 7:4, 7:13,
8:4, 8:14, 9:3,
9:13, 10:4,
10:13, 11:4,
11:13, 12:4
**essentially**
93:24
**est**
1:22
**established**
96:11
**estimate**
63:18
**et**
1:7, 1:12, 2:7,

2:13, 2:17,
2:22, 4:2, 7:3,
8:3, 10:3, 29:4
**evaluation**
89:12, 89:19,
133:1, 133:8,
147:1, 147:3
**even**
38:13
**ever**
15:18, 16:8,
112:2, 121:19,
125:2
**every**
84:6, 144:18,
147:25
**everybody**
19:24
**everyone**
126:14, 126:25,
127:21
**everything**
17:3, 82:11
**evidence**
59:24, 118:10
**exactly**
16:18, 73:20,
86:5, 97:18,
126:22
**examination**
13:2, 15:4
**examined**
15:5, 150:3
**example**
47:12, 75:9
**examples**
78:13, 78:24
**excellent**
91:15
**exception**
17:24
**exchange**
49:13, 70:15
**excuse**
109:13, 124:21
**executive**
39:20
**exhibit**
13:10, 13:11,

13:12, 13:13,
13:15, 13:16,
13:17, 13:18,
13:19, 13:20,
13:21, 13:22,
13:23, 13:24,
13:25, 14:1,
14:2, 14:3,
14:5, 23:17,
24:2, 24:4,
27:5, 27:10,
28:7, 28:12,
29:19, 34:5,
34:8, 36:18,
36:21, 37:12,
37:19, 38:17,
39:11, 39:14,
44:18, 49:22,
51:20, 54:21,
55:12, 55:13,
56:14, 59:9,
62:23, 66:19,
66:21, 68:16,
68:19, 70:10,
70:13, 71:23,
93:3, 112:16,
118:17, 118:18,
119:4, 130:5

**exhibits**
14:6, 24:1

**exists**
51:15

**expect**
101:20

**expiration**
144:23

**expires**
144:14, 151:17

**explain**
18:5, 18:9,
34:12, 46:3,
92:21, 98:24,
100:6, 100:14

**explained**
78:1, 125:2

**expressed**
125:2

**extent**
26:4, 30:21,

30:23, 31:13,
31:16, 39:5,
41:10, 45:24,
60:8, 61:22,
62:15, 64:12,
66:9, 72:20,
76:25, 78:15,
82:15, 88:19,
89:25, 90:19,
96:18, 97:6,
97:22, 97:25,
99:15, 100:9,
102:25, 104:12,
105:25, 110:1,
118:6, 120:3,
122:5, 123:14,
123:20, 126:6,
128:25, 131:11,
133:12, 134:1,
141:5, 147:7

**eyesight**
135:5

**F**

**faced**
115:7

**factor**
43:21

**facts**
59:23

**failing**
105:3

**familiar**
22:2, 36:1,
53:17, 54:9,
54:14, 67:15,
99:9, 106:22,
120:3, 120:6,
120:24

**familiarity**
110:14

**family**
21:12

**far**
68:2, 108:2,
125:23

**fear**
115:10

**federal**
24:8

**federation**
2:16, 4:2,
15:12, 27:8,
79:24, 149:2

**federation's**
28:9

**feel**
117:14, 117:25

**felonies**
94:1, 94:10,
95:11, 101:8,
101:11, 101:13,
101:19, 101:24,
102:5, 102:10,
102:14

**felony**
35:9, 91:19,
91:21, 92:1,
93:21, 95:23,
96:24, 97:2,
98:16, 98:25,
99:12, 100:6,
101:6, 103:22,
103:24, 104:9

**ferguson**
5:4, 13:5,
80:3, 91:7,
91:9, 94:16,
94:25, 99:18,
112:18, 113:10,
114:1, 114:3,
114:15, 114:17,
114:19, 114:25,
118:15, 118:23,
118:25, 119:6,
122:23, 126:13,
126:19, 126:21,
127:4, 127:10,
127:20, 127:24,
128:2, 128:5,
130:4, 134:9,
135:2, 135:10,
135:21, 137:8,
138:4, 138:12,
138:15, 147:20,
148:7

**few**
20:20, 78:8,
101:6, 107:3,
121:16, 126:22,
130:14, 146:10

**fi**
11:16

**fiduciaries**
141:19, 142:13

**field**
39:16, 41:22

**figure**
19:22

**filed**
81:8, 130:21

**files**
41:16

**fill**
59:1

**final**
143:4

**financial**
151:12

**finding**
120:13

**fine**
19:15, 26:9,
59:15, 59:16,
92:21, 105:2,
105:20, 106:11,
127:23

**fines**
130:13, 131:7,
131:16, 132:7,
132:21, 133:2,
139:3

**finished**
55:7, 56:9,
69:12, 93:17

**first**
17:3, 27:6,
28:9, 42:5,
42:8, 42:15,
42:16, 58:14,
69:7, 78:1,
78:11, 129:24,
135:24, 136:4

**fix**
87:12

**fl**
50:7
**flash**
76:4
**floor**
4:8, 8:17
**florida**
1:2, 1:5, 1:11,
1:17, 2:3, 2:7,
2:13, 2:22, 5:3,
6:7, 6:17, 7:7,
7:17, 8:8, 8:18,
9:2, 9:4, 9:7,
9:17, 10:8,
10:12, 10:18,
11:7, 11:17,
12:2, 12:5,
12:8, 15:14,
15:24, 20:3,
21:9, 21:11,
24:7, 24:25,
25:14, 25:21,
26:12, 26:18,
27:5, 28:8,
29:10, 30:6,
30:11, 30:13,
35:10, 39:21,
39:23, 40:3,
45:13, 45:21,
55:19, 63:2,
63:7, 63:12,
63:21, 64:1,
64:2, 64:8,
64:19, 65:9,
65:11, 65:15,
65:20, 66:6,
68:25, 70:2,
71:19, 72:17,
73:24, 76:21,
77:9, 91:10,
94:19, 111:11,
111:20, 113:2,
115:7, 115:9,
118:2, 121:19,
129:25, 145:2
**florida's**
73:11, 73:14
**focus**
38:25

**focused**
33:4
**folks**
38:19
**follow**
73:11, 110:6,
147:22
**follow-up**
77:23, 78:8
**following**
35:16, 117:5,
144:4
**follows**
15:6
**foregoing**
150:4, 151:4,
151:5
**formal**
51:25
**forms**
102:23, 103:14,
104:1, 141:2
**fort**
10:8
**forth**
125:13
**forward**
33:2, 62:13,
96:8
**foundation**
4:6
**four**
136:17
**frank**
7:4
**franklin**
10:5
**fraud**
98:17, 98:25,
99:13, 99:15,
100:7, 100:21,
101:3, 101:21,
101:24, 108:2,
108:7, 147:16
**front**
19:5, 19:11,
131:21
**full**
45:3, 110:9,

117:9, 120:10,
120:11, 120:22,
135:13, 135:19
**function**
118:22
**further**
61:21, 79:7,
79:20
**furthered**
60:4, 60:21,
61:20
**future**
100:21
**fyi**
48:6

---

**G**

**gaines**
12:7
**gainesville**
6:7
**gardens**
7:17
**general**
1:17, 2:12,
9:2, 9:5, 12:3,
12:6, 21:3,
24:8, 38:10,
38:24, 55:24,
68:25, 70:21,
71:3, 71:18,
73:6, 82:25,
83:11, 84:13,
87:11, 88:3,
88:8, 88:15,
88:20, 89:4,
89:22, 90:16,
92:6, 101:7,
116:17, 129:25,
134:6, 140:15,
140:20, 142:11,
143:18, 144:15,
144:18, 149:3,
149:9
**general's**
20:3, 20:10,
21:9, 21:20,
22:2, 24:25,

25:14, 25:21,
26:13, 26:19,
27:6, 27:12,
28:8, 29:10,
30:5, 31:25,
34:17, 38:20,
40:18, 41:1,
41:13, 41:23,
41:25, 42:3,
43:25, 47:19,
50:6, 51:23,
52:10, 52:14,
53:1, 54:7,
54:10, 56:21,
66:20, 73:24,
76:22, 78:4,
78:5, 82:8,
83:18, 86:23,
96:22, 97:20,
106:10, 142:5
**generally**
22:22, 22:25,
27:23, 47:24,
51:16, 53:12,
54:13, 75:15,
84:8, 85:14,
85:22, 87:3,
92:4, 107:8,
110:15, 112:13,
121:3
**gestures**
17:12
**getting**
114:11
**giblin**
9:14
**give**
17:21, 42:22,
59:17, 74:10,
92:5, 92:20,
93:12, 99:11,
107:3, 112:17,
121:7, 121:16,
130:9, 136:9,
146:1, 148:8,
148:14
**given**
16:8, 26:1,

51:18, 148:12,
150:6, 151:6
**gives**
144:22
**giving**
117:9, 148:11
**glades**
10:3
**gleaned**
130:25
**go**
16:11, 16:25,
17:18, 18:12,
19:22, 29:19,
29:22, 34:23,
38:16, 42:17,
42:25, 47:2,
48:5, 49:21,
55:17, 59:9,
62:9, 65:17,
65:23, 69:11,
77:14, 77:16,
80:3, 87:17,
92:22, 92:24,
98:11, 104:19,
109:11, 109:18,
113:4, 113:21,
113:24, 120:13,
120:21, 128:2,
134:19, 135:14,
137:10, 137:14,
138:24, 146:6
**going**
23:15, 23:21,
26:3, 26:5,
27:3, 27:15,
27:17, 27:22,
28:6, 29:20,
29:23, 30:16,
30:20, 33:2,
34:4, 34:7,
36:17, 38:16,
39:10, 41:22,
42:12, 42:21,
43:3, 43:12,
44:12, 44:17,
44:19, 45:23,
46:4, 48:16,

49:21, 50:9,
51:19, 53:3,
54:20, 55:11,
55:17, 55:21,
57:22, 59:16,
59:19, 60:7,
62:17, 62:22,
63:24, 66:17,
69:9, 71:8,
71:22, 77:12,
79:23, 80:1,
80:9, 81:10,
81:20, 81:23,
85:7, 87:6,
90:12, 91:10,
91:12, 92:13,
93:4, 94:14,
97:14, 97:22,
100:2, 105:6,
105:24, 112:15,
118:13, 119:1,
122:3, 123:19,
126:6, 126:10,
126:11, 126:17,
129:21, 130:19,
131:10, 132:25,
134:12, 134:18,
135:7, 135:17,
135:25, 137:9,
138:20, 138:23,
139:22, 143:3,
146:1, 147:9,
149:12
**good**
15:9, 44:14,
59:12, 85:15,
87:22, 91:8,
91:12, 126:25
**government**
65:9, 94:8,
95:10, 118:2,
121:19, 128:23,
145:2
**governor**
64:1, 64:9,
64:19, 65:12,
78:6, 94:19
**governor's**
64:16, 65:24

**graduated**
21:11
**gray**
8:5
**great**
87:24, 119:15,
135:6
**grounds**
141:7
**group**
4:15, 5:14,
7:14, 148:22
**groups**
84:17, 147:25
**grunts**
17:12
**guard**
38:19, 38:23
**guess**
25:24, 64:21,
74:9, 74:17,
74:19, 90:12,
92:5, 98:22,
99:9, 117:13,
121:6
**guidance**
44:9, 49:25,
50:16, 51:6,
51:7, 51:15,
51:24, 52:14,
52:18, 52:21,
78:20
**guys**
82:20
**guzza**
15:15
**guzzo**
1:19, 3:2,
13:2, 13:10,
15:3, 15:15,
15:17, 15:18,
20:2, 28:14,
34:10, 37:21,
39:15, 50:23,
91:8, 128:10,
150:2

