# EXHIBIT 5



# Transcript of Robert M. Stein, Ph.D.

**Date:** January 3, 2024
**Case:** Florida State Conference of Branches, et al. -v- Byrd

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1                 UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF FLORIDA

3                    TALLAHASSEE DIVISION

4    FLORIDA STATE CONFERENCE          :

5    OF BRANCHES AND YOUTH             :

6    UNITS OF THE NAACP, et al.,       :

7                         Plaintiffs,:

8       v.                        :Case Nos.

9    CORD BYRD, in his official    :4:23-cv-215-MW/MAF

10   capacity as Florida Secretary :4:23-cv-216-MW/MAF

11   of State, et al.              :4:23-cv-218-MW/MAF

12                       Defendants.:

13                       -----------

14            Videoconference Deposition of

15               ROBERT M. STEIN, Ph.D.

16               Wednesday, January 3, 2024

17               9:07 a.m. Eastern Time Zone

18

19

20

21

22

23   Job No.:  518912

24   Pages:  1 - 304

25   Reported By:  Dawn M. Hart, RPR/RMR/CRR

1       Pursuant to Notice, before Dawn M. Hart,

2   RPR/RMR/CRR and Notary Public.

3                A P P E A R A N C E S

4       ON BEHALF OF THE AMERICAN CIVIL LIBERTIES

5       UNION PLAINTIFFS RE HISPANIC FEDERATION V.

6       BYRD CASE ENDING IN 218:

7           MEGAN C. KEENAN, ESQUIRE

8           VOTING RIGHTS PROJECT

9           915 15th Street, Northwest

10          Washington, DC 20005

11          (740) 632-0671

12      ON BEHALF OF THE FLORIDA NAACP PLAINTIFFS:

13          MINDY JOHNSON, ESQUIRE

14          MAKEBA RUTAHINDURWA, ESQUIRE

15          ELIAS LAW GROUP LLP

16          700 13th Street, Northwest, #600

17          Washington, DC 20005

18          (202) 968-4490

19

20

21

22

23

24

25

```
 1            A P P E A R A N C E S (Continued)

 2        ON BEHALF OF THE DEFENDANT FLORIDA SECRETARY

 3        OF STATE:

 4              JOSHUA PRATT, ESQUIRE

 5              HOLTZMAN VOGEL BARAN

 6              TORCHINSKY & JOSEFIAK, PLLC

 7              119 South Monroe Street, Suite 500

 8              Tallahassee, Florida 32301

 9              (850) 879-3339

10    OTHER PARTICIPANTS:

11        Frank Mari, Esquire re Defendants Supervisors

12        of Elections for Brevard, DeSoto, Flagler,

13        Gilchrist, Highlands, Jefferson, Madison

14        Counties

15        Dayton Campbell-Harris re Hispanic

16        Federation, Staff Attorney, Voting Rights

17        Project, ACLU, (425) 516-8400

18        Stephanie A. Morse, re Florida Attorney

19        General, Special Counsel, Complex Litigation

20        Office of the Attorney General, PL-01 The

21        Capitol, Tallahassee, Florida 32399-1050

22        (850) 414-3664

23

24

25
```

```
1          A P P E A R A N C E S (Continued)

2    OTHER PARTICIPANTS:

3        Bob Swain re Kim Barton, Supervisor of

4        Elections for Alachua County, Deputy

5        County Attorney, Alachua County Attorney's

6        Office, 12 SE 1st Street, Gainesville,

7        Florida 32601, (352) 374-5218

8        Jerry Olivo re Glades, Hardee, Hendry,

9        Holmes, Levy and Okeechobee County SOEs

10       Henderson, Franklin, Starnes & Holt, P.A.

11       1715 Monroe Street, Fort Myers, Florida

12       33901, (239) 344-1168

13       Sarah Jonas re Volusia County Supervisor

14       of Elections, Lisa Lewis, Assistant

15       County Attorney, 123 W. Indiana Avenue,

16       DeLand, Florida 32720

17       (386) 736-5950

18       Jared D. Kahn re Julie Marcus, Pinellas

19       County Supervisor of Elections

20       Matt Smith, Pinellas SOE

21

22

23

24

25
```

```
 1          A P P E A R A N C E S (Continued)

 2     OTHER PARTICIPANTS:

 3          Noah Sjostrom re Florida Attorney General

 4          Office of Florida Attorney General

 5          Assistant Attorney General, General

 6          Civil Division - Complex Litigation

 7          PL-01 The Capitol, Tallahassee 32399-

 8          1050, (850) 414-3635

 9          Stephen M. Todd, Sr. Assistant County

10          Attorney, Litigation Division, Hillsborough

11          County Attorney's Office, 610 E. Kennedy

12          Boulevard, 27th Floor, Tampa, Florida

13          33602, (813) 272-5670

14          Ben Koon, Esquire re Palm Beach County

15          Supervisor of Elections, The Markarian Group,

16          2925 PGA Boulevard, Suite 204, Palm Beach

17          Gardens, Florida 33410, (561) 626-4700

18          Dale A. Scott re Citrus SOE, Roper, P.A.,

19          255 South Orange Avenue, Suite 750, Orlando,

20          Florida 32803, (407) 897-5150

21          Shilpa Jindia

22          Brent Ferguson

23          Leigh Rosenbloom

24          Christi Hankins

25
```

1                    C O N T E N T S

2    EXAMINATION OF ROBERT M. STEIN, Ph.D.        PAGE

3         By Ms. Keenan                            8

4         By Ms. Johnson                         167

5         By Ms. Keenan                          285

6                    E X H I B I T S

7         (Exhibits attached to the transcript.)

8    R. STEIN DEPOSITION EXHIBITS                PAGE

9     Exhibit 1     Deposition Notice re Stein    12

10    Exhibit 2     Stein-Alford Expert Report    18

11    Exhibit 3     Smith Expert Report           57

12    Exhibit 4     Smith Rebuttal Expert         57

13                  Report

14    Exhibit 5     Herron/Smith paper re        103

15                  HB 1355

16    Exhibit 6     Grimmer/Hersh paper How      139

17                  Election Rules Affect Who

18                  Wins

19    Exhibit 7     Grimmer paper Obstacles to   156

20                  Estimating Voter ID Laws'

21                  Effect on Voter Turnout

22    Exhibit 8     Cantoni paper Strict ID      159

23                  Laws Don't Stop Voters

24    Exhibit 9     (Not Marked)                 --

25

```
 1            E X H I B I T S  (Continued)

 2         (Exhibits attached to the transcript.)

 3    R. STEIN DEPOSITION EXHIBITS              PAGE

 4     Exhibit 10   Stein transcript re Arizona   29

 5                  case 10/26/23

 6     Exhibit 11   (Not Marked)                  --

 7     Exhibit 12   Stein Expert Report re        65

 8                  Virginia v. Brink case

 9     Exhibit 13   Lichtman Expert Report       188

10     Exhibit 14   Herron Expert Report         204

11     Exhibit 15   Herron Rebuttal Report       217

12     Exhibit 16   Joshua Douglas paper         286

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2                   ROBERT M. STEIN, Ph.D.

3           being first duly sworn or affirmed to

4    testify to the truth, the whole truth, and nothing

5    but the truth, was examined and testified as

6    follows:

7      EXAMINATION BY COUNSEL FOR THE AMERICAN CIVIL

8                  LIBERTIES UNION PLAINTIFFS

9    (HISPANIC FEDERATION V. BYRD CASE ENDING IN 218)

10   BY MS. KEENAN:

11       Q    Good morning, Dr. Stein.  We're now on

12   the record.  It's January 3rd, 2024, at 9:07 a.m.

13   Thank you so much for being here today.  Just to

14   introduce myself, my name is Megan Keenan.  I'm

15   part of the team of attorneys who represent the

16   Plaintiffs and Hispanic Federation versus Byrd,

17   and I'll be one of the attorneys questioning you

18   today.

19           Dr. Stein, how many times have you been

20   deposed before?

21       A    Several.  I'd say at least -- in my

22   lifetime time?  20.

23       Q    Okay.

24       A    More recently my resume indicates

25   probably a dozen.

1      Q    Okay.  So I'm sure you're generally

2   familiar, but I just want to walk through a couple

3   of ground rules as a reminder for today's

4   deposition.  First, everything is being

5   transcribed, so we need to speak clearly, give

6   verbal answers, and make sure we aren't speaking

7   over each other.  Does that sound okay to you?

8      A    Yes.

9      Q    All right.  There are a lot of lawyers

10  here attending for other parties, including the

11  Defense counsel who retained you.  They, of

12  course, have the right to object to my questions

13  as we go, so if Defense counsel or others on this

14  Zoom call start speaking when I complete a

15  question, please give them a moment to get any

16  objections on the record.

17         Once those objections are stated, you

18  should typically answer whatever question I've

19  posed unless I withdraw it or your counsel

20  specifically instructs you not to answer the

21  question.  Does that sound okay to you?

22     A    Yes.

23     Q    Okay.  If at any point you don't

24  understand a question that I ask, please do tell

25  me and I'll try to explain or rephrase it.  If you

1    don't tell me that you don't understand the

2    question, I will assume that you do understand it.

3    Does that work for you?

4         A    Yes.

5         Q    Okay.  If you need a break at any point,

6    just say so, we'll do our best to accommodate as

7    long as there's not a question pending.

8              I have a couple of questions about the

9    remote deposition setup because we're in separate

10   rooms.  So is anyone in the room with you now?

11        A    No.

12        Q    It looks like you have a computer screen

13   in front of you to appear via Zoom.  Can you tell

14   me how many screens you have up in front of you?

15        A    One.

16        Q    And is there anything other than this

17   Zoom program open on your computer screen?

18        A    Yes, my report, and the report of the

19   different experts for the Plaintiff.

20        Q    Okay.  Do those reports have any

21   annotations other than the things that were, you

22   know, submitted in the reports themselves?

23        A    No.

24        Q    Okay.  Do you have your email or any

25   Chat or messaging program open?

1      A     They're in, yeah, they're open on the

2  bottom.

3      Q     Okay.  During the deposition, we'd ask

4  that you keep the email and the Chat messaging

5  systems off the screen just as a matter of form.

6  And same with any smartphone you may have in the

7  room, if you can keep that aside while we're on

8  the record.  Can we agree to that for the day?

9      A     Yes.

10      Q     Can you think of any reason why you

11  might not be able to understand and respond

12  accurately and truthfully to my questions today?

13      A     No.

14      Q     All right.  I'm going to share my screen

15  so we can talk through some Exhibits.  I'll also

16  make sure I drop them in the Chat because I didn't

17  see any sort of an upload function prior to this

18  deposition.

19           So first I will share my screen.  Are

20  you able to see this clearly?

21      A     Yes.

22      Q     All right.  Great.  And I will drop

23  what's been premarked as Exhibit 1 into the Chat

24  here.

25

1          (Exhibit 1 was marked for identification

2    and is attached to the transcript.)

3        Q    Do you recognize this as the Deposition

4    Notice you received in this case?

5        A    Yes.

6        Q    Okay.  Did you do anything to prepare

7    for today's deposition?

8        A    Yes.

9        Q    What did you do to prepare for the

10    deposition?

11        A    I reread my report with Professor

12    Alford, I reread the Plaintiffs' experts' reports,

13    their rebuttal reports.  I had a meeting with Josh

14    on Friday, went over SB 7050 again, reread

15    sections of it -- oh, and spoke with John Alford,

16    my colleague, and that's it.  That's pretty much

17    it.  I've been over the reports several times

18    since, I think Friday, yes, before New Year's.

19        Q    That's helpful.  I have a couple of

20    follow-up questions about that.  You mentioned

21    that you spoke with counsel on Friday.  Was that

22    the only time you spoke with counsel on behalf of

23    this deposition?

24        A    I believe so.  I've had conversations

25    with counsel before, but specifically regarding

1  the deposition, we met Friday and went over many

2  of the same things you just asked me, you know,

3  don't talk over, things like that.

4      Q    Great.  How long was that meeting in

5  total, to the best of your recollection?

6      A    I'd say about an hour, hour and 15

7  minutes.

8      Q    Okay.  And was it just -- you mentioned

9  Josh.  Was anyone else present at that meeting?

10     A    It was another attorney, and I

11  apologize, I don't remember his name, and there

12  was, of course, John Alford.

13     Q    That's no problem.  Okay.  Other than

14  the people we've already discussed, and we'll talk

15  more about Dr. Alford later, have you spoken with

16  anybody else about today's deposition?

17     A    No.

18     Q    Since submitting your report, did you do

19  any independent research or internet searches

20  about this case?

21     A    I read the Plaintiffs' experts' rebuttal

22  reports, specifically Professor Herron's and

23  Professor Smith's.  I reread articles they cited

24  in those reports, but I didn't do any internet

25  searches.  Oh, I did reread, and with Josh's

1   assistance, some of the Secretary of State's, I

2   don't know if they're called rulings or

3   recommendations or directives, regarding aspects

4   of SB 7050 implementation issues so that I was

5   familiar with those.

6       Q   Okay.

7       A   And I did read those.  I didn't do a

8   search for those, though, I think Josh provided me

9   with information that clarified the law and its

10   implementation.

11       MR. PRATT:  And, Professor, I'd also

12   just ask, moving forward, for any conversations we

13   had or any other documents produced by counsel,

14   that we would please refrain from referring to

15   those if we could.  Thank you.

16       Q   Just to make sure I understand what --

17       MS. KEENAN:  And if you want to object

18   to privilege or anything, please let me know.

19       Q   -- but are we talking about the

20   rule-making documents?  Does that sound familiar?

21   Maybe rules promulgated by the Agency that you may

22   have reviewed, Dr. Stein?

23       MR. PRATT:  We'll object to privilege.

24   This is just part of general information,

25   background for the case, just so the doctor is

1    aware.

2        Q    Okay.  Did you rely on that information

3    in coming to your conclusions in this case in any

4    way?

5        A    I don't think I relied on them.  They

6    clarified information, but I don't think they in

7    any way changed or altered or were the basis of my

8    report.

9        Q    Did you request to see that information?

10        MR. PRATT:  Objection.  Privilege.

11   Communications between the parties' attorney and

12   their experts are beyond the scope of, you know,

13   what's able to be looked into.

14        MS. JOHNSON:  I definitely understand,

15   and I don't want to tread on anything privileged,

16   but I do think it's important to know what

17   information the expert needed to come to his

18   conclusions in this case.

19        So I'm just trying to get to the bottom

20   of whether Dr. Stein believed that information was

21   necessary to advance his conclusions in this case.

22        Q    Maybe it's helpful to ask, did you

23   request to receive that information before, or

24   after you submitted the report in this case?

25        A    No.

1        Q     Okay.  I was trying to get at the

2   temporal nature.  Did you review that information

3   before you submitted the report in this case?

4        A     No.

5        Q     Okay.  Thank you, that's helpful.

6              Do you know how many hours you've spent

7   working on this case?

8        A     I could look it up, but I would say at

9   least 40 hours in total, not including today's

10  deposition.

11       Q     Okay.  And do you have a general sense

12  of how that time has been spent to sort of break

13  down those 40 hours into component parts?

14       A     Yeah.  I mean I have a, I submit a time

15  sheet to the attorneys which details the nature of

16  my work.

17       Q     Okay.  Have you submitted any bills in

18  this case to date?

19       A     Yes.

20       Q     And the report mentions that the

21  compensation in this case is $600 an hour.  Is

22  that the rate for each of you, or is that rate

23  divided between you and Dr. Alford?

24       A     That's for each of us.

25       Q     Okay.  Are you aware of how much you've

1    been compensated for this case to date?

2        A    I have submitted, I'd have to look at my

3    spreadsheets, but I have not received any

4    compensation to date.  I just submitted, you know,

5    time sheets before the end of the year.

6        Q    Okay.  Is $600 an hour your typical

7    compensation rate?

8        A    It is now, yes.

9        Q    And when did that rate go up?

10        A    I'd say sometime in October, November,

11    in another case that I was working on.

12        Q    Okay.  At this point, though, $600 is

13    your standard hourly rate.  Do you ever charge

14    more or less in a case these days?

15        A    I have charged less, I've not charged

16    more.

17        Q    And why would you charge less than your

18    typical rate in a case?

19        A    I would say that the rate has a linear

20    and positive --

21        Q    Oh.

22        A    I don't have a differential rate at this

23    time.

24        Q    That's helpful.  Thank you.

25             I'm next going to share what's been

1    premarked as Exhibit 2, and I'll also put this

2    into the Chat for folks to see.

3            (Exhibit 2 was marked for identification

4    and is attached to the transcript.)

5        Q    Do you recognize this as the report that

6    you and Dr. Alford submitted?

7        A    Yes.

8        Q    And on Page 22 of this report, I believe

9    you attached your CV.  Does that look right to

10   you?

11       A    Yeah.  I mean that's not my CV.  Little

12   lower.  Yes, that's it.

13       Q    Okay.  So starting on Page 23, we see a

14   Curriculum Vitae up at the top.  It looks like

15   this was submitted current as of June 2023.  Does

16   this CV still accurately summarize your education,

17   work experience and qualifications?

18       A    Yeah.  I am sure there are some

19   additional publications since June that are not

20   listed.

21       Q    Did you prepare this CV?

22       A    Yes.

23       Q    It sounds like there may be some

24   updates, but are you aware of anything that's

25   incorrect in this CV to start?

1        A     No, not incorrect.  Probably incomplete.

2        Q     Okay.  And you mentioned that there may

3    be some publications that need to be added.  What

4    about in your litigation experience, anything

5    about your work as an expert witness that needs to

6    be added since June of 2023?

7        A     I think it's complete.  I'd have to

8    scroll down for me to doublecheck, and I think

9    those are at the end of the resume, but -- I think

10   this one is pretty up to date, but I'm not

11   positive.

12       Q     Okay.  Great.  We'll scroll down there

13   in a minute.  I want to make sure we focus on the

14   first page here first.

15             First, are each of the degrees you

16   mentioned here in political science?

17       A     Yes.

18       Q     You list a number of fields of

19   specialization below the educational background

20   including elections and election administration.

21   Can you describe what you mean by fields of

22   specialization?

23       A     Those are the fields in which I conduct

24   research and publish, the journals to which I

25   submit my articles and publications generally

1    cover those topics, and those also cover the

2    subject matters I teach.

3        Q    Okay.  And are those fields you've

4    listed terms of art, or are they just descriptions

5    in your own words about your areas of

6    specialization?

7        A    I think they -- in the American

8    Political Science Association listing of fields,

9    these are common names.  And common --

10        Q    Okay.  And so can you describe what you

11    mean when you say that one of your fields of

12    specialization is elections and election

13    administration?

14        A    It's the conduct -- election sciences,

15    election administration is the conduct of

16    elections which touches on how, where, when and

17    under what conditions individuals cast ballots in

18    elections, how those elections are administered,

19    equipped, staffed, and how outcomes are determined

20    in terms of counts.

21        Q    Of course, I think we both understand

22    that's a pretty broad field.  Are there areas

23    within elections and elections administration that

24    have been a particular focus of your work, or do

25    you really cover the full gamut?

1      A      I guess modes of voting are one area

2    that I have -- again, you have to talk to my

3    colleagues, but I'm probably best known for my

4    work on election day vote centers, early voting,

5    mail-in voting, mechanisms like voting equipment.

6    I have done work on voter turnout, and I have also

7    published papers on how to evaluate elections,

8    which is what we would loosely call in the broader

9    field policy evaluation.  Do we know that an

10   election method, election machine, voting scheme

11   does what it's supposed to do, and why, if it

12   doesn't, what are the factors that might mitigate

13   outcomes, desired outcomes.

14      Q      You list a number of different fields of

15   specialization here.  How long has elections and

16   election administration specifically been one of

17   your fields of specialization?

18      A      That's a good question.  I would say

19   since the, since -- I've been teaching elections

20   since I took my Ph.D., but election

21   administration, I would say for the last 25 to 30

22   years.  That is, if you look at my Vitae, you'll

23   see publications on this topic starting probably

24   in 1994.  The first paper I wrote was called Early

25   Voting:  An Introduction, which I think speaks for

1    itself, both myself and the topic.

2         Q    Great.  You've mentioned early voting,

3    vote centers, voter turnout.  How much work have

4    you done specifically on voter registration

5    issues?

6         A    I would say that's not an essential

7    focus, but it's almost impossible to study

8    election administration and not have studied voter

9    registration.

10             I have probably several published and

11   unpublished and book chapters, articles that touch

12   on the issue of voter registration, but I wouldn't

13   say that it is a -- I'd say it's probably about a

14   fifth to maybe a third of my work.  It's just hard

15   not to study voter registration when you're

16   looking at voter turnout, for instance.

17        Q    Sure.  In your CV, you've listed at

18   least some of your, you know, publications, your

19   research grants, that sort of thing.  Are any of

20   the ones listed in here relating to registration

21   specifically?

22        A    You'll have to go down a little bit.

23   Those are my -- keep on going, keep on going.

24   Slow down.

25             There's a paper, look at the fourth one

1  down, called How to Measure and Assess Turnout

2  Effects of Election Reforms that I'd say is

3  probably, you know, a paper that has garnered, and

4  it's a recent paper with my graduate student

5  Andrew Menger, but that touches on all aspects of

6  voter registration, voter turnout.  It's a broad

7  paper that has been cited as how we should

8  evaluate any of these election reforms, and we go

9  through a lot of discussion on voter registration.

10       Q    Okay.  Is it fair to say that you're

11  typically looking at voter registration as one

12  element of voter turnout, or do you study voter

13  registration in and of itself as well?

14       A    It's a hard, I don't mean to be evasive,

15  but that's a hard, I mean that's an interesting

16  question.

17            Is there an article that I have

18  published solely on voter registration?  I've

19  written papers on voter registration as it affects

20  turnout.  I can't think of a paper that I've

21  written in this list here that solely looks at

22  registration and not as it has consequences for

23  voter participation.

24       Q    Okay.  I'm going to keep going down to

25  the recent expert testimony that we touched on

1  briefly earlier.

2          So this is on Page 35 of Exhibit 2,

3  which is labeled Page 13 of the CV.  If you can

4  take a look at this recent expert testimony

5  section first and let me know if there's anything

6  missing since June 2023, that would be really

7  helpful.

8      A    No.  That covers everything I've done

9  since, as I said, 2014.  There are cases which

10  I've been an expert witness in before 2014, but I

11  can't honestly remember any of them pertaining to

12  elections or election administration.

13      Q    Okay.  I guess to follow-up on that, how

14  long have you been doing work as an expert witness

15  in total, including unrelated to elections?

16      A    Probably since 1980, 1979, but there was

17  probably a hiatus.  You'll see on my resume I was

18  a Chair and academic Dean, so there was a big, I

19  think hiatus would be the right word, in which I

20  didn't do very much work in expert witnessing.

21      Q    And you mentioned some of that earlier

22  work was not, to the best of your recollection,

23  about elections.  What other subject matter have

24  you testified about as an expert?

25      A    My other area of expertise, I suppose,

1    is survey research.  And I conducted a large

2    number of surveys dealing with a wide range of

3    topics.  The one that comes to mind were nuclear

4    power plant citings, emergency preparedness,

5    evacuations from hurricanes; something I'm sure

6    you in Florida appreciate.  But to my

7    recollection, virtually all of it was based on

8    work that I was asked to do because of my skills

9    at doing public opinion surveys.

10        Q    Okay.  You mentioned that your

11    election-related expert testimony began around

12    2014.  In that time, since 2014, have you been an

13    expert for a Plaintiff in a voting rights case?

14        A    Yes.

15        Q    Do you have a sense of a breakdown of

16    what percentage of time you do work for Plaintiffs

17    or Defendants in voting rights cases?

18        A    I don't.  I mean I'd have to sit down

19    and kind of work it through, but to the question

20    you specifically asked me, and I'm going to make

21    certain I have it here.

22             Oh, there it is, expert report in the

23    case of Virginia Elizondo and Spring Branch,

24    that's the Plaintiff in that case.  But I, you

25    know, again, I'd have to go back through here.

1    Most of these I've worked for municipal and state

2    jurisdictions.

3        Q    Okay.  That was going to be my next

4    question, actually.  Do you know how much of your

5    work has been on behalf of government entities or

6    officials as a rough percentage?

7        A    You know, again, if I count, I'd have

8    to, you know, you can see, I have worked for -- 1,

9    2 -- so 1, 2, 3, 4, 5, 6, 7, 8, 9 -- I'd say

10   probably 60/40, 70/30 I've represented states.

11   And in the, I think there are two here I've

12   represented individuals or Plaintiffs.  Does -- is

13   the NAACP one not on here?

14            I apologize.  I've omitted several here

15   that I have forgotten about.  I was the expert

16   witness in the NAACP lawsuit -- oh, there it is.

17   If you press me, I'd say it's probably getting now

18   closer to 50/50, Jayla Allen versus Waller

19   County --

20       Q    Oh, I see.

21       A    -- was the expert for the NAACP Legal

22   defense.  I was the expert, and continue to be the

23   expert, in the Spring Branch Independent School

24   District case.  I was the expert in the State of

25   Pennsylvania's lawsuit defending then-President

1    Trump.

2            I'd say close to 50/50.  And what I

3    didn't mention, you might want to look at the

4    bottom where it says consultant.

5        Q    Uh-humh.

6        A    In many instances, I was brought in by

7    different foundations to represent individuals who

8    were negotiating, not lawsuits, but negotiating

9    with local governments in the design,

10   implementation of election procedures, vote

11   centers, early voting, voter registration, and

12   purchasing of voting equipment.

13       Q    Okay.  Got it.  It sounds like it's been

14   a solid mix; is that fair?

15       A    Yeah.

16       Q    Okay.

17       A    I -- yes.  My view is that I tend to

18   take the cases on the basis of what I think I can

19   make a useful contribution to.

20       Q    Okay.  How many of the cases you've

21   worked on have involved laws that specifically

22   restrict voter registration efforts?

23       A    The Mark Wandering Medicine case, the

24   Thomas Poor Bear case.  The Virginia case

25   challenging the State's ballot access actually

1    ended up involving much more voter registration.

2           Let me look at the other one.  The

3    Arkansas versus Arkansas United, that involved

4    aspects, all aspects of elections, including voter

5    registration.

6       Q    You mentioned that Democratic Party of

7    Virginia versus Spring case and how that ended up

8    involving a lot of registration work.  Could you

9    tell me a little bit about what you were asked to

10   analyze in that case?

11      A    Yeah, it was an interesting one.  It

12   involved the requirement of a full, help me here,

13   nine-digit Social Security ID.  I think Virginia

14   and one other state right now are the only two

15   states that require that.  And so the issue was

16   whether or not the State should go to an

17   abbreviated shortened Social Security number, and

18   would that involve less registration among

19   targeted populations, non-whites in particular.

20      Q    And do you recall generally the

21   substance of your opinion in that case?

22      A    I'd have to -- I mean there were so many

23   issues there.  I represented the State.  I

24   honestly have to, I'd have to refresh my memory.

25           There were some questions about whether

1    voters knew their nine-digit Social Security

2    number, and whether or not it had an effect,

3    compared to other states which do not require the

4    full Social Security number, on race or

5    registration.

6         Q    I'll represent to you that I haven't

7    been able to find a copy of this report, but I am

8    going to show you what's been premarked as Exhibit

9    10.  This is a previous deposition transcript of

10   yours.  And I'm going to go to Page 40 here just

11   to see if this refreshes your memory on this case.

12             If you could start at Line 9, and then

13   just go ahead and read to yourself, let me know

14   when you get to the bottom of this page and I'll

15   show you a little bit of the next page.

16        A    Yes, okay.

17        Q    I'm going to keep scrolling just a

18   little bit, yeah, just to here.  This is all there

19   is on this case.  Let me know when you've read

20   through Page 41, Line 9 in what's been marked as

21   Exhibit 10.

22             I'm also placing Exhibit 10 in the Chat

23   so folks have access to it.

24             (Exhibit 10 was marked for

25   identification and is attached to the transcript.)

1          A     Okay.

2          Q     And I'm just asking because I haven't

3    been able to see this report.  So when you say you

4    did several analyses to see if giving away your

5    Social Security number was a deterrent to third

6    party registration, do you recall much about what

7    those analyses looked like?

8          A     You know, I'm reading the deposition.

9    Yes, I did several analysis to see if it was a

10   deterrent to third party registration.  That was

11   it.

12              (Reading.)

13              I mean as my deposition indicates, it

14   does refresh my memory, I've looked at data on

15   third party registrations to see whether or not

16   states that required the nine-digit Social

17   Security number had lower or higher or no

18   different rates of third party registration.

19         Q     Okay.  And is that what you mean when

20   you say you did some empirical work to show that

21   it's probably not the case?

22         A     Yes.

23         Q     Okay.  I'm going to go back to Exhibit 2

24   which is your CV.

25              You told us you'd been deposed up to

1    maybe a dozen or so times.  Do you know how many

2    times you've testified at trial as an expert in

3    voting rights cases?

4         A    I was called to a trial this late

5    November/early December, and I was sitting here

6    like we are now, and I was never called.  Is that

7    the right word?  So I spent a whole day with my

8    jacket on, ready, but I was never actually --

9    what's the word?  I wasn't --

10        Q    Called is right.

11        A    Yeah.  I was told to be prepared to

12   testify in an hour, in the Arizona case.  I hope I

13   listed that.  I may have been -- I did not list

14   that, and I do apologize.  That was a very recent

15   case on Arizona's laws -- but I never testified.

16   To the best of my knowledge, the last time I

17   testified at a trial was probably in the mid to

18   late 1980s.

19        Q    So not in an election-related case?

20        A    Not to my recollection, no.  All of my

21   work has been expert reports and depositions.

22        Q    Okay.  And when you say the Arizona

23   case, I'm flipping back to Exhibit 10 briefly, is

24   that the Mi Familia Vota District of Arizona case

25   from 2023 that you see here?

1          A     Yes.

2          Q     And it sounds like you submitted a

3    report, and we can see here you were deposed in

4    that case, but you didn't testify at trial; am I

5    getting that correctly?

6          A     Yes, I was called and I had an airline

7    ticket and I was supposed to be in Arizona, in

8    Phoenix.  Then they said you don't have to fly out

9    but you can do it on Zoom, but I never testified.

10         Q     Okay.  Other than that Arizona case, any

11   other cases that come to mind since this, really

12   between the Brink case and the present, there's

13   only one listed here, in the Vet Voice Foundation

14   case.  Are there any others you can think of?

15         A     This needs to be updated.  I'm also an

16   expert witness in the Colorado lawsuit over

17   signature verification for mail-in voting.

18         Q     Okay.  And were you retained by the

19   State in that case?

20         A     Yes, I was.

21         Q     And the same is true in the Arizona

22   case, or no?

23         A     I'm sorry, I couldn't hear your

24   question.

25         Q     Sorry.  In the Arizona case were you

1  also retained by the State?

2      A    Yes, I was.

3      Q    All right.  Have any parts of your prior

4  testimony or reports been limited by a court?

5      A    Not -- no.

6      Q    Have you ever had any testimony excluded

7  because a court determined that you were not

8  qualified to provide expert testimony on a

9  particular topic?

10     A    No.

11     Q    Has your testimony or report ever been

12 excluded for any other reason?

13     A    No.

14     Q    Has your testimony ever been criticized

15 in a judicial decision to your knowledge?

16     A    Not to my knowledge, no.

17     Q    Were any of the cases that we've talked

18 about today or that appear in your CV with the

19 same counsel you're working for now?

20     A    Mr. Pratt are you referring to and his

21 colleagues?

22     Q    Yes.

23     A    No.

24     Q    Okay.  And so how did you learn about

25 this case?

1      A     Oh, it's a good question.  John Alford,

2   I think, brought me to the attention, or

3   recommended me to the attorneys.

4      Q     And so you received outreach from Dr.

5   Alford before you received outreach from Defense

6   counsel in this case; is that right?

7      A     That's correct.

8      Q     Are you aware of how Dr. Alford came to

9   contact you?

10     A     He said that he was an expert witness on

11  a case in Florida, and that it called for someone

12  who might have knowledge of a literature research

13  on both voter registration and election

14  administration, and he knew of my work and

15  research in the area and thought I might be

16  helpful.

17     Q     When did Dr. Alford contact you, if you

18  remember?

19     A     Say late September, October, maybe.

20  First brought it up, and you know, I could go back

21  and look at my records, but I'd say closer

22  probably to October.

23     Q     So he contacts you around October, and

24  then you submitted this report, I'm just scrolling

25  up now to Page 21, on November 27; is that right?

1       A     That's correct.

2       Q     Do you recall how long after Dr. Alford

3  reached out to you that you began to do the work

4  necessary to form the opinions in this report?

5       A     Again, I'd have look at my time sheets,

6  but you know, I think the -- when John asked,

7  first approached me, he said, would you be

8  interested in and would you be willing or

9  interested in talking to the attorneys so they

10 could understand what they were, what the nature

11 of the case was.

12           The attorney sent me the, I guess the

13 right word is pleadings, you know, the things that

14 you, Plaintiffs filed.  I read those first.  And

15 again, I have to look at my time sheets, I'm sure

16 I talked to the attorneys after that so that I

17 could clarify any questions I might have had.

18           And I probably began, again, I'd have to

19 look at my time sheet, probably late October or

20 early November before I actually started work on

21 writing the report, you know, actually writing it,

22 but obviously I had read a lot before that.

23      Q     Okay.  I'm going to scroll up to the top

24 of the report.  It says this is the expert report

25 of Robert M. Stein, Ph.D., and John R. Alford,

1    Ph.D.  Prior to this report, had you ever

2    submitted a joint report in your expert work in

3    litigation?

4        A    I can only think of one or two that I've

5    done, but yes, I have.  Yes.

6        Q    And who are those reports with, to the

7    best of your knowledge?

8        A    I have to go back, but I did -- the

9    survey research work I have done is always, I say

10   always, I am certain with other colleagues.

11       Q    And when you say survey research work,

12   do you mean survey research work as an expert in

13   litigation, or as an academic, publishing?

14       A    No, no, no, I did, I would say in the

15   '80s and '90s, early '90s I did a good deal of

16   survey research as an expert in cases involving,

17   as I've mentioned before, the citing of a nuclear

18   power plant in south Texas and issues dealing with

19   emergency preparedness and flood control.

20       Q    Okay.  What about since 2014 when you

21   started to shift more toward election-related

22   litigation, any joint reports since then?

23       A    No.

24       Q    How do you know Dr. Alford?

25       A    He's a colleague in my department.

1      Q      Have you worked with him prior to this

2   case?

3      A      Yes.

4      Q      Have you published articles together?

5      A      No, no, we have not.

6      Q      In what capacity have you worked with

7   Dr. Alford prior to this case?

8      A      We were originally, what's the right

9   word, in the Spring Branch lawsuit, we had

10  originally worked on that together, and then were

11  separated when the school district decided to,

12  what's the right word, get a new attorney.

13         We have further worked on redistricting

14  plans for different school districts and

15  municipalities and County governments.

16     Q      And when you say you've worked on, for

17  example, the redistricting cases, do you mean you

18  were both experts retained to work on the same

19  case or that you've worked on parallel cases?

20     A      No, I'm sorry, I misspoke.  We did the

21  redistricting.  We were not experts in lawsuits.

22  We were requested by the jurisdictions to design

23  their, in almost all cases, single member district

24  forms of representation for various, I'd say the

25  overwhelming majority of school districts, some

1     cities and some counties.

2          Q     And so in that capacity, did you work

3     for what I understand to be Dr. Alford's company,

4     it's NDC, right?  Are you familiar with that

5     company?

6          A     I am not.

7          Q     Okay.  Was that in your capacity as a

8     Professor?

9                I know that -- oh, I'm sorry.  I'm

10    thinking of the wrong company.

11               I can withdraw the question about NDC.

12    It's a different expert I have in mind.

13               In what capacity were you two helping to

14    redraw the redistricting plans?  Were you retained

15    by a state or by a municipal body, or can you tell

16    me a little bit about how that worked?

17         A     At the University, we have a variety of

18    centers, but we were approached by the

19    jurisdiction, Spring -- excuse me, City of

20    Houston, Goose Creek School District, and they

21    would call one or both of us.  We've been doing

22    this for, I would say 40 years, so we had a

23    reputation.  And we did it as consulting work.  We

24    did not do it through the University, although the

25    University properly thinks this is an outreach

1    that we should do.

2        Q    Okay.  When you say you've been doing

3    this for 40 years, do you mean with John Alford

4    for 40 years, or that each of you have been doing

5    this for 40 years?

6        A    I'd have to check my records.  I mean

7    I've been at Rice and in Houston since 1979.  I

8    think that's 45 years.  I think I've been doing

9    redistricting in every decennial period since

10   1980.

11           John didn't come to Rice until, I'd have

12   to look at his resume, but I want to say the mid

13   '80s, so if we go back up there and see what year

14   he came to Rice, yeah.

15       Q    Yeah, '85 it looks like.

16       A    '81, yeah, '81.  Oh, God, that's a long

17   time ago.  So we've been working together, I

18   cannot recall all of the ones I did with John and

19   I did by myself or with somebody else, so -- but I

20   would say that if I were to reconstruct, I would

21   say an overwhelming majority of the redistricting

22   cases, projects were done with John.  Sometimes

23   with other people in my department as well.

24       Q    Okay.  I have a couple more follow-up

25   questions.  Just first for, just to make sure I'm

1    reading it right, it looks like he became an

2    Associate Professor at Rice in 1985, right?

3         A    Yes.

4         Q    Okay.  And so since 19 -- had you worked

5    with Dr. Alford prior to 1985?

6         A    Oh, I would think so.  I mean I would

7    think that I was working with him when he came to

8    Rice in 1981.

9         Q    And where are you seeing that he came to

10   Rice in 19 --

11        A    Oh, I'm sorry, I stand corrected, '85,

12   since he came to Rice.  I'm sorry.  He just got

13   his degree.

14             Yeah, I would say '85 is probably the

15   time we started.  But again, I can't imagine, I've

16   known John before he came to Rice, but I don't

17   believe I did any redistricting work with him

18   before he came to Rice.

19        Q    How did you know him prior to him coming

20   to Rice?

21        A    He was, I was aware of his scholarly

22   work.  We met at conferences.  His colleague, or

23   corroborator John Hibbing and I have known each

24   other since we all took our degrees within the

25   late '70s, early '80s.

1      Q    Okay.  Since 1985, do you have a, even a

2  ballpark estimate of how many projects you've

3  worked on with Dr. Alford?

4      A    I would have to guess.  I would say

5  they're in the double digits.

6      Q    More than a dozen?

7      A    Yes.

8      Q    Do you think more than 25?

9      A    I think that might be more at the high

10 end.

11     Q    I guess I'm going to ask this about this

12 specific case rather than all of the other

13 projects, but how did you divide up the work?

14     A    It's -- so I guess --

15          MR. PRATT:  I'm going to object on the

16 basis of privilege.  The witness can answer to the

17 extent that you don't divulge kind of the

18 conversations that you specifically had with

19 Professor Alford as those conversations would have

20 been at the direction of counsel.

21     A    You want to repeat your question?

22     Q    Yeah, I'll make the question more

23 specific, and we can talk about the scoping

24 issues.

25          But I guess the first question I had was

1    did you and Dr. Alford decide who would handle

2    which sections of the report, or did counsel?

3         A    No, Professor Alford and I made that

4    decision.

5         Q    Okay.  Did you take the primary role in

6    researching any, my first question is researching

7    any part of this report?

8         A    I think the, if you can scroll down a

9    little bit for me on the report to, go to about

10   Page 10.

11        Q    Okay.

12        A    Keep on going.  A little further.  Keep

13   on going.  I'm sorry, I apologize.

14        Q    No, it's okay.

15        A    Keep on going, keep on going, keep on

16   going -- no -- keep on going.  You're doing fine.

17        Q    Okay.

18        A    I don't want to take -- stop.

19             (Reading.)

20             This, starting at Page 14 is probably my

21   major -- is that the right word?  This is the work

22   that I brought to the project.

23        Q    So I wanted to talk about what that

24   means.  Starting at Page 14 is the major work you

25   brought to the project is what you just said, and

1    let's start with this section.

2            So Page 14 begins by talking about

3    something in Professor Smith and Herron's report

4    and how it, the report claims that they overlooked

5    two bodies of research.  And then this part of the

6    report goes on to describe two bodies of research.

7            Did you, did you bring to this project

8    the description of those two bodies of work?

9        A    Yes.

10       Q    Okay.  And then beneath those two

11   bodies, the summaries of those two bodies of work,

12   there are a handful of sections, one titled Early

13   Voting on Page 15 of the report, one titled Voter

14   ID Requirement starting on Page 16, and one titled

15   The Conditional Effects of Election Laws on Voter

16   Turnout.  Would you describe each of those three

17   subsections as work that you brought to the

18   project?

19       A    Yes.

20       Q    Going down a bit further, that -- so 14

21   through 20 you would describe as the major work

22   you brought to the project; is that right?

23       A    Yes.  I would say that I was responsible

24   for all of the material and the writing in that

25   section.

1      Q     What, if anything, was Dr. Alford's role

2   in preparing Pages 14 through 20 of this report?

3      A     Well, of course, he obviously read it,

4   made suggestions and edits to the text.

5      Q     Okay.

6      A     And -- oh, I'm sorry.

7      Q     No, you're fine, please.

8      A     And I'd have to check my memory more

9   carefully.  May have made suggestions for

10  inclusion of papers that I may have overlooked.

11     Q     Do you recall whether you accepted any

12  of those suggestions or edits?

13     A     I'm sorry, I couldn't hear you again.

14  You were --

15     Q     Do you recall whether you accepted any

16  of Dr. Alford's suggestions or edits to this

17  portion of the paper?

18     A     I am certain I did, yes.  I don't recall

19  that his edits and suggestions were, what's the

20  right word, were the subject of conversation or my

21  rejection.

22     Q     Did you understand that you had the

23  final say on what made it into this section of the

24  report?

25     A     No.

1      Q    Okay.

2      A    I drafted -- I wrote the section and

3 then shared it with John.  He made comments and

4 suggestions, and we agreed this was what we would

5 submit regarding Pages 14 to 20.

6      Q    And are you aware of which, if any, of

7 the papers are sourcing that was suggested

8 initially by Dr. Alford rather than you in this

9 section of the report?

10     A    I don't.  I mean I'm not being evasive,

11 I just don't.  His -- I don't recall.

12     Q    Okay.  And what about any of the edits

13 that he made beyond sourcing, do you recall any of

14 the specific edits he may have had to the section

15 that you wrote?

16     A    Not that I can recall.  I know there

17 were edits, typos, editorial phrasing, maybe even

18 transposed numbers, but I don't recall

19 specifically.

20     Q    Was that the nature of the edits,

21 though, editorial phrasing, transposing numbers,

22 and perhaps adding sources?

23     A    Yes.

24     Q    Is any portion of Pages 14 through 20

25 primarily written by Dr. Alford?

1        A    No.

2        Q    Okay.  You started on Page 14 when you

3   got to the section, the Effect of Past Election

4   Laws on Voter Turnout, I believe that's where you

5   told me to stop scrolling.  Does that seem right

6   to you?

7        A    Yes.

8        Q    What about at the bottom of Page 13, the

9   header over that section, it's called Cost-Benefit

10  Theories of Voter Registration and Turnout, and

11  there's two paragraphs before you get to the

12  header on Page 14 that says the Effect of Past

13  Election Laws on Voter Turnout.  Who is the

14  primary author of those two paragraphs?

15       A    Professor Alford.

16       Q    Okay.  Did you play any role in drafting

17  those two paragraphs?

18       A    In the drafting, no.

19       Q    And what was your role as to these two

20  paragraphs of the report?

21       A    Of course I read them and made comments

22  and suggested edits, but they were not any more

23  than editorial.

24       Q    Do any of these two paragraphs include

25  opinions that you do not agree with?

1          A      No.

2          Q      What about opinions that you didn't

3    personally reach in this litigation that you would

4    view as Dr. Alford's conclusions as opposed to

5    your own?

6          A      I don't understand.  Can you repeat, or

7    just rephrase that?

8          Q      Sure, I'll rephrase that.

9               The sections that Dr. Alford primarily

10   drafted, are you adopting those opinions as your

11   own, or do you view this as those are Dr. Alford's

12   opinions and Pages 14 to 20 are my opinions?

13               MR. PRATT:  Objection.  Form.

14         A      What I -- as, maybe the global answer

15   would be we coauthored this expert report and the

16   opinions in here are those that I also subscribe

17   to and share with Professor Alford.

18         Q      Okay.  So would you say, is it fair to

19   say you agree with the contents of the entire

20   report?

21         A      Yes.

22         Q      I want to keep going up, though.  I'm

23   going to start at the top so we're not scrolling

24   backwards just to make it a little less confusing.

25               The report begins by explaining your and

1    Dr. Alford's position about Dr. Lichtman's report

2    starting on Page 2, Dr. Herron's report starting

3    on Page 3, and just scrolling a little bit more,

4    Dr. Smith's report beginning on Page 8.

5              Did Dr. Alford draft each of these

6    sections of the report?

7              MR. PRATT:  Object.  Form.

8         A    To the best of my recollection -- let's

9    start off, he wrote the section --

10        Q    We can go one-by-one.  So let's start

11   with Dr. Lichtman.  Do you recall whether Dr.

12   Alford wrote this section of the report?

13        A    He drafted that section of the report.

14        Q    Do you recall whether Dr. Alford had

15   already drafted this section of the report before

16   he called and brought you on to assist with Pages

17   14 to 20?

18        A    I'm sorry, you went too fast here.  Say

19   it again.

20        Q    Sorry about that.

21             Do you recall whether Dr. Alford had

22   drafted this section of the report before he

23   brought you on to help with Pages 14 to 20?

24        A    Not to my knowledge, no.

25        Q    So after Dr. Alford drafted this

1    section, what was your role?

2         A    Well, maybe I should step back a step.

3         Q    Sure.

4         A    In my earlier testimony, I mentioned

5    that when John approached me about the case, he

6    told me the broad parameters.  He then shared with

7    me, with the approval, actually, I think the

8    lawyers, I have to check the email, I think the

9    lawyers sent me a number of documents.  Almost all

10   of them were pleadings or expert reports.

11          Before I agreed, and I think Mr. Pratt

12   will have to verify this, I think before I was

13   even considered as an expert in the case, I had

14   read everything that was sent to me.  That

15   included Mr., Professor Lichtman's report,

16   Professor Herron's report and Professor Smith's

17   report, and the papers that were with them.

18          So I had read Lichtman's report.  I had

19   read Herron's report.  I had read Smith's report.

20   I had read the pleadings in the case.

21        Q    Sure.  And I think what I was trying to

22   ask is, at the time that Dr. Alford contacted you

23   to bring you, to see if you were interested in

24   working on this case with him, did he send you a

25   draft report that he had begun working on?

1      A     No.  I'm sorry.  No, he did not.

2      Q     Okay.  So Dr. Alford drafts this section

3  of the report.  What is your role from that point?

4      A     What we had done is discuss all the

5  experts' reports before we did any drafting of our

6  report.  So we had agreed on what we thought of

7  Professor Lichtman's report.  John drafted that

8  section.

9      Q     Okay.  And is that the procedure that

10  you undertook for each of the sections describing

11  a Plaintiffs' expert report?

12      A     We discussed writing the report before

13  we drafted any sections.  After that discussion

14  where we kind of agreed on what we were going to

15  write in our expert report, we then divided up

16  sections of that report for each of us to draft.

17            This section John Alford drafted

18  regarding Dr. Lichtman's report.

19      Q     Okay.  And are you saying, then, that

20  these two, I think this is only one paragraph

21  about Dr. Lichtman, this reflects a conversation

22  that you and Dr. Alford had had prior to him

23  drafting this paragraph?

24      A     Yes.

25      Q     Okay.  Is there anything that Dr. Alford

1    went ahead and wrote that you hadn't discussed

2    prior to writing the report?

3          A    Not to my memory, no.

4          Q    And is that true about Dr. Herron's

5    report as well?

6          A    That is correct, yes.

7          Q    So you both read Dr. Herron's report

8    prior to drafting anything, right?

9          A    Yes.

10         Q    You had a conversation about your

11   thoughts on the report, right?

12         A    Yes.

13         Q    And then Dr. Alford drafted this section

14   about Dr. Herron's report?

15         A    Now my memory is -- has to be jogged.

16   Can you just scroll down a little bit?

17         Q    Of course.  Let me know when to stop.

18         A    This sections are drafted by John.

19         Q    Okay.

20         A    Keep on going.

21         Q    There's a summary here.  Also drafted

22   by --

23         A    Yeah, I think I actually drafted this

24   summary myself.

25         Q    Okay.  So you think you drafted the

1    summary on Page 4 about Dr. Herron's report?

2         A    Yes.

3              And continuing here, Missing Measures

4    and Analysis, I drafted this language, but John

5    did some editing to it.  He reorganized -- is that

6    the right word?  The words were probably, I know

7    the words were written by me originally, and John

8    reorganized it and put headings, like Missing

9    Measures and Analysis in the Herron Expert Report.

10        Q    Okay.  I'm going to ask you similar

11   things about what you drafted here, but other

12   counsel are going to ask you about this portion

13   about Herron and Lichtman's report, so I'm mostly

14   just confirming the drafting part of this stage.

15   Are we still in the section that you primarily

16   drafted, going from Page 5 into Page 6?

17        A    Yes.

18        Q    What about this table here?

19        A    Yes, I drafted that.

20        Q    We're going into a second table.  Is

21   this your drafting as well?

22        A    Yes.

23        Q    I'm now scrolling through Page 7, and

24   then up to the part where it says Dr. Smith's

25   report, is all of that, from where we started on

1   Page 4 through Page 8, is that your drafting?

2        A    Yes.

3        Q    And what about starting at the bottom of

4   Page 8 with Dr. Smith's report, who drafted this

5   section?

6        A    John Alford.

7        Q    Did you follow the same procedure where

8   you both read the report, discussed, and then he

9   drafted?

10       A    Yes, we did.

11       Q    I'm going to keep scrolling through just

12  to make sure it's not divided in the same way.

13  Let me know if you see anything here that you

14  drafted primarily as to Dr. Smith.

15            So I'm scrolling through Page 8 now.

16  Now I'm scrolling through the bottom of Page 9,

17  top of Page 10, through the bottom of Page 10.  So

18  all of Dr. Alford?

19       A    Yes.

20       Q    Now I'm on Page 11 through Page 12, is

21  that all Dr. Alford?

22       A    Yes.

23       Q    What about Figure 1, this is a

24  reproduction from Herron and Smith's Figure 4,

25  right?

1        A      That is correct, yes.

2        Q      Do you recall whether either of you took

3   the primary drafting responsibility as to the

4   Herron and Smith article?

5        A      Professor Alford did the drafting of

6   that and the text.

7        Q      And we've already talked about Page 13.

8               Okay, I think that covers who drafted

9   what.  You've said before that you have adopted

10  each of the opinions in this report, and that you

11  agree with them.  Do you also feel equipped to

12  talk about each of the sections of the report,

13  including the ones you didn't have the primary

14  role in drafting or researching?

15       A      Yes.

16       Q      Apart from Dr. Alford, did anyone assist

17  you in preparing your report?

18       A      No.

19       Q      Are all of the sources that you relied

20  upon disclosed in this report?

21       A      Yes.

22       Q      Are you sure that the same is true for

23  Dr. Alford?

24       A      I assume it is the case, yes.

25       Q      We can, we have another deposition with

1    him, so I'm sure we can ask him that question.

2            How did you identify the sources that

3    you relied upon in the sections of the report that

4    you drafted?

5        A    Say that again, I didn't hear the first

6    part.  How did I?

7        Q    How did you identify the sources you

8    relied upon in the sections you drafted?

9        A    I guess the answer to that is I read a

10   lot.  This is my field of researching and of

11   teaching, and I'd like to think that I have a wide

12   knowledge of work that is published at least, even

13   non-published work.  And I try to keep abreast of

14   the field.  And so particularly the sections

15   beginning, I think on 14, I think that is a -- I'd

16   like to think is a comprehensive, if not

17   exhaustive, listing of work that I think is

18   relevant to the topics I discussed.

19       Q    Okay.  I'm not asking you which sources,

20   but I'm asking did counsel provide you with any of

21   the sources that you relied upon in this report?

22       A    Other than the experts' reports, the

23   pleadings from the Plaintiffs' attorneys and the

24   statute on SB 7050 and other statutes that were

25   discussed mostly by the Plaintiffs, no, none of

1    the -- those are the only things that the

2    attorneys provided me.

3         Q    Were there any documents or other

4    information that you ever asked to see in forming

5    your conclusion that you did not get to see?

6         A    No, not to my recollection.

7         Q    Did you conduct any interviews to help

8    you form your opinions or prepare your report?

9         A    Interviews, could you kind of explain

10   what you mean by --

11        Q    Sure.  I'm mostly trying to figure out

12   if this is just reviewing papers, data analytics,

13   or if you conducted any interviews in the course

14   of preparing your report?

15        A    No, I did not conduct any interviews

16   with, you know, other scholars, or for that matter

17   -- no, my work was based on published

18   peer-reviewed journal articles and in some cases

19   non-published conference papers, things like that.

20        Q    Are there any other documents or

21   information that you would have wanted to help in

22   forming your opinions in this case?

23        A    That's a good question.  No.

24        Q    You mentioned that you had reviewed a

25   series of Plaintiffs' experts' reports in this

1  case.  I'm going to start by sharing what's been

2  premarked as Exhibit 3, and I'm going to scroll to

3  Page 4 of that PDF.  It's labeled as Page 1 of the

4  Expert Report of Daniel A Smith, Ph.D.

5          (Exhibit 3 was marked for identification

6  and is attached to the transcript.)

7      Q    Do you recognize this as Dr. Smith's

8  primary report in this case?

9      A    Yes.

10     Q    And is this one of the reports that you

11 reviewed in forming your opinions in this case?

12     A    Yes.

13     Q    You mentioned that since you submitted

14 your report you've also reviewed a series of

15 rebuttal reports.  I'm now sharing on my screen

16 what's been premarked as Exhibit 4.  Do you

17 recognize this as Dr. Smith's rebuttal report?

18          (Exhibit 4 was marked for identification

19 and is attached to the transcript.)

20     A    Yes.

21     Q    And have you read this report in its

22 entirety?

23     A    Yes.

24     Q    You have not submitted any report

25 containing conclusions about this rebuttal expert

1    report; is that right?

2        A    That is correct, yes.

3        Q    Before I get into some of the

4    methodology and other opinions in this case, it's

5    been a little over an hour on the record, would

6    now be an okay time to take a five-minute break?

7        A    That would be fine, yes.

8            MS. KEENAN:  Okay.  So I think we can go

9    off the record at 10:12.  We'll be back at 10:17,

10   if that works for everybody.

11           (A recess was taken at 10:12 a.m.)

12           MS. KEENAN:  It's 10:18 and we're back

13   on the record.

14   BY MS. KEENAN:

15       Q    So I wanted to ask before we get into

16   specific conclusions here, what is your

17   understanding of your function in this litigation?

18       A    I'm sorry, I didn't hear the end of that

19   sentence.

20       Q    What is your understanding of your

21   function in this litigation?

22       A    I was asked to review the expert's

23   reports and offer my opinion on their reports.

24       Q    And is that your understanding of your

25   precise assignment here, to review and comment on

1    the Plaintiffs' experts' reports?

2         A    Yes.

3         Q    Apart from the opinions included in the

4    report you've submitted, do you anticipate forming

5    any additional opinions in this case?

6         A    I do expect to form opinions on the

7    Plaintiffs' rebuttal reports, which I have not

8    responded to in writing, but I have read and have

9    formed opinions.

10        Q    But you've not submitted any written

11   report as to those rebuttal reports; is that

12   right?

13        A    That is correct, yes.

14        Q    And do you intend to?

15        A    I don't know.  I haven't been asked.

16   Obviously I have read the reports and I am

17   prepared today to discuss those reports, and I

18   have formed opinions on them, but I have not been

19   asked to write an expert -- I don't know, what

20   would you call it, rebuttal to the rebuttal.

21        Q    Yeah, sometimes surrebuttal, but sure,

22   yeah, same thing.

23             I just realized I haven't dropped

24   Exhibits 3 and 4 into the Chat for the other

25   counsel who are attending, so I'm going to do that

1  but don't let it distract you, it's the same ones

2  we already reviewed.

3          In reviewing the record in this case and

4  the articles that you cited as sources, did you

5  find anything inconsistent with the opinions

6  included in your reports?

7      A    I'm not certain I understand the

8  question, so I'll let you rephrase it before I

9  ask.

10      Q    Sure.  So you told us earlier today that

11  you reviewed a number of pleadings and other

12  documents from this case that counsel submitted to

13  you; is that right?

14      A    Yes.

15      Q    And you also reviewed, as cited in your

16  report, a series of articles, books, other

17  publications that you relied on in forming your

18  opinions, right?

19      A    Yes.

20      Q    In any of that literature or case

21  material, did you find anything inconsistent with

22  the opinions included in your report?

23      A    Again, I'm not trying to be obtuse.  So

24  I had formed some opinions about the experts'

25  reports, I read articles and cite them in my

1    expert report that seemed to, that I think support

2    my opinions.  Are there things in the papers I

3    read that would not support my positions?  I can't

4    think of any at this time.

5         Q     Okay.  Do you have a standard

6    methodology that you use as an expert?

7         A     Is there a standard methodology I use as

8    an expert?  That's a, kind of a broad question.  I

9    would hope you would help me and narrow it down to

10   what I might be experting about.  Voter turnout --

11        Q     Let's say in election cases, and I'll

12   start by saying it at that level and ask if

13   there's a standard methodology you use across the

14   election cases you've worked on since 2014.  If

15   the answer to that is no, I can get more specific.

16        A     And I don't mean to be pedantic here,

17   there is an article on my resume that I think

18   speaks to that.  It's the article on how to

19   evaluate voter turnout in the -- I apologize, I'm

20   getting old, the journal is the Journal on

21   Political Institutions.  That is what I think to

22   be the seminal methodology I both would advise and

23   use for evaluating a wide range of election laws.

24        Q     That's the 2020 article you mentioned

25   earlier with Andrew Menger?

1      A     Andrew Menger, yes.

2      Q     Okay, great.

3      A     If you would --

4      Q     Oh, I'm sorry, I thought I was showing

5  my screen.  I'm highlighting it on my screen.

6      A     I will only say if you're looking for a

7  piece that would say to you, Bob, this is a

8  methodology I recommend for evaluating, it would

9  be the paper How to Measure and Assess Turnout.  I

10  wrote that obviously some years ago with Andrew

11  Menger.

12            I will just note out of pride because I

13  think very highly of the Plaintiffs' experts, they

14  cite that paper at least once, if not twice, in

15  their own published work as how we should proceed

16  in evaluating turnout effects, as well as other

17  election reforms.

18      Q     And just to make sure, I'm on Page 27 of

19  Exhibit 2, and this is the article you're talking

20  about, How to Measure and Assess the Turnout

21  Effects, right?

22      A     That's correct.

23      Q     Okay, great.  Is the methodology that

24  you applied in this case consistent with the one

25  described in that paper?

1      A    Yes.

2      Q    And how so?  Could you explain how you

3   applied that methodology in this case?

4      A    A standard methodology for evaluating a

5   whole range of public policies is what's known as

6   a difference-in-difference test.  We don't always

7   have the data for doing that, but the short answer

8   is in that paper, I discuss all the different ways

9   in which researchers have evaluated election

10  reforms.  I use the word reforms loosely, but

11  we'll call them election laws, and that defied the

12  full cross-sectional time series, that's a lot, or

13  the difference-in-difference design as I discuss

14  in my expert report as the preferred method for

15  evaluating the impact of election law.

16     Q    And you said that sometimes the data

17  isn't available to conduct a

18  difference-in-difference report.  What kind of

19  data is required to conduct a

20  difference-in-difference report, at a high level?

21     A    You need to have information about the

22  alleged or anticipated outcome of the law before

23  and after it was adopted in the target populations

24  you're looking at.  And you need to have an

25  understanding of who those target populations are,

1    if they're target, voters, registered voters,

2    voters of different racial and ethnic backgrounds.

3    And you need to be able to have a baseline against

4    the adoption of a law; the baseline being before

5    and after, and they're -- I hope that's

6    responsive.

7          Q    It is.  It's very helpful.

8               You didn't conduct any sort of

9    difference-in-difference analysis in this case,

10   right?

11         A    No, I did not.

12         Q    Why not?

13         A    I wasn't asked to.  I was asked to read

14   the Plaintiffs' reports, but I was not asked to

15   conduct any independent analysis.

16         Q    Have you previously conducted

17   difference-in-difference analysis in your work as

18   an expert in litigation?

19         A    Yes.

20         Q    Do you recall any cases where you might

21   have done that?

22         A    I believe I did it in the Virginia case.

23   I did it in the -- can you scroll down to the

24   cases?  I know we did it in one of the Lakota

25   Tribe cases.

1      Q      There we go.

2      A      Thank you.  I'm pretty certain I did it

3  in the Mark Wandering Medicine case versus Linda

4  McCullough.  I may have done it in the Thomas Poor

5  Bear.  I did it in the Waller, Jayla Allen versus

6  Waller County.  I'm pretty certain I did it in the

7  Arkansas case.

8      Q      With an assist from a colleague I was

9  able to get a copy of the Virginia report during

10 the break so I premarked that as Exhibit 12.

11            (Exhibit 12 was marked for

12 identification and is attached to the transcript.)

13     Q      Do you recognize this as your report

14 from that case?

15     A      Yes.

16     Q      And this is one of the cases where you

17 said you did a difference-in-difference analysis,

18 right?

19     A      I believe I did.  I think I compared

20 states -- I may not have.  Again, I'll have to

21 reread the report.  It's been some time.  I may

22 not have done it.

23            Actually, I think so.

24     Q      Okay.  So I can see, for example, that

25 you compiled in this case data from the 2014,

1    2016, 2018, and '20 EAVS survey, right?

2        A    Yes.

3        Q    You looked at the share of registration

4    applications submitted by third party registration

5    drives using that data?

6        A    Yes.

7        Q    And you reported out analyzes based on

8    some of that EAVS and other elections data, right?

9        A    That's correct.

10       Q    Okay.  I'm going to drop this in the

11   Chat and at our next break, I'd like for you to

12   take a quick look at it and let me know what the

13   difference-in-difference analysis is that you did

14   in this case, but we don't need to do that here on

15   the record.  I'll put this in the Chat now so we

16   have a copy of it.  Give me one moment.

17           Okay.  But for now, I'm going to go back

18   to your report in this case.  And I want to start

19   with the portion of the report beginning on Page 8

20   of Exhibit 2, which is about Dr. Smith's report.

21           On Pages 8 and 9 you lay out Dr. Smith's

22   description of the purposes of his report and a

23   series of conclusions that he offers; is that

24   right?

25       A    Yes.

1        Q      And on Page 9 you state that Dr. Smith's

2   conclusions detail various statistics that support

3   the conclusion that 3PVROs register a non-trivial

4   number of Florida citizens.  Did I read that

5   correctly?

6        A      Yes.

7        Q      You do not offer any critiques of

8   Dr. Smith's conclusions about the number of

9   Florida voters who have relied on 3PVROs to

10  register to vote, do you?

11       A      That is correct.

12       Q      You don't offer any critiques of his

13  conclusion about the number of Florida voters who

14  have relied on 3PVROs to update their voter

15  registration either, right?

16       A      That is correct.

17       Q      You don't offer any critiques of

18  Dr. Smith's conclusions that these numbers are

19  likely an undercount based on data provided by the

20  Florida Department of Elections, right?

21       A      That is correct.

22       Q      You don't offer any critiques of

23  Dr. Smith's conclusions that voters of color rely

24  most heavily on 3PVROs, right?

25       A      No.  Right.

1       Q     I'm sorry, did you speak?

2       A     Yes.  The word "rely" would be a -- I

3   would say that a higher -- we do not dispute that

4   a higher proportion of voters of color, Hispanic

5   and black, have registered to vote through third

6   party registrations.  It's the word "rely" that I

7   would object to.

8       Q     I understand what you're saying.

9             You're saying you're not opining about

10  the total number of voters, but you'd agree that

11  Dr. Smith's conclusions showed that voters of

12  color disproportionately used 3PVROs in order to

13  register to vote?

14      A     I would -- and again, I'm not trying to

15  be argumentative here.

16      Q     Sure.

17      A     The word you use is an important word to

18  me.  So I would simply say that there is a higher

19  proportion of non-white registrations through

20  third party registrations.  The word "use, rely,"

21  I would not want to use, and I can explain if you

22  want my explanation now or later.

23      Q     I think the answer you gave is

24  sufficient based on the question I asked, but I

25  would like for you to explain why "use" or "rely"

1    is problematic so that I can avoid using that term

2    in the future if it's imprecise.  Can you let me

3    know why you're resisting the word "use" or

4    "rely"?

5         A    In the report I point out that there's

6    evidence that suggests that a higher proportion of

7    people of color are registered through third party

8    registration.  The question is why.

9              And the question goes further to whether

10   or not this impedes or enhances their likelihood

11   of both registering and voting.  And I believe

12   as -- I'm sorry.

13        Q    No, go ahead, I'm sorry.

14        A    As I've written in the report, the

15   evidence seems to suggest, and the history of

16   third party registrations would suggest, that

17   African Americans and Hispanics are sought out,

18   are targeted for registration and updating of

19   their registration by specific third party groups,

20   partisan groups like Mi Familia Vota, the NAACP,

21   the Democratic Party of Florida.  They go to and

22   actively solicit these registrations.  They don't

23   actively solicit registrations from voters who are

24   not inclined to vote Democratic or from those

25   groups that they represent, Hispanic and African

1    American groups.

2            So the idea that African Americans and

3    Hispanics "use" implies an element of

4    volunteerism, a seeking out and that there isn't

5    an alternative mechanism such as the DMV or other

6    places where voters can actively seek to register.

7            Again, the history of third party voter

8    registration, a history that I have read, I did

9    not include in my report and would be happy to

10   share with you at this time if you want, a very

11   fine history of third party shows that this is an

12   active targeting.  And I think what we have here

13   is not a volunteer, or a seeking out or using of

14   something, but rather a solicitation that may, in

15   fact, as Mr. Herron, Professor Herron and Smith

16   suggest, underwrite the cost of registering for

17   one group of voters possibly to the exclusion of

18   other voters.

19       Q    Okay.  So I have some follow-up

20   questions on that.

21           First, I heard you say that these were

22   partisan groups, and you listed Mi Familia Vota

23   and NAACP.  Are you offering the testimony that

24   those are partisan groups?

25       A    I wouldn't say that they are groups who

1   would -- they're not obviously registered

2   political parties.  In some cases they're not able

3   to advocate for or endorse candidates, but I would

4   say that their efforts on behalf of registering

5   voters disproportionately favors one party over

6   another.

7        Q    And would you be surprised to learn that

8   either of those entities are actually nonpartisan,

9   nonprofit organizations?

10       A    I'm not surprised.  Let me pose the

11  question to you.  What proportion of third party

12  registrations are Democratic and Republican

13  registrations?

14       Q    We can talk about that a little later.

15       A    Can I finish?

16       Q    What you cite --

17       A    You asked me a question, I'm trying to

18  respond.

19       Q    Sure.

20       A    I would not deny that these are

21  nonprofit, nonpartisan organizations that do not

22  affiliate with, nor do they endorse and advocate.

23  I would suggest that if we looked at the record,

24  which I have not, that the areas and geographies

25  in which third parties listed in Professor

1   Herron's original expert report, with the

2   exclusion of the Republican Party of Florida, are

3   disproportionately likely to register voters not

4   just of color, but who are more likely to vote

5   Democratic.  That to me is a reason.  If somebody

6   actively targets a population for registration, it

7   wouldn't be a surprise to me that their efforts

8   would net a higher proportion of registrations

9   that are among African Americans and Hispanics.  I

10  don't believe they actively and randomly assign

11  geographies or voters to register.  They go after

12  voters in specific areas of specific racial and

13  ethnic backgrounds that produces the high rate of

14  third party registrations among African Americans

15  and blacks.

16          It doesn't answer the question, however,

17  could blacks and Hispanics register another way.

18  Do they register another way, and are they impeded

19  from registering if third parties are in any way

20  disadvantaged by SB 7050.

21      Q    Okay.  Again, a lot of questions based

22  on that.  First, you just said it doesn't answer

23  the question of could they register another way,

24  do they register another way, or are they impeded

25  from registering another way.  But you'd agree it

1    does literally answer the question of do they

2    register another way when we see that they did, in

3    fact, register through a 3PVRO, right?

4          A    No.

5          Q    So you would say that the evidence that

6    Dr. Smith has assembled about who individually has

7    registered through a 3PVRO does not answer the

8    question of whether that number of individuals did

9    register through a 3PVRO?

10         A    I don't understand your question.

11              Let me try to answer it, however.

12         Q    Well, if you don't understand the

13   question, I'll rephrase it.  That was one of the

14   things we agreed about at the beginning.  So I'll

15   try it again.

16              You said a moment ago that the evidence

17   that Dr. Smith assembled doesn't answer the

18   question of do voters of color vote another way,

19   sorry, register another way.  Did I understand

20   your testimony correctly, or is that not what you

21   said?

22         A    Maybe I should ask the, Ms. Hart to

23   repeat what I just said.  That might be helpful.

24              MS. KEENAN:  Sure, if you have it in

25   front of you, if the stenographer has it, I

1  understood the line to begin with, could they

2  register another way, do they register another way

3  and are they impeded from registering another way.

4  We're just trying to figure out if that's the

5  correct series of --

6       A    That's correct.

7           (The record was read as follows:

8           It doesn't answer the question, however,

9  could blacks and Hispanics register another way.

10 Do they register another way, and are they impeded

11 from registering if third parties are in any way

12 disadvantaged by SB 7050.)

13      Q    And so I understand, I understand your

14 objections about could they register another way,

15 or would they be impeded from registering another

16 way.  What I'm asking is right now, we know the

17 question of how they did, in fact, register based

18 on the data that you don't dispute in Dr. Smith's

19 report?

20      A    So to answer that question I'm going to

21 have to remember, and there were two reports, as

22 of course we know, Professor Herron's and

23 Professor Smith's.  Professor Herron's was far

24 more detailed and more computational analytic than

25 Professor Smith's.

1          We raised in our report, Professor

2    Alford and I, the possibility that a diminution in

3    third party registrations among African Americans

4    and Hispanics might have been offset by

5    registrations through other modes, including the

6    DMV, Department of Motor Vehicles.  That was not

7    an analysis that Mr., Professor Herron or Smith,

8    particularly Professor Herron, followed up.  To my

9    knowledge, Professor Smith never brought that up.

10   He never looked at other modes of registration.

11   Professor Herron did.

12          We raised in the report that, I believe

13   a table that Professor Herron included in his

14   report suggested, suggested there might have been

15   an uptick in DMV registrations among voters of

16   color as a result of the drop in third party

17   registrations.

18      Q    So I want to be clear.  I'm not asking

19   about offsetting or what might happen based on

20   this law.  I'm asking about the data in

21   Dr. Smith's report which you said you reviewed,

22   right?

23          Sorry, I need a verbal answer for the

24   transcript.

25          I'm sorry, can you hear me?

1        A    I did.  I didn't know if there was a

2   question there or not.

3        Q    Sure.  Exhibit 3 is the Smith report

4   that you said you reviewed, right?

5        A    Yes.

6        Q    Okay.  And so I'm going to go to the

7   Summary of Findings.  You'd agree that this

8   summary of findings includes specific data about

9   how many voters were registered in Florida due to

10  the activities of 3PVROs, yes?

11       A    Yes.

12       Q    And you'd agree that based on that data

13  we know that they did, in fact, register through a

14  3PVRO, right?

15       A    As of September, yes.

16       Q    Right.  And he provides that data, told

17  about the number of Floridians as a whole, you'd

18  agree, based on the data he reviewed, right?

19       A    Yes.

20       Q    And also he provides a series of tables

21  that show how many voters of color and voters

22  living in certain counties were registered through

23  3PVROs, right?

24       A    Yes.

25       Q    And you don't dispute that any of that

1   data shows that those people did, in fact,

2   register through 3PVROs, right?

3        A    That's correct.

4        Q    What you are objecting to is what you

5   called volunteerism or whether these entities are

6   soliciting applications from certain people.  Do I

7   understand that to be the source of your

8   objection?

9        A    I don't know if it's an objection.  I

10  would say that Professor Smith --

11       Q    You don't include -- I'm going to go

12  back to your report.  I don't think the word

13  "solicit" or "volunteerism" appear in your report

14  even once, but please let me know if it's included

15  in your report.

16       A    I think we have a discussion of how

17  third party registrations occur, that's correct,

18  but no, I do not use the word solicitation or

19  volunteerism.  I'm simply suggesting that it

20  shouldn't be, it shouldn't be surprising that

21  groups that solicit disproportionately non-white

22  persons to register will have a higher share of

23  registrations through third parties.

24       Q    I understand you're saying that here

25  today.

1        MR. PRATT:  Counsel, it may be a little

2   bit of a Zoom disconnect, but if you can please

3   maybe let Dr. Stein finish his answer.

4        MS. KEENAN:  I'm sorry.  I thought he

5   was finished.

6    Q    Go ahead if you're not finished.

7    A    It might be helpful here to go back to

8   what you asked me earlier, which is the charge.

9   We understand our charge to be whether or not the

10  experts' reports demonstrate that the adoption and

11  implementation of SB 7050 would impede the

12  registration and voter turnout of non-whites.

13   Q    Yes.  And in -- oh, sorry, I thought you

14  were done again.

15   A    I'm trying, I'm trying.  I'm always

16  accused of talking quickly, so --

17        We evaluated the research done.  I will

18  make it clear that we don't dispute the high

19  proportion, higher proportion of third party

20  registrations among voters of color.  We just

21  don't think it's consequential, or more

22  importantly, we don't believe the Plaintiffs have

23  shown that it is consequential to the rate of

24  registration among non-whites and their ability to

25  vote.  And we further believe that the design of

1    the research cannot show that.

2              It does show that there is a higher

3    share of third party registrations among African

4    Americans and Hispanics.  It doesn't show that

5    that in any way impedes those groups of voters

6    from registering or has, however brief the time

7    series is, Professor Herron points out that it's

8    hard to compare the periods before and after SB

9    7050 was adopted and implemented.  But we don't

10   think it shows that voter registration among

11   African Americans and Hispanic voters has been

12   impeded as a result of SB 7050.  And that, I

13   think, is the summation of our report.

14        Q    So now that does sound like the

15   summation, that last answer sounds like the

16   summation of your report, but you said a whole

17   bunch of other stuff that I just want to confirm

18   is not in your report.  And the first is, I have

19   it down that you said that those organizations,

20   3PVROs, solicit applications from non-white voters

21   sometimes to the exclusion of white voters.  That

22   is not an opinion that is in your report; is that

23   right?

24        A    You know, if -- can you -- can I -- I

25   need to pull up my report so I can show you where

1  we do discuss that, but I'm not able --

2      Q    I have the report up.  You can tell me

3  where it is, where to go.

4      A    Would you have any objection if I were

5  to have control over the screen so I could go

6  through the report?

7      Q    No, I don't think so.  Let me see if I

8  can do that.  I don't --

9      A    You do it under Screen Share.

10          (A discussion was held off the record.)

11     A    Okay, got it.  I got it.

12          All right.  Let's go up to my report.

13 Section -- go up a little further.  Trying to go

14 up and find --

15          So if you look at the summary, here we

16 discuss the possibility that declines in non-white

17 registration by third party were substituted by

18 DMVs.

19     Q    And that, first of all, that's in the

20 Herron summary on Page 4, right?

21     A    Yes.

22     Q    Not in the section on Dr. Smith?

23     A    No, that is true.

24     Q    And it doesn't, it doesn't suggest that

25 3PVROs are registering non-white voters to the

1   exclusion of white voters, which is what you said,

2   right?

3        A    Yes.

4        Q    That conclusion is not in your report?

5        A    That is correct.  I am now bringing that

6   up in my reading of the rebuttal report.

7        Q    But you didn't offer any opinion to that

8   effect in your report, right?

9        A    That is correct.

10       Q    And you said earlier if you take a look

11  at the record, and I have not, I would suggest

12  that you might find, and then you went on to make

13  a suggestion about what might be in there.  But

14  you'd agree that you have not looked at the record

15  as it relates to the 3PVRO registration, right?

16       A    I have read about the history of third

17  party registrations and I did not include that

18  report that I read in my report.  But in light of

19  the rebuttal reports, I have noted that the

20  history of third party registrations is to target

21  populations that are specifically of color.

22       Q    But again, that's not based on the

23  record in this case, right?

24       A    No, it is not.

25       Q    And it's not based on anything you

1    included -- go ahead.

2        A    Other than what I'm just telling you is

3    part, that is I have not written a rebuttal report

4    to the rebuttal of reports of Professor Herron and

5    Smith, so this is only based on their original

6    expert reports.  Since then, and since I wrote

7    this report, I have offered now an opinion that it

8    shouldn't be a surprise that third party

9    registrations of the sort that are described in

10   these reports are disproportionately non-white

11   voters.

12       Q    But you have not offered, in the report

13   you've actually provided to the parties, you've

14   not offered any support for that conclusion that

15   you're offering for the first time today in this

16   deposition; is that fair to say?

17       A    That is fair to say, yes.

18       Q    Okay.  I think I can move on from this

19   line of questioning for now.

20            I want to go back to, I think that I am

21   going to stop the control and go back to the

22   section I was on.  Give me one moment to get

23   there.

24            So after that first sentence that we've

25   already read and discussed you say:  However,

1    neither his conclusions, nor his analysis in the

2    body of the report, provide empirical evidence of

3    an actual demonstrated disparate impact, if any,

4    of SB 7050 on black or Hispanic citizens

5    registering to vote or updating their existing

6    registration through 3PVROs.  Did I read that

7    correctly on Pages 9 and 10?

8        A    Yes.

9        Q    I want to make sure I understand what

10   you mean when you say Dr. Smith's report provides

11   no empirical evidence of an actual demonstrated

12   disparate impact.  First, this sentence focuses on

13   a disparate impact.  Setting aside whether SB 7050

14   disparately impacts certain groups of voters, does

15   your report contest that SB 7050 has any impact on

16   voters?

17       A    Would you read the last part of that

18   sentence for me?  If any on black or Hispanic

19   citizens registering to vote or updating their

20   existing voter registrations.

21       Q    Right.  So an actual demonstrated

22   disparate impact, if any, of SB 7050 on black or

23   Hispanic citizens registering to vote or updating

24   their registration.  I think I read that the first

25   time, right?

1          A      Yeah, you just didn't mention

2     registration.

3               We don't think that the evidence shows

4     that the impact of SB 7050 has a, that it

5     significantly impairs non-white, black and

6     Hispanic citizens from registering to vote, only

7     that they don't have, or don't register at the

8     same rates through third parties.

9          Q      Right.  And I understand -- that's why

10    I'm trying to focus on the word "disparate" and

11    what it means.  So I understand that you're

12    offering the conclusion that there's no evidence

13    of a disparate impact, in other words, the black

14    and Hispanic citizens are affected at a rate

15    different than how white citizens are affected by

16    SB 7050.

17               What I'm asking is, do you contest that

18    SB 7050 has an effect on citizens of Florida,

19    setting aside whether that effect is disparate?

20         A      I don't know what effect you're

21    referring to so I can't -- the answer is I don't

22    know whether or not SB 7050 had an effect on

23    voters.  What I do know, or what I have offered

24    is, I don't believe the reports of Professor

25    Herron and Smith have demonstrated that it has a

1    disparate impact on voter registration between

2    non-white and white voters.

3            It may or may not have had an impact,

4    but that wasn't what we were asked to evaluate.

5    We were asked to evaluate did they, Professor

6    Smith and Herron, provide evidence to support the

7    conclusion that there are disparate effects

8    between white and non-white voter registrations as

9    a result of the adoption and implementation of

10   7050.

11       Q    And so I understand that's what you were

12   looking at, but I want to be clear.  Does that

13   mean you weren't looking at whether there is

14   evidence to suggest that SB 7050 affects any

15   Florida citizens in terms of their ability to

16   register to vote?

17       A    We find no -- we did not look, nor did

18   we, nor were we instructed to answer that

19   question.  We were asked to evaluate the evidence

20   that Herron and Smith brought to bear on the

21   question they posed, and we don't find it

22   compelling and supportive of their conclusions.

23       Q    I understand that you're characterizing

24   that as the question they posed, but I just want

25   to be clear that you were asked only to look at

1   whether there was sufficient evidence to support a

2   disparate impact of SB 7050, and not the question

3   of whether there was evidence of an impact of 7050

4   on any Florida citizen's ability to vote

5   regardless of that disparate impact angle.

6        A    That is correct, we were not asked the

7   latter.

8        Q    Okay.  And as for evidence relating to

9   disparate impact, you would agree that Dr. Smith

10  provided evidence from data provided by the

11  Florida Department of Elections that black and

12  Hispanic registered voters in Florida are more

13  than five times more likely than white registered

14  voters in Florida to register with or update their

15  registration with 3PVROs based on the existing

16  data, right?

17       A    We did not dispute that finding.

18       Q    And you would agree that Dr. Smith

19  provided evidence from data provided by the

20  Florida Department of Elections that less than one

21  in 50 white registered voters in Florida most

22  recently relied on 3PVRO to register or update

23  their registration, right?

24       A    We did not dispute those numbers, no.

25       Q    Have you reviewed any of the

1  declarations submitted in this case that were not

2  submitted by expert Plaintiff witnesses?

3      A    My only recollection is in the pleadings

4  where I read about people who, actual Plaintiffs

5  who were affected by SB 7050.  I did read those,

6  but my recollection of them is very faint.

7      Q    You didn't offer any opinions in your

8  report contesting the impact of SB 7050 on any of

9  the individual Plaintiffs in this case, right?

10     A    That is correct.

11     Q    I notice that you don't cite any

12  empirical evidence about voter registration in

13  Florida in your report; is that fair to say?

14     A    We did not conduct any, any empirical

15  analyses.  We simply reviewed what was presented

16  to us from the Plaintiffs.

17     Q    What kind of empirical evidence would

18  show that SB 7050 has an actual demonstrated

19  disparate impact in the way you've described it in

20  your report?

21     A    If you scroll up in my report, or our

22  report, to Tables 1 and 2.

23     Q    Okay.  Scroll up, like here?

24     A    Yeah, keep on going.  Just a little

25  further.  Go up a little further.

1          Keep on going.  One more, I think one
2     more bullet.
3          Q     Okay.
4          A     Two empirical conditions need to be
5     shown to support Professor Herron's conclusion.
6     If you -- I'll just read it, or I don't mean to be
7     cumbersome, but it's the best words I can use.
8          Q     Of course.
9          A     And I want to be clear here, conclusion
10    that SB 7050 discriminated against non-white
11    citizen voting age persons registering to vote.
12    First, he needs to demonstrate that the difference
13    between the proportion of non-white and white
14    citizen voting age persons who registered to vote
15    and registered to vote by third parties was
16    significantly lower after the adoption of 7050
17    than before its adoption and implementation.
18          Second, if the decline in the proportion
19    of non-white citizen voting age persons who
20    registered to vote by a third party was
21    significantly greater than the observed white
22    citizen voting age persons, was this decline
23    offset by an increase in non-white citizen voting
24    age persons registering to vote by another mode of
25    voter registration.

1        So there are two parts to this.  One, if

2   you go up one bullet, you'll see that we didn't

3   think that Mr. Herron, Professor Herron was

4   comparing the proportions of persons eligible to

5   register to the total number of persons who did

6   register.

7        Q    Okay.  And like I said earlier, someone

8   else is going to talk to you about Professor

9   Herron, so I don't mean to cut you off, but

10   that's -- another group is going to talk to you

11   about Professor Herron.  I just want to focus on

12   these empirical conditions that you pointed to as

13   an answer to my question.

14        I'm looking at the same text you just

15   read, and I can see an important part of each of

16   these is what you talked about earlier when you

17   were describing how you conduct a difference-in-

18   difference analysis, you talked about how it's

19   important to have a baseline before and after,

20   right?

21        A    Correct.

22        Q    So you focus on whether the difference

23   is significantly lower after the adoption of SB

24   7050 than before the adoption and implementation,

25   right?

```
1        A     Correct.
2        Q     Are you aware that the SB 7050
3   citizenship requirement was enjoined this summer
4   before it had a chance to be implemented?
5        A     I was not.
6        Q     Are you aware that the SB 7050
7   citizenship requirement has not yet been enforced
8   by the Secretary of State or Attorney General of
9   Florida?
10       A     I was not.
11       Q     Would you agree that if the SB 7050
12  citizenship requirement has not yet been enforced,
13  these types of empirical evidence, and
14  particularly the baseline you mentioned, do not
15  currently exist?
16       A     Say -- could you repeat -- so are you
17  suggesting that we don't know the number of
18  citizen voting age persons in the State of
19  Florida?
20       Q     No, no.  I'm suggesting that we don't
21  know the difference before and after the
22  implementation of SB 7050 if SB 7050 has not, in
23  fact, been implemented and enforced yet.  Do you
24  agree with that?
25             MR. PRATT:  Objection.  Form.
```

1      A    So I am confused.  Are you suggesting

2    that SB 7050 hasn't been implemented?

3      Q    I am saying that SB 7050 has not been

4    enforced by the Secretary or the Attorney General

5    at this point in time, yes.  And I'm asking

6    whether that makes it impossible to do the before

7    and after baseline that you have suggested in your

8    report.

9          You don't have to agree that that's what

10    happened, but positing that that's true, I

11    understand you may not have that information, if

12    it is true that SB 7050 has not yet been enforced,

13    then we can't create a baseline for before and

14    after the enforcement of SB 7050; you would agree

15    with that?

16          MR. PRATT:  Objection.  Form.

17      A    The entire Plaintiffs' reports, both

18    Smith and Herron, is based on the fact that SB

19    7050 has been implemented requiring third parties

20    to do things they didn't do before that impeded

21    their efforts to register voters.  So am I wrong

22    in saying that SB 7050 --

23      Q    I'm not asking what you think those

24    reports were trying to do, respectfully.  I'm just

25    asking if, in fact, that is true that SB 7050 has

1    not been enforced, would you agree that it would

2    not be possible to create a before and after

3    baseline of a law that had not yet been enforced?

4        A    So I'll answer your question this way.

5    If a law that was adopted, but not implemented in

6    any way, why are we here today?

7        Q    I can represent to you, Doctor, that we

8    have already pursued litigation that has frozen

9    the law from being enforced, that that is the

10   result of the litigation that we are here

11   discussing today, and that as a result of the

12   litigation to date, the citizenship requirement

13   has not yet been enforced.

14       A    That is not --

15       Q    What I'm asking you is, assuming that is

16   true, I'm not asking you about your knowledge of

17   the fact, I'm just asking you, assuming that is

18   the case, do you agree that there would be no way

19   to do a before and after baseline of a law that

20   had not yet been enforced?

21       A    I would agree that a law not enforced

22   could not be evaluated.

23       Q    Okay.

24       A    I would not agree that that is the case

25   about SB 7050.

1        Q    I'm going to move on to the next

2   paragraph of this section of Dr. Smith.  This

3   says -- give me one second.

4            Can you read this paragraph on your

5   screen to yourself and let me know when you've

6   finished?

7        A    (Reviewing.)

8            I have finished.

9        Q    Okay.  First, when you say, there's only

10  speculation about the possibility that changes

11  like these can increase costs to voters and that

12  those costs in turn can lead to decreased

13  participation.  What is absent is any evidence

14  that these kinds of indirect potential costs have

15  been demonstrated to have an actual impact on

16  voter registration or turnout.

17            Did I read that correctly?

18       A    Yes.

19       Q    Okay.  This is your assessment of the

20  introductory paragraphs in Dr. Smith's report; is

21  that right?

22       A    Yes.

23       Q    Okay.  I want to go back over to

24  Exhibit 3, which is the Smith report.

25            You would agree that is -- I'm going to

1    show you the report.  You can take a look.  This

2    is the paragraph you've excerpted, right?

3         A    Yes.

4         Q    And when I go to the report, you'd agree

5    that that is actually Paragraph No. 16 on the Cost

6    of Voting, right?

7         A    I'll take your word for it.  Yes, it

8    looks like it very much.

9         Q    In the introductory paragraphs of the

10   Smith report, we have Purpose of Engagement, we

11   have Qualifications, we have Summary of Findings.

12   You don't see that paragraph in any of these

13   sections, right?

14        A    I don't see it.  You're scrolling

15   quickly, but no, I don't.

16        Q    So we see that as a paragraph here,

17   Paragraph 16, right?

18        A    Correct.

19        Q    Are you aware of anywhere else in the

20   Smith report that this literature is discussed?

21        A    I'm not.

22        Q    Okay.  I'm going to go back to

23   Exhibit 2.

24             When you say in that paragraph I just

25   asked you to read, there is certainly the

1    potential to provide such an empirical assessment,

2    is that, again, a reference to the sort of before

3    and after baseline difference-in-difference

4    analysis that we discussed earlier?

5         A    That is included in it, but there are

6    other empirical assessments that could be made

7    that were not made.

8         Q    And what kinds of other empirical

9    analyses other than those could be made?

10        A    I think what we're, what we're saying

11   here is that we have no evidence that voters

12   incurred a cost in registering to vote because of

13   the adoption of provisions in 7050.  All of these

14   requirements for non-citizens not to be allowed to

15   register, to return registrations in a shorter

16   period of time and the increased fines, those are

17   costs imposed on third parties, they're not costs

18   imposed on voters.  They're imposed on the third

19   parties' efforts to register voters.

20              We don't see any evidence that there

21   were costs imposed on voters as a result of the

22   new requirements in SB 7050 that were imposed on

23   third parties.  Unless I've read the law

24   incorrectly, voters were not fined, voters were

25   not required to return their ballot, excuse me,

1    their registrations in a certain designated time.

2    Only the third parties.

3           So what I would be looking for in that

4    sentence there is certainly the potential to

5    provide such empirical assessment.  It would

6    require evidence that SB 7050 did things to

7    require voters to, particularly of color, to do

8    something that voters, white voters would not have

9    to do to register.

10       Q    Would you agree that the requirement in

11   SB 7050 preventing noncitizens from collecting or

12   handling voter registration applications impacts

13   the ability of those noncitizens to interact with

14   individual voters?

15       A    So when SB 7050 says only citizens can

16   register voters through third parties --

17       Q    Right.

18       A    -- that if there were noncitizens who

19   were registering voters, and now couldn't register

20   them, those same noncitizens could not interact

21   with potential registered voters, no, they could.

22   All the law says is that they can't register them.

23          If you were a noncitizen and you

24   approached me before SB 7050 to register and I

25   took it upon myself to have you fill out my

1    registration, and now SB says, no, Megan Keenan

2    can't register me.  She can still urge me and

3    encourage me to register.  She can still be my

4    friend and talk to me.  But she simply cannot be

5    part of a third party registration.

6             So the answer to your question is no, it

7    doesn't impede the relationship between the

8    noncitizen and the potential registered voter.  It

9    simply prevents that noncitizen from being part of

10   a third party registration activity.

11       Q    Sure, and I can be more precise.  I

12   understand that might be your interpretation of

13   the law at issue.  But you would agree that

14   positing that I'm the noncitizen in this situation

15   per your example, that Megan Keenan can no longer

16   collect or handle a voter registration

17   application, including by handing that application

18   to a voter or collecting it from a voter, you

19   would agree with that?

20       A    Yes.

21            MR. PRATT:  Objection to the form.

22       A    Sorry.

23            THE WITNESS:  Did Josh have something

24   he --

25            MR. PRATT:  Just an objection to form.

1          You can answer.

2      A     So there's no question in my reading of

3   the law that denying noncitizens the right to

4   participate in third party voter registration

5   changes the potential relationship between that

6   noncitizen working with a third party to register

7   voters and the citizen, but it doesn't necessarily

8   prevent that noncitizen from participating in

9   efforts to get people registered to vote.  They

10  just simply can't participate and handle the

11  registration as part of a third party.

12     Q     And I understand that's your

13  interpretation of the law.  That's not the

14  question I'm asking.  I'm just asking if

15  collecting or handling, that's the terms that are

16  expressly prohibited by the law, you would agree

17  that noncitizens cannot collect a voter

18  registration application from a potential voter

19  anymore, right?

20     A     That's correct.  Yes, that's my

21  understanding of the law.

22     Q     Okay.  The next question I have is, and

23  again, you haven't examined any of the

24  declarations by the organizations or individuals

25  who purport to be affected by the potential

1    enforcement of SB 7050, right?

2         A    I may -- I am certain I read them, but I

3    have no detailed recollection of them.

4         Q    And you don't have any basis to dispute

5    them?

6         A    No.

7         Q    Moving on to the bottom of Page 10.  I'm

8    starting with the sentence that says, this is in

9    contrast to the earlier published assessment of

10   Florida's HB 1355 where Herron and Smith report a

11   test of the impact of HB 1355 on registrations for

12   blacks, Hispanics and whites in their Figure 4,

13   reproduced below as Figure 1.  Did I read that

14   correctly?

15        A    Yes.

16             THE WITNESS:  Ms. Keenan, could I just

17   interrupt?  Could I just get a glass of water for

18   five minutes?

19             MS. KEENAN:  Oh, my gosh.  Of course.

20   Absolutely.

21             THE WITNESS:  I apologize, I should have

22   done that earlier.

23             MS. KEENAN:  We can go off the record at

24   11:16.

25             (A recess was taken at 11:16 a.m.)

1          MS. KEENAN:  We can go back on record

2     now at 11:17.

3     BY MS. KEENAN:

4          Q    So you characterized that published

5     assessment of Florida's HB 1355 by saying there is

6     no evidence of statistically significant

7     differences in registration rates among whites,

8     blacks, or Hispanics after the adoption of HB

9     1355, right?

10         A    That's correct.

11         Q    Okay.  First, you would agree HB 1355 is

12    not one of the laws at issue in this case, right?

13         A    That is correct.

14         Q    That law, it was passed in 2011, right?

15         A    That was my recollection.  I would agree

16    with that.  I don't know for certain, but it

17    preceded this SB 7050, yes.

18         Q    Now, I know you told us earlier that

19    this section of the report, and particularly the

20    Smith/Herron article, was Dr. Alford's primary

21    responsibility in drafting the report, right?

22         A    He drafted this section, yes.

23         Q    So to the extent you know, how did you

24    reach the conclusion that the Smith and Herron

25    paper finds no evidence of statistically

1    significant differences in registration among

2    whites, blacks, or Hispanics after the adoption of

3    HB 1355?

4        A    Well, if you -- can you scroll up to the

5    table, figures that we reproduced from the report?

6        Q    Sure.

7        A    So this is the three graphs, and what

8    we've noticed was that they were all

9    significant -- well, we noticed that there were

10   downward sloping lines.

11       Q    So you formed this opinion -- I'm sorry,

12   were you done?  I couldn't tell.

13       A    Yeah -- no, let me -- I was going to

14   tell you -- could you scroll down a little bit to

15   the footnote?

16       Q    Of course.

17       A    So the registration differences by race,

18   registrants no older than 20.  Note:  Light gray

19   lines denote -- this is what they thought, or

20   offered, in their published paper were the effects

21   of this earlier law that also may have impeded

22   voter registrations and its impact on African

23   American, Hispanic and whites.  And when we looked

24   at the table, we saw that the line was steeper

25   after adoption for whites than it was for African

1    Americans and Hispanics.

2              We read in their rebuttal report, I

3    believe it's Mr. Herron's and Smith's, that they

4    have done subsequent analysis that suggested that

5    these slopes were significantly different and

6    greater for non-whites, Hispanics and African

7    Americans, but we didn't see that in the original

8    publication.

9        Q    Okay.  So just to break that down a

10    little bit, you took a look at this figure from

11    the original publication; is that right?

12        A    Correct.

13        Q    And you visually inspected the lines,

14    right?

15        A    Correct.

16        Q    And then you made opinions based on what

17    you thought those lines visually showed in terms

18    of the slopes and the effects they had across

19    groups; does that sound right?

20        A    Go down to our text.  We didn't --

21             You're going up.  Go down.

22        Q    Okay.

23        A    I think, I hope I'm right here.

24        Q    I don't think it's down.

25        A    I'm sorry, you're right, you were going

1    the right way, I apologize.

2         Q    That's okay.

3         A    We just didn't see, there was no

4    evidence of statistically significant differences

5    across these three groups.  We didn't see anything

6    reported in the article that suggested that those

7    slopes were statistically significantly different

8    across the racial groups.

9         Q    Okay.  I'm going to share what's been

10   premarked as Exhibit 5.

11              (Exhibit 5 is marked for identification

12   and is attached to the transcript.)

13        Q    Would you agree this is the Herron and

14   Smith report about the effects of House Bill 1355

15   on voter registration in Florida?

16        A    Yes.

17        Q    This is the paper you discuss in your

18   report, right?

19        A    Correct.

20        Q    And looking here, we see the figures.

21   These resemble the figures in your report, right?

22   I think here is Figure 3, I believe you said it

23   was -- hold on, I'm just going to check my number

24   here.

25              It says their Figure 4 reproduced below

1    as Exhibit 1.

2           MS. KEENAN:  Keep scrolling.  There we

3    are.

4        Q    This is Figure 4 from that article,

5    right?

6        A    That's correct.

7        Q    This is where, this is the article you

8    pulled this figure from when you put it in your

9    report, right?

10       A    Yes.

11       Q    Okay.

12       A    Wait, wait, can you just go up a little

13   bit?  I just want to make certain -- stop.

14       Q    Sure.

15       A    (Reviewing.)

16           Okay.  That's it, that's the figure that

17   we put in our report.

18       Q    Okay.  And give me one second.  I'm

19   having a pagination problem.  I'm going to stop my

20   Screen Share for one second just while I sort

21   something out.

22           Okay, I'm sorry, I'm looking at the

23   wrong page number.  I'm going to reshare my screen

24   again.

25           So we're back where we started.  This is

1  Page 298, Figure 4, what we were just looking at,

2  right?

3      A    Yes.

4      Q    I'm going to scroll up to Page 297, and

5  I'm asking you to take a look at the paragraph,

6  the first word "visually" is highlighted.

7          Go ahead and read that and let me know

8  when you're done reading it.

9      A    (Reviewing.)

10         Yep, I've read it.

11     Q    So this says:  Visually speaking, one

12 takes from Figure 4 the idea that the three main

13 racial groups in Florida all suffered from drops

14 in voter registration in late 2011 as compared

15 with late 2007.

16         Did I read that correctly?

17     A    That's correct.

18     Q    And that's what you were talking about

19 in your report, that visually speaking, it looks

20 like they all suffered drops.  It looked to you

21 like white voters suffered a more significant

22 drop, right?

23     A    Can you just stop for that and go back

24 to our report for a moment?

25     Q    Of course.

1    A    Because I know where you're going to go

2  and I want to speed you up.  Can you go to the

3  text above, I think it is, where we say, let me

4  emphasize -- read the last sentence in that

5  paragraph.

6    Q    I think that's the one I read you when

7  we started.  There is no evidence of statistically

8  significant --

9    A    There is no evidence of statistically

10 significant, what's the next word, differences in

11 the registration rates among white, blacks, or

12 Hispanics after the adoption.  You with me?  So

13 what are we comparing here?  Are we comparing

14 whites, blacks and Hispanics to each other, or are

15 we comparing whites to time, blacks to time, and

16 Hispanics.  The answer is we're comparing white

17 registrations to black registrations, black

18 registrations to Hispanics, and Hispanics to

19 whites.

20        Now, go back to the article, to Page

21 297.  Read carefully, and John will want to be

22 involved in this as well.  Where was the

23 highlight?  There is -- keep on reading,

24 nonetheless, when we fit regressions to the

25 registration differences in the three panels, one

1    of the six estimates of coefficient times, the

2    only statistically significant estimate is that

3    for African Americans.  So what are we comparing

4    here?  African Americans to time, whites to time,

5    Hispanics.

6              That is not the question John and I

7    raised.  We want to know whether the slopes in

8    figure, just below, go below, scroll down just a

9    little bit.  Are those slopes significantly

10   different from each other, not whether they're

11   significantly different from time.

12             I'm sure you're aware of this, but there

13   is a difference between significance, magnitude of

14   effect, and we're asking a different question.

15   We're asking was the drop that we see here

16   significantly different for Hispanics and whites,

17   whites and blacks, not whether it was

18   significantly different from time.

19        Q     So I have a couple of follow-up

20   questions.

21        A     Do you understand that difference?

22        Q     Of course, I understand that difference,

23   but it sounds like you're saying --

24        A     Hold on.  I haven't finished my answer.

25        Q     Sir, respectfully, I'm asking the

1  questions, and if you ask me a question, it's my

2  turn to speak.

3       A    All right.

4       Q    I'm asking you the question.  It sounds

5  like what you're saying is that this report you

6  cited and the report you conducted are asking

7  different questions.  Is that what you're saying?

8       A    That is substantially correct.

9       Q    Okay.

10      A    Not only are we asking a different

11 question, but as I'm sure you know, in the

12 rebuttal report from Herron and Smith, both

13 address this particular table, they shift over to

14 the question that we were asking and offer

15 evidence to show that there are significant

16 differences in these slopes across different

17 racial and ethnic groups, evidence that we didn't

18 have at the time of their original report.

19      Q    Sure.  But what you're doing here is

20 you're contrasting, you're saying they do not

21 offer any empirical -- back in your report, just

22 for the record, Exhibit 2, starting on Page 11.

23           You're saying Dr. Herron and Dr. Smith

24 are able to conclude that blacks and Hispanics are

25 more likely to be registered via 3PVROs than are

1    non-Hispanic whites, but they do not offer any

2    empirical evidence to support the speculation that

3    the impact of SB 7050 on actual voter registration

4    rates has been different for these groups.  I read

5    that correctly, right?

6          A     Correct.

7          Q     And you're saying that is the question

8    about whether, comparing those slopes to each

9    other, right?

10         A     Correct.

11         Q     But then you say, this is in contrast to

12   the earlier published assessment of Florida's

13   HB 1355 where Herron and Smith report a test of

14   the impact of HB 1355 on registrations for blacks,

15   Hispanics, and whites in their Figure 4, right?

16   So you're contrasting this report with what we

17   just looked at, Exhibit 5, right?

18         A     Correct.

19         Q     But now you're saying that Exhibit 5

20   doesn't perform a comparison of those slopes,

21   right?

22         A     It does.

23               MR. PRATT:  Objection.

24         A     Can I talk?  It does show a contrasting

25   difference between the impact of the, I forgot the

1  name, 1355 on blacks, whites and Hispanics.  It

2  just doesn't test for the significance of it.  It

3  only tests for the significance over time.  So

4  it's time versus Hispanic, African America and

5  white.  It doesn't compare the slopes.

6          So they show a picture that compares

7  slopes, but they don't test the difference of

8  those slopes.

9      Q    Right.  What they're doing is comparing

10  against time like you said before, right?

11      A    Correct.

12      Q    Not comparing the slopes, right?

13      A    Correct.  But they have evidence --

14      Q    In contrast to the earlier published

15  assessment where they reported tests on the impact

16  of HB 1355 on registration for blacks, Hispanics

17  and whites in their Figure 4, what they were doing

18  is reporting a test of the impact on registrations

19  for those groups against time, not against each

20  other, right?

21      A    They did both.  Maybe I should be -- you

22  didn't hear me the first time.  If you look at the

23  table in the journal article, the figure, that

24  contrasts, to me, if you looked at the slope for

25  whites, don't you think that's steeper than the

1    slope for blacks and Hispanics?

2         Q     I'm not going to speak to what these

3    tables show.  I'm not a political scientist.  I'm

4    saying what the report says.

5         A     I will answer the question this way.

6    They show a picture that to any reasonable person

7    would suggest that the slope, the decline is

8    greater among whites than it is Hispanics and

9    African Americans.  But they report in the second

10   paragraph above that the slope was only

11   significant for African Americans, not Hispanics

12   and not whites.

13             So they answer both questions, but leave

14   us wondering whether or not the statistically

15   significant differences in those slopes between

16   racial groups has been answered.  That's all.  The

17   picture tells me --

18        Q     You would agree -- go ahead, sorry.  I

19   thought you were done.

20        A     -- there would have been a statistical

21   test, which by the way they do perform in their

22   rebuttal report so it's not like they didn't think

23   it was important, they just didn't think it was

24   important to do when they wrote the article in

25   2014.

1     So we're sort of left with, again, and I
2  think you're right, we do have, we do ask
3  different questions.  We asked whether this was
4  consequential for disparate effects of SB 7050 or
5  1355 on these different racial groups.  But the
6  evidence is like, it's right in front of me.  That
7  line for the whites is steeper, and I would
8  imagine if we had 100 people walking into this
9  Zoom they would say, yeah, it looks like a bigger
10  drop.  Now whether it's statistically significant
11  is another question.
12     Q    And that's the question that's not
13  answered in the report, right?
14     A    In this paper, it's answered.  In the
15  report, it's not addressed.
16     Q    In this paper on our screen, Exhibit 5,
17  you think that question is answered?  That the
18  differences across in the slopes --
19     A    No, no.
20     Q    -- was significantly significant?
21     A    Let me go back.  All they're telling you
22  is that these drops in slopes are only significant
23  for African Americans.
24     Q    Right.
25     A    But nonetheless, the question that

1   remains unanswered, but visually suggestive, is

2   that these slopes are not the same, and are they

3   significantly different between each other.

4         Q    And like you just said, that question of

5   whether there are statistical differences between

6   the slopes is not answered in this paper that you

7   called attention to in your report --

8         A    That is correct.

9         Q    -- right?

10            Okay.  I'm going to go back to your

11  report, then.

12            Okay.  I'm going to move on to the

13  bottom of Page 13 now that we have discussed that

14  figure.  Do you see the sentence that begins with,

15  in addition to the limited empirical test

16  discussed above?

17        A    Yes.

18        Q    Can you explain what you mean here by

19  limited empirical test?

20        A    Well, we didn't get -- go up and I'll

21  read it again.

22            Little further.

23            Up, up, up.

24            There is no evidence of statistically

25  significant differences in registration rates

1    among whites, blacks or Hispanics after the

2    adoption of 1355.

3              Now go down, and that first statement

4    that says, in addition to the limited empirical

5    test, that limited empirical test refers to the

6    last sentence of the paragraph above the figure.

7         Q    So you're referring to the limited

8    empirical test that the experts performed in

9    relation to a different line in 2011?

10        A    Yeah, in addition to the limited

11   empirical test discussed above.  What was

12   discussed above?

13        Q    Well, there's a lot discussed above,

14   that's why I'm asking.  You talked about Lichtman,

15   you talked about Herron, you talked about Smith

16   and then you talked about this article.

17        A    Okay.

18        Q    So I'm just trying to understand.  This

19   is no longer about HB 1355, so that's why I'm

20   trying to figure out what you're referencing back

21   up to.

22        A    It is, in addition to their limited

23   empirical test discussed above, both 1355 and what

24   is discussed earlier regarding the best way to

25   evaluate the impact of 13 -- I'm sorry, of 7050.

1    So it refers to both, the 1350 paper -- 1355

2    paper, and it refers to our overall critique that

3    they did not test what we think is a key question,

4    what is the impact of 7050 on voter registration

5    differences among blacks and Hispanics.  So it

6    encompasses everything above.

7         Q    Okay.  Do you believe that the experts

8    conducted any limited empirical tests in their

9    reports in this case?

10        A    Yes.

11        Q    And can you explain what that is for

12   Dr. -- not Dr. Herron, but Dr. Smith, what's the

13   limited empirical test that you believe Dr. Smith

14   conducted in this case, just so I have an

15   understanding of what you mean?

16        A    Okay.  It is our understanding that, if

17   you're parsing the two reports separately, in

18   Dr. Smith's case, he's contesting, or he's, he's

19   showing, or he's claiming that by limiting the

20   ability, that the provisions of SB 7050 impede the

21   registration rates of non-whites.  And we don't

22   think that he has conducted the type of analysis

23   that shows that.  He has only shown that a

24   disproportionately larger number of non-whites

25   registered through third parties than register --

1    than whites.  That is the number of people who

2    register by third parties as a percentage of the

3    total number of third party registrations is

4    skewed towards non-whites.

5           And he's shown there is reason to

6    believe that the adoption and implementation of

7    SB 7050 has curtailed the rate at which non-whites

8    register through third parties.  He has not

9    answered the question, does this have

10   consequential effects on the overall registration

11   rates between whites and non-whites.  And we think

12   the design we suggested above is a preferred

13   design for doing that.

14       Q    And I understand you're focused on that

15   disparate impact question, but you would agree

16   that in the Summary of Findings, and I'm back at

17   Exhibit 3 in Dr. Smith's report, I'm just looking

18   at the Summary of Findings as a summary of what

19   his report was about, the first one doesn't have

20   anything to do with rates or disparate impact,

21   right?

22       A    That's correct.

23       Q    Okay.  What about the second one?

24       A    No, it doesn't.

25       Q    How about Paragraph 9?

1          A     No, it doesn't.

2          Q     What about Paragraphs 10, 11, and 12?

3          A     It doesn't.

4          Q     Okay.  What about Paragraph 13 and 14?

5          A     Well, there -- at 14 and 15 they do.

6     Particularly 15.

7          Q     Where in 14 does it reference race or

8     disparate impact?

9          A     Only in 15.

10         Q     Okay.  So the Summary of Findings

11    includes Paragraphs 7 through 15, and you're

12    saying in Paragraph 15, I'm just going to read it

13    aloud, says:

14              According to FDOE data, voters of color

15    and voters living in a dozen counties that account

16    for more than 7 million registered voters in

17    Florida rely most heavily on 3PVROs.

18              Did I read that correctly?

19         A     Yes.

20         Q     And so when you're saying the question

21    that Dr. Smith was trying to answer is about

22    disparate impact, that's because of the word

23    "rely," right?

24         A     That's correct.

25         Q     Okay.  But you would agree that if this

1    paragraph just said, voters of color and voters

2    living in a dozen counties disproportionately

3    register through 3PVROs, you would not dispute

4    that, right?

5        A    I would not dispute that in his report

6    or in Professor Herron's report.

7        Q    So it's really just the word "rely" and

8    then Paragraph 15 in the entire Smith report that

9    you're taking any issue with; is that right?

10       A    If we look at Smith's report, and of

11   course, I include Herron's in this, my

12   understanding is that he shows that voters of

13   color rely heavily on third party voter

14   registrations, and I don't take issue with that.

15       Q    Okay.  All right.  I'm going to return

16   to your report, then.

17            And to the extent, I guess, to the

18   extent that's the empirical work that Dr. Smith

19   does in his report, you don't contest any of that

20   empirical evidence, do you?

21       A    I would not contest the empirical

22   finding in Paragraph -- is it 15, of his, of

23   Dr. Smith's report.  And maybe I'm reading into

24   the report, the consequences of that would suggest

25   that this impedes voter registration among

1    non-whites.

2         Q    Sure.  I think you can have causal

3    concerns about that, but not with the actual

4    content of Dr. Smith's report, right?

5         A    I would say that there is nothing in 15,

6    and for that matter, regarding the previous

7    paragraphs, that I would disagree with on the

8    reliance of third party registrations.  The

9    conclusion that this implies is that this imposes

10   costs on voter registration and therefore impedes

11   voter registration among non-whites.

12        Q    Okay.

13        A    And let me go back to the report, if you

14   would, just for a second, or go to the laws

15   restricting voter registration efforts by 3PVROs

16   increase the costs of voting and can lead to voter

17   disenfranchisement, including those already

18   registered to vote.  That is what we think is the

19   lacking empirical evidence.

20        Q    Sure.  It's that line in Paragraph 16,

21   like I said.

22             Okay.  But you don't see that conclusion

23   anywhere else in the report, do you?  And

24   certainly not in the data relied upon in this

25   report, or the empirical analysis that Dr. Smith

```
1    does, right?

2              MR. PRATT:  Objection to form.

3         A    So let's go back up to that quote again.

4         Q    Sure.

5         A    I want to be certain I'm reading it

6    right.

7         Q    This is 16, right?

8         A    Right.  That conclusion or statement or

9    sentence, I mean Dr. Smith is an efficient writer

10   and didn't need to repeat himself, but it says,

11   laws restricting voter registration efforts by

12   3PVROs increase the costs of voting and can lead

13   to voter disenfranchisement.

14             We don't believe the empirical evidence

15   supports that conclusion.  We're not taking issue

16   with the earlier statement in 15, but this seems

17   to suggest that the whole reason for restricting

18   third party voter registrations is to limit voter

19   registration and voter participation, particularly

20   among non-whites, and we don't think that that

21   conclusion is supported by the evidence.  Only

22   that third party registrations are more widely

23   used by non-whites.

24        Q    And I just want to be clear.  You took

25   that from the sentence that says, laws restricting
```

1    voter registration by 3PVROs increase the costs of

2    voting and can lead to voter disenfranchisement of

3    eligible citizens, including of those already

4    registered to vote, right?

5        A    And if -- keep on reading.  It goes into

6    full effect.

7        Q    Right.  If SB 7050 goes into full

8    effect, the costs of voting for all eligible

9    citizens residing in Florida who seek to become

10   registered to vote, as well as to individuals

11   currently registered to vote in Florida who want

12   to update their registrations, will likely

13   increase, right?

14       A    Right.

15       Q    But certainly that sentence doesn't say

16   anything about differences by race or disparate

17   impact, does it?

18       A    All one has to do is read Paragraph 15.

19   If you go up to 15.

20       Q    Which you don't disagree with?

21           MR. PRATT:  Counsel, if you could please

22   let him finish the answer, please.  Thank you.

23       A    Could you go up to 15?

24       Q    Sure.

25       A    It preceded 16.  I read 15 to suggest

1    that non-whites rely on third party registrations.

2            When I read 16, it doesn't take a leap

3    of faith to suggest that the restrictions on voter

4    registration efforts by third party voter

5    organizations, or third party registrations will

6    not only increase the costs, but do it disparately

7    for non-whites.  Maybe I'm reading much into

8    David, into David -- into Dan's statements, but I

9    think that's a reasonable interpretation of 15 and

10   16.

11        Q    Well, I want to be clear what you're

12   inferring and what the report says.  What the

13   report says in 15 you don't disagree with.  You've

14   said that a number of times on the record, right?

15        A    The report --

16        Q    What the report says in Paragraph 15,

17   you don't disagree with that.  You've said that a

18   number of times, right?

19            MR. PRATT:  Objection.  Form.

20        A    We found no evidence to suggest or no

21   analysis to suggest that more non-whites register

22   by third parties.  We also found in 16 reason to

23   believe that if you restrict third party

24   registrations, you will restrict non-white

25   registrations.  That's what we contest.  That's

1    what we think is deficient.

2          Q     But not Paragraph 15, right?

3          A     No.

4          Q     Okay.  And what you're saying is if the

5    last sentence of Paragraph 16 is true, I'm going

6    to read it again, if SB 7050 goes into full

7    effect, the costs of voting for all eligible

8    citizens residing in Florida who seek to become

9    registered to vote, as well as to individuals

10   currently registered to vote in Florida who want

11   to update their registrations, will likely

12   increase.

13          You're saying if that sentence were

14   true, it would necessarily imply that non-white

15   citizens would be disproportionately impacted and

16   that's why you're quibbling with it, right?

17         A     No.

18         Q     Okay, then I don't think I understand at

19   all what you're saying about the relationship

20   between 15 and 16.  15 you haven't disputed, but

21   16 you're saying you dispute because of something

22   in 15, so I'm not sure I understand the

23   relationship you're drawing.

24         MR. PRATT:  Objection.  Form.

25         A     I didn't hear a question, so I'm not

1    being silent, I'm just -- is there a question

2    here?

3        Q    Tell me where I'm going wrong about why,

4    how these two sentences, the last one, why do you

5    keep drawing it back to 15 is the question I'm

6    going to ask you.  I read these two as stand-alone

7    sentences.  I'm asking why you keep drawing it

8    back to 15?

9        A    I think I've answered your question

10   before.

11       Q    I'd like you to answer it because I

12   don't believe that you have.  The question being

13   why you are drawing the last sentence of 16 back

14   up with 15 in describing your objection to it?

15       A    If -- what was my objection?  I'm not

16   certain I understood.  You said --

17       Q    I don't understand it either.  That's

18   what I'm trying to get to the bottom of.

19       A    Okay, well, I'll repeat it one more

20   time.  15 suggests, and we don't contest, that

21   more people of color register by third parties

22   than do whites.

23            The charge in the last sentence is that

24   if you adopt and implement 7050, you'll increase

25   the costs for all eligible voters, but

1  disproportionately so for non-white voters given

2  what we know in 15.

3          It seems logical to conclude that if, in

4  fact, more people register as a proportion of

5  total population by third parties who are

6  non-white, that if you restrict third party

7  registrations, you will, in fact,

8  disproportionately impede non-white registrations.

9  That we contest.

10          It's not -- I mean the language you're

11  looking for, the black letter language you're

12  looking for is not in Smith's report.  And I will

13  only say that the inference is to me very strong

14  that what is suggested here is that SB 7050, if it

15  goes into effect, and has at times, my

16  understanding, has gone into effect, will increase

17  the costs of registering to vote for non-whites

18  and impede their ability to register.  That's how

19  I read the Paragraphs 15 and 16.

20          And we don't think that that has been

21  substantiated in Herron's report.  And again, in

22  this report, we find no empirical evidence to show

23  that it will impede non-white registrations, and

24  for that matter, white registrations.  We don't

25  see any evidence of that.  And we don't see the

1    design that would test it.

2         Q     Okay.  I think I've got it now.  I'm

3    going to move on to what you discuss here on the

4    bottom of Page 13 into 14.  You describe a

5    cost-benefit theory for how SB 7050 could impact

6    voter registration, all other things being equal,

7    that you saw in Dr. Smith's report.

8              Other than -- I'm going back to

9    Exhibit 3.  Other than Paragraph 16, can you

10   explain what you're talking about when you talk

11   about the cost-benefit theory in Dr. Smith's

12   report?

13        A     Well, if you go back up to an earlier --

14   and again, I don't have control over this so

15   you'll have to just keep --

16        Q     I can scroll.

17        A     It refers to a body of research on the

18   costs of voting.

19        Q     That's the same paragraph.  One second.

20   That's here.

21        A     Here we go.

22        Q     That's Paragraph 16.  Other than

23   Paragraph 16, is there anywhere that the

24   cost-benefit theory appears in Dr. Smith's report?

25        A     Not that I know of.  I mean I'm sure

1    it -- he refers -- this is where he makes his case

2    for the cost of voting.

3        Q    When you say I'm sure, do you mean

4    you're sure he doesn't reference it elsewhere, or

5    you're sure he does reference it elsewhere?

6        A    It's referenced here.  I don't know if

7    it's referenced -- my knowledge of the report

8    isn't photographic, so if we could do a word

9    search.  But it's sufficient for me to say that he

10   makes the argument that the cost of voting theory

11   will have this impact on registration.

12       Q    Okay.  But I want to be clear about how

13   far this extends into your critique of the Smith

14   report, so I'm happy to scroll through.  I don't

15   see it anywhere else in the report.  We can go

16   page-by-page if that would be helpful.

17       A    Well, the argument that Professor Smith

18   makes is if you increase the cost of voter

19   registration, and we contest that, we don't think

20   that SB 7050 increases the cost of registering for

21   voters, it increases the cost for third parties to

22   register voters.  That's Distinction No. 1.

23            Distinction No. 2 is that there is a

24   literature on the cost of voting that suggests, as

25   Professor Smith writes here, that legal

1    restrictions on the exercise of the franchise can

2    create institutional barriers to participation,

3    which impart significant burdens on and lower the

4    probability of voting.

5             I don't know where that quote -- I guess

6    it comes from Hansen and Rosen -- Rosenstone and

7    Hansen.  That's a 1993 citation.

8             If you go to my report, you'll find that

9    I discuss a whole bunch of legislation that was

10   adopted to reduce the cost of voting or to

11   increase the cost of voting, voter ID, early

12   voting, and election day voting.  And in every

13   instance, the theory of cost of voting, sometimes

14   known also as rational choice theory, doesn't

15   produce the desired effect of the law.  If you

16   make it easier for people to vote, they don't

17   vote.  If you impose a cost, a voter ID, a

18   photographic voter ID, which would presume to

19   increase the cost for people to vote, it actually

20   doesn't have any substantial effect.  In fact,

21   early voting, which was thought to be probably the

22   most costless means of voting, has produced

23   negative effects on turnout.

24             So my point is that this explanation

25   fails to take into consideration a whole host of

1    confounders which in the report Dan Smith reports

2    about.  There may be other confounders.  So we

3    just find the cost of voting argument and the

4    expectation in the out years after SB 7050 is

5    further implemented not to be intuitive and may,

6    in fact, not produce the effects that he discusses

7    here.

8         Q    So I was going to get into that second

9    paragraph, that second half of your report

10   starting on Page 14, but first, you mentioned that

11   the first objection you had before you get into

12   the literature was that the costs are actually on

13   the third parties and not on voters.  That opinion

14   is not contained in your report, is it?

15        A    No, it is not.  It is not.  It's a

16   response I made, my response today to the rebuttal

17   report, which I didn't have when I wrote this

18   report.

19        Q    And which you didn't write any sort of

20   supplemental report about?

21        A    I have not written a supplemental report

22   on the rebuttal report, no, I have not.

23        Q    So now let's go into this Cost-Benefit

24   Theory to Voter Registration and Turnout section.

25   Here you suggest that the cost-benefit theory,

1    that they are, these assertions are inherently

2    speculative as the careful conditional wording of

3    them would suggest.

4            I take it that's the use in Exhibit 3 of

5    the words "can lead" and "will likely increase;"

6    is that what you mean by the "conditional

7    language"?

8        A    Yes.

9        Q    And so is your objection that this is --

10   I'll rephrase.

11           Do you think that an observation has to

12   be a certainty rather than a prediction in order

13   to constitute a valid expert opinion?

14       A    I think it has to be tempered against

15   the evidence.  They cite Rosenstone and Hansen.

16   That's a 1993 paper.  They know a vast body of

17   literature that has been published since then that

18   would lessen, or should have lessened, their

19   confidence that it would likely increase or,

20   what's the other phrase, can lead.  I think they

21   should have been aware of the fact that there is a

22   host of research that shows that election laws

23   adopted to decrease or increase the cost of voting

24   has not produced those effects.  And they should

25   have been aware of the fact that the non-intuitive

1   findings from this research can be explained by a

2   bunch of other conditional relationships.

3          I can explain those conditional

4   relationships if you are interested.  But these

5   are fine scholars, and I want to be very clear, I

6   have a high regard for their work.  They should

7   have -- I know they know this work because it's

8   cited in their papers published on their Vitae.

9          They know about the research on voter ID

10  laws, they know about the research on voter

11  turnout from early voting.  They should have been

12  more circumspect and suggested there were

13  intervening variables that can affect the impact

14  of voting laws that seem to have an effect on

15  cost.  Most scholars no longer believe the cost of

16  voting is a direct and unimpeded relationship.

17  It's complicated.

18      Q    So you drew attention to the 1993 study

19  that I'm highlighting here in Paragraph 15.  You'd

20  agree there are also studies from 1978, 1993,

21  1995, 2011, 2013 and 2018, right, in this

22  paragraph?

23      A    Yeah, but I don't want to be picky here.

24  The Rosenstone and Wolfinger papers on voter

25  registration, 1978, and the Aldrich as well, that

1    world has changed.  Verba, Schlozman and Brady, I

2    don't know why it was cited.  The Brady and

3    McNulty paper is all about changing boundaries to

4    precincts.  The Leighley/Nagler paper actually

5    doesn't support the conclusion they're making

6    here.

7            If you read their book, you would know

8    that they had, actually point out how early voting

9    has a negative effect on voter turnout.

10           The Piemonte, et al. paper is probably

11   the strongest piece of evidence that increasing

12   obstacles and legal restraints on registering and

13   voting, and not just registering, but on voting,

14   can impede turnout.

15           But some of these citations I'm a little

16   confused about and would not, if we looked at them

17   carefully, they would not be, I think you in the

18   lawyer world call it on point.  They would not

19   talk about either registration or even always

20   about the cost of voting.  Nevertheless --

21       Q    Go ahead.

22       A    I'll stop there.

23       Q    The Piemonte one that you just cited is

24   the most recent paper.  That's the one you said is

25   the most on point, right?

1      A      That is not the most recent paper.  I'm

2  surprised they didn't cite the 2023 paper that

3  just came out, or 2020 --

4      Q      The most recent paper cited in their

5  report I'm saying.

6      A      In their report.  And looks at a host of

7  other, what I will call obstacles to voting, but

8  not necessarily costs.

9             I should note that the Piemonte paper

10  doesn't directly test the cost hypothesis.  It

11  simply says here are some measures that cohere

12  together that purport to represent costs of

13  voting.

14      Q      Okay.  Is that in your report?

15      A      No, no.

16      Q      What about your opinion that you just

17  gave about this 2013 cite not being on point, is

18  that in your report?

19      A      Actually I cite the Leighley and Nagler,

20  I think I, I could be wrong, but in my report I

21  probably cited at least the Leighley paper --

22  book, if not the Lee and Piemonte as examples of

23  research that has shown that we get what we call

24  non-intuitive or counterintuitive findings about

25  the costs of voting.

1      Q     Okay.  Do you know where you said that

2   in your report?

3      A     Yes.  Let's keep on going on.  Go down

4   to the citations.

5            Stop right there.

6            This is on voter -- I was wrong, I did

7   not cite -- just keep on -- I can't remember all

8   the citations.

9      Q     Sure.

10     A     (Reading.)

11           No, I don't think I cited any of those

12  citations.

13     Q     Okay.  So the next thing I was going to

14  ask you about is -- oh, you would agree you've

15  previously made predictions in your work as an

16  expert witness, right?

17     A     Say that again.

18     Q     You would agree you've previously made

19  predictions in your work as an expert witness?

20     A     I'm sorry, you're breaking up.  I

21  couldn't hear the first part about, what about

22  predictions?

23     Q     You would agree that you have previously

24  made predictions in your work as an expert

25  witness, right?

1      A    I have made predictions, in this case?

2      Q    No, no, just in your work as an expert

3  witness in Federal Court.

4      A    I wouldn't use the word "prediction,"

5  no.  I'm simply drawing conclusions that lead to

6  reasonable hypotheses about what might likely

7  happen.  And I think predictions would be fair.  I

8  have made probabilistic statements about the

9  likelihood of certain election laws producing

10  certain types of effects.  So yeah, I've made --

11  the word "prediction" would be not one I would

12  use.  I'd simply say likelihood of something

13  happening.  And I do it in this case as well.

14      Q    Okay.  Just as to the word

15  "predictions," I'm going to go to what's been

16  marked as Exhibit 10 briefly.  This is that

17  deposition in the District Court in Arizona that

18  we talked about previously.

19          I'm on Page 85, Line 9, the question

20  says:  And, Professor Stein, you, yourself, have

21  made predictions as an expert witness, correct?

22          And in Line 12 it says the witness says,

23  yes, yes.

24          And Line 14 says, under penalty of

25  perjury in Federal Court, correct?

1          And in Line 16 the answer says yes.

2          Did I read that correctly?

3     A    Yes.

4     Q    I can just keep going just to make it a

5 little bit easier.  This next section of the

6 deposition is about that Boockvar case that you

7 submitted a report in; do you recall that?

8     A    Yes.

9     Q    And this question is looking at Page 10

10 of that report, and you say it reflects what you

11 wrote at that time.  In that report you stated,

12 quote, it is my considered opinion that expanding

13 mail-in voting and providing drop boxes should

14 serve as a corrective for the depressing effects

15 the COVID-19 pandemic will likely have on voter

16 turnout.

17          Did I read that correctly?

18     A    Yes.

19     Q    So you've even used the words "will

20 likely have" in your expert reports, right?

21     A    Yes.  I have made statements about what

22 I think is likely to occur.  I would probably

23 have, and I did use, the word "prediction," so I

24 am corrected, but I would not have used that word

25 "prediction," I would have said likely.  The

1    language I used in the Pennsylvania case is more

2    preferable.

3         Q    Sure.

4              Going back to your report, Exhibit 2,

5    again, I'm going to go back up to where we were on

6    Page 14.  You say, thus, their reliance on

7    rational choice theory to predict the impact of SB

8    7050 is incomplete and overlooks research that

9    offers alternative explanations about how this

10   legislation might impact voter registration and

11   voting.

12             I understand -- we'll get to in a minute

13   the reasons you think it is incomplete and

14   overlooks research, but my question is slightly

15   different right now, which is, are you offering

16   any opinion that rational choice theory is not a

17   legitimate means of work in political science?

18        A    Oh, no, no.  I mean it's been a

19   cornerstone of the profession.

20        Q    Okay.  So moving on to the section that

21   you say you drafted, that's the Effect of Past

22   Election Laws on Voter Turnout, your report says

23   there are two bodies of research that are relevant

24   in assessing the potential effect of SB 7050 on

25   voting that you argue Professor Smith overlooked.

1              Did I read that correctly?

2         A    Yes.

3         Q    I want to break those two apart.  First,

4    you say a significant number of research papers,

5    cited and discussed below, have shown the effect

6    of election laws intended to reduce the costs of

7    voting, or alleged to increase the costs of

8    voting, have either null or minimal and

9    non-consequential effects on voting.

10             I read that correctly, right?

11        A    Yes.

12        Q    And those are the ones you discuss down

13   here on early voting, on voter ID and that sort of

14   thing.  Am I understanding the relationship

15   between those correctly when you say "cited and

16   discussed below"?

17        A    Yes, yes.  I mean that includes that,

18   but it's not exclusive of the second.

19        Q    The second body of research, also cited

20   and discussed below, you say it posits the

21   relationship between voting and the costs of

22   voting is mediated through or conditional on other

23   factors which either enhance or mute the effect of

24   election laws on voting.

25             Did I read that correctly?

1          A      Yes.

2          Q      And you cite the Grimmer and Hersh paper

3    as something that best summarizes this body of

4    research; is that right?

5          A      Yes.

6          Q      And you linked to that paper in your

7    report in Footnote 3, right?

8          A      Yes.

9          Q      I'm now going to share what's been

10   premarked as Exhibit 6, this is the Grimmer and

11   Hersh report titled How Election Rules Affect Who

12   Wins, right?

13               (Exhibit 6 was marked for identification

14   and is attached to the transcript.)

15         A      Yes.

16         Q      Fair to say you're familiar with this

17   report?

18         A      Yes.

19         Q      I'm going to go on Page 2, and I want to

20   talk about what this paper is studying.  On Page

21   2, I'm starting with this paragraph that says, and

22   the evidence shows the laws have small effects on

23   turnout and essentially no effect on partisan

24   advantage in a state.  Did I read that correctly?

25         A      Yes.

```
1        Q    And the next sentence says, this is the

2   puzzle we address:  Why do election laws bear such

3   a modest relationship to who wins and who loses,

4   right?

5        A    Correct.

6        Q    The paper goes on to say, our answer is

7   that modern election reforms target narrow shares

8   of the population, have a small effect on turnout,

9   and/or are imprecisely targeted at members of

10   political parties.

11            Did I read that correctly?

12        A    Yes.

13        Q    Okay.  So this report is focusing on the

14   impact of election reforms on voter turnout, and

15   specifically on the partisan effect of those

16   reforms, right?

17        A    Yes.

18        Q    Okay.  The report doesn't purport to

19   address the effect of any laws on registration

20   rates alone, right?

21        A    Say that again.

22        Q    Sure.  I understand, just to give you

23   context, I understand the report addresses the

24   effect on turnout, but the report doesn't purport

25   to address the effect of any of these laws on
```

1    registration rates alone, just on turnout, right?

2        A    No.

3        Q    Where does the report address the effect

4    of the laws on registration rates specifically?

5        A    Repeat, could you repeat your question

6    that you originally asked?

7        Q    Sure.

8        A    Two parts to the question.

9        Q    I think I said I understand the report

10   purports to address ultimate turnout, right, and I

11   think you said yes, right?

12       A    No.

13       Q    You do not think that the report

14   addresses turnout?

15       A    Hold on.  Could you go back and read

16   what the paper -- you read it to me already so why

17   are you asking -- it purports to study turnout and

18   partisan vote shares, but --

19       Q    Right.

20       A    Okay.

21       Q    Oh, yeah, I'm not trying to exclude the

22   partisan effect.

23       A    I don't recall.  I'd have to reread it

24   and search that it specifically addresses issues

25   of voter registration.

1      Q    Okay.  I'm going to ask you about

2   something that it does say about registration, so

3   my question is whether you recall that it

4   addresses the effect of any laws on registration

5   rates.

6      A    I don't recall.

7      Q    So I'm going to go to Page 6 of this

8   report.

9           See the Section 2.1, the Scope of

10  Election Laws?

11     A    Yes.

12     Q    Okay.  This report does purport to

13  discuss several registration rules, is the term

14  they use, for example, same-day registration,

15  automatic registration, online registration, and

16  preregistration.  Do you see that there in the

17  report?

18     A    Yes.

19     Q    And then on Page 7 the paper cites a

20  series of studies showing that those laws do

21  affect turnout.  Would you agree with that?

22     A    Do you read that, as Menger and Stein

23  note, much of the research on the effects of these

24  laws on turnout relies on -- yeah, I know that

25  work.

1          And go back up to what you have cited as

2     voter registration laws.

3          Q     Sure.  Registration rules, same-day

4     registration, automatic, online and

5     preregistration.

6          A     Yes, they've all --

7          Q     Okay.  Go ahead.

8          A     Those are research, particularly on

9     same-day registration, do have positive effects on

10    turnout.

11         Q     And so the studies cited here in

12    Paragraph 7 in particular, I don't need to read

13    the whole thing out loud to you, you can read it

14    to yourself, would you agree that the studies

15    cited here report an increase in voter turnout by

16    between one and 5.8 percent on the various

17    registration rules discussed here?

18         A     Yes.

19               MR. PRATT:  Objection.  Form.

20         A     Well, I mean it talks about in-person,

21    vote by mail, it talks about preregistration of

22    young adults, automatic registration, and of

23    course, same-day registration all have been shown

24    to have significant and positive effects on voter

25    turnout.

1     Q     Okay.

2     A     I should note just for passing, I didn't

3  see in this third party registrations.

4     Q     To your knowledge, does this report

5  discuss third party registrations?

6     A     To my knowledge, I don't recall it

7  having discussed third party registrations.

8     Q     You would agree each of the rules that

9  you just talked about increase access to

10  registration, right?

11    A     Yes.

12    Q     This paper, to the best of your

13  knowledge, doesn't examine the effect of voter

14  registration rules that decrease avenues for

15  registering voters, right?

16    A     Not to my knowledge, no.

17    Q     And like you said, it doesn't say

18  anything about 3PVROs specifically, does it?

19    A     No, it does not.  Not to my -- I don't

20  recall.

21    Q     I'm going to move ahead to Pages 10 --

22  okay, so this is the part of the paper about

23  modeling how election laws affect outcomes, right?

24    A     Yes.

25    Q     Okay.  And in particular this is the

1  part of the paper that talks about trying to

2  determine the partisan effect of a law, right?

3      A    Yes.

4      Q    Would you agree that nothing in

5  Dr. Smith's report purports to be identifying the

6  partisan effect of SB 7050?

7      A    I would agree with that.

8      Q    Would you agree that the effect of a law

9  on race is not the same as the effect of a law on

10 party?

11     A    No.

12     Q    You would disagree with that?

13     A    I think there is substantial research in

14 the discipline, I think that's not a, that is not

15 yet a fixed judgment.  The high correlation

16 between partisanship and racial voting is the

17 subject of lots of research, and I'm inclined to

18 believe there is a relationship, although I do not

19 believe it to be one-to-one.

20     Q    So in the paper that you say best

21 summarizes the theory described in your report, it

22 says expressly, quote, the effect of a law on race

23 is not the same as the effect of a law on party.

24 That's at Page 26 of the same paper.  You disagree

25 with that is what you're telling us?

1       A    No, I completely agree with it.  It's

2  just --

3       Q    I think what I asked you --

4       A    Excuse me, can I finish?

5       Q    You're welcome to, sure.

6       A    Because what did I just say a minute

7  ago?  I don't believe it's a one-to-one

8  relationship.  Nor does Justin and Eitan believe

9  the effect of law on race is not the same as the

10  effect of a law on party.  That to me means that

11  there is, there could be a relationship, but it's

12  not the same.  It's not a one-to-one.  That's how

13  I interpret that sentence.  I don't think it's a

14  rejection of the relationship between race,

15  partisanship and election.

16       Q    Sure.  Maybe I misunderstood the answer

17  to your last question.  I asked you if this

18  statement was true and you said no.  So are you

19  now saying you agree with this statement?

20       A    I agree that the effect of a law on race

21  is not the same as the effect of law on party, but

22  I do believe --

23       Q    Correct.

24       A    -- that the effect --

25       Q    That's all I asked you.  That's all I

1    asked you.

2         A    You'll have to suffer with my answer.

3              I do believe there's a relationship

4    between the two, and I do believe that Grimmer and

5    Hersh also believe the same.  It's simply that it

6    deviates, that's all.

7         Q    Right.  Okay, maybe I misunderstood your

8    last answer.  I think we agree on that point.

9              The publication that I have in Exhibit

10   6, it doesn't suggest that no law could have an

11   effect on voter turnout, right?

12        A    Correct.

13        Q    So I'm going to go to Page 42 for a

14   minute.

15             Here in the last paragraph it says:

16   Policies that target a large politically

17   homogenous share of the population, a racial

18   group, a religious group, a group of party

19   registrants, and have a large effect on turnouts

20   specifically for that group, should raise serious

21   alarm about the consequences for election

22   outcomes.

23             Did I read that correctly?

24        A    Yes.

25        Q    So I want to turn back to a few examples

1  in your report.  First you talk about early

2  voting, right?

3      A    Correct.

4      Q    You'd agree early voting laws have no

5  effect on registration rates?

6      A    I have no knowledge of the effect of

7  early voting on registration rates.

8      Q    Okay.  Would you agree that early voting

9  laws don't affect who can register voters?

10     A    No, I don't believe early voting has an

11 effect on who can register voters.

12     Q    And to your knowledge, early voting laws

13 don't affect 3PVROs, do they?

14     A    Not exactly.  It's not -- can you go

15 down to the citations below on early voting?

16     Q    Do you mean on the next page?

17     A    Yeah, beyond 15 or 16.

18     Q    Sure.  I think it's 5 through 8 it looks

19 like?

20     A    The article, and I don't write this up,

21 but Burden, Canon, Mayer and Moynihan, you with

22 me?

23     Q    I'm here.  It's in Footnote 7.

24     A    Effect of Early Voting on Voter Turnout.

25 They also looked at the effect of same-day

1    registration and early voting.  With me?

2         Q    They look at how early voting affects

3    same-day registration, is that what you're saying?

4         A    Yes.  And the two of them together had

5    an effect, a positive effect, modest positive

6    effect.

7              So yes, there's been some research on

8    early voting and voter registration.

9         Q    Okay.  Got it.  Maybe to be more

10   precise, early voting doesn't directly regulate

11   registration, does it?

12             MR. PRATT:  Objection.  Form.

13        A    I will say that in states that have both

14   early voting and same registration, same-day

15   registration, then early voting does have an

16   effect on voter registration.

17        Q    Sure.  And you don't do anything to

18   disaggregate states that do have early voting and

19   same-day registration and states that don't in

20   this report, do you?

21        A    No, other than to cite the Burden, et

22   al. paper.

23        Q    Okay.  It seems like the gist of this

24   section of your report suggests that according to

25   the rational choice theory, early voting --

1    rational choice theory would have predicted,

2    rather, that early voting would have a positive

3    effect on turnout, right?

4        A    Yes.

5        Q    Your report acknowledges that some

6    studies have found increases in turnout associated

7    with early voting, right?

8        A    A handful of studies have found a

9    positive effect.

10       Q    Right.  You cite two of them in your

11   report?

12       A    Yes.

13       Q    You claim that the majority of the

14   studies have failed to find a significant positive

15   turnout effect or found a significant negative

16   effect, right?

17       A    That's correct.

18       Q    Okay.  There you cite three studies,

19   right?

20       A    Yes.

21       Q    It might be four.  Hold on.  I don't

22   want to discount you.

23       A    Yeah, and 8.

24       Q    I see four, right?

25       A    You want to add Rigby.

1    Q    I think -- I'm just trying to figure

2  out -- I think you've cited Burden, Larocca,

3  Richey and Rigby for that proposition; is that

4  right?

5    A    Right.

6    Q    Okay.  Are the sources cited in this

7  report the total number of studies on turnout

8  associated with early voting?

9    A    I'm sure they're not.

10    Q    So when you say majority, do you mean

11  majority of the studies that you cite in your

12  report, or what do you mean?  Can you give me a

13  scope of "majority"?

14    A    Yeah, I would say the following.

15  They're the majority of peer-reviewed publications

16  that one would find in a standard search of the

17  literature using Google Scholar.  There are

18  probably papers that are not published in peer-

19  reviewed journals, books, edited volumes, center

20  reports, research center reports, but I use a

21  standard of peer-reviewed journal articles that

22  one would find in a standard search on Google

23  Scholar.

24    Q    And is this the total number of,

25  Footnotes 5 through 7, is that the total number of

1    searches that would return on a standard search

2    for peer-reviewed articles on Google Scholar?

3         A    I would think there would be more,

4    there might be a few more that I did not include,

5    but I can't recall if that was the case.

6         Q    You told us earlier that all the sources

7    you relied upon in forming your conclusions in

8    this case were cited here.  Is that -- should I

9    take that to mean that these are the set that you

10   reviewed in assessing the majority, or are there

11   other studies you reviewed that you would count

12   toward the denominator there?

13        A    No, I would say that this is all of the

14   papers I reviewed on early voting that I'm

15   familiar with.

16        Q    Okay.  Am I right that one of the

17   studies you cite for having found small increases

18   in turnout associated with early voting is your

19   own?

20        A    Yes.

21        Q    Next you go on to talk about voter ID

22   requirements, right?

23        A    Yes.

24        Q    You'd agree that voter ID requirements

25   don't affect voter registration rates, right?

1          A     No, not to my knowledge.

2          Q     Okay.  Just when you say no, are you

3     agreeing that they don't affect?  I just want to

4     make sure I understand.

5          A     Let me qualify.

6          Q     Okay.

7          A     There are a lot of states that do and --

8     do not require photographic ID to register, but do

9     require it to vote.  Wisconsin, for instance,

10    doesn't require you to have a photo ID to register

11    but it does to vote.

12         Q     Right.

13         A     Other states actually require both.  And

14    I believe, I don't have the full count, I have it

15    somewhere in my files, that a majority of states

16    with a restrictive voter ID law do require it to

17    register to vote.

18         Q     That's part of what I want to talk about

19    here.  The voter ID requirement that you discuss

20    in your report, at least based on the studies that

21    I reviewed that were cited, seem to focus on voter

22    ID laws at the polling place.  Do you disagree

23    with that, that the reports cited here are

24    about --

25         A     No, I think that's fair.  The mail-in

1    voting requirements are a relatively new body of

2    work and I don't know of any published reports on

3    strict voter ID requirements for mail-in voting.

4    I do know they exist, but I don't know of any

5    research on that and how it affects mail-in

6    voting.

7         Q    Okay.  But the ones you're talking about

8    in this report focus on voter ID requirement at

9    the polling place, not at the time of

10   registration; is that right?

11        A    Right, yes.

12        Q    And so in that way, again, the voter ID

13   requirements at the polling place don't have any

14   sort of immediate effect on 3PVROs registering

15   people to vote, right?

16        A    I don't know.  I think it's a subject

17   of -- you raise a very interesting question.  If

18   the state, for instance, does require a third, a

19   photographic ID to register, then I do think it

20   has an impact on voter registration.  If the state

21   doesn't require a photo ID to register but does

22   require a photo ID to vote, then I think it has

23   what we call a bait and -- to me, interesting

24   question.  It can have a depressing effect on

25   turnout.  People can come to the polling place and

1   say, but I'm registered.  Nobody told me I needed

2   to have a driver's license or other photographic

3   ID.

4           So I think -- the answer is I don't know

5   of anyone who's done any research on it, but I

6   don't think it should preclude us suggesting it

7   could have a very, very chilling effect on voter

8   registration.

9       Q    Okay.  But the example you just gave was

10  about an effect on turnout, right?

11      A    Yeah.  But I mean if the state also

12  requires that you have an ID to register to vote,

13  then one might presume, I don't know if it's true

14  or not, that registration rates might be expected

15  to be lower in states where there is a

16  photographic ID, particularly among younger voters

17  and underrepresented populations of color.

18      Q    Sure.  But like you said, the report

19  doesn't focus on those requirements to have a

20  photo ID at the time of registration, right?

21      A    My report?

22      Q    Right, yeah.

23      A    No, no, I don't think there's a single

24  citation here dealing with voter registration

25  laws.

1      Q     Okay.  On the voter ID requirement

2  issue, your report states that research on the

3  turnout effect of voter ID requirements have

4  produced null results or weak and

5  non-consequential effects on turnouts for all

6  voters and for underrepresented groups, i.e.,

7  non-Anglos and younger voters.  Did I read that

8  correctly?

9      A     Yes.

10     Q     One of the reports that you cite for

11 that proposition, specifically in Footnote 9,

12 right after you say have produced null results, is

13 another Grimmer paper called Obstacles to

14 Estimating Voter ID Laws' Effect on Voter Turnout,

15 right?

16     A     Yes.

17     Q     Okay.  I'm going to share what's been

18 premarked as Exhibit 7, which is the Grimmer

19 report titled Obstacles to Estimating Voter ID

20 Laws' Effect on Turnout.

21          (Exhibit 7 was marked for identification

22 and is attached to the transcript.)

23     Q     Just starting here with the abstract,

24 you can see that it says, widespread concern that

25 voter identification laws suppress turnout among

1   racial and ethic minorities has made empirical

2   evaluations of these laws crucial.  But problems

3   with administrative records and survey data impede

4   such evaluations.

5                   Did I read that correctly?

6        A    Yes.

7        Q    And it states, in the same part in the

8   abstract, when errors are corrected, one can

9   recover positive, negative, or null estimates of

10  the effect of voter ID laws on turnout, precluding

11  firm conclusions.

12                  Did I read that correctly?

13       A    Yes.

14       Q    Okay.  And it states that this paper

15  highlights more, quote, more general problems with

16  available data for research on election

17  administration.

18                  Did I read that correctly?

19       A    Yes.

20       Q    Going down to Page 6, 6 of the PDF which

21  is Exhibit 7, it's labeled as Page 1050 of the

22  report, the subsection here is called Implications

23  for Future Research.  Do you see that?

24       A    Yes.

25       Q    And then within that subsection on

1    Implications for Future Research, but on the next

2    page, which is Page 7 of Exhibit 7, would you

3    agree that the authors of this paper state here

4    where I'm highlighting, our attempts to address

5    measurement and specification issues, with the

6    paper they're critiquing, still fail to produce

7    the robust results required to support public

8    policy recommendations.  Using these data and this

9    research design, we can draw no firm conclusions

10   about the turnout effects of strict voter ID laws.

11          Did I read that correctly?

12      A    That's correct.

13      Q    Okay.  I'm going to go through one more

14   report, I think, before we break for lunch if that

15   works okay for you, Dr. Stein.  Are you okay to

16   continue through one more of the reports you've

17   cited in here?

18      A    Yes.

19      Q    Great.  You also cite a report by, I'm

20   not sure if I'm saying this correctly, Cantoni and

21   Pons?

22      A    Yes.

23      Q    And you claim it finds that voter ID

24   laws have no negative effect on registration or

25   turnout overall or for any group defined by race,

1    gender, age, or party affiliation, right?

2         A    Yes.

3         Q    And you would agree this is an example

4    of where the voter ID laws being studied were

5    requirements to provide an ID at their polling

6    place, not at the time of registration?

7         A    I'm not positive of that, but yes,

8    that's my recollection of the Cantoni paper.

9         Q    I'm going to share on my screen what's

10   been premarked as Exhibit 8 which is the Cantoni

11   paper called Strict ID Laws Don't Stop Voters,

12   Evidence From a U.S. Nationwide Panel, 2008 to

13   2018.

14              (Exhibit 8 was marked for identification

15   and is attached to the transcript.)

16        Q    I'm going to turn to Page 2624 of the

17   article.  This one, even in PDF, is paginated

18   consistent with the article's page numbers so

19   that's what I'm referring to here.

20              In Section 2A the paper describes the

21   history of what it calls strict ID laws.  Do you

22   see that here?

23        A    Yes.

24        Q    Okay.  I'd like you, I'm going to zoom

25   out a little bit.  Can you still see it okay?

1          A     Yes.

2          Q     I'd like you to review Section 2A.  Just

3    let me know when you get to the bottom and I'll

4    scroll.

5          A     (Reviewing.)

6                I've read that first paragraph.

7          Q     Okay.  I'm just going to scroll down

8    here.  I think it might be the whole -- oh, no, go

9    ahead.

10         A     Okay.

11         Q     Just so you don't -- I don't think any

12   of this part is relevant, this is more about the

13   type of ID considered valid, but I'll let you take

14   a look at that just so you don't feel I'm shorting

15   you the rest of that.  Let me know when you finish

16   this first paragraph.

17         A     All right.  I'm up to "do."

18         Q     Okay, great.  So based on what you're

19   reading so far, this is repeatedly talking about

20   photo ID at the polls, right?

21         A     Yes.

22         Q     And then turning one more to Page 2636,

23   here it's clarifying that the strict ID laws do

24   not change registration requirements.  Do you see

25   that?

1          A      Yes.

2          Q      And it goes on to evaluate the same sort

3     of potential downstream consequences of requiring

4     photo IDs at the polls that you discussed a little

5     bit earlier, right?

6          A      Yes.

7          Q      But you'd agree that this report is

8     about the type of strict ID laws that do not

9     change registration requirements, right?

10         A      That's my understanding.

11         Q      Okay.  And if you take a look at page

12    2617 and 2618 below, the last paragraph on 2617

13    starts with the sentence, strict ID laws' overall

14    effects do not increase over time.  They remain

15    close to zero and nonsignificant whether the

16    election is a midterm or a Presidential election,

17    and whether the laws are the more restrictive type

18    that stipulate photo IDs.

19              Did I read that correctly?

20         A      Yes.

21         Q      Okay.  But the next paragraph contrasts

22    those results with, quote, I'll read the whole

23    sentence, these results contrast with the large

24    participation effects of other dimensions of

25    election administration, including specifically,

1    quote, voter registration laws, right?

2         A    Yes.

3         Q    Okay.  And it cites two studies about

4    the participation effects of voter registration

5    laws as distinct from the voter ID laws at the

6    polling place, right?

7         A    Yes.

8         Q    One of those cites is the same as the

9    1978 cite in the Smith report; is that right?

10        A    I think you confuse Rosenblome and

11   Wolfinger with Rosenstone and Hansen.  That's

12   Rosenstone and Wolfinger 1978.  Rosen -- I

13   apologize, it was not Rose -- Rosenstone and

14   Hansen were quoted earlier.  Okay, I apologize.

15   Right below.

16        Q    Just to be clear, the Smith report --

17        A    Hansen below as well.

18        Q    Yes.  The Smith report cites both the

19   Rosenstone and Wolfinger paper that appears in the

20   Cantoni paper, and the Rosenstone and Hansen paper

21   that you were describing, right?

22        A    Yes.

23        Q    Okay.  Honestly, I only have a handful

24   more before I think we can take a break and then I

25   might have some cleanups.  I think it's probably

1    best if I just go ahead and ask my handful about

2    election day vote centers, unless you're starving

3    for lunch.  It's totally up to you.  We can always

4    come back and do it after.  How are you feeling

5    about continuing for a few more minutes here?

6          A    I would just like to add something that

7    you implied in one of your earlier questions.

8          Q    I mean if you need to clarify your

9    answer, go ahead.  I don't think there's a

10   question pending, but you can go ahead.

11         A    Go ahead.  Proceed with your questions.

12   I'll bring it up later.

13         Q    Your counsel can ask you questions about

14   anything you need to clarify, so I think that's

15   probably the best protocol for that sort of thing.

16              I'm going back to Exhibit 2 to talk

17   about this last section here about the Conditional

18   Effects of Election Laws on Voter Turnout.  Do you

19   see that?

20         A    Hold on.  I just -- something popped up

21   on my screen.

22              Okay, go ahead.

23         Q    No worries.

24         A    Go ahead.

25         Q    This section talks about election day

1   vote centers, right?

2        A    Yes.

3        Q    And those centers allow voters to cast

4   their ballots at any election day polling location

5   in a voter's jurisdiction, right?

6        A    Yes.

7        Q    Laws that create election day vote

8   centers don't alter registration requirements, to

9   your knowledge, do they?

10       A    Not unless they have a same-day

11  registration.

12       Q    Right.  Okay.  And you discuss these

13  centers as an example of conditional effects of

14  election laws?

15       A    Yes.

16       Q    On Page 19 your report says, the

17  implementation of vote centers can also mitigate,

18  if not remove, any positive effect centers have on

19  voter turnout.  The inadequate implementation of

20  voter centers can produce congestion of polling

21  places and longer waiting times to vote, both

22  resulting in a strong deterrent to voting.

23            Did I read that correctly?

24       A    Yes.

25       Q    So that's an example of how a reform

1    that would appear to increase access to voting

2    could actually have unintended negative effects on

3    turnout, right?

4          A    Correct.

5          Q    You've not offered any conclusions in

6    this report about how banning noncitizens from

7    collecting and handling voter registration

8    applications could have a positive effect on

9    turnout, right?

10         A    No, I have not.

11         Q    And you haven't offered any conclusions

12   about how banning noncitizens from collecting and

13   handling voter registration applications could

14   have a positive effect on registration rates,

15   right?

16         A    No.

17              MS. KEENAN:  Okay.  I'm going to take

18   the lunch break to see if I have any wrap-up

19   questions.  I think we can go off the record at

20   12:37.

21              (A recess was taken at 12:37 p.m.)

22              AFTERNOON SESSION (1:14 p.m.)

23   BY MS. KEENAN:

24         Q    I only have a handful of additional

25   questions.  I am going to share my screen again.

1          Okay.  So I am back in Dr. Smith's

2   report, and I'm on Page 30, Paragraph 53.  Do you

3   see where I am?

4       A    Yes.

5       Q    I know I asked you about Paragraph 15 a

6   couple of times, but I think this is the actual

7   part of the report that discusses the findings.  I

8   just wanted to confirm that you didn't dispute the

9   data discussed in Paragraph 53 of Dr. Smith's

10  report either?

11      A    That I didn't -- I didn't hear the --

12      Q    You didn't dispute the data discussed in

13  Paragraph 53.

14      A    Oh, no, we did not.

15      Q    Okay.  And then the last thing I think I

16  forgot to ask you was, going back to Page 8 of

17  Exhibit 2, which is your own report, I know that

18  you said that Dr. Alford drafted the portion about

19  Dr. Smith's report in the first instance.  Do you

20  recall what, if any, edits you made to the section

21  of the report, as to the section of your report

22  about Dr. Smith's report, namely Pages 18 through

23  13 [sic]?

24      A    I don't recall making any what I call

25  substantive.  I may have made some typographical

1    changes, but I don't recall making any substantive

2    changes.

3            MS. KEENAN:  All right.  Well, with

4    that, I'm ready to pass the deposition, I believe

5    to Mindy next.

6            EXAMINATION BY COUNSEL FOR

7            THE FLORIDA NAACP PLAINTIFFS

8    BY MS. JOHNSON:

9        Q    Please let me know if at any point you

10   can't hear me clearly, and I'll attempt to resolve

11   any technical issues.

12           My name is Mindy Johnson, and I

13   represent what we're referring to as the NAACP

14   Plaintiffs in this litigation.  And I'll be asking

15   you a few questions today, specifically related to

16   your expert report and also Dr. Herron and

17   Dr. Lichtman's expert reports, okay?

18           So before I proceed, can we agree that

19   the same ground rules that counsel already went

20   over this morning apply to the rest of this

21   deposition?

22       A    Yes.

23       Q    Okay.  And the same rules go, that if

24   you need a break at any point, just let me know,

25   and as soon as you answer any pending question,

1   happy to take breaks.

2        A    Yes.

3        Q    Great.  I have attempted to

4   cross-reference all of the background that we

5   already went through as part of your deposition

6   this morning, but I do have a few additional

7   questions about your background and your

8   engagement in this case.  If there is some

9   redundancy, please bear with me, but I've

10  attempted to try and limit myself to new

11  questions, okay?

12       A    Okay.

13       Q    So one question I wanted to clarify is

14  you mentioned a few times that you reviewed

15  pleadings in this case.  Do you mean the

16  Complaints of the parties in this case?

17       A    Yes.

18       Q    Are you aware of whether you also relied

19  upon any of the preliminary injunction briefing or

20  materials informing your expert opinions?

21       A    I did not.

22       Q    You also testified that you are

23  currently a Professor at Rice University; is that

24  correct?

25       A    Yes.

1          Q    Are you currently teaching any courses

2     at Rice University?

3          A    Yes.

4          Q    What courses?

5          A    This fall I taught the introductory

6     course in the master's of social policy

7     evaluation, intro course, and I taught the

8     undergraduate survey research seminar.  This

9     semester I'll teach the graduate level course in

10    public policy, and in the fall my teaching

11    requirements will be the undergraduate course in

12    election administration, and, oh, campaigns and

13    elections.

14         Q    Have you taught any classes together

15    with Dr. Alford?

16         A    I have lectured in his class.  He

17    teaches, and will be teaching a course in the

18    fall.  Every election season we have a, Federal

19    election season we have a course, and I have

20    lectured in his class on, surprisingly, election

21    administration.

22         Q    Okay.  How often would you say you've

23    lectured in his classes?

24         A    I mean over the years?  Probably every

25    semester, every other year when he's taught that

1    course, and I do two, maybe as many as three

2    lectures.  Two, two primary.

3         Q    Are you familiar with Dr. Alford's

4    scholarship?

5         A    Scholarship?

6         Q    Yes.

7         A    Yes, very familiar with it.

8         Q    And have you ever referenced Dr. Alford

9    in your own scholarship?

10         A    Yes, I have, his more recent work on

11    genetics and hereditary effects on voting.

12         Q    How would you describe Dr. Alford's area

13    of expertise?

14         A    As in the nature of his expertise?

15         Q    Yes.

16         A    So he has, I would say kind of two

17    careers in political science if that's the right

18    way.  In this early career, I'd say the first 10,

19    20 years, he and several of his coauthors,

20    particularly Jim Hibbing, were known as

21    Congressional scholars and they studied

22    Congressional, with a very, very specific focus on

23    Congressional voting and incumbency effects.  And

24    they were probably, I would go so far as to say,

25    John Hibbing was a National Academy of Science

1    member, and John Alford were the stars of that

2    field.

3            And then John Alford, excuse me, got

4    very interested in biopolitics and genetics and

5    literally spent quite a few years, I would even go

6    so far as, if I looked at his vitae, to say 10

7    years retooling and reschooling and virtually

8    received a Ph.D. in biogenetics and started

9    publishing what many considered to be path mark

10   papers with John Hibbing on the biologic and

11   genetic basis of political behavior.

12       Q    How would you describe your own

13   expertise?

14       A    Much more modestly.  I started off as an

15   urban scholar.  My work was principally in the

16   area of what you would call Federal pork barrel.

17   I studied aid transfers, the economics and the

18   politics of the Federal pork barrel.  I wrote --

19   or, again, like a lot of academics, I'd say the

20   first 10 to 20 years of my career were in that

21   area.

22            I then shifted after, I guess it was

23   early '90s, late '80s, and with the 2000 -- well,

24   with the advent of early voting, started a pretty

25   robust research career on voting administration

1    which probably dates even before the 2000

2    election.

3              My other area of expertise, if you're in

4    Florida and you want to hire me, is I'm quite the

5    expert on flooding and evacuations and

6    mitigations.  I work with a lot of civil engineers

7    trying to figure out why all their wonderful ideas

8    don't work with voters and people, and that's

9    another whole other area you'll see on my vitae.

10        Q    Where would you say that your areas of

11   expertise overlap with Dr. Alford's areas of

12   expertise?

13        A    I don't know if it overlaps it.  It

14   compliments it is the word I would use.  John is

15   quite the scholar on his two expertise,

16   particularly in this genre.  He knows the law,

17   Voting Rights Act law very well.  He's quite an

18   expert on what we call political behavior,

19   particularly from his days working in election

20   administration.  And my expertise tends to be --

21              (Interruption.)

22              (A discussion was held off the record.)

23              MS. JOHNSON:  Just, I think the same

24   rules.  If you end up needing to look at your

25   phone for any reason, just let me know.

1        THE WITNESS:  I kept it off before and

2  then my wife called me and told me she brought me

3  lunch, so that was the --

4  BY MS. JOHNSON:

5        Q    You were describing how you would say

6  that your areas of expertise, I think your words

7  were compliment Dr. Alford.

8        A    Yeah.  He knows behavior and I

9  essentially, you would know that as the area of

10  public administration.  So I'm quite knowledgeable

11  about the research and, of how do we conduct

12  elections, you know, the who, the one, the where.

13  I'm particularly focused on election laws

14  particularly never do what they're supposed to do,

15  that genre.

16        So it's a compliment.  He knows

17  something I don't know, and I know something he

18  doesn't know.  That's how he invited me into the

19  case.  The attorneys, Joshua asked, you know, does

20  somebody know this, and John said, I got this

21  person.  I'm not certain I'm the right person, but

22  I do, I read a lot.

23        Q    Are you familiar with Dr. Alford's other

24  expert work?

25        A    Some of it.  We've -- as I've said to

1    Ms. Keenan, John and I have worked together on

2    redistricting, not lawsuits, but we've actually

3    drawn the boundaries and plans.  John does a lot

4    of that work.  He has been involved in other cases

5    and he has recommended me on more than one

6    occasion, the Arizona case, the Virginia case, on

7    my vitae the Georgia case, of course this one.

8         So I sort of know what he's doing and

9    he'll call me up and say one day, I need -- he

10   draws a line.  He won't -- I'll read this stuff,

11   but you know it better than I, so ... it's more of

12   a question of if I have the time.  I have

13   grandchildren.  He doesn't.

14      Q    What are the examples when he's called

15   you and said you know this area better than I do,

16   can you name some of the areas?

17      A    This case, this specific one, he felt

18   that I was much more familiar with the literature

19   on election law and its impact on both voter

20   turnout, voter registration and performance.

21        The Georgia case was an interesting one.

22   I don't know if you're familiar.  Georgia has a

23   ballot access rule.  People want to get on the

24   ballot to run for offices.  It's an extremely high

25   bar, difficult.  And he knew that I had read that

1    literature for a course, I teach a course on

2    ballot access -- not on ballot access, but a large

3    portion.  So he said, it would be a lot easier,

4    you know, if you were the person.  I don't even

5    think John was involved in that case.

6           Colorado and -- no, they didn't.  But

7    Arizona had an election law adopted much like

8    Florida, and John knew that I was familiar, again

9    with, I do a lot of work for election.  Maricopa

10   County I've worked for.  I've done work in New

11   Mexico.  So he knew I knew both the laws, I knew

12   the people, and yes, I had published on those

13   topics.

14        Q     Have you done election law work in

15   Florida previously?

16        A     No, I have not.

17        Q     Do you consider Dr. Alford to be

18   well-respected in your field?

19        A     Yes, yes, I do.

20        Q     And this might be similar to what you've

21   already just testified to, but do you have an

22   understanding of why there are two authors to the

23   expert report in this case?

24        A     I think it's goes back to my earlier

25   answer.  Complimentarity.  It just seemed to be a

1    logical -- again, it's a single report.  We both,

2    I would expect John to say tomorrow, or whenever

3    he's deposed, everything in the report we agree

4    to.  But there was no question, as Ms. Keenan

5    pointed out, or asked, we drafted different

6    sections that reflected probably our, if not our

7    expertise, our familiarity, so it was more

8    efficient.

9        Q    And so is it fair to say that you

10   endorse every portion of the report as if you

11   wrote it yourself?

12       A    Yes.

13       Q    Have you ever done any research on

14   Florida election laws?

15       A    I've written papers on multistate,

16   multi-jurisdiction studies in which Florida,

17   either the state, some counties or jurisdictions.

18   I just completed research on poll worker

19   recruitment and retention, and I believe there's

20   several jurisdictions in Florida that are included

21   in that.  And yes, I have talked extensively with

22   election officials in different counties,

23   particularly in the pan hand, and have been in

24   conferences with them.

25       Q    Can you name the counties that you can

1    think of sitting here today?

2         A    Tallahassee County, and is it Pete -- I

3    get Pima in Arizona is -- I can't remember.

4    Broward, it was in the study, I believe Miami was

5    in our study.

6             Now, there were, I should be very

7    careful here to say that there are 19 coauthors on

8    these papers Waiting to Vote and Guardians at the

9    Gate on poll workers, and my collaborators were

10   responsible for making relationships with the

11   local election officials and then we surveyed

12   them.  I was sort of a PI, principal investigator,

13   and myself and my students handled the data

14   collection, data analysis and writing up the

15   papers in which Florida jurisdictions were

16   included.

17             So yes, I had to read all the Florida

18   election laws, particularly pertaining to poll

19   workers and in-person voting.  That's what we

20   focused on principally.

21        Q    Did the survey questions you asked

22   include any questions about third party voter

23   registration organizations?

24        A    That's a very good question.  Yeah, my

25   recollection would be that we touched on those

1   issues, but I don't recall ever asking about a

2   particular third party group that registered

3   voters.  We asked questions about poll watchers.

4   We asked questions about partisan poll workers,

5   but I don't recall the word "third party

6   registration" actually being in the survey.

7       Q   Do you recall if there were questions

8   about voter registration generally as part of the

9   survey?

10       A   There were questions in the survey about

11   checking people in with proper voter registration

12   identification.

13       Q   Okay.  Anything else you can think of

14   sitting here?

15       A   No, not responsive to that question

16   about voter registration.

17       Q   Other than the multidistrict surveys and

18   study you just described, is there any other

19   research that you've done into Florida election

20   laws?

21       A   No.

22       Q   Have you ever researched third party

23   voter registration organizations in Florida or

24   otherwise?

25           Have you ever researched third party

1    voter registration organizations in Florida or

2    otherwise?

3         A    Otherwise, yes.  I've read -- the word

4    "extensive" wouldn't be, but I've probably read

5    more than most people in my field on the history

6    and the practice of third party registrations.

7    And I've relied on at least one or two reports --

8    you're going to ask me which ones, and I'd have to

9    log on and get my papers -- but all of them were,

10   I didn't know a lot about third party

11   registrations and I schooled myself on that one by

12   reading.

13        Q    So you can't think of the names or the

14   titles of what you've reviewed?

15        A    If it's okay -- I'll pull up the paper,

16   if it's okay with you.  Give me a second.  I know

17   exactly, I think I know exactly where it is.

18             Be careful what you wish for, right?

19             Yeah, it's by the Responsive Governing

20   Organization, which is like a non-partisan group,

21   and it's called the History of Third Party Voter

22   Registration Drives.  And I would be happy to

23   share it with you.  It was not cited in my -- I

24   read it, oh, gosh, months -- I wouldn't say months

25   ago, it's a May 17, 2003, so it couldn't have been

1    months ago, but I read it awhile back, and it kind

2    of, what's the right word?  Gave me background.  I

3    don't cite it.  I can't even tell you that I --

4            This morning Ms. Keenan was asking me

5    questions, and I want to be very clear, I would

6    have, I wouldn't use I draw, I drew on it in

7    response to the rebuttal reports from Professor

8    Herron and Smith.  But that's my knowledge of

9    third party, the history, and it goes back, you

10   know, quite a bit.

11       Q    And so when you say that you relied on

12   it as part of understanding the rebuttal reports

13   of Dr. Smith and Dr. Herron, can you explain what

14   you mean?

15       A    It was what I told Ms. Keenan before.

16   Specifically I was impressed by how targeted and

17   focused third party voter registration drives are.

18   I was particularly interested in the mechanics,

19   how are these third -- I have anecdotal evidence,

20   you know, of how it's done.  Many of my students

21   in my courses actually get involve as registrars.

22           What I didn't know is what the history

23   was.  And I was very impressed -- well, I wouldn't

24   say impressed, but it led me to make my comments

25   earlier on which are in the deposition.  But

1   basically these are targeted efforts.  They are

2   direct solicitations to people both by geography

3   and by racial and ethnic origin of the voter.

4       Q    Do you have an understanding of the

5   universe that was included in that report?

6       A    The universe?

7       Q    Geographically, for example.

8       A    I think it's the U.S.  It's a U.S.

9   study, all 50 states and historical, and goes back

10  to the early 19th century.

11      Q    Is there any other research that you've

12  reviewed on third party voter registration

13  organizations?

14      A    Other than what is in the Plaintiffs'

15  experts' reports, no.

16      Q    Have you previously produced any expert

17  reports related to third party voter registration

18  laws?

19      A    No, I have not.

20      Q    Have you taught any classes about third

21  party voter registration?

22      A    Have I heard any?

23      Q    Taught any classes.

24      A    Have I taught any classes?  No, no.  I

25  mean I've taught -- yes, there is on my vitae, on

1   my resume, on my, what do you call those?

2   Curriculum, syllabi, probably a whole bunch on

3   voter turnout studies and voter turnout and voter

4   registration experiments.  Yes, I'm pretty

5   familiar with that literature.

6         Q    Do you recall ever teaching on third

7   party voter registration organizations

8   specifically in your courses?

9         A    Yes.  I'd have to say that David

10  Nickerson's work comes out for political

11  scientists, who I still think is affiliated with

12  Temple, working full-time for the Democracy Fund;

13  Don Green, Alan Gerber, Costas, and you're going

14  to ask me to pronounce his last name and I can't.

15  It's Panagopoulos.

16              THE WITNESS:  Ms. Hart, I will later on

17  spell the name for you.

18        A    These are scholars who have done a lot

19  of work on voter registration drives and third

20  parties.  I -- yes, absolutely.

21        Q    And I'm happy to break it down by

22  author, but can you describe what kind of work or

23  research the individuals you've named have done on

24  voter registration drives?

25        A    Well, the famous one is something called

1    Make a Plan.  So there are studies that contact

2    unregistered or general eligible voters and they

3    try to get them to both register and to vote.  And

4    they usually do it by asking them to articulate a

5    plan for registering and for voting.  And the

6    researcher keeps a record of that and then sees

7    whether or not the voter actually executes that.

8             In psychology, that's a widely used

9    method.  It's like, are you going to visit your

10   mother, Mindy, next Easter?  And you say, yeah, I

11   always -- well, Mindy, are you, have you bought a

12   plane ticket, have you gotten someone to take care

13   of the dog?  The more tasks you start identifying

14   that you've done, the more likely you are to vote.

15            I've seen that done.  I've read research

16   on that both for turnout and voter registration,

17   and I should say that I was a Director of a

18   center, it's on my Vitae, the Center for Civic

19   Engagement, where we actively work with national

20   organizations to help register college students.

21   And I've advised high school students here in

22   Houston on preregistration projects.  These are

23   high school students who are going to come of age

24   and can preregister before they turn 18.

25        Q    And do you know what the authors found

1   in their study?

2        A     Well, the experimental work was very,

3   very efficacious, making a plan, extremely

4   efficacious on both turnout.  The registration

5   studies that come to mind are the ones that

6   attempt to get voters to go online to do

7   registration as opposed to requesting a paper, a

8   registration form to be sent, and they have been

9   very efficacious.

10       Q     Are there any other registration studies

11  that you just mentioned that you haven't yet

12  described?

13       A     I'm sure there are, but I can't think --

14  I mean I'd have to go back through my syllabus,

15  and I know there are, not the word scores, but

16  there are more than the two or three that I just

17  mentioned.

18       Q     Understood.  Sitting here and having

19  them on the top of your head, are there any others

20  that you can describe?

21       A     Lisa Bryant at UC Fresno and another

22  woman at Menlo College have done registration

23  drives with Hispanic populations, and so has

24  Costas, and they've compared different types of

25  treatment effects.  My recollection is they were

1    usually multimedia, email with a social --

2    websites, like the Facebook, those are the ones,

3    but -- and my recollection was they were not quite

4    as efficacious and as effective as some of the

5    ones that stand out that I remember are Making the

6    Plan.

7         Q    Anything else?

8         A    Nothing.  You're scratching the bottom

9    of the barrel for me.

10        Q    Great.  And are you aware of what

11   methods third party voter registration

12   organizations in Florida use to conduct outreach

13   to voters?

14        A    The research I'm talking, that we just

15   discussed, these are all done by scholars,

16   academics, sometimes with the active endorsement

17   and support of third parties; Democracy Fund comes

18   out to mind, Mi Familia Vota.

19             My resume doesn't include it, but I have

20   worked for Mi Familia Vota.  In fact, I've done as

21   many as five major research projects for them,

22   both for high school registrations and specific

23   engagement, but these are scholars who collaborate

24   with, I think the best way to put it is they get

25   access to the lists of voters to contact, even

1   money.  The published work would fully disclose

2   it.  It's where I had this anecdotal impression

3   that third party registration was a very active,

4   proactive.  It didn't, you know, wait for people

5   to come in like the Department of Motor Vehicles

6   or the County Courthouse.  These are groups that

7   actively sought out and targeted groups.

8         One of my colleagues here I didn't

9   mention, Melissa Marshall, with whom I'm close and

10  have, the word collaborate is wrong, she's asked

11  me to advise her, and they, they have a big grant

12  to register and mobilize underrepresented voters

13  and, 7 million-dollar grant to be exact.  That's

14  large scale here in Harris County.

15        And they -- actually, where I really got

16  the insight was they said to me, can you tell us

17  where unregistered African American and Hispanic

18  voters of a particular age are, and I assisted

19  them in the demographic analysis.

20        So that's where I got my insight into --

21  and then when I read this report from, I can't

22  remember the center now, I said, well, gee, this

23  isn't unique.  It's not contemporary, but it's

24  been the history of third party registrations.

25     Q   So the grant you just described and the

1    outreach you just described, that was for a Texas

2    County; is that correct?

3        A    Harris County, yes.

4        Q    Okay.  And so outside of what these

5    studies have mentioned about Florida third party

6    voter registration organizations' activities, do

7    you have any additional understanding of the

8    activities of Florida third party voter

9    registration organizations?

10       A    Only what I've read in the Plaintiffs'

11   reports, and again, these other sources I've

12   mentioned.

13       Q    And you mentioned working with Mi

14   Familia Vota.  Do you have any additional

15   understanding of Mi Familia Vota's third party

16   voter registration activities in Florida?

17       A    Other than what I've read in the

18   Plaintiffs' report, no.

19       Q    Apart from this case, have you ever been

20   asked to opine on the impact of third party voter

21   registration organizations on voter registration

22   or turnout?

23       A    No.

24       Q    Have you ever testified in Florida

25   courts?

1          A     No.

2          Q     Okay.  I think that covers the

3    background.  So now we're going to spend some time

4    looking at the actual reports.  My plan is to do

5    some back-and-forth, looking at your report and

6    looking at the rebuttal report, for example,

7    produced by Dr. Herron.  So it might be a little

8    tedious at times flipping between.  If at any

9    point you need to look back at something or need

10   us to refer to a different page, just let me know,

11   okay?

12         A     Got it.

13         Q     Great.

14         MS. JOHNSON:  So, Makeba, if you don't

15   mind helping pull up Dr. Lichtman's report to

16   start.

17               And I apologize, what Exhibit number are

18   we on next?

19         MS. RUTAHINDURWA:  I had left off 12,

20   Mindy, if that's helpful.

21         MS. JOHNSON:  So we'll mark this as

22   Exhibit 13.

23               (Exhibit 13 was marked for

24   identification and is attached to the transcript.)

25         Q     We can, again, scroll if you need, but

1    have you seen this before, Dr. Stein?

2          A    Yes.

3          Q    And is this the expert report of

4    Dr. Lichtman that you mentioned reviewing earlier?

5          A    Yes.

6          Q    Have you reviewed this report in its

7    entirety?

8          A    I've read this report, but as our report

9    indicated, we did not take it, I guess the nicest

10   way is, we did not focus on Professor Lichtman's

11   report other than to write what we wrote on Pages

12   2 and 3.

13         Q    Great.  So we'll take a look at that

14   now.  We can look at your report next; it's

15   already been marked as Exhibit 2.  And we'll start

16   on Page 1, or actually Page 2.  I apologize.

17              Okay.  Up at the top paragraph, you

18   wrote that Defendant's counsel requested that we

19   respond to the appropriateness of Dr. Lichtman's

20   conclusions.  Did you write that sentence, or did

21   Dr. Alford?

22         A    I think John Alford wrote, drafted that

23   statement.

24         Q    Okay.  What do you understand "respond

25   to the appropriateness of Dr. Lichtman's

1    conclusions" to mean?

2        A    Well, we felt that, as I've written in

3    the report here, he offered no new empirical

4    analysis aside from referencing what, with Dr.

5    Herron's report.  I don't think he even referenced

6    Dan Smith's report.  It's either speculative

7    assertions, as we write, that might happen as a

8    result of implementation of 7050.  It was a

9    repetition of, of what we call negative impacts

10   without any empirical support or actual observed

11   impacts.

12           I guess I just -- we didn't find

13   anything in it that was helpful, I think would be

14   the nicest way to put it, understanding how

15   SB 7050 has, or might, impact voter registration,

16   particularly among non-white voters.  It did

17   review a lot of history and background, but it

18   just didn't seem to be, I guess the word you guys,

19   it didn't seem to be on point.  It didn't seem to

20   be about SB 7050, other than speculating about

21   what might happen, but not offering any evidence

22   to that effect.

23       Q    I have a few follow-up questions related

24   to some of the things you just mentioned.

25           Have you ever relied on another expert's

1    empirical analysis in providing an expert opinion

2    or testimony?

3        A    Oh, sure.  Yeah.  I mean not expert, but

4    I've relied on other scholars' empirical work, if

5    that's what you mean, as opposed to the expert

6    reports.  My own report with John relies on other

7    scholars and other researchers.  And we do have a

8    standard.  We rely on peer-reviewed publications.

9    It doesn't mean that we won't cite other work, it

10   just means that that's what we're most confident.

11           Professor Lichtman's report didn't seem

12   to use, other than Professor Herron and Smith's

13   claims, now Professor Herron and Smith do far more

14   empirical work, but Lichtman seemed to be kind of

15   repeating what they found to justify his

16   arguments.

17           So we, again, didn't find anything

18   unique or different, maybe unique might be a

19   little hard, but we found nothing different in

20   Professor Lichtman's report that was helpful in

21   understanding the impact of SB 7050.

22       Q    Is it your opinion that it was

23   inappropriate for Dr. Lichtman to rely on the

24   quantitative or empirical analyses of Dr. Herron?

25       A    No, I don't think it's -- I mean we have

1  issues, as we've written in the report, with that,

2  with that work of Dr. Herron's and Dr. Smith's,

3  but it just didn't seem like Professor Lichtman's

4  report added to the discussion and understanding

5  of SB 7050's impact.

6      Q    You understand that your charge, I think

7  is how you've phrased it earlier, was different in

8  relation to Dr. Lichtman's report as it was to

9  respond to Dr. Herron and Dr. Smith?

10     A    No, I don't know that there was -- we

11  had a clear idea of what we were charged with

12  doing.  I -- I'm not absolutely certain what Dr.

13  Lichtman's charge was and how it was different

14  from Herron and Smith.

15     Q    And so just to make sure we're on the

16  same page, I'm not asking whether Dr. Lichtman's

17  charge was different than Dr. Herron's and Smith,

18  I'm asking whether your charge, responding to the

19  expert reports, was different in regards to

20  Dr. Lichtman's report than it was for Dr. Smith

21  and Dr. Herron's report?

22     A    No, it was the same.  We were asked to

23  assess the experts' reports pertaining to whether

24  or not SB 7050 would have, and had, a disparate

25  effect on voter registration and ultimately voter

1    enfranchisement by race and ethnicity.  So we

2    tended to see the charge in reading the three

3    reports as the same.

4         Q    If we scroll down on this page, you see

5    that you addressed Dr. Lichtman's report, on Pages

6    2 and then the top of Page 3, in a total of one

7    paragraph; is that correct?

8         A    Yes.

9         Q    So you provide no discussion of

10   Dr. Lichtman's report outside of this single

11   paragraph?

12        A    No, we do not.

13        Q    Who wrote this discussion of

14   Dr. Lichtman's report?

15        A    Well, we both wrote it, but I would say

16   that Dr. Alford did the draft of this.

17        Q    Okay.  And in your testimony a few

18   minutes ago, and in the second sentence of this

19   paragraph, you refer to Dr. Lichtman's report as

20   speculative.  What specific assertions in

21   Dr. Lichtman's report do you believe were

22   speculative?

23        A    I mean I could go through each line of

24   his report if you want, but I think the overall

25   tenor of the report is speculative about what

1   might happen or a repeat of the claims made by

2   opponents of SB 7050, and of course, Herron and

3   Smith's findings.

4       Q   You didn't include a list of what you

5   considered to be speculative assertions of

6   Dr. Lichtman?

7       A   There's none here.

8       Q   And sitting here, can you name

9   specifically what you believe to be speculative?

10      A   I would have to go back through the

11  report.

12      Q   Okay.  On the bottom of Page 2 you

13  write, in this report, we will be addressing the

14  quantitative empirical evidence in the reports and

15  as such will not be commenting on the narrative

16  discussion in Dr. Lichtman's report, nor will we

17  be commenting on a similar narrative section of

18  Dr. Herron's report.

19        Were you instructed to only address the

20  quantitative portions of the expert reports

21  produced by Plaintiff?

22      A   Were we expected?

23      Q   Were you asked to address only the

24  quantitative aspects of the reports?

25      A   No.  We indicated to the attorneys that

1    this is the scope of what we could do for them.

2        Q    Did you and Dr. Alford discuss whether

3    to respond to any of the narrative discussions as

4    you reference them in this paragraph?

5            MR. PRATT:  Objection.  I'm going to

6    assert a privilege on any communications between

7    Dr. Alford and Dr. Stein which would have been,

8    you know, within the purview of instruction from

9    counsel.

10           You can answer questions to the extent,

11   about the report, which portions were written by

12   you, et cetera.

13       Q    Separate from any instructions from

14   counsel, which you do not need to disclose, did

15   you and Dr. Alford discuss whether to address the

16   narrative portions of Dr. Herron and

17   Dr. Lichtman's report as you reference them in

18   this report?

19       A    Did we -- I'm not -- I'm not quite

20   certain I understand the question.  I know there

21   was an objection, but I'm not certain I understood

22   it.

23       Q    Sure.  My question, and again, if it

24   goes to conversations with counsel, you do not

25   need to respond, is how the decision was made not

1  to address the narrative portions of the expert

2  reports that were produced by Plaintiffs?

3      A    I think we mutually agreed on that

4  almost simultaneously.  We had read the reports,

5  we were, we knew what we could do and what we

6  couldn't do in terms of our expertise, and we knew

7  what our charge was, and we just didn't think

8  there was anything in Dr. Lichtman's report that

9  went to the issues that we were going to examine,

10  the impact of SB 7050 on registrations,

11  particularly among non-whites, and we found

12  nothing in the narrative, as we refer to it, as

13  helpful in understanding that.  We didn't see any

14  empirical claims.  So we -- and we saw no reason

15  to respond to that because there was, the nicest

16  way to put it, there was nothing to respond to.

17      Q    Is it fair to say that your testimony is

18  that you don't have the expertise to respond to

19  Dr. Lichtman's narratives?

20          THE WITNESS:  Hold on.  The battery in

21  my hearing aid just went out.

22          MS. JOHNSON:  We can go off the record.

23          (Interruption.)

24      A    Okay.  I'm sorry.  Could you repeat your

25  question?

1          MS. JOHNSON:  Let's go back on the

2     record.

3     BY MS. JOHNSON:

4          Q     My question is, do you believe you have

5     the expertise to respond to all of the information

6     in Dr. Lichtman's report?

7          A     I do believe I have the expertise, yes.

8     I just don't think there's anything, given the

9     charge that we had, that we needed to respond to.

10    He offered no new evidence that there was a

11    disparate impact.  He repeated many of the claims

12    that opponents, I call it the popular press

13    opponents had raised.  But it was Herron and Smith

14    who attempted to address, in a systematic and

15    empirical way, whether or not those claims of

16    effects have occurred and would continue.  I

17    didn't find anything in Professor Lichtman's

18    report that added to that evidence.

19         Q     And I believe you mentioned expertise as

20    part of your last answer in the discussion that

21    you and Dr. Alford had in what to respond to in

22    the expert reports.  So my question is to

23    understand what role did expertise play in

24    deciding not to respond in detail as to Dr.

25    Lichtman or Dr. Herron's reports in the narrative

1    portions.

2         A    Well, we did respond.  We may not have

3    responded in great length, but we did say, there

4    seemed, our response, let me repeat, our response

5    was that there was not anything that we thought

6    was, I'm sorry, directly -- I can't roll up or

7    down on your --

8         Q    This is the entirety of the paragraph

9    about Dr. Lichtman up on the screen right now.

10        A    Dr. Lichtman's report just offered no

11   new evidence, empirical quantitative evidence,

12   that we felt we could respond to.  That was our

13   expertise.  That was our expert judgment, that

14   there just wasn't anything that we could respond

15   to or required us to respond to outside of what we

16   have written in the report.

17        Q    And you also mentioned scope as part of

18   the decision of what to respond to.  How was scope

19   a component of deciding what to respond to in your

20   expert report?

21        A    Scope.  The scope of our investigations

22   was to review the Plaintiff, the Plaintiffs'

23   experts' report regarding the impact of SB 7050

24   on, disparate effects on voter registration.  That

25   was the scope of our work.  There are things in

1    the Lichtman report that go beyond what we

2    considered to be quantitative empirical analysis

3    and evidence of that impact.

4        Q    Why do you believe that the discussions

5    and the materials that Dr. Lichtman included in

6    his report are not helpful in assessing the impact

7    of SB 7050 on voters?

8        A    Because they don't address quantitative

9    empirical analysis, but rather hypotheses,

10   speculation, occasionally intent, which we're not

11   able to evaluate.

12       Q    Is it your opinion that the materials

13   that Dr. Lichtman included are not helpful in

14   assessing legislative intent?

15       A    That was outside the scope of our

16   analysis, so that's why we didn't address

17   ourselves to legislative intent.

18       Q    So you don't have an opinion one way or

19   the other whether Dr. Lichtman's report provides

20   helpful materials on legislative impact?

21       A    There is nothing in the scope of our

22   report, unless you see it, and I'll ask you to

23   draw attention to our report where we discuss the

24   scope of legislative intent.

25       Q    I don't believe there's any in there,

1   but I'm just confirming while we have you here

2   under deposition today whether you have an opinion

3   either way on the opinions that Dr. Lichtman

4   offers on legislative intent.

5       A    I have not formed an opinion on those

6   because they were beyond the scope of what our

7   charge was.

8       Q    And I recognize some of this might be a

9   little bit tedious, but it is helpful for me to

10  understand the exact scope of the opinion, so I do

11  appreciate you bearing with me.

12      A    I hope you have a grandfather that's my

13  age and you're nice to him.

14      Q    I do, I do.  And he would be very fed up

15  with me, I think, at this point as well.

16           The next question I did have, do you

17  agree that statements of the legislature may be

18  relevant to assessing legislative intent in

19  passing a law?

20      A    I don't have an opinion on that in this

21  case.

22      Q    And do you have an opinion of whether

23  presentations to the legislature may be relevant

24  to assessing legislative intent of a law?

25      A    I don't have an opinion on that in this

1     case.

2          Q     Do you agree that the processes in which

3     a law is passed through the legislature may be

4     relevant to legislative intent of a law?

5          A     What was that now, processes?

6          Q     Process in passing a law, do you believe

7     that that may be relevant to the legislative

8     intent of the law?

9          A     Again, I don't have an opinion on that

10    in this case.

11         Q     Okay.  Do you have an opinion on whether

12    historical analysis of discrimination in a state

13    may be relevant to understanding any present day

14    discrimination?

15         A     I don't have an opinion about that in

16    this case.

17         Q     Do you have an understanding of whether

18    that's discussed in many election cases?

19         A     I have read Dr. Lichtman's report and

20    have the impression that he believes that to be

21    true.  And he's quite an eminent scholar in his

22    field, so I would expect to have read that.  And

23    yes, I have read that in other works, historical

24    analysis.  But again, I don't know how relevant it

25    is in this case.  I haven't formed an opinion.

```
 1        Q      And so just to confirm what I think you
 2   just said, beyond Dr. Lichtman's report, you have
 3   seen in other cases a discussion of historical
 4   context and analysis?
 5        A      Yes, I have.
 6        Q      Have you ever provided an expert
 7   analysis regarding intentional discrimination?
 8        A      On -- say that again.
 9        Q      Intentional discrimination.
10        A      I didn't hear the --
11        Q      Intentional.
12        A      Oh.  Have I been an expert in cases
13   involving intentional discrimination?
14        Q      Have you provided an opinion,
15   specifically?
16        A      No, I have not.  You know, some might
17   think I have, but I don't recall in my expert
18   reports, in the cases that are on my resume, where
19   I've ever addressed this issue of intent and its
20   effect on discrimination.
21        Q      Are you aware that some Plaintiffs in
22   this case have alleged intentional discrimination
23   claims?
24        A      Yes, I have.
25        Q      Do you have any familiarity with what
```

1  type of evidence courts typically review in

2  assessing intentional discrimination claims?

3      A    I do not.

4      Q    Are you aware of what courts typically

5  find helpful in assessing intentional

6  discrimination claims?

7      A    I do not.

8      Q    So is it fair to characterize your

9  opinion as saying you didn't find the type of

10 analysis that Dr. Lichtman provided helpful to

11 you?

12     A    The word "helpful" would be a difficult

13 word.  We just didn't see it as relevant within

14 the scope of what we had been charged to do, which

15 was to respond to the experts' reports regarding

16 the impact of SB 7050.  So, we thought the issues

17 that he raised were well-outside the scope of what

18 we could assess.  Not to say that they're wrong or

19 that they're right.  I think the word

20 "speculative" is not pejorative, it's just what

21 they were.  Hypotheses would be the nice way to

22 put it.  But we didn't see many -- we didn't find

23 any way to assess them in his report.

24     Q    And so I believe this is consistent with

25 what you just said, but please correct me if I'm

1      wrong.  You're not offering the opinion of whether

2      the Court should or should not find this type of

3      analysis helpful?

4          A    That would be up for the Court.  We just

5      did not find it helpful for us to respond to the

6      charge that we'd been asked, you know, to engage

7      in.

8          Q    And you offer no opinion on the extent

9      to which SB 7050 was a result of intentional

10     discrimination?

11         A    We do not.  You know, I don't believe

12     there's anything in our report that addresses that

13     question.

14         Q    We're going to move on and talk now

15     about Dr. Herron's expert report, as well as his

16     rebuttal report.  So I'll go ahead and mark his

17     opening report as Exhibit 14.

18              (Exhibit 14 was marked for

19     identification and is attached to the transcript.)

20         Q    We'll take a look at this first.

21              Do you recognize this document?

22         A    Yes.

23         Q    Did you read Dr. Herron's opening expert

24     report in its entirety?

25         A    Yes.

1          Q     When was the last time that you read Dr.

2     Herron's opening expert report?

3          A     I probably looked at it last yesterday.

4     I did look at it.  I wouldn't say I read it in its

5     entirety, but I have been reviewing it the last

6     couple of days.

7          Q     Understood.  So this is going to get to

8     the part where we're going to be doing a lot of

9     flipping back and forth between your report and

10    Dr. Herron's report, so again, if at any point you

11    need clarification or need to look at a separate

12    document, just let us know.

13              So we'll go back to your report, on Page

14    3.  And you start off in describing Dr. Herron's

15    report as saying, quote, Dr. Herron first offers a

16    speculative account of the possible impact of SB

17    7050 based on academic theory.

18              Do you see that?

19         A     Yes.

20         Q     Who wrote this portion of the expert

21    report; you, or Dr. Alford?

22         A     These sentences here, I believe, are

23    John Alford's draft.

24         Q     Why do you believe this portion of Dr.

25    Herron's report is speculative?

1       A    Well, as we write, it establishes, and I
2   think, you know, again, I'd have to go into his
3   report to find the quotes, only one possible
4   scenario of what might have occurred, all things
5   being equal.  It doesn't look at empirical
6   evidence and its impacts on the actual, what we
7   think is a key issue, which is disparate impacts
8   on black and Hispanic registration.
9           It's a narrow analysis of what happens
10  when SB 7050 is implemented to the third party
11  registrations and the possible differential rate
12  of non-white registrations.  But to us, the key
13  question, I think we call it the key issue, is of
14  does this law affect non-white voter registration
15  and enfranchisement.  So we think it's a narrower
16  interpretation of what we think is the key issue.
17      Q    When you say "one possible explanation
18  for what happens," what do you mean?
19      A    Well, it's possible, not that Dr. Herron
20  tests this, that lower registration rates only
21  among non-whites is not due to third party
22  registration restrictions in the law, but offset
23  by non-white registrations through other methods
24  and modes.  We speculate on that as well.  It's
25  not our job to test those hypotheses.  We think

1    that there are alternative ways in which

2    non-whites who might not be registered through

3    third parties could still register to vote at the

4    Department of Motor Vehicles.

5        Q    And we'll discuss some of those specific

6    opinions of Dr. Herron's as we go through, but

7    just to confirm what you said, you do not have any

8    data to suggest that the overall non-white or

9    black or Hispanic registration rate has declined

10   across different registration methods, correct?

11       A    To suggest, is that the word you're

12   asking?  Yes, we do, and it's Dr. Herron's data.

13   In our report, we mention, I think, a table in

14   which he shows that the decline in third party

15   registration among non-whites is matched by an

16   increase in Motor Vehicle registrations among the

17   same people.  Speculative, suggestive, since it's

18   subject to empirical analysis, but we do suggest

19   that this is a possible avenue to pursue.  Hence

20   the alternative, what do we call it, scenarios

21   that might have occurred.

22       Q    And is this the comparison of 2021 to

23   2023 data that you describe in your expert report?

24       A    That is correct.

25       Q    And you understand that 2021 and 2023

1    are not similarly positioned years in an election

2    cycle?

3         A    That is Professor Herron's contention,

4    yes.

5         Q    You disagree with that contention?

6         A    I would simply say that it seems to suit

7    him when he does analysis on that period for

8    registrations, but doesn't seem to suit him when

9    we compare his own table.  So you'll have to ask

10   Professor Herron.

11        I accepted the two periods represent a

12   period before and after the adoption and

13   implementation of SB 7050.  Michael might have a

14   different view, but it seems to suit him well for

15   other analysis.

16        So I -- and I did read in his rebuttal

17   report he doesn't believe that our comparisons are

18   valid.  It is in his report, and we'll let the

19   Court make that decision.

20        Q    Do you have an understanding of whether

21   Dr. Herron uses comparisons of 2019 to 2023

22   throughout various places in his report?

23        A    I think those are, you know, a similar

24   period of comparison.

25        Q    So you do agree that Dr. Herron uses

1    comparisons of 2019 to 2023 throughout places in

2    his report?

3         A     Those are some of his comparisons.

4         Q     And that those are both years before a

5    Presidential election?

6         A     Again, I'm aware that he has made that

7    statement, yes.

8         Q     And you're aware that 2019 and 2023 are

9    both the years in advance of a Presidential

10   election?

11        A     I'm aware of that, yes.

12        Q     Do you have an expectation, or

13   understanding of whether you'd expect voter

14   registration to be higher in years preceding a

15   Presidential election?

16        A     I have no knowledge of that.

17        Q     No guess one way or the other?

18        A     Like I said, I have no knowledge.  One

19   could speculate about it, but I have no knowledge.

20   It could be higher or lower depending on the

21   nature of the Presidential election.  A

22   competitive race for Presidency might not have as

23   high an effect on voter registration and turnout

24   as a noncompetitive.

25        Q     And -- I forgot the question.  It will

1    probably come back to me.

2              I have some more questions about the

3    specific 2021 -- oh, it came back to me.

4              Are you aware of what years there are

5    versions of the voter file available with

6    registration method also tracked?

7        A    I'm not specific in the years.  I know

8    there are limitations to the available data that

9    are, and Professor Herron was quite specific, but

10   I didn't -- I'd have to go back into the report

11   and find them.  But I am aware that there were

12   data limitations, yes.

13       Q    And so if I represent to you that Dr.

14   Herron noted in his report that he only had a 2021

15   version of the voter file as well as 2023 versions

16   of the voter file available with registration

17   method available to him, would you have any way to

18   dispute that statement?

19       A    Would I have any way to what?

20       Q    Disagree with his claim of what data was

21   available to him.

22       A    I don't disagree with the data that was

23   available.  I would never suggest for a moment

24   that Professor Herron would be misrepresenting

25   what was available.  It's unfortunate that the

1  data he needs to test his propositions is not

2  available, but that simply is another limitation

3  of his analysis, not one that's due to Professor

4  Herron.  It's simply, you know, we don't know what

5  the future is going to hold or we cannot make

6  appropriate analyses for answering the question,

7  what was the impact of SB 7050.  The data

8  limitations is not Michael's fault, but it is a

9  limitation nonetheless.

10       Q     You testified earlier that sometimes

11 you're making an educated guess based on the

12 available information of what will happen.

13       A     You didn't come clear.  You need to get

14 closer to your mic.  It's hard to hear what you're

15 saying.  Say it again.

16       Q     You testified earlier that sometimes

17 you've made an educated guess on what you believe

18 will happen in regards to an election law.

19       A     Educated guess.  You'll have to explain

20 that to me.

21       Q     Sure.  I think that's what, I remember

22 you using words similar to that when you were

23 answering Ms. Keenan's questions, or correct me if

24 I'm wrong, but you've described how sometimes

25 you're making, maybe you called it educated

1  prediction of what you believe will happen?

2      A    I think what I suggested is that there

3  is empirical evidence in the literature to suggest

4  that one can infer, make a probabilistic, if you

5  want, educated guess about the future.  And that's

6  done in my report when I talk about the literature

7  on election reform or election laws and their

8  impact on voter turnout.

9      Q    And that's something that experts do

10  regularly in your field?

11      A    Yes, they make, they opine on what they

12  think might likely happen, yes.

13      Q    So when you use the word "speculative"

14  here to describe Dr. Herron's predictions, what do

15  you mean by speculative?

16      A    I don't think that the evidence he

17  presented and the analysis he did was sufficient

18  to establish that there would be a significant

19  diminution in non-white voter registration as a

20  result of the adoption of SB 7050.  And I think we

21  offer in the report plenty of examples of election

22  laws that have been adopted with similar

23  intuitions about the impact, and they don't come

24  to fruition because the empirical work that

25  attempts to find out what those outcomes are is

1    far more complicated.

2            I don't believe that Professor Herron

3    did the type of analysis that needed to be done

4    here with the existing data to establish even a

5    speculative or probabilistic or predicted or

6    educated guess.  I think we have to have better

7    data and a different research design and

8    potentially a longer period of time to see what

9    the impact of this law is.

10       Q    Ms. Keenan walked through this before,

11   but none of the papers and studies that you're

12   referring to studied the impact of election

13   regulations on third party voter registration

14   organizations; is that correct?

15       A    So you're asking about the work that I

16   cited in the report on Page 14 and on?

17       Q    Yes.

18       A    And you're asking whether or not, I

19   think what you're asking is are they directly

20   related to voter registration.  Some are, most are

21   not, but that wasn't the purpose of citing that

22   work.  The purpose of citing that work was to

23   establish the fact that there are many, many

24   election laws like SB 7050 where people speculate

25   about the outcome of the election law on turnout,

1    registration, disparate effects, and often those

2    predictions are wrong either because they don't

3    take into account these mitigating or conditional

4    variables, they don't use the right research

5    designs, or they don't have the data.

6            In Michael Herron's case, and I think to

7    some extent in the Smith case, at least two, if

8    not all three, of those conditions prevail to

9    lessen my confidence in the speculation,

10   hypotheses, predictions of these two experts.

11       Q    And so when you're referring to the laws

12   in those studies as like SB 7050, my question to

13   you is whether any of those studies were conducted

14   on laws that regulate the conduct of third party

15   voter registration organizations.

16       A    They, to my knowledge, none do, no.

17       Q    You also mention that Dr. Herron's

18   report was, in this sentence you say based on

19   academic theory.  Do you take issue with the

20   academic theories that Dr. Herron refers to in

21   this passage?

22       A    I think they were -- I take issue with

23   their incompleteness of the literature.  And

24   again, I come back to the same literature I

25   reviewed.  He is very well-versed in the

1  literature and knows that many election laws,

2  which are intended to increase turnout, possibly

3  impose costs, often do not because of these

4  conditional or mitigating circumstances. I felt

5  that he was incomplete in his review of the

6  literature as was, I think, as I mentioned with

7  Ms. Keenan before, in the report from Professor

8  Smith.

9      Q     Would you characterize SB 7050 as a law

10 intended to increase turnout?

11     A     I think the Plaintiffs' claim, it wasn't

12 the intention here, or the goal was multi-faceted,

13 some of which may have been to secure and protect

14 the voter registration and voting from voter

15 fraud, impersonation. And I know there are claims

16 I've read in the Lichtman report of other

17 intentions, negative intentions on, on suppressing

18 turnout.

19     Q     Right. So just to make sure I'm

20 understanding, those are representations that have

21 been made of SB 7050's intent to decrease access

22 to certain types of voter registration; is that

23 correct?

24     A     Yes. I think the, you know, my reading

25 of the Plaintiffs -- is the word pleadings right?

1     That there were multiple intentions, some of which

2     were to reduce access for purposes of securing

3     voter integrity and, I mean integrity of the voter

4     registration process.

5          Q     And so my question to you is whether

6     you've seen anything, or would personally

7     characterize SB 7050 as a law intended to increase

8     voter turnout?

9          A     I've seen no, you know, evidence either

10    way.

11         Q     Okay.  Would you agree that academic

12    theories, including some of those referred to by

13    Dr. Herron in his report, are generally supported

14    by peer-reviewed research and literature?

15         A     Yes.

16         Q     And would you agree that academics often

17    rely upon academic theories to proffer

18    explanations about real life behavior?

19         A     Yes.

20         Q     I'm on Page 3 as well of your report.

21    We're looking at the sentence, I think the last

22    full sentence on the page.  It starts, quote, it

23    does not provide empirical evidence of such

24    impacts and does not address the key issue of

25    actual disparate impacts on black and Hispanic

1    registration relative to non-Hispanic white

2    registration.

3              So my first question for you here is, is

4    "it" referring to Dr. Herron's expert report?

5         A    Yes.

6         Q    I'd like to go ahead now and take a look

7    at Dr. Herron's rebuttal report.  So we'll go

8    ahead and enter this as the next Exhibit.

9              (Exhibit 15 was marked for

10   identification and is attached to the transcript.)

11        Q    And it's Exhibit 15.  Do you recognize

12   this document?

13        A    Yes.

14        Q    And did you review the rebuttal report

15   of Dr. Herron in its entirety?

16        A    Yes.

17        Q    When do you recall reviewing Dr.

18   Herron's rebuttal expert report?

19        A    Within the last several days.

20        Q    So we'll turn now to Paragraph 12 of Dr.

21   Herron's rebuttal report.  And I'll read it.  Dr.

22   Herron writes, quote, according to the

23   Stein-Alford Report, Professor Herron's findings

24   demonstrate that a higher proportion of non-white

25   voters than white voters register to vote via

1    third parties.  And he included the citations at

2    Page 80 of your report.

3            Quote, the report expresses the same

4    point in writing that Dr. Herron is able to

5    conclude, that blacks and Hispanics are more

6    likely to be registered via 3PVROs than are

7    non-Hispanic whites.  And he includes a citation

8    to Page 11.

9            And so I believe you testified earlier

10   that you do not dispute that, the empirical

11   findings of Dr. Herron and Dr. Smith show that

12   black and Hispanic voters are more likely to

13   register via third party voter registration

14   organizations; is that correct?

15       A    Yes.

16       Q    Okay.  So then moving down to Paragraph

17   14, Dr. Herron writes, quote, if any racial group

18   in Florida disproportionately registers to vote

19   via 3PVRO, then this group will be

20   disproportionately affected by a law whose

21   provisions restrict and raise the operating cost

22   for 3PVROs.  It is best and logical for the

23   authors of the Stein-Alford Report to acknowledge

24   my report's finding that there is a group of

25   registered voters in Florida whose members

1    disproportionately registered to vote via 3PVRO

2    and yet claim that this finding does not address

3    the matter of whether the group is

4    disproportionately affected by SB 7050's

5    provisions regarding third party voter

6    registration organizations.

7              So my question to you is, what is your

8    response to Paragraph 14 in Dr. Herron's rebuttal

9    report?

10       A    My response goes like this.  It's very

11   much what I think I tried to express with Ms.

12   Keenan.

13             First, third party registrations are

14   higher among non-whites; we don't dispute that.

15   The question is why.  And the answer we think may

16   be that third party voter registration

17   organizations target non-white voters for

18   registration.

19             Two, if in fact SB 7050 suppresses third

20   party efforts to register voters, it doesn't

21   necessarily suppress non-white voter registration.

22   There may be an accompanying offsetting increase

23   in alternative methods of voter registration that

24   wasn't examined or pursued by Professor Herron.

25             Finally, the costs that are imposed are

1   not on the registered voter.  They're costs

2   imposed on the third parties.  So it seems that

3   there is a question here that we raised, and we

4   talked about it before in the table that shows it,

5   when voter registration declined among non-whites

6   through third party, it may have increased in

7   other ways.  We did not investigate that.  We

8   simply raise it as a possibility that wasn't

9   addressed.

10          We see no, finally, decrease in overall

11  non-white voter registration.  And that can only

12  be assessed, as we indicated in our report, by

13  comparing before and after the adoption of

14  SB 7050, the ratio of citizen vot -- of non-white

15  registrants to citizen voting age non-white

16  registrants, to the ratio of white registrants and

17  white citizen voting age population before and

18  after.  That wasn't done here.  So we're not

19  convinced that this evidence shows that SB 7050

20  had a disproportionate disparate effect on voter

21  registrations among non-whites.

22          We don't -- if you go up to 13, or I

23  think, yeah, Paragraph 13, we don't dispute that

24  third party registration organizations target

25  non-whites, hence the higher share of non, of

1    third party registrations being non-white.

2        Q    We'll walk through, I think, each of

3    those points through the questioning as we go

4    through different portions of Dr. Herron's

5    rebuttal report, but to start, what is your

6    opinion on the impact of organizations potentially

7    choosing to reach out to non-white voters on

8    whether that somehow nullifies or affects Dr.

9    Herron's conclusions?

10       A    So you're asking me, given the term, the

11   specifics of SB 7050, has it -- I think I've said

12   this on more than one occasion.  We don't disagree

13   that Professor Herron's findings demonstrate that

14   a higher proportion of non-white voters and white

15   voters registered to vote by third parties.  And

16   that it is possible, possible, that as a

17   consequence of SB 7050 and its implementation,

18   that a higher proportion of non-white voter

19   registration has declined, or at least the

20   absolute.

21            But we don't see evidence that this is,

22   has affected non-white voter registrations through

23   other methods, total non-white registrations.  And

24   we're not convinced, as we said, that the key

25   issue here is that this law has had an adverse

1   effect on non-white voter registration and

2   enfranchisement.

3       Q    But my question, and I'll attempt to

4   phrase it better this time, is what relevance is

5   it whether third party voter registration

6   organizations target non-white voters?

7       A    I don't understand.  What relevance is

8   that to --

9       Q    To Dr. Herron's conclusions that you're

10  disputing.

11      A    I don't know what the relevance is.

12      Q    In your answer a few minutes ago I

13  believe you stated that as a first point for how

14  you respond to Paragraph 14.  So my question is

15  trying to understand how it would undermine, or if

16  it would undermine, Dr. Herron's conclusions if,

17  in fact, third party voter registration

18  organizations do target non-white voters.

19      A    It's my understanding that the

20  provisions of the laws, SB 7050, may have had an

21  adverse effect on the ability of third parties to

22  register non-white registered -- unregistered

23  voters.  It does not suggest that those provisions

24  would have prevented non-whites from registering.

25          That's what I, to use your word,

1    relevance, the relevance here is I don't see a

2    demonstration that the conditions of SB 7050 had

3    an adverse effect on non-white voter

4    registrations.  It had an adverse effect

5    potentially on third parties registering

6    non-whites and other voters, but it didn't mean,

7    nor does he demonstrate in his report, that it had

8    an adverse effect on non-white registrations.

9        Q    So accepting what you've said the

10   literature finds that many third party voter

11   registration organizations do target non-white

12   voters in order to help them with their

13   registration, would a law that impacts or limits

14   third party voter registration organizations

15   necessarily have an impact on non-white voters?

16       A    It might.  But again, that is a subject

17   to some testing, and Professor Herron attempts to

18   offer such a test.

19            I would not dispute his effort.  All I

20   am suggesting is it doesn't seem to be relevant to

21   the question we were asking which is, is this

22   restriction on third party registrations

23   sufficient to diminish non-white voter

24   registrations by other methods, and we see no

25   evidence of that.  We see some speculative

1  evidence that it might not, but we don't see a

2  test.

3          And again, our report is short and

4  simple.  We offer a difference-in-difference

5  design that qualifies the base of non-white voters

6  to the total number of available non-white voters

7  to register, and that's CVAP.

8      Q    And you testified earlier that

9  difference-in-difference ratios are widely

10  accepted as strong methodology in reaching

11  opinions in these types of case.

12      A    Do I?

13      Q    You testified earlier that

14  difference-in-difference ratios are a common or

15  preferred methodology in reaching conclusions and

16  analyzing data in cases such as this one.

17      A    Yes.

18      Q    I'd like to look next at Paragraphs 31

19  and 32 of Dr. Herron's rebuttal report where he's

20  discussing some of the difference-in-difference

21  ratios that he reached in this case.  So I'll read

22  to start, quote, with this as background, the

23  contents of Tables 21 and 22 of my expert report

24  are divided into pre SB 7050 months (January

25  through June) and post SB 7050 months (July

1    through August), and they indicate that new voter

2    registrations overall in Florida were down almost

3    19 percent in July through August compared to

4    being down roughly four percent in January through

5    June.  And he cites his paragraph and page number

6    of his report.  The associated

7    difference-in-difference is approximately negative

8    15 percent.

9              And I'll go ahead and read Paragraph 32

10   and then ask my question.  So, quote, according to

11   Tables 21 and 22, the associated

12   difference-in-difference for third party voter

13   registration organization voter registrations is

14   roughly negative 28 percent, which is the greatest

15   in magnitude drop across the voter registration

16   methods of all the methods listed in the two

17   tables.  The difference-in-difference constitutes

18   evidence of the impact of SB 7050 on voter

19   registrations in Florida, countering the claim in

20   the Stein-Alford Report that my expert report,

21   quote, does not provide empirical evidence of the

22   impact of SB 7050 on voter registration in

23   Florida.  And he cites Page 3.

24             My question for you is, what response do

25   you have to these paragraphs in Dr. Herron's

1    rebuttal report?

2         A     Twofold.  I believe that the change in

3    third party voter registration rates after the

4    adoption/implementation of SB 7050 probably are

5    accurate.  What I don't know is whether or not the

6    difference-in-difference constitutes evidence of

7    the impact of SB 7050 on voter registration.

8    Voter registration is different than the method of

9    voter registration.

10              So what we know here is that third party

11   voter registration may have gone down with a

12   difference-in-difference.  We do not know whether

13   or not overall voter registration as a result of

14   the decline in third party voter registration went

15   down, and that is because the latter question must

16   establish a baseline.

17              One of the reasons that voter

18   registration may have declined is not because of

19   third party voter registration restrictions via SB

20   7050, but because there may have been fewer people

21   eligible to register to vote.  That is to say,

22   even if you're not looking at the racial

23   differences in voter registration, but you're

24   looking at overall voter registration, you have to

25   know what the base of eligible registrants are.

1   Citizen voting age population.  As we report in

2   our expert report, you should have a

3   ratio-of-ratio differences.

4           And the ratio in the second sentence,

5   the difference-in-difference constitutes evidence

6   is not evidence of lower voter registration.  It

7   is merely evidence of lower third party

8   registrations.  Evidence of less voter

9   registration would have to look at the ratio of

10  total registrants over total citizen voting age.

11          For instance, if we were at 90 percent

12  of registration among citizen voting age

13  population, it would be very hard to improve on

14  that.  So what we have to know is what is the base

15  from which we are making the generalization that a

16  change in the law decreased, rather than increased

17  or had no effect, on registrations.  That data is

18  simply not available, or not presented by

19  Professor Herron.

20      Q     So to start with the last part of what

21  you just testified to, do you have CVAP, I think

22  is the shorthand if you agree, of this type of

23  data available for 2023?

24      A     I don't know if it's available.  I've

25  read Professor Herron's report and he says it's

1    not available on a month-by-month basis.  I've

2    seen citizen voting age population data at

3    different levels of analysis for 2022, and I

4    believe, I believe, but it might take me some time

5    to find it for 2023, but I think it is available

6    now.

7              And if it was not available, I'm not

8    arguing with Michael on the issue of the monthly

9    data, that's unfortunate, but without that data,

10   you can't test that second sentence.  And let me

11   be very clear.  It's the second sentence, this

12   difference-in-difference constitutes evidence of

13   the impact of SB 7050 on voter registrations in

14   Florida.  It does not.  Without that denominator,

15   without knowing what the size of citizen voting

16   age population is, we can't make a

17   difference-in-difference test.

18             It's unfortunate the data may not be

19   available, but to say the least, not the problem

20   for the, for my colleague John and I, it would be

21   incumbent on Michael to come up with the design to

22   control for that base.

23      Q    We'll talk more about the design that

24   Dr. Herron did select, but just to confirm, you

25   don't have any evidence to offer that there is

1  CVAP data available for 2023?

2       A     Not at this time, no.

3       Q     Do you have any understanding of whether

4  there's CVAP data available for 2022?

5       A     I believe it's available, but again, I

6  make no, no -- what's the word?  Claim in our

7  report. I simply said that was what was needed to

8  do an adequate test.

9       Q     And if Dr. Herron represents that the

10  most recent CVAP data available is from 2021, do

11  you have any reason to, or basis to dispute his

12  claim?

13       A     Again, I have no basis, no, to dispute

14  that claim.

15       Q     Is it your understanding that groups

16  would need to wait two years after a law goes into

17  effect in order to ever have a chance to offer

18  empirical evidence about its impact?

19       A     Could you repeat that?  I couldn't hear

20  the first part.

21       Q     Sure.  My question is, assuming that Dr.

22  Herron is correct about the two-year delay in the

23  availability of CVAP data, is it your testimony

24  that Plaintiffs would need to wait two years after

25  a law goes into effect in order to ever be able to

1    offer an empirical analysis of its impact?

2          A    No.  You can offer, and Michael Herron

3    does, offer opinions about what the impact of the

4    law is.  You can offer opinions.  What I'm

5    suggesting is this is a design that would be

6    preferred.

7                I've seen people even use the 2021 data.

8    I don't believe that Michael did.  I think it was

9    also not available on a monthly basis, but again,

10   that's not my claim.  People can make judgments,

11   and as you pointed out, I've agreed that people

12   can make speculative hypotheses.  But the design,

13   again, let me repeat, the difference-in-difference

14   constitutes evidence for the impact is not

15   evidence.  Let me be clear.  He didn't offer a

16   two-year, or even using the 2021 CVAP.  He claims

17   that by showing that third party voter

18   registrations have declined as a result of the

19   adoption of SB 7050, that we can conclude that

20   overall registrations have gone down.  We cannot

21   conclude that.

22                We don't have -- he didn't marshal the

23   evidence necessary for doing that.  Whether he has

24   it or not or whether it's available, I don't

25   disagree.  I don't disagree the data may not be

1  available.  What I disagree with is that he should

2  not have said in this second sentence, we see that

3  the overall difference is a decline in voter

4  registration.  He can't know that.  He can

5  speculate about that, but he then says, this is

6  evidence of it, third party registrations may have

7  gone down, but he then links that to the decline

8  in overall registrations.  I don't know that to be

9  true, and I don't think he does either.

10        Q     In looking at Paragraph 31, back at what

11  I've read before but will repeat, Dr. Herron wrote

12  that new voter registrations overall in Florida

13  were down almost 19 percent in July through August

14  compared to being down roughly four percent in

15  January through June.

16              So my question is how is that not a

17  conclusion of overall voter registration decline?

18        A     Because as I said in our report, we

19  don't know what the base is.  The appropriate

20  analysis for assessing the impact of SB 7050 on

21  voter registration is to compare two ratios.  Two.

22  Ratio No. 1, total new registrations over citizen

23  voting age population.  Second ratio time 2.  Same

24  number, total new registrations over total CVAP,

25  for the two different time periods.  He doesn't

1  have that data, doesn't present that data, doesn't

2  speculate about it, doesn't raise it as a

3  potential threat to this conclusion.

4         The 19 percent decline could simply, be

5  simply that most people were registered to vote in

6  Florida in the period, the second period, what he

7  calls the post SB 7050 months.  I don't know that

8  because I don't know what the CVAP population

9  looked like.  Michael claims he doesn't know it

10  either.  I wouldn't -- I would speculate maybe,

11  but I wouldn't write it as "this is evidence" as

12  he writes here.  The difference-in-difference

13  constitutes evidence of the impact of voter

14  registration.  It doesn't.  It may be suggestive,

15  but it doesn't constitute evidence.  Am I wrong in

16  reading that sentence, this

17  difference-in-difference constitutes evidence?

18  No.

19         Now, if he disagrees with the design,

20  that it should be a comparison of ratios and not

21  just the numerator, the numerator would be the

22  number of new registrations.  What I want to know

23  is the number of new registrations over the

24  possible number of new registrations that could

25  have existed at time 1 versus time 2.  If time 1

1  had a high rate of registrations and time 2 had a

2  lower rate, then I would conclude that there's

3  something, some evidence of post SB 7050 months

4  may have impacted registrations, but we don't get

5  that test.

6         Q      And according to Dr. Herron's analysis

7  of the voter file, he presents evidence that new

8  voter registrations overall in Florida were down

9  almost 19 percent, correct?  Your issue is with

10 the source that he uses?

11        A      My issue is with the?

12        Q      The source of the data that he uses.

13        A      No.  My issue is with the design.

14 Again, the best way to know whether registrations

15 go up or down is to ask, first, how many people

16 could be registered.  Could you imagine a world

17 where everyone was registered?  Do you know of a

18 state in this country where everyone is a

19 registered voter?  That's a quiz.  It's called

20 North Dakota.  Everyone -- there is no voter

21 registration in North Dakota.  So how do you

22 calculate voter registration when everyone is

23 registered?

24        In the State of Florida, you have voter

25 registration.  So we don't assume that everyone is

1    registered to vote.  We do that by asking, how

2    many people are legally eligible to register.  We

3    then take that number and compare it to the number

4    of people who are registered and we get a rate.  I

5    don't know what the rate of registration is in

6    Florida, but that rate has to be compared before

7    and after.  That is a well-accepted design called

8    a difference-in-difference.  That's not what

9    Michael Herron did.

10         Q     You testified that it's a well-accepted

11   design.  Is it the only accepted design for

12   reaching conclusions and analyzing voter data?

13         A     Is it the only method used, or is it the

14   only acceptable method?

15         Q     Well, break -- is it the only -- we'll

16   start with used.  Is it the only method used when

17   analyzing voter data?

18         A     Well, obviously not in Michael Herron's

19   case.  But I would argue it is a widely accepted

20   and preferred method for doing

21   difference-in-difference.  And if you want at a

22   later date I will offer you research and designs

23   that recommend this type of difference, this

24   ratio.

25              I even would speculate, knowing Michael

1   Herron's work and Dan, that they have used this

2   design before themselves.

3       Q    And so not disputing that that is a

4   well-accepted design and a method, my question to

5   you is whether it is the only method used in

6   analyzing voter data?

7       A    No, I would have to say it is not the

8   only method used.  And clearly in this case for

9   Professor Herron and Smith it was used -- another

10  method was used.

11      Q    And do you have an understanding of

12  whether Courts have accepted other designs in

13  analyzing voter registration data?

14      A    I do not.

15      Q    So what is your opinion that this is the

16  only method that you would accept in analyzing the

17  voter data based on?

18      A    I believe this is a preferred method.

19  It is one that gives us greater confidence.  As

20  the authors in, as Michael, Professor Herron and

21  Dan Smith have pointed out, there are plenty of

22  confounders here.  And Professor Herron is very

23  careful in trying to get comparable time periods

24  as you've raised before.  Getting a Presidential

25  and non-Presidential election time period could be

1    problematic, and I'm not disagreeing.  But a more

2    basic one is asking the simple question, if

3    registration numbers go up, is that a preferred

4    measure to knowing how many registered, eligible

5    registered voters are in the state relative to the

6    number of eligible citizen voting age population.

7    I consider that superior, and I suspect, I would

8    hope the Court would find that more convincing.

9         Q    Do you have any understanding of whether

10   Dr. Herron's opinions similar to those he offers

11   in this case analyzing voter registration data

12   from the voter file have already been credited by

13   Florida courts?

14        A    I do not.

15        Q    And you don't have any understanding one

16   way or the other whether the 11th Circuit has

17   credited a similar analysis by Dr. Herron?

18        A    I do not.

19        MS. JOHNSON:  Okay.  I think this may be

20   a good time for a break.  Let's say maybe 10

21   minutes, if that's okay.

22        MR. PRATT:  Sure.  2:55 works, Eastern

23   time?

24        MS. JOHNSON:  Yes, sounds great.  Off

25   the record.

1          (A recess was taken at 2:44 p.m.)

2          (Back on the record at 2:55 p.m.)

3    BY MS. JOHNSON:

4          Q    Okay, I think we'll take a look back at

5    your expert report again.

6               MS. JOHNSON:  Makeba, if you don't mind

7    pulling it up.

8          Q    So Exhibit 2, which is your expert

9    report, and we'll look at Page 4.  We'll look at

10   the third bullet, which is something you've

11   mentioned already today.

12               You wrote, quote, Professor Herron's

13   analysis does not consider the possibility that

14   declines in the proportion of non-whites

15   registering to vote by a third party were

16   substituted by registrations by another model,

17   e.g., DMV.

18               Did I read that correctly?

19         A    That should probably be mode.  That's a

20   typo.  As in mode of registration.  But that's a

21   small point.

22         Q    Got it.  Okay.  Other than that typo, do

23   you agree that I read it correctly?

24         A    Yes.

25         Q    Who wrote this; you, or Dr. Alford?

1        A     I'm pretty certain I wrote that, I

2   drafted that.

3        Q     Turn to Dr. Herron's rebuttal report for

4   his response.  I'll be looking at Paragraph 118 on

5   Page 39.

6              Here we go.  118.  Dr. Herron wrote,

7   quote, the Stein-Alford Report offers no compared

8   evidence on either the cost of registering to vote

9   via 3PVRO or the cost of registering to vote at a

10  DMV office.  Indeed the Stein-Alford Report does

11  not offer any comparative evidence on the cost of

12  registering to vote with the various methods of

13  voter registration available in Florida.

14             Do you agree with Dr. Herron that you do

15  not offer any comparative evidence about the cost

16  of registering to vote via various registration

17  methods in your expert report?

18       A     No, we do not offer such evidence.

19       Q     Okay.  We'll go ahead and look at

20  Paragraph 119.  Notwithstanding, quote,

21  notwithstanding this lack of evidence, the authors

22  of the Stein-Alford Report do suggest that

23  3PVRO's, quote, target, unquote, minority voters

24  when seeking to register eligible Floridians to

25  vote, Page 8, noting that the Stein-Alford Report

1    refers to non-white voters, which I treat as

2    shorthand for minority voters.  The authors of the

3    Stein-Alford Report do not make a similar point

4    about Florida DMV offices, i.e., they do not claim

5    that officials in DMV offices target eligible

6    minority voters for voter registration purposes.

7    Thus, the only comparative point made in

8    Stein-Alford Report about voter registration via

9    3PVRO and voter registration at a DMV office is

10   one implying that for minority voters, the former

11   method of registration is less costly than the

12   latter.

13          What is your response to this paragraph

14   of Dr. Herron's rebuttal report?

15      A    Could you go down further on that?  I

16   just want to read the next sentence after that.

17      Q    Absolutely.

18          This is seemingly at odds with

19   Stein-Alford Report's statement that it is, quote,

20   is not, quote, obvious, end quote, that voter

21   registration via 3PVRO is less costly than voter

22   registration at a DMV office.

23      A    I don't have much of a reaction to this.

24   I've read this paragraph a half a dozen times,

25   maybe 10.  John and I have read it together.  I do

1    not know how it's responsive to our question,

2    could voter registration at the DMV offset any

3    decreases in third party voter registration.

4            Again, I'm not going to repeat for the

5    record how we would have done that.  I think I

6    made it very clear about the

7    difference-in-difference.  But it strikes me that

8    the costliness of third party voter registrations

9    and the DMV is simply an interesting question, but

10   we don't know whether or not the number of

11   non-white voters who registered at the DMV went

12   up, down, or relative to the availability of

13   voter, citizen voting age population relative to

14   the three, the third party.

15           So I don't know how this, I don't know

16   what to respond to this in saying, I don't know if

17   the DMV is more or less costly to the voter.  We

18   don't -- you know, third party registration, as we

19   suggested in the report, is a service that is

20   provided to third parties -- by third parties to

21   predominantly targeted non-white voters.  The DMV

22   is when somebody wants to get a driver's license,

23   so you have to actually go to the DMV and get the

24   driver's license.  A third party voter

25   registration might be thought of as a subsidy, but

1  again, the issue for us has always been, does the

2  law, SB 7050, have a diminishing effect on voter

3  registrations disparate between non-white and

4  white, and we think that it could have been offset

5  by the DMV.  That is, we don't dispute that third

6  party registrations may have gone down.  We just

7  don't know if they went up in the DMV relative to

8  the available population to be registered, that's

9  all.

10        I don't know how to respond to this

11 paragraph, and I'm not certain it's even

12 responsive to anything we wrote in our report.

13       Q    Just to confirm something, I think you

14 just said you don't disagree with Dr. Herron that

15 you only offer a claim that 3PVROs target

16 minorities but do not allege that the DMV has any

17 kind of similar targeting of minority voters,

18 correct?

19       A    No claim of that.

20       Q    Let's look back at your report.  We're

21 going to turn to Page 5, the next page.  Okay.

22 And we're going to look at that first paragraph on

23 Page 5 to start.

24        MS. JOHNSON:  If you can scroll back to

25 the bottom of 4, I forgot that it starts there.

1          Q     Okay.  So I'll read, you wrote, quote,

2     Professor Herron relies on comparing the

3     proportion of persons registering to vote by

4     race/ethnicity and method.  Professor Herron

5     reports a significantly greater proportion of

6     non-whites than whites who register to vote via

7     third party registrations and that this number

8     declines significantly after the adoption and

9     implementation of SB 7050.  We believe this is an

10    inappropriate measure of the incidence of

11    non-white and white total voter registrations and

12    registration by method.

13          So my first question is, did you or Dr.

14    Alford write this portion of your report?

15          A     Who wrote this portion of the report, is

16    that your question?  I did.

17          Q     Okay.

18          A     I drafted it, yes.

19          Q     Why do you believe that it's

20    inappropriate that Dr. Herron, or why do you

21    believe it's inappropriate as "inappropriate" is

22    used in this paragraph?

23          A     I think I've answered that question.

24          Q     It's fine if you want to refer to your

25    earlier testimony, you don't need to repeat again,

1  but I want to have an understanding because this

2  is a different portion of your report.

3       A    I'll go back and repeat what I said, I

4  think.  When looking at rates of registration, you

5  have to have a base from which to make

6  comparisons.  So if the rate -- that is to say the

7  number of registered voters over the total number

8  of persons who could be a registered voter is a

9  rate.  So if there's a thousand people who are

10 citizen voting age population, or a thousand

11 people who are African American, Hispanic or white

12 citizen voting age population, the question you

13 want to ask is, of those thousand people, how many

14 are registered, because the denominator, the

15 number below, can vary both across racial groups

16 and between and over time.  You must have a way to

17 standardize.  Otherwise what you're comparing are

18 essentially very different numbers that aren't

19 comparable.

20           So what we suggested is that you compare

21 two ratios, before and after the adoption and

22 implementation of SB 7050.  Professor Herron

23 doesn't do that.  He only compares total number.

24 He only compares numerators.  And what we don't

25 know is that we would, we might expect the

1  denominator to be bigger or smaller for different

2  racial and ethnic groups and across time.

3  Therefore, the preferred measure is a

4  difference-in-difference.  That's why they call it

5  a difference-in-difference.  It's a difference in

6  the difference over time of these two ratios.  And

7  I don't see any analysis that includes citizen

8  voting age population in the denominator.  He just

9  gives us raw numbers.

10      Q     The denominator in the calculations that

11  Dr. Herron performs are the total number of voters

12  in Florida's voter file, correct?

13      A     Yes.

14      Q     Have you ever relied upon voter files

15  when engaging in your expert work?

16      A     That's a very good question.

17            I honestly don't remember.  Probably in

18  my research, but not in my expert testimony.

19      Q     And when you refer to your research that

20  reviewed voter files, was that peer-reviewed and

21  published research?

22      A     Yes.

23      Q     Are you familiar with other, whether

24  other experts in your field rely upon voter files

25  in reaching part of their expert conclusions?

1        A    I know Michael Herron and Dan Smith do,

2   yes.  I can't think of others.

3        Q    You don't know one way or the other

4   whether other experts also use voter files to

5   reach conclusions?

6        A    In cases I've been involved in, or just

7   from my general knowledge?  I can't recall.

8        Q    Okay.

9        A    I'm sure they do, yes, I just can't

10  recall names and cases.

11       Q    Do you allege that any of Dr. Herron's

12  calculations were incorrect?

13       A    Any of Dr. Herron's populations?

14       Q    Calculations.

15       A    Oh, calculations.

16            No, we have done no independent analysis

17  or reanalysis of his data.

18       Q    Do you disagree with Dr. Herron's

19  finding that at least six to seven percent of all

20  voter registrations have been facilitated by third

21  party voter registration organizations?

22       A    We have not contested that, no.

23       Q    Do you agree that according to the voter

24  file, black registered voters in Florida use third

25  party voter registration organizations to register

1  to vote roughly five to six times as often as

2  white voters?

3      A    We did not contest that.

4      Q    Do you disagree with Dr. Herron that

5  according to the voter file, Hispanic voters have

6  used third party voter registration organizations

7  roughly four to five times as much as white

8  voters?

9      A    We have not contested that finding.

10     Q    Let's take a look at Dr. Herron's

11 rebuttal report again, Paragraph 63 this time.

12          I'll let you read the paragraph yourself

13 for just a second because I'm only going to read a

14 portion of it.

15     A    (Reviewing.)

16          I've read it.

17     Q    Okay.  So the part I want to focus on is

18 the last sentence, quote, indeed the Stein-Alford

19 Report does not provide evidence that even a

20 single conclusion in my expert report would have

21 been different had I divided the counts of third

22 party voter registrations (and other registrations

23 by other methods) by counts of citizens of voting

24 age in Florida.

25          And my question is, what is your

1    response to this portion of Dr. Herron's rebuttal

2    report?

3         A    I think this is not germane to the

4    question that we raise with Dr. Herron's report.

5    Let me be absolutely clear, because I've only said

6    this several times.  We have not contested the

7    share of third party voter registrations that

8    might be African American, Hispanic.  I'm going to

9    repeat that again so it's not asked.  We don't

10   dispute that a higher proportion of third party

11   voter registrations occur among non-white voters,

12   okay?  Is that clear?

13            We have said that the consequence of

14   SB 7050 on total voter registration and total

15   voter registration by race and ethnicity requires

16   a different strategy design.  That design would

17   look at the total number of registrations, new,

18   and the total number of citizen voting age

19   population by race and ethnicity.

20            We did not, I'll repeat carefully, we

21   did not, maybe I misread my own report and you'll

22   have to show me in my report, we did not say that

23   Professor Herron should have taken the ratio of

24   third party voter registration rates over the

25   total number of citizen voting age population.

1          Would you go back to my report, please,

2     and we'll go to, I think it's the top -- I think

3     it's right there.

4          Professor Herron reports a significantly

5     greater proportion of non-whites than whites who

6     register to vote via third party and that this

7     number declines significantly after the adoption.

8     We believe this is an inappropriate measure of the

9     incidence of non-white and total white voter

10    registrations and registrations by method.

11         So what I'm trying to suggest here is it

12    isn't that he should have taken the total number

13    of third party registrations over CVAP.  What he

14    should have taken is the total number of

15    registrations over CVAP and the total number of

16    registrations by race and ethnicity over the total

17    number of citizen voting age by race and

18    ethnicity.

19         We don't take, and I've said, we don't

20    take issue with the rate of third party

21    registrations by race and ethnicity.  We take

22    issue with the consequence of it on total

23    registrations.  We believe there isn't evidence

24    here that SB 7050 depressed total registrations by

25    race and ethnicity.  Not, we do not take issue

1   with how the law may or may not have affected

2   third party registrations.  We take issue with

3   whether or not that finding has consequences for

4   non-white voter registration.

5         Q    Let's look back at Dr. Herron's rebuttal

6   report again, on Page 28.  Starting with the

7   section header there, I'll read it.  Dr. Herron

8   wrote, quote, CVAP normalizations are consistent

9   with findings in my expert report.

10              Have you reviewed this section of Dr.

11  Herron's rebuttal report?

12        A    You're talking Paragraph 77?

13        Q    Yes.  And the subsequent paragraphs in

14  this section, 5.2.2.

15        A    Putting aside the fact that the universe

16  of Floridians who --

17              (Reading.)

18        Q    We're going to look down at the

19  paragraph on the next page.  I was just asking

20  whether you read this section.

21        A    I've read it, yes, and I'm reading it

22  now again.

23        Q    I am going to give you time to review

24  whatever you need, but just to expedite, so we'll

25  go on to the next page.

1          You'll see that Dr. Herron included a

2    new table, table 7, which he's titled, quote,

3    3PVRO Voter Registration Rates Based on CVAP

4    August 2021 Voter File.  Do you see that?

5          A    Yes.

6          Q    And then looking down to the next page,

7    on 86, Paragraph 86, Dr. Herron summarizes what he

8    found in Table 7.  He writes, quote, I concluded

9    from Table 7 that black citizens of voting age in

10   Florida use 3PVRO voter registration at greater

11   rates than white citizens of voting age in

12   Florida.  Because the correlation between missing

13   method of voter registration and race, the

14   black/white gap in 3PVRO registration rates is

15   conservative.

16          Do you have a response to this portion

17   of Dr. Herron's rebuttal report?

18          A    Yes.  And again, I don't contest, nor

19   does John, and you'll have him, that third party

20   voter registrations are greater among non-whites.

21   What we raised as a central issue is whether the

22   consequences of these laws, of this law,

23   provisions of this law had an adverse effect on

24   total voter registrations as a consequence of what

25   it may or may not have done to third party voter

1    registrations.  That can only be assessed by the

2    design that we outlined in our report, our expert

3    report.

4              What Michael has done here for one

5    period, 20 -- is it 2021?  August 2021 is simply

6    take the total number of third party voter

7    registrations for African Americans, Anglos, I

8    believe there were Hispanics in that category as

9    well, and divided it by the total number of CVAP.

10             Again, if you go back to our report, the

11    difference-in-difference design that we would have

12    recommended would be to compare the two ratios,

13    total registration, CVAP registration for race and

14    ethnicity.

15             This is not responsive to the point and

16    recommendation we made.  Michael took CVAP and did

17    it for -- go back to the table.  Above -- stop.

18    That is for August 2021.  But his analysis, his

19    most important analysis is to show that before and

20    after the adoption of SB 7050 there was a

21    demonstrable decline in third party registrations,

22    particularly among non-white voters.  We're not

23    contesting that.  We're saying that it is

24    non-consequential for, this effect, this finding

25    is non-consequential for the outcome of voter

1   registration for non-whites.  To do that we

2   recommended an analysis that Michael doesn't do

3   here.  I don't see the before and after.  I just

4   see that he divided the total number of

5   registrants, white, black and Hispanic, by CVAP,

6   which I would imagine is reasonably correlated

7   with total registered voters.

8           What I want to know, John and I raised,

9   is is this law and its implementation

10  consequential to voter registration among

11  non-whites.  That can only be done -- not only, it

12  can be better done, or preferred, a preferential

13  way to do it is the difference-in-difference

14  design of the two ratios.  This is not two ratios,

15  this is just comparing for one year -- or one

16  month, I should say.

17      Q    Let's go back to your report and then

18  look at Pages 6 and 7 and the number of

19  hypotheticals that you presented on these pages.

20  I am happy to let you review as much as you need,

21  but my question is going to be, why did you choose

22  to provide hypothetical numbers rather than

23  conducting an actual analysis and calculation

24  using real numbers?

25      A    Without being, and I really do mean not

1    to be snarky, but I don't work for the Plaintiff.

2    I was using this as a hypothetical.  The object of

3    our criticism is not the quality.  I want to be

4    very clear here, it's not the quality of Professor

5    Herron or Smith's research.  It is not the quality

6    of the data they were able to en masse.  It is not

7    their analytical strategy.  It is their

8    methodology.

9            This is not the way to assess the effect

10   of this law on non-white voter registration.  This

11   is purely a hypothetical example of the design

12   that should have been used.  It is not the design

13   that was used by Herron or Smith.  And we believe

14   this is the preferred design.

15           The numbers, as Michael suggests, are

16   not representative -- although I was surprised

17   that one of my numbers was actually quite close --

18   but they were just hypothetical examples to

19   demonstrate how we could show that the effects of

20   this law may or may not have diminished and

21   widened or narrowed the gap between voter

22   registration for white and non-white voters.

23       Q    Would you have access to the same data

24   that Dr. Herron used in his report?

25       A    I believe we do, yes.

1        Q     And to potentially save us from flipping

2    back and forth, but we can, I believe you just

3    mentioned that Dr. Herron responds in his rebuttal

4    report with an analysis showing that the 2019

5    numbers presented in this table are not accurate;

6    is that correct?

7        A     Yes.  I never -- let me be very clear.

8    I never purported that these numbers were actual

9    representations of real data in the State of

10   Florida.  I think I made it very clear they were

11   hypothetical numbers simply to illustrate what

12   might look like disparate and non-disparate

13   effects of SB 7050 on voter registration.

14       Q     And so you don't disagree with the 2019

15   calculations that Dr. Herron provided in his

16   rebuttal report?

17       A     Do I -- I'm sorry, I didn't hear that.

18       Q     You don't disagree with any of the 2019

19   calculations that Dr. Herron provided in his

20   rebuttal report?

21            MR. PRATT:  Objection.  Form.

22       A     I have no basis for knowing whether

23   those calculations are right or wrong.  I do have

24   a basis for knowing that the design, the

25   methodology, is not one that I think is superior

1    for answering the question that we were charged

2    with.

3        Q    Go back to Dr. Herron's rebuttal report.

4    We're going to look at Paragraph 105.

5            Okay, I'll read it.  Dr. Herron writes,

6    quote, as I point out in my expert report, SB 7050

7    was effective as of July 1st, 2023, and he cites

8    where he says that in his opening report, putting

9    aside the invented (and in the case of the 2019

10   rates, demonstrably wrong) voter registration

11   rates, subtracting 2023 and 2019 rates will result

12   in differences confounded by the fact that SB 7050

13   was not effective in the first half of 2023.

14           Do you have a response to this paragraph

15   of Dr. Herron's rebuttal report?

16       A    No, I don't disagree.  I assume that his

17   statement is actually accurate.

18       Q    And so would you agree that this is a

19   flaw in the research design that you propose

20   should have been undertaken?

21       A    No.  The concern here is it's a flaw in

22   Professor Herron's research design.  It may be

23   that we cannot effectively, accurately assess the

24   impact of SB 7050 on voter registration rates for

25   the very reasons that he raises.  It wasn't

1   effective for the first half, and he goes on to

2   explain why.  That difference merely -- what I

3   read from that is maybe we should have waited

4   until the second half of 2023 before we did the

5   evaluation.  That would, if I were doing scholarly

6   work, I'd say, I'll wait until the data is

7   available.  We don't know what the future will

8   hold.

9           It's, you know, he's speculating, but

10  he, himself, does this type of before/after

11  analysis.  We just think that he should have used

12  a different design.  He claims that CVAP wasn't

13  available on a monthly basis and that the SB 7050

14  wasn't in effect after the first half of 2023.

15  Would you agree that we're now in the second half

16  of 2023?  He could have done the analysis in the

17  last.  I know he is a very hardworking person, but

18  this doesn't change our evaluation of his

19  findings.

20      Q    Do you have an understanding of whether

21  Dr. Herron did, in fact, analyze the voter file

22  data from the second half of 2023?

23      A    I do not.

24      Q    Look at Page 7 of your report.  Back to

25  your report.  Right under Table 2 you write,

1    quote, we could not find in Professor Herron's

2    expert report any information that reported the

3    difference-in-difference ratios of white and

4    non-white registrations to white and non-white

5    citizen voting age populations for comparable the

6    periods preceding and following the adoption of SB

7    7050.

8                Who wrote this portion of the report?

9        A    I did.

10       Q    Okay.  Let's look at Dr. Herron's

11   rebuttal report.  We'll look at Paragraph 51.

12               So this is a new table that Dr. Herron

13   prepared in his rebuttal report.  And in paragraph

14   51 Dr. Herron wrote, quote, Table 4 shows that the

15   non-white difference-in-difference is roughly

16   negative 26 percent and the white

17   difference-in-difference is roughly negative

18   18 percent.  Non-white voters thus had a greater

19   post SB 7050 drop in voter registrations between

20   2019 and 2023 compared to white voters.  This is

21   consistent with SB 7050 having diminished voter

22   registrations disproportionately among non-white

23   voters compared to white voters, which is what

24   would be expected given, 1, SB 7050's provisions

25   regarding 3PVROs, and 2, the fact that non-white

1    voters are disproportionate users of voter

2    registration via 3PVRO.

3            My question is, what response do you

4    have to this portion of Dr. Herron's rebuttal

5    report?

6      A    I'll simply repeat the same thing I said

7    before.  This analysis doesn't take into

8    consideration the base from which these numbers

9    are calculated, citizen voting age population, and

10   it makes what I consider to be a speculative

11   relationship between the decline in third party

12   voter registration and third party voter

13   registration by race and the overall rates of

14   registration.  This is not the empirical analysis

15   that would be needed to test that.

16     Q    You disagree with the calculations that

17   Dr. Herron conducted in Table 4?

18     A    Absolutely not.  Absolutely not.

19   Calculations are different than research design.

20   He simply is unresponsive to the issues that we --

21   I am certain Michael is careful, and I take

22   objection to your suggestion that his calculations

23   are wrong and I think otherwise.  That's

24   offensive.  Michael does fine work and you should

25   know that.

1              What he has not done here is address the

2      key question, and I want to be very clear about

3      that.  Michael has done more research on these

4      questions and should know better.  This is not

5      responsive to the criticism or issues that we

6      raised.  He, his calculations, I assume, are

7      accurate.  It is not his calculations.  It is

8      simply the methodology by which he reaches the

9      conclusion that this is consistent with SB 7050

10     having a diminishing, having diminished voter

11     registration proportionately among non-whites.

12     That doesn't show -- that's not here in the table.

13             Two, which is what would be expected,

14     would be expected, given that SB 7050's provisions

15     regarding third party voter registrations and to

16     the fact that non-white voters were

17     disproportionate.

18             The logic here is tortured.  There's no

19     empirical evidence that links the effect of

20     SB 7050 on third party voter registrations, which

21     in turn links it to overall registration rates

22     among non-whites.  Why?  Because the design, not

23     the calculation, is what I think is incorrect.

24     The design would have been a

25     difference-in-difference analysis of ratios.

1    That's not done here.

2            Missing is the citizen voting age

3    population denominator needed to make this

4    analysis sufficient to at least show that there

5    was decline before and after the adoption of

6    SB 7050.  It's not here.  Calculations are

7    accurate.  It is simply not the appropriate

8    analysis or strategy or methodology, not

9    calculations.  I disagree with that.

10       Q    You mentioned that Dr. Herron has

11   experience with these, with this area of law; is

12   that correct?

13       A    I don't know if he has experience with

14   this area of law.  He has a great experience with

15   this type of data, yes, evidence his expert

16   report, his rebuttal report.

17            I think he chose to ask a different

18   question than Mike -- than John Alford and I have

19   asked.  Although in the report, he does say,

20   SB 7050 had a disparate effect on not only voter

21   registrations for non-whites, but on

22   enfranchisement.  I don't believe he's tested that

23   hypothesis.  He's simply shown that there's a

24   possibility that SB 7050 may have reduced overall

25   third party voter registrations and the share of

1    those registrations that are non-white.  What he

2    has not shown is that SB 7050 has had a disparate

3    effect on the registration rates of non-whites

4    relative to whites.

5         Q    We'll go back to your report and look at

6    Page 7.

7              And we're going to look at the next

8    bullet point on Page 7, which I believe is

9    something you referenced earlier in your

10   testimony.  You wrote, quote, post January 2012

11   registrations reported in Tables 13 and 15 of

12   Professor Herron's expert report show that DMV

13   registrations among black and Hispanic voters were

14   37 percent and 36 percent respectively, and 3PVRO

15   registrations were 15 percent and 11 percent in

16   August 2021.  In the September 2023 voter file,

17   black and Hispanic DMV registration rose to

18   44 percent and 42 percent respectively, while

19   3PVRO dropped to 13 percent and 10 percent among

20   blacks and Hispanics.

21             Though conclusions about the aggregate

22   numbers are subject to an ecological fallacy, they

23   are suggestive of substitution of DMV registration

24   for third party registration among non-white

25   voters.  Professor Herron neither comments on this

1    aggregate change, nor does he test to see if

2    non-white citizen voting age persons were

3    substituting registering at the DMV (or any of the

4    other options available for registering to vote)

5    for third party voter registration organizations.

6             Is it your opinion that when a voter

7    registration method is no longer available or not

8    as accessible to voters, you'd expect perfect

9    substitution into other methods of voter

10   registration?

11        A    No.  I would expect some substitution,

12   but I don't know at this point what that rate

13   would be.  It could range from zero to, as you

14   said, 100 percent, but I would have thought at the

15   very least it would have been tested and at least

16   examined.

17            And let me also note here that again,

18   the same recommendation, which is to look at

19   registration rates by citizen voting age

20   population for each racial and ethnic group.

21        Q    It says, your conclusion in this

22   paragraph, that burdening third party voter

23   registration organizations may not burden voters

24   who do substitute to other voter registration

25   methods depend upon assuming that every voter that

1    would have registered with a third party voter

2    registration organization will now register by

3    other means.

4         A    No.  That would be your conclusion.  My

5    conclusion is only that there was an option other

6    than third party.  And remember, third party,

7    unless we'll get to it, I guess on Page 8, we talk

8    about it, third party registrations are solicited

9    registrations.  DMV and other modes of voting,

10   other modes of registration are not solicitations,

11   although when you get your driver's license

12   renewed in Florida, they ask you if you want to

13   have yourself registered.  So you can turn down

14   voter registration at the DMV.

15        I don't know what the rates of

16   substitution are, but I would have thought that

17   Professor Herron would have looked at that table

18   and said, whoa, maybe we need to look more

19   carefully at whether or not there is substitution.

20   I don't know.  And no, we did not do any such

21   analysis.  It just seems a logical conclusion to

22   make that there might be substitution here.  We're

23   raising it and simply suggesting it should have

24   been looked at.  We did not.

25        And then my second point, which I've

1   repeated many times, sorry, is that even here we

2   don't see the base or standardizing to the citizen

3   voting age population that registered by third

4   party versus DMV or other methods.

5       Q    Do you agree that it's possible that

6   there will be a set of voters who do not register

7   to vote at all if 3PVROs face additional burdens

8   under SB 7050?

9       A    Say that again, it would be?

10      Q    Do you agree that it's possible that

11  there will be a set of voters who do not register

12  to vote at all now that 3PVROs face additional

13  regulations under SB 7050?

14      A    Absolutely I think it's possible, yes.

15  There will be some voters who will not register to

16  vote, yes.

17      Q    Is it also possible that voters will use

18  an alternate method of registration to register to

19  vote following SB 7050 but that they will incur

20  additional burdens or costs in doing so?

21      A    It's possible, yes.

22      Q    Do you agree that if one method of

23  registration becomes less available to voters, it

24  will increase the likelihood that they will use

25  other methods of voter registration?

1        A      Again, it's possible, but it's an

2    empirical question that should have been examined

3    in this report before we rushed to conclusions

4    about the effects, disparate effects on non-white

5    voters.

6        Q      And I believe you said this a few

7    minutes ago, but you do not have any data

8    comparing the costs of registering to vote via the

9    various methods available in Florida?

10       A      No.

11       Q      You've reviewed Dr. Herron and

12   Dr. Smith's paper that we looked at a bit earlier

13   analyzing Florida House Bill 1355?

14       A      Yes.

15       Q      You mention it in your report?

16       A      Yes.

17       Q      What explanation do you have for Dr.

18   Herron and Dr. Smith's finding in that paper that

19   a drop of overall registrations after HB 1355 was

20   demonstrated after additional regulations were

21   placed on 3PVROs?

22       A      What explanation do I have for their

23   finding?

24       Q      In that paper that there was an overall

25   drop in voter registration following additional

1    regulations of 3PVROs in House Bill 1355?

2         A    I don't have an explanation.

3         Q    Okay.

4         A    They do.  They have an explanation.

5         Q    You disagree with the findings of that

6    paper?

7         A    No.  I think they offer the paper as

8    evidence for both a decline in overall voter

9    registration and evidence of a disparate effect

10   for African Americans.  And as I said this

11   morning, the issue that we were concerned with was

12   whether or not the -- if you were to put up, can

13   you put the paper back up?  It might help.

14        Q    Sure.  I don't know if we have that

15   pulled up, but I am --

16        A    All right.  We don't need it.

17        Q    -- happy to take a break and get it.

18   I'm not meaning to withhold it.

19        A    The short answer was, we saw a decline

20   in voter registration among all racial/ethnic

21   groups.  The slope in Figure 3 appeared to me, and

22   to Professor Alford, as being steeper for white

23   voters than for African American and for Hispanic

24   voters.

25             Professor Herron and Smith report in

1   that 2014 paper that the slope only for African

2   Americans was statistically significant.  What we

3   thought was relevant, but not addressed in that

4   paper and not in their citing of it in their

5   expert report, was whether there were differences

6   in the slope between white and black, white and

7   Hispanic, and Hispanic and black, not whether or

8   not the comparison was between registration rates

9   over time by race.  That is, were there disparate

10  effects.  And we didn't, we didn't see any

11  evidence of that or any test of that in the 2014

12  paper.

13        Q    And so I believe what you just testified

14  to was material not covered within the paper that

15  we're discussing.  But just to confirm my

16  question, you don't disagree with any of the

17  findings that Dr. Herron and Dr. Smith reached in

18  that paper?

19        A    No.  I find nothing in that paper that

20  -- no.

21        Q    Okay.  We will move to Page 8 of your

22  expert report, and look at the paragraph here.

23  I'll read it.  You wrote, quote, Professor

24  Herron's findings demonstrate that a higher

25  proportion of non-white voters than white voters

1  registered to vote via third parties.  This,

2  however, may simply reflect the finding reported

3  in Table 1 of his expert report that an

4  overwhelming proportion of third party

5  registrations are conducted by groups that target

6  non-whites and/or Democratic voters.  Nine of the

7  top ten sources of voter registration applications

8  submitted by third party voter registration

9  organizations are affiliated with non-white

10  organizations and/or the Florida Democratic Party.

11  We suspect this accounts for the higher rate of

12  third party voter registrations among non-white

13  voters.  This expectation is confirmed by Herron's

14  regression analysis of the incidence of third

15  party registrations.  See Table 17.  Herron

16  reports a significant negative coefficient for

17  party registration as a Republican and the

18  likelihood of registering by a third party.

19         Okay.  I'm going to go ahead and flip to

20  Dr. Herron's rebuttal report to look at his

21  response to this paragraph.  I will be on

22  Paragraph 114.

23         Dr. Herron writes -- I'm going to start

24  a little bit into the sentence since the first is

25  a transition.  Quote, my regression results do not

1    show that political party affiliation, quote,

2    accounts for, unquote, disproportionately high

3    3PVRO registration usage among black and Hispanic

4    registered voters in Florida.  If political party

5    affiliation were to, quote, account for, unquote,

6    3PVRO registration usage among black and Hispanic

7    registered voters in Florida, then Table 17's (and

8    Table 23's) regression estimates associated with

9    race would not be statistically significant.  They

10   are, however, significant (and in the case of

11   Table 23's estimates, key are the marginal effects

12   in Table 18, which are also significant).

13          And I'll read Paragraph 15 and then ask

14   my question.  Overall, the regression results in

15   my expert report show that after controlling for

16   political party affiliation, voter race (black or

17   Hispanic) has a significant positive effect on

18   whether a voter registered to vote via a 3PVRO.

19   As a sidenote, the race estimates in Table 17 of

20   my expert report are several times greater than

21   corresponding political party estimates, implying

22   that the marginal effect of being black or

23   Hispanic (compared to being white) on the

24   likelihood of having registered to vote via 3PVRO

25   is greater than the marginal effect of Democratic

1   party affiliation (compared to Republican

2   political party affiliation) on the likelihood of

3   having registered to vote via 3PVRO.

4            So my question is whether you

5   disagree -- or how you would respond, let's say,

6   to either of these paragraphs in Dr. Herron's

7   rebuttal report.

8       A    I wouldn't disagree with 14 or 15.  The

9   numbers are, he's accurately reported his own

10  numbers.  This is the same question that

11  Ms. Keenan asked and is whether or not race/

12  ethnicity is a one-to-one correspondence

13  partisanship.  It is not.  Not every black voter

14  and every, particularly in Florida, not every

15  Hispanic voter is a Democrat.  It simply suggests

16  that there is a targeting more on race and

17  ethnicity than there is on party.  Nevertheless,

18  my -- hold on.  Can you roll up to Paragraph 113?

19      Q    Sure.

20           Including portions of the paragraph we

21  just looked at in your expert report.

22      A    Yeah, I want to reread 14, make

23  certain -- you were reading it kind of quickly.

24           Yeah, I mean am I mistaken in saying

25  that both race, ethnicity and party were

1    significant, but it was no question in Michael's

2    mind, and I have to go back and look at the

3    report, that race and ethnicity accounted for --

4    they had stronger effects on third party

5    registration than party.

6            And again, this is the question

7    Ms. Keenan asked.  I never suggested for a moment

8    there was a one-to-one correspondence between race

9    and ethnicity, in this case black and Hispanic,

10   and voting Democratic.  My point simply is that

11   the number of, or the share of third party voter

12   registrations that are non-white is because of an

13   effort to target that population believing that

14   they may be underrepresented or that the CVAP

15   share of black and Hispanic voters that are

16   registered is well below what is desirable or even

17   comparable to the general population.  But I don't

18   disagree with this.  It just simply says that race

19   is probably a stronger target variable than

20   partisanship.

21       Q    Turn to your conclusions about, or

22   discussion of the cost of voting in your report.

23   And I don't believe I ask questions about specific

24   portions, but we'll have it up in case we need to

25   take a look at something.

1          Is your opinion that you're offering

2     that the cost of voting is no longer an accepted

3     theory in your field?

4          A    Oh, no.  No.  Absolutely not.

5          Q    That cost of voting is something that

6     academics and experts rely upon frequently?

7          A    No.

8          Q    Can you explain why?

9          A    I mean we can have this discussion.

10    There's, the cost of voting theory has evolved

11    over time.  So, for instance, if you read

12    Rosenstone and Hansen's work, some of the early

13    Wolfinger and Rosenstone's work on voter

14    registration, you would find that a pure cost

15    explanation was the widely accepted theory.

16         Some 30 years later, the cost and

17    benefit theory of voting has evolved and voters,

18    and researchers recognize it's much more complex.

19    Or to put it simply, there are more conditional

20    and mitigating factors between the imposition of a

21    cost on a voter, whatever that cost may be, and

22    their likelihood of registering or voting.

23         So I guess what I'm saying is the theory

24    has evolved.  Your idea, I don't want to read

25    words into your statement, but the simple notion

1    that there's a direct relationship between the

2    imposition of some type of cost by law and the

3    likelihood that someone will register or vote is

4    no longer widely accepted.  And people recognize

5    that there are intervening and confounding

6    variables.

7              And that was the purpose in my report,

8    or my report with John, of talking about how early

9    voting might not have increased turnout, might

10   have decreased it because there was an intervening

11   variable called political parties and candidates

12   who do things that might actually depress turnout

13   rather than increase turnout in early voting

14   states.

15        Q    Do you have an understanding of whether

16   courts accept expert opinions related to the cost

17   of voting?

18        A    I have no knowledge of that.

19        Q    Okay.  We'll take a quick look at Dr.

20   Herron's rebuttal report, Paragraph 125 this time.

21   I'll read it first.  He wrote, quote, in terms of

22   my citing social science research on the cost of

23   voting, this reflects how I conduct social science

24   research in general.  In my expert report in this

25   litigation, I use academic literature to provide

1    context for my empirical analysis of SB 7050 and

2    voter registration in Florida.  My conclusions

3    about the disproportionate effect of SB 7050's

4    provisions regarding 3PVROs on black and Hispanic

5    registered voters in Florida follow from data.

6    Scholars of election administration regularly

7    invoke ideas like the cost of voting and the cost

8    of registering to vote when they use data to study

9    changes in a state's election administration rules

10   and procedures, exemplified here by the changes

11   that SB 7050 has imposed on Florida's election

12   administration, rules and procedures.

13          Do you disagree with any part of what

14   Dr. Herron wrote in Paragraph 125?

15      A    I do not disagree with it.  I think it's

16   incomplete, and I think it doesn't even reflect

17   Professor Herron's own work, scholarly work on his

18   vitae, and I don't think it even reflects his work

19   in this case.  Let me explain.

20          He makes a great deal of effort to get

21   the periods before and after the adoption of

22   SB 7050 to be in alignment.  Now what do we mean

23   by alignment?  And you've raised this point

24   before.  We want to have periods where there are

25   competitive Presidential elections and periods

1    post the 7050's adoption where there were

2    competitive Presidential elections.  He doesn't

3    want to mix apples and oranges; maybe midterm

4    elections to a Presidential.

5              What Michael is saying in essence by

6    doing that with his research is that there are

7    confounders.  There are things that could have

8    affected voter registration independent of 7050.

9              So I would have added to that statement,

10   which I agree with, scholars of election

11   administration regularly invoke ideas about the

12   cost of voting.  I do as well.  But what they also

13   invoke are the mitigating or confounding or

14   conditional factors that might also rival the

15   effect of SB 7050.  He didn't write that here, but

16   he, in fact, uses that research goal or research

17   tenet in his own research.  He wants to have

18   comparable periods.

19             What he's really doing is trying to

20   control for confounders.  I believe that my

21   review, the section I wrote of our report that

22   talks about early voting and voter ID laws and

23   vote centers is exemplary of that problem.  That

24   there are many intervening, mitigating factors to

25   the adoption of these state laws that might affect

1  their outcome or their impact on disparate voter

2  registration by race and ethnicity.  Some of them

3  are, in fact, considered by Michael in his

4  analysis by setting up the before and after very

5  carefully.

6          However, the shortness of the time

7  period, the absence of a base for knowing whether

8  registration went up or down relative to the

9  eligible population of people that could register

10  are missing pieces that lead me to be doubtful

11  that his conclusions about the disparate effects

12  of this law on racial registration are true.

13      Q    Do you agree that registering to vote

14  and voting is costly?

15      A    No, no, I don't believe that registering

16  to vote is costless.

17      Q    Costly, I'm sorry.

18      A    Oh, costly.  I'm sorry, you -- I think

19  there are costs to registering to vote, yes,

20  absolutely.

21      Q    Do you agree that voters will generally

22  register using the method that is of the lowest

23  cost to them?

24      A    Absolutely not.  And I have evidence for

25  that.  I have evidence that voters will often do

1    things that are seemingly irrational in terms of

2    cost to voting.  You want an example or should I

3    just say, leave it at that.

4         Q    -- your reasoning.

5         A    Well, there's a paper on my vitae that I

6    wrote with Andrew Menger that shows that when

7    voters are given the least costly way of voting,

8    they choose the most costly way.  And that is in

9    the State of Oregon, Washington, Colorado, Utah,

10   Wyoming and Vermont.  All of these states have

11   vote by mail.

12        So the most convenient way of voting

13   would be to mail you a ballot, even if you don't

14   know there's an election.  So every citizen in

15   those states gets a ballot.  And they get it in

16   the mail.  And they get a return envelope that is

17   already self-addressed and stamped to return by

18   mail, which they can go to their Post Office to do

19   or just leave in their mailbox.  That isn't

20   costless, but it's darn low in cost, right?

21        Would you want to guess what proportion

22   of voters in all of those states choose to walk

23   their ballot into a polling location three days or

24   fewer before election day?  Do you want a multiple

25   choice, or do you want to take a gamble?

1          Q      You can go ahead.

2          A      Would you say it's less than 50 percent,

3    or more than 50 percent?

4          Q      You can go ahead and tell me.

5          A      I'll save you the time.  I'm the one

6    that's getting old here.  63 percent on average,

7    with a standard deviation of about two percent,

8    walk their ballot in on three days or fewer, so

9    they're basically voting on election day.  They're

10   taking the most costly way.

11              Now you want to ask me why they do that?

12   I can go on and explain in that paper, but you

13   could read it.  I think it's Political Research

14   Quarterly some year.

15              So don't tell me that voters don't often

16   choose costly ways to cast their ballots or even

17   to register.  And it is not, by the way, a

18   distrust in the Postal Service.  The motivating

19   reasoning for why people walk their ballot in,

20   even though they can mail it, is they want to be

21   seen and see others voting.  There is a social

22   value, an intrinsic value, in being seen and

23   seeing other people.

24              And did I mention also, in that article,

25   these are the voters that walk their ballot into a

1   location that's closest to their election day

2   voting precinct, so they want their neighbors to

3   see them.  It won't do them any good to pass their

4   ballot in in a neighborhood where they don't live.

5         So you think of cost as a dollar amount,

6   or pecuniary, or time, or even knowledge, which

7   may be lacking in some voters.  What I'm

8   suggesting here is there's far more complexity to

9   voting than simply the idea that a third party

10   might knock on your door and have a non-citizen

11   ask you to register and then take that option

12   away.

13         Voting and registration are more complex

14   and involve far more information than was included

15   in Michael's study.  Not that Michael was

16   deficient; he simply couldn't look at those

17   things.  They weren't, as he pointed out, in some

18   instances, they weren't available to him.  Like

19   the CVAP voting or that the law had only, I think,

20   been in effect for one month, or is it three

21   months before 2023?  Half the year.

22      Q    Have you ever looked --

23      A    I'm sorry for being so pedantic.

24      Q    Oh, no, that's helpful.  Have you ever

25   looked at whether voters have reported a similar

1    extrinsic value in interacting with civic

2    organizations in registering to vote?

3        A     I know of some research on that, yes.

4    Not published.  I know that when, there's some

5    studies that show that when your neighbors ask you

6    to vote and vote for a certain candidate, there's

7    a higher rate of compliance.

8        Q     And the studies you were just describing

9    related to costs associated with voting, did your

10   study also include costs related to voter

11   registration?

12       A     No.  No, it's just voting.

13       Q     Okay.  Would you agree that registering

14   to vote with the assistance of a third party voter

15   registration organization is a low cost method of

16   registering?

17       A     I would say it is less costly than some

18   other methods.

19       Q     If a voter registers with a 3PVRO, they

20   do not have to travel to a government office,

21   correct?

22       A     Yes, I think, you know, if you think of

23   the -- I'm trying to remember how many different

24   modes of registration Michael included in his

25   report, but I would consider them among the lower

1    cost end of the continuum, yes.

2          Q    Do you agree, or disagree with Dr.

3    Herron that SB 7050's regulations of third party

4    voter registration organizations increased the

5    cost to voters in Florida?

6          A    I don't know if they've increased the

7    cost to voters.  I do not know that.

8          Q    Do you agree with Dr. Herron's

9    characterization of SB 7050's restrictions on

10   third party voter registration organizations as

11   non-trivial?

12         A    I would say this.  He has shown that the

13   adoption of the law and its restrictions has

14   diminished the share of non-white third party

15   voter registrations.  He has further shown that

16   probably is because they have targeted, third

17   party voter registration organizations, at least

18   non-white voters and some Democrats.  So the two

19   seem to go together.  He has not shown that this

20   has an adverse effect on overall registration

21   rates among non-white voters.

22         Q    In preparing your report, did you

23   analyze the interest that the State has offered in

24   defense of the new regulations that are being

25   challenged in SB 7050?

1      A    Did I analyze, or did I read?  I read

2   those reasons, yes.

3      Q    Did you reach an opinion on the interest

4   that the State has offered in defense of the

5   challenged provisions of SB 7050?

6      A    No, I did not.  I was not asked to offer

7   an opinion.

8      Q    Okay.  Have you reviewed the legislative

9   record in this case?

10      A    Other than what is written in the

11   reports by the Plaintiffs' experts, that's the

12   extent of my understanding of the legislative

13   record.

14      Q    In your report, for now, sitting here,

15   do you have an analysis to offer on the effects,

16   or the likely effects, of the provisions that

17   Plaintiffs challenge in SB 7050?

18      A    I don't know.  I don't.  I think the

19   hypotheses or speculations, even Professor

20   Lichtman's, are reasonable questions for future

21   analysis.  It does not appear to me that the

22   expert reports have offered a methodology for

23   doing that, and they haven't demonstrated, in my

24   view, that these effects have occurred.  But I

25   think there are deficiencies in their design, in

1    their data, as we've mentioned, that if corrected,

2    would be what I would call reasonable tests of

3    those hypotheses.

4         Q     And my question was whether you

5    conducted any analysis on the --

6         A     Oh, I have not.  Not of their data, no.

7         Q     Do you offer any opinions on what

8    benefits of the challenged provisions of SB 7050

9    could be?

10        A     No, I have not.

11        Q     Do you offer an opinion on whether any

12   of the challenge provisions will carry with them

13   benefits for election integrity or administration

14   simplicity, for example?

15        A     No, I have not.

16        Q     Do you offer any opinions on the harms

17   of the challenge provisions of SB 7050?

18        A     No, I have not.

19        Q     Are you aware of evidence of voter fraud

20   in Florida?

21        A     Am I aware of any evidence of voter

22   fraud?  I'm not, other than what I have read in, I

23   think specifically Professor Herron's report.

24        Q     Do you offer any opinions about the

25   extent of any voter fraud in Florida?

```
 1      A      No, I have not.

 2      Q      Do you offer any opinions about any

 3  potential fraud committed by third party voter

 4  registration organizations in Florida?

 5      A      No, other than what I have read in the

 6  report, I have no such opinions or knowledge.

 7      Q      And do you agree, or disagree that voter

 8  fraud is rare?

 9      A      That I would agree with, yes.

10      Q      Okay.

11      A      I don't know about Florida, but I would

12  agree with that as a general statement, yes.

13          MS. JOHNSON:  Okay.  I think if we can

14  take maybe just a 10-minute break now, I think

15  we'll be able to wrap up shortly after.  I just

16  want to go through my notes, and then hopefully we

17  can conclude.

18          We can go off the record.

19          (A recess was taken at 3:59 p.m.)

20          (Back on the record at 4:09 p.m.)

21          MS. JOHNSON:  Thank you, Dr. Stein.  I

22  don't have any further questions for you.  And

23  pass to my colleague who might.

24          THE WITNESS:  Have a good day.

25
```

1          FURTHER EXAMINATION BY COUNSEL FOR THE

2     COUNSEL FOR THE AMERICAN CIVIL LIBERTIES UNION

3     PLAINTIFFS (HISPANIC FEDERATION V. BYRD CASE

4     ENDING IN 218)

5     BY MS. KEENAN:

6          Q    Hi, again, Dr. Stein.  This is Megan

7     Keenan again representing the Hispanic Federation

8     Plaintiffs.  I just had a few follow-up questions

9     based on some information that came up in your

10    questions with the NAACP Plaintiffs.

11         Do you recall earlier when you said that

12    the papers you cited in your report showed that

13    certain registration rules had a positive effect

14    on voter turnout?

15         A    Yes.

16         Q    And you testified at that time that

17    those papers didn't talk specifically about third

18    party registration efforts, right?

19         A    To the best of my knowledge, no.  They

20    dealt with three types, same-day and election day,

21    and I think online voter registration, as in the

22    internet.

23         Q    Right.  But you referenced in your

24    discussion just a few minutes ago, or it may have

25    been an hour at this point, that you reviewed a

1   white paper on the history of third party voter

2   registration drives after reading the rebuttal

3   reports.  Do you recall that?

4        A    Yes, I do.

5        Q    I'm going to share my screen with what

6   I've marked as Exhibit 15 [sic], and I believe

7   that's the right number.  Is this that white paper

8   that you reviewed?

9             (Exhibit 16 was marked for

10  identification and is attached to the transcript.)

11       A    Yes, Douglas.  Joshua Douglas, yes.

12       Q    I just wanted to go take a look at page

13  15.  Do you see the paragraph starting, the NVRA

14  has been a huge success, at least when measuring

15  the rates of voter registration?

16       A    Yes.

17       Q    I'm just going to read a few lines here.

18  After that sentence I just read the paper goes on

19  to say, the law helped to ease voter registration

20  drives, allowing groups and individuals to go into

21  communities and bring a simple form to register

22  voters.  Voter registration increased by

23  1.82 percent, or about 3,390,000 people, in the

24  states subject to the NVRA during the 22 months

25  after it was implemented before the 1996

1    Presidential election.  Third party voter

2    registration drives contributed significantly to

3    the rise in registration.

4            Did I read that correctly, in the paper

5    that you cited?

6        A    Yes.

7        Q    Okay.  This is from the questioning from

8    the NAACP Plaintiffs.  I believe you mentioned --

9    I can stop sharing my screen now -- that online

10   registration and Make A Plan registration efforts

11   were efficacious.  Do you remember testifying

12   about that?

13       A    Yes.

14       Q    What do you mean when you say that those

15   types of efforts are "efficacious"?

16       A    My recollection of the research, and

17   what I mean is they increase voter registration,

18   and I believe there is evidence that they not only

19   increase registration, they did so among

20   underrepresented populations.  And I believe in

21   the case of Making a Plan, they had a positive

22   effect on voter turnout.

23       Q    When you talk about whether something is

24   efficacious, does that include the sort of

25   comparison against time that you've talked about a

1  number of times today?

2      A    Yes, it would be the difference-in-

3  difference design, that is to say, when you looked

4  at people who -- so you have a population of

5  people who you think are underrepresented in the

6  electorate, not registered, and there are 1,000.

7  And you look at the proportion of people in that

8  population who are registered at time 1.  And then

9  you do, you make your plan of Make a Plan to vote,

10  that's a kind of, it's called a randomized

11  controlled experiment.  You don't have -- I don't

12  want to get pedantic here, but there's a big

13  difference between randomized controlled

14  experiments, I consider those the gold standard,

15  and these studies that I make reference to.

16  Particularly the Nickerson paper are the very best

17  type of work.

18          When you don't get to control who you

19  contact, you then do these

20  difference-in-difference designs.  But in essence,

21  they're always the same calculation.  The control

22  is much greater when you randomize.

23          But yes, the papers I recall are the

24  best, and that were David Nickerson, Kevin

25  Arsenel, and of course, Don Green.  They're all

1    part of a group of researchers that work together.

2         Q    And so just to make sure I understand

3    what that time comparison shows, the idea is that

4    a registration rule is efficacious if prior to the

5    implementation of that rule we can see the number

6    of voters being registered, and that after the

7    implementation of that rule, you can see an

8    increase in the number of voters being registered

9    that you're tying it to that rule being

10   efficacious; is that right?

11        A    Yeah, with -- let me emphasize here.

12        Q    Sure.

13        A    It isn't the number of voters.  It's the

14   number of voters relative to their base.  So

15   what's real important here is that, you know, in

16   these randomized experiments, they're very short

17   periods.  They were days and weeks.  What they

18   were able to do is do follow-up on these voters in

19   terms of their likelihood of voting.  But the

20   important point is you were looking at number of

21   voters relative to their representation in the

22   population.  They were looking at young voters in

23   like colleges particularly, but it could be race

24   and ethnicity or other demographics.

25        Q    And those studies show that without

1   those registration rules in place, fewer folks

2   were being registered to vote within that base; is

3   that right?

4        A    It wasn't a negative.  That is to say,

5   again, the finding was you had a positive change

6   in the rate of registration, and on the making the

7   plan to vote, a higher rate of voting among those

8   populations that were eligible, in this case

9   registered to vote, and they were showing a link

10  between registration, making a plan and voting.

11       Q    And I understand you're saying it's a

12  positive trend, but we're comparing it against

13  people who didn't make a plan versus people who

14  did make a plan, and you can see the difference

15  that --

16       A    Yes.

17       Q    -- making a plan makes, right?

18       A    Remember, the difference was that one

19  line was straight, and the other line went like

20  this.  So it wasn't that not making a plan led you

21  to be less likely to vote.  You didn't go down,

22  you just stayed -- there was no change.

23            So one line, like in the SS article that

24  Michael Herron wrote, all the lines went down,

25  some more steeper than others.  So the question

1   then became was the treatment more efficacious for

2   one group over another type of group, and a lot

3   has to depend on where you start.

4          If you're at 10 percent registration

5   rate among African Americans, it won't take a lot

6   of effort to move that up to 20 percent, but --

7   you're still maybe well below the other group

8   where there was no effect, but they still had a

9   higher intersect.

10         So this is my point.  These things get

11  kind of complex and you have to look at intersect.

12  Do you know what I mean by that?  Where did you

13  start, where did you finish.  And it may be that I

14  got a 10 percent increase from 5 to 15, but white

15  voters returning at 80 percent.

16         So, you know, what is consequential in

17  our expert report really means kind of common

18  sensical, right?  Some techniques have an effect,

19  and they even have a statistically significant

20  effect; they're just not consequential.  They

21  don't matter.

22         Now in voting, you know, this is the

23  problem of knowing that you can't control all the

24  variables, the parties, candidates.

25     Q    Sure.  I did want to ask one more

1    follow-up question based on the charts you just

2    brought up, and I'm just going to go back to your

3    report, rather than to the Herron-Smith report.

4              In these figures, a number of times

5    you've referenced how the slope goes downward

6    after the Bill was implemented.  Do you -- oh, I'm

7    sorry, I thought I was sharing my screen.  Let me

8    share it again.  This is Exhibit 2, and it's

9    Figure 1 on Page 13.

10             And you're referencing how these slopes

11   are going downward in each of these charts; is

12   that right?

13        A    That's correct.

14        Q    And I just want to make sure I'm

15   understanding you correctly.  You take that to

16   mean that after the law took effect, within each

17   of these groups registration rates went down?

18        A    That's the appearance of those graphs,

19   yes.

20        Q    So what you're disputing is any

21   differential effect across the three groups,

22   right, whether it's statistically significant, the

23   difference in the slopes comparing group to group,

24   right?

25        A    Yes.

1      Q    Okay.  But you don't dispute that this

2   law that affected voter registration in Florida

3   caused the registration rates for each group to go

4   downward, right?

5      A    No.  I apologize if I'm going to -- I

6   don't dispute what Michael and Dan found.  If you

7   recall, the only slope that was significant over

8   time was for African Americers.  The other two

9   slopes are non-significant.  I don't question

10   that.

11         What Michael said was the effect of 1355

12   was to have a negative and significant effect on

13   African American registrations.  That's not the

14   case for Hispanics, he said, and it's not the case

15   for whites, even though it looks -- and things are

16   deceiving, right, because you know what a

17   confidence ban is here, so standard errors are

18   just huge.

19         However, we don't -- I don't disagree

20   with the paper.  It should be noted here by matter

21   of fact, for the record, I was one of the three

22   peer review people that read this paper for S&PQ.

23   So I liked the paper and I did strongly support

24   its publication, and they know that.  They know

25   because they release the names of the reviewers.

1          What I questioned was in their report,

2     in their expert report, they used this as an

3     example.  And now 1355 is not 7050, there are

4     plenty of differences, but they used it as

5     illustrative.  My problem is the comparison should

6     have been made between the white/Hispanic,

7     white/African American, and even African American.

8     Those slopes could be significantly different.

9     The overall effect of the law seems to have only

10    depressed black voter registration, nobody else.

11          But what I thought was important for the

12    -- and is the right word here analogy or

13    comparison?  Is that 1355 looks like 7050, then

14    the comparison should have been made between

15    African American/white, Hispanic and white, and it

16    wasn't.  And it didn't seem to me to support their

17    argument.

18          Now, their -- well, that's it.  I'll

19    stop there.

20       Q    Fair.  And just one follow-up question

21    about the -- that's helpful, and to know the peer

22    review part is helpful.

23          When it comes to comparing the groups to

24    each other to figure out whether the differences

25    in the slopes were statistically significant in

1   this paper, is that a comment that you gave the
2   authors when you did the peer review of this
3   paper?
4       A    Not only is it a comment, but I actually
5   in my, I found my review somewhere, I think I even
6   suggested that they do that in the revisions.
7   They didn't.  And there's nothing wrong, there's
8   nothing wrong with this paper.  It's just that
9   since -- it was written in 2014, it was written
10  probably in 2012, 2013.  But when they bring it
11  into their expert report making a comparison to
12  7050, I then say, well, then let's see how the
13  lines compare.  They didn't do that in their
14  expert report.
15      Q    Sorry.  But just to be clear, you did
16  support the publication of this paper here, not --
17      A    Yes.
18      Q    -- the report in this case?
19      A    I forgot the paper.  And John, I must
20  say John wrote this section of the -- he drafted
21  it, and I had -- until I saw it in their report, I
22  mean in Michael's report, I think -- no, it's
23  in -- Dan raises it in his report.  I could be
24  wrong which of them brought it up in their expert
25  report, I had forgotten about the paper.

1        Q    At what point did you remember this

2   paper and that you had had a role in peer-

3   reviewing it?

4        A    I remembered this paper when I read the,

5   I think it was Dan's report, and I said, oh, my

6   gosh, I remember that.  But I didn't rush to the

7   paper.  I said, I remember that paper.  They are

8   rather prolific.

9             It was John who said, hey, have you

10  looked at this paper recently, and I said I

11  didn't.  And he showed me the paper, and we looked

12  at the graphs, and I said, yeah.  And you have to

13  read the paper pretty carefully to see what's

14  going on.

15            I was also surprised to see how steep

16  the slope was for the whites.  And you probably

17  can't see it, but you can see how big the standard

18  errors are around that fitted line, so not much is

19  going to be significant there, even though the

20  standard errors on some of the others are large.

21            I think, I know we didn't make this

22  point in the paper, in the report, but I should

23  mention it now.  The magnitude of the effects,

24  even though they may be significant, are not very

25  large for African Americans.

1      Q     Okay.  I think -- I just want to clarify
2  one more thing about the timeline.  And I'm sorry,
3  I just didn't realize this was going to come up.
4          I think a minute ago you said that Dr.
5  Alford had drafted this portion of the report and
6  so you hadn't realized at this point about the
7  paper.  And so I'm wondering at what point after
8  he drafted that portion of the report you realized
9  this was a paper that you were already familiar
10 with.
11     A     Oh, I was familiar with the paper when I
12 read the report, and I don't know if I brought it
13 up to John or John brought it up to me, but before
14 he drafted this section of the report, we both
15 went back over the paper again, and that's when we
16 both, I have to say probably John was the first to
17 say because I was looking at the other figures as
18 well, but this is No. 1.  He said, does this make
19 sense to you?  Does it support the conclusion that
20 this Bill did what 7050.
21         So at that point it became obvious to me
22 there may be an issue here that we need to raise
23 in our report, yes.  But John didn't write the
24 draft until after we had both -- well, I have to
25 say I reread the paper, and I think John said he

1    hadn't read it completely until he saw it in the

2    report.  And then when he, we discussed what was

3    important in the report and what was not.

4        Q    Okay.  You didn't write in the report,

5    though, that you had peer-reviewed or had

6    familiarity with this report previously?

7        A    No.  I am 90 percent certain I read this

8    paper as a journal review.  I tried to find my

9    review of the paper, but I haven't found it yet.

10   I read about 50 or 60 papers a year.

11            It is sufficient to say that I had read

12   this paper well before, 10 years, at least 10

13   years ago, and so I am familiar with it.

14       Q    Sure.

15       A    You're probably know, if you read the

16   paper, that we cite each other.

17       Q    And I guess I want to make sure I

18   understand.  I think I heard you say earlier that

19   you found the review and you saw you provided a

20   comment about this issue, but then maybe I heard

21   you say you didn't find --

22       A    I found my writeup of notes on the

23   paper.  I can't be certain that is the review I

24   submitted to the journal.  I will search my files,

25   but I'm certain it was -- 10 years ago is, even

1    for me, a long time ago.

2         Q    Okay.

3         A    I have used this paper in my classes, so

4    I have all these notes on the paper.  And we, I

5    mean you should know that Michael and Dan, I mean

6    they're much younger than I am.  They're barely

7    50, although Dan says he's going to retire soon,

8    which I think is insane.  But we've known each

9    other at least 10, 15 years.

10        Q    Sure.

11        A    So it's hard to know when the

12   conversation, my notes, but I'm familiar with the

13   paper.  John wasn't.  John hadn't seen the paper

14   ever before, and he was quicker, I think, to see

15   the issue.  And maybe I'm a little myopic.  I kind

16   of -- I didn't see it until John said, you see

17   these slopes?  And I said, oh, yeah, they're

18   different.

19             And you can't really see the standard

20   errors real well in the paper because they kind of

21   get whitened out.  I said, how could that not be

22   significant?  And when you squinch in, you see the

23   standard errors and you go, that's not very

24   common, because I'm assuming that white voters are

25   a much larger portion of the electorate in

1  Florida, so it's not surprising across time you'll

2  get these big standard errors with black and

3  Hispanic voters or the -- I thought they're

4  concentrated in certain counties.

5      Q    I understand you might not know when

6  exactly those notes are from or if those are the

7  ones ultimately submitted in the review, do you

8  know when you found the notes that you had written

9  up about this report?

10     A    I did when I was looking at my syllabi

11  because that's the best way to know where I had

12  written.  Because I said, how could I have missed

13  this paper?  And I have, you know, I have weekly

14  written assignments for my students and then I

15  write up the answers before they do, and I noticed

16  I had written up this paper before.

17          And I can't even be certain it's my

18  notes because it doesn't have my name on it, and

19  my students are often required to read papers and

20  report on them in class, so it gets a little

21  incestuous.

22          But the best way to put it is I was

23  familiar with the paper, but not in the way that

24  John -- John gets the credit for pointing out to

25  me these different slopes.  I actually said, well,

1    wait a minute, whites had a bigger drop.  And he

2    said, well, read the paper carefully again and

3    notice that Dan and Mike only report a significant

4    decline for African Americans, and the decline was

5    rather small, but it was statistically

6    significant.

7            MS. KEENAN:  Okay.  Josh, we might be in

8    touch about requesting some of these notes, but we

9    can handle that off the record.

10           I don't have any further questions for

11   the witness.  Thanks so much for your time, Dr.

12   Stein.

13           THE WITNESS:  Have a good week.

14           MR. PRATT:  Ms. Keenan, just to confirm,

15   is that the completion of Plaintiffs' questions in

16   this deposition for the witness?

17           MS. KEENAN:  I want to check and make

18   sure Mindy is still here.

19           MS. JOHNSON:  Yes.  Nothing more from

20   me.

21           MR. PRATT:  Thank you, Ms. Johnson.

22   Thank you, Ms. Keenan.

23           Good afternoon, Dr. Stein.  Good to see

24   you again.

25           THE WITNESS:  Have a very good week.

1    Happy New Year, everyone.

2           MR. PRATT:  Well, on that note, I

3    actually don't have any questions for you so

4    hopefully you can go spend some time with your

5    grandkids.

6           Before you go, I guess just for the

7    Court Reporter, we'll read, not waive, a copy of

8    this transcript, please, and then we'll just place

9    an order, just, you know, regular speed for the

10   transcript for the Secretary's Office.  I don't

11   know if you wanted to ask for the other orders

12   from Plaintiffs.

13           (Off the record at 4:31 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1              ACKNOWLEDGMENT OF DEPONENT

2          I, Robert M. Stein, Ph.D., do hereby

3     acknowledge that I have read and examined the

4     foregoing testimony, and the same is a true,

5     correct and complete transcription of the

6     testimony given by me, and any corrections appear

7     on the attached Errata sheet signed by me.

8

9

10     _____       _____

11          (DATE)                      (SIGNATURE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            CERTIFICATE OF SHORTHAND REPORTER

2        I, Dawn M. Hart, the officer before whom the

3    foregoing deposition was taken, do hereby certify

4    that the foregoing transcript is a true and

5    correct record of the testimony given; that said

6    testimony was taken by me stenographically and

7    thereafter reduced to typewriting under my

8    direction; that reading and signing was not

9    waived; and that I am neither counsel for, related

10   to, nor employed by any of the parties to this

11   case and have no interest, financial or otherwise,

12   in its outcome.

13       IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 5th day

15   of January, 2024.

16   My commission expires:

17   January 2, 2025

18

19

20

21   NOTARY IN AND FOR THE

22   STATE OF MARYLAND

23

24

25

**A**

**abbreviated**
28:17
**ability**
78:24, 85:15,
86:4, 96:13,
115:20, 125:18,
222:21
**able**
11:11, 11:20,
15:13, 29:7,
30:3, 64:3,
65:9, 71:2,
80:1, 108:24,
199:11, 218:4,
229:25, 253:6,
284:15, 289:18
**above**
106:3, 111:10,
113:16, 114:6,
114:11, 114:12,
114:13, 114:23,
115:6, 116:12,
251:17
**abreast**
55:13
**absence**
276:7
**absent**
93:13
**absolute**
221:20
**absolutely**
99:20, 182:20,
192:12, 239:17,
247:5, 258:18,
264:14, 272:4,
276:20, 276:24
**abstract**
156:23, 157:8
**academic**
24:18, 36:13,
205:17, 214:19,
214:20, 216:11,
216:17, 273:25
**academics**
171:19, 185:16,

216:16, 272:6
**academy**
170:25
**accept**
235:16, 273:16
**acceptable**
234:14
**accepted**
44:11, 44:15,
208:11, 224:10,
234:11, 234:19,
235:12, 272:2,
272:15, 273:4
**accepting**
223:9
**access**
27:25, 29:23,
144:9, 165:1,
174:23, 175:2,
185:25, 215:21,
216:2, 253:23
**accessible**
262:8
**accommodate**
10:6
**accompanying**
219:22
**according**
117:14, 149:24,
217:22, 225:10,
233:6, 245:23,
246:5
**account**
117:15, 205:16,
214:3, 269:5
**accounted**
271:3
**accounts**
268:11, 269:2
**accurate**
226:5, 254:5,
255:17, 259:7,
260:7
**accurately**
11:12, 18:16,
255:23, 270:9
**accused**
78:16

**acknowledge**
218:23, 303:3
**acknowledges**
150:5
**acknowledgment**
303:1
**aclu**
3:17
**across**
61:13, 102:18,
103:5, 103:8,
108:16, 112:18,
207:10, 225:15,
243:15, 244:2,
292:21, 300:1
**act**
172:17
**active**
70:12, 185:16,
186:3
**actively**
69:22, 69:23,
70:6, 72:6,
72:10, 183:19,
186:7
**activities**
76:10, 187:6,
187:8, 187:16
**activity**
97:10
**actual**
83:3, 83:11,
83:21, 87:4,
87:18, 93:15,
109:3, 119:3,
166:6, 188:4,
190:10, 206:6,
216:25, 252:23,
254:8
**actually**
26:4, 27:25,
31:8, 35:20,
35:21, 49:7,
51:23, 65:23,
71:8, 82:13,
94:5, 128:19,
129:12, 132:4,
132:8, 133:19,

153:13, 165:2,
174:2, 178:6,
180:21, 183:7,
186:15, 189:16,
240:23, 253:17,
255:17, 273:12,
295:4, 300:25,
302:3
**add**
150:25, 163:6
**added**
19:3, 19:6,
192:4, 197:18,
275:9
**adding**
45:22
**addition**
113:15, 114:4,
114:10, 114:22
**additional**
18:19, 59:5,
165:24, 168:6,
187:7, 187:14,
264:7, 264:12,
264:20, 265:20,
265:25
**address**
108:13, 140:2,
140:19, 140:25,
141:3, 141:10,
158:4, 194:19,
194:23, 195:15,
196:1, 197:14,
199:8, 199:16,
216:24, 219:2,
259:1
**addressed**
112:15, 193:5,
202:19, 220:9,
267:3
**addresses**
140:23, 141:14,
141:24, 142:4,
204:12
**addressing**
194:13
**adequate**
229:8

**administered**
20:18
**administration**
19:20, 20:13,
20:15, 20:23,
21:16, 21:21,
22:8, 24:12,
34:14, 157:17,
161:25, 169:12,
169:21, 171:25,
172:20, 173:10,
274:6, 274:9,
274:12, 275:11,
283:13
**administrative**
157:3
**adopt**
124:24
**adopted**
54:9, 63:23,
79:9, 92:5,
128:10, 130:23,
175:7, 212:22
**adopting**
47:10
**adoption**
64:4, 78:10,
85:9, 88:16,
88:17, 89:23,
89:24, 95:13,
100:8, 101:2,
101:25, 106:12,
114:2, 116:6,
208:12, 212:20,
220:13, 226:4,
230:19, 242:8,
243:21, 248:7,
251:20, 257:6,
260:5, 274:21,
275:1, 275:25,
281:13
**adults**
143:22
**advance**
15:21, 209:9
**advantage**
139:24
**advent**
171:24

**adverse**
221:25, 222:21,
223:3, 223:4,
223:8, 250:23,
281:20
**advise**
61:22, 186:11
**advised**
183:21
**advocate**
71:3, 71:22
**affect**
6:17, 131:13,
139:11, 142:21,
144:23, 148:9,
148:13, 152:25,
153:3, 206:14,
275:25
**affected**
84:14, 84:15,
87:5, 98:25,
218:20, 219:4,
221:22, 249:1,
275:8, 293:2
**affects**
23:19, 85:14,
149:2, 154:5,
221:8
**affiliate**
71:22
**affiliated**
182:11, 268:9
**affiliation**
159:1, 269:1,
269:5, 269:16,
270:1, 270:2
**affirmed**
8:3
**affixed**
304:14
**african**
69:17, 69:25,
70:2, 72:9,
72:14, 75:3,
79:3, 79:11,
101:22, 101:25,
102:6, 107:3,
107:4, 110:4,

111:9, 111:11,
112:23, 186:17,
243:11, 247:8,
251:7, 266:10,
266:23, 267:1,
291:5, 293:8,
293:13, 294:7,
294:15, 296:25,
301:4
**after**
15:24, 35:2,
35:16, 48:25,
50:13, 63:23,
64:5, 72:11,
79:8, 82:24,
88:16, 89:19,
89:23, 90:21,
91:7, 91:14,
92:2, 92:19,
95:3, 100:8,
101:2, 101:25,
106:12, 114:1,
129:4, 156:12,
163:4, 171:22,
208:12, 220:13,
220:18, 226:3,
229:16, 229:24,
234:7, 239:16,
242:8, 243:21,
248:7, 251:20,
252:3, 256:10,
256:14, 260:5,
265:19, 274:21,
276:4, 284:15,
286:2, 286:18,
286:25, 289:6,
292:6, 292:16,
297:7, 297:24
**afternoon**
165:22, 301:23
**again**
12:14, 21:2,
25:25, 26:7,
35:5, 35:15,
35:18, 40:15,
44:13, 48:19,
55:5, 60:23,

65:20, 68:14,
70:7, 72:21,
73:15, 78:14,
81:22, 95:2,
98:23, 104:24,
112:1, 113:21,
120:3, 123:6,
125:21, 126:14,
134:17, 137:5,
140:21, 154:12,
165:25, 171:19,
175:8, 176:1,
187:11, 188:25,
191:17, 195:23,
201:9, 201:24,
202:8, 205:10,
206:2, 209:6,
211:15, 214:24,
223:16, 224:3,
229:5, 229:13,
230:9, 230:13,
233:14, 237:5,
240:4, 241:1,
242:25, 246:11,
247:9, 249:6,
249:22, 250:18,
251:10, 262:17,
264:9, 265:1,
271:6, 285:6,
285:7, 290:5,
292:8, 297:15,
301:2, 301:24
**against**
64:3, 88:10,
110:10, 110:19,
130:14, 287:25,
290:12
**age**
88:11, 88:14,
88:19, 88:22,
88:24, 90:18,
159:1, 183:23,
186:18, 200:13,
220:15, 220:17,
227:1, 227:10,
227:12, 228:2,
228:16, 231:23,
236:6, 240:13,

243:10, 243:12,
244:8, 246:24,
247:18, 247:25,
248:17, 250:9,
250:11, 257:5,
258:9, 260:2,
262:2, 262:19,
264:3
**agency**
14:21
**aggregate**
261:21, 262:1
**ago**
39:17, 62:10,
73:16, 146:7,
179:25, 180:1,
193:18, 222:12,
265:7, 285:24,
297:4, 298:13,
298:25, 299:1
**agree**
11:8, 46:25,
47:19, 54:11,
68:10, 72:25,
76:7, 76:12,
76:18, 81:14,
86:9, 86:18,
90:11, 90:24,
91:9, 91:14,
92:1, 92:18,
92:21, 92:24,
93:25, 94:4,
96:10, 97:13,
97:19, 98:16,
100:11, 100:15,
103:13, 111:18,
116:15, 117:25,
131:20, 134:14,
134:18, 134:23,
142:21, 143:14,
144:8, 145:4,
145:7, 145:8,
146:1, 146:19,
146:20, 147:8,
148:4, 148:8,
152:24, 158:3,
159:3, 161:7,
167:18, 176:3,

200:17, 201:2,
208:25, 216:11,
216:16, 227:22,
237:23, 238:14,
245:23, 255:18,
256:15, 264:5,
264:10, 264:22,
275:10, 276:13,
276:21, 280:13,
281:2, 281:8,
284:7, 284:9,
284:12
**agreed**
45:4, 49:11,
50:6, 50:14,
73:14, 196:3,
230:11
**agreeing**
153:3
**ahead**
29:13, 51:1,
69:13, 78:6,
82:1, 105:7,
111:18, 132:21,
143:7, 144:21,
160:9, 163:1,
163:9, 163:10,
163:11, 163:22,
163:24, 204:16,
217:6, 217:8,
225:9, 238:19,
268:19, 278:1,
278:4
**aid**
171:17, 196:21
**airline**
32:6
**al**
1:6, 1:11,
132:10, 149:22
**alachua**
4:4, 4:5
**alan**
182:13
**alarm**
147:21
**aldrich**
131:25

**alford**
12:12, 12:15,
13:12, 13:15,
16:23, 18:6,
34:1, 34:5,
34:8, 34:17,
35:2, 35:25,
36:24, 37:7,
39:3, 40:5,
41:3, 41:19,
42:1, 42:3,
45:8, 45:25,
46:15, 47:9,
47:17, 48:5,
48:12, 48:14,
48:21, 48:25,
49:22, 50:2,
50:17, 50:22,
50:25, 51:13,
53:6, 53:18,
53:21, 54:5,
54:16, 54:23,
75:2, 166:18,
169:15, 170:8,
171:1, 171:3,
173:7, 175:17,
189:21, 189:22,
193:16, 195:2,
195:7, 195:15,
197:21, 205:21,
237:25, 242:14,
260:18, 266:22,
297:5
**alford's**
38:3, 44:1,
44:16, 47:4,
47:11, 48:1,
100:20, 170:3,
170:12, 172:11,
173:23, 205:23
**alignment**
274:22, 274:23
**all**
9:9, 11:14,
11:22, 23:5,
25:7, 28:4,
29:18, 31:20,
33:3, 37:23,

39:18, 40:24,
41:12, 43:24,
49:9, 50:4,
52:25, 53:18,
53:21, 54:19,
63:8, 80:12,
80:19, 95:13,
96:22, 101:8,
105:13, 105:20,
108:3, 111:16,
112:21, 118:15,
121:8, 121:18,
123:7, 123:19,
124:25, 126:6,
132:3, 134:7,
143:6, 143:23,
146:25, 147:6,
152:6, 152:13,
156:5, 160:17,
167:3, 168:4,
172:7, 177:17,
179:9, 181:9,
185:15, 197:5,
206:4, 214:8,
223:19, 225:16,
241:9, 245:19,
264:7, 264:12,
266:16, 266:20,
277:10, 277:22,
288:25, 290:24,
291:23, 299:4
**allege**
241:16, 245:11
**alleged**
63:22, 138:7,
202:22
**allen**
26:18, 65:5
**allow**
164:3
**allowed**
95:14
**allowing**
286:20
**almost**
22:7, 37:23,
49:9, 196:4,
225:2, 231:13,

233:9
**alone**
140:20, 141:1
**aloud**
117:13
**already**
13:14, 48:15,
54:7, 60:2,
82:25, 92:8,
119:17, 121:3,
141:16, 167:19,
168:5, 175:21,
189:15, 236:12,
237:11, 277:17,
297:9
**also**
11:15, 14:11,
18:1, 20:1,
21:6, 29:22,
32:15, 33:1,
47:16, 51:21,
54:11, 57:14,
60:15, 76:20,
101:21, 122:22,
128:14, 131:20,
138:19, 147:5,
148:25, 155:11,
158:19, 164:17,
167:16, 168:18,
168:22, 198:17,
210:6, 214:17,
230:9, 245:4,
262:17, 264:17,
269:12, 275:12,
275:14, 278:24,
280:10, 296:15
**alter**
164:8
**altered**
15:7
**alternate**
264:18
**alternative**
70:5, 137:9,
207:1, 207:20,
219:23
**although**
38:24, 145:18,

253:16, 260:19,
263:11, 299:7
**always**
36:9, 36:10,
63:6, 78:15,
132:19, 163:3,
183:11, 241:1,
288:21
**america**
110:4
**american**
2:4, 8:7, 20:7,
70:1, 101:23,
186:17, 243:11,
247:8, 266:23,
285:2, 293:13,
294:7, 294:15
**americans**
69:17, 70:2,
72:9, 72:14,
75:3, 79:4,
79:11, 102:1,
102:7, 107:3,
107:4, 111:9,
111:11, 112:23,
251:7, 266:10,
267:2, 291:5,
293:8, 296:25,
301:4
**among**
28:18, 72:9,
72:14, 75:3,
75:15, 78:20,
78:24, 79:3,
79:10, 100:7,
101:1, 106:11,
111:8, 114:1,
115:5, 118:25,
119:11, 120:20,
155:16, 156:25,
190:16, 196:11,
206:21, 207:15,
207:16, 219:14,
220:5, 220:21,
227:12, 247:11,
250:20, 251:22,
252:10, 257:22,
259:11, 259:22,

261:13, 261:19,
261:24, 266:20,
268:12, 269:3,
269:6, 280:25,
281:21, 287:19,
290:7, 291:5
**amount**
279:5
**analogy**
294:12
**analyses**
30:4, 30:7,
87:15, 95:9,
191:24, 211:6
**analysis**
30:9, 52:4,
52:9, 64:9,
64:15, 64:17,
65:17, 66:13,
75:7, 83:1,
89:18, 95:4,
102:4, 115:22,
119:25, 122:21,
177:14, 186:19,
190:4, 191:1,
199:2, 199:9,
199:16, 201:12,
201:24, 202:4,
202:7, 203:10,
204:3, 206:9,
207:18, 208:7,
208:15, 211:3,
212:17, 213:3,
228:3, 230:1,
231:20, 233:6,
236:17, 237:13,
244:7, 245:16,
251:18, 251:19,
252:2, 252:23,
254:4, 256:11,
256:16, 258:7,
258:14, 259:25,
260:4, 260:8,
263:21, 268:14,
274:1, 276:4,
282:15, 282:21,
283:5
**analytic**
74:24

**analytical**
253:7
**analytics**
56:12
**analyze**
28:10, 256:21,
281:23, 282:1
**analyzes**
66:7
**analyzing**
224:16, 234:12,
234:17, 235:6,
235:13, 235:16,
236:11, 265:13
**andrew**
23:5, 61:25,
62:1, 62:10,
277:6
**anecdotal**
180:19, 186:2
**angle**
86:5
**anglos**
251:7
**annotations**
10:21
**another**
13:10, 17:11,
54:25, 71:6,
72:17, 72:18,
72:23, 72:24,
72:25, 73:2,
73:18, 73:19,
74:2, 74:3,
74:9, 74:10,
74:14, 74:15,
88:24, 89:10,
112:11, 156:13,
172:9, 184:21,
190:25, 211:2,
235:9, 237:16,
291:2
**answer**
9:18, 9:20,
41:16, 47:14,
55:9, 61:15,
63:7, 68:23,
72:16, 72:22,

73:1, 73:7,
73:11, 73:17,
74:8, 74:20,
75:23, 78:3,
79:15, 84:21,
85:18, 89:13,
92:4, 97:6,
98:1, 106:16,
107:24, 111:5,
111:13, 117:21,
121:22, 124:11,
136:1, 140:6,
146:16, 147:2,
147:8, 155:4,
163:9, 167:25,
175:25, 195:10,
197:20, 219:15,
222:12, 266:19

**answered**
111:16, 112:13,
112:14, 112:17,
113:6, 116:9,
124:9, 242:23

**answering**
211:6, 211:23,
255:1

**answers**
9:6, 300:15

**anticipate**
59:4

**anticipated**
63:22

**anybody**
13:16

**anymore**
98:19

**anyone**
10:10, 13:9,
54:16, 155:5

**anything**
10:16, 12:6,
14:18, 15:15,
18:24, 19:4,
24:5, 44:1,
50:25, 51:8,
53:13, 60:5,
60:21, 81:25,
103:5, 116:20,

121:16, 144:18,
149:17, 163:14,
178:13, 185:7,
190:13, 191:17,
196:8, 197:8,
197:17, 198:5,
198:14, 204:12,
216:6, 241:12

**anywhere**
94:19, 119:23,
126:23, 127:15

**apart**
54:16, 59:3,
138:3, 187:19

**apologize**
13:11, 26:14,
31:14, 42:13,
61:19, 99:21,
103:1, 162:13,
162:14, 188:17,
189:16, 293:5

**appear**
10:13, 33:18,
77:13, 165:1,
282:21, 303:6

**appearance**
292:18

**appeared**
266:21

**appears**
126:24, 162:19

**apples**
275:3

**application**
97:17, 98:18

**applications**
66:4, 77:6,
79:20, 96:12,
165:8, 165:13,
268:7

**applied**
62:24, 63:3

**apply**
167:20

**appreciate**
25:6, 200:11

**approached**
35:7, 38:18,

49:5, 96:24

**appropriate**
211:6, 231:19,
260:7

**appropriateness**
189:19, 189:25

**approval**
49:7

**approximately**
225:7

**area**
21:1, 24:25,
34:15, 170:12,
171:16, 171:21,
172:3, 172:9,
173:9, 174:15,
260:11, 260:14

**areas**
20:5, 20:22,
71:24, 72:12,
172:10, 172:11,
173:6, 174:16

**aren't**
9:6, 243:18

**argue**
137:25, 234:19

**arguing**
228:8

**argument**
127:10, 127:17,
129:3, 294:17

**argumentative**
68:15

**arguments**
191:16

**arizona**
7:4, 31:12,
31:22, 31:24,
32:7, 32:10,
32:21, 32:25,
135:17, 174:6,
175:7, 177:3

**arizona's**
31:15

**arkansas**
28:3, 65:7

**around**
25:11, 34:23,

296:18

**arsenel**
288:25

**art**
20:4

**article**
23:17, 54:4,
61:17, 61:18,
61:24, 62:19,
100:20, 103:6,
104:4, 104:7,
106:20, 110:23,
111:24, 114:16,
148:20, 159:17,
278:24, 290:23

**article's**
159:18

**articles**
13:23, 19:25,
22:11, 37:4,
56:18, 60:4,
60:16, 60:25,
151:21, 152:2

**articulate**
183:4

**aside**
11:7, 83:13,
84:19, 190:4,
249:15, 255:9

**asked**
13:2, 25:8,
25:20, 28:9,
35:6, 56:4,
58:22, 59:15,
59:19, 64:13,
64:14, 68:24,
71:17, 78:8,
85:4, 85:5,
85:19, 85:25,
86:6, 94:25,
112:3, 141:6,
146:3, 146:17,
146:25, 147:1,
166:5, 173:19,
176:5, 177:21,
178:3, 178:4,
186:10, 187:20,
192:22, 194:23,

204:6, 247:9,
260:19, 270:11,
271:7, 282:6
**asking**
30:2, 55:19,
55:20, 74:16,
75:18, 75:20,
84:17, 91:5,
91:23, 91:25,
92:15, 92:16,
92:17, 98:14,
105:5, 107:14,
107:15, 107:25,
108:4, 108:6,
108:10, 108:14,
114:14, 124:7,
141:17, 167:14,
178:1, 180:4,
183:4, 192:16,
192:18, 207:12,
213:15, 213:18,
213:19, 221:10,
223:21, 234:1,
236:2, 249:19
**aspects**
14:3, 23:5,
28:4, 194:24
**assembled**
73:6, 73:17
**assert**
195:6
**assertions**
130:1, 190:7,
193:20, 194:5
**assess**
23:1, 62:9,
62:20, 192:23,
203:18, 203:23,
253:9, 255:23
**assessed**
220:12, 251:1
**assessing**
137:24, 152:10,
199:6, 199:14,
200:18, 200:24,
203:2, 203:5,
231:20
**assessment**
93:19, 95:1,

96:5, 99:9,
100:5, 109:12,
110:15
**assessments**
95:6
**assign**
72:10
**assignment**
58:25
**assignments**
300:14
**assist**
48:16, 54:16,
65:8
**assistance**
14:1, 280:14
**assistant**
4:14, 5:5, 5:9
**assisted**
186:18
**associate**
40:2
**associated**
150:6, 151:8,
152:18, 225:6,
225:11, 269:8,
280:9
**association**
20:8
**assume**
10:2, 54:24,
233:25, 255:16,
259:6
**assuming**
92:15, 92:17,
229:21, 262:25,
299:24
**attached**
6:7, 7:2, 12:2,
18:4, 18:9,
29:25, 57:6,
57:19, 65:12,
103:12, 139:14,
156:22, 159:15,
188:24, 204:19,
217:10, 286:10,
303:7
**attempt**
167:10, 184:6,

222:3
**attempted**
168:3, 168:10,
197:14
**attempts**
158:4, 212:25,
223:17
**attending**
9:10, 59:25
**attention**
34:2, 113:7,
131:18, 199:23
**attorney**
3:16, 3:18,
3:20, 4:5, 4:15,
5:3, 5:4, 5:5,
5:10, 13:10,
15:11, 35:12,
37:12, 90:8,
91:4
**attorney's**
4:5, 5:11
**attorneys**
8:15, 8:17,
16:15, 34:3,
35:9, 35:16,
55:23, 56:2,
173:19, 194:25
**august**
225:1, 225:3,
231:13, 250:4,
251:5, 251:18,
261:16
**author**
46:14, 182:22
**authors**
158:3, 175:22,
183:25, 218:23,
235:20, 238:21,
239:2, 295:2
**automatic**
142:15, 143:4,
143:22
**availability**
229:23, 240:12
**available**
63:17, 157:16,
210:5, 210:8,

210:16, 210:17,
210:21, 210:23,
210:25, 211:2,
211:12, 224:6,
227:18, 227:23,
227:24, 228:1,
228:5, 228:7,
228:19, 229:1,
229:4, 229:5,
229:10, 230:9,
230:24, 231:1,
238:13, 241:8,
256:7, 256:13,
262:4, 262:7,
264:23, 265:9,
279:18
**avenue**
4:15, 5:19,
207:19
**avenues**
144:14
**average**
278:6
**avoid**
69:1
**aware**
15:1, 16:25,
18:24, 34:8,
40:21, 45:6,
90:2, 90:6,
94:19, 107:12,
130:21, 130:25,
168:18, 185:10,
202:21, 203:4,
209:6, 209:8,
209:11, 210:4,
210:11, 283:19,
283:21
**away**
30:4, 279:12
**awhile**
180:1

**B**

**back**
25:25, 30:23,
31:23, 34:20,
36:8, 39:13,

49:2, 58:9,
58:12, 66:17,
77:12, 78:7,
82:20, 82:21,
93:23, 94:22,
100:1, 104:25,
105:23, 106:20,
108:21, 112:21,
113:10, 114:20,
116:16, 119:13,
120:3, 124:5,
124:8, 124:13,
126:8, 126:13,
137:4, 137:5,
141:15, 143:1,
147:25, 163:4,
163:16, 166:1,
166:16, 175:24,
180:1, 180:9,
181:9, 184:14,
188:9, 194:10,
197:1, 205:9,
205:13, 210:1,
210:3, 210:10,
214:24, 231:10,
237:2, 237:4,
241:20, 241:24,
243:3, 248:1,
249:5, 251:10,
251:17, 252:17,
254:2, 255:3,
256:24, 261:5,
266:13, 271:2,
284:20, 292:2,
297:15
**back-and-forth**
188:5
**background**
14:25, 19:19,
168:4, 168:7,
180:2, 188:3,
190:17, 224:22
**backgrounds**
64:2, 72:13
**backwards**
47:24
**bait**
154:23

**ballot**
27:25, 95:25,
174:23, 174:24,
175:2, 277:13,
277:15, 277:23,
278:8, 278:19,
278:25, 279:4
**ballots**
20:17, 164:4,
278:16
**ballpark**
41:2
**ban**
293:17
**banning**
165:6, 165:12
**bar**
174:25
**baran**
3:5
**barely**
299:6
**barrel**
171:16, 171:18,
185:9
**barriers**
128:2
**barton**
4:3
**base**
224:5, 226:25,
227:14, 228:22,
231:19, 243:5,
258:8, 264:2,
276:7, 289:14,
290:2
**based**
25:7, 56:17,
66:7, 67:19,
68:24, 72:21,
74:17, 75:19,
76:12, 76:18,
81:22, 81:25,
91:18, 102:16,
153:20, 160:18,
205:17, 211:11,
214:18, 235:17,

250:3, 285:9,
292:1
**baseline**
64:3, 64:4,
89:19, 90:14,
91:7, 91:13,
92:3, 92:19,
95:3, 226:16
**basic**
236:2
**basically**
181:1, 278:9
**basis**
15:7, 27:18,
41:16, 99:4,
171:11, 228:1,
229:11, 229:13,
230:9, 254:22,
254:24, 256:13
**battery**
196:20
**beach**
5:14, 5:16
**bear**
27:24, 65:5,
85:20, 140:2,
168:9
**bearing**
200:11
**became**
40:1, 291:1,
297:21
**because**
10:9, 11:16,
25:8, 30:2,
33:7, 62:12,
95:12, 106:1,
117:22, 123:21,
124:11, 131:7,
146:6, 196:15,
199:8, 200:6,
212:24, 214:2,
215:3, 226:15,
226:18, 226:20,
231:18, 232:8,
243:1, 243:14,
246:13, 247:5,
250:12, 259:22,

271:12, 273:10,
281:16, 293:16,
293:25, 297:17,
299:20, 299:24,
300:11, 300:12,
300:18
**become**
121:9, 123:8
**becomes**
264:23
**before**
2:1, 8:20,
12:18, 12:25,
15:23, 16:3,
17:5, 24:10,
34:5, 35:20,
35:22, 36:17,
40:16, 40:18,
46:11, 48:15,
48:22, 49:11,
49:12, 50:5,
50:12, 54:9,
58:3, 58:15,
60:8, 63:22,
64:4, 79:8,
88:17, 89:19,
89:24, 90:4,
90:21, 91:6,
91:13, 91:20,
92:2, 92:19,
95:2, 96:24,
110:10, 124:10,
129:11, 158:14,
162:24, 167:18,
172:1, 173:1,
180:15, 183:24,
189:1, 208:12,
209:4, 213:10,
215:7, 220:4,
220:13, 220:17,
231:11, 234:6,
235:2, 235:24,
243:21, 251:19,
252:3, 256:4,
256:10, 258:7,
260:5, 265:3,
274:21, 274:24,
276:4, 277:24,

279:21, 286:25,
297:13, 298:12,
299:14, 300:15,
300:16, 302:6,
304:2
**began**
25:11, 35:3,
35:18
**begin**
74:1
**beginning**
48:4, 55:15,
66:19, 73:14
**begins**
43:2, 47:25,
113:14
**begun**
49:25
**behalf**
2:4, 2:12, 3:2,
12:22, 26:5,
71:4
**behavior**
171:11, 172:18,
173:8, 216:18
**being**
8:3, 8:13, 9:4,
45:10, 64:4,
92:9, 97:9,
124:1, 124:12,
126:6, 133:17,
159:4, 178:6,
206:5, 221:1,
225:4, 231:14,
252:25, 266:22,
269:22, 269:23,
278:22, 279:23,
281:24, 289:6,
289:8, 289:9,
290:2
**believe**
12:24, 18:8,
40:17, 46:4,
64:22, 65:19,
69:11, 72:10,
75:12, 78:22,
78:25, 84:24,
102:3, 103:22,

115:7, 115:13,
116:6, 120:14,
122:23, 124:12,
131:15, 145:18,
145:19, 146:7,
146:8, 146:22,
147:3, 147:4,
147:5, 148:10,
153:14, 167:4,
176:19, 177:4,
193:21, 194:9,
197:4, 197:7,
197:19, 199:4,
199:25, 201:6,
203:24, 204:11,
205:22, 205:24,
208:17, 211:17,
212:1, 213:2,
218:9, 222:13,
226:2, 228:4,
229:5, 230:8,
235:18, 242:9,
242:19, 242:21,
248:8, 248:23,
251:8, 253:13,
253:25, 254:2,
260:22, 261:8,
265:6, 267:13,
271:23, 275:20,
276:15, 286:6,
287:8, 287:18,
287:20
**believed**
15:20
**believes**
201:20
**believing**
271:13
**below**
19:19, 99:13,
103:25, 107:8,
138:5, 138:16,
138:20, 148:15,
161:12, 162:15,
162:17, 243:15,
271:16, 291:7
**ben**
5:14

**beneath**
43:10
**benefit**
272:17
**benefits**
283:8, 283:13
**best**
10:6, 13:5,
21:3, 24:22,
31:16, 36:7,
48:8, 88:7,
114:24, 139:3,
144:12, 145:20,
163:1, 163:15,
185:24, 218:22,
233:14, 285:19,
288:16, 288:24,
300:11, 300:22
**better**
174:11, 174:15,
213:6, 222:4,
252:12, 259:4
**between**
15:11, 16:23,
32:12, 85:1,
85:8, 88:13,
97:7, 98:5,
107:13, 109:25,
111:15, 113:3,
113:5, 116:11,
123:20, 138:15,
138:21, 143:16,
145:16, 146:14,
147:4, 188:8,
195:6, 205:9,
241:3, 243:16,
250:12, 253:21,
257:19, 258:11,
267:6, 267:8,
271:8, 272:20,
273:1, 288:13,
290:10, 294:6,
294:14
**beyond**
15:12, 45:13,
148:17, 199:1,
200:6, 202:2
**big**
24:18, 186:11,

288:12, 296:17,
300:2
**bigger**
112:9, 244:1,
301:1
**bill**
103:14, 265:13,
266:1, 292:6,
297:20
**bills**
16:17
**biogenetics**
171:8
**biologic**
171:10
**biopolitics**
171:4
**bit**
22:22, 28:9,
29:15, 29:18,
38:16, 42:9,
43:20, 48:3,
51:16, 78:2,
101:14, 102:10,
104:13, 107:9,
136:5, 159:25,
161:5, 180:10,
200:9, 265:12,
268:24
**black**
68:5, 83:4,
83:18, 83:22,
84:5, 84:13,
86:11, 106:17,
125:11, 206:8,
207:9, 216:25,
218:12, 245:24,
250:9, 250:14,
252:5, 261:13,
261:17, 267:6,
267:7, 269:3,
269:6, 269:16,
269:22, 270:13,
271:9, 271:15,
274:4, 294:10,
300:2
**blacks**
72:15, 72:17,

74:9, 99:12,
100:8, 101:2,
106:11, 106:14,
106:15, 107:17,
108:24, 109:14,
110:1, 110:16,
111:1, 114:1,
115:5, 218:5,
261:20

**bob**
4:3, 62:7

**bodies**
43:5, 43:6,
43:8, 43:11,
137:23

**body**
38:15, 83:2,
126:17, 130:16,
138:19, 139:3,
154:1

**boockvar**
136:6

**book**
22:11, 132:7,
133:22

**books**
60:16, 151:19

**both**
20:21, 22:1,
34:13, 37:18,
38:21, 51:7,
53:8, 61:22,
69:11, 91:17,
108:12, 110:21,
111:13, 114:23,
115:1, 149:13,
153:13, 162:18,
164:21, 174:19,
175:11, 176:1,
181:2, 183:3,
183:16, 184:4,
185:22, 193:15,
209:4, 209:9,
243:15, 266:8,
270:25, 297:14,
297:16, 297:24

**bottom**
11:2, 15:19,

27:4, 29:14,
46:8, 53:3,
53:16, 53:17,
99:7, 113:13,
124:18, 126:4,
160:3, 185:8,
194:12, 241:25

**bought**
183:11

**boulevard**
5:12, 5:16

**boundaries**
132:3, 174:3

**boxes**
136:13

**brady**
132:1, 132:2

**branch**
25:23, 26:23,
37:9

**branches**
1:5

**break**
10:5, 16:12,
58:6, 65:10,
66:11, 102:9,
138:3, 158:14,
162:24, 165:18,
167:24, 182:21,
234:15, 236:20,
266:17, 284:14

**breakdown**
25:15

**breaking**
134:20

**breaks**
168:1

**brent**
5:22

**brevard**
3:12

**brief**
79:6

**briefing**
168:19

**briefly**
24:1, 31:23,
135:16

**bring**
43:7, 49:23,
163:12, 286:21,
295:10

**bringing**
81:5

**brink**
7:8, 32:12

**broad**
20:22, 23:6,
49:6, 61:8

**broader**
21:8

**brought**
27:6, 34:2,
34:20, 42:22,
42:25, 43:17,
43:22, 48:16,
48:23, 75:9,
85:20, 173:2,
292:2, 295:24,
297:12, 297:13

**broward**
177:4

**bryant**
184:21

**bullet**
88:2, 89:2,
237:10, 261:8

**bunch**
79:17, 128:9,
131:2, 182:2

**burden**
148:21, 149:21,
151:2, 262:23

**burdening**
262:22

**burdens**
128:3, 264:7,
264:20

**byrd**
1:9, 2:6, 8:9,
8:16, 285:3

---
**C**
---

**calculate**
233:22

**calculated**
258:9

**calculation**
252:23, 259:23,
288:21

**calculations**
244:10, 245:12,
245:14, 245:15,
254:15, 254:19,
254:23, 258:16,
258:19, 258:22,
259:6, 259:7,
260:6, 260:9

**call**
9:14, 21:8,
38:21, 59:20,
63:11, 132:18,
133:7, 133:23,
154:23, 166:24,
171:16, 172:18,
174:9, 182:1,
190:9, 197:12,
206:13, 207:20,
244:4, 283:2

**called**
14:2, 21:24,
23:1, 31:4,
31:6, 31:10,
32:6, 34:11,
46:9, 48:16,
77:5, 113:7,
156:13, 157:22,
159:11, 173:2,
174:14, 179:21,
182:25, 211:25,
233:19, 234:7,
273:11, 288:10

**calls**
159:21, 232:7

**came**
34:8, 39:14,
40:7, 40:9,
40:12, 40:16,
40:18, 133:3,
210:3, 285:9

**campaigns**
169:12

**campbell-harris**
3:15

**can't**
23:20, 24:11,

40:15, 61:3,
84:21, 91:13,
96:22, 97:2,
98:10, 134:7,
152:5, 167:10,
177:3, 179:13,
180:3, 182:14,
184:13, 186:21,
198:6, 228:10,
228:16, 231:4,
245:2, 245:7,
245:9, 291:23,
296:17, 298:23,
299:19, 300:17
**candidate**
280:6
**candidates**
71:3, 273:11,
291:24
**cannot**
39:18, 79:1,
97:4, 98:17,
211:5, 230:20,
255:23
**canon**
148:21
**cantoni**
6:22, 158:20,
159:8, 159:10,
162:20
**capacity**
1:10, 37:6,
38:2, 38:7,
38:13
**capitol**
3:21, 5:7
**care**
183:12
**career**
170:18, 171:20,
171:25
**careers**
170:17
**careful**
130:2, 177:7,
179:18, 235:23,
258:21
**carefully**
44:9, 106:21,

132:17, 247:20,
263:19, 276:5,
296:13, 301:2
**carry**
283:12
**cases**
24:9, 25:17,
27:18, 27:20,
31:3, 32:11,
33:17, 36:16,
37:17, 37:19,
37:23, 39:22,
56:18, 61:11,
61:14, 64:20,
64:24, 64:25,
65:16, 71:2,
174:4, 201:18,
202:3, 202:12,
202:18, 224:16,
245:6, 245:10
**cast**
20:17, 164:3,
278:16
**category**
251:8
**causal**
119:2
**caused**
293:3
**center**
151:19, 151:20,
183:18, 186:22
**centers**
21:4, 22:3,
27:11, 38:18,
163:2, 164:1,
164:3, 164:8,
164:13, 164:17,
164:18, 164:20,
275:23
**central**
250:21
**century**
181:10
**certain**
25:21, 36:10,
44:18, 60:7,
65:2, 65:6,

76:22, 77:6,
83:14, 96:1,
99:2, 100:16,
104:13, 120:5,
124:16, 135:9,
135:10, 173:21,
192:12, 195:20,
195:21, 215:22,
238:1, 241:11,
258:21, 270:23,
280:6, 285:13,
298:7, 298:23,
298:25, 300:4,
300:17
**certainly**
94:25, 96:4,
119:24, 121:15
**certainty**
130:12
**certificate**
304:1
**certify**
304:3
**cetera**
195:12
**chair**
24:18
**challenge**
282:17, 283:12,
283:17
**challenged**
281:25, 282:5,
283:8
**challenging**
27:25
**chance**
90:4, 229:17
**change**
160:24, 161:9,
226:2, 227:16,
256:18, 262:1,
290:5, 290:22
**changed**
15:7, 132:1
**changes**
93:10, 98:5,
167:1, 167:2,
274:9, 274:10

**changing**
132:3
**chapters**
22:11
**characterization**
281:9
**characterize**
203:8, 215:9,
216:7
**characterized**
100:4
**characterizing**
85:23
**charge**
17:13, 17:17,
78:8, 78:9,
124:23, 192:6,
192:13, 192:17,
192:18, 193:2,
196:7, 197:9,
200:7, 204:6
**charged**
17:15, 192:11,
203:14, 255:1
**charts**
292:1, 292:11
**chat**
10:25, 11:4,
11:16, 11:23,
18:2, 29:22,
59:24, 66:11,
66:15
**check**
39:6, 44:8,
49:8, 103:23,
301:17
**checking**
178:11
**chilling**
155:7
**choice**
128:14, 137:7,
137:16, 149:25,
150:1, 277:25
**choose**
252:21, 277:8,
277:22, 278:16
**choosing**
221:7

chose
260:17
christi
5:24
circuit
236:16
circumspect
131:12
circumstances
215:4
citation
128:7, 155:24,
218:7
citations
132:15, 134:4,
134:8, 134:12,
148:15, 218:1
cite
60:25, 62:14,
71:16, 87:11,
130:15, 133:2,
133:17, 133:19,
134:7, 139:2,
149:21, 150:10,
150:18, 151:11,
152:17, 156:10,
158:19, 162:9,
180:3, 191:9,
298:16
cited
13:23, 23:7,
60:4, 60:15,
108:6, 131:8,
132:2, 132:23,
133:4, 133:21,
134:11, 138:5,
138:15, 138:19,
143:1, 143:11,
143:15, 151:2,
151:6, 152:8,
153:21, 153:23,
158:17, 179:23,
213:16, 285:12,
287:5
cites
142:19, 162:3,
162:8, 162:18,
225:5, 225:23,

255:7
cities
38:1
citing
36:17, 213:21,
213:22, 267:4,
273:22
citings
25:4
citizen
88:11, 88:14,
88:19, 88:22,
88:23, 90:18,
98:7, 220:14,
220:15, 220:17,
227:1, 227:10,
227:12, 228:2,
228:15, 231:22,
236:6, 240:13,
243:10, 243:12,
244:7, 247:18,
247:25, 248:17,
257:5, 258:9,
260:2, 262:2,
262:19, 264:2,
277:14
citizen's
86:4
citizens
67:4, 83:4,
83:19, 83:23,
84:6, 84:14,
84:15, 84:18,
85:15, 96:15,
121:3, 121:9,
123:8, 123:15,
246:23, 250:9,
250:11
citizenship
90:3, 90:7,
90:12, 92:12
citrus
5:18
city
38:19
civic
183:18, 280:1
civil
2:4, 5:6, 8:7,

172:6, 285:2
claim
150:13, 158:23,
210:20, 215:11,
219:2, 225:19,
229:6, 229:12,
229:14, 230:10,
239:4, 241:15,
241:19
claiming
115:19
claims
43:4, 191:13,
194:1, 196:14,
197:11, 196:14,
202:23, 203:2,
203:6, 215:15,
230:16, 232:9,
256:12
clarification
205:11
clarified
14:9, 15:6
clarify
35:17, 163:8,
163:14, 168:13,
297:1
clarifying
160:23
class
169:16, 169:20,
300:20
classes
169:14, 169:23,
181:20, 181:23,
181:24, 299:3
cleanups
162:25
clear
75:18, 78:18,
85:12, 85:25,
88:9, 120:24,
122:11, 127:12,
131:5, 162:16,
180:5, 192:11,
211:13, 228:11,
230:15, 240:6,
247:5, 247:12,

253:4, 254:7,
254:10, 259:2,
295:15
clearly
9:5, 11:20,
167:10, 235:8
close
27:2, 161:15,
186:9, 253:17
closer
26:18, 34:21,
211:14
closest
279:1
coauthored
47:15
coauthors
170:19, 177:7
coefficient
107:1, 268:16
cohere
133:11
collaborate
185:23, 186:10
collaborators
177:9
colleague
12:16, 36:25,
40:22, 65:8,
228:20, 284:23
colleagues
21:3, 33:21,
36:10, 186:8
collect
97:16, 98:17
collecting
96:11, 97:18,
98:15, 165:7,
165:12
collection
177:14
college
183:20, 184:22
colleges
289:23
color
67:23, 68:4,
68:12, 69:7,

72:4, 73:18,
75:16, 76:21,
78:20, 81:21,
96:7, 117:14,
118:1, 118:13,
124:21, 155:17
**colorado**
32:16, 175:6,
277:9
**come**
15:17, 32:11,
39:11, 154:25,
163:4, 183:23,
184:5, 186:5,
210:1, 211:13,
212:23, 214:24,
228:21, 297:3
**comes**
25:3, 128:6,
182:10, 185:17,
294:23
**coming**
15:3, 40:19
**comment**
58:25, 295:1,
295:4, 298:20
**commenting**
194:15, 194:17
**comments**
45:3, 46:21,
180:24, 261:25
**commission**
304:16
**committed**
284:3
**common**
20:9, 224:14,
291:17, 299:24
**communications**
15:11, 195:6
**communities**
286:21
**company**
38:3, 38:5,
38:10
**comparable**
235:23, 243:19,
257:5, 271:17,

275:18
**comparative**
238:11, 238:15,
239:7
**compare**
79:8, 110:5,
208:9, 231:21,
234:3, 243:20,
251:12, 295:13
**compared**
29:3, 65:19,
105:14, 184:24,
225:3, 231:14,
234:6, 238:7,
257:20, 257:23,
269:23, 270:1
**compares**
110:6, 243:23,
243:24
**comparing**
89:4, 106:13,
106:15, 106:16,
107:3, 109:8,
110:9, 110:12,
220:13, 242:2,
243:17, 252:15,
265:8, 290:12,
292:23, 294:23
**comparison**
109:20, 207:22,
208:24, 232:20,
267:8, 287:25,
289:3, 294:5,
294:13, 294:14,
295:11
**comparisons**
208:17, 208:21,
209:1, 209:3,
243:6
**compelling**
85:22
**compensated**
17:1
**compensation**
16:21, 17:4,
17:7
**competitive**
209:22, 274:25,

275:2
**compiled**
65:25
**complaints**
168:16
**complete**
9:14, 19:7,
303:5
**completed**
176:18
**completely**
146:1, 298:1
**completion**
301:15
**complex**
3:19, 5:6,
272:18, 279:13,
291:11
**complexity**
279:8
**compliance**
280:7
**complicated**
131:17, 213:1
**compliment**
173:7, 173:16
**complimentarity**
175:25
**compliments**
172:14
**component**
16:13, 198:19
**comprehensive**
55:16
**computational**
74:24
**computer**
10:12, 10:17
**concentrated**
300:4
**concern**
156:24, 255:21
**concerned**
266:11
**concerns**
119:3
**conclude**
108:24, 125:3,

218:5, 230:19,
230:21, 233:2,
284:17
**concluded**
250:8
**conclusion**
56:5, 67:3,
67:13, 81:4,
82:14, 84:12,
85:7, 88:5,
88:9, 100:24,
119:9, 119:22,
120:8, 120:15,
120:21, 132:5,
231:17, 232:3,
246:20, 259:9,
262:21, 263:4,
263:5, 263:21,
297:19
**conclusions**
15:3, 15:18,
15:21, 47:4,
57:25, 58:16,
66:23, 67:2,
67:8, 67:18,
67:23, 68:11,
83:1, 85:22,
135:5, 152:7,
157:11, 158:9,
165:5, 165:11,
189:20, 190:1,
221:9, 222:9,
222:16, 224:15,
234:12, 244:25,
245:5, 261:21,
265:3, 271:21,
274:2, 276:11
**conditional**
43:15, 130:2,
130:6, 131:2,
131:3, 138:22,
163:17, 164:13,
214:3, 215:4,
272:19, 275:14
**conditions**
20:17, 88:4,
89:12, 214:8,
223:2

conduct
19:23, 20:14,
20:15, 56:7,
56:15, 63:17,
63:19, 64:8,
64:15, 87:14,
89:17, 173:11,
185:12, 214:14,
273:23
conducted
25:1, 56:13,
64:16, 108:6,
115:8, 115:14,
115:22, 214:13,
258:17, 268:5,
283:5
conducting
252:23
conference
1:4, 56:19
conferences
40:22, 176:24
confidence
130:19, 214:9,
235:19, 293:17
confident
191:10
confirm
79:17, 166:8,
202:1, 207:7,
228:24, 241:13,
267:15, 301:14
confirmed
268:13
confirming
52:14, 200:1
confounded
255:12
confounders
129:1, 129:2,
235:22, 275:7,
275:20
confounding
273:5, 275:13
confuse
162:10
confused
91:1, 132:16

confusing
47:24
congestion
164:20
congressional
170:21, 170:22,
170:23
consequence
221:17, 247:13,
248:22, 250:24
consequences
23:22, 118:24,
147:21, 161:3,
249:3, 250:22
consequential
78:21, 78:23,
112:4, 116:10,
252:10, 291:16,
291:20
conservative
250:15
consider
175:17, 236:7,
237:13, 258:10,
280:25, 288:14
consideration
128:25, 258:8
considered
49:13, 136:12,
160:13, 171:9,
194:5, 199:2,
276:3
consistent
62:24, 159:18,
203:24, 249:8,
257:21, 259:9
constitute
130:13, 232:15
constitutes
225:17, 226:6,
227:5, 228:12,
230:14, 232:13,
232:17
consultant
27:4
consulting
38:23
contact
34:9, 34:17,

183:1, 185:25,
288:19
contacted
49:22
contacts
34:23
contained
129:14
containing
57:25
contemporary
186:23
content
119:4
contention
208:3, 208:5
contents
47:19, 224:23
contest
83:15, 84:17,
118:19, 118:21,
122:25, 124:20,
125:9, 127:19,
246:3, 250:18
contested
245:22, 246:9,
247:6
contesting
87:8, 115:18,
251:23
context
140:23, 202:4,
274:1
continue
26:22, 158:16,
197:16
continued
3:1, 4:1, 5:1,
7:1
continuing
52:3, 163:5
continuum
281:1
contrast
99:9, 109:11,
110:14, 161:23
contrasting
108:20, 109:16,

109:24
contrasts
110:24, 161:21
contributed
287:2
contribution
27:19
control
36:19, 80:5,
82:21, 126:14,
228:22, 275:20,
288:18, 288:21,
291:23
controlled
288:11, 288:13
controlling
269:15
convenient
277:12
conversation
44:20, 50:21,
51:10, 299:12
conversations
12:24, 14:12,
41:18, 41:19,
195:24
convinced
220:19, 221:24
convincing
236:8
copy
29:7, 65:9,
66:16, 302:7
cord
1:9
cornerstone
137:19
correct
34:7, 35:1,
51:6, 54:1,
58:2, 59:13,
62:22, 66:9,
67:11, 67:16,
67:21, 74:5,
74:6, 77:3,
77:17, 81:5,
81:9, 86:6,
87:10, 89:21,

90:1, 94:18,
98:20, 100:10,
100:13, 102:12,
102:15, 103:19,
104:6, 105:17,
108:8, 109:6,
109:10, 109:18,
110:11, 110:13,
113:8, 116:22,
117:24, 135:21,
135:25, 140:5,
146:23, 147:12,
148:3, 150:17,
158:12, 165:4,
168:24, 187:2,
193:7, 203:25,
207:10, 207:24,
211:23, 213:14,
215:23, 218:14,
229:22, 233:9,
241:18, 244:12,
254:6, 260:12,
280:21, 292:13,
303:5, 304:5
**corrected**
40:11, 136:24,
157:8, 283:1
**corrections**
303:6
**corrective**
136:14
**correctly**
32:5, 67:5,
73:20, 83:7,
93:17, 99:14,
105:16, 109:5,
117:18, 136:2,
136:17, 138:1,
138:10, 138:15,
138:25, 139:24,
140:11, 147:23,
156:8, 157:5,
157:12, 157:18,
158:11, 158:20,
161:19, 164:23,
237:18, 237:23,
287:4, 292:15
**correlated**
252:6

**correlation**
145:15, 250:12
**correspondence**
270:12, 271:8
**corresponding**
269:21
**corroborator**
40:23
**cost**
70:16, 94:5,
95:12, 127:2,
127:10, 127:18,
127:20, 127:21,
127:24, 128:10,
128:11, 128:13,
128:17, 128:19,
129:3, 130:23,
131:15, 132:20,
133:10, 218:21,
238:8, 238:9,
238:11, 238:15,
271:22, 272:2,
272:5, 272:10,
272:14, 272:16,
272:21, 273:2,
273:16, 273:22,
274:7, 275:12,
276:23, 277:2,
277:20, 279:5,
280:15, 281:1,
281:5, 281:7
**cost-benefit**
46:9, 126:5,
126:11, 126:24,
129:23, 129:25
**costas**
182:13, 184:24
**costless**
128:22, 276:16,
277:20
**costliness**
240:8
**costly**
239:11, 239:21,
240:17, 276:14,
276:17, 276:18,
277:7, 277:8,
278:10, 278:16,

280:17
**costs**
93:11, 93:12,
93:14, 95:17,
95:21, 119:10,
119:16, 120:12,
121:1, 121:8,
122:6, 123:7,
124:25, 125:17,
126:18, 129:12,
133:8, 133:12,
133:25, 138:6,
138:7, 138:21,
215:3, 219:25,
220:1, 264:20,
265:8, 276:19,
280:9, 280:10
**could**
14:15, 16:8,
28:8, 29:12,
34:20, 35:10,
35:17, 56:9,
63:2, 72:17,
72:23, 74:1,
74:9, 74:14,
80:5, 90:16,
92:22, 95:6,
95:9, 96:20,
96:21, 99:16,
99:17, 101:14,
121:21, 121:23,
126:5, 127:8,
133:20, 141:5,
141:15, 146:11,
147:10, 155:7,
165:2, 165:8,
165:13, 193:23,
195:1, 196:5,
196:24, 198:12,
198:14, 203:18,
207:3, 209:19,
209:20, 229:19,
232:4, 232:24,
233:16, 235:25,
239:15, 240:2,
241:4, 243:8,
253:19, 256:16,
257:1, 262:13,

275:7, 276:9,
278:13, 283:9,
289:23, 294:8,
295:23, 299:21,
300:12
**couldn't**
32:23, 44:13,
96:19, 101:12,
134:21, 179:25,
196:6, 229:19,
279:16
**counsel**
3:19, 8:7,
9:11, 9:13,
9:19, 12:21,
12:22, 12:25,
14:13, 33:19,
34:6, 41:20,
42:2, 52:12,
55:20, 59:25,
60:12, 78:1,
121:21, 163:13,
167:6, 167:19,
189:18, 195:9,
195:14, 195:24,
285:1, 285:2,
304:9
**count**
26:7, 152:11,
153:14
**countering**
225:19
**counterintuitive**
133:24
**counties**
3:14, 38:1,
76:22, 117:15,
118:2, 176:17,
176:22, 176:25,
300:4
**country**
233:18
**counts**
20:20, 246:21,
246:23
**county**
4:4, 4:5, 4:9,
4:13, 4:15,

4:19, 5:9, 5:11,
5:14, 26:19,
37:15, 65:6,
175:10, 177:2,
186:6, 186:14,
187:2, 187:3
**couple**
9:2, 10:8,
12:19, 39:24,
107:19, 166:6,
205:6
**course**
9:12, 13:12,
20:21, 44:3,
46:21, 51:17,
56:13, 74:22,
88:8, 99:19,
101:16, 105:25,
107:22, 118:11,
143:23, 169:6,
169:7, 169:9,
169:11, 169:17,
169:19, 170:1,
174:7, 175:1,
194:2, 288:25
**courses**
169:1, 169:4,
180:21, 182:8
**court**
1:1, 33:4,
33:7, 135:3,
135:17, 135:25,
204:2, 204:4,
208:19, 236:8,
302:7
**courthouse**
186:6
**courts**
187:25, 203:1,
203:4, 235:12,
236:13, 273:16
**cover**
20:1, 20:25
**covered**
267:14
**covers**
24:8, 54:8,
188:2

**covid**
136:15
**create**
91:13, 92:2,
128:2, 164:7
**credit**
300:24
**credited**
236:12, 236:17
**creek**
38:20
**criticism**
253:3, 259:5
**criticized**
33:14
**critique**
115:2, 127:13
**critiques**
67:7, 67:12,
67:17, 67:22
**critiquing**
158:6
**cross-reference**
168:4
**cross-sectional**
63:12
**crr**
1:25, 2:2
**crucial**
157:2
**cumbersome**
88:7
**current**
18:15
**currently**
90:15, 121:11,
123:10, 168:23,
169:1
**curriculum**
18:14, 182:2
**curtailed**
116:7
**cut**
89:9
**cv**
18:9, 18:11,
18:16, 18:21,
18:25, 22:17,

24:3, 30:24,
33:18
**cvap**
224:7, 227:21,
229:1, 229:4,
229:10, 229:23,
230:16, 231:24,
232:8, 248:13,
248:15, 249:8,
250:3, 251:9,
251:13, 251:16,
252:5, 256:12,
271:14, 279:19
**cycle**
208:2

---

## D

**dakota**
233:20, 233:21
**dale**
5:18
**dan**
129:1, 190:6,
235:1, 235:21,
245:1, 293:6,
295:23, 299:5,
299:7, 301:3
**dan's**
122:8, 296:5
**daniel**
57:4
**darn**
277:20
**data**
30:14, 56:12,
63:7, 63:16,
63:19, 65:25,
66:5, 66:8,
67:19, 74:18,
75:20, 76:8,
76:12, 76:16,
76:18, 77:1,
86:10, 86:16,
86:19, 117:14,
119:24, 157:3,
157:16, 158:8,
166:9, 166:12,
177:13, 177:14,

207:8, 207:12,
207:23, 210:8,
210:12, 210:20,
210:22, 211:1,
211:7, 213:4,
213:7, 214:5,
224:16, 227:17,
227:23, 228:2,
228:9, 228:18,
229:1, 229:4,
229:10, 229:23,
230:7, 230:25,
232:1, 233:12,
234:12, 234:17,
235:6, 235:13,
235:17, 236:11,
245:17, 253:6,
253:23, 254:9,
256:6, 256:22,
260:15, 265:7,
274:5, 274:8,
283:1, 283:6
**date**
16:18, 17:1,
17:4, 19:10,
92:12, 234:22,
303:11
**dates**
172:1
**david**
122:8, 182:9,
288:24
**dawn**
1:25, 2:1,
304:2
**day**
11:8, 21:4,
31:7, 128:12,
163:2, 163:25,
164:4, 164:7,
174:9, 201:13,
277:24, 278:9,
279:1, 284:24,
285:20, 304:14
**days**
17:14, 172:19,
205:6, 217:19,
277:23, 278:8,

289:17
**dayton**
3:15
**dc**
2:10, 2:17
**deal**
36:15, 274:20
**dealing**
25:2, 36:18,
155:24
**dealt**
285:20
**dean**
24:18
**deceiving**
293:16
**december**
31:5
**decennial**
39:9
**decide**
42:1
**decided**
37:11
**deciding**
197:24, 198:19
**decision**
33:15, 42:4,
195:25, 198:18,
208:19
**declarations**
87:1, 98:24
**decline**
88:18, 88:22,
111:7, 207:14,
226:14, 231:3,
231:7, 231:17,
232:4, 251:21,
258:11, 260:5,
266:8, 266:19,
301:4
**declined**
207:9, 220:5,
221:19, 226:18,
230:18
**declines**
80:16, 237:14,
242:8, 248:7

**decrease**
130:23, 144:14,
215:21, 220:10
**decreased**
93:12, 227:16,
273:10
**decreases**
240:3
**defendant**
3:2
**defendant's**
189:18
**defendants**
1:12, 3:11,
25:17
**defending**
26:25
**defense**
9:11, 9:13,
26:22, 34:5,
281:24, 282:4
**deficiencies**
282:25
**deficient**
123:1, 279:16
**defied**
63:11
**defined**
158:25
**definitely**
15:14
**degree**
40:13
**degrees**
19:15, 40:24
**deland**
4:16
**delay**
229:22
**democracy**
182:12, 185:17
**democrat**
270:15
**democratic**
28:6, 69:21,
69:24, 71:12,
72:5, 268:6,
268:10, 269:25,

271:10
**democrats**
281:18
**demographic**
186:19
**demographics**
289:24
**demonstrable**
251:21
**demonstrably**
255:10
**demonstrate**
78:10, 88:12,
217:24, 221:13,
223:7, 253:19,
267:24
**demonstrated**
83:3, 83:11,
83:21, 84:25,
87:18, 93:15,
265:20, 282:23
**demonstration**
223:2
**denominator**
152:12, 228:14,
243:14, 244:1,
244:8, 244:10,
260:3
**denote**
101:19
**deny**
71:20
**denying**
98:3
**department**
36:25, 39:23,
67:20, 75:6,
86:11, 86:20,
186:5, 207:4
**depend**
262:25, 291:3
**depending**
209:20
**deponent**
303:1
**deposed**
8:20, 30:25,
32:3, 176:3

**deposition**
1:14, 6:8, 6:9,
7:3, 9:4, 10:9,
11:3, 11:18,
12:3, 12:7,
12:10, 12:23,
13:1, 13:16,
16:10, 29:9,
30:8, 30:13,
54:25, 82:16,
135:17, 136:6,
167:4, 167:21,
168:5, 180:25,
200:2, 301:16,
304:3
**depositions**
31:21
**depress**
273:12
**depressed**
248:24, 294:10
**depressing**
136:14, 154:24
**deputy**
4:4
**describe**
19:21, 20:10,
43:6, 43:16,
43:21, 126:4,
170:12, 171:12,
182:22, 184:20,
207:23, 212:14
**described**
62:25, 82:9,
87:19, 145:21,
178:18, 184:12,
186:25, 187:1,
211:24
**describes**
159:20
**describing**
50:10, 89:17,
124:14, 162:21,
173:5, 205:14,
280:8
**description**
43:8, 66:22
**descriptions**
20:4

design
27:9, 37:22,
63:13, 78:25,
116:12, 116:13,
126:1, 158:9,
213:7, 224:5,
228:21, 228:23,
230:5, 230:12,
232:19, 233:13,
234:7, 234:11,
235:2, 235:4,
247:16, 251:2,
251:11, 252:14,
253:11, 253:12,
253:14, 254:24,
255:19, 255:22,
256:12, 258:19,
259:22, 259:24,
282:25, 288:3
designated
96:1
designs
214:5, 234:22,
235:12, 288:20
desirable
271:16
desired
21:13, 128:15
desoto
3:12
detail
67:2, 197:24
detailed
74:24, 99:3
details
16:15
determine
145:2
determined
20:19, 33:7
deterrent
30:5, 30:10,
164:22
deviates
147:6
deviation
278:7
difference
88:12, 89:18,

89:22, 90:21,
107:13, 107:21,
107:22, 109:25,
110:7, 231:3,
234:23, 244:5,
244:6, 256:2,
288:3, 288:13,
290:14, 290:18,
292:23
difference-in
89:17, 288:2
difference-in-di-
fference
63:6, 63:13,
63:18, 63:20,
64:9, 64:17,
65:17, 66:13,
95:3, 224:4,
224:9, 224:14,
224:20, 225:7,
225:12, 225:17,
226:6, 226:12,
227:5, 228:12,
228:17, 230:13,
232:12, 232:17,
234:8, 234:21,
240:7, 244:4,
244:5, 251:11,
252:13, 257:3,
257:15, 257:17,
259:25, 288:20
differences
100:7, 101:1,
101:17, 103:4,
106:10, 106:25,
108:16, 111:15,
112:18, 113:5,
113:25, 115:5,
121:16, 226:23,
227:3, 255:12,
267:5, 294:4,
294:24
different
10:19, 21:14,
27:7, 30:18,
37:14, 38:12,
63:8, 64:2,
84:15, 102:5,

103:7, 107:10,
107:11, 107:14,
107:16, 107:18,
108:7, 108:10,
108:16, 109:4,
112:3, 112:5,
113:3, 114:9,
137:15, 176:5,
176:22, 184:24,
188:10, 191:18,
191:19, 192:7,
192:13, 192:17,
192:19, 207:10,
208:14, 213:7,
221:4, 226:8,
228:3, 231:25,
243:2, 243:18,
244:1, 246:21,
247:16, 256:12,
258:19, 260:17,
280:23, 294:8,
299:18, 300:25
differential
17:22, 206:11,
292:21
difficult
174:25, 203:12
digits
41:5
dimensions
161:24
diminish
223:23
diminished
253:20, 257:21,
259:10, 281:14
diminishing
241:2, 259:10
diminution
75:2, 212:19
direct
131:16, 181:2,
273:1
direction
41:20, 304:8
directives
14:3
directly
133:10, 149:10,

198:6, 213:19
director
183:17
disadvantaged
72:20, 74:12
disaggregate
149:18
disagree
119:7, 121:20,
122:13, 122:17,
145:12, 145:24,
153:22, 208:5,
210:20, 210:22,
221:12, 230:25,
231:1, 241:14,
245:18, 246:4,
254:14, 254:18,
255:16, 258:16,
260:9, 266:5,
267:16, 270:5,
270:8, 271:18,
274:13, 274:15,
281:2, 284:7,
293:19
disagreeing
236:1
disagrees
232:19
discipline
145:14
disclose
186:1, 195:14
disclosed
54:20
disconnect
78:2
discount
150:22
discriminated
88:10
discrimination
201:12, 201:14,
202:7, 202:9,
202:13, 202:20,
202:22, 203:2,
203:6, 204:10
discuss
50:4, 59:17,

63:8, 63:13,
80:1, 80:16,
103:17, 126:3,
128:9, 138:12,
142:13, 144:5,
153:19, 164:12,
195:2, 195:15,
199:23, 207:5
**discussed**
13:14, 50:12,
51:1, 53:8,
55:18, 55:25,
82:25, 94:20,
95:4, 113:13,
113:16, 114:11,
114:12, 114:13,
114:23, 114:24,
138:5, 138:16,
138:20, 143:17,
144:7, 161:4,
166:9, 166:12,
185:15, 201:18,
298:2
**discusses**
129:6, 166:7
**discussing**
92:11, 224:20,
267:15
**discussion**
23:9, 50:13,
77:16, 80:10,
172:22, 192:4,
193:9, 193:13,
194:16, 197:20,
202:3, 271:22,
272:9, 285:24
**discussions**
195:3, 199:4
**disenfranchiseme-
nt**
119:17, 120:13,
121:2
**disparate**
83:3, 83:12,
83:13, 83:22,
84:10, 84:13,
84:19, 85:1,
85:7, 86:2,

86:5, 86:9,
87:19, 112:4,
116:15, 116:20,
117:8, 117:22,
121:16, 192:24,
197:11, 198:24,
206:7, 214:1,
216:25, 220:20,
241:3, 254:12,
260:20, 261:2,
265:4, 266:9,
267:9, 276:1,
276:11
**disparately**
83:14, 122:6
**disproportionate**
220:20, 258:1,
259:17, 274:3
**disproportionate-
ly**
68:12, 71:5,
72:3, 77:21,
82:10, 115:24,
118:2, 123:15,
125:1, 125:8,
218:18, 218:20,
219:1, 219:4,
257:22, 269:2
**dispute**
68:3, 74:18,
76:25, 78:18,
86:17, 86:24,
99:4, 118:3,
118:5, 123:21,
166:8, 166:12,
210:18, 218:10,
219:14, 220:23,
223:19, 229:11,
229:13, 241:5,
247:10, 293:1,
293:6
**disputed**
123:20
**disputing**
222:10, 235:3,
292:20
**distinct**
162:5

**distinction**
127:22, 127:23
**distract**
60:1
**district**
1:1, 1:2,
26:24, 31:24,
37:11, 37:23,
38:20, 135:17
**districts**
37:14, 37:25
**distrust**
278:18
**divide**
41:13
**divided**
16:23, 50:15,
53:12, 224:24,
246:21, 251:9,
252:4
**division**
1:3, 5:6, 5:10
**divulge**
41:17
**dmv**
70:5, 75:6,
75:15, 237:17,
238:10, 239:4,
239:5, 239:9,
239:22, 240:2,
240:9, 240:11,
240:17, 240:21,
240:23, 241:5,
241:7, 241:16,
261:12, 261:17,
261:23, 262:3,
263:9, 263:14,
264:4
**dmvs**
80:18
**doctor**
14:25, 92:7
**document**
204:21, 205:12,
217:12
**documents**
14:13, 14:20,
49:9, 56:3,

56:20, 60:12
**dog**
183:13
**doing**
24:14, 25:9,
38:21, 39:2,
39:4, 39:8,
42:16, 63:7,
108:19, 110:9,
110:17, 116:13,
174:8, 192:12,
205:8, 230:23,
234:20, 256:5,
264:20, 275:6,
275:19, 282:23
**dollar**
279:5
**don**
182:13, 288:25
**done**
21:6, 22:4,
24:8, 36:5,
36:9, 39:22,
50:4, 64:21,
65:4, 65:22,
78:14, 78:17,
99:22, 101:12,
102:4, 105:8,
111:19, 155:5,
175:10, 175:14,
176:13, 178:19,
180:20, 182:18,
182:23, 183:14,
183:15, 184:22,
185:15, 185:20,
212:6, 213:3,
220:18, 240:5,
245:16, 250:25,
251:4, 252:11,
252:12, 256:16,
259:1, 259:3,
260:1
**door**
279:10
**double**
41:5
**doublecheck**
19:8

**doubtful**
276:10
**douglas**
7:12, 286:11
**down**
16:13, 19:8,
19:12, 22:22,
22:24, 23:1,
23:24, 25:18,
42:8, 43:20,
51:16, 61:9,
64:23, 79:19,
101:14, 102:9,
102:20, 102:21,
102:24, 107:8,
114:3, 134:3,
138:12, 148:15,
157:20, 160:7,
182:21, 193:4,
198:7, 218:16,
225:2, 225:4,
226:11, 226:15,
230:20, 231:7,
231:13, 231:14,
233:8, 233:15,
239:15, 240:12,
241:6, 249:18,
250:6, 263:13,
276:8, 290:21,
290:24, 292:17
**downstream**
161:3
**downward**
101:10, 292:5,
292:11, 293:4
**dozen**
8:25, 31:1,
41:6, 117:15,
118:2, 239:24
**draft**
48:5, 49:25,
50:16, 193:16,
205:23, 297:24
**drafted**
45:2, 47:10,
48:13, 48:15,
48:22, 48:25,
50:7, 50:13,

50:17, 51:13,
51:18, 51:21,
51:23, 51:25,
52:4, 52:11,
52:16, 52:19,
53:4, 53:9,
53:14, 54:8,
55:4, 55:8,
100:22, 137:21,
166:18, 176:5,
189:22, 238:2,
242:18, 295:20,
297:5, 297:8,
297:14
**drafting**
46:16, 46:18,
50:5, 50:23,
51:8, 52:14,
52:21, 53:1,
54:3, 54:5,
54:14, 100:21
**drafts**
50:2
**draw**
158:9, 180:6,
199:23
**drawing**
123:23, 124:5,
124:7, 124:13,
135:5
**drawn**
174:3
**draws**
174:10
**drew**
131:18, 180:6
**driver's**
155:2, 240:22,
240:24, 263:11
**drives**
66:5, 179:22,
180:17, 182:19,
182:24, 184:23,
286:2, 286:20,
287:2
**drop**
11:16, 11:22,
66:10, 75:16,

105:22, 107:15,
112:10, 136:13,
225:15, 257:19,
265:19, 265:25,
301:1
**dropped**
59:23, 261:19
**drops**
105:13, 105:20,
112:22
**due**
76:9, 206:21,
211:3
**duly**
8:3
**during**
11:3, 65:9,
286:24

## E

**each**
9:7, 16:22,
16:24, 19:15,
39:4, 40:23,
43:16, 48:5,
50:10, 50:16,
54:10, 54:12,
89:15, 106:14,
107:10, 109:8,
110:19, 113:3,
144:8, 193:23,
221:2, 262:20,
292:11, 292:16,
293:3, 294:24,
298:16, 299:8
**earlier**
24:1, 24:21,
49:4, 60:10,
61:25, 78:8,
81:10, 89:7,
89:16, 95:4,
99:9, 99:22,
100:18, 101:21,
109:12, 110:14,
114:24, 120:16,
126:13, 152:6,
161:5, 162:14,
163:7, 175:24,

180:25, 189:4,
192:7, 211:10,
211:16, 218:9,
224:8, 224:13,
242:25, 261:9,
265:12, 285:11,
298:18
**early**
21:4, 21:24,
22:2, 27:11,
31:5, 35:20,
36:15, 40:25,
43:12, 128:11,
128:21, 131:11,
132:8, 138:13,
148:1, 148:4,
148:7, 148:8,
148:10, 148:12,
148:15, 148:24,
149:1, 149:2,
149:8, 149:10,
149:14, 149:15,
149:18, 149:25,
150:2, 150:7,
151:8, 152:14,
152:18, 170:18,
171:23, 171:24,
181:10, 272:12,
273:8, 273:13,
275:22
**ease**
286:19
**easier**
128:16, 136:5,
175:3
**easter**
183:10
**eastern**
1:17, 236:22
**eavs**
66:1, 66:8
**ecological**
261:22
**economics**
171:17
**edited**
151:19
**editing**
52:5

**editorial**
45:17, 45:21,
46:23
**edits**
44:4, 44:12,
44:16, 44:19,
45:12, 45:14,
45:17, 45:20,
46:22, 166:20
**educated**
211:11, 211:17,
211:19, 211:25,
212:5, 213:6
**education**
18:16
**educational**
19:19
**effective**
185:4, 255:7,
255:13, 256:1
**effectively**
255:23
**effects**
23:2, 43:15,
62:16, 62:21,
85:7, 101:20,
102:18, 103:14,
112:4, 116:10,
128:23, 129:6,
130:24, 135:10,
136:14, 138:9,
139:22, 142:23,
143:9, 143:24,
156:5, 158:10,
161:14, 161:24,
162:4, 163:18,
164:13, 165:2,
170:11, 170:23,
184:25, 197:16,
198:24, 214:1,
253:19, 254:13,
265:4, 267:10,
269:11, 271:4,
276:11, 282:15,
282:16, 282:24,
296:23
**efficacious**
184:3, 184:4,

184:9, 185:4,
287:11, 287:15,
287:24, 289:4,
289:10, 291:1
**efficient**
120:9, 176:8
**effort**
223:19, 271:13,
274:20, 291:6
**efforts**
27:22, 71:4,
72:7, 91:21,
95:19, 98:9,
119:15, 120:11,
122:4, 181:1,
219:20, 285:18,
287:10, 287:15
**eitan**
146:8
**either**
54:2, 67:15,
71:8, 124:17,
132:19, 138:8,
138:23, 166:10,
176:17, 190:6,
200:3, 214:2,
216:9, 231:9,
232:10, 238:8,
270:6
**election**
6:17, 19:20,
20:12, 20:14,
20:15, 21:4,
21:10, 21:16,
21:20, 22:8,
23:2, 23:8,
24:12, 27:10,
34:13, 43:15,
46:3, 46:13,
61:11, 61:14,
61:23, 62:17,
63:9, 63:11,
63:15, 128:12,
130:22, 135:9,
137:22, 138:6,
138:24, 139:11,
140:2, 140:7,
140:14, 142:10,

144:23, 146:15,
147:21, 157:16,
161:16, 161:25,
163:2, 163:18,
163:25, 164:4,
164:7, 164:14,
169:12, 169:18,
169:19, 169:20,
172:2, 172:19,
173:13, 174:19,
175:7, 175:9,
175:14, 176:14,
176:22, 177:11,
177:18, 178:19,
201:18, 208:1,
209:5, 209:10,
209:15, 209:21,
211:18, 212:7,
212:21, 213:12,
213:24, 213:25,
215:1, 235:25,
274:6, 274:9,
274:11, 275:10,
277:14, 277:24,
278:9, 279:1,
283:13, 285:20,
287:1
**election-related**
25:11, 31:19,
36:21
**elections**
3:12, 4:4,
4:14, 4:19,
5:15, 19:20,
20:12, 20:16,
20:18, 20:23,
21:7, 21:15,
21:19, 24:12,
24:15, 24:23,
28:4, 66:8,
67:20, 86:11,
86:20, 169:13,
173:12, 274:25,
275:2, 275:4
**electorate**
288:6, 299:25
**element**
23:12, 70:3

**elias**
2:15
**eligible**
89:4, 121:3,
121:8, 123:7,
124:25, 183:2,
226:21, 226:25,
234:2, 236:4,
236:6, 238:24,
239:5, 276:9,
290:8
**elizondo**
25:23
**else**
13:9, 13:16,
39:19, 89:8,
94:19, 119:23,
127:15, 178:13,
185:7, 294:10
**elsewhere**
127:4, 127:5
**email**
10:24, 11:4,
49:8, 185:1
**emergency**
25:4, 36:19
**eminent**
201:21
**emphasize**
106:4, 289:11
**empirical**
30:20, 83:2,
83:11, 87:12,
87:14, 87:17,
88:4, 89:12,
90:13, 95:1,
95:6, 95:8,
96:5, 108:21,
109:2, 113:15,
113:19, 114:4,
114:5, 114:8,
114:11, 114:23,
115:8, 115:13,
118:18, 118:20,
118:21, 119:19,
119:25, 120:14,
125:22, 157:1,
190:3, 190:10,

191:1, 191:4,
191:14, 191:24,
194:14, 196:14,
197:15, 198:11,
199:2, 199:9,
206:5, 207:18,
212:3, 212:24,
216:23, 218:10,
225:21, 229:18,
230:1, 258:14,
259:19, 265:2,
274:1
**employed**
304:10
**en**
253:6
**encompasses**
115:6
**encourage**
97:3
**end**
17:5, 19:9,
41:10, 58:18,
172:24, 239:20,
281:1
**ended**
28:1, 28:7
**ending**
2:6, 8:9, 285:4
**endorse**
71:3, 71:22,
176:10
**endorsement**
185:16
**enforced**
90:7, 90:12,
90:23, 91:4,
91:12, 92:1,
92:3, 92:9,
92:13, 92:20,
92:21
**enforcement**
91:14, 99:1
**enfranchisement**
193:1, 206:15,
222:2, 260:22
**engage**
204:6

**engagement**
94:10, 168:8,
183:19, 185:23
**engaging**
244:15
**engineers**
172:6
**enhance**
138:23
**enhances**
69:10
**enjoined**
90:3
**enter**
217:8
**entire**
47:19, 91:17,
118:8
**entirety**
57:22, 189:7,
198:8, 204:24,
205:5, 217:15
**entities**
26:5, 71:8,
77:5
**envelope**
277:16
**equal**
126:6, 206:5
**equipment**
21:5, 27:12
**equipped**
20:19, 54:11
**errata**
303:7
**errors**
157:8, 293:17,
296:18, 296:20,
299:20, 299:23,
300:2
**esquire**
2:7, 2:13,
2:14, 3:4, 3:11,
5:14
**essence**
275:5, 288:20
**essential**
22:6

**essentially**
139:23, 173:9,
243:18
**establish**
212:18, 213:4,
213:23, 226:16
**establishes**
206:1
**estimate**
41:2, 107:2
**estimates**
107:1, 157:9,
269:8, 269:11,
269:19, 269:21
**estimating**
6:20, 156:14,
156:19
**et**
1:6, 1:11,
132:10, 149:21,
195:12
**ethic**
157:1
**ethnic**
64:2, 72:13,
108:17, 181:3,
244:2, 262:20,
266:20
**ethnicity**
193:1, 242:4,
247:15, 247:19,
248:16, 248:18,
248:21, 248:25,
251:14, 270:12,
270:17, 270:25,
271:3, 271:9,
276:2, 289:24
**evacuations**
25:5, 172:5
**evaluate**
21:7, 23:8,
61:19, 85:4,
85:5, 85:19,
114:25, 161:2,
199:11
**evaluated**
63:9, 78:17,
92:22

**evaluating**
61:23, 62:8,
62:16, 63:4,
63:15
**evaluation**
21:9, 169:7,
256:5, 256:18
**evaluations**
157:2, 157:4
**evasive**
23:14, 45:10
**even**
41:1, 45:17,
49:13, 55:12,
77:14, 132:19,
136:19, 159:17,
171:5, 172:1,
175:4, 180:3,
185:25, 190:5,
213:4, 226:22,
230:7, 230:16,
234:25, 241:11,
246:19, 264:1,
271:16, 274:16,
274:18, 277:13,
278:16, 278:20,
279:6, 282:19,
291:19, 293:15,
294:7, 295:5,
296:19, 296:24,
298:25, 300:17
**ever**
17:13, 33:6,
33:11, 33:14,
36:1, 56:4,
170:8, 176:13,
178:1, 178:22,
178:25, 182:6,
187:19, 187:24,
190:25, 202:6,
202:19, 229:17,
229:25, 244:14,
279:22, 279:24,
299:14
**every**
39:9, 128:12,
169:18, 169:24,
169:25, 176:10,

262:25, 270:13,
270:14, 277:14
**everybody**
58:10
**everyone**
233:17, 233:18,
233:20, 233:22,
233:25, 302:1
**everything**
9:4, 24:8,
49:14, 115:6,
176:3
**evidence**
69:6, 69:15,
73:5, 73:16,
83:2, 83:11,
84:3, 84:12,
85:6, 85:14,
85:19, 86:1,
86:3, 86:8,
86:10, 86:19,
87:12, 87:17,
90:13, 93:13,
95:11, 95:20,
96:6, 100:6,
100:25, 103:4,
106:7, 106:9,
108:15, 108:17,
109:2, 110:13,
112:6, 113:24,
118:20, 119:19,
120:14, 120:21,
122:20, 125:22,
125:25, 130:15,
132:11, 139:22,
159:12, 180:19,
190:21, 194:14,
197:10, 197:18,
198:11, 199:3,
203:1, 206:6,
212:3, 212:16,
216:9, 216:23,
220:19, 221:21,
223:25, 224:1,
225:18, 225:21,
226:6, 227:5,
227:6, 227:7,
227:8, 228:12,

228:25, 229:18,
230:14, 230:15,
230:23, 231:6,
232:11, 232:13,
232:15, 232:17,
233:3, 233:7,
238:8, 238:11,
238:15, 238:18,
238:21, 246:19,
248:23, 259:19,
260:15, 266:8,
266:9, 267:11,
276:24, 276:25,
283:19, 283:21,
287:18
**evolved**
272:10, 272:17,
272:24
**exact**
186:13, 200:10
**exactly**
148:14, 179:17,
300:6
**examination**
6:2, 8:7,
167:6, 285:1
**examine**
144:13, 196:9
**examined**
8:5, 98:23,
219:24, 262:16,
265:2, 303:3
**example**
37:17, 65:24,
97:15, 142:14,
155:9, 159:3,
164:13, 164:25,
181:7, 188:6,
253:11, 277:2,
283:14, 294:3
**examples**
133:22, 147:25,
174:14, 212:21,
253:18
**excerpted**
94:2
**exclude**
141:21

**excluded**
33:6, 33:12
**exclusion**
70:17, 72:2,
79:21, 81:1
**exclusive**
138:18
**excuse**
38:19, 95:25,
146:4, 171:3
**executes**
183:7
**exemplary**
275:23
**exemplified**
274:10
**exercise**
128:1
**exhaustive**
55:17
**exhibit**
6:9, 6:10,
6:11, 6:12,
6:14, 6:16,
6:19, 6:22,
6:24, 7:4, 7:6,
7:7, 7:9, 7:10,
7:11, 7:12,
11:23, 12:1,
18:1, 18:3,
24:2, 29:8,
29:21, 29:22,
29:24, 30:23,
31:23, 57:2,
57:5, 57:16,
57:18, 62:19,
65:10, 65:11,
66:20, 76:3,
93:24, 94:23,
103:10, 103:11,
104:1, 108:22,
109:17, 109:19,
112:16, 116:17,
126:9, 130:4,
135:16, 137:4,
139:10, 139:13,
147:9, 156:18,
156:21, 157:21,

158:2, 159:10,
159:14, 163:16,
166:17, 188:17,
188:22, 188:23,
189:15, 204:17,
204:18, 217:8,
217:9, 217:11,
237:8, 286:6,
286:9, 292:8
**exhibits**
6:7, 6:8, 7:2,
7:3, 11:15,
59:24
**exist**
90:15, 154:4
**existed**
232:25
**existing**
83:5, 83:20,
86:15, 213:4
**expanding**
136:12
**expect**
59:6, 176:2,
201:22, 209:13,
243:25, 262:8,
262:11
**expectation**
129:4, 209:12,
268:13
**expected**
155:14, 194:22,
257:24, 259:13,
259:14
**expedite**
249:24
**experience**
18:17, 19:4,
260:11, 260:13,
260:14
**experiment**
288:11
**experimental**
184:2
**experiments**
182:4, 288:14,
289:16
**expert's**
58:22, 190:25

**experting**
61:10
**expertise**
24:25, 170:13,
170:14, 171:13,
172:3, 172:11,
172:12, 172:15,
172:20, 173:6,
176:7, 196:6,
196:18, 197:5,
197:7, 197:19,
197:23, 198:13
**experts**
10:19, 12:12,
13:21, 15:12,
37:18, 37:21,
50:5, 55:22,
56:25, 59:1,
60:24, 62:13,
78:10, 114:8,
115:7, 181:15,
192:23, 198:23,
203:15, 212:9,
214:10, 244:24,
245:4, 272:6,
282:11
**expires**
304:16
**explain**
9:25, 56:9,
63:2, 68:21,
68:25, 113:18,
115:11, 126:10,
131:3, 180:13,
211:19, 256:2,
272:8, 274:19,
278:12
**explained**
131:1
**explaining**
47:25
**explanation**
68:22, 128:24,
206:17, 265:17,
265:22, 266:2,
266:4, 272:15
**explanations**
137:9, 216:18

**express**
219:11
**expresses**
218:3
**expressly**
98:16, 145:22
**extends**
127:13
**extensive**
179:4
**extensively**
176:21
**extent**
41:17, 100:23,
118:17, 118:18,
195:10, 204:8,
214:7, 282:12,
283:25
**extremely**
174:24, 184:3
**extrinsic**
280:1

**F**

**face**
264:7, 264:12
**facebook**
185:2
**facilitated**
245:20
**fact**
70:15, 73:3,
74:17, 76:13,
77:1, 90:23,
91:18, 91:25,
92:17, 125:4,
125:7, 128:20,
129:6, 130:21,
130:25, 185:20,
213:23, 219:19,
222:17, 249:15,
255:12, 256:21,
257:25, 259:16,
275:16, 276:3,
293:21
**factors**
21:12, 138:23,
272:20, 275:14,

275:24
**fail**
158:6
**failed**
150:14
**fails**
128:25
**faint**
87:6
**fair**
23:10, 27:14,
47:18, 82:16,
82:17, 87:13,
135:7, 139:16,
153:25, 176:9,
196:17, 203:8,
294:20
**faith**
122:3
**fall**
169:5, 169:10,
169:18
**fallacy**
261:22
**familia**
31:24, 69:20,
70:22, 185:18,
185:20, 187:14,
187:15
**familiar**
9:2, 14:5,
14:20, 38:4,
139:16, 152:15,
170:3, 170:7,
173:23, 174:18,
174:22, 175:8,
182:5, 244:23,
297:9, 297:11,
298:13, 299:12,
300:23
**familiarity**
176:7, 202:25,
298:6
**famous**
182:25
**far**
74:23, 127:13,
160:19, 170:24,

171:6, 191:13,
213:1, 279:8,
279:14
**fast**
48:18
**fault**
211:8
**favors**
71:5
**fdoe**
117:14
**fed**
200:14
**federal**
135:3, 135:25,
169:18, 171:16,
171:18
**federation**
2:5, 3:16, 8:9,
8:16, 285:3,
285:7
**feel**
54:11, 160:14
**feeling**
163:4
**felt**
174:17, 190:2,
198:12, 215:4
**ferguson**
5:22
**few**
147:25, 152:4,
163:5, 167:15,
168:6, 168:14,
171:5, 190:23,
193:17, 222:12,
265:6, 285:8,
285:24, 286:17
**fewer**
226:20, 277:24,
278:8, 290:1
**field**
20:22, 21:9,
55:10, 55:14,
171:2, 175:18,
179:5, 201:22,
212:10, 244:24,
272:3

| | | | |
|---|---|---|---|
| **fields** | 60:21, 80:14, | **finished** | **flaw** |
| 19:18, 19:21, | 81:12, 85:17, | 78:5, 78:6, | 255:19, 255:21 |
| 19:23, 20:3, | 85:21, 125:22, | 93:6, 93:8, | **flip** |
| 20:8, 20:11, | 128:8, 129:3, | 107:24 | 268:19 |
| 21:14, 21:17 | 150:14, 151:16, | **firm** | **flipping** |
| **fifth** | 151:22, 190:12, | 157:11, 158:9 | 31:23, 188:8, |
| 22:14 | 191:17, 197:17, | **first** | 205:9, 254:1 |
| **figure** | 203:5, 203:9, | 8:3, 9:4, | **flood** |
| 53:23, 53:24, | 203:22, 204:2, | 11:19, 19:14, | 36:19 |
| 56:11, 74:4, | 204:5, 206:3, | 19:15, 21:24, | **flooding** |
| 99:12, 99:13, | 210:11, 212:25, | 24:5, 34:20, | 172:5 |
| 102:10, 103:22, | 228:5, 236:8, | 35:7, 35:14, | **floor** |
| 103:25, 104:4, | 257:1, 267:19, | 39:25, 41:25, | 5:12 |
| 104:8, 104:16, | 272:14, 298:8, | 42:6, 55:5, | **florida** |
| 105:1, 105:12, | 298:21 | 70:21, 72:22, | 1:2, 1:4, 1:10, |
| 107:8, 109:15, | **finding** | 79:18, 80:19, | 2:12, 3:2, 3:8, |
| 110:17, 110:23, | 86:17, 118:22, | 82:15, 82:24, | 3:18, 3:21, 4:7, |
| 113:14, 114:6, | 218:24, 219:2, | 83:12, 83:24, | 4:11, 4:16, 5:3, |
| 114:20, 151:1, | 245:19, 246:9, | 88:12, 93:9, | 5:4, 5:12, 5:17, |
| 172:7, 266:21, | 249:3, 251:24, | 100:11, 105:6, | 5:20, 25:6, |
| 292:9, 294:24 | 265:18, 265:23, | 110:22, 114:3, | 34:11, 67:4, |
| **figures** | 268:2, 290:5 | 116:19, 129:10, | 67:9, 67:13, |
| 101:5, 103:20, | **findings** | 129:11, 134:21, | 67:20, 69:21, |
| 103:21, 292:4, | 76:7, 76:8, | 138:3, 148:1, | 72:2, 76:9, |
| 297:17 | 94:11, 116:16, | 160:6, 160:16, | 84:18, 85:15, |
| **file** | 116:18, 117:10, | 166:19, 170:18, | 86:4, 86:11, |
| 210:5, 210:15, | 131:1, 133:24, | 171:20, 204:20, | 86:12, 86:14, |
| 210:16, 233:7, | 166:7, 194:3, | 205:15, 217:3, | 86:20, 86:21, |
| 236:12, 244:12, | 217:23, 218:11, | 219:13, 222:13, | 87:13, 90:9, |
| 245:24, 246:5, | 221:13, 249:9, | 229:20, 233:15, | 90:19, 103:15, |
| 250:4, 256:21, | 256:19, 266:5, | 241:22, 242:13, | 105:13, 117:17, |
| 261:16 | 267:17, 267:24 | 255:13, 256:1, | 121:9, 121:11, |
| **filed** | **finds** | 256:14, 268:24, | 123:8, 123:10, |
| 35:14 | 100:25, 158:23, | 273:21, 297:16 | 167:7, 172:4, |
| **files** | 223:10 | **fit** | 175:8, 175:15, |
| 153:15, 244:14, | **fine** | 106:24 | 176:14, 176:16, |
| 244:20, 244:24, | 42:16, 44:7, | **fitted** | 176:20, 177:15, |
| 245:4, 298:24 | 58:7, 70:11, | 296:18 | 177:17, 178:19, |
| **fill** | 131:5, 242:24, | **five** | 178:23, 179:1, |
| 96:25 | 258:24 | 86:13, 99:18, | 185:12, 187:5, |
| **final** | **fined** | 185:21, 246:1, | 187:8, 187:16, |
| 44:23 | 95:24 | 246:7 | 187:24, 218:18, |
| **finally** | **fines** | **five-minute** | 218:25, 225:2, |
| 219:25, 220:10 | 95:16 | 58:6 | 225:19, 225:23, |
| **financial** | **finish** | **fixed** | 228:14, 231:12, |
| 304:11 | 71:15, 78:3, | 145:15 | 232:6, 233:8, |
| **find** | 121:22, 146:4, | **flagler** | 233:24, 234:6, |
| 29:7, 60:5, | 160:15, 291:13 | 3:12 | 236:13, 238:13, |

239:4, 245:24,
246:24, 250:10,
250:12, 254:10,
263:12, 265:9,
265:13, 268:10,
269:4, 269:7,
270:14, 274:2,
274:5, 281:5,
283:20, 283:25,
284:4, 284:11,
293:2, 300:1
**florida's**
99:10, 100:5,
109:12, 244:12,
274:11
**floridians**
76:17, 238:24,
249:16
**fly**
32:8
**focus**
19:13, 20:24,
22:7, 84:10,
89:11, 89:22,
153:21, 154:8,
155:19, 170:22,
189:10, 246:17
**focused**
116:14, 173:13,
177:20, 180:17
**focuses**
83:12
**focusing**
140:13
**folks**
18:2, 29:23,
290:1
**follow**
53:7, 274:5
**follow-up**
12:20, 24:13,
39:24, 70:19,
107:19, 190:23,
285:8, 289:18,
292:1, 294:20
**followed**
75:8
**following**
151:14, 257:6,

264:19, 265:25
**follows**
8:6, 74:7
**footnote**
101:15, 139:7,
148:23, 156:11
**footnotes**
151:25
**foregoing**
303:4, 304:3,
304:4
**forgot**
109:25, 166:16,
209:25, 241:25,
295:19
**forgotten**
26:15, 295:25
**form**
11:5, 35:4,
47:13, 48:7,
56:8, 59:6,
90:25, 91:16,
97:21, 97:25,
120:2, 122:19,
123:24, 143:19,
149:12, 184:8,
254:21, 286:21
**formed**
59:9, 59:18,
60:24, 101:11,
200:5, 201:25
**former**
239:10
**forming**
56:4, 56:22,
57:11, 59:4,
60:17, 152:7
**forms**
37:24
**fort**
4:11
**forth**
205:9, 254:2
**forward**
14:12
**found**
122:20, 122:22,
150:6, 150:8,

150:15, 152:17,
183:25, 191:15,
191:19, 196:11,
250:8, 293:6,
295:5, 298:9,
298:19, 298:22,
300:8
**foundation**
32:13
**foundations**
27:7
**four**
150:21, 150:24,
225:4, 231:14,
246:7
**fourth**
22:25
**franchise**
128:1
**frank**
3:11
**franklin**
4:10
**fraud**
215:15, 283:19,
283:22, 283:25,
284:3, 284:8
**frequently**
272:6
**fresno**
184:21
**friday**
12:14, 12:18,
12:21, 13:1
**friend**
97:4
**front**
10:13, 10:14,
73:25, 112:6
**frozen**
92:8
**fruition**
212:24
**full**
20:25, 28:12,
29:4, 63:12,
121:6, 121:7,
123:6, 153:14,

216:22
**full-time**
182:12
**fully**
186:1
**function**
11:17, 58:17,
58:21
**fund**
182:12, 185:17
**further**
37:13, 42:12,
43:20, 69:9,
78:25, 80:13,
87:25, 113:22,
129:5, 239:15,
281:15, 284:22,
285:1, 301:10
**future**
69:2, 157:23,
158:1, 211:5,
212:5, 256:7,
282:20

**G**

**gainesville**
4:6
**gamble**
277:25
**gamut**
20:25
**gap**
250:14, 253:21
**gardens**
5:17
**garnered**
23:3
**gate**
177:9
**gave**
68:23, 133:17,
155:9, 180:2,
295:1
**gee**
186:22
**gender**
159:1
**general**
3:19, 3:20,

5:3, 5:4, 5:5,
14:24, 16:11,
90:8, 91:4,
157:15, 183:2,
245:7, 271:17,
273:24, 284:12
**generalization**
227:15
**generally**
9:1, 19:25,
28:20, 178:8,
216:13, 276:21
**genetic**
171:11
**genetics**
170:11, 171:4
**genre**
172:16, 173:15
**geographically**
181:7
**geographies**
71:24, 72:11
**geography**
181:2
**georgia**
174:7, 174:21,
174:22
**gerber**
182:13
**germane**
247:3
**getting**
26:17, 32:5,
61:20, 235:24,
278:6
**gilchrist**
3:13
**gist**
149:23
**give**
9:5, 9:15,
66:16, 82:22,
93:3, 104:18,
140:22, 151:12,
179:16, 249:23
**given**
125:1, 197:8,
221:10, 257:24,

259:14, 277:7,
303:6, 304:5
**gives**
235:19, 244:9
**giving**
30:4
**glades**
4:8
**glass**
99:17
**global**
47:14
**goal**
215:12, 275:16
**god**
39:16
**goes**
43:6, 69:9,
121:5, 121:7,
123:6, 125:15,
140:6, 161:2,
175:24, 180:9,
181:9, 195:24,
219:10, 229:16,
229:25, 256:1,
286:18, 292:5
**gold**
288:14
**gone**
125:16, 226:11,
230:20, 231:7,
241:6
**good**
8:11, 21:18,
34:1, 36:15,
56:23, 177:24,
236:20, 244:16,
279:3, 284:24,
301:13, 301:23,
301:25
**google**
151:17, 151:22,
152:2
**goose**
38:20
**gosh**
99:19, 179:24,
296:6

**gotten**
183:12
**governing**
179:19
**government**
26:5, 280:20
**governments**
27:9, 37:15
**graduate**
23:4, 169:9
**grandchildren**
174:13
**grandfather**
200:12
**grandkids**
302:5
**grant**
186:11, 186:13,
186:25
**grants**
22:19
**graphs**
101:7, 292:18,
296:12
**gray**
101:18
**great**
11:22, 13:4,
19:12, 22:2,
62:2, 62:23,
158:19, 160:18,
168:3, 185:10,
188:13, 189:13,
198:3, 236:24,
260:14, 274:20
**greater**
88:21, 102:6,
111:8, 235:19,
242:5, 248:5,
250:10, 250:20,
257:18, 269:20,
269:25, 288:22
**greatest**
225:14
**green**
182:13, 288:25
**grimmer**
6:16, 6:19,

139:2, 139:10,
147:4, 156:13,
156:18
**ground**
9:3, 167:19
**group**
2:15, 5:15,
70:17, 89:10,
147:18, 147:20,
158:25, 178:2,
179:20, 218:17,
218:19, 218:24,
219:3, 262:20,
289:1, 291:2,
291:7, 292:23,
293:3
**groups**
69:19, 69:20,
69:25, 70:1,
70:22, 70:24,
70:25, 77:21,
79:5, 83:14,
102:19, 103:5,
103:8, 105:13,
108:17, 109:4,
110:19, 111:16,
112:5, 156:6,
186:6, 186:7,
229:15, 243:15,
244:2, 266:21,
268:5, 286:20,
292:17, 292:21,
294:23
**guardians**
177:8
**guess**
21:1, 24:13,
35:12, 41:4,
41:11, 41:14,
41:25, 55:9,
118:17, 128:5,
171:22, 189:9,
190:12, 190:18,
209:17, 211:11,
211:17, 211:19,
212:5, 213:6,
263:7, 272:23,
277:21, 298:17,

302:6
**guys**
190:18

## H

**half**
129:9, 239:24,
255:13, 256:1,
256:4, 256:14,
256:15, 256:22,
279:21
**hand**
176:23, 304:14
**handful**
43:12, 150:8,
162:23, 163:1,
165:24
**handing**
97:17
**handle**
42:1, 97:16,
98:10, 301:9
**handled**
177:13
**handling**
96:12, 98:15,
165:7, 165:13
**hankins**
5:24
**hansen**
128:6, 128:7,
130:15, 162:11,
162:14, 162:17,
162:20
**hansen's**
272:12
**happen**
75:19, 135:7,
190:7, 190:21,
194:1, 211:12,
211:18, 212:1,
212:12
**happened**
91:10
**happening**
135:13
**happens**
206:9, 206:18

**happy**
70:9, 127:14,
168:1, 179:22,
182:21, 252:20,
266:17, 302:1
**hard**
22:14, 23:14,
23:15, 79:8,
191:19, 211:14,
227:13, 299:11
**hardee**
4:8
**hardworking**
256:17
**harms**
283:16
**harris**
186:14, 187:3
**hart**
1:25, 2:1,
73:22, 182:16,
304:2
**hb**
6:15, 99:10,
99:11, 100:5,
100:8, 100:11,
101:3, 109:13,
109:14, 110:16,
114:19, 265:19
**he'll**
174:9
**head**
184:19
**header**
46:9, 46:12,
249:7
**headings**
52:8
**hear**
32:23, 44:13,
55:5, 58:18,
75:25, 110:22,
123:25, 134:21,
166:11, 167:10,
202:10, 211:14,
229:19, 254:17
**heard**
70:21, 181:22,

298:18, 298:20
**hearing**
196:21
**heavily**
67:24, 117:17,
118:13
**held**
80:10, 172:22
**help**
28:12, 48:23,
56:7, 56:21,
61:9, 183:20,
223:12, 266:13
**helped**
286:19
**helpful**
12:19, 15:22,
16:5, 17:24,
24:7, 34:16,
64:7, 73:23,
78:7, 127:16,
188:20, 190:13,
191:20, 196:13,
199:6, 199:13,
199:20, 200:9,
203:5, 203:10,
203:12, 204:3,
204:5, 279:24,
294:21, 294:22
**helping**
38:13, 188:15
**hence**
207:19, 220:25
**henderson**
4:10
**hendry**
4:8
**hereby**
303:2, 304:3
**hereditary**
170:11
**hereunto**
304:13
**herron's**
13:22, 43:3,
48:2, 49:16,
49:19, 51:4,
51:7, 51:14,

52:1, 72:1,
74:22, 74:23,
88:5, 102:3,
118:6, 118:11,
125:21, 190:5,
192:2, 192:17,
192:21, 194:18,
197:25, 204:15,
204:23, 205:2,
205:10, 205:14,
205:25, 207:6,
207:12, 208:3,
212:14, 214:6,
214:17, 217:4,
217:7, 217:18,
217:21, 217:23,
219:8, 221:4,
221:9, 221:13,
222:9, 222:16,
224:19, 225:25,
227:25, 233:6,
234:18, 235:1,
236:10, 237:12,
238:3, 239:14,
245:11, 245:13,
245:18, 246:10,
247:1, 247:4,
249:5, 249:11,
250:17, 255:3,
255:15, 255:22,
257:1, 257:10,
258:4, 261:12,
267:24, 268:13,
268:20, 270:6,
273:20, 274:17,
281:8, 283:23
**herron-smith**
292:3
**hersh**
6:16, 139:2,
139:11, 147:5
**hey**
296:9
**hi**
285:6
**hiatus**
24:17, 24:19
**hibbing**
40:23, 170:20,

170:25, 171:10
**high**
41:9, 63:20,
72:13, 78:18,
131:6, 145:15,
174:24, 183:21,
183:23, 185:22,
209:23, 233:1,
269:2
**higher**
30:17, 68:3,
68:4, 68:18,
69:6, 72:8,
77:22, 78:19,
79:2, 209:14,
209:20, 217:24,
219:14, 220:25,
221:14, 221:18,
247:10, 267:24,
268:11, 280:7,
290:7, 291:9
**highlands**
3:13
**highlight**
106:23
**highlighted**
105:6
**highlighting**
62:5, 131:19,
158:4
**highlights**
157:15
**highly**
62:13
**hillsborough**
5:10
**himself**
120:10, 256:10
**hire**
172:4
**hispanic**
2:5, 3:15, 8:9,
8:16, 68:4,
69:25, 79:11,
83:4, 83:18,
83:23, 84:6,
84:14, 86:12,
101:23, 110:4,

184:23, 186:17,
206:8, 207:9,
216:25, 218:12,
243:11, 246:5,
247:8, 252:5,
261:13, 261:17,
266:23, 267:7,
269:3, 269:6,
269:17, 269:23,
270:15, 271:9,
271:15, 274:4,
285:3, 285:7,
294:6, 294:15,
300:3
**hispanics**
69:17, 70:3,
72:9, 72:17,
74:9, 75:4,
79:4, 99:12,
100:8, 101:2,
102:1, 102:6,
106:12, 106:14,
106:16, 106:18,
107:5, 107:16,
108:24, 109:15,
110:1, 110:16,
111:1, 111:8,
111:11, 114:1,
115:5, 218:5,
251:8, 261:20,
293:14
**historical**
181:9, 201:12,
201:23, 202:3
**history**
69:15, 70:7,
70:8, 70:11,
81:16, 81:20,
159:21, 179:5,
179:21, 180:9,
180:22, 186:24,
190:17, 286:1
**hold**
103:23, 107:24,
141:15, 150:21,
163:20, 196:20,
211:5, 256:8,
270:18

**holmes**
4:9
**holt**
4:10
**holtzman**
3:5
**homogenous**
147:17
**honestly**
24:11, 28:24,
162:13, 244:17
**hope**
31:12, 61:9,
64:5, 102:23,
200:12, 236:8
**hopefully**
284:16, 302:4
**host**
128:25, 130:22,
133:6
**hour**
13:6, 16:21,
17:6, 31:12,
58:5, 285:25
**hourly**
17:13
**hours**
16:6, 16:9,
16:13
**house**
103:14, 265:13,
266:1
**houston**
38:20, 39:7,
183:22
**however**
72:16, 73:11,
74:8, 79:6,
82:25, 268:2,
269:10, 276:6,
293:19
**huge**
286:14, 293:18
**hurricanes**
25:5
**hypotheses**
135:6, 199:9,
203:21, 206:25,

214:10, 230:12,
282:19, 283:3
**hypothesis**
133:10, 260:23
**hypothetical**
252:22, 253:2,
253:11, 253:18,
254:11
**hypotheticals**
252:19

---
**I**
---

**id**
6:20, 6:22,
28:13, 43:14,
128:11, 128:17,
128:18, 131:9,
138:13, 152:21,
152:24, 153:8,
153:10, 153:16,
153:19, 153:22,
154:3, 154:8,
154:12, 154:19,
154:21, 154:22,
155:3, 155:12,
155:16, 155:20,
156:1, 156:3,
156:14, 156:19,
157:10, 158:10,
158:23, 159:4,
159:5, 159:11,
159:21, 160:13,
160:20, 160:23,
161:8, 161:13,
162:5, 275:22
**idea**
70:2, 105:12,
192:11, 272:24,
279:9, 289:3
**ideas**
172:7, 274:7,
275:11
**identification**
12:1, 18:3,
29:25, 57:5,
57:18, 65:12,
103:11, 139:13,
156:21, 156:25,

159:14, 178:12,
188:24, 204:19,
217:10, 286:10
**identify**
55:2, 55:7
**identifying**
145:5, 183:13
**ids**
161:4, 161:18
**illustrate**
254:11
**illustrative**
294:5
**imagine**
40:15, 112:8,
233:16, 252:6
**immediate**
154:14
**impact**
63:15, 83:3,
83:12, 83:13,
83:15, 83:22,
84:4, 84:13,
85:1, 85:3,
86:2, 86:3,
86:5, 86:9,
87:8, 87:19,
93:15, 99:11,
101:22, 109:3,
109:14, 109:25,
110:15, 110:18,
114:25, 115:4,
116:15, 116:20,
117:8, 117:22,
121:17, 126:5,
127:11, 131:13,
137:7, 137:10,
140:14, 154:20,
174:19, 187:20,
190:15, 191:21,
192:5, 196:10,
197:11, 198:23,
199:3, 199:6,
199:20, 203:16,
205:16, 211:7,
212:8, 212:23,
213:9, 213:12,
221:6, 223:15,

225:18, 225:22,
226:7, 228:13,
229:18, 230:1,
230:3, 230:14,
231:20, 232:13,
255:24, 276:1
**impacted**
123:15, 233:4
**impacts**
83:14, 96:12,
190:9, 190:11,
206:6, 206:7,
216:24, 216:25,
223:13
**impairs**
84:5
**impart**
128:3
**impede**
78:11, 97:7,
115:20, 125:8,
125:18, 125:23,
132:14, 157:3
**impeded**
72:18, 72:24,
74:3, 74:10,
74:15, 79:12,
91:20, 101:21
**impedes**
69:10, 79:5,
118:25, 119:10
**impersonation**
215:15
**implement**
124:24
**implementation**
14:4, 14:10,
27:10, 78:11,
85:9, 88:17,
89:24, 90:22,
116:6, 164:17,
164:19, 190:8,
208:13, 221:17,
226:4, 242:9,
243:22, 252:9,
289:5, 289:7
**implemented**
79:9, 90:4,

90:23, 91:2,
91:19, 92:5,
129:5, 206:10,
286:25, 292:6
**implications**
157:22, 158:1
**implied**
163:7
**implies**
70:3, 119:9
**imply**
123:14
**implying**
239:10, 269:21
**important**
15:16, 68:17,
89:15, 89:19,
111:23, 111:24,
251:19, 289:15,
289:20, 294:11,
298:3
**importantly**
78:22
**impose**
128:17, 215:3
**imposed**
95:17, 95:18,
95:21, 95:22,
219:25, 220:2,
274:11
**imposes**
119:9
**imposition**
272:20, 273:2
**impossible**
22:7, 91:6
**imprecise**
69:2
**imprecisely**
140:9
**impressed**
180:16, 180:23,
180:24
**impression**
186:2, 201:20
**improve**
227:13
**in-person**
143:20, 177:19

**inadequate**
164:19
**inappropriate**
191:23, 242:10,
242:20, 242:21,
248:8
**incestuous**
300:21
**incidence**
242:10, 248:9,
268:14
**inclined**
69:24, 145:17
**include**
46:24, 70:9,
77:11, 81:17,
118:11, 152:4,
177:22, 185:19,
194:4, 280:10,
287:24
**included**
49:15, 59:3,
60:6, 60:22,
75:13, 77:14,
82:1, 95:5,
176:20, 177:16,
181:5, 199:5,
199:13, 218:1,
250:1, 279:14,
280:24
**includes**
76:8, 117:11,
138:17, 218:7,
244:7
**including**
9:10, 16:9,
19:20, 24:15,
28:4, 54:13,
75:5, 97:17,
119:17, 121:3,
161:25, 216:12,
270:20
**inclusion**
44:10
**incomplete**
19:1, 137:8,
137:13, 215:5,
274:16

incompleteness
214:23
inconsistent
60:5, 60:21
incorrect
18:25, 19:1,
245:12, 259:23
incorrectly
95:24
increase
88:23, 93:11,
119:16, 120:12,
121:1, 121:13,
122:6, 123:12,
124:24, 125:16,
127:18, 128:11,
128:19, 130:5,
130:19, 130:23,
138:7, 143:15,
144:9, 161:14,
165:1, 207:16,
215:2, 215:10,
216:7, 219:22,
264:24, 273:13,
287:17, 287:19,
289:8, 291:14
increased
95:16, 220:6,
227:16, 273:9,
281:4, 281:6,
286:22
increases
127:20, 127:21,
150:6, 152:17
increasing
132:11
incumbency
170:23
incumbent
228:21
incur
264:19
incurred
95:12
indeed
238:10, 246:18
independent
13:19, 26:23,

64:15, 245:16,
275:8
indiana
4:15
indicate
225:1
indicated
189:9, 194:25,
220:12
indicates
8:24, 30:13
indirect
93:14
individual
87:9, 96:14
individually
73:6
individuals
20:17, 26:12,
27:7, 73:8,
98:24, 121:10,
123:9, 182:23,
286:20
infer
212:4
inference
125:13
inferring
122:12
information
14:9, 14:24,
15:2, 15:6,
15:9, 15:17,
15:20, 15:23,
16:2, 56:4,
56:21, 63:21,
91:11, 197:5,
211:12, 257:2,
279:14, 285:9
informing
168:20
inherently
130:1
initially
45:8
injunction
168:19
insane
299:8

insight
186:16, 186:20
inspected
102:13
instance
22:16, 128:13,
153:9, 154:18,
166:19, 227:11,
272:11
instances
27:6, 279:18
institutional
128:2
institutions
61:21
instructed
85:18, 194:19
instruction
195:8
instructions
195:13
instructs
9:20
integrity
216:3, 283:13
intend
59:14
intended
138:6, 215:2,
215:10, 216:7
intent
199:10, 199:14,
199:17, 199:24,
200:4, 200:18,
200:24, 201:4,
201:8, 202:19,
215:21
intention
215:12
intentional
202:7, 202:9,
202:11, 202:13,
202:22, 203:2,
203:5, 204:9
intentions
215:17, 216:1
interact
96:13, 96:20

interacting
280:1
interest
281:23, 282:3,
304:11
interested
35:8, 35:9,
49:23, 131:4,
171:4, 180:18
interesting
23:15, 28:11,
154:17, 154:23,
174:21, 240:9
internet
13:19, 13:24,
285:22
interpret
146:13
interpretation
97:12, 98:13,
122:9, 206:16
interrupt
99:17
interruption
172:21, 196:23
intersect
291:9, 291:11
intervening
131:13, 273:5,
273:10, 275:24
interviews
56:7, 56:9,
56:13, 56:15
intrinsic
278:22
intro
169:7
introduce
8:14
introduction
21:25
introductory
93:20, 94:9,
169:5
intuitions
212:23
intuitive
129:5

**invented**
255:9
**investigate**
220:7
**investigations**
198:21
**investigator**
177:12
**invited**
173:18
**invoke**
274:7, 275:11,
275:13
**involve**
28:18, 180:21,
279:14
**involved**
27:21, 28:3,
28:12, 106:22,
174:4, 175:5,
245:6
**involving**
28:1, 28:8,
36:16, 202:13
**irrational**
277:1
**issue**
22:12, 28:15,
97:13, 100:12,
118:9, 118:14,
120:15, 156:2,
202:19, 206:7,
206:13, 206:16,
214:19, 214:22,
216:24, 221:25,
228:8, 233:9,
233:11, 233:13,
241:1, 248:20,
248:22, 248:25,
249:2, 250:21,
266:11, 297:22,
298:20, 299:15
**issues**
14:4, 22:5,
28:23, 36:18,
41:24, 141:24,
158:5, 167:11,
178:1, 192:1,

196:9, 203:16,
258:20, 259:5
**itself**
22:1, 23:13

---
**J**
---

**jacket**
31:8
**january**
1:16, 8:12,
224:24, 225:4,
231:15, 261:10,
304:15, 304:17
**jared**
4:18
**jayla**
26:18, 65:5
**jefferson**
3:13
**jerry**
4:8
**jim**
170:20
**jindia**
5:21
**job**
1:23, 206:25
**jogged**
51:15
**john**
12:15, 13:12,
34:1, 35:6,
35:25, 39:3,
39:11, 39:18,
39:22, 40:16,
40:23, 45:3,
49:5, 50:7,
50:17, 51:18,
52:4, 52:7,
53:6, 106:21,
107:6, 170:25,
171:1, 171:3,
171:10, 172:14,
173:20, 174:1,
174:3, 175:5,
175:8, 176:2,
189:22, 191:6,
205:23, 228:20,

239:25, 250:19,
252:8, 260:18,
273:8, 295:19,
295:20, 296:9,
297:13, 297:16,
297:23, 297:25,
299:13, 299:16,
300:24
**johnson**
2:13, 6:4,
15:14, 167:8,
167:12, 172:23,
173:4, 188:14,
188:21, 196:22,
197:1, 197:3,
236:19, 236:24,
237:3, 237:6,
241:24, 284:13,
284:21, 301:19,
301:21
**joint**
36:2, 36:22
**jonas**
4:13
**josefiak**
3:6
**josh**
12:13, 13:9,
14:8, 97:23,
301:7
**josh's**
13:25
**joshua**
3:4, 7:12,
173:19, 286:11
**journal**
56:18, 61:20,
110:23, 151:21,
298:8, 298:24
**journals**
19:24, 151:19
**judgment**
145:15, 198:13
**judgments**
230:10
**judicial**
33:15
**julie**
4:18

**july**
224:25, 225:3,
231:13, 255:7
**june**
18:15, 18:19,
19:6, 24:6,
224:25, 225:5,
231:15
**jurisdiction**
38:19, 164:5
**jurisdictions**
26:2, 37:22,
176:17, 176:20,
177:15
**justify**
191:15
**justin**
146:8

---
**K**
---

**kahn**
4:18
**keenan**
2:7, 6:3, 6:5,
8:10, 8:14,
14:17, 58:8,
58:12, 58:14,
73:24, 78:4,
97:1, 97:15,
99:16, 99:19,
99:23, 100:1,
100:3, 104:2,
165:17, 165:23,
167:3, 174:1,
176:4, 180:4,
180:15, 213:10,
215:7, 219:12,
270:11, 271:7,
285:5, 285:7,
301:7, 301:14,
301:17, 301:22
**keenan's**
211:23
**keep**
11:4, 11:7,
22:23, 23:24,
29:17, 42:12,
42:15, 42:16,

47:22, 51:20,
53:11, 55:13,
87:24, 88:1,
104:2, 106:23,
121:5, 124:5,
124:7, 126:15,
134:3, 134:7,
136:4
**keeps**
183:6
**kennedy**
5:11
**kept**
173:1
**kevin**
288:24
**key**
115:3, 206:7,
206:12, 206:13,
206:16, 216:24,
221:24, 259:2,
269:11
**kim**
4:3
**kind**
25:19, 41:17,
50:14, 56:9,
61:8, 63:18,
87:17, 170:16,
180:1, 182:22,
191:14, 241:17,
270:23, 288:10,
291:11, 291:17,
299:15, 299:20
**kinds**
93:14, 95:8
**knew**
29:1, 34:14,
174:25, 175:8,
175:11, 196:5,
196:6
**knock**
279:10
**knowing**
228:15, 234:25,
236:4, 254:22,
254:24, 276:7,
291:23

**knowledge**
31:16, 33:15,
33:16, 34:12,
36:7, 48:24,
55:12, 75:9,
92:16, 127:7,
144:4, 144:6,
144:13, 144:16,
148:6, 148:12,
153:1, 164:9,
180:8, 209:16,
209:18, 209:19,
214:16, 245:7,
273:18, 279:6,
284:6, 285:19
**knowledgeable**
173:10
**known**
21:3, 40:16,
40:23, 63:5,
128:14, 170:20,
299:8
**knows**
172:16, 173:8,
173:16, 215:1
**koon**
5:14

### L

**labeled**
24:3, 57:3,
157:21
**lack**
238:21
**lacking**
119:19, 279:7
**lakota**
64:24
**language**
52:4, 125:10,
125:11, 130:7,
137:1
**large**
25:1, 147:16,
147:19, 161:23,
175:2, 186:14,
296:20, 296:25
**larger**
115:24, 299:25

**larocca**
151:2
**last**
21:21, 31:16,
79:15, 83:17,
106:4, 114:6,
123:5, 124:4,
124:13, 124:23,
146:17, 147:8,
147:15, 161:12,
163:17, 166:15,
182:14, 197:20,
205:1, 205:3,
205:5, 216:21,
217:19, 227:20,
246:18, 256:17
**late**
31:4, 31:18,
34:19, 35:19,
40:25, 105:14,
105:15, 171:23
**later**
13:15, 68:22,
71:14, 163:12,
182:16, 234:22,
272:16
**latter**
86:7, 226:15,
239:12
**law**
2:15, 14:9,
63:15, 63:22,
64:4, 75:20,
92:3, 92:5,
92:9, 92:19,
92:21, 95:23,
96:22, 97:13,
98:3, 98:13,
98:16, 98:21,
100:14, 101:21,
128:15, 145:2,
145:8, 145:9,
145:22, 145:23,
146:9, 146:10,
146:20, 146:21,
147:10, 153:16,
172:16, 172:17,
174:19, 175:7,

175:14, 200:19,
200:24, 201:3,
201:4, 201:6,
201:8, 206:14,
206:22, 211:18,
213:9, 213:25,
215:9, 216:7,
218:20, 221:25,
223:13, 227:16,
229:16, 229:25,
230:4, 241:2,
249:1, 250:22,
250:23, 252:9,
253:10, 253:20,
260:11, 260:14,
273:2, 276:12,
279:19, 281:13,
286:19, 292:16,
293:2, 294:9
**laws**
6:20, 6:23,
27:21, 31:15,
43:15, 46:4,
46:13, 61:23,
63:11, 100:12,
119:14, 120:11,
120:25, 130:22,
131:10, 131:14,
135:9, 137:22,
138:6, 138:24,
139:22, 140:2,
140:19, 140:25,
141:4, 142:4,
142:10, 142:20,
142:24, 143:2,
144:23, 148:4,
148:9, 148:12,
153:22, 155:25,
156:14, 156:20,
156:25, 157:2,
157:10, 158:10,
158:24, 159:4,
159:11, 159:21,
160:23, 161:8,
161:13, 161:17,
162:1, 162:5,
163:18, 164:7,
164:14, 173:13,

175:11, 176:14,
177:18, 178:20,
181:18, 212:7,
212:22, 213:24,
214:11, 214:14,
215:1, 222:20,
250:22, 275:22,
275:25
**lawsuit**
26:16, 26:25,
32:16, 37:9
**lawsuits**
27:8, 37:21,
174:2
**lawyer**
132:18
**lawyers**
9:9, 49:8, 49:9
**lay**
66:21
**lead**
93:12, 119:16,
120:12, 121:2,
130:5, 130:20,
135:5, 276:10
**leap**
122:2
**learn**
33:24, 71:7
**least**
8:21, 16:9,
22:18, 55:12,
62:14, 133:21,
153:20, 179:7,
214:7, 221:19,
228:19, 245:19,
260:4, 262:15,
277:7, 281:17,
286:14, 298:12,
299:9
**leave**
111:13, 277:3,
277:19
**lectured**
169:16, 169:20,
169:23
**lectures**
170:2

**led**
180:24, 290:20
**lee**
133:22
**left**
112:1, 188:19
**legal**
26:21, 127:25,
132:12
**legally**
234:2
**legislation**
128:9, 137:10
**legislative**
199:14, 199:17,
199:20, 199:24,
200:4, 200:18,
200:24, 201:4,
201:7, 282:8,
282:12
**legislature**
200:17, 200:23,
201:3
**legitimate**
137:17
**leigh**
5:23
**leighley**
132:4, 133:19,
133:21
**length**
198:3
**less**
17:14, 17:15,
17:17, 28:18,
47:24, 86:20,
227:8, 239:11,
239:21, 240:17,
264:23, 278:2,
280:17, 290:21
**lessen**
130:18, 214:9
**lessened**
130:18
**let's**
43:1, 48:8,
48:10, 61:11,
80:12, 120:3,

129:23, 134:3,
197:1, 236:20,
241:20, 246:10,
249:5, 252:17,
257:10, 270:5,
295:12
**letter**
125:11
**level**
61:12, 63:20,
169:9
**levels**
228:3
**levy**
4:9
**lewis**
4:14
**liberties**
2:4, 8:8, 285:2
**license**
155:2, 240:22,
240:24, 263:11
**lichtman**
7:9, 48:11,
50:21, 114:14,
189:4, 191:14,
191:23, 194:6,
197:25, 198:9,
199:1, 199:5,
199:13, 200:3,
203:10, 215:16
**lichtman's**
48:1, 49:15,
49:18, 50:7,
50:18, 52:13,
167:17, 188:15,
189:10, 189:19,
189:25, 191:11,
191:20, 192:3,
192:8, 192:13,
192:16, 192:20,
193:5, 193:10,
193:14, 193:19,
193:21, 194:16,
195:17, 196:8,
196:19, 197:6,
197:17, 198:10,
199:19, 201:19,

202:2, 282:20
**life**
216:18
**lifetime**
8:22
**light**
81:18, 101:18
**liked**
293:23
**likelihood**
69:10, 135:9,
135:12, 264:24,
268:18, 269:24,
270:2, 272:22,
273:3, 289:19
**likely**
67:19, 72:3,
72:4, 86:13,
108:25, 121:12,
123:11, 130:5,
130:19, 135:6,
136:15, 136:20,
136:22, 136:25,
183:14, 212:12,
218:6, 218:12,
282:16, 290:21
**limit**
120:18, 168:10
**limitation**
211:2, 211:9
**limitations**
210:8, 210:12,
211:8
**limited**
33:4, 113:15,
113:19, 114:4,
114:5, 114:7,
114:10, 114:22,
115:8, 115:13
**limiting**
115:19
**limits**
223:13
**linda**
65:3
**line**
29:12, 29:20,
74:1, 82:19,

101:24, 112:7,
114:9, 119:20,
135:19, 135:22,
135:24, 136:1,
174:10, 193:23,
290:19, 290:23,
296:18
**linear**
17:19
**lines**
101:10, 101:19,
102:13, 102:17,
286:17, 290:24,
295:13
**link**
290:9
**linked**
139:6
**links**
231:7, 259:19,
259:21
**lisa**
4:14, 184:21
**list**
19:18, 21:14,
23:21, 31:13,
194:4
**listed**
18:20, 20:4,
22:17, 22:20,
31:13, 32:13,
70:22, 71:25,
225:16
**listing**
20:8, 55:17
**lists**
185:25
**literally**
73:1, 171:5
**literature**
34:12, 60:20,
94:20, 127:24,
129:12, 130:17,
151:17, 174:18,
175:1, 182:5,
212:3, 212:6,
214:23, 214:24,
215:1, 215:6,

216:14, 223:10,
273:25
**litigation**
3:19, 5:6,
5:10, 19:4,
36:3, 36:13,
36:22, 47:3,
58:17, 58:21,
64:18, 92:8,
92:10, 92:12,
167:14, 273:25
**little**
18:11, 22:22,
28:9, 29:15,
29:18, 38:16,
42:9, 42:12,
47:24, 48:3,
51:16, 58:5,
71:14, 78:1,
80:13, 87:24,
87:25, 101:14,
102:10, 104:12,
107:9, 113:22,
132:15, 136:5,
159:25, 161:4,
188:7, 191:19,
200:9, 268:24,
299:15, 300:20
**live**
279:4
**living**
76:22, 117:15,
118:2
**llp**
2:15
**local**
27:9, 177:11
**location**
164:4, 277:23,
279:1
**log**
179:9
**logic**
259:18
**logical**
125:3, 176:1,
218:22, 263:21
**long**
10:7, 13:4,

21:15, 24:14,
35:2, 39:16,
299:1
**longer**
97:15, 114:19,
131:15, 164:21,
213:8, 262:7,
272:2, 273:4
**look**
16:8, 17:2,
18:9, 21:22,
22:25, 24:4,
27:3, 28:2,
34:21, 35:5,
35:15, 35:19,
39:12, 66:12,
80:15, 81:10,
85:17, 85:25,
94:1, 102:10,
105:5, 110:22,
118:10, 149:2,
160:14, 161:11,
172:24, 188:9,
189:13, 189:14,
204:20, 205:4,
205:11, 206:5,
217:6, 224:18,
227:9, 237:4,
237:9, 238:19,
241:20, 241:22,
246:10, 247:17,
249:5, 249:18,
252:18, 254:12,
255:4, 256:24,
257:10, 257:11,
261:5, 261:7,
262:18, 263:18,
267:22, 268:20,
271:2, 271:25,
273:19, 279:16,
286:12, 288:7,
291:11
**looked**
15:13, 30:7,
30:14, 66:3,
71:23, 75:10,
81:14, 101:23,
105:20, 109:17,

110:24, 132:16,
148:25, 171:6,
205:3, 232:9,
263:17, 263:24,
265:12, 270:21,
279:22, 279:25,
288:3, 296:10,
296:11
**looking**
22:16, 23:11,
62:6, 63:24,
85:12, 85:13,
89:14, 96:3,
103:20, 104:22,
105:1, 116:17,
125:11, 125:12,
136:9, 188:4,
188:5, 188:6,
216:21, 226:22,
226:24, 231:10,
238:4, 243:4,
250:6, 289:20,
289:22, 297:17,
300:10
**looks**
10:12, 18:14,
23:21, 39:15,
40:1, 94:8,
105:19, 112:9,
133:6, 148:18,
293:15, 294:13
**loosely**
21:8, 63:10
**loses**
140:3
**lot**
9:9, 23:9,
28:8, 35:22,
55:10, 63:12,
72:21, 114:13,
153:7, 171:19,
172:6, 173:22,
174:3, 175:3,
175:9, 179:10,
182:18, 190:17,
205:8, 291:2,
291:5
**lots**
145:17

loud
143:13
low
277:20, 280:15
lower
18:12, 30:17,
88:16, 89:23,
128:3, 155:15,
206:20, 209:20,
227:6, 227:7,
233:2, 280:25
lowest
276:22
lunch
158:14, 163:3,
165:18, 173:3

**M**

machine
21:10
made
42:3, 44:4,
44:9, 44:23,
45:3, 45:13,
46:21, 95:6,
95:7, 95:9,
102:16, 129:16,
134:15, 134:18,
134:24, 135:1,
135:8, 135:10,
135:21, 136:21,
157:1, 166:20,
166:25, 194:1,
195:25, 209:6,
211:17, 215:21,
239:7, 240:6,
251:16, 254:10,
294:6, 294:14
madison
3:13
maf
1:9, 1:10, 1:11
magnitude
107:13, 225:15,
296:23
mail
143:21, 277:11,
277:13, 277:16,

277:18, 278:20
mail-in
21:5, 32:17,
136:13, 153:25,
154:3, 154:5
mailbox
277:19
main
105:12
major
42:21, 42:24,
43:21, 185:21
majority
37:25, 39:21,
150:13, 151:10,
151:11, 151:13,
151:15, 152:10,
153:15
make
9:6, 11:16,
14:16, 19:13,
25:20, 27:19,
39:25, 41:22,
47:24, 53:12,
62:18, 78:18,
81:12, 83:9,
104:13, 128:16,
136:4, 153:4,
180:24, 183:1,
192:15, 208:19,
211:5, 212:4,
212:11, 215:19,
228:16, 229:6,
230:10, 230:12,
239:3, 243:5,
260:3, 263:22,
270:22, 287:10,
288:9, 288:15,
289:2, 290:13,
290:14, 292:14,
296:21, 297:18,
298:17, 301:17
makeba
2:14, 188:14,
237:6
makes
91:6, 127:1,
127:10, 127:18,

258:10, 274:20,
290:17
making
132:5, 166:24,
167:1, 177:10,
184:3, 185:5,
211:11, 211:25,
227:15, 287:21,
290:6, 290:10,
290:17, 290:20,
295:11
many
8:19, 10:14,
13:1, 16:6,
27:6, 27:20,
28:22, 31:1,
41:2, 76:9,
76:21, 170:1,
171:9, 180:20,
185:21, 197:11,
201:18, 203:22,
213:23, 215:1,
223:10, 233:15,
234:2, 236:4,
243:13, 264:1,
275:24, 280:23
marcus
4:18
marginal
269:11, 269:22,
269:25
mari
3:11
maricopa
175:9
mark
27:23, 65:3,
171:9, 188:21,
204:16
markarian
5:15
marked
6:24, 7:6,
12:1, 18:3,
29:20, 29:24,
57:5, 57:18,
65:11, 103:11,
135:16, 139:13,

156:21, 159:14,
188:23, 189:15,
204:18, 217:9,
286:6, 286:9
marshal
230:22
marshall
186:9
maryland
304:22
masse
253:6
master's
169:6
matched
207:15
material
43:24, 60:21,
267:14
materials
168:20, 199:5,
199:12, 199:20
matt
4:20
matter
11:5, 24:23,
56:16, 119:6,
125:24, 219:3,
291:21, 293:20
matters
20:2
maybe
14:21, 15:22,
22:14, 31:1,
34:19, 45:17,
47:14, 49:2,
73:22, 78:3,
110:21, 118:23,
122:7, 146:16,
147:7, 149:9,
170:1, 191:18,
211:25, 232:10,
236:20, 239:25,
247:21, 256:3,
263:18, 275:3,
284:14, 291:7,
298:20, 299:15
mayer
148:21

**mccullough**
65:4
**mcnulty**
132:3
**mean**
16:14, 18:11,
19:21, 20:11,
23:14, 23:15,
25:18, 28:22,
30:13, 30:19,
36:12, 37:17,
39:3, 39:6,
40:6, 45:10,
56:10, 61:16,
83:10, 85:13,
88:6, 89:9,
113:18, 115:15,
120:9, 125:10,
126:25, 127:3,
130:6, 137:18,
138:17, 143:20,
148:16, 151:10,
151:12, 152:9,
155:11, 163:8,
168:15, 169:24,
180:14, 181:25,
184:14, 190:1,
191:3, 191:5,
191:9, 191:25,
193:23, 206:18,
212:15, 216:3,
223:6, 252:25,
270:24, 272:9,
274:22, 287:14,
287:17, 291:12,
292:16, 295:22,
299:5
**meaning**
266:18
**means**
42:24, 84:11,
128:22, 137:17,
146:10, 191:10,
263:3, 291:17
**measure**
23:1, 62:9,
62:20, 236:4,
242:10, 244:3,

248:8
**measurement**
158:5
**measures**
52:3, 52:9,
133:11
**measuring**
286:14
**mechanics**
180:18
**mechanism**
70:5
**mechanisms**
21:5
**mediated**
138:22
**medicine**
27:23, 65:3
**meeting**
12:13, 13:4,
13:9
**megan**
2:7, 8:14,
97:1, 97:15,
285:6
**melissa**
186:9
**member**
37:23, 171:1
**members**
140:9, 218:25
**memory**
28:24, 29:11,
30:14, 44:8,
51:3, 51:15
**menger**
23:5, 61:25,
62:1, 62:11,
142:22, 277:6
**menlo**
184:22
**mention**
27:3, 84:1,
186:9, 207:13,
214:17, 265:15,
278:24, 296:23
**mentioned**
12:20, 13:8,

19:2, 19:16,
22:2, 24:21,
25:10, 28:6,
36:17, 49:4,
56:24, 57:13,
61:24, 90:14,
129:10, 168:14,
184:11, 184:17,
187:5, 187:12,
187:13, 189:4,
190:24, 197:19,
198:17, 215:6,
237:11, 254:3,
260:10, 283:1,
287:8
**mentions**
16:20
**merely**
227:7, 256:2
**messaging**
10:25, 11:4
**met**
13:1, 40:22
**method**
21:10, 63:14,
183:9, 210:6,
210:17, 226:8,
234:13, 234:14,
234:16, 234:20,
235:4, 235:5,
235:8, 235:10,
235:16, 235:18,
239:11, 242:4,
242:12, 248:10,
250:13, 262:7,
264:18, 264:22,
276:22, 280:15
**methodology**
58:4, 61:6,
61:7, 61:13,
61:22, 62:8,
62:23, 63:3,
63:4, 224:10,
224:15, 253:8,
254:25, 259:8,
260:8, 282:22
**methods**
185:11, 206:23,

207:10, 219:23,
221:23, 223:24,
225:16, 238:12,
238:17, 246:23,
262:9, 262:25,
264:4, 264:25,
265:9, 280:18
**mexico**
175:11
**mi**
31:24, 69:20,
70:22, 185:18,
185:20, 187:13,
187:15
**miami**
177:4
**mic**
211:14
**michael**
208:13, 214:6,
228:8, 228:21,
230:2, 230:8,
232:9, 234:9,
234:18, 234:25,
235:20, 245:1,
251:4, 251:16,
252:2, 253:15,
258:21, 258:24,
259:3, 275:5,
276:3, 279:15,
280:24, 290:24,
293:6, 293:11,
299:5
**michael's**
211:8, 271:1,
279:15, 295:22
**mid**
31:17, 39:12
**midterm**
161:16, 275:3
**might**
11:11, 21:12,
27:3, 34:12,
34:15, 35:17,
41:9, 61:10,
64:20, 73:23,
75:4, 75:14,
75:19, 78:7,

81:12, 81:13,
97:12, 135:6,
137:10, 150:21,
152:4, 155:13,
155:14, 160:8,
162:25, 175:20,
188:7, 190:7,
190:15, 190:21,
191:18, 194:1,
200:8, 202:16,
206:4, 207:2,
207:21, 208:13,
209:22, 212:12,
223:16, 224:1,
228:4, 240:25,
243:25, 247:8,
254:12, 263:22,
266:13, 273:9,
273:12, 275:14,
275:25, 279:10,
284:23, 300:5,
301:7

**mike**
260:18, 301:3

**million**
117:16

**million-dollar**
186:13

**mind**
25:3, 32:11,
38:12, 184:5,
185:18, 188:15,
237:6, 271:2

**mindy**
2:13, 167:5,
167:12, 183:10,
183:11, 188:20,
301:18

**minimal**
138:8

**minorities**
157:1, 241:16

**minority**
238:23, 239:2,
239:6, 239:10,
241:17

**minute**
19:13, 137:12,

146:6, 147:14,
284:14, 297:4,
301:1

**minutes**
13:7, 99:18,
163:5, 193:18,
222:12, 236:21,
265:7, 285:24

**misread**
247:21

**misrepresenting**
210:24

**missed**
300:12

**missing**
24:6, 52:3,
52:8, 250:12,
260:2, 276:10

**misspoke**
37:20

**mistaken**
270:24

**misunderstood**
146:16, 147:7

**mitigate**
21:12, 164:17

**mitigating**
214:3, 215:4,
272:20, 275:13,
275:24

**mitigations**
172:6

**mix**
27:14, 275:3

**mobilize**
186:12

**mode**
88:24, 237:19,
237:20

**model**
237:16

**modeling**
144:23

**modern**
140:7

**modes**
21:1, 75:5,
75:10, 206:24,

263:9, 263:10,
280:24

**modest**
140:3, 149:5

**modestly**
171:14

**moment**
9:15, 66:16,
73:16, 82:22,
105:24, 210:23,
271:7

**money**
186:1

**monroe**
3:7, 4:11

**month**
252:16, 279:20

**month-by-month**
228:1

**monthly**
228:8, 230:9,
256:13

**months**
179:24, 180:1,
224:24, 224:25,
232:7, 233:3,
279:21, 286:24

**more**
8:24, 13:15,
17:14, 17:16,
28:1, 36:21,
39:24, 41:6,
41:8, 41:9,
41:22, 44:8,
46:22, 48:3,
61:15, 72:4,
74:24, 78:21,
86:12, 86:13,
88:1, 88:2,
97:11, 105:21,
108:25, 117:16,
120:22, 122:21,
124:19, 124:21,
125:4, 131:12,
137:1, 149:9,
152:3, 152:4,
157:15, 158:13,
158:16, 160:12,

160:22, 161:17,
162:24, 163:5,
170:10, 171:14,
174:5, 174:11,
174:18, 176:7,
179:5, 183:13,
183:14, 184:16,
191:13, 210:2,
213:1, 218:5,
218:12, 221:12,
228:23, 236:1,
236:8, 240:17,
259:3, 263:18,
270:16, 272:18,
272:19, 278:3,
279:8, 279:13,
279:14, 290:25,
291:1, 291:25,
297:2, 301:19

**morning**
8:11, 167:20,
168:6, 180:4,
266:11

**morse**
3:18

**most**
26:1, 67:24,
86:21, 117:17,
128:22, 131:15,
132:24, 132:25,
133:1, 133:4,
179:5, 191:10,
213:20, 229:10,
232:5, 251:19,
277:8, 277:12,
278:10

**mostly**
52:13, 55:25,
56:11

**mother**
183:10

**motivating**
278:18

**motor**
75:6, 186:5,
207:4, 207:16

**move**
82:18, 93:1,

113:12, 126:3,
144:21, 204:14,
267:21, 291:6
**moving**
14:12, 99:7,
137:20, 218:16
**moynihan**
148:21
**much**
8:13, 12:16,
16:25, 22:3,
24:20, 26:4,
28:1, 30:6,
94:8, 122:7,
142:23, 171:14,
174:18, 175:7,
219:11, 239:23,
246:7, 252:20,
272:18, 288:22,
296:18, 299:6,
299:25, 301:11
**multi-faceted**
215:12
**multi-jurisdicti-
on**
176:16
**multidistrict**
178:17
**multimedia**
185:1
**multiple**
216:1, 277:24
**multistate**
176:15
**municipal**
26:1, 38:15
**municipalities**
37:15
**must**
226:15, 243:16,
295:19
**mute**
138:23
**mutually**
196:3
**myers**
4:11
**myopic**
299:15

**myself**
8:14, 22:1,
39:19, 51:24,
96:25, 168:10,
177:13, 179:11

## N

**naacp**
1:6, 2:12,
26:13, 26:16,
26:21, 69:20,
70:23, 167:7,
167:13, 285:10,
287:8
**nagler**
132:4, 133:19
**name**
8:14, 13:11,
110:1, 167:12,
174:16, 176:25,
182:14, 182:17,
194:8, 300:18
**named**
182:23
**namely**
166:22
**names**
20:9, 179:13,
245:10, 293:25
**narrative**
194:15, 194:17,
195:3, 195:16,
196:1, 196:12,
197:25
**narratives**
196:19
**narrow**
61:9, 140:7,
206:9
**narrowed**
253:21
**narrower**
206:15
**national**
170:25, 183:19
**nationwide**
159:12
**nature**
16:2, 16:15,

35:10, 45:20,
170:14, 209:21
**ndc**
38:4, 38:11
**necessarily**
98:7, 123:14,
133:8, 219:21,
223:15
**necessary**
15:21, 35:4,
230:23
**need**
9:5, 10:5,
19:3, 63:21,
63:24, 64:3,
66:14, 75:23,
79:25, 88:4,
120:10, 143:12,
163:8, 163:14,
167:24, 174:9,
188:9, 188:25,
195:14, 195:25,
205:11, 211:13,
229:16, 229:24,
242:25, 249:24,
252:20, 263:18,
266:16, 271:24,
297:22
**needed**
15:17, 155:1,
197:9, 213:3,
229:7, 258:15,
260:3
**needing**
172:24
**needs**
19:5, 32:15,
88:12, 211:1
**negative**
128:23, 132:9,
150:15, 157:9,
158:24, 165:2,
190:9, 215:17,
225:7, 225:14,
257:16, 257:17,
268:16, 290:4,
293:12
**negotiating**
27:8

**neighborhood**
279:4
**neighbors**
279:2, 280:5
**neither**
83:1, 261:25,
304:9
**net**
72:8
**never**
31:6, 31:8,
31:15, 32:9,
75:9, 75:10,
173:14, 210:23,
254:7, 254:8,
271:7
**nevertheless**
132:20, 270:17
**new**
12:18, 37:12,
95:22, 154:1,
168:10, 175:10,
190:3, 197:10,
198:11, 225:1,
231:12, 231:22,
231:24, 232:22,
232:23, 232:24,
233:7, 247:17,
250:2, 257:12,
281:24, 302:1
**next**
17:25, 26:3,
29:15, 66:11,
93:1, 98:22,
106:10, 134:13,
136:5, 140:1,
148:16, 152:21,
158:1, 161:21,
167:5, 183:10,
188:18, 189:14,
200:16, 217:8,
224:18, 239:16,
241:21, 249:19,
249:25, 250:6,
261:7
**nice**
200:13, 203:21
**nicest**
189:9, 190:14,

196:15
**nickerson**
288:16, 288:24
**nickerson's**
182:10
**nine**
268:6
**nine-digit**
28:13, 29:1,
30:16
**noah**
5:3
**nobody**
155:1, 294:10
**non**
220:25
**non-anglos**
156:7
**non-citizen**
279:10
**non-citizens**
95:14
**non-consequential**
138:9, 156:5,
251:24, 251:25
**non-disparate**
254:12
**non-hispanic**
109:1, 217:1,
218:7
**non-intuitive**
130:25, 133:24
**non-partisan**
179:20
**non-presidential**
235:25
**non-published**
55:13, 56:19
**non-significant**
293:9
**non-trivial**
67:3, 281:11
**non-white**
68:19, 77:21,
79:20, 80:16,
80:25, 82:10,
84:5, 85:2,
85:8, 88:10,

88:13, 88:19,
88:23, 122:24,
123:14, 125:1,
125:6, 125:8,
125:23, 190:16,
206:12, 206:14,
206:23, 207:8,
212:19, 217:24,
219:17, 219:21,
220:11, 220:14,
220:15, 221:1,
221:7, 221:14,
221:18, 221:22,
221:23, 222:1,
222:6, 222:18,
222:22, 223:3,
223:8, 223:11,
223:15, 223:23,
224:5, 224:6,
239:1, 240:11,
240:21, 241:3,
242:11, 247:11,
248:9, 249:4,
251:22, 253:10,
253:22, 257:4,
257:15, 257:18,
257:22, 257:25,
259:16, 261:1,
261:24, 262:2,
265:4, 267:25,
268:9, 268:12,
271:12, 281:14,
281:18, 281:21
**non-whites**
28:19, 78:12,
78:24, 102:6,
115:21, 115:24,
116:4, 116:7,
116:11, 119:1,
119:11, 120:20,
120:23, 122:1,
122:7, 122:21,
125:17, 196:11,
206:21, 207:2,
207:15, 219:14,
220:5, 220:21,
220:25, 222:24,
223:6, 237:14,

242:6, 248:5,
250:20, 252:1,
252:11, 259:11,
259:22, 260:21,
261:3, 268:6
**noncitizen**
96:23, 97:8,
97:9, 97:14,
98:6, 98:8
**noncitizens**
96:11, 96:13,
96:18, 96:20,
98:3, 98:17,
165:6, 165:12
**noncompetitive**
209:24
**none**
55:25, 194:7,
213:11, 214:16
**nonetheless**
106:24, 112:25,
211:9
**nonpartisan**
71:8, 71:21
**nonprofit**
71:9, 71:21
**nonsignificant**
161:15
**normalizations**
249:8
**north**
233:20, 233:21
**northern**
1:2
**northwest**
2:9, 2:16
**nos**
1:8
**notarial**
304:14
**notary**
2:2, 304:21
**note**
62:12, 101:18,
133:9, 142:23,
144:2, 262:17,
302:2
**noted**
81:19, 210:14,

293:20
**notes**
284:16, 298:22,
299:4, 299:12,
300:6, 300:8,
300:18, 301:8
**nothing**
8:4, 119:5,
145:4, 185:8,
191:19, 196:12,
196:16, 199:21,
267:19, 295:7,
295:8, 301:19
**notice**
2:1, 6:9, 12:4,
87:11, 301:3
**noticed**
101:8, 101:9,
300:15
**noting**
238:25
**notion**
272:25
**notwithstanding**
238:20, 238:21
**november**
17:10, 31:5,
34:25, 35:20
**nuclear**
25:3, 36:17
**null**
138:8, 156:4,
156:12, 157:9
**nullifies**
221:8
**number**
19:18, 21:14,
25:2, 28:17,
29:2, 29:4,
30:5, 30:17,
49:9, 60:11,
67:4, 67:8,
67:13, 68:10,
73:8, 76:17,
89:5, 90:17,
103:23, 104:23,
115:24, 116:1,
116:3, 122:14,

122:18, 138:4,
151:7, 151:24,
151:25, 188:17,
224:6, 225:5,
231:24, 232:22,
232:23, 232:24,
234:3, 236:6,
240:10, 242:7,
243:7, 243:15,
243:23, 244:11,
247:17, 247:18,
247:25, 248:7,
248:12, 248:14,
248:15, 248:17,
251:6, 251:9,
252:4, 252:18,
271:11, 286:7,
288:1, 289:5,
289:8, 289:13,
289:14, 289:20,
292:4

**numbers**
45:18, 45:21,
67:18, 86:24,
159:18, 236:3,
243:18, 244:9,
252:22, 252:24,
253:15, 253:17,
254:5, 254:8,
254:11, 258:8,
261:22, 270:9,
270:10

**numerator**
232:21

**numerators**
243:24

**nvra**
286:13, 286:24

---

**O**

**object**
9:12, 14:17,
14:23, 41:15,
48:7, 68:7,
253:2

**objecting**
77:4

**objection**
15:10, 47:13,

77:8, 77:9,
80:4, 90:25,
91:16, 97:21,
97:25, 109:23,
120:2, 122:19,
123:24, 124:14,
124:15, 129:11,
130:9, 143:19,
149:12, 195:5,
195:21, 254:21,
258:22

**objections**
9:16, 9:17,
74:14

**observation**
130:11

**observed**
88:21, 190:10

**obstacles**
6:19, 132:12,
133:7, 156:13,
156:19

**obtuse**
60:23

**obvious**
239:20, 297:21

**obviously**
35:22, 44:3,
59:16, 62:10,
71:1, 234:18

**occasion**
174:6, 221:12

**occasionally**
199:10

**occur**
77:17, 136:22,
247:11

**occurred**
197:16, 206:4,
207:21, 282:24

**october**
17:10, 34:19,
34:22, 34:23,
35:19

**odds**
239:18

**offensive**
258:24

**offer**
58:23, 67:7,
67:12, 67:17,
67:22, 81:7,
87:7, 108:14,
108:21, 109:1,
204:8, 212:21,
223:18, 224:4,
228:25, 229:17,
230:1, 230:2,
230:3, 230:4,
230:15, 234:22,
238:11, 238:15,
238:18, 241:15,
266:7, 282:6,
282:15, 283:7,
283:11, 283:16,
283:24, 284:2

**offered**
82:7, 82:12,
82:14, 84:23,
101:20, 165:5,
165:11, 190:3,
197:10, 198:10,
281:23, 282:4,
282:22

**offering**
70:23, 82:15,
84:12, 137:15,
190:21, 204:1,
272:1

**offers**
66:23, 137:9,
200:4, 205:15,
236:10, 238:7

**office**
3:20, 4:6, 5:4,
5:11, 238:10,
239:9, 239:22,
277:18, 280:20,
302:10

**officer**
304:2

**offices**
174:24, 239:4,
239:5

**official**
1:9

**officials**
26:6, 176:22,
177:11, 239:5

**offset**
75:4, 88:23,
206:22, 240:2,
241:4

**offsetting**
75:19, 219:22

**often**
169:22, 214:1,
215:3, 216:16,
246:1, 276:25,
278:15, 300:19

**oh**
12:15, 13:25,
17:21, 25:22,
26:16, 26:20,
34:1, 38:9,
39:16, 40:6,
40:11, 44:6,
62:4, 78:13,
99:19, 134:14,
137:18, 141:21,
160:8, 166:14,
169:12, 179:24,
191:3, 202:12,
210:3, 245:15,
272:4, 276:18,
279:24, 283:6,
292:6, 296:5,
297:11, 299:17

**okeechobee**
4:9

**old**
61:20, 278:6

**older**
101:18

**olivo**
4:8

**omitted**
26:14

**once**
9:17, 62:14,
77:14

**one-by-one**
48:10

**one-to-one**
145:19, 146:7,

146:12, 270:12,
271:8
**ones**
22:20, 39:18,
54:13, 60:1,
138:12, 154:7,
179:8, 184:5,
185:2, 185:5,
300:7
**online**
142:15, 143:4,
184:6, 285:21,
287:9
**only**
12:22, 28:14,
32:13, 36:4,
50:20, 56:1,
62:6, 82:5,
84:6, 85:25,
87:3, 93:9,
96:2, 96:15,
107:2, 108:10,
110:3, 111:10,
112:22, 115:23,
117:9, 120:21,
122:6, 125:13,
162:23, 165:24,
187:10, 194:19,
194:23, 206:3,
206:20, 210:14,
220:11, 234:11,
234:13, 234:14,
234:15, 234:16,
235:5, 235:8,
235:16, 239:7,
241:15, 243:23,
243:24, 246:13,
247:5, 251:1,
252:11, 260:20,
263:5, 267:1,
279:19, 287:18,
293:7, 294:9,
295:4, 301:3
**open**
10:17, 10:25,
11:1
**opening**
204:17, 204:23,

205:2, 255:8
**operating**
218:21
**opine**
187:20, 212:11
**opining**
68:9
**opinion**
25:9, 28:21,
58:23, 79:22,
81:7, 82:7,
101:11, 129:13,
130:13, 133:16,
136:12, 137:16,
191:1, 191:22,
199:12, 199:18,
200:2, 200:5,
200:10, 200:20,
200:22, 200:25,
201:9, 201:11,
201:15, 201:25,
202:14, 203:9,
204:1, 204:8,
221:6, 235:15,
262:6, 272:1,
282:3, 282:7,
283:11
**opinions**
35:4, 46:25,
47:2, 47:10,
47:12, 47:16,
54:10, 56:8,
56:22, 57:11,
58:4, 59:3,
59:5, 59:6,
59:9, 59:18,
60:5, 60:18,
60:22, 60:24,
61:2, 87:7,
102:16, 168:20,
200:3, 207:6,
224:11, 230:3,
230:4, 236:10,
273:16, 283:7,
283:16, 283:24,
284:2, 284:6
**opponents**
194:2, 197:12,

197:13
**opposed**
47:4, 184:7,
191:5
**option**
263:5, 279:11
**options**
262:4
**orange**
5:19
**oranges**
275:3
**order**
68:12, 130:12,
223:12, 229:17,
229:25, 302:9
**orders**
302:11
**oregon**
277:9
**organization**
179:20, 225:13,
263:2, 280:15
**organizations**
71:9, 71:21,
79:19, 98:24,
122:5, 177:23,
178:23, 179:1,
181:13, 182:7,
183:20, 185:12,
187:6, 187:9,
187:21, 213:14,
214:15, 218:14,
219:6, 219:17,
220:24, 221:6,
222:6, 222:18,
223:11, 223:14,
245:21, 245:25,
246:6, 262:5,
262:23, 268:9,
268:10, 280:2,
281:4, 281:10,
281:17, 284:4
**origin**
181:3
**original**
72:1, 82:5,
102:7, 102:11,

108:18
**originally**
37:8, 37:10,
52:7, 141:6
**orlando**
5:19
**others**
9:13, 32:14,
184:19, 245:2,
278:21, 290:25,
296:20
**otherwise**
178:24, 179:2,
179:3, 243:17,
258:23, 304:11
**ourselves**
199:17
**out**
32:8, 35:3,
56:11, 62:12,
66:7, 66:21,
69:5, 69:17,
70:4, 70:13,
74:4, 79:7,
96:25, 104:21,
114:20, 129:4,
132:8, 133:3,
143:13, 151:2,
159:25, 172:7,
176:5, 182:10,
185:5, 185:18,
186:7, 196:21,
212:25, 221:7,
230:11, 235:21,
255:6, 279:17,
294:24, 299:21,
300:24
**outcome**
63:22, 213:25,
251:25, 276:1,
304:12
**outcomes**
20:19, 21:13,
144:23, 147:22,
212:25
**outlined**
251:2
**outreach**
34:4, 34:5,

38:25, 185:12,
187:1
**outside**
187:4, 193:10,
198:15, 199:15
**over**
9:7, 12:14,
12:17, 13:1,
13:3, 32:16,
46:9, 58:5,
71:5, 80:5,
93:23, 108:13,
110:3, 126:14,
161:14, 167:20,
169:24, 227:10,
231:22, 231:24,
232:23, 243:7,
243:16, 244:6,
247:24, 248:13,
248:15, 248:16,
267:9, 272:11,
291:2, 293:7,
297:15
**overall**
115:2, 116:10,
158:25, 161:13,
193:24, 207:8,
220:10, 225:2,
226:13, 226:24,
230:20, 231:3,
231:8, 231:12,
231:17, 233:8,
258:13, 259:21,
260:24, 265:19,
265:24, 266:8,
269:14, 281:20,
294:9
**overlap**
172:11
**overlaps**
172:13
**overlooked**
43:4, 44:10,
137:25
**overlooks**
137:8, 137:14
**overwhelming**
37:25, 39:21,

268:4
**own**
20:5, 47:5,
47:11, 62:15,
152:19, 166:17,
170:9, 171:12,
191:6, 208:9,
247:21, 270:9,
274:17, 275:17

---
**P**
---
**page**
6:2, 6:8, 7:3,
18:8, 18:13,
19:14, 24:2,
24:3, 29:10,
29:14, 29:15,
29:20, 34:25,
42:10, 42:20,
42:24, 43:2,
43:13, 43:14,
46:2, 46:8,
46:12, 48:2,
48:3, 48:4,
52:1, 52:16,
52:23, 53:1,
53:4, 53:15,
53:16, 53:17,
53:20, 54:7,
57:3, 62:18,
66:19, 67:1,
80:20, 99:7,
104:23, 105:1,
105:4, 106:20,
108:22, 113:13,
126:4, 129:10,
135:19, 136:9,
137:6, 139:19,
139:20, 142:7,
142:19, 145:24,
147:13, 148:16,
157:20, 157:21,
158:2, 159:16,
159:18, 160:22,
161:11, 164:16,
166:2, 166:16,
188:10, 189:16,
192:16, 193:4,

193:6, 194:12,
205:13, 213:16,
216:20, 216:22,
218:2, 218:8,
225:5, 225:23,
237:9, 238:5,
238:25, 241:21,
241:23, 249:6,
249:19, 249:25,
250:6, 256:24,
261:6, 261:8,
263:7, 267:21,
286:12, 292:9
**page-by-page**
127:16
**pages**
1:24, 44:2,
45:5, 45:24,
47:12, 48:16,
48:23, 66:21,
83:7, 144:21,
166:22, 189:11,
193:5, 252:18,
252:19
**paginated**
159:17
**pagination**
104:19
**palm**
5:14, 5:16
**pan**
176:23
**panagopoulos**
182:15
**pandemic**
136:15
**panel**
159:12
**panels**
106:25
**papers**
21:7, 23:19,
44:10, 45:7,
49:17, 56:12,
56:19, 61:2,
131:8, 131:24,
138:4, 151:18,
152:14, 171:10,

176:15, 177:8,
177:15, 179:9,
213:11, 285:12,
285:17, 288:23,
298:10, 300:19
**paragraph**
50:20, 50:23,
93:2, 93:4,
94:2, 94:5,
94:12, 94:16,
94:17, 94:24,
105:5, 106:5,
111:10, 114:6,
116:25, 117:4,
117:12, 118:1,
118:8, 118:22,
119:20, 121:18,
122:16, 123:2,
123:5, 126:9,
126:19, 126:22,
126:23, 129:9,
131:19, 131:22,
139:21, 143:12,
147:15, 160:6,
160:16, 161:12,
161:21, 166:2,
166:5, 166:9,
166:13, 189:17,
193:7, 193:11,
193:19, 195:4,
198:8, 217:20,
218:16, 219:8,
220:23, 222:14,
225:5, 225:9,
231:10, 238:4,
238:20, 239:13,
239:24, 241:11,
241:22, 242:22,
246:11, 246:12,
249:12, 249:19,
250:7, 255:4,
255:14, 257:11,
257:13, 262:22,
267:22, 268:21,
268:22, 269:13,
270:18, 270:20,
273:20, 274:14,
286:13

paragraphs
46:11, 46:14,
46:17, 46:20,
46:24, 93:20,
94:9, 117:2,
117:11, 119:7,
125:19, 224:18,
225:25, 249:13,
270:6
parallel
37:19
parameters
49:6
parsing
115:17
part
8:15, 14:24,
42:7, 43:5,
52:14, 52:24,
55:6, 82:3,
83:17, 89:15,
97:5, 97:9,
98:11, 134:21,
144:22, 145:1,
153:18, 157:7,
160:12, 166:7,
168:5, 178:8,
180:12, 197:20,
198:17, 205:8,
227:20, 229:20,
244:25, 246:17,
274:13, 289:1,
294:22
participants
3:10, 4:2, 5:2
participate
98:4, 98:10
participating
98:8
participation
23:23, 93:13,
120:19, 128:2,
161:24, 162:4
particular
20:24, 28:19,
33:9, 108:13,
143:12, 144:25,
178:2, 186:18

particularly
55:14, 75:8,
90:14, 96:7,
100:19, 117:6,
120:19, 143:8,
155:16, 170:20,
172:16, 172:19,
173:13, 173:14,
176:23, 177:18,
180:18, 190:16,
196:11, 251:22,
270:14, 288:16,
289:23
parties
9:10, 15:11,
71:2, 71:25,
72:19, 74:11,
77:23, 82:13,
84:8, 88:15,
91:19, 95:17,
95:19, 95:23,
96:2, 96:16,
115:25, 116:2,
116:8, 122:22,
124:21, 125:5,
127:21, 129:13,
140:10, 168:16,
182:20, 185:17,
207:3, 218:1,
220:2, 221:15,
222:21, 223:5,
240:20, 268:1,
273:11, 291:24,
304:10
partisan
69:20, 70:22,
70:24, 139:23,
140:15, 141:18,
141:22, 145:2,
145:6, 178:4
partisanship
145:16, 146:15,
270:13, 271:20
parts
16:13, 33:3,
89:1, 141:8
pass
167:4, 279:3,

284:23
passage
214:21
passed
100:14, 201:3
passing
144:2, 200:19,
201:6
past
46:3, 46:12,
137:21
path
171:9
pdf
57:3, 157:20,
159:17
pecuniary
279:6
pedantic
61:16, 279:23,
288:12
peer
151:18, 293:22,
294:21, 295:2,
296:2
peer-reviewed
56:18, 151:15,
151:21, 152:2,
191:8, 216:14,
244:20, 298:5
pejorative
203:20
penalty
135:24
pending
10:7, 163:10,
167:25
pennsylvania
137:1
pennsylvania's
26:25
people
13:14, 39:23,
69:7, 77:1,
77:6, 87:4,
98:9, 112:8,
116:1, 124:21,
125:4, 128:16,

128:19, 154:15,
154:25, 172:8,
174:23, 175:12,
178:11, 179:5,
181:2, 186:4,
207:17, 213:24,
226:20, 230:7,
230:10, 230:11,
232:5, 233:15,
234:2, 234:4,
243:9, 243:11,
243:13, 273:4,
276:9, 278:19,
278:23, 286:23,
288:4, 288:5,
288:7, 290:13,
293:22
percent
143:16, 225:3,
225:4, 225:8,
225:14, 227:11,
231:13, 231:14,
232:4, 233:9,
245:19, 257:16,
257:18, 261:14,
261:15, 261:18,
261:19, 262:14,
278:2, 278:3,
278:6, 278:7,
286:23, 291:4,
291:6, 291:14,
291:15, 298:7
percentage
25:16, 26:6,
116:2
perfect
262:8
perform
109:20, 111:21
performance
174:20
performed
114:8
performs
244:11
perhaps
45:22
period
39:9, 95:16,

208:7, 208:12, 208:24, 213:8, 232:6, 235:25, 251:5, 276:7

**periods**
79:8, 208:11, 231:25, 235:23, 257:6, 274:21, 274:24, 274:25, 275:18, 289:17

**perjury**
135:25

**person**
111:6, 173:21, 175:4, 256:17

**personally**
47:3, 216:6

**persons**
77:22, 88:11, 88:14, 88:19, 88:22, 88:24, 89:4, 89:5, 90:18, 242:3, 243:8, 262:2

**pertaining**
24:11, 177:18, 192:23

**pete**
177:2

**pga**
5:16

**ph**
1:15, 6:2, 8:2, 21:20, 35:25, 36:1, 57:4, 171:8, 303:2

**phoenix**
32:8

**phone**
172:25

**photo**
153:10, 154:21, 154:22, 155:20, 160:20, 161:4, 161:18

**photographic**
127:8, 128:18, 153:8, 154:19,

155:2, 155:16

**phrase**
130:20, 222:4

**phrased**
192:7

**phrasing**
45:17, 45:21

**pi**
177:12

**picky**
131:23

**picture**
110:6, 111:6, 111:17

**piece**
62:7, 132:11

**pieces**
276:10

**piemonte**
132:10, 132:23, 133:9, 133:22

**pima**
177:3

**pinellas**
4:18, 4:20

**pl**
3:20, 5:7

**place**
153:22, 154:9, 154:13, 154:25, 159:6, 162:6, 290:1, 302:8

**placed**
265:21

**places**
70:6, 164:21, 208:22, 209:1

**placing**
29:22

**plaintiff**
10:19, 25:13, 25:24, 87:2, 194:21, 198:22, 253:1

**plaintiffs**
1:7, 2:5, 2:12, 8:8, 8:16, 12:12, 13:21,

25:16, 26:12, 35:14, 50:11, 55:23, 55:25, 56:25, 59:1, 59:7, 62:13, 64:14, 78:22, 87:4, 87:9, 87:16, 91:17, 167:7, 167:14, 181:14, 187:10, 187:18, 196:2, 198:22, 202:21, 215:11, 215:25, 229:24, 282:11, 282:17, 285:3, 285:8, 285:10, 287:8, 301:15, 302:12

**plan**
183:1, 183:5, 184:3, 185:6, 188:4, 287:10, 287:21, 288:9, 290:7, 290:10, 290:13, 290:14, 290:17, 290:20

**plane**
183:12

**plans**
37:14, 38:14, 174:3

**plant**
25:4, 36:18

**play**
46:16, 197:23

**pleadings**
35:13, 49:10, 49:20, 55:23, 60:11, 87:3, 168:15, 215:25

**please**
9:15, 9:24, 14:14, 14:18, 44:7, 77:14, 78:2, 121:21, 121:22, 167:9, 168:9, 203:25, 248:1, 302:8

**plenty**
212:21, 235:21, 294:4

**pllc**
3:6

**point**
9:23, 10:5, 17:12, 50:3, 69:5, 91:5, 128:24, 132:8, 132:18, 132:25, 133:17, 147:8, 167:9, 167:24, 188:9, 190:19, 200:15, 205:10, 218:4, 222:13, 237:21, 239:3, 239:7, 251:15, 255:6, 261:8, 262:12, 263:25, 271:10, 274:23, 285:25, 289:20, 291:10, 296:1, 296:22, 297:6, 297:7, 297:21

**pointed**
89:12, 176:5, 230:11, 235:21, 279:17

**pointing**
300:24

**points**
79:7, 221:3

**policies**
63:5, 147:16

**policy**
21:9, 158:8, 169:6, 169:10

**political**
19:16, 20:8, 61:21, 71:2, 111:3, 137:17, 140:10, 170:17, 171:11, 172:18, 182:10, 269:1, 269:4, 269:16, 269:21, 270:2, 273:11, 278:13

politically
147:16
politics
171:18
poll
176:18, 177:9,
177:18, 178:3,
178:4
polling
153:22, 154:9,
154:13, 154:25,
159:5, 162:6,
164:4, 164:20,
277:23
polls
160:20, 161:4
pons
158:21
poor
27:24, 65:4
popped
163:20
popular
197:12
population
72:6, 125:5,
140:8, 147:17,
220:17, 227:1,
227:13, 228:2,
228:16, 231:23,
232:8, 236:6,
240:13, 241:8,
243:10, 243:12,
244:8, 247:19,
247:25, 258:9,
260:3, 262:20,
264:3, 271:13,
271:17, 276:9,
288:4, 288:8,
289:22
populations
28:19, 63:23,
63:25, 81:21,
155:17, 184:23,
245:13, 257:5,
287:20, 290:8
pork
171:16, 171:18

portion
44:17, 45:24,
52:12, 66:19,
166:18, 175:3,
176:10, 205:20,
205:24, 242:14,
242:15, 243:2,
246:14, 247:1,
250:16, 257:8,
258:4, 297:5,
297:8, 299:25
portions
194:20, 195:11,
195:16, 196:1,
198:1, 221:4,
270:20, 271:24
pose
71:10
posed
9:19, 85:21,
85:24
positing
91:10, 97:14
position
48:1
positioned
208:1
positions
61:3
positive
17:20, 19:11,
143:9, 143:24,
149:5, 150:2,
150:9, 150:14,
157:9, 159:7,
164:18, 165:8,
165:14, 269:17,
285:13, 287:21,
290:5, 290:12
posits
138:20
possibility
75:2, 80:16,
93:10, 220:8,
237:13, 260:24
possible
92:2, 205:16,
206:3, 206:11,

206:17, 206:19,
207:19, 221:16,
232:24, 264:5,
264:10, 264:14,
264:17, 264:21,
265:1
possibly
70:17, 215:2
post
224:25, 232:7,
233:3, 257:19,
261:10, 275:1,
277:18
postal
278:18
potential
93:14, 95:1,
96:4, 96:21,
97:8, 98:5,
98:18, 98:25,
137:24, 161:3,
232:3, 284:3
potentially
213:8, 221:6,
223:5, 254:1
power
25:4, 36:18
practice
179:6
pratt
3:4, 14:11,
14:23, 15:10,
33:20, 41:15,
47:13, 48:7,
49:11, 78:1,
90:25, 91:16,
97:21, 97:25,
109:23, 120:2,
121:21, 122:19,
123:24, 143:19,
149:12, 195:5,
236:22, 254:21,
301:14, 301:21,
302:2
pre
224:24
preceded
100:17, 121:25

preceding
209:14, 257:6
precinct
279:2
precincts
132:4
precise
58:25, 97:11,
149:10
preclude
155:6
precluding
157:10
predict
137:7
predicted
150:1, 213:5
prediction
130:12, 135:4,
135:11, 136:23,
136:25, 212:1
predictions
134:15, 134:19,
134:22, 134:24,
135:1, 135:7,
135:15, 135:21,
212:14, 214:2,
214:10
predominantly
240:21
preferable
137:2
preferential
252:12
preferred
63:14, 116:12,
224:15, 230:6,
234:20, 235:18,
236:3, 244:3,
252:12, 253:14
preliminary
168:19
premarked
11:23, 18:1,
29:8, 57:2,
57:16, 65:10,
103:10, 139:10,
156:18, 159:10

**prepare**
12:6, 12:9,
18:21, 56:8
**prepared**
31:11, 59:17,
257:13
**preparedness**
25:4, 36:19
**preparing**
44:2, 54:17,
56:14, 281:22
**preregister**
183:24
**preregistration**
142:16, 143:5,
143:21, 183:22
**present**
13:9, 32:12,
201:13, 232:1
**presentations**
200:23
**presented**
87:15, 212:17,
227:18, 252:19,
254:5
**presents**
233:7
**presidency**
209:22
**presidential**
161:16, 209:5,
209:9, 209:15,
209:21, 235:24,
274:25, 275:2,
275:4, 287:1
**press**
26:17, 197:12
**presume**
128:18, 155:13
**pretty**
12:16, 19:10,
20:22, 65:2,
65:6, 171:24,
182:4, 238:1,
296:13
**prevail**
214:8
**prevent**
98:8

**prevented**
222:24
**preventing**
96:11
**prevents**
97:9
**previous**
29:9, 119:6
**previously**
64:16, 134:15,
134:18, 134:23,
135:18, 175:15,
181:16, 298:6
**pride**
62:12
**primarily**
45:25, 47:9,
52:15, 53:14
**primary**
42:5, 46:14,
54:3, 54:13,
57:8, 100:20,
170:2
**principal**
177:12
**principally**
171:15, 177:20
**prior**
11:17, 33:3,
36:1, 37:1,
37:7, 40:5,
40:19, 50:22,
51:2, 51:8,
289:4
**privilege**
14:18, 14:23,
15:10, 41:16,
195:6
**privileged**
15:15
**proactive**
186:4
**probabilistic**
135:8, 212:4,
213:5
**probability**
128:4
**probably**
8:25, 19:1,

21:3, 21:23,
22:10, 22:13,
23:3, 24:16,
24:17, 26:10,
26:17, 30:21,
31:17, 34:22,
35:18, 35:19,
40:14, 42:20,
52:6, 128:21,
132:10, 133:21,
136:22, 151:18,
162:25, 163:15,
169:24, 170:24,
172:1, 176:6,
179:4, 182:2,
205:3, 210:1,
226:4, 237:19,
244:17, 271:19,
281:16, 295:10,
296:16, 297:16,
298:15
**problem**
13:13, 104:19,
228:19, 275:23,
291:23, 294:5
**problematic**
69:1, 236:1
**problems**
157:2, 157:15
**procedure**
50:9, 53:7
**procedures**
27:10, 274:10,
274:12
**proceed**
62:15, 163:11,
167:18
**process**
201:6, 216:4
**processes**
201:2, 201:5
**produce**
128:15, 129:6,
158:6, 164:20
**produced**
14:13, 128:22,
130:24, 156:4,
156:12, 181:16,

188:7, 194:21,
196:2
**produces**
72:13
**producing**
135:9
**profession**
137:19
**professor**
12:11, 13:22,
13:23, 14:11,
38:8, 40:2,
41:19, 42:3,
43:3, 46:15,
47:17, 49:15,
49:16, 50:7,
54:5, 70:15,
71:25, 74:22,
74:23, 74:25,
75:1, 75:7,
75:8, 75:9,
75:11, 75:13,
77:10, 79:7,
82:4, 84:24,
85:5, 88:5,
89:3, 89:8,
89:11, 118:6,
127:17, 127:25,
135:20, 137:25,
168:23, 180:7,
189:10, 191:11,
191:12, 191:13,
191:20, 192:3,
197:17, 208:3,
208:10, 210:9,
210:24, 211:3,
213:2, 215:7,
217:23, 219:24,
221:13, 223:17,
227:19, 227:25,
235:9, 235:20,
235:22, 237:12,
242:2, 242:4,
243:22, 247:23,
248:4, 253:4,
255:22, 257:1,
261:12, 261:25,
263:17, 266:22,

266:25, 267:23,
274:17, 282:19,
283:23
**proffer**
216:17
**program**
10:17, 10:25
**prohibited**
98:16
**project**
2:8, 3:17,
42:22, 42:25,
43:7, 43:18,
43:22
**projects**
39:22, 41:2,
41:13, 183:22,
185:21
**prolific**
296:8
**promulgated**
14:21
**pronounce**
182:14
**proper**
178:11
**properly**
38:25
**proportion**
68:4, 68:19,
69:6, 71:11,
72:8, 78:19,
88:13, 88:18,
125:4, 217:24,
221:14, 221:18,
237:14, 242:3,
242:5, 247:10,
248:5, 267:25,
268:4, 277:21,
288:7
**proportionately**
259:11
**proportions**
89:4
**propose**
255:19
**proposition**
151:3, 156:11

**propositions**
211:1
**protect**
215:13
**protocol**
163:15
**provide**
33:8, 55:20,
83:2, 85:6,
95:1, 96:5,
159:5, 193:9,
216:23, 225:21,
246:19, 252:22,
273:25
**provided**
14:8, 56:2,
67:19, 82:13,
86:10, 86:19,
202:6, 202:14,
203:10, 240:20,
254:15, 254:19,
298:19
**provides**
76:16, 76:20,
83:10, 199:19
**providing**
136:13, 191:1
**provisions**
95:13, 115:20,
218:21, 219:5,
222:20, 222:23,
250:23, 257:24,
259:14, 274:4,
282:5, 282:16,
283:8, 283:12,
283:17
**psychology**
183:8
**public**
2:2, 25:9,
63:5, 158:7,
169:10, 173:10
**publication**
102:8, 102:11,
147:9, 293:24,
295:16
**publications**
18:19, 19:3,

19:25, 21:23,
22:18, 60:17,
151:15, 191:8
**publish**
19:24
**published**
21:7, 22:10,
23:18, 37:4,
55:12, 56:17,
62:15, 99:9,
100:4, 101:20,
109:12, 110:14,
130:17, 131:8,
151:18, 154:2,
175:12, 186:1,
244:21, 280:4
**publishing**
36:13, 171:9
**pull**
79:25, 179:15,
188:15
**pulled**
104:8, 266:15
**pulling**
237:7
**purchasing**
27:12
**pure**
272:14
**purely**
253:11
**purport**
98:25, 133:12,
140:18, 140:24,
142:12
**purported**
254:8
**purports**
141:10, 141:17,
145:5
**purpose**
94:10, 213:21,
213:22, 273:7
**purposes**
66:22, 216:2,
239:6
**pursuant**
2:1

**pursue**
207:19
**pursued**
92:8, 219:24
**purview**
195:8
**put**
18:1, 52:8,
66:15, 104:8,
104:17, 185:24,
190:14, 196:16,
203:22, 266:12,
266:13, 272:19,
300:22
**putting**
249:15, 255:8
**puzzle**
140:2

---
Q
---

**qualifications**
18:17, 94:11
**qualified**
33:8
**qualifies**
224:5
**qualify**
153:5
**quality**
253:3, 253:4,
253:5
**quantitative**
191:24, 194:14,
194:20, 194:24,
198:11, 199:2,
199:8
**quarterly**
278:14
**questioned**
294:1
**questioning**
8:17, 82:19,
221:3, 287:7
**questions**
9:12, 10:8,
11:12, 12:20,
28:25, 35:17,
39:25, 70:20,

72:21, 107:20,
108:1, 108:7,
111:13, 112:3,
163:7, 163:11,
163:13, 165:19,
165:25, 167:15,
168:7, 168:11,
177:21, 177:22,
178:3, 178:4,
178:7, 178:10,
180:5, 190:23,
195:10, 210:2,
211:23, 259:4,
271:23, 282:20,
284:22, 285:8,
285:10, 301:10,
301:15, 302:3
**quibbling**
123:16
**quick**
66:12, 273:19
**quicker**
299:14
**quickly**
78:16, 94:15,
270:23
**quite**
171:5, 172:4,
172:15, 172:17,
173:10, 180:10,
185:3, 195:19,
201:21, 210:9,
253:17
**quiz**
233:19
**quote**
120:3, 128:5,
136:12, 145:22,
157:15, 161:22,
162:1, 205:15,
216:22, 217:22,
218:3, 218:17,
224:22, 225:10,
225:21, 237:12,
238:7, 238:20,
238:23, 239:19,
239:20, 242:1,
246:18, 249:8,

250:2, 250:8,
255:6, 257:1,
257:14, 261:10,
267:23, 268:25,
269:1, 269:5,
273:21
**quoted**
162:14
**quotes**
206:3

## R

**race**
29:4, 101:17,
117:7, 121:16,
145:9, 145:22,
146:9, 146:14,
146:20, 158:25,
193:1, 209:22,
242:4, 247:15,
247:19, 248:16,
248:17, 248:21,
248:25, 250:13,
251:13, 258:13,
267:9, 269:9,
269:16, 269:19,
270:11, 270:16,
270:25, 271:3,
271:8, 271:18,
276:2, 289:23
**racial**
64:2, 72:12,
103:8, 105:13,
108:17, 111:16,
112:5, 145:16,
147:17, 157:1,
181:3, 218:17,
226:22, 243:15,
244:2, 262:20,
266:20, 276:12
**raise**
147:20, 154:17,
218:21, 220:8,
232:2, 247:4,
297:22
**raised**
75:1, 75:12,
107:7, 197:13,

203:17, 220:3,
235:24, 250:21,
252:8, 259:6,
274:23
**raises**
255:25, 295:23
**raising**
263:23
**randomize**
288:22
**randomized**
288:10, 288:13,
289:16
**randomly**
72:10
**range**
25:2, 61:23,
63:5, 262:13
**rare**
284:8
**rate**
16:22, 17:7,
17:9, 17:13,
17:18, 17:19,
17:22, 72:13,
78:23, 84:14,
116:7, 206:11,
207:9, 233:1,
233:2, 234:4,
234:5, 234:6,
243:6, 243:9,
248:20, 262:12,
268:11, 280:7,
290:6, 290:7,
291:5
**rates**
30:18, 84:8,
100:7, 106:11,
109:4, 113:25,
115:21, 116:11,
116:20, 140:20,
141:1, 141:4,
142:5, 148:5,
148:7, 152:25,
155:14, 165:14,
206:20, 226:3,
243:4, 247:24,
250:3, 250:11,

250:14, 255:10,
255:11, 255:24,
258:13, 259:21,
261:3, 262:19,
263:15, 267:8,
281:21, 286:15,
292:17, 293:3
**rather**
41:12, 45:8,
70:14, 130:12,
150:2, 199:9,
227:16, 252:22,
273:13, 292:3,
296:8, 301:5
**ratio**
220:14, 220:16,
227:4, 227:9,
231:22, 231:23,
234:24, 247:23
**ratio-of-ratio**
227:3
**rational**
128:14, 137:7,
137:16, 149:25,
150:1
**ratios**
224:9, 224:14,
224:21, 231:21,
232:20, 243:21,
244:6, 251:12,
252:14, 257:3,
259:25
**raw**
244:9
**reach**
47:3, 100:24,
221:7, 245:5,
282:3
**reached**
35:3, 224:21,
267:17
**reaches**
259:8
**reaching**
224:10, 224:15,
234:12, 244:25
**reaction**
239:23

**reading**
30:8, 30:12,
40:1, 42:19,
81:6, 98:2,
105:8, 106:23,
118:23, 120:5,
121:5, 122:7,
134:10, 160:19,
179:12, 193:2,
215:24, 232:16,
249:17, 249:21,
270:23, 286:2,
304:8
**ready**
31:8, 167:4
**real**
216:18, 252:24,
254:9, 289:15,
299:20
**realize**
297:3
**realized**
59:23, 297:6,
297:8
**really**
20:25, 24:6,
32:11, 118:7,
186:15, 252:25,
275:19, 291:17,
299:19
**reanalysis**
245:17
**reason**
11:10, 33:12,
72:5, 116:5,
120:17, 122:22,
172:25, 196:14,
229:11
**reasonable**
111:6, 122:9,
135:6, 282:20,
283:2
**reasonably**
252:6
**reasoning**
277:4, 278:19
**reasons**
137:13, 226:17,

255:25, 282:2
**rebuttal**
6:12, 7:11,
12:13, 13:21,
57:15, 57:17,
57:25, 59:7,
59:11, 59:20,
81:6, 81:19,
82:3, 82:4,
102:2, 108:12,
111:22, 129:16,
129:22, 180:7,
180:12, 188:6,
204:16, 208:16,
217:7, 217:14,
217:18, 217:21,
219:8, 221:5,
224:19, 226:1,
238:3, 239:14,
246:11, 247:1,
249:5, 249:11,
250:17, 254:3,
254:16, 254:20,
255:3, 255:15,
257:11, 257:13,
258:4, 260:16,
268:20, 270:7,
273:20, 286:2
**recall**
28:20, 30:6,
35:2, 39:18,
44:11, 44:15,
44:18, 45:11,
45:13, 45:16,
45:18, 48:11,
48:14, 48:21,
54:2, 64:20,
136:7, 141:23,
142:3, 142:6,
144:6, 144:20,
152:5, 166:20,
166:24, 167:1,
178:1, 178:5,
178:7, 182:6,
202:17, 217:17,
245:7, 245:10,
285:11, 286:3,
288:23, 293:7

**receive**
15:23
**received**
12:4, 17:3,
34:4, 34:5,
171:8
**recent**
23:4, 23:25,
24:4, 31:14,
132:24, 133:1,
133:4, 170:10,
229:10
**recently**
8:24, 86:22,
296:10
**recess**
58:11, 99:25,
165:21, 237:1,
284:19
**recognize**
12:3, 18:5,
57:7, 57:17,
65:13, 200:8,
204:21, 217:11,
272:18, 273:4
**recollection**
13:5, 24:22,
25:7, 31:20,
48:8, 56:6,
87:3, 87:6,
99:3, 100:15,
159:8, 177:25,
184:25, 185:3,
287:16
**recommend**
62:8, 234:23
**recommendation**
251:16, 262:18
**recommendations**
14:3, 158:8
**recommended**
34:3, 174:5,
251:12, 252:2
**reconstruct**
39:20
**record**
8:12, 9:16,
11:8, 58:5,

58:9, 58:13,
60:3, 66:15,
71:23, 74:7,
80:10, 81:11,
81:14, 81:23,
99:23, 100:1,
108:22, 122:14,
165:19, 172:22,
183:6, 196:22,
197:2, 236:25,
237:2, 240:5,
282:9, 282:13,
284:18, 284:20,
293:21, 301:9,
302:13, 304:5
**records**
34:21, 39:6,
157:3
**recover**
157:9
**recruitment**
176:19
**redistricting**
37:13, 37:17,
37:21, 38:14,
39:9, 39:21,
40:17, 174:2
**redraw**
38:14
**reduce**
128:10, 138:6,
216:2
**reduced**
260:24, 304:7
**redundancy**
168:9
**refer**
188:10, 193:19,
196:12, 242:24,
244:19
**reference**
95:2, 117:7,
127:4, 127:5,
195:4, 195:17,
288:15
**referenced**
127:6, 127:7,
170:8, 190:5,

261:9, 285:23,
292:5

**referencing**
114:20, 190:4,
292:10

**referred**
216:12

**referring**
14:14, 33:20,
84:21, 114:7,
159:19, 167:13,
213:12, 214:11,
217:4

**refers**
114:5, 115:1,
115:2, 126:17,
127:1, 214:20,
239:1

**reflect**
268:2, 274:16

**reflected**
176:6

**reflects**
50:21, 136:10,
273:23, 274:18

**reform**
164:25, 212:7

**reforms**
23:2, 23:8,
62:17, 63:10,
140:7, 140:14,
140:16

**refrain**
14:14

**refresh**
28:24, 30:14

**refreshes**
29:11

**regard**
131:6

**regarding**
12:25, 14:3,
45:5, 50:18,
114:24, 119:6,
198:23, 202:7,
203:15, 219:5,
257:25, 259:15,
274:4

**regardless**
86:5

**regards**
192:19, 211:18

**register**
67:3, 67:10,
68:13, 70:6,
72:3, 72:11,
72:17, 72:18,
72:23, 72:24,
73:2, 73:3,
73:9, 73:19,
74:2, 74:9,
74:10, 74:14,
74:17, 76:13,
77:2, 77:22,
84:7, 85:16,
86:14, 86:22,
89:5, 89:6,
91:21, 95:15,
95:19, 96:9,
96:16, 96:19,
96:22, 96:24,
97:2, 97:3,
98:6, 115:25,
116:2, 116:8,
118:3, 122:21,
124:21, 125:4,
125:18, 127:22,
148:9, 148:11,
153:8, 153:10,
153:17, 154:19,
154:21, 155:12,
183:3, 183:20,
186:12, 207:3,
217:25, 218:13,
219:20, 222:22,
224:7, 226:21,
234:2, 238:24,
242:6, 245:25,
248:6, 263:2,
264:6, 264:11,
264:15, 264:18,
273:3, 276:9,
276:22, 278:17,
279:11, 286:21

**registered**
64:1, 68:5,

69:7, 71:1,
73:7, 76:9,
76:22, 86:12,
86:13, 86:21,
88:14, 88:15,
88:20, 96:21,
97:8, 98:9,
108:25, 115:25,
117:16, 119:18,
121:4, 121:10,
121:11, 123:9,
123:10, 155:1,
178:2, 207:2,
218:6, 218:25,
219:1, 220:1,
221:15, 222:22,
232:5, 233:16,
233:17, 233:19,
233:23, 234:1,
234:4, 236:4,
236:5, 240:11,
241:8, 243:7,
243:8, 243:14,
245:24, 252:7,
263:1, 263:13,
264:3, 268:1,
269:4, 269:7,
269:18, 269:24,
270:3, 271:16,
274:5, 288:6,
288:8, 289:6,
289:8, 290:2,
290:9

**registering**
69:11, 70:16,
71:4, 72:19,
72:25, 74:3,
74:11, 74:15,
79:6, 80:25,
83:5, 83:19,
83:23, 84:6,
88:11, 88:24,
95:12, 96:19,
125:17, 127:20,
132:12, 132:13,
144:15, 154:14,
183:5, 222:24,
223:5, 237:15,

238:8, 238:9,
238:12, 238:16,
242:3, 262:3,
262:4, 265:8,
268:18, 272:22,
274:8, 276:13,
276:15, 276:19,
280:2, 280:13,
280:16

**registers**
218:18, 280:19

**registrants**
101:18, 147:19,
220:15, 220:16,
226:25, 227:10,
252:5

**registrars**
180:21

**regression**
268:14, 268:25,
269:8, 269:14

**regressions**
106:24

**regular**
302:9

**regularly**
212:10, 274:6,
275:11

**regulate**
149:10, 214:14

**regulations**
213:13, 264:13,
265:20, 266:1,
281:3, 281:24

**rejection**
44:21, 146:14

**related**
167:15, 181:17,
190:23, 213:20,
273:16, 280:9,
280:10, 304:9

**relates**
81:15

**relating**
22:20, 86:8

**relation**
114:9, 192:8

**relationship**
97:7, 98:5,

123:19, 123:23,
131:16, 138:14,
138:21, 140:3,
145:18, 146:8,
146:11, 146:14,
147:3, 258:11,
273:1
**relationships**
131:2, 131:4,
177:10
**relative**
217:1, 236:5,
240:12, 240:13,
241:7, 261:4,
276:8, 289:14,
289:21
**relatively**
154:1
**release**
293:25
**relevance**
222:4, 222:7,
222:11, 223:1
**relevant**
55:18, 137:23,
160:12, 200:18,
200:23, 201:4,
201:7, 201:13,
201:24, 203:13,
223:20, 267:3
**reliance**
119:8, 137:6
**relied**
15:5, 54:19,
55:3, 55:8,
55:21, 60:17,
67:9, 67:14,
86:22, 119:24,
152:7, 168:18,
179:7, 180:11,
190:25, 191:4,
244:14
**relies**
142:24, 191:6,
242:2
**religious**
147:18
**rely**
15:2, 67:23,

68:2, 68:6,
68:20, 68:25,
69:4, 117:17,
117:23, 118:7,
118:13, 122:1,
191:8, 191:23,
216:17, 244:24,
272:6
**remain**
161:14
**remains**
113:1
**remember**
13:11, 24:11,
34:18, 74:21,
134:7, 177:3,
185:5, 186:22,
211:21, 244:17,
263:6, 280:23,
287:11, 290:18,
296:1, 296:6,
296:7
**remembered**
296:4
**reminder**
9:3
**remote**
10:9
**remove**
164:18
**renewed**
263:12
**reorganized**
52:5, 52:8
**repeat**
41:21, 47:6,
73:23, 90:16,
120:10, 124:19,
141:5, 194:1,
196:24, 198:4,
229:19, 230:13,
231:11, 240:4,
242:25, 243:3,
247:9, 247:20,
258:6
**repeated**
197:11, 264:1
**repeatedly**
160:19

**repeating**
191:15
**repetition**
190:9
**rephrase**
9:25, 47:7,
47:8, 60:8,
73:13, 130:10
**report's**
218:24, 239:19
**reported**
1:25, 66:7,
103:6, 110:15,
257:2, 261:11,
268:2, 270:9,
279:25
**reporter**
302:7, 304:1
**reporting**
110:18
**reports**
10:20, 10:22,
12:12, 12:13,
12:17, 13:22,
13:24, 31:21,
33:4, 36:6,
36:22, 49:10,
50:5, 55:22,
56:25, 57:10,
57:15, 58:23,
59:1, 59:7,
59:11, 59:16,
59:17, 60:6,
60:25, 64:14,
74:21, 78:10,
81:19, 82:4,
82:6, 82:10,
84:24, 91:17,
91:24, 115:9,
115:17, 129:1,
136:20, 151:20,
153:23, 154:2,
156:10, 158:16,
167:17, 179:7,
180:7, 180:12,
181:15, 181:17,
187:11, 188:4,
191:6, 192:19,

192:23, 193:3,
194:14, 194:20,
194:24, 196:2,
196:4, 197:22,
197:25, 202:18,
203:15, 242:5,
248:4, 268:16,
282:11, 282:22,
286:3
**represent**
8:15, 27:7,
29:6, 69:25,
92:7, 133:12,
167:13, 208:11,
210:13
**representation**
37:24, 289:21
**representations**
215:20, 254:9
**representative**
253:16
**represented**
26:10, 26:12,
28:23
**representing**
285:7
**represents**
229:9
**reproduced**
99:13, 101:5,
103:25
**reproduction**
53:24
**republican**
71:12, 72:2,
268:17, 270:1
**reputation**
38:23
**request**
15:9, 15:23
**requested**
37:22, 189:18
**requesting**
184:7, 301:8
**require**
28:15, 29:3,
96:6, 96:7,
153:8, 153:9,

153:10, 153:13,
153:16, 154:18,
154:21, 154:22
**required**
30:16, 63:19,
95:25, 158:7,
198:15, 300:19
**requirement**
28:12, 43:14,
90:3, 90:7,
90:12, 92:12,
96:10, 153:19,
154:8, 156:1
**requirements**
95:14, 95:22,
152:22, 152:24,
154:1, 154:3,
154:13, 155:19,
156:3, 159:5,
160:24, 161:9,
164:8, 169:11
**requires**
155:12, 247:15
**requiring**
91:19, 161:3
**reread**
12:11, 12:12,
12:14, 13:23,
13:25, 65:21,
141:23, 270:22,
297:25
**reschooling**
171:7
**research**
13:19, 19:24,
22:19, 25:1,
34:12, 34:15,
36:9, 36:11,
36:12, 36:16,
43:5, 43:6,
78:17, 79:1,
126:17, 130:22,
131:1, 131:9,
131:10, 133:23,
137:8, 137:14,
137:23, 138:4,
138:19, 139:4,
142:23, 143:8,

145:13, 145:17,
149:7, 151:20,
154:5, 155:5,
156:2, 157:16,
157:23, 158:1,
158:9, 169:8,
171:25, 173:11,
176:13, 176:18,
178:19, 181:11,
182:23, 183:15,
185:14, 185:21,
213:7, 214:4,
216:14, 234:22,
244:18, 244:19,
244:21, 253:5,
255:19, 255:22,
258:19, 259:3,
273:22, 273:24,
275:6, 275:16,
275:17, 278:13,
280:3, 287:16
**researched**
178:22, 178:25
**researcher**
183:6
**researchers**
63:9, 191:7,
272:18, 289:1
**researching**
42:6, 54:14,
55:10
**resemble**
103:21
**reshare**
104:23
**residing**
121:9, 123:8
**resisting**
69:3
**resolve**
167:10
**respectfully**
91:24, 107:25
**respectively**
261:14, 261:18
**respond**
11:11, 71:18,
189:19, 189:24,

192:9, 195:3,
195:25, 196:15,
196:16, 196:18,
197:5, 197:9,
197:21, 197:24,
198:2, 198:12,
198:14, 198:15,
198:18, 198:19,
203:15, 204:5,
222:14, 240:16,
241:10, 270:5
**responded**
59:8, 198:3
**responding**
192:18
**responds**
254:3
**response**
129:16, 180:7,
198:4, 219:8,
219:10, 225:24,
238:4, 239:13,
247:1, 250:16,
255:14, 258:3,
268:21
**responsibility**
54:3, 100:21
**responsible**
43:23, 177:10
**responsive**
64:6, 178:15,
179:19, 240:1,
241:12, 251:15,
259:5
**rest**
160:15, 167:20
**restraints**
132:12
**restrict**
27:22, 122:23,
122:24, 125:6,
218:21
**restricting**
119:15, 120:11,
120:17, 120:25
**restriction**
223:22
**restrictions**
122:3, 128:1,

206:22, 226:19,
281:9, 281:13
**restrictive**
153:16, 161:17
**result**
75:16, 79:12,
85:9, 92:10,
92:11, 95:21,
190:8, 204:9,
212:20, 226:13,
230:18, 255:11
**resulting**
164:22
**results**
156:4, 156:12,
158:7, 161:22,
161:23, 268:25,
269:14
**resume**
8:24, 19:9,
24:17, 39:12,
61:17, 182:1,
185:19, 202:18
**retained**
9:11, 32:18,
33:1, 37:18,
38:14
**retention**
176:19
**retire**
299:7
**retooling**
171:7
**return**
95:15, 95:25,
118:15, 152:1,
277:16, 277:17
**returning**
291:15
**review**
16:2, 58:22,
58:25, 160:2,
190:17, 198:22,
203:1, 215:5,
217:14, 249:23,
252:20, 275:21,
293:22, 294:22,
295:2, 295:5,

298:8, 298:9,
298:19, 298:23,
300:7
**reviewed**
14:22, 56:24,
57:11, 57:14,
60:2, 60:11,
60:15, 75:21,
76:4, 76:18,
86:25, 87:15,
151:19, 152:10,
152:11, 152:14,
153:21, 168:14,
179:14, 181:12,
189:6, 214:25,
244:20, 249:10,
265:11, 282:8,
285:25, 286:8
**reviewers**
293:25
**reviewing**
56:12, 60:3,
93:7, 104:15,
105:9, 160:5,
189:4, 205:5,
217:17, 246:15,
296:3
**revisions**
295:6
**rice**
39:7, 39:11,
39:14, 40:2,
40:8, 40:10,
40:12, 40:16,
40:18, 40:20,
168:23, 169:2
**richey**
151:3
**rigby**
150:25, 151:3
**rights**
2:8, 3:16,
25:13, 25:17,
31:3, 172:17
**rise**
287:3
**rival**
275:14

**rmr**
1:25, 2:2
**robert**
1:15, 6:2, 8:2,
35:25, 303:2
**robust**
158:7, 171:25
**role**
42:5, 44:1,
46:16, 46:19,
49:1, 50:3,
54:14, 197:23,
296:2
**roll**
198:6, 270:18
**room**
10:10, 11:7
**rooms**
10:10
**roper**
5:18
**rose**
162:13, 261:17
**rosen**
128:6, 162:12
**rosenbloom**
5:23
**rosenstone**
128:6, 130:15,
131:24, 162:10,
162:11, 162:12,
162:13, 162:19,
162:20, 272:12
**rosenstone's**
272:13
**rough**
26:6
**roughly**
225:4, 225:14,
231:14, 246:1,
246:7, 257:15,
257:17
**rpr**
1:25, 2:2
**rule**
174:23, 289:4,
289:5, 289:7,
289:9

**rule-making**
14:20
**rules**
6:17, 9:3,
14:21, 139:11,
142:13, 143:3,
143:17, 144:8,
144:14, 167:19,
167:23, 172:24,
274:9, 274:12,
285:13, 290:1
**rulings**
14:2
**run**
174:24
**rush**
296:6
**rushed**
265:3
**rutahindurwa**
2:14, 188:19

**S**

**s**
36:15, 39:13,
40:25, 171:23,
192:5, 215:21,
219:4, 257:24,
259:14, 269:7,
269:8, 269:11,
274:3, 275:1,
281:3, 281:9
**s&pq**
293:22
**said**
24:9, 32:8,
34:10, 35:7,
42:25, 54:9,
63:16, 65:17,
72:22, 73:16,
73:21, 73:23,
75:21, 76:4,
79:16, 79:19,
81:1, 81:10,
89:7, 103:22,
110:10, 113:4,
118:1, 119:21,
122:14, 122:17,

124:16, 132:24,
134:1, 136:25,
141:9, 141:11,
144:17, 146:18,
155:18, 166:18,
173:20, 173:25,
174:15, 175:3,
186:16, 186:22,
202:2, 203:25,
207:7, 209:18,
221:11, 221:24,
223:9, 229:7,
231:2, 231:18,
241:14, 243:3,
247:5, 247:13,
248:19, 258:6,
262:14, 263:18,
265:6, 266:10,
285:11, 293:11,
293:14, 296:5,
296:7, 296:9,
296:10, 296:12,
297:4, 297:18,
297:25, 299:16,
299:17, 299:21,
300:12, 300:25,
301:2, 304:5
**same**
11:6, 13:2,
32:21, 33:19,
37:18, 53:7,
53:12, 54:22,
59:22, 60:1,
84:8, 89:14,
96:20, 113:2,
126:19, 145:9,
145:23, 145:24,
146:9, 146:12,
146:21, 147:5,
149:14, 157:7,
161:2, 162:8,
167:19, 167:23,
172:23, 192:16,
192:22, 193:3,
207:17, 214:24,
218:3, 231:23,
253:23, 258:6,
262:18, 270:10,

288:21, 303:4
**same-day**
142:14, 143:3,
143:9, 143:23,
148:25, 149:3,
149:14, 149:19,
164:10, 285:20
**sarah**
4:13
**save**
254:1, 278:5
**saw**
101:24, 126:7,
196:14, 266:19,
295:21, 298:1,
298:19
**saying**
50:19, 61:12,
68:8, 68:9,
77:24, 91:3,
91:22, 95:10,
100:5, 107:23,
108:5, 108:7,
108:20, 108:23,
109:7, 109:19,
111:4, 117:12,
117:20, 123:4,
123:13, 123:19,
123:21, 133:5,
146:19, 149:3,
158:20, 203:9,
205:15, 211:15,
240:16, 251:23,
270:24, 272:23,
275:5, 290:11
**says**
27:4, 35:24,
46:12, 52:24,
93:3, 96:15,
96:22, 97:1,
99:8, 103:25,
105:11, 111:4,
114:4, 117:13,
120:10, 120:25,
122:12, 122:13,
122:16, 133:11,
135:20, 135:22,
135:24, 136:1,

137:22, 139:21,
140:1, 145:22,
147:15, 156:24,
164:16, 227:25,
231:5, 255:8,
262:21, 271:18,
299:7
**scale**
186:14
**scenario**
206:4
**scenarios**
207:20
**scheme**
21:10
**schlozman**
132:1
**scholar**
151:17, 151:23,
152:2, 171:15,
172:15, 201:21
**scholarly**
40:21, 256:5,
274:17
**scholars**
56:16, 131:5,
131:15, 170:21,
182:18, 185:15,
185:23, 191:4,
191:7, 274:6,
275:10
**scholarship**
170:4, 170:5,
170:9
**school**
26:23, 37:11,
37:14, 37:25,
38:20, 183:21,
183:23, 185:22
**schooled**
179:11
**science**
19:16, 20:8,
137:17, 170:17,
170:25, 273:22,
273:23
**sciences**
20:14

**scientist**
111:3
**scientists**
182:11
**scope**
15:12, 142:9,
151:13, 195:1,
198:17, 198:18,
198:21, 198:25,
199:15, 199:21,
199:24, 200:6,
200:10, 203:14,
203:17
**scoping**
41:23
**scores**
184:15
**scott**
5:18
**scratching**
185:8
**screen**
10:12, 10:17,
11:5, 11:14,
11:19, 57:15,
62:5, 80:5,
80:9, 93:5,
104:20, 104:23,
112:16, 159:9,
163:21, 165:25,
198:9, 286:5,
287:9, 292:7
**screens**
10:14
**scroll**
19:8, 19:12,
35:23, 42:8,
51:16, 57:2,
64:23, 87:21,
87:23, 101:4,
101:14, 105:4,
107:8, 126:16,
127:14, 160:4,
160:7, 188:25,
193:4, 241:24
**scrolling**
29:17, 34:24,
46:5, 47:23,

48:3, 52:23,
53:11, 53:15,
53:16, 94:14,
104:2
**se**
4:6
**seal**
304:14
**search**
14:8, 127:9,
141:24, 151:16,
151:22, 152:1,
298:24
**searches**
13:19, 13:25,
152:1
**season**
169:18, 169:19
**second**
52:20, 88:18,
93:3, 104:18,
104:20, 111:9,
116:23, 119:14,
126:19, 129:8,
129:9, 138:18,
138:19, 179:16,
193:18, 227:4,
228:10, 228:11,
231:2, 231:23,
232:6, 246:13,
256:4, 256:15,
256:22, 263:25
**secretary**
1:10, 3:2,
14:1, 90:8, 91:4
**secretary's**
302:10
**section**
24:5, 43:1,
43:25, 44:23,
45:2, 45:9,
45:14, 46:3,
46:9, 48:9,
48:12, 48:13,
48:15, 48:22,
49:1, 50:2,
50:8, 50:17,
51:13, 52:15,

53:5, 80:13,
80:22, 82:22,
93:2, 100:19,
100:22, 129:24,
136:5, 137:20,
142:9, 149:24,
159:20, 160:2,
163:17, 163:25,
166:20, 166:21,
194:17, 249:7,
249:10, 249:14,
249:20, 275:21,
295:20, 297:14
**sections**
12:15, 42:2,
43:12, 47:9,
48:6, 50:10,
50:13, 50:16,
51:18, 54:12,
55:3, 55:8,
55:14, 94:13,
176:6
**secure**
215:13
**securing**
216:2
**security**
28:13, 28:17,
29:1, 29:4,
30:5, 30:17
**see**
11:17, 11:20,
15:9, 18:2,
18:13, 21:23,
24:17, 26:8,
26:20, 29:11,
30:3, 30:4,
30:9, 30:15,
31:25, 32:3,
39:13, 49:23,
53:13, 56:4,
56:5, 65:24,
73:2, 80:7,
89:2, 89:15,
94:12, 94:14,
94:16, 95:20,
102:7, 103:3,
103:5, 103:20,

107:15, 113:14,
119:22, 125:25,
127:15, 142:9,
142:16, 144:3,
150:24, 156:24,
157:23, 159:22,
159:25, 160:24,
163:19, 165:18,
166:3, 172:9,
193:2, 193:4,
196:13, 199:22,
203:13, 203:22,
205:18, 213:8,
220:10, 221:21,
223:1, 223:24,
223:25, 224:1,
231:2, 244:7,
250:1, 250:4,
252:3, 252:4,
262:1, 264:2,
267:10, 268:15,
278:21, 279:3,
286:13, 289:5,
289:7, 290:14,
295:12, 296:13,
296:15, 296:17,
299:14, 299:16,
299:19, 299:22,
301:23
**seeing**
40:9, 278:23
**seek**
70:6, 121:9,
123:8
**seeking**
70:4, 70:13,
238:24
**seem**
46:5, 131:14,
153:21, 190:18,
190:19, 191:11,
192:3, 208:8,
223:20, 281:19,
294:16
**seemed**
61:1, 175:25,
191:14, 198:4
**seemingly**
239:18, 277:1

**seems**
69:15, 120:16,
125:3, 149:23,
208:6, 208:14,
220:2, 263:21,
294:9
**seen**
183:15, 189:1,
202:3, 216:6,
216:9, 228:2,
230:7, 278:21,
278:22, 299:13
**sees**
183:6
**select**
228:24
**self-addressed**
277:17
**semester**
169:9, 169:25
**seminal**
61:22
**seminar**
169:8
**send**
49:24
**sense**
16:11, 25:15,
297:19
**sensical**
291:18
**sent**
35:12, 49:9,
49:14, 184:8
**sentence**
58:19, 82:24,
83:12, 83:18,
96:4, 99:8,
106:4, 113:14,
114:6, 120:9,
120:25, 121:15,
123:5, 123:13,
124:13, 124:23,
140:1, 146:13,
161:13, 161:23,
189:20, 193:18,
214:18, 216:21,
216:22, 227:4,

228:10, 228:11,
231:2, 232:16,
239:16, 246:18,
268:24, 286:18
**sentences**
124:4, 124:7,
205:22
**separate**
10:9, 195:13,
205:11
**separated**
37:11
**separately**
115:17
**september**
34:19, 76:15,
261:16
**series**
56:25, 57:14,
60:16, 63:12,
66:23, 74:5,
76:20, 79:7,
142:20
**serious**
147:20
**serve**
136:14
**service**
240:19, 278:18
**session**
165:22
**set**
152:9, 264:6,
264:11, 304:13
**setting**
83:13, 84:19,
276:4
**setup**
10:9
**seven**
245:19
**several**
8:21, 12:17,
22:10, 26:14,
30:4, 30:9,
142:13, 170:19,
176:20, 217:19,
247:6, 269:20

**share**
11:14, 11:19,
17:25, 47:17,
66:3, 70:10,
77:22, 79:3,
80:9, 103:9,
104:20, 139:9,
147:17, 156:17,
159:9, 165:25,
179:23, 220:25,
247:7, 260:25,
271:11, 271:15,
281:14, 286:5,
292:8
**shared**
45:3, 49:6
**shares**
140:7, 141:18
**sharing**
57:1, 57:15,
287:9, 292:7
**sheet**
16:15, 35:19,
303:7
**sheets**
17:5, 35:5,
35:15
**shift**
36:21, 108:13
**shifted**
171:22
**shilpa**
5:21
**short**
63:7, 224:3,
266:19, 289:16
**shortened**
28:17
**shorter**
95:15
**shorthand**
227:22, 239:2,
304:1
**shorting**
160:14
**shortly**
284:15
**shortness**
276:6

**should**
9:18, 23:7,
28:16, 39:1,
49:2, 62:15,
73:22, 99:21,
110:21, 130:18,
130:21, 130:24,
131:6, 131:11,
133:9, 136:13,
144:2, 147:20,
152:8, 155:6,
177:6, 183:17,
204:2, 227:2,
231:1, 232:20,
237:19, 247:23,
248:12, 248:14,
252:16, 253:12,
255:20, 256:3,
256:11, 258:24,
259:4, 263:23,
265:2, 277:2,
293:20, 294:5,
294:14, 296:22,
299:5
**shouldn't**
77:20, 82:8
**show**
29:8, 29:15,
30:20, 76:21,
79:1, 79:2,
79:4, 79:25,
87:18, 94:1,
108:15, 109:24,
110:6, 111:3,
111:6, 125:22,
218:11, 247:22,
251:19, 253:19,
259:12, 260:4,
261:12, 269:1,
269:15, 280:5,
289:25
**showed**
68:11, 102:17,
285:12, 296:11
**showing**
62:4, 115:19,
142:20, 230:17,
254:4, 290:9

**shown**
78:23, 88:5,
115:23, 116:5,
133:23, 138:5,
143:23, 260:23,
261:2, 281:12,
281:15, 281:19
**shows**
70:11, 77:1,
79:10, 84:3,
115:23, 118:12,
130:22, 139:22,
207:14, 220:4,
220:19, 257:14,
277:6, 289:3
**sic**
166:23, 286:6
**sidenote**
269:19
**signature**
32:17, 303:11
**signature-p1kal**
304:18
**signed**
303:7
**significance**
107:13, 110:2,
110:3
**significant**
100:6, 101:1,
101:9, 103:4,
105:21, 106:8,
106:10, 107:2,
108:15, 111:11,
111:15, 112:10,
112:20, 112:22,
113:25, 128:3,
138:4, 143:24,
150:14, 150:15,
212:18, 267:2,
268:16, 269:9,
269:10, 269:12,
269:17, 271:1,
291:19, 292:22,
293:7, 293:12,
294:25, 296:19,
296:24, 299:22,
301:3, 301:6

**significantly**
84:5, 88:16,
88:21, 89:23,
102:5, 103:7,
107:9, 107:11,
107:16, 107:18,
112:20, 113:3,
242:5, 242:8,
248:4, 248:7,
287:2, 294:8
**signing**
304:8
**silent**
124:1
**similar**
52:10, 175:20,
194:17, 208:23,
211:22, 212:22,
236:10, 236:17,
239:3, 241:17,
279:25
**similarly**
208:1
**simple**
224:4, 236:2,
272:25, 286:21
**simplicity**
283:14
**simply**
68:18, 77:19,
87:15, 97:4,
97:9, 98:10,
133:11, 135:5,
135:12, 147:5,
208:6, 211:2,
211:4, 220:8,
227:18, 229:7,
232:4, 232:5,
240:9, 251:5,
254:11, 258:6,
258:20, 259:8,
260:7, 260:23,
263:23, 268:2,
270:15, 271:10,
271:18, 272:19,
279:9, 279:16
**simultaneously**
196:4

**since**
12:18, 13:18,
18:19, 19:6,
21:19, 21:20,
24:6, 24:9,
24:16, 25:12,
32:11, 36:20,
36:22, 39:7,
39:9, 40:4,
40:12, 40:24,
41:1, 57:13,
61:14, 82:6,
130:17, 207:17,
268:24, 295:9
**single**
37:23, 155:23,
176:1, 193:10,
246:20
**sir**
107:25
**sit**
25:18
**sitting**
31:5, 177:1,
178:14, 184:18,
194:8, 282:14
**situation**
97:14
**six**
107:1, 245:19,
246:1
**size**
228:15
**sjostrom**
5:3
**skewed**
116:4
**skills**
25:8
**slightly**
137:14
**slope**
110:24, 111:1,
111:7, 111:10,
266:21, 267:1,
267:6, 292:5,
293:7, 296:16
**slopes**
102:5, 102:18,

103:7, 107:7,
107:9, 108:16,
109:8, 109:20,
110:5, 110:7,
110:8, 110:12,
111:15, 112:18,
112:22, 113:2,
113:6, 292:10,
292:23, 293:9,
294:8, 294:25,
299:17, 300:25
**sloping**
101:10
**slow**
22:24
**small**
139:22, 140:8,
152:17, 237:21,
301:5
**smaller**
244:1
**smartphone**
11:6
**smith**
4:20, 6:11,
6:12, 6:14,
43:3, 53:14,
54:4, 57:4,
70:15, 73:6,
73:17, 75:7,
75:9, 76:3,
77:10, 80:22,
82:5, 84:25,
85:6, 85:20,
86:9, 86:18,
91:18, 93:2,
93:24, 94:10,
94:20, 99:10,
100:20, 100:24,
103:14, 108:12,
108:23, 109:13,
114:15, 115:12,
115:13, 117:21,
118:8, 118:18,
119:25, 120:9,
127:13, 127:17,
127:25, 129:1,
137:25, 162:9,

162:16, 162:18,
180:8, 180:13,
191:13, 192:9,
192:14, 192:17,
192:20, 197:13,
214:7, 215:8,
218:11, 235:9,
235:21, 245:1,
253:13, 266:25,
267:17
**smith's**
13:23, 48:4,
49:16, 49:19,
52:24, 53:4,
53:24, 57:7,
57:17, 66:20,
66:21, 67:1,
67:8, 67:18,
67:23, 68:11,
74:18, 74:23,
74:25, 75:21,
83:10, 93:20,
102:3, 115:18,
116:17, 118:10,
118:23, 119:4,
125:12, 126:7,
126:11, 126:24,
145:5, 166:1,
166:9, 166:19,
166:22, 190:6,
191:12, 192:2,
194:3, 253:5,
265:12, 265:18
**snarky**
253:1
**social**
28:13, 28:17,
29:1, 29:4,
30:5, 30:16,
169:6, 185:1,
273:22, 273:23,
278:21
**soe**
4:20, 5:18
**soes**
4:9
**solely**
23:18, 23:21

**solicit**
69:22, 69:23,
77:13, 77:21,
79:20
**solicitation**
70:14, 77:18
**solicitations**
181:2, 263:10
**solicited**
263:8
**soliciting**
77:6
**solid**
27:14
**some**
11:15, 14:1,
18:18, 18:23,
19:3, 22:18,
24:21, 28:25,
30:20, 37:25,
38:1, 52:5,
56:18, 58:3,
60:24, 62:10,
65:21, 66:8,
70:19, 71:2,
132:15, 133:11,
149:7, 150:5,
162:25, 166:25,
168:8, 173:25,
174:16, 176:17,
185:4, 188:3,
188:5, 190:24,
200:8, 202:16,
202:21, 207:5,
209:3, 210:2,
213:20, 214:7,
215:13, 216:1,
216:12, 223:17,
223:25, 224:20,
228:4, 233:3,
262:11, 264:15,
272:12, 272:16,
273:2, 276:2,
278:14, 279:7,
279:17, 280:3,
280:4, 280:17,
281:18, 285:9,
290:25, 291:18,

296:20, 301:8,
302:4
**somebody**
39:19, 72:5,
173:20, 240:22
**somehow**
221:8
**someone**
34:11, 89:7,
183:12, 273:3
**something**
25:5, 43:3,
70:14, 96:8,
97:23, 104:21,
123:21, 135:12,
139:3, 142:2,
163:6, 163:20,
173:17, 182:25,
188:9, 212:9,
233:3, 237:10,
241:13, 261:9,
271:25, 272:5,
287:23
**sometime**
17:10
**sometimes**
39:22, 59:21,
63:16, 79:21,
128:13, 185:16,
211:10, 211:16,
211:24
**somewhere**
153:15, 295:5
**soon**
167:25, 299:7
**sorry**
32:23, 32:25,
37:20, 38:9,
40:11, 40:12,
42:13, 44:6,
44:13, 48:18,
48:20, 50:1,
58:18, 62:4,
68:1, 69:12,
69:13, 73:19,
75:23, 75:25,
78:4, 78:13,
97:22, 101:11,

102:25, 104:22,
111:18, 114:25,
134:20, 196:24,
198:6, 254:17,
264:1, 276:17,
276:18, 279:23,
292:7, 295:15,
297:2
**sort**
11:17, 16:12,
22:19, 64:8,
82:9, 95:2,
104:20, 112:1,
129:19, 138:13,
154:14, 161:2,
163:15, 174:8,
177:12, 287:24
**sought**
69:17, 186:7
**sound**
9:7, 9:21,
14:20, 79:14,
102:19
**sounds**
18:23, 27:13,
32:2, 79:15,
107:23, 108:4,
236:24
**source**
77:7, 233:10,
233:12
**sources**
45:22, 54:19,
55:2, 55:7,
55:19, 55:21,
60:4, 151:6,
152:6, 187:11,
268:7
**sourcing**
45:7, 45:13
**south**
3:7, 5:19,
36:18
**speak**
9:5, 68:1,
108:2, 111:2
**speaking**
9:6, 9:14,

105:11, 105:19
**speaks**
21:25, 61:18
**special**
3:19
**specialization**
19:19, 19:22,
20:6, 20:12,
21:15, 21:17
**specific**
41:12, 41:23,
45:14, 58:16,
61:15, 69:19,
72:12, 76:8,
170:22, 174:17,
185:22, 193:20,
207:5, 210:3,
210:7, 210:9,
271:23
**specifically**
9:20, 12:25,
13:22, 21:16,
22:4, 22:21,
25:20, 27:21,
41:18, 45:19,
81:21, 140:15,
141:4, 141:24,
144:18, 147:20,
156:11, 161:25,
167:15, 180:16,
182:8, 194:9,
202:15, 283:23,
285:17
**specification**
158:5
**specifics**
221:11
**speculate**
206:24, 209:19,
213:24, 231:5,
232:2, 232:10,
234:25
**speculating**
190:20, 256:9
**speculation**
93:10, 109:2,
199:10, 214:9
**speculations**
282:19

**speculative**
130:2, 190:6,
193:20, 193:22,
193:25, 194:5,
194:9, 203:20,
205:16, 205:25,
207:17, 212:13,
212:15, 213:5,
223:25, 230:12,
258:10
**speed**
106:2, 302:9
**spell**
182:17
**spend**
188:3, 302:4
**spent**
16:6, 16:12,
31:7, 171:5
**spoke**
12:15, 12:21,
12:22
**spoken**
13:15
**spreadsheets**
17:3
**spring**
25:23, 26:23,
28:7, 37:9,
38:19
**squinch**
299:22
**sr**
5:9
**ss**
290:23
**staff**
3:16
**staffed**
20:19
**stage**
52:14
**stamped**
277:17
**stand**
40:11, 185:5
**stand-alone**
124:6

**standard**
17:13, 61:5,
61:7, 61:13,
63:4, 151:16,
151:21, 151:22,
152:1, 191:8,
278:7, 288:14,
293:17, 296:17,
296:20, 299:19,
299:23, 300:2
**standardize**
243:17
**standardizing**
264:2
**starnes**
4:10
**stars**
171:1
**start**
9:14, 18:25,
29:12, 43:1,
47:23, 48:9,
48:10, 57:1,
61:12, 66:18,
183:13, 188:16,
189:15, 205:14,
221:5, 224:22,
227:20, 234:16,
241:23, 268:23,
291:3, 291:13
**started**
35:20, 36:21,
40:15, 46:2,
52:25, 104:25,
106:7, 171:8,
171:14, 171:24
**starting**
18:13, 21:23,
42:20, 42:24,
43:14, 48:2,
53:3, 99:8,
108:22, 129:10,
139:21, 156:23,
249:6, 286:13
**starts**
161:13, 216:22,
241:25
**starving**
163:2

**state**
1:4, 1:11, 3:3,
26:1, 26:24,
28:14, 28:16,
28:23, 32:19,
33:1, 38:15,
67:1, 90:8,
90:18, 139:24,
154:18, 154:20,
155:11, 158:3,
176:17, 201:12,
233:18, 233:24,
236:5, 254:9,
275:25, 277:9,
281:23, 282:4,
304:22
**state's**
14:1, 27:25,
274:9
**stated**
9:17, 136:11,
222:13
**statement**
114:3, 120:8,
120:16, 146:18,
146:19, 189:23,
209:7, 210:18,
239:19, 255:17,
272:25, 275:9,
284:12
**statements**
122:8, 135:8,
136:21, 200:17
**states**
1:1, 26:10,
28:15, 29:3,
30:16, 65:20,
149:13, 149:18,
149:19, 153:7,
153:13, 153:15,
155:15, 156:2,
157:7, 157:14,
181:9, 273:14,
277:10, 277:15,
277:22, 286:24
**statistical**
111:20, 113:5
**statistically**
100:6, 100:25,

103:4, 103:7,
106:7, 106:9,
107:2, 111:14,
112:10, 113:24,
267:2, 269:9,
291:19, 292:22,
294:25, 301:5
**statistics**
67:2
**statute**
55:24
**statutes**
55:24
**stayed**
290:22
**steep**
296:15
**steeper**
101:24, 110:25,
112:7, 266:22,
290:25
**stein**
1:15, 6:2, 6:8,
6:9, 7:3, 7:4,
7:7, 8:2, 8:11,
8:19, 14:22,
15:20, 35:25,
78:3, 135:20,
142:22, 158:15,
189:1, 195:7,
284:21, 285:6,
301:12, 301:23,
303:2
**stein-alford**
6:10, 217:23,
218:23, 225:20,
238:7, 238:10,
238:22, 238:25,
239:3, 239:8,
239:19, 246:18
**stenographer**
73:25
**stenographically**
304:6
**step**
49:2
**stephanie**
3:18

**stephen**
5:9
**still**
18:16, 52:15,
97:2, 97:3,
158:6, 159:25,
182:11, 207:3,
291:7, 291:8,
301:18
**stipulate**
161:18
**stop**
6:23, 42:18,
46:5, 51:17,
82:21, 104:13,
104:19, 105:23,
132:22, 134:5,
159:11, 251:17,
287:9, 294:19
**straight**
290:19
**strategy**
247:16, 253:7,
260:8
**street**
2:9, 2:16, 3:7,
4:6, 4:11
**strict**
6:22, 154:3,
158:10, 159:11,
159:21, 160:23,
161:8, 161:13
**strikes**
240:7
**strong**
125:13, 164:22,
224:10
**stronger**
271:4, 271:19
**strongest**
132:11
**strongly**
293:23
**student**
23:4
**students**
177:13, 180:20,
183:20, 183:21,

183:23, 300:14,
300:19
**studied**
22:8, 159:4,
170:21, 171:17,
213:12
**studies**
131:20, 142:20,
143:11, 143:14,
150:6, 150:8,
150:14, 150:18,
151:7, 151:11,
152:11, 152:17,
153:20, 162:3,
176:16, 182:3,
183:1, 184:5,
184:10, 187:5,
213:11, 214:12,
214:13, 280:5,
280:8, 288:15,
289:25
**study**
22:7, 22:15,
23:12, 131:18,
141:17, 177:4,
177:5, 178:18,
181:9, 184:1,
274:8, 279:15,
280:10
**studying**
139:20
**stuff**
79:17, 174:10
**subject**
20:2, 24:23,
44:20, 145:17,
154:16, 207:18,
223:16, 261:22,
286:24
**submit**
16:14, 19:25,
45:5
**submitted**
10:22, 15:24,
16:3, 16:17,
17:2, 17:4,
18:6, 18:15,
32:2, 34:24,

36:2, 57:13,
57:24, 59:4,
59:10, 60:12,
66:4, 87:1,
87:2, 136:7,
268:8, 298:24,
300:7
**submitting**
13:18
**subscribe**
47:16
**subsection**
157:22, 157:25
**subsections**
43:17
**subsequent**
102:4, 249:13
**subsidy**
240:25
**substance**
28:21
**substantial**
128:20, 145:13
**substantially**
108:8
**substantiated**
125:21
**substantive**
166:25, 167:1
**substitute**
262:24
**substituted**
80:17, 237:16
**substituting**
262:3
**substitution**
261:23, 262:9,
262:11, 263:16,
263:19, 263:22
**subtracting**
255:11
**success**
286:14
**suffer**
147:2
**suffered**
105:13, 105:20,
105:21

**sufficient**
68:24, 86:1,
127:9, 212:17,
223:23, 260:4,
298:11
**suggest**
69:15, 69:16,
70:16, 71:23,
80:24, 81:11,
85:14, 111:7,
118:24, 120:17,
121:25, 122:3,
122:20, 122:21,
129:25, 130:3,
147:10, 207:8,
207:11, 207:18,
210:23, 212:3,
222:23, 238:22,
248:11
**suggested**
45:7, 46:22,
75:14, 91:7,
102:4, 103:6,
116:12, 125:14,
131:12, 212:2,
240:19, 243:20,
271:7, 295:6
**suggesting**
77:19, 90:17,
90:20, 91:1,
155:6, 223:20,
230:5, 263:23,
279:8
**suggestion**
81:13, 258:22
**suggestions**
44:4, 44:9,
44:12, 44:16,
44:19, 45:4
**suggestive**
113:1, 207:17,
232:14, 261:23
**suggests**
69:6, 124:20,
127:24, 149:24,
253:15, 270:15
**suit**
208:6, 208:8,

208:14
**suite**
3:7, 5:16, 5:19
**summaries**
43:11
**summarize**
18:16
**summarizes**
139:3, 145:21,
250:7
**summary**
51:21, 51:24,
52:1, 76:7,
76:8, 80:15,
80:20, 94:11,
116:16, 116:18,
117:10
**summation**
79:13, 79:15,
79:16
**summer**
90:3
**superior**
236:7, 254:25
**supervisor**
4:3, 4:13,
4:19, 5:15
**supervisors**
3:11
**supplemental**
129:20, 129:21
**support**
61:1, 61:3,
67:2, 82:14,
85:6, 86:1,
88:5, 109:2,
132:5, 158:7,
185:17, 190:10,
293:23, 294:16,
295:16, 297:19
**supported**
120:21, 216:13
**supportive**
85:22
**supports**
120:15
**suppose**
24:25

**supposed**
21:11, 32:7,
173:14
**suppress**
156:25, 219:21
**suppresses**
219:19
**suppressing**
215:17
**sure**
9:1, 9:6,
11:16, 14:16,
18:18, 19:13,
22:17, 25:5,
35:15, 39:25,
49:21, 53:12,
54:22, 55:1,
56:11, 59:21,
60:10, 62:18,
68:16, 71:19,
73:24, 76:3,
83:9, 97:11,
101:6, 104:14,
107:12, 108:11,
108:19, 119:2,
119:20, 120:4,
121:24, 123:22,
126:25, 127:3,
127:4, 127:5,
134:9, 137:3,
140:22, 141:7,
143:3, 146:5,
146:16, 148:18,
149:17, 151:9,
153:4, 155:18,
158:20, 184:13,
191:3, 192:15,
195:23, 211:21,
215:19, 229:21,
236:22, 245:9,
266:14, 270:19,
289:2, 289:12,
291:25, 292:14,
298:14, 298:17,
299:10, 301:18
**surprise**
72:7, 82:8

**surprised**
71:7, 71:10,
133:2, 253:16,
296:15
**surprising**
77:20, 300:1
**surprisingly**
169:20
**surrebuttal**
59:21
**survey**
25:1, 36:9,
36:11, 36:12,
36:16, 66:1,
157:3, 169:8,
177:21, 178:6,
178:9, 178:10
**surveyed**
177:11
**surveys**
25:2, 25:9,
178:17
**suspect**
236:7, 268:11
**swain**
4:3
**sworn**
8:3
**syllabi**
182:2, 300:10
**syllabus**
184:14
**systematic**
197:14
**systems**
11:5

---
**T**
---
**table**
52:18, 52:20,
75:13, 101:5,
101:24, 108:13,
110:23, 207:13,
208:9, 220:4,
250:2, 250:8,
250:9, 251:17,
254:5, 256:25,
257:12, 257:14,

258:17, 259:12,
263:17, 268:3,
268:15, 269:7,
269:8, 269:11,
269:12, 269:19
**tables**
76:20, 87:22,
111:3, 224:23,
225:11, 225:17,
261:11
**take**
24:4, 27:18,
42:5, 42:18,
58:6, 66:12,
81:10, 94:1,
94:7, 105:5,
118:14, 122:2,
128:25, 130:4,
152:9, 160:13,
161:11, 162:24,
165:17, 168:1,
183:12, 189:9,
189:13, 204:20,
214:3, 214:19,
214:22, 217:6,
228:4, 234:3,
237:4, 246:10,
248:19, 248:20,
248:21, 248:25,
249:2, 251:6,
258:7, 258:21,
266:17, 271:25,
273:19, 277:25,
279:11, 284:14,
286:12, 291:5,
292:15
**taken**
58:11, 99:25,
165:21, 237:1,
247:23, 248:12,
248:14, 284:19,
304:3, 304:6
**takes**
105:12
**taking**
118:9, 120:15,
278:10
**talk**
11:15, 13:3,

13:14, 21:2,
41:23, 42:23,
54:12, 71:14,
89:8, 89:10,
97:4, 109:24,
126:10, 132:19,
139:20, 148:1,
152:21, 153:18,
163:16, 204:14,
212:6, 228:23,
263:7, 285:17,
287:23
**talked**
33:17, 35:16,
54:7, 89:16,
89:18, 114:14,
114:15, 114:16,
135:18, 144:9,
176:21, 220:4,
287:25
**talking**
14:19, 35:9,
43:2, 62:19,
78:16, 105:18,
126:10, 154:7,
160:19, 185:14,
249:12, 273:8
**talks**
143:20, 143:21,
145:1, 163:25,
275:22
**tallahassee**
1:3, 3:8, 3:21,
5:7, 177:2
**tampa**
5:12
**target**
63:23, 63:25,
64:1, 81:20,
140:7, 147:16,
219:17, 220:24,
222:6, 222:18,
223:11, 238:23,
239:5, 241:15,
268:5, 271:13,
271:19
**targeted**
28:19, 69:18,

140:9, 180:16,
181:1, 186:7,
240:21, 281:16
**targeting**
70:12, 241:17,
270:16
**targets**
72:6
**tasks**
183:13
**taught**
169:5, 169:7,
169:14, 169:25,
181:20, 181:23,
181:24, 181:25
**teach**
20:2, 169:9,
175:1
**teaches**
169:17
**teaching**
21:19, 55:11,
169:1, 169:10,
169:17, 182:6
**team**
8:15
**technical**
167:11
**techniques**
291:18
**tedious**
188:8, 200:9
**tell**
9:24, 10:1,
10:13, 28:9,
38:15, 80:2,
101:12, 101:14,
124:3, 180:3,
186:16, 278:4,
278:15
**telling**
82:2, 112:21,
145:25
**tells**
111:17
**tempered**
130:14
**temple**
182:12

**temporal**
16:2
**ten**
268:7
**tend**
27:17
**tended**
193:2
**tends**
172:20
**tenet**
275:17
**tenor**
193:25
**term**
69:1, 142:13,
221:10
**terms**
20:4, 20:20,
85:15, 98:15,
102:17, 196:6,
273:21, 277:1,
289:19
**test**
63:6, 99:11,
109:13, 110:2,
110:7, 110:18,
111:21, 113:15,
113:19, 114:5,
114:8, 114:11,
114:23, 115:3,
115:13, 126:1,
133:10, 206:25,
211:1, 223:18,
224:2, 228:10,
228:17, 229:8,
233:5, 258:15,
262:1, 267:11
**tested**
260:22, 262:15
**testified**
8:5, 24:24,
31:2, 31:15,
31:17, 32:9,
168:22, 175:21,
187:24, 211:10,
211:16, 218:9,
224:8, 224:13,

227:21, 234:10,
267:13, 285:16
**testify**
8:4, 31:12,
32:4
**testifying**
287:11
**testimony**
23:25, 24:4,
25:11, 33:4,
33:6, 33:8,
33:11, 33:14,
49:4, 70:23,
73:20, 191:2,
193:17, 196:17,
229:23, 242:25,
244:18, 261:10,
303:4, 303:6,
304:5, 304:6
**testing**
223:17
**tests**
110:3, 110:15,
115:8, 206:20,
283:2
**texas**
36:18, 187:1
**text**
44:4, 54:6,
89:14, 102:20,
106:3
**th**
2:9, 2:16,
5:12, 181:10,
236:16
**thank**
8:13, 14:15,
16:5, 17:24,
65:2, 121:22,
284:21, 301:21,
301:22
**thanks**
301:11
**themselves**
10:22, 235:2
**then-president**
26:25
**theories**
46:10, 214:20,

216:12, 216:17
**theory**
126:5, 126:11,
126:24, 127:10,
128:13, 128:14,
129:24, 129:25,
137:7, 137:16,
145:21, 149:25,
150:1, 205:17,
214:19, 272:3,
272:10, 272:15,
272:17, 272:23
**thereafter**
304:7
**therefore**
119:10, 244:3
**thing**
22:19, 59:22,
134:13, 138:14,
143:13, 163:15,
166:15, 258:6,
297:2
**things**
10:21, 13:2,
13:3, 35:13,
52:11, 56:1,
56:19, 61:2,
73:14, 91:20,
96:6, 126:6,
190:24, 198:25,
206:4, 273:12,
275:7, 277:1,
279:17, 291:10,
293:15
**thinking**
38:10
**thinks**
38:25
**thomas**
27:24, 65:4
**thought**
34:15, 50:6,
62:4, 78:4,
78:13, 101:19,
102:17, 111:19,
128:21, 198:5,
203:16, 240:25,
262:14, 263:16,

267:3, 292:7,
294:11, 300:3
**thoughts**
51:11
**thousand**
243:9, 243:10,
243:13
**threat**
232:3
**three**
43:16, 101:7,
103:5, 105:12,
106:25, 150:18,
170:1, 184:16,
193:2, 214:8,
240:14, 277:23,
278:8, 279:20,
285:20, 292:21,
293:21
**through**
9:2, 11:15,
23:9, 25:19,
25:25, 29:20,
38:24, 43:21,
44:2, 45:24,
52:23, 53:1,
53:11, 53:15,
53:16, 53:17,
53:20, 68:5,
68:19, 69:7,
73:3, 73:7,
73:9, 75:5,
76:13, 76:22,
77:2, 77:23,
80:6, 83:6,
84:8, 96:16,
115:25, 116:8,
117:11, 118:3,
127:14, 138:22,
148:18, 151:25,
158:13, 158:16,
166:22, 168:5,
184:14, 193:23,
194:10, 201:3,
206:23, 207:2,
207:6, 213:10,
220:6, 221:2,
221:3, 221:4,

221:22, 224:25,
225:1, 225:3,
225:4, 231:13,
231:15, 284:16
**throughout**
208:22, 209:1
**ticket**
32:7, 183:12
**time**
1:17, 8:22,
12:22, 16:12,
16:14, 17:5,
17:23, 25:12,
25:16, 31:16,
35:5, 35:15,
35:19, 39:17,
40:15, 49:22,
58:6, 61:4,
63:12, 65:21,
70:10, 79:6,
82:15, 83:25,
91:5, 95:16,
96:1, 106:15,
107:4, 107:11,
107:18, 108:18,
110:3, 110:4,
110:10, 110:19,
110:22, 124:20,
136:11, 154:9,
155:20, 159:6,
161:14, 174:12,
188:3, 205:1,
213:8, 222:4,
228:4, 229:2,
231:23, 231:25,
232:25, 233:1,
235:23, 235:25,
236:20, 236:23,
243:16, 244:2,
244:6, 246:11,
249:23, 267:9,
272:11, 273:20,
276:6, 278:5,
279:6, 285:16,
287:25, 288:8,
289:3, 293:8,
299:1, 300:1,
301:11, 302:4

**timeline**
297:2
**times**
8:19, 12:17,
31:1, 31:2,
86:13, 107:1,
122:14, 122:18,
125:15, 164:21,
166:6, 168:14,
188:8, 239:24,
246:1, 246:7,
247:6, 264:1,
269:20, 288:1,
292:4
**titled**
43:12, 43:13,
43:14, 139:11,
156:19, 250:2
**titles**
179:14
**today**
8:13, 8:18,
11:12, 33:18,
59:17, 60:10,
77:25, 82:15,
92:6, 92:11,
129:16, 167:15,
177:1, 200:2,
237:11, 288:1
**today's**
9:3, 12:7,
13:16, 16:9
**todd**
5:9
**together**
37:4, 37:10,
39:17, 133:12,
149:4, 169:14,
174:1, 239:25,
281:19, 289:1
**told**
30:25, 31:11,
46:5, 49:6,
60:10, 76:16,
100:18, 152:6,
155:1, 173:2,
180:15
**tomorrow**
176:2

**took**
21:20, 40:24,
54:2, 96:25,
102:10, 120:24,
251:16, 292:16
**top**
18:14, 35:23,
47:23, 53:17,
184:19, 189:17,
193:6, 248:2,
268:7
**topic**
21:23, 22:1,
33:9
**topics**
20:1, 25:3,
55:18, 175:13
**torchinsky**
3:6
**tortured**
259:18
**total**
13:5, 16:9,
24:15, 68:10,
89:5, 116:3,
125:5, 151:7,
151:24, 151:25,
193:6, 221:23,
224:6, 227:10,
231:22, 231:24,
242:11, 243:7,
243:23, 244:11,
247:14, 247:17,
247:18, 247:25,
248:9, 248:12,
248:14, 248:15,
248:16, 248:22,
248:24, 250:24,
251:6, 251:9,
251:13, 252:4,
252:7
**totally**
163:3
**touch**
22:11, 301:8
**touched**
23:25, 177:25
**touches**
20:16, 23:5

**toward**
36:21, 152:12
**towards**
116:4
**tracked**
210:6
**transcribed**
9:5
**transcript**
6:7, 7:2, 7:4,
12:2, 18:4,
29:9, 29:25,
57:6, 57:19,
65:12, 75:24,
103:12, 139:14,
156:22, 159:15,
188:24, 204:19,
217:10, 286:10,
302:8, 302:10,
304:4
**transcription**
303:5
**transfers**
171:17
**transition**
268:25
**transposed**
45:18
**transposing**
45:21
**travel**
280:20
**tread**
15:15
**treat**
239:1
**treatment**
184:25, 291:1
**trend**
290:12
**trial**
31:2, 31:4,
31:17, 32:4
**tribe**
64:25
**tried**
219:11, 298:8
**true**
32:21, 51:4,

54:22, 80:23,
91:10, 91:12,
91:25, 92:16,
123:5, 123:14,
146:18, 155:13,
201:21, 231:9,
276:12, 303:4,
304:4
**trump**
27:1
**truth**
8:4, 8:5
**truthfully**
11:12
**try**
9:25, 55:13,
73:11, 73:15,
168:10, 183:3
**trying**
15:19, 16:1,
49:21, 56:11,
60:23, 68:14,
71:17, 74:4,
78:15, 80:13,
84:10, 91:24,
114:18, 114:20,
117:21, 124:18,
141:21, 145:1,
151:1, 172:7,
222:15, 235:23,
248:11, 275:19,
280:23
**turn**
93:12, 108:2,
147:25, 159:16,
183:24, 217:20,
238:3, 241:21,
259:21, 263:13,
271:21
**turning**
160:22
**turnout**
6:21, 21:6,
22:3, 22:16,
23:1, 23:6,
23:12, 23:20,
43:16, 46:4,
46:10, 46:13,

61:10, 61:19,
62:9, 62:16,
62:20, 78:12,
93:16, 128:23,
129:24, 131:11,
132:9, 132:14,
136:16, 137:22,
139:23, 140:8,
140:14, 140:24,
141:1, 141:10,
141:14, 141:17,
142:21, 142:24,
143:10, 143:15,
143:25, 147:11,
148:24, 150:3,
150:6, 150:15,
151:7, 152:18,
154:25, 155:10,
156:3, 156:14,
156:20, 156:25,
157:10, 158:10,
158:25, 163:18,
164:19, 165:3,
165:9, 174:20,
182:3, 183:16,
184:4, 187:22,
209:23, 212:8,
213:25, 215:2,
215:10, 215:18,
216:8, 273:9,
273:12, 273:13,
285:14, 287:22
**turnouts**
147:19, 156:5
**twice**
62:14
**two**
26:11, 28:14,
36:4, 38:13,
43:5, 43:6,
43:8, 43:10,
43:11, 46:11,
46:14, 46:17,
46:19, 46:24,
50:20, 74:21,
88:4, 89:1,
115:17, 124:4,
124:6, 137:23,

138:3, 141:8,
147:4, 149:4,
150:10, 162:3,
170:1, 170:2,
170:16, 172:15,
175:22, 179:7,
184:16, 208:11,
214:7, 214:10,
219:19, 225:16,
229:16, 229:24,
231:21, 231:25,
243:21, 244:6,
251:12, 252:14,
259:13, 278:7,
281:18, 293:8
**two-year**
229:22, 230:16
**twofold**
226:2
**tying**
289:9
**type**
115:12, 160:13,
161:8, 161:17,
203:1, 203:9,
204:2, 213:3,
227:22, 234:23,
256:10, 260:15,
273:2, 288:17,
291:2
**types**
90:13, 135:10,
184:24, 215:22,
224:11, 285:20,
287:15
**typewriting**
304:7
**typical**
17:6, 17:18
**typically**
9:18, 23:11,
203:1, 203:4
**typo**
237:20, 237:22
**typographical**
166:25
**typos**
45:17

| U | | | |
|---|---|---|---|
| **uc** | 189:24, 192:6, | **units** | **usage** |
| 184:21 | 195:20, 197:23, | 1:6 | 269:3, 269:6 |
| **uh-humh** | 200:10, 207:25, | **universe** | **use** |
| 27:5 | 222:7, 222:15, | 181:5, 181:6, | 61:6, 61:7, |
| **ultimate** | 289:2, 290:11, | 249:15 | 61:13, 61:23, |
| 141:10 | 298:18, 300:5 | **university** | 63:10, 68:17, |
| **ultimately** | **understanding** | 38:17, 38:24, | 68:20, 68:21, |
| 192:25, 300:7 | 58:17, 58:20, | 38:25, 168:23, | 68:25, 69:3, |
| **unanswered** | 58:24, 63:25, | 169:2 | 70:3, 77:18, |
| 113:1 | 98:21, 115:15, | **unless** | 88:7, 130:4, |
| **under** | 115:16, 118:12, | 9:19, 95:23, | 135:4, 135:12, |
| 20:17, 80:9, | 125:16, 138:14, | 163:2, 164:10, | 136:23, 142:14, |
| 135:24, 200:2, | 161:10, 175:22, | 199:22, 263:7 | 151:20, 172:14, |
| 256:25, 264:8, | 180:12, 181:4, | **unpublished** | 180:6, 185:12, |
| 264:13, 304:7 | 187:7, 187:15, | 22:11 | 191:12, 212:13, |
| **undercount** | 190:14, 191:21, | **unquote** | 214:4, 222:25, |
| 67:19 | 192:4, 196:13, | 238:23, 269:2, | 230:7, 245:4, |
| **undergraduate** | 201:13, 201:17, | 269:5 | 245:24, 250:10, |
| 169:8, 169:11 | 208:20, 209:13, | **unregistered** | 264:17, 264:24, |
| **undermine** | 215:20, 222:19, | 183:2, 186:17, | 273:25, 274:8 |
| 222:15, 222:16 | 229:3, 229:15, | 222:22 | **useful** |
| **underrepresented** | 235:11, 236:9, | **unrelated** | 27:19 |
| 155:17, 156:6, | 236:15, 243:1, | 24:15 | **users** |
| 186:12, 271:14, | 256:20, 273:15, | **unresponsive** | 258:1 |
| 287:20, 288:5 | 282:12, 292:15 | 258:20 | **uses** |
| **understand** | **understood** | **until** | 208:21, 208:25, |
| 9:24, 10:1, | 74:1, 124:16, | 39:11, 256:4, | 233:10, 233:12, |
| 10:2, 11:11, | 184:18, 195:21, | 256:6, 295:21, | 275:16 |
| 14:16, 15:14, | 205:7 | 297:24, 298:1, | **using** |
| 20:21, 35:10, | **undertaken** | 299:16 | 66:5, 69:1, |
| 38:3, 44:22, | 255:20 | **update** | 70:13, 151:17, |
| 47:6, 60:7, | **undertook** | 67:14, 86:14, | 158:8, 211:22, |
| 68:8, 73:10, | 50:10 | 86:22, 121:12, | 230:16, 252:24, |
| 73:12, 73:19, | **underwrite** | 123:11 | 253:2, 276:22 |
| 74:13, 77:7, | 70:16 | **updated** | **usually** |
| 77:24, 78:9, | **unfortunate** | 32:15 | 183:4, 185:1 |
| 83:9, 84:9, | 210:25, 228:9, | **updates** | **utah** |
| 84:11, 85:11, | 228:18 | 18:24 | 277:9 |
| 85:23, 91:11, | **unimpeded** | **updating** | |
| 97:12, 98:12, | 131:16 | 69:18, 83:5, | V |
| 107:21, 107:22, | **unintended** | 83:19, 83:23 | **valid** |
| 114:18, 116:14, | 165:2 | **upload** | 130:13, 160:13, |
| 123:18, 123:22, | **union** | 11:17 | 208:18 |
| 124:17, 137:12, | 2:5, 8:8, 285:2 | **uptick** | **value** |
| 140:22, 140:23, | **unique** | 75:15 | 278:22, 280:1 |
| 141:9, 153:4, | 186:23, 191:18 | **urban** | **variable** |
| | **united** | 171:15 | 271:19, 273:11 |
| | 1:1, 28:3 | **urge** | **variables** |
| | | 97:2 | 131:13, 214:4, |

273:6, 291:24
**variety**
38:17
**various**
37:24, 67:2,
143:16, 208:22,
238:12, 238:16,
265:9
**vary**
243:15
**vast**
130:16
**vehicle**
207:16
**vehicles**
75:6, 186:5,
207:4
**verba**
132:1
**verbal**
9:6, 75:23
**verification**
32:17
**verify**
49:12
**vermont**
277:10
**version**
210:15
**versions**
210:5, 210:15
**versus**
8:16, 26:18,
28:3, 28:7,
65:3, 65:5,
110:4, 232:25,
264:4, 290:13
**vet**
32:13
**via**
10:13, 108:25,
217:25, 218:6,
218:13, 218:19,
219:1, 226:19,
238:9, 238:16,
239:8, 239:21,
242:6, 248:6,
258:2, 265:8,

268:1, 269:18,
269:24, 270:3
**videoconference**
1:14
**view**
27:17, 47:4,
47:11, 208:14,
282:24
**virginia**
7:8, 25:23,
27:24, 28:7,
28:13, 64:22,
65:9, 174:6
**virtually**
25:7, 171:7
**visit**
183:9
**visually**
102:13, 102:17,
105:6, 105:11,
105:19, 113:1
**vitae**
18:14, 21:22,
131:8, 171:6,
172:9, 174:7,
181:25, 183:18,
274:18, 277:5
**vogel**
3:5
**voice**
32:13
**volumes**
151:19
**volunteer**
70:13
**volunteerism**
70:4, 77:5,
77:13, 77:19
**volusia**
4:13
**vot**
220:14
**vota**
31:24, 69:20,
70:22, 185:18,
185:20, 187:14
**vota's**
187:15

**vote**
21:4, 22:3,
27:10, 67:10,
68:5, 68:13,
69:24, 72:4,
73:18, 78:25,
83:5, 83:19,
83:23, 84:6,
85:16, 86:4,
88:11, 88:14,
88:15, 88:20,
88:24, 95:12,
98:9, 119:18,
121:4, 121:10,
121:11, 123:9,
123:10, 125:17,
128:16, 128:17,
128:19, 141:18,
143:21, 153:9,
153:11, 153:17,
154:15, 154:22,
155:12, 163:2,
164:1, 164:7,
164:17, 164:21,
177:8, 183:3,
183:14, 207:3,
217:25, 218:18,
219:1, 221:15,
226:21, 232:5,
234:1, 237:15,
238:8, 238:9,
238:12, 238:16,
238:25, 242:3,
242:6, 246:1,
248:6, 262:4,
264:7, 264:12,
264:16, 264:19,
265:8, 268:1,
269:18, 269:24,
270:3, 273:3,
274:8, 275:23,
276:13, 276:16,
276:19, 277:11,
280:2, 280:6,
280:14, 288:9,
290:2, 290:7,
290:9, 290:21
**voter's**
164:5

| W |
| --- |

**wait**
104:12, 186:4,
229:16, 229:24,
256:6, 301:1
**waited**
256:3
**waiting**
164:21, 177:8
**waive**
302:7
**waived**
304:9
**walk**
9:2, 221:2,
277:22, 278:8,
278:19, 278:25
**walked**
213:10
**walking**
112:8
**waller**
26:18, 65:5,
65:6
**wandering**
27:23, 65:3
**want**
9:2, 14:17,
15:15, 19:13,
27:3, 39:12,
41:21, 42:18,
47:22, 66:18,
68:21, 68:22,
70:10, 75:18,
79:17, 82:20,
83:9, 85:12,
85:24, 88:9,
89:11, 93:23,
104:13, 106:2,
106:21, 107:7,
120:5, 120:24,
121:11, 122:11,
123:10, 127:12,
131:5, 131:23,
138:3, 139:19,
147:25, 150:22,
150:25, 153:3,

153:18, 172:4,
174:23, 180:5,
193:24, 212:5,
232:22, 234:21,
239:16, 242:24,
243:1, 243:13,
246:17, 252:8,
253:3, 259:2,
263:12, 270:22,
272:24, 274:24,
275:3, 277:2,
277:21, 277:24,
277:25, 278:11,
278:20, 279:2,
284:16, 288:12,
291:25, 292:14,
297:1, 298:17,
301:17

**wanted**
42:23, 56:21,
58:15, 166:8,
168:13, 286:12,
302:11

**wants**
240:22, 275:17

**washington**
2:10, 2:17,
277:9

**watchers**
178:3

**water**
99:17

**way**
15:4, 15:7,
53:12, 72:17,
72:18, 72:19,
72:23, 72:24,
72:25, 73:2,
73:18, 73:19,
74:2, 74:3,
74:9, 74:10,
74:11, 74:14,
74:16, 79:5,
87:19, 92:4,
92:6, 92:18,
103:1, 111:5,
111:21, 114:24,
154:12, 170:18,

185:24, 189:10,
190:14, 196:16,
197:15, 199:18,
200:3, 203:21,
203:23, 209:17,
210:17, 210:19,
216:10, 233:14,
236:16, 243:16,
245:3, 252:13,
253:9, 277:7,
277:8, 277:12,
278:10, 278:17,
300:11, 300:22,
300:23

**ways**
63:8, 207:1,
220:7, 278:16

**we'll**
10:6, 13:14,
14:23, 19:12,
58:9, 63:11,
137:12, 188:21,
189:13, 189:15,
204:20, 205:13,
207:5, 208:18,
217:7, 217:20,
221:2, 228:23,
234:15, 237:4,
237:9, 238:19,
248:2, 249:24,
257:11, 261:5,
263:7, 271:24,
273:19, 284:15,
302:7, 302:8

**we're**
8:11, 10:9,
11:7, 47:23,
52:20, 58:12,
74:4, 95:10,
104:25, 106:16,
107:14, 107:15,
112:1, 120:15,
167:13, 188:3,
191:10, 192:15,
199:10, 204:14,
205:8, 216:21,
220:18, 221:24,
241:20, 241:22,

249:18, 251:22,
251:23, 255:4,
256:15, 261:7,
263:22, 267:15,
290:12

**we've**
13:14, 33:17,
38:21, 39:17,
54:7, 82:24,
101:8, 173:25,
174:2, 192:1,
283:1, 299:8

**weak**
156:4

**websites**
185:2

**wednesday**
1:16

**week**
301:13, 301:25

**weekly**
300:13

**weeks**
289:17

**welcome**
146:5

**well-accepted**
234:7, 234:10,
235:4

**well-outside**
203:17

**well-respected**
175:18

**well-versed**
214:25

**went**
12:14, 13:1,
48:18, 51:1,
81:12, 167:19,
168:5, 196:9,
196:21, 226:14,
240:11, 241:7,
276:8, 290:19,
290:24, 292:17,
297:15

**weren't**
85:13, 279:17,
279:18

**whatever**
9:18, 249:24,
272:21

**whenever**
176:2

**whereof**
304:13

**whether**
15:20, 28:16,
28:25, 29:2,
30:15, 44:11,
44:15, 48:11,
48:14, 48:21,
54:2, 69:9,
73:8, 77:5,
78:9, 83:13,
84:19, 84:22,
85:13, 86:1,
86:3, 89:22,
91:6, 107:7,
107:10, 107:17,
109:8, 111:14,
112:3, 112:10,
113:5, 142:3,
161:15, 161:17,
168:18, 183:7,
192:16, 192:18,
192:23, 195:2,
195:15, 197:15,
199:19, 200:2,
200:22, 201:11,
201:17, 204:1,
208:20, 209:13,
213:18, 214:13,
216:5, 219:3,
221:8, 222:5,
226:5, 226:12,
229:3, 230:23,
230:24, 233:14,
235:5, 235:12,
236:9, 236:16,
240:10, 244:23,
245:4, 249:3,
249:20, 250:21,
254:22, 256:20,
263:19, 266:12,
267:5, 267:7,
269:18, 270:4,

270:11, 273:15,
276:7, 279:25,
283:4, 283:11,
287:23, 292:22,
294:24
**white**
79:21, 81:1,
84:15, 85:2,
85:8, 86:13,
86:21, 88:13,
88:21, 96:8,
105:21, 106:11,
106:16, 110:5,
125:24, 217:1,
217:25, 220:16,
220:17, 221:14,
241:4, 242:11,
243:11, 246:2,
246:7, 248:9,
250:11, 250:14,
252:5, 253:22,
257:3, 257:4,
257:16, 257:20,
257:23, 266:22,
267:6, 267:25,
269:23, 286:1,
286:7, 291:14,
294:6, 294:7,
294:15, 299:24
**whitened**
299:21
**whites**
99:12, 100:7,
101:2, 101:23,
101:25, 106:14,
106:15, 106:19,
107:4, 107:16,
107:17, 109:1,
109:15, 110:1,
110:17, 110:25,
111:8, 111:12,
112:7, 114:1,
116:1, 116:11,
124:22, 218:7,
242:6, 248:5,
261:4, 293:15,
296:16, 301:1
**whoa**
263:18

**whole**
8:4, 31:7,
63:5, 76:17,
79:16, 120:17,
128:9, 128:25,
143:13, 160:8,
161:22, 172:9,
182:2
**wide**
25:2, 55:11,
61:23
**widely**
120:22, 183:8,
224:9, 234:19,
272:15, 273:4
**widened**
253:21
**widespread**
156:24
**wife**
173:2
**willing**
35:8
**wins**
6:18, 139:12,
140:3
**wisconsin**
153:9
**wish**
179:18
**withdraw**
9:19, 38:11
**withhold**
266:18
**within**
20:23, 40:24,
157:25, 195:8,
203:13, 217:19,
267:14, 290:2,
292:16
**without**
190:10, 228:9,
228:14, 228:15,
252:25, 289:25
**witness**
19:5, 24:10,
24:14, 26:16,
32:16, 34:10,

41:16, 97:23,
99:16, 99:21,
134:16, 134:19,
134:25, 135:3,
135:21, 135:22,
173:1, 182:16,
196:20, 284:24,
301:11, 301:13,
301:16, 301:25,
304:13
**witnesses**
87:2
**witnessing**
24:20
**wolfinger**
131:24, 162:11,
162:12, 162:19,
272:13
**woman**
184:22
**wonderful**
172:7
**wondering**
111:14, 297:7
**word**
24:19, 31:7,
31:9, 35:13,
37:9, 37:12,
42:21, 44:20,
52:6, 63:10,
68:2, 68:6,
68:17, 68:20,
69:3, 77:12,
77:18, 84:10,
94:7, 105:6,
106:10, 117:22,
118:7, 127:8,
135:4, 135:11,
135:14, 136:23,
136:24, 172:14,
178:5, 179:3,
180:2, 184:15,
186:10, 190:18,
203:12, 203:13,
203:19, 207:11,
212:13, 215:25,
222:25, 229:6,
294:12

**wording**
130:2
**words**
20:5, 52:6,
52:7, 84:13,
88:7, 130:5,
136:19, 173:6,
211:22, 272:25
**work**
10:3, 16:16,
18:17, 19:5,
20:24, 21:4,
21:6, 22:3,
22:14, 24:14,
24:20, 24:22,
25:8, 25:16,
25:19, 26:5,
28:8, 30:20,
31:21, 34:14,
35:3, 35:20,
36:2, 36:9,
36:11, 36:12,
37:18, 38:2,
38:23, 40:17,
40:22, 41:13,
42:21, 42:24,
43:8, 43:11,
43:17, 43:21,
55:12, 55:13,
55:17, 56:17,
62:15, 64:17,
118:18, 131:6,
131:7, 134:15,
134:19, 134:24,
135:2, 137:17,
142:25, 154:2,
170:10, 171:15,
172:6, 172:8,
173:24, 174:4,
175:9, 175:10,
175:14, 182:10,
182:19, 182:22,
183:19, 184:2,
186:1, 191:4,
191:9, 191:14,
192:2, 198:25,
212:24, 213:15,
213:22, 235:1,

244:15, 253:1,
256:6, 258:24,
272:12, 272:13,
274:17, 274:18,
288:17, 289:1
**worked**
26:1, 26:8,
27:21, 37:1,
37:6, 37:10,
37:13, 37:16,
37:19, 38:16,
40:4, 41:3,
61:14, 174:1,
175:10, 185:20
**worker**
176:18
**workers**
177:9, 177:19,
178:4
**working**
16:7, 17:11,
33:19, 39:17,
40:7, 49:24,
49:25, 98:6,
172:19, 182:12,
187:13
**works**
58:10, 158:15,
201:23, 236:22
**world**
132:1, 132:18,
233:16
**worries**
163:23
**wouldn't**
22:12, 70:25,
72:7, 135:4,
179:4, 179:24,
180:6, 180:23,
205:4, 232:10,
232:11, 270:8
**wrap**
284:15
**wrap-up**
165:18
**write**
50:15, 59:19,
129:19, 148:20,

189:11, 189:20,
190:7, 194:13,
206:1, 232:11,
242:14, 256:25,
275:15, 297:23,
298:4, 300:15
**writer**
120:9
**writes**
127:25, 217:22,
218:17, 232:12,
250:8, 255:5,
268:23
**writeup**
298:22
**writing**
35:21, 43:24,
50:12, 51:2,
59:8, 177:14,
218:4
**written**
23:19, 23:21,
45:25, 52:7,
59:10, 69:14,
82:3, 129:21,
176:15, 190:2,
192:1, 195:11,
198:16, 282:10,
295:9, 300:8,
300:12, 300:14,
300:16
**wrong**
38:10, 91:21,
104:23, 124:3,
133:20, 134:6,
186:10, 203:18,
204:1, 211:24,
214:2, 232:15,
254:23, 255:10,
258:23, 295:7,
295:8, 295:24
**wrote**
21:24, 45:2,
45:15, 48:9,
48:12, 51:1,
62:10, 82:6,
111:24, 129:17,
136:11, 171:18,

176:11, 189:11,
189:18, 189:22,
193:13, 193:15,
205:20, 231:11,
237:12, 237:25,
238:1, 238:6,
241:12, 242:1,
242:15, 249:8,
257:8, 257:14,
261:10, 267:23,
273:21, 274:14,
275:21, 277:6,
290:24, 295:20
**wyoming**
277:10

**Y**

**yeah**
11:1, 16:14,
18:11, 18:18,
27:15, 28:11,
29:18, 31:11,
39:14, 39:15,
39:16, 40:14,
41:22, 51:23,
59:21, 59:22,
84:1, 87:24,
101:13, 112:9,
114:10, 131:23,
135:10, 141:21,
142:24, 148:17,
150:23, 151:14,
155:11, 155:22,
173:8, 177:24,
179:19, 183:10,
191:3, 220:23,
270:22, 270:24,
289:11, 296:12,
299:17
**year**
17:5, 39:13,
169:25, 252:15,
278:14, 279:21,
298:10, 302:1
**year's**
12:18
**years**
21:22, 38:22,

39:3, 39:4,
39:5, 39:8,
62:10, 129:4,
169:24, 170:19,
171:5, 171:7,
171:20, 208:1,
209:4, 209:9,
209:14, 210:4,
210:7, 229:16,
229:24, 272:16,
298:12, 298:13,
298:25, 299:9
**yep**
105:10
**yesterday**
205:3
**young**
143:22, 289:22
**younger**
155:16, 156:7,
299:6
**yourself**
29:13, 93:5,
135:20, 143:14,
176:11, 246:12,
263:13
**youth**
1:5

**Z**

**zero**
161:15, 262:13
**zone**
1:17
**zoom**
9:14, 10:13,
10:17, 32:9,
78:2, 112:9,
159:24

**$**

**$600**
16:21, 17:6,
17:12

**.**

**.2**
249:14

| 0 |
| --- |

**01**
3:20, 5:7
**0671**
2:11
**07**
1:17, 8:12
**09**
284:20

| 1 |
| --- |

**1**
165:22
**1,000**
288:6
**1.82**
286:23
**10**
7:4, 7:5, 29:9,
29:21, 29:22,
29:24, 31:23,
42:10, 53:17,
58:9, 58:11,
58:12, 83:7,
99:7, 117:2,
135:16, 136:9,
144:21, 170:18,
171:6, 171:20,
236:20, 239:25,
261:19, 284:14,
291:4, 291:14,
298:12, 298:25,
299:9
**100**
112:8, 262:14
**103**
6:14
**105**
255:4
**1050**
3:21, 5:8,
157:21
**11**
7:6, 53:20,
99:24, 99:25,
100:2, 108:22,
117:2, 218:8,

236:16, 261:15
**113**
270:18
**114**
268:22
**1168**
4:12
**118**
238:4, 238:6
**119**
3:7, 238:20
**12**
4:6, 6:9, 7:7,
53:20, 58:9,
58:11, 65:10,
65:11, 117:2,
135:22, 165:20,
165:21, 188:19,
217:20
**123**
4:15
**125**
273:20, 274:14
**13**
2:16, 7:9,
24:3, 46:8,
54:7, 113:13,
114:25, 117:4,
126:4, 166:23,
188:22, 188:23,
220:22, 220:23,
261:11, 261:19,
292:9
**1350**
115:1
**1355**
6:15, 99:10,
99:11, 100:5,
100:9, 100:11,
101:3, 103:14,
109:13, 109:14,
110:1, 110:16,
112:5, 114:2,
114:19, 114:23,
115:1, 265:13,
265:19, 266:1,
293:11, 294:3,
294:13

**139**
6:16
**14**
7:10, 42:20,
42:24, 43:2,
43:20, 44:2,
45:5, 45:24,
46:2, 46:12,
47:12, 48:17,
48:23, 55:15,
117:4, 117:5,
117:7, 126:4,
129:10, 135:24,
137:6, 165:22,
204:17, 204:18,
213:16, 218:17,
219:8, 222:14,
270:8, 270:22
**15**
2:9, 7:11,
13:6, 43:13,
117:5, 117:6,
117:9, 117:11,
117:12, 118:8,
118:22, 119:5,
120:16, 121:18,
121:19, 121:23,
121:25, 122:9,
122:13, 122:16,
123:2, 123:20,
123:22, 124:5,
124:8, 124:14,
124:20, 125:2,
125:19, 131:19,
148:17, 166:5,
217:9, 217:11,
225:8, 261:11,
261:15, 269:13,
270:8, 286:6,
286:13, 291:14,
299:9
**156**
6:19
**159**
6:22
**16**
7:12, 43:14,
94:5, 94:17,

99:24, 99:25,
119:20, 120:7,
121:25, 122:2,
122:10, 122:22,
123:5, 123:20,
123:21, 124:13,
125:19, 126:9,
126:22, 126:23,
136:1, 148:17,
286:9
**167**
6:4
**17**
58:9, 100:2,
179:25, 268:15,
269:7, 269:19
**1715**
4:11
**18**
6:10, 58:12,
166:22, 183:24,
257:18, 269:12
**188**
7:9
**19**
40:4, 40:10,
136:15, 164:16,
177:7, 181:10,
225:3, 231:13,
232:4, 233:9
**1978**
131:20, 131:25,
162:9, 162:12
**1979**
24:16, 39:7
**1980**
24:16, 31:18,
39:10
**1981**
40:8
**1985**
40:2, 40:5,
41:1
**1993**
128:7, 130:16,
131:18, 131:20
**1994**
21:24

**1995**
131:21
**1996**
286:25
**1st**
4:6, 255:7

**2**

**2**
236:22, 237:1, 237:2
**2.1**
142:9
**20**
8:22, 43:21, 44:2, 45:5, 45:24, 47:12, 48:17, 48:23, 66:1, 101:18, 170:19, 171:20, 251:5, 291:6
**2000**
171:23, 172:1
**20005**
2:10, 2:17
**2003**
179:25
**2007**
105:15
**2008**
159:12
**2011**
100:14, 105:14, 114:9, 131:21
**2012**
261:10, 295:10
**2013**
131:21, 133:17, 295:10
**2014**
24:9, 24:10, 25:12, 36:20, 61:14, 65:25, 111:25, 267:1, 267:11, 295:9
**2016**
66:1
**2018**
66:1, 131:21,

159:13
**2019**
208:21, 209:1, 209:8, 254:4, 254:14, 254:18, 255:9, 255:11, 257:20
**202**
2:18
**2020**
61:24, 133:3
**2021**
207:22, 207:25, 210:3, 210:14, 229:10, 230:7, 230:16, 250:4, 251:5, 251:18, 261:16
**2022**
228:3, 229:4
**2023**
18:15, 19:6, 24:6, 31:25, 133:2, 207:23, 207:25, 208:21, 209:1, 209:8, 210:15, 227:23, 228:5, 229:1, 255:7, 255:11, 255:13, 256:4, 256:14, 256:16, 256:22, 257:20, 261:16, 279:21
**2024**
1:16, 8:12, 304:15
**2025**
304:17
**204**
5:16, 7:10
**21**
34:25, 224:23, 225:11, 251:5
**215**
1:9
**216**
1:10
**217**
7:11

**218**
1:11, 2:6, 8:9, 285:4
**22**
18:8, 224:23, 225:11, 286:24
**23**
1:9, 1:10, 1:11, 7:5, 18:13, 269:8, 269:11
**239**
4:12
**25**
21:21, 41:8
**255**
5:19
**26**
7:5, 145:24, 257:16
**2617**
161:12
**2618**
161:12
**2624**
159:16
**2636**
160:22
**27**
5:12, 34:25, 62:18
**272**
5:13
**28**
225:14, 249:6
**285**
6:5
**286**
7:12
**29**
7:4
**2925**
5:16
**297**
105:4, 106:21
**298**
105:1
**2a**
159:20, 160:2

**3**

**3**
284:19
**3,390,000**
286:23
**30**
21:21, 26:10, 166:2, 272:16
**304**
1:24
**31**
224:18, 231:10, 302:13
**32**
224:19, 225:9
**32301**
3:8
**32399**
3:21, 5:7
**32601**
4:7
**32720**
4:16
**32803**
5:20
**3339**
3:9
**33410**
5:17
**33602**
5:13
**33901**
4:12
**344**
4:12
**35**
24:2
**352**
4:7
**36**
261:14
**3635**
5:8
**3664**
3:22
**37**
165:20, 165:21,

261:14
**374**
4:7
**386**
4:17
**39**
238:5
**3pvro**
73:3, 73:7,
73:9, 76:14,
81:15, 86:22,
218:19, 219:1,
238:9, 239:9,
239:21, 250:3,
250:10, 250:14,
258:2, 261:14,
261:19, 269:3,
269:6, 269:18,
269:24, 270:3,
280:19
**3pvro's**
238:23
**3pvros**
67:3, 67:9,
67:14, 67:24,
68:12, 76:10,
76:23, 77:2,
79:20, 80:25,
83:6, 86:15,
108:25, 117:17,
118:3, 119:15,
120:12, 121:1,
144:18, 148:13,
154:14, 218:6,
218:22, 241:15,
257:25, 264:7,
264:12, 265:21,
266:1, 274:4
**3rd**
8:12

--- **4** ---

**4**
284:20, 302:13
**40**
16:9, 16:13,
26:10, 29:10,
38:22, 39:3,

39:4, 39:5
**407**
5:20
**41**
29:20
**414**
3:22, 5:8
**42**
147:13, 261:18
**425**
3:17
**44**
237:1, 261:18
**4490**
2:18
**45**
39:8
**4700**
5:17
**4:-cv--mw**
1:9, 1:10, 1:11

--- **5** ---

**5.2**
249:14
**5.8**
143:16
**50**
26:18, 27:2,
86:21, 181:9,
278:2, 278:3,
298:10, 299:7
**500**
3:7
**51**
257:11, 257:14
**5150**
5:20
**516**
3:17
**518912**
1:23
**5218**
4:7
**53**
166:2, 166:9,
166:13
**55**
236:22, 237:2

**561**
5:17
**5670**
5:13
**57**
6:11, 6:12
**59**
284:19
**5950**
4:17
**5th**
304:14

--- **6** ---

**60**
26:10, 298:10
**600**
2:16
**610**
5:11
**626**
5:17
**63**
246:11, 278:6
**632**
2:11
**65**
7:7

--- **7** ---

**70**
26:10, 40:25
**700**
2:16
**736**
4:17
**740**
2:11
**750**
5:19
**77**
249:12

--- **8** ---

**80**
36:15, 39:13,
40:25, 171:23,
218:2, 291:15

**81**
39:16
**813**
5:13
**8400**
3:17
**85**
39:15, 40:11,
40:14, 135:19
**850**
3:9, 3:22, 5:8
**86**
250:7
**879**
3:9
**897**
5:20

--- **9** ---

**9**
1:17, 8:12
**90**
36:15, 171:23,
227:11, 298:7
**915**
2:9
**968**
2:18