# EXHIBIT 6



# Transcript of John R. Alford, Ph.D.

**Date:** January 4, 2024
**Case:** Florida State Conference of Branches, et al. -v- Byrd

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE          :

OF BRANCHES AND YOUTH             :

UNITS OF THE NAACP, et al.,       :

                       Plaintiffs,:

  v.                              :Case Nos.

CORD BYRD, in his official        :4:23-cv-215-MW/MAF

capacity as Florida Secretary     :4:23-cv-216-MW/MAF

of State, et al.                  :4:23-cv-218-MW/MAF

                    Defendants.:

-----------

Videoconference Deposition of

JOHN RICHARD ALFORD, Ph.D.

Thursday, January 4, 2024

9:02 a.m. Eastern Time Zone

Job No.:  518935

Pages:  1 - 247

Reported By:  Dawn M. Hart, RPR/RMR/CRR

1          Pursuant to Notice, before Dawn M. Hart,

2    RPR/RMR/CRR and Notary Public.

3                    A P P E A R A N C E S

4         ON BEHALF OF THE AMERICAN CIVIL LIBERTIES

5         UNION PLAINTIFFS RE HISPANIC FEDERATION V.

6         BYRD CASE ENDING IN 218:

7              MEGAN C. KEENAN, ESQUIRE

8              VOTING RIGHTS PROJECT

9              915 15th Street, Northwest

10             Washington, DC 20005

11             (740) 632-0671

12        ON BEHALF OF THE FLORIDA NAACP PLAINTIFFS:

13             MAKEBA RUTAHINDURWA, ESQUIRE (Seattle)

14             RENATTA O'DONNELL, ESQUIRE

15             ELIAS LAW GROUP LLP

16             250 Masschusetts Avenue, Northwest, #400

17             Washington, DC 20001

18             (202) 968-4490

19

20

21

22

23

24

25

```
 1            A P P E A R A N C E S (Continued)

 2       ON BEHALF OF THE DEFENDANT FLORIDA SECRETARY

 3       OF STATE:

 4             JOSHUA PRATT, ESQUIRE

 5             HOLTZMAN VOGEL BARAN

 6             TORCHINSKY & JOSEFIAK, PLLC

 7             119 South Monroe Street, Suite 500

 8             Tallahassee, Florida 32301

 9             (850) 879-3339

10       ON BEHALF OF THE AMERICAN CIVIL LIBERTIES

11       UNION PLAINTIFFS RE HISPANIC FEDERATION V.

12       BYRD CASE ENDING IN 218

13             DAYTON CAMPBELL-HARRIS, Esquire

14             Staff Attorney

15             Voting Rights Project

16             (425) 516-8400

17   OTHER PARTICIPANTS:

18       Steven Gendreau re Glades, Hardee, Hendry,

19       Holmes, Levy and Okeechobee County SOEs

20       Henderson, Franklin, Starnes & Holt, P.A.

21       1715 Monroe Street, Fort Myers, Florida

22       33901, (239) 344-1168

23

24

25
```

1           A P P E A R A N C E S (Continued)

2     OTHER PARTICIPANTS:

3           Ben Koon, Esquire re Palm Beach County

4           Supervisor of Elections, The Markarian Group,

5           2925 PGA Boulevard, Suite 204, Palm Beach

6           Gardens, Florida 33410, (561) 626-4700

7           Dale A. Scott re Citrus SOE, Roper, P.A.,

8           255 South Orange Avenue, Suite 750, Orlando,

9           Florida 32803, (407) 897-5150

10           Christina Locke re Citrus SOE, Roper, P.A.,

11           255 South Orange Avenue, Suite 750, Orlando,

12           Florida 32803, (407) 897-5150

13           Christopher Lapining re League of Women

14           Voters Plaintiffs, Legal Counsel, Voting

15           Rights, Campaign Legal Center, 1101 14th

16           Street, Northwest, Suite 400, Washington,

17           DC 20005

18           Carrie McNamara, Esquire, ACLU of Florida,

19           Hispanic Federation Plaintiffs #218,

20           4343 W. Flagler Street, Suite 400, Miami,

21           Florida 33134, (786) 363-1392

22           Delmarie Alicea re Latino Justice

23           Diana Johnson

24           Christi Hankins

25           Zack Bennington, Paralegal, Holtzman Vogel

1                    C O N T E N T S

2  EXAMINATION JOHN RICHARD ALFORD, Ph.D.       PAGE

3          By Ms. Rutahindurwa                    6

4          By Mr. Campbell-Harris              171

5                     E X H I B I T S

6          (Exhibits attached to the transcript.)

7  J. ALFORD DEPOSITION EXHIBITS                PAGE

8    Exhibit 1    Stein-Alford Expert Report     26

9    Exhibit 2    Lichtman Expert Report         37

10   Exhibit 3    Herron Expert Report           60

11   Exhibit 4    Herron Rebuttal Report         72

12   Exhibit 5    Smith Expert Report           179

13   Exhibit 6    Herron/Smith State            188

14                Politics paper

15   Exhibit 7    Smith Rebuttal Report         222

16

17

18

19

20

21

22

23

24

25

```
1                  P R O C E E D I N G S
2            JOHN RICHARD ALFORD, Ph.D.
3            being first duly sworn or affirmed to
4    testify to the truth, the whole truth, and nothing
5    but the truth, was examined and testified as
6    follows:
7                  EXAMINATION BY COUNSEL FOR
8                  THE FLORIDA NAACP PLAINTIFFS
9    BY MS. RUTAHINDURWA:
10       Q    Good morning, Dr. Alford.
11       A    Good morning.
12       Q    It's good to see you again.  My name is
13   Makeba, and I represent the NAACP Plaintiffs in
14   this matter.  Can you just please state your full
15   name for the record?
16       A    Yes, it's John Richard Alford.
17       Q    And I know the answer to this, but have
18   you been deposed before?
19       A    I have.
20       Q    Okay.  About how many times have you
21   been deposed?
22       A    I think maybe 50 or more times.
23       Q    When was the most recent time that you
24   were deposed?
25       A    I was just deposed a couple of weeks ago
```

1   in Austin.

2        Q    And what was that case about?

3        A    State of Mississippi.

4        Q    What area of expertise were you speaking

5   on?

6        A    It's a VRA case, and my testimony was

7   primarily Gingles 2 and 3.

8        Q    Do you recall the last time that you

9   were deposed as an expert on election-related

10  matters unrelated to racially polarized voting in

11  the redistricting context?

12       A    I don't recall.

13       Q    Do you know if you've ever been deposed

14  as an expert in election-related matters that

15  would be unrelated to racially polarized voting in

16  the redistricting context?

17       A    If I have been, it would have been

18  earlier on.  So I've done a wide variety of things

19  over time.  In the last couple of decades I've

20  focused almost exclusively on issues related to

21  Gingles 2 and 3, sometimes Gingles 1.

22            So it would have been sometime in that

23  earlier era.  I could go back and look at all

24  that, but off the top of my head I couldn't say

25  whether I had or hadn't.

1      Q    Well, I'll just go over some ground

2  rules for today's deposition.  Since you've been

3  deposed before, this will be very familiar to you,

4  but I want to go over them anyways just to make

5  sure we're on the same page.

6           The Court Reporter is taking down

7  everything we say so it's important that we try

8  and speak clearly and not talk over each other.

9  Please wait for me to finish my question before

10 you answer, and be sure to give a verbal response

11 rather than a head nod or uh-humh, anything like

12 that.  Does that make sense?

13     A    Yes.

14     Q    You're under oath and you're sworn to

15 tell the truth the same as if you were in court.

16 Do you understand that?

17     A    Yes.

18     Q    If you don't understand my question,

19 please let me know, I'll try and rephrase.  If you

20 answer the question, I'm going to assume that you

21 understood my question.  Does that sound good?

22     A    I got it.

23     Q    Your attorney may object to some of my

24 questions.  The objections are for a judge to

25 consider later.  You must still answer my question

1    unless your attorney instructs you not to answer,

2    okay?

3          A     Yes.

4          Q     You may not communicate with your

5    attorney while we are on the record other than

6    verbally so the Court Reporter can take it down.

7    So in other words, no phone calls silently or

8    texting with your attorney while we're on the

9    record, okay?

10         A     Okay.

11         Q     And finally, if you need to take a break

12   for any reason, please let me know, I'm happy to

13   do so.  We just ask that you finish answering the

14   question before we take a break.

15         A     All right.

16         Q     Any reason you can't testify completely

17   and accurately today?

18         A     No.

19         Q     Do you have any documents in front of

20   you?

21         A     I do.

22         Q     What documents do you have in front of

23   you?

24         A     I have a clean copy of the Stein and

25   Alford expert report, a clean copy of Dr. Smith's

1    initial report, Dr. Smith's rebuttal report, Dr.

2    Herron's initial report, Dr. Herron's rebuttal

3    report, and the State Politics article that was

4    referenced in both our reports and in the Herron

5    and Smith reports.

6         Q    Okay.  And do you have any documents up

7    on your screen?

8         A    I do not.

9         Q    Do you have any other windows open on

10   your screen apart from this Zoom?

11        A    Let me see.

12             Okay.  So I had my email open.  I've got

13   that closed.  So there's nothing open except the

14   Zoom.

15        Q    Great.  And is your phone near you?

16        A    Yes.

17        Q    Is it turned off, put away?

18        A    It's silenced.

19        Q    Okay, great.  We'd just ask that, you

20   know, you keep your phone away while we're on the

21   record.  Thank you.

22             And if you decide to look at the

23   documents that you just referenced, can you please

24   let me know if you're looking at them while

25   answering a question?

1          A     Yes.

2          Q     How did you first hear about this

3    lawsuit?

4          A     I was contacted by the attorneys, I

5    don't know the exact date, asked if it was

6    something that I might be interested in or had

7    thoughts about.  I discussed some thoughts I had

8    about it and indicated that it was really more the

9    kind of work that my colleague, Dr. Stein, does,

10   and said I would put the attorneys in touch with

11   Dr. Stein.

12         Q     And approximately when were you retained

13   to be an expert in this case?  Was it in

14   September?

15         A     I honestly don't -- fairly recently, but

16   I do not know the month that that occurred.

17   There's a contract somewhere that has a date on

18   it, so ...

19         Q     What were you asked to do in this case?

20         A     My understanding, as I said, I'd

21   referred the lawyers to Dr. Stein and then there

22   was a discussion.  He talked to the attorneys

23   about the case and indicated that he, you know,

24   was willing to work on the case.  He preferred

25   that I be involved as well, mostly because of time

1  constraints, just having somebody to help out a

2  little bit.

3            And so read the original, read the

4  original Complaint.  And my understanding of the

5  task was essentially to address the expert reports

6  of Dr. Herron and Dr. Smith, as well as Dr.

7  Lichtman, with an eye toward basically assessing

8  the empirical evidence provided in those reports.

9      Q    And how much were you compensated for

10  your expert report?

11      A    I think it's $600 an hour.  That's in a

12  contract somewhere, too.  That is my current rate

13  so I think that's what it would be.

14      Q    About how much time have you spent, did

15  you spend preparing an expert report?

16      A    I don't know.  Not, certainly not a lot

17  relative to what I would typically spend on an

18  expert report because I don't typically do expert

19  reports with anyone else.  I, you know, I do them

20  on my own.  And here my involvement with, in terms

21  of the writing of the report, was certainly less

22  than the majority of the report.  So I don't know,

23  you know, what the total hours would be, but most

24  of that time would have been time spent reviewing

25  materials rather than writing the report.

1      Q    Can you provide an estimation of how

2  much time you spent on the report?

3      A    Off the top of my head I just don't, I

4  just don't know.  I'm involved in a number, as you

5  are, a number of cases and so I don't, I don't

6  know exactly what those hours would total without

7  going back and, you know, looking at my accounting

8  system to figure out what the hours were.

9      Q    Would it be less than 50?

10     A    Sorry?

11     Q    Less than 50 hours?

12     A    Oh, that's possible.  So normally, I

13  wouldn't normally be at this stage with a full

14  expert report with less than 50 hours of time, but

15  that's possible.  Again, it's just not, my time is

16  just not as extensive on this as it typically

17  would be.

18     Q    What materials were provided to you?

19     A    So initially the, I think a copy of the

20  Complaint, copy of the expert reports that have

21  been produced, links to the data that was

22  disclosed by the other experts.  I think that's --

23  may have been some other material related to the

24  actual legislation, I don't recall.

25     Q    Did you receive any of the briefings

1    that were submitted in this case, such as the

2    preliminary injunction briefing?

3         A    That may have been included in some

4    material that was sent early on.  I don't -- if it

5    was included, I probably would have reviewed it,

6    but I don't have a distinct recollection of

7    reviewing the briefings.

8         Q    So from your recollection, sitting here

9    today, you reviewed the Complaints, the expert

10   reports and the data submitted with those expert

11   reports?

12        A    Yeah, that certainly was my focus.

13        Q    Did you rely on anything other than what

14   counsel provided to you?

15        A    I read the published article that I told

16   you about.  Obviously I relied on my own

17   experience, training in political science and

18   statistics, but not anything else specific.

19        Q    And did you request any additional

20   information to be provided to you?

21        A    Certainly at the early stages I would

22   have requested that we get any of the, you know,

23   underlying disclosure material, which was provided

24   to us, but not anything other than that.

25        Q    What did you do to prepare for today's

1    deposition?

2         A    I looked back over the reports and

3    rebuttals, had a chat with the lawyers.  I looked

4    back over the article that I referenced.

5         Q    When did you have a chat with the

6    lawyers?

7         A    Let's see.  The last, a chat last week,

8    and then a briefer chat last night.

9         Q    How long was the conversation last

10   night?

11        A    Fifteen minutes, maybe.

12        Q    And how long was the conversation last

13   week?

14        A    Something -- maybe an hour, maybe a

15   little bit more.  Probably less than two hours.

16        Q    Was there anyone present at the meeting

17   or conversation apart from your attorneys?

18        A    Dr. Stein.

19        Q    So you spoke with Dr. Stein yesterday?

20        A    Yes.

21        Q    And you spoke with him after he had

22   already taken his deposition in this case?

23        A    Yes.

24        Q    And what did he tell you about what to

25   expect at this deposition?

1          MR. PRATT:  Objection.  Privileged.

2    This would have been a conversation and

3    consultation with counsel.

4          MS. RUTAHINDURWA:  Communications

5    between experts are not privileged information.

6          MR. PRATT:  I respectfully disagree.  If

7    counsel is in conversation with both experts, then

8    experts' communications would be at the direction

9    and instruction of counsel.

10        Q    So did you review any documents in

11   preparation for today's deposition?

12        A    Yes.

13        Q    What documents did you review?

14        A    I reviewed Dr. Herron's initial report,

15   Dr. Herron's rebuttal report, Dr. Smith's initial

16   report, Dr. Smith's rebuttal report.  My -- or the

17   Stein and Alford report and the State Politics

18   Herron and Smith article.

19        Q    Did you review any deposition testimony?

20        A    No.

21        Q    Did you review any of your past trial

22   testimony?

23        A    No.

24        Q    Anything else you can think of that you

25   did to prepare for today's deposition?

1      A     I had a cup of coffee.  I made sure Zoom

2    was working, which on my computer it has been an

3    ongoing trial.  I'm not sure why.  Everything was

4    good for awhile, and then in the last week or so,

5    whenever I start it, it seems to want me to update

6    it or re-log in or something.  So I tried to make

7    sure that that was taken care of prior to getting

8    things started here, but that's it.

9      Q     Have you discussed this case with anyone

10   else apart from your attorneys and Dr. Stein?

11     A     I certainly mentioned it in passing, I'm

12   sure, to members of my family, just that I was

13   working on this.  But in terms of the actual

14   substance of the case, I have not discussed it

15   with anyone else.

16     Q     And we know the answer to this, but your

17   expert report is coauthored by you and Dr. Stein;

18   is that right?

19     A     Correct.

20     Q     How do you know Dr. Stein?

21     A     We are both in the same Department of

22   Political Science of Rice University.  Dr. Stein

23   was the one that was responsible for hiring me.

24   He was the Department Chair at the time that I was

25   recruited.  I was, at that point, at the

1    University of Georgia.

2            So I've, and I had known him prior to

3    that, you know, just professionally, familiar with

4    him and had met him, but -- so he brought me to

5    Rice University 38 years ago, and we've been, we

6    are -- our offices are next-door to each other and

7    we've been colleagues, as well as personal

8    friends, for that entire time.

9        Q    And have you worked together previously?

10       A    We have.

11       Q    Can you explain, give a few examples of

12   what you've worked on together?

13       A    So we worked on redistricting together.

14   We redistrict for local entities, so cities,

15   school boards.  That's something we've been doing

16   for, I guess maybe 20 years.

17           We've worked on, particularly earlier

18   on, worked on cases together.  We did some, did,

19   for awhile did jury experiment consulting with

20   local law firms together.  We've taught courses

21   together.

22       Q    What classes have you taught together?

23       A    Courses on, related to elections, so

24   specifically courses, topical courses around

25   particular election cycles.

1          Q     When was the last time you taught a

2     class together?

3          A     We were both involved in teaching a

4     course on the 2022 election.

5          Q     How would you describe Dr. Stein's area

6     of expertise?

7          A     He's much more of a state and local

8     person.  I'm more of a Federal, I say Federal, but

9     of course I mean national, I'm more of a national

10    government person, more Congressional elections.

11    He's more state and local.  His work is much

12    more -- or his work is, recent work particularly,

13    has been centered largely on voting, particularly

14    the impact of various changes in voting methods,

15    voting access, things like that.  He previously

16    did a lot of work on things related to pork barrel

17    and budgeting and a variety of other kinds of

18    things.  So state and local, the recent focus on

19    elections, election mechanisms I'd say is how I

20    would describe his work.

21         Q     And how would you describe your area of

22    expertise?

23         A     So I obviously testify a lot about

24    racially polarized voting, Gingles 2 and 3 and

25    that narrow part of the totality of circumstances.

1    I have testified more broadly in the areas related

2    to a variety of kinds of statistical analysis

3    related to legal issues.

4            My previous, my initial training and

5    research was in public policy analysis and my

6    initial publication, my first publication was in

7    policy analysis.  Then much of the rest of my

8    early career was related to various factors that

9    influence U.S. Congressional elections, House and

10   Senate.  And then subsequently changed directions

11   a bit and my recent scholarship is related to the

12   influence of biological factors on political

13   attitudes and behaviors.

14       Q    Would you say that your areas of

15   expertise overlap in any way?

16       A    We're both, we both have research

17   interests in the area of elections.  Again, my

18   work would have been, was more related to

19   Congressional elections, his more local elections.

20   But, for example, he's done work on incumbency

21   advantage largely as it related to state and local

22   elections.  I've done work on that as it relates

23   to Congressional elections.

24            So there's, certainly we overlap in the

25   sense of our kind of methodological training and

1    utilization.  We overlap in the sense that we both

2    have interest in, and have done, and have worked

3    extensively in redistricting and drawing district

4    lines.  And we're just more broadly, we're, you

5    know, we're scholars of political behavior,

6    basically the idea, particularly political

7    behaviors as it relates to the realm of voting.

8         Q    And are you familiar with Dr. Stein's

9    scholarship?

10        A    Yes.

11        Q    Have you ever referenced his scholarship

12   in your own work?

13        A    Probably not.

14        Q    Are you familiar with his expert witness

15   participation in other cases?

16        A    I mean I know that he's testified in

17   other cases.  We're on opposite sides of a case

18   currently.  Spring Branch Independent School

19   District.  So I'm familiar with his work there.

20   I've read and responded to his expert report.  And

21   I know, you know, that he's done some, you know,

22   we've talked at various times about cases where

23   he's been involved in, you know, issues related

24   to, again, to vote, access vote centers, you know,

25   things to do with methods of voting.

1          Again, if someone asked me about

2     something in those areas, I would, he's the person

3     I would refer them to, either to help them as an

4     expert or to put them in touch with other people

5     in the field.

6          So I'm familiar with, I don't know all

7     of the, all of what he's done in that area, but

8     I'm familiar with, at any moment in time I have

9     some idea if he's doing something or with

10    somebody.

11         Q     Have you ever coauthored an expert

12    report with Dr. Stein before?

13         A     I think we must have.  Again, this is

14    going back sometime.  I think we've, I think we

15    worked together on, on an early case involving, I

16    think single member districting for judicial

17    elections in Texas.  We did some work for the

18    Attorney General, and I think that may, it may or

19    may not have involved, or I think it involved an

20    expert report, but I don't know.

21         We worked together, I'm pretty sure, on

22    a case for the U.S. Attorney in Houston about the

23    jury wheel, the representativeness of the jury

24    wheel.  I think there may have been some, one

25    other, one other early case, I think we were, we

1    were on the same report, but those are, you know,

2    early on.

3           So again, as I've become more

4    specialized in Section 2 and in the Gingles

5    factors or in the case of Section 5 retrogression,

6    those are not areas we've worked together or edit

7    or written reports together in.

8       Q    In the last 10 years, have you ever

9    coauthored an expert report with anyone?

10      A    I don't recall coauthoring an expert

11   report with anyone in the last 10 years.  I

12   apologize in advance if I'm leaving something out

13   because, you know, authorship is so important in

14   academics, but I don't -- I could be missing

15   something in there, but certainly it would be

16   unusual.  As I said, I do not typically coauthor

17   expert reports.

18      Q    Do you consider Dr. Stein to be

19   well-respected in his field?

20      A    Yes, he's well-respected in his field.

21      Q    Do you know why two authors were asked

22   to write this expert report?

23      A    Certainly I would say my involvement was

24   somewhat reluctant.  I'm busy, and I basically,

25   you know, Dr. Stein wanted me to be involved, and

1    I agreed to be involved, and primarily in kind of

2    getting things structured, you know, being

3    something of an editor, I guess.

4            So my -- he certainly is the author of

5    the bulk of the analysis in the report.  My

6    involvement was writing some front material, and

7    you know, reorganizing, cutting and pasting some

8    of his work to fit it in, sort of into a series of

9    sections.  So I -- that takes some of the burden

10   off of him.  The time frame was short.  He's busy,

11   I'm busy, so my feeling is it had largely to do

12   with efficiency more than anything else.

13       Q    And you mentioned that you wrote what

14   you described as front materials.  What does that

15   mean?

16       A    So I -- the beginning of the report

17   there's an introductory section about what we were

18   asked to do and what we did, a brief commentary on

19   why we're not addressing with any specificity the

20   report of Dr. Lichtman.  That was, I wrote that

21   up.

22           And I would have, I think there's a

23   section later that, or there's some commentary on

24   a figure from the State Politics article.  I did

25   the initial draft of that, that initial paragraph

1  or two, I wrote.  The rest, most of the rest of

2  the material is material that was sent to me by

3  Dr. Stein and then packaged in with the other

4  material.

5       Q   So it sounds like your understanding of

6  the division of labor is that the bulk and the

7  majority of the substance of this expert report

8  was authored by Dr. Stein with your input and

9  edits and suggestions apart from kind of the

10  introductory materials, introductory paragraphs;

11  is that a fair representation?

12      A   Yes, just the introductory material and

13  the section that references the figure from the

14  Smith and Herron State Politics article, that's

15  correct.

16      Q   And do you --

17      A   Just if I can, I'm sorry for speaking

18  over you.  But I just want -- we discussed -- he

19  provided me with drafts.  We discussed those

20  things.  We, you know, we, in the final editing

21  there was back-and-forth and discussion.

22        So I wouldn't, I wouldn't say I had no

23  input into what he wrote, either in the sense that

24  we discussed it and we discussed broadly the

25  issues prior to his taking up his writing task and

1  my taking up mine.  But in terms of where the,

2  where the first draft of the text came from, it's,

3  I think the discussion we've had is accurate.

4      Q    And do you endorse everything in the

5  expert report as if it was attributable and

6  written by you?

7      A    Yes.

8      Q    I'm going to show you Exhibit 1.

9          MS. RUTAHINDURWA:  Renata, if you can

10  pull that up for us.

11          (Exhibit 1 was marked for identification

12  and is attached to the transcript.)

13          MR. PRATT:  And, counsel, would it

14  perhaps be possible to drop the Exhibits in the

15  Chat function as we go?

16          MS. RUTAHINDURWA:  Yes, we can do that.

17          MR. PRATT:  Thank you very much.

18      Q    So, Dr. Alford, are you familiar with

19  this document?

20      A    What I'm seeing here looks like the

21  title page of the report Dr. Stein and I provided.

22      Q    Let's just scroll down to Page 1 and 2

23  just to be clear.

24          So this is a true and correct copy of

25  the expert report you provided in this case?

1       A     I'm sure that if you say that's what it

2    is, that's what it is.  I don't know.  I didn't

3    copy it.  But it looks like, at least the

4    beginning looks like what I recall is in our

5    report.

6       Q     And moving to Page 36, Appendix B.

7             MS. RUTAHINDURWA:  Right there.

8             Page 36.  Perfect.  Thank you.

9       Q     So this is the CV that you provided with

10   your expert report.  Does that look right?

11      A     From what I can see as they were

12   scrolling, it looks like sort of end of the year

13   highlights of my CV flashing by, yes.

14      Q     Did you provide your most up-to-date CV

15   for this expert report?

16      A     Yes.

17      Q     Is there anything now that you recall is

18   missing from your CV or anything you want to add

19   to it?

20      A     If there's anything new, it would be in

21   the final section where I list the cases I'm

22   involved in.  I don't really, I don't know whether

23   they're -- I think there may have been something

24   that's come up since, but I'd have to see that to

25   be sure.

1          Q      And we've already discussed this a

2     little bit, but you're a Professor at Rice

3     University?

4          A      I am.

5          Q      Did you teach any courses this past

6     fall?

7          A      I did teach a course this past fall on,

8     senior level course on the biology of politics.

9          Q      Have you taught any election-related

10    courses apart from kind of your newer research on

11    biopolitics in the past five or 10 years?

12         A      Yes.  So I teach a course on elections

13    and voting behavior, which is a course I'll be

14    teaching in the spring.  In every even-numbered

15    fall year, or since, I don't know when, but for

16    the last decade or so I have taught a course

17    directly following the elections, Congressional

18    midterms or the Presidential elections.  So it's a

19    fall course that focuses on exposing students to

20    the political science research on elections and

21    voting behavior, while also following the

22    evolution of the election itself, teaching

23    students about sort of how it is we incorporate

24    our understanding of voting behavior into things

25    like predicting or understanding the outcome of

1    elections.  So I do that on an every two-year

2    basis.  I'll be doing that again in the fall.  I

3    did that in fall of 2022 and fall of 2020 and so

4    forth going back.

5              So I've, I routinely teach also,

6    typically at least once a year, some years I'll

7    teach the Introduction to American Politics course

8    which involves both institutions and behaviors.

9              So I'd say in terms of my regular

10   teaching over the last decade or so, it's

11   typically involved a course on biology and

12   politics, a course on either elections and voting

13   behavior or political psychology, and the

14   Introductory to American course.

15       Q    And do you plan to teach any courses in

16   the spring?

17       A    In the spring I'll be teaching elections

18   and voting behavior, which in this case, although

19   it's not the fall election course, I'll

20   nonetheless bring in some materials from the

21   primary process, particularly the Republican

22   primary process which is more interesting this

23   time than the Democratic process, but that's more

24   a course on political science research on

25   elections and voting behavior.  And I will be,

1    also be teaching the Introduction to American

2    Politics in the spring.

3        Q    Have you ever been published on issues

4    related to voter registration?

5        A    No.

6        Q    Have you ever researched issues related

7    to voter registration?

8        A    I don't recall a specific project

9    related to voting registration.

10            MS. RUTAHINDURWA:  And we can take down

11   the Exhibit 1 now.  Thank you.

12       Q    What about research into the motivations

13   behind why people register to vote using different

14   voter registration methods?

15       A    That's not an area I've done any

16   research in.

17       Q    And any research on third party voter

18   registration organizations?

19       A    No.

20       Q    Apart from this case, have you ever

21   written an expert report related to voter

22   registration?

23       A    There may have been some issues related

24   to that in the, with regard to the jury wheel.  I

25   remember some, there has been some discussion

1    about the issue of the relationship between being

2    registered to vote and being selected to be on the

3    jury wheel, but that's pretty tangential.  It's

4    not an area that I typically do expert work in.

5        Q    Have you ever published anything related

6    to Florida law generally?

7        A    No.

8        Q    Any research on Florida laws?

9        A    Research on Florida laws.  I'm certainly

10   not a legal scholar, so no.  I don't think I've

11   ever published anything related to Florida laws.

12       Q    Have you ever written any expert reports

13   in Florida other than this case?

14       A    I have.

15       Q    Which cases have you worked on as an

16   expert in Florida?

17       A    This case, the case involving the Miami

18   City Council redistricting this time.  I was

19   involved in redistricting for some localities, I

20   think Sarasota and Fort Myers, if I'm remembering

21   right, in this round.  I don't know if either of

22   those involved litigation or not, but I was

23   involved in the redistricting.

24            So I think the --  sometime in the past,

25   I think at least two decades back, I testified for

1    some Democratic Congress members who were

2    challenging the redistricting, Congressional

3    district plan for Florida.  That's what I recall.

4        Q    So fair to say all your work in Florida

5    has been in the redistricting context?

6        A    Yes.

7        Q    Apart from this case?

8        A    Yes.

9        Q    And do you recall providing testimony in

10   any Florida court based on that prior work with

11   redistricting?

12       A    I'm not sure.  So I -- again, I'm

13   involved in the Miami case, which is active.  I

14   don't recall -- I testified in, again, that

15   earlier case involving the Congressional

16   redistricting.  I did provide a report and I did

17   testify.  At least I was deposed, I don't know if

18   I actually testified in court, but I do recall in

19   detail flying to Florida and being deposed in that

20   case.

21            It was a horrible -- I was reading

22   through my, flipping through some reports and

23   things on the airplane and I ended up getting a

24   paper cut on my cornea.  And so I testified with a

25   black eye patch with tears running down my face in

1   a video deposition.  I looked like a pirate who

2   was terminally depressed.  It was a terrible

3   experience.  So I do remember that.

4           And I filed reports and been -- I think

5   I've been deposed in the Miami case, but I may

6   testify -- you know, I don't know that case, where

7   exactly that's going.  That's -- as is true for

8   much this decade, I've given up trying to figure

9   out exactly who's on first and who's on second

10  with much of this, but those are the, those are

11  the two cases I recall that I, you know, would

12  either have or would expect to be involved in

13  terms of testimony.

14      Q     So going through your CV, you list 30

15  cases that you've consulted or worked on as an

16  expert.  To your knowledge, is this a complete and

17  accurate list?

18      A     I think it's everything from the last

19  decade.  Again, there may be, I may have been

20  retained on something very recently that's not on

21  there, but it would be, as far as I know,

22  everything I've been involved in in the last

23  decade.  It doesn't go back -- my earliest

24  involvement is in the 1980s, so it obviously

25  doesn't go back.  But everything back to, I think

1  to 2014 is there.

2          Q    And any of these cases not related to

3  racially polarized voting analyses?

4          A    In the last decade, I don't think so.

5          Q    Apart from this current case, have you

6  ever been asked to opine on the impact of third

7  party voter registration organizations on voter

8  registration or voter turnout?

9          A    No.

10         MS. RUTAHINDURWA:  If we can pull up

11  Exhibit 1 again, and go to Page 1.

12         Q    So you understand the purpose of this

13  deposition is just to understand the opinions that

14  you intend to offer in this case, right?

15         A    Yes.

16         Q    So this report identifies your opinions

17  in this case?

18         A    As of the time the report was written,

19  yes.

20         Q    On Page 1 of your report you note that,

21  quote -- if we can go, sorry.  Yeah.  Page 2

22  technically.

23             quote, Defendant's counsel requested

24  that we respond to the appropriateness of Dr.

25  Lichtman's conclusions.  What do you mean by that?

1      A    It's fairly awkward language.  My

2  understanding of that discussion with counsel was

3  I indicated early on that, you know, to the extent

4  that Dr. Stein and I were involved, it would be

5  with regard to the empirical analysis in the

6  reports.  And after looking through the reports, I

7  indicated that we wouldn't be saying much about

8  Lichtman's report because it's not an empirical --

9  we're not historians.  It's not an empirical

10 analysis.  I've done empirical work in history

11 before, call it quantitative work, but it's not

12 quantitative work.  It's, you know, it's just not.

13 It's something else.

14         So it's not, you know, our expertise is

15 with regard to empirical information we can

16 provide for the Court.  And so there wasn't much

17 in Dr. Lichtman's report along those lines, and so

18 there wasn't much to be said.

19     Q    So was it you who narrowed the scope of

20 what kind of opinions you were able to offer with

21 respect to Dr. Lichtman's report, or was it

22 Defense counsel's ask to you that was different

23 than the other expert reports in this case?

24     A    I mean, again, I think early on there

25 was a general agreement that, you know, what we

1    could do was to focus on the empirical analysis,

2    and so Dr. Lichtman's report simply falls out

3    because there just isn't much empirical analysis

4    there.

5              But his report, as I indicate in the

6    short paragraph about his report, is, his report

7    just does something other than provide -- repeats

8    some empirical analysis, but doesn't actually

9    provide empirical analysis.

10      Q    And did counsel request that you respond

11   to the substance of Lichtman's analysis and

12   conclusions?

13      A    I mean they -- that was one of the

14   reports that was provided to us.  And again, we,

15   you know, we made the decision about what, the

16   scope of our analysis, explained early on what it

17   was that we could do, or were comfortable doing as

18   experts, which is to provide expert testimony or

19   expert commentary within the range of our, of our

20   skills, and those have to do with empirical

21   analysis.  And if Dr. Lichtman -- I've certainly

22   responded to Dr. Lichtman's analysis before in

23   cases where he's, for example, provided empirical

24   analysis related to Gingles 2 and 3 or racially

25   polarized voting analysis, but his report here is

1    not, does not include any of his own empirical

2    analysis.

3          Q    Let's pull up Exhibit 2.

4              (Exhibit 2 was marked for identification

5    and is attached to the transcript.)

6          Q    So this is the expert report that Dr.

7    Lichtman provided in this case.  Do you recognize

8    this document?

9          A    Yes.

10         Q    Did you read the entirety of Dr.

11   Lichtman's report?

12         A    I did not read the entirety of the

13   report.  I read much of it and skimmed parts of

14   it.  So where there were sections that, basically

15   where he was repeating legislative testimony, that

16   sort of material, I mostly skimmed over that.

17         Q    How were you made aware that Dr.

18   Lichtman didn't provide any empirical, his own

19   empirical analysis?

20         A    By reviewing his report.

21         Q    But you just testified that you didn't

22   read all of it.  You just skimmed certain portions

23   of it.

24         A    Well, when he, as he does various

25   places, quotes at length from testimony to the

1    legislature or comments from the legislature, I'm

2    not reading.  I don't need to read that to find

3    out if he's quoting.  I mean he can hardly put his

4    own empirical analysis into the middle of a

5    lengthy quote from the legislative record.

6            So I'm not, I'm not interested in

7    reading the legislative record, you know.  I'm

8    capable of reading it.  But I'm also sure the

9    Court is capable of reading it.  So I don't need

10   Dr. Lichtman to, you know, to hand me a Xerox copy

11   of the legislative record if I want to get the

12   legislative record.

13           Again, that's not my area of expertise

14   when it comes to providing information to courts.

15   My area is providing, you know, quantitative

16   empirical analysis.  So I'm certainly not going to

17   comment on the, or assess the accuracy of his

18   replication of the legislative record.

19           And to the extent that he has opinions

20   on the legislative record, they're opinions that

21   reflect something other than what I would consider

22   to be an expert opinion on political science which

23   would be based on some empirical analysis, as is

24   true with the reports of Dr. Smith and Dr. Herron.

25       Q    Let's go back to Exhibit 1, and scroll

1    down to the title of the section Dr. Lichtman's

2    Report.

3              So on Pages 2 and 3 you provide one

4    paragraph regarding his report; is that fair?

5         A    Yes.

6         Q    And you provide no discussion of Dr.

7    Lichtman's report outside of this paragraph,

8    right?

9         A    That's correct.

10        Q    In the second sentence you state, quote,

11   most of Dr. Lichtman's report is either

12   speculative assertions about what might happen as

13   a consequence of SB 7050 or a recitation of claims

14   made by various opponents of SB 7050 about

15   potential negative impacts without any empirical

16   evidence of an actual impact.

17             Did I read that correctly?

18        A    Yes.

19        Q    Did you write that sentence, or did

20   Dr. Stein?

21        A    I wrote that sentence.

22        Q    What's your basis for stating that Dr.

23   Lichtman's report contains speculative assertions?

24        A    Again, there he is speculating on what

25   might happen.  He's not providing an empirical

1  analysis of an actual impact of either this

2  legislation or similar legislation.  He's just

3  speculating about what might happen.

4         So that's my reading of his report, is

5  that, that to the extent he offers an assessment

6  of the impact of SB 7050, it is not empirical.  It

7  is, it's his opinion based, I suppose, on reading

8  the material that he's provided here.

9     Q    And what specific assertions do you

10  believe are speculative?

11    A    I don't think there's anything that he

12  asserts that isn't speculative because it's not

13  based on an empirical analysis.  ?

14         Much of, much of the reports of Dr.

15  Herron and Dr. Smith are speculative as well in

16  the sense that they refer to what they think is

17  likely to occur or might well occur, and they

18  usually hedge that by saying all other things

19  being equal.

20         So, again, those are -- saying that all

21  other things being equal, this is likely to be the

22  impact is speculative unless it's backed up by

23  some empirical analysis.  Dr. Herron and Dr. Smith

24  have some empirical analysis, which Dr. Stein

25  responds to.  Dr. Lichtman either relies on that

1    work from the other reports or doesn't provide

2    anything.

3              So I'm not going to comment on his

4    comments on Herron and Smith, because I'm

5    commenting on Herron and Smith.  And what he has

6    beyond that is, does not reflect any quantitative

7    or empirical analysis of the impact, but just

8    talks about what might possibly be the impact.

9         Q    So you note that Dr. Lichtman relies on

10   Dr. Herron's empirical analysis, but you did not

11   respond to Dr. Lichtman's analysis based on that

12   empirical evidence.  Why not?

13        A    Because there's, as the rest of the

14   report indicates, there is a response to Dr.

15   Herron's analysis itself and Dr. Herron's

16   conclusions drawn from Dr. Herron's analysis.  And

17   so the, sort of Dr. Lichtman's kind of secondhand

18   assertions about it are, in my view, less

19   important than Dr. Herron's or Dr. Smith's

20   assessment about their own empirical analysis.

21        Q    Do you find it improper that Dr.

22   Lichtman relied on other experts' empirical

23   evidence or data to reach opinions in a case?

24        A    I don't think it's improper to do that,

25   but he doesn't, by -- in repeating that

1    information, he doesn't add anything that isn't

2    there in their, in their reports themselves.

3        Q    And have you ever relied on other

4    experts' empirical data or evidence to reach

5    opinions in cases in which you've provided expert

6    reports?

7        A    Yes, I fairly often rely on analysis,

8    empirical analysis provided, for example, by

9    Plaintiff's experts in reaching conclusions where

10   I'm able to satisfy myself that that empirical

11   analysis is accurate.

12           So I don't think, I don't -- relying on

13   someone else's empirical work is not, it's not

14   improper, it's just that, again, when I rely on

15   someone's empirical work, I assess their empirical

16   work and use that to draw my conclusions.  So I'm

17   accepting the Plaintiff's empirical work as being,

18   you know, correct and useful.

19           But here Dr. Lichtman is not challenging

20   Dr. Herron's or Dr. Smith's analysis or their

21   conclusions.

22       Q    What's your basis for stating that Dr.

23   Lichtman's report recites claims made by various

24   opponents of SB 7050 without any empirical

25   evidence of impact?

1          A      Again, he's not providing any empirical

2     evidence.  And the recitation of claims is based

3     on reading his report where he recites claims made

4     by, publicly or in legislative testimony,

5     hearings, et cetera, of opponents of SB 7050.  So

6     that's just a factual statement about his report.

7          Q      Are there any specific claims that

8     you're referring to in this sentence?

9          A      The claims that he reports at length in

10    his report.  I'm not highlighting any one

11    particular claim, but just broadly, just

12    reproducing material that's already in the

13    legislative record from opponents of the

14    legislation, you know, I'm not sure exactly what

15    that amounts to.  It's already in the legislative

16    record.  It's available to the Court.  It doesn't

17    take any particular expertise to cut and paste

18    testimony from various groups.

19              So I mean it convinces me that there

20    were groups that were opposed to SB 7050 and that

21    they had opinions about the likely impact of the

22    legislation.  That's all it does.  I don't -- I

23    don't see where Dr. Lichtman is adding any expert

24    value to that recitation, so that's all I'm

25    pointing out.  It's a recitation of claims, it's

1    not -- Dr. Lichtman is not doing more than just

2    curating those claims.

3        Q    If we can scroll so that we can read the

4    entirety of this final sentence starting in this

5    report.

6            MS. RUTAHINDURWA:  Up a little bit.

7            Thanks.

8        Q    So towards the bottom of Page 2 folding

9    into Page 3 you write, quote, in this report we

10   will be addressing the quantitative empirical

11   evidence in the reports and as such, will not be

12   commenting on the narrative discussion in Dr.

13   Lichtman's report, nor will we be commenting on

14   the similar narrative section of Dr. Herron's

15   report.

16           Did I read that correctly?

17       A    Yes.

18       Q    And we already went over this earlier,

19   but it sounds like you and Dr. Stein decided to

20   address only the quantitative empirical evidence

21   in the reports; is that right?

22       A    Yes.

23       Q    And you were not instructed by counsel

24   to do so.  It was a decision made by you as

25   experts, correct?

1      A    I mean that's -- we have an agreement in
2  discussion with counsel that this is what we would
3  do.  So that he did not come to us and say, we
4  want you to ignore Dr. Lichtman's report and
5  ignore this part of Dr. Herron's report.  We were
6  asked to look at everything and say what it was
7  that we, you know, what -- and then address what
8  we could address, and that's what this reflects.
9      Q    And right after that sentence you state,
10 quote, such narrative discussions are not helpful
11 in assessing the impacts, if any, of SB 7050 on
12 Florida voters.  Nor are they helpful in assessing
13 the intent of those who enacted the legislation.
14 That ultimately is a question for the Court and
15 not the experts to assess.
16          Did I read that correctly?
17     A    Yes.
18     Q    Are there any specific narrative
19 discussions that you're referring to with respect
20 to Dr. Lichtman's report?
21     A    Again, I'm just broadly characterizing
22 the narrative discussions throughout his report.
23     Q    What about with respect to Dr. Herron's
24 report?
25     A    Again, there is a lengthy section in Dr.

1    Herron's report that follows a similar tact of

2    talking about the things that were brought up in

3    opposition and things that were brought up in

4    favor, and making comments on, you know, his view

5    of how realistic or appropriate, I suppose, those

6    things might be.

7          Again, the reproduction of that material

8    is not an expert task.  Having experts comment on

9    those things is, can be interesting, I suppose,

10   but I don't consider it to be, in itself to be

11   expertise.

12         I try to confine myself to analyzing and

13   offering assistance in understanding the empirical

14   analysis of information relevant to things like

15   this, not speculating about intent of the

16   legislature.  I'm not even sure there is such a

17   thing, so why they debate a point whether there is

18   even such a thing as collective intent for

19   anybody, much less for legislators, or

20   legislatures.

21         And again, just simply curating

22   criticism of the legislation, or curating, you

23   know, testimony supportive of the legislation is

24   not something that I think -- I'm not sure what

25   expertise it requires, but it's not the expertise

1    that I bring to cases.

2         Q    Are you aware that Plaintiffs in this

3    case are alleging intentional discrimination?

4         A    I believe that's correct.

5         Q    Are you aware how Plaintiffs who allege

6    intentional discrimination typically prove their

7    claims?

8         A    I've certainly read that sort of

9    material.  It's not an area I work in.  I don't

10   have any expertise that would allow me to provide

11   any empirical or expert opinion about intent.

12   It's a very murky topic.  It's an academic topic,

13   and I suspect it might be as well a legal topic, I

14   don't know.

15             So it's -- you know, I just, I don't --

16   you know, I think to the extent that you can

17   deduce, or adduce intent from things like

18   commentary and so forth, then you read the

19   commentary and you see what you can adduce from

20   it.  I don't see an independent scholarship being

21   brought to bear here about how it is as scholars

22   we might ultimately understand the intent of a

23   given individual.

24             I mean, there is recent scholarship in

25   the social sciences to suggest that there's no

1    such thing as free will.  And so we -- in trying

2    to understand human decision-making and the brain,

3    trying to understand if there is such a thing as

4    intent at the individual level is still

5    controversial and open to lots of varying

6    research, agendas.

7            The idea of collective intent is,

8    there's even less, if any, agreement about what

9    that might mean in a social science sense or how

10   you might go about assessing that in a neutral

11   scientific way.  Bringing actual neutral empirical

12   evidence to bear on collective legislative intent

13   is just not an area that's been developed, or much

14   progress has been made, if any, in political

15   science.  And so if it's, if there's not a science

16   there, then in my view, there's nothing I have to

17   offer with regard to providing what I consider to

18   be appropriate expert testimony.

19           This is not an area where, in political

20   science or in the social sciences, where there's a

21   set of clear research outcomes that could document

22   how this might be useful, how you might go about

23   it in a way that's not hopelessly, you know,

24   contaminated or biased by your own opinions.

25           You know, how you would deduce the

1  intent of individual legislators and then how you

2  would -- how that would then be combined to form

3  something you might call a hive mindset, again,

4  these are things people can talk about in a

5  nonexpert way.  But the fact is we don't have

6  research that provides us an empirical path toward

7  assessing whether something is a fact or not.

8       But that's very different than saying,

9  this legislation will have a negative impact on

10  black voter registration.  That's an empirical

11  statement, and we know a lot about how we might go

12  about empirically bringing data to bear on it, as

13  Dr. Herron and Dr. Smith attempt to do.

14       This question about the intent of the

15  legislature, I understand that it's a legal

16  question, but that may not be a legal question

17  where experts have anything to offer the Court.

18  My view is that's something the Court makes the

19  decision on based on reading the record.  And

20  having Dr. Lichtman Xerox the record for you and

21  offer his opinion about what the record means is,

22  again, I don't view that as social scientific

23  expertise.  I view that as commentary.

24       Q    Have you ever provided expert analysis

25  regarding intentional discrimination in a case?

1          A      Not relating to intent, no.

2          Q      And do you know what kinds of evidence

3    courts typically use in assessing such claims?

4          A      In my limited experience with looking at

5    that sort of thing, they seem to take into account

6    lots of things, mostly involving reading the

7    legislative record.  They -- statements of

8    particular policymakers are often utilized.  I

9    know in the Miami case a lot's been made of sort

10   of public statements in the Council record from

11   one individual about what the purpose of the

12   redistricting plan is.

13          And again, the Court doesn't need a

14   political scientist to tell them this is what the,

15   on the record, this is what the President of the

16   Council said.  They can read what the President of

17   the Council said.  What does that mean about the

18   intent of the Council that one person said this,

19   said it publicly, or that someone else, you know,

20   looked to the left when they said it.  We don't

21   know that as experts.

22          So the Court can read it, and it's kind

23   of a soaking and poking.  They can read all that

24   and try to deduce what they think means some legal

25   standard.  But if they're looking to social

1   science, and I think of this sort of parallel with

2   regard to partisan gerrymanders, right?  The Court

3   wanted to know if social science could help them

4   find a standard so that they could apply the,

5   apply a legal sanction for partisan

6   gerrymandering, but they needed a metric that was

7   empirical and could provide them with a real

8   standard to use, not just "I know it when I see

9   it."

10          And social scientists worked very hard

11  and produced some very, I think very inventive,

12  somewhat sometimes problematic, but nonetheless I

13  think substantial, empirical basis for the Court

14  to at least judge the level of partisan

15  gerrymandering.  The Court, as you know,

16  nonetheless rejected that.

17          Here there's nothing at all, not a bit

18  approaching what social science provided on

19  partisan gerrymandering.  With intent, there's no

20  real social science at all.  So if the Court wants

21  to do it, they're going to do it on their own and

22  they're going to do it "as we know it when we see

23  it" because social science is not providing

24  anything.

25          Dr. Lichtman is not providing anything

1   here in the way of expertise about legislative

2   intent because he has no empirical research on

3   legislative intent.

4        Q    So I understand your testimony to be

5   saying that you don't believe that statements of

6   the legislature may be relevant to assessing the

7   legislature's intent in passing a law; is that

8   right?

9        A    So statements of legislators may or may

10  not be useful in assessing the intent of the

11  legislator who made the statements.  That's

12  something you have to think about.  Can they then

13  sort of somehow automatically be ascribed to the

14  legislature itself when it passes or doesn't pass

15  a piece of legislation?  That's a big leap.

16            And again, I'm not saying that those

17  can't be useful.  A judge can look at them and

18  make what they're going to make of them.  But they

19  are not, they cannot be connected with actual

20  theory or empirical analysis to something that

21  would generate an index or something of that sort.

22            What the Court was looking for in

23  partisan gerrymandering was actually provided to

24  them a variety of different ways to come up with

25  an index of the degree of bias in the system and

1    so forth.

2            Here there's no index being provided.

3    There's just, you know, one person's reading, Dr.

4    Lichtman, the Court's reading.  It's a legal

5    standard, Dr. Lichtman is not a legal scholar.

6    Even if he were a legal scholar, all he's

7    providing, then, is commentary dicta for the

8    Court.  There is not, there is not a body of

9    scientific evidence that supports an empirical way

10   in which you take this raw material and turn it

11   into an index or an assessment of intent.  To the

12   extent it can be done, it can be done only in the

13   "know it when you see it."  and because it's a

14   legal judgment that the Court needs to make, I

15   don't think having Dr. Lichtman opine on it is,

16   adds anything to the Court's decision-making

17   beyond what they can make by reading the

18   legislative record.

19       Q    Would you agree that historical analysis

20   of discrimination in a state may be relevant to

21   understanding the present day?

22       A    Yes.

23       Q    Would you agree that the processes and

24   the ways in which laws pass through the

25   legislature may be relevant in assessing the

1    legislature's intent in passing the law?

2        A    And the operative word there is "may."

3    Yes, they may be.

4            But how they would be utilized to assess

5    what happened there, again, they may be relevant,

6    and there is not a scientific, there's not a

7    series of empirical peer-reviewed articles that

8    talk about, here, these are the markers that have

9    to do with legislative process that might show an

10   improper process.  Here's the legislation.  Here's

11   the percent of the time that it's connected,

12   here's the regression.  Wait for it.  Here's the

13   statistical significance of it.  None of that

14   exists.  There's just commentary from people who

15   say, well, maybe if the legislature did something

16   in secret, or maybe if the legislature did

17   something quickly, and then you can speculate

18   about that.

19           So we have all kinds of speculations

20   this time around about was the redistricting cycle

21   compressed because of COVID, or was it compressed

22   because the policymakers wanted to compress it?

23   Well, what's the empirical answer to that?  I mean

24   I don't know.

25           Again, that's, the fact that you can

1    talk about those things and that they may be of

2    relevance, they -- obviously, that's true, but

3    exactly how they're relevant, how you put them

4    together, how you weight them, how you decide if

5    there's anything more than chance there, those are

6    things that social scientists address.  That's why

7    we have a methodology.  That's why we do empirical

8    work.  This is not an area where we have any

9    empirical wisdom for or guidance or index to offer

10   the Court.

11       Q    So you don't believe that intentional,

12   that the study of intentional discrimination is a

13   field of research for social scientists,

14   historians, political scientists; is that right?

15       A    Political science does study

16   discrimination, and it does study prejudice,

17   right?  So there's a whole field of political

18   behavior and political psychology that's involved

19   in understanding stereotyping and racism with a

20   lot of empirical information there to be offered

21   that can be quite useful.  That's not what this

22   is.

23            This is not, this is not empirical

24   assessments based on reasonable methodologies of

25   the racial attitudes, orientations or reactions of

1    the legislators individually or how you might

2    aggregate those.  This is really something quite

3    different.  It is -- again, my main point is that

4    I don't -- I'm an empirical social scientist.  I'm

5    a Midwestern normal science-trained political

6    scientist.  And I can help the Court to understand

7    some complicated issues where there's empirical

8    information to be added or an empirical analysis

9    to be understood.

10          So I could help the Court understand

11   properly, to the best of my ability, what the

12   empirical analysis shows about the intent of the

13   legislature, but there's no empirical analysis

14   here to help them understand.  I can't help them

15   read.  They're perfectly good at doing that.  I

16   can't help them decide if it's legally relevant

17   because they're the legal experts, I'm not.

18        Q    And are you aware of courts accepting

19   expert reports, such as reports that Dr. Lichtman

20   wrote here, as helpful in assessing claims of

21   intentional discrimination?

22        A    Yes.

23        Q    So --

24        A    And when you have no other basis for

25   doing it, you know, you'd accept, all kinds of

1    things can be helpful in backing up your opinion

2    if you have an opinion you need to offer about

3    something like this.  I -- again, I, you know, I

4    don't take that to be in any way a reflection on

5    what I would be willing or not willing to offer

6    the Court or my assessment of what Dr. Lichtman

7    has provided to the Court.

8         Q    So when you say such narrative

9    discussions are not helpful in assessing the

10   impacts, if any, of SB 7050 on Florida voters, you

11   mean that they're not helpful for you as an expert

12   in responding to what you were tasked to do in

13   this case, right?

14          You're not saying that the Court

15   shouldn't consider Dr. Lichtman's report or should

16   find that analysis helpful, are you?

17          MR. PRATT:  Objection.  Form.

18        A    Again, I'm not saying that these, that

19   these things, like reviewing the legislative

20   testimony, reviewing the comments of legislators,

21   you know, you're trying to do this, that might be

22   someplace you want to look.

23          Having Dr. Lichtman regurgitate that

24   material is not helpful.  It's not helpful in

25   understanding the impact of the legislation

1    because the impact of the legislation has to do

2    with the impact of the legislation, not with the

3    intent, guided or misguided, of the people who

4    passed the legislation.

5              The unintended consequences of

6    legislation are so manyfold that in some ways it's

7    very possible that it actually dwarfs the intent

8    of the impact of legislation.

9              So again, having Dr. Lichtman offer a

10   narrative discussion of this doesn't tell us

11   anything about the impacts and is not helpful, I

12   think, to the Court.  And in terms of assessing

13   the intent of the people who enacted the

14   legislation, there may be, there may be some legal

15   fiction called legislative intent that the Court

16   feels it has to make a decision about, but it -- I

17   think it's -- I personally don't like to see

18   experts say the Court can base this on an expert

19   assessment of intent when it, when it is, in fact,

20   simply a legal fiction.  There is not a science of

21   legislative intent.

22        Q    And --

23        A    So that's, again, it's ultimately a

24   question for the Court, and the Court can assess

25   that from the material available to the Court.  If

1    it's helpful to the Court to have someone provide

2    the clerical task of pulling together those

3    materials, then that would -- that's about the,

4    all I would assign to the value of what's -- of

5    bringing that, pulling that together in the way

6    Dr. Lichtman does.  And given that Dr. Lichtman is

7    selectively doing that, I'm not even sure how

8    helpful that is.  You might be better off just

9    doing it yourself and not being selective.

10        Q    You offer no opinion on the extent to

11   which SB 7050 was driven by intentional

12   discrimination, right?

13        A    I have no opinion about whether it was

14   driven by intentional discrimination.

15        Q    And you're not a historian; is that

16   right?

17        A    I am not an historian.  I have done, I

18   have published articles in -- I've given

19   presentations at qualitative -- quantitative

20   history conventions, and I've published in that

21   area, but I am not an historian.

22             I do, to the extent I do anything

23   historical, and I have done historical work, it's

24   empirical historical science, not just my opinions

25   about what might have been in the minds of people

1    at any point in time.

2              MS. RUTAHINDURWA:  I think we've been

3    going for about an hour 20 minutes.  Why don't we

4    take a five-minute break, if that works for

5    everyone.

6              MR. PRATT:  That sounds good.

7              (A recess was taken at 10:10 a.m.)

8              (Back on the record at 10:27 a.m.)

9    BY MS. RUTAHINDURWA:

10       Q    So, Dr. Alford, on Page 3 of your report

11   you have a section titled Dr. Herron's Report; is

12   that right?

13       A    Yes.

14       Q    Let's pull up and mark what I've already

15   marked as Exhibit 3, the expert report of Dr.

16   Herron.

17              (Exhibit 3 was marked for identification

18   and is attached to the transcript.)

19              MS. RUTAHINDURWA:  And scroll down just

20   so that we can see the entire page and the sign

21   date.  Perfect.

22       Q    So you do you recognize this report?

23       A    All I'm seeing is the signature line,

24   but I assume this is Dr. Herron's report in this

25   case.

1      Q    All right.  She fixed it for you.  How

2   about now?

3      A    That looks like the whole title page of

4   Dr. Herron's report in this case.  Looks like the

5   one that I got.

6      Q    Did you read the entire report?

7      A    Yes.

8      Q    When did you read the report?

9      A    Shortly after I received the report.  So

10  the lawyers sent, again, the reports in the case

11  and I read through the reports.  Dr. Herron's

12  more, in more detail than Dr. Lichtman's because

13  there's empirical analysis that I paid particular

14  attention to in Dr. Herron's report.

15     Q    Did you reread the report in preparation

16  for today's deposition?

17     A    I looked back through the report.  I did

18  not read it in its entirety.

19     Q    So let's go back to Exhibit 1.

20          MS. RUTAHINDURWA:  And you can just take

21  down Exhibit 2.

22     Q    On Page 3 of your report you first quote

23  a paragraph from Dr. Herron's report which you

24  refer to as, quote, a speculative account of the

25  possible impact of SB 7050 based on academic

1    theory; is that right?

2          A    Yes.

3          Q    Who wrote this portion of the report;

4    you, or Dr. Stein?

5          A    This portion I wrote.

6          Q    And --

7          A    I think -- when I say this portion, I

8    don't know what comes below it, but I think this

9    introductory paragraph I think I wrote.

10         Q    Does this all still look like what you

11   wrote?

12         A    I think the first draft of this I would

13   have written.  I don't know, it also is something

14   Dr. Stein would have looked at.  He may have made

15   edits to it, but I think I wrote the first draft

16   of that, of this section.

17         Q    Why do you believe this portion of Dr.

18   Herron's analysis to be speculative?

19         A    Just the language itself indicates that

20   it is speculative.  First of all --

21              (Simultaneous speaking.)

22         Q    Apologies.  I didn't mean to interrupt.

23   Go ahead.

24         A    So there are, the idea that it has an

25   impact is based on a series of assumptions working

1    through a process.  Those assumptions are based on

2    possibilities of how things might work out all

3    other things being equal or logic dictates or, you

4    know, that something could subsequently, whatever,

5    right?  So this is, this is basically offering a

6    path through several steps by which this might

7    have a particular impact.

8              Again, it's not, it's -- I mean the

9    final, the conclusion here is fairly clear.  It

10   should be expected to lead to lower voter turnout

11   in Florida, all things being equal.  So "should be

12   expected" doesn't mean it will.  It just means

13   that based on these things, his conclusion, by

14   weighting all these on the effect this is going to

15   have on the organizations and the effect that the

16   organizations' operations are going to have on

17   their activity, we don't know, particularity at

18   this stage where you don't even have the final

19   regulations, we don't know exactly what the

20   legislature, or what the legal environment is

21   going to be.  We don't know how the organizations

22   are going to respond to it.

23             He's suggesting one way they might.  We

24   don't know how that's going to affect their

25   contact with the voters, but he speculates about

1    what that might be.  And then we don't know what

2    impact that's going to have on the voter

3    registration, but he says that we should expect

4    that to lead to lower voter turnout, all other

5    things being equal.

6             So we're going from potential legal

7    effect on third party organizations to voter

8    turnout in Florida, and that connection is being

9    made, none of those connecting points here are

10   based on an actual assessment of those things

11   happening, but based on could we construct the

12   logic by which this legislation might lead to

13   lower voter turnout, and we can't construct that

14   logic.

15            But again, that is speculative both

16   because the chain here is much longer.  This is

17   not a piece of legislation that directly affects

18   voter turnout.  It doesn't act on voters in the

19   sense of saying, you know, whether voters can drop

20   off, drop off ballots or something.  It's a

21   potential effect on multiple independent

22   organizations that may or may not affect how they

23   work, that may or may not affect registration,

24   that may or may not affect turnout.

25            So this is, at each stage, speculative.

1    And then combining that kind of speculation across

2    multiple stages from where the legislation

3    actually has a potential impact to lower voter

4    turnout, that's a long chain of speculation.

5        Q    Are so are you defining speculation as

6    one possibility that has yet to be proven to

7    happen yet?  Like, how would you define or

8    understand the word "speculative" in this context?

9        A    Well, I can maybe start by saying what I

10   would like to see here.  If these provisions are

11   going to lower voter turnout in Florida, I'd like

12   to see evidence of this lowering voter turnout in

13   Florida, not just this possibility of that this

14   might happen in the future.

15            Moreover, the issue of it, as I

16   understand it, the question of whether it lowers

17   voter turnout is not really the key question.  The

18   key question is whether this lowered voter turnout

19   affects disproportionately minority voters.  So

20   that's not even being addressed here.

21            So again, I suspect it doesn't require a

22   lot of expertise to suggest that among other

23   possibilities, one thing that might happen as a

24   result is lower voter turnout.  But that sort of

25   statement about voter turnout has been made about

1    all kind of potential changes, and is made about

2    laws in all kinds of areas as well.  Speculating

3    about what this law might do or an impact it might

4    have on a particular area is simply offering that

5    something is a logical possibility.  It doesn't

6    help us distinguish it from other things.  It

7    doesn't help us answer the question of what the

8    actual impact is or what the actual impact will

9    be.

10        Q    Do you take issue with the academic

11   theory that Dr. Herron refers to in this passage?

12        A    I mean he seems to rely on a theory in

13   which at various stages both these volunteer, or

14   sorry, nonprofit organizations, non-governmental

15   agencies, a theory about how they respond to their

16   environment, which is a, basically a rational

17   choice theory.  And he compounds that by assuming

18   that voters, in fact, make decisions about

19   registration and turnout based on what is

20   essentially a rational theory of behavior.

21            And so, yeah, I -- there's certainly,

22   that particular theory has not been successful in

23   the area of understanding voting behavior, for the

24   most part, certainly in U.S. elections.  So it's a

25   particular theory and a particular possible set of

1    events, but again, other than laying out one

2    theory of what might happen, that's different than

3    showing empirically that something has happened.

4         Q    So is it your understanding that

5    academic theory about what might happen is an

6    inappropriate way to measure a potential impact of

7    a law?

8         A    Well, those academic theories get

9    tested, and this is an area where this particular

10   academic theory has been tested with regard to

11   voting behavior and with regard to reforms to

12   voting behavior extensively, and it's not proven

13   to be a very accurate predictor of what's going to

14   happen, in part because it's, the theory itself

15   assumes all other things being equal.

16         And given the number of chains in this,

17   and just given the nature of behavior in general,

18   making a change doesn't -- the idea that all other

19   things will be equal is a useful theoretical

20   assumption in economics.  It's not a practical

21   useful assumption in political science or as it

22   turns out, for most of economics either as all

23   things being equal.  The fact is all things aren't

24   going to be equal.  You've disturbed an

25   environment, a complex environment involving

1    multiple players and organizations, and you can

2    make some prediction about all things being equal

3    what would happen, but you'd have to acknowledge

4    that all things will not likely be equal.

5          Q    So how would you assess the impacts of a

6    law that has yet to be passed or implemented to

7    try and understand what will happen if that law is

8    actually passed?

9          A    Well, you certainly, if the law has not

10   been put into effect, then you might want to wait

11   until you have some actual evidence of what the

12   law is going to do, what its actual impact is

13   going to be.  If it's necessary to be preemptive

14   and deal with that prior to it being put into

15   effect, then I think you set a pretty high bar for

16   empirical evidence that, not just that all other

17   things being equal, but that in these kinds of

18   circumstances there's actually evidence based on

19   past research that in each of these stages these

20   things actually happen and that they connect up in

21   the way that you're suggesting they will connect

22   up.  Because ultimately you have to assess the

23   probability that these stages will all take place

24   and take place in this fashion, and that requires

25   being able to make an estimate of the likelihood

1  of these things, not just the potential for these

2  to occur, but the -- but what is actually likely

3  to occur, not just what might occur.

4      Q    And it's your position that this, this

5  passage here demonstrates what is, could

6  potentially occur but not what is likely to occur?

7      A    There's, as I understand it, there's not

8  an indication here -- I guess maybe in Dr.

9  Herron's view this is what's most likely to occur.

10  But "most likely to occur" can be something that

11  might occur only five percent of the time, but

12  still is more likely than any of the other things

13  that might occur.

14        So it's, there's an impressionistic

15  assessment.  There certainly is a useful account

16  because it lays out a kind of theory, like here

17  are the things that will need to happen for this

18  to occur.  And again, I think that's, you know,

19  it's helpful to be able to lay out a chain of

20  events that might lead to this given how indirect

21  the expected impact is because among other things,

22  it highlights that this is a very indirect impact.

23        But we're not talking about, even the

24  first link in this just is this legislation going

25  to, you know, significantly curtail the activity

1    of third party organizations.  We don't know

2    whether it is or not, but you can make some

3    assessment on whether that might happen or might

4    not happen.  Then you've got to move down the rest

5    of the chain until you get all the way to voter

6    turnout, and that's a lot of links in the chain.

7            So again, certainly if you can't make

8    this, if you couldn't make a logical case that it

9    might have an impact, then you're sort of at a

10   dead end.  If you can make a logical case that it

11   might have an impact, then you can attempt a

12   separate process, which is trying to determine how

13   likely it is to have this impact.

14       Q    And you would agree that academics often

15   rely on academic theories to proffer explanations

16   about real life behaviors or predictions, right?

17       A    Academics mostly use, I'd say mostly use

18   those theories as the hypothesis for hypothesis

19   testing.  But you use theories to generate

20   hypotheses.  Those hypotheses then are

21   operationalized, so you find actual indicators for

22   the things you're hypothesizing about.  Then you

23   measure those indicators, and then you come back

24   and say, does the, do we get what we expect based

25   on the theory given it's operationalized in this

1    way, in this context and at this moment in time.

2            So certainly it's not uncommon at the

3    beginning of an article to lay out a theory that

4    will guide the empirical testing in the article.

5    It's not unusual at the end of the article in the

6    social sciences to also offer some speculation

7    about what's going on based on theory, and that's

8    presumed to be speculation that will generate the

9    next round of empirical research.  So that's often

10   in the section of, sort of, you know, future

11   research, what more do we need to know here.

12           So yes, we try to understand things by

13   utilizing a theoretical context.  That doesn't

14   mean that we are, that we reify those theoretical

15   contexts.  We test them, and to the extent that

16   they prove to be true, they're useful to the

17   extent -- the idea that voters respond rationally

18   to cost in terms of voter turnout has been, you

19   know, is a huge area of research, and hardly one

20   in which the conclusions are, straightforwardly

21   support rational voting behavior.

22           So as we learn empirically about certain

23   theoretical expectations, we recognize that some

24   of them are less useful than others, and that's

25   how this process works.  It's an iterative

1    process.

2         Q    So scrolling down to that paragraph,

3    page 3, your report states, quote, it does not

4    provide empirical evidence of such impacts and

5    does not address the key issue of actual disparate

6    impacts on black and Hispanic registration

7    relative to non-Hispanic white registration.

8              Did I read that correctly?

9         A    Yes.

10        Q    And when you say "it," you're referring

11   to Dr. Herron's report?

12        A    I'm referring to the discussion above.

13   This is one possible explanation.  And then the

14   report doesn't go on to actually provide the

15   empirical evidence that would connect up those

16   chains with regard to this particular legislation.

17        Q    So I'd like to turn to premarked

18   Exhibit 4.

19              (Exhibit 4 was marked for identification

20   and is attached to the transcript.)

21        Q    This is Dr. Herron's rebuttal report.

22   Do you recognize this report?

23        A    Yes.

24        Q    Did you read the entire report?

25        A    Yes.

1      Q    When did you read the report?

2      A    It was provided to me, I think maybe a

3  week ago.  So sometime shortly after it was filed,

4  I expect.  And I read it at that time, and I've

5  looked back over it in preparation for the

6  deposition.

7      Q    If we go to paragraph 12 of the rebuttal

8  report.

9            THE WITNESS:  Hold on a second.

10         (Interruption.)

11         THE WITNESS:  All right, I'm back.

12      Q    So paragraph 12, Dr. Herron writes,

13  quote, according to the Stein-Alford Report,

14  quote, Professor Herron's findings demonstrate

15  that a higher proportion of non-white voters than

16  white voters register to vote via third parties,

17  end quote, Page 8.  The report expresses the same

18  point in writing that, quote, Dr. Herron is able

19  to conclude that blacks and Hispanics are more

20  likely to be registered via 3PVROs than are

21  non-Hispanic whites, end quote, Page 11.

22         What is your response to paragraph 12 of

23  Dr. Herron's rebuttal?

24      A    Paragraph 12 just says according to the

25  Stein-Alford Report and offers a quote that looks

1  to me to be accurate.  And then it says the report

2  expresses the same point in writing that Dr.

3  Herron is able to conclude.  So those look to be

4  accurate quotes from the report.  That's all he's

5  saying is that these, these appear in the report

6  at Page 8 and Page 11.  I agree those are in the

7  report at Page 8 and Page 11.

8      Q    And so you don't dispute that blacks and

9  Hispanics register to vote via 3PVROs at higher

10  rates than whites in Florida?

11      A    No.

12      Q    And you don't dispute that blacks and

13  Hispanics are more likely to register via 3PVROs?

14      A    Correct.

15      Q    So then we go to paragraph 14, and Dr.

16  Herron says, quote, if any racial group in Florida

17  disproportionately registers to vote via 3PVRO,

18  then this group will be disproportionately

19  affected by a law whose provisions restrict and

20  raise the operating costs for 3PVROs.  It is thus

21  illogical for the authors of the Stein-Alford

22  Report to acknowledge my expert report's findings

23  that there is a group of registered voters in

24  Florida whose members disproportionately register

25  to vote via 3PVRO and yet claim that this finding

1    does not, quote, address, end quote, the matter of

2    whether the group is disproportionately affected

3    by SB 7050's provisions regarding 3PVROs.

4           What is your response to this paragraph

5    in Dr. Herron's rebuttal report?

6        A    Well, again, as I've commented on

7    already, Dr. Herron is just offering a speculation

8    about what the impact might be on the

9    organizations and what the impact on those

10   organizations, if it is what he thinks it may be,

11   one particular impact may be, what impact that may

12   have on registration for particular groups.  And

13   then what impact that may have ultimately on

14   turnout for those groups.

15          I don't think we're anywhere in the

16   report suggesting that he doesn't offer that

17   speculation.  That's what we just discussed

18   already.

19          So yes, he offers that speculation, but

20   again, for, if any racial group in Florida

21   disproportionately registers to vote, then

22   therefore we can conclude as a matter of fact that

23   that group is going to be, is going to turn out at

24   lower rates than whites on the basis of this

25   legislation.  All you can conclude is that is a

1    possibility.  It also could be possible if the

2    opposite were true.

3            This legislation could reduce black

4    voter registration and turnout even if the

5    legislation disproportionately affected white

6    voters.  Lots of legislation disproportionately

7    affects white voters relative to black voters and

8    can still potentially be discriminatory in terms

9    of having an effect in which black voters are more

10   affected by the legislation than non-black voters.

11   So just the proportion that are registered via

12   third party is, it has no logical connection to

13   the outcome.

14           First of all, it's -- the most obvious

15   assumption here is that, it says they will be

16   disproportionately affected by a law whose

17   provisions restrict and raise the operating costs

18   for third party voter registrations.  What's the

19   assumption there, right?  The completely untested

20   and unstated assumption is that it's simply a fact

21   that if you provide any legal restriction or

22   control over the operation of third party voter

23   registration organizations, then it will have a

24   negative impact on that voting group.  It may not.

25   It may have a positive impact.  I mean some people

1    are reluctant to utilize methods of voting, or

2    methods of registration because they believe them

3    to be insecure.  And so if the legislation

4    convinces people that giving your driver's license

5    number to a third party is not going to result in

6    them selling your driver's license number to a

7    marketer or retaining it in insecure ways, if

8    you're convinced that the group that's registering

9    you is required and that there are real penalties

10   if they don't actually get your registration

11   delivered on time, all these things may buttress

12   people's confidence in these organizations that

13   they are being regulated, that they are, bad

14   actors are being kept out.  And say just as you

15   might have regulations on how the Post Office

16   handles a ballot that may make it more expensive

17   to handle a ballot but make voters more confident

18   that they can mail a ballot and that it will be

19   handled properly.

20           So again, I'm not saying that's what's

21   going to happen here.  That's just -- there are a

22   whole variety of ways that legislation can affect

23   behavior.  It's not, he's has not factually

24   demonstrated what he says in that first sentence,

25   nor is it the case that just because this group is

1    more likely to register by this process, that it

2    will be more likely to be impacted by it in a

3    negative way, much less get to the end of that

4    other paragraph you quoted where he says this is

5    going to affect voter turnout.

6        Q    Anything else that supports your basis

7    for opining that although SB 7050 regulates 3PVROs

8    and more black and Hispanic voters register via

9    3PVROs, the impact of SB 7050 is not, on specific

10    voters is not clear apart from what you've already

11    stated?

12        A    Again, the disproportionate registration

13    of black and minority voters by third party

14    organizations is neither a necessary or a

15    sufficient condition for the impact he's talking

16    about.  So it could potentially enhance the impact

17    if you've actually demonstrated something about

18    it.  But in and of itself does it demonstrate

19    that?  He seems to say this is it, this is all we

20    need to say.  These groups are more likely to

21    register by this method, therefore, end of story.

22    Any legislation that, any provision that restricts

23    or raises the operating costs for 3PVROs will by

24    definition be discriminatory.  That is not a

25    logical connection.

1        Q    You would agree that if the State were

2   to prohibit third party voter registration

3   organizations from registering voters, that those

4   voters who do rely on third party voter

5   registration organizations would have to find

6   another method to register to vote, right?

7        A    I guess I'm not sure what you mean by

8   "rely on those organizations."  So are you talking

9   about voters that are solicited by those

10  organizations to register, or voters that come,

11  that when they think about registering to vote say

12  I'm going to seek out a third party to register me

13  as opposed to I'm going to register online or with

14  the DMV?

15       Q    Well -- sorry, I didn't mean to

16  interrupt you.

17       A    I guess I'm just not clear.  Are you

18  talking about voters that might not register

19  unless someone seeks them out and tries to

20  register them, or are you talking about voters

21  that in the absence of these organizations will

22  not have a, basically not have a method for

23  registering to vote?

24       Q    We know that third party voter

25  registration organizations register a lot of

1    voters in Florida, right?

2        A    That's correct.

3        Q    And so those voters, if third party

4    voter registration organizations were unavailable

5    to them, they would have had to either, because

6    they were not solicited or because they chose not

7    to, they would have to find another method to

8    register to vote, right?

9        A    Yes.  So anything that eliminated a

10   particular method of registration would require

11   people to register by some other method or not be

12   registered.

13       Q    Let's take a look at paragraphs 31 and

14   32 of Dr. Herron's rebuttal.  So he states --

15            MS. RUTAHINDURWA:  Continue to scroll

16   just a little bit.  Thank you.

17       Q    Quote, the contents of tables 21 and 22

18   of my expert report are divided into pre-SB 7050

19   months, January through June, and post-SB 7050

20   months, July through August, and they indicate

21   that, quote, new voter registrations overall in

22   Florida were down almost 19 percent in July

23   through August compared to being down roughly four

24   percent in January through June.  The associated

25   difference-in-difference is approximately negative

1    15 percent.

2            And then paragraph 32 -- sorry, were you

3    going to respond?

4        A    I was going to say that's what it says,

5    yes.

6        Q    Paragraph 32 states, according to tables

7    21 and 22, the associated difference-in-difference

8    for 3PVRO voter registrations is roughly negative

9    28 percent, which is the greatest (in magnitude)

10   drop across voter registration methods of all the

11   methods listed in the two tables.  The

12   difference-in-difference constitutes evidence of

13   the impact of SB 7050 on voter registrations in

14   Florida countering the claim in the Stein-Alford

15   Report that my expert report, quote, does not

16   provide empirical evidence of the impact of SB

17   7050 on voter registration in Florida, end quote.

18           Would you agree that

19   difference-in-difference calculations are an

20   accepted method of reaching conclusions in your

21   field?

22       A    Yes, they can be.

23       Q    And what response do you have to these

24   paragraphs of Dr. Herron's rebuttal?

25           MR. PRATT:  Objection.  Form.

1      A      I guess, first, I'd -- he says that it

2  counters the claim on page 3, but he doesn't

3  actually provide the full -- I'm not sure exactly

4  what he's doing there.  There seems to be the

5  start of a quote and then a bracketed section.  I

6  don't know what the quote is exactly on page 3 of

7  our report, so I'd want to know whether I agree

8  with the fact that that's an accurate statement of

9  our claim.  I'd want to read what's actually on

10  page 3 of our report.

11      Q      Let's go back to Exhibit 1, page 3.

12          MS. RUTAHINDURWA:  Right here.  We're

13  good.

14      Q      And the second sentence of this

15  paragraph says, it does not provide empirical

16  evidence of such impacts and does not address the

17  key issue of actual disparate impacts on black and

18  Hispanic registration relative to non-Hispanic

19  white registration.  Such impacts refers to the

20  impacts of the law of SB 7050 on voter

21  registration in Florida.

22          Do you agree with that?

23      A      Yes, specifically to the impact,

24  disparate impacts on black and Hispanic voter

25  registration.

1      Q    So let's go back to Dr. Herron's

2  rebuttal report.

3           And does that make you feel more

4  confident responding to the paragraphs?

5      A    So again, setting aside questions about

6  the analytical method, what the analytical method

7  shows is that calculated this way, there is, there

8  are varieties of impacts in terms of comparing the

9  comparison between these periods now and these

10  periods four years ago.  It doesn't -- obviously,

11  it's addressing a method of registration.  There's

12  nothing in the table that talks about the race or

13  ethnicity of the voters registered by the method.

14           So again, I don't -- that's not an

15  empirical assessment.  It's an empirical

16  assessment of one way of assessing, you know,

17  variation over time, but it doesn't link it

18  directly to the legislation or to the effect on

19  the organizations, and it doesn't link it to any

20  kind of an effect that would be different for

21  racial or ethnic groups.

22      Q    So are you aware that SB 7050 was passed

23  and the effective date was July 1st?

24      A    Yes.

25      Q    And so when Dr. Herron states that new

1    registrations overall were down 19 percent in July

2    and August compared to being down roughly four

3    percent in January to June, this is all in the

4    year 2023.  He's saying after the enactment of

5    SB 7050 voter registrations were down.  Do you

6    agree with that statement?

7         A    Yes.

8         Q    And then he also states that the

9    difference-in-difference for 3PVRO voter

10   registration is roughly negative 28 percent, which

11   is the greatest in magnitude drop across voter

12   registration methods of all the methods listed in

13   the two tables.  That is that of the different

14   types of methods of voter registration, third

15   party voter registrations were down the most

16   between those two periods of time, from January to

17   June, July and August.

18        Do you agree with that?

19        A    You know, be careful because you're

20   talking about difference-in-difference.  So you're

21   stating as if you're just talking about what

22   happened to voter registration in 2023.  You're

23   not.  You're talking about the difference in what

24   happened in 2023 and 2019, between the period

25   before and after.  So you're not actually just

1    talking about what's the impact of the

2    legislation.  You're talking about what's

3    different in the impact of the legislation in

4    those time periods compared to what happened in

5    those time periods in 2019.  And yes, that's what

6    the table shows.

7            Now does that have to do with -- is that

8    attributable to SB 7050?  We don't know.  I mean

9    SB 7050 happened at a point in time.  But

10   presumably SB 7050, which is, as far as I

11   understand, not completely implemented yet, I mean

12   I could just point to the -- I mean there's a drop

13   for various registration methods during that

14   period that seems unlikely to have anything to do

15   with SB 7050, right?  So because the drop is --

16   the difference-in-difference is somewhat larger

17   for third party, he's simply attributing all that

18   to the effect of the legislation.  But what's his

19   explanation for the drops in other categories, or

20   the increases in other categories?  Again, all

21   relative to the first and second half of 2019.

22   What makes 2019, first and second half, magical in

23   the sense of somehow controlling for everything

24   else?  It doesn't.

25            It tells us that the change in, the

1    decline in registration by third party voter

2    organizations in the second half basically, to the

3    extent we've gotten that data in the second half

4    of the year 2023, is somewhat different than it

5    was in 2019.  But lots of things are different

6    between now and 2019.  This is basically, in

7    effect, a kind of time series with only two

8    comparison points that relies heavily on the

9    difference-in-difference as opposed to an actual

10   difference within the particular time period.

11          So, again, this is, this is certainly

12   something you would expect to see if this effect

13   was taking place, but it also may be caused by

14   lots of other things.  This is not a controlled

15   experiment in any sense.

16       Q    Okay.  So my understanding is that you

17   don't dispute the quantitative data that Dr.

18   Herron provides, you dispute what that data shows,

19   or what that data means; is that a fair assessment

20   of what you're saying?

21       A    Yes.  Understanding the implication of

22   what's being produced here is complex.  There are

23   a lot of different ways of doing the

24   difference-in-difference and summarizing what has

25   changed.  There are a lot of different ways of

1  providing a baseline for this, like doing a true

2  time series analysis.

3          This is an interrupted policy analysis

4  and it's a fairly -- it's one that has a, requires

5  a lot of assumptions to believe that it's actually

6  made this assessment in an appropriate way.

7          And again, it's, as I indicate on, or we

8  indicate on page 3, it does not provide evidence

9  that there's been a disparate impact on black,

10  white, and Hispanic voters as a consequence of the

11  legislation.

12     Q    Let's go back to your report, on page 4,

13  the section called Summary.  The first bullet

14  point you state, quote, we do not find Professor

15  Herron's conclusion about the discriminatory

16  effect of SB 7050 to be supported by his findings.

17  His findings do not address the central question

18  of whether SB 7050 has had a discriminatory effect

19  on non-white voter registrations.

20          Who wrote this bullet?  Was it you, or

21  Dr. Stein?

22     A    I think we probably worked on the

23  bullets together, although I suspect that bullet

24  reflects more my input in terms of -- I think I

25  probably was the initial drafter of that bullet.

1      Whether it was modified, I don't remember.

2          Q      And when you refer to non-white voter

3      registrations, what specific races or ethnicities

4      are you referring to?

5          A      I'm referring to the two groups that Dr.

6      Herron is referring to, as I understand it, which

7      is black voters and Hispanic voters.  And of

8      course -- so non-white is not a precise term

9      because Hispanics are white.  So it would be

10     non-white Hispanic -- yeah, Hispanic voters or

11     black voters.

12         Q      And can you explain what you mean by

13     "central question"?

14         A      I guess my understanding is that the

15     focus of the report is on the issue, from the

16     introduction of Dr. Herron's report and

17     Dr. Smith's report, the focus is on the notion

18     that there's been, has been and will continue to

19     be, a discriminatory effect of this legislation in

20     terms of both registration and turnout for black

21     and Hispanic voters, and Dr. Herron's report

22     doesn't provide empirical evidence of that.

23         Q      So you determine central questions based

24     on your understanding of Dr. Herron's expert

25     report, or -- I'll leave that there.

1      A      My understanding of what he's asserting

2  in his report, as well as my understanding of what

3  is at issue in the case.

4      Q      Why do you think his findings do not

5  address the central question?

6      A      Because he doesn't have anything in his

7  report that shows that the legislation has,

8  relative to registration of non-Hispanic whites,

9  reduced registration disproportionately for black

10 or Hispanic voters, much less turnout.

11     Q      And the second bullet point states,

12 quote, Professor Herron's measure of white and

13 non-white voter registration failed to take into

14 consideration the base number of white and

15 non-white eligible voters, i.e., citizen voting

16 population.

17            Did I read that correctly?

18     A      Yes.

19     Q      Who wrote this bullet point?  Was it

20 you, or Dr. Stein?

21     A      That looks like a Stein bullet point to

22 me.

23     Q      Do you stand by it as if you've written

24 it your own?

25     A      Yes, I think it's correct.

1      Q    So is it your opinion that an analysis

2  of data on the citizen voting age population, or

3  CVAP for short, would address the central question

4  you mention in the first bullet point?

5      A    I mean I think it would, it would be

6  important.  There are a whole series of things

7  that would be important.  That would be important

8  in addressing that.  I don't think that any

9  analysis that took it into account would therefore

10  necessarily address the criticism, but -- it's a

11  broader criticism, but that's a piece of it.

12      Q    How would you address the central

13  question?

14      A    By looking at a properly controlled over

15  time analysis of voter registration and turnout

16  ratios or proportions.  So, again, looking at that

17  over time with a proper time series or control

18  basis, sufficient time to actually see that impact

19  develop and looking at whether, or the degree

20  which that actually impacts levels of

21  registration, disproportionately impacts levels of

22  registration and turnout among white, Hispanic,

23  and black voters.

24      Q    In the third bullet point of your

25  summary you state, quote, Professor Herron's

1    analysis does not consider the possibility that

2    declines in the proportion of non-whites

3    registering to vote by a third party were

4    substituted by registrations by another model, for

5    example, DMV.

6            Did I read that correctly?

7        A    Yes.

8        Q    Who wrote this bullet point; you, or Dr.

9    Stein?

10       A    I don't recall.

11       Q    But you stand by it as if you'd written

12   it on your own?

13       A    I do.

14       Q    Why is this bullet point included in

15   your summary?  What -- I'll leave that there.

16       A    In my view, it's useful to me -- again,

17   I'm not sure I wrote it, but it's useful to me

18   because it suggests that, just as Dr. Herron has

19   kind of a plausible logical route by which this

20   might have happened, there are also logical

21   plausible routes by which it would not happen, and

22   this happens to be one of them, right?

23           People may substitute registration

24   methods in ways that actually don't lead to a

25   disproportionate effect on minorities once you get

1    to the level of actual registration or ultimately

2    to voter turnout.

3           So, again, there's, just there are a lot

4    of pieces missing in this chain of analysis, and

5    this is one of them.

6       Q    Let's go back to Dr. Herron's rebuttal

7    report, on page 39, paragraph 118.  It says in

8    this paragraph, Dr. Herron writes, quote, the

9    Stein-Alford Report offers no comparative evidence

10   on either the cost of registering to vote via

11   3PVRO or the cost of registering to vote at a DMV

12   office.  Indeed the Stein-Alford Report does not

13   offer any comparative evidence on the cost of

14   registering to vote with the various methods of

15   voter registration available in Florida.

16          Did I read that correctly?

17      A    Yes.

18      Q    Do you agree with this paragraph that

19   you do not offer any comparative evidence?

20      A    Yes.  We're not, we don't have the

21   burden of proof here so we didn't write the report

22   setting out to prove that, that this is not true.

23   Our job is just to assess the degree to which

24   Drs. Smith, Herron, and Lichtman have demonstrated

25   that it is true.

1      So I mean if one of those pieces they

2  think is important is to show empirically that the

3  cost of registering in Florida is different across

4  different methods, then they should have that in

5  their reports, not ask whether we put it in our

6  report.

7      Q    You anticipated my next question, which

8  is going to be what's your response.  Do you have

9  anything else to add in response to this

10  paragraph?

11      A    No.  Again, I don't recall that they

12  provided a lot of empirical analysis of the

13  perceived cost of registering to vote by different

14  methods or how that might be connected to any

15  broader theoretical, much less empirical,

16  connection here.

17      So I -- he's right that we didn't

18  provide, there's a whole series of things we

19  didn't provide.  We're not here to do an

20  independent analysis to prove there was no impact.

21  That's just, neither as a practical or legal

22  matter is that what we set out to do.  It's not

23  what we were asked to do and it's not what we did.

24      Q    So in the next paragraph Dr. Herron

25  writes, quote, the authors of the Stein-Alford

1    Report do suggest that 3PVROs, quote, target,

2    unquote, minority voters when seeking to register

3    eligible Floridians to vote, Page 8, noting that

4    the Stein-Alford Report refers to non-white

5    voters, which I treat as shorthand for minority

6    voters.  The authors of the Stein-Alford Report do

7    not make a similar point about Florida DMV

8    offices, i.e., they do not claim that officials in

9    DMV offices target eligible minority voters for

10   voter registration purposes.  Thus, the only

11   comparative point made in the Stein-Alford Report

12   about voter registration via 3PVRO and voter

13   registration at a DMV office is one implying that,

14   for minority voters, the former method of voter

15   registration is less costly than the latter.

16           Do you have a response to this paragraph

17   of Dr. Herron's report?

18       A    It seems extremely tangential to me, but

19   if they want to make that point, they can make

20   that point.  They're quite right that we were not

21   seeking to do our own positive analysis of the

22   relative costs of methods of registration.  I may

23   have misread the report, but I didn't think that

24   they were making, or Herron was making a strong

25   empirical presentation about an assessment of the

1  relative costs of registering via different

2  methods.

3           To say basically that they haven't made

4  that presentation, but that their interpretation

5  of something we said suggests that, that maybe one

6  is less costly than the latter is, if that's a

7  point they thought was important to make, this is

8  a very weak way to make it because again, it's on

9  assumptions, right?  They're assuming that if your

10 targeted versus non-targeted that that affects

11 the, that makes one more costly than the other.

12          And again, the notion that making it

13 more or less costly is going to directly translate

14 into actual registration level differences,

15 that's, that just isn't, you just can't make that

16 assumption.  That's based on a rational theory

17 about cost-benefit that's been shown for lots of

18 purposes, the entire field of behavioral

19 economics, Nobel Prizes included, about the fact

20 that this is not the way actual individuals

21 respond even in individual, much less collective,

22 decisions.  And maybe no more clearly made

23 anywhere than the area of voting behavior where

24 turning out to vote in a national election,

25 economists agree, is completely irrational.  The

1    costs of voting are magnitudes higher than the

2    benefits of voting, and yet millions and millions

3    of people turn out to vote.

4            So just simply saying that it's the case

5    that, you know, when costs go up, you know, voting

6    will go down assumes that there is this kind of

7    rational behavior on the part of individuals.

8    It's certainly one of the things that might

9    happen, it might even be the things you would

10   expect more often than not to happen, but they

11   haven't demonstrated that and certainly not

12   empirically for Florida.

13       Q    Let's go back to --

14       A    Nor have we demonstrated it.  Again,

15   they're trying to make an empirical point by using

16   a remark we made.  That remark that we made is not

17   an empirical demonstration of the point that they

18   seem to want to make now or wish we had done

19   research on.  I don't, quite frankly I don't

20   understand how all of this comes in as an

21   important point.

22       Q    Let's go back to your report, Exhibit 1,

23   on page 5, the first paragraph, you state, in the

24   second sentence, that the, that you believe that

25   Dr. Herron's measures of voters who register via

1    third party voter registration organizations

2    determined using Florida's voter files is, quote,

3    inappropriate, right?  We believe this is a,

4    quote, inappropriate measure of the incidence of

5    non-white and white total voter registrations and

6    registrations by method.

7         A    Yes.

8         Q    Who wrote this bullet; you, or Dr.

9    Stein?

10        A    This whole section is written by Dr.

11   Stein.

12        Q    And you stand by it as if it was written

13   by you?

14        A    Yes.

15        Q    Why do you believe that it's

16   inappropriate?

17        A    Again, I think they, they basically

18   operate with their empirical analysis a long

19   distance away from what it is they're actually

20   trying to reach a conclusion about.  And what

21   they're trying to reach a conclusion about is the

22   impact on voter registration or turnout by race.

23   And that means understanding, you know, what

24   proportion of eligible citizens by, of different

25   race or ethnicities are, end up actually getting

1    registered and turning out to vote.

2            So that's the appropriate dependent

3    variable for understanding this impact.  It's a

4    disparate impact on the impact of eligibles who

5    participate in the process.  It's not just simply

6    based on, you know, a pool, pooled number of

7    individuals or a pooled set of registrations, but

8    based on relative access to, or ability to,

9    register and turn out to vote.

10       Q    You're not opining here that any of Dr.

11   Herron's calculations were incorrect, right?

12       A    I mean you'd be better asking Dr. Stein

13   about what, exactly what he's referring to in that

14   regard.  I don't find anything here that I

15   disagree with, but I didn't write it.  It's not,

16   you know, it's not the point, the point that I'm

17   particularly making here.  So he could tell you

18   about that better than I could.  It's his area,

19   it's not really mine.

20            (Simultaneous speaking.)

21       A    It's also his area of expertise so he'd

22   be the right person to ask.

23       Q    Have you relied on voter files when

24   analyzing expert work?

25       A    Yes.

1      Q    And you agree that experts in your field
2  analyze voter files as part of evidence, as part
3  of their academic and expert work?
4      A    If what you're interested in is the
5  behavior of voters, then you'd use a voter file to
6  find out who is a registered voter or who is a
7  turned-out voter, if that's what you're interested
8  in.
9           Obviously it depends on the question
10  you're interested in.  So, you know, it wouldn't
11  be a useful file to look at if you were interested
12  in drunk driving.  I just -- I'm not saying that
13  the voter registration information is not
14  important information.  What I take Dr. Stein to
15  be saying is that when you construct a measure of
16  what it is you're trying to look at, that measure
17  is actually with respect to the eligible
18  population.  So sometimes it's with respect to the
19  eligible population and sometimes your purpose of
20  using a voter file is not.
21           When I'm looking at, you know, how black
22  and white voters vote, I'm not interested in that
23  relative to the eligible population.  It's a very
24  different question.  It's confined to that group.
25  This question isn't confined to that group.  The

1   question is ultimately about the ability of the

2   eligible population to register and vote, and

3   that's not the question when you're doing, for

4   example, racially polarized voting analysis based

5   on registered or turned-out voters when the

6   question is how those voters voted, not how the

7   eligible population voted.

8       Q    So in reviewing the voter files, Dr.

9   Herron found that at least 6 to 7 percent of all

10  voter registrations were facilitated by third

11  party voter registration organizations.  You're

12  not disputing that finding, right?

13      A    The finding of what proportion -- I'm

14  sorry, what proportion of people are registered by

15  this method?

16      Q    Right.

17      A    I have no idea.  I'm not disputing it.

18      Q    Okay.  And you're not disputing that

19  according to the voter file, black registered

20  voters in Florida used third party voter

21  registration organizations to register to vote

22  roughly five to six times as often as white

23  voters, right?

24      A    It depends on how you're assessing it.

25      Q    What do you mean by "it depends on how

1    you're assessing that"?

2         A    Well, I mean I can't remember if it's

3    Dr. Herron or Dr. Smith, you have to -- sorry if I

4    confuse them.  It would have been easier if they

5    had written a report together, or maybe it

6    wouldn't, I don't know.

7              They've got, you know, when they address

8    this issue about all the things that affect and

9    what's the effect of race on third party

10   registration, they have a regression analysis and

11   a probative analysis where they show that being

12   black adds about, I think they said about

13   eight percent, makes it about eight percent more

14   likely.  That's a long way from, you know, three,

15   four, 5,000 percent.

16             So they brought a variety of different

17   ways of assessing the impact of race on third

18   party registration.  Third party registration is

19   more common for minority groups, but in terms of

20   their assessment, what they say is the impact of

21   race, the impact of race is a very modest impact

22   when they actually look at and control for things

23   like partisanship and other characteristics.  So I

24   mean that depends on how you want to express that.

25        Q    Okay.  So I understand your point to

1   mean about the impact of how race influences what

2   method of voter registration someone decides to

3   do, but my question was just according to the

4   voter file numbers, black registered voters in

5   Florida used third party voter registration

6   organizations to register to vote roughly five to

7   six times as often as white voters.  Do you

8   dispute that finding?

9        A    I don't dispute the finding, although I

10  think you need to be -- I'm not agreeing entirely

11  with the way you're expressing that.

12       Q    Can you explain to me what you disagree

13  about the way I've expressed that?

14       A    Well, because -- so I think a voter, a

15  voter can utilize online registration as a way of

16  voting, or getting registered, right?  So I want

17  to register to vote.  I can go down to the DMV or

18  maybe I'm going anyway.  I can register online.  I

19  can go down to the county courthouse and register.

20  There are a variety of methods I might utilize.

21       The third party voter registration is

22  somebody registering me, right?  It's being

23  utilized by the organization as a mechanism to

24  register voters.  But a voter doesn't say, I think

25  I'll just, you know, I need to get registered

1   today, I'll go find a third party registration

2   organization.  They don't have a storefront

3   somewhere, right?  They don't have a website that

4   I can utilize to register.

5           So I think saying that voters utilize

6   this method implies sort of an active choice on

7   their part as opposed to their being solicited to

8   register by this method.  They are registered by

9   this method, but I don't think it means that they

10  disproportionately choose to utilize this as a --

11  in the sense of when they think about registering

12  to vote, that this is the mechanism they choose as

13  opposed to the mechanism that chooses them.

14      Q    So you're inserting an implication with

15  the term "use" of third party voter registration

16  organizations?

17      A    Or utilize.  I think that implies that

18  the motivation of the action is on the part of the

19  voter when in fact the organizations are

20  soliciting the voter registration rather than the

21  other way around.

22      Q    But you would agree that black voters

23  have been registered to vote via third party voter

24  registration organizations --

25      A    Correct.

1      Q      -- five to six times more often as white
2  voters?
3      A      As a proportion, yes.
4      Q      And you would agree that according to
5  the voter file, Hispanic voters have been
6  registered to vote via third party voter
7  registration organizations roughly four to five
8  times more than white voters?
9      A      Again, as a proportion.  And again, that
10  doesn't indicate as their report makes clear, that
11  is not a measure of the impact of race on method
12  of registration.  The impact of race on method of
13  registration is actually quite small.  But in
14  terms of expressing that as a proportion, that is
15  what the proportion shows.
16      Q      And you write in your expert report on
17  page 8 that, quote, Professor Herron's findings
18  demonstrate that a higher proportion of non-white
19  voters than white voters register to vote via
20  third parties, right?
21      A      Correct.
22      Q      Do you know who wrote that section of
23  your report; you, or Dr. Stein?
24      A      I don't know.  I'm sure we -- it's a
25  simple empirical fact.  It's an empirical fact

1    that's made repeatedly by Dr. Herron and Dr.

2    Smith.  We're not disputing that it's an empirical

3    fact.  I think we both agree with it.

4            Again, there are lots of different ways

5    to look at it.  They look at it different ways.

6    There's lots of different implications of that,

7    but just that as a simple fact is a simple fact.

8            It is not, despite how often they repeat

9    it and demonstrate it, it is not what they need to

10   demonstrate in order, in my view, to do what it is

11   they say they're setting out to do.  It's, again,

12   it's not a necessary or sufficient condition, but

13   it is true.

14        Q    Let's go to page 11.

15            MS. RUTAHINDURWA:  So is there any way

16   to see more of the page so -- yeah, zoom into the

17   last paragraph.

18        Q    So in summary, you write, in summary,

19   quote, both Dr. Herron and Dr. Smith are able to

20   conclude that blacks and Hispanics are more likely

21   to be registered via 3PVROs than are non-Hispanic

22   whites, but they do not offer any empirical

23   evidence to support the speculation that the

24   impact of SB 7050 on actual voter registration

25   rates has been different for these groups.

1          Do you remember who wrote this portion

2     of the report; you, or Dr. Stein?

3          A     I think I might have, but I may just be

4     credit claiming here.  I really don't know when we

5     got to the -- you know, sort of the individual

6     sections we talked about I think are clear.  When

7     it came to things like summary, probably a joint

8     process, but I don't, I don't recall precisely.

9          Q     And this kind of goes to what we were

10    talking about earlier, which is that you don't

11    dispute the numbers, which is that black and

12    Hispanic voters are more likely to be registered

13    to vote via 3PVRO than are non-Hispanic whites,

14    right?

15         A     Correct.

16         Q     Let's go to Dr. Herron's rebuttal

17    report, paragraph 63.

18         So Dr. Herron writes in the last

19    sentence, indeed, the Stein-Alford Report does not

20    provide evidence that even a single conclusion in

21    my expert report would have been different had I

22    divided counts of 3PVRO voter registrations (and

23    registrations by other methods) by counts of

24    citizens of voting age in Florida.

25         Do you have a response to this?

1      A    It's not our job to do this analysis.

2   We're just responding to what's adequate and

3   what's potentially inadequate in that analysis.

4   This, this is a more appropriate way to do it.

5   It's -- they're not -- we didn't provide evidence

6   to show that if you did it a different way, it

7   would produce a different conclusion.  They don't

8   provide evidence to show that if they did it this

9   way, it'd produce the same conclusion.

10            So if you want to summarize that

11  paragraph, they're just saying that this might or

12  might not matter.  Those are logical statements

13  given that we don't know whether it does or

14  doesn't.

15            So I don't dispute that those are two

16  logical possibilities.  And it's their

17  responsibility to provide analysis that provides

18  the Court with something, in my view, that says

19  this is, this is what happens, not this is one of

20  the things that might happen or might not happen.

21  And our job is not to do their analysis or to try

22  to prove that the legislation hasn't had this

23  effect or wouldn't have this effect.  It's just to

24  assess the adequacy of what they've done.

25      Q    Let's go back to Exhibit 1, on page 5,

1   so the first paragraph, and the second sentence

2   there you write, that the appropriate measure is

3   the proportion of persons by race and ethnicity

4   eligible to register, i.e., citizen voter age

5   population, who register to vote.  Right?

6       A    Yes.

7       Q    Why do you consider this to be the

8   appropriate measure?

9       A    Because it operationalizes the question

10  that you're asking here.

11      Q    And what is the question that's being

12  asked?

13      A    You're asking whether this, ultimately

14  whether this legislation has a disproportionate

15  effect on minority voters and their ability to

16  successfully register and ultimately to vote.  And

17  that's a -- the way that you measure that is to

18  look at what proportion of eligible citizens are

19  able to register in those categories before and

20  after the legislation and then try to connect it

21  in a reasonable way with the legislation itself.

22          It's just that -- the correct measure

23  for measuring access to the ballot is to look at

24  what proportion of a group that's eligible to be

25  registered is registered.

1      Q    Are you aware of any data on Florida

2  citizen voting age population in 2023?

3      A    Again, this is Dr. Stein's section, so

4  you might ask him about that.  I'm certainly aware

5  of the fact that there is data on citizenship.

6  What its actual availability is in Florida, I

7  don't know.

8      Q    And what its availability is in 2023 you

9  also don't know?

10      A    Specifically to Florida, no, I don't.

11      Q    And so you're not aware of any data on

12  Florida's citizen voting age population for after

13  July of 2023 either, right?

14      A    I'm not aware.

15      Q    And you didn't look into whether this

16  data is available?

17      A    It doesn't change what the appropriate

18  measure is.  If the data is not available, then

19  you can't measure this appropriately, and you can

20  wait until the data is available or you can

21  acknowledge that this is an imperfect measure.

22          So the availability, the right way to do

23  this, or the ability to draw conclusion from an

24  analysis doesn't magically improve if you just

25  say, oh, I know this isn't the right way to

1  measure it, but I wasn't able to measure it the

2  right way so I measured it the wrong way and you

3  can't do any better than me.  That's something,

4  that's the thing that you would disclose about

5  limitations of the analysis, and there are always

6  limitations of an analysis.

7           But it doesn't change the fact that if

8  you're making a strong claim about something, that

9  the strength of that claim depends on measuring

10 things appropriately.  If the time frame doesn't

11 allow that, then you either change the time frame

12 or you just acknowledge that you haven't measured

13 what you really wanted to measure.

14      Q     And to clarify, you didn't look into

15 whether the data was available, right?

16      A     No, I did not.

17      Q     And you didn't provide any citizen

18 voting age population analysis in your report,

19 right?

20      A     Not our job to do that.

21      Q     So is that a no?

22      A     That's a no.

23      Q     Is it your contention when you are

24 talking about the appropriate measure, that it's

25 the only appropriate measure, or is it just the

1    more appropriate measure?

2        A    I haven't really thought exhaustively

3    about whether it's the only appropriate measure,

4    but it is the appropriate measure and it's not the

5    measure that was used.

6             And this is Dr. Stein's area more than

7    it is mine, so I agree with what's being said

8    here, and I agree with it not on the basis of my

9    personal familiarity with what other alternatives

10   there might be, but just assessing what the

11   conclusions are being drawn about and what's being

12   measured.  And what's being measured in their

13   report is not what they're drawing the conclusions

14   about.  They are drawing some intermediate

15   conclusions, like the conclusion that this method

16   of registration is used disproportionately by

17   blacks and by Hispanics relative to non-Hispanic

18   whites.  But that's not, just that simple fact

19   about this is not what the area of inquiry is

20   here.  It's about whether this actually then

21   translates into a disproportionate access to

22   registration, and that requires you have a

23   baseline of eligible population, otherwise you

24   don't know what proportion of the eligible

25   population is registered before or after.

1        Q     If Dr. Stein agreed that it was not the

2    only appropriate measure, would you stand by Dr.

3    Stein's position as well?

4        A     I would have to discuss with him what he

5    means by that.

6        Q     Let's go back to Dr. Herron's rebuttal,

7    on page 28.  He has a section titled CVAP

8    Normalizations are Consistent with Findings in my

9    Expert Report.  Have you reviewed this section?

10       A     I have.

11       Q     Do you agree with Dr. Herron that the

12   most recent CVAP data is from 2021?

13       A     Again, I'm not entirely familiar with

14   Florida, but I'd, my impression is that there is a

15   2022 CVAP file.  But, you know, if he says that's

16   all available, that's -- yeah, I don't know

17   whether that's correct or not.

18       Q     Do you have any reason to dispute Dr.

19   Herron's statement that 2021 is the most recent

20   year for which statewide CVAP data is available in

21   Florida?

22       A     Well, it is 2024 now and that, that's a

23   pretty long lag.  My experience is that the CVAP

24   files are updated more regularly than that.  So I

25   would assume that there was a 2022 file, but -- so

1    I can't endorse, I can't say he's right about

2    that.  I can't say for certain that he's wrong.

3         Q    On page 29, the next page, Dr. Herron

4    includes a new table 7 that's titled 3PVRO Voter

5    Registration Rates Based on CVAP August 2021 Voter

6    File.  Do you see that table?

7         A    Yes.

8         Q    And then in paragraph 86, which is the

9    next page, I believe, he writes, I conclude, quote

10   -- sorry, he writes, quote, I conclude from table

11   7 that black citizens of voting age in Florida use

12   3PVRO voter registration at greater rates than

13   white citizens of voting age in Florida.

14        What is your response to this section of

15   Dr. Herron's rebuttal report?

16        A    I mean that's his, that's what he

17   concluded.

18        Q    Do you have any basis to disagree?

19        A    I'm not, I'm not sure we're disagreeing

20   about the same thing.  He seems to still, as

21   much as -- seems to be focused on this issue about

22   whether in fact there's a gap in the proportion of

23   blacks and whites that utilized third party

24   registration in the past.  I think you've asked me

25   that repeatedly.  I've agreed repeatedly that

1   there's a gap.  There are different ways to

2   characterize it, but nobody is disputing that.

3           And certainly this issue about CVAP is

4   not about disputing the gap in terms of how this

5   method is utilized.  There's a gap in how the

6   method is utilized, I'm not disputing that, we're

7   not disputing that.  They're asserting it, and

8   I've said before, that's neither necessary, nor

9   sufficient.  So it's a very minor intermediate

10  point.

11          And at least in my understanding, again,

12  ask Dr. Stein, but in my view, the relevance of

13  the eligible population is to understand the

14  disproportionate effect of the legislation on

15  black and white voter registration, not to assess

16  whether there actually is a gap.

17          The gap is not about the proportion of

18  eligible citizens that are registered by different

19  methods.  This is a meaningless correction.

20  Certainly not what I would suggest that needed to

21  be corrected.  If I thought it needed to be

22  corrected, then when you said, is there a gap, I

23  wouldn't have said yes, and our report wouldn't

24  have stated repeatedly that there is evidence that

25  there's a gap in the level of usage of this method

1    of registration.

2           The issue is about whether the changes

3    are affecting the relative ability of people to

4    register.  This is not being assessed here.  This

5    is just going back and saying, see, there's a

6    difference in historical utilization of these two

7    methods.  Given that they repeated the quotes in

8    which we say we're not disputing that, then why is

9    it they think they can fix an undisputed fact by

10   taking into account a measure like CVAP.  This is

11   just nonsensical.

12          MS. RUTAHINDURWA:  Let's go off the

13   record and take a five-minute break.

14          MR. PRATT:  Sounds good.

15          (A recess was taken at 11:46 a.m.)

16          (Back on the record at 11:52 a.m.)

17   BY MS. RUTAHINDURWA:

18     Q     So, pulling up your expert report again,

19   Exhibit 1, on page 5, the second bullet point here

20   you state, quote, two empirical conditions need to

21   be shown to support Professor Herron's conclusion

22   that SB 7050 discriminated against non-white

23   citizen voting age persons registering to vote in

24   Florida.  First he needs to demonstrate that the

25   difference between the proportion of non-white and

1    white citizen voting age persons who registered to

2    vote and registered to vote by third parties was

3    significantly lower after the adoption of SB 7050

4    than before its adoption and implementation.

5           Second, if the decline in the proportion

6    of non-white citizen voting age persons who

7    registered to vote by a third party was

8    significantly greater than observed for white

9    citizen voting age persons, was this decline

10   offset by an increase in non-white citizen voting

11   age persons registering by another mode of voter

12   registration, e.g., DMV and any other method of

13   registration available to Floridians.  We have

14   been unable to identify where in his expert report

15   Professor Herron provides tests for these

16   conditions.

17          Who wrote this portion of the report;

18   was it you, or Dr. Stein?

19       A    I think I may have drafted this

20   Conclusion section, but I'm not a hundred percent

21   certain.

22       Q    And how did you determine that these are

23   the two empirical conditions that need to be

24   shown?

25       A    I actually think Dr. Stein wrote this.

1  I don't think I wrote it.  So these are certainly

2  two empirical conditions that would need to be

3  demonstrated, but -- and I agree that need to be

4  demonstrated, but I'm not sure what his thinking

5  was as far as why these versus some other sets of

6  conditions.  They're certainly critical, but I

7  don't think I wrote this.

8       Q     So you say they're certainly critical,

9  but are they necessary conditions?

10      A     Yes, I think they're necessary.

11      Q     Why do you think they're necessary?

12      A     Because they are basically the ultimate,

13  they address, they operationalize the ultimate

14  question which is, is this having a differential

15  effect on the ability of eligible citizens to

16  register in a way that's disproportionate and

17  related to race or ethnicity.

18      Q     And do you believe these are the only

19  two necessary conditions, or that there are other

20  conditions that are necessary as well that Dr.

21  Stein didn't provide in this report?

22      A     There are a host of empirical

23  conditions, but -- to do with how things are

24  measured and quality of measurement and the time

25  period and discounting other things that may be

1   occurring simultaneously.  There are design

2   questions.  There are a host of empirical

3   questions.  I think this points out two things

4   that are specifically important and enlightening.

5        Q    And you already testified that you

6   believe that Dr. Stein was the one that wrote

7   this, but do you have an understanding of how

8   these two empirical conditions were determined to

9   be necessary?

10       A    I don't.

11       Q    So you don't know if that determination

12  was based on literature?

13       A    I don't know.

14       Q    Or a previous case; you don't know?

15       A    Don't know.

16       Q    And I know the answer that you're going

17  to provide, but you don't actually provide an

18  analysis of these two empirical conditions in your

19  expert report; is that right?

20       A    Not what we were asked to do.  Not what

21  we were tasked to do, and not what we did.

22       Q    But you do provide hypotheticals on page

23  6 and 7 of your report?

24       A    Dr. Stein does, yes.

25       Q    And you take ownership of this report as

1    if it's your own?

2         A    I don't know what that means.

3         Q    You agree that all of the, everything

4    that's written in this report, you take ownership

5    over as if you had written it on your own, right?

6         A    I mean that sounds exactly like the

7    definition of plagiarism.  I don't take ownership

8    of it.  You asked me if I disagreed with anything

9    or if I agree.  I've obviously read the whole

10   report.  I agree with the parts that Dr. Stein

11   authored, but I don't take ownership of them in

12   the sense of, you know, that these are my words,

13   they're not.  But -- I don't disagree with that

14   part of the report, but I didn't write that report

15   so I can't take ownership of it.

16        Q    I didn't mean to interrupt you.

17        A    I don't know what it means to take

18   ownership of something, but in my view, with

19   scholarship, taking ownership means both credit

20   claiming and basically having been an essential

21   producer of that, of that text and that narrative,

22   and I'm not either of those here.

23             So I'm not disagreeing with it, but I

24   can't explain it in terms of the origin of it much

25   beyond telling you that, at least in my

1    recollection, Dr. Stein wrote this.

2          Q    And you do agree that you testified

3    earlier that you believe everything in this report

4    can be attributable to you as a coauthor, right?

5          A    Again, if I said that, I wasn't thinking

6    about what you might mean by, as I should have

7    been, by attributable.  Again, attribution is an

8    authorship question.  That's an important one in

9    academics.  If I didn't write it, it can't be

10   attributed to me.

11         Q    You coauthored this report?

12         A    Yes.

13         Q    And you stand by the assertions that are

14   made in this report regardless of who wrote it?

15         A    Yes, I do.  But I guess there are two

16   ways of thinking, or three ways at least of

17   thinking about coauthorship.  You could say a

18   paper is coauthored, meaning that I wrote half of

19   it and Dr. Stein wrote half of it.  That's not the

20   case.  He wrote more than half of it.

21              You could say it's coauthored in the

22   sense that we both wrote all of it.  And I have

23   written papers that way before where literally

24   every word of the report was, the two people were

25   sitting together in a room and a third person was

1  typing, and the two people who are coauthoring the

2  report were literally filling in beginnings and

3  endings of sentences to the point that you

4  couldn't have taken a single sentence out of the

5  report and said that it wasn't coauthored.  That's

6  not the case here.

7          There are sections of this, large

8  sections of the report that were written by Dr.

9  Stein and then pieced into the final report by me.

10 So we are not coauthors in the sense that

11 everything here reflects our coordinated or

12 collective thinking.  It's coauthored in the sense

13 that we broadly agree, I think with each other, on

14 the contents of the report, but there are sections

15 that are my words and my thoughts, and there are

16 sections that are Dr. Stein's words and Dr.

17 Stein's thoughts.

18     Q    So do you know why Dr. Stein chose to

19 provide hypothetical numbers rather than an

20 analysis or calculation of actual numbers?

21     A    Again, I don't think, I don't believe

22 that it's our task to provide empirical analysis

23 that demonstrates or doesn't demonstrate.  So the,

24 in terms of if he thought a hypothetical is a

25 useful way, as it often is, to illustrate a

1    particular point, as long as it's clearly labeled

2    as a hypothetical, then -- if it were the actual

3    numbers, it would -- if you put the actual numbers

4    in and call them a hypothetical, that would be

5    dishonest.  They're not a hypothetical, they're

6    the actual numbers.  If you put in a hypothetical,

7    then somebody criticizes you because the numbers

8    in your hypothetical are a hypothetical, I have no

9    sympathy for that criticism at all.

10          So Dr. Stein, for whatever reason,

11   thought a hypothetical would be a useful way to

12   illustrate this point.  I don't think he's wrong

13   about that, and I don't think he was in any sense

14   obscuring the fact that it was a hypothetical.

15   You just referred to it as a hypothetical.

16      Q    And would you have found reliance on

17   actual numbers to have been more beneficial than a

18   hypothetical in this case?

19      A    No.

20      Q    Why not?

21      A    Well, first of all, the purpose of the

22   hypothetical is to, is to demonstrate what your

23   point is, you know, in terms of what is possible.

24   So you're showing hypothetically, for example,

25   this is how this could work.  It's intended to

1   help somebody understand the concept, it's not

2   intended as evidence about the concept.

3          As I said, we're not, this was not our

4   purpose.  This was not what we were engaged to do,

5   to provide new evidence to counter, but rather to

6   respond to what, the adequacy of what was provided

7   here by Dr. Smith, Herron and Lichtfield [sic].

8   So that was not our task.

9          That wasn't surprising at all to me that

10  Dr. Stein chose to illustrate with a brief

11  hypothetical.  Again, it's an aid to understanding

12  his point.  It's not intended to be evidence.  And

13  that sort of analysis in the, given the task we

14  were assigned and the time frame we had, I

15  wouldn't, if I thought it would have been more

16  useful to have real numbers, or more appropriate,

17  then I would feel differently about it, but I

18  don't.  All it is is a hypothetical.  That's all

19  it's intended to be.

20     Q    I'd like to go to Herron's rebuttal

21  report, paragraph 105.  Dr. Herron writes, quote,

22  as I point out in my expert report, SB 7050 was

23  effective as of July 1, 2023.  Putting aside the

24  invented (and, in the case of 2019 rates,

25  demonstrably wrong) voter registration rates,

1    subtracting 2023 and 2019 rates will result in

2    differences confounded by the fact that SB 7050

3    was not effective in the first half of 2023.

4            Do you have a response to this

5    paragraph?

6        A    I'd have to look to our report to see

7    what section it is he's talking about.  This is

8    clearly something Stein authored.  I don't know

9    off the top of my head what exactly he's referring

10   to here.

11       Q    Implementation of the law halfway

12   through the year is an intervening circumstance

13   that might change data of an entire year's worth

14   of data, right?

15       A    Entire year's worth of whose data?

16       Q    So in this instance, Dr. Herron states,

17   subtracting 2023 and 2019 rates will result in

18   differences confounded by the fact that SB 7050

19   was not effective in the first half of 2023 so

20   comparing it to 2019 where there was not a similar

21   midyear change in law or effect would be

22   inappropriate.

23           Do you agree with that?

24       A    I would have to see that in context.  I

25   don't -- I don't know exactly what the point is

1  there.

2       Q    So sitting here, without going back to

3  context, you don't really have a response to

4  paragraph 105; is that fair?

5       A    No, that's better addressed by Dr.

6  Stein.

7       Q    Let's go back to page 7 of your expert

8  report.  The first bullet point states, quote, we

9  could not find in Professor Herron's expert report

10 any information that reported the

11 difference-in-difference ratios of white and

12 non-white registrations to white and non-white

13 citizen voting age populations for comparable

14 periods preceding and following the adoption of

15 SB 7050.  Do you know who wrote this bullet point?

16 Was it you, or Dr. Stein?

17      A    I don't know.

18      Q    Do you agree with this assertion?

19      A    Yes.

20      Q    And going back to Dr. Herron's rebuttal

21 report, paragraph 40, Dr. Herron writes, I

22 interpret this critique as asserting that my

23 expert report does not provide evidence using

24 difference-in-differences based on comparable time

25 periods of the effect of SB 7050 on white and

1    non-white voters.  The passage above from the

2    Stein-Alford Report mentions the citizen voting

3    age population (CVAP) of Florida, but as I discuss

4    later in this rebuttal, there's no data available

5    on Florida CVAP in 2023, much less monthly data on

6    CVAP in 2023 and in years prior.

7            And then if you go to table 4 and

8    paragraph 51, it shows the outcome of a new

9    analysis that Dr. Herron conducted in response to

10   your report's critique.  In paragraph 51 he

11   writes, table 4 shows that the non-white

12   difference-in-difference is roughly negative

13   26 percent and the white difference-in-difference

14   is roughly negative 18 percent.  Non-white voters

15   thus had a greater post-SB 7050 drop in voter

16   registrations between 2019 and 2023 compared to

17   white voters.  This is consistent with SB 7050

18   having diminished voter registrations

19   disproportionately among non-white voters compared

20   to white voters, which is what would be expected

21   given, 1, SB 7050's provisions regarding 3PVROs,

22   and 2, the fact that non-white voters are

23   disproportionate users of voter registration via

24   3PVRO.

25           Do you have a response to table 4 in

1   paragraph 51 of Dr. Herron's rebuttal?

2       A    Could I see table 3?

3           Well, so first of all, I'd say this is a

4   table that did not exist in his report, if I'm not

5   mistaken.  So again, we, in our report, we were

6   criticizing his failure to do this, and apparently

7   we were correct because now he's doing it, which

8   he didn't do it before.

9           So this is not what his conclusions are

10  based on because it's something he didn't do.

11      Q    Do you have any critiques sitting here

12  today of table 3, table 4 and paragraph 51, or do

13  you agree with its conclusions?

14          MR. PRATT:  Objection.  Form.

15      A    Well, again, I haven't seen the data, I

16  haven't reanalyzed this, but I mean just off the

17  top of my head, what I see here is it looks like

18  post-SB 7050, looks like white registration is

19  down about 20 percent.  It looks like black

20  registration is down about 20 percent.

21          So I guess I'm not overwhelmed by that.

22  It looks to me like the decline in registration

23  for whites and non-whites is very similar.

24          Now he's making something more

25  complicated out of this by doing a difference-

1  in-difference and a comparison back to 2019 in the

2  first half and the second half of 2019.  I'm just

3  saying that the data on the ground there, which is

4  what's the difference for whites pre/post, in 2023

5  pre/post-SB 7050, because there is no pre/post-SB

6  7050 in 2019 because, of course, it doesn't exist

7  then.

8           So what we see there is, you know, that

9  things are different pre/post.  I mean they're

10  also different in 2019, which is interesting

11  because, you know, there was no SB, so it's,

12  obviously things change.  There's a lot of

13  changing going on.  There's lots of variation in

14  this data that's not being accounted for here.

15           But given all that noise in the data,

16  there's a simple question we can ask, which is,

17  after SB 7050 went into effect, did white voter

18  registration drop, and by how much.  And it

19  dropped by about 20 percent.  And did non-white

20  voter registration drop, and it did by about

21  20 percent.

22           So I guess I don't see that, it's the

23  first, this is the first time they tried to do

24  this kind of analysis.  They did not include it in

25  the original report, and that's dramatically

1    different than what they're suggesting in the

2    original report would be the expectation.

3          Based on the original report, it seems

4    to me their expectation was there would be a

5    decline in non-white registration that would be

6    substantially larger than the decline in white

7    registration, and that isn't the case.

8    Q    What would you deem to be substantially

9    different?

10   A    Well, they're talking about registration

11   differences, as you said, on a five times or six

12   times as likely than.  So I don't know what the

13   exact percentage is there, but I'm looking at

14   those numbers.  They're both right around

15   20 percent.  They may be slightly different than

16   each other in one direction or the other, I can't

17   do that in my head, but they're of extremely

18   similar magnitude.

19   Q    Let's go back to table 4.

20         Do you dispute that the non-white

21   difference-in-difference is roughly negative

22   26 percent?

23   A    No.

24   Q    Do you dispute that the white

25   difference-in-difference is roughly negative

1    18 percent?

2         A    No.  Again, those are --

3         Q    Do you consider that a substantial

4    difference?

5         A    No, that's not a very large difference.

6    That's not a very large difference, and that's the

7    difference-in-difference difference, right?

8              Again, what's the actual difference,

9    what's the actual effect in 2023 of SB 7050, and

10   it's, again, they're both roughly in the

11   20 percent range.  And I don't think they're that,

12   I don't know exactly where they are, but I don't

13   think they're anywhere near that far apart, and

14   that's not that far apart anyway.  And that's a

15   construct out of -- remember, this is not, this is

16   not the difference in their registration rates in

17   2023.  This is the difference in the difference,

18   the difference between the registration rates in

19   2019 first period to 2023 first period, and the

20   same for the post periods.

21             So it's on the assumption that the way

22   normally everything works is the way the first two

23   halves of 2019 work.  That's an extremely strong

24   assumption.  This suggests that there's more

25   difference between 2023 and 2019 than there is

1    difference between the two racial groups in 2023

2    itself.  What's the origin of that?  It seems

3    logical to me that the origin of that is probably

4    in those big differences back in 2019, and we

5    don't know what that's about, but it's not about

6    SB 7050.

7            So this is new evidence.  I haven't had

8    a chance to look at it.  I can't authenticate it.

9    But what it shows is that something much closer

10   than this 18/25, which itself is not a very large

11   difference, but the actual difference in 2023 is

12   much less than that.  Not more than a couple of

13   percentage points would be my guess.  And that's

14   just not a substantively, or for something that's

15   given, again, that this analysis doesn't take into

16   account other things, just the fact that after,

17   after that change in method, given -- out of all

18   of the stuff that's been piled on here about costs

19   and disproportionate utilization, et cetera, et

20   cetera, we're led to believe this has had a

21   substantial impact, and there's no indication that

22   that's substantial.

23           There's nothing here to test the

24   statistical significance of any of these changes.

25   This is a very limited -- there's none of that.

1    There's no regression.  There's no probative

2    analysis of the sort that there was in their

3    previous article about this.  There's no chart

4    that shows this data.  There are just some --

5    we're just to assume that the appropriate

6    comparator is the way things changed during the

7    calendar year 2019, and that that, therefore,

8    stands for, somehow stands for a neutral

9    comparator that is certainly not a control.  It's

10   certainly not the only choice for a

11   difference-in-difference.  And if you just simply

12   look at the actual differences opposed to this,

13   you know, artificial 2019, 2023

14   difference-in-difference, at least based on their

15   analysis, and I'm accepting it without having been

16   able to look at it in detail, but their table 3

17   shows little, if any, difference.  I mean it just,

18   that table shows that there is about a 20 percent

19   decline for both groups.  There's your fact.  So

20   what do you want to make of that?

21          Is that fact compatible with the story

22   that was told at the beginning of these reports

23   about how this method of registration is used six

24   times as often by black voters as non-minority

25   voters and that any impact here is going to be

1    substantial and it's going to be substantial and

2    disproportionate for black voters?  And then you

3    look at the decline in registration, and black

4    voting registration has declined by about

5    20 percent post legislation and so does white

6    voter registration.

7            So I'm not seeing, I'm not seeing that

8    this makes their case.  And again, it certainly,

9    it makes me perfectly comfortable with everything

10   we said in our initial report, and I frankly don't

11   understand why it wasn't in their initial report.

12   They had the data to do this.

13       Q    Is it your opinion that a difference has

14   to be substantial to be disproportionate?

15       A    Well, I mean we haven't even talked

16   about the design flaws here, but given the extreme

17   limitations on this form of analysis, this

18   non-causal, non-experimental analysis, you're

19   looking for differences that are both

20   statistically different and substantively

21   different.  And the reason you're looking for that

22   is because -- not because it doesn't matter if

23   it's only 10 voters, but because if it's only 10

24   voters, you have no idea if it's actually 10

25   voters, you have no idea if it's actually in the

1    right direction.  We can't measure that with this

2    precision.  Given the problems in design and the

3    problem in the precision, differences that small

4    are simply subsumed by the broader question about

5    what we're actually measuring.

6            So they're not substantive in the sense

7    that they don't indicate that there is anything

8    there that we can clearly attribute to the impact

9    of the legislation affecting black and white

10   registration differently once we get to the actual

11   question of black and white registration post-SB

12   7050 in 2023.

13       Q    But it's not your opinion that a

14   difference has to be substantial to be

15   disproportionate, right?

16       A    It has, in this context, it has to be

17   substantial to be real.  Differences that aren't

18   real can't be disproportionate.  But we don't

19   know -- that's just too small a change for us to

20   know if it's actually that direction or the

21   opposite direction.

22           That's why we put, do statistical

23   testing in here.  There's no statistical test that

24   can completely summarize all of the things that

25   are causing problems here.  It's not a sampling

1    problem because we don't have a sample, we have

2    the universe.  The uncertainty here comes from

3    the, from the simple challenges of the design

4    itself.

5        Q    Let's go back to your report, page 7.

6    You write --

7            MS. RATUHINDURWA:  You're good.  Let's

8    zoom in on the two bullet points.

9        Q    So the second bullet point, halfway

10   through you write, though conclusions about these

11   aggregate numbers are subject to an ecological

12   fallacy, they are suggestive of a substitution of

13   DMV registration for third party registration

14   among non-white voters.

15           Did I read that correctly?

16       A    Yes.

17       Q    And so what are, what conclusion are you

18   trying to form in that, in this bullet point?

19       A    I didn't write this bullet point.  So

20   you want to know what I think?  What the point I

21   take from Dr. Stein's bullet point is, and again,

22   this is compatible with the table we just looked

23   at, it looks like overall whatever changes may

24   have taken place or not taken place with regard to

25   third party registration, overall registration

1  declines amongst blacks and whites, or among

2  whites and non-white are comparable, very similar

3  levels, which suggests that if, in fact, there has

4  been a decline in third party registration, a

5  disproportionate decline among black and white

6  voters, then it must have been made up for by

7  something because the overall registration levels

8  of black voters have not declined

9  disproportionately with regard to white voters.

10  So it suggests some substitution effect is a

11  possibility and that's what this is offering as a

12  possibility.

13      Q    Is it your opinion that when a voter

14  method, a voter registration method is no longer

15  available, or not as accessible to voters, you'd

16  expect perfect substitution with other voter

17  registration methods?

18      A    No, and this is not to suggest perfect

19  substitution.  This is compatible also with an

20  argument when there's no substitution at all.  The

21  point is that whatever level of substitution there

22  may be is that where you end up with is that the

23  decline in voter registration post-legislation is

24  essentially the same for white and non-white

25  voters.  And so there may be, there may have been

1    substitution, there may have been no substitution

2    by anybody, there are lots of possibilities here.

3    But whatever happened, it ends up not having a net

4    effect on, in terms of relative decline.  It

5    doesn't produce a decline in registration amongst

6    blacks and Hispanics and level registration among

7    whites, or white registration goes up and black

8    goes down.  Both of them go down.  They go down by

9    similar amounts.

10           So whether there's substitution or not,

11   somehow -- I mean there either is some kind of

12   substitution going on to equalize this or there is

13   not the expected disproportionate impact that

14   Herron and Smith talk about because in the end

15   both groups, registration for both groups is

16   declining by about 20 percent.

17           So they're registering or not

18   registering relative to each other.  Whatever is

19   going on, they're ending up with access to

20   registration that -- or a decline in taking

21   advantage of registration in that time period

22   that's essentially equivalent.

23       Q    And would you agree that if one method

24   of voter registration becomes less available, it

25   increases the likelihood that voters will have to

1     use another registration method to register to

2     vote?

3         A     Again, if you're trying to register to

4     vote and a method that's been utilized in the past

5     disappears, then you'll have to utilize some other

6     method.  But there are lots of different ways to

7     register to vote in Florida and people register

8     via those different methods at different points in

9     time by, in different proportions.  But, and my

10    guess is that has varied over time as those

11    methods have become easier or more or less common.

12             So -- but it isn't as though there are

13    just two ways to register to vote in Florida.

14    There are a lot of ways to register to vote in

15    Florida.  And presumably you could track through

16    all kinds of things to figure out what actually

17    happened here, but in the end you're going to have

18    to have an explanation for the fact that there

19    are, that voter registration declined roughly

20    20 percent for minority voters and 20 percent for

21    white voters.

22        Q     And you would agree that it's possible

23    that there will be a group of voters who do not

24    register to vote at all once their form of voter

25    registration method is limited or removed, right?

1      A    That certainly could be.  But again,

2 that doesn't demonstrate that that's different for

3 different racial groups.

4      Q    And it's also possible that voters will

5 use a different method of voter registration but

6 they'll have to incur additional costs in order to

7 do so, right?

8      A    All kinds of things are possible.

9 That's among the things that are possible, but not

10 necessarily among the things that have been

11 demonstrated here.

12      Q    And what data do you have comparing the

13 cost of various methods of voter registration in

14 Florida?

15      A    I don't have any of my own, and I don't

16 have any that I got from Dr. Herron or Dr.

17 Lichtfield or Dr. Smith because I haven't seen a

18 table that shows empirically cost of registration

19 by method for Florida in any of these reports.

20      Q    And when you say you don't have any of

21 your own, you mean there are none provided in your

22 expert report, right?

23      A    I don't have them.  I have no data on

24 cost of registration by method in Florida.

25 There's none in the report.  There's none in Dr.

1    Herron's report.  There's none in Dr. Smith's

2    report.  There's none in Dr. Lichtfield's report.

3    And there's none in my possession.  I don't know

4    if they have that data in their possession, but

5    I'm not concerned with that.  I'm concerned with

6    what's in their report.

7        Q    You've reviewed Dr. Herron and Dr.

8    Smith's paper Analyzing Florida House Bill 1355,

9    right?

10       A    I read that, yes.

11       Q    And you mention it in your report?

12       A    Yes.

13       Q    If voter registration method

14   substitution is common, what explanation do you

15   have for Herron and Smith finding a drop in

16   overall registrations after HB 1355's regulations

17   plus 3PVRO organizations was implemented?

18       A    Are you're talking about the finding in

19   their reports here, or in the State Policy

20   article?

21       Q    In the article, Dr. Herron and Dr. Smith

22   found a drop in overall registrations following

23   the implementation of HB 1355.  Do you agree with

24   that statement?  Do you agree that was their

25   finding?

1      A    That was their finding.

2      Q    So if voter registration, if the method

3  of voter registration is commonly substituted,

4  what explanation is there for the finding of a

5  drop of overall registrations following HB 1355

6  regulations of 3PVROs?

7      A    Well, first of all, there is a drop in

8  registration in the latter part of many years and

9  that doesn't necessarily mean it has to do with

10  legislation that did or didn't happen.  So first

11  of all, we have to be able to associate the

12  registration drop with the legislation, and then

13  the question about substitution, again, is, the

14  only question about substitution here is whether

15  there's sufficient substitutability that this ends

16  up not having a disproportionate effect on

17  minorities.

18           And the evidence for that is the

19  evidence that you just showed me in their rebuttal

20  table, which is that the minority and non-minority

21  voters both showed declines following this

22  legislation.  That doesn't mean that those

23  declines among white voters, that 20 percent

24  decline in registration among white voters, I

25  don't think you can simply attribute all that to

1    this legislation.  That would be a foolish thing

2    to do.  But the fact is that those two are

3    basically equivalent in magnitude of decline.

4            And so, again, it's, the issue is not

5    whether some voters find a substitution method or

6    not or whether this fully substituted or not.  The

7    point is just that with whatever redistribution

8    takes place, is that effect one that ends up

9    leaving the drop in registration substantially

10   larger for minority voters than non-minority

11   voters, and apparently that's not the case.

12       Q    When you're talking about the fact data,

13   you're specifically referring to the tables in Dr.

14   Herron's rebuttal report?

15       A    Yes.  And again, there's a similar sort

16   of pattern in the State Policy article, but it's

17   difficult to compare these two directly because

18   for whatever reason, the methodology they use here

19   is not the methodology they used in the State

20   Politics report and so you can't make a direct

21   comparison of what the findings are here to what

22   the findings were there because the method of

23   analysis is substantially different.

24       Q    And when you say "substantially

25   different," what do you mean?

1      A      Well, first of all, the analysis of the
2  racial impact is not the main point of that
3  article.  That article, like these two reports,
4  focuses largely on this more general issue about
5  third party voter registration and utilization,
6  not on the disproportionate impact of the
7  legislation.
8              There's only one paragraph and one
9  figure in that article that focuses on that.  And
10  that one paragraph focuses on two kinds of
11  analysis; one a graphical analysis, which is in
12  the figure, and the second which is not in the
13  article, it's just simply their representation of
14  what a regression analysis shows, again for this
15  same kind of comparison, and neither of those are
16  available anywhere in their report or in their
17  rebuttal reports.  So there's no regression
18  analysis, there's no probative analysis, there's
19  no four-pane graph to show the changes over time.
20  None of that is here.
21              So, you know, it's hard to say whether
22  what we're seeing here is somehow equivalent to
23  what happened in that previous time period.  I
24  don't know.  But again, that's a different time
25  period, but it is -- they were asking a very

 1   similar question, and analytically, they

 2   approached it, there's some similarity in their

 3   analytical approach.

 4          The fact that they're doing a

 5   difference-in-difference, but then the actual

 6   methodology they applied, both the graphs that

 7   they highlighted and the regression analysis that

 8   they simply characterize rather than actually

 9   report, are not available here.

10       Q    Let's go to page 7.  Oh, we are already

11   on Page 7 of your expert report.  You write at the

12   bottom of it, Professor Herron neither comments on

13   this aggregate change of DMV registration rates.

14          Did I read that correctly?

15       A    Yes.

16       Q    And let's go to Dr. Herron's rebuttal

17   report, and paragraph 56.  He writes, as to my not

18   assessing the effect of SB 7050 on voter

19   registrations in Florida by comparing total voter

20   registrations in the August 2021 and

21   September 2023 voter files, this was deliberate.

22   The years 2021 and 2023 are not equally spaced in

23   four-year Presidential election cycles and thus

24   are not comparable.  The year 2021 is one year

25   after a Presidential election and the year 2023 is

1    one year before a Presidential election.

2              And I'm going to paragraph 57.

3    Moreover, SB 7050 has been in effect only for the

4    latter half of 2023, starting on July 1, 2023, to

5    be exact.  It is thus illogical to subtract voter

6    registration rates based on voter registrations

7    through August 2021 from voter registration rates

8    based on voter registrations through

9    September 2023 and treat resulting differences as

10   if they isolate the effect of SB 7050.

11             Do you have a response to these two

12   paragraphs?

13       A    I guess I certainly understand what he's

14   saying.  It's just difficult to choose a

15   comparison year that isn't different in some way.

16   So there are probably lots of other choices that

17   could be made, or a much more extensive choice,

18   but again, we're not doing an analysis here.  My

19   view of this is just pointing in an illustrative

20   way to the data they do present with regard to the

21   fact that there are obviously changes over time in

22   various methods of registration and they could

23   therefore be compensatory.

24       Q    On paragraph 61 Dr. Herron goes on to

25   state, what the Stein-Alford Report cites as

1   evidence of substitution from 3PVRO to DMV

2   registration is consistent with SB 7050 driving

3   down new 3PVRO registration rates among black and

4   Hispanic registered voters and forcing existing

5   registered voters to update their registrations

6   without the services of 3PVROs.  Therefore, it

7   does not follow from what the Stein-Alford Report

8   cites as evidence of substitution from 3PVRO to

9   DMV registration that black and Hispanic voters

10  actually substituted DMV registration for 3PVRO

11  registration, thus muting the effect of SB 7050's

12  provisions regarding 3PVROs.

13           Do you have a response to this

14  paragraph?

15       A    At least as I read this paragraph, it's

16  entirely addressing the potential impact on black

17  and Hispanic voters and nowhere addressing the

18  comparative impact on black and Hispanic voters

19  versus non-Hispanic white voters.  So our point is

20  about whether this ends up having a different

21  effect across race.  They're just simply talking

22  about an analysis that looks just at what happened

23  among black and Hispanic voters.  So the question

24  whether that was different than what happened

25  among non-Hispanic white voters is not addressed

1    here at all.

2        Q    Let's go back to your report, page 8.

3    This bullet you state that Professor Herron's

4    findings demonstrate that a higher proportion of

5    non-white voters than white voters registered to

6    vote via third parties.  This, however, may simply

7    reflect the finding reported in table 1 of his

8    expert report that an overwhelming proportion of

9    third party registrations are conducted by groups

10   that target non-whites and/or Democratic voters.

11   Nine of the top ten sources of voter registration

12   applications submitted by third party voter

13   registration organizations are affiliated with

14   non-white organizations and/or the Florida

15   Democratic Party.  We suspect this accounts for

16   the higher rate of third party registrations among

17   non-white voters.  This expectation is confirmed

18   by Herron's regression analysis of the incidence

19   of third party registrations (see table 17).

20   Herron reports a significant negative coefficient

21   for party registration as a Republican and the

22   likelihood of registering by a third party.

23   Moreover, it's not obvious that third party

24   registration is less costly to the voter than some

25   other modes of registration, specifically

1    registration at the Department of Motor Vehicles.

2            Did I read that bullet correctly?

3        A    Yes.

4        Q    Who wrote that; you, or Dr. Stein?

5        A    Dr. Stein.

6        Q    Do you agree with the bullet in that,

7    with the assertions made in that bullet?

8        A    Yes.

9        Q    Let's go to Herron's rebuttal report on

10   paragraph 114.  Dr. Herron writes, quote, my

11   regression results do not show that political

12   party affiliation, quote, accounts for

13   disproportionately high 3PVRO registration usage

14   among black and Hispanic registered voters in

15   Florida.  If political party affiliation were to

16   account for 3PVRO registration usage among black

17   and Hispanic registered voters in Florida, then

18   table 17's (and table 23's) regression estimates

19   associated with race would not be statistically

20   significant.  They are however significant (and in

21   the case of table 23's estimate, key are the

22   marginal effects in table 18, which are also

23   significant).

24            Do you have a response to this

25   paragraph?

1      A     Well, I think what he's saying is, at

2     least I understand what he's saying is, that his

3     regression analysis suggests that there is a party

4     effect and it's there both in the Republican

5     coefficient, it's there in the non-party

6     coefficient as well.  So there is a party effect,

7     and the party effect does not completely eliminate

8     a racial estimate given, at least given the model

9     that he's got there, which is basically a model

10    that includes age, party, and race, or gender, I

11    think.

12           So there's obviously an age effect there

13    as well, so you could talk about that.  But there

14    is, there are effects of political affiliation

15    that are demonstrated there.  How much of the

16    difference in utilization is reflected by party

17    targeting versus just direct.  I mean some of

18    these groups are targeting people directly on the

19    basis of ethnicity, for example.  So a group that

20    is seeking to register Hispanic voters is not

21    simply trying to find Democrats, but is trying to

22    find Hispanics and they're going to, in that case,

23    register both Democrats and Republicans,

24    particularly in Florida.  On the other hand, other

25    organizations, you know, may have a more, more of

1    a political target.

2            So again, it doesn't account for all of

3    this effect, but it, as he points out, the race

4    effects remain significant, but the party effects

5    are significant as well.

6        Q    Right.

7        A    The last sentence, I don't understand

8    what the last sentence means, quite frankly.

9        Q    Do you agree that regression estimates

10   associated with race are significant?

11       A    In the model of the form that he's

12   running, yes, they remain significant.  So I think

13   they continue to be, for the total pool of voters,

14   they continue to have an effect, but how much of

15   that effect is countered by party, you can't tell

16   from this regression given the form that it's in.

17           And then again, the last sentence, I

18   simply don't understand what the sentence means.

19       Q    If you go to paragraph 115, it continues

20   by saying, overall the regression results in my

21   expert report show that after controlling for

22   political party affiliation, voter race (black or

23   Hispanic) has a significantly positive effect on

24   whether a voter registered to vote via a 3PVRO.

25   As a side note, the race estimates in table 17 of

1    my expert report are several times greater than

2    corresponding political party estimates, implying

3    that the marginal effect of being black or

4    Hispanic (compared to being white) on the

5    likelihood of having registered to vote via 3PVRO

6    is greater than the marginal effect of Democratic

7    party affiliation (compared to Republican

8    political party affiliation) on the likelihood of

9    having registered to vote via 3PVRO.

10           Do you agree with Dr. Herron's

11   conclusions in this paragraph?

12       A    That's one interpretation of the

13   findings.  But again, that depends on the

14   structure of the model.  Those are not things that

15   are being, as least as I read the model, are not

16   things that are being directly tested in terms of

17   the model.  In terms of the, you know, testing the

18   relative effects is different than just reporting

19   what you see in the overall regression.

20           So I don't think it's something that

21   that table actually investigated at any length.

22   But I guess what I take from it is to the degree

23   that there's evidence there, the evidence suggests

24   that there's an impact of party, an impact of

25   race, and the impact of race is still there even

1    when you control for party.  May be diminished.

2    Can't tell that from the table.  So that's what

3    the table shows.

4        Q    Going back to page 13 of your expert

5    report, right here under Cost-Benefit Theories of

6    Voter Registration and Turnout, this entire

7    section, did you write this section of the report,

8    or did Dr. Stein?

9        A    Dr. Stein wrote this section.  I may

10   have written the introductory sentence because

11   again, I took the stuff that he wrote -- he wrote

12   a long section on cost-benefit theories.  I

13   repackaged it in putting the report together so

14   there were transitions that made sense.

15            So I may have written the first

16   transition sentence or the second, but this

17   section is almost entirely written by Dr. Stein.

18            MR. PRATT:  Counsel, I'm sorry to

19   interrupt.  I just wanted to note it's about 12:45

20   Eastern time.  Just wanted to check in to see if

21   you had any thoughts on a lunch break time.

22            MS. KEENAN:  Yes.  I think I have about

23   10, 15 more minutes of questioning and then maybe

24   we can break for lunch.  Does that sound good?

25            MR. PRATT:  Does that work for you, Dr.

1    Alford, or do you need a short break?

2            THE WITNESS:  Works for me.  I'll just

3    start giving short answers instead of a short

4    break, how's that?  That will be novel.

5            MR. PRATT:  Sounds good.

6    BY MS. RUTAHINDURWA:

7        Q    All right.  The second sentence says, of

8    this section says, these assertions of advancing a

9    cost-benefit theory for how SB 7050 could impact

10   voter registration, quote, are inherently

11   speculative as the careful conditional wording of

12   them would suggest.

13       A    Yes.

14       Q    So what "conditional wording" are you

15   referring to?

16       A    So I give all credit to Dr. Herron and

17   Dr. Smith.  When they discuss these issues, they

18   are careful in their language.  So they establish

19   these are things that could produce this effect,

20   and they almost always qualify that by saying "all

21   things being equal."

22            And so in that sense, when they're

23   saying this could be happening, all other things

24   be equal, that's, economists would use the phrase

25   ceteris paribus, which is -- because economists

1  are fancy people so they use Latin, and political

2  scientists just use English, but the idea is the

3  same.  It is all things being equal in this kind

4  of analysis, as the analysis itself comes from

5  economics not from political science, and it is

6  very much an analysis that is intended to say once

7  everything else is controlled for, if the only

8  thing we manipulate is cost, for example, then we

9  should always get a diminished demand.

10         We know that's not true in economics.

11 We certainly know it's not true in political

12 science.  But they don't assert that it's always

13 true, they just assert that this could happen, and

14 they always qualify it, or almost always qualify

15 it as all other things being equal.  And we know

16 that there are many instances in which this simple

17 association of cost and behavior are not

18 empirically borne out, and we know that all things

19 are not equal.

20         So again, it's -- I'm not disputing the

21 way, given what they say and the way they say it,

22 that this is something that could be true all

23 other things being equal.  I agree with that it

24 could be true all other things being equal, but it

25 is not necessarily the case that it is true.

1    Doesn't seem to be true here, and all things are

2    not equal.

3           So I guess I compliment them for being

4    appropriately conditional in their wording because

5    that conditional wording allows what they say to

6    be true without it being something that is,

7    therefore, empirically going to be the case.

8        Q    So you're not asserting here that the

9    cost of voting is no longer an accepted theory in

10   your field, right?

11       A    There's been a lot of work on cost of

12   voting, and it's produced -- it is still something

13   people talk about, and it's undoubtedly something

14   that can have an effect.  But it is also the case

15   that in a large area of literature where it was

16   assumed that that, as they are assuming, that that

17   would be what was happening and that all things

18   would be equal, there's been a lot of empirical

19   work to show that that is empirically not the case

20   in a substantial number of important areas.

21          So the question is, if they're raising

22   this as a possibility, does the fact that it's a

23   possibility mean that we should take it at face

24   value and attribute it to SB 7050?  The empirical

25   work suggests, both in economics and political

1  science and in, directly in the area of voting

2  behavior suggests that would be a mistake to

3  simply assume that it would be empirically true.

4  It quite often is demonstrated to not be

5  empirically true even by people who made the same

6  assumptions that Dr. Herron and Dr. Smith are

7  making here.

8        So there are lots of examples of people

9  who assumed this would be the case and their own

10  empirical work shows it not to be the case.

11     Q    Do you know whether or not courts have

12  accepted expert opinions related to cost of

13  voting?

14     A    I have not followed how courts have

15  interpreted about things related to cost of voting

16  or how they've interpreted evidence related to

17  cost of voting.

18     Q    And in this section of your report, is

19  there any evidence or suggestion of empirical

20  findings that have refuted theory-based

21  predictions?

22     A    Well, again, this is Dr. Stein's section

23  and his area of research.  He seems to think so.

24  As I read it and as I follow the literature over

25  the years, that seems to be exactly what, how I

1   would characterize most of this sort of simple,

2   simpleminded theories about what would happen or

3   our ability to predict what would happen given a

4   change in things related to voting, that those

5   conditions would produce obvious direct results of

6   the sort that as costs go up, the chosen behavior

7   will go down.

8          Again, in their simple form, haven't in

9   the complexity in the world of actual legislation,

10  actual implementation and actual campaign response

11  to those things, all other things being equal

12  suggests that, for example, campaigns don't

13  respond to this.  The way they get absorbed in the

14  political world is so much more complex than the

15  "all other things being equal" assumption would

16  suggest.  It's in that sense not surprising that

17  there's a lot of literature out there that

18  disconfirms the notion that things that on their

19  face seem as though they produce a particular sort

20  of voter response actually don't produce that kind

21  of response at all things.  So things that should

22  drive up turnout don't necessarily drive it up.

23  Things that should drive it down don't necessarily

24  drive it down.

25        Q    Do you agree that registering to vote is

1   costly?

2        A    That what?

3        Q    Registering to vote is costly.

4        A    Registering to vote is costly.  Yes,

5   there are costs associated with registering to

6   vote.

7        Q    And you agree there are costs associated

8   with voting?

9        A    There are costs associated with voting.

10       Q    Would you agree that registering to vote

11  with the assistance of a third party voter

12  registration organization is a low-cost method of

13  voter registration?

14       A    From the perspective of the voter?

15       Q    Correct.

16       A    Yeah, I would say that it's, I suspect

17  it's probably perceived as a low cost from the

18  perspective of the voter.

19       Q    The voter doesn't --

20       A    I don't have, I don't have research on

21  that from, that actually looks at that.  Again, I

22  don't see any research here in the reports from

23  the Plaintiffs' experts that establish what either

24  the real or perceptual costs are.

25            So again, I'm not saying any more than

1    what they're saying, which is what you're saying

2    doesn't sound, I wouldn't discount it out of hand

3    that that may be perceived or may be a less costly

4    method of voting, but I don't have empirical

5    evidence about that.

6        Q    Okay.  You agree a voter wouldn't have

7    to travel to a government office if they're

8    registering to vote by a third party voter

9    registration organization?

10       A    Again, if you're saying, if the

11   organization is coming to them where they are,

12   then they would not have to travel.

13       Q    And the voter doesn't have to deliver

14   the application themselves, right?

15       A    Yes.  And that may be, again, that may

16   be viewed as a cost or a benefit.  You know, not

17   losing control of your voter application may be

18   viewed by some people as a cost of that method of

19   registration, not as a benefit.

20            People are complicated.  That's, all I'm

21   saying is this -- economists have a very strong

22   prediction about what that would mean, but as

23   social scientists, we don't have a very strong

24   empirical assessment of what that might mean

25   because people are complex in their behavior,

1    including their economic behavior as the entire

2    field of behavioral economics is built on is

3    contrary to rational choice expectations.

4         Q    Would you agree with Dr. Herron's

5    characterization of SB 7050's restrictions on

6    third party voter registrations or --

7              MS. RUTAHINDURWA:  Sorry.  Josh, were

8    you saying something?

9              MR. PRATT:  I was going to make an

10   objection, but I was going to allow you to

11   complete.

12        Q    Okay.  Do you agree with Dr. Herron's

13   characterization of SB 7050's restrictions on

14   third party voter registration organizations as

15   nontrivial?

16        A    I just -- these kind of things, you

17   know, I don't know what nontrivial means.  They

18   seem like they are, it seems like a legitimate, as

19   I read it, and I'm not an expert on legislation or

20   an expert in this area of regulation of third

21   party voter registration, but they seem to me to

22   be substantive legislation in the sense that they

23   strike me as an attempt to offer something that

24   could potentially, you know, reassure voters, for

25   example, about the security of their personal

1    information or the security of how their voter

2    registration is being handled or ensuring its

3    delivery is timely.

4            It seems to me to be stuff that could

5    potentially take that seriously.  It's not at all

6    clear to me, you know, what the, ultimately how

7    you'd assess the ultimate impact of it because as

8    a policy analyst, from my full training, we're

9    always cautioned not to assess policies but to

10   assess the implementation of the policy.

11           So when a policy hasn't been fully

12   implemented, it's really difficult to say what its

13   implication might be.  There are lots of policies

14   that have been passed and turn out to have no

15   impact at all because they simply are not

16   implemented in the way that you might suspect they

17   would be or could be based on the legislation.

18           So part of that is, you know, remains to

19   be seen.  I mean my assessment of them is that in

20   terms of -- they certainly don't impose costs on

21   voters directly.  They impose some costs on

22   organizations, which the organizations can then,

23   can choose to bear or not bear.

24           So it changes the regulatory environment

25   in a way that I think, for most of at least my

1    reading is, most of it changes the regulatory

2    environment in a way, not that creates new

3    regulatory policy, but that makes marginal changes

4    in the existing regulatory framework.

5              So this is not an area that's

6    unregulated and is going to be regulated.  It's an

7    area that's regulated and there are changes in the

8    levels of fines or areas in which things like

9    retaining information are regulated.

10             So it seems to me to be a Bill, if

11   implemented, could have some substantive impact on

12   the functioning of third party voter

13   organizations, but that's about all I could say.

14        Q    There are two things I want to follow up

15   on.  The first is when you said it seems to me, it

16   seems to me, you were providing a personal opinion

17   in those assessments, right?  You're not speaking

18   as an expert on an analysis of the legislation,

19   right?

20        A    That's correct.

21        Q    Okay.  And then the second thing you

22   said is that SB 7050 does not burden voters.

23   What's your basis for that opinion?

24        A    I don't know how I phrased it exactly,

25   but what I'm saying is it doesn't regulate the

1    behavior of voters and it doesn't impose costs on

2    voters.  There's not a fine on the voter, like you

3    pay a fine if you don't turn your application in

4    on time or you can't retain information from your

5    own application, but it imposes -- it's a

6    regulatory environment for the organization.  It's

7    not, you know, unlike other kinds of laws that

8    affect, you know, when you lower the voting age,

9    that's affecting the voters directly.  If you have

10   an ID requirement that says you need to bring an

11   ID with you when you come to register, that

12   affects the voter.

13          This affects the organization, and then,

14   so then we're making some assumptions, which is

15   what Dr. Herron and Dr. Smith are doing here.

16   You're making some assumptions about

17   hypothetically how those changes in the regulation

18   of the organizations will affect the behavior of

19   the organizations and ultimately might affect

20   voters.

21          But none of the costs associated with

22   this are being borne by the voters in the sense

23   that if the organization has to pay their

24   employees more, that's not borne by voters because

25   they don't charge voters a fee.  They're not going

1   to raise the fee on voters in order to cover their

2   personnel costs.  They're not going to raise the

3   fee on voters to cover the fact that they can't

4   sell the voters' information later.  They're not

5   going -- you know, when they get fined for turning

6   in your information late, they're not going to

7   send you a bill that's your share of the fine.

8          So these are, these are regulations with

9   requirements and potential costs for violations of

10  the regulation that are between the State and the

11  organizations, not between the State acting on the

12  voters.

13         MS. RUTAHINDURWA:  I have a few more

14  questions, but why don't we break for lunch and

15  then I'll ask my questions and pass it on.

16         MR. PRATT:  Sure.

17         Ms. Hart, please go off the record.

18         (A recess was taken at 1:00 p.m.)

19         AFTERNOON SESSION (1:34 p.m.)

20  BY MS. RUTAHINDURWA:

21     Q    So, Dr. Alford, in preparing your

22  report, did you analyze any of the interests that

23  the State has offered in defense of the challenge

24  provisions in SB 7050?

25     A    I did not do any analysis of those

1   issues.

2       Q    And I believe you testified that you

3   didn't review the legislative record?

4       A    That's correct.

5       Q    And you offered no opinion on the

6   interests the State offers one way or another,

7   right?

8       A    I don't have an expert opinion that's

9   specific to the situation in Florida.  I have an

10  opinion more broadly, but not about specifics of

11  Florida.

12      Q    And in your report, do you have any

13  analysis on the effects, or the likely effects, of

14  provisions that Plaintiffs challenge in SB 7050?

15      A    No.

16      Q    And do you offer any opinions on what

17  the benefits of the challenged provisions of the

18  SB 7050 would be?

19      A    No, the report doesn't discuss the

20  benefits.

21      Q    Do you offer any opinions on the harms

22  of the challenged provisions of SB 7050?

23      A    Our report does not discuss the harms.

24      Q    And your report doesn't discuss voter

25  fraud, right?

1       A     Correct.

2       Q     Are you aware of any evidence of voter

3   fraud in Florida?

4       A     I have not followed the issue of voter

5   fraud in Florida.

6       Q     Have you done any research into voter

7   fraud generally?

8       A     No.

9       Q     And have you done any research into

10  voter fraud in Florida?

11      A     No.

12      Q     Are you aware of any fraud committed by

13  third party voter registration organizations?

14      A     Beyond what I read in the, I can't

15  remember whose expert report, they had some

16  listing of incidents that I looked at, but beyond

17  that, I have no other knowledge.

18      Q     Would you agree that voter fraud is

19  rare?

20      A     Generally speaking, yes, voter fraud

21  is -- I guess it depends on what you mean by, as

22  always, what you mean by "rare."It is not a, it's

23  not a common occurrence.  I'd say certainly

24  voters, as is true for a variety of policy issues,

25  voters' response is often, or public opinion

1    response is often disproportionate to the actual

2    threat.

3            I think that's true of airline security.

4    Hijacking airlines, in my lifetime, has become an

5    increasingly rare event.  Blowing up airlines,

6    very, very rare.  I'm always puzzled why I'm still

7    taking my shoes off.  I can't remember the last

8    time anybody tried to sneak a bomb through their

9    shoe.

10       Q    You don't have TSA Precheck, Dr. Alford?

11       A    I do now.  I have TSA Precheck, I'm

12    proud to say, but every now and then either the

13    airline messes up and doesn't get it on my ticket

14    or I get randomly selected.

15            But again, I fully appreciate the

16    process.  I mean I know that TSA represents our

17    legislative response to a perceived threat and

18    that the real purpose is not so much to eliminate

19    the threat as to reassure people about flying,

20    right?

21            That -- and this is true with

22    legislatures dealing with voter fraud.  That you,

23    it's very important to assure people of the

24    integrity of the election system.  As we know, on

25    both sides of the aisle there are concerns about

1    that these days, and that's a perilous area.

2            So, I mean I know, for example, that TSA

3    has, doesn't allow the agents at the airport to be

4    noncitizens.  And I don't suspect that that's

5    because the TSA had some study that showed that

6    noncitizens don't screen baggage just as well as

7    citizens.  But again, it reflects sort of what,

8    what are the things you can control that affect

9    how people, how secure people feel about flying or

10   about voting or any number of other things that

11   legislation responds to.

12           So it's, just in my background generally

13   in public policy, I'm aware that a lot of the

14   response and structure of regulatory policy is

15   designed to reassure people, even about things

16   like Ebola or airline explosions or voter fraud

17   that are relatively rare occurrences.  But that

18   you want people to feel, perceptually you want

19   them to feel that they're not only rare, but that

20   there is real effort being undertaken to make sure

21   that they remain rare events.

22       Q    And I believe you answered this in

23   addition to other things, but you would agree that

24   voter fraud is, I believe the words you used,

25   "relatively rare," right?

1      A      Yeah, I would put it in that category.

2  Areas where the policies are not a response to the

3  actual level of incidents, but rather to the

4  perception that, as is true with airline

5  hijacking, the idea that any, any irregularity in

6  voting, any amount of fraud is too much because it

7  undermines the integrity of the ballot.

8          And so it doesn't have to be

9  consequential.  It's always, you know, as a

10  general matter, it's, you should never aim for a

11  policy to eradicate something because that extra

12  mile is the one that provides all the costs and

13  all the harm to other goods and services and

14  freedoms.  But there are, there are places where

15  the policy is directed at perception more than

16  it's directed at -- the legislature can't convince

17  people that elections are secure by holding a

18  public policy event.  They, you get that security

19  by, you know, proposing legislation, whether it's

20  legislation about, you know, ensuring that you

21  don't get, you know, false electors submitted or

22  legislation about, you know, voter fraud.  Again,

23  it doesn't reflect the fact that this is a common

24  occurrence necessarily, but rather a desire to be

25  sure that elections, election integrity is

1    protected perceptually as much as possible.

2        Q    And I know that when I'm thinking, I

3    often look in other ways, but I just want to make

4    sure, when you're looking down, you're not looking

5    or reading anything, you're just thinking, true?

6        A    I've got a keyboard here that I look at.

7        Q    Okay.  Just wanted to make sure.

8            And in your expert report you did not

9    offer a quantitative empirical analysis separate

10   and distinct from Dr. Herron's analysis, right?

11       A    Correct.

12       Q    You didn't provide any substantive

13   response to any particular assertion or section of

14   Dr. Lichtman's report, right?

15       A    There's no detailed discussion of any of

16   the areas covered by Dr. Lichtman beyond what's in

17   that one paragraph.

18       Q    You didn't conduct any regression

19   analyses disclosed in your report?

20       A    No.

21       Q    And you didn't recreate or refute any of

22   Dr. Herron's calculations in your report, right?

23       A    That's correct.

24            MS. RUTAHINDURWA:  I think those are all

25   the questions I have.  Thank you very much for

1    your time.

2              THE WITNESS:  Thank you.

3    EXAMINATION BY COUNSEL ON BEHALF OF THE AMERICAN

4    CIVIL LIBERTIES UNION PLAINTIFFS RE HISPANIC

5    FEDERATION V. BYRD CASE ENDING IN 218

6    BY MR. CAMPBELL-HARRIS:

7         Q    Good afternoon, Dr. Alford, pleasure to

8    see you again.

9         A    Good afternoon.  How are you?

10        Q    Doing very well.  Doing very well.

11             For the record, my name is Dayton

12   Campbell-Harris.  I'm an attorney with the ACLU,

13   and I'm representing the Hispanic Federation

14   Plaintiffs in this matter.

15             Before we begin, can we agree to all the

16   ground rules that you agreed to with my

17   Co-Plaintiffs' counsel this morning, that they

18   apply to us as well?

19        A    Yes, indeed.

20        Q    Excellent.  So I have some questions

21   about your relationship with Dr. Stein to begin

22   with.  Without disclosing any conversations at the

23   direction of counsel, what did you discuss with

24   Dr. Stein to prepare for this deposition?

25             MR. PRATT: Objection.  Privilege.  We

1   would assert the same objection as earlier, that

2   the conversations between Dr. Alford and Dr. Stein

3   were at the direction of counsel with regards to

4   both the report and also in preparing for this

5   deposition.

6        Q    Okay.  Dr. Alford, you and Dr. Stein are

7   colleagues and personal friends; is that correct?

8        A    Yes, it is true.

9        Q    And you both have worked together for

10  approximately 38 years; is that correct as well?

11       A    That's how long I've been at Rice.  He

12  was at Rice before I came and was involved in

13  hiring me, so yes, in one form or another,

14  research, administrative, as well as just being

15  family friends for 38 years, yes.

16       Q    And in that time, you've had

17  conversations with Dr. Stein that are not

18  specifically at the direction of counsel or about

19  this deposition, right?

20       A    Yes.

21       Q    And can you explain what conversations

22  you and Dr. Stein had about SB 7050 that were not

23  at the direction of counsel or to prepare for this

24  deposition?

25            MR. PRATT:  Objection.  Privilege.  Dr.

1   Alford's and Dr. Stein's work in this case would

2   be covered kind of broadly by being retained by

3   counsel to provide expert testimony.  And just

4   like their expert report drafts would not be

5   allowed to be seen and still be confidential, so

6   should their conversations together.

7            Of course, you may ask about anything

8   that they wrote in the report, whether they agree

9   with the reports, conclusions and the like, but I

10  would ask the witness not to answer about their

11  direct conversations.

12       Q    Okay.  Dr. Alford, you actually spoke

13  with Dr. Stein before he was formally retained in

14  this litigation, right?

15       A    Yes.

16       Q    What conversations did you have with him

17  at that time?

18       A    I told him that I had been contacted by

19  some lawyers with regard to a case in Florida,

20  that it was related to third party registration,

21  that I thought it was more in his area than mine.

22  I told him as much, and that if he was okay with

23  it, I would pass along contact information and

24  have him talk to the lawyers.

25       Q    Thank you.  I have some questions for

1    you about Dr. Smith's reports and analysis now.

2    You reviewed Dr. Smith's initial report and his

3    rebuttal report in preparation for this

4    deposition, right?

5         A    That's correct.

6         Q    And your report responds to Dr. Smith's

7    first report, and not his rebuttal report, right?

8         A    That's correct.

9         Q    Okay.  I'm going to put on the screen

10   what's already been marked as Exhibit 1.

11            So on Page 2 of -- well, first, Dr.

12   Alford, do you recognize this to be your expert

13   report?

14        A    That looks to be it.

15        Q    Excellent.  So on Page 2 you write that

16   you're responding to a claim of Dr. Herron and Dr.

17   Smith that SB 7050 impacts voter registration of

18   blacks and Hispanics relative to non-Hispanic

19   whites in Florida.  Does that accurately describe

20   the full scope of your report that is responsive

21   to Dr. Smith's analysis?

22        A    I think it's, again, it's meant to be,

23   encapsulate the main purpose in a single sentence

24   so it'll cover a lot of things in the report, but

25   they're centered around that basic issue.

1      Q    Okay.  Were you asked to respond to

2   anything else in Dr. Smith's report?

3      A    I think initially we were just asked to

4   respond to the reports, and I think then, in

5   conversation, clarified sort of what it was that,

6   you know, we thought was something that we could

7   respond to in terms of our expertise and we

8   thought it was important to respond to.

9           So I don't think we were ever told not

10  to address anything.  I guess my view is sort of

11  the, you know, what the lawyers wanted us to do

12  was to see what we could, what we thought we could

13  usefully offer in the time that we had with regard

14  to the primary claims in those reports and that's

15  what we, that's what we produced.

16     Q    Okay.  So correct me if I'm wrong, but

17  Defense counsel approached you to respond to the

18  reports, and then you and Dr. Stein proposed

19  responding to the impacts voter registration of

20  blacks and Hispanics relative to non-Hispanic

21  whites in Florida is; is that correct?

22     A    So again, that's the one sentence that

23  is, that sort of highlights what we're responding

24  to.  Obviously there's, the report has some

25  response to Dr. Lichtman, mainly indicating that

1    we're not going to offer a fulsome response and

2    why.

3              So we, you know, we assessed, we looked

4    at everything in all three reports and we

5    responded here to the things we responded to.  So,

6    you know, there's a response to the sort of

7    theoretical notion of cost-benefit, there's some

8    other things in here, but in terms of the headline

9    single sentence, what we're responding to, it is

10   basically this idea that there's a different

11   relative impact on black and Hispanic versus

12   non-Hispanic whites with regard to voter

13   registration or voter turnout.

14       Q    Okay.  And you reviewed the data that

15   Dr. Smith relied on?

16       A    I saw the data that Dr. Smith relied on.

17   I didn't review it in the sense that, of checking

18   it against sources for accuracy or doing an

19   independent analysis on it, but I did see the data

20   sets that he disclosed.

21       Q    Okay.  Did Defense counsel offer you any

22   other facts or data in this case that you relied

23   on in preparing your report?

24       A    You know, we had some discussions back

25   and forth about, just about the general nature of

1    the legislation, but in terms of what's in the

2    report, there, what's in the report is my

3    conclusions or Dr. Stein's conclusions.

4        Q    Okay.  So Defense counsel did not offer

5    you any additional data that you relied on?

6        A    The only data sets I saw were the data

7    sets that came from disclosure from Dr. Herron or

8    Dr. Smith.

9        Q    Thank you.  Do you have any concerns

10   with the data that Dr. Herron or Dr. Smith relied

11   on in reaching their conclusions?

12       A    I guess if I thought what they did with

13   the data was, reached what it needed to reach to

14   establish what we talked about here, then I would

15   have spent more time making sure that both the

16   analysis was free of error and the data was

17   appropriately assembled and coded.

18            But the argument, or the assessment that

19   I have, and that Dr. Stein has, is that what was,

20   the analysis provided simply doesn't reach the

21   ultimate question.  And so the issue of whether

22   their analysis is accurate or not is not what

23   we're assessing here.  It's the issue about

24   whether it reaches the issue in this case.

25       Q    But your report does not criticize the

1  data that Dr. Smith relied on?

2      A    The data that was produced and that they

3  relied on, I presume they relied on, I have not

4  reviewed and I'm not critical of.

5      Q    Thank you.  Did you have enough time to

6  complete the review and any analysis you believe

7  was necessary to respond to Dr. Smith's opinions?

8      A    It's certainly a more compressed time

9  format than I think is ideal, but you know, we all

10 face those kinds of constraints.  I think, you

11 know, six months, sort of about how long it takes

12 to write a research article, that's about how long

13 we should have to write one of these reports.

14 That's rarely the case.

15          So I didn't -- there's certainly more

16 that could be done here, but I'm comfortable that

17 we had the time to do, to make the essential

18 points we wanted to make, and we made those.

19          So again, there's, you can always do

20 more, but I think we had time to do what we

21 thought was the important response to the reports

22 that we were provided.

23     Q    I'm going to go to page 9 of your

24 report, which I believe is where you both begin

25 discussing Dr. Smith -- oops, sorry, page 8 on to

1    page 9.  Did you write this section of the report?

2         A    Yes.

3         Q    Okay.  And page 9 here, this presents a

4    summary of findings from Dr. Smith's report; is

5    that correct?

6         A    Correct.

7         Q    I'm going to pull up now what's been

8    marked as Exhibit -- or what I'm marking as

9    Exhibit 5, which is Dr. Smith's initial report.

10   Does this look like a fair and accurate copy of

11   Dr. Smith's report?

12             (Exhibit 5 was marked for identification

13   and is attached to the transcript.)

14        A    It looks like the first page.

15        Q    Perfect.  Do you have a paper copy with

16   you?

17        A    I have one available, yes.

18        Q    Excellent.

19             I'm going to go to page 6, which has, or

20   starts with paragraph 7.

21             So these -- do you contest any of the

22   findings from paragraph 7 to 15?  And you can take

23   a moment the look at the paper copy that you have

24   on hand.

25        A    All right.  Expert report of Smith.

1          (Reviewing.)

2          MR. PRATT:  And objection.  Form.

3      A    I don't object to any of these.  Again,

4  I -- they're, they're setting, what I would think

5  of as setting the kind of groundwork for assessing

6  this impact.  They don't, in themselves, provide

7  any empirical information about the impact itself.

8  They just provide background information about the

9  existing level of utilization currently and

10 historically of third party voter registration.

11     Q    Okay.  But you don't contest any of the

12 findings from paragraph 7 to 15?

13     A    I can't endorse them because I haven't

14 replicated them, but I don't, I'm not contesting

15 them.

16     Q    Okay.  I'm going to return to Exhibit 1,

17 which is your report, and go to the bottom of page

18 9.  You write here, going on to page 10, note that

19 Dr. Smith's conclusions detail various statistics

20 that support the conclusion that 3PVROs register a

21 nontrivial number of Florida citizens.  However,

22 neither his conclusions, nor his analysis in the

23 body of the report, provide empirical evidence of

24 an actual demonstrated disparate impact, if any,

25 of SB 7050 on black or Hispanic citizens

1   registering to vote or updating their existing

2   voter registrations through 3PVROs.

3           Did I read that correctly?

4       A    Yes.

5       Q    Okay.  I just want to make sure I

6   understand what you mean when you write, Dr.

7   Smith's report does not offer any empirical

8   evidence of an actual demonstrated disparate

9   impact.

10          You agree that Dr. Smith provided

11  evidence from data provided by the Florida

12  Department of Elections that black and Hispanic

13  registered voters in Florida are more than five

14  times more likely than white registered voters in

15  Florida to register with or update the

16  registration with 3PVROs, right?

17      A    Yes.  And again, there are a variety of

18  different ways you might calculate that, but

19  that's one of their calculations.  And I think,

20  I'm not disputing that as a proportion, method

21  that the third party is more common as a

22  proportion among black and Hispanic voters than it

23  is among non-Hispanic white voters.

24      Q    Okay.  And similarly, then, you would

25  agree that Dr. Smith provided evidence from data

1  provided by the Florida Department of Elections

2  that roughly 1 in 10 black and Hispanic registered

3  voters in Florida most recently relied on a 3PVRO

4  to register/update their voter registration?

5      A    Yes.  And again, I think he

6  characterizes those as rough estimates.  He has

7  lots of questions about alternative ways of doing

8  things, but he says he thinks that's a rough, or

9  sometimes a conservative, estimate of the level of

10  reliance.

11        So again, it's obviously not the

12  dominant method of registration for any kind of

13  voters by any stretch of the imagination, but I

14  think it is utilized, you know, to a, again, a

15  significant or nontrivial extent by Florida

16  citizens as -- or it is utilized to register

17  Florida citizens.  I wouldn't say they utilize it,

18  but it is utilized to a nontrivial extent to

19  register Florida citizens to vote.

20      Q    Okay.  And likewise, then, you would

21  also agree that Dr. Smith provided evidence from

22  the Florida Department of Elections data that less

23  than 1 in 50 white registered voters in Florida

24  most recently relied on 3PVROs to register/update

25  the registration, right?

1          A     I don't know if that's the exact figure,

2     but I'm not disputing any of the figures he

3     produced about levels of or mechanism of

4     registration for any of the groups in Florida.

5          Q     And your report does not cite any

6     empirical evidence about voter registration in

7     Florida, too, correct?

8          A     It cites their report on voter

9     registration information and certainly cites their

10    reports themselves, but not any information other

11    than information that was provided or cited by Dr.

12    Smith or Dr. Herron.

13         Q     Okay.  What kind of empirical evidence

14    do you think is needed to show that SB 7050 has an

15    actual demonstrated disparate impact?

16         A     I think you need to, first of all, focus

17    on the key question, which is you can't show a

18    disparate impact by focusing on groups as a whole

19    or just by focusing on who registers using a

20    method.  You have to focus on the individual

21    groups.  You have to focus on the impact of the

22    legislation itself.

23             So you have to look at what happens

24    after the legislation goes into effect.  And then

25    you have to do that analysis in a way that lets

1   you demonstrate both what, if any, differences

2   there are and whether those differences are

3   statistically or substantively significant.

4        Q    Okay.  Are you familiar with the

5   citizenship requirement contained within SB 7050

6   and what it imposed on 3PVROs?

7        A    I'm familiar.  I read the requirement,

8   yes.

9        Q    Okay.  And you know that the SB 7050

10  citizenship requirement was enjoined the summer of

11  2023 before it could take effect, right?

12       A    I have some recollection of that, but I

13  have not followed the legal ins and outs of the

14  case.  I've been paying attention to the expert

15  reports.

16       Q    But you know that the SB 7050

17  citizenship requirement has not yet been enforced?

18       A    I don't know that.  I think I read

19  something like that, but I don't know that.

20       Q    Okay.  Would you agree that you cannot

21  determine the impact of a law not yet enforced?

22       A    It's very difficult to determine the

23  impact of anything that hasn't happened yet, but

24  for law, given that the law provides a legal

25  framework, and that particularly regulatory law

1    provides a legal framework for regulation and the

2    regulation itself is usually promulgated by an

3    administrative agency, it's very difficult to, to

4    say in advance what the impact of a particular law

5    might be, particularly of changes in a regulatory

6    environment.  It's not impossible.

7             Some things are so clear on their face

8    that you can draw conclusions about what might

9    come about as a result.  But in general, sort of

10   regulatory rewrites are very difficult in advance

11   to anticipate what the actual regulations will be,

12   how the affected institutions will respond, and

13   then what the ultimate impact might be on those

14   institutions, consumers or on their production.

15   Q    Okay.  You said that it would be very

16   difficult.  Can you provide, or offer, some

17   examples of a law that has not yet been enforced

18   to know the impact of it?

19   A    Well, I mean, again, some fairly simple.

20   You can have some idea of the broad outlines of

21   laws that are very direct in their nature, and you

22   can't be certain with any of this, but some things

23   are clearer than others.

24            So you can, you know, for example,

25   lowering the voting age from 21 to 18, while it's

1  difficult to say what level of participation might

2  occur among people 18, 19 and 20, I think a

3  reasonable person might predict that it would be

4  higher than it had been when it was illegal for

5  them to vote.

6          Some things are very clear-cut.  They

7  offer very clear prohibitions on certain kinds of

8  behavior or allowances for certain kinds of

9  behavior, and that gives you at least a window

10 into what might occur.  But how much might occur?

11 Well, there were lots of people who thought there

12 would be an explosion of voting interest among 18-

13 to 20-year-olds.  There wasn't.  They remain very

14 low turnout voter groups.

15          So the sort of expectations, that it

16 might have produced levels of turnout equal to

17 those of older populations, have not proven to be

18 the case.  But if all you were suggesting was that

19 it would have a positive impact on the proportion

20 of 18- to 20-year-olds who registered and turned

21 out to vote, I think you could make that fairly

22 confidently with that kind of legislation.

23     Q     Thank you.  Did you perform any analysis

24 to determine how many voters in Florida register

25 at the DMV?

1      A    No.

2      Q    Let's continue to the bottom of page 11

3  of, again, what's been marked as Exhibit 1.  So

4  you write here, in summary, this is what my

5  colleague had mentioned earlier, both Dr. Herron

6  and Dr. Smith are able to conclude that blacks and

7  Hispanics are more likely to be registered via

8  3PVROs than are non-Hispanic whites, but they do

9  not offer any empirical evidence to support the

10  speculation that the impact of SB 7050 on actual

11  voter registration rates has been different for

12  these groups.  This is in contrast to the earlier

13  published assessment of Florida's HB 1355 where

14  Herron and Smith report a test of the impact of

15  HB 1355 on registrations for blacks, Hispanics,

16  and whites in their figure 4 (reproduced below as

17  figure 1).

18           Did I read that correctly?

19      A    Yes.

20      Q    Okay.  You characterize the reporting --

21  or yeah, you characterize the report in this next

22  sentence as no evidence of statistically

23  significant differences in registration rates

24  among whites, blacks or Hispanics after the

25  adoption of HB 1355; is that correct?

1          A    Yes.

2          Q    Okay.  And you would agree that HB 1355

3    is not one of the laws at issue in this case?

4          A    I agree.

5          Q    Okay.  And HB 1355 was passed in 2011?

6          A    I believe that's correct, yes.

7          Q    How did you reach the conclusion that

8    the Smith and Herron paper finds no evidence of

9    statistically significant differences in

10   registration rates among whites, blacks or

11   Hispanics after the adoption of HB 1355?

12         A    By reviewing the paper.

13         Q    Okay, let's pull it up.

14              What I'm going to mark as Exhibit 6.

15              (Exhibit 6 was marked for identification

16   and is attached to the transcript.)

17         Q    Let me go to the top.

18              Does this look like a fair and accurate

19   copy of the Herron and Smith paper that you're

20   referencing?

21         A    Yes.

22         Q    So you've reviewed this paper?

23         A    I've read the paper.  You know, for

24   academics, "review" would mean that I was one of

25   the anonymous reviewers when it was submitted for

1    publication.  I wasn't a reviewer on the paper,

2    and I haven't written a review, but I did read the

3    paper in preparation for the report.

4         Q    Thank you for that clarification.

5              Do you recall talking with Dr. Stein

6    about this paper?

7         A    Yes.

8         Q    And who first thought of the critique

9    relating to this paper on HB 1355?

10        A    When I saw the citation to it in the

11   report, and so I pulled it up, largely because

12   it's not, this is not my area of research, as I've

13   said before, so I don't actually read State

14   Politics and Policy Quarterly on a regular basis.

15   In fact, I may never have read anything in that

16   journal before reading this.

17             So I was just looking at what it is they

18   were citing because I was trying to understand why

19   there was not any actual racial analysis in the

20   report, so I thought this might be informative.

21   So I pulled it up and read it and brought it to

22   Dr. Stein's attention, and that refreshed his

23   memory about the article as well.

24        Q    Okay.  When you say it refreshed his

25   memory, what do you mean exactly?

1          A     I think he initially said he wasn't sure

2     if he'd actually seen the article.  Then when he

3     read the article, he said he thought he remembered

4     seeing it at the time it came out, something like

5     that.

6          Q     Okay.  And did you draft the portion of

7     your report that discusses the Smith and Herron

8     paper?

9          A     Yes.

10         Q     Okay.  So it's one of the portions that

11    is attributable to you?

12         A     Correct.

13         Q     Do you recall whether in speaking with

14    Dr. Stein about this paper he ever mentioned that

15    he peer-reviewed this paper as well?

16         A     I don't recall whether he mentioned it

17    or not.  I know when I -- again, when I -- I'm the

18    one who downloaded the paper, looked at it, and

19    asked him, brought it to his attention, asked him

20    about it.  And he initially, you know, until he

21    read it, wasn't sure he'd actually seen it.

22               So there was some discussion about when

23    he might have seen it, but I have no idea whether

24    he was a reviewer or not.

25         Q     Does him being a peer reviewer on this

1    paper affect your view of the Smith and Herron

2    paper at all?

3        A    No.

4        Q    I'm going to turn to page 298 of the

5    paper.  Do you see the visual you reproduced in

6    your report?

7        A    Yes.

8        Q    Okay.  I'm going to scroll back up to

9    297.  Do you see the section titled Race Ethnicity

10   in Registrations?

11       A    Yes.

12       Q    Okay.  I'm going to read the second

13   paragraph aloud.  Visually speaking, one takes

14   from figure 4 the idea that the three main racial

15   groups in Florida all suffered from drops in voter

16   registrations in late 2011 as compared with late

17   2007.  Nonetheless, when we fit regressions to the

18   registration differences in the three panels of

19   figure 4, out of the six estimate coefficients

20   (two time indicator variables per regression), the

21   only statistically significant estimate is that

22   for the post-August 17 variable in the African

23   American regression.  This is evidence that HB

24   1355's effects varied by racial/ethnic group and

25   were particularly pronounced for a group that in

1    Florida is closely tied to the Democratic Party.

2              Did I read that right?

3        A    Yes.

4        Q    Okay.  Do you still stand by the

5    conclusion in this paper I just read from "finds

6    no evidence of statistically significant

7    differences in registration rates among whites,

8    blacks, or Hispanics after the adoption of HB

9    1355"?

10       A    Yes.  So the evidence in the paper is

11   the figure, and the figure obviously doesn't tell

12   us anything about statistically significant

13   differences.  There is discussion here about

14   fitting regressions, but there is no regression

15   analysis produced with the paper.  There are no

16   equations.  There are no results.  There are no

17   tests of significance.

18              And it's from the very brief, for a

19   paper that's supposed to be entirely about this

20   topic, the fact that there are only two paragraphs

21   here and that second paragraph has a very brief

22   discussion of an analysis not included in the

23   published version of the paper.  And the reference

24   there does not make it possible to distinguish

25   what it is that is statistically significant.

1    That is, it's not clear without seeing that

2    analysis in more detail what they're, what it is,

3    what the downward slope in the African American

4    registration is significantly different than.  Is

5    it significantly different than the overall trend?

6    Is it significantly different than its trend

7    prior?

8              So if you look at those graphs, you can

9    see that all the graphs show downward trends.  And

10   it may very well be that that downward trend for

11   African Americans is significantly different than

12   that slight downward trend prior to that, whereas

13   it may not be significant for the other graphs.

14   Certainly you can see that for whites.  If you

15   look at the, at the smooth line as opposed to the

16   actual data graph, there's enormous variability

17   there.

18             So the question is, is the African

19   American downward tilt the only one that's

20   significantly different than its slope or

21   direction prior to the legislation, or is that

22   downward slope significantly different from the

23   seemingly larger downward slope for white voters

24   or the more similar slope for Hispanic voters?

25             So there's a very specific question

1    here, which is, is the downward slope for these

2    non, for these minority groups significantly

3    different than the downward slope for the white

4    groups post-legislation?  And there's no table,

5    there's no numbers, there's no report that would

6    allow you to ascertain whether that's, that's what

7    they were actually asserting here.

8           So as far as I can tell, it looks as

9    though they're saying that that downward slope for

10   African Americans is statistically significant,

11   and for Hispanics and whites it isn't.  But that

12   doesn't mean it's statistically different from

13   each other.  We just don't have -- for whatever

14   reason, they chose to include the graph, which

15   shows obviously that they all have a downward

16   trend, and to make a fairly general reference to

17   the notion that the African American trend might

18   be significant, but they do not say it's

19   significantly different from the downward trend

20   for white voters.  It may or may not be, but they

21   don't say it is, and they provide no, no table

22   with that actual analysis here.

23          The report is simply the figure, and

24   it's a somewhat unclear figure even at that.  If

25   you look at the labeling for the figure it says

1    that the solid lines are smooth counts, dashed

2    lines represent bootstrap confidence intervals.

3    I'm not seeing dashed lines, so I don't know if

4    it's even labeled correctly.

5           But the main point is they offer a, sort

6    of an offhand suggestion that you shouldn't pay

7    too much attention.  They agree that they're all

8    showing downward trends, but they're saying that

9    the only trend that's significant is the African

10   American trend.  That's not saying that it's

11   significantly different than the white trend.  The

12   African American trend downward can be significant

13   without it being significantly different from the

14   white trend.  Simply because the white trend isn't

15   significant, given the amount of noise in that

16   data, not very surprising.  The African American

17   trend, much less noise, it might be statistically

18   significant.  That doesn't make them statistically

19   significantly different from each other because

20   you actually don't know much about where the right

21   trend really is given the amount of noise in that

22   data, for example.

23          So all I'm saying is while they do use

24   the words "statistically significant" in relation

25   to the African American trend and they say that

1    the Hispanic and the white trends are not

2    statistically significant, that is not an

3    assertion, at least as I read this, and I have no

4    other information to go by since they didn't

5    include that analysis, it doesn't mean that

6    they've actually tested whether the trends for

7    whites and African Americans are statistically

8    significantly different.  Nor do they tell us what

9    that difference is.  Is it a difference of one

10   point, 10 points, 100 points?  We have no idea.

11   There is no numerical information here at all.

12           So, again, there's a lot more here than

13   is in their report.  Their report has no graph

14   like this.  Their report has no underlying

15   analysis of the sort.  They report in summary

16   fashion in that paragraph.  So it's a lot more of

17   addressing this topic than is in either the Herron

18   or the Smith report.  But even in the article, it

19   is only a small piece of the article, and it's

20   insufficiently addressed to answer the question

21   that needs to be answered here.

22      Q    Okay.  When you say the report has no

23   graph like that, you would agree that the graph is

24   literally in the report, though, right?

25      A    I don't recall if this graph is in the

1    report.

2         Q    Okay.  But that's where this graph came

3    from, isn't it?

4         A    No.  This graph is in the article, it's

5    not from the report.  I'm saying, in their report,

6    I think this analysis in the article falls short

7    of clearly demonstrating that this whole piece of

8    legislation had a real effect.  They simply don't

9    provide the information we need to know that.  It

10   was insufficient in the article, and the article

11   goes much further than the report.

12            So 10 years later, writing a report

13   presumably on the same topic as this article, they

14   omit this kind of graph.  They omit the analysis

15   that they summarize in that paragraph.  There is

16   no regression analysis of the trends.  There's no

17   test of significance for the trends, so they don't

18   even go this far.

19            I don't think this is completely

20   sufficient, but it makes the work in the current

21   report -- again, my main surprise in finding this

22   article is that this analysis that we see in the

23   article is not contained in the report they wrote

24   10 years later about a very similar issue.

25        Q    Okay.  So your position isn't that this

1    paper fails to address the issue, it's that the

2    underlying analysis is not included in this paper;

3    is that right?

4         A    Two things.  One is that with regard to

5    the article itself, self-contained, it fails to

6    provide the actual information that would be

7    needed to determine if there was a statistically

8    significant difference between blacks and whites,

9    or Hispanic and whites back in 2011.

10             Secondly, even though the article falls

11   short on that, the article goes well-beyond what

12   was done in the reports.  And clearly Herron and

13   Smith are aware of this methodology for answering

14   this question because it's the methodology they

15   used if they didn't fully report it 10 years ago

16   in analyzing this in an academic article.  Then in

17   providing a report to the Court, they don't do

18   this at all.

19        Q    Okay.  Let's focus on the paper and then

20   we'll shift back to the report.

21             Do you think the lack of analysis in

22   this paper is a flaw with the paper?

23        A    In my own view, yes.  I think if you're

24   going -- I'll say this, again, as I've said

25   before, they use language very carefully and very

1  appropriately.  Herron and Smith are good

2  scholars.  They understand what it is they can say

3  and they don't say things that go beyond what the

4  evidence is, unless they say them in ways that

5  suggest that they're suggesting something.  So

6  they say "this might well be" or "this is

7  compatible with" as opposed to "this

8  demonstrates."

9          So their language is careful here.  They

10  do not make a lot -- this is not a big part of the

11  article.  They don't make a lot of the conclusion,

12  and they only mention in passing that there is at

13  least an indication that there might be a racial

14  effect here, right?  So they don't say we've

15  demonstrated the racial effect and here's the size

16  of it.  They just say, even though the trends look

17  really similar, it's not incompatible with the

18  possibility that there might be an effect on

19  African Americans, right?  So that's right,

20  particularly pronounced for a group closely tied

21  to the Democratic Party.

22          Again, this brings back this whole issue

23  about party versus race.  They seem to accept in

24  the article that this is closely tied to the

25  Democratic Party.  But in any case, they're just,

1    they're saying, as I said, their concluding

2    sentence to that paragraph, this raises the

3    specter of what might befall nonregistered African

4    Americans residing in Florida if Section 5 is

5    curtailed or eliminated, okay?  So right, again,

6    this is sort of a possibility, right?

7            They then talk about some possible

8    confounds.  So obviously there was some pushback

9    in the review process about how certain they could

10   be about this.  They address a couple of

11   confounding factors, but they never really -- this

12   is not the center point of the article.  They

13   don't hit on this analysis very hard.  But it is

14   at least an attempt, utilizing the same data they

15   have now, to offer an empirical, at least an

16   initial empirical assessment of this question, and

17   that is in the report, it doesn't actually reach

18   the point of being a full-blown demonstration

19   where they tell us how much the difference is, why

20   that difference is reliable or that it's

21   statistically significant.  They don't lay out any

22   of that here, but rather treat it as a suggestion

23   about what might be, what might be the impact.

24   And again, when they get to the report, they

25   abandon this altogether.

1      Q    So if you were peer-reviewing this

2  paper, would you point out to the authors that

3  this lack of analysis is something that you would

4  like to see added?

5      A    So there are a lot of things that go

6  into the review process and into the final

7  publication.  So some of those things are space

8  constraints.  I've been on both sides of that

9  process; the author responding to a reviewer, and

10  the reviewer hammering on authors, and then the

11  editor gets in between.  And the editor really

12  finally decides ultimately what to tell.

13  Reviewers don't tell the authors what to do.  They

14  suggest to the editor what they might want to

15  suggest to the author, and then things go around

16  from there.

17          I would never, if I was reviewing a

18  paper that offered a graph of an analysis and then

19  immediately pull -- tells you not to pay too much

20  attention to the graph because there's this

21  elaborate analysis that is much more useful and

22  then doesn't produce that analysis, that's -- if I

23  was a reviewer or an editor, I would question why

24  we're taking up a whole page with a graph that

25  they say is misleading.

1      Q      Okay.  So if you were a reviewer, would

2   you have made that recommendation to the editor?

3      A      I certainly would have wanted to see the

4   other analysis, and then I guess my question for

5   the editor ultimately would be, are you including,

6   are you including the graph because you think the

7   table might mislead the viewers, right?

8             There are two ways you can be misled

9   here.  If you only see the numbers and all you see

10  is that there is a significant decline for African

11  Americans but not for anybody else, right, on the

12  basis of that table I would conclude that probably

13  voter registration was pretty level for whites and

14  was falling significantly for blacks.

15            So it may well be that the editor said,

16  look, you know, you can discuss those findings,

17  but you're going to have to put the figure in

18  because otherwise people are going to believe that

19  there was not a significant decline for whites,

20  significant in the nonstatistical sense, right?

21  Because there wasn't a substantive decline for all

22  three groups.

23            And so that the purpose, the figure is

24  exactly what the figure does, to suggest that

25  voter registration was declining for all of these

1  groups.  And then the question is, you know, was

2  there, how big a difference was there.  And the

3  paper simply doesn't make, hit hard on that point

4  at all.  And that may be -- again, I don't know if

5  that was the author's choice or if that's the

6  editor's choice, but as presented, the paper makes

7  it pretty clear that the effect of race and

8  ethnicity on registration with regard to HB 1355

9  in terms of what happened to registration post

10  that legislation was registration turned down for

11  everybody.  It didn't, it wasn't flat for whites

12  and down for blacks.  It wasn't up for whites and

13  down for blacks.  It was down for everybody at

14  roughly the same, graphically, at roughly the same

15  level.

16        So maybe that's there because that's the

17  most honest depiction of what happened.  All I

18  know is it's not in the report, in that form or

19  any other form.

20      Q    Would this lack of analysis prevent you

21  from publishing the paper if you had final say

22  over publication?

23      A    No.  If I had seen the rest of that

24  analysis and I believed that the figure actually

25  was a fair representation of what conclusion we

1    could draw, I would be perfectly comfortable with

2    having it done exactly as it's done here, or with

3    eliminating that discussion of the analysis that's

4    not actually presented.

5              So as it is, it presents a, sort of a

6    balance of the two.  It certainly eliminates the

7    suggestion that, just in terms of what's happening

8    with registration, that there's something

9    happening that's different, obviously different

10   for blacks and Hispanics than for whites, and

11   that's a fair representation, as I understand it,

12   of the data that they had for this paper.

13       Q    Okay.

14       A    I will say I was not a reviewer on this

15   paper, and I would not be a reviewer on this paper

16   because it's not my, I'm not a state and local

17   politics person.

18             And so, you know, I'm sure the reviewers

19   were well-qualified to do this.  I'm sure the

20   editor was well-qualified.  This was the decision

21   they came to and it reflects what it reflects.

22       Q    Okay.  And are those the same standards

23   that you would expect another peer reviewer to

24   hold to the article?

25       A    It's a collective process that involves

1   multiple reviewers, the editor and the authors.

2   So I don't -- again, what they collectively held

3   the authors to is difficult to say because there

4   are different pieces operating in different places

5   in that process.  It is a peer-reviewed article,

6   so that means that, in theory at least, some

7   reviewers who were not aware of who wrote the

8   article provided reviews, and the editor took that

9   into account in making decisions and revisions, if

10  revisions were required.

11          So that's, you know, that's a

12  gatekeeping standard.  It doesn't mean everything

13  that gets past it is right or that everything that

14  doesn't get past it is wrong.  But it is a

15  peer-reviewed article, so I automatically give it

16  more credence than I would to a non-peer-reviewed

17  article.

18      Q    Do you have any reason to believe

19  whether those peer reviewers are actually from the

20  correct field or not?

21      A    My long experience with publication is

22  that for the most part, the reviewers that agree,

23  were solicited and agree to review are typically

24  at least roughly matched to the article.  I've had

25  cases where I felt the reviewers were not

1    correctly matched to articles I had coauthored and

2    kind of objected to the editor about that exact

3    point.

4              So I wouldn't say that it's impossible,

5    but again, that's, you know, I don't have enough

6    knowledge about what happened with this article to

7    say one way or the other whether they were

8    qualified or not.

9        Q    Let's go ahead and return to what's been

10   marked as Exhibit 1, which, again, is your report.

11   And I'm going to go page 11 -- sorry, page 13.  So

12   this reflects the graph that we just saw on the

13   Herron and Smith report, correct?

14       A    Correct.

15       Q    And this is a graph depicting the

16   registration differences over time?

17       A    It appears to be, based on what I can

18   tell from the discussion and from the label, yes,

19   it appears to be a track of, in the light -- in

20   the background a track of daily registrations, and

21   then more prominently in a smooth line, the

22   results of smoothening those daily results.

23       Q    Okay.  And you see the dates that have

24   been marked here as May 19th and August 17th?

25       A    Yes.

1      Q    Okay.  And you see that the scratch is

2  the difference in registration before and after HB

3  1355 was implemented?

4      A    Yes.

5      Q    Okay.  If a law had not yet been

6  implemented, would you agree it would be

7  impossible to create a graph showing the effects

8  before and after implementation?

9      A    Yes, if the law is not implemented, then

10  you could, you could put a graph up, and it could

11  show what happened before and after some date, the

12  date the law went into effect, or the date that

13  the law was supposed to take full effect, or a

14  variety of different time points, but they

15  wouldn't -- whatever the graph showed, it couldn't

16  be the result of, it could be the result of the

17  passage of the law or the publicity surrounding

18  the law, but it couldn't be the result of the

19  actual policy changes of the law itself if those

20  policy changes weren't implemented.

21      Q    Okay.  So if a law has not been

22  implemented, you agree it would be impossible to

23  show, or create a graph showing the effects

24  illustrating before and after the law's

25  implementation because it has not yet been

1    implemented, correct?

2        A    There's nothing to stop you from

3    creating the graph, and there's nothing that stops

4    the graph from showing the impact of the law as

5    being negative or positive or neutral.  It's just

6    that it doesn't actually, whatever it's showing,

7    it's showing something that isn't the result of

8    the law being implemented if the law hasn't been

9    implemented.

10            There's nothing to stop you from

11   creating the graph, and there's nothing, none of

12   that conditions what the graph will show.  It

13   could show things being level, or ticking up, or

14   ticking down.  It can do all kinds of things.  It

15   just means that you can't attribute that to the

16   implementation of the law.

17            Again, you can attribute it to the

18   passage of the law or a variety of other things,

19   the weather, whatever, but you can't attribute it

20   to the implementation of the law if the law hasn't

21   been implemented.

22       Q    Let's move to the bottom of page 13.  So

23   here you see the sentence that says, in addition

24   to the limited empirical test discussed above,

25   both Dr. Herron and Dr. Smith advance a cost-

1    benefit theory of how SB 7050 could impact voter

2    registration all other things being equal.

3            Did I read that correctly?

4        A    Yes.

5        Q    Okay.  Can you explain what you meant

6    here by "a limited empirical test"?

7        A    What I mean by "limited empirical test"

8    is that in the reports of Dr. Herron and Dr.

9    Smith, there is a much more, there is some

10   empirical test about who registered by what method

11   and how that looks in overall statistics, but

12   there is nothing of the sort of detailed

13   investigation of the racial impact that there is

14   in the article.  And so their assessment,

15   empirical assessment of this issue is limited in

16   the sense that, it's limited in the absolute

17   sense, but also limited in the sense that they

18   didn't do nearly as much as was published in the

19   article.  And even what was published in the

20   article was limited in the sense that it didn't

21   provide full information about the regression

22   analysis.

23       Q    Okay.  Now, earlier in your report, on

24   page 9, you say, that there's no empirical

25   evidence in Dr. Smith's report.  So I'm just

1    trying to learn what you meant here when you

2    indicate that there's a limited empirical test.

3    Can you elaborate on that a little bit?

4         A    Well, I mean I would guess severely

5    limited.  It's so limited that it's difficult to

6    distinguish it from just the general language of

7    their report.  I mean their report just simply

8    stops short of even the limited analysis that you

9    get in the article.

10              So I guess I don't mean anything

11   different by that than to say that there isn't

12   empirical analysis on it or that the analysis is

13   limited.  It's limited.  It's limited to things

14   that they offer as circumstantial or potentially

15   plausible arguments about impacts, but they

16   actually don't show empirical impacts on

17   registration or turnout for racial groups post-SB

18   7050.  So that's pretty limited.  It's not there.

19        Q    Let's go back to the bottom of page 13

20   where you talk about cost-benefit theories of

21   voter registration and turnout.  You describe a

22   cost-benefit theory for how SB 7050 could impact

23   voter registration all things being equal that you

24   saw advanced in Dr. Smith's report.  Can you

25   explain what section of Dr. Smith's report you're

1    talking about here?

2        A    I'd have to look back at Dr. Smith's

3    report, but when, in their discussion where they

4    talk about the idea that this potentially raises

5    costs for the organization and that potentially

6    could make, you know, registration more costly for

7    individuals, that's the, sort of the broad

8    connective theory they're using.  There is

9    essentially this kind of cost-benefit or rational

10   actor, however you want to describe that.  That's

11   roughly, that's sort of that economic theory about

12   the impact of cost on behavior is what they're

13   anchoring that in.

14       Q    Okay.  We can go to Dr. Smith's report,

15   which again has been marked as Exhibit 5, and then

16   maybe you can let me know what section you're

17   referring to as I scroll down.  Would that be

18   helpful?

19       A    I can scroll my paper copy.  Might be

20   easier.

21       Q    Let's do that.

22       A    (Reviewing.)

23            So I'd say section 4 that's titled Costs

24   of Voting would be a likely place to look.

25       Q    Okay.  So paragraph 16?

1      A     Yeah.  It looks like it's mostly

2   paragraph 16 and then to some extent 17, 18 and 19

3   seem to sort of walk it back a little bit.

4           So, again, their, I'm not criticizing

5   their, the way that they express these

6   speculations and limited opinions.  They put them

7   in the appropriate language.  They don't assert

8   that they're findings, but rather that they're

9   just a possible explanation or a possible theory

10  to operate with, and that's what is being done in

11  a very brief way in paragraph 16.

12     Q     Okay.  I'm going to return back to

13  Exhibit 1, which again has been marked as your

14  report, and scroll down to page 14 where you say,

15  these assertions are inherently speculative as the

16  careful conditional wording of them would suggest.

17  And can you -- I'll go back to Dr. Smith's report

18  in a second, but which assertions in his report

19  are you referencing as being inherently

20  speculative?

21     A     Again, this section on cost of voting,

22  if you look sort of to the middle of that

23  paragraph, laws restricting voter registration

24  efforts increase the cost of voting and can lead

25  to voter disenfranchisement of eligible citizens,

1    including those already registered to vote.

2         Q    Okay.  Is there anything else besides

3    this sentence?

4         A    The sentence before it says, as

5    Rosenstone and Hansen summarize, legal

6    restrictions on the exercise of the franchise can

7    create institutional barriers to participation,

8    which impose significant burdens on American

9    citizens and lower the probability they will

10   participate in political life.  And they can do

11   that.

12        It says if SB 7050 goes into full

13   effect, the cost of voting for all eligible

14   citizens residing in Florida who seek to become

15   registered to vote, as well as to individuals

16   currently registered to vote and want to update

17   their registration, will likely increase.

18        Again, they're not saying these are

19   definitely going to happen, but they say they can

20   happen or they're likely to happen.

21        And again, all of these relate just

22   broadly to the issue of voter registration and

23   methods of registration.  None of this is, relates

24   to treating different groups of citizens

25   differently or differential impacts by race or

1    ethnicity.

2         Q    I'm going to return back to your report

3    on Exhibit 1.  Do you see the header on page 14

4    that reads, the Effect of Past Election Laws on

5    Voter Turnout?

6         A    Yes.

7         Q    Okay.  Do you recall testifying a little

8    bit earlier that this part of the report, all the

9    way down, I think until Page 20, was more the kind

10   of work that your colleague, Dr. Stein, writes

11   about?

12        A    He wrote it, so yeah, he writes, it's

13   more his area of work and he wrote this section of

14   the report.

15        Q    Okay.  So you would agree that this

16   portion of the report from that header, the Effect

17   of Past Election Laws on Voter Turnout, to the

18   Conclusion is attributable to Dr. Stein?

19        A    So again, I think when we talked about

20   it earlier I indicated I, it's very possible that

21   I wrote the first, and maybe the second sentence,

22   in terms of just framing in order to bring his

23   analysis into the flow of what was going on with

24   the report so that the transition sentence, or two

25   transition sentences -- the first transition

1    sentence I probably wrote.  The second one is

2    probably just a rewording of what he had as an

3    introductory sentence to sort of summarize again

4    what's coming below.  But certainly beyond that,

5    that's at least his initial draft.  How far it

6    goes, I mean you keep saying it goes to wherever,

7    I'd have to see it, scroll by to know how far it

8    goes.

9              This is all still Stein.

10             Look at those footnotes.  That's Stein.

11             If I can just see the last page, because

12   it's -- okay, there, we both, we both worked on

13   the signature page.

14             Yeah, that's Stein all the way until my

15   signature.  And my signature is mine.  But

16   everything from where we started, again, setting

17   aside maybe one transitional sentence, everything

18   below that is drafted by Dr. Stein.

19     Q    Okay.  So just to be clear, this

20   sentence that reads, Professors Smith and Herron

21   overlook two bodies of research that are relevant

22   in assessing the potential effect of SB 7050 on

23   voting, end quote, and then the second sentence

24   following that that you added some revisions to,

25   those are the only parts of the following pages

1    that you had any role in editing or adding to?

2        A    Yeah.  And actually, looking at this

3    again, I don't think I would have made -- I wasn't

4    sure about what the flow of that second sentence

5    was, but the first and second, which are in, you

6    know, in how things are laid in that paragraph

7    would not be my addition, that would have been

8    there.  So it's possible that the first sentence

9    is also from Dr. Stein.

10              I just, I know I wrote some transition

11   sentences.  Now I look at it, it certainly

12   wouldn't be anything more than the first sentence.

13   I don't think I did anything to that second

14   sentence.

15       Q    Okay.  So you might have just provided

16   the first sentence of the paragraph under the

17   header, the Effect of Past Election Laws on Voter

18   Turnout, and nothing else for the rest of the

19   pages going forward?

20       A    Yeah.  I may not even have provided the

21   header.

22       Q    Okay.

23       A    That's not exactly the way I usually do

24   headers, so it's quite possible that nothing

25   from -- inclusive of the header on is, is

1    certainly not my first draft of anything.

2         Q    Did you read all the papers that are

3    cited between Pages 14 to 20?

4         A    I did not reread anything with regard to

5    that section.  Most of them are papers that I've

6    read at some time, but not all of them, and I've

7    not reread them since.

8         Q    Okay.  Are you familiar enough with

9    these papers to perhaps answer some questions

10   about them?

11        A    It's much better off -- I'm not the one

12   who put them in the paper.  This is not my area of

13   research.  So I'd, I'd be happy to see what I can

14   offer, but I can't offer you much beyond, you

15   know, what Dr. Stein could tell you about them.

16             Again, I can't tell you why he wrote

17   what he wrote, and I can't really provide

18   independent expertise about the findings because

19   it's not my area of expertise, it's his.

20        Q    How about I ask you some questions about

21   some of the papers and if you don't know, just say

22   you don't know, okay?

23        A    Fair enough.

24        Q    Perfect.

25             Do you know whether any of these papers

1    address third party voter registration

2    organizations?

3        A    I don't believe they do.

4        Q    Okay.

5        A    I could be wrong, maybe one of them did,

6    but by and large, that hasn't been a big area of

7    study in political science.  It doesn't occur as

8    often as a variety of other kinds of things

9    related to either registration or turnout.

10            So again, these are all broadly in this

11   framework of, you know, if you raise the cost,

12   what will happen to groups that are

13   disproportionately affected, et cetera.  But

14   they're not specific about the very narrow notion

15   of third party registration organizations.

16       Q    Do you know whether any of these papers

17   showed that voter registration rules have an

18   effect on turnout?

19       A    My recollection are that, or actually is

20   that they all, to some degree, show effects on --

21   to the degree they focus on registration rather

22   than turnout, they would show some effect on

23   registration.

24       Q    Okay.  So your answer is yes, you know

25   that some of these papers showed that voter

1   registration rules do have an effect on voter

2   turnout?

3          A    Yes.

4          Q    I want to go page 16 where Dr. Stein

5   writes, the consensus in the literature, however,

6   is that early voting has not produced consistent

7   and positive effects on turnout.  While two

8   studies have found small increases in turnout

9   associated with early voting, the majority of the

10  studies have failed to find a significant positive

11  turnout effect or found a significant negative

12  effect.

13              Did I read that correctly?

14         A    Yes.

15         Q    And this is another line that Dr. Stein

16  drafted, right?

17         A    Correct.

18         Q    Okay.  Did you do anything to confirm

19  that this line is true?

20         A    No.

21         Q    So did you do anything to determine that

22  this is the consensus of, in the literature?

23         A    No.

24         Q    Okay.  Did you do anything to determine

25  that the majority of studies found, or failed to

1   find this?

2        A    No.

3        Q    And did you read any of the papers cited

4   in footnotes 5, and 6, or 7 of your report?

5        A    So I didn't read the Wolfinger and

6   Highton, Mullin.  At some point I read the Stein

7   and Garcia-Monet.  I believe I've read Fitzgerald.

8   Don't think I read the Gronke piece; it's a review

9   piece.  I've not read the Primo piece.  I've read

10  the Burden piece.  I'm not sure about the Larocca

11  piece.  I might have read it, but I can't recall.

12  Didn't read the Richey piece.  Not sure about

13  Rigby.  The Berinsky I think I may have read.

14       Q    Oh, I just asked about 5 through 7.

15       A    Oh, sorry.  Give me an assignment, I go

16  to town.

17       Q    I appreciate the thoroughness, Dr.

18  Alford.

19            So it's fair to say you didn't read all

20  the papers in footnotes 5 through 7 of the report,

21  right?

22       A    Correct.

23       Q    And you trust Dr. Stein's judgment as an

24  expert in this field, right?

25       A    Yes.

1       Q    And are you aware that one of the papers

2  cited here, the Voting Early but Not Often in

3  footnote 5, that paper found that voter ID laws

4  had a positive effect on turnout and that's his

5  paper?

6       A    I am not.

7       Q    Okay.  Let's go down to page -- well,

8  starting on page 16, talking about voter ID

9  requirements.  Do you know whether the papers

10  cited in this section of the report address ID

11  requirements at the registration phase, or at the

12  polling place?

13       A    I don't know.

14       Q    I want to go back up to page 9 just for

15  a moment.  So just to confirm, you testified

16  earlier that the portion about Dr. Smith's report

17  from page 8, all the way through to the middle of

18  page 14 before we reach the header, the Effect of

19  Past Election Laws on Voter Turnout, that was one

20  of your focuses that you drafted, right?

21       A    Correct.

22       Q    Okay.  And so that whole section is

23  attributable to you, right?

24       A    That I would have been the first draft

25  on that section, yes.

1       Q    Thank you.  Okay, I want to ask you some

2    questions about the rebuttal report.  And I know

3    we've been going for a little while.  Do you need

4    a break, or can we keep marching?

5       A    We can keep going.

6       Q    Let's keep going.  I'm going to pull up

7    what's been marked as Exhibit 7.

8            (Exhibit 7 was marked for identification

9    and is attached to the transcript.)

10      Q    And that is Dr. Smith's rebuttal report.

11   Does this look like a fair and accurate copy of

12   the rebuttal report that you reviewed for this

13   deposition?

14      A    That's the cover page that I've got.

15      Q    Excellent.  Did you read this report

16   earlier today?

17      A    I've printed off clean copies of all the

18   reports.  I don't -- I may have looked at it.  I

19   didn't read it today, but I may have glanced at it

20   when it was coming off the printer.

21      Q    Okay.  When besides today did you read

22   this report?

23      A    I would have reviewed it sometime after

24   it was provided to me, so sometime over the last

25   week, possibly week ago.

1      Q      So you reviewed this report once last

2  week and then today and no other times?

3      A      I may have, I probably read over it more

4  than once.  So probably read it a couple of times,

5  or looked at it, at least looked at sections of it

6  a couple of different times over the time, the

7  week or so that I've had it, and then briefly

8  looked at it coming off the printer this morning.

9      Q      Do you have any reactions to Dr. Smith's

10  critiques?

11      A      I think much of it just repeats things

12  that we've been talking about.  They just repeat

13  the fact that they feel that -- he feels that he's

14  demonstrated certain things in his initial report.

15          I'm not -- nothing in the report changes

16  my belief from my initial report.  I haven't, you

17  know, gotten to the point of producing or writing

18  my response to the rebuttals.  I haven't been

19  asked to do that.  If I was asked to do it, I

20  would.  So it doesn't change my opinions from the

21  report that we wrote.

22      Q      Okay.  Have you memorialized these

23  opinions anywhere in writing?

24      A      No.

25      Q      And it sounds like you don't intend to

1    present these opinions in a report, right?

2          A     I'll do whatever I'm asked to do.  I,

3    you know, I'm not paying the bill.  So if somebody

4    wants me to write a report, I'll see if I can fit

5    it in, but I'm not going to write one on my own

6    hook.  So if asked to do it, I certainly would.

7          Q     Okay.  And you know the deadline to

8    submit a supplemental report passed already?

9          A     No idea.  I leave those to people who

10   are better at dealing with deadlines.  If I was

11   going to deal with deadlines, I wouldn't be an

12   academic, so ...

13         Q     That is fair.

14         A     I have no idea.  Although I will say I

15   do know one thing, that every time I think I've

16   been saved by some deadline that's passed, some

17   weird procedure happens that I don't understand

18   and it either is completely opened up again or has

19   completely gone away, or you know, or the Fifth

20   Circuit's gotten involved.  Who knows what's

21   happened?  Particularly this decade, I quit

22   believing that anything is either finally settled

23   or finally not settled, either way, so I try to

24   keep my options open.

25         Q     In your experience as an expert, then,

1    have you submitted an expert opinion after a

2    deadline has passed?

3         A    I know I've been asked to do things

4    after, you know, years after what I thought were

5    the final deadlines in all kinds of cases,

6    including a case in Texas that dragged out for

7    seven years.

8              So I don't recall specifically, you

9    know, a specific case where, you know, I had

10   provided a report after some actual enforced

11   deadline.  But again, I don't, I'm not a lawyer

12   and, on all kinds of grounds, but particularly

13   when it comes to the sort of procedural.  I'll

14   just say, in my experience, you know, if a Federal

15   judge wants something, they can usually figure out

16   a way to get it even if they previously seemed to

17   have precluded it.

18        Q    Excellent.  Just to be clear, your

19   report does not address Dr. Smith's rebuttal

20   analysis in any way, right?

21        A    Correct.

22        Q    Okay.  I just have some final wrap-up

23   questions here about your experience in voting

24   rights cases.  You've previously testified as an

25   expert on racially polarized voting, right?

1        A     That's correct.

2        Q     What training do you have on the effects

3   of voter registration laws?

4        A     Again, I, you know, one of my -- I have

5   a degree in public administration, a master's

6   degree.  I have taught graduate level courses on

7   public policy analysis.  My first major

8   publication was a public policy analysis.  My

9   first peer-reviewed article was a public policy

10  analysis.

11             I don't do a lot of public policy

12  analysis, and haven't done after the early part of

13  my career, but I do have training in that area.

14  I'm not trained specifically in this, and it's

15  not, you know, this is not an area that I do

16  research in or typically consult in.  Sort of

17  details of third party voter registration

18  organizations are not my thing.

19             So I have -- part of what we're, part of

20  what this is about is what does the structure of a

21  policy analysis look like, and I've done policy

22  analysis and I've taught methods for policy

23  analysis so I feel qualified to comment on that,

24  and that's what I'm doing here.

25             But it's not, this is not an area that I

1    do research in or follow, and it's not the main

2    area, most of my expert testimony in, particularly

3    in recent decades, has been narrowly focused on

4    racially polarized voting analysis for Gingles 2

5    and 3, and Senate Factor 2.

6        Q    But you don't teach any courses, it

7    sounds like, on the effects of voter registration

8    laws?

9        A    I do not.

10       Q    And prior to this litigation you didn't

11   have any experience analyzing the effects of voter

12   registration laws or regulations, correct?

13       A    I think that is correct.  Again, some

14   far distant thing that was tangentially related,

15   but it's not an area that I have any recent

16   experience in or that I would consider to be a

17   major area for my work as a testifying expert.

18       Q    I'm curious.  How do you generally view

19   the effects of voter registration laws like SB

20   7050?

21       A    Good question.  I, so I think, again,

22   the -- as an empirical matter, my reading of the

23   research and the articles I've used in teaching in

24   this area, you know, when I teach voting behavior,

25   when I teach elections and we talk about these

1    issues about, obviously the issues about things,

2    like particularly theories of turnout and what

3    motivates voters.  So I spend a week on

4    cost-benefit theories of voter turnout, voter

5    participation, and that includes the idea of

6    registration, and registration is a barrier to

7    turnout, and you know, sort of, there's a long

8    literature on that, and I cover that.

9            And my sense from all of that, I think,

10   is similar to what Dr. Stein summarized in the

11   report, is that we often have an idea, legislators

12   often have an idea of what the effect is going to

13   be on a -- proponents and opponents often differ

14   on that.  It's not always clear who's going to

15   turn out to be right about the impact or if

16   there's even going to be an impact.  So I think

17   it's an area where we don't have a great deal of

18   predictive capability, particularly when things

19   are more nuanced.

20           So here where you're not regulating

21   voters directly, but regulating third party

22   groups, there are just a lot of, there are a lot

23   of things in play here.  This is a political -- I

24   guess my other main feeling about this is that

25   this is an intensely political area.  It's not

1    just that it's decided by political bodies like

2    state legislatures, but it is, the kind of

3    decisions about registration and voting and

4    turnout are political.  "Get out to vote" efforts

5    are, you know, may be hardly the purview of just

6    good citizen groups, but they also are very much

7    the purview of political parties and political

8    candidates.

9            So there's a lot of money involved in

10   this.  There's a lot of effort that goes into this

11   in the political sense, getting your voters

12   registered, getting your voters turned out.  So

13   it's a process that is very much in the political

14   thicket and that is part of what makes it

15   difficult to predict in terms of how something is

16   going to play out.

17           I think, for example, the Court, Supreme

18   Court was a bit naive about how Citizens United

19   might play out in terms of its impact.  They said

20   it would have some minimal impact on the way

21   campaigns work in the United States.  It's

22   completely reworked the campaign system in the

23   United States.

24           So sometimes we underestimate, sometimes

25   we overestimate.  But part of the reason is

1    because it's connected to important political

2    processes and outcomes that are highly contested

3    and by groups well-beyond the voter registration

4    groups themselves or the legislature in this case.

5              So give you an example.  If you do

6    something that voter registration groups think is

7    going to be, is going to raise their costs in

8    Florida, they may use that as a fundraising tool

9    and actually be better funded than they were prior

10   to the legislation.  But if the reaction to the

11   legislation among their supporters is that this is

12   an attack on our efforts to register voters, then

13   that may actually, they may get more volunteers,

14   they may get more money, they may actually be able

15   to register more people in this new regulatory

16   environment because again, predicting the all

17   other things being equal effects, what are the,

18   you know, what's the impact of that is going to be

19   in a political, broadly political sense with a lot

20   of moving parts is just very hard.  It's very hard

21   to predict.

22             So the process that produces this

23   legislation is political.  The process that

24   conditions its implementation is very political,

25   much more so than it was -- I mean, you know, I'm

1    old enough to remember when the only voter

2    registration effort was kind of a League of Women

3    Voters.  Like get out some impartial information

4    and try to hand out voter registration cards.

5              We're in a very, very polarized partisan

6    political context now.  And that polarized context

7    makes it really hard to guess what the endpoint

8    might be for any of this kind of highly charged,

9    highly publicized legislation, both in terms of,

10    you know, what's likely to come out of the

11    legislative process and how it's likely to be, to

12    ultimately affect voters who are not necessarily

13    the target of the legislation, but where there are

14    intervening moving parts that will have some

15    impact or say in how things play out.

16              So I guess that's my view.  It's very

17    political.  It's very complicated.  It is very

18    much the political thicket.

19    Q    Thank you.  And just to be clear, you

20    don't consider yourself an expert on voter

21    registration laws, correct?

22    A    Correct.

23    Q    And have you ever testified on behalf of

24    Plaintiffs in a voting case challenging election

25    administration laws?

1    A    No.

2    Q    Okay.  Thank you.

3         MR. CAMPBELL-HARRIS:  I think now is a

4    good time to take maybe like a five-minute break

5    and then we can come back.

6         THE WITNESS:  Sounds good.

7         (A recess was taken at 3:06 p.m.)

8         MR. CAMPBELL-HARRIS:  Those are all the

9    questions I have, Dr. Alford.  Thank you so much

10   for testifying today.  There is one housekeeping

11   matter which might result in us asking more

12   questions.

13        Josh, we had some folks do research into

14   the privilege issue that you asserted, and it's

15   pretty clear that the case law in the 11th Circuit

16   indicates that if counsel is not present,

17   communications between two experts is not

18   privileged.

19        And if you want to assert that

20   privilege, then we'll keep the deposition open.

21   Otherwise we'd like to just ask Dr. Alford about

22   the conversations he had with Dr. Stein and then

23   we can perhaps close the deposition today.

24        MR. PRATT:  Thanks for that.  Actually,

25   what I'd ask is if you wouldn't mind sending me

1    the case cites you're referring to, we'll break

2    maybe for 15 minutes and I'll review to see

3    whether the privilege would still need to be

4    asserted.  But as to any conversations where

5    counsel is present, definitely privilege still

6    would apply and there's no question in my mind as

7    to at the direction of counsel, conversations

8    they're having.  But I will review the case law

9    you were referring to.

10            MR. CAMPBELL-HARRIS:  Sounds great.  And

11   I agree that if counsel is present, that is

12   absolutely privileged.

13            I'll give you 15 minutes to review the

14   case law and then we'll circle back perhaps at

15   3:30.

16            MR. PRATT:  3:30 works.  Thank you.

17            (A recess was taken at 3:13 p.m.)

18

19

20

21

22            (Back on the record at 3:51 p.m.)

23            MR. PRATT:  Thank you, Mr.

24   Campbell-Harris, for that brief time.  We're back

25   on the record at 3:51.

1          So I've had the opportunity to review

2    the case you've provided, and just for clarity of

3    the record, the area of inquiry you're seeking now

4    is to ask about some communications that Dr.

5    Alford and Dr. Stein may have had when counsel was

6    not present, either in person or on phone calls,

7    and so my understanding is your questions would be

8    in that narrow scope, not in that scope of

9    communications with counsel; is that correct?

10         MR. CAMPBELL-HARRIS:  That is correct.

11   And written communications between Dr. Alford and

12   Dr. Stein that did not include counsel.

13         MR. PRATT:  Got you.  And the written

14   communications would not include any draft expert

15   reports in this matter, which would be protected,

16   correct?

17         MR. CAMPBELL-HARRIS:  That is correct.

18         MR. PRATT:  And it also would not

19   include any documents provided to the experts that

20   were not ultimately relied on in their conclusions

21   in their report, correct?

22         MR. CAMPBELL-HARRIS:  I think we can

23   agree to that, but I won't speak for all the

24   Plaintiffs.

25         MR. PRATT:  Excellent.

1          So with that understanding and that

2     limitation, you know, we'll withdraw the privilege

3     objection so that you may ask about the

4     communications directly between Dr. Alford and Dr.

5     Stein that were not with counsel present or on the

6     phone and not communications directly with us.

7          MR. CAMPBELL-HARRIS:  Excellent.  Thank

8     you so much, Josh.

9          MR. PRATT:  Yeah.

10    BY MR. CAMPBELL-HARRIS:

11    Q     All right, Dr. Alford, I just have a

12    couple of wrap-up questions.  Thank you for

13    holding tight and being patient.  Are you ready?

14    A     I'm ready.

15    Q     Excellent.

16          So circling back to what you discussed,

17    what did you discuss with Dr. Stein to prepare for

18    this deposition that did not involve counsel

19    present?

20    A     So I know the only conversation that I

21    had with Dr. Stein after his deposition was the

22    conversation with counsel.

23    Q     Okay.

24    A     So I haven't spoken to Dr. Stein

25    privately about anything since his deposition.

1          Q     Okay.

2          A     I believe in the time prior to the

3    deposition, our conversation, or deposition

4    preparation conversation was with the attorneys.

5    There may have been a brief phone call about the

6    timing, about when we would be available or when

7    would be a good time to do that.

8                I've been out of town for a deposition

9    and out of town for Thanksgiving and so -- and

10   he's been out of town several times as well.  So

11   there's some back-and-forth about scheduling, but

12   no substantive conversations about deposition prep

13   other than the two conversations with the

14   attorneys present.

15         Q     Okay.  So from the time that you started

16   working on this case to the deposition today, how

17   many times have you spoken with Dr. Stein without

18   counsel present?

19         A     So I'd say most of our back-and-forth

20   individually has been about schedule, particularly

21   times that we can coordinate and talk to, talk to

22   the lawyers.

23               We've had some very brief conversations

24   in the transition of things.  So initially I guess

25   a discussion that -- I can't remember if I was out

1    of town at the time, but when we started the

2    process, I talked briefly to Dr. Stein and he

3    indicated he would start his work first and then

4    sort of let me know where he was.

5            He sent that material to me.  I -- we

6    had a brief conversation where I just talked about

7    sort of, organizationally about kind of the things

8    we covered here, that I'd put some front end on it

9    and would reorganize rather than rewrite the

10   sections he'd worked on.

11       Q    Okay.

12       A    Most of our substantive conversations

13   about the expert report, including our various

14   sections of it and so forth, were in conversations

15   jointly with the attorneys after we'd started

16   circulating drafts.

17           So I think we, at some point we may have

18   had some conversation where just the two of us

19   chatted just briefly about the Smith and Herron

20   article.  I think that the substance of that

21   conversation was really about who would write that

22   up, and I told him that I had already had a couple

23   of paragraphs and I would take that.

24           Very early on there would have been a

25   brief, you know, brief conversation, as I

1    indicated earlier, about, you know, would he be

2    interested in being involved and how to contact

3    the lawyers, and I think I may have told him what

4    my current rate was.  That's what I recall.

5         Q     Thank you.  Did any of these

6    conversations occur over email?

7         A     I could look.  I don't recall.

8    Presumably when we were moving drafts of the

9    report sections back and forth, those would have

10   been by email, but whether there's anything in the

11   email other than the report drafts during the

12   drafting phase, I don't recall any substantive

13   email conversations.

14        Q     Okay.  So besides exchanging drafts of

15   the report, there was no email correspondence

16   between you and Dr. Stein about this case?

17        A     Not that I recall.  My recollection is

18   we mostly, we mostly communicated by phone.  I'm

19   not often as responsive to emails as my colleagues

20   would like, so most of them, like Dr. Stein,

21   usually contact me by phone where I'm more likely

22   to actually respond.

23             So, but I don't recall specifically an

24   email.  There may have been some emails, but I

25   don't recall any specifically.

1        Q    Did you search your email to see whether

2   or not there had been any correspondence between

3   you and Dr. Stein about this case?

4        A    I have not.

5        Q    Okay.  Did you and Dr. Stein exchange

6   text messages about this case?

7        A    It's possible in terms of a scheduling

8   thing, like is that going to work, or you know,

9   are you back in town, something like that that

10  would have been tangentially related.  But I'm a

11  one-finger typist so I don't do a lot by text

12  message other than "call me" is my most common

13  text message.

14       Q    So are you saying that you and Dr. Stein

15  did not communicate about this case over any other

16  messaging platforms besides email and over the

17  phone and then in-person conversations?

18       A    Yes.  We don't, we don't share any other

19  platforms that we communicate on.  We're pretty

20  helpless in that sense.

21            So yeah, we're not, we have no

22  collaborative software, that kind of thing, which

23  my students think is crazy that we don't have a

24  shared workspace, but we have nothing of that

25  sort.

1      Q     Okay.  So going back to how you both

2   initially got involved, it sounds as though Dr.

3   Stein wrote parts of the report and then you had

4   the opportunity to see what he did, and you wrote

5   portions, and then you all combined them and

6   produced a draft and that draft was then exchanged

7   with counsel, correct?

8      A     I think that's a rough outline of the

9   bulk of the process.  I'm a little unsure, I think

10  I probably had at least some paragraphs roughed in

11  while he was working on his first draft so that

12  the bulk of the report he was doing as a first

13  draft.

14         By the time he sent that to me, I think

15  we talked about it with counsel in a Zoom call, I

16  would have probably already, just because of the

17  way scheduling was working, I think I had a moment

18  in there where I drafted some of what would become

19  the front part and possibly part of what became

20  the Smith commentary I had been drafting

21  simultaneously.  So that sort of when I saw his

22  draft, I may have already had some of that done.

23         But by and large, my process was to,

24  when I got serious about pulling it into a report,

25  was to take his material, finish up the parts that

1    I had put in bullet form or outline form, and then

2    return that to him.  And then in conversation with

3    counsel, we talked about what, you know, did this,

4    what looked finished and what didn't and so forth.

5        Q    Did you and Dr. Stein ever communicate

6    about the noncitizen provision outside the scope

7    of exchanging drafts?

8        A    We may -- I'm not sure when that

9    conversation took place, or if it was one of the

10   conversations with lawyers, but it's possible that

11   we, in a phone conversation, may have discussed --

12   I think there may have been a phone conversation

13   where we talked about the citizenship provision

14   because I remember mentioning to him that I was

15   aware that there was a citizenship requirement at

16   the TSA and I wasn't sure if he was aware of that.

17   I think that may have been mentioned in a phone

18   conversation, but I'm not sure exactly what venue

19   it was mentioned in.

20       Q    So the only communication you recall

21   with Dr. Stein about the non-citizenship provision

22   was a phone conversation and it involved your

23   recollection about the TSA citizenship requirement

24   as well?

25       A    Yeah.  I'm sure there would have been

1    some other context for that, but that's really the

2    only part that I remember specifically.

3        Q    And just to be clear, there were no

4    written correspondence about the non-citizenship

5    provision between you and Dr. Stein?

6        A    Not that I recall, no.

7        Q    Okay.  I want to go back to the Herron-

8    Smith paper.  So Dr. Stein never told you that he

9    peer-reviewed that paper; is that correct?

10       A    Again, he may have said something like

11   that.  I just don't recall whether he said that he

12   might have been a reviewer or that he was a

13   reviewer, I don't know.  I really don't recall

14   specifically what he said about that.  It was

15   something, some reference to it that wasn't a

16   conclusive reference, so -- I think he may have --

17   I'm not sure he said anything, but he might have

18   said something to the effect that he might have

19   been a reviewer on the paper.  That's all I know.

20           MR. CAMPBELL-HARRIS:  I think those are

21   all the questions I have.  I'll pass it off to

22   other counsel.

23           MR. LAPINING:  Hi, Dr. Alford.  My name

24   is Chris Lapining.  I represent the League of

25   Women Voters Plaintiffs and we actually have no

1    further questions for you, so I think I'll pass it

2    on to whoever is next.

3              It might be time for cross-examination

4    or redirect, I'm sorry, if I'm not mistaken.

5              MR. PRATT:  Understood.  So it looks

6    like Plaintiffs are done with their questioning.

7    So, Dr. Alford, it's good to see you again today.

8    Thank you so much for your time.

9              THE WITNESS:  Right.  I would like to

10   say on the record that I really appreciate the

11   civility of the attorneys in this process.  I'm

12   always telling people that attorneys are actually

13   much more civil people than people give them

14   credit for, sometimes, and so -- I am big fan and

15   promoter of civility in government and politics,

16   and both of you are great examples of that

17   civility, so I appreciate that very much.

18             MR. PRATT:  Thank you, sir.  Definitely

19   appreciate my colleagues on the other side as

20   well.

21             But to wrap things up, I actually don't

22   have any questions for you today, so we'll try to

23   keep this short and sweet.

24             At this time, Ms. Hart, we have now

25   completed the deposition.  Mr. Alford will read

1    and not waive, and we would like to order a copy

2    of the transcript for the Secretary, but just your

3    normal process of when you have it ready.

4              MR. CAMPBELL-HARRIS:  Also, I just want

5    to say for the record also thank you for the

6    civility.  But, Josh, we are going to submit a

7    request for any documents and materials exchanged

8    between Dr. Stein and Dr. Alford after he's done a

9    search of his inbox and phone records.  And you'll

10   receive a written correspondence, but I just want

11   to give you notice of that.

12             MR. PRATT:  Understood.  And will that

13   request be for communications between them that

14   exclude drafts of reports?

15             MR. CAMPBELL-HARRIS:  I believe so, yes.

16   Nothing privileged.

17             MR. PRATT:  Thank you.

18             MS. O'DONNELL:  And on behalf of NAACP

19   Plaintiffs, first, we just want to join in saying

20   thank you so much, Dr. Alford, for your time and

21   for your cooperation.  We appreciate it.

22             We also want to join the ACLU in that

23   request, and again, we'll be providing that in

24   written notice.

25             Also pending the receipt of that

1  additional discovery, we think it would be

2  appropriate to keep the deposition open at this

3  time.

4            MR. PRATT:  Understood.  And we

5  respectfully disagree and would object to it

6  remaining open, the deposition, but understand

7  your position.  And we're happy to communicate

8  with you offline.

9            MS. O'DONNELL:  Great.  Thanks so much.

10 There's nothing else from NAACP Plaintiffs on that

11 point.

12           MR. PRATT:  Well, Ms. Hart, you have the

13 Secretary's order for the transcript.

14           MS. O'DONNELL:  NAACP Plaintiffs will

15 take a copy as well.

16           (Off the record at 4:07 p.m.)

17

18

19

20

21

22

23

24

25

1          ACKNOWLEDGMENT OF DEPONENT

2     I, John Richard Alford, Ph.D., do hereby

3  acknowledge that I have read and examined the

4  foregoing testimony, and the same is a true,

5  correct and complete transcription of the

6  testimony given by me, and any corrections appear

7  on the attached Errata sheet signed by me.

8

9

10  _____     _____

11        (DATE)                      (SIGNATURE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              CERTIFICATE OF SHORTHAND REPORTER

2         I, Dawn M. Hart, the officer before whom the

3    foregoing deposition was taken, do hereby certify

4    that the foregoing transcript is a true and

5    correct record of the testimony given; that said

6    testimony was taken by me stenographically and

7    thereafter reduced to typewriting under my

8    direction; that reading and signing was not

9    waived; and that I am neither counsel for, related

10   to, nor employed by any of the parties to this

11   case and have no interest, financial or otherwise,

12   in its outcome.

13         IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 9th day

15   of January, 2024.

16   My commission expires:

17   January 2, 2025

18

19

20   _____

21   NOTARY IN AND FOR THE

22   STATE OF MARYLAND

23

24

25
```

| A | | | |
|---|---|---|---|

**abandon**
200:25
**ability**
56:11, 98:8,
100:1, 108:15,
109:23, 115:3,
117:15, 157:3
**able**
35:20, 42:10,
68:25, 69:19,
73:18, 74:3,
105:19, 108:19,
110:1, 132:16,
141:11, 187:6,
230:14
**above**
72:12, 126:1,
208:24
**absence**
79:21
**absolute**
209:16
**absolutely**
233:12
**absorbed**
157:13
**academic**
47:12, 61:25,
66:10, 67:5,
67:8, 67:10,
70:15, 99:3,
198:16, 224:12
**academics**
23:14, 70:14,
70:17, 120:9,
188:24
**accept**
56:25, 199:23
**accepted**
81:20, 155:9,
156:12
**accepting**
42:17, 56:18,
132:15
**access**
19:15, 21:24,

98:8, 108:23,
111:21, 137:19
**accessible**
136:15
**according**
73:13, 73:24,
81:6, 100:19,
102:3, 104:4
**account**
50:5, 61:24,
69:15, 90:9,
115:10, 131:16,
148:16, 150:2,
205:9
**accounted**
128:14
**accounting**
13:7
**accounts**
147:15, 148:12
**accuracy**
38:17, 176:18
**accurate**
26:3, 33:17,
42:11, 67:13,
74:1, 74:4,
82:8, 177:22,
179:10, 188:18,
222:11
**accurately**
9:17, 174:19
**acknowledge**
68:3, 74:22,
109:21, 110:12,
246:3
**acknowledgment**
246:1
**aclu**
4:18, 171:12,
244:22
**across**
65:1, 81:10,
84:11, 93:3,
146:21
**act**
64:18
**acting**
164:11

**action**
103:18
**active**
32:13, 103:6
**activity**
63:17, 69:25
**actor**
211:10
**actors**
77:14
**actual**
13:24, 17:13,
39:16, 40:1,
48:11, 52:19,
64:10, 66:8,
68:11, 68:12,
70:21, 72:5,
82:17, 86:9,
92:1, 95:14,
95:20, 105:24,
109:6, 121:20,
122:2, 122:3,
122:6, 122:17,
130:8, 130:9,
131:11, 132:12,
134:10, 144:5,
157:9, 157:10,
167:1, 169:3,
180:24, 181:8,
183:15, 185:11,
187:10, 189:19,
193:16, 194:22,
198:6, 207:19,
225:10
**actually**
32:18, 36:8,
52:23, 58:7,
65:3, 68:8,
68:18, 68:20,
69:2, 72:14,
77:10, 78:17,
82:3, 82:9,
84:25, 87:5,
90:18, 90:20,
91:24, 97:19,
97:25, 99:17,
101:22, 104:13,
111:20, 114:16,

116:25, 118:17,
133:24, 133:25,
134:5, 134:20,
138:16, 144:8,
146:10, 151:21,
157:20, 158:21,
173:12, 189:13,
190:2, 190:21,
194:7, 195:20,
196:6, 200:17,
203:24, 204:4,
205:19, 208:6,
210:16, 216:2,
218:19, 230:9,
230:13, 230:14,
232:24, 238:22,
242:25, 243:12,
243:21
**add**
27:18, 42:1,
93:9
**added**
56:8, 201:4,
215:24
**adding**
43:23, 216:1
**addition**
168:23, 208:23,
216:7
**additional**
14:19, 139:6,
177:5, 245:1
**address**
12:5, 44:20,
45:7, 45:8,
55:6, 72:5,
75:1, 82:16,
87:17, 89:5,
90:3, 90:10,
90:12, 101:7,
117:13, 175:10,
198:1, 200:10,
218:1, 221:10,
225:19
**addressed**
65:20, 125:5,
146:25, 196:20
**addressing**
24:19, 44:10,

83:11, 90:8,
146:16, 146:17,
196:17
**adds**
53:16, 101:12
**adduce**
47:17, 47:19
**adequacy**
107:24, 123:6
**adequate**
107:2
**administration**
226:5, 231:25
**administrative**
172:14, 185:3
**adoption**
116:3, 116:4,
125:14, 187:25,
188:11, 192:8
**advance**
23:12, 185:4,
185:10, 208:25
**advanced**
210:24
**advancing**
153:8
**advantage**
20:21, 137:21
**affect**
63:24, 64:22,
64:23, 64:24,
77:22, 78:5,
101:8, 163:8,
163:18, 163:19,
168:8, 191:1,
231:12
**affected**
74:19, 75:2,
76:5, 76:10,
76:16, 185:12,
218:13
**affecting**
115:3, 134:9,
163:9
**affects**
64:17, 65:19,
76:7, 95:10,
163:12, 163:13

**affiliated**
147:13
**affiliation**
148:12, 148:15,
149:14, 150:22,
151:7, 151:8
**affirmed**
6:3
**affixed**
247:14
**african**
191:22, 193:3,
193:11, 193:18,
194:10, 194:17,
195:9, 195:12,
195:16, 195:25,
196:7, 199:19,
200:3, 202:10
**after**
15:21, 35:6,
45:9, 61:9,
73:3, 84:4,
84:25, 108:20,
109:12, 111:25,
116:3, 128:17,
131:16, 131:17,
140:16, 144:25,
150:21, 183:24,
187:24, 188:11,
192:8, 207:2,
207:8, 207:11,
207:24, 222:23,
225:1, 225:4,
225:10, 226:12,
235:21, 237:15,
244:8
**afternoon**
164:19, 171:7,
171:9
**against**
115:22, 176:18
**age**
90:2, 106:24,
108:4, 109:2,
109:12, 110:18,
113:11, 113:13,
115:23, 116:1,
116:6, 116:9,

116:11, 125:13,
126:3, 149:10,
149:12, 163:8,
185:25
**agencies**
66:15
**agency**
185:3
**agendas**
48:6
**agents**
168:3
**aggregate**
56:2, 135:11,
144:13
**ago**
6:25, 18:5,
73:3, 83:10,
198:15, 222:25
**agree**
53:19, 53:23,
70:14, 74:6,
79:1, 81:18,
82:7, 82:22,
84:6, 84:18,
92:18, 95:25,
99:1, 103:22,
104:4, 105:3,
111:7, 111:8,
112:11, 117:3,
119:3, 119:9,
119:10, 120:2,
121:13, 124:23,
125:18, 127:13,
137:23, 138:22,
140:23, 140:24,
148:6, 150:9,
151:10, 154:23,
157:25, 158:7,
158:10, 159:6,
160:4, 160:12,
166:18, 168:23,
171:15, 173:8,
181:10, 181:25,
182:21, 184:20,
188:2, 188:4,
195:7, 196:23,
205:22, 205:23,

207:6, 207:22,
214:15, 233:11,
234:23
**agreed**
24:1, 112:1,
113:25, 171:16
**agreeing**
102:10
**agreement**
35:25, 45:1,
48:8
**ahead**
62:23, 206:9
**aid**
123:11
**aim**
169:10
**airline**
167:3, 167:13,
168:16, 169:4
**airlines**
167:4, 167:5
**airplane**
32:23
**airport**
168:3
**aisle**
167:25
**al**
1:6, 1:11
**alford**
1:15, 5:2, 5:7,
6:2, 6:10, 6:16,
9:25, 16:17,
26:18, 60:10,
153:1, 164:21,
167:10, 171:7,
172:2, 172:6,
173:12, 174:12,
220:18, 232:9,
232:21, 234:5,
234:11, 235:4,
235:11, 242:23,
243:7, 243:25,
244:8, 244:20,
246:2
**alford's**
173:1

alicea
4:22
allege
47:5
alleging
47:3
allow
47:10, 110:11,
160:10, 168:3,
194:6
allowances
186:8
allowed
173:5
allows
155:5
almost
7:20, 80:22,
152:17, 153:20,
154:14
along
35:17, 173:23
aloud
191:13
already
15:22, 28:1,
43:12, 43:15,
44:18, 60:14,
75:7, 75:18,
78:10, 118:5,
144:10, 174:10,
213:1, 224:8,
237:22, 240:16,
240:22
also
28:21, 29:5,
30:1, 38:8,
62:13, 71:6,
76:1, 84:8,
86:13, 91:20,
98:21, 109:9,
128:10, 136:19,
139:4, 148:22,
155:14, 172:4,
182:21, 209:17,
216:9, 229:6,
234:18, 244:4,
244:5, 244:22,

244:25
alternative
182:7
alternatives
111:9
although
29:18, 78:7,
87:23, 102:9,
224:14
altogether
200:25
always
110:5, 153:20,
154:9, 154:12,
154:14, 161:9,
166:22, 167:6,
169:9, 178:19,
228:14, 243:12
american
2:4, 3:10,
29:7, 29:14,
30:1, 171:3,
191:23, 193:3,
193:19, 194:17,
195:10, 195:12,
195:16, 195:25,
213:8
americans
193:11, 194:10,
196:7, 199:19,
200:4, 202:11
among
65:22, 69:21,
90:22, 126:19,
135:14, 136:1,
136:5, 137:6,
139:9, 139:10,
141:23, 141:24,
146:3, 146:23,
146:25, 147:16,
148:14, 148:16,
181:22, 181:23,
186:2, 186:12,
187:24, 188:10,
192:7, 230:11
amongst
136:1, 137:5
amount
169:6, 195:15,

195:21
amounts
43:15, 137:9
analyses
34:3, 170:19
analyst
161:8
analytical
83:6, 144:3
analytically
144:1
analyze
99:2, 164:22
analyzing
46:12, 98:24,
140:8, 198:16,
227:11
anchoring
211:13
anonymous
188:25
another
79:6, 80:7,
91:4, 116:11,
138:1, 165:6,
172:13, 204:23,
219:15
answer
6:17, 8:10,
8:20, 8:25, 9:1,
17:16, 54:23,
66:7, 118:16,
173:10, 196:20,
217:9, 218:24
answered
168:22, 196:21
answering
9:13, 10:25,
198:13
answers
153:3
anticipate
185:11
anticipated
93:7
anybody
46:19, 137:2,
167:8, 202:11

anyone
12:19, 15:16,
17:9, 17:15,
23:9, 23:11
anything
8:11, 14:13,
14:18, 14:24,
16:24, 24:12,
27:17, 27:18,
27:20, 31:5,
31:11, 40:11,
41:2, 42:1,
49:17, 51:24,
51:25, 53:16,
55:5, 58:11,
59:22, 78:6,
80:9, 85:14,
89:6, 93:9,
98:14, 119:8,
134:7, 170:5,
173:7, 175:2,
175:10, 184:23,
189:15, 192:12,
210:10, 213:2,
216:12, 216:13,
217:1, 217:4,
219:18, 219:21,
219:24, 224:22,
235:25, 238:10,
242:17
anyway
102:18, 130:14
anyways
8:4
anywhere
75:15, 95:23,
130:13, 143:16,
223:23
apart
10:10, 15:17,
17:10, 25:9,
28:10, 30:20,
32:7, 34:5,
78:10, 130:13,
130:14
apologies
62:22
apologize
23:12

apparently
127:6, 142:11
appear
74:5, 246:6
appears
206:17, 206:19
appendix
27:6
application
159:14, 159:17,
163:3, 163:5
applications
147:12
applied
144:6
apply
51:4, 51:5,
171:18, 233:6
appreciate
167:15, 220:17,
243:10, 243:17,
243:19, 244:21
approach
144:3
approached
144:2, 175:17
approaching
51:18
appropriate
46:5, 48:18,
87:6, 98:2,
107:4, 108:2,
108:8, 109:17,
110:24, 110:25,
111:1, 111:3,
111:4, 112:2,
123:16, 132:5,
212:7, 245:2
appropriately
109:19, 110:10,
155:4, 177:17,
199:1
appropriateness
34:24
approximately
11:12, 80:25,
172:10
area
7:4, 19:5,

19:21, 20:17,
22:7, 30:15,
31:4, 38:13,
38:15, 47:9,
48:13, 48:19,
55:8, 59:21,
66:4, 66:23,
67:9, 71:19,
95:23, 98:18,
98:21, 111:6,
111:19, 155:15,
156:1, 156:23,
160:20, 162:5,
162:7, 168:1,
173:21, 189:12,
214:13, 217:12,
217:19, 218:6,
226:13, 226:15,
226:25, 227:2,
227:15, 227:17,
227:24, 228:17,
228:25, 234:3
areas
20:1, 20:14,
22:2, 23:6,
66:2, 155:20,
162:8, 169:2,
170:16
aren't
67:23, 134:17
argument
136:20, 177:18
arguments
210:15
around
18:24, 54:20,
103:21, 129:14,
174:25, 201:15
article
10:3, 14:15,
15:4, 16:18,
24:24, 25:14,
71:3, 71:4,
71:5, 132:3,
140:20, 140:21,
142:16, 143:3,
143:9, 143:13,
178:12, 189:23,

190:2, 190:3,
196:18, 196:19,
197:4, 197:6,
197:10, 197:13,
197:22, 197:23,
198:5, 198:10,
198:11, 198:16,
199:11, 199:24,
200:12, 204:24,
205:5, 205:8,
205:15, 205:17,
205:24, 206:6,
209:14, 209:19,
209:20, 210:9,
226:9, 237:20
articles
54:7, 59:18,
206:1, 227:23
artificial
132:13
ascertain
194:6
ascribed
52:13
aside
83:5, 123:23,
215:17
asked
11:5, 11:19,
22:1, 23:21,
24:18, 34:6,
45:6, 93:23,
108:12, 113:24,
118:20, 119:8,
175:1, 175:3,
190:19, 220:14,
223:19, 224:2,
224:6, 225:3
asking
98:12, 108:10,
108:13, 143:25,
232:11
assembled
177:17
assert
154:12, 154:13,
172:1, 212:7,
232:19

asserted
232:14, 233:4
asserting
89:1, 114:7,
125:22, 155:8,
194:7
assertion
125:18, 170:13,
196:3
assertions
39:12, 39:23,
40:9, 41:18,
120:13, 148:7,
153:8, 212:15,
212:18
asserts
40:12
assess
38:17, 42:15,
45:15, 54:4,
58:24, 68:5,
68:22, 92:23,
107:24, 114:15,
161:7, 161:9,
161:10
assessed
115:4, 176:3
assessing
12:7, 45:11,
45:12, 48:10,
49:7, 50:3,
52:6, 52:10,
53:25, 56:20,
57:9, 58:12,
83:16, 100:24,
101:1, 101:17,
111:10, 144:18,
177:23, 180:5,
215:22
assessment
40:5, 41:20,
53:11, 57:6,
58:19, 64:10,
69:15, 70:3,
83:15, 83:16,
86:19, 87:6,
94:25, 101:20,
159:24, 161:19,

177:18, 187:13,
200:16, 209:14,
209:15
**assessments**
55:24, 162:17
**assign**
59:4
**assigned**
123:14
**assignment**
220:15
**assistance**
46:13, 158:11
**associate**
141:11
**associated**
80:24, 81:7,
148:19, 150:10,
158:5, 158:7,
158:9, 163:21,
219:9
**association**
154:17
**assume**
8:20, 60:24,
112:25, 132:5,
156:3
**assumed**
155:16, 156:9
**assumes**
67:15, 96:6
**assuming**
66:17, 95:9,
155:16
**assumption**
67:20, 67:21,
76:15, 76:19,
76:20, 95:16,
130:21, 130:24,
157:15
**assumptions**
62:25, 63:1,
87:5, 95:9,
156:6, 163:14,
163:16
**assure**
167:23
**attached**
5:6, 26:12,

37:5, 60:18,
72:20, 179:13,
188:16, 222:9,
246:7
**attack**
230:12
**attempt**
49:13, 70:11,
160:23, 200:14
**attention**
61:14, 184:14,
189:22, 190:19,
195:7, 201:20
**attitudes**
20:13, 55:25
**attorney**
3:14, 8:23,
9:1, 9:5, 9:8,
22:18, 22:22,
171:12
**attorneys**
11:4, 11:10,
11:22, 15:17,
17:10, 236:4,
236:14, 237:15,
243:11, 243:12
**attributable**
26:5, 85:8,
120:4, 120:7,
190:11, 214:18,
221:23
**attribute**
134:8, 141:25,
155:24, 208:15,
208:17, 208:19
**attributed**
120:10
**attributing**
85:17
**attribution**
120:7
**august**
80:20, 80:23,
84:2, 84:17,
113:5, 144:20,
145:7, 206:24
**austin**
7:1

**authenticate**
131:8
**author**
24:4, 201:9,
201:15
**author's**
203:5
**authored**
25:8, 119:11,
124:8
**authors**
23:21, 74:21,
93:25, 94:6,
201:2, 201:10,
201:13, 205:1,
205:3
**authorship**
23:13, 120:8
**automatically**
52:13, 205:15
**availability**
109:6, 109:8,
109:22
**available**
43:16, 58:25,
92:15, 109:16,
109:18, 109:20,
110:15, 112:16,
112:20, 116:13,
126:4, 136:15,
137:24, 143:16,
144:9, 179:17,
236:6
**avenue**
2:16, 4:8, 4:11
**aware**
37:17, 47:2,
47:5, 56:18,
83:22, 109:1,
109:4, 109:11,
109:14, 166:2,
166:12, 168:13,
198:13, 205:7,
221:1, 241:15,
241:16
**away**
10:17, 10:20,
97:19, 224:19

**awhile**
17:4, 18:19
**awkward**
35:1

---
**B**
---

**back**
7:23, 13:7,
15:2, 15:4,
22:14, 29:4,
31:25, 33:23,
33:25, 38:25,
60:8, 61:17,
61:19, 70:23,
73:5, 73:11,
82:11, 83:1,
87:12, 92:6,
96:13, 96:22,
107:25, 112:6,
115:5, 115:16,
125:2, 125:7,
125:20, 128:1,
129:19, 131:4,
135:5, 147:2,
152:4, 176:24,
191:8, 198:9,
198:20, 199:22,
210:19, 211:2,
212:3, 212:12,
212:17, 214:2,
221:14, 232:5,
233:14, 233:22,
233:24, 235:16,
238:9, 239:9,
240:1, 242:7
**back-and-forth**
25:21, 236:11,
236:19
**backed**
40:22
**background**
168:12, 180:8,
206:20
**backing**
57:1
**bad**
77:13
**baggage**
168:6

balance
204:6
ballot
77:16, 77:17,
77:18, 108:23,
169:7
ballots
64:20
bar
68:15
baran
3:5
barrel
19:16
barrier
228:6
barriers
213:7
base
58:18, 89:14
based
32:10, 38:23,
40:7, 40:13,
41:11, 43:2,
49:19, 55:24,
61:25, 62:25,
63:1, 63:13,
64:10, 64:11,
66:19, 68:18,
70:24, 71:7,
88:23, 95:16,
98:6, 98:8,
100:4, 113:5,
118:12, 125:24,
127:10, 129:3,
132:14, 145:6,
145:8, 161:17,
206:17
baseline
87:1, 111:23
basic
174:25
basically
12:7, 21:6,
23:24, 37:14,
63:5, 66:16,
79:22, 86:2,
86:6, 95:3,

97:17, 117:12,
119:20, 142:3,
149:9, 176:10
basis
29:2, 39:22,
42:22, 51:13,
56:24, 75:24,
78:6, 90:18,
111:8, 113:18,
149:19, 162:23,
189:14, 202:12
beach
4:3, 4:5
bear
47:21, 48:12,
49:12, 161:23
became
240:19
because
11:25, 12:18,
23:13, 35:8,
36:3, 40:12,
41:4, 41:13,
51:23, 52:2,
53:13, 54:21,
54:22, 56:17,
58:1, 61:12,
64:16, 67:14,
68:22, 69:16,
69:21, 77:2,
77:25, 80:5,
80:6, 84:19,
85:15, 88:9,
89:6, 91:18,
95:8, 102:14,
108:9, 117:12,
122:7, 127:7,
127:10, 128:5,
128:6, 128:11,
133:22, 133:23,
135:1, 136:7,
137:14, 139:17,
142:17, 142:22,
152:10, 153:25,
155:4, 159:25,
161:7, 161:15,
163:24, 168:5,
169:6, 169:11,

180:13, 189:11,
189:18, 195:14,
195:19, 198:14,
201:20, 202:6,
202:18, 202:21,
203:16, 204:16,
205:3, 207:25,
215:11, 217:18,
230:1, 230:16,
240:16, 241:14
become
23:3, 138:11,
167:4, 213:14,
240:18
becomes
137:24
befall
200:3
before
2:1, 6:18, 8:3,
8:9, 9:14,
22:12, 35:11,
36:22, 84:25,
108:19, 111:25,
114:8, 116:4,
120:23, 127:8,
145:1, 171:15,
172:12, 173:13,
184:11, 189:13,
189:16, 198:25,
207:2, 207:8,
207:11, 207:24,
213:4, 221:18,
247:2
begin
171:15, 171:21,
178:24
beginning
24:16, 27:4,
71:3, 132:22
beginnings
121:2
behalf
2:4, 2:12, 3:2,
3:10, 171:3,
231:23, 244:18
behavior
21:5, 28:13,

28:21, 28:24,
29:13, 29:18,
29:25, 55:18,
66:20, 66:23,
67:11, 67:12,
67:17, 71:21,
77:23, 95:23,
96:7, 99:5,
154:17, 156:2,
157:6, 159:25,
160:1, 163:1,
163:18, 186:8,
186:9, 211:12,
227:24
behavioral
95:18, 160:2
behaviors
20:13, 21:7,
29:8, 70:16
behind
30:13
being
6:3, 24:2,
31:1, 31:2,
32:19, 40:19,
40:21, 42:17,
47:20, 53:2,
59:9, 63:3,
63:11, 64:5,
64:8, 65:20,
67:15, 67:23,
68:2, 68:14,
68:17, 68:25,
77:13, 77:14,
80:23, 84:2,
86:22, 101:11,
102:22, 103:7,
108:11, 111:7,
111:11, 111:12,
115:4, 128:14,
151:3, 151:4,
151:15, 151:16,
153:21, 154:3,
154:15, 154:23,
154:24, 155:3,
155:6, 157:11,
157:15, 161:2,
163:22, 168:20,

172:14, 173:2,
190:25, 195:13,
200:18, 208:5,
208:8, 208:13,
209:2, 210:23,
212:10, 212:19,
230:17, 235:13,
238:2
**belief**
223:16
**believe**
40:10, 47:4,
52:5, 55:11,
62:17, 77:2,
87:5, 96:24,
97:3, 97:15,
113:9, 117:18,
118:6, 120:3,
121:21, 131:20,
165:2, 168:22,
168:24, 178:6,
178:24, 188:6,
202:18, 205:18,
218:3, 220:7,
236:2, 244:15
**believed**
203:24
**believing**
224:22
**below**
62:8, 187:16,
215:4, 215:18
**ben**
4:3
**beneficial**
122:17
**benefit**
159:16, 159:19,
209:1
**benefits**
96:2, 165:17,
165:20
**bennington**
4:25
**berinsky**
220:13
**besides**
213:2, 222:21,

238:14, 239:16
**best**
56:11
**better**
59:8, 98:12,
98:18, 110:3,
125:5, 217:11,
224:10, 230:9
**between**
16:5, 31:1,
83:9, 84:16,
84:24, 86:6,
115:25, 126:16,
130:18, 130:25,
131:1, 164:10,
164:11, 172:2,
198:8, 201:11,
217:3, 232:17,
234:11, 235:4,
238:16, 239:2,
242:5, 244:8,
244:13
**beyond**
41:6, 53:17,
119:25, 166:14,
166:16, 170:16,
199:3, 215:4,
217:14
**bias**
52:25
**biased**
48:24
**big**
52:15, 131:4,
199:10, 203:2,
218:6, 243:14
**bill**
140:8, 162:10,
164:7, 224:3
**biological**
20:12
**biology**
28:8, 29:11
**biopolitics**
28:11
**bit**
12:2, 15:15,
20:11, 28:2,

44:6, 51:17,
80:16, 210:3,
212:3, 214:8,
229:18
**black**
32:25, 49:10,
72:6, 76:3,
76:7, 76:9,
78:8, 78:13,
82:17, 82:24,
87:9, 88:7,
88:11, 88:20,
89:9, 90:23,
99:21, 100:19,
101:12, 102:4,
103:22, 106:11,
113:11, 114:15,
127:19, 132:24,
133:2, 133:3,
134:9, 134:11,
136:5, 136:8,
137:7, 146:3,
146:9, 146:16,
146:18, 146:23,
148:14, 148:16,
150:22, 151:3,
176:11, 180:25,
181:12, 181:22,
182:2
**blacks**
73:19, 74:8,
74:12, 105:20,
111:17, 113:23,
136:1, 137:6,
174:18, 175:20,
187:6, 187:15,
187:24, 188:10,
192:8, 198:8,
202:14, 203:12,
203:13, 204:10
**blowing**
167:5
**boards**
18:15
**bodies**
215:21, 229:1
**body**
53:8, 180:23

**bomb**
167:8
**bootstrap**
195:2
**borne**
154:18, 163:22,
163:24
**both**
10:4, 16:7,
17:21, 19:3,
20:16, 21:1,
29:8, 64:15,
66:13, 88:20,
105:3, 105:19,
119:19, 120:22,
129:14, 130:10,
132:19, 133:19,
137:8, 137:15,
141:21, 144:6,
149:4, 149:23,
155:25, 167:25,
172:4, 172:9,
177:15, 178:24,
184:1, 187:5,
201:8, 208:25,
215:12, 231:9,
240:1, 243:16
**bottom**
44:8, 144:12,
180:17, 187:2,
208:22, 210:19
**boulevard**
4:5
**bracketed**
82:5
**brain**
48:2
**branch**
21:18
**branches**
1:5
**break**
9:11, 9:14,
60:4, 115:13,
152:21, 152:24,
153:1, 153:4,
164:14, 222:4,
232:4, 233:1

brief
24:18, 123:10,
192:18, 192:21,
212:11, 233:24,
236:5, 236:23,
237:6, 237:25
briefer
15:8
briefing
14:2
briefings
13:25, 14:7
briefly
223:7, 237:2,
237:19
bring
29:20, 47:1,
163:10, 214:22
bringing
48:11, 49:12,
59:5
brings
199:22
broad
185:20, 211:7
broader
90:11, 93:15,
134:4
broadly
20:1, 21:4,
25:24, 43:11,
45:21, 121:13,
165:10, 173:2,
213:22, 218:10,
230:19
brought
18:4, 46:2,
46:3, 47:21,
101:16, 189:21,
190:19
budgeting
19:17
built
160:2
bulk
24:5, 25:6,
240:9, 240:12
bullet
87:13, 87:20,

87:23, 87:25,
89:11, 89:19,
89:21, 90:4,
90:24, 91:8,
91:14, 97:8,
115:19, 125:8,
125:15, 135:8,
135:9, 135:18,
135:19, 135:21,
147:3, 148:2,
148:6, 148:7,
241:1
bullets
87:23
burden
24:9, 92:21,
162:22, 220:10
burdens
213:8
busy
23:24, 24:10,
24:11
buttress
77:11
byrd
1:9, 2:6, 3:12,
171:5

**C**

calculate
181:18
calculated
83:7
calculation
121:20
calculations
81:19, 98:11,
170:22, 181:19
calendar
132:7
call
35:11, 49:3,
122:4, 236:5,
239:12, 240:15
called
58:15, 87:13
calls
9:7, 234:6

came
26:2, 106:7,
172:12, 177:7,
190:4, 197:2,
204:21
campaign
4:15, 157:10,
229:22
campaigns
157:12, 229:21
campbell-harris
3:13, 5:4,
171:6, 171:12,
232:3, 232:8,
233:10, 233:24,
234:10, 234:17,
234:22, 235:7,
235:10, 242:20,
244:4, 244:15
can't
9:16, 52:17,
56:14, 56:16,
64:13, 70:7,
95:15, 101:2,
109:19, 110:3,
113:1, 113:2,
119:15, 119:24,
120:9, 129:16,
131:8, 134:1,
134:18, 142:20,
150:15, 152:2,
163:4, 164:3,
166:14, 167:7,
169:16, 180:13,
183:17, 185:22,
208:15, 208:19,
217:14, 217:16,
217:17, 220:11,
236:25
candidates
229:8
cannot
52:19, 184:20
capability
228:18
capable
38:8, 38:9
capacity
1:10

cards
231:4
care
17:7
career
20:8, 226:13
careful
84:19, 153:11,
153:18, 199:9,
212:16
carefully
198:25
carrie
4:18
case
1:8, 2:6, 3:12,
7:2, 7:6, 11:13,
11:19, 11:23,
11:24, 14:1,
15:22, 17:9,
17:14, 21:17,
22:15, 22:22,
22:25, 23:5,
26:25, 29:18,
30:20, 31:13,
31:17, 32:7,
32:13, 32:15,
32:20, 33:5,
33:6, 34:5,
34:14, 34:17,
35:23, 37:7,
41:23, 47:3,
49:25, 50:9,
57:13, 60:25,
61:4, 61:10,
70:8, 70:10,
77:25, 89:3,
96:4, 118:14,
120:20, 121:6,
122:18, 123:24,
129:7, 133:8,
142:11, 148:21,
149:22, 154:25,
155:7, 155:14,
155:19, 156:9,
156:10, 171:5,
173:1, 173:19,
176:22, 177:24,

178:14, 184:14,
186:18, 188:3,
199:25, 225:6,
225:9, 230:4,
231:24, 232:15,
233:1, 233:8,
233:14, 234:2,
236:16, 238:16,
239:3, 239:6,
239:15, 247:11
**cases**
13:5, 18:18,
21:15, 21:17,
21:22, 27:21,
31:15, 33:11,
33:15, 34:2,
36:23, 42:5,
47:1, 205:25,
225:5, 225:24
**categories**
85:19, 85:20,
108:19
**category**
169:1
**caused**
86:13
**causing**
134:25
**cautioned**
161:9
**center**
4:15, 200:12
**centered**
19:13, 174:25
**centers**
21:24
**central**
87:17, 88:13,
88:23, 89:5,
90:3, 90:12
**certain**
37:22, 71:22,
113:2, 116:21,
185:22, 186:7,
186:8, 200:9,
223:14
**certainly**
12:16, 12:21,

14:12, 14:21,
17:11, 20:24,
23:15, 23:23,
24:4, 31:9,
36:21, 38:16,
47:8, 66:21,
66:24, 68:9,
69:15, 70:7,
71:2, 86:11,
96:8, 96:11,
109:4, 114:3,
114:20, 117:1,
117:6, 117:8,
132:9, 132:10,
133:8, 139:1,
145:13, 154:11,
161:20, 166:23,
178:8, 178:15,
183:9, 193:14,
202:3, 204:6,
215:4, 216:11,
217:1, 224:6
**certificate**
247:1
**certify**
247:3
**cetera**
43:5, 131:19,
131:20, 218:13
**ceteris**
153:25
**chain**
64:16, 65:4,
69:19, 70:5,
70:6, 92:4
**chains**
67:16, 72:16
**chair**
17:24
**challenge**
164:23, 165:14
**challenged**
165:17, 165:22
**challenges**
135:3
**challenging**
32:2, 42:19,
231:24

**chance**
55:5, 131:8
**change**
67:18, 85:25,
109:17, 110:7,
110:11, 124:13,
124:21, 128:12,
131:17, 134:19,
144:13, 157:4,
223:20
**changed**
20:10, 86:25,
132:6
**changes**
19:14, 66:1,
115:2, 131:24,
135:23, 143:19,
145:21, 161:24,
162:1, 162:3,
162:7, 163:17,
185:5, 207:19,
207:20, 223:15
**changing**
128:13
**characteristics**
101:23
**characterization**
160:5, 160:13
**characterize**
114:2, 144:8,
157:1, 187:20,
187:21
**characterizes**
182:6
**characterizing**
45:21
**charge**
163:25
**charged**
231:8
**chart**
132:3
**chat**
15:3, 15:5,
15:7, 15:8,
26:15
**chatted**
237:19

**check**
152:20
**checking**
176:17
**choice**
66:17, 103:6,
132:10, 145:17,
160:3, 203:5,
203:6
**choices**
145:16
**choose**
103:10, 103:12,
145:14, 161:23
**chooses**
103:13
**chose**
80:6, 121:18,
123:10, 194:14
**chosen**
157:6
**chris**
242:24
**christi**
4:24
**christina**
4:10
**christopher**
4:13
**circle**
233:14
**circling**
235:16
**circuit**
232:15
**circuit's**
224:20
**circulating**
237:16
**circumstance**
124:12
**circumstances**
19:25, 68:18
**circumstantial**
210:14
**citation**
189:10
**cite**
183:5

cited
183:11, 217:3,
220:3, 221:2,
221:10
cites
145:25, 146:8,
183:8, 183:9,
233:1
cities
18:14
citing
189:18
citizen
89:15, 90:2,
108:4, 109:2,
109:12, 110:17,
115:23, 116:1,
116:6, 116:9,
116:10, 125:13,
126:2, 229:6
citizens
97:24, 106:24,
108:18, 113:11,
113:13, 114:18,
117:15, 168:7,
180:21, 180:25,
182:16, 182:17,
182:19, 212:25,
213:9, 213:14,
213:24, 229:18
citizenship
109:5, 184:5,
184:10, 184:17,
241:13, 241:15,
241:23
citrus
4:7, 4:10
city
31:18
civil
2:4, 3:10,
171:4, 243:13
civility
243:11, 243:15,
243:17, 244:6
claim
43:11, 74:25,
81:14, 82:2,

82:9, 94:8,
110:8, 110:9,
174:16
claiming
106:4, 119:20
claims
39:13, 42:23,
43:2, 43:3,
43:7, 43:9,
43:25, 44:2,
47:7, 50:3,
56:20, 175:14
clarification
189:4
clarified
175:5
clarify
110:14
clarity
234:2
class
19:2
classes
18:22
clean
9:24, 9:25,
222:17
clear
26:23, 48:21,
63:9, 78:10,
79:17, 104:10,
106:6, 161:6,
185:7, 186:7,
193:1, 203:7,
215:19, 225:18,
228:14, 231:19,
232:15, 242:3
clear-cut
186:6
clearer
185:23
clearly
8:8, 95:22,
122:1, 124:8,
134:8, 197:7,
198:12
clerical
59:2

close
232:23
closed
10:13
closely
192:1, 199:20,
199:24
closer
131:9
co-plaintiffs
171:17
coauthor
23:16, 120:4
coauthored
17:17, 22:11,
23:9, 120:11,
120:18, 120:21,
121:5, 121:12,
206:1
coauthoring
23:10, 121:1
coauthors
121:10
coauthorship
120:17
coded
177:17
coefficient
147:20, 149:5,
149:6
coefficients
191:19
coffee
17:1
collaborative
239:22
colleague
11:9, 187:5,
214:10
colleagues
18:7, 172:7,
238:19, 243:19
collective
46:18, 48:7,
48:12, 95:21,
121:12, 204:25
collectively
205:2

combined
49:2, 240:5
combining
65:1
come
27:24, 45:3,
52:24, 70:23,
79:10, 163:11,
185:9, 231:10,
232:5
comes
38:14, 62:8,
96:20, 135:2,
154:4, 225:13
comfortable
36:17, 133:9,
178:16, 204:1
coming
159:11, 215:4,
222:20, 223:8
comment
38:17, 41:3,
46:8, 226:23
commentary
24:18, 24:23,
36:19, 47:18,
47:19, 49:23,
53:7, 54:14,
240:20
commented
75:6
commenting
41:5, 44:12,
44:13
comments
38:1, 41:4,
46:4, 57:20,
144:12
commission
247:16
committed
166:12
common
101:19, 138:11,
140:14, 166:23,
169:23, 181:21,
239:12
commonly
141:3

communicate
9:4, 239:15,
239:19, 241:5,
245:7
communicated
238:18
communication
241:20
communications
16:4, 16:8,
232:17, 234:4,
234:9, 234:11,
234:14, 235:4,
235:6, 244:13
comparable
125:13, 125:24,
136:2, 144:24
comparative
92:9, 92:13,
92:19, 94:11,
146:18
comparator
132:6, 132:9
compare
142:17
compared
80:23, 84:2,
85:4, 126:16,
126:19, 151:4,
151:7, 191:16
comparing
83:8, 124:20,
139:12, 144:19
comparison
83:9, 86:8,
128:1, 142:21,
143:15, 145:15
compatible
132:21, 135:22,
136:19, 199:7
compensated
12:9
compensatory
145:23
complaint
12:4, 13:20
complaints
14:9

complete
33:16, 160:11,
178:6, 246:5
completed
243:25
completely
9:16, 76:19,
85:11, 95:25,
134:24, 149:7,
197:19, 224:18,
224:19, 229:22
complex
67:25, 86:22,
157:14, 159:25
complexity
157:9
complicated
56:7, 127:25,
159:20, 231:17
compliment
155:3
compounds
66:17
compress
54:22
compressed
54:21, 178:8
computer
17:2
concept
123:1, 123:2
concerned
140:5
concerns
167:25, 177:9
conclude
73:19, 74:3,
75:22, 75:25,
105:20, 113:9,
113:10, 187:6,
202:12
concluded
113:17
concluding
200:1
conclusion
63:9, 63:13,
87:15, 97:20,

97:21, 106:20,
107:7, 107:9,
109:23, 111:15,
115:21, 116:20,
135:17, 180:20,
188:7, 192:5,
199:11, 203:25,
214:18
conclusions
34:25, 36:12,
41:16, 42:9,
42:16, 42:21,
71:20, 81:20,
111:11, 111:13,
111:15, 127:9,
127:13, 135:10,
151:11, 173:9,
177:3, 177:11,
180:19, 180:22,
185:8, 234:20
conclusive
242:16
condition
78:15, 105:12
conditional
153:11, 153:14,
155:4, 155:5,
212:16
conditions
115:20, 116:16,
116:23, 117:2,
117:6, 117:9,
117:19, 117:20,
117:23, 118:8,
118:18, 157:5,
208:12, 230:24
conduct
170:18
conducted
126:9, 147:9
conference
1:4
confidence
77:12, 195:2
confident
77:17, 83:4
confidential
173:5

confidently
186:22
confine
46:12
confined
99:24, 99:25
confirm
219:18, 221:15
confirmed
147:17
confounded
124:2, 124:18
confounding
200:11
confounds
200:8
confuse
101:4
congress
32:1
congressional
19:10, 20:9,
20:19, 20:23,
28:17, 32:2,
32:15
connect
68:20, 68:21,
72:15, 108:20
connected
52:19, 54:11,
93:14, 230:1
connecting
64:9
connection
64:8, 76:12,
78:25, 93:16
connective
211:8
consensus
219:5, 219:22
consequence
39:13, 87:10
consequences
58:5
consequential
169:9
conservative
182:9

consider
8:25, 23:18,
38:21, 46:10,
48:17, 57:15,
91:1, 108:7,
130:3, 227:16,
231:20
consideration
89:14
consistent
112:8, 126:17,
146:2, 219:6
constitutes
81:12
constraints
12:1, 178:10,
201:8
construct
64:11, 64:13,
99:15, 130:15
consult
226:16
consultation
16:3
consulted
33:15
consulting
18:19
consumers
185:14
contact
63:25, 173:23,
238:2, 238:21
contacted
11:4, 173:18
contained
184:5, 197:23
contains
39:23
contaminated
48:24
contention
110:23
contents
80:17, 121:14
contest
179:21, 180:11
contested
230:2

contesting
180:14
context
7:11, 7:16,
32:5, 65:8,
71:1, 71:13,
124:24, 125:3,
134:16, 231:6,
242:1
contexts
71:15
continue
80:15, 88:18,
150:13, 150:14,
187:2
continued
3:1, 4:1
continues
150:19
contract
11:17, 12:12
contrary
160:3
contrast
187:12
control
76:22, 90:17,
101:22, 132:9,
152:1, 159:17,
168:8
controlled
86:14, 90:14,
154:7
controlling
85:23, 150:21
controversial
48:5
conventions
59:20
conversation
15:9, 15:12,
15:17, 16:2,
16:7, 175:5,
235:20, 235:22,
236:3, 236:4,
237:6, 237:18,
237:21, 237:25,
241:2, 241:9,

241:11, 241:12,
241:18, 241:22
conversations
171:22, 172:2,
172:17, 172:21,
173:6, 173:11,
173:16, 232:22,
233:4, 233:7,
236:12, 236:13,
236:23, 237:12,
237:14, 238:6,
238:13, 239:17,
241:10
convince
169:16
convinced
77:8
convinces
43:19, 77:4
cooperation
244:21
coordinate
236:21
coordinated
121:11
copies
222:17
copy
9:24, 9:25,
13:19, 13:20,
26:24, 27:3,
38:10, 179:10,
179:15, 179:23,
188:19, 211:19,
222:11, 244:1,
245:15
cord
1:9
cornea
32:24
correct
17:19, 25:15,
26:24, 39:9,
42:18, 44:25,
47:4, 74:14,
80:2, 89:25,
103:25, 104:21,
106:15, 108:22,

112:17, 127:7,
158:15, 162:20,
165:4, 166:1,
170:11, 170:23,
172:7, 172:10,
174:5, 174:8,
175:16, 175:21,
179:5, 179:6,
183:7, 187:25,
188:6, 190:12,
205:20, 206:13,
206:14, 208:1,
219:17, 220:22,
221:21, 225:21,
226:1, 227:12,
227:13, 231:21,
231:22, 234:9,
234:10, 234:16,
234:17, 234:21,
240:7, 242:9,
246:5, 247:5
corrected
114:21, 114:22
correction
114:19
corrections
246:6
correctly
39:17, 44:16,
45:16, 72:8,
89:17, 91:6,
92:16, 135:15,
144:14, 148:2,
181:3, 187:18,
195:4, 206:1,
209:3, 219:13
correspondence
238:15, 239:2,
242:4, 244:10
corresponding
151:2
cost
71:18, 92:10,
92:11, 92:13,
93:3, 93:13,
139:13, 139:18,
139:24, 154:8,
154:17, 155:9,

155:11, 156:12,
156:15, 156:17,
158:17, 159:16,
159:18, 208:25,
211:12, 212:21,
212:24, 213:13,
218:11
**cost-benefit**
95:17, 152:5,
152:12, 153:9,
176:7, 210:20,
210:22, 211:9,
228:4
**costly**
94:15, 95:6,
95:11, 95:13,
147:24, 158:1,
158:3, 158:4,
159:3, 211:6
**costs**
74:20, 76:17,
78:23, 94:22,
95:1, 96:1,
96:5, 131:18,
139:6, 157:6,
158:5, 158:7,
158:9, 158:24,
161:20, 161:21,
163:1, 163:21,
164:2, 164:9,
169:12, 211:5,
211:23, 230:7
**could**
7:23, 23:14,
36:1, 36:17,
45:8, 48:21,
51:3, 51:4,
51:7, 56:10,
63:4, 64:11,
69:5, 76:1,
76:3, 78:16,
85:12, 98:17,
98:18, 120:17,
120:21, 122:25,
125:9, 127:2,
138:15, 139:1,
145:17, 145:22,
149:13, 153:9,

153:19, 153:23,
154:13, 154:22,
154:24, 160:24,
161:4, 161:17,
162:11, 162:13,
175:6, 175:12,
178:16, 184:11,
186:21, 200:9,
204:1, 207:10,
207:16, 208:13,
209:1, 210:22,
211:6, 217:15,
218:5, 238:7
**couldn't**
7:24, 70:8,
121:4, 207:15,
207:18
**council**
31:18, 50:10,
50:16, 50:17,
50:18
**counsel**
4:14, 6:7,
14:14, 16:3,
16:7, 16:9,
26:13, 34:23,
35:2, 36:10,
44:23, 45:2,
152:18, 171:3,
171:17, 171:23,
172:3, 172:18,
172:23, 173:3,
175:17, 176:21,
177:4, 232:16,
233:5, 233:7,
233:11, 234:5,
234:9, 234:12,
235:5, 235:18,
235:22, 236:18,
240:7, 240:15,
241:3, 242:22,
247:9
**counsel's**
35:22
**counter**
123:5
**countered**
150:15

**countering**
81:14
**counters**
82:2
**counts**
106:22, 106:23,
195:1
**county**
3:19, 4:3,
102:19
**couple**
6:25, 7:19,
131:12, 200:10,
223:4, 223:6,
235:12, 237:22
**course**
19:4, 19:9,
28:7, 28:8,
28:12, 28:13,
28:16, 28:19,
29:7, 29:11,
29:12, 29:14,
29:19, 29:24,
88:8, 128:6,
173:7
**courses**
18:20, 18:23,
18:24, 28:5,
28:10, 29:15,
226:6, 227:6
**court**
1:1, 8:6, 8:15,
9:6, 32:10,
32:18, 35:16,
38:9, 43:16,
45:14, 49:17,
49:18, 50:13,
50:22, 51:2,
51:13, 51:15,
51:20, 52:22,
53:8, 53:14,
55:10, 56:6,
56:10, 57:6,
57:7, 57:14,
58:12, 58:15,
58:18, 58:24,
58:25, 59:1,
107:18, 198:17,

229:17, 229:18
**court's**
53:4, 53:16
**courthouse**
102:19
**courts**
38:14, 50:3,
56:18, 156:11,
156:14
**cover**
164:1, 164:3,
174:24, 222:14,
228:8
**covered**
170:16, 173:2,
237:8
**covid**
54:21
**crazy**
239:23
**create**
207:7, 207:23,
213:7
**creates**
162:2
**creating**
208:3, 208:11
**credence**
205:16
**credit**
106:4, 119:19,
153:16, 243:14
**critical**
117:6, 117:8,
178:4
**criticism**
46:22, 90:10,
90:11, 122:9
**criticize**
177:25
**criticizes**
122:7
**criticizing**
127:6, 212:4
**critique**
125:22, 126:10,
189:8
**critiques**
127:11, 223:10

cross-examination
243:3
crr
1:25, 2:2
cup
17:1
curating
44:2, 46:21,
46:22
curious
227:18
current
12:12, 34:5,
197:20, 238:4
currently
21:18, 180:9,
213:16
curtail
69:25
curtailed
200:5
cut
32:24, 43:17
cutting
24:7
cv
27:9, 27:13,
27:14, 27:18,
33:14
cvap
90:3, 112:7,
112:12, 112:15,
112:20, 112:23,
113:5, 114:3,
115:10, 126:3,
126:5, 126:6
cycle
54:20
cycles
18:25, 144:23

D

daily
206:20, 206:22
dale
4:7
dashed
195:1, 195:3

data
13:21, 14:10,
41:23, 42:4,
49:12, 86:3,
86:17, 86:18,
86:19, 90:2,
109:1, 109:5,
109:11, 109:16,
109:18, 109:20,
110:15, 112:12,
112:20, 124:13,
124:14, 124:15,
126:4, 126:5,
127:15, 128:3,
128:14, 128:15,
132:4, 133:12,
139:12, 139:23,
140:4, 142:12,
145:20, 176:14,
176:16, 176:19,
176:22, 177:5,
177:6, 177:10,
177:13, 177:16,
178:1, 178:2,
181:11, 181:25,
182:22, 193:16,
195:16, 195:22,
200:14, 204:12
date
11:5, 11:17,
60:21, 83:23,
207:11, 207:12,
246:11
dates
206:23
dawn
1:25, 2:1,
247:2
day
53:21, 247:14
days
168:1
dayton
3:13, 171:11
dc
2:10, 2:17,
4:17
dead
70:10

deadline
224:7, 224:16,
225:2, 225:11
deadlines
224:10, 224:11,
225:5
deal
68:14, 224:11,
228:17
dealing
167:22, 224:10
debate
46:17
decade
28:16, 29:10,
33:8, 33:19,
33:23, 34:4,
224:21
decades
7:19, 31:25,
227:3
decide
10:22, 55:4,
56:16
decided
44:19, 229:1
decides
102:2, 201:12
decision
36:15, 44:24,
49:19, 58:16,
204:20
decision-making
48:2, 53:16
decisions
66:18, 95:22,
205:9, 229:3
decline
86:1, 116:5,
116:9, 127:22,
129:5, 129:6,
132:19, 133:3,
136:4, 136:5,
136:23, 137:4,
137:5, 137:20,
141:24, 142:3,
202:10, 202:19,
202:21

declined
133:4, 136:8,
138:19
declines
91:2, 136:1,
141:21, 141:23
declining
137:16, 202:25
deduce
47:17, 48:25,
50:24
deem
129:8
defendant
3:2
defendant's
34:23
defendants
1:12
defense
35:22, 164:23,
175:17, 176:21,
177:4
define
65:7
defining
65:5
definitely
213:19, 233:5,
243:18
definition
78:24, 119:7
degree
52:25, 90:19,
92:23, 151:22,
218:20, 218:21,
226:5, 226:6
deliberate
144:21
deliver
159:13
delivered
77:11
delivery
161:3
delmarie
4:22
demand
154:9

**democratic**
29:23, 32:1,
147:10, 147:15,
151:6, 192:1,
199:21, 199:25
**democrats**
149:21, 149:23
**demonstrably**
123:25
**demonstrate**
73:14, 78:18,
104:18, 105:9,
105:10, 115:24,
121:23, 122:22,
139:2, 147:4,
184:1
**demonstrated**
77:24, 78:17,
92:24, 96:11,
96:14, 117:3,
117:4, 139:11,
149:15, 156:4,
180:24, 181:8,
183:15, 199:15,
223:14
**demonstrates**
69:5, 121:23,
199:8
**demonstrating**
197:7
**demonstration**
96:17, 200:18
**department**
17:21, 17:24,
148:1, 181:12,
182:1, 182:22
**dependent**
98:2
**depends**
99:9, 100:24,
100:25, 101:24,
110:9, 151:13,
166:21
**depicting**
206:15
**depiction**
203:17
**deponent**
246:1

**deposed**
6:18, 6:21,
6:24, 6:25, 7:9,
7:13, 8:3,
32:17, 32:19,
33:5
**deposition**
1:14, 5:7, 8:2,
15:1, 15:22,
15:25, 16:11,
16:19, 16:25,
33:1, 34:13,
61:16, 73:6,
171:24, 172:5,
172:19, 172:24,
174:4, 222:13,
232:20, 232:23,
235:18, 235:21,
235:25, 236:3,
236:8, 236:12,
236:16, 243:25,
245:2, 245:6,
247:3
**depressed**
33:2
**describe**
19:5, 19:20,
19:21, 174:19,
210:21, 211:10
**described**
24:14
**design**
118:1, 133:16,
134:2, 135:3
**designed**
168:15
**desire**
169:24
**despite**
105:8
**detail**
32:19, 61:12,
132:16, 180:19,
193:2
**detailed**
170:15, 209:12
**details**
226:17

**determination**
118:11
**determine**
70:12, 88:23,
116:22, 184:21,
184:22, 186:24,
198:7, 219:21,
219:24
**determined**
97:2, 118:8
**develop**
90:19
**developed**
48:13
**diana**
4:23
**dicta**
53:7
**dictates**
63:3
**differ**
228:13
**difference**
84:23, 86:10,
115:6, 115:25,
127:25, 128:4,
130:4, 130:5,
130:6, 130:7,
130:8, 130:16,
130:17, 130:18,
130:25, 131:1,
131:11, 132:17,
133:13, 134:14,
149:16, 196:9,
198:8, 200:19,
200:20, 203:2,
207:2
**difference-in-di-**
**fference**
80:25, 81:7,
81:12, 81:19,
84:9, 84:20,
85:16, 86:9,
86:24, 125:11,
126:12, 126:13,
129:21, 129:25,
130:7, 132:11,
132:14, 144:5

**difference-in-di-**
**fferences**
125:24
**differences**
95:14, 124:2,
124:18, 129:11,
131:4, 132:12,
133:19, 134:3,
134:17, 145:9,
184:1, 184:2,
187:23, 188:9,
191:18, 192:7,
192:13, 206:16
**different**
30:13, 35:22,
49:8, 52:24,
56:3, 67:2,
83:20, 84:13,
85:3, 86:4,
86:5, 86:23,
86:25, 93:3,
93:4, 93:13,
95:1, 97:24,
99:24, 101:16,
105:4, 105:5,
105:6, 105:25,
106:21, 107:6,
107:7, 114:1,
114:18, 128:9,
128:10, 129:1,
129:9, 129:15,
133:20, 133:21,
138:6, 138:8,
138:9, 139:2,
139:3, 139:5,
142:23, 142:25,
143:24, 145:15,
146:20, 146:24,
151:18, 176:10,
181:18, 187:11,
193:4, 193:5,
193:6, 193:11,
193:20, 193:22,
194:3, 194:12,
194:19, 195:11,
195:13, 195:19,
196:8, 204:9,
205:4, 207:14,

210:11, 213:24,
223:6

**differential**
117:14, 213:25

**differently**
123:17, 134:10,
213:25

**difficult**
142:17, 145:14,
161:12, 184:22,
185:3, 185:10,
185:16, 186:1,
205:3, 210:5,
229:15

**diminished**
126:18, 152:1,
154:9

**direct**
142:20, 149:17,
157:5, 173:11,
185:21

**directed**
169:15, 169:16

**direction**
16:8, 129:16,
134:1, 134:20,
134:21, 171:23,
172:3, 172:18,
172:23, 193:21,
233:7, 247:8

**directions**
20:10

**directly**
28:17, 64:17,
83:18, 95:13,
142:17, 149:18,
151:16, 156:1,
161:21, 163:9,
228:21, 235:4,
235:6

**disagree**
16:6, 98:15,
102:12, 113:18,
119:13, 245:5

**disagreed**
119:8

**disagreeing**
113:19, 119:23

**disappears**
138:5

**disclose**
110:4

**disclosed**
13:22, 170:19,
176:20

**disclosing**
171:22

**disclosure**
14:23, 177:7

**disconfirms**
157:18

**discount**
159:2

**discounting**
117:25

**discovery**
245:1

**discriminated**
115:22

**discrimination**
47:3, 47:6,
49:25, 53:20,
55:12, 55:16,
56:21, 59:12,
59:14

**discriminatory**
76:8, 78:24,
87:15, 87:18,
88:19

**discuss**
112:4, 126:3,
153:17, 165:19,
165:23, 165:24,
171:23, 202:16,
235:17

**discussed**
11:7, 17:9,
17:14, 25:18,
25:19, 25:24,
28:1, 75:17,
208:24, 235:16,
241:11

**discusses**
190:7

**discussing**
178:25

**discussion**
11:22, 25:21,
26:3, 30:25,
35:2, 39:6,
44:12, 45:2,
58:10, 72:12,
170:15, 190:22,
192:13, 192:22,
204:3, 206:18,
211:3, 236:25

**discussions**
45:10, 45:19,
45:22, 57:9,
176:24

**disenfranchiseme-
nt**
212:25

**dishonest**
122:5

**disparate**
72:5, 82:17,
82:24, 87:9,
98:4, 180:24,
181:8, 183:15,
183:18

**disproportionate**
78:12, 91:25,
108:14, 111:21,
114:14, 117:16,
126:23, 131:19,
133:2, 133:14,
134:15, 134:18,
136:5, 137:13,
141:16, 143:6,
167:1

**disproportionate-
ly**
65:19, 74:17,
74:18, 74:24,
75:2, 75:21,
76:5, 76:6,
76:16, 89:9,
90:21, 103:10,
111:16, 126:19,
136:9, 148:13,
218:13

**dispute**
74:8, 74:12,

**discussion**
86:17, 86:18,
102:8, 102:9,
106:11, 107:15,
112:18, 129:20,
129:24

**disputing**
100:12, 100:17,
100:18, 105:2,
114:2, 114:4,
114:6, 114:7,
115:8, 154:20,
181:20, 183:2

**distance**
97:19

**distant**
227:14

**distinct**
14:6, 170:10

**distinguish**
66:6, 192:24,
210:6

**district**
1:1, 1:2, 21:3,
21:19, 32:3

**districting**
22:16

**disturbed**
67:24

**divided**
80:18, 106:22

**division**
1:3, 25:6

**dmv**
79:14, 91:5,
92:11, 94:7,
94:9, 94:13,
102:17, 116:12,
135:13, 144:13,
146:1, 146:9,
146:10, 186:25

**document**
26:19, 37:8,
48:21

**documents**
9:19, 9:22,
10:6, 10:23,
16:10, 16:13,
234:19, 244:7

**doing**
18:15, 22:9,
29:2, 36:17,
44:1, 56:15,
56:25, 59:7,
59:9, 82:4,
86:23, 87:1,
100:3, 127:7,
127:25, 144:4,
145:18, 163:15,
171:10, 176:18,
182:7, 226:24,
240:12

**dominant**
182:12

**done**
7:18, 20:20,
20:22, 21:2,
21:21, 22:7,
30:15, 35:10,
53:12, 59:17,
59:23, 96:18,
107:24, 166:6,
166:9, 178:16,
198:12, 204:2,
212:10, 226:12,
226:21, 240:22,
243:6, 244:8

**down**
8:6, 9:6,
26:22, 30:10,
32:25, 39:1,
60:19, 61:21,
70:4, 72:2,
80:22, 80:23,
84:1, 84:2,
84:5, 84:15,
96:6, 102:17,
102:19, 127:19,
127:20, 137:8,
146:3, 157:7,
157:23, 157:24,
170:4, 203:10,
203:12, 203:13,
208:14, 211:17,
212:14, 214:9,
221:7

**downloaded**
190:18

**downward**
193:3, 193:9,
193:10, 193:12,
193:19, 193:22,
193:23, 194:1,
194:3, 194:9,
194:15, 194:19,
195:8, 195:12

**draft**
24:25, 26:2,
62:12, 62:15,
190:6, 215:5,
217:1, 221:24,
234:14, 240:6,
240:11, 240:13,
240:22

**drafted**
116:19, 215:18,
219:16, 221:20,
240:18

**drafter**
87:25

**drafting**
238:12, 240:20

**drafts**
25:19, 173:4,
237:16, 238:8,
238:11, 238:14,
241:7, 244:14

**dragged**
225:6

**dramatically**
128:25

**draw**
42:16, 109:23,
185:8, 204:1

**drawing**
21:3, 111:13,
111:14

**drawn**
41:16, 111:11

**drive**
157:22, 157:23,
157:24

**driven**
59:11, 59:14

**driver's**
77:4, 77:6

**driving**
99:12, 146:2

**drop**
26:14, 64:19,
64:20, 81:10,
84:11, 85:12,
85:15, 126:15,
128:18, 128:20,
140:15, 140:22,
141:5, 141:7,
141:12, 142:9

**dropped**
128:19

**drops**
85:19, 191:15

**drs**
92:24

**drunk**
99:12

**duly**
6:3

**during**
85:13, 132:6,
238:11

**dwarfs**
58:7

<hr>

**E**

**each**
8:8, 18:6,
64:25, 68:19,
121:13, 129:16,
137:18, 194:13,
195:19

**earlier**
7:18, 7:23,
18:17, 32:15,
44:18, 106:10,
120:3, 172:1,
187:5, 187:12,
209:23, 214:8,
214:20, 221:16,
222:16, 238:1

**earliest**
33:23

**early**
14:4, 14:21,
20:8, 22:15,

22:25, 23:2,
35:3, 35:24,
36:16, 219:6,
219:9, 221:2,
226:12, 237:24

**easier**
101:4, 138:11,
211:20

**eastern**
1:17, 152:20

**ebola**
168:16

**ecological**
135:11

**economic**
160:1, 211:11

**economics**
67:20, 67:22,
95:19, 154:5,
154:10, 155:25,
160:2

**economists**
95:25, 153:24,
153:25, 159:21

**edit**
23:6

**editing**
25:20, 216:1

**editor**
24:3, 201:11,
201:14, 201:23,
202:2, 202:5,
202:15, 204:20,
205:1, 205:8,
206:2

**editor's**
203:6

**edits**
25:9, 62:15

**effect**
63:14, 63:15,
64:7, 64:21,
68:10, 68:15,
76:9, 83:18,
83:20, 85:18,
86:7, 86:12,
87:16, 87:18,
88:19, 91:25,

101:9, 107:23,
108:15, 114:14,
117:15, 124:21,
125:25, 128:17,
130:9, 136:10,
137:4, 141:16,
142:8, 144:18,
145:3, 145:10,
146:11, 146:21,
149:4, 149:6,
149:7, 149:12,
150:3, 150:14,
150:15, 150:23,
151:3, 151:6,
153:19, 155:14,
183:24, 184:11,
197:8, 199:14,
199:15, 199:18,
203:7, 207:12,
207:13, 213:13,
214:4, 214:16,
215:22, 216:17,
218:18, 218:22,
219:1, 219:11,
219:12, 221:4,
221:18, 228:12,
242:18
**effective**
83:23, 123:23,
124:3, 124:19
**effects**
148:22, 149:14,
150:4, 151:18,
165:13, 191:24,
207:7, 207:23,
218:20, 219:7,
226:2, 227:7,
227:11, 227:19,
230:17
**efficiency**
24:12
**effort**
168:20, 229:10,
231:2
**efforts**
212:24, 229:4,
230:12
**eight**
101:13

**either**
22:3, 25:23,
29:12, 31:21,
33:12, 39:11,
40:1, 40:25,
67:22, 80:5,
92:10, 109:13,
110:11, 119:22,
137:11, 158:23,
167:12, 196:17,
218:9, 224:18,
224:22, 224:23,
234:6
**elaborate**
201:21, 210:3
**election**
18:25, 19:4,
19:19, 28:22,
29:19, 95:24,
144:23, 144:25,
145:1, 167:24,
169:25, 214:4,
214:17, 216:17,
221:19, 231:24
**election-related**
7:9, 7:14, 28:9
**elections**
4:4, 18:23,
19:10, 19:19,
20:9, 20:17,
20:19, 20:22,
20:23, 22:17,
28:12, 28:17,
28:18, 28:20,
29:1, 29:12,
29:17, 29:25,
66:24, 169:17,
169:25, 181:12,
182:1, 182:22,
227:25
**electors**
169:21
**elias**
2:15
**eligible**
89:15, 94:3,
94:9, 97:24,
99:17, 99:19,

99:23, 100:2,
100:7, 108:4,
108:18, 108:24,
111:23, 111:24,
114:13, 114:18,
117:15, 212:25,
213:13
**eligibles**
98:4
**eliminate**
149:7, 167:18
**eliminated**
80:9, 200:5
**eliminates**
204:6
**eliminating**
204:3
**else**
12:19, 14:18,
16:24, 17:10,
17:15, 24:12,
35:13, 50:19,
78:6, 85:24,
93:9, 154:7,
175:2, 202:11,
213:2, 216:18,
245:10
**else's**
42:13
**email**
10:12, 238:6,
238:10, 238:11,
238:13, 238:15,
238:24, 239:1,
239:16
**emails**
238:19, 238:24
**empirically**
49:12, 67:3,
71:22, 93:2,
96:12, 139:18,
154:18, 155:7,
155:19, 156:3,
156:5
**employed**
247:10
**employees**
163:24

**enacted**
45:13, 58:13
**enactment**
84:4
**encapsulate**
174:23
**end**
27:12, 70:10,
71:5, 73:17,
73:21, 75:1,
78:3, 78:21,
81:17, 97:25,
136:22, 137:14,
138:17, 215:23,
237:8
**ended**
32:23
**ending**
2:6, 3:12,
137:19, 171:5
**endings**
121:3
**endorse**
26:4, 113:1,
180:13
**endpoint**
231:7
**ends**
137:3, 141:15,
142:8, 146:20
**enforced**
184:17, 184:21,
185:17, 225:10
**engaged**
123:4
**english**
154:2
**enhance**
78:16
**enjoined**
184:10
**enlightening**
118:4
**enormous**
193:16
**enough**
178:5, 206:5,
217:8, 217:23,

231:1
**ensuring**
161:2, 169:20
**entire**
18:8, 60:20,
61:6, 72:24,
95:18, 124:13,
124:15, 152:6,
160:1
**entirely**
102:10, 112:13,
146:16, 152:17,
192:19
**entirety**
37:10, 37:12,
44:4, 61:18
**entities**
18:14
**environment**
63:20, 66:16,
67:25, 161:24,
162:2, 163:6,
185:6, 230:16
**equal**
40:19, 40:21,
63:3, 63:11,
64:5, 67:15,
67:19, 67:23,
67:24, 68:2,
68:4, 68:17,
153:21, 153:24,
154:3, 154:15,
154:19, 154:23,
154:24, 155:2,
155:18, 157:11,
157:15, 186:16,
209:2, 210:23,
230:17
**equalize**
137:12
**equally**
144:22
**equations**
192:16
**equivalent**
137:22, 142:3,
143:22
**era**
7:23

**eradicate**
169:11
**errata**
246:7
**error**
177:16
**esquire**
2:7, 2:13,
2:14, 3:4, 3:13,
4:3, 4:18
**essential**
119:20, 178:17
**essentially**
12:5, 66:20,
136:24, 137:22,
211:9
**establish**
153:18, 158:23,
177:14
**estimate**
68:25, 148:21,
149:8, 182:9,
191:19, 191:21
**estimates**
148:18, 150:9,
150:25, 151:2,
182:6
**estimation**
13:1
**et**
1:6, 1:11,
43:5, 131:19,
218:13
**ethnic**
83:21, 191:24
**ethnicities**
88:3, 97:25
**ethnicity**
83:13, 108:3,
117:17, 149:19,
191:9, 203:8,
214:1
**even**
46:16, 46:18,
48:8, 53:6,
59:7, 63:18,
65:20, 69:23,
76:4, 95:21,

96:9, 106:20,
133:15, 151:25,
156:5, 168:15,
194:24, 195:4,
196:18, 197:18,
198:10, 199:16,
209:19, 210:8,
216:20, 225:16,
228:16
**even-numbered**
28:14
**event**
167:5, 169:18
**events**
67:1, 69:20,
168:21
**ever**
7:13, 21:11,
22:11, 23:8,
30:3, 30:6,
30:20, 31:5,
31:11, 31:12,
34:6, 42:3,
49:24, 175:9,
190:14, 231:23,
241:5
**every**
28:14, 29:1,
120:24, 167:12,
224:15
**everybody**
203:11, 203:13
**everyone**
60:5
**everything**
8:7, 17:3,
26:4, 33:18,
33:22, 33:25,
45:6, 85:23,
119:3, 120:3,
121:11, 130:22,
133:9, 154:7,
176:4, 205:12,
205:13, 215:16,
215:17
**evidence**
12:8, 39:16,
41:12, 41:23,

42:4, 42:25,
43:2, 44:11,
44:20, 48:12,
50:2, 53:9,
65:12, 68:11,
68:16, 68:18,
72:4, 72:15,
81:12, 81:16,
82:16, 87:8,
88:22, 92:9,
92:13, 92:19,
99:2, 105:23,
106:20, 107:5,
107:8, 114:24,
123:2, 123:5,
123:12, 125:23,
131:7, 141:18,
141:19, 146:1,
146:8, 151:23,
156:16, 156:19,
159:5, 166:2,
180:23, 181:8,
181:11, 181:25,
182:21, 183:6,
183:13, 187:9,
187:22, 188:8,
191:23, 192:6,
192:10, 199:4,
209:25
**evolution**
28:22
**exact**
11:5, 129:13,
145:5, 183:1,
206:2
**exactly**
13:6, 33:7,
33:9, 43:14,
55:3, 63:19,
82:3, 82:6,
98:13, 119:6,
124:9, 124:25,
130:12, 156:25,
162:24, 189:25,
202:24, 204:2,
216:23, 241:18
**examination**
5:2, 6:7, 171:3

examined
6:5, 246:3
example
20:20, 36:23,
42:8, 91:5,
100:4, 122:24,
149:19, 154:8,
157:12, 160:25,
168:2, 185:24,
195:22, 229:17,
230:5
examples
18:11, 156:8,
185:17, 243:16
excellent
171:20, 174:15,
179:18, 222:15,
225:18, 234:25,
235:7, 235:15
except
10:13
exchange
239:5
exchanged
240:6, 244:7
exchanging
238:14, 241:7
exclude
244:14
exclusively
7:20
exercise
213:6
exhaustively
111:2
exhibit
5:8, 5:9, 5:10,
5:11, 5:12,
5:13, 5:15,
26:8, 26:11,
30:11, 34:11,
37:3, 37:4,
38:25, 60:15,
60:17, 61:19,
61:21, 72:18,
72:19, 82:11,
96:22, 107:25,
115:19, 174:10,

179:8, 179:9,
179:12, 180:16,
187:3, 188:14,
188:15, 206:10,
211:15, 212:13,
214:3, 222:7,
222:8
exhibits
5:6, 5:7, 26:14
exist
127:4, 128:6
existing
146:4, 162:4,
180:9, 181:1
exists
54:14
expect
15:25, 33:12,
64:3, 70:24,
73:4, 86:12,
96:10, 136:16,
204:23
expectation
129:2, 129:4,
147:17
expectations
71:23, 160:3,
186:15
expected
63:10, 63:12,
69:21, 126:20,
137:13
expensive
77:16
experience
14:17, 33:3,
50:4, 112:23,
205:21, 224:25,
225:14, 225:23,
227:11, 227:16
experiment
18:19, 86:15
expert
5:8, 5:9, 5:10,
5:12, 7:9, 7:14,
9:25, 11:13,
12:5, 12:10,
12:15, 12:18,

13:14, 13:20,
14:9, 14:10,
17:17, 21:14,
21:20, 22:4,
22:11, 22:20,
23:9, 23:10,
23:17, 23:22,
25:7, 26:5,
26:25, 27:10,
27:15, 30:21,
31:4, 31:12,
31:16, 33:16,
35:23, 36:18,
36:19, 37:6,
38:22, 42:5,
43:23, 46:8,
47:11, 48:18,
49:24, 56:19,
57:11, 58:18,
60:15, 74:22,
80:18, 81:15,
88:24, 98:24,
99:3, 104:16,
106:21, 112:9,
115:18, 116:14,
118:19, 123:22,
125:7, 125:9,
125:23, 139:22,
144:11, 147:8,
150:21, 151:1,
152:4, 156:12,
160:19, 160:20,
162:18, 165:8,
166:15, 170:8,
173:3, 173:4,
174:12, 179:25,
184:14, 220:24,
224:25, 225:1,
225:25, 227:2,
227:17, 231:20,
234:14, 237:13
expertise
7:4, 19:6,
19:22, 20:15,
35:14, 38:13,
43:17, 46:11,
46:25, 47:10,
49:23, 52:1,

65:22, 98:21,
175:7, 217:18,
217:19
experts
13:22, 16:5,
16:7, 16:8,
36:18, 41:22,
42:4, 42:9,
44:25, 45:15,
46:8, 49:17,
50:21, 56:17,
58:18, 99:1,
158:23, 232:17,
234:19
expires
247:16
explain
18:11, 88:12,
102:12, 119:24,
172:21, 209:5,
210:25
explained
36:16
explanation
72:13, 85:19,
138:18, 140:14,
141:4, 212:9
explanations
70:15
explosion
186:12
explosions
168:16
exposing
28:19
express
101:24, 212:5
expressed
102:13
expresses
73:17, 74:2
expressing
102:11, 104:14
extensive
13:16, 145:17
extensively
21:3, 67:12
extent
35:3, 38:19,

| | | | |
|---|---|---|---|
| 40:5, 47:16, | **facts** | **family** | **fifth** |
| 53:12, 59:10, | 176:22 | 17:12, 172:15 | 224:19 |
| 59:22, 71:15, | **factual** | **fan** | **figure** |
| 71:17, 86:3, | 43:6 | 243:14 | 13:8, 24:24, |
| 182:15, 182:18, | **factually** | **fancy** | 25:13, 33:8, |
| 212:2 | 77:23 | 154:1 | 138:16, 143:9, |
| **extra** | **failed** | **far** | 143:12, 183:1, |
| 169:11 | 89:13, 219:10, | 33:21, 85:10, | 187:16, 187:17, |
| **extreme** | 219:25 | 117:5, 130:13, | 191:14, 191:19, |
| 133:16 | **fails** | 130:14, 194:8, | 192:11, 194:23, |
| **extremely** | 198:1, 198:5 | 197:18, 215:5, | 194:24, 194:25, |
| 94:18, 129:17, | **failure** | 215:7, 227:14 | 202:17, 202:23, |
| 130:23 | 127:6 | **fashion** | 202:24, 203:24, |
| **eye** | **fair** | 68:24, 196:16 | 225:15 |
| 12:7, 32:25 | 25:11, 32:4, | **favor** | **figures** |
| **F** | 39:4, 86:19, | 46:4 | 183:2 |
| **face** | 125:4, 179:10, | **federal** | **file** |
| 32:25, 155:23, | 188:18, 203:25, | 19:8, 225:14 | 99:5, 99:11, |
| 157:19, 178:10, | 204:11, 217:23, | **federation** | 99:20, 100:19, |
| 185:7 | 220:19, 222:11, | 2:5, 3:11, | 102:4, 104:5, |
| **facilitated** | 224:13 | 4:19, 171:5, | 112:15, 112:25, |
| 100:10 | **fairly** | 171:13 | 113:6 |
| **fact** | 11:15, 35:1, | **fee** | **filed** |
| 49:5, 49:7, | 42:7, 63:9, | 163:25, 164:1, | 33:4, 73:3 |
| 54:25, 58:19, | 87:4, 185:19, | 164:3 | **files** |
| 66:18, 67:23, | 186:21, 194:16 | **feel** | 97:2, 98:23, |
| 75:22, 76:20, | **fall** | 83:3, 123:17, | 99:2, 100:8, |
| 82:8, 95:19, | 28:6, 28:7, | 168:9, 168:18, | 112:24, 144:21 |
| 103:19, 104:25, | 28:15, 28:19, | 168:19, 223:13, | **filling** |
| 105:3, 105:7, | 29:2, 29:3, | 226:23 | 121:2 |
| 109:5, 110:7, | 29:19 | **feeling** | **final** |
| 111:18, 113:22, | **fallacy** | 24:11, 228:24 | 25:20, 27:21, |
| 115:9, 122:14, | 135:12 | **feels** | 44:4, 63:9, |
| 124:2, 124:18, | **falling** | 58:16, 223:13 | 63:18, 121:9, |
| 126:22, 131:16, | 202:14 | **felt** | 201:6, 203:21, |
| 132:19, 132:21, | **falls** | 205:25 | 225:5, 225:22 |
| 136:3, 138:18, | 36:2, 197:6, | **few** | **finally** |
| 142:2, 142:12, | 198:10 | 18:11, 164:13 | 9:11, 201:12, |
| 144:4, 145:21, | **false** | **fiction** | 224:22, 224:23 |
| 155:22, 164:3, | 169:21 | 58:15, 58:20 | **financial** |
| 169:23, 189:15, | **familiar** | **field** | 247:11 |
| 192:20, 223:13 | 8:3, 18:3, | 22:5, 23:19, | **find** |
| **factor** | 21:8, 21:14, | 23:20, 55:13, | 38:2, 41:21, |
| 227:5 | 21:19, 22:6, | 55:17, 81:21, | 51:4, 57:16, |
| **factors** | 22:8, 26:18, | 95:18, 99:1, | 70:21, 79:5, |
| 20:8, 20:12, | 112:13, 184:4, | 155:10, 160:2, | 80:7, 87:14, |
| 23:5, 200:11 | 184:7, 217:8 | 205:20, 220:24 | 98:14, 99:6, |
| | **familiarity** | **fifteen** | 103:1, 125:9, |
| | 111:9 | 15:11 | |

142:5, 149:21,
149:22, 219:10,
220:1

**finding**
74:25, 100:12,
100:13, 102:8,
102:9, 140:15,
140:18, 140:25,
141:1, 141:4,
147:7, 197:21

**findings**
73:14, 74:22,
87:16, 87:17,
89:4, 104:17,
112:8, 142:21,
142:22, 147:4,
151:13, 156:20,
179:4, 179:22,
180:12, 202:16,
212:8, 217:18

**finds**
188:8, 192:5

**fine**
163:2, 163:3,
164:7

**fined**
164:5

**fines**
162:8

**finish**
8:9, 9:13,
240:25

**finished**
241:4

**firms**
18:20

**first**
6:3, 11:2,
20:6, 26:2,
33:9, 61:22,
62:12, 62:15,
62:20, 69:24,
76:14, 77:24,
82:1, 85:21,
85:22, 87:13,
90:4, 96:23,
108:1, 115:24,
122:21, 124:3,

124:19, 125:8,
127:3, 128:2,
128:23, 130:19,
130:22, 141:7,
141:10, 143:1,
152:15, 162:15,
174:7, 174:11,
179:14, 183:16,
189:8, 214:21,
214:25, 216:5,
216:8, 216:12,
216:16, 217:1,
221:24, 226:7,
226:9, 237:3,
240:11, 240:12,
244:19

**fit**
24:8, 191:17,
224:4

**fitting**
192:14

**fitzgerald**
220:7

**five**
28:11, 69:11,
100:22, 102:6,
104:1, 104:7,
129:11, 181:13

**five-minute**
60:4, 115:13,
232:4

**fix**
115:9

**fixed**
61:1

**flagler**
4:20

**flashing**
27:13

**flat**
203:11

**flaw**
198:22

**flaws**
133:16

**flipping**
32:22

**florida**
1:2, 1:4, 1:10,

2:12, 3:2, 3:8,
3:21, 4:6, 4:9,
4:12, 4:18,
4:21, 6:8, 31:6,
31:8, 31:9,
31:11, 31:13,
31:16, 32:3,
32:4, 32:10,
32:19, 45:12,
57:10, 63:11,
64:8, 65:11,
65:13, 74:10,
74:16, 74:24,
75:20, 80:1,
80:22, 81:14,
81:17, 82:21,
92:15, 93:3,
94:7, 96:12,
100:20, 102:5,
106:24, 109:1,
109:6, 109:10,
112:14, 112:21,
113:11, 113:13,
115:24, 126:3,
126:5, 138:7,
138:13, 138:15,
139:14, 139:19,
139:24, 140:8,
144:19, 147:14,
148:15, 148:17,
149:24, 165:9,
165:11, 166:3,
166:5, 166:10,
173:19, 174:19,
175:21, 180:21,
181:11, 181:13,
181:15, 182:1,
182:3, 182:15,
182:17, 182:19,
182:22, 182:23,
183:4, 183:7,
186:24, 191:15,
192:1, 200:4,
213:14, 230:8

**florida's**
97:2, 109:12,
187:13

**floridians**
94:3, 116:13

**flow**
214:23, 216:4

**flying**
32:19, 167:19,
168:9

**focus**
14:12, 19:18,
36:1, 88:1,
88:17, 183:16,
183:20, 183:21,
198:19, 218:21

**focused**
7:20, 113:21,
227:3

**focuses**
28:19, 143:4,
143:9, 143:10,
221:20

**focusing**
183:18, 183:19

**folding**
44:8

**folks**
232:13

**follow**
146:7, 156:24,
162:14, 227:1

**followed**
156:14, 166:4,
184:13

**following**
28:17, 28:21,
125:14, 140:22,
141:5, 141:21,
215:24, 215:25

**follows**
6:6, 46:1

**foolish**
142:1

**footnote**
221:3

**footnotes**
215:10, 220:4,
220:20

**forcing**
146:4

**foregoing**
246:4, 247:3,

| | | | |
|---|---|---|---|
| 247:4<br>**form**<br>49:2, 57:17,<br>81:25, 127:14,<br>133:17, 135:18,<br>138:24, 150:11,<br>150:16, 157:8,<br>172:13, 180:2,<br>203:18, 203:19,<br>241:1<br>**formally**<br>173:13<br>**format**<br>178:9<br>**former**<br>94:14<br>**fort**<br>3:21, 31:20<br>**forth**<br>29:4, 47:18,<br>53:1, 176:25,<br>237:14, 238:9,<br>241:4<br>**forward**<br>216:19<br>**found**<br>100:9, 122:16,<br>140:22, 219:8,<br>219:11, 219:25,<br>221:3<br>**four**<br>80:23, 83:10,<br>84:2, 101:15,<br>104:7<br>**four-pane**<br>143:19<br>**four-year**<br>144:23<br>**frame**<br>24:10, 110:10,<br>110:11, 123:14<br>**framework**<br>162:4, 184:25,<br>185:1, 218:11<br>**framing**<br>214:22<br>**franchise**<br>213:6 | **franklin**<br>3:20<br>**frankly**<br>96:19, 133:10,<br>150:8<br>**fraud**<br>165:25, 166:3,<br>166:5, 166:7,<br>166:10, 166:12,<br>166:18, 166:20,<br>167:22, 168:16,<br>168:24, 169:6,<br>169:22<br>**free**<br>48:1, 177:16<br>**freedoms**<br>169:14<br>**friends**<br>18:8, 172:7,<br>172:15<br>**front**<br>9:19, 9:22,<br>24:6, 24:14,<br>237:8, 240:19<br>**full**<br>6:14, 13:13,<br>82:3, 161:8,<br>174:20, 207:13,<br>209:21, 213:12<br>**full-blown**<br>200:18<br>**fully**<br>142:6, 161:11,<br>167:15, 198:15<br>**fulsome**<br>176:1<br>**function**<br>26:15<br>**functioning**<br>162:12<br>**funded**<br>230:9<br>**fundraising**<br>230:8<br>**further**<br>197:11, 243:1<br>**future**<br>65:14, 71:10 | **G**<br>**gap**<br>113:22, 114:1,<br>114:4, 114:5,<br>114:16, 114:17,<br>114:22, 114:25<br>**garcia-monet**<br>220:7<br>**gardens**<br>4:6<br>**gatekeeping**<br>205:12<br>**gender**<br>149:10<br>**gendreau**<br>3:18<br>**general**<br>22:18, 35:25,<br>67:17, 143:4,<br>169:10, 176:25,<br>185:9, 194:16,<br>210:6<br>**generally**<br>31:6, 166:7,<br>166:20, 168:12,<br>227:18<br>**generate**<br>52:21, 70:19,<br>71:8<br>**georgia**<br>18:1<br>**gerrymandering**<br>51:6, 51:15,<br>51:19, 52:23<br>**gerrymanders**<br>51:2<br>**getting**<br>17:7, 24:2,<br>32:23, 97:25,<br>102:16, 229:11,<br>229:12<br>**gingles**<br>7:7, 7:21,<br>19:24, 23:4,<br>36:24, 227:4<br>**give**<br>8:10, 18:11, | 153:16, 205:15,<br>220:15, 230:5,<br>233:13, 243:13,<br>244:11<br>**given**<br>33:8, 47:23,<br>59:6, 59:18,<br>67:16, 67:17,<br>69:20, 70:25,<br>107:13, 115:7,<br>123:13, 126:21,<br>128:15, 131:15,<br>131:17, 133:16,<br>134:2, 149:8,<br>150:16, 154:21,<br>157:3, 184:24,<br>195:15, 195:21,<br>246:6, 247:5<br>**gives**<br>186:9<br>**giving**<br>77:4, 153:3<br>**glades**<br>3:18<br>**glanced**<br>222:19<br>**go**<br>7:23, 8:1, 8:4,<br>26:15, 33:23,<br>33:25, 34:11,<br>34:21, 38:25,<br>48:10, 48:22,<br>49:11, 61:19,<br>62:23, 72:14,<br>73:7, 74:15,<br>82:11, 83:1,<br>87:12, 92:6,<br>96:5, 96:6,<br>96:13, 96:22,<br>102:17, 102:19,<br>103:1, 105:14,<br>106:16, 107:25,<br>112:6, 115:12,<br>123:20, 125:7,<br>126:7, 129:19,<br>135:5, 137:8,<br>144:10, 144:16,<br>147:2, 148:9, |

150:19, 157:6,
157:7, 164:17,
178:23, 179:19,
180:17, 188:17,
196:4, 197:18,
199:3, 201:5,
201:15, 206:9,
206:11, 210:19,
211:14, 212:17,
219:4, 220:15,
221:7, 221:14,
242:7

**goes**
106:9, 137:7,
137:8, 145:24,
183:24, 197:11,
198:11, 213:12,
215:6, 215:8,
229:10

**going**
8:20, 13:7,
22:14, 26:8,
29:4, 33:7,
33:14, 38:16,
41:3, 51:21,
51:22, 52:18,
60:3, 63:14,
63:16, 63:21,
63:22, 63:24,
64:2, 64:6,
65:11, 67:13,
67:24, 68:12,
68:13, 69:24,
71:7, 75:23,
77:5, 77:21,
78:5, 79:12,
79:13, 81:3,
81:4, 93:8,
95:13, 102:18,
115:5, 118:16,
125:2, 125:20,
128:13, 132:25,
133:1, 137:12,
137:19, 138:17,
145:2, 149:22,
152:4, 155:7,
160:9, 160:10,
162:6, 163:25,

164:2, 164:5,
164:6, 174:9,
176:1, 178:23,
179:7, 179:19,
180:16, 180:18,
188:14, 191:4,
191:8, 191:12,
198:24, 202:17,
202:18, 206:11,
212:12, 213:19,
214:2, 214:23,
216:19, 222:3,
222:5, 222:6,
224:5, 224:11,
228:12, 228:14,
228:16, 229:16,
230:7, 230:18,
239:8, 240:1,
244:6

**gone**
224:19

**good**
6:10, 6:11,
6:12, 8:21,
17:4, 56:15,
60:6, 82:13,
115:14, 135:7,
152:24, 153:5,
171:7, 171:9,
199:1, 227:21,
229:6, 232:4,
232:6, 236:7,
243:7

**goods**
169:13

**gotten**
86:3, 223:17,
224:20

**government**
19:10, 159:7,
243:15

**graduate**
226:6

**graph**
143:19, 193:16,
194:14, 196:13,
196:23, 196:25,
197:2, 197:4,

197:14, 201:18,
201:20, 201:24,
202:6, 206:12,
206:15, 207:7,
207:10, 207:15,
207:23, 208:3,
208:4, 208:11,
208:12

**graphical**
143:11

**graphically**
203:14

**graphs**
144:6, 193:8,
193:9, 193:13

**great**
10:15, 10:19,
228:17, 233:10,
243:16, 245:9

**greater**
113:12, 116:8,
126:15, 151:1,
151:6

**greatest**
81:9, 84:11

**gronke**
220:8

**ground**
8:1, 128:3,
171:16

**grounds**
225:12

**groundwork**
180:5

**group**
2:15, 4:4,
74:16, 74:18,
74:23, 75:2,
75:20, 75:23,
76:24, 77:8,
77:25, 99:24,
99:25, 108:24,
138:23, 149:19,
191:24, 191:25,
199:20

**groups**
43:18, 43:20,
75:12, 75:14,

78:20, 83:21,
88:5, 101:19,
105:25, 131:1,
132:19, 137:15,
139:3, 147:9,
149:18, 183:4,
183:18, 183:21,
186:14, 187:12,
191:15, 194:2,
194:4, 202:22,
203:1, 210:17,
213:24, 218:12,
228:22, 229:6,
230:3, 230:4,
230:6

**guess**
18:16, 24:3,
69:8, 79:7,
79:17, 82:1,
88:14, 120:15,
127:21, 128:22,
131:13, 138:10,
145:13, 151:22,
155:3, 166:21,
175:10, 177:12,
202:4, 210:4,
210:10, 228:24,
231:7, 231:16,
236:24

**guidance**
55:9

**guide**
71:4

**guided**
58:3

**H**

**half**
85:21, 85:22,
86:2, 86:3,
120:18, 120:19,
120:20, 124:3,
124:19, 128:2,
145:4

**halfway**
124:11, 135:9

**halves**
130:23

**hammering**
201:10
**hand**
38:10, 149:24,
159:2, 179:24,
231:4, 247:14
**handle**
77:17
**handled**
77:19, 161:2
**handles**
77:16
**hankins**
4:24
**hansen**
213:5
**happen**
39:12, 39:25,
40:3, 65:7,
65:14, 65:23,
67:2, 67:5,
67:14, 68:3,
68:7, 68:20,
69:17, 70:3,
70:4, 77:21,
91:21, 96:9,
96:10, 107:20,
141:10, 154:13,
157:2, 157:3,
213:19, 213:20,
218:12
**happened**
54:5, 67:3,
84:22, 84:24,
85:4, 85:9,
91:20, 137:3,
138:17, 143:23,
146:22, 146:24,
184:23, 203:9,
203:17, 206:6,
207:11, 224:21
**happening**
64:11, 153:23,
155:17, 204:7,
204:9
**happens**
91:22, 107:19,
183:23, 224:17

**happy**
9:12, 217:13,
245:7
**hard**
51:10, 143:21,
200:13, 203:3,
230:20, 231:7
**hardee**
3:18
**hardly**
38:3, 71:19,
229:5
**harm**
169:13
**harms**
165:21, 165:23
**hart**
1:25, 2:1,
164:17, 243:24,
245:12, 247:2
**hb**
140:16, 140:23,
141:5, 187:13,
187:15, 187:25,
188:2, 188:5,
188:11, 189:9,
191:23, 192:8,
203:8, 207:2
**head**
7:24, 8:11,
13:3, 124:9,
127:17, 129:17
**header**
214:3, 214:16,
216:17, 216:21,
216:25, 221:18
**headers**
216:24
**headline**
176:8
**hear**
11:2
**hearings**
43:5
**heavily**
86:8
**hedge**
40:18

**held**
205:2
**help**
12:1, 22:3,
51:3, 56:6,
56:10, 56:14,
56:16, 66:6,
66:7, 123:1
**helpful**
45:10, 45:12,
56:20, 57:1,
57:9, 57:11,
57:16, 57:24,
58:11, 59:1,
59:8, 69:19,
211:18
**helpless**
239:20
**henderson**
3:20
**hendry**
3:18
**here's**
54:10, 54:12,
199:15
**hereby**
246:2, 247:3
**hereunto**
247:13
**herron**
5:10, 5:11,
5:13, 10:4,
12:6, 16:18,
25:14, 38:24,
40:15, 40:23,
41:4, 41:5,
49:13, 60:16,
66:11, 73:12,
73:18, 74:3,
74:16, 75:7,
83:25, 86:18,
88:6, 91:18,
92:8, 92:24,
93:24, 94:24,
100:9, 101:3,
105:1, 105:19,
106:18, 112:11,
113:3, 116:15,

123:7, 123:21,
124:16, 125:21,
126:9, 137:14,
139:16, 140:7,
140:15, 140:21,
144:12, 145:24,
147:20, 148:10,
153:16, 156:6,
163:15, 174:16,
177:7, 177:10,
183:12, 187:5,
187:14, 188:8,
188:19, 190:7,
191:1, 196:17,
198:12, 199:1,
206:13, 208:25,
209:8, 215:20,
237:19, 242:7
**herron's**
10:2, 16:14,
16:15, 41:10,
41:15, 41:16,
41:19, 42:20,
44:14, 45:5,
45:23, 46:1,
60:11, 60:24,
61:4, 61:11,
61:14, 61:23,
62:18, 69:9,
72:11, 72:21,
73:14, 73:23,
75:5, 80:14,
81:24, 83:1,
87:15, 88:16,
88:21, 88:24,
89:12, 90:25,
92:6, 94:17,
96:25, 98:11,
104:17, 106:16,
112:6, 112:19,
113:15, 115:21,
123:20, 125:9,
125:20, 127:1,
140:1, 142:14,
144:16, 147:3,
147:18, 148:9,
151:10, 160:4,
160:12, 170:10,

170:22
**hi**
242:23
**high**
68:15, 148:13
**higher**
73:15, 74:9,
96:1, 104:18,
147:4, 147:16,
186:4
**highlighted**
144:7
**highlighting**
43:10
**highlights**
27:13, 69:22,
175:23
**highly**
230:2, 231:8,
231:9
**highton**
220:6
**hijacking**
167:4, 169:5
**hiring**
17:23, 172:13
**hispanic**
2:5, 3:11,
4:19, 72:6,
78:8, 82:18,
82:24, 87:10,
88:7, 88:10,
88:21, 89:10,
90:22, 104:5,
106:12, 146:4,
146:9, 146:17,
146:18, 146:23,
148:14, 148:17,
149:20, 150:23,
151:4, 171:4,
171:13, 176:11,
180:25, 181:12,
181:22, 182:2,
193:24, 196:1,
198:9
**hispanics**
73:19, 74:9,
74:13, 88:9,

105:20, 111:17,
137:6, 149:22,
174:18, 175:20,
187:7, 187:15,
187:24, 188:11,
192:8, 194:11,
204:10
**historian**
59:15, 59:17,
59:21
**historians**
35:9, 55:14
**historical**
53:19, 59:23,
59:24, 115:6
**historically**
180:10
**history**
35:10, 59:20
**hit**
200:13, 203:3
**hive**
49:3
**hold**
73:9, 204:24
**holding**
169:17, 235:13
**holmes**
3:19
**holt**
3:20
**holtzman**
3:5, 4:25
**honest**
203:17
**honestly**
11:15
**hook**
224:6
**hopelessly**
48:23
**horrible**
32:21
**host**
117:22, 118:2
**hour**
12:11, 15:14,
60:3

**hours**
12:23, 13:6,
13:8, 13:11,
13:14, 15:15
**house**
20:9, 140:8
**housekeeping**
232:10
**houston**
22:22
**how's**
153:4
**however**
147:6, 148:20,
180:21, 211:10,
219:5
**huge**
71:19
**human**
48:2
**hundred**
116:20
**hypotheses**
70:20
**hypothesis**
70:18
**hypothesizing**
70:22
**hypothetical**
121:19, 121:24,
122:2, 122:4,
122:5, 122:6,
122:8, 122:11,
122:14, 122:15,
122:18, 122:22,
123:11, 123:18
**hypothetically**
122:24, 163:17
**hypotheticals**
118:22

**I**

**id**
163:10, 163:11,
221:3, 221:8,
221:10
**idea**
21:6, 22:9,

48:7, 62:24,
67:18, 71:17,
100:17, 133:24,
133:25, 154:2,
169:5, 176:10,
185:20, 190:23,
191:14, 196:10,
211:4, 224:9,
224:14, 228:5,
228:11, 228:12
**ideal**
178:9
**identification**
26:11, 37:4,
60:17, 72:19,
179:12, 188:15,
222:8
**identifies**
34:16
**identify**
116:14
**ignore**
45:4, 45:5
**illegal**
186:4
**illogical**
74:21, 145:5
**illustrate**
121:25, 122:12,
123:10
**illustrating**
207:24
**illustrative**
145:19
**imagination**
182:13
**immediately**
201:19
**impact**
19:14, 34:6,
39:16, 40:1,
40:6, 40:22,
41:7, 41:8,
42:25, 43:21,
49:9, 57:25,
58:1, 58:2,
58:8, 61:25,
62:25, 63:7,

64:2, 65:3,
66:3, 66:8,
67:6, 68:12,
69:21, 69:22,
70:9, 70:11,
70:13, 75:8,
75:9, 75:11,
75:13, 76:24,
76:25, 78:9,
78:15, 78:16,
81:13, 81:16,
82:23, 85:1,
85:3, 87:9,
90:18, 93:20,
97:22, 98:3,
98:4, 101:17,
101:20, 101:21,
102:1, 104:11,
104:12, 105:24,
131:21, 132:25,
134:8, 137:13,
143:2, 143:6,
146:16, 146:18,
151:24, 151:25,
153:9, 161:7,
161:15, 162:11,
176:11, 180:6,
180:7, 180:24,
181:9, 183:15,
183:18, 183:21,
184:21, 184:23,
185:4, 185:13,
185:18, 186:19,
187:10, 187:14,
200:23, 208:4,
209:1, 209:13,
210:22, 211:12,
228:15, 228:16,
229:19, 229:20,
230:18, 231:15
**impacted**
78:2
**impacts**
39:15, 45:11,
57:10, 58:11,
68:5, 72:4,
72:6, 82:16,
82:17, 82:19,

82:20, 82:24,
83:8, 90:20,
90:21, 174:17,
175:19, 210:15,
210:16, 213:25
**impartial**
231:3
**imperfect**
109:21
**implementation**
116:4, 124:11,
140:23, 157:10,
161:10, 207:8,
207:25, 208:16,
208:20, 230:24
**implemented**
68:6, 85:11,
140:17, 161:12,
161:16, 162:11,
207:3, 207:6,
207:9, 207:20,
207:22, 208:1,
208:8, 208:9,
208:21
**implication**
86:21, 103:14,
161:13
**implications**
105:6
**implies**
103:6, 103:17
**implying**
94:13, 151:2
**important**
8:7, 23:13,
41:19, 90:6,
90:7, 93:2,
95:7, 96:21,
99:14, 118:4,
120:8, 155:20,
167:23, 175:8,
178:21, 230:1
**impose**
161:20, 161:21,
163:1, 213:8
**imposed**
184:6
**imposes**
163:5

**impossible**
185:6, 206:4,
207:7, 207:22
**impression**
112:14
**impressionistic**
69:14
**improper**
41:21, 41:24,
42:14, 54:10
**improve**
109:24
**in-difference**
128:1
**in-person**
239:17
**inadequate**
107:3
**inappropriate**
67:6, 97:3,
97:4, 97:16,
124:22
**inbox**
244:9
**incidence**
97:4, 147:18
**incidents**
166:16, 169:3
**include**
37:1, 128:24,
194:14, 196:5,
234:12, 234:14,
234:19
**included**
14:3, 14:5,
91:14, 95:19,
192:22, 198:2
**includes**
113:4, 149:10,
228:5
**including**
160:1, 202:5,
202:6, 213:1,
225:6, 237:13
**inclusive**
216:25
**incompatible**
199:17

**incorporate**
28:23
**incorrect**
98:11
**increase**
116:10, 212:24,
213:17
**increases**
85:20, 137:25,
219:8
**increasingly**
167:5
**incumbency**
20:20
**incur**
139:6
**indeed**
92:12, 106:19,
171:19
**independent**
21:18, 47:20,
64:21, 93:20,
176:19, 217:18
**index**
52:21, 52:25,
53:2, 53:11,
55:9
**indicate**
36:5, 80:20,
87:7, 87:8,
104:10, 134:7,
210:2
**indicated**
11:8, 11:23,
35:3, 35:7,
214:20, 237:3,
238:1
**indicates**
41:14, 62:19,
232:16
**indicating**
175:25
**indication**
69:8, 131:21,
199:13
**indicator**
191:20
**indicators**
70:21, 70:23

indirect
69:20, 69:22
individual
47:23, 48:4,
49:1, 50:11,
95:21, 106:5,
183:20
individually
56:1, 236:20
individuals
95:20, 96:7,
98:7, 211:7,
213:15
influence
20:9, 20:12
influences
102:1
information
14:20, 16:5,
35:15, 38:14,
42:1, 46:14,
55:20, 56:8,
99:13, 99:14,
125:10, 161:1,
162:9, 163:4,
164:4, 164:6,
173:23, 180:7,
180:8, 183:9,
183:10, 183:11,
196:4, 196:11,
197:9, 198:6,
209:21, 231:3
informative
189:20
inherently
153:10, 212:15,
212:19
initial
10:1, 10:2,
16:14, 16:15,
20:4, 20:6,
24:25, 87:25,
133:10, 133:11,
174:2, 179:9,
200:16, 215:5,
223:14, 223:16
initially
13:19, 175:3,

190:1, 190:20,
236:24, 240:2
injunction
14:2
input
25:8, 25:23,
87:24
inquiry
111:19, 234:3
ins
184:13
insecure
77:3, 77:7
inserting
103:14
instance
124:16
instances
154:16
instead
153:3
institutional
213:7
institutions
29:8, 185:12,
185:14
instructed
44:23
instruction
16:9
instructs
9:1
insufficient
197:10
insufficiently
196:20
integrity
167:24, 169:7,
169:25
intend
34:14, 223:25
intended
122:25, 123:2,
123:12, 123:19,
154:6
intensely
228:25
intent
45:13, 46:15,

46:18, 47:11,
47:17, 47:22,
48:4, 48:7,
48:12, 49:1,
49:14, 50:1,
50:18, 51:19,
52:2, 52:3,
52:7, 52:10,
53:11, 54:1,
56:12, 58:3,
58:7, 58:13,
58:15, 58:19,
58:21
intentional
47:3, 47:6,
49:25, 55:11,
55:12, 56:21,
59:11, 59:14
interest
21:2, 186:12,
247:11
interested
11:6, 38:6,
99:4, 99:7,
99:10, 99:11,
99:22, 238:2
interesting
29:22, 46:9,
128:10
interests
20:17, 164:22,
165:6
intermediate
111:14, 114:9
interpret
125:22
interpretation
95:4, 151:12
interpreted
156:15, 156:16
interrupt
62:2, 79:16,
119:16, 152:19
interrupted
87:3
interruption
73:10
intervals
195:2

intervening
124:12, 231:14
introduction
29:7, 30:1,
88:16
introductory
24:17, 25:10,
25:12, 29:14,
62:9, 152:10,
215:3
invented
123:24
inventive
51:11
investigated
151:21
investigation
209:13
involve
235:18
involved
11:25, 13:4,
19:3, 21:23,
22:19, 23:25,
24:1, 27:22,
29:11, 31:19,
31:22, 31:23,
32:13, 33:12,
33:22, 35:4,
55:18, 172:12,
224:20, 229:9,
238:2, 240:2,
241:22
involvement
12:20, 23:23,
24:6, 33:24
involves
29:8, 204:25
involving
22:15, 31:17,
32:15, 50:6,
67:25
irrational
95:25
irregularity
169:5
isolate
145:10

**issue**
31:1, 65:15,
66:10, 72:5,
82:17, 88:15,
89:3, 101:8,
113:21, 114:3,
115:2, 142:4,
143:4, 166:4,
174:25, 177:21,
177:23, 177:24,
188:3, 197:24,
198:1, 199:22,
209:15, 213:22,
232:14
**issues**
7:20, 20:3,
21:23, 25:25,
30:3, 30:6,
30:23, 56:7,
153:17, 165:1,
166:24, 228:1
**it'd**
107:9
**it'll**
174:24
**iterative**
71:25
**itself**
28:22, 41:15,
46:10, 52:14,
62:19, 67:14,
78:18, 108:21,
131:2, 131:10,
135:4, 154:4,
180:7, 183:22,
185:2, 198:5,
207:19

**J**

**january**
1:16, 80:19,
80:24, 84:3,
84:16, 247:15,
247:17
**job**
1:23, 92:23,
107:1, 107:21,
110:20

**john**
1:15, 5:2, 6:2,
6:16, 246:2
**johnson**
4:23
**join**
244:19, 244:22
**joint**
106:7
**jointly**
237:15
**josefiak**
3:6
**josh**
160:7, 232:13,
235:8, 244:6
**joshua**
3:4
**journal**
189:16
**judge**
8:24, 51:14,
52:17, 225:15
**judgment**
53:14, 220:23
**judicial**
22:16
**july**
80:20, 80:22,
83:23, 84:1,
84:17, 109:13,
123:23, 145:4
**june**
80:19, 80:24,
84:3, 84:17
**jury**
18:19, 22:23,
30:24, 31:3
**justice**
4:22

**K**

**keenan**
2:7, 152:22
**keep**
10:20, 215:6,
222:4, 222:5,
222:6, 224:24,

232:20, 243:23,
245:2
**kept**
77:14
**key**
65:17, 65:18,
72:5, 82:17,
148:21, 183:17
**keyboard**
170:6
**kind**
11:9, 20:25,
24:1, 25:9,
28:10, 35:20,
41:17, 50:22,
65:1, 66:1,
69:16, 83:20,
86:7, 91:19,
96:6, 106:9,
128:24, 137:11,
143:15, 154:3,
157:20, 160:16,
173:2, 180:5,
182:12, 183:13,
186:22, 197:14,
206:2, 211:9,
214:9, 229:2,
231:2, 231:8,
237:7, 239:22
**kinds**
19:17, 20:2,
50:2, 54:19,
56:25, 66:2,
68:17, 138:16,
139:8, 143:10,
163:7, 178:10,
186:7, 186:8,
208:14, 218:8,
225:5, 225:12
**knowledge**
33:16, 166:17,
206:6
**known**
18:2
**knows**
224:20
**koon**
4:3

**L**

**label**
206:18
**labeled**
122:1, 195:4
**labeling**
194:25
**labor**
25:6
**lack**
198:21, 201:3,
203:20
**lag**
112:23
**laid**
216:6
**language**
35:1, 62:19,
153:18, 198:25,
199:9, 210:6,
212:7
**lapining**
4:13, 242:23,
242:24
**large**
121:7, 130:5,
130:6, 131:10,
155:15, 218:6,
240:23
**largely**
19:13, 20:21,
24:11, 143:4,
189:11
**larger**
85:16, 129:6,
142:10, 193:23
**larocca**
220:10
**last**
7:8, 7:19,
15:7, 15:8,
15:9, 15:12,
17:4, 19:1,
23:8, 23:11,
28:16, 29:10,
33:18, 33:22,
34:4, 105:17,

106:18, 150:7,
150:8, 150:17,
167:7, 215:11,
222:24, 223:1
**late**
164:6, 191:16
**later**
8:25, 24:23,
126:4, 164:4,
197:12, 197:24
**latin**
154:1
**latino**
4:22
**latter**
94:15, 95:6,
141:8, 145:4
**law**
2:15, 18:20,
31:6, 52:7,
54:1, 66:3,
67:7, 68:6,
68:7, 68:9,
68:12, 74:19,
76:16, 82:20,
124:11, 124:21,
184:21, 184:24,
184:25, 185:4,
185:17, 207:5,
207:9, 207:12,
207:13, 207:17,
207:18, 207:19,
207:21, 208:4,
208:8, 208:16,
208:18, 208:20,
232:15, 233:8,
233:14
**law's**
207:24
**laws**
31:8, 31:9,
31:11, 53:24,
66:2, 163:7,
185:21, 188:3,
212:23, 214:4,
214:17, 216:17,
221:3, 221:19,
226:3, 227:8,

227:12, 227:19,
231:21, 231:25
**lawsuit**
11:3
**lawyer**
225:11
**lawyers**
11:21, 15:3,
15:6, 61:10,
173:19, 173:24,
175:11, 236:22,
238:3, 241:10
**lay**
69:19, 71:3,
200:21
**laying**
67:1
**lays**
69:16
**lead**
63:10, 64:4,
64:12, 69:20,
91:24, 212:24
**league**
4:13, 231:2,
242:24
**leap**
52:15
**learn**
71:22, 210:1
**least**
27:3, 29:6,
31:25, 32:17,
51:14, 100:9,
114:11, 119:25,
120:16, 132:14,
146:15, 149:2,
149:8, 151:15,
161:25, 186:9,
196:3, 199:13,
200:14, 200:15,
205:6, 205:24,
215:5, 223:5,
240:10
**leave**
88:25, 91:15,
224:9
**leaving**
23:12, 142:9

**led**
131:20
**left**
50:20
**legal**
4:14, 4:15,
20:3, 31:10,
47:13, 49:15,
49:16, 50:24,
51:5, 53:4,
53:5, 53:6,
53:14, 56:17,
58:14, 58:20,
63:20, 64:6,
76:21, 93:21,
184:13, 184:24,
185:1, 213:5
**legally**
56:16
**legislation**
13:24, 40:2,
43:14, 43:22,
45:13, 46:22,
46:23, 49:9,
52:15, 54:10,
57:25, 58:1,
58:2, 58:4,
58:6, 58:8,
58:14, 64:12,
64:17, 65:2,
69:24, 72:16,
75:25, 76:3,
76:5, 76:6,
76:10, 77:3,
77:22, 78:22,
83:18, 85:2,
85:3, 85:18,
87:11, 88:19,
89:7, 107:22,
108:14, 108:20,
108:21, 114:14,
133:5, 134:9,
141:10, 141:12,
141:22, 142:1,
143:7, 157:9,
160:19, 160:22,
161:17, 162:18,
168:11, 169:19,

169:20, 169:22,
177:1, 183:22,
183:24, 186:22,
193:21, 197:8,
203:10, 230:10,
230:11, 230:23,
231:9, 231:13
**legislative**
37:15, 38:5,
38:7, 38:11,
38:12, 38:18,
38:20, 43:4,
43:13, 43:15,
48:12, 50:7,
52:1, 52:3,
53:18, 54:9,
57:19, 58:15,
58:21, 165:3,
167:17, 231:11
**legislator**
52:11
**legislators**
46:19, 49:1,
52:9, 56:1,
57:20, 228:11
**legislature**
38:1, 46:16,
49:15, 52:6,
52:14, 53:25,
54:15, 54:16,
56:13, 63:20,
169:16, 230:4
**legislature's**
52:7, 54:1
**legislatures**
46:20, 167:22,
229:2
**legitimate**
160:18
**length**
37:25, 43:9,
151:21
**lengthy**
38:5, 45:25
**less**
12:21, 13:9,
13:11, 13:14,
15:15, 41:18,

46:19, 48:8,
71:24, 78:3,
89:10, 93:15,
94:15, 95:6,
95:13, 95:21,
126:5, 131:12,
137:24, 138:11,
147:24, 159:3,
182:22, 195:17
**let's**
15:7, 26:22,
37:3, 38:25,
60:14, 61:19,
80:13, 82:11,
83:1, 87:12,
92:6, 96:13,
96:22, 105:14,
106:16, 107:25,
112:6, 115:12,
125:7, 129:19,
135:5, 135:7,
144:10, 144:16,
147:2, 148:9,
187:2, 188:13,
198:19, 206:9,
208:22, 210:19,
211:21, 221:7,
222:6
**level**
28:8, 48:4,
51:14, 92:1,
95:14, 114:25,
136:21, 137:6,
169:3, 180:9,
182:9, 186:1,
202:13, 203:15,
208:13, 226:6
**levels**
90:20, 90:21,
136:3, 136:7,
162:8, 183:3,
186:16
**levy**
3:19
**liberties**
2:4, 3:10,
171:4
**license**
77:4, 77:6

**lichtfield**
123:7, 139:17
**lichtfield's**
140:2
**lichtman**
5:9, 12:7,
24:20, 36:21,
37:7, 37:18,
38:10, 40:25,
41:9, 41:22,
42:19, 43:23,
44:1, 49:20,
51:25, 53:4,
53:5, 53:15,
56:19, 57:6,
57:23, 58:9,
59:6, 92:24,
170:16, 175:25
**lichtman's**
34:25, 35:8,
35:17, 35:21,
36:2, 36:11,
36:22, 37:11,
39:1, 39:7,
39:11, 39:23,
41:11, 41:17,
42:23, 44:13,
45:4, 45:20,
57:15, 61:12,
170:14
**life**
70:16, 213:10
**lifetime**
167:4
**light**
206:19
**likelihood**
68:25, 137:25,
147:22, 151:5,
151:8
**likely**
40:17, 40:21,
43:21, 68:4,
69:2, 69:6,
69:9, 69:10,
69:12, 70:13,
73:20, 74:13,
78:1, 78:2,

78:20, 101:14,
105:20, 106:12,
129:12, 165:13,
181:14, 187:7,
211:24, 213:17,
213:20, 231:10,
231:11, 238:21
**likewise**
182:20
**limitation**
235:2
**limitations**
110:5, 110:6,
133:17
**limited**
50:4, 131:25,
138:25, 208:24,
209:6, 209:7,
209:15, 209:16,
209:17, 209:20,
210:2, 210:5,
210:8, 210:13,
210:18, 212:6
**line**
60:23, 193:15,
206:21, 219:15,
219:19
**lines**
21:4, 35:17,
195:1, 195:2,
195:3
**link**
69:24, 83:17,
83:19
**links**
13:21, 70:6
**list**
27:21, 33:14,
33:17
**listed**
81:11, 84:12
**listing**
166:16
**literally**
120:23, 121:2,
196:24
**literature**
118:12, 155:15,

156:24, 157:17,
219:5, 219:22,
228:8
**litigation**
31:22, 173:14,
227:10
**little**
12:2, 15:15,
28:2, 44:6,
80:16, 132:17,
210:3, 212:3,
214:7, 222:3,
240:9
**llp**
2:15
**local**
18:14, 18:20,
19:7, 19:11,
19:18, 20:19,
20:21, 204:16
**localities**
31:19
**locke**
4:10
**logic**
63:3, 64:12,
64:14
**logical**
66:5, 70:8,
70:10, 76:12,
78:25, 91:19,
91:20, 107:12,
107:16, 131:3
**long**
15:9, 15:12,
65:4, 97:18,
101:14, 112:23,
122:1, 152:12,
172:11, 178:11,
178:12, 205:21,
228:7
**longer**
64:16, 136:14,
155:9
**look**
7:23, 10:22,
27:10, 45:6,
52:17, 57:22,

62:10, 74:3,
80:13, 99:11,
99:16, 101:22,
105:5, 108:18,
108:23, 109:15,
110:14, 124:6,
131:8, 132:12,
132:16, 133:3,
170:3, 170:6,
179:10, 179:23,
183:23, 188:18,
193:8, 193:15,
194:25, 199:16,
202:16, 211:2,
211:24, 212:22,
215:10, 216:11,
222:11, 226:21,
238:7
**looked**
15:2, 15:3,
33:1, 50:20,
61:17, 62:14,
73:5, 135:22,
166:16, 176:3,
190:18, 222:18,
223:5, 223:8,
241:4
**looking**
10:24, 13:7,
35:6, 50:4,
50:25, 52:22,
90:14, 90:16,
90:19, 99:21,
129:13, 133:19,
133:21, 170:4,
189:17, 216:2
**looks**
26:20, 27:3,
27:4, 27:12,
61:3, 61:4,
73:25, 89:21,
127:17, 127:18,
127:19, 127:22,
135:23, 146:22,
158:21, 174:14,
179:14, 194:8,
209:11, 212:1,
243:5

**losing**
159:17
**lot**
12:16, 19:16,
19:23, 49:11,
55:20, 65:22,
70:6, 79:25,
86:23, 86:25,
87:5, 92:3,
93:12, 128:12,
138:14, 155:11,
155:18, 157:17,
168:13, 174:24,
196:12, 196:16,
199:10, 199:11,
201:5, 226:11,
228:22, 229:9,
229:10, 230:19,
239:11
**lot's**
50:9
**lots**
48:5, 50:6,
76:6, 86:5,
86:14, 95:17,
105:4, 105:6,
128:13, 137:2,
138:6, 145:16,
156:8, 161:13,
182:7, 186:11
**low**
158:17, 186:14
**low-cost**
158:12
**lower**
63:10, 64:4,
64:13, 65:3,
65:11, 65:24,
75:24, 116:3,
163:8, 213:9
**lowered**
65:18
**lowering**
65:12, 185:25
**lowers**
65:16
**lunch**
152:21, 152:24,

164:14

**M**

**made**
17:1, 36:15,
37:17, 39:14,
42:23, 43:3,
44:24, 48:14,
50:9, 52:11,
62:14, 64:9,
65:25, 66:1,
87:6, 94:11,
95:3, 95:22,
96:16, 105:1,
120:14, 136:6,
145:17, 148:7,
152:14, 156:5,
178:18, 202:2,
216:3
**maf**
1:9, 1:10, 1:11
**magical**
85:22
**magically**
109:24
**magnitude**
81:9, 84:11,
129:18, 142:3
**magnitudes**
96:1
**mail**
77:18
**main**
56:3, 143:2,
174:23, 191:14,
195:5, 197:21,
227:1, 228:24
**mainly**
175:25
**major**
226:7, 227:17
**majority**
12:22, 25:7,
219:9, 219:25
**make**
8:4, 8:12,
17:6, 52:18,
53:14, 53:17,

58:16, 66:18,
68:2, 68:25,
70:2, 70:7,
70:8, 70:10,
77:16, 77:17,
83:3, 94:7,
94:19, 95:7,
95:8, 95:15,
96:15, 96:18,
132:20, 142:20,
160:9, 168:20,
170:3, 170:7,
178:17, 178:18,
181:5, 186:21,
192:24, 194:16,
195:18, 199:10,
199:11, 203:3,
211:6
**makeba**
2:13, 6:13
**makes**
49:18, 85:22,
95:11, 101:13,
104:10, 133:8,
133:9, 162:3,
197:20, 203:6,
229:14, 231:7
**making**
46:4, 67:18,
94:24, 95:12,
98:17, 110:8,
127:24, 156:7,
163:14, 163:16,
177:15, 205:9
**manipulate**
154:8
**many**
6:20, 141:8,
154:16, 186:24,
236:17
**manyfold**
58:6
**marching**
222:4
**marginal**
148:22, 151:3,
151:6, 162:3
**mark**
60:14, 188:14

| | | | |
|---|---|---|---|
| **markarian** | **maybe** | 215:6, 230:25 | **megan** |
| 4:4 | 6:22, 15:11, | **meaning** | 2:7 |
| **marked** | 15:14, 18:16, | 120:18 | **member** |
| 26:11, 37:4, | 54:15, 54:16, | **meaningless** | 22:16 |
| 60:15, 60:17, | 65:9, 69:8, | 114:19 | **members** |
| 72:19, 174:10, | 73:2, 95:5, | **means** | 17:12, 32:1, |
| 179:8, 179:12, | 95:22, 101:5, | 49:21, 50:24, | 74:24 |
| 187:3, 188:15, | 102:18, 152:23, | 63:12, 86:19, | **memorialized** |
| 206:10, 206:24, | 203:16, 211:16, | 97:23, 103:9, | 223:22 |
| 211:15, 212:13, | 214:21, 215:17, | 112:5, 119:2, | **memory** |
| 222:7, 222:8 | 218:5, 232:4, | 119:17, 119:19, | 189:23, 189:25 |
| **markers** | 233:2 | 150:8, 150:18, | **mention** |
| 54:8 | **mcnamara** | 160:17, 205:6, | 90:4, 140:11, |
| **marketer** | 4:18 | 208:15 | 199:12 |
| 77:7 | **mean** | **meant** | **mentioned** |
| **marking** | 19:9, 21:16, | 174:22, 209:5, | 17:11, 24:13, |
| 179:8 | 24:15, 34:25, | 210:1 | 187:5, 190:14, |
| **maryland** | 35:24, 36:13, | **measure** | 190:16, 241:17, |
| 247:22 | 38:3, 43:19, | 67:6, 70:23, | 241:19 |
| **masschusetts** | 45:1, 47:24, | 89:12, 97:4, | **mentioning** |
| 2:16 | 48:9, 50:17, | 99:15, 99:16, | 241:14 |
| **master's** | 54:23, 57:11, | 104:11, 108:2, | **mentions** |
| 226:5 | 62:22, 63:8, | 108:8, 108:17, | 126:2 |
| **matched** | 63:12, 66:12, | 108:22, 109:18, | **message** |
| 205:24, 206:1 | 71:14, 76:25, | 109:19, 109:21, | 239:12, 239:13 |
| **material** | 79:7, 79:15, | 110:1, 110:13, | **messages** |
| 13:23, 14:4, | 85:8, 85:11, | 110:24, 110:25, | 239:6 |
| 14:23, 24:6, | 85:12, 88:12, | 111:1, 111:3, | **messaging** |
| 25:2, 25:4, | 90:5, 93:1, | 111:4, 111:5, | 239:16 |
| 25:12, 37:16, | 98:12, 100:25, | 112:2, 115:10, | **messes** |
| 40:8, 43:12, | 101:2, 101:24, | 134:1 | 167:13 |
| 46:7, 47:9, | 102:1, 113:16, | **measured** | **met** |
| 53:10, 57:24, | 119:6, 119:16, | 110:2, 110:12, | 18:4 |
| 58:25, 237:5, | 120:6, 127:16, | 111:12, 117:24 | **method** |
| 240:25 | 128:9, 132:17, | **measurement** | 78:21, 79:6, |
| **materials** | 133:15, 137:11, | 117:24 | 79:22, 80:7, |
| 12:25, 13:18, | 139:21, 141:9, | **measures** | 80:10, 80:11, |
| 24:14, 25:10, | 141:22, 142:25, | 96:25 | 81:20, 83:6, |
| 29:20, 59:3, | 149:17, 155:23, | **measuring** | 83:11, 83:13, |
| 244:7 | 159:22, 159:24, | 108:23, 110:9, | 94:14, 97:6, |
| **matter** | 161:19, 166:21, | 134:5 | 100:15, 102:2, |
| 6:14, 75:1, | 166:22, 167:16, | **mechanism** | 103:6, 103:8, |
| 75:22, 93:22, | 168:2, 181:6, | 102:23, 103:12, | 103:9, 104:11, |
| 107:12, 133:22, | 185:19, 188:24, | 103:13, 183:3 | 104:12, 111:15, |
| 169:10, 171:14, | 189:25, 194:12, | **mechanisms** | 114:5, 114:6, |
| 227:22, 232:11, | 196:5, 205:12, | 19:19 | 114:25, 116:12, |
| 234:15 | 209:7, 210:4, | **meeting** | 131:17, 132:23, |
| **matters** | 210:7, 210:10, | 15:16 | 136:14, 137:23, |
| 7:10, 7:14 | | | |

138:1, 138:4,
138:6, 138:25,
139:5, 139:19,
139:24, 140:13,
141:2, 142:5,
142:22, 158:12,
159:4, 159:18,
181:20, 182:12,
183:20, 209:10
**methodological**
20:25
**methodologies**
55:24
**methodology**
55:7, 142:18,
142:19, 144:6,
198:13, 198:14
**methods**
19:14, 21:25,
30:14, 77:1,
77:2, 81:10,
81:11, 84:12,
84:14, 85:13,
91:24, 92:14,
93:4, 93:14,
94:22, 95:2,
102:20, 106:23,
114:19, 115:7,
136:17, 138:8,
138:11, 139:13,
145:22, 213:23,
226:22
**metric**
51:6
**miami**
4:20, 31:17,
32:13, 33:5,
50:9
**middle**
38:4, 212:22,
221:17
**midterms**
28:18
**midwestern**
56:5
**midyear**
124:21
**might**
11:6, 39:12,

39:25, 40:3,
40:17, 41:8,
46:6, 47:13,
47:22, 48:9,
48:10, 48:22,
49:3, 49:11,
54:9, 56:1,
57:21, 59:8,
59:25, 63:2,
63:6, 63:23,
64:1, 64:12,
65:14, 65:23,
66:3, 67:2,
67:5, 68:10,
69:3, 69:11,
69:13, 69:20,
70:3, 70:9,
70:11, 75:8,
77:15, 79:18,
91:20, 93:14,
96:8, 96:9,
102:20, 106:3,
107:11, 107:12,
107:20, 109:4,
111:10, 120:6,
124:13, 159:24,
161:13, 161:16,
163:19, 181:18,
185:5, 185:8,
185:13, 186:1,
186:3, 186:10,
186:16, 189:20,
190:23, 194:17,
195:17, 199:6,
199:13, 199:18,
200:3, 200:23,
201:14, 202:7,
211:19, 216:15,
220:11, 229:19,
231:8, 232:11,
242:12, 242:17,
242:18, 243:3
**mile**
169:12
**millions**
96:2
**mind**
232:25, 233:6

**minds**
59:25
**mindset**
49:3
**mine**
26:1, 98:19,
111:7, 173:21,
215:15
**minimal**
229:20
**minor**
114:9
**minorities**
91:25, 141:17
**minority**
65:19, 78:13,
94:2, 94:5,
94:9, 94:14,
101:19, 108:15,
138:20, 141:20,
142:10, 194:2
**minutes**
15:11, 60:3,
152:23, 233:2,
233:13
**misguided**
58:3
**mislead**
202:7
**misleading**
201:25
**misled**
202:8
**misread**
94:23
**missing**
23:14, 27:18,
92:4
**mississippi**
7:3
**mistake**
156:2
**mistaken**
127:5, 243:4
**mode**
116:11
**model**
91:4, 149:8,

149:9, 150:11,
151:14, 151:15,
151:17
**modes**
147:25
**modest**
101:21
**modified**
88:1
**moment**
22:8, 71:1,
179:23, 221:15,
240:17
**money**
229:9, 230:14
**monroe**
3:7, 3:21
**month**
11:16
**monthly**
126:5
**months**
80:19, 80:20,
178:11
**more**
6:22, 11:8,
15:15, 19:7,
19:8, 19:9,
19:10, 19:11,
19:12, 20:1,
20:18, 20:19,
21:4, 23:3,
24:12, 29:22,
29:23, 44:1,
55:5, 61:12,
69:12, 71:11,
73:19, 74:13,
76:9, 77:16,
77:17, 78:1,
78:2, 78:8,
78:20, 83:3,
87:24, 95:11,
95:13, 95:22,
96:10, 101:13,
101:19, 104:1,
104:8, 105:16,
105:20, 106:12,
107:4, 111:1,

111:6, 112:24,
120:20, 122:17,
123:15, 123:16,
127:24, 130:24,
131:12, 138:11,
143:4, 145:17,
149:25, 152:23,
157:14, 158:25,
163:24, 164:13,
165:10, 169:15,
173:21, 177:15,
178:8, 178:15,
178:20, 181:13,
181:14, 181:21,
187:7, 193:2,
193:24, 196:12,
196:16, 201:21,
205:16, 206:21,
209:9, 211:6,
214:9, 214:13,
216:12, 223:3,
228:19, 230:13,
230:14, 230:15,
230:25, 232:11,
238:21, 243:13
**moreover**
65:15, 145:3,
147:23
**morning**
6:10, 6:11,
171:17, 223:8
**most**
6:23, 12:23,
25:1, 27:14,
39:11, 66:24,
67:22, 69:9,
69:10, 76:14,
84:15, 112:12,
112:19, 157:1,
161:25, 162:1,
182:3, 182:24,
203:17, 205:22,
217:5, 227:2,
236:19, 237:12,
238:20, 239:12
**mostly**
11:25, 37:16,
50:6, 70:17,

212:1, 238:18
**motivates**
228:3
**motivation**
103:18
**motivations**
30:12
**motor**
148:1
**move**
70:4, 208:22
**moving**
27:6, 230:20,
231:14, 238:8
**much**
12:9, 12:14,
13:2, 19:7,
19:11, 20:7,
26:17, 33:8,
33:10, 35:7,
35:16, 35:18,
36:3, 37:13,
40:14, 46:19,
48:13, 64:16,
78:3, 89:10,
93:15, 95:21,
113:21, 119:24,
126:5, 128:18,
131:9, 131:12,
145:17, 149:15,
150:14, 154:6,
157:14, 167:18,
169:6, 170:1,
170:25, 173:22,
186:10, 195:7,
195:17, 195:20,
197:11, 200:19,
201:19, 201:21,
209:9, 209:18,
217:11, 217:14,
223:11, 229:6,
229:13, 230:25,
231:18, 232:9,
235:8, 243:8,
243:13, 243:17,
244:20, 245:9
**mullin**
220:6

**multiple**
64:21, 65:2,
68:1, 205:1
**murky**
47:12
**must**
8:25, 22:13,
136:6
**muting**
146:11
**myers**
3:21, 31:20
**myself**
42:10, 46:12

**N**

**naacp**
1:6, 2:12, 6:8,
6:13, 244:18,
245:10, 245:14
**naive**
229:18
**name**
6:12, 6:15,
171:11, 242:23
**narrative**
44:12, 44:14,
45:10, 45:18,
45:22, 57:8,
58:10, 119:21
**narrow**
19:25, 218:14,
234:8
**narrowed**
35:19
**narrowly**
227:3
**national**
19:9, 95:24
**nature**
67:17, 176:25,
185:21
**near**
10:15, 130:13
**nearly**
209:18
**necessarily**
90:10, 139:10,

141:9, 154:25,
157:22, 157:23,
169:24, 231:12
**necessary**
68:13, 78:14,
105:12, 114:8,
117:9, 117:10,
117:11, 117:19,
117:20, 118:9,
178:7
**need**
9:11, 38:2,
38:9, 50:13,
57:2, 69:17,
71:11, 78:20,
102:10, 102:25,
105:9, 115:20,
116:23, 117:2,
117:3, 153:1,
163:10, 183:16,
197:9, 222:3,
233:3
**needed**
51:6, 114:20,
114:21, 177:13,
183:14, 198:7
**needs**
53:14, 115:24,
196:21
**negative**
39:15, 49:9,
76:24, 78:3,
80:25, 81:8,
84:10, 126:12,
126:14, 129:21,
129:25, 147:20,
208:5, 219:11
**neither**
78:14, 93:21,
114:8, 143:15,
144:12, 180:22,
247:9
**net**
137:3
**neutral**
48:10, 48:11,
132:8, 208:5
**never**
169:10, 189:15,

200:11, 201:17,
242:8
**new**
27:20, 80:21,
83:25, 113:4,
123:5, 126:8,
131:7, 146:3,
162:2, 230:15
**newer**
28:10
**next**
71:9, 93:7,
93:24, 113:3,
113:9, 187:21,
243:2
**next-door**
18:6
**night**
15:8, 15:10
**nine**
147:11
**nobel**
95:19
**nobody**
114:2
**nod**
8:11
**noise**
128:15, 195:15,
195:17, 195:21
**non**
194:2
**non-black**
76:10
**non-causal**
133:18
**non-citizenship**
241:21, 242:4
**non-experimental**
133:18
**non-governmental**
66:14
**non-hispanic**
72:7, 73:21,
82:18, 89:8,
105:21, 106:13,
111:17, 146:19,
146:25, 174:18,

175:20, 176:12,
181:23, 187:8
**non-minority**
132:24, 141:20,
142:10
**non-party**
149:5
**non-peer-reviewed**
205:16
**non-targeted**
95:10
**non-white**
73:15, 87:19,
88:2, 88:8,
88:10, 89:13,
89:15, 94:4,
97:5, 104:18,
115:22, 115:25,
116:6, 116:10,
125:12, 126:1,
126:11, 126:14,
126:19, 126:22,
128:19, 129:5,
129:20, 135:14,
136:2, 136:24,
147:5, 147:14,
147:17
**non-whites**
91:2, 127:23,
147:10
**noncitizen**
241:6
**noncitizens**
168:4, 168:6
**none**
54:13, 64:9,
131:25, 139:21,
139:25, 140:1,
140:2, 140:3,
143:20, 163:21,
208:11, 213:23
**nonetheless**
29:20, 51:12,
51:16, 191:17
**nonexpert**
49:5
**nonprofit**
66:14

**nonregistered**
200:3
**nonsensical**
115:11
**nonstatistical**
202:20
**nontrivial**
160:15, 160:17,
180:21, 182:15,
182:18
**normal**
56:5, 244:3
**normalizations**
112:8
**normally**
13:12, 13:13,
130:22
**northern**
1:2
**northwest**
2:9, 2:16, 4:16
**nos**
1:8
**notarial**
247:14
**notary**
2:2, 247:21
**note**
34:20, 41:9,
150:25, 152:19,
180:18
**nothing**
6:4, 10:13,
48:16, 51:17,
83:12, 131:23,
208:2, 208:3,
208:10, 208:11,
209:12, 216:18,
216:24, 223:15,
239:24, 244:16,
245:10
**notice**
2:1, 244:11,
244:24
**noting**
94:3
**notion**
88:17, 95:12,

157:18, 176:7,
194:17, 218:14
**novel**
153:4
**nowhere**
146:17
**nuanced**
228:19
**number**
13:4, 13:5,
67:16, 77:5,
77:6, 89:14,
98:6, 155:20,
168:10, 180:21
**numbers**
102:4, 106:11,
121:19, 121:20,
122:3, 122:6,
122:7, 122:17,
123:16, 129:14,
135:11, 194:5,
202:9
**numerical**
196:11

**O**

**o'donnell**
2:14, 244:18,
245:9, 245:14
**oath**
8:14
**object**
8:23, 180:3,
245:5
**objected**
206:2
**objection**
16:1, 57:17,
81:25, 127:14,
160:10, 171:25,
172:1, 172:25,
180:2, 235:3
**objections**
8:24
**obscuring**
122:14
**observed**
116:8

| | | | |
|---|---|---|---|
| **obvious** 76:14, 147:23, 157:5 **obviously** 14:16, 19:23, 33:24, 55:2, 83:10, 99:9, 119:9, 128:12, 145:21, 149:12, 175:24, 182:11, 192:11, 194:15, 200:8, 204:9, 228:1 **occur** 40:17, 69:2, 69:3, 69:6, 69:9, 69:10, 69:11, 69:13, 69:18, 186:2, 186:10, 218:7, 238:6 **occurred** 11:16 **occurrence** 166:23, 169:24 **occurrences** 168:17 **occurring** 118:1 **offer** 34:14, 35:20, 48:17, 49:17, 49:21, 55:9, 57:2, 57:5, 58:9, 59:10, 71:6, 75:16, 92:13, 92:19, 105:22, 160:23, 165:16, 165:21, 170:9, 175:13, 176:1, 176:21, 177:4, 181:7, 185:16, 186:7, 187:9, 195:5, 200:15, 210:14, 217:14 **offered** 55:20, 164:23, | 165:5, 201:18 **offering** 46:13, 63:5, 66:4, 75:7, 136:11 **offers** 40:5, 73:25, 75:19, 92:9, 165:6 **offhand** 195:6 **office** 77:15, 92:12, 94:13, 159:7 **officer** 247:2 **offices** 18:6, 94:8, 94:9 **official** 1:9 **officials** 94:8 **offline** 245:8 **offset** 116:10 **often** 42:7, 50:8, 70:14, 71:9, 96:10, 100:22, 102:7, 104:1, 105:8, 121:25, 132:24, 156:4, 166:25, 167:1, 170:3, 218:8, 221:2, 228:11, 228:12, 228:13, 238:19 **oh** 13:12, 109:25, 144:10, 220:14, 220:15 **okay** 6:20, 9:2, 9:9, 9:10, 10:6, 10:12, 10:19, 86:16, 100:18, | 101:25, 159:6, 160:12, 162:21, 170:7, 172:6, 173:12, 173:22, 174:9, 175:1, 175:16, 176:14, 176:21, 177:4, 179:3, 180:11, 180:16, 181:5, 181:24, 182:20, 183:13, 184:4, 184:9, 184:20, 185:15, 187:20, 188:2, 188:5, 188:13, 189:24, 190:6, 190:10, 191:8, 191:12, 192:4, 196:22, 197:2, 197:25, 198:19, 200:5, 202:1, 204:13, 204:22, 206:23, 207:1, 207:5, 207:21, 209:5, 209:23, 211:14, 211:25, 212:12, 213:2, 214:7, 214:15, 215:12, 215:19, 216:15, 216:22, 217:8, 217:22, 218:4, 218:24, 219:18, 219:24, 221:7, 221:22, 222:1, 222:21, 223:22, 224:7, 225:22, 232:2, 235:23, 236:1, 236:15, 237:11, 238:14, 239:5, 240:1, 242:7 **okeechobee** 3:19 **old** 231:1 **older** 186:17 **omit** 197:14 | **once** 29:6, 91:25, 134:10, 138:24, 154:6, 223:1, 223:4 **one** 17:23, 22:24, 22:25, 36:13, 39:3, 43:10, 50:11, 50:18, 53:3, 61:5, 63:23, 65:6, 65:23, 67:1, 71:19, 72:13, 75:11, 83:16, 87:4, 91:22, 92:5, 93:1, 94:13, 95:5, 95:11, 96:8, 107:19, 118:6, 120:8, 129:16, 137:23, 142:8, 143:8, 143:10, 143:11, 144:24, 145:1, 151:12, 165:6, 169:12, 170:17, 172:13, 175:22, 178:13, 179:17, 181:19, 188:3, 188:24, 190:10, 190:18, 191:13, 193:19, 196:9, 198:4, 206:7, 215:1, 215:17, 217:11, 218:5, 221:1, 221:19, 224:5, 224:15, 226:4, 232:10, 241:9 **one-finger** 239:11 **ongoing** 17:3 **online** 79:13, 102:15, 102:18 **only** 44:20, 53:12, |

69:11, 86:7,
94:10, 110:25,
111:3, 112:2,
117:18, 132:10,
133:23, 141:14,
143:8, 145:3,
154:7, 168:19,
177:6, 191:21,
192:20, 193:19,
195:9, 196:19,
199:12, 202:9,
215:25, 231:1,
235:20, 241:20,
242:2
**oops**
178:25
**open**
10:9, 10:12,
10:13, 48:5,
224:24, 232:20,
245:2, 245:6
**opened**
224:18
**operate**
97:18, 212:10
**operating**
74:20, 76:17,
78:23, 205:4
**operation**
76:22
**operationalize**
117:13
**operationalized**
70:21, 70:25
**operationalizes**
108:9
**operations**
63:16
**operative**
54:2
**opine**
34:6, 53:15
**opining**
78:7, 98:10
**opinion**
38:22, 40:7,
47:11, 49:21,
57:1, 57:2,

59:10, 59:13,
90:1, 133:13,
134:13, 136:13,
162:16, 162:23,
165:5, 165:8,
165:10, 166:25,
225:1
**opinions**
34:13, 34:16,
35:20, 38:19,
38:20, 41:23,
42:5, 43:21,
48:24, 59:24,
156:12, 165:16,
165:21, 178:7,
212:6, 223:20,
223:23, 224:1
**opponents**
39:14, 42:24,
43:5, 43:13,
228:13
**opportunity**
234:1, 240:4
**opposed**
43:20, 79:13,
86:9, 103:7,
103:13, 132:12,
193:15, 199:7
**opposite**
21:17, 76:2,
134:21
**opposition**
46:3
**options**
224:24
**orange**
4:8, 4:11
**order**
105:10, 139:6,
164:1, 214:22,
244:1, 245:13
**organization**
102:23, 103:2,
158:12, 159:9,
159:11, 163:6,
163:13, 163:23,
211:5
**organizationally**
237:7

**organizations**
30:18, 34:7,
63:15, 63:16,
63:21, 64:7,
64:22, 66:14,
68:1, 70:1,
75:9, 75:10,
76:23, 77:12,
78:14, 79:3,
79:5, 79:8,
79:10, 79:21,
79:25, 80:4,
83:19, 86:2,
97:1, 100:11,
100:21, 102:6,
103:16, 103:19,
103:24, 104:7,
140:17, 147:13,
147:14, 149:25,
160:14, 161:22,
162:13, 163:18,
163:19, 164:11,
166:13, 218:2,
218:15, 226:18
**orientations**
55:25
**origin**
119:24, 131:2,
131:3
**original**
12:3, 12:4,
128:25, 129:2,
129:3
**orlando**
4:8, 4:11
**other**
3:17, 4:2, 8:8,
9:5, 9:7, 10:9,
13:22, 13:23,
14:13, 14:24,
18:6, 19:17,
21:15, 21:17,
22:4, 22:25,
25:3, 31:13,
35:23, 36:7,
38:21, 40:18,
40:21, 41:1,
41:22, 42:3,

56:24, 63:3,
64:4, 65:22,
66:6, 67:1,
67:15, 67:18,
68:16, 69:12,
69:21, 78:4,
80:11, 85:19,
85:20, 86:14,
95:11, 101:23,
103:21, 106:23,
111:9, 116:12,
117:5, 117:19,
117:25, 121:13,
129:16, 131:16,
136:16, 137:18,
138:5, 145:16,
147:25, 149:24,
153:23, 154:15,
154:23, 154:24,
157:11, 157:15,
163:7, 166:17,
168:10, 168:23,
169:13, 170:3,
176:8, 176:22,
183:10, 193:13,
194:13, 195:19,
196:4, 202:4,
203:19, 206:7,
208:18, 209:2,
218:8, 223:2,
228:24, 230:17,
236:13, 238:11,
239:12, 239:15,
239:18, 242:1,
242:22, 243:19
**others**
71:24, 185:23
**otherwise**
111:23, 202:18,
232:21, 247:11
**out**
12:1, 13:8,
23:12, 33:9,
36:2, 38:3,
43:25, 63:2,
67:1, 67:22,
69:16, 69:19,
71:3, 75:23,

77:14, 79:12,
79:19, 92:22,
93:22, 95:24,
96:3, 98:1,
98:9, 99:6,
105:11, 118:3,
121:4, 123:22,
127:25, 130:15,
131:17, 138:16,
150:3, 154:18,
157:17, 159:2,
161:14, 186:21,
190:4, 191:19,
200:21, 201:2,
225:6, 225:15,
228:15, 229:4,
229:12, 229:16,
229:19, 231:3,
231:4, 231:10,
231:15, 236:8,
236:9, 236:10,
236:25
**outcome**
28:25, 76:13,
126:8, 247:12
**outcomes**
48:21, 230:2
**outline**
240:8, 241:1
**outlines**
185:20
**outs**
184:13
**outside**
39:7, 241:6
**over**
7:19, 8:1, 8:4,
8:8, 15:2, 15:4,
25:18, 29:10,
37:16, 44:18,
73:5, 76:22,
83:17, 90:14,
90:17, 119:5,
138:10, 143:19,
145:21, 156:24,
203:22, 206:16,
222:24, 223:3,
223:6, 238:6,

239:15, 239:16
**overall**
80:21, 84:1,
135:23, 135:25,
136:7, 140:16,
140:22, 141:5,
150:20, 151:19,
193:5, 209:11
**overestimate**
229:25
**overlap**
20:15, 20:24,
21:1
**overlook**
215:21
**overwhelmed**
127:21
**overwhelming**
147:8
**own**
12:20, 14:16,
21:12, 37:1,
37:18, 38:4,
41:20, 48:24,
51:21, 89:24,
91:12, 94:21,
119:1, 119:5,
139:15, 139:21,
156:9, 163:5,
198:23, 224:5
**ownership**
118:25, 119:4,
119:7, 119:11,
119:15, 119:18,
119:19

**P**

**packaged**
25:3
**page**
5:2, 5:7, 8:5,
26:21, 26:22,
27:6, 27:8,
34:11, 34:20,
34:21, 44:8,
44:9, 60:10,
60:20, 61:3,
61:22, 72:3,

73:17, 73:21,
74:6, 74:7,
82:2, 82:6,
82:10, 82:11,
87:8, 87:12,
92:7, 94:3,
96:23, 104:17,
105:14, 105:16,
107:25, 112:7,
113:3, 113:9,
115:19, 118:22,
125:7, 135:5,
144:10, 144:11,
147:2, 152:4,
174:11, 174:15,
178:23, 178:25,
179:1, 179:3,
179:14, 179:19,
180:17, 180:18,
187:2, 191:4,
201:24, 206:11,
208:22, 209:24,
210:19, 212:14,
214:3, 214:9,
215:11, 215:13,
219:4, 221:7,
221:8, 221:14,
221:17, 221:18,
222:14
**pages**
1:24, 39:3,
215:25, 216:19,
217:3
**paid**
61:13
**palm**
4:3, 4:5
**panels**
191:18
**paper**
5:14, 32:24,
120:18, 140:8,
179:15, 179:23,
188:8, 188:12,
188:19, 188:22,
188:23, 189:1,
189:3, 189:6,
189:9, 190:8,

190:14, 190:15,
190:18, 191:1,
191:2, 191:5,
192:5, 192:10,
192:15, 192:19,
192:23, 198:1,
198:2, 198:19,
198:22, 201:2,
201:18, 203:3,
203:6, 203:21,
204:12, 204:15,
211:19, 217:12,
221:3, 221:5,
242:8, 242:9,
242:19
**papers**
120:23, 217:2,
217:5, 217:9,
217:21, 217:25,
218:16, 218:25,
220:3, 220:20,
221:1, 221:9
**paragraph**
24:25, 36:6,
39:4, 39:7,
61:23, 62:9,
72:2, 73:7,
73:12, 73:22,
73:24, 74:15,
75:4, 78:4,
81:2, 81:6,
82:15, 92:7,
92:8, 92:18,
93:10, 93:24,
94:16, 96:23,
105:17, 106:17,
107:11, 108:1,
113:8, 123:21,
124:5, 125:4,
125:21, 126:8,
126:10, 127:1,
127:12, 143:8,
143:10, 144:17,
145:2, 145:24,
146:14, 146:15,
148:10, 148:25,
150:19, 151:11,
170:17, 179:20,

179:22, 180:12,
191:13, 192:21,
196:16, 197:15,
200:2, 211:25,
212:2, 212:11,
212:23, 216:6,
216:16
**paragraphs**
25:10, 80:13,
81:24, 83:4,
145:12, 192:20,
237:23, 240:10
**paralegal**
4:25
**parallel**
51:1
**paribus**
153:25
**part**
19:25, 45:5,
66:24, 67:14,
96:7, 99:2,
103:7, 103:18,
119:14, 141:8,
161:18, 199:10,
205:22, 214:8,
226:12, 226:19,
229:14, 229:25,
240:19, 242:2
**participants**
3:17, 4:2
**participate**
98:5, 213:10
**participation**
21:15, 186:1,
213:7, 228:5
**particular**
18:25, 43:11,
43:17, 50:8,
61:13, 63:7,
66:4, 66:22,
66:25, 67:9,
72:16, 75:11,
75:12, 80:10,
86:10, 122:1,
157:19, 170:13,
185:4
**particularity**
63:17

**particularly**
18:17, 19:12,
19:13, 21:6,
29:21, 98:17,
149:24, 184:25,
185:5, 191:25,
199:20, 224:21,
225:12, 227:2,
228:2, 228:18,
236:20
**parties**
73:16, 104:20,
116:2, 147:6,
229:7, 247:10
**partisan**
51:2, 51:5,
51:14, 51:19,
52:23, 231:5
**partisanship**
101:23
**parts**
37:13, 119:10,
215:25, 230:20,
231:14, 240:3,
240:25
**party**
30:17, 34:7,
64:7, 70:1,
76:12, 76:18,
76:22, 77:5,
78:13, 79:2,
79:4, 79:12,
79:24, 80:3,
84:15, 85:17,
86:1, 91:3,
97:1, 100:11,
100:20, 101:9,
101:18, 102:5,
102:21, 103:1,
103:15, 103:23,
104:6, 113:23,
116:7, 135:13,
135:25, 136:4,
143:5, 147:9,
147:12, 147:15,
147:16, 147:19,
147:21, 147:22,
147:23, 148:12,

148:15, 149:3,
149:6, 149:7,
149:10, 149:16,
150:4, 150:15,
150:22, 151:2,
151:7, 151:8,
151:24, 152:1,
158:11, 159:8,
160:6, 160:14,
160:21, 162:12,
166:13, 173:20,
180:10, 181:21,
192:1, 199:21,
199:23, 199:25,
218:1, 218:15,
226:17, 228:21
**pass**
52:14, 53:24,
164:15, 173:23,
242:21, 243:1
**passage**
66:11, 69:5,
126:1, 207:17,
208:18
**passed**
58:4, 68:6,
68:8, 83:22,
161:14, 188:5,
224:8, 224:16,
225:2
**passes**
52:14
**passing**
17:11, 52:7,
54:1, 199:12
**past**
16:21, 28:5,
28:7, 28:11,
31:24, 68:19,
113:24, 138:4,
205:13, 205:14,
214:4, 214:17,
216:17, 221:19
**paste**
43:17
**pasting**
24:7
**patch**
32:25

**path**
49:6, 63:6
**patient**
235:13
**pattern**
142:16
**pay**
163:3, 163:23,
195:6, 201:19
**paying**
184:14, 224:3
**peer**
190:25, 204:23,
205:19
**peer-reviewed**
54:7, 190:15,
205:5, 205:15,
226:9, 242:9
**peer-reviewing**
201:1
**penalties**
77:9
**pending**
244:25
**people**
22:4, 30:13,
49:4, 54:14,
58:3, 58:13,
59:25, 76:25,
77:4, 80:11,
91:23, 96:3,
100:14, 115:3,
120:24, 121:1,
138:7, 149:16,
154:1, 155:13,
156:5, 156:8,
159:18, 159:20,
159:25, 167:19,
167:23, 168:9,
168:15, 168:18,
169:17, 186:2,
186:11, 202:18,
224:9, 230:15,
243:12, 243:13
**people's**
77:12
**perceived**
93:13, 158:17,

159:3, 167:17

**percent**
54:11, 69:11,
80:22, 80:24,
81:1, 81:9,
84:1, 84:3,
84:10, 100:9,
101:13, 101:15,
116:20, 126:13,
126:14, 127:19,
127:20, 128:19,
128:21, 129:15,
129:22, 130:1,
130:11, 132:18,
133:5, 137:16,
138:20, 141:23

**percentage**
129:13, 131:13

**perception**
169:4, 169:15

**perceptual**
158:24

**perceptually**
168:18, 170:1

**perfect**
27:8, 60:21,
136:16, 136:18,
179:15, 217:24

**perfectly**
56:15, 133:9,
204:1

**perform**
186:23

**perhaps**
26:14, 217:9,
232:23, 233:14

**perilous**
168:1

**period**
84:24, 85:14,
86:10, 117:25,
130:19, 137:21,
143:23, 143:25

**periods**
83:9, 83:10,
84:16, 85:4,
85:5, 125:14,
125:25, 130:20

**person**
19:8, 19:10,
22:2, 50:18,
98:22, 120:25,
186:3, 204:17,
234:6

**person's**
53:3

**personal**
18:7, 111:9,
160:25, 162:16,
172:7

**personally**
58:17

**personnel**
164:2

**persons**
108:3, 115:23,
116:1, 116:6,
116:9, 116:11

**perspective**
158:14, 158:18

**pga**
4:5

**ph**
1:15, 5:2, 6:2,
246:2

**phase**
221:11, 238:12

**phone**
9:7, 10:15,
10:20, 234:6,
235:6, 236:5,
238:18, 238:21,
239:17, 241:11,
241:12, 241:17,
241:22, 244:9

**phrase**
153:24

**phrased**
162:24

**piece**
52:15, 64:17,
90:11, 196:19,
197:7, 220:8,
220:9, 220:10,
220:11, 220:12

**pieced**
121:9

**pieces**
92:4, 93:1,
205:4

**piled**
131:18

**pirate**
33:1

**place**
68:23, 68:24,
86:13, 135:24,
142:8, 211:24,
221:12, 241:9

**places**
37:25, 169:14,
205:4

**plagiarism**
119:7

**plaintiff's**
42:9, 42:17

**plaintiffs**
1:7, 2:5, 2:12,
3:11, 4:14,
4:19, 6:8, 6:13,
47:2, 47:5,
158:23, 165:14,
171:4, 171:14,
231:24, 234:24,
242:25, 243:6,
244:19, 245:10,
245:14

**plan**
29:15, 32:3,
50:12

**platforms**
239:16, 239:19

**plausible**
91:19, 91:21,
210:15

**play**
228:23, 229:16,
229:19, 231:15

**players**
68:1

**please**
6:14, 8:9,
8:19, 9:12,
10:23, 164:17

**pleasure**
171:7

**pllc**
3:6

**plus**
140:17

**point**
17:25, 46:17,
56:3, 60:1,
73:18, 74:2,
85:9, 85:12,
87:14, 89:11,
89:19, 89:21,
90:4, 90:24,
91:8, 91:14,
94:7, 94:11,
94:19, 94:20,
95:7, 96:15,
96:17, 96:21,
98:16, 101:25,
114:10, 115:19,
121:3, 122:1,
122:12, 122:23,
123:12, 123:22,
124:25, 125:8,
125:15, 135:9,
135:18, 135:19,
135:20, 135:21,
136:21, 142:7,
143:2, 146:19,
195:5, 196:10,
200:12, 200:18,
201:2, 203:3,
206:3, 220:6,
223:17, 237:17,
245:11

**pointing**
43:25, 145:19

**points**
64:9, 86:8,
118:3, 131:13,
135:8, 138:8,
150:3, 178:18,
196:10, 207:14

**poking**
50:23

**polarized**
7:10, 7:15,
19:24, 34:3,
36:25, 100:4,

225:25, 227:4,
231:5, 231:6
**policies**
161:9, 161:13,
169:2
**policy**
20:5, 20:7,
87:3, 140:19,
142:16, 161:8,
161:10, 161:11,
162:3, 166:24,
168:13, 168:14,
169:11, 169:15,
169:18, 189:14,
207:19, 207:20,
226:7, 226:8,
226:9, 226:11,
226:21, 226:22
**policymakers**
50:8, 54:22
**political**
14:17, 17:22,
20:12, 21:5,
21:6, 28:20,
29:13, 29:24,
38:22, 48:14,
48:19, 50:14,
55:14, 55:15,
55:17, 55:18,
56:5, 67:21,
148:11, 148:15,
149:14, 150:1,
150:22, 151:2,
151:8, 154:1,
154:5, 154:11,
155:25, 157:14,
213:10, 218:7,
228:23, 228:25,
229:1, 229:4,
229:7, 229:11,
229:13, 230:1,
230:19, 230:23,
230:24, 231:6,
231:17, 231:18
**politics**
5:14, 10:3,
16:17, 24:24,
25:14, 28:8,

29:7, 29:12,
30:2, 142:20,
189:14, 204:17,
243:15
**polling**
221:12
**pool**
98:6, 150:13
**pooled**
98:6, 98:7
**population**
89:16, 90:2,
99:18, 99:19,
99:23, 100:2,
100:7, 108:5,
109:2, 109:12,
110:18, 111:23,
111:25, 114:13,
126:3
**populations**
125:13, 186:17
**pork**
19:16
**portion**
62:3, 62:5,
62:7, 62:17,
106:1, 116:17,
190:6, 214:16,
221:16
**portions**
37:22, 190:10,
240:5
**position**
69:4, 112:3,
197:25, 245:7
**positive**
76:25, 94:21,
150:23, 186:19,
208:5, 219:7,
219:10, 221:4
**possession**
140:3, 140:4
**possibilities**
63:2, 65:23,
107:16, 137:2
**possibility**
65:6, 65:13,
66:5, 76:1,

91:1, 136:11,
136:12, 155:22,
155:23, 199:18,
200:6
**possible**
13:12, 13:15,
26:14, 58:7,
61:25, 66:25,
72:13, 76:1,
122:23, 138:22,
139:4, 139:8,
139:9, 170:1,
192:24, 200:7,
212:9, 214:20,
216:8, 216:24,
239:7, 241:10
**possibly**
41:8, 222:25,
240:19
**post**
77:15, 128:4,
128:9, 130:20,
133:5, 203:9
**post-august**
191:22
**post-legislation**
136:23, 194:4
**post-sb**
80:19, 126:15,
127:18, 128:5,
134:11, 210:17
**potential**
39:15, 64:6,
64:21, 65:3,
66:1, 67:6,
69:1, 146:16,
164:9, 215:22
**potentially**
69:6, 76:8,
78:16, 107:3,
160:24, 161:5,
210:14, 211:4,
211:5
**practical**
67:20, 93:21
**pratt**
3:4, 16:1,
16:6, 26:13,

26:17, 57:17,
60:6, 81:25,
115:14, 127:14,
152:18, 152:25,
153:5, 160:9,
164:16, 171:25,
172:25, 180:2,
232:24, 233:16,
233:23, 234:13,
234:18, 234:25,
235:9, 243:5,
243:18, 244:12,
244:17, 245:4,
245:12
**pre**
128:4, 128:5,
128:9
**pre-sb**
80:18
**preceding**
125:14
**precheck**
167:10, 167:11
**precise**
88:8
**precisely**
106:8
**precision**
134:2, 134:3
**precluded**
225:17
**predict**
157:3, 186:3,
229:15, 230:21
**predicting**
28:25, 230:16
**prediction**
68:2, 159:22
**predictions**
70:16, 156:21
**predictive**
228:18
**predictor**
67:13
**preemptive**
68:13
**preferred**
11:24

**prejudice**
55:16
**preliminary**
14:2
**premarked**
72:17
**prep**
236:12
**preparation**
16:11, 61:15,
73:5, 174:3,
189:3, 236:4
**prepare**
14:25, 16:25,
171:24, 172:23,
235:17
**preparing**
12:15, 164:21,
172:4, 176:23
**present**
15:16, 53:21,
145:20, 224:1,
232:16, 233:5,
233:11, 234:6,
235:5, 235:19,
236:14, 236:18
**presentation**
94:25, 95:4
**presentations**
59:19
**presented**
203:6, 204:4
**presents**
179:3, 204:5
**president**
50:15, 50:16
**presidential**
28:18, 144:23,
144:25, 145:1
**presumably**
85:10, 138:15,
197:13, 238:8
**presume**
178:3
**presumed**
71:8
**pretty**
22:21, 31:3,

68:15, 112:23,
202:13, 203:7,
210:18, 232:15,
239:19
**prevent**
203:20
**previous**
20:4, 118:14,
132:3, 143:23
**previously**
18:9, 19:15,
225:16, 225:24
**primarily**
7:7, 24:1
**primary**
29:21, 29:22,
175:14
**primo**
220:9
**printed**
222:17
**printer**
222:20, 223:8
**prior**
17:7, 18:2,
25:25, 32:10,
68:14, 126:6,
193:7, 193:12,
193:21, 227:10,
230:9, 236:2
**privately**
235:25
**privilege**
171:25, 172:25,
232:14, 232:20,
233:3, 233:5,
235:2
**privileged**
16:1, 16:5,
232:18, 233:12,
244:16
**prizes**
95:19
**probability**
68:23, 213:9
**probably**
14:5, 15:15,
21:13, 87:22,

87:25, 106:7,
131:3, 145:16,
158:17, 202:12,
215:1, 215:2,
223:3, 223:4,
240:10, 240:16
**probative**
101:13, 132:1,
143:18
**problem**
134:3, 135:1
**problematic**
51:12
**problems**
134:2, 134:25
**procedural**
225:13
**procedure**
224:17
**process**
29:21, 29:22,
29:23, 54:9,
54:10, 63:1,
70:12, 71:25,
72:1, 78:1,
98:5, 106:8,
167:16, 200:9,
201:6, 201:9,
204:25, 205:5,
229:13, 230:22,
230:23, 231:11,
237:2, 240:9,
240:23, 243:11,
244:3
**processes**
53:23, 230:2
**produce**
107:7, 107:9,
137:5, 153:19,
157:5, 157:19,
157:20, 201:22
**produced**
13:21, 51:11,
86:22, 155:12,
175:15, 178:2,
183:3, 186:16,
192:15, 219:6,
240:6

**producer**
119:21
**produces**
230:22
**producing**
223:17
**production**
185:14
**professionally**
18:3
**professor**
28:2, 73:14,
87:14, 89:12,
90:25, 104:17,
115:21, 116:15,
125:9, 144:12,
147:3
**professors**
215:20
**proffer**
70:15
**progress**
48:14
**prohibit**
79:2
**prohibitions**
186:7
**project**
2:8, 3:15, 30:8
**prominently**
206:21
**promoter**
243:15
**promulgated**
185:2
**pronounced**
191:25, 199:20
**proof**
92:21
**proper**
90:17
**properly**
56:11, 77:19,
90:14
**proponents**
228:13
**proportion**
73:15, 76:11,

91:2, 97:24,
100:13, 100:14,
104:3, 104:9,
104:14, 104:15,
104:18, 108:3,
108:18, 108:24,
111:24, 113:22,
114:17, 115:25,
116:5, 147:4,
147:8, 181:20,
181:22, 186:19
**proportions**
90:16, 138:9
**proposed**
175:18
**proposing**
169:19
**protected**
170:1, 234:15
**proud**
167:12
**prove**
47:6, 71:16,
92:22, 93:20,
107:22
**proven**
65:6, 67:12,
186:17
**provide**
13:1, 27:14,
32:16, 35:16,
36:7, 36:9,
36:18, 37:18,
39:3, 39:6,
41:1, 47:10,
51:7, 59:1,
72:4, 72:14,
76:21, 81:16,
82:3, 82:15,
87:8, 88:22,
93:18, 93:19,
106:20, 107:5,
107:8, 107:17,
110:17, 117:21,
118:17, 118:22,
121:19, 121:22,
123:5, 125:23,
170:12, 173:3,

180:6, 180:8,
180:23, 185:16,
194:21, 197:9,
198:6, 209:21,
217:17
**provided**
12:8, 13:18,
14:14, 14:20,
14:23, 25:19,
26:21, 26:25,
27:9, 36:14,
36:23, 37:7,
40:8, 42:5,
42:8, 49:24,
51:18, 52:23,
53:2, 57:7,
73:2, 93:12,
123:6, 139:21,
177:20, 178:22,
181:10, 181:11,
181:25, 182:1,
182:21, 183:11,
205:8, 216:15,
216:20, 222:24,
225:10, 234:2,
234:19
**provides**
49:6, 86:18,
107:17, 116:15,
169:12, 184:24,
185:1
**providing**
32:9, 38:14,
38:15, 39:25,
43:1, 48:17,
51:23, 51:25,
53:7, 87:1,
162:16, 198:17,
244:23
**provision**
78:22, 241:6,
241:13, 241:21,
242:5
**provisions**
65:10, 74:19,
75:3, 76:17,
126:21, 146:12,
164:24, 165:14,

165:17, 165:22
**psychology**
29:13, 55:18
**public**
2:2, 20:5,
50:10, 166:25,
168:13, 169:18,
226:5, 226:7,
226:8, 226:9,
226:11
**publication**
20:6, 189:1,
201:7, 203:22,
205:21, 226:8
**publicity**
207:17
**publicized**
231:9
**publicly**
43:4, 50:19
**published**
14:15, 30:3,
31:5, 31:11,
59:18, 59:20,
187:13, 192:23,
209:18, 209:19
**publishing**
203:21
**pull**
26:10, 34:10,
37:3, 60:14,
179:7, 188:13,
201:19, 222:6
**pulled**
189:11, 189:21
**pulling**
59:2, 59:5,
115:18, 240:24
**purpose**
34:12, 50:11,
99:19, 122:21,
123:4, 167:18,
174:23, 202:23
**purposes**
94:10, 95:18
**pursuant**
2:1
**purview**
229:5, 229:7

**pushback**
200:8
**put**
10:17, 11:10,
22:4, 38:3,
55:3, 68:10,
68:14, 93:5,
122:3, 122:6,
134:22, 169:1,
174:9, 202:17,
207:10, 212:6,
217:12, 237:8,
241:1
**putting**
123:23, 152:13
**puzzled**
167:6

**Q**

**qualified**
206:8, 226:23
**qualify**
153:20, 154:14
**qualitative**
59:19
**quality**
117:24
**quantitative**
35:11, 35:12,
38:15, 41:6,
44:10, 44:20,
59:19, 86:17,
170:9
**quarterly**
189:14
**question**
8:9, 8:18,
8:20, 8:21,
8:25, 9:14,
10:25, 45:14,
49:14, 49:16,
58:24, 65:16,
65:17, 65:18,
66:7, 87:17,
88:13, 89:5,
90:3, 90:13,
93:7, 99:9,
99:24, 99:25,

100:1, 100:3,
100:6, 102:3,
108:9, 108:11,
117:14, 120:8,
128:16, 134:4,
134:11, 141:13,
141:14, 144:1,
146:23, 155:21,
177:21, 183:17,
193:18, 193:25,
196:20, 198:14,
200:16, 201:23,
202:4, 203:1,
227:21, 233:6
**questioning**
152:23, 243:6
**questions**
8:24, 83:5,
88:23, 118:2,
118:3, 164:14,
164:15, 170:25,
171:20, 173:25,
182:7, 217:9,
217:20, 222:2,
225:23, 232:9,
232:12, 234:7,
235:12, 242:21,
243:1, 243:22
**quickly**
54:17
**quit**
224:21
**quite**
55:21, 56:2,
94:20, 96:19,
104:13, 150:8,
156:4, 216:24
**quote**
34:21, 34:23,
38:5, 39:10,
44:9, 45:10,
61:22, 61:24,
72:3, 73:13,
73:14, 73:17,
73:18, 73:21,
73:25, 74:16,
75:1, 80:17,
80:21, 81:15,

81:17, 82:5,
82:6, 87:14,
89:12, 90:25,
92:8, 93:25,
94:1, 97:2,
97:4, 104:17,
105:19, 113:9,
113:10, 115:20,
123:21, 125:8,
148:10, 148:12,
153:10, 215:23
**quoted**
78:4
**quotes**
37:25, 74:4,
115:7
**quoting**
38:3

## R

**race**
83:12, 97:22,
97:25, 101:9,
101:17, 101:21,
102:1, 104:11,
104:12, 108:3,
117:17, 146:21,
148:19, 149:10,
150:3, 150:10,
150:22, 150:25,
151:25, 191:9,
199:23, 203:7,
213:25
**races**
88:3
**racial**
55:25, 74:16,
75:20, 83:21,
131:1, 139:3,
143:2, 149:8,
189:19, 191:14,
191:24, 199:13,
199:15, 209:13,
210:17
**racially**
7:10, 7:15,
19:24, 34:3,
36:24, 100:4,

225:25, 227:4
**racism**
55:19
**raise**
74:20, 76:17,
164:1, 164:2,
218:11, 230:7
**raises**
78:23, 200:2,
211:4
**raising**
155:21
**randomly**
167:14
**range**
36:19, 130:11
**rare**
166:19, 166:22,
167:5, 167:6,
168:17, 168:19,
168:21, 168:25
**rarely**
178:14
**rate**
12:12, 147:16,
238:4
**rates**
74:10, 75:24,
105:25, 113:5,
113:12, 123:24,
123:25, 124:1,
124:17, 130:16,
130:18, 144:13,
145:6, 145:7,
146:3, 187:11,
187:23, 188:10,
192:7
**rather**
8:11, 12:25,
103:20, 121:19,
123:5, 144:8,
169:3, 169:24,
200:22, 212:8,
218:21, 237:9
**rational**
66:16, 66:20,
71:21, 95:16,
96:7, 160:3,

211:9
**rationally**
71:17
**ratios**
90:16, 125:11
**ratuhindurwa**
135:7
**raw**
53:10
**re-log**
17:6
**reach**
41:23, 42:4,
97:20, 97:21,
177:13, 177:20,
188:7, 200:17,
221:18
**reached**
177:13
**reaches**
177:24
**reaching**
42:9, 81:20,
177:11
**reaction**
230:10
**reactions**
55:25, 223:9
**read**
12:3, 14:15,
21:20, 37:10,
37:12, 37:13,
37:22, 38:2,
39:17, 44:3,
44:16, 45:16,
47:8, 47:18,
50:16, 50:22,
50:23, 56:15,
61:6, 61:8,
61:11, 61:18,
72:8, 72:24,
73:1, 73:4,
82:9, 89:17,
91:6, 92:16,
119:9, 135:15,
140:10, 144:14,
146:15, 148:2,
151:15, 156:24,

160:19, 166:14,
181:3, 184:7,
184:18, 187:18,
188:23, 189:2,
189:13, 189:15,
189:21, 190:3,
190:21, 191:12,
192:2, 192:5,
196:3, 209:3,
217:2, 217:6,
219:13, 220:3,
220:5, 220:6,
220:7, 220:8,
220:9, 220:11,
220:12, 220:13,
220:19, 222:15,
222:19, 222:21,
223:3, 223:4,
243:25, 246:3
**reading**
32:21, 38:2,
38:7, 38:8,
38:9, 40:4,
40:7, 43:3,
49:19, 50:6,
53:3, 53:4,
53:17, 162:1,
170:5, 189:16,
227:22, 247:8
**reads**
214:4, 215:20
**ready**
235:13, 235:14,
244:3
**real**
51:7, 51:20,
70:16, 77:9,
123:16, 134:17,
134:18, 158:24,
167:18, 168:20,
197:8
**realistic**
46:5
**really**
11:8, 27:22,
56:2, 65:17,
98:19, 106:4,
110:13, 111:2,

125:3, 161:12,
195:21, 199:17,
200:11, 201:11,
217:17, 231:7,
237:21, 242:1,
242:13, 243:10
**realm**
21:7
**reanalyzed**
127:16
**reason**
9:12, 9:16,
112:18, 122:10,
133:21, 142:18,
194:14, 205:18,
229:25
**reasonable**
55:24, 108:21,
186:3
**reassure**
160:24, 167:19,
168:15
**rebuttal**
5:11, 5:15,
10:1, 10:2,
16:15, 16:16,
72:21, 73:7,
73:23, 75:5,
80:14, 81:24,
83:2, 92:6,
106:16, 112:6,
113:15, 123:20,
125:20, 126:4,
127:1, 141:19,
142:14, 143:17,
144:16, 148:9,
174:3, 174:7,
222:2, 222:10,
222:12, 225:19
**rebuttals**
15:3, 223:18
**recall**
7:8, 7:12,
13:24, 23:10,
27:4, 27:17,
30:8, 32:3,
32:9, 32:14,
32:18, 33:11,

91:10, 93:11,
106:8, 189:5,
190:13, 190:16,
196:25, 214:7,
220:11, 225:8,
238:4, 238:7,
238:12, 238:17,
238:23, 238:25,
241:20, 242:6,
242:11, 242:13
**receipt**
244:25
**receive**
13:25, 244:10
**received**
61:9
**recent**
6:23, 19:12,
19:18, 20:11,
47:24, 112:12,
112:19, 227:3,
227:15
**recently**
11:15, 33:20,
182:3, 182:24
**recess**
60:7, 115:15,
164:18, 232:7,
233:17
**recitation**
39:13, 43:2,
43:24, 43:25
**recites**
42:23, 43:3
**recognize**
37:7, 60:22,
71:23, 72:22,
174:12
**recollection**
14:6, 14:8,
120:1, 184:12,
218:19, 238:17,
241:23
**recommendation**
202:2
**record**
6:15, 9:5, 9:9,
10:21, 38:5,

38:7, 38:11,
38:12, 38:18,
38:20, 43:13,
43:16, 49:19,
49:20, 49:21,
50:7, 50:10,
50:15, 53:18,
60:8, 115:13,
115:16, 164:17,
165:3, 171:11,
233:22, 233:25,
234:3, 243:10,
244:5, 245:16,
247:5
**records**
244:9
**recreate**
170:21
**recruited**
17:25
**redirect**
243:4
**redistribution**
142:7
**redistrict**
18:14
**redistricting**
7:11, 7:16,
18:13, 21:3,
31:18, 31:19,
31:23, 32:2,
32:5, 32:11,
32:16, 50:12,
54:20
**reduce**
76:3
**reduced**
89:9, 247:7
**refer**
22:3, 40:16,
61:24, 88:2
**reference**
192:23, 194:16,
242:15, 242:16
**referenced**
10:4, 10:23,
15:4, 21:11
**references**
25:13

**referencing**
188:20, 212:19
**referred**
11:21, 122:15
**referring**
43:8, 45:19,
72:10, 72:12,
88:4, 88:5,
88:6, 98:13,
124:9, 142:13,
153:15, 211:17,
233:1, 233:9
**refers**
66:11, 82:19,
94:4
**reflect**
38:21, 41:6,
147:7, 169:23
**reflected**
149:16
**reflection**
57:4
**reflects**
45:8, 87:24,
121:11, 168:7,
204:21, 206:12
**reforms**
67:11
**refreshed**
189:22, 189:24
**refute**
170:21
**refuted**
156:20
**regard**
30:24, 35:5,
35:15, 48:17,
51:2, 67:10,
67:11, 72:16,
98:14, 135:24,
136:9, 145:20,
173:19, 175:13,
176:12, 198:4,
203:8, 217:4
**regarding**
39:4, 49:25,
75:3, 126:21,
146:12

**regardless**
120:14
**regards**
172:3
**register**
30:13, 73:16,
74:9, 74:13,
74:24, 78:1,
78:8, 78:21,
79:6, 79:10,
79:12, 79:13,
79:18, 79:20,
79:25, 80:8,
80:11, 94:2,
96:25, 98:9,
100:2, 100:21,
102:6, 102:17,
102:18, 102:19,
102:24, 103:4,
103:8, 104:19,
108:4, 108:5,
108:16, 108:19,
115:4, 117:16,
138:1, 138:3,
138:7, 138:13,
138:14, 138:24,
149:20, 149:23,
163:11, 180:20,
181:15, 182:4,
182:16, 182:19,
182:24, 186:24,
230:12, 230:15
**registered**
31:2, 73:20,
74:23, 76:11,
80:12, 83:13,
98:1, 99:6,
100:5, 100:14,
100:19, 102:4,
102:16, 102:25,
103:8, 103:23,
104:6, 105:21,
106:12, 108:25,
111:25, 114:18,
116:1, 116:2,
116:7, 146:4,
146:5, 147:5,
148:14, 148:17,

150:24, 151:5,
151:9, 181:13,
181:14, 182:2,
182:23, 186:20,
187:7, 209:10,
213:1, 213:15,
213:16, 229:12
**registering**
77:8, 79:3,
79:11, 79:23,
91:3, 92:10,
92:11, 92:14,
93:3, 93:13,
95:1, 102:22,
103:11, 115:23,
116:11, 137:17,
137:18, 147:22,
157:25, 158:3,
158:4, 158:5,
158:10, 159:8,
181:1
**registers**
74:17, 75:21,
183:19
**registrations**
76:18, 80:21,
81:8, 81:13,
84:1, 84:5,
84:15, 87:19,
88:3, 91:4,
97:5, 97:6,
98:7, 100:10,
106:22, 106:23,
125:12, 126:16,
126:18, 140:16,
140:22, 141:5,
144:19, 144:20,
145:6, 145:8,
146:5, 147:9,
147:16, 147:19,
160:6, 181:2,
187:15, 191:10,
191:16, 206:20
**regression**
54:12, 101:10,
132:1, 143:14,
143:17, 144:7,
147:18, 148:11,

148:18, 149:3,
150:9, 150:16,
150:20, 151:19,
170:18, 191:20,
191:23, 192:14,
197:16, 209:21
**regressions**
191:17, 192:14
**regular**
29:9, 189:14
**regularly**
112:24
**regulate**
162:25
**regulated**
77:13, 162:6,
162:7, 162:9
**regulates**
78:7
**regulating**
228:20, 228:21
**regulation**
160:20, 163:17,
164:10, 185:1,
185:2
**regulations**
63:19, 77:15,
140:16, 141:6,
164:8, 185:11,
227:12
**regulatory**
161:24, 162:1,
162:3, 162:4,
163:6, 168:14,
184:25, 185:5,
185:10, 230:15
**regurgitate**
57:23
**reify**
71:14
**rejected**
51:16
**relate**
213:21
**related**
7:20, 13:23,
18:23, 19:16,
20:1, 20:3,

20:8, 20:11,
20:18, 20:21,
21:23, 30:4,
30:6, 30:9,
30:21, 30:23,
31:5, 31:11,
34:2, 36:24,
117:17, 156:12,
156:15, 156:16,
157:4, 173:20,
218:9, 227:14,
239:10, 247:9
**relates**
20:22, 21:7,
213:23
**relating**
50:1, 189:9
**relation**
195:24
**relationship**
31:1, 171:21
**relative**
12:17, 72:7,
76:7, 82:18,
85:21, 89:8,
94:22, 95:1,
98:8, 99:23,
111:17, 115:3,
137:4, 137:18,
151:18, 174:18,
175:20, 176:11
**relatively**
168:17, 168:25
**relevance**
55:2, 114:12
**relevant**
46:14, 52:6,
53:20, 53:25,
54:5, 55:3,
56:16, 215:21
**reliable**
200:20
**reliance**
122:16, 182:10
**relied**
14:16, 41:22,
42:3, 98:23,
176:15, 176:16,

176:22, 177:5,
177:10, 178:1,
178:3, 182:3,
182:24, 234:20
**relies**
40:25, 41:9,
86:8
**reluctant**
23:24, 77:1
**rely**
14:13, 42:7,
42:14, 66:12,
70:15, 79:4,
79:8
**relying**
42:12
**remain**
150:4, 150:12,
168:21, 186:13
**remaining**
245:6
**remains**
161:18
**remark**
96:16
**remember**
30:25, 33:3,
88:1, 101:2,
106:1, 130:15,
166:15, 167:7,
231:1, 236:25,
241:14, 242:2
**remembered**
190:3
**remembering**
31:20
**removed**
138:25
**renata**
26:9
**renatta**
2:14
**reorganize**
237:9
**reorganizing**
24:7
**repackaged**
152:13

**repeat**
105:8, 223:12
**repeated**
115:7
**repeatedly**
105:1, 113:25,
114:24
**repeating**
37:15, 41:25
**repeats**
36:7, 223:11
**rephrase**
8:19
**replicated**
180:14
**replication**
38:18
**report's**
74:22, 126:10
**reported**
1:25, 125:10,
147:7
**reporter**
8:6, 9:6, 247:1
**reporting**
151:18, 187:20
**reports**
10:4, 10:5,
12:5, 12:8,
12:19, 13:20,
14:10, 14:11,
15:2, 23:7,
23:17, 31:12,
32:22, 33:4,
35:6, 35:23,
36:14, 38:24,
40:14, 41:1,
42:2, 42:6,
43:9, 44:11,
44:21, 56:19,
61:10, 61:11,
93:5, 132:22,
139:19, 140:19,
143:3, 143:17,
147:20, 158:22,
173:9, 174:1,
175:4, 175:14,
175:18, 176:4,

178:13, 178:21,
183:10, 184:15,
198:12, 209:8,
222:18, 234:15,
244:14
**represent**
6:13, 195:2,
242:24
**representation**
25:11, 143:13,
203:25, 204:11
**representativene-
ss**
22:23
**representing**
171:13
**represents**
167:16
**reproduced**
187:16, 191:5
**reproducing**
43:12
**reproduction**
46:7
**republican**
29:21, 147:21,
149:4, 151:7
**republicans**
149:23
**request**
14:19, 36:10,
244:7, 244:13,
244:23
**requested**
14:22, 34:23
**require**
65:21, 80:10
**required**
77:9, 205:10
**requirement**
163:10, 184:5,
184:7, 184:10,
184:17, 241:15,
241:23
**requirements**
164:9, 221:9,
221:11
**requires**
46:25, 68:24,

reread
61:15, 217:4,
217:7
research
20:5, 20:16,
28:10, 28:20,
29:24, 30:12,
30:16, 30:17,
31:8, 31:9,
48:6, 48:21,
49:6, 52:2,
55:13, 68:19,
71:9, 71:11,
71:19, 96:19,
156:23, 158:20,
158:22, 166:6,
166:9, 172:14,
178:12, 189:12,
215:21, 217:13,
226:16, 227:1,
227:23, 232:13
researched
30:6
residing
200:4, 213:14
respect
35:21, 45:19,
45:23, 99:17,
99:18
respectfully
16:6, 245:5
respond
34:24, 36:10,
41:11, 63:22,
66:15, 71:17,
81:3, 95:21,
123:6, 157:13,
175:1, 175:4,
175:7, 175:8,
175:17, 178:7,
185:12, 238:22
responded
21:20, 36:22,
176:5
responding
57:12, 83:4,
107:2, 174:16,

175:19, 175:23,
176:9, 201:9
responds
40:25, 168:11,
174:6
response
8:10, 41:14,
73:22, 75:4,
81:23, 93:8,
93:9, 94:16,
106:25, 113:14,
124:4, 125:3,
126:9, 126:25,
145:11, 146:13,
148:24, 157:10,
157:20, 157:21,
166:25, 167:1,
167:17, 168:14,
169:2, 170:13,
175:25, 176:1,
176:6, 178:21,
223:18
responsibility
107:17
responsible
17:23
responsive
174:20, 238:19
rest
20:7, 25:1,
41:13, 70:4,
203:23, 216:18
restrict
74:19, 76:17
restricting
212:23
restriction
76:21
restrictions
160:5, 160:13,
213:6
restricts
78:22
result
65:24, 77:5,
124:1, 124:17,
185:9, 207:16,
207:18, 208:7,

232:11
resulting
145:9
results
148:11, 150:20,
157:5, 192:16,
206:22
retain
163:4
retained
11:12, 33:20,
173:2, 173:13
retaining
77:7, 162:9
retrogression
23:5
return
180:16, 206:9,
212:12, 214:2,
241:2
review
16:10, 16:13,
16:19, 16:21,
165:3, 176:17,
178:6, 188:24,
189:2, 200:9,
201:6, 205:23,
220:8, 233:2,
233:8, 233:13,
234:1
reviewed
14:5, 14:9,
16:14, 112:9,
140:7, 174:2,
176:14, 178:4,
188:22, 222:12,
222:23, 223:1
reviewer
189:1, 190:24,
190:25, 201:9,
201:10, 201:23,
202:1, 204:14,
204:15, 204:23,
242:12, 242:13,
242:19
reviewers
188:25, 201:13,
204:18, 205:1,

205:7, 205:19,
205:22, 205:25
reviewing
12:24, 14:7,
37:20, 57:19,
57:20, 100:8,
180:1, 188:12,
201:17, 211:22
reviews
205:8
revisions
205:9, 205:10,
215:24
rewording
215:2
reworked
229:22
rewrite
237:9
rewrites
185:10
rice
17:22, 18:5,
28:2, 172:11,
172:12
richard
1:15, 5:2, 6:2,
6:16, 246:2
richey
220:12
rigby
220:13
rights
2:8, 3:15,
4:15, 225:24
rmr
1:25, 2:2
role
216:1
room
120:25
roper
4:7, 4:10
rosenstone
213:5
rough
182:6, 182:8,
240:8

87:4, 111:22

**roughed**
240:10
**roughly**
80:23, 81:8,
84:2, 84:10,
100:22, 102:6,
104:7, 126:12,
126:14, 129:21,
129:25, 130:10,
138:19, 182:2,
203:14, 205:24,
211:11
**round**
31:21, 71:9
**route**
91:19
**routes**
91:21
**routinely**
29:5
**rpr**
1:25, 2:2
**rules**
8:2, 171:16,
218:17, 219:1
**running**
32:25, 150:12
**rutahindurwa**
2:13, 5:3, 6:9,
16:4, 26:9,
26:16, 27:7,
30:10, 34:10,
44:6, 60:2,
60:9, 60:19,
61:20, 80:15,
82:12, 105:15,
115:12, 115:17,
153:6, 160:7,
164:13, 164:20,
170:24

**S**

**s**
75:3, 126:21,
140:16, 146:11,
148:18, 148:21,
160:5, 160:13,
191:24

**said**
11:10, 11:20,
23:16, 35:18,
50:16, 50:17,
50:18, 50:19,
50:20, 95:5,
101:12, 111:7,
114:8, 114:22,
114:23, 120:5,
121:5, 123:3,
129:11, 133:10,
162:15, 162:22,
185:15, 189:13,
190:1, 190:3,
198:24, 200:1,
202:15, 229:19,
242:10, 242:11,
242:14, 242:17,
242:18, 247:5
**same**
8:5, 8:15,
17:21, 23:1,
73:17, 74:2,
107:9, 113:20,
130:20, 136:24,
143:15, 154:3,
156:5, 172:1,
197:13, 200:14,
203:14, 204:22,
246:4
**sample**
135:1
**sampling**
134:25
**sanction**
51:5
**sarasota**
31:20
**satisfy**
42:10
**saved**
224:16
**saw**
176:16, 177:6,
189:10, 206:12,
210:24, 240:21
**say**
7:24, 8:7,

19:8, 19:19,
20:14, 23:23,
25:22, 27:1,
29:9, 32:4,
45:3, 45:6,
54:15, 57:8,
58:18, 62:7,
70:17, 70:24,
72:10, 77:14,
78:19, 78:20,
79:11, 81:4,
95:3, 101:20,
102:24, 105:11,
109:25, 113:1,
113:2, 115:8,
117:8, 120:17,
120:21, 127:3,
139:20, 142:24,
143:21, 154:6,
154:21, 155:5,
158:16, 161:12,
162:13, 166:23,
167:12, 182:17,
185:4, 186:1,
189:24, 194:18,
194:21, 195:25,
196:22, 198:24,
199:2, 199:3,
199:4, 199:6,
199:14, 199:16,
201:25, 203:21,
204:14, 205:3,
206:4, 206:7,
209:24, 210:11,
211:23, 212:14,
213:19, 217:21,
220:19, 224:14,
225:14, 231:15,
236:19, 243:10,
244:5
**saying**
35:7, 40:18,
40:20, 49:8,
52:5, 52:16,
57:14, 57:18,
64:19, 65:9,
74:5, 77:20,
84:4, 86:20,

96:4, 99:12,
99:15, 103:5,
107:11, 115:5,
128:3, 145:14,
149:1, 149:2,
150:20, 153:20,
153:23, 158:25,
159:1, 159:10,
159:21, 160:8,
162:25, 194:9,
195:8, 195:10,
195:23, 197:5,
200:1, 213:18,
215:6, 239:14,
244:19
**says**
64:3, 73:24,
74:1, 74:16,
76:15, 77:24,
78:4, 81:4,
82:1, 82:15,
92:7, 107:18,
112:15, 153:7,
153:8, 163:10,
182:8, 194:25,
208:23, 213:4,
213:12
**sb**
39:13, 39:14,
40:6, 42:24,
43:5, 43:20,
45:11, 57:10,
59:11, 61:25,
75:3, 78:7,
78:9, 81:13,
81:16, 82:20,
83:22, 84:5,
85:8, 85:9,
85:10, 85:15,
87:16, 87:18,
105:24, 115:22,
116:3, 123:22,
124:2, 124:18,
125:15, 125:25,
126:17, 126:21,
128:11, 128:17,
130:9, 131:6,
144:18, 145:3,

145:10, 146:2,
146:11, 153:9,
155:24, 160:5,
160:13, 162:22,
164:24, 165:14,
165:18, 165:22,
172:22, 174:17,
180:25, 183:14,
184:5, 184:9,
184:16, 187:10,
209:1, 210:22,
213:12, 215:22,
227:19

**schedule**
236:20

**scheduling**
236:11, 239:7,
240:17

**scholar**
31:10, 53:5,
53:6

**scholars**
21:5, 47:21,
199:2

**scholarship**
20:11, 21:9,
21:11, 47:20,
47:24, 119:19

**school**
18:15, 21:18

**science**
14:17, 17:22,
28:20, 29:24,
38:22, 48:9,
48:15, 48:20,
51:1, 51:3,
51:18, 51:20,
51:23, 55:15,
58:20, 59:24,
67:21, 154:5,
154:12, 156:1,
218:7

**science-trained**
56:5

**sciences**
47:25, 48:20,
71:6

**scientific**
48:11, 49:22,

53:9, 54:6

**scientist**
50:14, 56:4,
56:6

**scientists**
51:10, 55:6,
55:13, 55:14,
154:2, 159:23

**scope**
35:19, 36:16,
174:20, 234:8,
241:6

**scott**
4:7

**scratch**
207:1

**screen**
10:7, 10:10,
168:6, 174:9

**scroll**
26:22, 38:25,
44:3, 60:19,
80:15, 191:8,
211:17, 211:19,
212:14, 215:7

**scrolling**
27:12, 72:2

**seal**
247:14

**search**
239:1, 244:9

**seattle**
2:13

**second**
33:9, 39:10,
73:9, 82:14,
85:21, 85:22,
86:2, 86:3,
89:11, 96:24,
108:1, 115:19,
116:5, 128:2,
135:9, 143:12,
152:16, 153:7,
162:21, 191:12,
192:21, 212:18,
214:21, 215:1,
215:23, 216:4,
216:5, 216:13

**secondhand**
41:17

**secondly**
198:10

**secret**
54:16

**secretary**
1:10, 3:2,
244:2

**secretary's**
245:13

**section**
23:4, 23:5,
24:17, 24:23,
25:13, 27:21,
39:1, 44:14,
45:25, 60:11,
62:16, 71:10,
82:5, 87:13,
97:10, 104:22,
109:3, 112:7,
112:9, 113:14,
116:20, 124:7,
152:7, 152:9,
152:12, 152:17,
153:8, 156:18,
156:22, 170:13,
179:1, 191:9,
200:4, 210:25,
211:16, 211:23,
212:21, 214:13,
217:5, 221:10,
221:22, 221:25

**sections**
24:9, 37:14,
106:6, 121:7,
121:8, 121:14,
121:16, 223:5,
237:10, 237:14,
238:9

**secure**
168:9, 169:17

**security**
160:25, 161:1,
167:3, 169:18

**see**
6:12, 10:11,
15:7, 27:11,

27:24, 43:23,
47:19, 47:20,
51:8, 51:22,
53:13, 58:17,
60:20, 65:10,
65:12, 86:12,
90:18, 105:16,
113:6, 115:5,
124:6, 124:24,
127:2, 127:17,
128:8, 128:22,
147:19, 151:19,
152:20, 158:22,
171:8, 175:12,
176:19, 191:5,
191:9, 193:9,
193:14, 197:22,
201:4, 202:3,
202:9, 206:23,
207:1, 208:23,
214:3, 215:7,
215:11, 217:13,
224:4, 233:2,
239:1, 240:4,
243:7

**seeing**
26:20, 60:23,
133:7, 143:22,
190:4, 193:1,
195:3

**seek**
79:12, 213:14

**seeking**
94:2, 94:21,
149:20, 234:3

**seeks**
79:19

**seem**
50:5, 96:18,
155:1, 157:19,
160:18, 160:21,
199:23, 212:3

**seemed**
225:16

**seemingly**
193:23

**seems**
17:5, 66:12,

78:19, 82:4,
85:14, 94:18,
113:20, 113:21,
129:3, 131:2,
156:23, 156:25,
160:18, 161:4,
162:10, 162:15,
162:16
**seen**
127:15, 139:17,
161:19, 173:5,
190:2, 190:21,
190:23, 203:23
**selected**
31:2, 167:14
**selective**
59:9
**selectively**
59:7
**self-contained**
198:5
**sell**
164:4
**selling**
77:6
**senate**
20:10, 227:5
**send**
164:7
**sending**
232:25
**senior**
28:8
**sense**
8:12, 20:25,
21:1, 25:23,
40:16, 48:9,
64:19, 85:23,
86:15, 103:11,
119:12, 120:22,
121:10, 121:12,
122:13, 134:6,
152:14, 153:22,
157:16, 160:22,
163:22, 176:17,
202:20, 209:16,
209:17, 209:20,
228:9, 229:11,

230:19, 239:20
**sent**
14:4, 25:2,
61:10, 237:5,
240:14
**sentence**
39:10, 39:19,
39:21, 43:8,
44:4, 45:9,
77:24, 82:14,
96:24, 106:19,
108:1, 121:4,
150:7, 150:8,
150:17, 150:18,
152:10, 152:16,
153:7, 174:23,
175:22, 176:9,
187:22, 200:2,
208:23, 213:3,
213:4, 214:21,
214:24, 215:1,
215:3, 215:17,
215:20, 215:23,
216:4, 216:8,
216:12, 216:14,
216:16
**sentences**
121:3, 214:25,
216:11
**separate**
70:12, 170:9
**september**
11:14, 144:21,
145:9
**series**
24:8, 54:7,
62:25, 86:7,
87:2, 90:6,
90:17, 93:18
**serious**
240:24
**seriously**
161:5
**services**
146:6, 169:13
**session**
164:19
**set**
48:21, 66:25,

68:15, 93:22,
98:7, 247:13
**sets**
117:5, 176:20,
177:6, 177:7
**setting**
83:5, 92:22,
105:11, 180:4,
180:5, 215:16
**settled**
224:22, 224:23
**seven**
225:7
**several**
63:6, 151:1,
236:10
**severely**
210:4
**share**
164:7, 239:18
**shared**
239:24
**sheet**
246:7
**shift**
198:20
**shoe**
167:9
**shoes**
167:7
**short**
24:10, 36:6,
90:3, 153:1,
153:3, 197:6,
198:11, 210:8,
243:23
**shorthand**
94:5, 247:1
**shortly**
61:9, 73:3
**should**
57:15, 63:10,
63:11, 64:3,
93:4, 120:6,
154:9, 155:23,
157:21, 157:23,
169:10, 173:6,
178:13

**shouldn't**
57:15, 195:6
**show**
26:8, 54:9,
93:2, 101:11,
107:6, 107:8,
143:19, 148:11,
150:21, 155:19,
183:14, 183:17,
193:9, 207:11,
207:23, 208:12,
208:13, 210:16,
218:20, 218:22
**showed**
141:19, 141:21,
168:5, 207:15,
218:17, 218:25
**showing**
67:3, 122:24,
195:8, 207:7,
207:23, 208:4,
208:6, 208:7
**shown**
95:17, 115:21,
116:24
**shows**
56:12, 83:7,
85:6, 86:18,
89:7, 104:15,
126:8, 126:11,
131:9, 132:4,
132:17, 132:18,
139:18, 143:14,
152:3, 156:10,
194:15
**sic**
123:7
**side**
150:25, 243:19
**sides**
21:17, 167:25,
201:8
**sign**
60:20
**signature**
60:23, 215:13,
215:15, 246:11
**signature-5tm1q**
247:19

signed
246:7
significance
54:13, 131:24,
192:17, 197:17
significant
147:20, 148:20,
148:23, 150:4,
150:5, 150:10,
150:12, 182:15,
184:3, 187:23,
188:9, 191:21,
192:6, 192:12,
192:25, 193:13,
194:10, 194:18,
195:9, 195:12,
195:15, 195:18,
195:24, 196:2,
198:8, 200:21,
202:10, 202:19,
202:20, 213:8,
219:10, 219:11
significantly
69:25, 116:3,
116:8, 150:23,
193:4, 193:5,
193:6, 193:11,
193:20, 193:22,
194:2, 194:19,
195:11, 195:13,
195:19, 196:8,
202:14
signing
247:8
silenced
10:18
silently
9:7
similar
40:2, 44:14,
46:1, 94:7,
124:20, 127:23,
129:18, 136:2,
137:9, 142:15,
144:1, 193:24,
197:24, 199:17,
228:10
similarity
144:2

similarly
181:24
simple
104:25, 105:7,
111:18, 128:16,
135:3, 154:16,
157:1, 157:8,
185:19
simpleminded
157:2
simply
36:2, 46:21,
58:20, 66:4,
76:20, 85:17,
96:4, 98:5,
132:11, 134:4,
141:25, 143:13,
144:8, 146:21,
147:6, 149:21,
150:18, 156:3,
161:15, 177:20,
194:23, 195:14,
197:8, 203:3,
210:7
simultaneous
62:21, 98:20
simultaneously
118:1, 240:21
since
8:2, 27:24,
28:15, 196:4,
217:7, 235:25
single
22:16, 106:20,
121:4, 174:23,
176:9
sir
243:18
sitting
14:8, 120:25,
125:2, 127:11
situation
165:9
six
100:22, 102:7,
104:1, 129:11,
132:23, 178:11,
191:19

size
199:15
skills
36:20
skimmed
37:13, 37:16,
37:22
slight
193:12
slightly
129:15
slope
193:3, 193:20,
193:22, 193:23,
193:24, 194:1,
194:3, 194:9
small
104:13, 134:3,
134:19, 196:19,
219:8
smith
5:12, 5:13,
5:15, 10:5,
12:6, 16:18,
25:14, 38:24,
40:15, 40:23,
41:4, 41:5,
49:13, 92:24,
101:3, 105:2,
105:19, 123:7,
137:14, 139:17,
140:15, 140:21,
153:17, 156:6,
163:15, 174:17,
176:15, 176:16,
177:8, 177:10,
178:1, 178:25,
179:25, 181:10,
181:25, 182:21,
183:12, 187:6,
187:14, 188:8,
188:19, 190:7,
191:1, 196:18,
198:13, 199:1,
206:13, 208:25,
209:9, 215:20,
237:19, 240:20,
242:8

smith's
9:25, 10:1,
16:15, 16:16,
41:19, 42:20,
88:17, 140:1,
140:8, 174:1,
174:2, 174:6,
174:21, 175:2,
178:7, 179:4,
179:9, 179:11,
180:19, 181:7,
209:25, 210:24,
210:25, 211:2,
211:14, 212:17,
221:16, 222:10,
223:9, 225:19
smooth
193:15, 195:1,
206:21
smoothening
206:22
sneak
167:8
soaking
50:23
social
47:25, 48:9,
48:20, 49:22,
50:25, 51:3,
51:10, 51:18,
51:20, 51:23,
55:6, 55:13,
56:4, 71:6,
159:23
soe
4:7, 4:10
soes
3:19
software
239:22
solicited
79:9, 80:6,
103:7, 205:23
soliciting
103:20
solid
195:1
somebody
12:1, 22:10,

102:22, 122:7,
123:1, 224:3
**somehow**
52:13, 85:23,
132:8, 137:11,
143:22
**someone**
22:1, 42:13,
50:19, 59:1,
79:19, 102:2
**someone's**
42:15
**someplace**
57:22
**something**
11:6, 15:14,
17:6, 18:15,
22:2, 22:9,
23:12, 23:15,
24:3, 27:23,
33:20, 35:13,
36:7, 38:21,
46:24, 49:3,
49:7, 49:18,
52:12, 52:20,
52:21, 54:15,
54:17, 56:2,
57:3, 62:13,
63:4, 64:20,
66:5, 67:3,
69:10, 78:17,
86:12, 95:5,
107:18, 110:3,
110:8, 119:18,
124:8, 127:10,
127:24, 131:9,
131:14, 136:7,
151:20, 154:22,
155:6, 155:12,
155:13, 160:8,
160:23, 169:11,
175:6, 184:19,
190:4, 199:5,
201:3, 204:8,
208:7, 225:15,
229:15, 230:6,
239:9, 242:10,
242:15, 242:18

**sometime**
7:22, 22:14,
31:24, 73:3,
222:23, 222:24
**sometimes**
7:21, 51:12,
99:18, 99:19,
182:9, 229:24,
243:14
**somewhat**
23:24, 51:12,
85:16, 86:4,
194:24
**somewhere**
11:17, 12:12,
103:3
**sorry**
13:10, 25:17,
34:21, 66:14,
79:15, 81:2,
100:14, 101:3,
113:10, 152:18,
160:7, 178:25,
206:11, 220:15,
243:4
**sort**
24:8, 27:12,
28:23, 37:16,
41:17, 47:8,
50:5, 50:9,
51:1, 52:13,
52:21, 65:24,
70:9, 71:10,
103:6, 106:5,
123:13, 132:2,
142:15, 157:1,
157:6, 157:19,
168:7, 175:5,
175:10, 175:23,
176:6, 178:11,
185:9, 186:15,
195:5, 196:15,
200:6, 204:5,
209:12, 211:7,
211:11, 212:3,
212:22, 215:3,
225:13, 226:16,
228:7, 237:4,

237:7, 239:25,
240:21
**sound**
8:21, 152:24,
159:2
**sounds**
25:5, 44:19,
60:6, 115:14,
119:6, 153:5,
223:25, 227:7,
232:6, 233:10,
240:2
**sources**
147:11, 176:18
**south**
3:7, 4:8, 4:11
**space**
201:7
**spaced**
144:22
**speak**
8:8, 234:23
**speaking**
7:4, 25:17,
62:21, 98:20,
162:17, 166:20,
190:13, 191:13
**specialized**
23:4
**specific**
14:18, 30:8,
40:9, 43:7,
45:18, 78:9,
88:3, 165:9,
193:25, 218:14,
225:9
**specifically**
18:24, 82:23,
109:10, 118:4,
142:13, 147:25,
172:18, 225:8,
226:14, 238:23,
238:25, 242:2,
242:14
**specificity**
24:19
**specifics**
165:10

**specter**
200:3
**speculate**
54:17
**speculates**
63:25
**speculating**
39:24, 40:3,
46:15, 66:2
**speculation**
65:1, 65:4,
65:5, 71:6,
71:8, 75:7,
75:17, 75:19,
105:23, 187:10
**speculations**
54:19, 212:6
**speculative**
39:12, 39:23,
40:10, 40:12,
40:15, 40:22,
61:24, 62:18,
62:20, 64:15,
64:25, 65:8,
153:11, 212:15,
212:20
**spend**
12:15, 12:17,
228:3
**spent**
12:14, 12:24,
13:2, 177:15
**spoke**
15:19, 15:21,
173:12
**spoken**
235:24, 236:17
**spring**
21:18, 28:14,
29:16, 29:17,
30:2
**staff**
3:14
**stage**
13:13, 63:18,
64:25
**stages**
14:21, 65:2,

66:13, 68:19,
68:23
**stand**
89:23, 91:11,
97:12, 112:2,
120:13, 192:4
**standard**
50:25, 51:4,
51:8, 53:5,
205:12
**standards**
204:22
**stands**
132:8
**starnes**
3:20
**start**
17:5, 65:9,
82:5, 153:3,
237:3
**started**
17:8, 215:16,
236:15, 237:1,
237:15
**starting**
44:4, 145:4,
221:8
**starts**
179:20
**state**
1:4, 1:11, 3:3,
5:13, 6:14, 7:3,
10:3, 16:17,
19:7, 19:11,
19:18, 20:21,
24:24, 25:14,
39:10, 45:9,
53:20, 79:1,
87:14, 90:25,
96:23, 115:20,
140:19, 142:16,
142:19, 145:25,
147:3, 164:10,
164:11, 164:23,
165:6, 189:13,
204:16, 229:2,
247:22
**stated**
78:11, 114:24

**statement**
43:6, 49:11,
65:25, 82:8,
84:6, 112:19,
140:24
**statements**
50:7, 50:10,
52:5, 52:9,
52:11, 107:12
**states**
1:1, 72:3,
80:14, 81:6,
83:25, 84:8,
89:11, 124:16,
125:8, 229:21,
229:23
**statewide**
112:20
**stating**
39:22, 42:22,
84:21
**statistical**
20:2, 54:13,
131:24, 134:22,
134:23
**statistically**
133:20, 148:19,
184:3, 187:22,
188:9, 191:21,
192:6, 192:12,
192:25, 194:10,
194:12, 195:17,
195:18, 195:24,
196:2, 196:7,
198:7, 200:21
**statistics**
14:18, 180:19,
209:11
**stein**
9:24, 11:9,
11:11, 11:21,
15:18, 15:19,
16:17, 17:10,
17:17, 17:20,
17:22, 22:12,
23:18, 23:25,
25:3, 25:8,
26:21, 35:4,

39:20, 40:24,
44:19, 62:4,
62:14, 87:21,
89:20, 89:21,
91:9, 97:9,
97:11, 98:12,
99:14, 104:23,
106:2, 112:1,
114:12, 116:18,
116:25, 117:21,
118:6, 118:24,
119:10, 120:1,
120:19, 121:9,
121:18, 122:10,
123:10, 124:8,
125:6, 125:16,
148:4, 148:5,
152:8, 152:9,
152:17, 171:21,
171:24, 172:2,
172:6, 172:17,
172:22, 173:13,
175:18, 177:19,
189:5, 190:14,
214:10, 214:18,
215:9, 215:10,
215:14, 215:18,
216:9, 217:15,
219:4, 219:15,
220:6, 228:10,
232:22, 234:5,
234:12, 235:5,
235:17, 235:21,
235:24, 236:17,
237:2, 238:16,
238:20, 239:3,
239:5, 239:14,
240:3, 241:5,
241:21, 242:5,
242:8, 244:8
**stein's**
19:5, 21:8,
109:3, 111:6,
112:3, 121:16,
121:17, 135:21,
156:22, 173:1,
177:3, 189:22,
220:23

**stein-alford**
5:8, 73:13,
73:25, 74:21,
81:14, 92:9,
92:12, 93:25,
94:4, 94:6,
94:11, 106:19,
126:2, 145:25,
146:7
**stenographically**
247:6
**steps**
63:6
**stereotyping**
55:19
**steven**
3:18
**still**
8:25, 48:4,
62:10, 69:12,
76:8, 113:20,
151:25, 155:12,
167:6, 173:5,
192:4, 215:9,
233:3, 233:5
**stop**
208:2, 208:10
**stops**
208:3, 210:8
**storefront**
103:2
**story**
78:21, 132:21
**straightforwardly**
71:20
**street**
2:9, 3:7, 3:21,
4:16, 4:20
**strength**
110:9
**stretch**
182:13
**strike**
160:23
**strong**
94:24, 110:8,
130:23, 159:21,
159:23

structure
151:14, 168:14,
226:20
structured
24:2
students
28:19, 28:23,
239:23
studies
219:8, 219:10,
219:25
study
55:12, 55:15,
55:16, 168:5,
218:7
stuff
131:18, 152:11,
161:4
subject
135:11
submit
224:8, 244:6
submitted
14:1, 14:10,
147:12, 169:21,
188:25, 225:1
subsequently
20:10, 63:4
substance
17:14, 25:7,
36:11, 237:20
substantial
51:13, 130:3,
131:21, 131:22,
133:1, 133:14,
134:14, 134:17,
155:20
substantially
129:6, 129:8,
142:9, 142:23,
142:24
substantive
134:6, 160:22,
162:11, 170:12,
202:21, 236:12,
237:12, 238:12
substantively
131:14, 133:20,

184:3
substitutability
141:15
substitute
91:23
substituted
91:4, 141:3,
142:6, 146:10
substitution
135:12, 136:10,
136:16, 136:19,
136:20, 136:21,
137:1, 137:10,
137:12, 140:14,
141:13, 141:14,
142:5, 146:1,
146:8
subsumed
134:4
subtract
145:5
subtracting
124:1, 124:17
successful
66:22
successfully
108:16
suffered
191:15
sufficient
78:15, 90:18,
105:12, 114:9,
141:15, 197:20
suggest
47:25, 65:22,
94:1, 114:20,
136:18, 153:12,
157:16, 199:5,
201:14, 201:15,
202:24, 212:16
suggesting
63:23, 68:21,
75:16, 129:1,
186:18, 199:5
suggestion
156:19, 195:6,
200:22, 204:7
suggestions
25:9

suggestive
135:12
suggests
91:18, 95:5,
130:24, 136:3,
136:10, 149:3,
151:23, 155:25,
156:2, 157:12
suite
3:7, 4:5, 4:8,
4:11, 4:16, 4:20
summarize
107:10, 134:24,
197:15, 213:5,
215:3
summarized
228:10
summarizing
86:24
summary
87:13, 90:25,
91:15, 105:18,
106:7, 179:4,
187:4, 196:15
summer
184:10
supervisor
4:4
supplemental
224:8
support
71:21, 105:23,
115:21, 180:20,
187:9
supported
87:16
supporters
230:11
supportive
46:23
supports
53:9, 78:6
suppose
40:7, 46:5,
46:9
supposed
192:19, 207:13
supreme
229:17

sure
8:5, 8:10,
17:1, 17:3,
17:7, 17:12,
22:21, 27:1,
27:25, 32:12,
38:8, 43:14,
46:16, 46:24,
59:7, 79:7,
82:3, 91:17,
104:24, 113:19,
117:4, 164:16,
168:20, 169:25,
170:4, 170:7,
177:15, 181:5,
190:1, 190:21,
204:18, 204:19,
216:4, 220:10,
220:12, 241:8,
241:16, 241:18,
241:25, 242:17
surprise
197:21
surprising
123:9, 157:16,
195:16
surrounding
207:17
suspect
47:13, 65:21,
87:23, 147:15,
158:16, 161:16,
168:4
sweet
243:23
sworn
6:3, 8:14
sympathy
122:9
system
13:8, 52:25,
167:24, 229:22

**T**

table
83:12, 85:6,
113:4, 113:6,
113:10, 126:7,

126:11, 126:25,
127:2, 127:4,
127:12, 129:19,
132:16, 132:18,
135:22, 139:18,
141:20, 147:7,
147:19, 148:18,
148:21, 148:22,
150:25, 151:21,
152:2, 152:3,
194:4, 194:21,
202:7, 202:12

**tables**
80:17, 81:6,
81:11, 84:13,
142:13

**tact**
46:1

**take**
9:6, 9:11,
9:14, 30:10,
43:17, 50:5,
53:10, 57:4,
60:4, 61:20,
66:10, 68:23,
68:24, 80:13,
89:13, 99:14,
115:13, 118:25,
119:4, 119:7,
119:11, 119:15,
119:17, 131:15,
135:21, 151:22,
155:23, 161:5,
179:22, 184:11,
207:13, 232:4,
237:23, 240:25,
245:15

**taken**
15:22, 17:7,
60:7, 115:15,
121:4, 135:24,
164:18, 232:7,
233:17, 247:3,
247:6

**takes**
24:9, 142:8,
178:11, 191:13

**taking**
8:6, 25:25,

26:1, 86:13,
115:10, 119:19,
137:20, 167:7,
201:24

**talk**
8:8, 49:4,
54:8, 55:1,
137:14, 149:13,
155:13, 173:24,
200:7, 210:20,
211:4, 227:25,
236:21

**talked**
11:22, 21:22,
106:6, 133:15,
177:14, 214:19,
237:2, 237:6,
240:15, 241:3,
241:13

**talking**
46:2, 69:23,
78:15, 79:8,
79:18, 79:20,
84:20, 84:21,
84:23, 85:1,
85:2, 106:10,
110:24, 124:7,
129:10, 140:18,
142:12, 146:21,
189:5, 211:1,
221:8, 223:12

**talks**
41:8, 83:12

**tallahassee**
1:3, 3:8

**tangential**
31:3, 94:18

**tangentially**
227:14, 239:10

**target**
94:1, 94:9,
147:10, 150:1,
231:13

**targeted**
95:10

**targeting**
149:17, 149:18

**task**
12:5, 25:25,

46:8, 59:2,
121:22, 123:8,
123:13

**tasked**
57:12, 118:21

**taught**
18:20, 18:22,
19:1, 28:9,
28:16, 226:6,
226:22

**teach**
28:5, 28:7,
28:12, 29:5,
29:7, 29:15,
227:6, 227:24,
227:25

**teaching**
19:3, 28:14,
28:22, 29:10,
29:17, 30:1,
227:23

**tears**
32:25

**technically**
34:22

**tell**
8:15, 15:24,
50:14, 58:10,
98:17, 150:15,
152:2, 192:11,
194:8, 196:8,
200:19, 201:12,
201:13, 206:18,
217:15, 217:16

**telling**
119:25, 243:12

**tells**
85:25, 201:19

**ten**
147:11

**term**
88:8, 103:15

**terminally**
33:2

**terms**
12:20, 17:13,
26:1, 29:9,
33:13, 58:12,

71:18, 76:8,
83:8, 87:24,
88:20, 101:19,
104:14, 114:4,
119:24, 121:24,
122:23, 137:4,
151:16, 151:17,
161:20, 175:7,
176:8, 177:1,
203:9, 204:7,
214:22, 229:15,
229:19, 231:9,
239:7

**terrible**
33:2

**test**
71:15, 131:23,
134:23, 187:14,
197:17, 208:24,
209:6, 209:7,
209:10, 210:2

**tested**
67:9, 67:10,
151:16, 196:6

**testified**
6:5, 20:1,
21:16, 31:25,
32:14, 32:18,
32:24, 37:21,
118:5, 120:2,
165:2, 221:15,
225:24, 231:23

**testify**
6:4, 9:16,
19:23, 32:17,
33:6

**testifying**
214:7, 227:17,
232:10

**testimony**
7:6, 16:19,
16:22, 32:9,
33:13, 36:18,
37:15, 37:25,
43:4, 43:18,
46:23, 48:18,
52:4, 57:20,
173:3, 227:2,

246:4, 246:6,
247:5, 247:6
**testing**
70:19, 71:4,
134:23, 151:17
**tests**
116:15, 192:17
**texas**
22:17, 225:6
**text**
26:2, 119:21,
239:6, 239:11,
239:13
**texting**
9:8
**th**
2:9, 4:15,
206:24, 232:15
**thank**
10:21, 26:17,
27:8, 30:11,
80:16, 170:25,
171:2, 173:25,
177:9, 178:5,
186:23, 189:4,
222:1, 231:19,
232:2, 232:9,
233:16, 233:23,
235:7, 235:12,
238:5, 243:8,
243:18, 244:5,
244:17, 244:20
**thanks**
44:7, 232:24,
245:9
**thanksgiving**
236:9
**themselves**
42:2, 159:14,
180:6, 183:10,
230:4
**theoretical**
67:19, 71:13,
71:14, 71:23,
93:15, 176:7
**theories**
67:8, 70:15,
70:18, 70:19,

152:5, 152:12,
157:2, 210:20,
228:2, 228:4
**theory**
52:20, 62:1,
66:11, 66:12,
66:15, 66:17,
66:20, 66:22,
66:25, 67:2,
67:5, 67:10,
67:14, 69:16,
70:25, 71:3,
71:7, 95:16,
153:9, 155:9,
205:6, 209:1,
210:22, 211:8,
211:11, 212:9
**theory-based**
156:20
**thereafter**
247:7
**therefore**
75:22, 78:21,
90:9, 132:7,
145:23, 146:6,
155:7
**thicket**
229:14, 231:18
**thing**
46:17, 46:18,
48:1, 48:3,
50:5, 65:23,
110:4, 113:20,
142:1, 154:8,
162:21, 224:15,
226:18, 227:14,
239:8, 239:22
**thinking**
117:4, 120:5,
120:16, 120:17,
121:12, 170:2,
170:5
**thinks**
75:10, 182:8
**third**
30:17, 34:6,
64:7, 70:1,
73:16, 76:12,

76:18, 76:22,
77:5, 78:13,
79:2, 79:4,
79:12, 79:24,
80:3, 84:14,
85:17, 86:1,
90:24, 91:3,
97:1, 100:10,
100:20, 101:9,
101:17, 101:18,
102:5, 102:21,
103:1, 103:15,
103:23, 104:6,
104:20, 113:23,
116:2, 116:7,
120:25, 135:13,
135:25, 136:4,
143:5, 147:6,
147:9, 147:12,
147:16, 147:19,
147:22, 147:23,
158:11, 159:8,
160:6, 160:14,
160:20, 162:12,
166:13, 173:20,
180:10, 181:21,
218:1, 218:15,
226:17, 228:21
**thoroughness**
220:17
**thought**
95:7, 111:2,
114:21, 121:24,
122:11, 123:15,
173:21, 175:6,
175:8, 175:12,
177:12, 178:21,
186:11, 189:8,
189:20, 190:3,
225:4
**thoughts**
11:7, 121:15,
121:17, 152:21
**threat**
167:2, 167:17,
167:19
**three**
101:14, 120:16,

176:4, 191:14,
191:18, 202:22
**through**
32:22, 33:14,
35:6, 53:24,
61:11, 61:17,
63:1, 63:6,
80:19, 80:20,
80:23, 80:24,
124:12, 135:10,
138:15, 145:7,
145:8, 167:8,
181:2, 220:14,
220:20, 221:17
**throughout**
45:22
**thursday**
1:16
**ticket**
167:13
**ticking**
208:13, 208:14
**tied**
192:1, 199:20,
199:24
**tight**
235:13
**tilt**
193:19
**time**
1:17, 6:23,
7:8, 7:19,
11:25, 12:14,
12:24, 13:2,
13:14, 13:15,
17:24, 18:8,
19:1, 22:8,
24:10, 29:23,
31:18, 34:18,
54:11, 54:20,
60:1, 69:11,
71:1, 73:4,
77:11, 83:17,
84:16, 85:4,
85:5, 85:9,
86:7, 86:10,
87:2, 90:15,
90:17, 90:18,

| | | | |
|---|---|---|---|
| 110:10, 110:11, 117:24, 123:14, 125:24, 128:23, 137:21, 138:9, 138:10, 143:19, 143:23, 143:24, 145:21, 152:20, 152:21, 163:4, 167:8, 171:1, 172:16, 173:17, 175:13, 177:15, 178:5, 178:8, 178:17, 178:20, 190:4, 191:20, 206:16, 207:14, 217:6, 223:6, 224:15, 232:4, 233:24, 236:2, 236:7, 236:15, 237:1, 240:14, 243:3, 243:8, 243:24, 244:20, 245:3 | 222:21, 223:2, 232:10, 232:23, 236:16, 243:7, 243:22 | touch | 193:10, 193:12, |

**touch**
11:10, 22:4
**toward**
12:7, 49:6
**towards**
44:8
**town**
220:16, 236:8, 236:9, 236:10, 237:1, 239:9
**track**
138:15, 206:19, 206:20
**trained**
226:14
**training**
14:17, 20:4, 20:25, 161:8, 226:2, 226:13
**transcript**
5:6, 26:12, 37:5, 60:18, 72:20, 179:13, 188:16, 222:9, 244:2, 245:13, 247:4
**transcription**
246:5
**transition**
152:16, 214:24, 214:25, 216:10, 236:24
**transitional**
215:17
**transitions**
152:14
**translate**
95:13
**translates**
111:21
**travel**
159:7, 159:12
**treat**
94:5, 145:9, 200:22
**treating**
213:24
**trend**
193:5, 193:6,

**today's**
8:2, 14:25, 16:11, 16:25, 61:16
**together**
18:9, 18:12, 18:13, 18:18, 18:20, 18:21, 18:22, 19:2, 22:15, 22:21, 23:6, 23:7, 55:4, 59:2, 59:5, 87:23, 101:5, 120:25, 152:13, 172:9, 173:6
**told**
14:15, 132:22, 173:18, 173:22, 175:9, 237:22, 238:3, 242:8
**took**
90:9, 152:11, 205:8, 241:9
**tool**
230:8
**top**
7:24, 13:3, 124:9, 127:17, 147:11, 188:17
**topic**
47:12, 47:13, 192:20, 196:17, 197:13
**topical**
18:24
**torchinsky**
3:6
**total**
12:23, 13:6, 97:5, 144:19, 150:13
**totality**
19:25

193:10, 193:12, 194:16, 194:17, 194:19, 195:9, 195:10, 195:11, 195:12, 195:14, 195:17, 195:21, 195:25
**trends**
193:9, 195:8, 196:1, 196:6, 197:16, 197:17, 199:16
**trial**
16:21, 17:3
**tried**
17:6, 128:23, 167:8
**tries**
79:19
**true**
26:24, 33:7, 38:24, 55:2, 71:16, 76:2, 87:1, 92:22, 92:25, 105:13, 154:10, 154:11, 154:13, 154:22, 154:24, 154:25, 155:1, 155:6, 156:3, 156:5, 166:24, 167:3, 167:21, 169:4, 170:5, 172:8, 219:19, 246:4, 247:4
**trust**
220:23
**truth**
6:4, 6:5, 8:15
**try**
8:7, 8:19, 46:12, 50:24, 68:7, 71:12, 107:21, 108:20, 224:23, 231:4, 243:22
**trying**
33:8, 48:1,

**timely**
161:3
**times**
6:20, 6:22, 21:22, 100:22, 102:7, 104:1, 104:8, 129:11, 129:12, 132:24, 151:1, 181:14, 223:2, 223:4, 223:6, 236:10, 236:17, 236:21
**timing**
236:6
**title**
26:21, 39:1, 61:3
**titled**
60:11, 112:7, 113:4, 191:9, 211:23
**today**
9:17, 14:9, 103:1, 127:12, 222:16, 222:19,

48:3, 57:21,
70:12, 96:15,
97:20, 97:21,
99:16, 135:18,
138:3, 149:21,
189:18, 210:1
**tsa**
167:10, 167:11,
167:16, 168:2,
168:5, 241:16,
241:23
**turn**
53:10, 72:17,
75:23, 96:3,
98:9, 161:14,
163:3, 191:4,
228:15
**turned**
10:17, 186:20,
203:10, 229:12
**turned-out**
99:7, 100:5
**turning**
95:24, 98:1,
164:5
**turnout**
34:8, 63:10,
64:4, 64:8,
64:13, 64:18,
64:24, 65:4,
65:11, 65:12,
65:17, 65:18,
65:24, 65:25,
66:19, 70:6,
71:18, 75:14,
76:4, 78:5,
88:20, 89:10,
90:15, 90:22,
92:2, 97:22,
152:6, 157:22,
176:13, 186:14,
186:16, 210:17,
210:21, 214:5,
214:17, 216:18,
218:9, 218:18,
218:22, 219:2,
219:7, 219:8,
219:11, 221:4,

221:19, 228:2,
228:4, 228:7,
229:4
**turns**
67:22
**two**
15:15, 23:21,
25:1, 31:25,
33:11, 81:11,
84:13, 84:16,
86:7, 88:5,
107:15, 115:6,
115:20, 116:23,
117:2, 117:19,
118:3, 118:8,
118:18, 120:15,
120:24, 121:1,
130:22, 131:1,
135:8, 138:13,
142:2, 142:17,
143:3, 143:10,
145:11, 162:14,
191:20, 192:20,
198:4, 202:8,
204:6, 214:24,
215:21, 219:7,
232:17, 236:13,
237:18
**two-year**
29:1
**types**
84:14
**typewriting**
247:7
**typically**
12:17, 12:18,
13:16, 23:16,
29:6, 29:11,
31:4, 47:6,
50:3, 205:23,
226:16
**typing**
121:1
**typist**
239:11

---
**U**
---
**uh-humh**
8:11

**ultimate**
117:12, 117:13,
161:7, 177:21,
185:13
**ultimately**
45:14, 47:22,
58:23, 68:22,
75:13, 92:1,
100:1, 108:13,
108:16, 161:6,
163:19, 201:12,
202:5, 231:12,
234:20
**unable**
116:14
**unavailable**
80:4
**uncertainty**
135:2
**unclear**
194:24
**uncommon**
71:2
**under**
8:14, 152:5,
216:16, 247:7
**underestimate**
229:24
**underlying**
14:23, 196:14,
198:2
**undermines**
169:7
**understand**
8:16, 8:18,
34:12, 34:13,
47:22, 48:2,
48:3, 49:15,
52:4, 56:6,
56:10, 56:14,
65:8, 65:16,
68:7, 69:7,
71:12, 85:11,
88:6, 96:20,
101:25, 114:13,
123:1, 133:11,
145:13, 149:2,
150:7, 150:18,

181:6, 189:18,
199:2, 204:11,
224:17, 245:6
**understanding**
11:20, 12:4,
25:5, 28:24,
28:25, 35:2,
46:13, 53:21,
55:19, 57:25,
66:23, 67:4,
86:16, 86:21,
88:14, 88:24,
89:1, 89:2,
97:23, 98:3,
114:11, 118:7,
123:11, 234:7,
235:1
**understood**
8:21, 56:9,
243:5, 244:12,
245:4
**undertaken**
168:20
**undisputed**
115:9
**undoubtedly**
155:13
**unintended**
58:5
**union**
2:5, 3:11,
171:4
**united**
1:1, 229:18,
229:21, 229:23
**units**
1:6
**universe**
135:2
**university**
17:22, 18:1,
18:5, 28:3
**unless**
9:1, 40:22,
79:19, 199:4
**unlike**
163:7
**unlikely**
85:14

unquote
94:2
unregulated
162:6
unrelated
7:10, 7:15
unstated
76:20
unsure
240:9
untested
76:19
until
68:11, 70:5,
109:20, 190:20,
214:9, 215:14
unusual
23:16, 71:5
up-to-date
27:14
update
17:5, 146:5,
181:15, 182:4,
182:24, 213:16
updated
112:24
updating
181:1
usage
114:25, 148:13,
148:16
use
42:16, 50:3,
51:8, 70:17,
70:19, 99:5,
103:15, 113:11,
138:1, 139:5,
142:18, 153:24,
154:1, 154:2,
195:23, 198:25,
230:8
useful
42:18, 48:22,
52:10, 52:17,
55:21, 67:19,
67:21, 69:15,
71:16, 71:24,
91:16, 91:17,

99:11, 121:25,
122:11, 123:16,
201:21
usefully
175:13
users
126:23
using
30:13, 96:15,
97:2, 99:20,
125:23, 183:19,
211:8
usually
40:18, 185:2,
216:23, 225:15,
238:21
utilization
21:1, 115:6,
131:19, 143:5,
149:16, 180:9
utilize
77:1, 102:15,
102:20, 103:4,
103:5, 103:10,
103:17, 138:5,
182:17
utilized
50:8, 54:4,
102:23, 113:23,
114:5, 114:6,
138:4, 182:14,
182:16, 182:18
utilizing
71:13, 200:14

**V**

value
43:24, 59:4,
155:24
variability
193:16
variable
98:3, 191:22
variables
191:20
variation
83:17, 128:13
varied
138:10, 191:24

varieties
83:8
variety
7:18, 19:17,
20:2, 52:24,
77:22, 101:16,
102:20, 166:24,
181:17, 207:14,
208:18, 218:8
various
19:14, 20:8,
21:22, 37:24,
39:14, 42:23,
43:18, 66:13,
85:13, 92:14,
139:13, 145:22,
180:19, 237:13
varying
48:5
vehicles
148:1
venue
241:18
verbal
8:10
verbally
9:6
version
192:23
versus
95:10, 117:5,
146:19, 149:17,
176:11, 199:23
via
73:16, 73:20,
74:9, 74:13,
74:17, 74:25,
76:11, 78:8,
92:10, 94:12,
95:1, 96:25,
103:23, 104:6,
104:19, 105:21,
106:13, 126:23,
138:8, 147:6,
150:24, 151:5,
151:9, 187:7
video
33:1

videoconference
1:14
view
41:18, 46:4,
48:16, 49:18,
49:22, 49:23,
69:9, 91:16,
105:10, 107:18,
114:12, 119:18,
145:19, 175:10,
191:1, 198:23,
227:18, 231:16
viewed
159:16, 159:18
viewers
202:7
violations
164:9
visual
191:5
visually
191:13
vogel
3:5, 4:25
volunteer
66:13
volunteers
230:13
vote
21:24, 30:13,
31:2, 73:16,
74:9, 74:17,
74:25, 75:21,
79:6, 79:11,
79:23, 80:8,
91:3, 92:10,
92:11, 92:14,
93:13, 94:3,
95:24, 96:3,
98:1, 98:9,
99:22, 100:2,
100:21, 102:6,
102:17, 103:12,
103:23, 104:6,
104:19, 106:13,
108:5, 108:16,
115:23, 116:2,
116:7, 138:2,

138:4, 138:7,
138:13, 138:14,
138:24, 147:6,
150:24, 151:5,
151:9, 157:25,
158:3, 158:4,
158:6, 158:10,
159:8, 181:1,
182:19, 186:5,
186:21, 213:1,
213:15, 213:16,
229:4
**voted**
100:6, 100:7
**voting**
2:8, 3:15,
4:14, 7:10,
7:15, 19:13,
19:14, 19:15,
19:24, 21:7,
21:25, 28:13,
28:21, 28:24,
29:12, 29:18,
29:25, 30:9,
34:3, 36:25,
66:23, 67:11,
67:12, 71:21,
76:24, 77:1,
89:15, 90:2,
95:23, 96:1,
96:2, 96:5,
100:4, 102:16,
106:24, 109:2,
109:12, 110:18,
113:11, 113:13,
115:23, 116:1,
116:6, 116:9,
116:10, 125:13,
126:2, 133:4,
155:9, 155:12,
156:1, 156:13,
156:15, 156:17,
157:4, 158:8,
158:9, 159:4,
163:8, 168:10,
169:6, 185:25,
186:12, 211:24,
212:21, 212:24,

213:13, 215:23,
219:6, 219:9,
221:2, 225:23,
225:25, 227:4,
227:24, 229:3,
231:24
**vra**
7:6

## W

**wait**
8:9, 54:12,
68:10, 109:20
**waive**
244:1
**waived**
247:9
**walk**
212:3
**want**
8:4, 17:5,
25:18, 27:18,
38:11, 45:4,
57:22, 68:10,
82:7, 82:9,
94:19, 96:18,
101:24, 102:16,
107:10, 132:20,
135:20, 162:14,
168:18, 170:3,
181:5, 201:14,
211:10, 213:16,
219:4, 221:14,
222:1, 232:19,
242:7, 244:4,
244:10, 244:19,
244:22
**wanted**
23:25, 51:3,
54:22, 110:13,
152:19, 152:20,
170:7, 175:11,
178:18, 202:3
**wants**
51:20, 224:4,
225:15
**washington**
2:10, 2:17,

4:16
**way**
20:15, 48:11,
48:23, 49:5,
52:1, 53:9,
57:4, 59:5,
63:23, 67:6,
68:21, 70:5,
71:1, 78:3,
83:7, 83:16,
87:6, 95:8,
95:20, 101:14,
102:11, 102:13,
102:15, 103:21,
105:15, 107:4,
107:6, 107:9,
108:17, 108:21,
109:22, 109:25,
110:2, 117:16,
120:23, 121:25,
122:11, 130:21,
130:22, 132:6,
145:15, 145:20,
154:21, 157:13,
161:16, 161:25,
162:2, 165:6,
183:25, 206:7,
212:5, 212:11,
214:9, 215:14,
216:23, 221:17,
224:23, 225:16,
225:20, 229:20,
240:17
**ways**
52:24, 53:24,
58:6, 77:7,
77:22, 86:23,
86:25, 91:24,
101:17, 105:4,
105:5, 114:1,
120:16, 138:6,
138:13, 138:14,
170:3, 181:18,
182:7, 199:4,
202:8
**we'll**
198:20, 232:20,
233:1, 233:14,

235:2, 243:22,
244:23
**we're**
8:5, 9:8,
10:20, 20:16,
21:4, 21:5,
21:17, 24:19,
35:9, 64:6,
69:23, 75:15,
82:12, 92:20,
93:19, 105:2,
107:2, 113:19,
114:6, 115:8,
123:3, 131:20,
132:5, 134:5,
143:22, 145:18,
161:8, 163:14,
175:23, 176:1,
176:9, 177:23,
201:24, 226:19,
231:5, 233:24,
239:19, 239:21,
245:7
**we've**
18:5, 18:7,
18:15, 18:17,
18:20, 21:22,
22:14, 23:6,
26:3, 28:1,
60:2, 86:3,
199:14, 222:3,
223:12, 236:23
**weak**
95:8
**weather**
208:19
**website**
103:3
**week**
15:7, 15:13,
17:4, 73:3,
222:25, 223:2,
223:7, 228:3
**weeks**
6:25
**weight**
55:4
**weighting**
63:14

weird
224:17
well-beyond
198:11, 230:3
well-qualified
204:19, 204:20
well-respected
23:19, 23:20
went
44:18, 128:17,
207:12
weren't
207:20
whatever
63:4, 122:10,
135:23, 136:21,
137:3, 137:18,
142:7, 142:18,
194:13, 207:15,
208:6, 208:19,
224:2
wheel
22:23, 22:24,
30:24, 31:3
whenever
17:5
whereas
193:12
whereof
247:13
wherever
215:6
whether
7:25, 27:22,
46:17, 49:7,
59:13, 64:19,
65:16, 65:18,
70:2, 70:3,
75:2, 82:7,
87:18, 88:1,
90:19, 93:5,
107:13, 108:13,
108:14, 109:15,
110:15, 111:3,
111:20, 112:17,
113:22, 114:16,
115:2, 137:10,
141:14, 142:5,

142:6, 143:21,
146:20, 146:24,
150:24, 156:11,
169:19, 173:8,
177:21, 177:24,
184:2, 190:13,
190:16, 190:23,
194:6, 196:6,
205:19, 206:7,
217:25, 218:16,
221:9, 233:3,
238:10, 239:1,
242:11
white
72:7, 73:16,
76:5, 76:7,
82:19, 87:10,
88:9, 89:12,
89:14, 90:22,
97:5, 99:22,
100:22, 102:7,
104:1, 104:8,
104:19, 113:13,
114:15, 116:1,
116:8, 125:11,
125:12, 125:25,
126:13, 126:17,
126:20, 127:18,
128:17, 129:6,
129:24, 133:5,
134:9, 134:11,
136:5, 136:9,
136:24, 137:7,
138:21, 141:23,
141:24, 146:19,
146:25, 147:5,
151:4, 181:14,
181:23, 182:23,
193:23, 194:3,
194:20, 195:11,
195:14, 196:1
whites
73:21, 74:10,
75:24, 89:8,
105:22, 106:13,
111:18, 113:23,
127:23, 128:4,
136:1, 136:2,

137:7, 174:19,
175:21, 176:12,
187:8, 187:16,
187:24, 188:10,
192:7, 193:14,
194:11, 196:7,
198:8, 198:9,
202:13, 202:19,
203:11, 203:12,
204:10
whoever
243:2
whole
6:4, 55:17,
61:3, 77:22,
90:6, 93:18,
97:10, 119:9,
183:18, 197:7,
199:22, 201:24,
221:22
wide
7:18
willing
11:24, 57:5
window
186:9
windows
10:9
wisdom
55:9
wish
96:18
withdraw
235:2
within
36:19, 86:10,
184:5
without
13:6, 39:15,
42:24, 125:2,
132:15, 146:6,
155:6, 171:22,
193:1, 195:13,
236:17
witness
21:14, 73:9,
73:11, 153:2,
171:2, 173:10,

232:6, 243:9,
247:13
wolfinger
220:5
women
4:13, 231:2,
242:25
word
54:2, 65:8,
120:24
wording
153:11, 153:14,
155:4, 155:5,
212:16
words
9:7, 119:12,
121:15, 121:16,
168:24, 195:24
work
11:9, 11:24,
19:11, 19:12,
19:16, 19:20,
20:18, 20:20,
20:22, 21:12,
21:19, 22:17,
24:8, 31:4,
32:4, 32:10,
35:10, 35:11,
35:12, 41:1,
42:13, 42:15,
42:16, 42:17,
47:9, 55:8,
59:23, 63:2,
64:23, 98:24,
99:3, 122:25,
130:23, 152:25,
155:11, 155:19,
155:25, 156:10,
173:1, 197:20,
214:10, 214:13,
227:17, 229:21,
237:3, 239:8
worked
18:9, 18:12,
18:13, 18:17,
18:18, 21:2,
22:15, 22:21,
23:6, 31:15,

33:15, 51:10,
87:22, 172:9,
215:12, 237:10
**working**
17:2, 17:13,
62:25, 236:16,
240:11, 240:17
**works**
60:4, 71:25,
130:22, 153:2,
233:16
**workspace**
239:24
**world**
157:9, 157:14
**worth**
124:13, 124:15
**wouldn't**
13:13, 25:22,
35:7, 99:10,
101:6, 107:23,
114:23, 123:15,
159:2, 159:6,
182:17, 206:4,
207:15, 216:12,
224:11, 232:25
**wrap**
243:21
**wrap-up**
225:22, 235:12
**write**
23:22, 39:19,
44:9, 92:21,
98:15, 104:16,
105:18, 108:2,
119:14, 120:9,
135:6, 135:10,
135:19, 144:11,
152:7, 174:15,
178:12, 178:13,
179:1, 180:18,
181:6, 187:4,
224:4, 224:5,
237:21
**writes**
73:12, 92:8,
93:25, 106:18,
113:9, 113:10,

123:21, 125:21,
126:11, 144:17,
148:10, 214:10,
214:12, 219:5
**writing**
12:21, 12:25,
24:6, 25:25,
73:18, 74:2,
197:12, 223:17,
223:23
**written**
23:7, 26:6,
30:21, 31:12,
34:18, 62:13,
89:23, 91:11,
97:10, 97:12,
101:5, 119:4,
119:5, 120:23,
121:8, 152:10,
152:15, 152:17,
189:2, 234:11,
234:13, 242:4,
244:10, 244:24
**wrong**
110:2, 113:2,
122:12, 123:25,
175:16, 205:14,
218:5
**wrote**
24:13, 24:20,
25:1, 25:23,
39:21, 56:20,
62:3, 62:5,
62:9, 62:11,
62:15, 87:20,
89:19, 91:8,
91:17, 97:8,
104:22, 106:1,
116:17, 116:25,
117:1, 117:7,
118:6, 120:1,
120:14, 120:18,
120:19, 120:20,
120:22, 125:15,
148:4, 152:9,
152:11, 173:8,
197:23, 205:7,
214:12, 214:13,

214:21, 215:1,
216:10, 217:16,
217:17, 223:21,
240:3, 240:4

**X**

**xerox**
38:10, 49:20

**Y**

**yeah**
14:12, 34:21,
66:21, 88:10,
105:16, 112:16,
158:16, 169:1,
187:21, 212:1,
214:12, 215:14,
216:2, 216:20,
235:9, 239:21,
241:25
**year**
27:12, 28:15,
29:6, 84:4,
86:4, 112:20,
124:12, 132:7,
144:24, 144:25,
145:1, 145:15
**year's**
124:13, 124:15
**year-olds**
186:13, 186:20
**years**
18:5, 18:16,
23:8, 23:11,
28:11, 29:6,
83:10, 126:6,
141:8, 144:22,
156:25, 172:10,
172:15, 197:12,
197:24, 198:15,
225:4, 225:7
**yesterday**
15:19
**yourself**
59:9, 231:20
**youth**
1:5

**Z**

**zack**
4:25

**zone**
1:17
**zoom**
10:10, 10:14,
17:1, 105:16,
135:8, 240:15

**$**

**$600**
12:11

**0**

**00**
164:18
**02**
1:17
**06**
232:7
**0671**
2:11
**07**
245:16

**1**

**1**
164:18, 164:19,
187:17
**10**
23:8, 23:11,
28:11, 60:7,
60:8, 133:23,
133:24, 152:23,
180:18, 182:2,
196:10, 197:12,
197:24, 198:15
**100**
196:10
**105**
123:21, 125:4
**11**
73:21, 74:6,
74:7, 105:14,
115:15, 115:16,
187:2, 206:11,
232:15
**1101**
4:15
**114**
148:10

**115**
150:19
**1168**
3:22
**118**
92:7
**119**
3:7
**12**
73:7, 73:12,
73:22, 73:24,
152:19
**13**
152:4, 206:11,
208:22, 210:19,
233:17
**1355**
140:8, 140:16,
140:23, 141:5,
187:13, 187:15,
187:25, 188:2,
188:5, 188:11,
189:9, 191:24,
192:9, 203:8,
207:3
**1392**
4:21
**14**
4:15, 74:15,
212:14, 214:3,
217:3, 221:18
**15**
2:9, 81:1,
152:23, 179:22,
180:12, 233:2,
233:13
**16**
211:25, 212:2,
212:11, 219:4,
221:8
**17**
147:19, 148:18,
150:25, 191:22,
206:24, 212:2
**171**
5:4
**1715**
3:21

**179**
5:12
**18**
126:14, 130:1,
131:10, 148:22,
185:25, 186:2,
186:12, 186:20,
212:2
**188**
5:13
**19**
80:22, 84:1,
186:2, 206:24,
212:2
**1980**
33:24
**1st**
83:23

---
**2**
---
**20**
18:16, 60:3,
127:19, 127:20,
128:19, 128:21,
129:15, 130:11,
132:18, 133:5,
137:16, 138:20,
141:23, 186:2,
186:13, 186:20,
214:9, 217:3
**20001**
2:17
**20005**
2:10, 4:17
**2007**
191:17
**2011**
188:5, 191:16,
198:9
**2014**
34:1
**2019**
84:24, 85:5,
85:21, 85:22,
86:5, 86:6,
123:24, 124:1,
124:17, 124:20,
126:16, 128:1,

128:2, 128:6,
128:10, 130:19,
130:23, 130:25,
131:4, 132:7,
132:13
**202**
2:18
**2020**
29:3
**2021**
112:12, 112:19,
113:5, 144:20,
144:22, 144:24,
145:7
**2022**
19:4, 29:3,
112:15, 112:25
**2023**
84:4, 84:22,
84:24, 86:4,
109:2, 109:8,
109:13, 123:23,
124:1, 124:3,
124:17, 124:19,
126:5, 126:6,
126:16, 128:4,
130:9, 130:17,
130:19, 130:25,
131:1, 131:11,
132:13, 134:12,
144:21, 144:22,
144:25, 145:4,
145:9, 184:11
**2024**
1:16, 112:22,
247:15
**2025**
247:17
**204**
4:5
**21**
80:17, 81:7,
185:25
**215**
1:9
**216**
1:10
**218**
1:11, 2:6,

3:12, 4:19,
171:5
**22**
80:17, 81:7
**222**
5:15
**23**
1:9, 1:10,
1:11, 148:18,
148:21
**239**
3:22
**247**
1:24
**25**
131:10
**250**
2:16
**255**
4:8, 4:11
**26**
5:8, 126:13,
129:22
**27**
60:8
**28**
81:9, 84:10,
112:7
**29**
113:3
**2925**
4:5
**297**
191:9
**298**
191:4

---
**3**
---
**3**
232:7, 233:15,
233:16, 233:17,
233:22, 233:25
**30**
33:14, 233:15,
233:16
**31**
80:13
**32**
80:14, 81:2,

| | | | |
|---|---|---|---|
| 81:6 | 180:20, 181:2, | **52** | 155:24, 160:5, |
| **32301** | 181:16, 182:24, | 115:16 | 160:13, 162:22, |
| 3:8 | 184:6, 187:8 | **56** | 164:24, 165:14, |
| **32803** | **4** | 144:17 | 165:18, 165:22, |
| 4:9, 4:12 | **4** | **561** | 172:22, 174:17, |
| **33134** | 245:16 | 4:6 | 180:25, 183:14, |
| 4:21 | **40** | **57** | 184:5, 184:9, |
| **3339** | 125:21 | 145:2 | 184:16, 187:10, |
| 3:9 | **400** | **6** | 209:1, 210:18, |
| **33410** | 2:16, 4:16, | **60** | 210:22, 213:12, |
| 4:6 | 4:20 | 5:10 | 215:22, 227:20 |
| **33901** | **407** | **61** | **72** |
| 3:22 | 4:9, 4:12 | 145:24 | 5:11 |
| **34** | **425** | **626** | **740** |
| 164:19 | 3:16 | 4:6 | 2:11 |
| **344** | **4343** | **63** | **750** |
| 3:22 | 4:20 | 106:17 | 4:8, 4:11 |
| **36** | **4490** | **632** | **786** |
| 27:6, 27:8 | 2:18 | 2:11 | 4:21 |
| **363** | **45** | **7** | **8** |
| 4:21 | 152:19 | **7050** | **8400** |
| **37** | **46** | 39:13, 39:14, | 3:16 |
| 5:9 | 115:15 | 40:6, 42:24, | **850** |
| **38** | **4700** | 43:5, 43:20, | 3:9 |
| 18:5, 172:10, | 4:6 | 45:11, 57:10, | **86** |
| 172:15 | **4:-cv--mw** | 59:11, 61:25, | 113:8 |
| **39** | 1:9, 1:10, 1:11 | 75:3, 78:7, | **879** |
| 92:7 | **5** | 78:9, 80:18, | 3:9 |
| **3pvro** | **5,000** | 80:19, 81:13, | **897** |
| 74:17, 74:25, | 101:15 | 81:17, 82:20, | 4:9, 4:12 |
| 81:8, 84:9, | **50** | 83:22, 84:5, | **9** |
| 92:11, 94:12, | 6:22, 13:9, | 85:8, 85:9, | **9** |
| 106:13, 106:22, | 13:11, 13:14, | 85:10, 85:15, | 1:17 |
| 113:4, 113:12, | 182:23 | 87:16, 87:18, | **915** |
| 126:24, 140:17, | **500** | 105:24, 115:22, | 2:9 |
| 146:1, 146:3, | 3:7 | 116:3, 123:22, | **968** |
| 146:8, 146:10, | **51** | 124:2, 124:18, | 2:18 |
| 148:13, 148:16, | 126:8, 126:10, | 125:15, 125:25, | **9th** |
| 150:24, 151:5, | 127:1, 127:12, | 126:15, 126:17, | 247:14 |
| 151:9, 182:3 | 233:22, 233:25 | 126:21, 127:18, | |
| **3pvros** | **5150** | 128:5, 128:6, | |
| 73:20, 74:9, | 4:9, 4:12 | 128:17, 130:9, | |
| 74:13, 74:20, | **516** | 131:6, 134:12, | |
| 75:3, 78:7, | 3:16 | 144:18, 145:3, | |
| 78:9, 78:23, | **518935** | 145:10, 146:2, | |
| 94:1, 105:21, | 1:23 | 146:11, 153:9, | |
| 126:21, 141:6, | | | |
| 146:6, 146:12, | | | |