IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS OF
THE NAACP, et al.,

    *Plaintiffs*,

    v.                                              4:23-cv-215-MW/MAF

CORD BYRD, in his official capacity as
Florida Secretary of State, et al.,

    *Defendants*.
_____/

## THE SECRETARY'S RESPONSES
## TO PLAINTIFFS' MOTIONS IN LIMINE

The Secretary responds to the *NAACP* Plaintiffs' motions in limine and joinder

of the *Hispanic Federation* Plaintiffs' motion in limine. Docs.230, 231, 232.

1

**Introduction**

Plaintiffs filed two motions in limine: one concerning the State's interests in passing SB7050, Doc.231, and one concerning the State's experts, Dr. Alford and Dr. Stein, Doc.232. Plaintiffs also filed a joinder, incorporating and adopting the arguments made in the *Hispanic Federation* Plaintiffs' motion in limine about the Individual Plaintiffs' immigration histories and benefits. Doc.230. For the reasons explained below, those motions and joinder should be denied.

**Argument**

I. **This Court Should Deny Plaintiffs' "Motion in Limine Regarding Evidence of State Interests for the Challenged Provisions of SB 7050," Doc.231.**

**A.** In their first motion in limine, Plaintiffs urge this Court to "limit evidence related to the state's interests in enacting the challenged provisions of SB 7050 to the actual interests considered by the legislature, not post hoc justifications for those provisions." Doc.231 at 1 (emphasis omitted). This is appropriate, Plaintiffs contend, because their "First Amendment and equal protection claims trigger strict scrutiny." Doc.231 at 1.

The issue with this argument is that it presupposes a legal conclusion for a subset of their claims—that strict scrutiny, based on the facts and based on the governing law, actually applies for some of their claims (as opposed to a lesser form of scrutiny under *Anderson-Burdick*, the political-function exception, etc.). This Court hasn't made that conclusive decision yet, and it's inappropriate to do so on a motion in limine. In any

2

event, there's no theory that would support the application of strict scrutiny to Plaintiffs' statutory claims against the Citizenship Restriction and the Mail-In Ballot Request Restriction, respectively.

Plaintiffs' motion is also unnecessary. If—based on the facts and governing law—strict scrutiny applies, then strict scrutiny applies, along with its standards on State interests. If strict scrutiny doesn't apply, then it doesn't apply, and the State can offer any rational justification to justify its legislation. *FCC v. Beach Comm'ns*, 508 U.S. 307, 315 (1993). A motion in limine doesn't change the level-of-scrutiny analysis. And, if the applicable level of scrutiny remains a close call, the better approach would be for this Court to hear the evidence during the bench trial and sort through the evidentiary value in the final order.

This situation is no different from *League of Women Voters of Florida v. Florida Secretary of State*, 4:21-cv-186, Doc.422 (N.D. Fla. Jan. 4, 2022). There, the plaintiffs "move[d] to preclude" the State defendants "from offering post-hoc rationalizations in defense of" a bill's "challenged provisions when defending against claims that trigger heightened scrutiny." 4:21-cv-186, Doc.422 at 5. This Court denied the motion, reasoning that it was "inclined to hear the parties' evidence and then decide what weight, if any, to give it." 4:21-cv-186, Doc.422 at 6. So too here. This Court should hear the parties' evidence and then decide what level of scrutiny applies and then review the State's evidence under that level.

3

**B.** Even so, Plaintiffs offer an alternative argument: "if the Court considers evidence from after SB 7050's passage in assessing the state's interests, the Court should limit Defendants to presenting the interests adduced over the course of document and deposition discovery." Doc.231 at 2. "Allowing Defendants to present new evidence regarding the state's interests at trial," say Plaintiffs, "would undermine" the rules of civil procedure "and prejudice Plaintiffs by precluding them from investigating that evidence over the course of discovery." Doc.231 at 4-5.

At a broad level, the Secretary is satisfied that the *evidence* produced to Plaintiffs during discovery, and the *State interests* provided to Plaintiffs, more than justify SB7050's challenged provisions. And at trial, the Secretary will rely on the *evidence* he produced to Plaintiffs and the *State interests* he provided to Plaintiffs together with the testimony elicited from witnesses properly disclosed to the Parties.

