# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS
OF FLORIDA, INC.; LEAGUE OF WOMEN
VOTERS OF FLORIDA EDUCATION
FUND,

     *Plaintiffs*,

     v.

ASHLEY MOODY, in her official
capacity as Attorney General of Florida;
CORD BYRD, in his official capacity as
Florida Secretary of State,

     *Defendants*.

Case No. 4:23-cv-00216
Consolidated Case No. 4:23-cv-00215

## OPENING STATEMENT

## **TABLE OF CONTENTS**

Table of Authorities ................................................................

I.      Introduction ...................................................................... 1

II.     Standing ............................................................................ 2

        A.      The Receipt Provision ...................................... 4

                1.      *Organizational Standing* ....................... 4

                        a.      Direct injury ................................ 4

                        b.      Diversion of resources ............... 6

                2.      *Associational Standing* ........................ 7

        B.      The Retention Provision .................................. 9

                1.      *Organizational Standing* ....................... 9

                        a.      Direct injury ................................ 9

                        b.      Diversion of resources ............. 10

                2.      *Associational Standing* ...................... 11

        C.      The 3PVRO Fines Provision ........................ 11

                1.      *Organizational Standing* ..................... 11

                        a.      Direct injury .............................. 11

                        b.      Diversion of resources ............. 13

                2.      *Associational Standing* ...................... 14

        D.      The Citizenship Provision ............................ 14

                1.      *Organizational Standing* ..................... 14

                        a.      Direct injury .............................. 14

                        b.      Diversion of resources ............. 15

                2.      *Associational Standing* ...................... 16

III.    Merits ............................................................................. 17

        A.      Count 1: Violation of LWVFL's First Amendment
                Rights to Free Speech and Expressive Conduct ................. 17

        B.      Count 2: Violation of LWVFL's First Amendment
                Right to Free Association ...................................... 23

        C.      Count 3: Substantial Overbreadth ...................... 28

        D.      Count 4: Vagueness .......................................... 32

IV.     Conclusion ..................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                  **Page**

*American Association of People with Disabilities v. Herrera*,
580 F. Supp. 2d 1195 (D. N.M. 2008) .................................................. 24

*Boos v. Barry*, 485 U.S. 312 (1988) ......................................................... 28

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) .............................. 24

*Buckley v. American Constitutional Law Foundation, Inc.*,
525 U.S. 182 (1999) ............................................................ 5, 18, 21, 27

*Burns v. Town of Palm Beach*, 999 F.3d 1317 (11th Cir. 2021) ............ 32

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ...................................... 33

*Curling v. Raffensperger*, 50 F.4th 1114 (11th Cir. 2022) ...................... 20

*Dream Defenders v. Governor of the State of Florida*, 57 F.4th 879
(11th Cir. 2023) ....................................................................... 8, 32, 34

*Florida State Conference of Branches & Youth Units of the NAACP v.
Byrd,* No. 4:23-cv-215-MW/MAF, 2023 WL 4311084
(N.D. Fla. July 3, 2023)........................................... 4, 10, 11, 12, 30, 34

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018)...................................................... 17, 18

*Haitian Refugee Center, Inc. v. Baker*, 789 F. Supp. 1552
(S.D. Fla. 1991) ................................................................................. 26

*Jacobson v. Florida Secretary of State*, 974 F.3d 1236
(11th Cir. 2020) ............................................................................... 2, 3

*Kusper v. Pontikes*, 414 U.S. 51 (1973) ............................................ 23, 24

*League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155
(N.D. Fla. 2012)............................................................................ 24, 25

*League of Women Voters of Florida v. Cobb*, 447 F. Supp. 2d 1314
(S.D. Fla. 2006) .............................................. 12, 13, 17, 18, 20, 21, 22

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706 (M.D. Tenn. 2019) ......................................................... 17, 19, 22, 25

*League of Women Voters of Florida, Inc. v. Lee*, 576 F. Supp. 3d 1004 (N.D. Fla. 2021) ..................................................................... 34

*League of Women Voters of Florida, Inc. v. Lee*, 595 F. Supp. 3d 1042 (N.D. Fla. 2022) ................................................................. 28, 29

*League of Women Voters of Florida, Inc. v. Florida Secretary of State*, 66 F.4th 905 (11th Cir. 2023) .................................... 28, 32, 33

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) .............. 20

*Meyer v Grant*, 486 U.S. 414 (1988) .................................................. 18, 19

*Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018) ...................... 19

*National Association for the Advancement of Colored People v. Button*, 371 U.S. 415 (1963) ................................................................... 24

*New York v. Ferber*, 458 U.S. 747 (1982) ......................................... 29, 30

*Petersen v. Talisman Sugar Corporation*, 478 F.2d 73 (5th Cir. 1973) ............................................................................ 26

*Reed v. Town of Gilbert, Arizona*, 576 U.S. 155 (2015) ........................ 19

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) .................................................................. 19, 28, 31

*United States v. Williams*, 553 U.S. 285 (2008) ............................... 29, 30

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) .................................................................... 30

*Virginia v. Hicks*, 539 U.S. 113 (2003) ................................................ 29

*VoteAmerica v. Schwab*, 576 F. Supp. 3d 862 (D. Kan. 2021) ................ 24

*Wollschlaeger v. Governor, State of Florida*, 848 F.3d 1293 (11th Cir. 2017) .................................................................... 33

**Statutes** **Page**

Fla. Stat. § 97.0575(1)(f).................................................................... 1, 37

Fla. Stat. § 97.0575(4) ................................................................. 1, 35, 37

Fla. Stat. § 97.0575(5)(a) ................................................................. 1, 36

Fla. Stat. § 97.0575(7) .......................................................... 1, 30, 34, 37

## I.   Introduction

Last May, Florida enacted a far-reaching law, SB 7050, tailor-made to debilitate third-party voter registration organizations ("3PVROs"). At trial, the plaintiffs will show how the law has already succeeded and that the law will do much more damage if upheld.

