## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

     *Plaintiffs*,

v.

CORD BYRD, in his official capacity as Secretary of State of Florida, *et al.*,

     *Defendants*.

Case No.: 4:23-cv-00218
Consolidated Case No. 4:23-cv-00215

**PLAINTIFFS' WRITTEN OPENING STATEMENT**

Pursuant to this Court's Scheduling Order of February 28, 2024 (ECF No. 146), Plaintiffs submit the following Written Opening Statement.

## INTRODUCTION

This case asks whether a state can, consistent with the Constitution, interfere with the right of private organizations and individuals to associate with, encourage, communicate with, and help eligible citizens to register to vote.  It cannot.

The Hispanic Federation Plaintiffs challenge Florida's prohibition on non-citizens working or volunteering on behalf of voter-engagement organizations "handling" or "collecting" voter registration forms.  This irrational restriction on community-based voter-registration organizations carries harsh penalties of $50,000 for each non-citizen an organization employs in essentially any voter-registration activity.  The purpose and effect of the law is to suppress the protected speech and

association of voter-engagement organizations, including Plaintiffs, restrict access to voter registration, and so, reduce access to the franchise.  The law constrains voter-registration organizations' staffing capabilities.  It chills their efforts, programs, and funding.  It should be enjoined permanently.

The challenged law is unconstitutional on many fronts.  This Court has already recognized that it facially discriminates against non-citizens in violation of the Fourteenth Amendment's Equal Protection Clause.  But at trial, the Court will hear testimony showing that the law is also an afront to the First Amendment and to the Fourteenth Amendment's Due Process Clause.  The prohibition reduces the quantum of speech, expression, and association that plaintiff organizations engage in.  It also chills protected speech.  Its overbreadth restricts Plaintiffs from engaging eligible would-be voters and encouraging them to register to vote.  It also silences Plaintiffs' ability to promote democratic participation.  And its vagueness leaves Plaintiffs unable to know *what* non-citizens or their employers can do to lawfully comply with the law.

## I.   PLAINTIFFS

The "Hispanic Federation Plaintiffs" are two organizational plaintiffs and three individuals affected by SB7050.  Hispanic Federation and Poder Latinx (together, the "Organizational Plaintiffs") are civic organizations who encourage

2

political participation by helping underrepresented communities register to vote. They are referred to under Florida law as "third-party voter registration organizations" or "3PVROs." The Organizational Plaintiffs join Ms. Verónica Herrera-Lucha, Ms. Norka Martínez, and Ms. Elizabeth Pico (together, the "Individual Plaintiffs") in challenging the provision of SB7050 that imposes a $50,000 fine for each non-citizen that engages in voter-registration activities on behalf of a 3PVRO.

The Hispanic Federation Plaintiffs allege that the SB7050 provision codified at Fla. Stat. § 97.0575(1)(f) (*i.e.*, the "Citizenship Requirement") unlawfully abridges 3PVROs' and their staff's First Amendment rights to core political speech and association. They also allege that it is substantially overbroad and impermissibly vague, in violation of Plaintiffs' First Amendment rights and Fourteenth Amendment due process rights.[1]

---

[1] The Court mostly resolved two of the Hispanic Federation Plaintiffs' pled claims on summary judgment. On March 1, 2024, the Court granted summary judgment for the Plaintiffs against the Secretary on a claim that the Citizenship Requirement unconstitutionally discriminates against non-citizens under the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. § 1983. ECF No. 149. The Court denied Plaintiffs' summary judgment motion as to the Attorney General. *See id.* at 6. On February 27, 2024, the Court entered summary judgment against the Hispanic Federation Plaintiffs' claim that the Citizenship provision is preempted because it unlawfully interferes with non-citizens' right to contract under 42 U.S.C. § 1981. ECF No. 145.

The Citizenship Requirement requires a 3PVRO to affirm to the Florida Department of State's Division of Elections that "each person collecting or handling voter registration applications" on its behalf is "a citizen of the United States."[2]  It punishes 3PVROs with a $50,000 fine for each violation—specifically, for "each such person" (*i.e.*, any non-citizen) collecting or handling applications on the organization's behalf.  A related provision authorizes the Attorney General to enforce the Citizenship Requirement and authorizes the Secretary to refer cases to the Attorney General when he "reasonably believes that a person has committed a violation."[3]

Plaintiffs seek declaratory and permanent injunctive relief preventing Defendants from enforcing the Citizenship Requirement, attorneys' fees, and any other relief that the Court deems appropriate.

