# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC.; LEAGUE OF WOMEN
VOTERS OF FLORIDA EDUCATION
FUND,

     *Plaintiffs*,

     v.

ASHLEY MOODY, in her official
capacity as Attorney General of Florida;
CORD BYRD, in his official capacity as
Florida Secretary of State,

     *Defendants*.

Case No. 4:23-cv-00216
Case No. 4:23-cv-00215
   (Consolidated)

## LWVFL PLANTIFFS' CLOSING STATEMENT

## <u>TABLE OF CONTENTS</u>

Table of Authorities................................................................v

I.   Introduction...............................................................1

II.  Standing ..................................................................3

    A.   Online Registration................................................5

        1.   *Organizational Standing* .............................7

            a.   Direct injury ..................................7

            b.   Diversion of resources ....................10

        2.   *Associational Standing* ...............................12

    B.   The Receipt Provision ............................................13

        1.   *Organizational Standing* .............................13

            a.   Direct injury ..................................13

            b.   Diversion of resources ....................17

            c.   Online registration.........................19

        2.   *Associational Standing* ...............................20

    C.   The Retention Provision .........................................21

        1.   *Organizational Standing* .............................21

            a.   Direct injury ..................................21

            b.   Diversion of resources ....................25

            c.   Online registration.........................27

        2.   *Associational Standing* ...............................28

    D.   The 3PVRO Fines Provision .....................................29

        1.   *Organizational Standing* .............................29

            a.   Direct injury ..................................29

            b.   Diversion of resources ....................31

            c.   Online registration.........................33

        2.   *Associational Standing* ...............................35

    E.   The Citizenship Provision........................................36

|     | 1. | *Organizational Standing* | 36 |

      1.   *Organizational Standing* .......................................... 36

          a.   Direct injury ...................................................... 36

          b.   Diversion of resources ...................................... 37

          c.   Online registration............................................ 39

      2.   *Associational Standing* ................................. 40

   F.   The League's Injuries Are Fairly Traceable to Defendants, and Redressable Through a Permanent Injunction ............ 41

      1.   *Secretary of State* ........................................ 41

      2.   *Attorney General* ........................................ 42

III.   Merits ..................................................................................... 45

   A.   The League's Voter Registration Activities Are Protected by the First Amendment ............................................................ 45

      1.   *Strict scrutiny applies because the League's registration drives constitute core political speech* ........................ 46

      2.   *The League's collection and submission of voter registration forms is inextricably intertwined with core political speech* ............................... 50

      3.   *Collecting and delivering voter registration applications is expressive conduct*................................. 54

      4.   *The League engages in expressive political association with its volunteers and the voters they help to register* ....................................... 57

      5.   *The challenged provisions constitute content- and viewpoint-based restrictions*........................................ 58

   B.   The Court Should Not Apply *Anderson-Burdick* Balancing to the League's First Amendment Claims ........................... 59

   C.   Counts 1 and 2: Violation of LWVFL's First Amendment Rights to Free Speech, Expressive Conduct, and Association.................................................... 62

      1.   *The Receipt Provision*.................................... 63

          a.   The Receipt Provision cannot survive strict or exacting scrutiny................................................ 63

b. The Receipt Provision fails the *Anderson-Burdick* test .................................................................. 68

2. *The Retention Provision* ................................................. 72

a. The Retention Provision fails strict or exacting scrutiny ............................................................. 72

b. The Retention Provision fails the *Anderson-Burdick* test ............................................... 74

3. *The 3PVRO Fines Provision* ........................................... 75

a. The 3PVRO Fines Provision must be invalidated under strict or exacting scrutiny ........................ 75

b. The 3PVRO Fines Provision fails the *Anderson-Burdick* test ..................................... 77

4. *The Citizenship Provision* ............................................. 79

a. The Citizenship Provision must be invalidated under strict or exacting scrutiny ........................ 79

b. The Citizenship Provision fails any version of the *Anderson-Burdick* test ........................................ 81

D. Counts 3 and 4: Vagueness and Overbreadth ..................... 83

1. *The challenged provisions are unconstitutionally vague* ........................................................................... 86

a. The Retention Provision ..................................... 87

b. The Receipt Provision ......................................... 90

c. The 3PVRO Fines Provision ............................... 93

d. The Citizenship Provision................................... 95

2. *The Retention, Receipt, and Citizenship Provisions are unconstitutionally overbroad* ........................... 98

a. The Retention Provision ..................................... 99

b. The Receipt Provision ....................................... 103

c. The Citizenship Provision................................... 106

IV. Conclusion................................................................................. 109

Certificate of Compliance ....................................................................... 110

Certificate of Service ................................................................ 110

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*American Association of People with Disabilities v. Herrera*, 690 F.
   Supp. 2d 1183 (D.N.M. 2010) .................................................. 52, 56, 57

*Americans for Prosperity Foundation v. Bonta*,
   141 S. Ct. 2373 (2021) .......................................................... 46

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ......................................... 59

*Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014) ........ 4

*Boos v. Barry*, 485 U.S. 312 (1988) .................................... 85, 89, 93, 108

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ............................... 57

*Buckley v. American Constitutional Law Foundation, Inc.*,
   525 U.S. 182 (1999) .................. 46, 47, 49, 50, 51, 52, 60, 61, 63, 64, 67

*Burdick v. Takushi*, 504 U.S. 428 (1992) ............................................ 59

*Burns v. Town of Palm Beach*,
   999 F.3d 1317 (11th Cir. 2021) .............................................. 55, 56, 83

*Citizens United v. Federal Election Commission*,
   558 U.S. 310 (2010) ............................................................ 72

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ..................................... 86

*City of South Miami v. Governor of the State of Florida*, 65 F.4th 631
   (11th Cir. 2023) ............................................................ 5, 17

*Corbett v. Transportation Security Administration*, 930 F.3d 1225
   (11th Cir. 2019) ............................................................... 5

*Curling v. Raffensperger*, 50 F.4th 1114 (11th Cir. 2022) ...................... 60

*Democracy North Carolina v. North Carolina State Board of Elections*,
   476 F. Supp. 3d 158 (M.D.N.C. 2020) ............................................ 52

*Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312
(11th Cir. 2019) .................................................... 68, 69, 70, 71, 75, 79

*Dream Defenders v. Governor of the State of Florida*, 57 F.4th 879
(11th Cir. 2023) ...................................................... 4, 84, 107

*Florida ex rel. Attorney General v. United States Department of Health
and Human Services*, 648 F.3d 1235 (11th Cir. 2011) ......................... 4

*Florida State Conference of the National Association for the
Advancement of Colored People v. Browning*, 522 F.3d 1153
(11th Cir. 2008) (*Browning I*) ........................................ 14, 17

*Florida State Conference of Branches and Youth Units of the NAACP v.
Byrd,* 680 F. Supp. 3d. 1291
(N.D. Fla. 2023) ........................ 4, 19, 22, 23, 26, 28, 73, 81, 89, 99, 100

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) .................................... 54, 55

*Kusper v. Pontikes*, 414 U.S. 51 (1973) .................................. 57

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706
(M.D. Tenn. 2019) ............................. 48, 49, 53, 55, 58, 60, 61, 62, 68

*League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155
(N.D. Fla. 2012) (*Browning II*) ............................... 49, 58, 63

*League of Women Voters of Florida v. Cobb*, 447 F. Supp. 2d 1314
(S.D. Fla. 2006) ............. 7, 49, 51, 53, 61, 62, 68, 71, 75, 76, 77, 78, 79

*League of Women Voters of Florida, Inc. v. Lee*, 576 F. Supp. 3d 1004
(N.D. Fla. 2021) .................................................... 86

*League of Women Voters of Florida, Inc. v. Lee*, 595 F. Supp. 3d 1042
(N.D. Fla. 2022) .................................................. 85, 86

*League of Women Voters of Florida Inc. v. Florida Secretary of State*,
66 F.4th 905 (11th Cir. 2023) ................................ 83, 85, 92

*Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984) .................... 5

*McIntyre v. Ohio Elections Commission*,
514 U.S. 334 (1995).......................................................... 46, 59, 62, 63

*Meyer v. Grant*, 486 U.S. 414 (1988) ..............46, 47, 48, 49, 50, 53, 60, 62

*NAACP v. Button*, 371 U.S. 415 (1963)..................................................... 46

*National Association for the Advancement of Colored People v. State of Alabama ex rel. Patterson*, 357 U.S. 449 (1958).................................. 45

*New York v. Ferber*, 458 U.S. 747 (1982) .................................................. 99

*Priorities USA v. Nessel*, 462 F. Supp. 3d 792 (E.D. Mich. 2020) .......... 52

*Project Vote v. Blackwell*, 455 F. Supp. 2d 694 (N.D. Ohio 2006) .......... 52

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
547 U.S. 47 (2006) (*FAIR*) .................................................................. 55

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ........................................... 59, 84, 106

*Texas v. Johnson*, 491 U.S. 397 (1989) ............................................54, 55

*Thornhill v. Alabama*, 310 U.S. 88 (1940)......................................45, 54

*Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622 (1994) ......... 47

*United States v. Williams*, 553 U.S. 285 (2008)..................................... 98

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982)............................................................... 85, 86, 99

*Village of Schaumburg v. Citizens for a Better Environment*,
444 U.S. 620 (1980).................................................................... 51, 53

*Virginia v. Hicks*, 539 U.S. 113 (2003).................................................... 85

*VoteAmerica v. Schwab,* 671 F. Supp. 3d 1230 (D. Kan. 2023)............. 68

*Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013)............ 52

*Wollschlaeger v. Governor, State of Florida*, 848 F.3d 1293
(11th Cir. 2017) ...................................................................... 42, 46, 84

## Statutes and Codes                                    Page

Fla. Stat. § 16.01(3) ................................................................ 44

Fla. Stat. § 16.08 .................................................................... 44

Fla. Stat. § 16.56(1)(c) ........................................................... 43

Fla. Stat. § 16.56(1)(c)(5) ....................................................... 43

Fla. Stat. § 97.0575(1)(e) ......................................................... 6

Fla. Stat. § 97.0575(1)(f) .................................. 1, 30, 92, 95, 106

Fla. Stat. § 97.0575(4) .................. 1, 13, 68, 91, 92, 93, 96, 104

Fla. Stat. § 97.0575(5) ....................................................... 1, 92

Fla. Stat. § 97.0575(5)(a) ................................................. 29, 30

Fla. Stat. § 97.0575(5)(a)(1) ............................................. 76, 94

Fla. Stat. § 97.0575(5)(a)(2) ............................................. 76, 94

Fla. Stat. § 97.0575(5)(a)(3) ................................................... 94

Fla. Stat. § 97.0575(7) ............................ 1, 43, 87, 89, 92, 96, 99

Fla. Stat. § 97.0575(8) ................................................. 41, 43, 44

Fla. Stat. § 97.0575(12) ........................................................ 41

Internal Revenue Code § 501(c)(3) .......................................... 3

Internal Revenue Code § 501(c)(4) .......................................... 3

**Other Authorities**                                                    **Page**

*Florida State Conference of Branches and Youth Units of the NAACP v.*
     *Byrd*, 23-12308, Appellants' Initial Brief, ECF No. 29
     (11th Cir. Aug. 21, 2023) .................................................................. 80

*League of Women Voters of Florida v. Moody,* 4:23-cv-00216, ECF No. 95
     (N.D. Fla. Feb. 13, 2024)................................................................... 6

## I.   Introduction

Florida has comprehensively regulated third-party voter registration organizations (3PVROs) for years. Those groups have adhered to increasingly punitive and complex sets of rules, all while providing an invaluable service to Florida: helping its citizens participate in our democracy.

Last year, Florida clamped down still further. In enacting Senate Bill 7050 (SB 7050), it banned non-U.S. citizens from assisting with voter registration, Fla. Stat. § 97.0575(1)(f); made it a felony for 3PVROs to keep a voter's contact information, *id.* § 97.0575(7); required 3PVRO volunteers to provide their full name in writing to every voter they help to register, *id.* § 97.0575(4); and imposed steep new fines for minor compliance violations while shortening the deadline for 3PVROs to turn in applications, *id.* § 97.0575(5).

These four provisions have concretely injured many 3PVROs, including the League of Women Voters of Florida (the League or LWVFL). At trial, the League showed that each of the provisions directly impedes its mission of registering more voters. The laws will lead volunteers to quit, and those who stay will have to follow cumbersome

1

new rules, limiting their ability to connect with and register voters. The League likewise has spent and will need to spend its scarce resources— time and money—to ensure compliance, to avert fines that could exceed its annual budget, and to avoid putting its members at risk of criminal prosecution.

The challenged provisions have thus left the League between a rock and a hard place: risk financial ruin for the League, as well as felony prosecution and harassment of its members, or modify its voter registration method. Faced with that painful choice, the League decided to, at least temporarily, stop registering voters using paper registration forms, and instead register them online. This has helped the League avoid the penalties of SB 7050, but has itself led to serious harms: fewer registered voters, fewer events, more costs, and less effective fundraising, to name a few.

None of those burdens were necessary. The League and almost all other 3PVROs rigorously follow the rules, and the few mistakes that some groups have made have not compromised either citizens' right to vote or the State's election administration system.

At trial, the State tried to cast 3PVROs as bad actors responsible for widespread misconduct in Florida's elections. But the evidence simply is not there. Many of the examples of election-related wrongdoing the State cited had nothing to do with 3PVROs. Those few incidents that did largely involved a single 3PVRO whose canvassers were identified and prosecuted under law that predated SB 7050.

Even more troubling, the four challenged provisions are not targeted at the small amount of misconduct that has come from 3PVROs. Rather, they would achieve their unstated purpose: to make it even harder for Floridians to band together to help more people register to vote and participate in democracy in this state. Thus, the four challenged provisions should all be permanently enjoined.

## II.  Standing[1]

The League proved at trial that it has organizational and associational standing to challenge each of the four provisions at issue.

---

[1] In this Part, "the League" or "LWVFL" refers to the LWVFL Education Fund, organized under Internal Revenue Code § 501(c)(3), which conducts the organization's voter registration activities. Trial Tr. vol. 4, 1200:7–12, 1200:25–1201:3 (Scoon). Because LWVFL Education Fund has standing for each claim upon which relief is sought, the court need not address whether LWVFL Inc., organized under § 501(c)(4), separately

First, the League demonstrated organizational standing by showing that each provision "directly impedes" the League's "ability to accomplish [its] mission[]." *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd,* 680 F. Supp. 3d. 1291, 1309 (N.D. Fla. 2023). Separately, the League has organizational standing because it has had to and will continue to divert time and resources to counteract the harms inflicted by each of the challenged provisions. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014). The League likewise demonstrated that it has associational standing because: (1) its members would have standing to sue on their own; (2) the interests at stake are related to LWVFL's purpose; and (3) the participation of individual members is not required. *See Dream Defenders v. Governor of the State of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023).

---

has standing. *See, Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health and Human Servs.*, 648 F.3d 1235, 1243 (11th Cir. 2011) ("The law is abundantly clear that so long as at least one plaintiff has standing to raise each claim—as is the case here—we need not address whether the remaining plaintiffs have standing."). Regardless, LWVFL Inc. also has standing to challenge all four provisions, based on the time and resources spent advocating against their adoption. *See* Trial Tr. vol. 4, 1200:13–24, 1208:25–1210:10 (Scoon) (recounting LWVFL Inc.'s efforts writing to the Governor and testifying before the Legislature).

A plaintiff satisfies the injury-in-fact requirement by showing that it "has sustained" a direct injury already as the result of a challenged law, *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019) (internal quotation marks omitted), or that it is "immediately in danger of sustaining some direct injury." *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) (internal quotation marks omitted); *see also, e.g.*, *City of S. Miami v. Governor*, 65 F.4th 631, 636–37 (11th Cir. 2023) (an organization suffers actual injury where it can establish that it has "already been harmed" by a challenged law). Here, the League has shown that it sustained injury immediately after enactment of the four challenged provisions, that it is being injured right now, and that it is in immediate danger of further injury.

## A.   Online Registration

At the outset, testimony established the serious burdens created by each of the four challenged provisions, such that each provision on its own would likely have led the League to cease its traditional paper registration activities and move to online-only registration.[2] *See* Parts

---

[2] As explained by the League's statewide Co-President, Cecile Scoon, "online registration" refers to a method of voter registration in which the

II.B.–II.E, *infra*. Switching to online registration was not a capricious decision—it was a "very, very painful" choice that sharply divided League members. Trial Tr. vol. 4, 1224:15–1225:23 (Scoon); *see also, e.g.*, Trial Tr. vol. 4, 1344:4–24 (Elliott). But as explained in more detail in Parts II.B.–II.E, that decision was necessary: continuing with paper registration could have subjected League members to felony prosecution for simply retaining a voter's contact information. It would have required members to identify themselves to the public against their will, even after facing harassment and intimidation in the past. And aside from those very real fears, the laws could subject the League to astronomical financial penalties, threatening its very existence. Further, it would have required the League to question its members about their citizenship status, a prospect antithetical to the League's mission.[3]

---

League assists voters with registering online, as well as distributing blank voter registration forms, along with pre-addressed envelopes with stamps. Trial Tr. vol. 4, 1212:11–1214:13 (Scoon).

