## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE
OF BRANCHES AND YOUTH
UNITS OF THE NAACP; VOTERS
OF TOMORROW ACTION, INC.;
DISABILITY RIGHTS FLORIDA;
ALIANZA FOR PROGRESS;
ALIANZA CENTER; UNIDOSUS;
FLORIDA ALLIANCE FOR
RETIRED AMERICANS;
SANTIAGO MAYER
ARTASANCHEZ; ESPERANZA
SÁNCHEZ; and HUMBERTO
ORJUELA PRIETO,

     *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Secretary of State of Florida;
ASHLEY MOODY, in her official
capacity as Florida Attorney General;
KIM BARTON, in her official capacity
as Supervisor of Elections for Alachua
County; CHRISTOPHER MILTON, in
his official capacity as Supervisor of
Elections for Baker County; MARK
ANDERSEN, in his official capacity as
Supervisor of Elections for Bay
County; AMANDA SEYFANG, in her
official capacity as Supervisor of
Elections for Bradford County; TIM
BOBANIC, in his official capacity as
Supervisor of Elections for Brevard

Case No. 4:23-cv-00215-MW/MAF

County; JOE SCOTT, in his official
capacity as Supervisor of Elections for
Broward County; SHARON
CHASON, in her official capacity as
Supervisor of Elections for Calhoun
County; LEAH VALENTI, in her
official capacity as Supervisor of
Elections for Charlotte County;
MAUREEN "MO" BAIRD, in her
official capacity as Supervisor of
Elections for Citrus County; CHRIS H.
CHAMBLESS, in his official capacity
as Supervisor of Elections for Clay
County; MELISSA BLAZIER, in her
official capacity as Supervisor of
Elections for Collier County; TOMI
STINSON BROWN, in her official
capacity as Supervisor of Elections for
Columbia County; MARK F.
NEGLEY, in his official capacity as
Supervisor of Elections for DeSoto
County; STARLET CANNON, in her
official capacity as Supervisor of
Elections for Dixie County; JERRY
HOLLAND, in his official capacity as
Supervisor of Elections for Duval
County; ROBERT BENDER, in his
official capacity as Supervisor of
Elections for Escambia County; KAITI
LENHART, in her official capacity as
Supervisor of Elections for Flagler
County; HEATHER RILEY, in her
official capacity as Supervisor of
Elections for Franklin County;
SHIRLEY G. KNIGHT, in her official
capacity as Supervisor of Elections for
Gadsden County; CONNIE

SANCHEZ, in her official capacity as Supervisor of Elections for Gilchrist County; ALETRIS FARNAM, in her official capacity as Supervisor of Elections for Glades County; JOHN HANLON, in his official capacity as Supervisor of Elections for Gulf County; LAURA HUTTO, in her official capacity as Supervisor of Elections for Hamilton County; DIANE SMITH, in her official capacity as Supervisor of Elections for Hardee County; SHERRY TAYLOR, in her official capacity as Supervisor of Elections for Hendry County; SHIRLEY ANDERSON, in her official capacity as Supervisor of Elections for Hernando County; KAREN HEALY, in her official capacity as Supervisor of Elections for Highlands County; CRAIG LATIMER, in his official capacity as Supervisor of Elections for Hillsborough County; H. RUSSELL WILLIAMS, in his official capacity as Supervisor of Elections for Holmes County; LESLIE ROSSWAY SWAN, in her official capacity as Supervisor of Elections for Indian River County; CAROL A. DUNAWAY, in her official capacity as Supervisor of Elections for Jackson County; MICHELLE MILLIGAN, in her official capacity as Supervisor of Elections for Jefferson County; TRAVIS HART, in his official capacity as Supervisor of Elections for Lafayette County; ALAN HAYS, in

his official capacity as Supervisor of
Elections for Lake County; TOMMY
DOYLE, in his official capacity as
Supervisor of Elections for Lee
County; MARK S. EARLEY, in his
official capacity as Supervisor of
Elections for Leon County; TAMMY
JONES, in her official capacity as
Supervisor of Elections for Levy
County; GRANT CONYERS, in his
official capacity as Supervisor of
Elections for Liberty County; HEATH
DRIGGERS, in his official capacity as
Supervisor of Elections for Madison
County; MICHAEL BENNETT, in his
official capacity as Supervisor of
Elections for Manatee County;
WESLEY WILCOX, in his official
capacity as Supervisor of Elections for
Marion County; VICKI DAVIS, in her
official capacity as Supervisor of
Elections for Martin County;
CHRISTINA WHITE, in her official
capacity as Supervisor of Elections for
Miami-Dade County; JOYCE
GRIFFIN, in her official capacity as
Supervisor of Elections for Monroe
County; JANET H. ADKINS, in her
official capacity as Supervisor of
Elections for Nassau County; PAUL A.
LUX, in his official capacity as
Supervisor of Elections for Okaloosa
County; MELISSA ARNOLD, in her
official capacity as Supervisor of
Elections for Okeechobee County;
BILL COWLES, in his official
capacity as Supervisor of Elections for

Orange County; MARY JANE
ARRINGTON, in her official capacity
as Supervisor of Elections for Osceola
County; WENDY SARTORY LINK,
in her official capacity as Supervisor of
Elections for Palm Beach County;
BRIAN E. CORLEY, in his official
capacity as Supervisor of Elections for
Pasco County; JULIE MARCUS, in
her official capacity as Supervisor of
Elections for Pinellas County; LORI
EDWARDS, in her official capacity as
Supervisor of Elections for Polk
County; CHARLES OVERTURF, in
his official capacity as Supervisor of
Elections for Putnam County; TAPPIE
A. VILLANE, in her official capacity
as Supervisor of Elections for Santa
Rosa County; RON TURNER, in his
official capacity as Supervisor of
Elections for Sarasota County; CHRIS
ANDERSON, in his official capacity
as Supervisor of Elections for Seminole
County; VICKY OAKES, in her
official capacity as Supervisor of
Elections for St. Johns County;
GERTRUDE WALKER, in her official
capacity as Supervisor of Elections for
St. Lucie County; WILLIAM KEEN,
in his official capacity as Supervisor of
Elections for Sumter County;
JENNIFER MUSGROVE KINSEY, in
her official capacity as Supervisor of
Elections for Suwannee County;
DANA SOUTHERLAND, in her
official capacity as Supervisor of
Elections for Taylor County;

DEBORAH K. OSBORNE, in her
official capacity as Supervisor of
Elections for Union County; LISA
LEWIS, in her official capacity as
Supervisor of Elections for Volusia
County; JOSEPH MORGAN, in his
official capacity as Supervisor of
Elections for Wakulla County; RYAN
MESSER, in his official capacity as
Supervisor of Elections for Walton
County; CAROL F. RUDD, in her
official capacity as Supervisor of
Elections for Washington County,

*Defendants*.

## FOURTH AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF[1]

Plaintiffs Florida State Conference of Branches and Youth Units of the
NAACP, Voters of Tomorrow Action, Inc., Disability Rights Florida, Alianza for
Progress, Alianza Center, UnidosUS, Florida Alliance for Retired Americans,
Santiago Mayer Artasanchez ("Santiago Mayer"), Esperanza Sánchez, and
Humberto Orjuela Prieto file this Complaint for Declaratory and Injunctive Relief
against Defendants Cord Byrd, in his official capacity as Florida Secretary of State,

---

[1] NAACP Plaintiffs' Fourth Amended Complaint is being filed pursuant to this
Court's granting of their unopposed ore tenus motion to amend the pleadings to
conform to the record. Trial Tr. at 2030:10-11. This Fourth Amended Complaint
includes Count VIII, comprising paragraphs 183 through 191 and its associated
request for relief, as the only alteration from the earlier Third Amended Complaint.

- 6 -

Ashley Moody, in her official capacity as Florida Attorney General, and Florida's 67 supervisors of elections, each in their official capacities as supervisors for their respective counties. Plaintiffs allege as follows:

### NATURE OF THE CASE

1.      Since 2018, third-party voter registration organizations ("3PVROs") have helped register roughly a quarter of a million voters in Florida.[2] These organizations are crucial to ensuring that every eligible voter in Florida has access to the electoral process. This case arises from Florida's efforts to disrupt and discourage these organizations from continuing their important work, and to disenfranchise the voters they assist.

2.      On May 24, 2023, Florida enacted Senate Bill 7050 ("SB 7050"), an omnibus election bill that imposes harsh new restrictions and penalties on 3PVROs engaging in voter registration and voter engagement activities and makes it harder for eligible Floridians—and in particular voters of color and voters with disabilities—to participate in the State's elections.

3.      SB 7050 largely targets 3PVROs in an attempt to chill their voter registration activities by imposing new and significant fines for late-returned voter

---

[2] Fla. Dep't of State, Division of Elections, *Voter Registration – Method and Location*, https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/voter-registration-method-and-location/ (last visited April 26, 2023).

registration applications, prohibiting noncitizen canvassers from handling voter registration applications, and criminalizing routine voter information retention. In so doing, the bill threatens to severely curtail—and in some cases shut down altogether—these organizations' ability to engage in core protected speech through voter registration activities.

4.      There is no question which Floridians will be most affected by these efforts. 3PVROs serve communities that have been historically excluded from the franchise—in particular Black and Latinx populations. Indeed, people of color are five times more likely than white Floridians to register with the assistance of a 3PVRO. As Senator Thompson emphatically expressed on the Senate floor, "what the bill really is about" is voter suppression, aimed at ensuring that "only certain people vote[]."

5.      The burdens imposed on Floridians from marginalized communities are not limited to the bill's 3PVRO restrictions. SB 7050 also harms voters with disabilities and non-English or limited-English speakers by cutting off their ability to seek assistance from individuals and organizations beyond their immediate families when requesting mail ballots.

6.      Plaintiffs are 3PVROs, other organizations whose missions include expanding access to the franchise to Black, brown, young, and disabled voters, and individual noncitizens who will no longer be lawfully permitted to engage in voter

registration activity as a result of SB 7050. SB 7050 imposes significant burdens on Plaintiffs' First Amendment rights and the voting rights of the marginalized populations they serve. SB 7050 serves no legitimate—let alone compelling—state interest that would justify these limitations on Plaintiffs' fundamental freedom to engage voters in the political process.