**H**

**half**
126:11

**halfway**
34:24
**hand**
151:15
**handful**
77:23
**handle**
52:19, 140:13,
140:19
**handled**
29:2
**handling**
35:8, 35:18,
35:23, 51:10,
52:5, 54:16,
57:14, 60:5,
60:21, 102:18,
114:14
**happen**
36:3
**happy**
46:2, 57:19,
81:22, 126:24,
141:19
**harassment**
111:12, 111:20,
113:3, 115:8,
115:23, 117:17
**hard**
80:10
**head**
73:18
**headline**
112:22, 113:1,
116:2
**hear**
48:17
**heard**
112:2, 112:9
**held**
20:14, 119:9
**help**
75:17, 109:1,
109:24, 147:15
**helped**
86:16, 86:25,
108:18
**helpful**
137:15, 141:20

| | | | |
|---|---|---|---|
| **helping** | **hillsborough** | 51:24, 88:7, | **incorrectly** |
| 140:24 | 11:11, 11:14 | 90:14, 118:3 | 47:13 |
| **helps** | **hispanic** | **identifying** | **increasing** |
| 41:15, 41:17 | 2:16, 4:2, | 35:11 | 115:8 |
| **henderson** | 15:12, 27:7, | **implementation** | **independent** |
| 10:5 | 28:9, 79:24, | 44:10 | 62:14, 149:5 |
| **here** | 149:1 | **implementing** | **indicates** |
| 17:4, 17:16, | **hm-mmm** | 49:24, 50:6, | 36:7, 42:7, |
| 19:24, 29:22, | 107:23, 145:23 | 50:25 | 57:11, 58:20 |
| 30:20, 37:3, | **hold** | **implicate** | **indicating** |
| 37:11, 37:23, | 29:6, 58:5, | 54:6 | 101:2 |
| 39:16, 40:23, | 72:25, 73:23, | **implicated** | **individual** |
| 42:6, 42:9, | 73:25, 113:9, | 26:5 | 30:7, 76:17, |
| 43:22, 50:10, | 113:12, 113:16, | **implicates** | 110:10 |
| 52:24, 56:7, | 113:22, 114:8 | 30:21, 31:14, | **individually** |
| 56:12, 58:14, | **holt** | 39:5, 60:8, | 76:9 |
| 59:4, 68:12, | 10:5 | 61:23, 62:16, | **individuals** |
| 69:7, 69:14, | **holtzman** | 64:12, 66:10, | 72:23 |
| 69:22, 77:17, | 10:14 | 72:20, 77:1, | **informal** |
| 81:13, 82:10, | **hour** | 78:16, 82:15, | 52:1 |
| 89:21, 93:23, | 59:12, 59:18, | 88:19, 90:1, | **information** |
| 94:10, 99:20, | 80:21, 126:11, | 90:19, 96:18, | 16:20, 26:7, |
| 102:6, 107:11, | 127:15, 127:17 | 97:6, 97:7, | 27:19, 30:24, |
| 109:5, 112:16, | **house** | 97:23, 102:25, | 35:11, 53:14, |
| 113:8, 113:25, | 34:16 | 104:12, 110:2, | 60:10, 61:25, |
| 114:20, 115:4, | **housed** | 118:6, 123:14, | 69:21, 78:19, |
| 115:19, 116:8, | 40:4, 40:9 | 126:7, 129:1, | 84:24, 94:8, |
| 119:2, 122:11, | **however** | 131:11, 133:12, | 95:19, 95:20, |
| 122:24, 124:12, | 74:18 | 141:5, 147:8 | 100:12, 101:2, |
| 132:6, 134:13, | **human** | **important** | 103:3, 118:2, |
| 135:25, 137:3, | 88:10, 89:3 | 84:23 | 119:17, 121:1, |
| 137:12, 138:7, | **hutson's** | **inability** | 121:2, 121:20, |
| 138:23, 139:2, | 37:10, 37:22 | 148:12, 148:23 | 121:22, 122:2, |
| 141:15, 143:10, | **I** | **inc** | 122:7, 122:13, |
| 146:3 | **idea** | 2:7 | 123:7, 123:9, |
| **hereby** | 36:6, 122:10 | **include** | 123:12, 125:4, |
| 150:2, 151:4 | **ideas** | 74:7, 107:13 | 126:1, 126:5, |
| **hereunto** | 21:2, 88:22 | **included** | 130:25, 133:18, |
| 151:14 | **identification** | 48:18, 55:5, | 133:21, 144:4, |
| **hi** | 35:12 | 56:13, 97:19, | 147:10, 147:12 |
| 80:7 | **identified** | 101:13 | **initial** |
| **highlight** | 49:19, 61:10, | **includes** | 130:21 |
| 42:6, 130:20, | 62:12, 89:23, | 55:1, 69:10 | **initially** |
| 132:25 | 108:17, 108:25, | **including** | 20:16 |
| **highlighted** | 109:24 | 65:11, 65:14, | **injunction** |
| 48:17, 48:21, | **identify** | 72:1, 119:2, | 130:24, 131:5 |
| 49:7 | 38:19, 39:2, | 119:21 | **injunctive** |
| **highlights** | | **incorporated** | 81:17 |
| 149:5 | | 124:3 | |

input
32:16, 33:9
instances
111:3, 111:12,
117:1, 121:20
instead
124:15
institute
55:24
instruct
26:5, 60:9,
97:24, 105:24
instructed
73:9, 73:11,
74:1
instructing
103:1
instructions
24:13, 52:1,
58:25
intended
108:6
intends
149:4
intent
90:5, 90:25,
96:5, 98:21,
99:10, 99:25,
108:12, 124:23
intentions
108:13
interact
41:9, 41:11
interaction
41:18
interactions
67:22, 68:3
interest
59:21, 60:3,
60:14, 60:16,
60:20, 61:4,
61:7, 61:9,
61:14, 61:19,
62:4, 62:14,
62:18, 62:21,
79:6, 79:12,
89:13, 89:19,
89:23, 90:24,

96:12, 103:22,
104:5, 107:16,
108:15, 108:23,
109:22, 110:5,
110:8, 123:3,
123:11, 123:18,
124:15, 125:2,
125:3, 125:5,
125:11, 125:13,
125:15, 125:20,
125:24, 129:7,
130:25, 133:1,
139:2, 141:15,
147:2, 149:4,
151:12
interested
21:3, 127:7
interests
59:25, 87:8,
90:14, 92:11,
95:22, 96:6,
96:15, 96:23,
97:1, 97:11,
97:16, 97:18,
99:22, 107:21,
108:4, 109:4,
109:14, 122:25,
124:2, 124:13,
126:5, 129:13,
148:24
internal
29:2
internet
19:21
interrogatories
13:12, 14:2,
14:5, 27:7,
27:24, 81:4,
85:7, 86:25,
98:6, 129:17,
129:24, 145:20
interrogatory
27:16, 51:21,
51:22, 52:11,
86:15, 87:6,
87:25, 89:18,
130:8, 130:15,
131:8, 131:17,

145:12, 146:2,
146:15
intimidation
111:12, 111:21,
112:4
investigating
21:19
investigation
79:4, 79:9,
122:17
investigations
78:13
investing
21:19
invoking
133:17
involve
16:12, 16:22,
97:25, 146:14
involved
22:1, 22:19,
64:24, 98:20,
99:5, 105:18,
106:3, 108:9,
134:6
involvement
106:7, 120:17,
120:19
involves
97:25, 100:9,
105:25
involving
23:8, 23:12
issue
23:10, 86:4,
86:9, 89:4,
89:7, 113:25
issues
23:8, 23:12,
44:8, 48:25,
70:1
issuing
85:24
italicized
35:23, 35:25
italicizing
36:3, 36:7,
36:12

items
73:18
itself
47:1, 60:19,
83:5

**J**

jacksonville
8:8
james
38:18, 38:22
january
64:4, 64:10,
65:21, 66:7,
67:12, 95:3
jared
8:14
jefferson
7:6, 11:6
jerry
10:4
jindia
12:15
job
1:23, 20:6,
37:24, 54:5
john
27:16, 27:21,
28:1, 38:19,
38:23
join
148:22, 148:24
joined
90:23, 96:9,
130:21
joining
21:8, 91:2
josefiak
10:15
joshua
10:13
julie
6:11
jump
49:22, 62:22,
63:24, 80:1

**K**

kahn
8:14

**keenan**
4:3, 13:3,
15:8, 15:10,
23:23, 26:8,
27:9, 28:11,
32:23, 33:1,
34:7, 36:17,
37:18, 39:13,
42:14, 46:2,
46:15, 47:3,
48:1, 48:4,
50:13, 50:19,
51:5, 52:23,
53:5, 53:8,
53:16, 54:20,
57:25, 58:10,
66:17, 67:7,
68:15, 70:9,
77:16, 77:20,
77:22, 79:20,
85:10, 140:6,
149:1, 149:20,
149:21

**keep**
59:16, 59:18,
62:17, 77:3,
91:12, 100:2,
115:11, 127:11,
127:12, 138:20,
148:11, 149:7

**keeping**
122:12, 123:4,
149:9

**kennedy**
11:15

**kept**
121:21

**keyword**
75:9, 75:16

**keywords**
75:21, 75:25

**kind**
99:19, 121:22

**kinds**
38:8, 47:5,
100:24, 101:13,
112:3

**knew**
85:10, 85:17

**knowledge**
16:24, 30:9,
49:20, 51:12,
75:3, 75:12,
75:14, 75:23,
76:20, 106:17

**knows**
108:25

**koon**
7:13

**L**

**lack**
148:12

**laid**
103:4

**language**
37:5, 37:16,
38:3, 38:14,
39:1, 39:3,
44:4, 45:22,
46:9, 47:5,
48:18, 49:3,
49:8, 49:18,
56:4, 87:13,
123:23

**large**
124:13

**larger**
110:17

**largo**
6:17

**last**
19:13, 19:19,
21:15, 44:7,
45:16, 67:4,
67:6, 67:11,
69:14, 119:18

**lastly**
18:17

**late**
102:1

**later**
62:21, 94:10

**law**
4:15, 5:14,
40:21, 41:6,
41:9, 56:25,

61:20, 73:12,
73:14, 95:2,
95:8, 102:7,
102:13, 111:5,
120:25, 143:4,
148:22

**laws**
60:18, 61:17

**lawsuit**
97:14

**lawyers**
17:15, 17:19

**lays**
144:24

**lead**
115:11

**leading**
115:9

**league**
2:6, 5:2,
91:10, 145:21

**learn**
84:24, 85:4

**learned**
84:17

**least**
54:5

**leave**
19:16

**leaving**
148:19

**legal**
5:5, 38:11,
105:24, 106:14

**legislation**
61:8, 82:21,
83:8, 87:10,
88:2, 88:11,
88:13, 88:22,
94:23, 98:21,
100:4, 105:18,
106:3, 145:7

**legislations**
88:8

**legislative**
16:3, 20:8,
20:11, 20:14,
20:21, 20:25,

21:18, 22:5,
22:9, 22:10,
22:15, 23:12,
31:22, 37:16,
37:25, 38:1,
38:2, 41:10,
47:5, 47:8,
47:18, 54:4,
62:6, 64:25,
65:6, 65:7,
65:25, 78:3,
90:4, 90:9,
90:25, 96:4,
98:21, 99:4,
99:10, 99:25,
124:23, 129:5

**legislator**
21:1, 30:7,
62:5, 65:3

**legislators**
62:5, 78:7,
78:23, 90:5,
91:1

**legislature**
21:4, 30:6,
31:12, 31:18,
33:11, 33:15,
34:14, 41:20,
60:15, 61:6,
61:11, 61:15,
64:2, 65:15,
65:18, 65:20,
67:4, 94:7,
94:20, 95:9,
96:7, 98:22,
108:11, 108:13,
109:14, 124:20,
128:22

**leigh**
8:4

**let's**
29:19, 31:8,
59:10, 92:24,
93:2, 118:13,
140:21, 140:23

**letter**
13:23, 68:20,
68:23, 69:4,

69:5, 69:18,
69:19, 70:4,
72:25
**letters**
69:24
**liberties**
4:5
**light**
19:19
**likely**
100:21, 100:23,
101:3, 101:25,
134:4, 139:15
**limit**
33:1
**limited**
22:4, 72:2
**line**
93:10, 105:10,
107:2, 121:13,
122:4, 123:24,
128:17, 143:13
**lined**
99:3
**link**
37:2, 37:4,
37:9, 37:15,
123:17
**list**
25:2, 57:7,
69:5, 70:20,
71:2, 71:17,
95:10, 101:11,
101:14, 101:19,
136:10
**listed**
24:19, 56:25,
87:5, 88:14,
96:5, 96:6,
97:11, 98:5,
98:22, 99:2,
100:1, 101:8,
102:17, 107:13,
108:14, 116:2,
116:3, 116:11,
120:8, 122:16,
132:1, 137:3
**litigation**
29:6, 29:11,