That said, Plaintiffs' argument—as applied to both *evidence* and *State interests*—runs into problems if rational-basis review applies. Under that level of review, Plaintiffs have the burden "to negative every conceivable basis which might support" the action, even if the State doesn't advance a particular basis and even if there's no record evidence for it. *FCC*, 508 U.S. at 315 (citation omitted); *see also Heller v. Doe*, 509 U.S. 312, 320-21 (1993). As the Supreme Court explained, under rational-basis review, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC*, 508 U.S. at 315. Plaintiffs' alternative

4

argument attempts to sidestep this constitutional standard. It should be rejected for that reason.

In sum, Plaintiffs' first motion in limine should be denied.

## II. This Court Should Deny Plaintiffs' "Motion in Limine to Exclude the Testimony of Dr. Robert Stein and Dr. John Alford," Doc.232.

In their next motion, Plaintiffs urge this Court to preclude the testimony of the State's only two expert witnesses, Dr. Stein and Dr. Alford. Plaintiffs contend that Dr. Stein and Dr. Alford shouldn't be able to opine on their experts, Dr. Lichtman and Dr. Herron. Doc.232 at 1-2.

**A.** Plaintiffs' first argument—that Dr. Stein and Dr. Alford shouldn't opine on Dr. Lichtman—falls flat. Dr. Stein and Dr. Alford's joint report focuses on the quantitative empirical evidence in Dr. Herron's and Dr. Smith's reports, not on the narrative discussions in Dr. Lichtman's report on legislative intent:

> In this report, we will be addressing the quantitative empirical evidence in the reports and as such will not be commenting on the narrative discussion in Dr. Lichtman's report, nor will we be commenting on the similar narrative section of Dr. Herron's report. Such narrative discussions are not helpful in assessing the impacts, if any, of SB 7050 on Florida voters. Nor are they helpful in assessing the intent of those who enacted the legislation; that, ultimately, is a question for the Court and not the experts to assess.

Doc.232-3 at 3-4. The reason is simple: as a *quantitative empirical evidentiary matter*, discussions of legislative intent are not helpful in assessing the impacts, if any, of SB 7050 on Florida voters. *See, e.g.*, Doc.232-5 199:4 – 199:11 (Dr. Stein explaining that the discussions and the materials that Dr. Lichtman included in his report are not helpful

5

in assessing the impact of SB 7050 on voters because "they don't address quantitative empirical analysis, but rather hypotheses, speculation, occasionally intent, which we're not able to [quantitatively empirically] evaluate"); Doc.232-6 41:3 – 41:8 (Dr. Alford: "So I'm not going to comment on [Dr. Lichtman's] comments on Herron and Smith, because I'm commenting on Herron and Smith. And what he has beyond that is, does not reflect any quantitative or empirical analysis of the impact, but just talks about what might possibly be the impact."); *see also* Doc.232-6 43:1 – 43:6; Doc.232-6 57:18 – 58:21.

In other words, it is the State's position, and that of its experts, that Dr. Lichtman's discussion of legislative intent has no bearing on Plaintiffs' factual allegations of discriminatory impact. Because the legislative intent behind SB 7050 cannot be assessed *empirically*, Dr. Lichtman's recitation of the legislative record merely serves to compile rather than produce empirical analysis. *See, e.g.*, Doc.232-6 53:8 – 53:11 (Dr. Alford: "There is not, there is not a body of scientific evidence that supports an empirical way in which you take this raw material and turn it into an index or an assessment of intent."); *see also* Doc.232-6 47:8 – 49:23; Doc.232-6 50:4 – 52:3.[1]

Therefore, Plaintiffs' first argument does very little. To the extent the State's experts provide an opinion as to why, that opinion should be allowed.