The League of Women Voters of Florida ("LWVFL," or "the League") challenges four provisions of SB 7050: the Receipt Provision;[1] the Retention Provision;[2] the 3PVRO Fines Provision;[3] and the Citizenship Provision.[4]

Each of these provisions on its own has caused concrete harms to the League and its members, and will continue to do so if upheld. No matter how the League modifies its voter registration program to comply with the law, it will register fewer voters as a result of the challenged

---

[1] Fla. Stat. § 97.0575(4). For uniformity, this document refers to SB 7050's provisions as they are named in the parties' Joint Pretrial Stipulation, ECF No. 244. LWVFL has previously referred to the Receipt Provision as the Receipt Requirement.

[2] Fla. Stat. § 97.0575(7). LWVFL has previously referred to the Retention Provision as the Voter Information Restriction.

[3] Fla. Stat. § 97.0575(5)(a). LWVFL has previously referred to the 3PVRO Fines Provision as the Delivery Penalties.

[4] Fla. Stat. § 97.0575(1)(f). LWVFL has previously referred to the Citizenship Provision as the Non-U.S. Citizen Volunteer Restriction.

provisions. The League has already spent time and money to plan and carry out modifications to its voter registration work, and any mistake by a member or volunteer risks steep financial penalties to the League and felony prosecution for the member.

Each of the four provisions challenged by the League violates the First Amendment: they all restrict the League's core political speech and association, and three of the four are overbroad. The state cannot identify any reasonable justification for enacting any of the challenged provisions, let alone one that is narrowly tailored. Though Defendants will point to a handful of alleged violations by one or two 3PVROs, they will fail to establish that the four provisions are tailored to solve the few problems that have occurred. Compounding these harms to the League's First Amendment activity, each provision is vague, leaving the League and other 3PVROs unsure how to follow the law and avoid fines or felony prosecution.

## II.    Standing

The League must show that it has standing to challenge each of the four provisions at issue. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236,

1248 (11th Cir. 2020). Trial evidence will establish that the League has both organizational and associational standing as to each provision.[5]

As explained in more detail below, enforcement of any one of the four challenged provisions on its own will injure the League. Either the League can continue to conduct voter registration solely by assisting voters with online voter registration,[6] or the League can return to registering voters by assisting them in filling out paper voter registration applications, collecting the applications, and submitting the applications to the relevant election officials. Conducting online registration is more costly and less effective than paper registration, while returning to paper registration would impose substantial costs on the League in order to ensure that it complies with the challenged provisions. In either scenario, the League will face increased costs and will register fewer eligible voters as a direct result of the challenged law.

---

[5] Trial evidence will establish that the League's harms as described below are fairly traceable to both the Secretary of State and the Attorney General and are redressable here.

[6] "Online registration" refers to a method of voter registration in which the League does not collect any completed paper voter registration forms. It includes assisting voters with registering online, as well as distributing blank voter registration forms, along with pre-addressed envelopes with stamps.

A.     **The Receipt Provision**

1.     *Organizational Standing*

a.     **Direct injury**

Evidence at trial will demonstrate that the Receipt Provision "directly impedes" the League's "ability to accomplish [its] mission[]." *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd,* No. 4:23-cv-215-MW/MAF, 2023 WL 4311084, at *10 (N.D. Fla. July 3, 2023).

The Receipt Provision requires that League members and volunteers who collect completed voter registration applications provide a receipt to the voter that includes the full name of the member or volunteer who assisted the voter. Complying with the Receipt Provision will create significant new costs and logistical hurdles for the League. First, the League will need to re-train each volunteer to provide receipts, print thousands of receipts each year, and ensure that those receipts are available at each drive and digitally copied before they are given to each applicant. Second, evidence will establish that many League members have a bona fide fear of providing their full name to applicants who they don't know, and that fewer members and volunteers are likely to engage in voter registration activity with the League if they must comply with

the Receipt Provision. As a result, the Receipt Provision has a chilling effect on the League's voter registration activity, in violation of the First Amendment. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 198-200 (1999) (invalidating Colorado requiring petition circulators to wear name badge despite state interest in identifying circulators who committed misconduct).

*Online registration harms.* Evidence at trial will show that implementation of the Receipt Provision would require the League to switch to online registration, at least temporarily, while it develops the training and materials necessary to comply with the provision and retrains its members and volunteers, figure out how to make sure each receipt is copied. Online registration directly impedes the League's mission because it leads to fewer voter registrations and fewer members willing to volunteer with the League. *See id.* (concluding that name badge requirement would reduce number of petition circulators willing to work for plaintiff).

*Paper registration harms.* Evidence will show that the Receipt Provision will directly injure the League when it returns to its traditional paper registration model. The League will register fewer voters because

its volunteers will need to spend time filling out and copying a receipt every time they register a voter, which will decrease their capacity to register additional voters. It will also register fewer voters because fewer members will be willing to volunteer due to legitimate fear of harassment and intimidation. Finally, the Receipt Provision will impose additional costs on the League by requiring them to print additional materials and develop new trainings for members and volunteers.