## II.   HISPANIC FEDERATION PLAINTIFFS' LEGAL CLAIMS

The Hispanic Federation Plaintiffs' legal claims include constitutional claims for infringement of free speech and expression claims and due process claims.  One triable issue—*i.e.*, whether Plaintiffs have standing to sue the Attorney General— remains in relation to Plaintiffs' otherwise-resolved claim that the Citizenship

---

[2]  Fla. Stat. § 97.0575(1)(f).

[3] *Id.* § 97.0575(8).

Requirement violates their right to equal protection under law.  *See* ECF No. 149 at 6.  The following legal principles and facts are therefore relevant to the claims pending for trial:

**A.**   ***Counts I and III: Free Speech and Association.***  Plaintiffs challenge the Citizenship Requirement as a violation of their First Amendment rights to free speech and expression.  Because the Citizenship Requirement regulates "core" First Amendment activity the State may only sustain it by meeting the most demanding level of judicial review.  These claims require Plaintiffs to prove the following issues by a preponderance of the evidence:

**1.   *Do Plaintiffs have standing to challenge the Citizenship Requirement as to Counts I and III?***  Yes, they do.

A plaintiff has Article III standing to bring a claim if they suffered a cognizable injury that is "fairly traceable to the challenged action" and "redressable by a favorable ruling."[4]  The Hispanic Federation Plaintiffs meet all these factors.

**a)   *Organizational Plaintiffs***

The evidence at trial will show that Organizational Plaintiffs have *both*: (i) organizational standing because the Citizenship Requirement will injure the

---

[4] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

organizations themselves and (ii) organizational standing on a "diversion-of-resources" theory.[5]

### i. Standing to Assert Injuries to Themselves

As to the Organizational Plaintiffs' direct standing, Plaintiffs will show that both Hispanic Federation and Poder Latinx stand to have their political speech curtailed because of the Citizenship Requirement. Both organizations employ a significant number of non-citizen employees and volunteers who possess the crucial language and cultural-literacy skills needed to conduct outreach to the Latino community and educate Latino Floridians on the voter registration process and the importance of voting. Hispanic Federation and Poder Latinx have been and will be injured, because the Citizenship Requirement constrains their speech even before any enforcement, by chilling them, their staff, and their volunteers from engaging in constitutional activity. They *will* be injured if the Citizenship Requirement takes effect because they have (and will show) a clear "intention to engage in a course of conduct . . . proscribed by a statute."[6]

---

[5] *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

[6] *Dream Defs. v. Gov. of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023) quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

6

The Court will hear testimony from representatives for the Organizational Plaintiffs about how their organizations' ability to speak and register voters in the communities they serve is diminished as a direct result of the Citizenship Requirement. An order striking the Ban as unconstitutional would redress their injuries by allowing them to continue staffing non-citizens who can then register voters and educate the community on the value of civic participation.

### ii.    *Diversion of Resources*

Organizational Plaintiffs also have standing because they had or will have to divert resources in direct response to the Citizenship Requirement. For example, the court will hear testimony about how the Organizational Plaintiffs diverted funds reserved for registering voters to re-train staff to comply with the law. Both Organizational Plaintiffs have already had to divert resources to restructure their programs because of the Citizenship Requirement's burdens on recruitment, retention, and each organizations' hiring process. If not for the Court's preliminary injunction, they would have had to divert additional resources. They have also diverted resources to reconfigure their voter registration programs—and would have to divert additional resources if the law takes effect. Organizational Plaintiffs diverted these resources in direct response to the concrete harm of $50,000 fines,

which constrain who the organizations can hire to advance their mission of registering as many eligible voters as possible and Latino voters, in particular.

### b)  *Individual Plaintiffs*

Individual Plaintiffs will also show they meet all the needed factors for standing because their roles with their employer—a 3PVRO—are adversely impacted by the Non-Citizen Ban.  *First*, each of the Individual Plaintiffs is a non-citizen who will suffer an injury because the Ban dramatically curbs their ability to engage with voters in the voter-registration process and their use of expressive free speech.  *Second*, there is no doubt that the claimed First Amendment injury is a result of the Defendants' threatened enforcement of the law.   *And third*, a permanent injunction would redress this injury because it would prohibit the law's enforcement.