[3] This Court previously held that the League's "decision to cease paper-registration activities" in part due to the Felony Volunteer Restriction, Fla. Stat. § 97.0575(1)(e), was a "self-imposed injury based on [a] speculative fear." *League of Women Voters of Fla. v. Moody,* 4:23-cv-00216, ECF No. 95 at 7 (N.D. Fla. Feb. 13, 2024). The same is not true here: the Receipt, Retention, and 3PVRO Fines Provisions indisputably affect the League's core voter registration activity. And as explained in

That transition to online registration, compelled by the four challenged provisions, has concretely harmed the League: its mission is seriously impeded, its members' rights to free speech and association are infringed, and it has diverted resources toward the transition.

### 1. *Organizational Standing*

### a. **Direct injury**

Without question, the switch to online registration has directly impeded the League's mission of registering voters. Trial Tr. vol. 4, 1198:10–16, 1220:20–1221:5 (Scoon); *see also League of Women Voters v. Cobb*, 447 F. Supp. 2d 1314, 1325, 1339 (S.D. Fla. 2006) (finding irreparable injury after law forced the League to "impose[] a moratorium on voter registration"). Since the switch, "[t]he numbers have really gone down" for a host of reasons. Trial Tr. vol. 4, 1220:20–23 (Scoon).

First, a potential voter cannot register online if they do not have a driver's license or state identification card, meaning that the League cannot register many people they approach. Trial Tr. vol. 4, 1219:21–1220:4 (Scoon); Trial Tr. vol. 4, 1365:11–21 (Elliott). This is an especially

---

Part II.E., enforcing the Citizenship Provision would also create serious First Amendment harms, leading the League to lose volunteers, complete fewer registrations, and pay compliance costs.

big problem for "Black and Brown and Hispanic communities," as well as younger voters, who are less likely to possess the required identification. Trial Tr. vol. 4, 1225:24–1226:9 (Scoon); Trial Tr. vol. 4, 1365:11–21 (Elliott). In some areas, including the "burgeoning community in Central Florida" with many immigrants from Puerto Rico, "a high percentage cannot use the digital" method of registration, and paper registration would be much more effective. Trial Tr. vol. 4, 1277:2–15, 1286:9–1287:20 (Scoon). Thus, online registration not only hampers the League's general mission of registering more voters, but also its efforts to target the underserved Hispanic community, both in registering voters and recruiting members. *Id.* at 1225:24–1226:22, 1286:25–1287:20 (Scoon).

Second, online registration leads to fewer registrations because it requires retraining, as well as additional time and effort for volunteers. After the challenged provisions were enacted, all League volunteers were decertified and required to retrain and take a new quiz geared toward online registration before they could register any voters. *Id.* at 1211:22–1212:10 (Scoon). Fewer volunteers were thus available to perform voter registration services. *Id.* The "learning curve" for the new method, in turn, led to fewer registration drives. *Id.* at 1220:20–1221:5 (Scoon).

Third, the League registers fewer voters at the drives that do occur because the online system makes it more difficult to register multiple voters. If a local League can only afford to bring two digital tablets to a registration drive, volunteers can only help two voters at once; those waiting in line may "walk away." *Id.* at 1220:5–19 (Scoon). If the League were using paper registration forms, volunteers could pass them out to everyone waiting in line and "march them through together." *Id.*

Several other obstacles hinder the effectiveness of online registration: as Dr. Monica Elliott testified,[4] some people, especially older voters, are uncomfortable with using digital devices. Trial Tr. vol. 4, 1365:22–1366:3 (Elliott). While those and other voters can be given blank registration forms with envelopes, the League cannot ensure that the voter actually mails the envelope to the correct state office. Trial Tr. vol. 4, 1215:14–17 (Scoon). And many voters want to update their existing registration with a new signature, but there is no way to do that online. Trial Tr. vol. 4, 1366:4–18 (Elliott).

---

[4] Dr. Elliott is the League's Secretary and Voter Services Chair, as well as local Broward County League chapter Co-President and Voter Services Chair, Trial Tr. vol. 4, 1338:18–25 (Elliott).

9

Aside from directly impeding the number of voters the League can register, online registration hinders the League's effectiveness in other ways. Because the League cannot track its completed online registrations like it can with paper, League leadership cannot determine which local Leagues are performing well and which need more education or resources. Trial Tr. vol. 4, 1214:18–1215:17 (Scoon). Further, it is more difficult to attract financial donations crucial to the League's operation when the League cannot prove its effectiveness by pointing to the number of voters it has helped to register. *Id.* at 1216:5–8 (Scoon).

### b.    Diversion of resources

Trial evidence established that LWVFL has diverted, and will continue to divert, significant time and resources toward transitioning to online registration.

The League has already spent countless hours ramping up its online registration operation: each volunteer needed to be trained to perform online registration and take a quiz showing they could lawfully do so; some volunteers have not yet done that. *Id.* at 1211:22–1212:10, 1217:4–8, 1221:7–1222:3 (Scoon). The training included webinars, PowerPoint presentations, videos, and "two-pagers" to explain the new

process. *Id.* at 1221:10–23 (Scoon). Those same League leaders answered "hundreds of emails" from members across the state about the new method. *Id.* at 1221:24–1222:3 (Scoon). Ms. Scoon also spent time on fundraising, including by editing fundraising letters, so the League could finance the transition to online registration. *Id.* at 1219:1–8 (Scoon); *see also, e.g.*, PX 798 at 1 (requesting money to "fund[] hot spots and digital devices so that the League can shift from collecting paper applications to register people to vote online").

That is all time League members would otherwise have spent working on "restoration of voting rights for persons with felony convictions," including training Florida lawyers and law students to provide pro bono services to returning citizens. Trial Tr. vol. 4, 1222:25–1223:21 (Scoon). That time also would also have been devoted to "getting the right for women to have an abortion without governmental interference on the ballot and educating people about that." *Id.* at 1224:5–14 (Scoon) ("[T]hose two programs . . . are suffering. We are not giving them the full force of our effort and time and focus because we've taken away a lot of focus and time on 7050.").

The financial costs of switching to online registration are major: some larger local Leagues have spent $1,000 to $2,000 to buy digital tablets and hot spots to facilitate online registration. *Id.* at 1216:21–24 (Scoon). But many local Leagues do not yet have the funding to do that; when they do, each will need to spend about $200 to buy a hot spot and $20–$40 per month to pay for its service, in addition to the cost of tablets. *Id.* at 1216:11–20 (Scoon). The League has also begun to buy envelopes and stamps so voters can mail their own applications, and will spend $3,000–$4,000 per year on those. *Id.* at 1219:13–20 (Scoon). That money has been and will be diverted from printing materials to distribute to voters about various issues, such as education or reproductive rights, which "local Leagues really need." *Id.* at 1222:13–1223:14 (Scoon).

## 2.   *Associational Standing*

League members, including Ms. Scoon and Dr. Elliott, also have standing to sue on their own based on the compelled transition to online registration. First, after SB 7050 was passed, each League volunteer was de-certified, meaning that they could no longer register voters at all for some time. *Id.* at 1211:22–1212:10 (Scoon). Each one who wanted to resume registering voters was required to undergo new training and re-

12

take the certification quiz. *Id.* Ms. Scoon and Dr. Elliott in particular spent dozens of hours studying the law and coordinating the volunteer training. *Id.* at 1211:7–21 (Scoon).

League membership was divided about whether to continue with paper registration. *Id.* at 1224:15–1225:23 (Scoon). Those members who wanted to continue registering voters using the traditional paper method were completely unable to do so. And all voter registration volunteers have suffered harm due to the switch: they have registered voters at a lower rate, especially in target communities. *Id.* at 1220:20–23, 1225:24–1226:9 (Scoon). Thus, their ability to speak and associate with members and other voters has been significantly curtailed.

### B. The Receipt Provision

#### 1. *Organizational Standing*

##### a. Direct injury

The Receipt Provision directly impedes the League's ability to accomplish its mission. It requires League volunteers who collect voter registration applications to provide a receipt to each voter that includes, *inter alia*, the volunteer's full name in writing. Fla. Stat. § 97.0575(4). Complying with the provision will create significant problems for the

League that will reduce the number of volunteers willing to register voters and reduce the number of voters the League can register. Trial Tr. vol. 4, 1369:2–7, 1369:12–15 (Elliott).

With the Receipt Provision in effect, the League will register fewer voters because its volunteers will need to spend about one extra minute filling out and copying a receipt[5] every time they register a voter, which will decrease their capacity to register additional voters. Trial Tr. vol. 4, 1229:5–14, 1231:4–1232:1 (Scoon). Because completing a registration takes just a few minutes for many voters, one extra minute spent on the receipt increases the time spent with each voter by a large percentage, seriously reducing the number of voters that volunteers can approach. *Id.* at 1229:5–14 (Scoon); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008) [hereinafter *Browning I*] ("The net effect is that the average cost of registering each voter

---

[5] The League would plan to copy receipts to prove compliance with the Receipt Provision and maintain accurate records; however, it is concerned that keeping copies of the receipt would violate the Retention Provision's ban on retaining any voter's "personal information," given the vagueness of that term. Trial Tr. vol. 4, 1229:15–1230:16 (Scoon); *see also* Part III.D.1.b, *infra*.

increases, and because plaintiffs cannot bring to bear limitless resources, their noneconomic goals will suffer.").

The League will also register fewer voters because fewer members will be willing to volunteer due to legitimate fears of harassment and intimidation. Many League members have a bona fide fear of providing their full name to applicants they do not know, due to experiences of harassment at voter registration drives, fears of prosecutions by the Office of Election Crimes and Security (OECS), and phishing scams targeting League members. Trial Tr. vol. 4, 1234:2–1237:3, 1237:5–15, 1239:16–1244:5, 1300:10–25 (Scoon); Trial Tr. vol. 4, 1349:24–1353:8, 1354:23–1356:5 (Elliott).

League members testified at trial about harassment they experienced at voter registration drives from individuals who were "very angry," "very hostile and argument[at]ive," who returned multiple times to harass them after leaving or being escorted away, and whose threatening demeanor necessitated calling law enforcement. Trial Tr. vol. 4, 1234:2–1237:3, 1300:10–25 (Scoon); Trial Tr. vol. 4, 1349:24–1353:8, 1354:23–1355:20 (Elliott). These members—whose identities as League volunteers are not otherwise made public, Trial Tr. vol. 4,

15

1372:10–12 (Elliott)—do not want to be forced to give their full names, in writing, to every person they assist, including those who seem threatening. *See, e.g.*, Trial Tr. vol. 4, 1234:2–1237:3 (Scoon); Trial Tr. vol. 4, 1350:16–18, 1353:6–8 (Elliott).[6]

Because of their concerns, fewer members and volunteers are likely to engage in voter registration activity with the League if they must comply with the Receipt Provision. Trial Tr. vol. 4, 1243:6–1244:5, 1249:2–19 (Scoon); Trial Tr. vol. 4, 1344:4–24, 1367:1–1368:7, 1369:2–7, 1369:12–15 (Elliott). And the percentage of volunteers lost will be substantial, gutting the League's voter registration abilities. Trial Tr. vol. 4, 1243:6–1244:5 (Scoon) ("We are well aware that we would probably lose – at least 20 percent of the people doing voter registration would be unwilling [because of the Receipt Provision]"); Trial Tr. vol. 4, 1367:1–1369:15 (Elliott) (14 out of the 21 voter services leaders polled would be unwilling to return to paper registration due to the Receipt Provision).

---

[6] The suggestion that League members could refuse to register those who make them uncomfortable is antithetical to the League's commitment to register all eligible voters, and it creates a host of additional First Amendment harms. Trial Tr. vol. 4, 1371:12–14 (Elliott) ("Q. You would not have to help register [a man who was hostile toward the League] to vote, would you? A. We would not have to, but we would because we don't discriminate in terms of who comes up to the table.").

### b.     Diversion of resources

The League began diverting resources due to the Receipt Provision immediately upon its enactment, including by "educating volunteers . . . on compliance" with the law. *Browning I*, 522 F.3d at 1166.[7] First, League leaders read and analyzed the language of the Receipt Provision to determine how to comply. Trial Tr. vol. 4, 1210:11–1212:10, 1228:21– 1229:4 (Scoon); Trial Tr. vol. 4, 1340:5–1344:24, 1347:8–23 (Elliott). They held internal meetings, discussed the requirement at their statewide convention, and polled members to determine if and how they could proceed with paper registration. Trial Tr. vol. 4, 1340:21–1341:5, 1342:1– 12 (Elliott). Two members of League leadership, alone, spent at least 20 hours on the immediate response to the Receipt Provision specifically. Trial Tr. vol. 4, 1229:2–4 (Scoon); Trial Tr. vol. 4, 1347:8–11 (Elliott). These activities diverted time away from Dr. Elliott's project of "developing PowerPoints and educational materials" for the League's public voter education, Trial Tr. vol. 4, 1347:12–23 (Elliott), as well as

---

[7] The League's diversion of resources to address the Receipt Provision immediately upon enactment of SB 7050 is sufficient to confer standing. *City of S. Miami*, 65 F.4th at 636–37 (organization suffers actual injury when it has "already been harmed" by a challenged law). The same is true with the other three challenged provisions.

from the League's "Community Conversations," where the League has tried to "bring civility back to people being on different sides of an issue," Trial Tr. vol. 4, 1245:5–1246:4 (Scoon).

The Receipt Provision will lead to additional resource diversion at paper registration drives. The League will need to pay to print thousands of receipts and create receipt books to copy those receipts by "carbonless" copy. *Id.* at 1230:17–1231:3, 1232:2–15 (Scoon). Because the receipt books would need to be customized for and mailed to each local League, they would cost at least $5,000 annually. *Id.* at 1232:2–15 (Scoon). That money would otherwise be spent on buying T-shirts, banners, signs, and other materials that ensure the League's presence is visible at large events, as well as paying for security at some of those events. *Id.* at 1244:6–1245:4 (Scoon).

League leaders will likewise need to spend time training volunteers to comply with the Receipt Provision and coordinating logistics, while volunteers will spend time not only learning the Provision's new requirements, but filling out and copying receipts each time they collect a registration application. *Id.* at 1229:5–1231:3, 1232:2–1234:1 (Scoon); Trial Tr. vol. 4, 1347:24–1349:23 (Elliott). If not for that diversion, the

League would spend more time planning and hosting its Community Conversations. Trial Tr. vol. 4, 1245:5–1246:4 (Scoon).

### c.    Online registration

Because of the serious burdens just discussed, the League was compelled to switch to online registration to avoid them. *Id.* at 1248:20–1249:19 (Scoon). If the League had continued performing voter registration drives, the Receipt Provision would have led volunteers to quit because of their fears of harassment or intimidation, and risked subjecting remaining volunteers to such harassment. *Id.* at 1243:6–1244:5, 1300:10–25 (Scoon); Trial Tr. vol. 4, 1349:24–1353:8, 1354:23–1355:20 (Elliott). The League would have also had to spend significant time and money to comply, as discussed *supra*.

As discussed in detail in Part II.A, however, the transition to online registration has also injured the League and its members: it has led to fewer voter registrations, caused significant resource diversion, and prevented members from speaking and associating with voters in the most effective way possible. *See Fla. NAACP*, 680 F. Supp. 3d. at 1308, n.12 ("The fact that a statute leaves open a more burdensome avenue of communication does not relieve its burden on the targeted group.").

19

## 2.   *Associational Standing*

LWVFL also has associational standing to challenge the Receipt Provision because individual League members have standing. First, the Receipt Provision has a direct chilling effect on League members who have a bona fide fear of complying with the receipt requirement, including Ms. Scoon and Dr. Elliott themselves. Trial Tr. vol. 4, 1234:2–1237:3, 1300:10–25 (Scoon); Trial Tr. vol. 4, 1349:24–1353:8, 1354:23–1355:20 (Elliott). As a result of this fear, some of these members will not engage in voter registration activity with the League, and those who do will be forced to provide their name to every voter they assist, even when they have serious misgivings. Trial Tr. vol. 4, 1243:6–1244:5 (Scoon); Trial Tr. vol. 4, 1344:4–24, 1369:2–15 (Elliott). Second, several members spent dozens of hours working on an immediate response to the provision's passage and creating a plan for the League's compliance. Trial Tr. vol. 4, 1228:21–1229:4 (Scoon); Trial Tr. vol. 4, 1340:5–1344:24, 1347:8–23 (Elliott). And once the League moved to online registration, thousands of members were harmed: they registered fewer voters, participated in fewer voter registration drives, and associated less with other volunteers and voters because of the League's modified practices.