7.     This Court should declare the challenged provisions of SB 7050 unlawful and enjoin the Secretary of State, the Attorney General, and the Supervisors from enforcing them in future elections.

## JURISDICTION AND VENUE

8.     Plaintiffs bring this action under 42 U.S.C. §§ 1981, 1983, and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

9.     Plaintiffs also bring a claim under the Voting Rights Act, 52 U.S.C. § 10508.

10.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and the laws of the United States.

11.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants are residents of Florida and numerous Defendants reside in this judicial district. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to Plaintiffs' claims occurred and will occur in this judicial district.

13.     This Court has the authority to provide declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65, as well as 28 U.S.C. §§ 2201 and 2202.

## PARTIES

14.     Plaintiff Florida State Conference of Branches and Youth Units of the NAACP ("Florida NAACP") is a nonprofit, nonpartisan civil rights organization in Florida. Founded in 1909, Florida NAACP is the oldest civil rights organization in Florida and serves as the umbrella organization for local branch units throughout the State. Florida NAACP is headquartered in Fort Lauderdale, Florida, and its 12,000 members are predominantly Black and other minority individuals who reside in all 67 of Florida's counties. Its mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination.

15.     Florida NAACP is a registered 3PVRO. For decades, it has engaged in statewide voter registration, public education, and advocacy to encourage civic and electoral participation among its members and other voters. For example, Florida

NAACP holds registration events in coordination with local partners such as the Divine-Nine Pan-Hellenic Council, the Links, Masonic Lodges, and others. Florida NAACP also works with churches and other faith-based organizations to register voters within the communities it serves. When Florida NAACP and its members and canvassers register voters, they communicate a pro-voting message about the importance of political participation.

16.    To carry out its 3PVRO registration efforts, Florida NAACP relies, in part, on noncitizen canvassers and volunteers to register voters in their communities.

17.    Florida NAACP engages in other voting related advocacy as well, such as facilitating trainings to help its members understand election related bills, amendments, and other issues affecting the voting process. Florida NAACP also holds get-out-the vote ("GOTV") events, such as "souls to the polls," where Florida NAACP offers transportation from local churches to polling places. Outside of the electoral sphere, Florida NAACP also engages in advocacy work involving health care, criminal justice, the school-to-prison pipeline, education, environmental justice, climate change, and the economy.

18.    SB 7050's new and increased fines and criminal penalties threaten substantial economic harm to Florida NAACP—both from the penalties themselves and because it will compel Florida NAACP to divert limited resources to attempt to

avoid those penalties—and will affect the magnitude and impact of Florida NAACP's voter registration efforts.

19.     Additionally, SB 7050's new restrictions on the citizenship status of 3PVRO canvassers will force Florida NAACP to expend its limited resources verifying and investigating canvassers' backgrounds and will decrease the number of canvassers available to the organization, limiting its impact. Every bit of money, time, and effort spent in one aspect of its mission necessarily detracts from the amount of resources that Florida NAACP can direct to others.

20.     And by prohibiting Florida NAACP from retaining any information from voters whom they register to vote, SB 7050 limits Florida NAACP's ability to associate with these voters through further conversations aimed at encouraging the voters it registers to participate in the political process.

21.     In addition to the direct harms to Florida NAACP as an organization, SB 7050 threatens to deny its members the opportunity to vote.

22.     SB 7050's chilling effect on 3PVROs will result in fewer avenues and resources for Florida NAACP members to register to vote.

23.     Additionally, under SB 7050, registered members may no longer rely on Florida NAACP, other community organizations, friends, caretakers, or non-immediate family members to help them apply for vote-by-mail ballots.

24.     Plaintiff Voters of Tomorrow Action, Inc. ("VOT") is a national, youth-led organization that focuses on building youth political power through advocacy, organizing on high school and college campuses, online organizing, and maintaining a nationwide network of young organizers and activists. A crucial part of its mission is educating, engaging, and representing young voters to make sure that they are taking an active part in democracy. VOT has a state board in Florida, which consists of members who are currently attending college in Florida and who benefit from, share in, and help guide the organization's priorities and activities. VOT also has high school members who conduct voter registration and voter advocacy within their respective schools and communities.

25.     VOT's members work with 3PVROs in Florida to encourage young voters to register through voter registration drives, rallies, voter education campaigns, and other activities. Moreover, VOT's GOTV activities include texting and calling young voters and providing free buses and rideshares to the polls. VOT also organizes protests and lobbies against contraception bans, book bans, and other issues that are important to members and constituent supporters.

26.     Prior to SB 7050's enactment, VOT intended to register as a 3PVRO in Florida ahead of the 2024 general election. SB 7050's new and increased fines and criminal penalties for violating SB 7050's 3PVRO regulations, however, have forced VOT to reassess its ability to do so. Some of VOT's members are noncitizens who

would be barred from handling voter registration forms under SB 7050's citizenship requirement. VOT also relies upon a network of volunteer canvassers to assist with its organizing and engagement efforts, but canvassers are likely to reconsider their involvement with VOT if they are subject to increased scrutiny about their citizenship status or subject to criminal penalties if they retain voter information. This will reduce the scale and impact of VOT's GOTV efforts and will unduly burden VOT's speech and associational rights.

27.    Plaintiff Disability Rights Florida, Inc. ("DRF") is an independent nonprofit corporation organized under the laws of the State of Florida, with a primary office in Tallahassee, Florida. DRF is a Protection and Advocacy system ("P&A"), as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15041 et seq., the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10801 et seq., and the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e et seq. In this capacity, DRF is authorized to pursue legal, administrative, and other appropriate remedies to ensure the protection of and advocacy for the rights of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i).

28.    DRF's mission is to ensure the safety, wellbeing, and success of people with disabilities. A significant part of DRF's work is to ensure that people with

disabilities have equal access to the political process and to bring to light, and address through reform, the barriers imposed against voters with disabilities, including inaccessible polling sites and ballots, limited assistance with voting, and limited or non-existent supervised facility voting options for people with disabilities residing in residential facilities. DRF engages in legislative and public advocacy on these issues, and directly engages with and trains election officials and voters on expanding voting accessibility.

29.    DRF is a registered 3PVRO. But DRF may have to reduce or cancel altogether its voter registration work based on the threat of significant fines and penalties imposed by SB 7050.

30.    DRF was also a member of a statewide accessible vote-by-mail task force devoted to proposing and evaluating recommendations to the State regarding its commitment, via settlement agreement, to provide accessible vote-by-mail in every county. SB 7050's restriction on who may assist voters in requesting vote-by-mail ballots runs counter to DRF's work on this taskforce and its overall mission. Before enactment of SB 7050, DRF actively engaged with its constituent voters to assist them in requesting and submitting vote-by-mail ballots. SB 7050 not only forecloses its ability to engage in this activity and thereby communicate its pro-voting message, it will also force DRF to divert its limited resources toward ensuring

that its constituents are informed of and able to navigate the new restrictions on receiving assistance requesting vote-by-mail ballots.

31.    DRF retains voter information for people it helps register to vote for future GOTV efforts and voter advocacy. SB 7050's provision banning voter information retention limits DRF's ability to associate with these voters and communicate a pro-voting message about the importance of participating in the electoral process.

32.    Plaintiff Alianza for Progress is a nonpartisan political organization dedicated to uniting the Puerto Rican and Hispanic population in the State of Florida and developing leaders from within those communities that will support progressive policies. Alianza for Progress organizes within its communities through voter education, civic engagement, and issue advocacy. Alianza for Progress relies on its members' donations and grants, which are limited resources, to effectuate its mission. Alianza for Progress's members reside throughout Florida.

33.    Plaintiff Alianza Center is a community-centered 501(c)(3) organization with a mission to register, educate, and increase political engagement and leadership within the Puerto Rican and Hispanic communities in Florida. In support of its mission, Alianza Center engages in extensive voter registration, voter education, and voter engagement work.

34.     Alianza for Progress and Alianza Center (together, "Alianza Plaintiffs") are registered 3PVROs in Florida. In support of their mission, Alianza Plaintiffs organize and participate in voter registration drives, engage in community outreach to educate their constituents about the voting process and the importance of exercising the right to vote, and run digital organizing and communications campaigns directed at Florida's Puerto Rican and Latinx communities, who are at an increased risk of disenfranchisement because of language barriers, recent migration, economic disadvantage, and other structural barriers to effective political speech and association.

35.     SB 7050's new provisions restricting and penalizing 3PVROs directly harm Alianza Plaintiffs' organizational goals and missions. The threat of significant fines for late applications and noncitizen canvassers makes acting as a 3PVRO cost prohibitive, as hundreds of thousands of dollars in fines would effectively defund these organizations. To the extent Alianza Plaintiffs are able to continue voter registration activities, SB 7050's restrictions limiting who may manage and collect voter registration applications and requiring 3PVROs to affirm their canvassers' citizenship status will force Alianza Plaintiffs to divert their limited resources away from voter education and outreach efforts toward more stringent means of verifying and investigating canvassers' backgrounds, limiting their impact.

36.     In addition, Alianza Plaintiffs will have to expend resources to find and train staff to replace their extremely robust and professional group of canvassers who are no longer able to assist solely because of their citizenship status. Many of Alianza Plaintiffs' canvassers are legal resident noncitizens dedicated to advancing voting rights in Florida's Latinx communities. Without the help of these individuals, Alianza Plaintiffs would be unable to continue their operations at full capacity and their voter registration work would be severely diminished.

37.     Alianza Plaintiffs maintain contact information for people they help register to vote, not only to ensure that their members and canvassers are providing excellent and effective assistance, but also for future GOTV efforts and voter advocacy. SB 7050's provision banning voter information retention limits Alianza Plaintiffs' ability to associate with these voters and communicate a pro-voting message about the importance of participating in the electoral process.

38.     In addition to the direct harms to these organizations, Alianza Plaintiffs' members and canvassers are also harmed by SB 7050 because they include legal noncitizen residents who can no longer engage in voter registration efforts.