72:18, 72:24,
73:4, 73:23,
73:25, 75:6,
77:2, 81:5,
81:8, 84:9,
84:16, 86:17,
89:24, 90:17,
130:12, 133:14,
142:10
**little**
20:5, 21:7,
62:21, 72:10,
127:8, 129:16,
137:9, 138:10
**llp**
4:15, 5:14
**lobbytools**
38:5
**long**
16:4, 18:15,
20:2, 73:13,
74:18, 80:20,
80:24, 101:19,
102:21, 126:22,
137:9
**longer**
126:15, 126:17,
126:24, 127:8,
128:15
**look**
19:4, 44:18,
44:21, 51:20,
57:23, 59:10,
69:11, 93:13,
93:16, 101:5,
107:4, 134:18,
136:10, 138:6,
141:19
**looked**
130:11, 138:19,
139:3
**looking**
42:5, 57:18,
62:23, 132:6
**looks**
44:13
**lot**
17:15, 44:21,

101:18, 101:21
**loud**
81:25, 113:1
**lunch**
126:17, 126:24
**lux**
9:11

## M

**ma'am**
17:7, 19:3,
26:15, 42:4,
67:14, 69:23,
72:9
**madam**
149:11
**made**
113:12
**maf**
1:10, 1:11,
1:12, 2:10,
2:11, 2:12
**mahan**
9:15
**main**
113:1
**mainly**
32:21, 32:23
**maintain**
73:9, 76:3,
76:12
**maintaining**
46:24
**maintains**
63:9, 63:15
**make**
17:10, 18:1,
18:11, 25:3,
53:8, 69:17,
78:9, 88:16,
130:6
**makeba**
4:14, 80:7,
148:21
**making**
108:16, 108:24,
109:23
**many**
15:21, 15:23,

22:8, 22:14,
80:16, 85:20,
109:18, 111:3
**marcus**
6:11
**mari**
7:4
**mark**
23:25, 24:3,
27:10, 28:12,
34:8, 36:20,
39:14, 55:13,
59:18, 66:21,
68:18, 70:13,
112:16, 118:17
**markarian**
7:14
**marked**
14:6, 37:11,
39:11, 49:22,
93:3, 119:3,
119:8, 130:5
**marks**
8:5
**maryland**
3:12
**massachusetts**
5:15
**match**
25:8
**matches**
83:8
**material**
132:20
**materials**
51:24
**matt**
6:13
**matter**
80:8, 99:16,
116:13
**matters**
53:15, 85:21,
103:12, 103:15,
122:18
**matthew**
9:13
**maybe**
81:2, 135:9,

137:15, 142:3
**mcvay**
66:23, 66:25,
68:24
**mean**
16:6, 19:9,
22:25, 25:1,
42:9, 49:10,
75:14, 78:10,
90:2, 98:4,
100:13, 116:1,
116:25, 118:25,
120:5, 121:9,
126:16, 137:16,
140:1, 141:8
**means**
36:4, 43:21,
52:15, 72:3
**meet**
80:16
**meeting**
80:20, 80:23,
80:25
**megan**
4:3, 15:9
**members**
21:2, 31:18,
65:14
**memo**
35:4
**memory**
55:11
**mention**
108:12, 146:19
**mentioned**
22:18, 26:16,
29:13, 36:1,
47:10, 48:23,
54:3, 73:6,
83:25, 88:12,
90:4, 95:17,
101:9, 107:20,
108:10, 117:20,
124:24, 131:8,
146:15, 146:23
**mentions**
132:7, 132:11
**met**
80:14, 80:18

**methods**
74:15
**middle**
93:9
**might**
18:18, 38:8,
62:20, 91:24,
110:19, 110:21,
110:22, 126:23,
135:11
**mind**
80:1, 112:25
**minute**
16:12, 69:6,
70:23
**minutes**
81:2, 126:22,
127:9, 127:13,
127:20, 146:10
**mis-summarized**
124:9
**mischaracterizat-
ion**
60:25
**misconduct**
94:11, 95:13,
100:20, 100:24,
101:3, 121:23
**mispronouncing**
85:12
**misremembered**
94:24
**miss**
53:9
**misspeak**
105:7
**moment**
17:21, 38:17,
39:1, 55:4,
93:2, 112:17,
128:14, 136:10,
146:2, 148:8
**momentarily**
51:20, 93:4
**moments**
93:12, 101:6,
107:3, 121:16,
130:14

**monroe**
10:7, 10:16
**months**
133:7
**moody**
2:10
**more**
33:2, 79:18,
100:20, 100:23,
101:2, 101:24,
126:22, 127:13,
134:12, 139:16,
142:4
**morning**
15:9, 91:8
**most**
42:20, 134:4
**mouse**
113:17, 114:5,
114:6
**move**
37:25, 42:17,
51:19, 71:22,
93:2, 128:6
**moving**
21:6, 65:3,
66:2
**much**
23:7, 80:9,
126:15, 146:7
**multiple**
124:24, 148:18
**murder**
100:20, 101:9
**must**
35:7, 35:17,
107:13, 144:3
**myers**
10:8
**myself**
22:10, 22:17

**N**

**naacp**
1:7, 4:13,
5:12, 80:8,
87:8, 130:1
**nabors**
9:14

**nair**
1:25, 3:10,
151:3
**name**
15:9, 25:18,
29:14, 29:17,
72:13, 80:7,
85:12, 91:8,
110:10, 117:9,
117:22, 119:17,
119:18, 119:24,
120:10, 120:11,
120:22, 122:13,
123:8, 125:4,
125:25
**named**
44:1
**narrowly**
75:17
**nature**
26:2
**nauseam**
123:19
**near**
137:1, 139:7
**nearing**
77:11, 77:13
**necessary**
44:9, 61:20,
61:21, 104:8,
104:15, 110:9,
148:11
**need**
17:4, 18:13,
19:14, 81:22,
113:4, 113:24,
149:21
**neither**
151:10
**never**
125:10, 136:6,
136:15, 137:21
**new**
4:9
**newly**
83:1
**news**
112:2, 113:5

next
1:15, 42:18,
42:19, 42:22,
43:2, 44:17,
59:13, 59:20,
63:25, 65:18,
79:23, 118:17,
119:4, 135:17
nick
66:24, 66:25,
92:8, 122:20
nickerson
9:14
noah
9:3
nods
17:12
noncitizens
51:10, 52:4,
54:16, 60:5,
60:21, 62:12,
70:1, 70:5,
70:20, 71:2,
71:6, 71:7,
71:17, 71:18,
71:20, 78:14,
79:4, 79:11
nonpartisan
115:11
nope
82:1
northern
1:2, 2:3, 15:14
nos
1:9, 2:9
notarial
151:15
notary
3:11
note
19:13, 19:19,
138:4, 138:7
notes
77:15
nothing
57:11, 57:17,
57:18, 57:19,
58:16, 58:20,

79:20, 106:4,
106:16, 131:7
notice
3:10, 13:11,
24:6, 24:20,
29:20, 46:10,
99:8
noticed
46:1, 46:3,
71:11
notification
38:5, 38:14
notify
38:4
noting
18:22
november
143:18, 144:12
nowhere
69:24
number
15:13, 23:24,
24:2, 51:21,
51:23, 57:3,
59:11, 62:23,
63:24, 87:6,
87:25, 92:11,
94:1, 105:8,
118:18, 125:19,
130:8, 130:15,
134:25, 135:13,
135:19, 139:23,
146:2, 148:18
numbers
25:2, 135:11
nw
5:6, 5:15

**O**

o'brien
12:13
o'donnell
5:13
oag
30:12, 34:6,
34:20, 36:19,
37:11, 37:20,
39:2, 39:12,

48:14, 66:20,
68:17, 70:15,
76:23, 78:12,
78:23, 79:3,
79:9, 130:21
oag's
48:10, 67:22,
73:8, 89:12,
132:25
oag-related
139:13
oag_hf_1strfp
70:12
oath
57:13, 58:21,
58:23
oaths
55:5, 56:20
object
17:17, 25:25,
26:3, 27:22,
30:20, 45:23,
50:9, 60:7,
71:8, 94:14,
95:15, 96:19,
97:8, 97:21,
97:22, 122:3,
122:4, 123:19,
126:4, 126:6,
134:1, 139:22,
139:23, 141:6,
148:16, 148:19
objection
17:25, 22:24,
23:9, 30:8,
30:14, 31:6,
31:13, 32:3,
32:4, 32:18,
33:12, 33:24,
37:14, 39:4,
42:11, 46:25,
47:23, 47:24,
56:2, 56:15,
56:23, 57:16,
60:24, 61:12,
61:22, 62:15,
63:13, 64:11,
66:9, 67:5,

72:19, 76:7,
76:15, 76:25,
78:15, 79:1,
79:8, 79:14,
82:13, 82:16,
83:4, 83:13,
83:21, 84:11,
84:19, 85:2,
86:18, 88:4,
88:18, 89:25,
90:18, 92:17,
94:13, 95:25,
96:17, 97:5,
98:18, 99:1,
99:14, 99:23,
100:8, 102:2,
102:24, 102:25,
103:9, 104:2,
104:11, 105:23,
106:13, 106:14,
107:12, 107:17,
108:8, 108:20,
109:2, 109:7,
110:1, 110:11,
111:8, 111:14,
111:23, 112:11,
115:24, 116:10,
116:23, 117:10,
117:23, 118:5,
120:1, 120:2,
121:24, 122:15,
123:13, 124:5,
125:7, 125:16,
126:3, 128:25,
129:9, 129:10,
131:9, 131:18,
132:16, 132:22,
133:11, 133:25,
137:4, 139:10,
140:16, 141:4,
142:18, 142:24,
144:20, 145:4,
146:16, 147:6,
147:7, 148:23
objections
17:21, 17:22
objects
149:9

**oecs**
67:3, 67:16
**offenses**
100:20, 101:10
**offers**
41:10
**office's**
47:19, 49:24,
50:24, 62:24,
71:24, 104:7,
129:16, 130:19,
146:3, 147:1
**officer**
151:3
**offices**
14:4, 21:2,
34:2, 65:8,
78:6, 78:12,
134:23
**official**
1:10, 2:11,
2:20, 95:10
**officials**
60:15, 61:6,
61:16, 62:6,
62:10, 90:6,
91:2, 94:8,
96:7, 109:15,
124:22
**oh**
36:14, 62:9,
67:9, 87:15,
105:12, 113:12,
113:13, 114:18,
114:21, 129:10,
135:16
**okaloosa**
9:11
**olivo**
10:4
**once**
17:22, 80:18,
99:3, 106:2,
116:11, 129:11,
145:9
**one**
16:6, 21:15,
22:13, 25:22,

34:14, 36:24,
41:15, 43:5,
44:21, 51:21,
51:23, 53:17,
54:1, 56:20,
59:11, 60:17,
69:14, 70:14,
86:13, 87:7,
88:1, 89:5,
92:11, 93:2,
93:20, 93:25,
94:9, 95:11,
99:21, 100:1,
102:5, 102:10,
102:13, 108:1,
110:18, 111:6,
125:18, 125:19,
128:15, 134:12,
138:19, 140:11,
143:3, 144:1,
145:20, 148:13,
148:18
**ones**
24:21, 29:14,
29:17, 36:24,
60:18, 61:8,
61:14, 61:16,
89:9, 96:8
**ongoing**
89:14, 89:20,
90:10, 133:2,
147:2
**only**
76:22
**oops**
38:17
**open**
148:11, 148:20,
149:7, 149:10
**operations**
134:2
**opinion**
116:8, 116:13
**opportunity**
53:9, 59:18,
100:16
**order**
29:22, 149:24

**ordered**
149:17
**orders**
149:22
**ordinary**
73:10
**organization**
143:20, 144:14
**organization's**
54:17
**organizational**
141:10, 141:14
**organizations**
16:23, 22:20,
22:23, 110:17,
111:1, 111:10,
141:10
**origination**
58:24
**orlando**
7:7, 11:7
**other**
17:5, 17:16,
22:14, 25:20,
26:11, 29:16,
34:2, 49:17,
51:25, 60:15,
61:6, 61:15,
61:18, 65:8,
75:7, 75:21,
85:21, 89:5,
89:17, 90:6,
91:1, 96:7,
98:7, 100:23,
101:10, 102:21,
108:10, 109:3,
109:15, 109:21,
119:17, 124:21,
128:21, 147:22,
149:18
**others**
17:19, 110:20,
126:23, 127:1
**otherwise**
151:13
**out**
19:22, 29:22,
38:6, 38:9,