---

[1] Dr. Alford read Dr. Lichtman's report. He only "skimmed" the portions of the report "where [Dr. Lichtman] was repeating legislative testimony" because Dr. Lichtman couldn't "put his own empirical analysis into the middle of a lengthy quote from the legislative record." Doc.232-6 37:12 – 38:5.

**B.** Their second argument—that Dr. Stein and Dr. Alford can't opine on Dr. Herron—does little better. In their motion, Plaintiffs offer several reasons why Dr. Stein and Dr. Alford fail a *Daubert* inquiry.

**1.** Plaintiffs start by arguing that "Drs. Stein and Alford provide no methodology for the Court to assess." Doc.232 at 11 (emphasis omitted). But that's inaccurate. Even a cursory review of Dr. Stein and Dr. Alford's joint report (not to mention their depositions) evidences their principal methodology: reviewing the quantitative empirical evidence marshalled by Plaintiffs' experts and explaining how the evidence (or lack thereof) fails to support the findings of Plaintiffs' experts regarding the purported impacts of SB 7050 on Florida voters. *See, e.g.*, Doc.232-3 at 4-21 (analyzing Dr. Herron's and Dr. Smith's reports and pointing out various flaws including missing measures and analysis). While Plaintiffs (and Plaintiffs' experts) may disagree with Dr. Stein and Dr. Alford's conclusions, they cannot credibly argue that Dr. Stein and Dr. Alford fail to explain the bases for such conclusions.

Relatedly, Plaintiffs assert that "Drs. Stein and Alford fail to explain why their preferred design method—comparing registrations to overall CVAP [citizen voting age population]—is preferrable to Dr. Herron's method." Doc.232 at 12. "In fact," say Plaintiffs, Dr. Stein and Dr. Alford "concede that there is no way to quantitatively assess the impact of SB 7050 under their preferred method and failed to confirm whether such data was available before criticizing Dr. Herron for not taking this approach." Doc.232 at 12.

7

Plaintiffs' contentions are belied by both the joint report and deposition testimony. The joint report explains why citizen voting age population is preferrable:

> The appropriate measure is the proportion of persons by race and ethnicity eligible to register (i.e., citizen voter age population) who registered to vote. This ratio properly controls for differences in the number of eligible persons who can register to vote before and after the adoption of SB 7050. Professor Herron's changes in the share of voters registered by method and race/ethnicity do not adequately or correctly measure the incidence of voter registration by race and ethnicity.

Doc.232-3 at 6. And Dr. Stein's *full* deposition colloquy explains why citizen voter age population is needed to support Dr. Herron's conclusions.

> Q. So to start with the last part of what you just testified to, do you have CVAP, I think is the shorthand if you agree, of this type of data available for 2023?
>
> A. I don't know if it's available. I've read Professor Herron's report and he says it's not available on a month-by-month basis. I've seen citizen voting age population data at different levels of analysis for 2022, and I believe, I believe, but it might take me some time to find it for 2023, but I think it is available now.
>
> And if it was not available, I'm not arguing with Michael [Herron] on the issue of the monthly data, that's unfortunate, but without that data, you can't test that second sentence. And let me be very clear. It's the second sentence, this difference-in-difference constitutes evidence of the impact of SB 7050 on voter registrations in Florida. It does not. Without that denominator, without knowing what the size of citizen voting age population is, we can't make a difference-in-difference test.
>
> It's unfortunate the data may not be available, but to say the least, not the problem for the, for my colleague John [Alford] and I, it would be incumbent on Michael [Herron] to come up with the design to control for that base.
>
> Q. We'll talk more about the design that Dr. Herron did select, but just to confirm, you don't have any evidence to offer that there is CVAP data available for 2023?

A. Not at this time, no.

Q. Do you have any understanding of whether there's CVAP data available for 2022?

A. I believe it's available, but again, I make no, no – what's the word? Claim in our report. I simply said that was what was needed to do an adequate test.

Q. And if Dr. Herron represents that the most recent CVAP data available is from 2021, do you have any reason to, or basis to dispute his

claim?

A. Again, I have no basis, no, to dispute that claim.

Q. Is it your understanding that groups would need to wait two years after a law goes into effect in order to ever have a chance to offer empirical evidence about its impact?