### b.    Diversion of resources

*Immediate response harms.* The League began diverting resources due to the Receipt Provision immediately upon its enactment. League leaders read and analyzed Fla. Stat. § 97.0575(4) to determine what they would need to do to comply. They held internal meetings, discussed the requirement at their statewide convention, and polled members to determine if and how they could proceed with paper registration.

*Online registration harms.* Evidence will establish that the League has diverted and will continue to divert significant resources to establishing its online registration program. First, the League had to train members and create a plan for how online registration would work, including time spent assessing how and whether to purchase iPads or

6

other tablets, along with Wi-Fi hotspots to enable online registration. The League has started to and will continue to spend money on those tablets and hotspots, as well as on stamps and envelopes to give to registrants who prefer to fill out and return their own paper applications.

*Paper registration harms*. The Receipt Provision will lead to significant resource diversion when the League conducts paper registration drives. The League will need to pay to print thousands of receipts, and will spend time training volunteers to comply, coordinating logistics, and filling out and copying the receipts.

Trial evidence will establish not only how the League has diverted its time and money in response to the Receipt Provision, but where those resources were diverted from. Separate evidence will establish where resource were diverted from with regard to each of the remaining three challenged provisions.

### 2.   *Associational Standing*

Evidence will also establish that LWVFL has associational standing to challenge the Receipt Provision because (1) its members would have standing to sue on their own; (2) the interests at stake are related to LWVFL's purpose; and (3) the participation of individual

7

members is not required. *See Dream Defenders v. Governor*, 57 F.4th 879, 886 (11th Cir. 2023).

League members have standing to challenge the Receipt Provision for several reasons. First, the Receipt Provision has a direct chilling effect on League members who have a bona fide fear of complying with the receipt requirement, and who will decline to engage in voter registration activity with the League as a result. Second, evidence will show that several members spent dozens of hours working on an immediate response to the provision's passage and creating a plan for the League. And once the League moved to online registration, thousands of members were harmed: they registered fewer voters, participated in fewer voter registration drives, and associated less with other volunteers and voters because of the League's modified practices. When the League returns to paper registration, those same members will register fewer voters because of the time and effort spent filling out and copying receipts. Some will not register voters because of fear about providing their name, and

those who do will be forced to provide their name despite serious misgivings.[7]

## B.    The Retention Provision

### 1.    *Organizational Standing*

#### a.    Direct injury

*Online registration harms.* Evidence will establish that the League would have transitioned to online registration solely due to enactment of the Retention Provision and will continue with online registration for at least some period after trial if the provision is upheld. That is because, if any League member retains the name and contact information of a voter registration applicant, she could face a third-degree felony charge. And, as noted, evidence will clearly establish that online registration has hampered and will hamper the League's efforts to register voters.

*Paper registration harms.* Likewise, the League will be directly injured when it returns to paper registration and must comply with the Retention Provision: because the law "threatens [its] staff, members, and

---

[7] With regard to the Receipt Provision and the three other challenged provisions, evidence will also unequivocally show that the interests at issue are germane to LWVFL's purpose of increasing voter participation, and this case does not require participation of individual members.

volunteers with *felony prosecutions* if they copy or retain a voter's personal information . . . [the League] will no longer be able to carry out [its] mission of increasing political participation by contacting voters they have registered." *Fla. NAACP*, 2023 WL 4311084, at *10. The provision will also prevent the League from retaining voters' information, with the voters' consent, to contact them about becoming League members.

### b.   Diversion of resources

*Immediate response harms.* Evidence will demonstrate that after the Retention Provision was passed, the League Co-Presidents and others read the statute and spent many hours meeting about compliance and researching how potential criminal penalties could affect League members.

*Online registration harms.* As noted in detail in Part II.A.1.b., *supra*, evidence will establish that the League's move to online registration has cost the League significant time and money.

*Paper registration harms.* Upon return to paper registration, LWVFL "will divert resources to mitigate the risk that *their own staff, members, and volunteers* will face felony prosecutions for carrying out the organizations' practice of retaining voter information so that they can

later encourage them to vote in the future." *Fla. NAACP*, 2023 WL 4311084 at \*10, n.11. Evidence will establish that such mitigation will require revising training materials, planning for potential prosecution, and more.

### 2.   *Associational Standing*

Evidence will establish that League members would have standing to challenge the Retention Provision. Most obviously, every League member who registers voters risks a third-degree felony prosecution for retaining a voter's personal information, even if it is done by accident or with consent. Further, League members have already devoted time to determining how to react to the Retention Provision, will have to devote more time to training, and have been harmed by the necessary transition to online registration.

### C.   The 3PVRO Fines Provision

#### 1.   *Organizational Standing*

##### a.   Direct injury

*Online registration harms.* At trial, League witnesses will establish that the 3PVRO Fines Provision caused the League to transition to online registration, and the provision enacted by itself would have led to the

same decision. *See League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1325 (S.D. Fla. 2006) ("In March 2006, the League imposed a moratorium on voter registration for the first time ever. The League was concerned that it would be liable for severe fines under the Law given that its registration drives are conducted by volunteers throughout the state.") (citation omitted).