### 2.    *Do 3PVROs, their staff, and volunteers engage in core political speech or expression when they work to register eligible voters?*   Yes, they do.

Plaintiffs will present testimony to show that they carry out efforts to help others register that are themselves political statements.   Courts have held that "[e]ncouraging others to register to vote is pure speech, and, because that speech is political in nature, it is a core First Amendment activity."[7]

---

[7] *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (internal citations omitted) (quoting *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012)).

So too here.  Plaintiffs will show that their voter-registration efforts signal that Plaintiffs value the democratic process and believe in the capacity of popular will to shape the government's composition and direction.  They will speak to how Individual Plaintiffs and Organizational Plaintiffs' non-citizen staff engage voters in public forums and initiate conversations about the voter-registration process.  By providing non-partisan information on how to vote as well as sharing culturally relevant explanations on the importance of voting, Plaintiffs or their agents enlist like-minded individuals to promote shared political, social, and economic positions through the franchise.  Their efforts to register voters inherently implicate political thought and expression as expressive free speech.  Their testimony will demonstrate as much.

**3.**     *Is "most exacting" or "strict" scrutiny applicable to the Citizenship Requirement?*  Yes, it is.

Once Plaintiffs' evidence establishes that the activity the Citizenship Requirement restricts is protected, the Court will have to determine what "type" of judicial review to apply.  This is an easy question in this case.

Here, what the Supreme Court has called its "most exacting" scrutiny applies because the Citizenship Requirement regulates expressive conduct.  The Court

would also be correct to apply strict scrutiny[8] because the Citizenship Requirement is a content-based restriction on speech.

In either case, *Defendants* will then have to establish that the Citizenship Requirement furthers a compelling interest and is narrowly tailored to achieve it.

> ### a) The Court should apply the type of "most exacting scrutiny" reserved for restrictions on core political speech or expression.

Because this case involves a limitation on political expression, the Citizenship Requirement must meet "most exacting scrutiny."  Cases like *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), should be most instructive to this Court.  As there, Plaintiffs' voter-registration activities here are "core political speech."

> ### b) Strict scrutiny would also be warranted because the Citizenship Requirement is a content-based restriction on protected speech.

The evidence to be presented at trial will also support a finding that the Citizenship Requirement unlawfully targets speech based on its communicative content—*i.e.*, it is *not* content-neutral.

---

[8] To be clear, "[t]he Supreme Court has equated the phrase 'most exacting scrutiny' with its frequently used term 'strict scrutiny.'"  *United States v. Hamilton*, 699 F.3d 356, 370 n.12 (4th Cir. 2012).  While the difference may not matter much in practice, Plaintiffs use the nomenclature the Supreme Court has usually used in speaking to each of the different types of First-Amendment cases cited above.

The factual evidence will show that the Citizenship Requirement specifically targets the speech and expressive conduct of non-citizens on specific content: encouraging and assisting eligible voters to register.   Of course, "[f]reedom of speech . . . is accorded aliens residing in this country."[9]   Yet, the legislative and evidentiary record is clear that the State sought to silence *all* non-citizens from a particular kind of speech and expressive conduct.

In litigation, Defendants have offered some *post-hoc* justifications, saying interests like "safeguarding election integrity, preventing voter fraud, ensuring a timely submission of voter registration applications, and then otherwise promoting uniformity, efficiency, and confidence in the election system" are "furthered by banning non-citizens from handling or collecting voter registration applications."[10] These claimed purposes underscore the obvious: the law targets *specific* speakers (*i.e.*, non-citizens).  This targeting alone makes the Citizenship Requirement content based.[11]

---

[9] *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

[10] ECF No. 125-10 (Darlington Dep.) at 63:4–24; *see also* ECF 122-1 (Darlington Decl.) ¶ 5 (stating same interests).

[11] *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content.").