20

Trial Tr. vol. 4, 1365:6–1366:22, 1369:2–15 (Elliott). When the League returns to paper registration, those same members will register fewer voters because of the time and effort spent filling out and copying receipts. Trial Tr. vol. 4, 1229:5–14, 1231:4–1232:1 (Scoon).[8]

## C.   The Retention Provision

### 1.   *Organizational Standing*

#### a.   Direct injury

If enforced, the Retention Provision will directly impede the League's mission. It will prevent the League from retaining any "personal information," including a voter's basic contact information, such as their address, phone number, or email address—even with the voter's consent, *see* Parts III.D.1.a., 2.a, *infra* (describing vagueness and overbreadth of term "personal information"). This would severely impede the League's efforts to get out the vote, Trial Tr. vol. 4, 1255:11–121 (Scoon), recruit members, *id.* at 1254:24–1255:7 (Scoon), and provide information to

---

[8] For each of the challenged provisions, evidence also established that the interests at issue are germane to LWVFL's purpose, and this case does not require participation of individual members. Each provision hinders the League's mission of registering voters, and the League's interests align with its members' such that no individual participation is necessary.

members of the public about elections and political issues, *id.* at 1254:9–15 (Scoon).

Prior to enactment of the Retention Provision, the League routinely collected voter registrants' contact information. *Id.* at 1251:24–1252:12 (Scoon). During a voter registration event, League volunteers would typically put out a sign-up sheet next to a sign offering more information about the League. *Id.* at 1252:2–5 (Scoon). Anyone could write down their name, contact information, and an area of interest covered by the League. *Id.* at 1252:2–9 (Scoon). No one was required to provide any information about themselves in order to register. *Id.* at 1252:9–12 (Scoon).

The League used contact information from voters for various purposes. First, "sometimes the citizens ask[ed the League] to remind them of when elections are," and follow-up contact would "oftentimes get [them] more energized to vote for everything themselves." Trial Tr. vol. 4, 1254:9–19 (Scoon); *see also, e.g.*, Trial Tr. vol. 5, 1562:12–22 (Lichtman); *Fla. NAACP*, 680 F. Supp. 3d. at 1308 n.12 ("the *targeted* voter outreach made possible by retaining a voter's contact information is central to their purpose of increasing civic engagement")

(emphasis in original).[9] But now, because the law "threatens [the League's] staff, members, and volunteers *with felony prosecutions* if they copy or retain a voter's personal information . . . [the League] will no longer be able to carry out [its] mission of increasing political participation by contacting voters they have registered." *Fla. NAACP*, 680 F. Supp. 3d. at 1308 (emphasis in original); Trial Tr. vol. 4, 1254:9–19 (Scoon) (the Retention Provision would "interfere with the League's goal of getting as many people to vote as possible"); *see also, e.g.*, Trial Tr. vol. 5, 1471:25–1472:17 (Lichtman).

Second, the ban will prevent the League from recruiting voters to become members. When applicants share their name and contact information, they "often put, 'Hey, I'd like to join the League.'" Trial Tr. vol. 4, 1252:13–20 (Scoon). Indeed, the League gets at least one quarter of its volunteers this way. *Id.* at 1252:13–24 (Scoon). It is crucial for the League to steadily recruit members to stave off attrition resulting from a largely older membership that frequently steps away from voter

---

[9] Multiple other plaintiffs also attested to the value of collecting basic contact information to follow up with applicants. *See, e.g.*, Trial Tr. vol. 1, 97:6–20 (Nordlund); Trial Tr. vol. 4, 1161:16–1163:3, 1182:13–23 (Slater); Trial Tr. vol. 4, 1328:3–15 (Babis Keller).

recruitment because of health issues or moves out of state to be closer to family. *Id.* at 1255:14–1256:9 (Scoon). Thus, the Retention Provision will create a huge obstacle to maintaining and expanding the League's volunteer network and, in turn, its ability to register voters.

Third, the League routinely used voters' contact information to share requested information on issues of interest. *Id.* at 1252:2–12 (Scoon). If an individual expressed an interest in education, for example, a League member would follow up to connect them with the League's action chair for education, as well as direct them to the League's website, which includes information on the League's priority issues, descriptions of activities, and notifications of upcoming events the public can attend. *Id.* at 1253:2–16 (Scoon).

Finally, if the Retention Ban goes into effect, League members will be less willing to volunteer to register voters because of the threat of felony prosecution associated with the retention of *any* voters' personal information. This, in turn, will restrict the number of voters the League can register. *Id.* at 1255:3–21 (Scoon). Members' fears are exacerbated by the targeted prosecutions in Florida of certain 3PVROs and their members. *See id.* at 1239:16–1241:3 (Scoon).

### b.    Diversion of resources

Immediately after the Retention Provision was passed, the League's Co-Presidents and other members read and analyzed the statute and spent hours meeting about compliance, researching how potential criminal penalties could affect League members, and informing League members about the new law. *Id.* at 1210:11–1211:4 (Scoon). The League devoted a "large portion" of its response to SB 7050 solely to the Retention Provision, in particular because violating it could lead to felony prosecution of League members. *Id.* at 1251:19–23 (Scoon); *see also Browning I*, 522 F.3d at 1166 (finding standing where organization "divert[ed] personnel and time to educating volunteers").[10]

If the Retention Provision goes into effect, LWVFL "will divert resources to mitigate the risk that [its] *own staff, members, and volunteers* will face felony prosecutions for carrying out the organization['s] practice of retaining voter information so that they can later encourage them to vote in the future." *Fla. NAACP*, 680 F. Supp. 3d

---

[10]   The League's immediate response diverted time away from development of public voter education materials, as well as its Community Conversations program. Trial Tr. vol. 4, 1245:5–1246:4 (Scoon); Trial Tr. vol. 4, 1347:12–23 (Elliott).

at 1308 n.11 (emphasis in original). LWVFL leadership will need to, once again, amend its training materials, as well as reformulate the League's mandatory quiz for volunteers. Trial Tr. vol. 4, 1256:14–1257:2 (Scoon). It will then need to organize additional sessions for its members to retake the quiz. *Id.* at 1257:3–5 (Scoon). LWVFL leadership will also need to spend time devising a new method to collect voter information if the Retention Provision is enforced, to both meet voters' informational needs and to facilitate membership recruitment. *Id.* at 1258:19–1259:6 (Scoon). The League's Co-Presidents and other voter services leaders would need to spend 15 to 20 hours each implementing new policies and practices related to the Retention Provision. *Id.* at 1257:6–15 (Scoon).

The time spent responding to the Retention Provision has diverted and will divert valuable hours away from LWVFL's other priorities. The League chooses four legislative priorities each year and invites panelists to speak on those topics; includes discussions of them in its voter guide; and prepares in-depth presentations for citizens. *Id.* at 1257:16–24 (Scoon). In addition, the League hopes to inform citizens about two initiatives that will be on the ballot in November 2024. *Id.* at 1257:16–1258:3 (Scoon). The time spent on the response to the Retention Provision

has prevented the League from spending sufficient time on those priorities and will do so in the future if the law is enforced.

### c.    Online registration

Before the Retention Provision was enjoined, its passage as part of SB 7050 forced the League to transition to online registration to avoid the threat of felony prosecution. *Id.* at 1258:15–18 (Scoon). If the Retention Provision is upheld, it alone may lead the League to continue using online registration only. *Id.* at 1258:15–1259:6 (Scoon). The League does not want to risk felony prosecution of one of its members or lose members due to that fear, and if a volunteer were prosecuted, it could have debilitating effects on the League's voter registration program and its ability to recruit new members. *Id.* at 1255:3–21 (Scoon). Moreover, the vagueness of the term "personal information," *see* Part III.D.1.a, *infra*, leaves the League uncertain how to avoid such prosecution. Trial Tr. vol. 4, 1251:1–15, 1258:9–14 (Scoon). Further, it is vital that the League continue collecting voters' contact information to recruit new members, remind people to vote, and share information about political issues, meaning that using online registration to avoid the Retention Provision is necessary. *Id.* at 1251:24–1252:24, 1254:9–19 (Scoon).

27

For these reasons, the Retention Provision has and, if enforced, will lead the League to only register voters online. As detailed in Part II.A., however, online registration creates its own concrete injury to the League and its members. *See Fla. NAACP*, 680 F. Supp. 3d. at 1308 n.12. The Retention Provision, just as with all the other challenged provisions, leaves the League between a rock and a hard place.

### 2.   *Associational Standing*

The League also has associational standing to challenge the Retention Provision on behalf of its members. Every voter registration volunteer risks a third-degree felony prosecution for retaining a voter's personal information, even if it is done by accident or with the voter's express consent. Trial Tr. vol. 4, 1258:9–14 (Scoon). The League expects that such threat of felony prosecution will "severely" affect members' willingness to register voters, as "[n]o League member wants to be accused of a felony." *Id.* at 1254:20–1255:21 (Scoon).

The Retention Provision will likewise prevent League members, including Ms. Scoon and Dr. Elliott, from connecting with voters to provide them with information about future elections, political issues, upcoming events, and the League itself. *Id.* at 1254:9–19 (Scoon).

Members will also be injured because they will have to undergo retraining to ensure their understanding of and compliance with the challenged provisions—including retaking the League's mandatory quiz to be able to continue registering voters at all. *Id.* at 1256:14–1257:5 (Scoon). Moreover, the real risk of felony prosecution under the Retention Provision could force the League to continue online registration, which prevents members from speaking and associating with voters in the most effective way. *See* Part II.A, *supra*.

### D.    The 3PVRO Fines Provision

#### 1.    *Organizational Standing*

##### a.    Direct injury

Trial evidence established that the 3PVRO Fines Provision impairs the League's ability to carry out its mission. The law increased nearly every fine 3PVROs could incur while shortening the deadline for returning applications from 14 to ten days. The law now imposes fines of $50 per application per day beyond the new ten-day deadline, up to $2,500; $100 per application per day late, up to $5,000, if delivered after book closing, and $500 per application not submitted to the applicant's county of residence. Fla. Stat. § 97.0575(5)(a). The Provision likewise

imposes fines of $2,500, $5,000, and $5,000, respectively, for "willful" noncompliance. *Id.* And it raises the aggregate cap for total fines from $50,000 to $250,000[11]—roughly the amount of the League's annual budget. Trial Tr. vol. 4, 1199:23–25 (Scoon).

The combination of the ten-day deadline with increased fines will lead to a decrease in the number of voters the League can register. This is in part because the League will instruct volunteers that applications must be hand-delivered to county supervisors, so volunteers should not accept applications if they "don't have the capacity to turn it in . . . within a certain amount of time" or if a voter from a different county wants to register—the risk of a substantial fine for a late or misdelivered application would be too high. *Id.* at 1262:15–1263:17 (Scoon).[12] Further, local League leaders would need to make more frequent trips to turn in application forms, and more time in the car would mean "a likely

---

[11] This cap applies only to the fines "pursuant to this paragraph," Fla. Stat. 97.0575(5)(a), and so does not limit the $50,000 fines for League volunteers based on citizenship status, *id.* § 97.0575(1)(f).

[12] The prospect of having to turn away *any* applicants is antithetical to the League's mission to help register to vote as many eligible Floridians as possible. *See* Trial Tr. vol. 4, 1198:10–18, 1371:12–14 (Scoon).

decrease in the amount of people" the League can register. *Id.* at 1266:10–18 (Scoon).

The League would also have fewer volunteers to engage in its drives, leading to fewer voter registrations. When financial penalties are increased, the League has "had more difficulty filling those [volunteer] slots and getting things done, which has made it more difficult to host as many voter registration events as we would like to." *Id.* at 1266:22–1267:4 (Scoon). Moreover, because the League would have to retrain its volunteers, the number of people available to register voters would drop, at least until all volunteers could be recertified. *Id.* at 1265:22–25 (Scoon) ("We would host another quiz and have all of our members who want to do voter registration pass the new quiz").

### b.    Diversion of resources

League leaders spent time in the immediate aftermath of SB 7050 analyzing the bill—including the 3PVRO Fines Provision—informing members about the content of the new law and answering "hundreds of emails" with questions from League members across the state, among other things. *Id.* at 1210:11–1212:10, 1221:10–1222:3, 1266:2–9 (Scoon).

Ms. Scoon spent "at least 20 hours" of her time personally analyzing the 3PVRO Fines Provision and responding to it. *Id.* at 1261:22–25 (Scoon).

Operating under the 3PVRO Fines Provision will require the League to spend extra time to ensure compliance and avoid devastating fines—it would "end up with more oversight and more structure of reviewing what's going on at the table." *Id.* at 1262:11–1263:2 (Scoon). The League will need to spend about 20 hours to retrain its volunteers to be able to meet the new ten-day deadline, and to review applicants' county of residence before accepting a completed application. *Id.* at 1265:16–1266:6, 1262:11–1263:13 (Scoon). Further, League members will need to make more trips to county supervisors' offices to ensure applications are timely submitted. *Id.* at 1263:20–1264:14 (Scoon). Those trips will take more time and will require local League leaders to spend more money on gas. *Id.* at 1264:11–14 (Scoon).[13]

---

[13] The League has determined that sending the applications by mail is not reliable or quick enough to meet the ten-day deadline. Trial Tr. vol. 4, 1264:23–1265:12 (Scoon); Trial Tr. vol. 4, 1360:25–1361:9. If volunteers did mail applications rather than deliver them personally, the League would incur significant postage costs to ensure fast delivery. *Id.* at 1265:13–15 (Scoon).

If not for the 3PVRO Fines Provision, the League would spend its time working to ensure access for members to training programs and raising money to fund sending postcards to returning citizens. *Id.* at 1270:4–1271:3 (Scoon). The League would be able to spend the money used to comply with the 3PVRO Fines Provision to fund that same postcard program. *Id.*

### c. Online registration

The 3PVRO Fines Provision is a "showstopper" for the League and could have a "devastating impact"—a $250,000 fine would shut the League down. *Id.* at 1267:5–10, 1271:2–13 (Scoon). Even a fine of $20,000 would have a momentous impact, and "put a lot of fear and concern" in the minds of League members. *Id.* at 1267:11–20 (Scoon). Even a $2,500 fine "could be half of a local league's annual budget." *Id.* at 1267:21–1268:5 (Scoon). Thus, it is "[v]ery, very likely" that the 3PVRO Fines Provision on its own would have led the League to switch to online registration, at least temporarily. *Id.* at 1271:25–1272:6 (Scoon).

That change was necessary not only because of the amount of possible fines and the ten-day deadline, but because the fines regime makes the League strictly liable for problems outside its control. For

example, even before the 3PVRO Fines Provision was passed, OECS fined 3PVROs for submitting applications to the wrong county, even though the *voter* identified it as their county of residence. Trial Tr. vol. 2, 649:03–12 (Vilar). One organization was fined $26,000 for such deliveries, without any indication a voter was disenfranchised. *See* PX 894; Trial Tr. vol. 2, 546:21–547:20 (Wassmer). If a League volunteer collected an application and later realized the voter wrote the wrong county on the form, she would be "between [a] rock and [a] hard place"— the League could be fined $5,000 for "willfully" submitting that form to the county that the voter included on the form, or, if the volunteer cannot meet with the voter in time to correct the error, the League may be fined $2,500 for submitting the application more than ten days late. Trial Tr. vol. 4, 1362:1–17, 1364:22–1365:5 (Elliott). More fundamentally, the League cannot even be sure what it means to "act willfully" given the vagueness of the statute, and does not know whether the increased fines for acting willfully apply daily or in addition to the standard fines. Trial Tr. vol. 4, 1268:12–1269:8 (Scoon); *see also* Part III.D.1.c.

The League is using online registration to avoid potentially catastrophic penalties, but for the reasons described in Part II.A., the use of online registration harms the League as well.

## 2. *Associational Standing*

Evidence at trial also established that the League has associational standing to challenge the 3PVRO Fines Provision. League members, including Ms. Scoon and Dr. Elliott, spent hours of their time responding to the 3PVRO Fines Provision and helping inform other members and volunteers about its requirements. Trial Tr. vol. 4, 1261:19–25 (Scoon). Because the 3PVRO Fines Provision forced the League to cease paper drives, those same League members have likewise been unable to register voters effectively due to the switch to online registration. *See* Part II.A, *supra*. And if the League does return to paper registration, members will need to undergo additional training, follow stricter compliance rules, and make additional trips to county offices to turn in registration forms. Trial Tr. vol. 4, 1262:11–1264:14, 1265:16–1266:7 (Scoon). With that extra work and time, and because the League may need to turn some voters away rather than risk serious fines for late or

misdelivered applications, League members will be able to register fewer voters. *Id.* at 1262:15–1264:10 (Scoon).