39.     Additionally, Alianza Plaintiffs' members and constituents may no longer rely on the support of these organizations, community members, and volunteers to assist them in applying for vote-by-mail ballots—help which is often critical due to language barriers and a lack of immediate family in the State.

40.     Plaintiff UnidosUS is a nonprofit, nonpartisan organization, and one of the largest Latino civil rights and advocacy organizations in the country. UnidosUS has offices in Florida and 18 member-affiliate organizations based or working in the State. UnidosUS's mission is to champion and elevate the Latino community through economic, political, and social empowerment.

41.     UnidosUS is a registered 3PVRO in Florida that engages in extensive voter registration efforts, public education, and advocacy to encourage political participation among the communities it serves. UnidosUS conducts voter registration by community canvassing, placement of digital ads, mailers, and direct engagement with voters. And UnidosUS provides support and technical assistance to affiliated non-profit members it works with on voter registration. When UnidosUS and its canvassers and affiliate members register voters, they communicate a pro-voting message about the importance of participating in the electoral process. UnidosUS was responsible for approximately 406,005 voter registrations in Florida since 2008, including approximately 34,000 during the 2022 elections. Of these 406,005 voter registrations, 370,781 were from community canvassing.

42.     SB 7050's new restrictions on the citizenship status of 3PVRO canvassers will force UnidosUS to expend its limited resources verifying and investigating canvassers' backgrounds and will significantly decrease the number of skilled canvassers available to the organization, limiting its impact. At least 80% of

UnidosUS's canvassers are legal noncitizen residents. UnidosUS would have to rebuild its entire voter registration program if it is unable to rely on these canvassers.

43.    The new and increased fines and criminal penalties for violations of SB 7050's 3PVRO regulations also threaten substantial economic harm to UnidosUS and will deter the organization from engaging in voter registration. What's more, the prohibition against retaining voter information limits UnidosUS's ability to associate with these voters through further conversations aimed at encouraging the voters it registers to participate in the political process.

44.    In addition to the direct harms to UnidosUS as an organization, SB 7050 threatens to deny its citizen constituents the opportunity to vote. SB 7050's chilling effect on 3PVROs will result in fewer avenues and resources for UnidosUS's citizen constituents to register to vote.

45.    Additionally, under SB 7050, Latino community members—many of whom are non-English or limited-English speakers—may no longer rely on UnidosUS, other community organizations, friends, caretakers, or non-immediate family members to help them apply for vote-by-mail ballots. And prohibiting noncitizens from handling voter registration directly harms UnidosUS's noncitizen canvassers who can no longer work on behalf of UnidosUS and engage in voter registration.

46.     Plaintiff Florida Alliance for Retired Americans ("Florida Alliance") is a 501(c)(4) nonprofit, social welfare organization. It has 180,000 members throughout Florida's 67 counties, including retirees from public and private sector unions and community organizations, and is a chartered state affiliate of the Alliance for Retired Americans. Florida Alliance's mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work.

47.     SB 7050 limits who may assist a voter in requesting a vote-by-mail ballot, which directly harms Florida Alliance's members, many of whom are living with disabilities or do not speak or read English and who, as a result of SB 7050's new limitations on who may assist voters in requesting mail ballots, can no longer utilize the assistance of friends, neighbors, and caregivers in requesting their vote-by-mail ballots.

48.     Plaintiff Santiago Mayer is the Executive Director of VOT. He founded VOT in 2019 when he was 18 years old. Mr. Mayer is a legal permanent resident but not a citizen of the United States. He has previously engaged in voter registration efforts in Florida and, prior to SB 7050, intended to return to Florida this year to help register voters. He also interacts with data related to Florida voters that is collected by partner 3PVROs in Florida. Because of SB 7050, Mr. Mayer may not participate in any Florida voter registration this year and may not handle any Florida voter registration data.

49. Plaintiff Esperanza Sánchez  is an organizer at UnidosUS. She recently became a citizen of the United States. She makes $24 per hour as an organizer for UnidosUS. Ms. Sánchez has distributed and collected voter registration applications on behalf of UnidosUS. She takes pride in her work and relies on the income that she makes through it.

50. Plaintiff Humberto Orjuela Prieto (together with Mr. Mayer and Ms. Sánchez "Individual Plaintiffs") has worked as a captain at UnidosUS. He is a legal permanent resident but not a citizen of the United States. He was paid by UnidosUS for his work distributing and collecting voter registration applications on behalf of UnidosUS during the 2022 election cycle.  But for the threat of the enforcement of the challenged provisions Mr. Prieto would engage in voter registration canvassing for UnidosUS in 2024.

51. SB 7050 precludes noncitizens from "collecting" or "handling" voter registration materials in a manner that directly harms Individual Plaintiffs, all of whom have helped register voters on behalf of or in coordination with 3PVROs in the past and, absent SB 7050, would do so in the future. Moreover, Mr. Prieto relies on the income he receives from his work registering voters. As a result of SB 7050, Mr. Prieto will lose his ability to work with a 3PVRO as a canvasser.

52. Enjoining SB 7050's new restrictions on 3PVROs would redress Plaintiffs' injuries because it would allow them to engage in protected speech by

conducting important voter registration work, and to continue to associate with the voters they register, without the threat of significant financial and criminal penalties. And Plaintiffs will be able to reallocate their diverted resources to other projects in service of their missions.

53.    Additionally, enjoining SB 7050's limitation on who may assist voters in requesting vote-by-mail ballots will restore the ability of Plaintiffs' members and constituents to seek help from organizations and individuals outside their immediate families in accessing Florida's vote-by-mail ballot system. And Plaintiffs will be able to reallocate their diverted resources away from aiding voters in requesting vote-by-mail ballots to other projects in service of their missions.

54.    Because of Defendants' direct roles in enforcing SB 7050's provisions challenged in this lawsuit, the injuries to Plaintiffs and their members are directly traceable to Defendants and are redressable by an injunction against them.

55.    Defendant CORD BYRD is sued in his official capacity as the Secretary of State of Florida. Pursuant to Fla. Stat. § 97.012, the Secretary is the chief elections officer of the State and responsible for the administration of state laws affecting voting. The Secretary's duties consist of, among other things, "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws." *Id*. § 97.012(1). The Secretary is also tasked with ensuring that county supervisors of elections perform their statutory duties, *see id.* § 97.012(14); is

responsible for providing technical assistance to supervisors of elections on voter education, election personnel training services, and voting systems, *see id.* § 97.012(4)-(5); and is responsible for "[p]rovid[ing] written direction and opinions to the supervisors of elections on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State." *Id.* § 97.012(16).

56.    The Secretary's duties also include overseeing the Office of Election Crimes and Security, a division within the Department of State, which is tasked with, among other things, assisting the Department in investigating and reporting allegations of election law violations, reporting findings to the Attorney General or state attorneys, and imposing fines on 3PVROs for violations of Florida's Election Code. *Id.* § 97.022; *see also* Florida Dep't of State, *Office of Election Crimes and Security Report* (Jan. 15, 2023) at 5 ("The OECS assessed statutory fines in the amount of $41,600.00 against those 3PVROs that did not comply with the statutory requirements.").[3]

57.    Defendant ASHLEY MOODY is sued in her official capacity as the Attorney General of Florida. The Attorney General's authority includes overseeing the Office of the Florida Statewide Prosecutor, which has the responsibility to "[i]nvestigate and prosecute any crime involving . . . [v]oting in an election in which

---

[3] Available at https://files.floridados.gov/media/706232/dos-oecs-report-2022.pdf.

a candidate for a federal or state office is on the ballot" or "voter registration." Fla. Stat. § 16.56(1)(c). The Attorney General is specifically tasked with enforcing the newly created and amended civil and criminal penalties against 3PVROs provided in SB 7050. *See id.* § 97.0575(8).

58.     Defendants supervisors of elections, who are sued in their official capacities only, are responsible for administering elections in each of Florida's 67 counties. Their responsibilities include, but are not limited to, administering in-person voting and voting by mail, processing voter registration applications, notifying voters of the disposition of their applications, maintaining voter registration information, updating voter rolls, and canvassing and counting vote-by-mail ballots. *See* Fla. Stat. §§ 98.015, 102.012, 102.072. In this capacity, Defendant Supervisors play a direct role in enforcing the Mail-In Ballot Request Restriction described below.

59.     For the 3PVRO Information Retention Ban and the Citizenship Requirement (described below), the Supervisors have no role in any aspect of enforcement.

60.     For the 3PVRO Fines Provision, the Supervisors play an active role in reporting statutory violations as part of their independent duty to process registration applications that the Secretary or Attorney General may later access and use to make enforcement decisions. The Supervisors are charged with reporting violations of Fla.

- 25 -

Stat. § 97.0575 to the Secretary and Attorney General, and may issue warnings to 3PVROs. They are thus charged with enforcing the 3PVRO Fines Provision.