41:17, 59:1,
72:25, 76:18,
81:25, 88:22,
96:5, 98:22,
99:3, 100:1,
103:4, 105:10,
113:1, 116:2,
144:24
**outcome**
151:13
**outside**
94:14, 122:15,
133:19
**over**
16:25, 17:5,
20:5, 28:22,
28:24, 41:7,
52:10, 74:19,
77:6, 104:24,
109:18, 111:12,
117:17, 146:6,
148:19
**oversee**
40:6
**oversees**
22:12, 142:21
**overview**
14:3, 134:22,
137:11
**own**
83:10

---

**P**

---

**page**
1:15, 2:1,
13:2, 13:10,
23:22, 24:5,
24:12, 24:16,
25:4, 25:6,
27:13, 27:16,
29:24, 34:23,
39:19, 42:5,
42:16, 42:18,
42:19, 45:11,
48:5, 48:16,
49:23, 54:25,
55:17, 55:18,
56:7, 58:14,

62:24, 69:4,
69:7, 69:10,
69:12, 69:14,
81:16, 93:9,
102:17, 107:14,
115:6, 128:17,
134:19, 135:25,
138:7, 138:25,
143:25, 144:10,
144:21, 146:3

**pages**
1:24, 137:8

**palm**
7:11, 7:17

**paper**
74:13, 76:11,
76:13, 105:13

**parade**
140:24

**paragraph**
35:3, 81:20,
81:21, 82:7,
82:12

**paraphrased**
125:9

**part**
15:11, 25:5,
28:2, 37:24,
38:1, 41:12,
41:18, 42:23,
54:4, 86:3,
87:4, 98:17,
119:21, 124:13,
128:6, 128:23,
137:18, 141:3,
141:25, 142:16,
142:22, 143:16

**partially**
115:4

**participated**
63:16

**participating**
17:9

**participation**
69:20

**particular**
96:23, 116:20

**particularly**
99:15

**parties**
17:16, 32:12,
149:18, 151:11

**parts**
42:8, 108:10

**party**
136:19, 136:20

**pass**
77:24, 79:21,
79:23

**passage**
30:1, 46:6,
47:20, 95:2,
99:6, 100:4

**passed**
30:17, 46:9,
95:3

**past**
42:22

**paul**
9:11

**penalties**
83:2, 85:1,
85:24, 86:4,
86:9, 130:13,
139:4

**penalty**
105:22

**pending**
18:16

**people**
91:25, 94:9,
100:19, 101:23,
103:16, 103:23,
111:21, 140:11,
140:25

**people's**
141:2

**percival**
38:18, 38:22

**person**
35:7, 35:13,
35:17, 44:1,
57:13, 80:25,
93:25, 102:15,
119:18, 120:11,
120:14, 140:22,
141:24, 142:22

**person's**
119:24

**personal**
35:10, 35:12,
121:21

**personally**
23:12, 26:23,
85:19, 89:9,
108:25

**persons**
95:10, 143:21

**pertains**
82:22

**peter**
70:16

**pga**
7:15

**phase**
78:25

**phones**
20:17

**phonetic**
40:12

**phrase**
34:25

**pieces**
56:17

**pinellas**
6:11, 6:14,
8:12, 8:15

**pl**
9:6

**place**
49:11, 64:18,
73:23, 76:23,
136:22

**placed**
149:23

**plaintiff**
87:9, 127:3,
147:25

**plaintiffs**
1:8, 2:8, 2:18,
4:13, 5:12,
15:12, 24:6,
27:6, 71:25,
79:24, 80:8,
82:10, 90:16,

129:23, 147:22,
148:1, 148:22,
149:2

**plans**
127:6

**play**
21:18, 21:22,
28:17, 28:23,
31:10, 105:15

**pleadings**
131:20

**please**
17:10, 17:20,
18:4, 18:11,
18:14, 47:2,
50:13, 78:19,
79:10, 95:6,
97:10, 108:21,
112:23, 143:7

**pllc**
10:15

**point**
18:3, 18:14,
57:19, 77:11,
91:13, 105:10,
143:11

**pointedly**
125:10

**polling**
136:21

**portion**
48:22, 50:11,
50:14, 83:16,
119:20, 146:8

**portions**
58:18, 82:21,
82:22, 131:13

**position**
33:19, 33:22,
50:23, 89:22,
90:8, 90:23,
96:4, 104:7,
104:14, 104:18,
142:10, 148:25

**possessing**
35:12

**potential**
73:1, 74:4

potentially
72:5, 75:19,
77:8, 117:1,
117:7
practice
47:6
pratt
10:13
precursor
143:25
predecessor
31:4
prefer
121:9
preliminary
130:23, 131:5
premarked
23:16, 23:24,
24:2, 27:4,
28:7, 34:5,
36:18, 37:19,
44:18, 54:21,
55:12, 66:18,
68:16, 70:10
preparation
26:13, 53:21,
80:13
prepare
25:13
prepared
53:11
preparing
28:17, 28:23
present
12:12, 64:4,
64:10, 65:22,
66:8
pretty
114:7, 135:2
prevent
56:1, 98:17,
102:7, 103:23,
108:6, 122:11,
123:7, 147:16
prevented
102:15
preventing
123:11, 125:3,

125:24
prevents
98:25, 99:13,
100:7
previous
2:1, 91:25,
104:4, 119:6,
124:3, 124:16,
145:11
previously
23:1, 90:22,
91:16, 96:3,
129:16
primary
136:20
printed
76:18
prior
16:3, 21:8,
54:2, 62:3,
91:22, 94:23,
107:19, 108:10,
109:13, 122:6,
123:25, 124:1,
146:23
priority
47:9, 64:25,
65:6, 66:1,
78:3, 87:9,
88:1, 88:7,
88:17, 88:22,
89:3, 89:9
private
32:12
privilege
17:25, 30:22,
31:15, 32:4,
32:6, 39:6,
60:9, 62:16,
64:13, 66:11,
72:21, 77:1,
78:17, 82:14,
82:16, 90:1,
90:20, 96:19,
97:7, 97:23,
100:10, 103:1,
104:12, 104:13,
106:1, 110:3,

118:7, 123:15,
123:21, 126:7,
129:2, 131:10,
133:13, 133:17,
133:19, 141:6,
147:8
privileged
26:1, 30:24,
78:19, 100:11
probably
135:17, 148:10
problem
19:23, 58:1,
91:15, 95:7,
118:23, 133:22
problems
39:2, 70:5,
136:21
procedure
24:9
proceeded
133:9
process
29:3, 30:22,
31:14, 32:4,
32:6, 36:15,
38:1, 39:5,
62:6, 64:12,
66:2, 66:11,
71:24, 72:24,
73:6, 75:16,
78:16, 90:9,
104:13, 111:9,
129:1, 129:2,
129:5, 141:3,
142:1, 142:17,
142:23, 145:8
processes
21:25, 88:19
produced
26:17, 29:5,
29:10, 34:6,
36:19, 37:11,
37:20, 39:12,
66:19, 68:17,
70:11, 81:4,
137:13
producing
71:24

product
26:4, 26:7,
26:10, 60:9,
60:10, 61:23,
61:25, 62:16,
72:20, 77:1,
82:14, 82:16,
90:1, 90:19,
96:18, 97:7,
97:23, 98:1,
98:3, 100:10,
103:1, 103:2,
104:12, 106:1,
110:2, 118:6,
123:14, 126:7,
131:10, 133:12,
133:15, 141:6,
147:8, 147:10
production
13:13, 28:10,
28:17, 28:19,
72:1
prohibited
94:2
prohibition
51:10, 52:4
prohibits
92:6
promotes
59:23
promulgated
48:19
pronounce
15:16, 27:17,
40:11
proposal
64:25
proposals
37:25
propose
45:21, 126:11
proposed
31:9, 37:10,
38:4, 43:17,
47:5, 47:7,
47:14
prosecute
21:23, 22:1

prosecution
79:4, 122:17
prosecutions
78:13, 86:12
prosecutor
38:12, 68:1,
79:16, 83:15,
86:9, 100:17
prosecutor's
122:10
protection
89:6
protections
88:13
provide
33:9, 34:17,
44:9, 71:2,
78:12, 78:24,
94:7, 95:9,
95:17, 118:1,
121:19, 144:3
provided
25:17, 27:11,
32:16, 50:1,
50:17, 52:1,
52:2, 52:14,
75:16, 78:21,
81:9, 83:2,
87:8, 98:23,
108:3, 147:5
provides
34:14, 55:23
providing
70:20, 100:11
provision
91:17, 91:24,
92:3, 92:15,
92:21, 93:20,
95:23, 96:16,
104:16, 105:4,
106:4, 106:8,
120:25, 122:5,
122:19, 123:2,
123:6, 123:17,
128:11, 128:16,
130:10, 130:13,
131:7, 131:16,
132:8, 132:21,

133:2, 139:3,
139:4, 140:11,
143:4, 143:10,
144:25
provisions
30:2, 32:21,
32:24, 33:5,
46:7, 46:12,
46:13, 46:16,
46:20, 46:23,
48:3, 50:2,
50:18, 54:6,
59:22, 59:25,
64:4, 78:2,
78:8, 82:9,
83:12, 89:18,
90:15, 92:12,
94:21, 96:13,
107:9, 124:12,
125:22
public
3:11, 29:1,
33:21, 34:22,
72:12, 72:14,
73:12, 73:14,
151:1
publicly
33:19
pull
81:11, 93:3,
134:12, 143:6
punishment
104:8, 104:15
purports
70:19, 71:1
purposes
73:4
pursuant
3:10, 24:8
put
62:13, 106:25,
112:18, 121:9,
125:13, 128:12,
129:21
puts
119:22

**Q**

quality
110:22

question
17:20, 17:23,
18:4, 18:10,
18:11, 18:16,
25:23, 30:21,
33:6, 51:6,
58:15, 60:8,
62:21, 71:12,
79:10, 82:15,
84:6, 86:20,
90:13, 92:18,
94:22, 94:25,
95:5, 96:22,
97:6, 101:23,
102:25, 104:6,
106:7, 110:2,
120:2, 123:19,
126:7, 131:11,
132:19, 135:17,
138:2, 139:1,
139:13, 139:17,
142:9, 142:14,
142:16, 143:2,
145:10, 147:25
questioning
122:4, 126:18
questions
17:2, 17:18,
18:20, 23:1,
33:4, 46:18,
47:1, 50:21,
53:10, 59:8,
71:9, 77:14,
77:24, 78:9,
80:2, 80:10,
81:24, 85:6,
91:4, 91:11,
91:18, 92:10,
92:25, 109:4,
127:3, 127:6,
128:21, 147:21,
148:5, 148:13
quick
59:13, 114:3
quit
115:12
quote
67:8, 116:3

**R**

races
136:20
racial
62:25, 63:6,
63:11, 63:19,
83:19, 84:4,
84:17
rationale
123:15
re-ask
146:17
re-referencing
57:2
re-register
144:18
re-registration
143:5, 146:14,
146:19, 147:14
read
25:16, 30:3,
42:25, 50:3,
52:7, 54:2,
55:4, 55:8,
56:8, 56:10,
56:18, 58:14,
60:1, 63:3,
64:5, 68:10,
69:25, 72:8,
81:21, 82:1,
101:9, 105:6,
107:7, 112:1,
112:22, 115:2,
115:3, 115:17,
130:9, 130:15,
136:13, 143:17,
144:7, 144:11,
146:2, 149:14,
149:14, 149:19,
150:3
reading
67:7, 81:25,
112:25, 149:13,
151:9
reads
54:22
ready
44:22, 69:15