A. Could you repeat that? I couldn't hear the first part.

Q. Sure. My question is, assuming that Dr. Herron is correct about the two-year delay in the availability of CVAP data, is it your testimony that Plaintiffs would need to wait two years after a law goes into effect in order to ever be able to offer an empirical analysis of its impact?

A. No. You can offer, and Michael Herron does, offer opinions about what the impact of the law is. You can offer opinions. What I'm suggesting is this is a design that would be preferred.

I've seen people even use the 2021 data. I don't believe that Michael did. I think it was also not available on a monthly basis, but again, that's not my claim. People can make judgments, and as you pointed out, I've agreed that people can make speculative hypotheses. But the design, again, let me repeat, the difference-in-difference constitutes evidence for the impact is not evidence. Let me be clear. He didn't offer a two-year, or even using the 2021 CVAP. He claims that by showing that third party voter registrations have declined as a result of the adoption of SB 7050, that we can conclude that overall registrations have gone down. We cannot conclude that.

We don't have – he didn't marshal the evidence necessary for doing that. Whether he has it or not or whether it's available, I don't disagree. I don't disagree the data may not be available. What I disagree with is that

9

> he should not have said in this second sentence, we see that the overall difference is a decline in voter registration. He can't know that. He can speculate about that, but he then says, this is evidence of it, third party registrations may have gone down, but he then links that to the decline in overall registrations. I don't know that to be true, and I don't think he does either.

Doc.232-5 227:20 – 231:9. The deposition transcript tells a different story than Plaintiffs' retelling of it. As Dr. Stein explained, for Dr. Herron to opine on SB7050's impact, he needed to marshal relevant evidence—like citizen voting age population—to do so, or, without that evidence, change his methodology. Having failed to do so, Dr. Herron doesn't have the bases to opine on SB7050's impact.

**2.** Not content, Plaintiffs then contend that Dr. Stein and Dr. Alford don't "conduct any of their own analyses, do not present any of the data they contend are 'central' to the inquiry, and do not even attempt to replicate Dr. Herron's calculations, despite the fact the same data was available to them." Doc.232 at 13.

Yet these aren't required under the "flexible" *Daubert* inquiry. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993). "In some cases, an admissible expert will need rigorous scientific or statistical analysis, but *Daubert* also allows for admitting experts whose methods are less formal[.]" *United States v. Esformes*, 60 F.4th 621, 637 (11th Cir. 2023).

It's enough that Dr. Stein and Dr. Alford, based on their extensive training, background, and experience in political science, statistics, and elections, identified flaws in Dr. Herron's analysis and conclusions. *See* Doc.232-3 at 23 – 36 (Dr. Stein's

curriculum vitae); Doc.232-3 at 37 – 50 (Dr. Alford's curriculum vitae). It's on Dr. Herron—not Dr. Stein or Dr. Alford—to present data, analyses, and conclusions to support Plaintiffs' claims. Plaintiffs may complain about Dr. Stein and Dr. Alford's (two) uses of hypotheticals, but they are used to illustrate the flaws in Dr. Herron's analyses and conclusions.[2]

In fact, the central thrust of Dr. Stein and Dr. Alford's joint report is that Plaintiffs' experts, including Dr. Herron, don't have the empirical data needed to reach their conclusions on SB7050's impact. The lack of necessary evidence isn't a flaw in Dr. Stein and Dr. Alford's joint report; it's a flaw in Plaintiffs' expert reports.

**3.** Then as a final matter, Plaintiffs claim that Dr. Stein and Dr. Alford's evaluation of Dr. Herron's analysis "is based on a misunderstanding of the basic procedural facts of the challenged bill," such as when the bill was passed and when it went into effect. Doc.232 at 13-14. Dr. Stein and Dr. Alford's depositions belie that contention. *See, e.g.*, Doc.232-5 125:14 – 125:16 (Dr. Stein explaining his "understanding" that SB 7050 "has at times . . . gone into effect"); Doc.232-6 85:10 – 85:11 (Dr. Alford explaining his "understand[ing]" that SB 7050 is "not completely implemented yet"); *see also* Doc.232-6 161:11 – 162:13. In any event, Plaintiffs'

---

[2] Perhaps Plaintiffs should recall that the very purpose of a hypothetical is to illustrate a point rather than to measure a result. *See, e.g.*, Doc.232-6 122:6 – 122:9 (Dr. Alford: "If you put in a hypothetical, then somebody criticizes you because the numbers in your hypothetical are a hypothetical, I have no sympathy for that criticism at all."); *see also* Doc.232-5 254:7 – 254:13.