The provision sets a tight deadline for returning applications, steeply raises the penalties for even good-faith noncompliance, and contains unclear language, leaving LWVFL without a fair understanding of its potential liability. A few mistakes could radically alter the League's ability to carry out its mission, and a single mistake could cost a local League its entire annual budget, which is a principal reason the 3PVRO Fines Provision on its own would have led the League to move to online registration. But the switch to online registration comes with costs, preventing the League from engaging in the most effective method of voter registration.

*Paper registration harms*. The draconian penalties levied by the state through the 3PVRO Fines Provision, along with the new 10-day deadline for returning voter registration applications, will prevent the

League from registering as many voters as it has in the past. Evidence at trial will detail the various ways the provision will inevitably lead to that impediment.

### b.   Diversion of resources

*Immediate response harms.* The enactment of the 3PVRO Fines Provision led to immediate and necessary diversion of resources: the League spent time seeking to understand the provision and assessing both how the fines would affect the League and its local chapters and whether its practices could be modified to make fines unlikely.

*Online registration harms.* The League diverted significant time and financial resources when it moved to online registration due to the 3PVRO Fines Provision. *See* Part II.A.1.b., *supra*.

*Paper registration harms.* When it resumes paper registration, the League will need to divert even more resources to ensure it complies with the 10-day delivery deadline and avoids debilitating financial penalties. Evidence will establish various ways in which the League will need to alter its practices, spending additional time and money to meet the deadline and avoid fines.

### 2. *Associational Standing*

Again, League members have standing to challenge the 3PVRO Fines Provision due to the time and resources they devoted to understanding the provision and creating a plan for operating under the new rules. Members have also suffered harms due to switching to online registration, as explained above. Further, members who perform paper voter registration will be required to undergo new training and spend additional time and money delivering applications quickly, often by car, in order to comply with the provision.

## D.   The Citizenship Provision

### 1. *Organizational Standing*

#### a.   Direct injury

*Online registration harms.* Evidence at trial will prove that the League would need to employ its online registration system for some time if the Citizenship Provision were in effect, even if no other parts of SB 7050 could be enforced. The law levies a $50,000 fine that applies any time a non-citizen collects or handles a voter registration application on behalf of the League, even if the volunteer claimed to be a citizen. Moreover, the League's policies prevent it from asking members to attest

to their citizenship. And because the Citizenship Provision would make the move to less-effective online registration necessary, the League would be directly injured, registering fewer voters.

*Paper registration harms.* The Citizenship Provision will grievously harm the League upon its return to paper registration. As explained, complying with the law would force the League to violate its values and ask every volunteer about their citizenship. Even if the League chose to do that, it would lose volunteers who refuse to answer or find the question inappropriate. And the League will register fewer voters when it operates with fewer volunteers and is unable to collaborate with other organizations who may have non-citizen members.

### b.   Diversion of resources

*Immediate response harms.* Evidence will establish that when the Citizenship Provision became law, League leadership devoted hours to reading the provision, holding meetings to assess the League's potential liability, and developing a plan for how to keep registering voters.

*Online registration harms.* As explained, the transition to online registration has required the League to divert significant resources away from other projects. *See* Part II.A.1.b., *supra.*

15

*Paper registration harms*. Conducting paper registration drives under the Citizenship Provision will be dramatically different from before the law was passed, leading to resource diversion: the League will need to retrain every volunteer and local leaders; ensure that every volunteer has affirmed that he or she is a U.S. Citizen; turn away volunteers who are non-U.S. citizens, and modify practices to ensure that there is no risk of any volunteer who has not been vetted by the League collecting even a single application.

### 2.  *Associational Standing*

Evidence will establish that League members would have standing due to the time and resources devoted to reading the Citizenship Provision and assessing how to operate under the provision. Members have also suffered concrete injury from being forced to use only the online registration method. Members who engage in paper voter registration under the Citizenship Provision will be forced to undergo additional training and attest to their citizenship, and will be unable to work with volunteers who are not citizens or other organizations who may have noncitizen members. Moreover, non-citizen members of the League will be prohibited from engaging in voter registration.

16

## III.   Merits

### A.   Count 1: Violation of LWVFL's First Amendment Rights to Free Speech and Expressive Conduct

LWVFL will prove at trial that all four challenged provisions violate its First Amendment rights to free speech and expressive conduct.

Courts have consistently held that the First Amendment protects the speech and expressive conduct inherent in helping people register to vote. *See, e.g.*, *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019); *Cobb*, 447 F. Supp. 2d at 1331-34. There is no question that laws curtailing voter-registration activity substantially proscribe communication with potential voters about political issues, leading to "'speech diminution.'" *Hargett*, 400 F. Supp. 3d at 723 (quoting *Buckley*, 525 U.S. at 194).

LWVFL's voter-registration activity involves conduct as well as speech, but "[c]onstitutional protection for freedom of speech does not end at the spoken or written word." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (quotation marks omitted). LWVFL's voter registration drives are expressive because they clearly demonstrate "[a]n intent to convey a particularized message"—that registering to vote is important and should be

17

encouraged—and there is no question that "*some* sort of message" would be understood by those who viewed it. *Id*. (quotation marks omitted).

Evidence at trial will establish that during voter registration drives, League members typically engage potential voters in discussions about important local and national political issues. Because LWVFL's voter registration activity involves "core political speech," as well as related expressive conduct and associational activity, this Court must apply "exacting" scrutiny, as applied in *Meyer v Grant*, 486 U.S. 414 (1988), and *Buckley*, 525 U.S. 182. Just as in *Meyer* and *Buckley*, each of the four challenged provisions "limit[s] the number of voices who [would] convey [the League's pro-registration] message and, consequently, cut[s] down the size of the audience [the League could] reach." *Buckley*, 525 U.S. at 194-95 (quotation marks omitted); *see also Cobb*, 447 F. Supp. 2d at 1332-33. Accordingly, the intertwined speech and conduct LWVFL volunteers engage in during voter registration drives are entitled to protection by this "well-nigh insurmountable" standard. *Meyer*, 486 U.S. at 425.

Importantly, the availability of "other means to disseminate [the League's] ideas," such as online voter registration, does not diminish

First Amendment protection for its chosen means of communication—voter registration using paper applications. *Id.* at 424 (holding that availability of "more burdensome avenues of communication [did] not relieve [the law's] burden on First Amendment expression") (quotation marks omitted). Because the challenged provisions regulate "traditional voter registration drives, which include central elements of expression and advocacy, it does not matter that [the provisions] would not apply to some other . . . activity that a group might concoct specifically to evade the Act's requirements." *Hargett*, 400 F. Supp. 3d at 721.

Separately, the challenged provisions must be reviewed under strict scrutiny because they are content- and viewpoint-based. *See Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). The challenged provisions apply "because of the topic discussed"—voter registration—and thus are content-based. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The same provisions are also viewpoint-based because they "prohibit[] only one perspective"—encouragement of voter registration. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 (11th Cir. 2022).[8]

---

[8] Even if the challenged provisions applied to groups that wish to *discourage* voter participation, they would still be content-based because they undisputedly target the topic of voter registration.

Even if the Court were to review the challenged provisions under the *Anderson-Burdick* test that applies to regulations that "control the mechanics of the electoral process," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995),[9] there is little difference between the *Meyer-Buckley* standard and the close scrutiny applied under *Anderson-Burdick* when considering regulations on core political speech, which are necessarily severe, *see Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022). Weighing the burden "against the precise interests put forward by the State" demonstrates that the challenged provisions cannot survive, for the reasons explained below. *Id.* at 1121 (quotation marks omitted).

"Because the collection and submission of voter registration drives is" unquestionably "intertwined with speech and association, the question is not whether Plaintiffs' conduct comes within the protections

---

[9] Under *Anderson-Burdick,* "a court must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments. Thereafter, the state must identify its precise interests and the extent to which those interests justify the burden imposed by the law. 'Only after reviewing all these factors is the reviewing court in a position to decide whether the challenged provision is constitutional.'" *Cobb*, 447 F. Supp. 2d at 1332 (citation omitted).

of the First Amendment, but whether Defendants have regulated such conduct in a permissible way." *Cobb*, 447 F. Supp. 2d at 1334.

Defendants have been and will be unable at trial to prove that the challenged provisions are narrowly tailored to serve a compelling interest. Thus far, the state has asserted broad and generalized state interests to justify the provisions challenged here. *See*, *e.g.*, Dkt. 38, Sec'y of State's Response in Opp. to Mot. for Prelim. Inj. & Incorporated Mem. of Law at 11 ("[G]enerally speaking, the 2023 Law Florida [*sic*] promotes the State's interests in safeguarding election integrity, preventing voter fraud, and promoting uniformity, efficiency, and confidence in the election system as a whole.").

With respect to the **Receipt Provision**, no acceptable state interest justifies requiring League volunteers to provide their name in writing to every voter they assist; this discourages League members from assisting with voter registration and adds additional logistical burdens for all 3PVROs. *See Buckley*, 525 U.S. at 198-99. Further, if the State does have an interest in identifying volunteers, it could do so without requiring the volunteers to give their names to every registrant. *See id.*

As to the **Retention Provision**, any state interest in protecting the privacy of applicants' information falls woefully short of meeting *Meyer*'s standard. *See Hargett*, 400 F. Supp. 3d at 726.[10] The provision purportedly applies to *all* "personal information," including an applicant's name and telephone number—the very information the League needs to remind an applicant to vote, notify them of an error on their registration form, or recruit them to become a League member. The state cannot (and has not tried to) show why retention of such basic contact information as a part of voter registration activities is sufficiently threatening to justify the law's burden on the League.

As to the **3PVRO Fines Provision**, it imposes severe punitive civil sanctions based on the League's political expression, thereby inhibiting LWVFL's exercise of its First Amendment freedoms. The state cannot show any interest, let alone a compelling one, justifying the chilling effect on the League's speech from the risk of such severe fines.

Finally, with respect to the **Citizenship Provision**, the state cannot point to any evidence that allowing non-citizens to collect and

---

[10] The Retention Provision is even more burdensome than the one invalidated in *Hargett* because it contains no exception for applicants who consent to share their information.

handle voter registration forms will encourage unlawful or inaccurate voter registration, or led to problems of voter fraud, identity theft, or untimeliness prior to enactment of SB 7050. The provision is likewise not narrowly tailored to protect the integrity of Florida's elections: it does not distinguish between legal residents and those who are undocumented; it prevents all "collecting and handling" of applications by non-citizens, though the state could target its alleged concerns more directly; and it imposes staggering civil penalties on 3PVROs on a strict-liability basis.

In sum, LWVFL will show that the challenged provisions will diminish the League's speech and prevent it from both employing its chosen means of expression and fully associating with certain volunteers.

## B.   Count 2: Violation of LWVFL's First Amendment Right to Free Association

LWVFL will prove at trial that all four challenged provisions likewise violate the League's First Amendment right to free association.

The *Meyer* standard of exacting scrutiny also applies when assessing the challenged provisions' burden on the League's right to freely associate with others. There is no question that the "freedom to associate with others for the common advancement of political beliefs and ideas is a form of orderly group activity protected by the First and

Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973) (quotation marks and citation omitted).

The freedom of association protects the right of associations to engage in advocacy on behalf of their members and the organization, including by persuading others to action. *See NAACP v. Button*, 371 U.S. 415, 429-31 (1963). The freedom of association also protects efforts to expand expressive associations to new associates. *See id.* at 429-32, 437. This "encompasses not only the right to associate with others but also the right to choose how one associates with others." *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 875 (D. Kan. 2021) (citation omitted); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000).

"Organized voter-registration activities," like those LWVFL engages in, "necessarily involve political association, both within the voter-registration organizations and with the citizens they seek to register." *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1229 (D. N.M. 2008). Through its voter registration activities, the League "act[s] collectively" with its members and volunteers, and seeks to do so with potential voters, "implicating the First Amendment

right of association." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012).

As relevant to all four challenged provisions, LWVFL will show at trial how its voter registration activities further its associational ties—to members, volunteers, prospective voters, and other organizations. LWVFL will likewise introduce evidence that the challenged provisions force the League to alter its voter registration activities to avoid the risk of severe fines for itself and criminal prosecution of its staff, members, or volunteers. LWVFL will further show that these risks and the alteration of its activities undermine each aspect of the League's associations because "the threat of penalties is likely to"—and does—"have a chilling effect on the entirety of the [registration] drive." *Hargett*, 400 F. Supp. 3d at 720.

LWVFL will introduce evidence that the **Receipt Provision** specifically reduces the number of members the League may use for voter registration drives, because some members will refuse to participate if they are required to disclose their name in writing to every voter they assist.

25

LWVFL will also introduce evidence at trial that the **Retention Provision** hinders the League's ability to grow and associate with prospective voters, because it prevents the League from retaining applicants' contact information, even with voters' consent.

LWVFL will introduce evidence that the **3PVRO Fines Provision** likewise hinders the League's ability to associate with its members and volunteers, many of whom will be reluctant to participate in voter registration activities that could risk such debilitating fines for the League. The 3PVRO Fines Provision additionally burden the League's associational rights by preventing the League from associating with voters it will be unable to register because of the shortened deadline and increased fines.

Finally, LWVFL will introduce evidence that the **Citizenship Provision** will prohibit the League from working with an entire class of Floridians at voter registration drives—its core membership activity.[11]

---

[11] Courts have consistently recognized a First Amendment right to associate with non-citizens. *See*, *e.g.*, *Petersen v. Talisman Sugar Corp.*, 478 F.2d 73, 83 (5th Cir. 1973); *Haitian Refugee Ctr., Inc. v. Baker*, 789 F. Supp. 1552, 1572 n.11 (S.D. Fla. 1991) (noting that "the Supreme Court has recognized a first amendment right to associate with an excluded alien").

LWVFL will introduce additional evidence that the Citizenship Provision will make the League's outreach to certain communities of voters more difficult, thereby undermining the League's associational purpose to register as many eligible Floridians to vote as possible. Lastly, LWVFL will introduce evidence that the Citizenship Provision will force the League to investigate its own members in a manner contrary to its organizational values, thereby undermining the League's right to choose how it associates with its members.

Because all four challenged provisions impose a severe burden on the League's associational activities, they "must be narrowly tailored to serve a compelling interest." *Buckley*, 525 U.S. at 206 (Thomas, J., concurring in the judgment). But as discussed in Part III.A., *supra*, the state has been and will be unable to prove at trial that its asserted interests in the challenged provisions are either narrowly tailored or compelling. Accordingly, LWVFL will prevail on its freedom of association claim.

## C.   Count 3: Substantial Overbreadth

The League will also prove at trial that the Receipt Provision, the Retention Provision, and the Citizenship Provision of SB 7050 are unconstitutionally overbroad.

Inquiry with respect to both overbreadth and vagueness must begin with the statute itself, which the Court has a duty to construe as constitutional if it can. *See Boos v. Barry*, 485 U.S. 312, 330 (1988). This duty varies, however, depending on whether the challenged statute is state or federal law. *See League of Women Voters of Fla. v. Lee*, 595 F. Supp. 3d 1042, 1131 (N.D. Fla. 2022), *aff'd in part, vacated in part, rev'd in part sub nom. League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023). Where—as here—a state law is at issue, "federal courts must be careful not to encroach upon the domain of a state legislature by rewriting a law to conform it to constitutional requirements." *Id.* at 1132 (internal quotation marks and citation omitted). Accordingly, this Court may not "adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Boos*, 485 U.S. at 330.

Under the First Amendment, "[a] regulation that covers substantially more speech than the First Amendment allows is overbroad and thus invalid." *Speech First*, 32 F.4th at 1125. "[T]he overbreadth doctrine loosens the rules typically governing facial attacks on the constitutionality of a statute," because "the threat of enforcement of an overbroad law may deter or chill constitutionally protected speech." *Lee*, 595 F. Supp. 3d at 1137. Accordingly, a court must ask whether the challenged law prohibits a substantial amount of activity protected by the First Amendment relative to the amount of unprotected activity it prohibits. *See id.*; *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003).

The first step is to determine what the statute prohibits. *United States v. Williams*, 553 U.S. 285, 293 (2008). While the Court "should of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction," *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982), it "cannot twist itself into a pretzel to save an otherwise invalid statute," *Lee*, 595 F. Supp. 3d at 1137 (citation omitted).

Where, as here, the statute is not subject to a limiting construction,[12] the next question is whether the statute "criminalizes a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 297. "In making that determination, a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.6 (1982). If the statute is overbroad, the Court must determine whether it can sever the problematic provision from the rest of the statute. *Ferber*, 458 U.S. at 769 n.24.

LWVFL will show that the Receipt Provision and the Retention Provision are both overbroad, especially when considered together. Though the state could likely find a permissible and less restrictive way to protect the privacy of applicants' sensitive information, the **Retention Provision** prohibits *all* retention of applicants' "personal information," except for unspecified compliance purposes. *See* Fla. Stat. § 97.0575(7). LWVFL will introduce evidence that this prohibition will prevent the

---

[12] The Department of State's rulemaking does not save any of the challenged provisions, as Defendants' proposed constructions are neither reasonable nor readily apparent from the face of the statute. *See, e.g.*, *Fla. NAACP*, 2023 WL 4311084 at *17-18.

League from retaining basic contact information for follow-up regardless of whether the applicant requests such communication.

Similarly, with respect to the **Receipt Provision**, even if there were a justifiable state interest in requiring League volunteers to provide every applicant a receipt, that interest does not justify requiring all volunteers to disclose their name on that receipt—especially when the name of the 3PVRO is already required. Accordingly, LWVFL will show at trial that, even if portions of both the Retention Provision and the Receipt Provision could be permissibly applied in some circumstances, they plainly "cover[] substantially more speech than the First Amendment allows." *Speech First*, 32 F.4th at 1125.

Finally, the League will prove at trial that the **Citizenship Provision** is overbroad because it reaches far beyond any reasonable scope of the state's interest in ensuring competent and honest performance of voter registration assistance. The Citizenship Provision prevents non-citizens from any activity involving "collecting or handling" voter registration applications, even if they are supervised by other experienced voter registration agents. The Provision likewise forbids all non-citizens from taking part in voter registration, even if they are legal

31

residents who have never done anything warranting a restriction of their First Amendment rights. Lastly, these problems are further exacerbated by the Citizenship Provision's strict liability standard, which imposes a $50,000 fine for each violation, even if the League were to violate its own principles by investigating the background of each of its volunteers. *See Dream Defenders*, 57 F.4th at 892 (determining law's mens rea requirement is necessary part of overbreadth analysis).

In sum, LWVFL will prevail in proving at trial that the Retention, Receipt, and Citizenship Provisions of SB 7050 are overbroad.

### D.    Count 4: Vagueness

Lastly, LWVFL will prove at trial that all four challenged provisions of SB 7050 must be enjoined because they are impermissibly vague.

"It is . . . a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1349 (11th Cir. 2021) (internal quotation marks omitted). A statute is vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and

discriminatory enforcement." *Fl. Sec. of State*, 66 F.4th at 946 (internal quotation marks and citation omitted).

The First Amendment context further amplifies these concerns because—as here—"an unconstitutionally vague law can chill expressive conduct by causing citizens to steer far wider of the unlawful zone to avoid the law's unclear boundaries." *Dream Defenders*, 57 F.4th at 890 (internal quotation marks and citation omitted). Consequently, though "perfect clarity and precise guidance" are not required, "government may regulate in the area of First Amendment freedoms only with narrow specificity." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (internal quotation marks and citation omitted).

As with overbreadth, inquiry begins with the statute itself. *See Lee*, 595 F. Supp. 3d at 1131. The Court must determine not how the statute actually applies, but rather how a person of ordinary intelligence would read it. *Id.* at 1133. "Thus, the canons of construction, while still relevant, take on less significance." *Id.* The Court must likewise determine whether the statute provides "any standard by which [the law's enforcers] can judge whether an individual" has engaged in prohibited conduct. *City of Chicago v. Morales*, 527 U.S. 41, 66 (1999). LWVFL will

prove that the challenged provisions of SB 7050 do neither. LWVFL will likewise show that the First Amendment applies to its voter registration activities, *see* Part III.A, *supra*, such that its vagueness challenge is entitled to "more lenient review." *League of Women Voters of Fla., Inc. v. Lee*, 576 F. Supp. 3d 1004, 1015 (N.D. Fla. 2021) (citation omitted).

The League will show at trial that the Receipt Provision and the Retention Provision are both impermissibly vague, especially when considered together. The **Retention Provision** purportedly prohibits the retention of *any* "personal information"—specifying only a nonexhaustive list of examples—"for any reason other than to provide such application or information to the [3PVRO] in compliance with this section." Fla. Stat. § 97.0575(7). Violation of this prohibition is a third-degree felony. But the Retention Provision does not define "personal information," nor does it elaborate on what uses of personal information by 3PVROs would be "in compliance" with the statute. The Retention Provision likewise does not identify clearly to whom it applies; arguably, it may include the complete chain of command and chain of custody within a 3PVRO. *See Fla. NAACP*, 2023 WL 4311084 at *17. Accordingly, LWVFL will show that the Retention Provision leaves the League

34

without a reasonable understanding of the state's requirements, and could allow the Division of Elections to refer League volunteers for felony prosecution simply for retaining an applicant's name and telephone number, even with the applicant's consent.

At the same time, LWVFL will introduce evidence that the **Receipt Provision** presents the League with an even more difficult question. This provision requires the League to provide a detailed written receipt to every applicant, including but not limited to the applicant's name, the applicant's political party affiliation, and the county in which the applicant resides. Fla. Stat. § 97.0575(4). Though the obvious way to track compliance with this provision would be to keep a copy of each receipt, this could lead to felony prosecution for violating the Retention Provision. LWVFL will show that the law's vagueness about which personal information may be retained means that both the Retention Provision and the Receipt Provision must be invalidated on vagueness grounds.

The League will also introduce evidence at trial that the **3PVRO Fines Provision** is vague because it does not clearly identify the total penalties that may be imposed on 3PVROs or the conduct that is

prohibited. The 3PVRO Fines Provision imposes fines per application per each day late up to a prescribed limit for applications submitted more than 10 days after completion or after book closing, and fines for each application submitted to the wrong county.[13] Fla. Stat. § 97.0575(5)(a)(1)-(3). The Provision imposes additional penalties for each type of violation "if the third-party voter registration organization or any person, entity, or agency acting on its behalf acted willfully." *Id*. LWVFL will introduce evidence that the 3PVRO Fines Provision does not define "willful" conduct, or what actions constitute willfulness. Likewise, the Provision does not clearly indicate whether fines for willfulness are in addition to or in place of the other prescribed penalties per application, and whether fines for willfulness are assessed per day. Finally, the 3PVRO Fines Provision does not specify how much a 3PVRO like the League could be fined for one application containing multiple errors—if, for example, an

---

[13] The 3PVRO Fines Provision does not indicate whether fines per application submitted to the wrong county will be assessed daily and, if so, the maximum fine per application. *Compare* Fla. Stat. § 97.0575(5)(a)(3) *with id.* § 97.0575(5)(a)(1), (2). Further, it is unclear whether Fla. Stat. § 97.0575(5)(a)(3) will be interpreted to fine 3PVROs for submitting an application to the wrong county or only for completely failing to submit an application.

application were submitted after book closing and to the wrong county or after the 10-day deadline and after book closing.

Finally, the League will adduce evidence at trial that the **Citizenship Provision** is vague because it does not define what it means to "collect[] or handl[e] voter registration applications. *See* Fla. Stat. § 97.0575(1)(f). It is unclear whether "handling" means simply managing an application with the hands or, more broadly, to have responsibility for supervising or directing. It is likewise unclear whether, for example, an individual who assists with quality control for voter registration applications, helps transport collected voter registration applications, or even just receives and distributes voter registration applications falls within the definition of "collecting and handling" applications.[14] LWVFL will thus show that the Citizenship Provision fails to clearly identify what volunteer activity by whom is prohibited,

---

[14] Notably, the challenged provisions do not distinguish between (1) people who "collect[] or handl[e]" applications, who are subject to the Citizenship Provision, Fla. Stat. § 97.0575(1)(f); (2) "registration agent[s]," who are required to provide their name on the receipt they give to voter registration applicants, Fla. Stat. § 97.0575(4); and (3) people who simply "collect" applications, who are subject to the Voter Information Restriction, Fla. Stat. § 97.0575(7).

leaving 3PVROs with insufficient guidance and allowing for arbitrary enforcement by the state.

In sum, LWVFL will prove at trial that all four challenged provisions of SB 7050 are unconstitutionally vague.

## IV. Conclusion

Because the League will establish that it has standing to challenge each of the four disputed provisions and that each provision is unconstitutional, Defendants should be permanently enjoined from enforcing them.

Dated: March 27, 2024            Respectfully submitted,


                                 /s/ Brent Ferguson

Chad W. Dunn                     Brent Ferguson (D.C. Bar No. 1782289)*
Florida Bar No. 0119137          Danielle Lang (D.C. Bar No. 1500218)*
1200 Brickell Avenue,            Jonathan Diaz (D.C. Bar No. 1613558)*
Suite 1950                       Molly E. Danahy (D.C. Bar No. 1643411)*
Miami, FL 33131                  Christopher Lapinig (Cal. Bar No. 322141)*
Telephone: (305) 783-2190        Ellen Boettcher (D.C. Bar No. 90005525)*
Facsimile: (305) 783-2268        Alexandra Copper (Cal. Bar No. 335528)*
chad@brazilanddunn.com           Michael Ortega (IL Bar No. 6339469)*
                                 Simone Leeper (D.C. Bar No. 1737977)*
                                 1101 14th Street NW, Ste. 400
                                 Washington, DC 20005
                                 (202) 736-2200
                                 bferguson@campaignlegal.org

dlang@campaignlegal.org
jdiaz@campaignlegal.org
mdanahy@campaignlegal.org
clapinig@campaignlegal.org
eboettcher@campaignlegal.org
acopper@campaignlegal.org
mortega@campaignlegal.org
sleeper@campaignlegal.org

*Counsel for Consolidated Plaintiffs League
of Women Voters of Florida, Inc. and League
of Women Voters of Florida Education Fund*

\* Admitted *Pro Hac Vice*

## **CERTIFICATE OF COMPLIANCE**

I certify that this document is 7,128 words. I also certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

/s/ Brent Ferguson
Brent Ferguson

## **CERTIFICATE OF SERVICE**

I certify that on March 27, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

/s/ Brent Ferguson
Brent Ferguson