Plaintiffs will show the Citizenship Requirement is also content based because it prohibits only one perspective: *i.e.*, the importance of political participation by eligible voters.  Trial testimony will show that *this* message—*i.e.*, that it is vitally important for eligible voters to participate in their democracy—is what Plaintiffs communicate as they register voters.  By targeting that message—*and that message alone* (when delivered by non-citizens)—the Citizenship Requirement is the archetypal "facially neutral statute [that] is nevertheless content-based [because] it regulates speech based on its 'function or purpose.'"[12]

**4.    *Can the Citizenship Requirement survive "most exacting" or "strict" scrutiny?***  It cannot, and the evidence at trial will make this clear.

Most exacting scrutiny, demands *the State* to prove that the challenged restriction is narrowly tailored to serve an overriding state interest.  As such, a blanket ban on engaging in voter-registration activities is almost *per se* unjustifiable.

Further, strict scrutiny requires that the challenged law be the least restrictive means of achieving a compelling state interest.  Here, the Court can expect to hear testimony showing the Department's interests lack any factual support and that the Legislature rejected more narrowly tailored alternatives.  Plaintiffs will thus

---

[12] *In re Georgia Senate Bill 202*, 622 F. Supp. 3d 1312, 1332 (N.D. Ga. 2022); *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015).

ultimately show that this law cannot meet the highest level of judicial scrutiny it merits.

**5.**   ***Should the Court instead consider Count I under the* "Anderson-Burdick"** ***framework?***   The Court should not—the Citizenship Requirement is no mere election regulation, so, as described above, it merits "exacting" or "strict" review.

To be sure, the Supreme Court has applied a different "framework to cases governing the 'mechanics of the electoral process'" rather than "core political speech."[13]   The "*Anderson-Burdick*" framework is therefore appropriate to assess challenges to "a wide range of electoral-process regulations," including "the time, place, and manner of elections, such as notices, registration, supervision of voting, protection of voters," and others.[14]

"But when an election law . . . is instead 'a regulation of pure speech,' an 'exacting scrutiny' test applies."[15]   For the reasons noted above, that is precisely what this case entails.  *Anderson-Burdick* isn't the proper standard.

---

[13] *VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230, 1246–47 (D. Kan. 2023) (internal citations omitted).

[14] *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 140–41 (3d Cir. 2022), cert. denied sub nom. *Mazo v. Way*, 144 S. Ct. 76 (2023) (quotation marks omitted).

[15] *Harriet Tubman Freedom Fighters Corp. v. Lee*, 576 F. Supp. 3d 994, 1003 (N.D. Fla. 2021) (quoting *McIntyre*, 514 U.S. at 334, 345).

6.    ***Still, if the Court concludes the* "Anderson-Burdick" *framework instead applies, can the Citizenship Requirement survive it?***   No.   If the Court determines that Plaintiffs' First Amendment challenge to the Citizenship Requirement is best considered under the *Anderson-Burdick* standard, the result will be the same.   That's why Count III of Plaintiffs' Complaint alternatively alleges that the Citizenship Requirement unduly burdens Plaintiffs' First and Fourteenth Amendment rights in connection with the right to vote.

To apply the *Anderson-Burdick* test, courts weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden.   Courts then consider the extent to which the State's concern makes the burden necessary.   A law that imposes "severe burdens must be narrowly tailored and advance a compelling state interest."[16]

Plaintiffs will present evidence showing that the Citizenship Requirement's attendant burdens on Plaintiffs' speech and association are severe.   Indeed, "when regulations of core political speech are at issue it makes little difference whether we determine burden first because [those] restrictions . . . so plainly impose a 'severe burden.'"[17]   The Citizenship Requirement also severely impinges on "the right of

---

[16] *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 351 (1997).

[17] *Buckley*, 525 U.S. at 208 (Thomas, J., concurring in the judgment).

14

[Plaintiffs] to associate for the advancement of political beliefs," separate, even, from "the right of qualified voters . . . to cast their votes effectively."[18]

Plaintiffs' testimony will illustrate how the Citizenship Requirement's imposition of fines chills their willingness to engage in the solicitation of new voters and collect voter registration forms, burdening their political speech and association. The Court will hear how the provision restricts "who is eligible to participate in voter registration drives" and the "methods or means [3PVROs] may use to solicit new voters and distribute registration applications."[19]   The Citizenship Requirement thus acts as a double-edged sword.  On the one hand, it severely limits who 3PVROs can hire and staff to spread its civic engagement message.   Plaintiffs will present evidence showing that the Requirement has created staffing shortages that result in Plaintiffs reaching Latino communities in fewer places: a direct limitation on Plaintiffs' speech.  On the other hand, the Requirement limits the speech that 3PVRO staff can participate in.   The Citizenship Requirement thus imposes a "severe" restriction that fails under the *Anderson-Burdick* framework.

---

[18] *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

[19] *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1321–22 (S.D. Fla. 2008).

And the burdens that the law imposes on access to voter registration are not justified by any legitimate state interest.  Therefore, even under *Anderson-Burdick*, the Court should strike down the Citizenship Requirement.

**B.**     ***Counts II and IV: Substantial Overbreadth and Vagueness.***  Plaintiffs challenge the Citizenship Requirement as *both* a violation of the Due Process Clause of the Fourteenth Amendment because it is unlawfully vague, *and* a violation of the First Amendment because it is overbroad.   Vagueness and overbreadth are interrelated but discrete concepts, which courts in the Eleventh Circuit frequently address in tandem.

A *vague* law violates the Due Process Clause because it fails to give notice of what it prohibits.   An *overbroad* law violates the First Amendment because it punishes "a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep."[20]  When an *indefinite* law gives the government leeway to *punish protected conduct*, then the law is both overbroad and vague.

The Citizenship Requirement is a classic example of overbreadth from indeterminacy.  Plaintiffs will establish at trial why the law is both impermissibly vague and substantially overbroad by proving the following items by a preponderance of the evidence:

---

[20] *Virginia v. Hicks*, 539 U.S. 113, 118 no. 1 (2003).

**1. *Do Plaintiffs have standing to bring vagueness and overbreadth challenges?*** Yes, they do.

### a) *Injuries Suffered by* **Both** *Individual and Organizational Plaintiffs*

To show standing to challenge a law as vague or overbroad, Plaintiffs need only show that they unambiguously mean to engage in constitutionally protected conduct that the Citizenship Requirement will affect.[21]

Both the Individual Plaintiffs and the Organizational Plaintiffs—3PVROs and employees of 3PVROs—will easily make this showing, as each has been engaging in the voter-registration efforts that the Citizenship Requirement restricts (either engaging in such activities as non-citizens or deploying non-citizens as employees or volunteers to engage in such activities), and each intends to continue to engage in that same conduct if the law is permanently enjoined.[22]

---

[21] *See Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1252 (N.D. Fla. 2021).

[22] That the law has not yet been enforced against them does not weaken Plaintiffs' standing or the ripeness of their claims. "[B]inding Supreme Court and Eleventh Circuit precedent has held that pre-enforcement review is available for plaintiffs in facial vagueness and overbreadth challenges in the First Amendment context." *Dream Defs.*, 559 F. Supp. 3d at 1264–65; *see also Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293 (11th Cir. 2017) (en banc); *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011)).

### b)  *Additional Injuries Suffered by Organizational Plaintiffs*

Through evidence and trial testimony, the Organizational Plaintiffs will also show that they have suffered additional injuries, "including [(a)] their diversion of resources and [(b)] self-censorship," which are "sufficiently concrete and particularized to support Article III standing to challenge the enforcement" of the Citizenship Requirement.[23]

The Organizational Plaintiffs will show they have been injured via diversion of resources because the defendants' illegal acts have impaired and will continue to impair the organizations' ability to engage in their own projects by forcing the organization to divert resources in response.[24] As noted above, because of the sweeping nature of the provisions and the threat of strict liability for non-compliance, the Court will learn that Organizational Plaintiffs diverted funds and resources reserved for registering voters to re-train staff to comply with the law. Organizational Plaintiffs have diverted resources from registering voters to restructure their hiring and recruitment processes, to reconfigure their voter registration programs, and re-establish the viability of their voter-registration

---

[23] *Dream Defs.*, 559 F. Supp. at 1257.

[24] *Arcia*, 772 F.3d at 1341.

operations under threat of enforcement of the Citizenship Requirement with long-established funders of their programs.

Organizational Plaintiffs will also show a pre-enforcement "self-censorship" harm because "[i]n the First-Amendment realm, plaintiffs do not have to expose themselves to enforcement in order to challenge a law."[25] Here, Plaintiffs will testify to how they would understandably and meaningfully cut back on their voter-registration work because even the threat of an investigation from the Department of State or Attorney General would chill their speech and association, let alone the threat of enforcement.

### c) *Traceability and Redressability*

The harms Plaintiffs will establish they have or will suffer are traceable to the Secretary and Attorney General, because the law provides each of them with authority to enforce the law in different ways. The Secretary has the authority to issue fines in the amount of $50,000 for each such person who is not a citizen and is collecting or handling voter registration applications on behalf of a 3PVRO and has the authority to refer a violation of the Citizenship Requirement to the Attorney General for enforcement. The Attorney General has the authority to seek a permanent or temporary injunction, a restraining order, or any other appropriate

---

[25] *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998).

relief to prevent a violation of the Citizenship Requirement and has the authority to institute a civil cause of action to collect a fine assessed by the Secretary of State after the exhaustion of administrative remedies.

Finally, success in this litigation would redress these harms. Enjoining the Secretary and Attorney General "from enforcing the challenged law has the practical consequence of removing the threat" of enforcement by any entity in Florida.[26]

**2.** ***Vagueness*: *Does the Citizenship Requirement fail to give notice of what it prohibits, in violation of the Fourteenth Amendment?*** Yes—it is unconstitutionally vague as a result.

At trial, Plaintiffs will present evidence that will show the Citizenship Requirement "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" and "authorizes or even encourages arbitrary and discriminatory enforcement."[27]

As noted, the Citizenship Requirement requires each 3PVRO to affirm "that each person collecting or handling voter registration applications on behalf of the third-party voter registration organization is a citizen of the United States of

---

[26] *Dream Defs.*, 559 F. Supp. 3d at 1263; *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008).

[27] *Johnson v. United States*, 576 U.S. 591, 612 (2015) (Thomas, J., concurring).

America."  The penalty is a $50,000 fine "for each such person who is not a citizen and is collecting or handling voter registration applications" on a 3PVRO's behalf.[28]

The evidence and testimony will show that this is a woefully vague law that begs several questions in need of answers.  For example:

- *Does "collecting" or "handling" apply only to conduct that includes exercising physical custody over voter applications, or does it also sweep in to capture those—usually more-experienced or knowledgeable staff—who supervise and direct canvassing and voter-registration activities?*

- *How much physical contact with a form is necessary to trigger a violation? Would* de minimis *physical contact with a form—for example, the kind needed to ensure canvassing "quality control" by reviewing completed forms—be subject to the restriction?*

- *Separately, since the law refers only to "voter registration applications," does it subject a 3PVRO to its hefty fines if a non-citizen handles only completed/filled-out applications—or does it apply to blank applications as well?*

---

[28] Fla. Stat. § 97.0575(1)(f).

- *Further, does the Citizenship Requirement's saying that a 3PVRO "is liable" for each non-citizen collecting or handling voter registrations impose a strict liability scheme? Or is there an applicable knowledge requirement?*

None of these questions are easily answerable to "people of ordinary intelligence" who may try or who want to comply with the Citizenship Requirement. That is especially true in the context of free speech and association.

Indeed, the "wide scope of potential interpretations for individuals" evident here is particularly disfavored in laws that restrict First Amendment rights.[29]  "While 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity' . . . 'government may regulate in the area' of First Amendment freedoms 'only with narrow specificity.'"[30]  This "special sensitivity" is proper here "because '[v]ague laws force potential speakers to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked,' thus silencing more speech than intended.'"[31]

---

[29] *Dream Defs.*, 559 F. Supp. 3d at 1281.

[30] *Id.* at 1280 (quoting *Wollschlaeger*, 848 F.3d at 1320); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *NAACP v. Button*, 371 U.S. 415, 433 (1963).

[31] *Dream Defs.*, 559 F. Supp. 3d at 1281 (quoting *Wollschlaeger*, 848 F.3d at 1320 and *Baggett*, 377 U.S. at 372).

**3.**       ***Overbreadth: Does the Citizenship Requirement punish a substantial amount of protected free speech, judged in relation to its plainly legitimate sweep, in violation of the First Amendment?*** Yes, it does.

### a)  *The Citizenship Requirement's vagueness results in overbreadth.*

The Citizenship Requirement's vagueness contributes to its overbreadth. Because "ambiguous meanings cause citizens to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked,'" courts "evaluate the ambiguous as well as the unambiguous scope of the enactment" in assessing whether a statute is overbroad.[32]

To the extent Section 97.0575 lawfully proscribes *any* conduct, the testimony at trial will show that the Citizenship Requirement's ambiguities ensure that it chills *substantially more protected speech* than unprotected conduct.

For instance—and as suggested above—it is reasonable for Individual Plaintiffs or Organizational Plaintiffs' non-citizen staff to stop distributing even *blank* applications to comply with the law, since those who distribute blank applications would surely be "handling" them.  That is a huge infringement on protected speech *in itself* that would not necessarily implicate any of the State's

---

[32] *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.6 (1982).

claimed interests (*e.g.*, in the timely return of *completed* applications).  Preventing employees and volunteers from distributing the application would stop *all* speech that flows from that initial interaction, including the act of registration.

The testimony at trial will show how the Citizenship Requirement would deter—indeed, *has* deterred—Plaintiffs from communicating civic and political messages and from engaging in associational activity important to advancing their missions and beliefs, providing the public with fewer options to register to vote and fewer opportunities to associate with Plaintiffs in meaningful civic activities.

### b) *Strict liability only amplifies the overbreadth problem.*

The Law's breadth is further "magnified by its strict-liability phrasing."[33] Strict liability "cannot be applied in settings where [it has] the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it."[34]

The testimony and evidence will show that the Citizenship Requirement imposes a monetary fine large enough to put 3PVROs out of business without any

---

[33] *United States v. Kelly*, 625 F.3d 516, 522 (8th Cir. 2010).

[34] *Smith v. State of California*, 361 U.S. 147, 150–51 (1959); *see also Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 611 (6th Cir. 2005) ("any statute that chills the exercise of First Amendment rights must contain a knowledge element").

kind of scienter requirement.  The law will thereby impose a "a severe limitation on" 3PVROs' ability to engage with eligible voters.[35]

Further, the Citizenship Requirement's strict-liability penalties chill speech by creating "indirect burdens on speech," which contribute to the law's overbreadth.[36] Plaintiffs will offer testimony showing that the threat of strict liability would require their organizations not to work with any canvassers who fail to provide proof of citizenship—including even would-be U.S.-citizen staff and volunteers who cannot (or choose not to) furnish such proof.  Again, none of the state's purported interests could possibly support such sweeping harms to free speech.

The Citizenship Requirement, "through its ambiguity, chills speech and eviscerates that essential breathing space.  The law is overbroad."[37]

## C.   *Count V: Equal Protection – Differential Treatment of Non-Citizens.*

Plaintiffs challenge the Citizenship Requirement on Equal Protection grounds. This Court "conclude[d] that Plaintiffs are entitled to judgment as a matter of law on" Count V, the Equal Protection claim.  ECF 149 at 2.  The only remaining triable

---

[35] *Smith*, 361 U.S. at 153.  Though *Smith* examined a criminal law, where "a fine may be imposed by the state for violating the Act," the Law still "carries . . . the risk of self-censorship discussed in *Smith*."  *Video Software Dealers Ass'n v. Webster*, 773 F. Supp. 1275, 1282 (W.D. Mo. 1991), *aff'd*, 968 F.2d 684 (8th Cir. 1992).

[36] *Weaver v. Bonner*, 309 F.3d 1312, 1318 (11th Cir. 2002).

[37] *Dream Defs.*, 559 F. Supp. 3d at 1284.

issues on Count V are (a) whether Plaintiffs' injuries are traceable to Florida's Attorney General and (b) whether an injunction against her can remedy Plaintiffs' injuries.  The Court will hear testimony at trial showing that the Attorney General is a proper Defendant.

SB 7050 allows the Attorney General to "institute a civil action for a violation of" the Citizenship Requirement "or to prevent a violation of" it.[38]  This authority to bring civil actions is not expressly dependent on Department of State referral.  And while the Attorney General stipulated that it interprets its authority to bring civil actions must come at the Department of State's behest, that policy is not law.  That policy can change anytime.  Moreover, referrals from SOE offices and local prosecutors can give rise to Citizenship Requirement violations as well.  Neither the Organizational Plaintiffs nor Individual Plaintiffs have received any affirmation from the Attorney General that it would not prosecute Citizenship Requirement violations.  Even with the Secretary of State enjoined from enforcement, the Attorney General can still act to harm Plaintiffs.  The Court will hear testimony to this end at trial showing that Plaintiffs injuries are both traceable to, and can be remedied by an injunction entered against, the Attorney General.

---

[38] Fla. Stat. § 97.0575(8).

## IV.   ANTICIPATED WITNESS TESTIMONY

The Court will hear testimony from individual plaintiffs Verónica Herrera Lucha, Norka Martínez, and Elizabeth Pico, as well as representatives from organizational plaintiffs Hispanic Federation and Poder Latinx, about how the Citizenship Provision would harm Plaintiffs and infringe on their rights, as well as the rights of other similarly situated organizations, staff, and volunteers, and the rights of Florida voters.  Because the Court will hear testimony from at least ten plaintiffs across the three consolidated cases, Plaintiffs will endeavor to streamline this testimony, while also ensuring that each witness presents the individualized evidence necessary to show their standing.

Plaintiffs will also present the expert testimony of political scientist Dr. Daniel Smith.  Dr. Smith has analyzed the data that the Defendants produced in this litigation about voter registration in Florida.  He will break down how many Florida voters have relied on 3PVROs to register to vote and update their registrations and testify about how the Citizenship Provision would raise the costs of voting for Florida voters—particularly voters of color, who have disproportionately relied on 3PVROs to register to vote.

Finally, Plaintiffs will present the testimony of Nicholas Cox, one of the Attorney General's designated representatives in this litigation, to demonstrate that

the harms caused by the Citizenship Provision are traceable to the Attorney General and redressable by enjoining the Attorney General from enforcement.

## CONCLUSION

At the end of the trial, based on the evidence that will be presented, Plaintiffs will ask the Court to issue declaratory relief and to permanently enjoin the Citizenship Requirement.

Dated: March 27, 2024

Cesar Z. Ruiz*
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org

Roberto Cruz (FBN 18436)
Miranda Galindo (FBN 1039848)
**LatinoJustice PRLDEF**
5700 Millenia Blvd. Suite 500
Orlando, FL 32839
(321) 754-1935
rcruz@latinojustice.org
mgalindo@latinojustice.org

Delmarie Alicea (FBN 1024650)
**LatinoJustice PRLDEF**
5700 Millenia Blvd. Suite 500
Orlando, FL 32839
(321) 418-6354
dalicea@latinojustice.org

Roni Druks*
Phi Nguyen*
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
rdruks@demos.org
pnguyen@demos.org

John A. Freedman[†]
Jeremy Karpatkin[†]
**Arnold & Porter Kaye Scholer LLP**

Respectfully submitted,

*/s/ Adriel I. Cepeda Derieux*
Adriel I. Cepeda Derieux*
Megan C. Keenan*
**American Civil Liberties
Union Foundation**
915 15th Street NW
Washington, DC 20005
(212) 549-2500
acepedaderieux@aclu.org
mkeenan@aclu.org

Julie A. Ebenstein (FBN 91033)
Dayton Campbell-Harris*
Sophia Lin Lakin*
Victoria Ochoa*
**American Civil Liberties
Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org
vochoa@aclu.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400

29

601 Massachusetts Avenue, N.W.      Miami, FL 33134
Washington, DC 20001                (786) 363-2714
(202) 942-5316                      dtilley@aclufl.org
john.freedman@arnoldporter.com      cmcnamara@aclufl.org
jeremy.karpatkin@arnoldporter.com

*Admitted Pro Hac Vice*

**Counsel for Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico**

## CERTIFICATE OF COMPLIANCE

I certify that this document contains 5,544 words.  I also certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

*/s/ Adriel I. Cepeda Derieux*
Adriel I. Cepeda Derieux

## CERTIFICATE OF SERVICE

I certify that on March 27, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

*/s/ Adriel I. Cepeda Derieux*
Adriel I. Cepeda Derieux