### E.   The Citizenship Provision

#### 1.   *Organizational Standing*

##### a.   Direct injury

The Citizenship Provision will also impair LWVFL's mission, and will grievously harm the League if it is enforced. Complying with the law would force the League to violate its policies and values by asking every volunteer about their citizenship status. *Id.* at 1272:25–1274:14, 1280:5–1281:19 (Scoon); Trial Tr. vol. 4, 1359:12–20 (Elliott). Even if the League chose to do that, it would lose volunteers who refuse to answer or find the question inappropriate. Trial Tr. vol. 4, 1274:20–1275:4, 1281:20–1282:15 (Scoon); Trial Tr. vol. 4, 1343:13–17, 1359:12–20, 1368:4–9, 1369:8–15 (Elliott). This particularly harms an organization composed of volunteers, like the League. In the words of Ms. Scoon:

> We would lose the woman and the manpower to do the voter registration because people would take a principle[d] stance on [the Citizenship Provision]. The League is made up of people who act on their principles. We are not being paid. We do not get a check. We do not get brownie points in our church or whatever things we do. We are doing this for our internal sense of well-being and wanting to make our state and our communities better.

Trial Tr. vol. 4, 1282:3–10 (Scoon).

The League will register fewer voters if it operates with fewer volunteers and is unable to collaborate with other organizations, such as Poder Latinx, who may have noncitizen members. *Id.* at 1275:5–1278:3, 1281:20–1282:15 (Scoon). The League will also register fewer voters due to the logistical burdens the Citizenship Provision imposes: every new volunteer will be required to sign a citizenship declaration, under penalty of perjury, before attending their first registration event, which will take time and planning from every local League. *Id.* at 1278:13–1279:17 (Scoon); PX 761.[14] Finally, asking about a person's citizenship status prevents the League from being able to recruit new members from the diverse communities they seek to reach. Trial Tr. vol. 4, 1280:5–1281:19 (Scoon).

### b.      Diversion of resources

When the Citizenship Provision became law, League leadership devoted 15 to 20 hours to reading the provision, holding meetings to assess the League's potential liability, assessing League members'

---

[14] Having to attest to one's citizenship under penalty of perjury may itself deter some volunteers from volunteering at all. *See, e.g.*, Trial Tr. vol. 3, 915:21–916:5 (Eskamani).

reactions to the requirement of citizenship declarations, and developing a plan for how to keep registering voters. Trial Tr. vol. 4, 1272:19–24 (Scoon); *see also* Trial Tr. vol. 4, 1341:16–1342:12, 1343:13–17, 1367:6–18, 1368:4–9 (Elliott) (testifying to polling League members on multiple occasions regarding the Citizenship Provision).

Conducting paper registration drives under the Citizenship Provision will be dramatically different from before the law was passed, costing the League valuable time: the League will need to retrain every volunteer and local leaders; arrange a time for every volunteer to affirm that he or she is a U.S. Citizen; and modify practices to ensure that there is no risk of any volunteer who has not been vetted by the League collecting even a single application. Trial Tr. vol. 4, 1278:4–1280:4 (Scoon); Trial Tr. vol. 4, 1358:17–1359:8 (Elliott). Creating these new protocols would divert time away from creating new voter guides that would cover the constitutional amendments that the Florida Supreme Court recently allowed onto the ballot, Trial Tr. vol. 4, 1282:16–1283:16 (Scoon), as well as time spent on educational voter services, Trial Tr. vol. 4, 1359:9–11 (Elliott).

Printing and mailing the thousands of declarations needed for the League's voter services volunteers across Florida could cost thousands of dollars, because of the postage alone. Trial Tr. vol. 4, 1279:21–1280:4 (Scoon). That expense would force the League to divert money away from assisting local Leagues by providing banners and signs and paying for printing expenses. *Id.* at 1283:20–1285:3 (Scoon).

### c. Online registration

The Citizenship Provision itself would necessitate online-only registration because of the "incredibl[e] overkill [of the] $50,000 fine," which would be "crushing." *Id.* at 1289:12–18 (Scoon); *see also* Trial Tr. vol. 4, 1358:8–16 (Elliott) (explaining that $50,000 is a "substantial" amount of the statewide League's annual budget and is *double* the Broward County League's annual budget). And even if the League were able to avoid a fine, it would lose volunteers if it began requiring everyone to affirm their citizenship under penalty of perjury, and it would still need to pay significant costs to implement the requirement. Trial Tr. vol. 4, 1274:20–1275:4, 1279:21–1280:4, 1281:20–1282:15 (Scoon); Trial Tr. vol. 4, 1343:13–17, 1368:4–9, 1369:8–15 (Elliott).

Indeed, for these reasons, the Citizenship Provision was part of the reason the League transitioned to online registration in 2023, before the Provision was enjoined. Trial Tr. vol. 4, 1289:6–11 (Scoon). As detailed above, however, the switch to online registration has also concretely injured the League. *See* Part II.A, *supra*.

### 2.   *Associational Standing*

League members have standing to challenge the Citizenship Provision due to the time and resources devoted to reading the law and assessing how to operate under it. Trial Tr. vol. 4, 1272:19–24 (Scoon); Trial Tr. vol. 4, 1339:25–1344:24 (Elliott). Members have also suffered concrete injury from being forced to use only the less-effective online registration method. *See* Part II.A, *supra*.

Members who engage in paper voter registration under the Citizenship Provision will be forced to undergo additional training and attest to their citizenship under penalty of perjury, and they will be unable to work with volunteers who are not citizens or other organizations who may have noncitizen members. Trial Tr. vol. 4, 1275:5–1280:4, 1281:20–1282:15 (Scoon); Trial Tr. vol. 4, 1358:17–1359:10 (Elliott). Moreover, noncitizen members of the League will be

prohibited from engaging in voter registration. Trial Tr. vol. 4, 1274:7–9 (Scoon); Trial Tr. vol. 4, 1359:12–20 (Elliott) (describing how the League has never asked about its members' citizenship status because doing so would not conform with the League's values, so it cannot quantify the number of affected members).

### F. The League's Injuries Are Fairly Traceable to Defendants, and Redressable Through a Permanent Injunction

The League's injuries are traceable to both the Secretary of State and the Attorney General, such that a permanent injunction prohibiting both Defendants from enforcing the challenged provisions would redress the League's injuries.

#### 1. *Secretary of State*

The Secretary of State does not dispute that the League's injuries are traceable to his authority to enforce all four of the challenged provisions. *See* Fla. Stat. §§ 97.0575(8), (12). Neither the facts nor the law have changed since SB 7050 was passed with respect to the Secretary's enforcement authority, and there is no evidence in the record that the Secretary will *not* enforce any of the penalties accompanying the

41

challenged provisions.[15] Accordingly, as a matter of law, the League's injuries are fairly traceable to Defendant Byrd's threatened enforcement of the challenged provisions.

The League has likewise shown that an injunction prohibiting the Secretary of State from enforcing the challenged provisions would redress the League's injuries. Removing the threat of enforcement would allow the League to register voters without fear of the Secretary penalizing the organization with devastating fines, automatic cancellation of its registration, or further civil enforcement actions based on referrals to the Attorney General.

### 2.   *Attorney General*

The League's injuries are likewise traceable to the Attorney General, and redressable through an injunction barring her office from enforcing the challenged provisions.

Florida law gives the Attorney General's Office of Statewide Prosecution authority to investigate and prosecute voting-related crimes,

---

[15] Indeed, given that the Secretary—and the Attorney General—has "vigorously defended" the challenged provisions in court, "'an intent to enforce [the challenged provisions] may be inferred.'" *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (citation omitted).

including those involving voter registration, Fla. Stat. § 16.56(1)(c); *see also* Trial Tr. vol. 3, 812:7–15, 813:17–814:1, 825:25–826:10 (Cox), and the Office is exercising that statutory authority, Trial Tr. vol. 3, 813:6–8 (Cox). The Retention Provision—which carries third-degree felony penalties, Fla. Stat. § 97.0575(7)—clearly falls within the Attorney General's authority to investigate and prosecute registration-related crimes, Fla. Stat. § 16.56(1)(c)(5). Accordingly, the League's injuries from the Retention Provision are fairly traceable to Defendant Moody.

In addition, § 97.0575 specifically authorizes the Attorney General to "institute a civil action for a violation" *or* "to prevent a violation" of any of the challenged provisions. Fla. Stat. § 97.0575(8) ("An action for relief may include a permanent or temporary injunction, a restraining order, or any other appropriate order."); *see also* Trial Tr. vol. 3, 827:20–22, 837:11–25 (Cox). Based on the plain language of the statute, the Attorney General's civil enforcement authority is not dependent on a referral from the Secretary of State. *See* Fla. Stat. § 97.0575(8); *see also* Trial Tr. vol. 3, 828:7–9, 828:13–19 (Cox) ("there's nothing in there that says it requires the Secretary of State"; "there's not wording in there that says

it must come from the Secretary of State").[16] Accordingly, the League faces an independent threat of civil enforcement by the Attorney General, including injunctions and restraining orders that could force the League to halt its voter registration operations altogether.[17]

Florida law also requires the Attorney General to issue official opinions and legal advice when requested by state attorneys or certain Florida state officials—including the Secretary of State. *See* Fla. Stat. §§ 16.01(3), 16.08. The Attorney General thus has the duty, when asked, to clarify the meaning or reach of the challenged provisions, and the scope of the Secretary of State's duties with respect to them. Such interpretations would, in turn, bind both civil and criminal enforcement, including any complaints or actions brought against the League or its

---

[16] At a minimum, the Attorney General's authority to act "to *prevent* a violation" does not depend on a referral from the Secretary of State, as the Secretary's authority covers only violations already committed. *See* Fla. Stat. § 97.0575(8) ("If the Secretary of State reasonably believes that a person *has committed* a violation of this section, the secretary *may* refer the matter to the Attorney General for enforcement.") (emphasis added); *see also* Trial Tr. vol. 3, 828:24–829:4 (Cox) (testifying that the Secretary does not have any authority with respect to prevention of violations).

[17] The parties' joint stipulation does not show otherwise, as it simply codifies the Attorney General's *interpretation* that "SB 7050 . . . require[s] a referral from the Secretary of State before the OAG can enforce the challenged civil provisions." PX 179 at 2.

members. *See, e.g.*, PX 179 at 2 (specifying that Statewide Prosecutor's interpretation of Citizenship Provision "applies . . . in both the civil and criminal contexts").

## III.  Merits

The League proved at trial that all four challenged provisions violate the League's and its members' First Amendment rights to free speech, expressive conduct, and association, and are unconstitutionally vague. The Receipt, Retention, and Citizenship Provisions are likewise unconstitutionally overbroad.

### A.  The League's Voter Registration Activities Are Protected by the First Amendment

The First Amendment is our democracy's lodestar and protector. It guards most fervently our freedom to engage members of the public through words and action regarding issues of public concern, *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940), and to associate with like-minded people for political ends. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).

1. ***Strict scrutiny applies because the League's registration drives constitute core political speech***

Restrictions on core political speech trigger strict scrutiny. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 n.10, 347 (1995). Because the challenged provisions "reduc[e] the total quantum of speech on a public issue," Defendants must show "that it is necessary to burden [plaintiffs'] ability to communicate their message in order to meet its concerns." *Meyer v. Grant*, 486 U.S. 414, 422–23, 426 (1988). "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

In evaluating whether a provision is narrowly tailored, courts must consider the other tools a state has to achieve its interests. In *Buckley v. American Constitutional Law Foundation, Inc.*, for instance, the Supreme Court struck down several challenged provisions while noting that "Colorado retains an arsenal of safeguards" to deter fraud in the initiative process. 525 U.S. 182, 204–205 (1999). The government likewise must "do more than simply 'posit the existence of the disease sought to be cured.'" *Wollschlaeger*, 848 F.3d at 1316 (quoting *Turner*

46

*Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994)). The government must demonstrate that the harms it seeks to remedy are "real, [and] not merely conjectural," and that the challenged provisions "will in fact alleviate these harms in a direct and material way." *Id.* at 1313 (citation omitted).

By registering voters, the League and its members seeks to achieve political change in Florida; the First Amendment guards their right "freely to engage in discussions concerning the need for that change." *Meyer*, 486 U.S. at 421. The League's mission is to "encourage and assist as many lawful citizens to be able to participate in voting in the franchise, and . . . to encourage people to vote." Trial Tr. vol. 4, 1198:11–18 (Scoon). The League's speech in service of that mission—*i.e.*, its voter registration activities—are "at the core of our electoral process and of the First Amendment freedoms." *Meyer*, 486 U.S. at 425 (collecting cases). "[T]he First Amendment requires us to be vigilant . . . , to guard against undue hindrances to" just such "political conversations and the exchange of ideas." *Buckley*, 525 U.S. at 192.

Through its voter registration drives, the League engages the public in quintessential political speech. *See League of Women Voters v. Hargett*,

400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (collecting cases). The League expresses its message through its volunteers' conversations with potential voters. Trial Tr. vol. 4, 1203:16–22 (Scoon). The League conducts its drive "at places where pretty much the entire community turns up." *Id.* at 1202:6–8 (Scoon). After introducing themselves as "with the League" and talking about the League, volunteers ask people if they are registered to vote, offer information about important issues, and remind people about upcoming local elections. *See id.* at 1204:8–14 (Scoon). If someone is not yet registered, after "explain[ing] the nature of the proposal and why [they] support it," *Meyer*, 486 U.S. at 421, League volunteers provide the potential voter an application to register, offer assistance as needed in completing it, and, once completed, offer to turn the form in for the voter, Trial Tr. vol. 4, 1205:15–1206:10 (Scoon).

Political speech occurs before, during, and after collecting and handling voter registration applications. Throughout the process, including as follow-up after registration, the League reminds these soon-to-be voters of upcoming elections, provides them with its popular "voter guide"—"people snatch those things up like hotcakes"—and invites them to League debates and forums on issues of the day. *Id.* at 1204:08–

1205:14 (Scoon). The League's speech and conduct during and after voter registration drives are "interactive communication concerning political change," which is precisely the area "in which the importance of First Amendment protection is at its zenith." *Meyer*, 486 U.S. at 422, 425 (internal quotation marks omitted); *see also id.* at 421 n.4 (describing conversations like those at issue here as "fall[ing] squarely within the protections of the First Amendment").[18]

In this regard, the challenged provisions are indistinguishable from those in *Meyer* and *Buckley*. The Citizenship Provision, like the ban on paying circulators in *Meyer*, limits the persons available to speak the League's message. *Meyer*, 486 U.S. at 422. The Receipt Requirement, like the ID badge at issue in *Buckley*, forces volunteers "to reveal their identities at the same time they deliver their political message." *Buckley*, 525 U.S. at 199. And like the felony statute struck down in *Meyer*, the Retention and 3PVRO Fines Provisions exact severe civil and criminal penalties that chill political expression. *See Meyer*, 486 U.S. at 417.

---

[18] *See also, e.g.*, *Hargett*, 400 F. Supp. 3d at 720; *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012) [hereinafter *Browning II*]; *Cobb*, 447 F. Supp. 2d at 1332–33.

Like the laws at issue in *Meyer* and *Buckley*, the challenged provisions limit political expression by regulating the conduct around it. In *Meyer*, Colorado's ban on paying petition circulators did not ban speech directly, but the Court nevertheless struck it down because it "limit[ed] the number of voices" willing to convey the sponsor's message. 486 U.S. at 422–23. Similarly, in *Buckley*, the Court highlighted evidence that compelling circulators to wear ID badges "inhibits participation in the petitioning process" because of circulators' reluctance to identify themselves and their fears of "recrimination and retaliation . . . on volatile issues." 525 U.S. at 197–98 (internal citations omitted). The injury—a decline in willing speakers—stemmed from "forc[ing] circulators to reveal their identities at the same time they deliver their political message." *Buckley*, 525 U.S. at 198–99. It made no difference that circulators were not directly barred from speaking. Nor should it here.

### 2. *The League's collection and submission of voter registration forms is inextricably intertwined with core political speech*

The act of registering someone to vote cannot be separated from core political speech. This is not just because political speech occurs while

assisting someone to register; it is because the act of voter registration *cannot be performed* without expressing a political message. *See, e.g.*, Trial Tr. vol. 2, 512:9–23 (Martinez); Trial Tr. vol. 2, 569:21–570:5 (Velez Burgos); *see also* Trial Tr. vol. 4, 1198:10–16 (Scoon). Any attempt to regulate this conduct necessarily infringes on protected speech. *See, e.g.*, *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (charitable solicitation is "characteristically intertwined with informative and perhaps persuasive speech"); *Cobb*, 447 F. Supp. 2d at 1334 ("[T]he collection and submission of voter registration drives [sic] is intertwined with speech and association.").

Registering to vote is a political act. In *Buckley*, the Supreme Court held unconstitutional a requirement that petition circulators be registered voters, notwithstanding "the ease with which qualified voters may register." 525 U.S. at 195–96. The Court noted that the choice to register, or not, "implicates political thought and expression." *Id.* at 195; *see also* Trial Tr. vol. 4, 1198:11–16 (Scoon) (distinguishing between "providing pathways" to registration and encouraging people to vote). Indeed, the Court identified the very idea that the League here combats through its drives: that some people "refuse to register because they don't

believe that the political process is responsive to their needs." *Buckley*, 525 U.S. at 196 (internal citation omitted); *see also Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1216 (D.N.M. 2010) ("Given that voter registration is a communicative avenue, one way to counter the message of those who oppose the democratic process is to participate in and persuade others to engage in voter registration."); Trial Tr. vol. 4, 1198:14–16 (Scoon) ("we also try to encourage people to vote to let them know, you know . . . what are the consequences of voting and not voting"). Because assisting an eligible voter to register is a political act, the League's conduct during its registration drives is no less protected than its speech.[19]

Defendants misstate the facts when they suggest that "no speech is taking place" when League volunteers collect and handle voter registration forms. Secretary's Opening Statement, ECF No. 268 at 7 (citing *Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013)). The League has shown that these direct, one-on-one communications are part

---

[19] *See, e.g.*, *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 222–24 (M.D.N.C. 2020); *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 812 (E.D. Mich. 2020); *Herrera*, 690 F. Supp. 2d at 1217; *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006).

of the voter registration process and occur less when the State burdens 3PVROs as it has. Trial Tr. vol. 4, 1220:20–1221:6 (Scoon); *see also Cobb*, 447 F. Supp. 2d at 1333 ("Plaintiffs' testimony has demonstrated that the success of voter registration drives is severely undermined when third party organizations cannot collect voter registration applications."). Defendants evince no "due regard for the reality" that, without the ability to collect and deliver voter registration forms, the League's flow of information and advocacy has been seriously decreased. *Schaumburg*, 444 U.S. at 632; *see also Hargett,* 400 F. Supp. 3d at 720 ("[W]hile the civil penalties . . . are directed only at the paperwork produced by a drive, the threat of penalties is likely to have a chilling effect on the entirety of the drive, including its communicative aspects.").

Finally, whether the League can express a similar message without collecting voter registration applications is irrelevant. The League has shown that collecting and delivering voter registration forms—expressive conduct that brings it under regulation by the challenged provisions—is the "most effective, fundamental, and perhaps economical avenue of political discourse" for advocating their political beliefs. *Meyer*, 486 U.S. at 424; *see also* Parts III.A.3, .4, *infra*. The availability of other avenues

53

of expression simply has no bearing on whether the challenged provisions at issue burden the League's most effective one. *Cf. Thornhill*, 310 U.S. at 95–96.

### 3. *Collecting and delivering voter registration applications is expressive conduct*

The First Amendment protects not only speech, but also expressive conduct. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). To determine whether the First Amendment protects a particular act, courts determine whether "an intent to convey a particularized message was present" and given the act's context, whether "the reasonable person would interpret it as *some* sort of message." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (citation and internal quotation marks omitted). Only the second step is at issue here. There is no doubt that the League intends to convey its message of political participation and civic engagement through its collecting and submitting of voter registration forms. As such, the only issue here is whether the League's intended message is reasonably understood when it collects and submits voter registration forms.

Defendants argue that there is no speech involved in handling registration forms. Secretary's Opening Statement, ECF No. 268 at 7. But

because the context of an act determines "the dividing line between expressive conduct and everyday conduct," *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1343 (11th Cir. 2021) (citation omitted), the League's collecting and handling of forms cannot be viewed in a vacuum.[20] Conduct that is unquestionably protected expression in one setting may, in other settings, not implicate the First Amendment at all. *See Fort Lauderdale Food Not Bombs*, 901 F.3d at 1241.

As the League demonstrated at trial, "a voter registration drive involves more than just accepting and delivering a form like a neutral courier." *Hargett*, 400 F. Supp.3d at 720. The League "set[s] up tables and its banner and distribute[s] literature at its events." *Burns*, 999 F.3d at 1333; *see also* Trial Tr. vol. 4, 1244:20–25 (Scoon). The League's drives are conducted at parades and large events "historically associated with the exercise of First Amendment rights." *Burns*, 999 F.3d at 1333–34

---

[20] To the extent Defendants argue that the conduct viewed alone is not "inherently expressive," *see Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 66 (2006) [hereinafter *FAIR*], they rely on a misreading of *Texas v. Johnson. Compare FAIR* at 66 ("Unlike flag burning, the conduct regulated . . . is not inherently expressive.") *with Johnson*, 491 U.S. at 405 ("We have not automatically concluded, however, that any action taken with respect to our flag is expressive. Instead, in characterizing such action for First Amendment purposes, we have considered the context in which it occurred.").

(internal quotation marks omitted); *see also* Trial Tr. vol. 4, 1202:13–19 (Scoon). A League volunteer's offer to collect and submit registration applications, in turn, embodies the League's belief that our democracy is worth participating in—certainly "an issue of concern in the community" today. *Burns*, 999 F.3d at 1334 (internal quotation marks omitted); *see also* Trial Tr. vol. 4, 1215:22–24 (Scoon).

The League has been engaging in First Amendment protected speech, registering voters for the better part of a century; and doing so has long been associated with the advance of civil rights in this country. *See* Trial Tr. vol. 6, 1706:22–1707:2 (Stein). Indeed, League members have been harassed for just this conduct. Trial Tr. vol. 4, 1234:09–1236:10 (Scoon); Trial Tr. vol. 4, 1352:14–1353:05 (Elliott). On this record, there can be no doubt that a reasonable person would interpret the League's collecting and handling of voter registration forms as expressing "*some* sort of message." *Burns*, 999 F.3d at 1336 (citation and internal quotation marks omitted; emphasis in original).[21]

---

[21] *See also Herrera*, 690 F. Supp. 2d at 1216 ("Volunteers actively aiding in voter-registration activities are distinct from a person picking up a registration form from a box at the post-office or local library, and changes the manner and setting in which prospective voters register.

###### 4. *The League engages in expressive political association with its volunteers and the voters they help to register*

The First Amendment also protects the right to associate with others to promote ideas collectively. More than fifty years ago, the Supreme Court declared that "[t]here can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of orderly group activity protected by the First and Fourteenth Amendment." *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) (internal citations omitted); *see also Herrera*, 690 F. Supp. 2d at 1202 (collecting cases). This right of "expressive association" encompasses not only the ability to join with others, but also the right to define the expressive nature of that association. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000).

The League and its volunteers exercise their right to expressive association through their voter registration activities. League members associate with each other at drives to advance their political beliefs and the overall mission of the League to register as many eligible Floridians

---

Rather than lacking communicative force, efforts to register people to vote communicates a message that democratic participation is important.")

to vote as possible. *See* Trial Tr. vol. 4, 1282:06–15 (Scoon) ("The League is made up of people who act on their principles . . . wanting to make our state and our communities better.") The League's registration drives thus broaden support for and engagement with their programs to increase political participation. *Id.* at 1252:13–20 (Scoon). League members and volunteers also associate directly not just with each other, but also with those they assist, recruiting new members and inviting further discussion. *Id.* at 1258:23–1259:06 (Scoon); *see also, e.g.*, *Browning II*, 863 F. Supp. 2d at 1158.[22]

### 5. *The challenged provisions constitute content- and viewpoint-based restrictions*

The challenged provisions are also subject to strict scrutiny as content- and viewpoint-based restrictions on protected expression. Because the challenged provisions apply only to those engaged in voter registration drives, they restrict speech "because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155,

---

[22] Because "'voting is the political right . . . preservative of all rights,' . . . [i]f anything, a person's decision to sign up to vote is more central to shared political life than his decision to sign an initiative petition." *Hargett*, 400 F. Supp. 3d at 723 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

163 (2015). Moreover, the challenged provisions thwart only those seeking to encourage political participation, not to discourage it. The First Amendment forbids the State from enacting policies that all but eliminate voter registration efforts, effectively "choos[ing] winners and losers in the marketplace of ideas." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 (11th Cir. 2022).

**B.    The Court Should Not Apply *Anderson-Burdick* Balancing to the League's First Amendment Claims**

The *Anderson-Burdick* balancing test is inapposite here for two reasons: the activity reached by the challenged provisions and the nature of the League's claims.

First, the test applies to regulations governing "the mechanics of the electoral process," not core political speech about the political process. *McIntyre*, 514 U.S. at 345. In *Anderson*, the Supreme Court considered a challenge to an early filing deadline for non-party candidates to appear on the ballot. *Anderson v. Celebrezze*, 460 U.S. 780, 785 (1983). In *Burdick*, the Court considered a prohibition on write-in candidates. *Burdick v. Takushi*, 504 U.S. 428, 430 (1992). The cases struck a balance between the right to express and associate "through the ballot," *Burdick*, 504 U.S. at 433, and the regulation necessary to make elections an

59

effective means of discerning popular will. No such balancing is appropriate where—as here—the regulations target protected expression well before voters head to the polls. *See, e.g.*, *Hargett*, 400 F. Supp. 3d at 722 ("[L]aws that govern . . . election-related speech and association [] go beyond merely the intersection between voting rights and election administration.") The *Anderson-Burdick* standard thus does not obviate the First Amendment's command "to guard against undue hindrances to political conservations and the exchange of ideas." *Buckley*, 525 U.S. at 192 (quoting *Meyer*, 486 U.S. at 421).

Second, *Anderson-Burdick* is inapplicable because the League asserts pure First Amendment claims, not a right-to-vote claim. While the Eleventh Circuit has applied *Anderson-Burdick* to those asserting burdens on the right to vote,[23] here, the League's injuries sound in its own speech, expressive conduct, and political association that takes place well before any election. *See* Part III.A, *supra*. The *Buckley* Court, writing after both *Anderson* and *Burdick*, applied the test articulated in *Meyer*, demonstrating that *Anderson-Burdick* balancing does not diminish the protection the First Amendment affords to the political speech,

---

[23] *See, e.g.*, *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022).

expression, and association that occurs outside the ballot box. *See Buckley*, 525 U.S. at 204 (state's interest in preventing fraud less strong at petition-gathering stage than at the time of balloting.); *see also Hargett*, 400 F. Supp. 3d at 722.[24]

Even if *Anderson-Burdick* were to apply, the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments. Thereafter, the State must identify its precise interests and the extent to which those interests justify the burden imposed by the law." *Cobb*, 447 F. Supp. 2d at 1332 (citation omitted). Because the League has shown that the challenged provisions severely burden the League's speech and association rather than the right to vote of its members or the community members with whom it seeks to speak and associate, *see* Part III.A, *supra*, the State must put forward interests that justify the burden on 3PVROs

---

[24] In *Buckley*, Justice Thomas distinguished between "election law[s] directly regulat[ing] core political speech" and an election law that "burdens voting and associational interests." 525 U.S. at 207 (Thomas, J., concurring). He noted that, as to the former, the Court has "always subjected the challenged restriction to strict scrutiny . . . [e]ven where a State's law does not directly regulate core political speech[, and] . . . without first determining that the State's laws severely burdens speech." *Id.* (collecting cases).

like the League, irrespective of any additional burdens on Florida voters.[25] On this record, where "[t]he plaintiffs have produced evidence of significant burdens associated with the Act's provisions, and the defendants have conspicuously failed to provide much, if any, factual basis for disputing the plaintiffs' claims in that regard," the *Anderson-Burdick* framework "is just another road to strict scrutiny." *Hargett*, 400 F. Supp. 3d at 725 n.9.

### C.   Counts 1 and 2: Violation of LWVFL's First Amendment Rights to Free Speech, Expressive Conduct, and Association

None of the four challenged provisions can meet the "well-nigh insurmountable" standard established in *Meyer* and *Buckley*. *Meyer*, 486 U.S. at 425; *see also McIntyre*, 514 U.S. at 346 n.10, 347 (describing *Meyer* standard as "strict scrutiny" and outlining exacting scrutiny analysis). The State put forth precious little evidence regarding *any* interests justifying the provisions, and no evidence establishing that they are

---

[25] This is not to suggest that weighing the burdens to voters would result in a lower standard of review. *See Cobb*, 447 F. Supp. 2d at 1324 ("If third party voter registration organizations permanently cease their voter registration efforts, Florida citizens will be stripped of an important means and choice of registering to vote and of associating with one another.").

narrowly tailored.[26] And even if *Anderson-Burdick* applies, the four provisions must be invalidated because the injuries they create far outweigh the State's justifications.

### 1. *The Receipt Provision*

#### a. The Receipt Provision cannot survive strict or exacting scrutiny

*Buckley* itself establishes that the State may not require all voter registration volunteers to provide their name in writing to every person they register. There, Colorado required petition circulators to wear identification badges. *Buckley*, 525 U.S. at 197–198. As here, the requirement "limited the number of people willing to work" because of the "harassment" and "retaliation" that some had experienced. *Id.* at 198 (quotation marks omitted). Although the state argued that the badge helped the public identify circulators and helped the state apprehend circulators who committed misconduct, the Supreme Court invalidated the requirement because it compelled identification when the speaker had an interest in anonymity. *Id.* at 199; *see also McIntyre*, 514 U.S. at

---

[26] Further, "the defendants have submitted no evidence" that the law prior to passage "failed in any respect to protect the state's legitimate interests in regulating the conduct of voter-registration organizations." *Browning II*, 863 F. Supp. 2d at 1160.

342–43. And importantly, the Court explained that the state's interest was served by a separate requirement that circulators include their names when delivering completed petitions to the state. *Id*. at 198–99.[27]

The result must be the same here: voluminous testimony showed that League members have faced harassment, and many would refuse to register voters if required to provide their name on a receipt. Trial Tr. vol. 4, 1243:6–1244:5, 1249:2–6 (Scoon); Trial Tr. vol. 4, 1344:4–13, 1369:2–7 (Elliott). The State's purported interest is insufficient, especially because it could be accomplished in other ways. Florida already requires 3PVRO volunteers to include their initials on the back of completed registration forms, *see* PX 174 at 2, Rule 1S-2.042(5)(c), and it could easily enhance that requirement to meet its interests without requiring public identification of volunteers.

Defendants' paltry evidence at trial only confirms this result. The testimony seemed designed to show that a receipt with a volunteer's name would help voters and investigators identify individuals who

---

[27] The *Buckley* Court also invalidated a requirement that the names of paid petition circulators be publicly disclosed, explaining that "[t]he added benefit of revealing the names" of the speakers in question was "hardly apparent and has not been demonstrated." *Id*. at 203.

engaged in fraudulent voter registration activity. But although the Receipt Provision has been in effect for six months, not a single witness testified that they had seen a completed receipt, *see, e.g.*, Trial Tr. vol. 3, 757:7–12 (Earley), likely because 3PVRO misconduct is in fact quite rare, Trial Tr. vol. 1, 205:14–23 (Herron). And for the single investigation for which the State could allege a receipt may have been helpful—when a person named Cheryl Hall changed many voters' party affiliation to Republican without their consent—the perpetrator was identified and prosecuted before the Receipt Provision was enacted. Trial Tr. vol. 6, 1783:7–12 (Gladson); Trial Tr. vol. 6, 1841:15–20 (Hays).

Indeed, on close examination, it becomes apparent that the Receipt Provision usually will *not* assist the State in identifying individuals who engaged in fraudulent behavior. First, while State Attorney Amira Fox testified that having a receipt would have made the investigation of Hard Knocks "a lot easier," Trial Tr. vol. 6, 1795:9–11 (Fox), she later conceded that the charges against Hard Knocks employees "were charges that they had fraudulently filled out the form and that they had not ever interacted with the voter," *id.* at 1809:1–6 (Fox). Moreover, if a 3PVRO canvasser fills out a form fraudulently and does not interact with a voter, there is

no opportunity to even provide a receipt. *See* Trial Tr. vol. 3, 760:16–761:15 (Earley). And testimony showed that, in fact, the large majority of circumstances in which the State has raised concerns about fraud do not involve any interaction between a canvasser and voter—they involve use of a deceased or fictitious person's name. Trial Tr. vol. 6, 1751:16–1755:9 (VanderGiesen). In the other cases identified, it was the registration applicant themselves who provided false information, meaning that identification of the canvasser would not have aided the investigation. *Id.*

Even in the narrow circumstances where the State could claim that a receipt would be helpful—in which a canvasser and voter actually interacted—the State's interest rests on a faulty foundation: it assumes that a canvasser intending to commit misconduct would willingly provide their real name to the voter who they planned to defraud. The State offered no reason to believe that implausible scenario would occur. *See* Trial. Tr. vol. 3, 761:2–12 (Earley) ("If they are going to forge the voter's information, they could forge the receipt."); Trial Tr. vol. 6, 1762:4–8 (VanderGiesen).

Even if the State could show that requiring volunteers to disclose their name to voters served its interest in streamlining investigations, it

could make no showing that the provision is at all tailored to meet that goal. As in *Buckley*, 525 U.S. at 198–99, the State could—and does—require 3PVROs to include its volunteers' initials on completed voter registration applications. PX 174 at 2, Rule 1S-2.042(5)(c). That requirement is already sufficient to identify the individual volunteer responsible for an application, *see* Trial Tr. vol. 3, 760:12–15 (Earley); it could also be modified to ensure that the State has the volunteer's full name rather than initials, if that information is demonstrably more helpful to addressing the voter's complaint.

Further, evidence showed that having an individual volunteer's name on a receipt would often be unhelpful, because the person who collects and submits the application usually immediately gives that application to a 3PVRO supervisor, and thus is likely not responsible for any problems that occur. Trial Tr. vol. 4, 1206:11–1207:9 (Scoon); *see also id.* at 1248:4–19 (Scoon) (explaining why it would be "more helpful for a voter to have the name or contact information just of the 3PVRO that

helps them"). A receipt with the name and contact information of the 3PVRO itself would be much better tailored to the State's goals.[28]

### b.   The Receipt Provision fails the *Anderson-Burdick* test

As explained above, the Receipt Provision should not be analyzed under the *Anderson-Burdick* test: the League has challenged the provision because it limits volunteers' right to free speech and association, not the mechanics of the voting process. *See Hargett*, 400 F. Supp. 3d at 725. But regardless, the Receipt Provision cannot survive any version of the *Anderson-Burdick* test.

Under *Anderson-Burdick*, because the Receipt Provision imposes a severe burden on the League's rights to free speech and association,[29] it "must be narrowly drawn to serve a compelling state interest."

---

[28] The Receipt Provision already requires listing the name of the 3PVRO on the receipt, such that a voter could easily identify the organization responsible for their application. Fla. Stat. § 97.0575(4).

[29] If *Anderson-Burdick* were the appropriate test to apply, the group whose burden should be assessed is the League (and its members), not the voters—they are the plaintiffs and those whose First Amendment rights are most affected. *See Cobb,* 447 F. Supp. 2d at 1332–33 (applying "character and magnitude" test from *Anderson* to League plaintiffs); *see also VoteAmerica v. Schwab,* 671 F. Supp. 3d 1230, 1251 (D. Kan. 2023) (applying *Anderson-Burdick* and assessing burden to nonprofit plaintiff group that sent mail ballot applications).

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). That severe burden was well-established at trial. Ms. Scoon testified that the Receipt Provision would create a "very significant" burden on the League and "on the League's ability to register voters." Trial Tr. vol. 4, 1249:2–19 (Scoon); *see also id.* at 1243:6–1244:5 (Scoon); *see also* Trial Tr. vol. 4, 1344:4–16, 1369:2–7, 1369:12–15 (Elliott).

League members have experienced harassment, and more than half of those asked said they would not continue to volunteer if required to provide their name in writing to every voter they assist. Trial Tr. vol. 4, 1243:6–1244:5 (Scoon); Trial Tr. vol. 4, 1367:1–1369:15 (Elliott). Leon County Supervisor Mark Earley testified that instances of harassment have made election workers reluctant to continue their work, Trial Tr. vol. 3, 758:13–20 (Earley); that same concern is reasonable among volunteers. That concern, along with the retraining required and the significant logistical burdens and costs of providing receipts, led the League to switch to online registration where it has registered far fewer applicants, limiting its opportunities to speak and associate with potential voters. *See* Part II.B.1.c, *supra.*

69

That burden is not outweighed by any state interests. As discussed above, evidence adduced at trial shows that the Receipt Provision would not actually help solve the problems the State identifies, and it is poorly tailored to serve the State's interest. *See* Part III.C.1.a, *supra*.

Even if the Court were to find that the Receipt Provision's burdens are not severe, it fails a more relaxed version of the *Anderson-Burdick* test. In that situation, "relevant and legitimate interests of sufficient weight still must justify that burden," and the Court must consider "the extent to which those interests make it *necessary* to burden" voting rights. *Lee*, 915 F.3d at 1318–19, 1322 (citation omitted; emphasis in original). As in *Lee*, here the State's interest "does not warrant the complained-of burden because Defendants have not demonstrated that" their interests require volunteers to provide their full names in writing on a receipt to voters. *Id.* at 1322. Instead, that interest could be served as already described: providing a receipt with the 3PVRO's name and contact information, combined with a requirement that 3PVRO volunteer names are recorded or included on completed applications.

Likewise, "evidence in this case does not demonstrate a significant problem with voter registration applications stemming from third party

voter registration organizations." *Cobb*, 447 F. Supp. 2d at 1337. Even if the Receipt Provision was well-suited to address the problems the State relies on, the magnitude of those problems is indisputably small, and cannot justify the burden the law creates.[30]

*   *   *

For these reasons, the Receipt Provision should be invalidated in full. Evidence at trial also showed why the law should be struck down as applied to the League in particular: it is an all-volunteer organization whose members are mostly older women who do not typically provide their names to voters they help register. Trial Tr. vol. 4, 1234:2–8, 1256:8–9 (Scoon). That is in part because League members have been threatened and harassed at events, including by "a man with a camera [who] approached [League] volunteers and was complaining about the fact that [they] were helping women get the right to vote." Trial Tr. vol. 4, 1351:3–1353:8 (Elliott); *see also* Trial Tr. vol. 4, 1235:5–1236:10 (Scoon). Evidence shows that a large percentage of the League's members

---

[30] In *Lee*, the Court emphasized that the state law affected only about 4,000 ballots of nine million cast. *Lee*, 915 F.3d at 1322. Here, the State has shown much less than that, even assuming that each voter affected by misconduct from Cheryl Hall and Hard Knocks should be counted in that analysis.

would refuse to continue with paper registration if required to provide their name on a receipt. Trial Tr. vol. 4, 1243:6–1244:5 (Scoon); Trial Tr. vol. 4, 1367:1–1369:15 (Elliott); *see also, e.g., Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 367 (2010) (noting that, if a disclosure provision is facially upheld, "as-applied challenges would be available if a group could show a reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals") (quotation marks omitted).

## 2.  *The Retention Provision*

### a.  The Retention Provision fails strict or exacting scrutiny

The State cannot show that the Retention Provision, properly interpreted, is narrowly tailored to serve a compelling state interest.

The only evidence that the State put forth to support the Retention Provision was from Lake County Supervisor of Elections Alan Hays, who testified that prohibiting 3PVROs from "retaining someone's driver's license information, Florida ID number, social security number, last four and a copy of the signature" was important to prevent identity theft. Trial

Tr. vol. 6, 1824:10–23 (Hays).[31] Yet no evidence supports the ban on retaining other "personal information," such as a voter's phone number, home address, or email address. Indeed, the State has never sought to justify banning retention of that information, instead relying on its argument that the ban does not cover voters' contact information. But this Court already once concluded that the term "personal information" is vague and may include information beyond that which is "non-public." *Fla. NAACP*, 680 F. Supp. 3d. at 1318–19; *see also* Part III.D.1.a, *infra*.

Without any evidence of a state interest in preventing 3PVROs from retaining a person's name and contact information, and therefore no way to argue that the ban is narrowly tailored, the Retention Provision must be invalidated.

---

[31] There is no evidence in the record that prior, to enactment of the Retention Provision, 3PVROs retaining voter contact information led to *any* instances of election law violations or identity theft. *See, e.g.*, Trial Tr. vol. 1, 225:24–226:4, 227:9–11 (Herron) (testifying that he found no evidence in OECS report that 3PVROs' retention of voter information for Get Out the Vote purposes led to election law violations or identity theft); Trial Tr. vol. 6, 1831:19–1832:2 (Hays) (indicating that his office has not referred anyone to be charged for identity theft based on 3PVROs' retention of information from registration applications).

### b. The Retention Provision fails the *Anderson-Burdick* test

The Retention Provision would fare no better if any version of the *Anderson-Burdick* test were applied. The law creates a severe burden on the League's and other 3PVROs' speech and association[32]: it is a vague statute that may lead to felony prosecution. The mere threat of such prosecution will lead fewer volunteers to associate with the League and will mean the League registers fewer voters; if a volunteer were actually prosecuted, that effect would be exponentially magnified. Trial Tr. vol. 4, 1255:3–1256:24 (Scoon). Even aside from prosecution, the law significantly hampers 3PVRO activity by limiting recruitment, quality control protocols, get-out-the-vote efforts, and distribution of political material to voters, as well as requiring retraining and other efforts. *See* Part II.C.1; *see also, e.g.*, Trial Tr. vol. 1, 103:7–13; 104:1–15 (Nordlund).

---

[32] *See, e.g.*, Trial Tr. vol. 3, 703:13–14 (Vilar) ("We decided to end our voter registration because of this language"); Trial Tr. vol. 3, 972:13–973:1 (Mayer) ("And I think if the consequences of making a mistake for them can be that they get a felony, many [volunteers] will simply refuse to participate in any voter registration efforts, which would completely annihilate our ability to register voters in the state"); Trial Tr. vol. 4, 1327:13–23 (Babis Keller) ("[T]o receive a felony would be hugely impactful for our staff, so this has really created a chilling effect in staff members that want to be involved with voter registration").

Even if the law's burdens were minimal, the Retention Provision could not survive: Florida has no cognizable interest in banning the collection of voters' contact information, and has not attempted to show why the burden created is necessary. *Lee*, 915 F.3d at 1318–19, 1322.

### 3.   *The 3PVRO Fines Provision*

#### a.   The 3PVRO Fines Provision must be invalidated under strict or exacting scrutiny

The 3PVRO Fines Provision, like the Receipt and Retention Provisions, must be analyzed using strict or exacting scrutiny. As the court held when it reviewed very similar fines in *Cobb*, "[t]he situation before the Court is analogous to that in *Meyer v. Grant*," because the "inevitable effect" of the state law was to "reduce the total quantum of speech on a public issue." 447 F. Supp. 2d at 1332 (quotation marks omitted). And Defendants cannot show that the 3PVRO Fines Provision is narrowly tailored to serve a compelling state interest.

Again, Defendants offered little justification for the 3PVRO Fines Provision at trial. At most, evidence showed that some 3PVROs have submitted some applications beyond the statutory deadline, *e.g.*, Trial Tr. vol. 6, 1917:20–25 (Matthews), but "the evidence in this case does not demonstrate a significant problem with voter registration applications

stemming from third party voter registration organizations," *Cobb*, 447 F. Supp. 2d at 1337; *see also* Trial Tr. vol. 1, 238:11–20 (Herron) (explaining relatively low number of fine letters).

No evidence established that late applications have caused any problems for the State—the percentage of late applications from 3PVROs is quite small, and very few late applications end up preventing a voter from being registered.[33] And of course, shortening that statutory deadline does nothing to remedy the problem of late applications. More broadly, the State utterly failed to show that increased fines would lead to better compliance—increased fines are more likely simply to prevent 3PVROs from operating, which will decrease voter registrations, not increase them. Trial Tr. vol. 3 at 741:23–742:4 (Earley); *see also Cobb*, 447 F. Supp. 2d at 1337 ("Defendants have not demonstrated that the combination of strict liability, heavy fines, and joint and several liability is necessary to ensure that third party organizations do not strip Florida citizens of their right to vote.").

---

[33] Applications submitted beyond the ten- or 14-day deadline under Fla. Stat. § 97.0575(5)(a)(1) do not keep a voter from being registered unless that application is also submitted after book closing. Trial Tr. vol. 3, 739:18–740:1 (Earley). And applications submitted after book closing are penalized by a separate provision. Fla. Stat. § 97.0575(5)(a)(2).

Similarly, Defendants have not attempted to establish that the ten-day deadline or the fines in general—let alone each of the *six* individual increased fines—are tailored to serve the State's interests. If the State needs more time to process applications (which it has not established), Defendants have not shown that the ten-day deadline will help them do that. *See, e.g.*, Trial Tr. vol. 3, 738:9–14 (Earley) (testifying that the previous 14-day deadline was "workable" and did not "jam up" his office's ability to process applications). And even if increased fines were shown to help compliance, the record contains no evidence establishing why such stiff penalties, including a maximum $250,000 fine, is necessary. *See Cobb*, 447 F. Supp. 2d at 1338 ("Defendants have not provided any evidence much less an explanation for the necessity of the amount of the fines . . . on volunteers, their organizations, and their registered agents.").

### b. The 3PVRO Fines Provision fails the *Anderson-Burdick* test

Under *Anderson-Burdick*, the 3PVRO Fines Provision must be narrowly tailored to serve a compelling state interest, because the Provision creates a "devastating" burden on the League's free speech and associational rights. Trial Tr. vol. 4, 1271:2–24 (Scoon). That burden was well-established at trial: a $250,000 fine would "pretty much shut [the

77

League's] business," while a $20,000 fine would very significantly impact its operations. *Id.* at 1267:5–20 (Scoon). Even a $2,500 fine "could be half of a local league's annual budget," *id.* at 1267:21–1268:5 (Scoon); *see also Cobb*, 447 F. Supp. 2d at 1325 ("[T]he resulting $5,000 fine would eliminate the local Tallahassee League's entire yearly income."). The 3PVRO Fines Provisions' steep potential penalties will mean fewer volunteers associating with the League, which will lead to fewer interactions with voters and fewer registrations. Trial Tr. vol. 4, 1266:22–1267:4 (Scoon). Further, the 3PVRO Fines Provision will require the League to retrain its volunteers, increase oversight, make more trips to deliver applications in-person, and even reject some applications—all creating a significant obstacle to its operations. *See* Part II.D.1, *supra*.

As explained just above, Defendants cannot show that these burdens are outweighed by any compelling state interest. *See* Part III.C.3.a, *supra*. But even under a more permissive *Anderson-Burdick* test, the 3PVRO Fines Provision would still fail. No trial evidence establishes a legitimate state interest in the fines or the new ten-day deadline; even if such an interest were shown, Defendants have not established that "those interests make it *necessary* to burden" the

78

League's rights. *Lee*, 915 F.3d at 1322 (emphasis in original). Indeed, Defendants have not attempted to show that "the Law's punitive provisions are necessary to advance" *any* state interest. *Cobb*, 447 F. Supp. 2d at 1337.

### 4.   *The Citizenship Provision*

#### a.   **The Citizenship Provision must be invalidated under strict or exacting scrutiny**

Defendants cannot justify the Citizenship Provision under strict or exacting scrutiny because they put forth no evidence that the Provision serves any state interest. No witness testimony or even any exhibit established that non-U.S. citizens have committed any misconduct relating to voter registration, let alone at higher rates than U.S. citizens. *See* Trial Tr. vol. 3, 844:12–22 (Cox); Trial Tr. vol. 3, 744:24–745:5 (Earley); Trial Tr. vol. 6, 1833:12–1834:22 (Hays); Trial Tr. vol. 6, 1741:7–10, 1748:19–1749:10 (VanderGiesen); *see also* Trial Tr. vol. 1, 220:13–221:6, 221:15–23, 222:13–20 (Herron) (noting absence of incidents involving noncitizens in OECS report and fine letters).[34]   While

---

[34] One State witness testified about an investigation into a noncitizen who "thought that they could vote and did vote," but there was no evidence that any 3PVRO was involved, and that person "genuinely was confused about their status." Trial Tr. vol. 6, 1787:3–8 (Gladson).

Defendants have previously speculated that non-U.S. citizens may be more likely to spontaneously leave Florida in possession of completed 3PVRO applications, *see* ECF No. 101 at 34, they made no effort to prove that claim at trial.[35] Instead, testimony established that non-U.S. citizens are just as reliable and honest as others at serving the function of a 3PVRO canvasser. *See* Trial Tr. vol. 4, 1274:10–14 (Scoon); *see also* Trial Tr. vol. 5, 1548:12–1550:2 (Lichtman) (discussing the "real incentive" noncitizens have "to follow the rules, to not get into trouble, to not break the law.")[36]

Having provided no state interest justifying the Citizenship Provision, Defendants cannot show that the law is narrowly tailored. And even if Defendants conjure some state interest to justify the law after the fact, they will be unable to show narrow tailoring: the law applies to all

---

[35] *See also, e.g.*, Trial Tr. vol. 1, 161:10–17 (Orjuela) (testifying that he has not personally, nor has he ever observed any fellow canvassers leave the state or country with voter registration applications); Trial Tr. vol. 1, 87:24–88:2 (Nordlund) (testifying that he is not aware of a time a noncitizen canvasser left the country with voter registration applications); Trial Tr. vol. 1, 186:13–16 (Sanchez) (testifying that he has never left Florida or the country still in possession of applications).

[36] Indeed, elsewhere Defendants have actually admitted that the Citizenship Provision could not withstand strict scrutiny. *See* Appellants' Initial Brief, *Fla. NAACP v. Byrd*, 23-12308, ECF No. 29 at 32 (11th Cir. Aug. 21, 2023).

noncitizens, regardless of their legal status, criminal background, or ties to any other country. Such a broadly discriminatory ban simply cannot stand. *See Fla. NAACP*, 680 F. Supp. 3d at 1311–1313 (noting that the Citizenship Provision applies to all noncitizens and that Defendants do not attempt to demonstrate how it satisfies strict scrutiny).[37]

### b.  The Citizenship Provision fails any version of the *Anderson-Burdick* test

The Citizenship Provision fails the *Anderson-Burdick* test because it severely burdens the League, as well as other 3PVROs and their canvassers, and is not narrowly drawn to serve a compelling state interest. The Provision burdens the League's rights to free speech and association because it would require the League to ask volunteers about their citizenship status, which violates League values and would cause some members to stop volunteering altogether. *See* Trial Tr. vol. 4, 1272:25–1274:6, 1274:20–1275:4, 1281:20–1282:15 (Scoon); Trial Tr. vol. 4, 1343:13–17, 1359:12–20, 1368:4–9, 1369:8–15 (Elliott). Even if the League asks that question, the law imposes a debilitating $50,000 fine if

---

[37] For the reasons already explained by this Court, the political function exception applicable to Equal Protection claims does not apply here. *See Fla. NAACP*, 680 F. Supp. 3d at 1312.

any noncitizen collects or handles an application for the League, regardless of whether the League has diligently tried to follow the law. And trying to follow the law would require spending time and money to print citizenship declarations and require that every voter registration volunteer sign one. Trial Tr. vol. 4, 1278:17–1280:4 (Scoon). All of this together would mean harming the League's reputation, risking financial calamity, and registering fewer voters. *Id.* at 1281:20–1282:5 (Scoon).

Testimony from other plaintiffs reinforced the severe burden the Citizenship Provision would create. For example, Humberto Orjuela Prieto has not only lost the opportunity to help inform voters about their right to participate in democracy, but also his opportunity to work a well-paying job. *See, e.g.*, Trial Tr. vol. 1, 156:5–9, 164:6–20 (Orjuela). Likewise, Unidos US would terminate all noncitizen employees working on voter registration because "pretty much everybody in our operation touches a form." Trial Tr. vol. 1, 82:9–14, 82:21–83:2 (Nordlund).

Because the State did not present evidence of any interest that the Citizenship Provision serves, it cannot show that the burden is outweighed under any version of the *Anderson-Burdick* test.

In sum, the League proved at trial that all four challenged provisions violate the League's and its members' First Amendment rights to free speech, expressive conduct, and association and, accordingly, must be permanently enjoined.

### D.   Counts 3 and 4: Vagueness and Overbreadth

The League likewise proved at trial that all four challenged provisions are unconstitutionally vague, and that the Retention, Receipt, and Citizenship Provisions are also impermissibly overbroad.

It is "a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Burns*, 999 F.3d at 1349 (internal quotation marks omitted). A statute is vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 946 (11th Cir. 2023) (internal quotation marks and citation omitted). All four provisions suffer both sins.

The First Amendment context further amplifies these concerns because—as here—"an unconstitutionally vague law can chill expressive

conduct by causing citizens to steer far wider of the unlawful zone to avoid the law's unclear boundaries." *Dream Defenders*, 57 F.4th at 890 (internal quotation marks and citation omitted); *see also, e.g.*, Trial Tr. vol. 4, 1288:21–1289:5 (Scoon) (on the League's "very, very painful" decision to suspend paper voter registration: "when we weigh the cost-benefit analysis of trying to use the paper voter registration application with these kinds of gray areas where you're not sure and there's a $50,00 fine and, in some instances, there's a third-degree felony, it's overwhelming"); *id.* at 1224:15–1225:23 (Scoon) ("all it would take would be one of our members to be challenged . . . [a]nd that would really unravel our power[,] so we felt that we had no choice"); Trial Tr. vol. 3, 700:1–3 (Vilar). Consequently, though "perfect clarity and precise guidance" are not required, "government may regulate in the area of First Amendment freedoms only with narrow specificity." *Wollschlaeger*, 848 F.3d at 1320 (internal quotation marks and citation omitted).

Moreover, "[a] regulation that covers substantially more speech than the First Amendment allows is overbroad and thus invalid." *Speech First*, 32 F.4th at 1125. "[T]he overbreadth doctrine loosens the rules typically governing facial attacks on the constitutionality of a statute,"

because "the threat of enforcement of an overbroad law may deter or chill constitutionally protected speech." *League of Women Voters of Fla. v. Lee*, 595 F. Supp. 3d 1042, 1137 (N.D. Fla. 2022), *aff'd in part, vacated in part, rev'd in part sub nom. Fla. Sec'y of State*, 66 F.4th 905. Accordingly, a court must ask whether the challenged law prohibits a substantial amount of activity protected by the First Amendment relative to the amount of unprotected activity it prohibits. *See id.*; *see also Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003).

The first step of the inquiry with respect to both vagueness and overbreadth is to look at the statute itself. When interpreting a state statute, the Court must "consider any limiting construction that a state court or enforcement agency has proffered." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.5 (1982). But the Court is prohibited from "adopt[ing] a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330 (1988). A state statute does not pass constitutional muster if it would require the Court "to rewrite the statute to conform it to constitutional requirements." *Lee*, 595 F. Supp. 3d at

1131. The Court "cannot twist itself into a pretzel to save an otherwise invalid statute." *Id.* at 1137 (citation omitted).

1.   ***The challenged provisions are unconstitutionally vague***

In analyzing whether a provision is unconstitutionally vague, the Court must determine not how the statute actually applies, but rather how a person of ordinary intelligence would read it. *Id.* at 1133. "Thus, the canons of construction, while still relevant, take on less significance." *Id.* The Court must likewise determine whether the statute provides "any standard by which [the law's enforcers] can judge whether an individual" has engaged in prohibited conduct. *City of Chicago v. Morales*, 527 U.S. 41, 66 (1999).

LWVFL has proven that the challenged provisions provide no such standard. The League has likewise shown that the First Amendment applies to its voter registration activities, *see* Part III.A, *supra*, such that its vagueness challenge is entitled to "more lenient review." *League of Women Voters of Fla., Inc. v. Lee*, 576 F. Supp. 3d 1004, 1015 (N.D. Fla. 2021) (citing *Vill. of Hoffman Estates*, 455 U.S. at 494).

### a.   The Retention Provision

The Retention Provision is impermissibly vague because it fails to adequately define what "personal information" may not be retained, by whom, and under what circumstances.

The Retention Provision makes it a felony to retain *any* "personal information" about a voter—specifying only a nonexhaustive list of examples—"for any reason other than to provide such application or information to the [3PVRO] in compliance with this section." Fla. Stat. § 97.0575(7); *see also* Trial Tr. vol. 3, 839:11–14 (Cox) (agreeing that provision provides nonexclusive list of personal information).

But the Retention Provision does not define "personal information" beyond the limited examples enumerated. Trial Tr. vol. 3, 751:17–23 (Earley) (agreeing that "such as" language denotes a nonexclusive list and "makes the provision a little bit vague"); Trial Tr. vol. 3, 843:15–844:11 (Cox) (agreeing that specificity of criminal statutes is "important," but that Retention Provision does not define "personal information" beyond nonexclusive list of examples). It is thus unclear what else the term encompasses, Trial Tr. vol. 5, 1472:18–24, 1574:21–1575:5 (Lichtman), including for example, whether an applicant's phone

number, email address, or home address is "personal information," Trial Tr. vol. 4, 1251:1–15 (Scoon); Trial Tr. vol. 3, 752:5–14 (Earley); Trial Tr. vol. 1, 101:4–22 (Nordlund); Trial Tr. vol. 3, 701:6–702:19 (Vilar); Trial Tr. vol. 3, 971:10–22 (Mayer); Trial Tr. vol. 4, 1326:9–19 (Babis Keller).

The Retention Provision likewise does not how a 3PVRO may retain applicants' personal information "in compliance with this section." Trial Tr. vol. 3, 750:21–751:1 (Earley) ("the wording there is a little convoluted"); Trial Tr. vol. 1, 101:23–102:15 (Nordlund); Trial Tr. vol. 3, 702:20–703:7 (Vilar); Trial Tr. vol. 3, 971:23–972:4 (Mayer); Trial Tr. vol. 4, 1326:20–24 (Babis Keller). Accordingly, it is unclear whether 3PVROs may retain personal information about applicants for quality control measures or as documentation in the event the organization is accused of misfeasance. Trial Tr. vol. 1, 102:16–22 (Nordlund); Trial Tr. vol. 3, 972:9–12 (Mayer).

The Retention Provision also does not specify whether a 3PVRO may retain any personal information with an applicant's express permission, including basic contact information important for 3PVROs to follow up and remind applicants to vote. Trial Tr. vol. 4, 1326:25–1327:9 (Babis Keller) ("There's nothing saying . . . with the voter's consent").

Finally, the Retention Provision does not identify clearly to whom it applies. Based on the law's language, it could apply only to the individual employee or volunteer collecting a voter registration application, or also to everyone in the chain of command and chain of custody within a 3PVRO. Trial Tr. vol. 4, 1258:4–14 (Scoon); Trial Tr. vol. 1, 102:23–103:1 (Nordlund); Trial Tr. vol. 3, 972:5–8 (Mayer); *see also Fla. NAACP*, 680 F. Supp. 3d. at 1316.

The Secretary of State's rulemaking does little to remedy the Retention Provision's vague terms. Rule 1S-2.042 does not address whether 3PVROs may retain applicants' information with the applicant's consent. *See generally* PX 174. Nor does it clarify adequately the circumstances under which 3PVROs may retain applicants' personal information "in compliance" with the section.[38] *Id.* Finally, though Rule

---

[38] Rule 1S-2.042(5)(f) provides that "a person collecting a voter registration application on behalf of a 3PVRO . . . shall be deemed to be 'in compliance with this section'" if the person (1) turns the completed application in to the 3PVRO and (2) does not retain the application or any information therein. PX 174 at 2. But this interpretation of "in compliance with this section," is not "reasonable and readily apparent" on the face of the Retention Provision, which prohibits "cop[ying] a voter's application or retain[ing] a voter's personal information . . . for any reason other than to provide such application or information to the [3PVRO] in compliance with this section," Fla. Stat. § 97.0575(7); *see also Boos*, 485 U.S. at 330.

1S-2.042(3)(h) defines "voter's personal information" to mean "a voter's private information that is not generally available to the public," *id.* at 1, Rule 1S-2.042(3)(h), it provides no instruction on what qualifies as private information not generally available to the public, save the same nonexhaustive list of examples found in the Retention Provision itself, *see* Trial Tr. vol. 3, 839:23–840:10 (Cox). Thus, the rule's definition of "personal information" does nothing to clarify its meaning.

In sum, the Retention Provision's vague terms leave the League and other 3PVROs without a reasonable understanding of the State's requirements and could allow the State to prosecute members for retaining an applicant's telephone number or email address, even with the applicant's consent.

### b.   The Receipt Provision

The Receipt Provision is impermissibly vague, both on its face and especially when considered together with the Retention Provision.

The Receipt Provision requires the League to provide a detailed written receipt to every applicant. The receipt must include the name of the 3PVRO volunteer who collected the application, as well as the applicant's name, political party affiliation, and county of residence. Fla.

Stat. § 97.0575(4); *see also* Trial Tr. vol. 3, 757:13–16 (Earley) (acknowledging that receipt includes certain personal information about the applicant).

Though the obvious way to track compliance with this provision would be to keep a copy of each receipt, this could lead to felony prosecution for violating the Retention Provision's ban on retaining applicants' "personal information." As Ms. Scoon testified, tracking compliance with the Receipt Provision is a "very big concern" for the League: "If it were authorized, we would try to make a copy [of the receipt], but we don't know whether that's authorized. . . . We feel that is prohibited . . . And [the Retention Provision] states that it's a felony." Trial Tr. vol. 4, 1229:15–1230:16 (Scoon). The law's vagueness about which personal information may be retained means that both the Receipt and Retention Provisions must be invalidated on vagueness grounds.

In addition, voters often refuse to take a piece of paper offered to them, *see* Trial Tr. vol. 4, 1356:9–12 (Elliott), but the Receipt Provision provides no instruction to 3PVROs about what to do if a voter declines to take the receipt now mandated by law, *see id.* at 1356:16–1357:1 (Elliott)

("We would sincerely try to give it to them, because, otherwise, what are we supposed to do with it?").

Finally, and fatally, the Receipt Provision is vague because, unlike all the other challenged provisions, it is not even clear what the penalty *is* for a 3PVRO failing to provide a receipt to voters. *Compare* Fla. Stat. § 97.0575(4) *with id.* § 97.0575(1)(f), (5), (7). The provision specifies no fine or other civil or criminal sanction attached to violations. Accordingly, the Receipt Provision denies the League and other 3PVROs a clear understanding of the ramifications of potential receipt-related violations and encourages arbitrary and discriminatory enforcement of the Provision. *Fla. Sec'y of State*, 66 F.4th at 946.

Here too, the State's rulemaking does not solve the problem. It includes no guidance on what the penalty is for a receipt-related violation by a 3PVRO, or what a 3PVRO should do if a voter refuses to accept the receipt. *See* Trial Tr. vol. 4, 1357:2–5 (Elliott); *see also generally* PX 174. Moreover, although Rule 1S-2.042(3)(h) defines "[v]oter's personal information" to exclude information contained on the State's uniform

92

receipt form, PX 174 at 1[39]—the State's construction excluding only the applicant's name, party affiliation, and county of residence from the definition of "personal information" is in no way "reasonable and readily apparent" on the face of either the Retention or Receipt Provisions and, thus, should not be accepted by the Court, *see Boos*, 485 U.S. at 330.[40]

In sum, the League has proven that the Receipt Provision is vague in several key ways and should therefore be permanently enjoined.

### c.    The 3PVRO Fines Provision

The 3PVRO Fines Provision is vague because it does not clearly identify the total penalties that may be imposed on 3PVROs or the conduct that is prohibited.

---

[39] Of note, the uniform receipt itself appears to contravene the Receipt Provision's statutory requirements: whereas the provision requires including "the name of the third-party voter registration organization," Fla. Stat. § 97.0575(4), the uniform receipt requires only the "3PVRO ID #," PX 778.

[40] The Receipt Provision further requires providing the name of the 3PVRO "registration agent," Fla. Stat. § 97.0575(4), but fails to define that term, leaving 3PVROs like the League unsure who among its volunteers qualifies as a registration agent, *see* Trial Tr. vol. 4, 1345:20–1346:1 (Elliott). While Rule 1S-2.042(3)(g) defines "registration agent" as any individual "who collects voter registration applications . . . on behalf of the 3PVRO," PX 174 at 1, this definition depends on a clear definition of "collecting," which, as explained *infra* at n.42, is itself vague.

The 3PVRO Fines Provision imposes fines per application per each day late for applications submitted more than ten days after completion or after book closing, and fines for each application submitted to the wrong county.[41] Fla. Stat. § 97.0575(5)(a)(1)–(3). The Provision imposes additional penalties for each type of violation "if the third-party voter registration organization or any person, entity, or agency acting on its behalf acted willfully." *Id.*

But the 3PVRO Fines Provision does not define "willful" conduct. Trial Tr. vol. 4, 1269:3–8 (Scoon). It is thus unclear, for example, whether the League could be found to have acted willfully in turning an application in late when it had to wait to meet a voter to correct an error on their application, or to the wrong county when the applicant themselves wrote down the wrong county. *Id.* at 1269:9–21 (Scoon); Trial Tr. vol. 4, 1361:22–1362:17 (Elliott); *see also* Trial Tr. vol. 3, 871:18–872:10, 873:25–875:7 (Eskamani) (describing general lack of clarity over what to do when 3PVRO discovers but cannot remedy a mistake on a

---

[41] The 3PVRO Fines Provision does not indicate whether fines per application submitted to the wrong county will be assessed daily and, if so, the maximum fine per application. *Compare* Fla. Stat. § 97.0575(5)(a)(3) *with id.* § 97.0575(5)(a)(1), (2).

completed voter registration application); Trial Tr. vol. 4, 1363:4–1364:7, 1364:22–1365:5 (Elliott) (same).

The 3PVRO Fines Provision likewise does not clearly indicate whether fines for willfulness are in addition to or in place of the other prescribed penalties per application, or whether fines for willfulness are assessed per day. Trial Tr. vol. 4, 1268:6–1269:2 (Scoon). Finally, the 3PVRO Fines Provision does not specify how much a 3PVRO like the League could be fined for one application containing multiple errors—if, for example, an application was submitted after the ten-day deadline and to the wrong county or after the ten-day deadline and after book closing.

No state guidance even attempts to clarify any of these ambiguities. Accordingly, there is no real dispute: the 3PVRO Fines Provision fails to provide reasonable notice of what conduct it prohibits and allows for disparate enforcement with respect to both "willful" violations and the treatment of applications with multiple errors.

### d.   The Citizenship Provision

Finally, ample evidence was introduced at trial that the Citizenship Provision is vague because it does not define what it means to "collect[] or handl[e] voter registration applications." Fla. Stat. § 97.0575(1)(f); *see,*

95

*e.g.*, Trial Tr. vol. 4, 1288:5–10, 1295:2–5 (Scoon); Trial Tr. vol. 1, 90:23–25 (Nordlund); Trial Tr. vol. 2, 544:2–4 (Wassmer).

The law does not specify whether "collecting or handling" means simply managing an application with the hands or, more broadly, to have responsibility for supervising or directing. Consequently, it is unclear whether an individual is "collecting or handling" an application when they assist with quality control for voter registration applications, oversee other volunteers directly assisting voters to register, help transport collected voter registration applications, receive and distribute blank voter registration applications, or even just move a stack of completed registration applications from one desk to another. Trial Tr. vol. 4, 1288:11–1289:5 (Scoon); Trial Tr. vol. 1, 91:1–92:14 (Nordlund); Trial Tr. vol. 2, 397:25–398:11, 398:24–399:14, 409:10–410:9 (Herrera-Lucha); Trial Tr. vol. 2, 537:16–538:17, 544:21–545:20 (Wassmer); Trial Tr. vol. 3, 699:12–700:21 (Vilar).[42] As the Citizenship Provision makes no

_____

[42] Notably, the challenged provisions do not distinguish between (1) people "collecting or handling" applications, who are subject to the Citizenship Provision; (2) "registration agent[s]," who are subject to the Receipt Provision, Fla. Stat. § 97.0575(4); and (3) people simply "collecting" applications, who are subject to the Retention Provision, Fla. Stat. § 97.0575(7). Rule 1S-2.042 does nothing to clarify, as it circularly

allowance for accidental or inadvertent incidents involving noncitizens "collecting or handling" registration applications, 3PVROs are concerned they may even be fined if, for example, a citizen volunteer drops completed registration applications and a noncitizen helps to pick them up. Trial. Tr. vol. 2, 589:11–23 (Velez Burgos).

The State's attempt to define "collecting or handling" through rulemaking does not remedy the Citizenship Provision's vagueness, as the rule does not actually clarify the Provision's vague terms. Rule 1S-2.042(3)(c) defines "collecting or handling" to mean "physically exercising custody over voter registration applications containing a voter's personal information." PX 174 at 1, Rule 1S-2.042(3)(c). But this definition leads 3PVROs down "the same rabbit hole" in trying to understand what constitutes "physically exercising custody." Trial Tr. vol. 2, 605:6–24 (Velez Burgos). The rule, for example, does not clarify who is "physically exercising custody" when a noncitizen drives a citizen volunteer who put completed applications in the trunk, when a noncitizen helps to pick up completed applications dropped by a citizen volunteer, when volunteers

---

defines "registration agent" as any individual who "collects" applications, without defining "collecting" separate and apart from "collecting or handling." *See* PX 174 at 1, Rule 1S-2.042(3)(c), (g).

in a group setting put completed applications into envelopes to send to the State, or when completed registration forms are left on a desk assigned to a noncitizen or in an office with no one present. Trial Tr. vol. 2, 605:25–607:7 (Velez Burgos); Trial Tr. vol. 3, 746:25–749:2, 749:25–750:14 (Earley). Consequently, the rule does not truly clarify the meaning of "collecting or handling."[43]

LWVFL has thus shown that the Citizenship Provision fails to identify what volunteer activity by whom is prohibited, leaving 3PVROs with insufficient guidance and allowing for arbitrary enforcement.

### 2. *The Retention, Receipt, and Citizenship Provisions are unconstitutionally overbroad*

The first step in overbreadth analysis is to determine what the statute prohibits. *United States v. Williams*, 553 U.S. 285, 293 (2008). Where, as here, the statute is not subject to a limiting construction,[44] the

---

[43] Rule 1S-2.042(3)(c) actually excludes from the definition of "collecting or handling," *inter alia*, "assisting a voter who requests assistance to fill out their voter registration application." PX 174 at 1. This introduces a confusing but major exception to the rule against a noncitizen "physically exercising custody" over applications, thereby deepening rather than alleviating the Citizenship Provision's vagueness.

[44] As explained throughout Parts III.D.1 and 2, Rule 1S-2.042 does not save any of the challenged provisions. Defendants' proposed constructions, where they even address overbreadth or vagueness

next question is whether the statute "criminalizes a substantial amount of protected expressive activity." *Id.* at 297. "In making that determination, a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Vill. of Hoffman Estates*, 455 U.S. at 495 n.6. If the statute is overbroad, the Court must determine whether it can sever the problematic provision from the rest of the statute. *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982).

### a.   The Retention Provision

The Retention Provision is overbroad because it prohibits *all* retention of applicants' "personal information," except for unspecified "compliance" purposes. *See* Fla. Stat. § 97.0575(7); *see also* Part III.D.1.a, *supra* (explaining vagueness of the provision's key terms). The Retention Provision thus prevents the League and other 3PVROs from retaining even an applicant's basic contact information—even with the applicant's express consent. *See, e.g.*, Trial Tr. vol. 4, 1326:25–1327:9 (Babis Keller).

---

problems, are neither reasonable nor readily apparent from the face of the statute. *See, e.g.*, *Fla. NAACP*, 680 F. Supp. 3d. at 1316–1318; *cf.* Trial Tr. vol. 3, 745:23–25 (Earley) (where a statute and administrative rule conflict, he follows the statute).

Numerous witnesses attested that 3PVROs, including the League, collect such basic contact information to follow up with applicants: to ensure they received their voter registration card, to remind and encourage them to vote, to engage with them on particular issues of interest, and to provide more information about becoming a 3PVRO member or volunteer. Trial Tr. vol. 4, 1251:24–1253:22 (Scoon); Trial Tr. vol. 1, 97:6–20 (Nordlund); Trial Tr. vol. 4, 1161:16–1163:3, 1182:13–23 (Slater); Trial Tr. vol. 4, 1328:3–15 (Babis Keller).[45] In this way, 3PVROs like the League use voters' basic contact information to further essential organizational goals: encouraging and assisting as many eligible Floridians to vote as possible, and deepening associations with individual voters, who may even become members. *See, e.g.*, Trial Tr. vol. 4, 1198:10–18, 1252:21–24 (Scoon); Trial Tr. vol. 5, 1562:12–22 (Lichtman); *Fla. NAACP*, 680 F. Supp. 3d. at 1308 n.12 ("the *targeted* voter outreach made possible by retaining a voter's contact information is central to their purpose of increasing civic engagement") (emphasis in original).

---

[45] 3PVROs also retain certain information about applicants for quality control purposes and as documentation should the organization be accused of any misconduct. *See, e.g.*, Trial Tr. vol. 1, 97:21–24, 102:19–22, 103:7–13 (Nordlund).

The Retention Provision prevents all of this, "crack[ing] down" on the "vital civic function" 3PVROs play "by limiting the retention of [applicants' contact] information." Trial Tr. vol. 5, 1471:25–1472:17 (Lichtman); *see also, e.g.*, Trial Tr. vol. 4, 1254:9–19 (Scoon) (agreeing the Retention Provision would "interfere with the League's goal of getting as many people to vote as possible"); Trial Tr. vol. 1, 104:1–15 (Nordlund) ("we wouldn't be able to have . . . an actual relationship with that voter throughout the year and then make sure that they . . . [are given] a plan to go vote").[46]

The State has not even attempted to remedy the Retention Provision's overbreadth through rulemaking. Rule 1S-2.042 does not address whether 3PVROs may retain applicants' contact information with express consent. *See generally* PX 174. The rule does not exclude applicants' contact information from the definition of "personal information," despite specifying other exceptions. *See id.* at 1, Rule 1S-2.042(3)(h); PX 778. And the rule does not specify whether an applicant's

---

[46] The League also expects that the threat of felony prosecution for retaining any applicant's "personal information," even with consent, will "severely" affect members' willingness to register voters, in turn reducing the number of voters the League can assist. Trial Tr. vol. 4, 1254:20–1255:21 (Scoon) ("No League member wants to be accused of a felony.").

phone number, email address, or home address qualify as "information . . . not generally available to the public" and which a 3PVRO therefore cannot retain. *Id.* at 1, Rule 1S-2.042(3)(h); *see also* Part III.D.1.a, *supra.*[47]

The Retention Provision's overbreadth is especially unnecessary given the availability of less restrictive alternatives that would protect the privacy of applicants' sensitive information[48] without precluding a 3PVRO from retaining applicants' contact information. As Dr. Lichtman explained, "there's a simple solution . . . : [s]pecify exactly what information you can't retain and limit it to information that could be used for identity theft, but leav[e] it open for information that the 3PVROs could use for follow-ups, like names and addresses." Trial. Tr. vol. 5, 1575:1–5 (Lichtman). Allowing 3PVROs to retain certain contact

---

[47] The rule merely reiterates that a 3PVRO "may not retain an applicant's voter registration application (or the voter's personal information contained therein)" and may not "use such application (or the voter's personal information contained therein) for any purpose other than promptly delivering such application." PX 174 at 2, Rule 1S-2.042(5)(g).

[48] As explained *supra* at n.31, there is no evidence in the record that, prior to enactment of the Retention Provision, 3PVROs retaining voter contact information led to *any* instances of election law violations or identity theft.

information with the express permission of the applicant could similarly lessen the burden created by the Retention Provision.

In sum, the League has proven that the Retention Provision is overbroad because it prohibits the retention of *any* "personal information" about a voter, even with the voter's express permission. This severely and unnecessarily burdens 3PVROs like the League in their fundamental speech and association, when the State had available but failed to adopt obviously less discriminatory alternatives.

### b.    The Receipt Provision

The Receipt Provision likewise is overbroad. Even if there were a justifiable state interest in requiring 3PVRO volunteers to provide every applicant a receipt, that interest does not justify requiring *all* volunteers to disclose their name in writing to every voter they assist. *See* Part III.C.1, *supra*.

The Receipt Provision puts 3PVRO volunteers at risk of harassment and intimidation, phishing attempts, and even criminal prosecution—which will deter some from volunteering at all. Trial Tr. vol. 4, 1234:2–1236:13, 1237:5–15, 1239:16–1241:3 (Scoon); Trial Tr. vol. 4, 1349:24–1351:5, 1352:14–1353:17, 1354:25–1356:5 (Elliott); *cf.* Trial

Tr. vol. 3, 758:13–20 (Earley). As Dr. Elliott explained, "with this law, we are being required to give that receipt to the voter, and it has our name on it that they can use however they see fit." Trial Tr. vol. 4, 1353:14–17 (Elliott). The Receipt Provision thus "decrease[s] the willingness of volunteers," hindering the League's ability "to build our team and continue to get more volunteers and members" and, in turn, to help register as many eligible Floridians as possible. Trial Tr. vol. 4, 1243:6–1244:5 (Scoon); *see also* Trial Tr. vol. 4, 1344:4–16, 1369:2–7, 1369:12–15 (Elliott).

The Receipt Provision's unnecessary overbreadth is obvious given that it is possible to determine the 3PVRO and volunteer responsible for a given application, *without* requiring every volunteer to provide their name in writing to every voter they assist. Indeed, the Receipt Provision itself requires listing the name of the 3PVRO on the receipt, such that a voter could easily identify the organization responsible for their application. Fla. Stat. § 97.0575(4); *see also* Trial Tr. vol. 4, 1248:4–19 (Scoon) (explaining why it would be "more helpful for the voter to have the name or contact information just of the 3PVRO that helps them"). Likewise, 3PVRO volunteers are required to include their initials—plus

104

the 3PVRO's identification number—on the front of every registration application they assist a voter in completing. *See* PX 174 at 2, Rule 1S-2.042(5)(c); Trial Tr. vol. 3, 760:8–11 (Earley). This means that between election officials and a 3PVRO, there is already a record of which individual volunteer collected each voter registration application. Trial Tr. vol. 3, 760:12–15 (Earley). And of course, the State could tailor that requirement still further to serve its purpose, such as by requiring that the 3PVRO volunteer include their full name on completed applications. The Receipt Provision's requirement to disclose volunteers' names on receipts is thus gratuitous.[49]

In sum, by requiring *all* 3PVRO volunteers to provide their full name in writing to every applicant they assist—when such information is not necessary to determine the 3PVRO and volunteer responsible for an application or to detect fraud—the Receipt Provision plainly "covers

---

[49] As explained in Part III.C.1.a, *supra*, the Receipt Provision will usually be unhelpful in investigating fraud, and the State provided no evidence that a receipt has ever been used for that purpose. *See* Trial Tr. vol. 3, 804:21–24 (Earley). As Supervisor Earley acknowledged, for example, any canvasser planning to commit fraud could write a fake name on the receipt. *Id.* at 760:16–761:15 (Earley).

substantially more speech than the First Amendment allows." *Speech First*, 32 F.4th at 1125.

### c.   The Citizenship Provision

Ample evidence was introduced at trial that the Citizenship Provision is overbroad because it reaches far beyond any reasonable scope of the State's interest in ensuring competent and honest performance of voter registration assistance.

The Citizenship Provision prevents *all* noncitizens from "collecting or handling" voter registration applications, even if they are supervised by other experienced voter registration agents. Fla. Stat. § 97.0575(1)(f). This is a major "substantive deviation" from past practice both in Florida and nationally, Trial Tr. vol. 5, 1531:9–17, 1531:23–1533:2 (Lichtman), with devastating consequences for 3PVROs' ability to recruit members and volunteers and, in turn, register as many eligible Floridians as possible, *see, e.g.*, Trial Tr. vol. 4, 1343:13–17, 1368:4–9, 1369:8–15 (Elliott); Trial Tr. vol. 2, 587:6–14 (Velez Burgos) ("it would from one day to the other obliterate our workforce[, w]e would lose about 70 percent of our canvassers"); Trial Tr. vol. 2, 410:20–411:2 (Herrera-Lucha). The vagueness of the Citizenship Provision's key term, "collecting or

handling"—explained in Part III.D.1.d, *supra*—exacerbates still further concerns about the law's reach.

What is clear is that the Citizenship Provision forbids even legal residents from taking part in voter registration activities even when they have never done anything warranting a restriction of their First Amendment rights.[50] *See* Trial Tr. vol. 5, 1458:7–1459:10, 1546:16–25 (Lichtman). Given the paucity of registration-related malfeasance by noncitizens, "there is no justification for sweeping in 1.6 million noncitizens who are authorized to work when the evidence shows they are likely to be very reliable" and, indeed, "essential employees" uniquely capable of reaching certain communities of voters. *Id.* at 1548:23–1550:2 (Lichtman). The "pretty obvious" alternative "would be only to exclude noncitizens who are not legally authorized to work." *Id.* at 1572:23–1573:16 (Lichtman).

The Citizenship Provision's overbreadth is further evinced by the Provision's strict liability standard, which imposes a $50,000 fine for each violation. *See Dream Defenders*, 57 F.4th at 892 (determining law's mens

---

[50] As explained in Part III.C.4.a, *supra*, there is no evidence of legal permanent residents—or any noncitizen 3PVRO volunteers—engaging in unlawful activity related to voter registration.

rea requirement is necessary part of overbreadth analysis). As one witness explained, such hefty fines imposed on a strict liability basis are an "existential threat" to 3PVROs: "we just can't expose ourselves to that type of liability." Trial Tr. vol. 2, 604:13–605:5 (Velez Burgos).

The State has not remedied the Citizenship Provision's overbreadth through rulemaking. Rule 1S-2.042 does not exclude legal residents or other noncitizens authorized to work from the prohibition. Nor does it clarify the meaning of "collecting or handling" *See generally* PX 174; *see also* Part III.D.1.d, *supra*. And while Rule 1S-2.042(6)(e) does provide that a 3PVRO may avoid the $50,000 fine by requiring every volunteer collecting or handling applications to attest to their citizenship under penalty of perjury, *see* PX 174 at 3, that exception is not "reasonable and readily apparent" on the face of the statute and should not be accepted as a legitimate narrowing construction, *Boos*, 485 U.S. at 330.

The League has thus shown that the Citizenship Provision is overbroad in subjecting 3PVROs to a $50,000 strict liability fine if *any* noncitizen participates in *any* activity involving "collecting or handling" registration applications.

## IV.   Conclusion

In sum, trial evidence established that all four of the challenged

provisions should be permanently enjoined.


Dated: April 22, 2024          Respectfully submitted,


                               /s/ Brent Ferguson

Chad W. Dunn                   Brent Ferguson (D.C. Bar No. 1782289)*
Florida Bar No. 0119137        Molly E. Danahy (D.C. Bar No. 1643411)*
1200 Brickell Avenue,          Alexandra Copper (Cal. Bar No. 335528)*
Suite 1950                     Ellen Boettcher (D.C. Bar No. 90005525)*
Miami, FL 33131                Michael Ortega (IL Bar No. 6339469)*
Telephone: (305) 783-2190      1101 14th Street NW, Ste. 400
Facsimile: (305) 783-2268      Washington, DC 20005
chad@brazilanddunn.com         (202) 736-2200
                               bferguson@campaignlegal.org
                               mdanahy@campaignlegal.org
                               acopper@campaignlegal.org
                               eboettcher@campaignlegal.org
                               mortega@campaignlegal.org

                               *Counsel for Consolidated Plaintiffs League
                               of Women Voters of Florida, Inc. and League
                               of Women Voters of Florida Education Fund*

                               * Admitted *Pro Hac Vice*

## **CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

/s/ Brent Ferguson
Brent Ferguson

## **CERTIFICATE OF SERVICE**

I certify that on April 22, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

/s/ Brent Ferguson
Brent Ferguson