61.     Defendants supervisors of elections are: KIM BARTON, in her official capacity as Supervisor of Elections for Alachua County; CHRISTOPHER MILTON, in his official capacity as Supervisor of Elections for Baker County; MARK ANDERSEN, in his official capacity as Supervisor of Elections for Bay County; AMANDA SEYFANG, in her official capacity as Supervisor of Elections for Bradford County; TIM BOBANIC, in his official capacity as Supervisor of Elections for Brevard County; JOE SCOTT, in his official capacity as Supervisor of Elections for Broward County; SHARON CHASON, in her official capacity as Supervisor of Elections for Calhoun County; LEAH VALENTI, in her official capacity as Supervisor of Elections for Charlotte County; MAUREEN "MO" BAIRD, in her official capacity as Supervisor of Elections for Citrus County; CHRIS H. CHAMBLESS, in his official capacity as Supervisor of Elections for Clay County; MELISSA BLAZIER, in her official capacity as Supervisor of Elections for Collier County; TOMI STINSON BROWN, in her official capacity as Supervisor of Elections for Columbia County; MARK F. NEGLEY, in his official capacity as Supervisor of Elections for DeSoto County; STARLET CANNON, in her official capacity as Supervisor of Elections for Dixie County; JERRY HOLLAND, in his official capacity as Supervisor of Elections for Duval County; ROBERT BENDER,

in his official capacity as Supervisor of Elections for Escambia County; KAITI LENHART, in her official capacity as Supervisor of Elections for Flagler County; HEATHER RILEY, in her official capacity as Supervisor of Elections for Franklin County; SHIRLEY G. KNIGHT, in her official capacity as Supervisor of Elections for Gadsden County; CONNIE SANCHEZ, in her official capacity as Supervisor of Elections for Gilchrist County; ALETRIS FARNAM, in her official capacity as Supervisor of Elections for Glades County; JOHN HANLON, in his official capacity as Supervisor of Elections for Gulf County; LAURA HUTTO, in her official capacity as Supervisor of Elections for Hamilton County; DIANE SMITH, in her official capacity as Supervisor of Elections for Hardee County; SHERRY TAYLOR, in her official capacity as Supervisor of Elections for Hendry County; SHIRLEY ANDERSON, in her official capacity as Supervisor of Elections for Hernando County; KAREN HEALY, in her official capacity as Supervisor of Elections for Highlands County; CRAIG LATIMER, in his official capacity as Supervisor of Elections for Hillsborough County; H. RUSSELL WILLIAMS, in his official capacity as Supervisor of Elections for Holmes County; LESLIE ROSSWAY SWAN, in her official capacity as Supervisor of Elections for Indian River County; CAROL A. DUNAWAY, in her official capacity as Supervisor of Elections for Jackson County; MICHELLE MILLIGAN, in her official capacity as Supervisor of Elections for Jefferson County; TRAVIS HART, in his official capacity as

Supervisor of Elections for Lafayette County; ALAN HAYS, in his official capacity as Supervisor of Elections for Lake County; TOMMY DOYLE, in his official capacity as Supervisor of Elections for Lee County; MARK S. EARLEY, in his official capacity as Supervisor of Elections for Leon County; TAMMY JONES, in her official capacity as Supervisor of Elections for Levy County; GRANT CONYERS, in his official capacity as Supervisor of Elections for Liberty County; HEATH DRIGGERS, in his official capacity as Supervisor of Elections for Madison County; MICHAEL BENNETT, in his official capacity as Supervisor of Elections for Manatee County; WESLEY WILCOX, in his official capacity as Supervisor of Elections for Marion County; VICKI DAVIS, in her official capacity as Supervisor of Elections for Martin County; CHRISTINA WHITE, in her official capacity as Supervisor of Elections for Miami-Dade County; JOYCE GRIFFIN, in her official capacity as Supervisor of Elections for Monroe County; JANET H. ADKINS, in her official capacity as Supervisor of Elections for Nassau County; PAUL A. LUX, in his official capacity as Supervisor of Elections for Okaloosa County; MELISSA ARNOLD, in her official capacity as Supervisor of Elections for Okeechobee County; BILL COWLES, in his official capacity as Supervisor of Elections for Orange County; MARY JANE ARRINGTON, in her official capacity as Supervisor of Elections for Osceola County; WENDY SARTORY LINK, in her official capacity as Supervisor of Elections for Palm Beach County; BRIAN E. CORLEY,

in his official capacity as Supervisor of Elections for Pasco County; JULIE MARCUS, in her official capacity as Supervisor of Elections for Pinellas County; LORI EDWARDS, in her official capacity as Supervisor of Elections for Polk County; CHARLES OVERTURF, in his official capacity as Supervisor of Elections for Putnam County; TAPPIE A. VILLANE, in her official capacity as Supervisor of Elections for Santa Rosa County; RON TURNER, in his official capacity as Supervisor of Elections for Sarasota County; CHRIS ANDERSON, in his official capacity as Supervisor of Elections for Seminole County; VICKY OAKES, in her official capacity as Supervisor of Elections for St. Johns County; GERTRUDE WALKER, in her official capacity as Supervisor of Elections for St. Lucie County; WILLIAM KEEN, in his official capacity as Supervisor of Elections for Sumter County; JENNIFER MUSGROVE KINSEY, in her official capacity as Supervisor of Elections for Suwannee County; DANA SOUTHERLAND, in her official capacity as Supervisor of Elections for Taylor County; DEBORAH K. OSBORNE, in her official capacity as Supervisor of Elections for Union County; LISA LEWIS, in her official capacity as Supervisor of Elections for Volusia County; JOSEPH MORGAN, in his official capacity as Supervisor of Elections for Wakulla County; RYAN MESSER, in his official capacity as Supervisor of Elections for Walton County; CAROL F. RUDD, in her official capacity as Supervisor of Elections for Washington County.

## STATEMENT OF FACTS AND LAW

**I.   The challenged provisions infringe 3PVRO's First Amendment rights and unlawfully harm voters.**

62.   SB 7050 targets 3PVROs to chill their voter registration and GOTV efforts and scale back the political participation of the marginalized voter populations they serve. Each of the challenged 3PVRO restrictions limits 3PVROs' protected speech and associational activities, thereby reducing the number of voters they register and turn out to vote.

63.   Additionally, SB 7050 unlawfully limits who voters may turn to for help requesting their vote-by-mail ballots. In particular, voters with disabilities and non-English or limited-English speakers may only seek help from immediate family members, in violation of their rights under federal law.

### A. 3PVRO Restrictions

64.   The challenged provisions infringe 3PVROs' First Amendment rights to engage in core protected political speech and associational activities. First, SB 7050 unjustifiably prohibits lawful noncitizens from conducting voter registration activities on behalf of 3PVROs. Second, it severely increases fines for late-returned voter registration applications and applications inadvertently submitted to the wrong county. Third, it criminalizes retention of voter information for any purpose other than registration, including GOTV efforts and other voter assistance efforts that afford 3PVROs the freedom to associate with the voters they register in service of

their missions. These restrictions (together, "3PVRO Restrictions") individually and collectively harm Plaintiffs' ability to advance their missions and reduce the number of voters these organizations can register to vote and turn out—voters who are disproportionately Floridians of color.

### 1. Citizenship Requirement

65.    SB 7050 prohibits noncitizens from collecting or handling any voter registration materials. Fla. Stat. § 97.0575(1)(f) ("Citizenship Requirement"). A 3PVRO is liable for a $50,000 fine for each prohibited individual who handles applications on behalf of the 3PVRO. There is no limit on the total amount of fines that may be imposed on a single 3PVRO for violating this provision.

66.    The Citizenship Requirement severely harms organizational Plaintiffs in at least two ways.

67.    First, organizations such as Florida NAACP, Alianza Plaintiffs, UnidosUS, and VOT who do or would deploy canvassers, volunteers, and staff to help register voters have no clear way of verifying that each of their canvassers is a citizen. They must rely on the representations of their volunteers. If their canvassers do not accurately disclose their citizenship, these organizations risk fines that could curtail or even foreclose their ability to engage in voter registration.

68.    The Legislature failed to identify any work-around for 3PVROs acting in good faith. When asked how 3PVROs should ensure compliance with these

provisions, SB 7050's sponsor stated that it "would be at the discretion and choice of the organization," but provided no further guidance.

69.     Second, many organizations rely on noncitizen legal residents to assist with voter outreach, voter registration, and GOTV efforts in their communities. For example, Plaintiff Alianza Center mobilizes and registers Floridians with Latinx heritage and works with many noncitizen legal residents to do so. And UnidosUS estimates that at least 80% of its voter registration canvassers are noncitizen legal permanent residents. By prohibiting noncitizens from registering voters in their own communities, SB 7050 reduces the number of canvassers Plaintiffs and other community organizations can recruit and coordinate with to spread their pro-voting messages. Organizations like Plaintiff Alianza Center and UnidosUS, who rely primarily on noncitizens to help register voters, will be forced to severely curtail their work, and all 3PVROs will have to divert significant resources to attempt to verify the citizenship status of remaining canvassers. All of this will ultimately make it harder for the marginalized communities served by these 3PVROs to register to vote.

70.     Similarly, VOT relies on legal noncitizen residents, both members and volunteer canvassers, to conduct voter outreach and advocacy, including voter registration with partner organizations. The Citizenship Requirement deters VOT from registering as a 3PVRO, and prevents its members and volunteer canvassers

who are noncitizens from working with other 3PVROs to engage young voters in the State.

71.   Florida NAACP also relies on noncitizen canvassers to solicit and collect voter registration applications. For example, Florida NAACP's college chapters include noncitizen student members who work on civic engagement, voter registration, and other GOTV activities. These students are vital to ensuring that young and newly eligible voters register to vote.

72.   The Citizenship Requirement also directly harms Individual Plaintiffs. The Requirement prohibits Individual Plaintiffs from collecting or handling voter registration applications, thereby inhibiting their political speech and associational activity, and preventing them from entering into employment contracts with 3PVROs to conduct voter registration. This work is integral to their lives, their livelihoods, and their organizations' missions, and because of the Citizenship Requirement, they will no longer be able to do it.

73.   Throughout the hearings on SB 7050, no legislator offered any policy rationale for the Citizenship Requirement. Instead, when asked during a committee hearing for a justification for this provision, the bill's sponsor stated only that "regarding non-citizens, there are certain rights in our country that only citizens get to enjoy."

74.     At the Senate Session hearing on SB 7050, proponents of the bill stated only that it was a "policy call" despite repeated efforts by opponents to stress the absurdity of restricting legal noncitizen residents from handling voter registration applications, while allowing those same individuals the ability to work for the state of Florida, including for example, the Department of State, Division of Elections, and Department of Highway Safety. No evidence was presented of any noncitizen mishandling voter registration applications. In fact, no legitimate government interest justifies this prohibition.

## 2.     3PVRO Fines Provision

75.     SB 7050 dramatically increases the penalties for incorrectly and late-returned applications from 3PVROs from one $50 fine to a $50 fine *for each day late*, up to $2,500, for each application received more than 10 (decreased from 14) days after the application was received by the 3PVRO, and $2,500 (up from $250) for each such application if the 3PVRO "acted willfully"; (2) $100 *for each day late*, up to $5,000, for each late returned application received after the voter registration deadline and an additional $5,000 fine (up from $500) per each such application if the 3PVRO "acted willfully"; and (3) a $5,000 fine (up from $1,000) for any application willfully not submitted to the right division or supervisor of elections. Fla. Stat. § 97.0575(5)(a) ("3PVRO Fines Provision").

76. In 2022, Florida increased aggregate fines for late-returned applications from $1,000 to $50,000. *See* SB 524 (2022). SB 7050's 3PVRO Fines Provision increases the aggregate fines for late-returned applications from $50,000 to $250,000.

77. Due to the threat of hundreds of thousands of dollars in fines, 3PVROs—most of whom have highly limited resources—will be deterred from engaging in registration efforts and forced to divert resources to training and compliance, chilling their protected political speech and association activities.

78. Similarly, other Plaintiff organizations will have to change their GOTV efforts and divert resources to avoid the risk of these significant penalties. For example, Plaintiff DRF has historically held events where voters from all over Florida may register to vote. As a result of the increased fines for applications returned to the wrong county, these organizations may be forced to limit events to registering only voters who reside in a single county. Similarly, Plaintiffs will have to divert multiple additional employees and canvassers to ensure no applications are returned late.

79. Proponents of this provision could not explain the policy purposes served by these significant increases in fines or any new developments over the past two years requiring additional increases. While SB 7050's supporters claimed the 3PVRO Fines Provision was "based on data and information that we have, um, in,

in some of the feedback and we're uncovering with some bad actors," they repeatedly referenced only a single organization's failure to comply with existing regulations of 3PVROs. It was not until closing argument on the bill just before the Senate vote that any other evidence of 3PVRO issues was presented; and even then, the number increased from one 3PVRO to two. As Senator Thompson observed in opposing these provisions, the fines imposed on 3PVROs "are designed . . . to put them out of business, make them go away and those are the organizations that have helped increase participation in democracy."

80.    Proponents' purported justifications at the Senate Session hearing similarly fell short. They argued that "some of the bad actors . . . look at these fines as ultimately the cost of doing business" and so the purpose of the increased fines is to let the organizations know that "we [the Legislature] are serious." But 3PVROs are nonprofit organizations with limited resources, there was no evidence that these so-called "bad actors," of which SB 7050's proponents could identify only one or two, would be deterred from wrongdoing by increased fines, and most importantly, proponents failed to respond to concerns about the deterrent effect these fines would have on the majority of 3PVROs who follow the law.

81.    During the House Session, proponents of the bill described the purpose of the 3PVRO Restrictions as "putting a priority on [] voters' information" but failed to explain how increasing fines for late-returned applications achieves that goal.

82.    As shown by the legislative debates on the 3PVRO Fines Provision, no legitimate state interest is served by the arbitrary and exorbitant increase in fines.

### 3.    3PVRO Information Retention Ban

83.    SB 7050 amends Fla. Stat. § 97.0575(7) (the "Information Retention Ban") to prohibit 3PVROs from retaining *any* identifying information of the voters it registers for any purpose other than registration itself. Doing so is a felony of the third degree, punishable by up to 5 years in prison and up to $5,000 in fines.

84.    By prohibiting 3PVROs from retaining this information, SB 7050 eliminates the protected speech 3PVROs would engage in with voters after they are registered to vote and inhibits 3PVROs' ability to associate with those voters. Plaintiffs Florida NAACP, DRF, Alianza Plaintiffs, and UnidosUS, for example, routinely retain voter information from registration forms to engage with the voters they register to, for example, encourage them to vote, provide polling place and other helpful information about upcoming election-related activities, or generally communicate their pro-voting message. And VOT is deterred from becoming a 3PVRO if they are unable to maintain voter information to be able to contact voters close to the election and encourage them to exercise their right to vote—follow-up that is especially important with young voters, who are often first-time voters and more likely to vote with encouragement from their peers.

85.    There is no legitimate basis to prevent 3PVROs from retaining voter information—which is required to be publicly available under the National Voter Registration Act, 52 U.S.C. § 20507(i)(1)—for the purpose of engaging in protected speech with voters by encouraging and enabling them to vote.

### B. Mail-In Ballot Request Assistance Restriction

86.    SB 7050 amends the Florida Election Code to provide that supervisors of elections may accept requests for vote-by-mail ballots "only from a voter or, if directly instructed by the voter, a member of the voter's immediate family or the voter's legal guardian." Fla. Stat. § 101.62(1)(a) ("The Mail-In Ballot Request Restriction"). Previously, Floridians could depend on trusted friends, neighbors, community organizations, and caregivers to request a vote-by-mail ballot.

87.    Immediate family is defined as the voter's spouse, parent, child, grandparent, or sibling, or the parent, child, grandparent, grandchild, or sibling of the voter's spouse. *Id*. § 101.62(1)(d).

88.    Voters who are blind, have a disability, non-English or limited-English speakers, or are unable to read or write are entitled under federal law to choose for themselves who may assist them with the voting process. 52 U.S.C. § 10508.

89.    There are an estimated 2.6 million eligible voters with disabilities in Florida, including many of the Florida Alliance's members and DRF's constituents.

Plaintiff DRF works directly with and on behalf of these individuals to ensure they are able to access the franchise, including Florida's vote-by-mail system.

90.     U.S. Census data estimates that 30% of Florida's households, and nearly 3.9 million adults, speak languages other than English at home. Many of Alianza Plaintiffs and UnidosUS's members, canvassers, and volunteers fall into this category, and Alianza Plaintiffs and UnidosUS have historically engaged with and assist voters who do not speak English, or who speak limited English to request vote-by-mail ballots.

91.     These millions of Floridians may not have immediate family as defined under the provision available to assist. For example, partners who are not spouses, friends, roommates, and caregivers are excluded without justification. And Floridians with disabilities, including many of the Alliance's members and DRF's constituents, reside in nursing homes or assisted living facilities away from immediate family members.

92.     The Mail-In Ballot Assistance Restriction prohibits these voters from seeking lawful assistance from the individual of their choice. Worse yet, the Legislature has articulated no policy goal served by this provision.

93.     In apparent recognition that the Legislature violated federal law in drafting the Mail-In Ballot Assistance Restriction, the Secretary issued a proposed

rulemaking, proposed Rule 1S-2.055, in an attempt to remedy the Restriction's blatant unlawfulness. In relevant part, the rulemaking provides:

- A voter who requires assistance to request a vote-by-mail ballot because of his or her disability or inability to read or write may directly instruct a person of the voter's choice (other than the voter's employer or agent of that employer or officer or agent of the voter's union) to request a vote-by-mail ballot for the voter.

- A supervisor of elections shall accept a request for a vote-by-mail ballot from a person directly instructed by the voter (other than the voter's employer or agent of that employer or officer or agent of the voter's union) who is disabled or unable to read or write. A request may be made in person, in writing, by telephone, or through the supervisor's website.

- For purposes of this rule, the term "disability" includes blindness.

94. By its plain text, the Mail-In Ballot Assistance Restriction does not provide an exception for voters who require assistance to request vote-by-mail ballots based on disability or inability to read or write.

**II.     The challenged provisions were passed in the wake of two of Florida's "most secure" and successful elections with high turnout.**

95.     SB 7050 was passed under the guise of "election integrity." But the Legislature's purported concerns about election integrity have no basis in actual instances of election fraud or security breaches in the State.

96.     Governor Ron DeSantis has referred to the 2022 election as "one of the most secure" elections in Florida's history. And in his 2021 State of the State address, Governor DeSantis said: "[W]e should take a moment to enjoy the fact that Florida ran perhaps the most transparent and efficient election in the nation in 2020."

97.     Florida legislators have similarly commented on the security of Florida's elections. SB 7050's sponsor stated that Florida is already "the gold standard for elections, and we should be proud of that." And the sponsor of SB 7050's companion bill in the House—HB 7005—commented on the impressive security of Florida's elections.

98.     Florida legislators have also observed that Florida's elections have been marked by high voter turnout, emphasizing that Florida had its third-highest turnout in a midterm election in history in 2022. Turnout in the 2020 election was 77 percent—the highest turnout in 28 years in Florida and one of the highest turnout rates in the State's history.

99.     In the wake of elections that have seen robust voter participation without an accompanied increase in election fraud or other election security

concerns, the Legislature's "election integrity" justification for the harsh restrictions imposed by SB 7050 rings hollow.

100.   The process by which SB 7050 was enacted further reflects the Legislature's apparent determination to arrive at a predetermined outcome regardless of countervailing evidence and the well-recognized impact the bill would have on minority Floridians.

101.   SB 7050 was introduced with just a few weeks remaining in the legislative session. To accommodate the late introduction, legislators moved the bill through the Senate and House simultaneously, rather than sequentially, as their typical protocol dictates.

102.   When legislators first posted SB 7050 on March 30, 2023, it was just two sentences. By the time the first full version of the bill was posted, advocates, staff, and legislators had just 24 hours to review 98 new pages of text before the first public hearing on the bill. During committee hearings on SB 7050, legislators and the public lamented the fact that they had not had the opportunity to read and process the bill because only a few hours passed between the time that SB 7050's sponsors posted the bill and the time of the hearing. For example, as Senator Rosalind Osgood explained, she was forced to "read[] in the wee hours of th[e] morning."

103.   The Senate rushed to complete the second and third reading on the same day so that it could quickly be referred to the House. The House voted to waive its

rules in order to read the bill a third time and pass the legislation the same day. The House also limited discussion on the many meritorious amendments to the bill to only two minutes and forty seconds per amendment, which resulted in speakers continually being cut off as they attempted to fit introductions, questions, debate, and closing remarks into a less than three-minute period.

104.   The SB 7050 hearings made clear that these provisions harm Floridians of color and Floridians with disabilities with no legitimate justification. For example, numerous speakers noted that minority communities, including Black and Latinx voters, are significantly more likely to register to vote through a 3PVRO. As one speaker explained, "[t]o be clear . . . eligible Black and Hispanic voters are roughly five times more likely than white voters to rely on community-based voter registration organizations like the ones targeted in this bill."

105.   In fact, just the day before the Legislature enacted SB 7050, the Eleventh Circuit recognized that Floridians of color disproportionately rely on 3PVROS. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 938 (11th Cir. 2023) ("[E]vidence in the record suggested that the registration-delivery provision imposed compliance costs on the third-party organizations. The finding that the registration-delivery provision will have a disparate impact on black voters is not clearly erroneous."). When the Legislature passed SB 7050, they had

ample, recent, and specific notice of the disproportionate impact of 3PVRO regulations on minorities, and nevertheless doubled down on these restrictions.

106.   When asked during the Senate hearing whether there was evidence of noncitizens mishandling voter registration, the Bill's proponent identified precisely zero instances of noncitizens mishandling voter registration applications. Senator Hutson later commented that they wanted to make sure "illegal[s]" were not handling voter registration applications, but SB 7050 does not carve out an exception for legal noncitizens. When pressed for a justification, proponents stated only that it was a "policy call."

107.   Following SB 7050's passage by the Legislature, House Democrats released a statement condemning the bill, noting that "we are moving backwards" and that the Legislature "[doesn't] even wait to see what last year's bill does before we propose the next set of changes." Representative Valdes stated: "[t]his bill targets our young voters, first-time voters, black and Hispanic voters, and organizations that work to get people registered to vote." And Representative Waldron confirmed Plaintiffs' concerns, noting that "changes to third-party voter registration organization laws will have a chilling effect on voter participation."

108.   Senator Davis similarly lamented the bill's passage because "[t]he complete lack of bipartisanship on issues that are this complex and technical means that they never intended to pass this bill in good faith."

## CLAIMS FOR RELIEF

### <u>COUNT I</u>
**Infringement of Free Speech**
**U.S. Const. amends. I & XIV, 42 U.S.C. § 1983**
**(3PVRO Restrictions, Fla. Stat. § 97.0575)**
**Against All Defendants**

109.  Plaintiffs reallege and reincorporate by reference paragraphs 1-108 of this Complaint as though fully set forth herein.

110.  The First Amendment protects against the promulgation of laws "prohibiting the free exercise [of] or abridg[ment] [of] freedom of speech." U.S. Const. amend. I. The First Amendment applies to the states through the Fourteenth Amendment.

111.  Political speech is one of the highest forms of protected speech. *See League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) ("[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'") (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)).

112.  Voter registration activities are "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988); *see also League of Women*

*Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1332–34 (S.D. Fla. 2006) (same); *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 875 (D. Kan. 2021) (collecting cases).

113.   When speakers "'disclose,' 'publish,' or 'disseminate' information, they engage in 'speech.'" *NetChoice v. Att'y Gen., Fla*., 34 F.4th 1196, 1210 (11th Cir. 2022) (quoting *Sorrell v. IMS Health Inc*., 564 U.S. 552, 570 (2011)). Voter registration efforts—including encouraging individuals to register to vote, providing information about how to register to vote, and assisting with registration applications in person and online—are core political speech and a means by which Plaintiffs Florida NAACP, DRF, Alianza Plaintiffs, UnidosUS, and VOT communicate their belief in the power and importance of participating in democratic elections.

114.   SB 7050 regulates core protected political speech and other activity "sufficiently imbued with elements of communication." *Spence v. Washington*, 418 U.S. 405, 409 (1974). The 3PVRO Restrictions—both individually and collectively—restrict and chill speech of 3PVROs such as Plaintiffs Florida NAACP, DRF, Alianza Plaintiffs, UnidosUS, and VOT, and in some cases eliminate their speech via voter registration activities altogether.

115.   SB 7050 also regulates Individual Plaintiffs' core protected political speech, as it prohibits them from participating in the voter registration process in Florida.

116.   "The proper test to be applied to determine the constitutionality of restrictions on 'core political speech' is strict scrutiny." *Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002); *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring) (collecting cases and finding that laws that directly regulate core political speech are subject to strict scrutiny). Such "regulations of core political speech" do not require courts to "determine burden first" because "restrictions on core political speech so plainly impose a 'severe burden.'" *Buckley*, 525 U.S. at 208.

117.   Strict scrutiny requires that Florida's 3PVRO Restrictions be narrowly tailored to a compelling state interest. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010). None of the 3PVRO Restrictions is supported by a legitimate—let alone compelling—state interest sufficient to justify the resulting restrictions on the speech rights of Florida's 3PVROs. And the law is not narrowly tailored to serve any hypothetical interest, as the new regulations dramatically change the status quo.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

    A. Declaring that the 3PVRO Fines Provision violates the First and Fourteenth Amendments to the U.S. Constitution;

    B. Declaring that the Citizenship Requirement violates the First and Fourteenth Amendments of the U.S. Constitution;

    C. Declaring that the Information Retention Ban violates the First and Fourteenth Amendments of the U.S. Constitution;

D. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the challenged provision(s);

E. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

F. Granting such other and further relief as the Court deems just and proper.

<div align="center">

**COUNT II**
**Infringement of Associational Rights**
**U.S. Const. amends. I & XIV, 42 U.S.C. § 1983**
**(3PVRO Restrictions, Fla. Stat. § 97.0575)**
**Against All Defendants**

</div>

118.   Plaintiffs reallege and reincorporate by reference paragraphs 1-108 of this Complaint as though fully set forth herein.

119.   The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); *see also Hadnott v. Amos*, 394 U.S. 358, 364 (1969) ("First Amendment rights '[] include the right to band together for the advancement of political beliefs.'").

120.   When individuals or groups "wish to speak and act collectively with others," it "implicat[es] the First Amendment right of association." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012).

121.   "An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'" *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986)).

122.   This right to associate encompasses "the right to choose how one associates with others." *VoteAmerica*, 576 F. Supp. 3d at 875 (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000) ("As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression.")).

123.   Plaintiffs Florida NAACP, DRF, Alianza Plaintiffs, UnidosUS, VOT, Mr. Mayer, Ms. Sánchez, and Mr. Prieto "wish to speak and act collectively with others" by engaging in efforts to register more voters and garner support for their civic causes. They do so by assisting voters with the completion, collection, and submission of voter registration applications, as well as through GOTV activities following registration. *See Am. Ass'n of People With Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1229 (D.N.M. 2008) ("Organized voter-registration activities necessarily involve political association, both within the voter-registration organizations and with the citizens they seek to register.").

124.   The 3PVRO Restrictions restrict and chill Plaintiffs' associational activities with voters, and in some cases eliminate their association via voter registration altogether. For example, the Citizenship Requirement prohibits 3PVROs from associating with noncitizens to conduct their voter registration work and prohibits the Individual Plaintiffs from associating with 3PVROs to do voter registration work, and the Information Retention Ban effectively prevents continued communication with voters that organizations engage. And the 3PVRO Fines Provision deters, and even prevents, 3PVROs from engaging in voter registration efforts, thereby limiting who they associate with.

125.   Severe associational burdens are subject to strict scrutiny. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005); *see also Boy Scouts of Am.*, 530 U.S. at 648; *Hargett*, 400 F. Supp. 3d at 722 ("[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'") (quoting *Eu*, 489 U.S. at 223).

126.   Strict scrutiny requires that Florida's 3PVRO Restrictions be narrowly tailored to a compelling state interest. *See Citizens United*, 558 U.S. at 340. None of the 3PVRO Restrictions is supported by a legitimate—let alone compelling—state interest sufficient to justify the resulting restrictions on the association rights of

Florida's 3PVROs. And the law is not narrowly tailored to serve any hypothetical interest, as the new regulations dramatically change the status quo.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A. Declaring that the 3PVRO Fines Provision violates the First and Fourteenth Amendments to the U.S. Constitution;

B. Declaring that the Citizenship Requirement violates the First and Fourteenth Amendments of the U.S. Constitution;

C. Declaring that the Information Retention Ban violates the First and Fourteenth Amendments of the U.S. Constitution;

D. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the challenged provision(s);

E. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

F. Granting such other and further relief as the Court deems just and proper.

## COUNT III
### Equal Protection Clause
### U.S. Const. amend. XIV 42 U.S.C. § 1983
### (Citizenship Requirement, Fla. Stat. § 97.0575(1)(f))
### Against Defendants Byrd and Moody

127. Plaintiffs reallege and incorporate by reference paragraphs 1-108 of this Complaint as though set forth fully herein.

128.   The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

129.   SB 7050 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by prohibiting noncitizens, including Individual Plaintiffs and Florida NAACP, Alianza Plaintiffs, UnidosUS, and VOT's members, volunteers, and canvassers, from collecting or handling voter registration applications without any legitimate justification for doing so, thus denying noncitizens equal protection of the law.

130.   "Classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate." *Graham v. Richardson*, 403 U.S. 365, 372 (1971).

131.   A state law that delineates based on a suspect classification—like noncitizens—"bears a heavy burden of justification." *Appl. of Griffiths*, 413 U.S. 717, 721 (1973). Where a state law adopts a suspect classification like this one, "a State must show that its purpose or interest is both constitutionally permissible and

substantial, and that its use of the classification is necessary to the accomplishment of its purpose or the safeguarding of its interest." *Id.* at 721–22 (alterations and footnotes omitted).

132.   "Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society. It is appropriate that a State bear a heavy burden when it deprives them of [] opportunities." *Id.* at 722.

133.   SB 7050's Citizenship Requirement expressly singles out noncitizens and prohibit them from helping to register voters without any justification, apart from the circular reasoning that they are not citizens of the United States and, therefore, are not entitled to all of the privileges of citizens. This is a wholly insufficient reason to deprive them of the opportunity to engage in the political process through helping people register to vote.

134.   That noncitizens are refused certain privileges has nothing to do with their right to associate and engage in protected speech. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (noncitizen U.S. residents receive constitutional protections, including under the First Amendment). Nor does it justify infringing 3PVROs' associational and speech rights. *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (recognizing protected First Amendment right to associate with noncitizen).

135.   Defendants cannot satisfy their heavy burden of explaining why excluding noncitizens from handling voter registration applications is narrowly tailored to further a sufficiently weighty state interest.

136.   SB 7050's Citizenship Requirement separately violates the Fourteenth Amendment to the United States Constitution because it was purposefully enacted, at least in part, with an intent to discriminate against noncitizens.

137.   *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and later case law require considering several factors about the law and its adoption to demonstrate discriminatory intent, including (1) the impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to its passage; (4) departures from the normal procedural sequence; (5) the legislative history, including legislative statements; (6) the foreseeability of the disparate impact; (7) knowledge of intent; and (8) the availability of less discriminatory alternatives. *League of Women Voters of Fla. Inc.*, 66 F.4th at 922.

138.   Those factors are met here. SB 7050's Citizenship Requirement will exclude, without exception, noncitizens from handling voter registration applications. Florida NAACP, Alianza Plaintiffs, UnidosUS, and VOT have members and canvassers who will be impacted by this requirement, and Individual Plaintiffs will be precluded from participating in voter registration because of it.

Proponents of the Citizenship Requirement did not shy away from expressing that the purpose of the provision was to exclude noncitizens. When asked during a committee hearing for a justification, the bill's sponsor stated, "regarding non-citizens, there are certain rights in our country that only citizens get to enjoy."

139.   At the Senate Session hearing, proponents of the bill stated only that it was a "policy call" despite repeated efforts by opponents to stress the absurdity of restricting legal noncitizen residents from handling voter registration applications, while allowing those same individuals the ability to work for the state of Florida, including for example, the Department of State, Division of Elections, and Department of Highway Safety. No evidence was presented of any noncitizen mishandling voter registration applications.

140.   The Legislature is therefore targeting noncitizens because of their status and nothing more.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A. Declaring that the Citizenship Requirement violates the Fourteenth Amendment to the U.S. Constitution;

B. Declaring that the Citizenship Requirement was enacted with discriminatory intent in violation of the Fourteenth Amendment to the U.S. Constitution;

C. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the challenged provision;

D.  Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

E.  Granting such other and further relief as the Court deems just and proper.

**COUNT IV**
**Equal Rights Under the Law**
**42 U.S.C. § 1981**
**(Citizenship Requirement, Fla. Stat. § 97.0575(1)(f))**
**Against Defendants Byrd and Moody**

141.  Plaintiffs reallege and incorporate by reference paragraphs 1-108 of this Complaint as though set forth fully herein.

142.  SB 7050's Citizenship Requirement interferes with noncitizens', including Individual Plaintiffs', rights "to make and enforce contracts," in direct conflict with 42 U.S.C. § 1981.

143.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens" and "shall be subject to like punishment, pains, penalties, . . . and to no other." 42 U.S.C. § 1981(a). "The protection of this section has been held to extend to aliens as well as to citizens." *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948).

144.  As a legal permanent resident who works with UnidosUS as an organizer, Plaintiff Prieto is protected under Section 1981. The Citizenship

- 56 -

Requirement uniquely restricts noncitizens like Plaintiff Prieto's ability to pursue a livelihood by obtaining and maintaining employment with 3PVROs.

145.    The Supremacy Clause of the United States Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. State law must give way to federal law where they conflict, including where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," it is preempted by federal law. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks and citation omitted).

146.    The Citizenship Requirement directly conflicts with, and stands as an obstacle to, the purpose of Section 1981 because it denies noncitizens the same rights enjoyed by other Floridians, including the right to enter into employment contracts with 3PVROs to collect and handle voter registration applications. For instance, Plaintiff Prieto has worked for UnidosUS as a canvasser and captain during the 2022 election cycle. He has relied on that income to support himself, and will be unable to continue his chosen work because the law prohibits him from collecting and handling voter registration applications. As a result, the Citizenship Requirement uniquely restricts noncitizens' ability to pursue a livelihood by obtaining and maintaining employment with 3PVROs.

147.   By prohibiting noncitizens like Plaintiff  Prieto from collecting and handling voter registration applications on behalf of 3PVROs, the Citizenship Requirement interferes with their right to "make and enforce" employment contracts with 3PVROs. 42 U.S.C. § 1981(a). And because the Citizenship Requirement interferes with Congress's express intent to give legal noncitizens equal rights under federal law, it is preempted under the Constitution's Supremacy Clause.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A. Declaring that the Citizenship Requirement violates 42 U.S.C. § 1981;

B. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the challenged provision;

C. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

D. Granting such other and further relief as the Court deems just and proper.

**<u>COUNT V</u>**
**Equal Protection Clause, U.S. Const. amend. XIV**
**42 U.S.C. § 1983**
**(3PVRO Restrictions, Fla. Stat. § 97.0575)**
**Against All Defendants**

148.   Plaintiffs reallege and reincorporate by reference paragraphs 1-108 of this Complaint as though set forth fully herein.

149.   The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

150.   The 3PVRO Restrictions violate the Fourteenth Amendment to the United States Constitution because they were purposefully enacted, at least in part, with a racially discriminatory intent to discriminate against Black and Hispanic voters and have the effect individually and collectively of denying, abridging, or suppressing the right to vote of otherwise eligible voters on account of race, ethnicity, or color.

151.   *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and later case law require considering several factors about the law and its adoption to demonstrate discriminatory intent, including (1) the impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to its passage; (4) departures from the normal procedural sequence; (5) the legislative history, including legislative statements; (6) the foreseeability of the disparate impact; (7) knowledge of intent; and (8) the availability of less discriminatory alternatives. *League of Women Voters of Fla. Inc.*, 66 F.4th at 922.

152.   Many of these factors are met here. SB 7050's 3PVRO restrictions will impact Black and Hispanic Floridians with precision, particularly because 3PVROs are five times more likely to register Black and Hispanic voters than white voters, and legislators were well aware of this fact, *see supra* Part II. The legislature hastily introduced the bill, giving legislators and the public little time to digest its contents before hearings and depriving them the opportunity to make informed comments on and amendments to the bill. The legislature also waived its normal procedures to speed up the process. *See supra* Part II. Each of these facts, individually and collectively, supports a strong inference of discriminatory purpose in violation of the Fourteenth Amendment.

153.   The feeble state justifications for SB 7050—election integrity and security—also raise an inference of discriminatory purpose in violation of the Fourteenth Amendment. There is no purpose to the harsh fines and fees levied against 3PVROs in SB 7050 except to stop 3PVROs from registering people who are disproportionately Floridians of color. For example, one speaker testified that "I think the fines that are being imposed on the third-party voter registration organizations are designed . . . to put them out of business, make them go away, and those are the organizations that have helped increase participation in democracy." And as Senator Thomson explained: "What the bill really is about is elections outcome[s] . . . this really is suppression [] just like poll taxes . . . violence against

people who wanted to vote . . . intimidation when you had the Ku Klux Klan march through certain communities before voting day, that was suppression and so is this. [] I see different characters but the same objective: [] to make sure only certain people vote." Likewise, there is no reason to prohibit 3PVROs from retaining voter contact information other than to reduce the impact of these organizations. And because it is well known that Black and Hispanic people are significantly more likely to register through a 3PVRO, the clear impact of these provisions will be to reduce the number of Black and Hispanic voters in Florida.

154. The 3PVRO Restrictions are not narrowly tailored to serve a compelling state interest. Less discriminatory alternatives to the 3PVRO Restrictions are available, including, among others, maintaining the status quo; prohibiting solely the retention of sensitive voter information like social security numbers while allowing 3PVROs to maintain contact information used for voter engagement; increasing fines only for repeated violations of third-party voter registration laws; and/or limiting the Citizenship Requirement to noncitizens with certain criminal histories.

155. By enacting the 3PVRO Restrictions, the Legislature intentionally discriminates against Plaintiffs' members, in violation of the Fourteenth Amendment.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

    A. Declaring that the 3PVRO Fines Provision was enacted with discriminatory intent in violation of the Fourteenth Amendment to the U.S. Constitution;

    B. Declaring that the Citizenship Requirement was enacted with discriminatory intent in violation of the Fourteenth Amendment to the U.S. Constitution;

    C. Declaring that the Information Retention Ban was enacted with discriminatory intent in violation of the Fourteenth Amendment to the U.S. Constitution;

    D. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the challenged provision(s);

    E. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

    F. Granting such other and further relief as the Court deems just and proper.

### COUNT VI
**Vagueness and Overbreadth**
**U.S. Const. amends. I & XIV, 42 U.S.C. § 1983**
**(Citizenship Requirement and Information Retention Ban, Fla. Stat.**
**§ 97.0575(1)(f), (7))**
**Against Defendants Byrd and Moody**

156. Plaintiffs reallege and reincorporate by reference paragraphs 1-108 of this Complaint as though fully set forth herein.

157.   A vague law is "no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Laws can be vague either because they (1) fail to inform people of what they prohibit or (2) lend themselves to arbitrary and discriminatory enforcement. *See Chicago v. Morales*, 527 U.S. 41, 58 (1999); *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972). Vague laws are especially pernicious in the First Amendment context, as they "force potential speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (en banc) (cleaned up).

158.   An overbroad law violates the First Amendment because it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quotations omitted). A law can be overbroad if, "in its ambiguity, it also consumes vast swaths of core First Amendment speech." *Dream Defs. V. DeSantis*, 559 F. Supp. 3d 1238, 1283 (N.D. Fla. 2021).

159.   As explained above, by registering Floridians to vote, and then later encouraging those Floridians to vote, Plaintiffs engage in speech and association protected by the First Amendment. The Citizenship Requirement and the

Information Retention Ban restrict this protected activity through their impermissible vagueness.

160.   The Citizenship Requirement is impermissibly vague because it leaves unclear what it means to "handle" "voter registration applications."

161.   "Handl[ing]" a registration application could be to physically touch any application, to possess the application, transport the application, supervise the voter registration process, or participate in the process of soliciting voter registrations at all. For these reasons, the term "handle" in the Citizenship Requirement cannot be understood by a person of ordinary intelligence. This leaves Plaintiffs guessing as to who in their organizations can do what in the voter registration process.

162.   Similarly, the term "voter registration application" is impermissibly vague. For example, a person of ordinary intelligence would not know whether the term "voter registration applications" encompasses only completed applications or blank applications as well.

163.   At the same time, these ambiguities lend themselves to selective enforcement, as the Secretary or Attorney General can decide, after the fact, what conduct is prohibited. Both provisions are thus unconstitutionally vague and violate the Fourteenth Amendment to the United States Constitution.

164.   Because the Citizenship Requirement imposes a $50,000 fine for each infraction, and because of the provision's vagueness, Plaintiff organizations will

forgo using any noncitizen canvassers or employees to collect or handle voter registration applications. For several of these organizations, this may force them to halt registration operations altogether. Individual Plaintiffs will also stop such work. As a result, the vagueness of the Citizenship Requirement unlawfully "force[s] potential speakers to steer far wider of the unlawful zone." *Wollschlaeger*, 848 F.3d at 1320 (cleaned up).

165.   The Information Retention Ban, which broadly prohibits "retain[ing] a voter's personal information" "for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section," is also impermissibly vague. At least two of Ban's phrases, "personal information" and "in compliance with this section," are unconstitutionally vague because a person of ordinary intelligence would not know what "personal information" they are barred from copying or retaining and what it otherwise means to use that information "in compliance with this section." Does "personal information" include someone's contact information or is it limited to only more sensitive information like a social security number? Does "in compliance with this section" prohibit 3PVROs from retaining personal information to confirm whether applications were accepted or to defend themselves against allegations of mishandling? Or can they retain personal information for their broader voter engagement work? Plaintiffs, their canvassers, and their volunteers are left to guess.

166.   Because SB 7050 leaves these terms undefined, it is susceptible to selective enforcement, as the Secretary or Attorney General may arbitrarily decide whether retained information is "personal" or being used "incompliance with [the] section." In this way too, the Information Retention Ban is impermissibly vague.

167. Because the Information Retention Ban makes impermissible information retention a felony, and because of the provision's vagueness, Plaintiffs may forgo retaining *any* information about those they register. *See Wollschlaeger*, 848 F.3d at 1320.

168.   In addition, because the Information Retention Ban prevents Plaintiffs from engaging in a substantial amount of protected speech and association—that is all of the speech and association that would occur absent the Ban, including GOTV efforts encouraging Floridians to vote and assisting them to do so—judged in relation to its legitimate sweep, it is also overbroad in violation of the First Amendment. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations.").

169.   State Defendants have proposed rulemaking related to the Citizenship Requirement and Information Retention Ban about the meaning of the terms "collecting and handling" and "voter's personal information." Rule 1S-2.042.

170.    The proposed rulemaking does not inform judicial review of the statute. Florida law prohibits courts from "deferr[ing] to an administrative agency's interpretation of [a] statute"; they "must instead interpret such statute or rule de novo." Fla. Const. art. V, § 21; *see, e.g.*, *Orange Cnty. Fire Fighters Ass'n, I.A.F.F. Loc. 2057 v. Orange Cnty. Bd. Of Cnty. Comm'rs*, No. 1D22-1427, 2023 WL 3859343, at *1 (Fla. 1st DCA June 7, 2023) ("We no longer defer to an agency's interpretation of law.").

171.    Even if the rulemaking took effect, Plaintiffs would still be left in a state of confusion. Because the statutory text of the Citizenship Requirement and Information Retention Ban remains vague, Plaintiffs would need to guess whether certain voter registration conduct was now permissible or could result in a $50,000 fine or felony criminal charge.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A. Declaring that the Information Retention Ban violates the First and Fourteenth Amendments to the U.S. Constitution;

B. Declaring that the Citizenship Requirement violates the Fourteenth Amendment to the U.S. Constitution;

C. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from either provision;

D. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

E. Granting such other and further relief as the Court deems just and proper.

<div align="center">

**<u>COUNT VII</u>**
**Section 208 of the Voting Rights Act**
**52 U.S.C. § 10508**
**(Mail-In Ballot Request Restriction, Fla. Stat. § 101.62)**
**Against All Defendants**

</div>

172.   Plaintiffs reallege and reincorporate by reference paragraphs 1-108 of this Complaint as though fully set forth herein.

173.   Section 208 of the VRA provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice [with limited exceptions]." 52 U.S.C. § 10508.

174.   The Voting Rights Act defines "vote" to include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly." *Id.* § 10310(c)(1). Thus, people who require assistance in the voting process, including assistance in requesting vote-by-mail ballots, are promised the freedom of choice for their assister.

175.   DRF, Florida Alliance, UnidosUS, and Alianza Plaintiffs' members, canvassers, and constituents who are protected under Section 208 have a private right of action under Section 208. *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 988–90 (N.D. Fla. 2021).

176.   "In the absence of an express congressional command, state law is preempted if that law actually conflicts with federal law." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992).

177.   The Mail-In Ballot Request Restriction unlawfully prevents individuals covered by Section 208 of the VRA, including DRF, Florida Alliance, UnidosUS, and Alianza Plaintiffs' members, canvassers, and constituents, from choosing their preferred assister and prohibits broad categories of individuals and organizations from providing assistance to eligible voters seeking to request a vote-by-mail ballot.

178.   As such, SB 7050's Mail-In Ballot Request Restriction conflicts with federal law because it limits the right of protected voters from choosing who they want to assist them with the voting process.

179.   The Mail-In Ballot Request Restriction is therefore preempted by federal law and must be declared invalid.

180.   The proposed rulemaking does not inform judicial review of the statute. Florida law prohibits courts from "deferr[ing] to an administrative agency's interpretation of [a] statute"; they "must instead interpret such statute or rule de

novo." Fla. Const. art. V, § 21; *see, e.g.*, *Orange Cnty. Fire Fighters Ass'n, I.A.F.F. Loc. 2057 v. Orange Cnty. Bd. of Cnty. Comm'rs*, No. 1D22-1427, 2023 WL 3859343, at *1 (Fla. 1st DCA June 7, 2023) ("We no longer defer to an agency's interpretation of law.").

181.   Moreover, in enacting rules, the Secretary is bound by Fla. Stat. § 102.54(c), which provides that "[n]o statutory provision shall be delayed in its implementation pending an agency's adopting of implementing rules unless there is an express statutory provision prohibiting its application until the adoption of implementing rules." SB 7050 does not contain an express statutory provision prohibiting its application until the adoption of implementing rules. And so, the Mail-In Ballot Assistance Restriction is still in effect and impacting Plaintiffs.

182.   Even if the rulemaking took effect, Plaintiffs would still be left in a state of confusion. Because the rulemaking conflicts with the text of the Mail-In Ballot Assistance Restriction as written in SB 7050, Organizational Plaintiffs would be left to wonder how they can operate lawfully in instructing their constituents on how to request mail-in ballots with assistance, and their constituents would be left to wonder how to request mail-in ballots in a lawful manner.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

> A. Declaring that the Mail-In Ballot Request Restriction violates Section 208 of the Voting Rights Act, 52 U.S.C. § 10508;

B. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the challenged provision;

C. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws;

D. Granting such other and further relief as the Court deems just and proper.

**<u>COUNT VIII</u>**
**First and Fourteenth Amendments**
**42 U.S.C. § 1983**
**(3PVRO Restrictions, Fla. Stat. § 97.0575)**
**Against All Defendants**

183. Plaintiffs reallege and reincorporate by reference paragraphs 1-108 of this Complaint as though fully set forth herein.

184. A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

185. "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., plurality op.) (quotation marks omitted). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient

weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019).

186.   SB 7050 burdens all voters, but especially Black and Hispanic voters, and voters of low socioeconomic status in Florida. "Disparate impact matters under *Anderson-Burdick*." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018). SB 7050's 3PVRO Restrictions will impact Black and Hispanic Floridians with precision, particularly because 3PVROs are five times more likely to register Black and Hispanic voters than white voters, *see supra* Part II.

187.   The 3PVRO Restrictions—both individually and collectively—burden the rights of Organizational Plaintiffs' members and constituents in registering to vote and ultimately voting, as well as the rights of Individual Plaintiff Esperanza Sánchez as a newly-eligible Florida voter along with other Florida voters.

188.   The Citizenship Requirement limits who may help voters to register, depriving voters of dedicated canvassers who come from their communities and speak a common language to lessen the barriers associated with submitting a voter registration application.

189.   The Information Retention Ban restricts the ability of 3PVROs and their canvassers to retain voters' information to follow up and make sure voters were

successfully registered and to provide key information and encouragement to voters to make sure they are able to show up to the polls in order to cast a ballot.

190.   The 3PVRO Fines Provisions raises the cost of operation for 3PVROs in Florida. These increased fines have caused a number of organizations, including Alianza Plaintiffs, to shut down operations entirely, or they have discouraged aspiring 3PVROs, including Voters of Tomorrow, from registering as a 3PVRO due to the financial risks. As a result, voters in Florida have less access to a low-cost and accessible method of registration via 3PVRO, and fewer Florida voters will register and turn out to vote in Florida as a result.

191.   None of the 3PVRO Restrictions is supported by a legitimate—let alone compelling—state interest sufficient to justify the resulting restrictions on the voting process, and each individually as well as all three restrictions cumulatively unduly burden the right to vote in violation of the First and Fourteenth Amendments.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

> A. Declaring that the 3PVRO Fines Provision unlawfully burdens the right to vote, in violation of the First and Fourteenth Amendments to the U.S. Constitution;
>
> B. Declaring that the Citizenship Requirement unlawfully burdens the right to vote, in violation of the Fourteenth Amendment to the U.S. Constitution;

C. Declaring that the Information Retention Ban unlawfully burdens the right to vote, in violation of the First and Fourteenth Amendments to the U.S. Constitution;

D. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the challenged provisions;

E. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

F. Granting such other and further relief as the Court deems just and proper.

Dated: April 22, 2024

Respectfully submitted,

Abha Khanna*
Makeba Rutahindurwa*
**ELIAS LAW GROUP LLP**
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
akhanna@elias.law
mrutahindurwa@elias.law

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111
King, Blackwell, Zehnder & Wermuth, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

Lalitha D. Madduri*
Melinda Johnson*
Renata O'Donnell*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
mjohnson@elias.law
rodonnell@elias.law

*Counsel for Plaintiffs Florida State Conference of Branches of Youth Units of the NAACP, Voters of Tomorrow Action, Inc., Disability Rights Florida, Alianza for Progress, Alianza Center, UnidosUS, Florida Alliance for Retired Americans, Santiago Mayer Artasanchez, Esperanza Sánchez, and Humberto Orjuela Prieto*

*Admitted *Pro Hac Vice*

- 74 -

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 22nd day of April, 2024, I electronically

filed the foregoing with the Clerk of the Court by using the CM/ECF system, which

will send a notice of electronic filing to all counsel of record.

<div style="margin-left: 40%;">

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111

</div>