**realize**
59:11, 115:4
**really**
135:11
**reason**
18:18, 19:21,
119:21
**reasonable**
115:22, 116:9,
116:22, 117:1,
117:8, 117:21
**recall**
24:23, 37:2,
37:21, 45:16,
68:22, 70:3,
84:6, 84:8,
88:12, 112:5,
129:18
**receipt**
14:1, 106:22,
107:10, 107:16,
108:6, 110:8,
110:9, 111:5,
118:13, 119:23,
120:7, 120:10,
120:20
**received**
34:20, 125:23,
126:5
**recent**
112:2
**recess**
77:21, 128:4
**recognize**
34:9, 36:22
**recollection**
22:21
**record**
17:22, 18:22,
19:17, 19:22,
23:23, 46:3,
50:20, 67:13,
74:6, 74:14,
77:17, 94:17,
112:23, 113:1,
119:10, 122:24,
128:3, 136:14,
143:17, 148:4,

149:25, 151:6
**records**
29:1, 51:17,
72:12, 72:15,
73:9, 73:12,
73:14, 74:8,
74:10, 74:24,
76:4, 76:12,
76:13
**reduced**
151:8
**refer**
93:22, 104:4,
131:25
**reference**
62:2, 83:7,
118:14, 130:20,
145:12
**referenced**
25:17, 68:12,
107:11, 124:19,
125:1, 131:15
**references**
67:2
**referencing**
82:21, 109:20,
131:16
**referred**
93:21, 124:15,
130:12, 143:4
**referring**
23:4, 32:20,
32:21, 32:23,
99:10, 146:13
**refers**
146:8
**reflects**
56:16
**refresh**
55:10
**refresher**
140:10
**regard**
95:13, 102:7
**regarding**
16:17, 32:5,
33:22, 46:18,
47:11, 50:17,

64:3, 64:9,
65:21, 66:7,
94:11, 94:20,
130:23
**register**
108:18, 109:1,
109:25, 140:25,
144:3
**registered**
63:1, 63:7,
63:12, 63:20,
136:17, 139:8,
139:21, 144:16,
144:24
**registering**
70:2, 143:20
**registrar**
41:17
**registration**
13:20, 14:1,
16:23, 22:20,
22:23, 35:6,
51:11, 52:5,
52:16, 52:20,
54:23, 56:13,
57:14, 60:6,
60:22, 69:19,
94:12, 95:14,
101:25, 102:8,
102:19, 103:17,
103:23, 104:1,
105:21, 106:12,
108:17, 110:6,
110:20, 111:7,
118:3, 136:24,
137:1, 137:12,
139:7, 140:13,
143:20, 144:2,
144:13, 144:14
**rejected**
46:19
**related**
17:25, 31:4,
65:23, 71:9,
75:20, 89:6,
101:21, 151:11
**relates**
23:1, 46:15,

46:21, 54:11,
68:8, 82:9,
94:17, 109:4,
122:5, 123:2
**relating**
50:1, 52:25,
63:19, 70:1,
91:24
**relationship**
26:2, 85:16
**relay**
60:16
**relaying**
124:23
**relevant**
76:1, 138:24,
143:10
**relief**
81:18
**rely**
61:15, 149:4
**remember**
16:15, 79:22,
140:8
**remind**
72:12
**remote**
18:23
**renata**
5:13
**repeat**
36:9, 79:10,
80:10
**repeating**
100:2, 129:11
**rephrase**
18:5, 18:9,
90:13
**report**
22:12, 67:3,
68:11
**reported**
1:25
**reporter**
3:11, 17:8,
17:11, 23:25,
24:3, 27:10,
28:12, 34:8,

36:20, 39:14,
55:13, 66:21,
68:18, 70:13,
112:19, 118:16,
119:2, 134:11,
149:11, 149:15,
149:20
**reporter-notary**
151:1
**represent**
15:11, 30:6,
30:12, 37:8,
80:7, 89:16,
101:18, 125:12,
130:10, 135:14,
141:17
**representative**
1:18, 86:24,
106:9
**represented**
98:13, 123:5
**representing**
30:10, 91:9,
98:10
**request**
13:13, 28:9,
71:25, 77:12,
149:7
**requested**
46:19, 48:17,
151:10
**requests**
26:21
**require**
144:18
**required**
77:6, 111:5
**requirement**
33:3, 50:7,
54:12, 79:6,
79:13, 106:23,
107:6, 107:16,
108:6, 110:8,
140:5, 143:5,
145:2, 145:11,
146:14, 146:20,
147:15
**requires**
35:5, 73:14

**reserve**
149:19
**respect**
46:22
**respond**
18:19, 50:11,
86:16, 86:24,
86:25, 89:17,
148:23
**responded**
26:19
**responding**
26:24
**response**
28:8, 44:14,
48:13, 52:12,
53:7, 70:22,
71:25, 93:14,
126:19, 129:12,
146:3
**responses**
17:10, 26:20,
26:25, 27:6,
27:11, 28:13,
81:3, 86:16,
89:18, 129:23
**responsibilities**
20:13, 82:8
**responsible**
85:24, 86:15,
100:3
**responsive**
29:8, 52:11,
72:5, 77:8
**rest**
57:20
**restate**
49:5
**restriction**
91:19, 91:21,
93:22, 95:24,
96:24, 97:2,
98:16, 98:25,
99:13, 100:7,
101:6, 104:10,
121:1, 122:11,
123:7
**restrictions**
89:14

**resulting**
131:6
**retaining**
73:14, 123:8,
123:12, 125:3,
125:25
**retention**
73:17, 73:22,
74:14, 121:2
**return**
77:17
**returning**
77:18
**reveal**
26:6, 60:10,
103:2, 147:9
**revealing**
26:10, 30:24,
61:25, 98:2,
123:21
**review**
24:19, 29:9,
29:16, 45:2,
69:4, 69:6,
70:23, 77:6,
81:3, 81:7
**reviewed**
24:21, 26:16,
29:14, 53:19,
68:20, 72:4,
72:7
**reviewing**
43:19
**rid**
74:2
**right**
17:8, 17:17,
18:6, 19:6,
24:17, 27:18,
33:4, 36:25,
37:7, 37:12,
39:21, 40:19,
43:14, 43:17,
44:1, 44:5,
44:10, 44:15,
45:9, 45:14,
45:17, 45:22,
47:20, 48:7,

48:14, 48:20,
48:25, 49:15,
51:1, 53:2,
54:7, 54:23,
55:2, 55:15,
55:19, 56:1,
56:14, 57:4,
57:8, 59:5,
60:23, 61:1,
61:11, 63:21,
67:4, 67:13,
69:1, 70:6,
70:17, 70:21,
71:3, 71:7,
81:18, 84:1,
84:5, 87:11,
87:18, 88:3,
102:11, 112:7,
116:15, 118:18,
120:18, 127:24,
127:25, 132:3,
134:10, 135:3,
141:12, 149:19
**rise**
89:1
**risk**
105:21
**riverplace**
8:6
**road**
6:16
**roberts**
45:13, 45:20
**role**
20:24, 21:17,
21:18, 21:22,
28:16, 28:22,
29:25, 31:9,
31:17, 38:2,
40:25, 41:3,
46:5, 47:19,
49:24, 50:5,
50:24, 54:3,
83:11, 85:5,
86:3, 86:7,
95:1, 103:6,
105:15, 134:4,
141:11

**roles**
20:22
**room**
18:24, 19:1
**rooms**
18:24
**roper**
7:5, 11:5
**rosenbloom**
8:4
**rule**
24:8
**rule-making**
41:5, 48:25,
49:4, 49:9
**rules**
48:19, 49:11
**ruling**
41:16
**rutahindurwa**
4:14, 13:4,
79:25, 80:4,
80:6, 148:21

**S**

**s**
51:9, 52:4
**said**
36:13, 43:20,
48:14, 49:1,
56:4, 57:10,
61:3, 64:22,
80:14, 85:12,
85:17, 85:21,
86:5, 87:2,
96:3, 97:12,
98:19, 109:13,
110:24, 120:15,
123:25, 124:9,
124:20, 125:10,
126:8, 127:5,
131:25, 139:11,
141:8, 151:7
**same**
25:4, 62:17,
66:13, 78:22,
79:1, 79:2,
95:19, 95:20,

97:5, 99:23,
100:3, 106:13,
109:2, 109:3,
122:14, 129:11,
132:22, 132:23,
146:9, 146:23,
150:4
**save**
50:21
**saw**
45:17, 70:7,
88:25, 135:24
**say**
18:14, 23:2,
37:15, 38:7,
56:24, 59:1,
60:13, 61:4,
67:6, 70:4,
71:12, 71:13,
82:20, 84:12,
88:21, 89:8,
91:21, 97:9,
98:8, 99:2,
99:25, 103:4,
104:25, 105:6,
106:2, 106:24,
107:18, 108:21,
109:3, 111:17,
112:5, 115:25,
116:4, 116:11,
116:25, 117:12,
122:9, 122:24,
125:8, 131:19,
134:3, 137:16,
140:1, 140:19,
140:22, 140:23,
142:7, 143:1,
144:8, 144:21,
144:24, 146:22,
148:10, 149:3
**saying**
93:25, 98:12,
108:3, 112:9,
124:7, 132:5,
133:18, 144:7
**says**
27:16, 29:25,
35:4, 35:16,

37:5, 43:15,
44:2, 44:6,
44:8, 44:11,
44:13, 44:16,
48:6, 48:9,
48:12, 48:15,
48:22, 49:24,
52:12, 54:24,
55:3, 58:16,
59:4, 59:6,
59:11, 60:2,
62:24, 63:4,
63:25, 67:10,
67:11, 70:18,
71:4, 71:24,
74:1, 81:16,
81:19, 81:25,
83:6, 89:12,
90:10, 93:10,
102:17, 115:6,
120:7, 129:23,
130:19, 130:24,
132:24, 134:22,
135:9, 135:10,
136:1, 140:2,
140:11, 140:18,
144:1, 146:25
**sb**
13:21, 22:19,
30:17, 30:18,
31:5, 31:9,
31:10, 32:1,
32:13, 32:17,
32:20, 33:5,
33:10, 33:15,
33:22, 37:10,
39:3, 44:4,
45:22, 46:9,
49:18, 49:25,
50:7, 50:25,
51:9, 52:4,
52:16, 52:20,
54:11, 55:15,
56:12, 57:6,
64:9, 65:21,
66:7, 78:3,
78:11, 78:23,
83:3, 83:12,

84:1, 84:16,
87:9, 88:1,
91:17, 91:23,
93:8, 94:6,
105:2, 106:23,
121:18, 128:7,
135:9
**scary**
113:2
**schedules**
73:17, 73:22
**scheduling**
41:14, 47:12,
88:11, 88:25
**sciences**
21:13
**scope**
71:10, 89:2,
94:15
**scott**
11:4
**screen**
23:16, 23:19,
27:4, 28:7,
58:5, 58:8,
81:11, 81:12,
85:7, 85:8,
87:12, 93:4,
118:14, 119:1,
119:13, 121:10,
128:13, 129:22,
134:15, 145:14,
147:13
**screens**
19:5
**scroll**
23:21, 24:11,
24:15, 25:6,
27:15, 39:19,
42:21, 43:3,
43:8, 43:9,
44:19, 44:22,
44:23, 55:21,
57:20, 69:9,
81:20, 81:22,
82:5, 87:13,
113:5, 114:7,
114:13, 114:17,

114:20, 115:17,
129:22, 137:6,
137:24, 143:24
**scrolling**
56:6, 114:14,
130:7, 144:10
**se**
6:6
**seal**
151:15
**search**
29:2, 29:4,
51:14, 51:17,
51:18, 73:7,
75:17, 75:24,
77:9
**searchable**
75:2
**searched**
72:4, 72:6,
75:5, 75:9,
75:13, 76:5,
76:23
**seattle**
4:18
**second**
35:3, 57:12,
58:23, 69:3,
69:4, 69:10
**secretary**
1:12, 2:21,
10:12, 30:12,
30:13, 31:24,
32:9, 64:3,
66:6, 66:23,
68:24, 70:16,
78:6, 91:3,
109:16, 130:22,
134:5, 137:13,
139:14, 142:3,
142:7, 142:11,
148:2, 149:5
**section**
41:7, 46:14,
54:25, 55:18,
55:22, 55:25,
56:1, 56:10,
56:11, 57:9,

101:16, 138:8,
138:23
**security**
67:20, 67:24,
68:11
**see**
18:24, 19:10,
23:18, 24:5,
24:12, 24:16,
27:11, 34:24,
35:1, 35:14,
35:20, 37:5,
39:18, 40:22,
42:13, 42:22,
43:3, 43:13,
43:22, 43:23,
45:8, 45:11,
45:19, 48:6,
51:22, 55:14,
55:18, 69:22,
81:12, 83:8,
85:8, 87:18,
87:20, 87:21,
93:5, 93:9,
101:15, 112:20,
113:20, 114:10,
115:14, 115:18,
119:12, 119:16,
121:14, 128:17,
131:2, 133:3,
134:14, 134:20,
134:24, 135:3,
135:7, 136:2,
136:7, 137:7,
137:12, 138:1,
143:8, 143:22,
144:5, 145:15,
145:22, 146:8,
148:8
**seeing**
114:19, 114:23
**seeks**
44:3
**seen**
28:13, 45:5,
54:18, 93:8,
137:21
**senate**
13:17, 16:17,

34:14, 43:16,
45:21, 53:19
**senate's**
45:13
**senator**
37:9, 37:22
**send**
38:6, 135:23,
149:23
**sending**
38:8
**sense**
18:1, 38:13,
40:5, 41:4,
47:15, 92:14,
139:5
**sent**
36:24, 37:3,
37:21, 38:2,
38:15, 38:18,
43:20, 44:15,
64:22, 66:25,
67:12, 72:25
**sentence**
35:14, 35:16,
35:20, 42:9
**sentences**
35:24, 44:8
**separate**
18:23
**september**
133:6
**series**
24:12, 24:17
**serve**
84:5, 84:10,
84:18
**serves**
59:23
**session**
19:24, 38:2
**set**
27:7, 129:24,
145:19, 151:15
**seven**
57:19
**seventh**
4:16

**several**
124:11
**sexual**
100:20, 101:10
**share**
23:15, 27:3,
28:6, 81:10,
85:7, 93:4,
119:1, 145:14
**sharing**
81:12
**shaud**
9:13
**sheet**
150:7
**shilpa**
12:15
**short**
143:16
**shortened**
128:7
**shorter**
70:15
**shorthand**
151:1
**should**
17:23, 85:4,
126:16
**shouldn't**
85:4
**show**
34:4, 36:17,
39:10, 54:20,
55:11, 66:18,
68:15
**showing**
37:18, 58:3,
70:9, 116:16
**sic**
38:3
**side**
22:5
**sign**
27:24, 87:3,
90:3, 149:14
**sign-on**
109:15
**signature**
39:19, 40:22,

| | | | |
|---|---|---|---|
| 150:25 | 135:8 | **sometimes** | 110:12, 111:9, |
| **signature-k9lvk** | **smartphone** | 40:16 | 111:24, 112:6, |
| 151:20 | 19:8, 19:16 | **soon** | 115:25, 116:5, |
| **signatures** | **smith** | 114:7 | 117:24, 122:9, |
| 42:21 | 6:13 | **sorry** | 123:22, 125:17, |
| **signed** | **sole** | 32:8, 36:9, | 126:9, 131:21, |
| 139:19, 150:7 | 103:25 | 48:24, 49:14, | 133:16, 137:18, |
| **signing** | **some** | 53:25, 58:9, | 141:9, 147:17 |
| 151:9 | 26:16, 26:19, | 58:15, 58:19, | **speaking** |
| **similar** | 29:21, 50:21, | 61:20, 62:10, | 17:5, 17:20, |
| 145:10 | 74:10, 75:18, | 71:12, 71:23, | 117:2, 122:16 |
| **simple** | 85:6, 88:10, | 87:15, 98:11, | **speaks** |
| 132:19 | 91:11, 91:16, | 102:9, 104:19, | 83:5 |
| **simply** | 91:18, 92:13, | 104:24, 105:12, | **special** |
| 97:2 | 95:13, 110:14, | 109:11, 111:15, | 20:19 |
| **since** | 110:16, 110:17, | 113:7, 114:12, | **specific** |
| 84:15, 89:5, | 110:19, 115:9, | 115:1, 118:20, | 72:22, 83:8, |
| 89:8, 143:16, | 121:22, 148:14 | 121:6, 123:24, | 117:18, 118:4, |
| 147:4 | **somebody** | 127:5, 128:7, | 118:12, 124:15, |
| **sit** | 46:4 | 132:18, 135:14, | 139:16, 142:8, |
| 132:6 | **someone** | 135:21, 137:5, | 143:18, 144:8, |
| **sitting** | 76:16, 77:5, | 148:7 | 144:15 |
| 89:21, 109:5 | 85:22, 102:4, | **sort** | **specifically** |
| **situation** | 102:10, 108:18, | 63:18 | 16:19, 33:2, |
| 103:12, 117:6, | 109:1, 109:24, | **sorts** | 44:7, 82:25 |
| 117:18 | 112:2, 116:1, | 36:2 | **specifics** |
| **situational** | 117:14, 119:22, | **sought** | 73:16, 117:2, |
| 39:9, 43:6, | 120:21, 139:18, | 118:3 | 131:21, 132:13, |
| 64:23 | 142:20 | **sound** | 132:14 |
| **situationally** | **someone's** | 17:13, 19:25, | **speculation** |
| 21:5, 37:24, | 120:10, 123:8, | 37:12 | 117:11 |
| 54:5, 66:1 | 125:4, 125:25 | **sources** | **speculative** |
| **situations** | **something** | 72:2, 72:5, | 142:25 |
| 94:3, 110:18, | 47:13, 58:4, | 74:4, 77:7 | **split** |
| 117:13, 117:16, | 58:5, 64:24, | **spb** | 143:11 |
| 117:19 | 79:16, 83:14, | 42:8, 43:14, | **spoke** |
| **size** | 83:24, 84:21, | 43:19 | 25:19 |
| 114:9 | 86:10, 92:8, | **speak** | **squarely** |
| **sjostrom** | 103:6, 104:17, | 17:4, 25:13, | 99:21, 122:15 |
| 9:3 | 110:12, 111:24, | 25:20, 26:12, | **staff** |
| **skim** | 112:6, 112:9, | 47:1, 58:24, | 22:11, 25:21, |
| 42:17 | 120:16, 122:8, | 68:3, 72:22, | 25:22, 26:11, |
| **skip** | 123:22, 125:17, | 73:4, 73:16, | 31:22, 34:16, |
| 51:5 | 126:8, 130:18, | 76:8, 76:17, | 36:2, 36:8, |
| **slowly** | 132:2, 132:5, | 85:3, 86:6, | 36:11, 36:12, |
| 115:17 | 134:3, 134:5, | 100:17, 101:16, | 36:15, 38:22, |
| **small** | 137:17, 142:2, | 103:7, 104:6, | 64:9, 64:20, |
| 113:12, 135:3, | 142:19, 147:17 | 106:4, 110:4, | 65:21, 66:6, |

70:16, 72:17,
73:8
**staffers**
22:14
**starkey**
6:16
**starnes**
10:5
**start**
17:19, 29:23,
59:13, 91:18
**started**
17:1, 20:16,
133:14
**starting**
24:16, 27:12
**starts**
93:11, 107:2,
121:13, 128:16,
144:11
**state**
1:5, 1:12,
2:22, 3:12,
10:12, 21:11,
30:6, 30:12,
30:13, 33:6,
46:22, 59:20,
59:25, 60:3,
60:14, 60:16,
60:20, 61:4,
61:7, 61:9,
61:10, 61:14,
62:4, 62:14,
62:18, 62:20,
64:3, 66:6,
78:7, 79:5,
79:12, 83:20,
84:10, 87:7,
89:19, 89:22,
90:14, 90:24,
91:3, 92:11,
94:16, 95:5,
95:22, 96:5,
96:12, 96:15,
97:1, 97:10,
97:15, 98:15,
98:16, 99:22,
104:5, 108:5,

108:15, 108:23,
109:4, 109:14,
109:16, 109:22,
110:7, 122:25,
123:2, 123:5,
123:10, 123:18,
124:1, 124:2,
124:13, 125:1,
125:5, 125:11,
125:13, 125:14,
125:20, 125:24,
126:5, 130:1,
130:22, 130:25,
133:23, 134:5,
134:21, 137:13,
139:14, 141:15,
141:18, 141:23,
142:3, 142:7,
142:11, 142:12,
148:2, 148:24,
149:4
**state's**
31:25, 32:9,
66:23, 68:25,
70:17, 89:12,
96:23, 97:18,
103:22, 107:16,
108:4, 110:5,
124:16, 129:6,
129:12, 133:1,
139:2, 141:15,
141:24, 142:9,
147:1
**stated**
17:22, 63:14,
82:11, 83:23,
84:21, 88:5,
90:7, 90:24,
90:25, 100:15,
105:17, 116:14,
145:6
**states**
1:1, 2:2,
35:19, 49:16,
94:5, 105:13
**statewide**
38:11, 68:1,
79:16, 83:15,

86:8, 100:17,
122:9, 124:21
**stating**
73:1
**statues**
101:15
**statute**
38:14, 46:13,
47:24, 56:4,
103:5, 103:21,
140:2, 140:18,
144:22
**statutes**
47:20, 55:19
**statutory**
47:11, 102:1
**step**
53:18, 89:15
**stephanie**
12:4, 41:21,
123:25, 135:12
**stephen**
11:13
**still**
90:10, 113:14,
137:24
**storage**
74:23
**store**
74:8
**stored**
74:11, 74:12,
74:18, 75:7
**stories**
112:2
**story**
113:5
**street**
4:7, 5:6, 6:6,
7:6, 8:16, 10:7,
10:16, 11:6,
12:7
**structural**
40:8
**structure**
40:5, 110:25,
141:10, 141:14
**sub**
144:11

**subdivision**
93:10, 144:1
**subgroup**
117:19
**subject**
100:11, 131:17
**sublets**
136:16
**submit**
35:5, 47:14
**submitted**
67:3, 133:6,
133:10, 136:6,
136:15, 136:16
**subsection**
55:22, 55:23,
56:6, 56:11,
56:19
**subsequent**
46:17
**substance**
51:3
**substances**
41:14
**substantive**
61:19
**suggested**
48:7
**suggests**
58:22
**suite**
4:17, 5:7,
5:16, 7:16, 8:7,
9:16, 10:17
**suja**
1:25, 3:10,
151:3
**supervise**
102:21
**supervising**
103:14, 142:20
**supervisor**
6:2, 6:12,
6:14, 7:2, 7:12,
8:2, 8:12, 9:12,
10:2, 11:2,
11:12, 103:16
**supervisors**
14:3, 69:25,

| | | |
|---|---|---|
| 110:21, 115:10, 115:21, 116:4, 116:18, 116:21, 134:22 | **T** | 91:20, 95:12, 99:19, 102:6, 106:24, 118:21, 124:12, 127:2, 128:16, 138:8 | testified 15:6, 110:13 |
| | **table** 19:10, 137:14 | | |

| | | |
|---|---|---|
| 110:21, 115:10, 115:21, 116:4, 116:18, 116:21, 134:22 | **T** | 91:20, 95:12, 99:19, 102:6, 106:24, 118:21, 124:12, 127:2, 128:16, 138:8 |
| **support** 33:22, 34:1, 79:5, 79:12 | **table** 19:10, 137:14 | **talks** 69:19, 95:1 |
| **supporting** 59:24, 60:20 | **tailor** 75:18 | **tallahassee** 1:3, 2:4, 9:7, 9:17, 10:18, 12:8 |
| **supports** 125:21 | **take** 17:12, 33:18, 33:21, 37:16, 44:17, 44:20, 53:17, 55:4, 59:10, 59:12, 69:3, 69:6, 69:11, 70:23, 89:15, 90:8, 90:22, 93:13, 93:15, 96:3, 107:4, 110:19, 114:3, 116:12, 126:16, 126:24, 127:13, 127:15, 127:16, 130:14, 136:10, 147:13 | **tampa** 11:17 |
| **supposed** 83:15 | | **tasked** 82:25, 84:25 |
| **sure** 16:18, 17:10, 18:11, 21:10, 25:4, 26:1, 26:8, 27:17, 33:8, 40:11, 41:2, 42:14, 48:4, 49:6, 53:8, 60:12, 71:15, 73:19, 76:19, 78:9, 79:18, 86:5, 88:9, 93:1, 93:18, 95:7, 98:14, 101:17, 103:8, 104:21, 106:5, 108:16, 108:22, 108:24, 109:5, 109:19, 109:23, 111:2, 117:24, 121:12, 122:22, 124:8, 127:10, 127:22, 128:1, 129:14, 130:4, 130:6, 132:9, 132:10, 132:12, 132:14, 135:12, 137:19, 137:23 | | **team** 15:11 |
| | | **technical** 113:23 |
| | | **tell** 18:4, 21:7, 61:2, 96:25, 102:4, 129:6, 133:8, 133:22, 137:2, 147:3 |
| | **taken** 77:21, 128:4, 142:10, 151:4, 151:7 | **tellechea** 40:12, 40:13, 40:14, 40:15, 40:17, 41:12, 41:15, 44:13, 45:9, 48:10, 48:14 |
| | **taking** 24:6, 51:20, 61:13, 91:13, 127:8 | **tellechea's** 48:24 |
| | **talk** 24:1, 33:3, 46:4, 46:5, 47:17, 50:15, 50:24, 52:24, 68:6, 68:9, 74:3, 92:11, 92:13, 92:16, 96:12, 104:24, 112:3, 143:3, 145:1, 149:21 | **tellechia** 40:12 |
| | | **ten** 20:5, 127:8, 127:13, 128:18 |
| | | **ten-day** 139:6 |
| **swain** 6:4 | | **ten-minute** 77:13, 126:12 |
| **sworn** 15:5 | **talked** 72:10, 80:18, 91:16, 107:22, 108:1, 118:12, 124:14, 146:9 | **terms** 29:4, 36:7, 36:13, 51:18, 75:16, 80:13, 145:13 |
| **system** 74:6, 115:13 | **talking** 48:10, 80:22, | |

110:21, 115:10, 115:21, 116:4, 116:18, 116:21, 134:22

**support**
33:22, 34:1, 79:5, 79:12

**supporting**
59:24, 60:20

**supports**
125:21

**supposed**
83:15

**sure**
16:18, 17:10, 18:11, 21:10, 25:4, 26:1, 26:8, 27:17, 33:8, 40:11, 41:2, 42:14, 48:4, 49:6, 53:8, 60:12, 71:15, 73:19, 76:19, 78:9, 79:18, 86:5, 88:9, 93:1, 93:18, 95:7, 98:14, 101:17, 103:8, 104:21, 106:5, 108:16, 108:22, 108:24, 109:5, 109:19, 109:23, 111:2, 117:24, 121:12, 122:22, 124:8, 127:10, 127:22, 128:1, 129:14, 130:4, 130:6, 132:9, 132:10, 132:12, 132:14, 135:12, 137:19, 137:23

**swain**
6:4

**sworn**
15:5

**system**
74:6, 115:13

**T**

**table**
19:10, 137:14

**tailor**
75:18

**take**
17:12, 33:18, 33:21, 37:16, 44:17, 44:20, 53:17, 55:4, 59:10, 59:12, 69:3, 69:6, 69:11, 70:23, 89:15, 90:8, 90:22, 93:13, 93:15, 96:3, 107:4, 110:19, 114:3, 116:12, 126:16, 126:24, 127:13, 127:15, 127:16, 130:14, 136:10, 147:13

**taken**
77:21, 128:4, 142:10, 151:4, 151:7

**taking**
24:6, 51:20, 61:13, 91:13, 127:8

**talk**
24:1, 33:3, 46:4, 46:5, 47:17, 50:15, 50:24, 52:24, 68:6, 68:9, 74:3, 92:11, 92:13, 92:16, 96:12, 104:24, 112:3, 143:3, 145:1, 149:21

**talked**
72:10, 80:18, 91:16, 107:22, 108:1, 118:12, 124:14, 146:9

**talking**
48:10, 80:22,

91:20, 95:12, 99:19, 102:6, 106:24, 118:21, 124:12, 127:2, 128:16, 138:8

**talks**
69:19, 95:1

**tallahassee**
1:3, 2:4, 9:7, 9:17, 10:18, 12:8

**tampa**
11:17

**tasked**
82:25, 84:25

**team**
15:11

**technical**
113:23

**tell**
18:4, 21:7, 61:2, 96:25, 102:4, 129:6, 133:8, 133:22, 137:2, 147:3

**tellechea**
40:12, 40:13, 40:14, 40:15, 40:17, 41:12, 41:15, 44:13, 45:9, 48:10, 48:14

**tellechea's**
48:24

**tellechia**
40:12

**ten**
20:5, 127:8, 127:13, 128:18

**ten-day**
139:6

**ten-minute**
77:13, 126:12

**terms**
29:4, 36:7, 36:13, 51:18, 75:16, 80:13, 145:13

**testified**
15:6, 110:13

**testify**
24:24, 25:10, 33:15

**testimony**
16:9, 60:25, 97:17, 109:8, 109:9, 150:4, 150:6, 151:6, 151:7

**text**
44:21, 53:19

**th**
4:8, 5:6, 67:12, 130:22, 131:6, 145:13, 146:9, 146:18, 151:16

**thank**
80:8, 91:5, 91:14

**thankfully**
70:14

**thanks**
77:20, 79:18, 80:4

**thereafter**
151:8

**they'd**
148:15

**thing**
100:3, 115:3, 137:25, 138:2

**things**
21:5, 57:7, 74:19, 75:20, 88:21, 98:7, 103:19, 124:24, 124:25

**think**
18:17, 26:9, 46:10, 59:7, 77:13, 80:1, 84:23, 90:3, 90:9, 91:4, 94:14, 96:11, 98:5, 100:15,

105:19, 106:10,
113:14, 113:17,
114:7, 114:10,
114:12, 114:13,
115:19, 115:21,
116:12, 116:21,
116:22, 117:8,
117:20, 123:16,
129:15, 130:17,
135:6, 135:8,
135:10, 138:10,
138:23, 141:8,
147:25, 148:10,
149:2, 149:21
**thinks**
141:21, 141:23
**third**
81:7, 81:11,
81:13, 81:16,
127:2
**third-party**
16:22, 22:20,
22:23, 143:19,
144:13
**thought**
88:19
**thread**
45:12, 49:14,
113:15
**threats**
111:20, 112:3,
113:3, 115:8
**three**
15:22, 15:25,
16:6, 20:22,
27:16, 43:21,
88:14, 133:7
**threshold**
73:19
**through**
1:18, 25:3,
25:7, 25:16,
29:21, 37:25,
38:5, 44:19,
57:20, 65:3,
66:2, 74:20,
75:5, 75:17,
76:5, 76:14,

77:15, 113:5,
137:6, 137:25,
145:11
**throughout**
21:3, 23:4
**tie**
71:16
**time**
30:16, 35:6,
59:12, 80:9,
81:2, 113:2,
126:23, 130:9,
136:19, 148:14
**timeframe**
95:4, 140:2
**times**
15:21, 80:16,
80:22, 109:19,
124:24, 139:23,
148:19
**timothy**
39:16, 42:24,
43:13
**title**
16:18, 20:6,
24:5, 54:22,
75:10, 86:6
**titled**
81:13
**today**
17:9, 18:20,
18:25, 23:5,
24:20, 80:9,
89:21, 92:13,
93:23, 97:17,
99:9, 99:12,
100:6, 100:14,
109:6, 109:22,
125:14, 125:19,
126:2, 132:6,
133:10
**todd**
11:13
**together**
141:20
**tomorrow**
50:22, 53:2,
53:11, 79:17,

79:19, 83:16,
100:17, 122:21
**tomorrow's**
122:20
**took**
37:9, 64:18,
101:5, 149:18
**top**
42:20, 44:13,
73:18, 88:14,
115:3, 115:6,
119:20, 129:23,
136:14, 137:10,
145:22
**topic**
25:5, 29:23,
29:25, 49:23,
50:12, 50:14,
59:10, 59:14,
59:20, 62:22,
62:24, 63:23,
63:24, 63:25,
71:10, 71:23,
75:22, 76:22,
84:13, 87:4,
92:11, 95:1,
95:4, 99:8,
99:21, 148:13,
148:18
**topics**
24:17, 24:19,
24:23, 25:5,
25:6, 25:13,
25:16, 29:21,
45:25, 46:10,
68:8, 88:23,
94:15, 94:17,
99:17, 122:6,
122:16, 125:19
**torchinsky**
10:15
**touch**
102:22
**touches**
38:12
**touching**
103:14
**towards**
139:14

**track**
63:6, 83:24,
84:22
**tracking**
62:25, 63:8,
63:15, 120:21
**tracks**
56:12, 83:19
**trafficking**
88:10, 89:3
**training**
51:24
**transcribed**
17:4
**transcribing**
17:9
**transcript**
13:9, 149:16,
151:5
**transcription**
150:5
**trend**
115:10
**trial**
16:8
**tried**
138:11
**trigger**
38:8
**true**
53:3, 111:3,
123:10, 139:8,
150:4, 151:5
**truly**
40:8
**trust**
115:12
**truthfully**
18:19
**try**
18:5, 80:9,
87:12, 103:23,
138:9
**trying**
113:11, 114:6,
114:9, 123:1,
123:17, 132:18,
139:5

tuesday
1:21
turn
31:8, 77:6,
101:25, 128:8
turned
28:21, 28:23,
52:10, 74:19,
139:6
turning
111:6
turns
136:24
twice
80:19
two
55:5, 55:8,
56:17, 80:22,
144:11, 146:2
tying
71:6
type
46:18, 95:13
types
16:1, 84:9
typewriting
151:8
typically
17:23, 36:4
typo
35:7

**U**

unable
92:20
unclear
42:7, 43:20
under
40:4, 40:9,
52:20, 54:11,
86:2, 92:10,
151:8
underlying
94:1, 94:10,
95:11, 101:8,
102:5, 103:24
understand
18:3, 18:19,

40:2, 43:16,
47:16, 49:2,
49:7, 68:5,
78:9, 99:7,
99:19, 109:17
understanding
25:4, 25:9,
85:15, 92:6,
92:15, 94:4,
99:12, 101:7,
101:12, 102:15,
121:8, 124:14,
139:20, 140:15,
140:20, 141:1,
144:17
understood
18:10, 78:2
undertake
49:4, 49:9,
49:10
undertaken
69:20
unfortunately
143:11
union
4:6
unit
72:12
united
1:1, 2:2, 35:19
units
1:7
unlawfully
35:11
unless
17:23, 76:16
until
19:22
untimely
136:5, 136:15
use
35:10, 36:13
using
75:24

**V**

vaccaro
39:16, 42:7,

42:24, 43:13,
43:20, 44:15,
45:8, 45:12,
45:20, 48:6
valid
117:1, 117:7,
117:17
verbal
17:11, 53:7,
70:22, 93:14,
126:19
version
55:15, 93:8
versus
15:13, 75:21,
130:1
via
63:1
videoconference
1:16, 3:1
view
113:12, 141:25
violates
56:20
violating
104:9, 104:16
violation
35:9, 55:25,
56:1, 57:8
violence
111:20
virtual
19:20
virtually
1:20, 3:2
vogel
10:14
volunteer
91:19, 91:21,
93:21, 95:23,
96:24, 97:2,
98:16, 98:25,
99:12, 100:6,
101:6, 103:13,
104:9, 108:24,
110:10, 111:4,
116:20, 117:8,
117:21, 120:14,

120:22, 121:21,
122:12, 140:21,
141:2, 142:16,
142:21
volunteering
140:23
volunteers
102:21, 108:16,
109:23, 110:19,
115:11, 115:22,
118:4, 141:16,
142:13
vote
103:18, 108:19,
109:1, 136:18,
136:20, 143:21
voted
70:20, 71:2,
71:17
voter
14:1, 16:23,
22:20, 22:23,
35:8, 35:18,
51:11, 52:5,
52:15, 52:19,
57:14, 60:5,
60:22, 69:19,
69:20, 69:21,
94:11, 95:14,
101:25, 102:8,
102:19, 103:17,
103:23, 103:25,
105:20, 106:11,
108:17, 110:6,
110:19, 111:6,
118:2, 121:1,
123:6, 133:24,
136:1, 136:17,
136:18, 136:21,
137:1, 137:3,
137:11, 139:8,
139:21, 140:13,
143:19, 144:2,
144:13
voters
2:6, 5:2, 63:1,
63:7, 63:11,
63:20, 70:2,

83:19, 91:10,
145:21
**voting**
71:7, 71:21,
136:22

---

**W**

**waiving**
149:13
**walk**
25:3, 29:20
**want**
16:25, 25:2,
29:22, 32:19,
34:23, 43:7,
49:22, 50:20,
53:8, 59:9,
65:17, 68:15,
69:17, 74:3,
77:14, 80:12,
92:22, 105:5,
105:7, 109:18,
114:1, 115:16,
117:21, 119:7,
124:7, 127:11,
127:12, 127:15,
127:16, 132:1,
135:12, 146:6,
148:3, 149:16
**wanted**
19:11, 19:17,
59:17, 92:14
**washington**
4:18, 5:8, 5:17
**way**
40:8, 46:16,
86:13, 89:17,
121:11, 138:6
**we'll**
18:14, 19:22,
19:23, 46:17,
92:9, 96:10,
149:14
**we're**
18:23, 19:17,
21:4, 25:4,
29:20, 32:5,
43:12, 44:17,

59:12, 61:13,
64:13, 66:11,
73:11, 74:1,
82:14, 92:13,
98:10, 99:19,
102:6, 113:22,
114:23, 118:18,
129:11, 134:18,
138:22, 143:13,
148:1
**we've**
63:23, 95:12,
96:11, 107:21,
108:1, 122:25,
124:11, 124:12,
126:10, 144:7,
147:15, 147:23
**website**
141:18, 141:20,
142:12, 142:15
**weekend**
67:4, 67:6,
67:11
**went**
145:11
**weren't**
78:3, 98:19
**whatever**
98:21, 116:3,
138:12, 138:15,
140:2
**whenever**
73:23
**whereof**
151:14
**whereupon**
15:2
**whether**
21:23, 22:1,
32:15, 36:6,
36:12, 41:21,
47:4, 51:13,
51:14, 52:13,
57:13, 64:18,
75:1, 75:6,
77:3, 86:14,
86:22, 103:15,
106:18, 109:22,

116:8, 116:21,
131:23, 132:7,
132:10, 132:20,
142:16
**whoever**
149:18
**whole**
67:23, 101:10,
113:5, 115:3,
115:18, 137:7,
137:25, 138:2,
138:5
**wholly**
124:2
**withdraw**
17:24, 121:6
**within**
33:5, 38:20,
41:19, 42:2,
46:10, 82:23,
85:5, 88:24,
89:1, 95:4,
98:5, 98:6,
99:16, 103:6,
122:6
**without**
26:10, 30:23,
61:24, 78:18,
91:12, 98:2,
109:20, 123:20,
132:6
**witness**
26:6, 27:23,
31:15, 36:18,
37:19, 39:10,
42:13, 45:25,
50:10, 50:14,
53:10, 53:14,
54:21, 58:7,
60:9, 66:12,
66:18, 68:16,
70:10, 79:21,
79:23, 82:18,
97:24, 103:2,
105:25, 113:14,
113:18, 113:21,
113:24, 114:22,
127:14, 127:18,

127:22, 135:8,
138:2, 141:7,
147:9, 148:6,
148:17, 149:12,
151:14
**witness's**
148:23
**women**
2:6, 5:2,
91:10, 145:21
**wondering**
135:18
**word**
55:1, 83:9
**words**
35:22, 36:3,
38:6, 38:7,
38:8, 83:10
**work**
20:9, 20:17,
21:4, 22:4,
26:4, 26:6,
26:10, 27:21,
28:1, 39:15,
40:6, 40:10,
40:15, 41:3,
41:12, 60:8,
60:10, 61:23,
61:25, 62:16,
72:20, 77:1,
82:14, 82:15,
85:22, 87:2,
90:1, 90:19,
91:25, 96:18,
97:7, 97:23,
98:1, 98:3,
100:9, 102:20,
103:1, 103:2,
104:12, 106:1,
106:12, 110:2,
111:21, 118:6,
123:14, 126:7,
126:13, 127:18,
127:21, 131:10,
133:12, 133:15,
141:6, 147:8,
147:10
**worked**
20:3, 22:19,

23:7, 23:10,
67:19, 71:18,
85:13, 88:10
**workers**
111:13, 113:3,
115:7, 115:12
**working**
62:13, 70:6,
71:7, 78:14,
79:5, 79:11,
94:2, 113:17,
114:7, 115:22
**works**
40:18, 40:21,
41:23, 48:24,
48:25, 85:19,
149:24
**worries**
58:10
**wouldn't**
61:4, 101:20
**write**
27:2, 60:18
**writes**
111:5
**writing**
61:16
**written**
26:20, 26:24,
35:25

**Y**

**yeah**
32:24, 54:1,
57:25, 71:13,
72:14, 74:16,
80:3, 83:23,
85:17, 86:19,
86:21, 87:2,
90:11, 91:14,
92:24, 96:2,
105:6, 105:9,
105:13, 106:2,
106:16, 106:20,
107:1, 107:8,
108:21, 108:22,
109:17, 111:16,
111:18, 112:13,

113:10, 114:15,
114:21, 114:22,
114:23, 116:6,
117:12, 118:8,
118:25, 120:5,
121:12, 122:8,
123:22, 124:6,
124:8, 124:10,
126:21, 127:4,
127:7, 127:23,
128:12, 128:14,
129:19, 129:20,
131:19, 132:12,
133:16, 133:20,
134:3, 135:2,
135:16, 135:18,
137:8, 138:1,
138:12, 140:17,
143:1, 145:16,
146:17, 147:11
**year**
73:19, 133:6
**years**
16:7, 20:5,
20:20, 112:3
**york**
4:9
**yourself**
25:13, 55:5,
56:8, 82:1
**youth**
1:6

**Z**

**zack**
12:14
**zoom**
17:19

**$**

**$50,000**
105:14, 105:19,
106:10

**0**

**00**
126:20
**000001**
70:12

**000594**
66:20
**000859**
68:17
**001069**
34:6
**001117**
36:19
**001118**
37:11, 37:20
**001376**
39:12
**01**
9:6
**0177**
4:19
**05**
1:22

**1**

**1**
1:24, 126:20,
127:25, 128:1,
149:25
**10**
1:22, 13:18,
39:11, 39:14,
128:9, 129:8
**10004**
4:9
**107**
12:7
**11**
13:19, 25:6,
29:24, 44:18,
62:24, 77:12,
77:17, 77:19,
130:22, 131:6,
133:24, 136:24,
139:19, 145:13,
146:9, 146:18
**1101**
5:6
**1168**
10:9
**119**
10:16
**12**
6:6, 25:7,

**62:23, 127:25**
**1200**
8:6
**125**
4:7
**13**
29:23, 29:25,
55:17, 63:24,
94:17, 95:1,
143:25
**13001**
6:16
**14**
5:6, 56:7,
63:24, 94:18,
95:4, 128:9,
129:7
**15**
13:3, 25:7,
71:23, 144:11
**1500**
9:15
**151**
1:24
**16**
107:14, 138:7
**1700**
4:16
**1715**
10:7
**18**
4:8
**184**
81:14
**19**
1:21, 151:16
**1d**
143:13
**1e**
91:23
**1f**
56:6, 56:8,
56:12
**1st**
6:6

**2**

**20**
67:12

**200**
9:16
**20001**
5:17
**20005**
5:8
**2010**
21:12
**202**
5:9, 5:18
**2020**
70:21, 71:3,
71:17
**2022**
66:7, 95:3,
115:9
**2023**
1:21, 59:4,
67:13, 88:8,
151:16
**2024**
143:18, 144:12
**2027**
151:17
**204**
7:16
**206**
4:19
**21**
151:17
**2100**
4:17
**212**
4:10
**2127**
8:9
**215**
1:10, 2:10,
130:2
**216**
1:11, 2:11,
145:21
**218**
1:12, 2:12,
15:13
**22**
64:4, 64:10,
65:21

**224**
9:18
**23**
1:10, 1:11,
1:12, 2:10,
2:11, 2:12,
15:13, 130:2,
135:25, 145:21
**239**
10:9
**25**
127:25, 128:1
**250**
5:15
**2500**
4:10
**26**
59:4
**266**
5:9
**27**
11:16, 77:17
**270**
10:19
**2707**
7:6, 11:6
**272**
11:18
**2925**
7:15

---
**3**
---

**30**
24:9, 77:12,
81:2, 127:20
**315**
8:16
**32207**
8:8
**32301**
10:18
**32308**
9:17
**32399**
9:7, 12:8
**32601**
6:7
**32803**
7:7, 11:7

**33**
13:22, 66:19,
66:21
**33410**
7:17
**3354**
8:19
**33602**
11:17
**33756**
8:18
**33773**
6:17
**33901**
10:8
**34**
13:23, 68:16,
68:19
**344**
10:9
**35**
13:24, 70:10,
70:13
**352**
6:8
**36**
13:20, 54:21,
56:14
**3635**
9:8
**3664**
12:9
**37**
13:21, 55:12,
55:13, 77:17,
77:19, 93:3
**374**
6:8
**38**
13:25
**387**
143:14
**39**
14:1
**390**
93:10
**398**
105:10

**3prvos**
35:6
**3pvro**
13:20, 54:22,
56:13, 56:20,
57:15, 89:13,
94:2, 102:21,
105:3, 108:16,
108:24, 118:4,
119:23, 121:21,
122:12, 130:12,
133:1, 136:6,
136:16, 136:24,
138:8, 138:22,
140:14, 140:23,
140:24, 141:16,
141:21, 144:2,
144:8
**3pvros**
23:4, 23:8,
23:13, 35:5,
35:17, 54:15,
57:12, 58:20,
58:22, 60:6,
62:13, 63:1,
63:7, 63:12,
63:20, 70:6,
71:7, 71:19,
78:14, 79:5,
79:11, 83:2,
84:5, 84:10,
84:18, 85:1,
85:25, 91:24,
104:8, 104:16,
105:20, 106:11,
110:14, 123:11,
125:3, 125:25,
128:8, 141:19,
144:18

---
**4**
---

**40**
14:2, 137:8
**400**
5:7, 5:16
**407**
7:8, 11:8
**4070**
9:18

**41**
14:3
**413**
144:11
**414**
9:8, 12:9
**42**
14:5
**432**
107:2
**442**
128:16
**449**
128:17
**464**
6:18, 8:19
**4700**
7:18
**498**
5:18
**4:-cv**
15:13
**4:-cv--mw**
1:10, 1:11,
1:12, 2:10,
2:11, 2:12
**4th**
43:14

---
**5**
---
**50**
128:7
**500**
10:17
**506**
121:14, 123:24
**5150**
7:8, 11:8
**518700**
1:23
**5218**
6:8
**549**
4:10
**55**
127:25
**561**
7:18

**5670**
11:18
**57**
81:21
**5747**
5:9
**5751**
6:18
**58**
149:25
**5938**
10:19
**5a**
130:11

---
**6**
---
**601**
11:15
**626**
7:18
**656**
4:19
**6th**
8:17

---
**7**
---
**70**
128:7
**7050**
13:21, 30:17,
30:19, 31:5,
31:9, 31:10,
31:19, 32:1,
32:13, 32:17,
32:20, 33:5,
33:10, 33:16,
33:22, 34:15,
37:6, 37:10,
39:3, 42:8,
43:14, 43:17,
43:19, 44:4,
45:22, 46:9,
47:25, 49:18,
49:25, 50:8,
50:25, 51:9,
52:4, 52:17,
52:20, 53:20,
54:11, 55:15,

56:12, 57:6,
64:9, 65:21,
66:7, 78:3,
78:12, 78:23,
83:3, 83:12,
87:9, 88:1,
91:17, 91:23,
93:8, 94:6,
105:3, 106:23,
121:18, 128:7,
128:24, 135:9
**727**
6:18, 8:19

---
**8**
---
**80**
13:4
**800**
8:7
**807**
8:9
**813**
11:18
**850**
9:8, 9:18,
10:19, 12:9
**8556**
5:18
**897**
7:8, 11:8

---
**9**
---
**9.0575**
143:13
**90**
16:17, 22:19,
84:1, 84:16
**904**
8:9
**91**
13:5
**97.0575**
55:19, 56:19,
91:23, 130:11
**98101**
4:18