11

complaints don't go to the *Daubert* inquiry; they go to cross-examination questions, to assess Dr. Stein's and Dr. Alford's credibility and the weight of their testimony. Motions in limine aren't "intended to supplant the adversary system." *Allision v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999). Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" contested "but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

**4.** Two final points bear noting. *First*, in arguing for a *complete* bar of Dr. Stein's and Dr. Alford's expert testimony, Plaintiffs focus solely on *half* of Dr. Stein and Dr. Alford's joint report. Plaintiffs are principally concerned with the experts' disagreement with Dr. Herron's quantitative analyses, Doc.232-3 at 4-9, but Plaintiffs don't provide any comment on the other half of the joint report—i.e., Dr. Stein and Dr. Alford's academic disagreement with Dr. Herron's analysis of and conclusions regarding the "cost of voting" theory, Doc.232-3 at 14-21—a topic that Dr. Herron opines on and relies on in his report, *e.g.*, Doc.232-2 at 12-14. As such, Plaintiffs aren't justified in seeking to completely bar Dr. Stein's and Dr. Alford's testimony.

*And second*, this situation is, again, no different from *League of Women Voters of Florida v. Florida Secretary of State*, 4:21-cv-186, Doc.422 (N.D. Fla. Jan. 4, 2022). There, the plaintiffs moved to exclude a State expert witness, arguing, in part, that his analysis was unreliable and unhelpful. 4:21-cv-186, Doc.422 at 10. The State countered that the expert, "as a political scientist," could "comment on the statistical analyses performed

by Plaintiffs' political science expert." 4:21-cv-186, Doc.422 at 10. This Court denied the plaintiffs' motion and reasoned that "an adversarial presentation at trial will put it in the best position to determine what weight—if any—to give" the State's expert witness's "testimony." 4:21-cv-186, Doc.422 at 10; *see also* 4:21-cv-186, Doc.360 at 3 (similar). Again, so too here.

All told, Plaintiffs' second motion in limine should be denied.

### III. This Court Should Deny the *Hispanic Federation* Plaintiffs' "Motion to Limit Evidence Related to Immigration Histories and Benefits," Doc.230.

The *Hispanic Federation* Plaintiffs filed a motion in limine, seeking to bar evidence of the Individual Plaintiffs' immigration histories and benefits. 4:23-cv-218, Doc.142 (N.D. Fla. Feb. 23, 2024). The *NAACP* Plaintiffs joined that motion. Doc.230. The Secretary provided a response in opposition to the *Hispanic Federation* Plaintiffs' motion in the *Hispanic Federation* docket. He incorporates and adopts the arguments made in that response in this response.

### Conclusion

For the reasons explained above, this Court should reject Plaintiffs' two motions in limine and joinder of the *Hispanic Federation* Plaintiffs' motion in limine. Docs.230, 231, 232.

Dated: February 29, 2024

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Joseph Van de Bogart (FBN 84764)
joseph.vandebogart@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

Respectfully submitted,

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Joshua E. Pratt (FB 119347)
jpratt@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

John J. Cycon (NYBN 5261912)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
15405 John Marshall Hwy
Haymarket, VA 20169
Telephone: (212) 701-3402
jcycon@holtzmanvogel.com

*Counsel for Secretary Byrd*

*Admitted pro hac vice*

**Certificate of Compliance**

I certify that this response is 3,319 words, which is under the 8,000-word limit in Local Rule 7.1. I also certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil

**Certificate of Service**

I certify that on February 29, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil