# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS OF
THE NAACP, et al.,

                    Plaintiffs,

                    v.

CORD BYRD, in his official capacity as
Florida Secretary of State, et al.,

                    Defendants.

Case Nos.: 4:23-cv-215-MW/MAF
             4:23-cv-216-MW-MAF
             4:23-cv-218-MW-MAF

## NAACP PLAINTIFFS' CLOSING ARGUMENT

# TABLE OF CONTENTS

I.   Factual Background ......................................................................................1

    A.   Who is Served by Florida 3PVROs ........................................................1

        1.   Fact Testimony ..............................................................................2

        2.   Expert Testimony ..........................................................................7

    B.   How 3PVROs Operate ..........................................................................10

    C.   What 3PVRO Canvassers Don't Do .....................................................15

    D.   Plaintiffs' Speech and Association through Voter Registration ............17

    E.   Rarity of 3PVRO Issues in Florida ......................................................21

        1.   Fact Witness Testimony ...............................................................21

        2.   Expert Testimony ........................................................................26

    F.   Relevant History Leading Up to SB 7050 ............................................28

        1.   Florida's Recent History .............................................................28

        2.   Florida's Regulation of 3PVROs Prior to SB 7050 ......................36

        3.   Selective enforcement of 3PVRO regulations. .............................39

    G.   Legislative Process ...............................................................................41

    H.   Lack of Justifications for SB 7050 .......................................................47

    I.   Witness Confusion About the Meaning of the Challenged Provisions .51

    J.   The Impact of SB 7050 on 3PVROs and Voters ...................................54

        1.   Fact Witness Testimony ...............................................................54

        2.   Expert Testimony ........................................................................57

    K.   Defendants' Case ..................................................................................61

II.  The NAACP Plaintiffs Have Standing to Bring Their Claims. ....................67

    A.   Injury-in-fact .......................................................................................68

        1.   Individual Standing .....................................................................69

        2.   Organizational Standing ..............................................................72

        3.   Associational Standing ................................................................79

           a.   Associational injuries from the 3PVRO Restrictions .............80

           b.   Associational injuries from the Mail-In Ballot Request

                Restriction.................................................................81

      4.   Employer Standing .......................................................83

      5.   Third Party Standing ....................................................84

   B.   Traceability .........................................................................85

      1.   3PVRO Restrictions .....................................................86

      2.   Mail-In Ballot Request Restriction ...............................89

   C.   Redressability.....................................................................90

III.  NAACP Plaintiffs Should Prevail on Each Claim.........................91

   A.   The 3PVRO Restrictions unconstitutionally infringe on NAACP
Plaintiffs' speech and association rights (Counts I and II). ..................92

      1.   Strict scrutiny applies to Plaintiffs' First Amendment claims. ......92

           a.   Voter registration is expressive activity. ..................................93

           b.   Plaintiffs engage in core political speech. ..............................93

           c.   The Citizenship Requirement is content-based. ......................96

           d.   The 3PVRO Restrictions severely infringe upon associational

               activities.................................................................98

      2.   In the alternative, the Anderson-Burdick test should apply to
Plaintiffs' First Amendment claims...............................................100

   B.   SB 7050's Citizenship Requirement and Information Retention Ban are
overbroad and vague (Count VI). ........................................................101

   C.   The 3PVRO Restrictions unconstitutionally burden NAACP Plaintiffs'
right to equal protection and right to vote. ..........................................105

      1.   The Citizenship Requirement unconstitutionally discriminates on
the basis of alienage (Count III).....................................................105

        a.   The Citizenship Requirement violates the Equal Protection Clause as applied to Plaintiffs. ...............................................106

        b.   Alternatively, the Citizenship Requirement violates the Equal Protection Clause under the Arlington Heights standard. ....107

    2.   The 3PVRO Restrictions are intentionally racially discriminatory and unduly burden voters (Counts V and VIII). ..........................110

        a.   The 3PVRO Restrictions burden all voters. ..........................114

        b.   The 3PVRO Restrictions have a disparate impact on Black and Hispanic voters. ...................................................................116

        c.   Other Arlington Heights factors show the 3PVRO Restrictions are intentionally discriminatory...........................................120

D.   The State Lacks Sufficient Interests in the 3PVRO Restrictions. .......127

    1.   The State lacks sufficient interests in the Citizenship Requirement. ...............................................................................128

    2.   The State lacks sufficient interests in the Information Retention Ban. ...................................................................................129

    3.   The State lacks sufficient interests in the 3PVRO Fines Provision..........................................................................131

E.   Voting Rights Act Preemption Claim (Count VII)..............................133

IV.  NAACP Plaintiffs are Entitled to Their Requested Relief. ..........................136

A.   Declaratory relief is appropriate here. .................................................136

B.   Plaintiffs satisfy the standard for permanent injunctive relief.............137

C.   NAACP Plaintiffs are entitled to fees...................................................139

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
   585 U.S. 579 (2018) ........................................................................ 122

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) ......................................................... 106

*Alabama v. U.S. Army Corps of Eng'rs*,
   424 F.3d 1117 (11th Cir. 2005) ...................................................... 137

*Am. Ass'n of People with Disabilities v. Herrera*,
   580 F. Supp. 2d 1195 (D.N.M. 2008) ......................................... 95, 99

*Ameritas Variable Life Ins. Co. v. Roach*,
   411 F.3d 1328 (11th Cir. 2005) ...................................................... 137

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ........................................................................ 114

*Arcia v. Fla. Sec'y of State*,
   772 F.3d 1335 (11th Cir. 2014) ........................................................ 72

*Barrett v. Walker Cnty. Sch. Dist.*,
   872 F.3d 1209 (11th Cir. 2017) .............................................. 137, 138

*Bernal v. Fainter*,
   467 U.S. 216 (1984) ........................................................................ 127

*Boos v. Barry*,
   485 U.S. 312 (1988) ........................................................................ 104

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000) .................................................................. 98, 100

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ........................................................................ 104

*Brooklyn Branch of the NAACP v. Kosinski*,
   657 F. Supp. 3d 504 (S.D.N.Y. 2023) ............................................... 97

v

*Buckley v. Am. Constitutional L. Found., Inc.*,
    525 U.S. 182 (1999)......................................................................92, 96

*Burdick v. Takushi*,
    504 U.S. 428 (1992)........................................................................113

*Burns v. Town of Palm Beach*,
    999 F.3d 1317 (11th Cir. 2021) ......................................................93

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
    451 F.3d 1257 (11th Cir. 2006) ......................................................67

*Cash Inn of Dade, Inc. v. Met. Dade County*,
    938 F.2d 1239 (11th Cir. 1991) ....................................................131

*Chang v. Glynn Cnty. Sch. Dist.*,
    457 F. Supp. 2d 1378 (S.D. Ga. 2006) ..........................................137

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    596 U.S. 61 (2022)...........................................................................97

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)........................................................................109

*Clingman v. Beaver*,
    544 U.S. 581 (2005)...................................................................98, 100

*Coastal Conservation Ass'n v. Gutierrez*,
    417 F. Supp. 2d 1304 (M.D. Fla. 2006)........................................140

*Common Cause Ind. v. Marion Cnty. Election Bd.*,
    311 F. Supp. 3d 949 (S.D. Ind. 2018), *vacated and remanded on*
    *mootness grounds*, 925 F.3d 928 (7th Cir. 2019) ..........................118

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008)................................................................100, 113

*Democracy N.C. v. N.C. State Bd. of Elections*,
    476 F. Supp. 3d 158 (M.D.N.C. 2020) ...........................................95

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ......................................113, 114, 138

*Disability Rts. N.C. v. N.C. State Bd. of Elections*,
　No. 5:21-CV-361-BO, 2022 WL 2678884 (E.D.N.C. July 11,
　2022) ...................................................................................................134

*Dream Defs. v. DeSantis*,
　559 F. Supp. 3d 1238 (N.D. Fla. 2021) ....................................103, 104

*Duke Power Co. v. Env't Study Grp.*,
　438 U.S. 59 (1978).........................................................................85, 90

*Espinoza v. Mont. Dep't of Revenue*,
　591 U.S. 464 (2020).............................................................................127

*Falls v. DeSantis*,
　609 F. Supp. 3d 1273 (N.D. Fla. 2022) ...............................................83

*Fish v. Schwab*,
　957 F.3d 1105 (10th Cir. 2020) .............................................112, 113

*Fla. Bar v. Went For It, Inc.*,
　515 U.S. 618 (1995).....................................................................127, 131

*Fla. State Conf. of NAACP v. Lee*,
　566 F. Supp. 3d 1262 (N.D. Fla. 2021) .............................80, 108, 112

*Foley v. Connelie*,
　435 U.S. 291 (1978).............................................................................107

*Ga. Republican Party v. SEC*,
　888 F.3d 1198 (11th Cir. 2018) .........................................................80

*In re Georgia Senate Bill 202*,
　622 F. Supp. 3d 1312 (N.D. Ga. 2022)..............................................139

*Gooding v. Wilson*,
　405 U.S. 518 (1972).............................................................................104

*Greater Birmingham Ministries v. Sec'y of State of Ala.*,
　992 F.3d 1299 (11th Cir. 2021) .................................79, 108, 113, 116

*Hadnott v. Amos*,
　394 U.S. 358 (1969).............................................................................98

vii

*Hardware Mut. Cas. Co. v. Schantz*,
178 F.2d 779 (5th Cir. 1949) ............................................................................137

*Harrell v. Fla. Bar*,
608 F.3d 1241 (11th Cir. 2010) ...........................................................................68

*Harriet Tubman Freedom Fighters Corp. v. Lee*,
576 F. Supp. 3d 994 (N.D. Fla. 2021) .............................................................100

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)..............................................................................................72

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..............................................................................................81

*Hunter v. Underwood*,
471 U.S. 222 (1985)............................................................................................126

*Jean v. Nelson*,
711 F.2d 1455 (1983)..........................................................................................126

*June Med. Servs. LLC v. Russo*,
591 U.S. 299 (2020), *abrogated on other grounds by Dobbs v.
Jackson Women's Health Org.*, 597 U.S. 215 (2022) ........................................84

*Kolender v. Lawson*,
461 U.S. 352 (1983)............................................................................................102

*League of Women Voters of Fla., Inc. v. Detzner*,
314 F. Supp. 3d 1205 (N.D. Fla. 2018) ....................................................113, 114

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
32 F.4th 1363 (11th Cir. 2022) .........................................................................139

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
66 F.4th 905 (11th Cir. 2023) .....................................................................*passim*

*League of Women Voters of Fla. v. Browning*,
863 F. Supp. 2d 1155 (N.D. Fla. 2012) .......................................................36, 98

*League of Women Voters of Fla. v. Cobb*,
447 F. Supp. 2d 1314 (S.D. Fla. 2006) ........................................................93, 95

*League of Women Voters of Fla. v. Detzner*,
   No. 4:11CV628-RH/WCS, 2012 WL 12810507 (N.D. Fla. Aug.
   30, 2012) ..................................................................................................36

*League of Women Voters of Fla. v. Lee*,
   595 F. Supp. 3d 1042 (N.D. Fla. 2022) .................................11, 22, 94

*League of Women Voters v. Hargett*,
   400 F. Supp. 3d 706 (M.D. Tenn. 2019) ........................................94

*LeClerc v. Webb*,
   419 F.3d 405 (5th Cir. 2005) ............................................................106

*Link v. Diaz*,
   669 F. Supp. 3d 1192 (N.D. Fla. 2023) ...........................................68

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)....................................................67, 68, 85

*Marks v. United States*,
   430 U.S. 188 (1977).........................................................................113

*Mays v. LaRose*,
   951 F.3d 775 (6th Cir. 2020) ..........................................................113

*McCullen v. Coakley*,
   573 U.S. 464 (2014)....................................................................92, 98

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995)..........................................................................96

*Messina v. City of Fort Lauderdale, Fla.*,
   No. 21-CV-60168, 2024 WL 301574
   (S.D. Fla. Jan. 26, 2024) ................................................................130

*Meyer v. Grant*,
   486 U.S. 414 (1988)....................................................................93, 94

*Miller v. Johnson*,
   515 U.S. 900 (1995)..........................................................................126

*Moody v. Holman*,
   887 F.3d 1281 (11th Cir. 2018) .......................................................90

*N.C. State Conf. of the NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ....................................................122, 123

*N.Y. State Club Ass'n v. City of New York*,
   487 U.S. 1 (1988)...................................................................................80

*NAACP v. Alabama, ex rel. Patterson*,
   357 U.S. 449 (1958)..............................................................................98

*NAACP v. Button*,
   371 U.S. 415 (1963)............................................................................103

*Namphy v. DeSantis*,
   493 F. Supp. 3d 1130 (N.D. Fla. 2020) ...................................115, 116

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018)..............................................................................97

*NetChoice, LLC v. Att'y Gen., Fla.*,
   34 F.4th 1196 (11th Cir. 2022) .......................................................92, 97

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ............................................................114

*Ohio State Conf. of N.A.A.C.P. v. Husted*,
   768 F.3d 524 (6th Cir.), *vacated* No. 14-3877, 2014 WL 10384647
   (6th Cir. Oct. 1, 2014)........................................................................118

*Orange Cnty. Fire Fighters Ass'n, I.A.F.F. Loc. 2057 v. Orange Cnty.*
   *Bd. of Cnty. Comm'rs*,
   No. 1D22-1427, 2023 WL 3859343 (Fla. Dist. Ct. App. June 7,
   2023) ....................................................................................................104

*Pena v. Bd. of Educ. of City of Atlanta*,
   620 F. Supp. 293 (N.D. Ga. 1985).........................................108, 129

*Pub. Integrity All., Inc. v. City of Tucson*,
   836 F.3d 1019 (9th Cir. 2016) ..........................................................113

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006)................................................................................139

*Rine v. Imagitas, Inc.*,
   590 F.3d 1215 (11th Cir. 2009) .........................................................133

*Shen v. Simpson*,
   No. 4:23-CV-208-AW-MAF, 2023 WL 5517253
   (N.D. Fla. Aug. 17, 2023) ..................................................................105

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) .............................................................69

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008)..............................................................................90

*Stenberg v. Carhart*,
   530 U.S. 914 (2000)............................................................................104

*Sugarman v. Dougall*,
   413 U.S. 634 (1973)............................................................................107

*Support Working Animals, Inc. v. DeSantis*,
   457 F. Supp. 3d 1193 (N.D. Fla. 2020) .............................................127

*Support Working Animals, Inc. v. Gov'r of Fla.*,
   8 F.4th 1198 (11th Cir. 2021) .................................................86, 90, 91

*Tenn. State Conf. of N.A.A.C.P. v. Hargett*,
   420 F. Supp. 3d 683 (M.D. Tenn. 2019) ..............................................96

*Turner Broad. Sys., Inc. v. F.C.C.*,
   512 U.S. 622 (1994).............................................................................132

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ...............................................................125

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)..................................................108, 111, 112, 125

*VoteAmerica v. Schwab*,
   671 F. Supp. 3d 1230 (D. Kan. 2023)..................................................101

*Walters v. Fast AC, LLC*,
   60 F.4th 642 (11th Cir. 2023) ...............................................................86

*Weaver v. Bonner,*
    309 F.3d 1312 (11th Cir. 2002) ....................................................92, 96

*Wiersum v. U.S. Bank, N.A.,*
    785 F.3d 483 (11th Cir. 2015) .........................................................133

*Wilding v. DNC Servs. Corp.,*
    941 F.3d 1116 (11th Cir. 2019) ....................................................85, 88

*Wollschlaeger v. Gov'r, Fla.,*
    848 F.3d 1293 (11th Cir. 2017) (en banc) .........................68, 101, 103

*Worley v. Fla. Sec'y of State,*
    717 F.3d 1238 (11th Cir. 2013) ........................................................96

**Statutes**

28 U.S.C. § 2201 ...............................................................................136

28 U.S.C. § 2202 ...............................................................................136

42 U.S.C. § 1988 ........................................................................136, 139

52 U.S.C. § 10508 ...............................................................................81

Fla. Stat. § 16.56(1)(c)(5) ..................................................................87

Fla. Stat. § 97.012 ..............................................................................86

Fla. Stat. § 97.012(14) ........................................................................91

Fla. Stat. § 97.022 ..............................................................................86

Fla. Stat. § 97.022(1) ..........................................................................89

Fla. Stat. § 97.022(7) ..........................................................................42

Fla. Stat. § 97.0575(1)(f) ..............................................................51, 87

Fla. Stat. § 97.0575(7) ...................................................................52, 87

Fla. Stat. § 97.0575(8) ........................................................................87

Fla. Stat. § 101.62(3) ........................................................................138

**Other Authorities**

Fla. Admin. Code R. 1S-2.042(8)(c) .......................................................... 88

Fla. Const. art. V, § 21 ............................................................................. 104

Senate Bill 7050 imposes severe new restrictions on Florida's third-party voter registration organizations ("3PVROs"), which have had and will have the predictable effect of curtailing or cutting of 3PVROs' ability to register voters, and thereby decreasing the number of Floridians in underserved communities who are able to access the franchise. The NAACP Plaintiffs—including some of the oldest and most prolific 3PVROs in Florida—have proved that the 3PVRO Restrictions (Citizenship Requirement, Information Retention Ban, and Fines Provisions) unconstitutionally infringe on their rights under the First and Fourteenth Amendments, and that the Mail-in Ballot Request Restriction violates Section 208 of Voting Rights Act. To prevent further injury, this Court should find in Plaintiffs' favor and permanently enjoin enforcement of the challenged provisions. As the 2024 general election approaches, it is imperative that Plaintiffs are able continue to serve Florida's most marginalized communities without obstruction or fear of retribution, with the goal of obtaining equal access to the franchise for all eligible voters.

## I.    Factual Background

Plaintiffs collectively called twenty-two witnesses that presented evidence over five extended trial days. The most relevant testimony is summarized below.

### A.    Who is Served by Florida 3PVROs

Detailed testimony from fact and expert witnesses—including Plaintiffs, Florida Supervisors of Elections, legislators, and political scientists—established the

importance of 3PVROs in registering eligible Floridians to vote, particularly for voters in the Black and Hispanic communities. As the evidence established, these voters are far more likely to be registered by 3PVROs than their white counterparts and some of these voters are unlikely to register at all unless reached by 3PRVOs.

### 1.    Fact Testimony

**Hundreds of thousands of Hispanic voters have been registered by Florida 3PVROs.** Multiple representatives from the Plaintiff groups testified as to the importance of 3PVROs in registering eligible Hispanic voters to vote in Florida.

3PVROs are crucial to reaching these voters. As Jared Nordlund, UnidosUS Florida State Advocacy Director testified, "the reason why" voters—and specifically Hispanic voters—often register with the help of UnidosUS is "because the way to actually register to vote is unclear, especially for a first time voter." Tr. 126:13-20. This is particularly true in the communities where UnidosUS works, where many work "hourly jobs and can't take off time to go to the elections office when they're open to register [] to vote." Tr. 145:17-22. And "[b]ecause most people don't have interactions with state government on a daily basis" they would not know to go to "a nonvoting office to register to vote." Tr. 144:23-145:2. He also testified that many in the community are not able to access registration online, explaining that there is also a "problem with a digital divide in our community, that most people" in the areas 3PVROs serve "don't have access to online so they can't use that" to register

to vote. Tr. 145:3-8. Even for those who have access to the internet, if the "DMV system has your name wrong, they can't actually register to vote online," and "if you don't have a paper form at your house or" "if you don't have a printer at your house, you can't print off [the voter registration] form" to submit. Tr. 145:9-16. And getting to a Supervisor's office is nearly impossible for many people in these communities who "are probably working 9:00 to 5:00 hourly jobs and can't take off time to go to the elections office when they're open to register them to vote." Tr. 145:20-22.

3PVRO canvassers, by contrast, "meet voters . . . where they are," Tr. 145:23-25; *see also* Tr. 543:11-12. Their canvassers come from the same communities as the people they serve, which is important because "it would be like registering your neighbor, so you trust your neighbor more than a random person you don't know"; the voter and the canvasser "probably [have] a shared life experience" and so the voter "can relate better to that canvasser" than they could to someone at a government office. Tr. 146:1-14; *cf.* Tr. 404:3-5 (V. Herrera testifying that Mi Vecino "know[s] how to culturally communicate" with Spanish-speaking voters because they "know how to reach them, how to approach them"); Tr. 572:18-20 (Hispanic Federation representative describing working with "trusted messengers" to communicate that "Latinos should get registered to vote").

This outreach has been incredibly successful in registering Hispanic voters. For example, UnidosUS has registered just under 400,000 voters through paper

application community canvassing since 2008, at least 70 to 80 percent of whom identify as Hispanic. Tr. 67:8-20. An estimated 20 to 30 percent of these voters are first-time registrants. Tr. 142:7-11. Other Plaintiffs provided similar testimony. *See, e.g.*, Tr. 576:8-11 (Hispanic Federation representative testifying to similar proportion of Hispanic voters registered with about 60 to 70 percent as new voters). As these Plaintiffs testified, "given the percentage of Floridians who are eligible to vote" but "not actually registered to vote," "a good part of [the Hispanic] community would not be touched at all" without 3PVRO outreach. Tr. 132:14-19; *see also* Tr. 528:9-10; Tr. 570:6-25.

Because UnidosUS does not have unlimited resources to stretch across all Florida counties, it concentrates its operations on places with the highest concentrations of Hispanic voters, including Miami-Dade, Orange, and Osceola. Tr. 22:18-23, 126:21-127:3. Marcos Vilar, Executive Director of Alianza, provided similar testimony on behalf of Alianza, explaining that he established the 3PVRO in Central Florida "[b]ecause that's where the highest concentrations of Puerto Ricans are in the state. Tr. 623:4-5, 624:10-11; *see also id.* at 626:7-12 ("Osceola County, where you have the highest concentration of Puerto Ricans, has the lowest participation rate in elections of any . . . county in the entire state."). He further testified that where Puerto Ricans in Central Florida have difficulty accessing government services, Tr. 625:15-22, often face difficulty trying to balance the

demands of their "mostly low-paying" jobs with other responsibilities, Tr. 624:14, and struggle with a language barrier, Tr. 626:16-25, 3PVROs reach those the government is unable to reach.  Tr. 627:1-11. Other Plaintiffs provided similar testimony. *See* Tr. 525:18-21 (Poder Latinx focuses on Orange and Osceola County); Tr. 569:10-11 (Hispanic Federation canvassing focused in Central Florida); Tr. 944:22-945:5 (VOT in Florida serves "a disproportionate number of Hispanics, specifically Puerto Ricans").

**Black Florida voters also heavily rely upon 3PVROs.** Cynthia Slater, Civic Engagement Chair of Florida NAACP, testified about the critical work the organization does to reach Black voters in Florida. She has been a member of the organization for roughly 30 years, serving many roles including her current positions as Chair of the Civic Engagement Committee and President of the Volusia County Daytona Beach Branch. Tr. 1151:23-1152:21. Ms. Slater testified that Florida NAACP is uniquely positioned to engage with Black voters because "we know the community and they know us, and they trust us" and "the work that we do."  Tr. 1163:4-17. That partnership allowed Florida NAACP "to see, help and guide" potential voters and to create a "comfort level" that would result in successful voter registration. Tr. 1174:3-8. Florida NAACP's membership is 90 percent Black and can reach Black voters in a way the State cannot by going "out into the community" including at "football games, basketball games, summer program initiatives,

Juneteenth, [and] special events that would happen in the communities." Tr. 1154:19-22, 1164:1-20. Florida NAACP also reaches voters who would otherwise be unable to access to the franchise since "we have individuals who don't have access to computers . . . [or] have limited ability for transportation to go to the library to register to vote or go to other government agencies that may have voter registration applications." Tr. 1173:2-17.

Cecile Scoon, co-President of the League of Women Voters of Florida, explained that the League has seen that a higher number of voters in Black and Hispanic communities do not have the state IDs required to register online. Tr. 1226:5-19. She testified that new voters, including those who have come from Puerto Rico with different electoral systems, "need reliable information on how the process works in our state" and for whom "the digital process" of registering to vote "is not meeting [their] need[s]." Tr. 1277:2-9, Tr. 1286:9-12; *see also* Tr. 1280:17-20 ("We are here trying to build bridges and go into communities that have been historically harmed by the government with regards to their voting rights or just by the societal marginalization of communities.").

Other witnesses at trial similarly testified about the important role 3PVROs play in reaching voters that other means of registration often do not. For instance:

- **Supervisor of Elections of Leon County Mark Earley**, with 35 years of experience in elections mostly in Florida, corroborated that 3PVROs "reach people that are difficult for [his] office to reach," specifically "communities

of color" who "trust 3PVROs more than they trust the government to help them register to vote." Tr. 734:9-14, 735:3-23.

- **Representative Anna Eskamani** explained that "not every person has the ability to engage with the processes nine to five . . . [or] knows those resources [like online voter registration] exist." Tr. 863:4-17. "3PVROs can really bring democracy to the ground level and engage [those] who might not typically have interactions with government and who might also have historically negative interactions with government." Tr. 863:18-24.

### 2.    Expert Testimony

**NAACP Plaintiffs' expert witness Dr. Michael Herron** provided an empirical analysis of the voters served by 3PVROs, and the benefits that they provide voters for whom the "cost" of registering to vote may otherwise be prohibitively high.[1] Dr. Herron testified that 3PVROs have registered 2.4 million Florida voters in total. Tr. 252:23-253:3. This includes approximately 277,000 since 2018 alone. Tr. 252:23-253:16. These numbers are drawn from the Florida Department of State's own data, but as Dr. Herron explained, the Florida voter file undercounts 3PVRO registrations; as a result, these numbers are conservative and could well be higher. Tr. 265:8-12, 266:5-8.

---

[1] Dr. Herron's full credentials are included in PX 13. He has extensive experience researching Florida's election laws and administration, Tr. 198:24-199:7, and regularly works with the data sources and statistical techniques that he used in this case in his other expert and academic work, Tr. 199:8-18. Courts have relied on Dr. Herron's testimony in cases involving the impact of election laws, and no court has rejected him as an expert or found his testimony or opinions to be unreliable. Tr. 200:11-19.

Dr. Herron also analyzed recent versions of the Florida voter file to discern which voters, by racial group, most heavily rely upon 3PVROs. Dr. Herron found that, in Florida, 3PVROs register higher rates of Black and Hispanic than white voters. Tr. 272:21-24; *see also* PX 61. Specifically, in analyzing the December 2023 data file, PX 263, Dr. Herron found that:

- **Black voters are 6.6 times more likely to rely on 3PVROs to register than white voters.**

- **Hispanic voters are 5.2 times more likely to rely on 3PVROs to register than white voters.**

Tr. 284:2-14.  Dr. Herron got similar results when he reviewed the September 2023 and August 2021 voter files. Tr. 284:18-285:2; *see* PXs. 261 & 262.[2]

Dr. Herron also explained how 3PVROs benefit underserved minority communities, reaching out to them to make voting more accessible. Tr. 246:21-22, 251:13-22. Dr. Herron defined these communities as ones where "socioeconomic status is lower, where employment is lower, where jobs are more restrictive, or individuals don't have as many resources to allow them to take advantage of other

---

[2] To ensure that other factors were not driving this gap between Black and Hispanic as compared to white voters' use of 3PVROs, Dr. Herron carried out multiple regression analyses to control for age, gender, party registration, and county. Tr. 285:15-23, 286:14-20, 286:24-287:4. The linear regression results were statistically significant, in part as a reflection of the millions of observations, Tr. 288:10-14, and Dr. Herron found that he got similar results as he found in the voter file even controlling for these other variables, Tr. 288:15-24; *see* PX 33. He found similar numbers in his linear regression, as well. Tr. 295:5-12; *see* PXs 34 & 39.

forms of registration." Tr. 252:6-19. Dr. Herron is not aware of any similar outreach to underserved communities done by, for example, the DMV. Tr. 252:20-22.

**Defendants' expert Dr. Robert Stein corroborated much of Dr. Herron's testimony on who 3PVROs serve**. Dr. Stein testified that he has no basis to dispute that 3PVROs have facilitated six to seven percent of all voter registrations in Florida. Tr. 1688:19-22. He acknowledged that the data Dr. Herron analyzed demonstrated that voters of color heavily rely on 3PVROs. Tr. 1689:21-24. Additionally, in the course of preparing his expert testimony, Dr. Stein reviewed and relied on a paper by the Institute for Responsive Government on the history of 3PVROs, Tr. 1701:9-23, which outlined (and which Dr. Stein offered no evidence to contradict) that:

- Voter registration requirements were historically used as tools of disenfranchisement, but 3PVROs have helped more people access democracy. Tr. 1703:3-21;

- A sustained push for voter registration came with the Civil Rights Movement, and registration efforts of 3PVROs were focused on "non-white" voters. Tr. 1704:5-10, 1706:22-1707:2;

- Regulations, including those imposed by white registrars, were historically used to slow down the registration activities of 3PVROs. Tr. 1707:8-17;

- 3PVROs, despite countless barriers, have increased the number of racial minorities registered to vote. Tr. 1707:18-1708:3; and

- 3PVROs today specifically target or help to reach racial minorities and individuals of lower socioeconomic status, Tr. 1709:2-6, 16-21.

**B.     How 3PVROs Operate**

NAACP Plaintiffs provided detailed testimony about the meticulous way they operate voter registration programs in Florida.

For instance, this Court heard from Florida State Advocacy Director of UnidosUS, Jared Nordlund. Tr. 20:13-14. Mr. Nordlund outlined UnidosUS's thorough processes that have "been a part of [the organization's] model from day one before any type of fines or anything like that at all." Tr. 121:20-122:4.

**Staffing and steps of review:** As Mr. Nordlund described, each UnidosUS office has two field organizers, a quality control manager, a captain (an on-the-ground supervisor) per team of four canvassers, and—since SB 7050—an HR specialist. *See* Court Ex. 1; Tr. 26:7-15. UnidosUS meets with individual Supervisors of Elections in advance of each voter registration campaign to provide notice and details of its intended operations. Tr. 29:2-13. Each day before a canvassing shift, there is a morning debriefing with the canvassing teams. Tr. 29:18-30:10, and at the end of each shift, UnidosUS canvassers account for all 20 forms that were in each canvassers' possession with a signed tracking sheet. Tr. 31:8-19; *see also* Tr. 156:12-157:24, 185:19-186:7, 191:10-13 (individual canvassers testifying to same). The captain then takes possession of the voter registration applications at the end of each shift and spot-checks the application packet for each canvasser. Tr. 32:2-16. Captains then provide the voter registration applications to the field organizers, who spot-

check the forms again and then give them to the quality control manager in the UnidosUS office for processing. Tr. 32:17-33:18; *cf.* Tr. 532:15-533:8 (describing similar process at Poder Latinx).[3]

**Additional quality control:** Quality control managers are firewalled off from the collection process so that they may conduct an "independent audit" of collected applications. After reviewing the cover sheets and corresponding applications, quality control managers scan the applications and upload them to a quality-control platform, redacting each voter's driver's license number, last four digits of their social security number, and signature. Tr. 33:25-36:12. The quality control vendor then conducts a more intense verification process by flagging any missing information and calling a sampling of voters to make sure they personally submitted the application. Tr. 37:5-18; *see also id.* 37:17-18 (QC platform calls 20 percent of voters associated with each canvasser's packet). The vendor also assembles voters' names, phone numbers, and addresses, from the scanned applications so that

---

[3] This Court has also already found that the League and Poder Latinx operate their voter registration programs with precision and care. *League of Women Voters of Fla. v. Lee*, 595 F. Supp. 3d 1042, 1149–50 (N.D. Fla. 2022) (describing how of the thousands of registrations collected by the League and Poder Latinx only a handful are delivered late and "there was a 99.8% chance that Poder Latinx *would* return the application on time"), *aff'd in part, vacated in part, rev'd in part on other grounds*, *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023).

UnidosUS can follow up with these voters after they are registered to vote. Tr. 38:16-21.[4]

**Secured applications and submission:** After the quality control manager scans and redacts each application, all completed applications go into a lockbox that only the quality control manager, campaign strategist, and field organizers have access to—no individual canvassers or even captains have access. Tr. 35:2-14. When applications are flagged by the quality control platform, UnidosUS managers pull the forms to investigate the issue, communicate with the voter and canvasser directly, and in some cases conduct a retraining to avoid similar issues in the future. Tr. 40:6-18. Forms are then stored in the lockbox until they are mailed by the field organizer or campaign strategist via USPS priority mail to the Secretary of State's Department of Elections twice a week. Tr. 40:21-41:11. Because of the extensive quality control process, applications are often mailed in on the eighth, ninth, or tenth day from the date that the voter filled out the form. Tr. 124:13-22; *cf.* Tr. 578:14-581:24 (Hispanic Federation representative describing similar quality control and submission process). UnidosUS keeps copies of scanned applications for a year to know what

---

[4] Throughout trial, Defendants' questioning seemed to suggest there was something nefarious about 3PVROs' uploading of redacted voter registration applications to a platform. They did not identify any specific issues with the platform and, as Supervisor Earley testified, that Florida's Supervisors of Elections themselves upload unredacted voter registration applications to a program called "Voter Focus," which is owned by a private company but is licensed to the SOEs to help them maintain voter registration logs. Tr. 736:16-737:22.

the form looked like when they submitted it in the event they are fined or investigated by the State. Tr. 42:7-12.

Notably, the security and quality control measures taken during the registration process and outlined only build upon the meticulous work 3PVROs often engage in long before canvassing begins.

**Hiring process:** Employed canvassers at UnidosUS are subject to background checks and put through the E-Verify system. Tr. 43:21-44:10; *cf.* Tr. 534:4-9 (testifying Poder Latinx canvassers go through the same); Tr. 693:5-9 (testifying Alianza similarly ensured that noncitizen canvasser was authorized to work in the United States).[5]

When UnidosUS begins its hiring process each cycle, it tries to recruit canvassers from previous cycles who bring with them the skills and institutional knowledge acquired through experience. After assembling their "dream team of staff," UnidosUS "go[es] out in the community [to] recruit people to fill th[e] gaps." Tr. 27:14-17.

Hiring noncitizens is a significant part of the operations of several of the Plaintiff 3PVROs. Roughly 70 percent of UnidosUS canvassers were Hispanic

---

[5] NAACP Plaintiffs who rely upon volunteers for voter registration—Florida NAACP and Voters of Tomorrow, for example—do not conduct formal background checks, and instead rely upon a trusted network of volunteers known to their organizations. *See, e.g.*, Tr. 950:9-21; Tr. 1157:8-1158:11, 1178:1-12.

noncitizens prior to SB 7050's passage. Tr. 79:9-16; *cf.* Tr. 536:17-21 (90 percent of Poder Latinx staff were noncitizens); Tr. 586:6-9 (70 percent of Hispanic Federation canvassers were noncitizens in 2022). Noncitizen canvassers are important to Plaintiffs' abilities to advance their missions for several reasons. They often live in the Hispanic communities these 3PVROs serve, which gives them unique and particular knowledge, including where to go to be most effective in helping people register to vote. Tr. 95:12-22. Their language skills are also incredibly important to enabling Plaintiffs to advance their missions: because a number of Hispanic U.S. citizens are Spanish monolingual, "they need to have somebody who actually speaks [] Spanish" to help them register, and that is more often noncitizens than citizens. Tr. 96:6-13. Plaintiffs have also found that their noncitizen canvassers are among some of their "best workers," committed to the training process and "completely prepared to do the work." Tr. 693:5-9; *see also* Tr. 81:8-20 (J. Nordlund noting higher retention and lower turnover among noncitizen employees).

**Training:** Before any UnidosUS canvassers can go into the field for any given registration drive, each of them—including returning canvassers—must undergo a two- to three-day training. Tr. 44:11-21; *see also* PX 754 (sample training agenda). The organization also conducts additional periodic trainings, daily briefings, and on-the-spot trainings for canvassers. Tr. 44:24-45:15. The same is true for Florida NAACP, which conducts extensive trainings with its branches, often including the

local supervisors of elections, to ensure volunteers are prepared to conduct voter registration in accordance with the law. Tr. 1158:17-1159:8. Other 3PVROs similarly require training for all canvassers. *See* Tr. 974:2-12 (VOT); Tr. 398:16-23 (Mi Vecino); Tr. 531:8-23 (Poder Latinx); Tr. 576:18-578:11 (Hispanic Federation); Tr. 1201:10-1202:1 (League of Women Voters).

* * *

UnidosUS and other 3PVROs engage in this multi-step process "to ensure that everybody who comes through our campaign to register to vote . . . can ultimately vote on election day." Tr. 42:24-43:3; *see also* Tr. 400:9-22 (V. Herrera describing operations and quality control at Mi Vecino as "perfectionist"). In other words, it serves Plaintiffs' missions to make sure that the applications they collect result in successful voter registrations.

### C.   What 3PVRO Canvassers Don't Do

NAACP Plaintiffs' testimony confirmed that canvassers:

- **Do not engage in policymaking**. Tr. 50:4-7 (J. Nordlund, UnidosUS); Tr. 159:1-3 (H. Orjuela); Tr. 977:11-14 (S. Mayer, VOT).

- **Do not exercise discretion** when it comes to performing their jobs. Tr. 50:8-12 (J. Nordlund, UnidosUS); *see also* Tr. 158:13-18 (H. Orjuela); Tr. 977:15-17 (S. Mayer agreeing the task of collecting and submitting voter registration applications is "ministerial").

- **Do not have a choice in whether to return a completed voter registration application**. Tr. 50:13-18 (J. Nordlund, UnidosUS); *see also* Tr. 158:19-22 (H. Orjuela: "I always have to turn [voter registration applications] in. All voter registration applications have to be turned in."); Tr. 977:7-10 (S. Mayer:

Following election laws "is not a choice. I think it is an obligation"); Tr. 180:11-20 (E. Sánchez: "If we had received ten applications in the morning, then ten of them would have to come back at the end of the day" regardless of whether they were completed or not).

- **Do not tell voters who to vote for**. Tr. 156:10-11 (H. Orjuela); Tr. 959:3-5 (S. Mayer); *see also* Tr. 1183:1-4 (C. Slater: "[W]hen we do voter registration, we don't tell a person how to register, whether it's Democrat, Republican, or Independent or whatever.").

- **Do not change information on registration applications**. Tr. 157:13-15, 186:10-12, 191:2-5, Tr. 431:16-19.

And, in particular, noncitizen canvassers:

- **Do not leave the country with voter registration applications in their possession**. Tr. 87:24-88:2 (J. Nordlund, UnidosUS); Tr. 161:10-17 (H. Orjuela); Tr. 186:13-16 (E. Sánchez); Tr. 976:2-15 (S. Mayer: "I think it's ludicrous. I think when I'm making my suitcase, I'm packing my clothes. I'm not grabbing paper forms and putting them in.").

- **Do not fail to turn in voter registration applications**. Tr. 88:3-6, 11-20 (J. Nordlund, UnidosUS); Tr. 975:11-13 (S. Mayer, VOT); Tr. 587:20-22 (F. Velez Burgos, Hispanic Federation)

- **Do not warrant less trust**. Tr. 88:3-6, 11-20 (J. Nordlund, UnidosUS); Tr. 975:11-13 (S. Mayer, VOT); Tr. 587:20-22 (F. Velez Burgos, Hispanic Federation); *see also* Tr. 1750:16-19 (Secretary's witness Assistant State Attorney VanderGiesen testifying that he has no reason to believe any noncitizen colleagues in his office would be any less trustworthy).[6]

---

[6] Plaintiff Veronica Herrera-Lucha also provided testimony about an important job that permanent resident canvassers like herself *can* do: work as a notary. 392:24-393:6. As a notary, Ms. Lucha certifies affidavits and reviews citizens' forms of identification and identification information. Tr. 393:7-18.

### D.      Plaintiffs' Speech and Association through Voter Registration

The evidence at trial made clear that 3PVRO voter registration is an expressive and associational activity designed to engage voters in the political process.

**Speech during voter registration.** Canvassers communicate messages about "the importance and significance of voting," Tr. 639:2-640:6, 959:14-19 ("you can't defend democracy if you can't vote"), provide information about key issues and races on the ballot, Tr. 530:3-10, 1204:4-1205:14, and answer voters' questions about everything from election logistics to future work opportunities with the 3PVRO, Tr. 465:3-20 (Senator Torres explaining canvassers provide important information to voters such as where to vote, "who [is] running," "what precinct [] to vote in," the "three ways of voting" and to "make sure they come out and vote during the times of elections"). Each canvasser has "their own way of [] communicating how they would want to encourage somebody to register to vote," Tr. 48:15-21, often drawing upon their own "background or lived experience," Tr. 48:22-49:16. The purpose of these conversations between canvassers and voters is for the canvasser to communicate why they believe in registering to vote—both on their own behalf and on behalf of their organization. Tr. 49:14-16, Tr. 181:1-10 (Ms. Sánchez explaining that her role as a canvasser was "educating them [about] the importance of that registration that leads to a vote"); Tr. 512:9-23 (Ms. Martinez testifying that she

comes from a country in which "democracy has practically been lost" and "to help the Latino population in this country to support democracy" is "very important" for her).

**Associations among canvassers and within the community.** Plaintiffs also testified that many canvassers, including noncitizen canvassers, come back year after year to work with the 3PVROs to help register voters and "so over time" they, together with the organization and fellow canvassers, "begin to [] create a family." Tr. 88:15-20 (J. Nordlund, UnidosUS). 3PVRO canvassers not only foster these relationships within their organizations, they also view voter registration work as their way of connecting with the broader political community. For instance, Plaintiff Humberto Orjuela Prieto testified that laws passed in Florida "affect everyone that is here" regardless of citizenship, and that canvassing is how he stays connected to the political community. Tr. 161:18-24. Mr. Mayer likewise explained, "[A]s an immigrant who hopes to naturalize in the near future, I want to make sure that when I'm able to vote, the country will be in a better place than it is right now, because I care about it. And, again, that's why I'm doing this job. That's why I want to register voters." Tr. 976:16-25. Ms. Scoon also explained how monitoring the citizenship of members would create division and undermine the work the League has done to bring together Hispanic and Black members of the organization. Tr. 1272:25-1274:6;

*see also* Tr. 608:21-609:23 (F. Velez Burgos testifying that it would be hypocritical and contrary to Hispanic Federation mission to ban noncitizens from participating).

**Post-registration communications and associations.** Plaintiffs testified about the importance of retaining voter contact information for their get-out-the-vote work, including to "follow up with voters after they're registered to make sure they have a plan to go vote in the upcoming election." Tr. 97:11-16 (J. Nordlund, UnidosUS); *see also* Tr. 959:20-25 (S. Mayer explaining that VOT will send texts or emails to "make sure that [voters] are aware of where their polling place and that they are . . . ready to go vote."); Tr. 1162:2-8 (C. Slater testifying that Florida NAACP "make[s] sure that [the voter's] contact number is on the [] voter registration application" and "follow[s] up" with voters "to make sure that they received their voter registration card"); Tr. 1252:13-24, 1254:9-19 (C. Scoon explaining that the League retains voters' information to keep in touch about League events and remind voters of upcoming election dates). Sometimes these follow-up messages are the difference between a voter turning out or not. For instance, Plaintiff Santiago Mayer provided one example of a voter responding to a text saying, "I'm going to go vote just because of you." Tr. 960:11-21.[7]

---

[7] Olivia Babis Keller testified that Disability Rights Florida planned to build an accessible get-out-the-vote platform that would be the first of its kind in the country using retained voter information, as other platforms are not accessible for some of

Some 3PVROs also use contact information to reach out to engage new voters in issue advocacy on topics most relevant to the community. Tr. 97:17-20 (J. Nordlund, UnidosUS). These organizations form ongoing relationships with the voters they help register, often engaging them to participate in advocacy campaigns or future voter registration campaigns on behalf of the 3PVRO. Tr. 99:1-22 (J. Nordlund, UnidosUS); *see also* Tr. 961:14-962:3 (S. Mayer testifying that retention of voter information has led to recruiting new VOT volunteers "multiple times"); Tr. 533:13-15 (C. Wassmer: "Many times our canvassers out in the field recruit community members to join our campaigns."); Tr. 190:14-23 (Ms. Sánchez speaks with potential voters about the ability "to find some work" with the 3PVRO). Ms. Slater recalled one instance where a voter she helped register became deeply engaged and involved in Florida NAACP:

> "[T]his young man registered to vote, got his voter registration card, knew when our membership meeting was, came to our membership meeting, stood up . . . pulled his voter registration card out, showed us his card with . . . just a great big smile and wanted to be a part of one of our committees. [H]e is actually part of our executive committee. And so he is proud of being a member, proud of being a registered voter, and he's excited about doing the work in the community."

---

DRF's constituents, particularly those who are blind. Tr. 1328:3-1329:20. Those plans remain stalled in light of the ban imposed by SB 7050. *Id.* 1329:21-1330:12.

Tr. 1162:14-25. This example highlights "the stories that we are so proud of when it comes to not only registering people to vote but being a part of the community and making a change." Tr. 1162:25-1163:3.

### E.    Rarity of 3PVRO Issues in Florida

The testimony at trial—from fact witnesses, Dr. Herron, as well as admissions from all of the Supervisors of Elections—revealed no evidence of an actual, systemic problem among Florida 3PVROs that precipitated or necessitated enactment of the challenged provisions. SB 7050, in other words, was quite literally a solution in search of a problem.

#### 1.    Fact Witness Testimony

**3PVRO civil violations prior to SB 7050 were exceedingly rare.** Many 3PVROs have never received fines for their voter registration work, including Plaintiff DRF. Tr. 1324:18-20. A few Plaintiffs have received civil penalties in very limited circumstances. UnidosUS has received a civil penalty twice, once for two applications delivered to the wrong county, and once for an isolated incident of five applications (out of over 50,000 for that canvassing year) being turned in late because they had gotten stuck between folders in the lockbox. *See* Tr. 58:1-15, 59:11-14, 61:3-62:10. [8]  UnidosUS received no indication that those five individuals were

---

[8] This Court has previously articulated how rare UnidosUS's issues are:

unable to vote because of the delayed submission. Tr. 65:13-16. Alianza has submitted only 13 applications that were noncompliant (most were for delivery to the wrong county) out of the 7,000 applications submitted on behalf of registrants. Tr. 661:12-662:6, 663:17-22. Florida NAACP has received no fines letters in the last five years. Tr 1174:14-16. And despite being active in registering voters for decades, Florida NAACP has been fined only once, and received three other warning letters from the State in 2016 and 2017. Tr. 1174:17-1175:12.

Supervisor Earley testified that, prior to SB 7050, his office rarely received voter registration applications from 3PVROs after the deadline. Tr. 738:15-17. He also agreed that for those applications he did receive from the wrong county, it was because it is not always clear which county a voter lives in. Tr. 743:9-14. Supervisor of Elections for Lake County Alan Hays also testified that he was not aware of any problems with 3PVROs turning in late applications in the 2020 election or with a

---

Unidos has registered 300,000 voters since 2012. Of those 300,000, five applications were submitted late, 3 were too late to vote in the primary and 2 were too late to vote in the general election. That means there is roughly a 0.00016% chance that a voter who registered through Unidos would be unable to vote because Unidos submitted their application late. By contrast, there is roughly a 0.0065% chance that a person will be struck by lightning their lifetime (a 1/15,300 chance). In other words, potential registrants are more likely to be stuck by lightning during their life than to have Unidos turn their application in late. In short, it is incredibly unlikely that the Plaintiff organizations would turn in an application late.

*Lee*, 595 F. Supp. 3d at 1149–50 (citations omitted).

voter ever being prevented from voting because of a 3PVRO action. Tr. 1829:23-1830:4.

**There is scant evidence of misconduct among noncitizen canvassers.** As the testimony at trial repeatedly underscored, most organizations have never had an issue with a noncitizen canvasser acting inappropriately. *See, e.g.*, Tr. 951:2-4, 975:7-13, 975:18-24 (S. Mayer, VOT). This makes sense: organizations want to help voters register and thus "really, really keep strong control over" voter registration applications, setting "rules, guidelines, control, responsibility, expectations, and [] a system to avoid mistakes or anything of that nature." Tr. 1208:17-23. None of the NAACP Individual Plaintiffs have ever misplaced a voter's registration application during canvassing. Tr. 160:24-161:6 (Mr. Orjuela), 186:8-9 (Ms. Sánchez); *cf.* Tr. 976:2-11 (Mr. Mayer testifying that he has not left the state with voter registration applications in his possession).

None of the state officials who testified offered any evidence of noncitizen misconduct either. Tr. 844:19-22 (Florida Statewide Prosecutor Nicholas Cox testifying that he is "not [] aware of any incidents involving a noncitizen mishandling voter registration materials on behalf of a 3PVRO"); Tr. 1741:1-10 (State Attorney VanderGiesen testifying that he is not aware of any noncitizens mishandling voter registration information). Supervisor Earley was similarly not aware of a single instance in which a noncitizen canvasser mishandled a voter registration application,

23

Tr. 744:24-745:5, nor was Supervisor Hays, Tr. 1833:12-1834:22.[9] Of the remaining

65 Supervisors who did not testify, none could identify any issue with a noncitizen

canvasser, as reflected in their discovery responses. *See* PXs 647-713.

**3PVROs do not have problems with identity theft or improper use of voter information and there is no evidence of systemic voter fraud among 3PVROs.** Supervisor Earley agreed that instances of fraud by individual canvassers were exceedingly rare and "the exception, not the rule." Tr. 804:7-12. Any fraud has been limited to a small number of bad actors, and he had only received suspicious applications from six 3PVROs out of all thousands of 3PVROs. Tr. 805:4-14. Moreover, the 3PVRO that primarily had issues in his county was terminated. Tr. 805:17-806:16. Supervisor Hays testified similarly. Tr. 1831:19-1833:1 (stating his office has not referred any instances of identity theft or any illegal use of voter information related to a 3PVROs' retention of voter information for criminal investigation). Of the remaining 65 Supervisors who did not testify, just four identified in discovery responses that they had referred to law enforcement potentially unlawful activities related to third party voter registration conduct, *see*

---

[9] Just two years ago, more Supervisors, including Supervisor White, Supervisor Scott, and Supervisor Latimer, testified "that they were unaware of widespread issues related to 3PVROs turning in applications late." *Lee*, 595 F. Supp. 3d at 1150.

PXs 686, 688, 694, and 662, meaning 62 of the 67 counties have not dealt with any such issues whatsoever. *See* PXs 647-713.[10]

Of course, as with anything, there have been rare and isolated instances of bad actors. For example, UnidosUS has been operating a voter registration program in Florida since 2008 and has encountered an issue with an individual canvasser only "a few times." Tr. 50:22-51:1. When those issues arose, the canvassers were immediately suspended and were no longer allowed in the field or around voter registration applications. Tr. 54:20-24. Once the investigations were completed, the canvassers were terminated. Tr. 54:25-55:2. Other canvassers at UnidosUS had to undergo re-training within a day or so of the isolated issue. 55:3-16.[11] Florida NAACP, meanwhile, has only had an issue with one member—out of 12,000—involving an investigation into whether two voter registration applications had their dates altered. Tr. 1154:1-2, 1175:13-1176:5; *cf.* Tr. 560:22-561:4 (describing termination of single Poder Latinx canvasser under similar circumstances); Tr.

---

[10] Only the Supervisor for Duval County could identify two specific individuals who were referred and prosecuted for identity theft or illegal use of personal information from a voter registration application. PX 688 at 2. However, in reviewing the article Supervisor Holland included in his responses to the requests for admission, it is apparent that the two individuals used other people's personal information to "secure voter registration applications;" they did not take information from a voter registration application for unlawful purposes. *Id.* (linking to https://jaxtoday.org/2022/11/04/three-sentenced-in-duval-county-voting-schemes/)

[11] UnidosUS cooperated with state authorities and provided them with any information they requested during these investigations. Tr. 57:15-16.

583:1-3 (canvassers terminated for breaking Hispanic Federation protocols). Notably, none of these instances involved a canvasser mishandling voter information or identity theft. Tr. 106:18-22.

## 2.    Expert Testimony

Dr. Herron examined the frequency of 3PVRO issues as reflected in the 2023 Office of Election Crimes and Security (OECS) Report, letters sent to 3PVROs assessing fines against them from 2016 to 2023, and—for context—a dataset from the U.S. Election Assistance Commission on rejected voter registration applications. Tr. 203:19-204:8, 222:3-4. Dr. Herron's analysis corroborated the fact witness testimony that problems with Florida 3PVROs are exceedingly rare.

In particular, Dr. Herron concluded that only 1 percent of the "roughly 440,000" applications processed since 2016 were "fineable registration applications." Tr. 238:5-20. Excluding the sole identifiable bad actor, Hard Knocks, which was responsible for over of half the delinquent applications, Tr. 232:1-8, 234:25-235:25, 236:7-14, 237:19-25; PX 14, that percentage decreases to 0.5 percent, Tr. 238:24-239:9. There was no evidence presented at trial that a noncitizen canvasser was implicated in any of these instances of noncompliance, Tr. 221:21-23, or that identity theft occurred, Tr. 227:9-11.

Moreover, of the 17 3PVRO-related allegations in the OECS report, none resulted in an arrest. Tr. 205:21-206:17; *see also* PX 22 (table reflecting the same).

None concerned noncitizens. Tr. 220:13-221:23. Nothing in the OECS Report or fines letters indicated that 3PVROs' retention of voter information to use for get-out-the-vote purposes had led to illegal activity. Tr. 225:24-226:4. While Dr. Herron found two instances of individuals working with 3PVROs fraudulently filling out voter applications, he testified that it was not clear where these individuals got the voter information, and these acts were already criminalized and investigated under existing criminal laws prior to SB 7050. Tr. 226:5-227:7. And there was no evidence that these instances involved identity theft. Tr. 227:9-16.[12]

Finally, in reviewing data from the U.S. Election Assistance Commission, Dr. Herron concluded there was no evidence that Florida voter registration applications were rejected at higher rates as compared to other states that have 3PVROs. *See* Tr. 231:7-25. Nor does any literature or study suggest that noncitizens are more likely to misuse voter information or misplace voter registration applications. Tr. 222:5-12.

\* \* \*

---

[12] During cross examination, counsel for the Secretary suggested that certain entries in the OECS report would not have turned up in Dr. Herron's search, but the two examples he showed—Entry 2676 and Entry 2677—*do* include the word 3PVRO and were included within Dr. Herron's count of 17 3PVRO entries. *Compare* Tr. 311:8-312:21, *with* DX 14 at 78. Counsel for the Secretary represented to this Court that they would put up a witness to talk about the OECS report, Tr. 371:3-25, but they never did. As a result, Dr. Herron's testimony about the report and entries involving 3PVROs is uncontested in the record.

In sum, the evidence presented from both Plaintiffs and Defendants reveals that there is no widespread misconduct or illegal activity by or within 3PVROs.

### F.    Relevant History Leading Up to SB 7050

In Florida, efforts by the legislature to rewrite or erase history and pass archaic laws all but guarantee that the worst parts of our history—rife with discrimination, inequality, and violence—reign once again.

#### 1.    Florida's Recent History

Dr. Allan Lichtman testified about Florida's recent historical background in education, immigration, and voting, and how it led up to and informed SB 7050. Tr. 1495:19-20.[13] His analysis focused almost entirely on twenty-first century history. Tr. 1496:8-13.

Dr. Lichtman testified that "SB 7050 was not an aberration, not something that came out of nowhere, but something that is intimately tied to what is revealed

---

[13] Dr. Lichtman's full credentials are included in Plaintiffs' Exhibit 83. He is a distinguished professor of history at American University and has been teaching for 50 years. Tr. 1421:21-22, 1423:18-20. He has written numerous books on political history, Tr. 1424:20-1425:13, written a book and provided commentary relying on political analysis, Tr. 1425:22-1426:12, and has written a book and multiple articles on historical and quantitative methods, Tr. 1426:21-1427:8. He has served as an expert witness in approximately 110 cases. Tr. 1427:22-23.  Courts have relied on Dr. Herron's testimony in cases concerning racial discrimination, including the United States Supreme Court. Tr. 1427:24-1428:12. He has offered expert opinion many times in cases concerning discriminatory intent. Tr. 1429:22-1430:19. In the 40 years that Dr. Lichtman has served as an expert witness, every court that he has testified in front of has credited Dr. Lichtman as an expert. Tr. 1430:21-1431:4.

in the recent historical background, in particular a racial ideology and a particular immigrant threat narrative." Tr. 1495:21-1496:3. This racial ideology "downplays past discrimination against minorities, particularly [] the role of white people in that discrimination. It denies any connection between a history of discrimination and the current status of minorities[.]" Tr. 1508:7-17. Because this ideology "denies that there is any existing discrimination against minorities, that America's a pure meritocracy where race doesn't matter and everybody just succeeds by virtually their own wit and ability," it does not embrace "outreach efforts to minorities, like affirmative action or diversity, equity and inclusion programs and, ultimately, does privilege whites." Tr. 1508:12-23.

Based on his assessment of the recent history in education, immigration, and voting in Florida, Dr. Lichtman found that SB 7050 "was consistent with a history of discrimination" and that such discrimination has impacted "a subset of Floridians," specifically "African-Americans and Hispanics." Tr. 1525:10-17.

**Florida's racial ideology in SB 7050 is evidenced in recent education laws.** Dr. Lichtman testified that education was relevant to his analysis because it demonstrates "the willingness to use state power to impose that ideology" in a manner that could carry through to legislation. Tr. 1508:2-6. Dr. Lichtman testified to Florida's recent education policy to exclude the voices of minority groups. For instance, during Governor DeSantis's post-2018 election revamp of Florida's public

schools' secondary education curriculum, the only higher education entity involved in the process was Hillsdale College, a small, out-of-state Christian college that was also involved in the 1776 Project, which was "designed to guide the teaching of American history and civics" but "downplayed or even excused past instances of discrimination, didn't discuss any linkages between past discrimination and present-day status of minorities in the United States, did not talk about any existing discrimination against minorities." Tr. 1510:2-25. "None of [the groups involved] were civil rights organizations; none were headed by minorities; none were academic" organizations. Tr. 1509:13-22.

Dr. Lichtman also testified about HB 7, a bill that sought to combat "woke indoctrination." Tr. 1512:23-1513:5. HB 7's ban on critical race theory—which banned any discussion outside of "factual information on topics including African-American history and the Holocaust" because anything more could lead to "subjective indoctrination that pushes collective guilt" in Florida's public school curriculum, Tr. 1514:4-8—is not based on "any alternative body of scholarship" because that scholarship "doesn't exist." Tr. 1514:16-24.

Dr. Lichtman also testified that the state relied on legislatively permitted book bans to scrub out critical race theory and related content from books relied on in schools. Tr. 1516:20-1517:18. The legislature explicitly passed a law to loosen restrictions on book banning, which led to an increase in bans on books primarily

authored by "eminent minority authors[.]" Tr. 1519: 13-25. Dr. Lichtman that these book bans, in addition to the revamping of Florida education and HB 7, demonstrated "officials in Florida using the power of the State to impose the racial ideology. DeSantis is involved, but the legislature is at the center of it because they are passing the laws." Tr. 1519:8-12.

**The noncitizen threat narrative in SB 7050 runs through recent immigration policy.** Dr. Lichtman discussed the way in which Florida's recent immigration policy is based on the "immigrant threat narrative," which posits that immigrants are "a serious threat to the lives and safety of Americans, that immigrants are dangerous and threatening and need to be dealt with. So they're associating being an immigrant with [] being a potential criminal or someone who is dangerous." Tr. 1520:20-25.

For instance, SB 1718, which among other things mandated hospitals to ask and report documentation status, Tr. 855:17-24, was passed "almost exactly at the same time as the adoption of 7050 by the same legislature" and was "one of the most stringent anti-immigration bills passed by any state" that "implicated so many aspects of immigrant life—employment, law enforcement, medical care, transportation." Tr. 1524:3-11.

Dr. Lichtman testified that the immigrant threat narrative is a fabrication without any basis in facts or data. Tr. 1521:23-1522:20.

**Discrimination in SB 7050 parallels Florida's recent voting law history.**

Dr. Lichtman also examined recent voting laws in Florida and uncovered a consistent pattern of discriminatory impact against minority voters.

For instance, in the redistricting context, Dr. Lichtman testified that Florida's 2002 House plan was found by the U.S. Department of Justice to "discriminate[] against Hispanic voters" in Collier County and "had to be redrawn." Tr. 1497:5-17. And in the most recent redistricting cycle, the State admitted that the 2022 congressional plan had the effect of "dismantling a functioning, performing Black opportunity district and then creating new districts, none of which were effective in performing for Black voters." Tr. 1501:22-1502:1.

Dr. Lichtman further testified to recent voter purges in Florida, including two that were performed at the behest of the legislature and had a discriminatory impact on Black and Hispanic voters. Tr. 1503:8-1505:13.

Dr. Lichtman also discussed the recent "crackdown on alleged voter fraud"—notwithstanding the Governor's proclamation that Florida was the "gold standard" in election administration—in which OECS has intervened in cases primarily involving Black Floridians who were previously convicted of felonies and were attempting to vote. Tr. 1505:14-1506:11. In stark contrast, OECS ignored the allegations of double voting in the predominately white neighborhood the Villages,

even though double voting is a "much more serious crime, and one that would be a crime in any state, unlike felon disenfranchisement." Tr. 1506:17-20.[14]

**The testimony of Plaintiffs' witnesses and state legislators reinforced Dr. Lichtman's expert analysis.** Senator Torres and Representative Eskamani both testified about how the legislature has targeted democratic participation by Hispanic voters and immigrants as Central Florida has seen substantial growth within "the Hispanic, the Puerto Rican community." Tr. 452:17-19, 456:13-15, 457:18-21, 458:16-459:9, 489:18-21, 851:2-10, 852:6-22.

Between 2012 and 2022, the Hispanic citizen voting age population in Osceola County nearly doubled in size. Tr. 456:22-457:10. As the demographics of the state shifted, in part "following Hurricane Maria, with many climate refugees" and "a large Central and South American community," Tr. 852:23-853:13, 853:23-25, efforts to target and limit Hispanic—and specifically Puerto Rican—participation in the democratic process grew. Tr. 471:9-472:1 (Senator Torres noting that the legislature "was targeting my community over and over"). Minority communities are increasingly experiencing "hateful rhetoric" and "policies that make it harder to be an immigrant in Florida." Tr. 854:1-11. As a first-generation

---

[14] Dr. Lichtman testified that the prosecutions against Black voters did not result in any convictions, in part because "in many cases . . . these individuals were not intentionally committing voter fraud"; they were simply confused about whether people previously convicted of felonies could vote at all. Tr. 1506:23-1507:5.

immigrant, Representative Eskamani spoke to her personal experience being targeted. Tr. 854:11-16. And she discussed how anti-immigrant legislation like SB 1718 passed despite vocalized concerns from many legislators and stakeholders "of different political backgrounds." Tr. 855:6-856:14.

In addition, Representative Eskamani described "sweeping pieces of policy that impact the immigrant experience, that impact representation, [and] that impact historical context," so much so that she believes "we can all agree across the aisle, there's been, more than not, policies that make life harder to be an immigrant or a person of color in the Sunshine State." Tr. 857:1-14. For example, SB 1718—enacted during Representative Eskamani's tenure, Tr. 855:6-11—is "an omnibus bill that explicitly makes it difficult to be an immigrant in Florida" in a variety of ways. Tr. 855:17-18. The law "is one of the most stringent anti-immigration bills passed by any state, so stringent that . . . the largest Hispanic advocacy organization . . . called for a boycott of Florida." Tr. 1524:3-9. The law "implicated so many aspects of immigrant life—employment, law enforcement, hospital care, transportation," Tr. 1524:9-11, mandating among other things that "hospitals that receive Medicaid have to ask about documentation status" and provide that data to the state. Tr. 855:16-24.

The legislature's sweeping policies extended beyond immigrants and also impacted Black Floridians. For instance, HB 7, "really is designed to go after diversity, equity, inclusion trainings within different sectors of society, specifically

K to 12, the private sector and businesses, and then also higher ed." Tr. 857:15-21, 859:4-7. In reviewing Governor DeSantis's press release about the bill, Representative Eskamani noted that the rhetoric surrounding "wokeness" and "critical race theory" have become "dog whistles for issues of racial tension and race identity." Tr. 858:20-859:11. "[F]or Black caucus members in particular, it was a very painful piece of policy to debate on the House Floor." Tr. 859:12-16. Since HB 7's passage, "there's been a lot of litigation" though "that hasn't stopped new bills that pull pieces of HB 7 into their language." Tr. 860:10-19. From debates over whether "enslaved people benefited from slavery" to "book objections," Florida's recent history has "really created this environment where many of [Eskamani's] constituents feel as if they are being isolated and erased from different parts of society and that their lived experiences don't matter compared to their peers." Tr. 860:20-861:5. While many of these DEI programs were "designed to create an even playing field to address societal disparities," that progress "has visually been removed from different institutions." Tr. 861:6-12. Although it may "take longer to see the impact," "a lot of those steps have already been taken by the legislature." Tr. 861:6-12.[15]

_____

[15] In response to the history of race-related legislation to which Representative Eskamani testified, counsel for Defendants pointed out that Hispanic legislators voted for these bills. But as she made clear, "Hispanic legislators are not a monolith." 918:12-920:14. Defendants further tried (and failed) to get any witness to agree that

## 2.    Florida's Regulation of 3PVROs Prior to SB 7050

SB 7050 was enacted on the heels of other Florida legislation limiting 3PVRO engagement and voter outreach.

In 2011, the legislature passed HB in 2011, which among other things required 3PVROs to return voter registration applications within 48 hours. *See League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1157–58 (N.D. Fla. 2012). As a result of litigation, the Court entered a permanent injunction finding that "any period less than 10 days" for delivery of applications would be unlawful. *League of Women Voters of Fla. v. Detzner*, No. 4:11CV628-RH/WCS, 2012 WL 12810507, at *1 (N.D. Fla. Aug. 30, 2012). As a result of that decision, there was a period of relative peace, with 3PVROs serving and registering voters in their communities— until the legislature passed SB 90.

Enacted in 2021, SB 90 introduced the requirement that 3PVROs must deliver voter registration applications to the county in which the applicant resides within 14 days and compelled 3PVROs to "notify the applicant at the time the application is collected that the organization might not deliver the application" on time or to the right county and "must also inform the applicant how to register online." Tr. 869:6-

---

the "language of a piece of legislation [] speaks for itself." Tr. 921:5-6. The Court instead heard "that there is a lot of untold stories behind text" including who had input into and drafted the legislation and the process of how the language evolved over time. Tr. 921:7-10.

18; *see also League of Women Voters of Fla. Inc.*, 66 F.4th at 919–20 (describing these provisions of SB 90).

While litigation over SB 90 was still pending, the legislature introduced and passed SB 524 in 2022, raising the aggregate fines that could be assessed against a 3PVRO "50 times over" from $1,000 to $50,000. Tr. 468:24-469:9 (Sen. Torres). Representative Eskamani provided additional details: The stated rationale of SB 524 was to try to "stop individuals that are intentionally withholding voter registration forms." Tr. 887:5-12. Yet intent was not included in the provision, and 3PVROs were, and continue to be, fined regardless of whether the late-returned or wrong county applications were intentional. Tr. 887:13-20. SB 524 "not only upped penalties but then created the Office of Elections Crime and Security." Tr. 867:22-24. The stated rationale for OECS was purportedly "trying to stop bad actors that fall through the cracks," but there was no evidence of specific bad actors or fraud presented; to the contrary, "Governor Ron DeSantis had celebrated Florida election systems for being . . . the best in the country." Tr. 879:20-880:24. And the OECS, "which continues to receiv[e] more funding, which continues to operate in existence, has not delivered on any type of necessary need of the integrity of our elections, especially since there has been no . . . dramatic discovery of fraud, if you will, that wasn't already being accounted for by other agencies." Tr. 882:22-883:2.

In Representative Eskamani's words, the legislature's formation of OECS was "part of a pattern of behavior of creating election law not because it's something necessary, but because there's an intent to weaponize agencies to make it more difficult to vote and register people to vote." Tr. 884:7-11. Coupled with the fact that the Secretary is given discretion to enforce the provisions against 3PVROs, when and why organizations are fined became "very confusing." Tr. 877:7-22. As Representative Eskamani testified, "the fact that SB 524 "[came] to fruition and chang[ed] 3PVRO laws again when they were just changed, without indication of any media reporting or testimony of concern . . . should raise red flags." Tr. 891:10-14. With the passage of SB 7050, Representative Eskamani felt a sense of "déjà vu." Tr. 867:25-868:7.

Dr. Lichtman's testimony corroborated this recent history of 3PVRO regulation in Florida. As he discussed, for over a decade the maximum fine for a 3PVRO was $1,000, and then SB 90 hiked up that figure to $50,000, "a quantum leap type of escalation." Tr. 1530:2-4. During the SB 7050 legislative process, the legislature initially proposed to double the fine to $100,000. Tr. 1530:5-7. Then "in the midst of the deliberations, without review, the sponsors of SB 7050 went from 100,000 to 250,000, 2.5-fold increase in the midst of the legislation and 250 times

higher than where it had been at $1,000, and, of course, five times higher than it had been hiked just a couple of years earlier." Tr. 1530:5-12.[16]

### 3. Selective enforcement of 3PVRO regulations.

The evidence at trial also reveals a pattern of selective enforcement against those 3PVROs that serve central Florida's (overwhelmingly Puerto Rican) Hispanic population. Between March 29, 2022 and October 27, 2022, for example, the Department of State received a number of noncompliance forms reporting violations by Hispanic 3PVROs in Central Florida. *See* PXs 460-61 (UnidosUS), 414-24 (Hispanic Federation), 431-40 (Mi Familia Vota), 365-82 (Poder Latinx). But the Department declined to act on these reports. Instead, as early as February 2023 the Department began working with the legislature to draft SB 7050 to both increase the allowable fines and target non-citizen canvassers. *See* PX 162. Only after the legislature passed SB 7050 did the Department act on the noncompliance forms discussed above, issuing a bevy of fines between May 15th and 17th 2023—many over a year after the violation was reported. *See* PX 264.

These fines were not evenly distributed across the state. Polk County, in Central Florida, accounted for 72 percent of all 3PVRO fines imposed in 2023. *See*

---

[16] Not only were significant fines already in place prior to SB 7050, but also as Statewide Prosecutor Cox testified, the Attorney General's Office had the power to prosecute crimes related to voter registration, voter fraud, identity theft, and the submission of false voter registration information prior to SB 7050's passage. Tr. 838:12-25.

Appendix A. This is so even though Polk County accounted for less than four percent of the state's 36,571 3PVRO registrations in 2022. PX 230. On the other hand, Miami-Dade—the state's most populous county and the county with the greatest number of 3PVRO registrations submitted (over 8,000 in total in 2022)—saw *no* 3PVRO fines that year. Appendix A; PX 230.

This disparity is not for lack of fineable offenses from South Florida. Between March 24, 2022 and October 18, 2022, for example, the Department received seven 3PVRO noncompliance forms from Supervisors reporting violations in Miami-Dade County by a 3PVRO named Family Action Network Movement. PX 285–92. The Department even drafted a fine letter to the organization alleging that it had submitted 12 applications to the wrong county, among other violations. PX 284. That letter, however, was apparently never issued. *See* PX 264. Months later, the Department drafted a second letter to Family Action Network—dated May 9, 2023— this time identifying 14 applications delivered to the wrong county. PX 513. This letter too was apparently never issued. PX 264. Similarly, the Department drafted a letter to the Republican Party of Florida (dated May 8, 2023) issuing fines for late applications and for applications, largely in South Florida, delivered to the wrong county. PX 512. This letter was never issued. PX 264. A draft letter to the Florida Democratic Party (dated May 8, 2023) issuing fines for a host of alleged violations

across the state also went unsent. PX 510, 264.[17]  Finally, additional 2023 violations by the Republican Party and an organization called "MAGA The Movement" also apparently did not merit fines. *Id.*; *see also* PX 463, 473 (Collier County noncompliance forms reporting MAGA The Movement violations). The Department seemed to enforce fines with particular fervor in Central Florida. *See* Appendix B.

In short, the Department withheld enforcement of existing penalties while working with the legislature to again increase penalties. Then, once those penalties were passed into law—along with other targeted provisions—the Department dumped a year's-plus worth of enforcement on Central Florida's Hispanic 3PVROs. This one-two punch had the desired effect—3PVRO activity in Central Florida stuttered and collapsed. *See infra* Section I.J.

### G.    Legislative Process

Several participants in the legislative process for SB 7050 testified to the uniquely truncated manner in which the legislation was introduced, debated, and enacted. As Representative Eskamani explained, the typical process of considering and passing legislation is "very much like *Schoolhouse Rock*," with plenty of "back-and-forth" to edit the bill, assignment to different committees, consideration on the "respective chamber floors" and eventually signing by the Governor. Tr. 897:6-

---

[17] These violations, along with those actually fined, are also noted in PX 742 at 3 (noting "wrong county" violations in 2022 by the Republican Party of Florida, Family Action Network Movement, and the Florida Democratic Party).

899:7. But SB 7050 was like a "fast-forwarded" episode, with a "very expedited approach to policymaking that doesn't happen very often, and . . . limits public engagement." Tr. 899:8-17.

**Legislators received the OECS report, which lacked evidence of 3PVRO misconduct, prior to SB 7050's introduction.** Dr. Herron testified that the 2023 OECS report was published before SB 7050 was passed, and that OECS has an obligation to send this report to the legislature. Tr. 210:3-16; *see also* Fla. Stat. § 97.022(7) ("By January 15 of each year, the [Office of Election Crimes and Security] shall submit a report to the Governor, the President of the Senate, and the Speaker of the House of Representatives detailing information on investigations of alleged election law violations or election irregularities conducted during the prior calendar year."). Representative Eskamani confirmed that she had expected to receive the report in January 2023, that it was publicly available, and the report did not give any clarity as to 3PVRO-related misconduct. Tr. 879:15-19; 910:12-911:6.

**SB 7050's truncated process.** SB 7050 was enacted in a manner that deviated from other Florida laws both in how fast it moved through committees and how long the full legislative bodies had to consider and debate the legislation. While Senator Torres testified that usually bills are offered "before session begins" and average three committee stops, SB 7050 was first introduced in the Senate Ethics and Elections Committee over three weeks after session had already begun, on March

30, 2023. Tr. 474:24-475:11. Legislators and stakeholders had just a few hours with the 98-page bill before they had to debate it. Tr. 1534:18-24. The bill was then introduced on the House side before the State Affairs Committee on April 19, 2023, almost a month into the 60-day legislative session. Tr. 899:24-900:8; PX 248. Despite the amount of election code changes proposed in the bill, the legislature took shortcuts to pass the bill. SB 7050 passed through the legislature within 25 days of its introduction. Tr. 1539:8-13. And the legislature "acted to suspend its own rules" by conducting a second and third reading of the bill on the same day in both the House and Senate. Tr. 1538:15-1539:7.

As Representative Eskamani testified, "for a bill that large and transformative in its impact, typically, . . . a legislative process would allow for there to be vetting of that. . . and public discourse, public engagement." Tr. 900:9-21. And while the majority party certainly prioritizes some bills over others, "even those prioritized bills don't always come out of committee in such an immediate and mysterious way" like SB 7050 did. Tr. 901:5-902:21; *see also* Tr. 1533:4-20 (Dr. Lichtman testifying that bill was passed "without time for full review, analysis, criticism, and response to the criticism").

Those members of the public who were able to keep up and speak in opposition to SB 7050, meanwhile, were given two minutes, which was later cut down to one minute. Tr. 903:16-904:10. Most committees that Representative

Eskamani serves on do not have a time limit at all; if the agenda is packed, "three minutes is typically average, but two to one to 30 seconds is definitely abnormal and, of course, very frustrating for the public who travel to Tallahassee to express their perspectives." Tr. 904:4-10.

Notably, every single speaker who testified during committee and full legislative meetings spoke in opposition to SB 7050, including specifically the Citizenship Requirement and 3PVRO Fines Provision. In one committee hearing alone, "it was 54 to 0, 54 against and 0 for" in terms of stakeholders testifying to their position on SB 7050. Tr. 1475:15-22.

**Legislators were made aware of SB 7050's racial impact.** Legislators were made aware of SB 7050's racial impact in advance of voting on the bill. Stakeholders Speakers specifically testified to the fact that Black and Hispanic voters are roughly 5 times more likely than white voters to rely on 3PVROs. Tr. 477:2-17. That testimony was unrebutted. Tr. 478:4-19. Legislators reiterated the evidence of the discriminatory impact of the law on the House and Senate floors. Tr. 911:7-912:22.

Supervisor Earley testified that he also communicated to individuals at the state level who worked on SB 7050 that the increased fines could have a detrimental impact on 3PVROs and that they would make it more difficult for 3PVROs to serve voters in minority communities. Tr. 742:15-743:1. Supervisor Earley expressed his

concerns that the fines were overwhelming enough to keep 3PVROs from registering voters at all. Tr. 743:2-5.

As Dr. Lichtman testified, there were also at least two letters that were sent to members of the legislature that demonstrated that they both knew and should have foreseen "the crippling effects" that the fines and regulations would have on 3PVROs, as well as that "the impact [was] going to be disproportionately falling on minorities." Tr. 1486:23-1487:1. One letter from the NAACP Legal Defense Fund was sent to the full Committee on Fiscal Policy, Tr. 1485:16-22, while the second from 35 civic organizations in Florida sent to the Senate President and the Speaker of the House. Tr. 1485:23-24. Both letters cited "the crippling effects of fines and regulations" on 3PVROs and indicated that SB 7050's impact is disproportionately going to be on minorities. Tr. 1486:23-1487:10. As Dr. Lichtman explained, support or opposition "from the leadership can make or break legislation," given that these leaders "are centrally involved in shepherding the legislation through the" legislative body. Tr. 1486:8-12.

**Amendments to minimize discriminatory impact were rejected.** Several legislators proposed amendments to the bill "designed to ease what the proposers of the amendments believed were the discriminatory impacts of SB 7050." Tr. 1494:6-9. These included same-day registration, decreasing fines, modifying the Citizenship Requirement to apply only to undocumented immigrants, and an amendment to

delay the implementation of SB 7050. Tr. 1494:9-15. "Those are some examples of some of the more significant amendments which represent[atives] argued for. All of them were rejected by the Republican decision-makers who control the General Assembly." Tr. 1494:15-18 (Dr. Lichtman testifying).

Dr. Lichtman testified that many of these amendments would have been less discriminatory alternatives to the challenged provisions of SB 7050. For example, same-day registration would "resolve so many of the issues that supposedly the legislature is addressing here," Tr. 1564:22-1565:1, with the collateral benefit of increasing voter turnout, as it has in other states, Tr. 1565:14-18. He also testified that the less discriminatory alternative to the Citizenship Requirement would have allowed "the 1.6 million [] immigrants in Florida who are legally authorized to work to hold jobs with the 3PVROs." Tr. 1573:3-4. But these "ameliorative amendments" failed. Tr. 1570:17-20.[18]

---

[18] Dr. Lichtman also testified to multiple less discriminatory alternatives that the legislature could have considered but were not proposed as amendments. For example, Dr. Lichtman testified that the legislature could have considered moving the book closing deadline closer to the election to "make it less likely that [an] application will [] be rejected for an upcoming election." Tr. 1574:4-13. The government could also "fine aggressively the bad actors"—such as Hard Knocks, the only bad actor that legislators could specifically name—rather than undertake "a crippling total revamping of the system" that punishes all 3PVROs. Tr. 1574:17-20.

### H.      Lack of Justifications for SB 7050

The rationales provided for the 3PVRO Restrictions were not only weak—they were nonexistent, and they ignored the "stakeholders testifying before the key committees, letters by the LDF and 35 organizations to committee members and key leaders, full-throttle debates on the floor, and amendments that [were] presented reflecting those critiques." Tr. 1563:14-19 (Dr. Lichtman testifying).

**Legislators attempted to broadly justify SB 7050 because of bad actors but failed to identify anyone other than a single 3PVRO.**  Although legislators repeatedly and the Secretary repeatedly invoked "bad actors" that motivated the 3PVRO Restrictions, PX 250 at 9:24-10:10; PX 248 at 69:21-70:7, neither the Secretary nor any legislator produced any evidence of widespread fraud to justify SB 7050's harsh 3PVRO Restrictions. When Representative Eskamani pressed Secretary Byrd in the House State Affairs Committee hearing to name bad actors, he named only Hard Knocks, and directed the committee members to the "public record." Tr. 909:11-18; PX 248:70:3-6. The OECS report similarly did not support claims about any prevalence of 3PVRO-related misconduct. Tr. 909:19-911:6 (noting the report "basically seems to be justifying the office's existence" and, apart from Hard Knocks, had unrelated facts about "petition gathering"). Senator Torres similarly noted that on the Senate side, when he pressed for specific instances of bad actors mishandling voter registration materials, proponents of SB 7050 could not

specifically name "the three bad actors they were talking about. They were ping-ponging between the two senators trying to find out who had the right answer" and invoking alleged, unnamed bad actors from twenty years earlier, in 2003. Tr. 481:10-19.

**The evidentiary record lacks any justification for the Citizenship Requirement.** Both Dr. Lichtman and Dr. Herron scoured the legislative record and found no justifications for the Citizenship Requirement. Instead, they found jumbled and nonsensical statements that seemed to take noncitizen dishonesty as a given. For instance:

- **The Citizenship Requirement applies to *all* noncitizens, not just undocumented noncitizens.** The full Senate learned that "SB 7050 is not limited to illegals but sweeps in those who are authorized legally to work." Tr. 1545:24-1546:1 (Dr. Lichtman testimony).

- **Noncitizens did not mishandle voter registration materials.** Proponents of the bill never discussed "even one example of a noncitizen who mishandled registration materials. The lack of examples is very striking." Tr. 1557:13-15 (Dr. Lichtman testimony).

- **Noncitizens lacking certain rights is not a rationale.** Senator Burgess's statement that "there are rights in the United States that only citizens have" while true, does not offer a rationale for banning noncitizens from canvassing. Tr. 217:13-219:3.

The closest thing to a rationale was provided by Senator Huston, who spoke out against "an illegal doing third-party voter registration." PX 252 at 15:11-12. As Dr. Herron testified, to the extent this statement suggests that noncitizens are more likely to be involved in illegal election activities, Tr. 219:7-25, Dr. Herron could

"find no evidence consistent with that rationale." Tr. 222:19-20; *see supra* Section I.C.

Consistent with the lack of any evidence before the legislature to justify the Citizenship Requirement, the trial testimony also failed to identify any basis for the provision. None of the 3PVRO representatives, canvassers, supervisors of elections, or state attorneys who testified at trial could identify a single instance of noncitizen misconduct. *Supra* Section I.B; *see also* Tr. 1741:1-10 (state attorney testifying that he is unaware of any noncitizens involved in voter registration and his office does not even collect that data to be aware of such instances); Tr. 744:24-745:5 (Supervisor Earley testifying that he is not aware of "a single instance in which a noncitizen mishandled a voter registration application" and is not "aware of any problem that the citizenship requirement solves"); Tr. 844:19-23 (Statewide Prosecutor Cox testifying that he is not "aware of any incidents involving a noncitizen mishandling voter registration materials on behalf of a 3PVRO"). The Defendants similarly failed to introduce any evidence that noncitizen canvassers had violated Florida's election laws.

**The evidentiary record lacks any justification for the 3PVRO Fines Provision.** Both Dr. Lichtman and Dr. Herron examined the legislative record and found no justifications for significant changes in the 3PVRO Fines Provision. Proponents of the bill "never explained why you needed to jump the fine fivefold,

why the existing structure . . . wasn't enough and why it had to be so dramatically increased." Tr. 1557:2-6; *see also* Tr. 1557:18-22. Moreover, the legislature could not provide any specific examples of problematic 3PVROs other than Hard Knocks—"one out of nearly 2,000" 3PVROs. Tr. 1554:4-1555:4. Dr. Lichtman compared this to passing a law that "cripples the ability of the state trooper force to do its job" when faced with "one bad state trooper out of thousands of state troopers." Tr. 1554:21-25.

The evidence at trial did not supply a justification. To the contrary, as Supervisor Earley testified, there is no benefit to shortening the application return deadline from 14 to 10 days and, as long as the application is submitted before book closing, the amount of time between signing and submitting a voter registration application has no bearing on their ability to get registered. Tr. 738:6-739:3.

**The evidentiary record lacks any justification for the Information Retention Ban.** Dr. Herron reviewed statements from Senator Burgess suggesting that identity theft was the concern the Information Retention Ban was meant to address, and that in Senator Burgess's opinion, there was "no purpose for" 3PVROs' retention of voter information. Tr. 225:8-23. As summarized *supra*, Dr. Herron did not find evidence of 3PVRO identity theft to support Senator Burgess's statements. Tr. 227:9-11. Indeed, as Dr. Lichtman testified, 3PVROs and their canvassers were subject to several criminal laws that predated SB 7050 that would deter and punish

any fraud committed. Tr. 1572:2-8. And Supervisor Earley testified that SB 7050 has not made it easier for him and his team to detect or investigate any fraud committed by 3PVROs. Tr. 804:21-24.

## I.    Witness Confusion About the Meaning of the Challenged Provisions

As Plaintiffs' representatives testified, it is critical that 3PVROs understand the laws that govern them so that they can properly train their staff, ensure compliance, and avoid the harsh penalties for violations. Tr. 89:19-90:9 (J. Nordlund, UnidosUS); Tr. 967:17-968:9 (S. Mayer, VOT); Tr. 699:3-6, 721:25-722:6 (M. Vilar, Alianza). But, as the trial testimony repeatedly established, the language of the Citizenship Requirement and Information Retention Ban is anything but clear and has engendered extensive confusion among 3PVROs and even among supervisors of elections.

First, the term "handling" as used in the Citizenship Requirement has sparked confusion among 3PVROs. By its terms, the provision prevents noncitizens from "collecting" or "handling" voter registration applications. Fla. Stat. § 97.0575(1)(f). As the trial testimony established, many 3PVRO representatives are uncertain whether the provision prohibits physical contact with forms or general responsibility for them, and whether the provision applies only to completed forms or also to blank ones. Tr. 90:23-91:14 (J. Nordlund, UnidosUS); Tr. 968:15-970:2 (S. Mayer, VOT); Tr. 699:12-17 (M. Vilar, Alianza). As a result, Plaintiffs testified that they do not feel

comfortable instructing their employees and/or members on the meaning of the Citizenship Requirement, including specifically what the term "handling" prohibits. *See* Tr. 91:15-20 (J. Nordlund: "I think it's very vague in terms of what it means."); Tr. 970:3-15 ("it is very difficult for a word with so many . . . meanings for me to take the risk of choosing one and hoping that it's the right one."); Tr. 699:3-22 (M. Vilar: "Well, that could be interpreted in many ways."). If the 3PVROs guess wrong, they could be hit with a $50,000 fine for each infraction. Tr. 91:21-25 (J. Nordlund, UnidosUS); Tr. 951:16-18 (S. Mayer, VOT); Tr. 699:7-11 (M. Vilar, Alianza). Indeed, Supervisor Earley similarly testified that the meaning of collecting and handling is "confusing" and unclear. Tr. 748:7-9, 750:3-5.

Second, at least two phrases from the Information Retention Ban engendered similar confusion. That provision provides that if a 3PVRO canvasser copies a registration application or "retains a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section," the person commits a third-degree felony. Fla. Stat. § 97.0575(7). As witnesses testified at trial, there is significant confusion surrounding the meaning and reach of both the terms "personal information" and "in compliance with this section" as used in the Information Retention Ban. In particular, Plaintiffs testified

that they were not sure whether the list of examples of personal information was exhaustive, or whether contact information for a voter they register constitutes "personal information" within the meaning of the Ban. Tr. 101:4-102:22 (J. Nordlund, UnidosUS); Tr. 701:6-703:14 (M. Vilar, Alianza); Tr. 1326:9-24 (O. Babis Keller, DRF). In addition, Plaintiffs testified that they did not know whether they as organizations can keep information with voters' permission. Tr. 101:4-18, 102:3-103:1 (J. Nordlund, UnidosUS); 970:24-971:17, 971:23-972:12 (S. Mayer, VOT); Tr. 701:1-702:24 (M. Vilar, Alianza); Tr. 1326:2-1327:9 (O. Babis Keller, DRF); *see also* Tr. 1251:5-15 (C. Scoon testifying similarly for the League). Here, too, the consequences for misconstruing these phrases are severe: any violation—intentional or not—is subject to criminal liability. Tr. 103:2-3 (J. Nordlund, UnidosUS); Tr. 972:13-16 (S. Mayer, VOT); Tr. 1327:10-23 (O. Babis Keller, DRF); *see also* Tr. 1224:20-1225:12 (Ms. Scoon testifying about League members saying they were afraid of criminal and civil consequences in SB 7050).

Again, it was not just Plaintiffs who testified as to confusion over these terms: Supervisor Earley agreed that the Information Retention Ban is "convoluted" and "vague," Tr. 750:15-752:14, while Statewide Prosecutor Cox testified he is "not aware" of a definition of personal information in the statute and that "specificity is important" in criminal statutes "so the public is on notice what the crime is." Tr. 843:15-18, 844:4-9.

### J.     The Impact of SB 7050 on 3PVROs and Voters

#### 1.     Fact Witness Testimony

As the fact witness testimony at trial established, the impact of the challenged provisions on the Plaintiff 3PVRO organizations and the individual Plaintiffs has been nothing short of devastating. These impacts have, in turn, harmed Florida voters, who are registering in far fewer numbers with 3PVROs as a result.

In fact, Alianza stopped its voter registration program entirely as a result of SB 7050, because it "couldn't afford to continue risking the financial standing of the organization by doing this activity that's now literally been made illegal for third-party organizations" due to "penalties being increased significantly in 7050." Tr. 641:13-642:2; *see also* Tr. 1323:4-17, 1324:1-12 (DRF voter registration program currently suspended because of SB 7050). Other organizations like VOT had planned to register as a 3PVRO, but VOT's plans are "frozen solid by SB 7050," so it will not be able to "significantly expand [its] capacity and hit significantly more campuses" than it does working with its current 3PVRO partner. Tr. 946:20-25, 949:1-5.

While Florida NAACP has not stopped registering voters entirely, it has had to institute severe and significant detrimental changes to its program as a result of SB 7050, and is now not doing paper canvassing at all as a direct result of the challenged provisions. Instead, it has resorted to "handing out [blank] voter

registration applications" at events and doing "online voter registration through vote.org." Tr. 1172:8-21. These "very limited" registration efforts are far less effective than Florida NAACP's pre-SB 7050 voter registration program— volunteers can no longer "track those individuals who registered to vote with the NAACP" or check "whether the form[s are] accurate." Tr. 1172:22-23, 1173:22-1174:2.

Other Plaintiff organizations have been forced to spend resources in response to SB 7050 to find ways to keep doing the voter registration work central to their missions. For example, even though the Citizenship Requirement is enjoined, UnidosUS "can't stop and start programs and kind of retool" things in the middle of cycles, so they took the "more conservative view" and have attempted to hire more citizens in the event that the injunction is lifted. Tr. 81:21-82:5. UnidosUS has dedicated two full-time HR specialists with salaries of $60,000 each to help "hire U.S. citizens," which is "more of a 'needle in a haystack' type of operation versus [hiring] anybody who is authorized to work in the state – in the country." Tr. 80:20-81:7, 85:6-21, 135:13-19.

SB 7050's impact on lawful residents such as individual Plaintiffs in this action has also been monumental. If the Citizenship Requirement goes into effect, Mr. Orjuela will lose "his access to a better paying job" as well as "los[e] th[e] right to participate" in democracy through canvassing. Tr. 164:14-20. His canvassing

positions pay about 40 percent higher than other jobs he has had in the United States, Tr. 153:15-20, 154:3-10, and while Mr. Orjuela has lost jobs in the past based on his lack of English fluency, in his work as a canvasser his Spanish skills have been an asset. Tr. 155:4-18. Mr. Mayer will not be able to travel to register voters in Florida, which he worries will impact his future employment opportunities in his chosen field if he "can't do the most basic aspect of my job and register voters" because of his citizenship status. Tr. 963:19-964:12. And Plaintiff Esperanza Sánchez described how she will be unable to associate with her noncitizen colleagues who work together "year after year" to continue registering voters. Tr. 186:22-187:17. And the exclusion of noncitizens disproportionately affects minorities. As Dr. Lichtman testified, noncitizens who are eligible to work legally "are overwhelmingly non-white" and "Hispanic in Florida[.]" Tr. 1459:3-8.

The testimony also established that fewer voters will register to vote as a result of SB 7050. Due to UnidosUS's "operation size" and "reach in the communities that are underserved," Mr. Nordlund was confident in testifying that "there will be fewer voters out there who are Hispanic" should all of the challenged provisions go into effect. Tr. 126:7-12. Supervisor Earley confirmed Mr. Nordlund's expectations, as he has seen "a dramatic decrease" in 3PVRO activity since the enactment of SB 7050, Tr. 754:10-12, "from thousands a year to almost zero." Tr. 801:23-802:1. The result, Supervisor Earley agreed, is fewer Floridians in the communities 3PVROs

typically reached getting registered to vote, which in his experience is people of color. Tr. 754:10-21.

### 2.    Expert Testimony

Dr. Herron found that after SB 7050, registrations via 3PVRO and "nonwhite" registrations have declined. Based on the Secretary of State's data, together with his prior study of Florida election laws, Dr. Herron concluded that SB 7050 has caused fewer Black and Hispanic Florida voters to register to vote.

To evaluate the impact of SB 7050 on voters, Dr. Herron used a framework called the calculus of voting. Tr. 240:4-8. Scholars and experts in the election administration field regularly use the calculus of voting to guide their analysis of the effects of election laws, and it is the "dominant theoretical framework used in election administration studies." Tr. 242:2-6. Under this framework, Dr. Herron considered the costs associated with SB 7050 and the effect these costs would have on 3PVROs and voters. Tr. 246:13-20. Dr. Herron testified that SB 7050's 3PVRO Restrictions directly constrain 3PVROs. Tr. 247:3-16. He further explained that these costs will be passed on to voters by raising the cost of registration—and therefore voting—in Florida. Tr. 247:3-16. Dr. Herron testified that as a result, he would expect to see fewer voter registrations and lower turnout post SB 7050's passage. Tr. 247:17-22.

Dr. Herron had a strong basis for offering his opinions about SB 7050's likely effects—he had studied the effects of new regulations on 3PVROs in Florida both in prior litigation and in his academic study. Tr. 248:8-15. In his paper "The Effects of House Bill 1355 on Voter Registration in Florida," Dr. Herron together with Dr. Daniel Smith studied Florida House Bill 1355, which also imposed new regulations upon 3PVROs. Tr. 248:25-249:10. Dr. Herron found that after HB 1355's passage, voter registrations fell by about 5 percent. Tr. 249:11-18.  His "paper on HB 1355 serves as a foundation for [his] analysis of SB 7050 because it shows that a regulation actually had observable effects on voter registration in Florida. It's not just an expectation, it's actually what we observed in the data." Tr. 250:3-9. The study also showed Dr. Herron that, because voter registration decreased after HB 1355, "various voter registration methods are not substitutes for each other" or else voters would have just used another one and the rate of registration would have remained the same. *See* Tr. 250:10-251:1.

Dr. Herron further studied the effects of SB 7050 by analyzing data available since its enactment. As discussed further below, the data demonstrated both a drop in 3PVRO registration overall and a more precipitous drop among non-white registrants. **3PVRO registrations dropped the most of any registration method post-SB 7050 and "in fact, they almost vanished."** Tr. 259:6-19; *see also* PXs 55 & 56. Dr. Herron compared 2023, the year of SB 7050's passage, to 2019, a year

identically placed in the presidential election cycle. Tr. 254:24-255:5. And because SB 7050 had an effective date of July 1, and to control for any seasonal trends in registration, Dr. Herron compared registrations after July 1 in 2023 and 2019 to registrations before July 1 in the same years. 254:4-23, 255:10-16. Dr. Herron found evidence in this data to support his expectation that SB 7050 would yield fewer voter registrations. Tr. 257:3-6. Dr. Lichtman also testified that, based on data from the Secretary of State's website, 3PVROs registered only 238 people in July 2023. Tr. 1464:6-7. This figure is 21.9 times lower than the average July 3PVRO registrations of the previous five years. Tr. 1464:8-12.

**Registrations by "non-white" voters dropped more than white voters post-SB 7050.** Tr. 1989:8-19; *see also* PXs 58 & 59. Relying on a different observed data set, voter and recap files, Dr. Herron looked at changes to registration by racial group by analyzing other post-SB 7050 data. Tr. 1987:24-1988:3. This additional data was further support for his conclusion that Black and Hispanic voter registration will decline after SB 7050.[19]

---

[19] Dr. Herron disagreed with the State's experts that he needed access to 2023 Citizen Voting Age Population, or CVAP, data to reach conclusion about the racial impact of SB 7050. Tr. 268:11-16. Dr. Herron pointed out the untenable implication of accepting the Secretary's experts' approach: election laws could not be evaluated until roughly two years after passage when CVAP data becomes available; any constitutional harms must endure in the interim. *See* Tr. 281:22-282:6; *see also* Tr. 1687:15-25 (Dr. Stein testifying that, in his view, plaintiffs need to wait for availability of data despite delay). Still, Dr. Herron "took the CVAP data that I could,

These effects were observed even though two of the challenged provisions of SB 7050 have been enjoined since July of 2023. From the available evidence those provisions are still having an effect on 3PVRO operations, even though that effect is likely understated. *See* Tr. 1978:11-1979:6 ("I am not observing the full force of 7050 because of the injunction, but I am observing some of the force.").

The possible substitutability of voter registration methods did not undermine Dr. Herron's certainty about the impact of SB 7050 on voters. Tr. 2000:21-24. Based on his knowledge about the costs of different voter registrations and the findings in his HB 1355 paper, Dr. Herron testified that "the concept of substitutability definitely informed my analysis. It was something I'm aware of, and it doesn't undermine any of my results." Tr. 2003:4-7. Dr. Herron concluded that "voter registration methods in Florida are not substitutes for each other and [] we should not expect voters to costlessly switch between methods of" registration. Tr. 2005:6-10.

---

and I looked to see if there's any evidence that the calculations I could carry out with CVAP data gave me different results than the calculations I carried out without CVAP data" to see whether Dr. Stein's "critique actually has any purpose. Tr. 1993:23-1994:6. The ratios of 3PVRO registration by racial group were similar to when Dr. Herron looked at the voter file data alone, and Dr. Herron reached identical conclusions looking at the last available CVAP data from 2021. Tr. 1997:13-1998:1.

Dr. Herron testified that he "can be very confident" that SB 7050 led to a decline of Black and Hispanic registration via 3PVRO specifically. Tr. 1990:4-1991:6. He offered "compelling evidence that SB 7050 had real effects . . . on Hispanic and Black voters in Florida." Tr. 1991:4-6. Dr. Herron also explained how the overall racial composition of the Florida electorate is relevant in accessing impact. By concluding that SB 7050 has a disparate effect on different racial groups in Florida, and in particular Black and Hispanic voters, then he knows that this disparate impact "affects millions of individuals, in particular at least 4.5 million" Hispanic and Black voters. Tr. 263:10-25.

Dr. Stein agreed with many of the opinions Dr. Herron offered. Dr. Stein acknowledged that SB 7050's regulations of 3PVROs impose costs on them. Tr. 1692:25-1693:25. Dr. Stein agreed that he would not predict perfect substitution between voter registration methods in Florida. Tr. 1694:9-13. He acknowledged that Dr. Herron's HB 1355 paper shows total registrations declined after the 3PVRO regulations passed. Tr. 1697:1-5. And most significantly, Dr. Stein agreed that some voters who would have registered via 3PVRO in Florida will not register at all as a result of SB 7050. Tr. 1694:14-17.

## K.   Defendants' Case

In response to the testimony detailed above, Defendants presented not even a full day of testimony. They called Director of the Division of Elections Maria

61

Matthews, Supervisor of Elections for Lake County Alan Hays, three State Attorneys, and two experts with a muddled joint report. None of these witnesses rebutted the relevant testimony from Plaintiffs outlined above.

Director Matthews was the only representative of the Secretary's office to testify, and her testimony was extremely limited. First, Director Matthews testified about the definition of a 3PVRO activity as it relates to Section 97.0575. But "3PVRO activity" is not a term defined within the election code, and Director Matthews's testimony failed to touch upon the various ways 3PVROs operate in practice.

Director Matthews also testified that her office may provide advisory opinions to 3PVROs and suggested those opinions could shield organizations from criminal liability. But as the Court raised in its questions, it is unclear how these advisory opinions could prevent adverse action in all counties from all twenty state attorneys, Tr. 1934:14-20, and whether the advisory opinion would protect against arrest—itself a harm—or merely serve as an ultimate defense during prosecution, *see* Tr. 1934:9-11. Director Matthews also said nothing about these advisory opinions preventing civil liability. Director Matthews could not provide an estimate on the number of pending advisory opinions in her office, Tr. 1941:13-17, 1943:20-21, nor could she guarantee a timeframe for responding to requests for advisory opinions,

62

Tr. 1944:17-21. The possibility of obtaining an advisory opinion is therefore of little comfort to 3PVROs in the regulatory scheme.

Director Matthews also acknowledged an example of when reliance on Department of State materials has led to confusion. Despite this Court's order enjoining the Secretary's enforcement of the Citizenship Requirement, the 3PVRO registration form currently on the Department of State's website includes an affirmation—which must be signed under penalty of perjury—that each person submitting the applications on behalf of a 3PVRO is a U.S. citizen. 1945:18-1946:6. Director Matthews admitted that "it would not" be smart for a 3PVRO to sign the attestation if a 3PVRO currently has noncitizens employed in canvassing. Tr. 1946:15-20.

As for Supervisor Hays, he proved a better witness for Plaintiffs than Defendants. Among other things, as a former legislator, he testified about the importance of listening to members of the public and carefully considering credible information presented. Tr. 1849:13-1850:11, 1851:22-1852:13. Supervisor Hays also testified that he has not had problems with noncitizen canvassers, misuse of voter information by 3PVROs, or late applications in his county. *See* Tr. 1829:23-1830:4, Tr. 1831:19-1833:1, Tr. 1833:12-1834:22, 1847:12-15, 1848:20-24. And Supervisor Hays's main concern with 3PVROs, those that pre-filled applications with incorrect information, was addressed in a provision not challenged in this

litigation. Tr. 1822:7-1823:4, 1849:5-8. Supervisor Hays also confirmed that, in the past, caregivers and friends requested mail-in ballots on behalf of voters in his county. Tr. 1845:22-24, 1845:16-19.

The State Attorneys were presumably called to testify to about their offices' encounters with 3PVROs, but all their testimony showed was that there have been isolated instances of misconduct limited to a few *citizen* bad actors. Assistant State Attorney Tim VanderGiesen testified that (1) his office does not receive "a lot of provable violations" about 3PVROs, Tr. 1728:6-1729:2, 1766:3-4; (2) election code violations, and within that 3PVRO investigations, are a small fraction of what his office does, Tr. 1763:17-1764:7; and (3) he is not aware of noncitizens involved in any 3PVRO complaints or investigations, Tr. 1740:17-1741:10, and "can't think of why" citizenship status "would be" relevant in investigations. Tr. 1749:1-10. State Attorney William Gladson confirmed that his office was able to successfully prosecute a single citizen canvasser who committed fraud with laws in place before SB 7050. Tr. 1783:7-12. And State Attorney Amira Fox testified that she is not aware of any 3PVRO other than one, Hard Knocks, who had canvassers implicated in voter registration fraud. Tr. 1803:9-11. Finally, like State Attorney VanderGiesen, State Attorney Fox testified that citizenship status was not part of her investigations and "never is." Tr. 1806:2-7.

Defendants' experts added next to nothing. It was entirely unclear who was testifying to what, whether they had the expertise to do so, and if they even read the reports they were hired to rebut. The testimony they did provide to challenge the methodologies of Drs. Lichtman and Herron, in part asking them to rely upon data that does not exist, did not undermine Plaintiffs' experts.

Defendants offered Dr. Stein to rebut the testimony of Dr. Herron. Unlike Dr. Herron, Dr. Stein has not done research or provided expert testimony about Florida laws or 3PVROs. Tr. 1675:2-22. Dr. Stein agreed that the framework Dr. Herron relied upon is legitimate and the "building block" of understanding voter behavior. Tr. 1684:5-7, Tr.1685:14-17. Dr. Stein has personally conducted analyses like those Dr. Herron did in this case, including analyzing voter files and making probabilistic statements about the likelihood of a specific election law producing certain effects. Tr. 1680:20-25, 1683:20-1684:1. Here, however, Dr. Stein did not do any analysis of the effect of SB 7050, despite having access to the same data as Dr. Herron. Tr. 1676:10-17, Tr. 1679:10-15. Perhaps most importantly, Dr. Stein acknowledged that his proposed methodology was, in his view, "simply" a "preferable way" to assess the impact of SB 7050, and not the only way. Tr. 1701:4-8.

The Secretary called Dr. John Alford for the purpose of "focus[ing] on Dr. Lichtman," Tr. 1860:1-3. This was a surprise given that the entirety of Dr. Alford's critique of Dr. Lichtman in his report was contained in a single paragraph, Tr.

1904:23-1905:11, and because Dr. Alford has no expertise in and did not opine on Florida history or intentional discrimination. Tr. 1906:4-9. Incredibly, Dr. Alford did not even read the entirety of Dr. Lichtman's report before drafting his expert report. Tr. 1904:3-10. Still, Dr. Alford testified about a chart used by Dr. Lichtman during his testimony and was surprised to learn on cross that chart reflected Secretary of State data described in Dr. Lichtman's report, Tr. 1902:5-1903:11. In another bizarre turn, Dr. Alford attempted to critique Dr. Lichtman's application of rational choice theory, but Dr. Lichtman didn't write about rational choice theory or invoke the calculus of voting in his report, Tr. 1905:12-24—something else Dr. Alford may have known if he had actually read Dr. Lichtman's report. Dr. Alford otherwise did not respond to any of the specific information in Dr. Lichtman's report, Tr. 1903:24-1904:2, and instead testified that he was "somewhat reluctant" to be involved in the case and "would have preferred not to have had any involvement." Tr. 1906:13-19.

Finally, perhaps most telling was the witness Defendants did *not* call—the head of the Office of the Election Crimes and Security, Andrew Darlington. Mr. Darlington's office sends 3PVRO fine letters, and he personally signed the letters sent to certain Plaintiffs in 2023. Mr. Darlington's office prepared the 2023 OECS Report evaluated by Plaintiffs' experts and discussed throughout trial. Mr. Darlington offered declarations purporting to outline state interests in opposition to NAACP Plaintiffs' preliminary injunction motion and motion for summary

judgment. ECF No. 92-1 at 91-97; ECF No. 200-1. Mr. Darlington was designated as the Secretary's 30(b)(6) representative during discovery. And Mr. Darlington was the only fact witness to appear on every iteration of Defendants' "will call" list. *See* ECF No. 244-4. Defendants' counsel referred to his pending arrival at several points during trial, including the morning of their single day of testimony. Tr. 1621:15-18, 1656:20-23. But in the end, Mr. Darlington was nowhere to be seen.

As a result, Defendants offered no witness who could speak on behalf of the office created to combat voter fraud and charged with administering the challenged provisions to refute the burdens of these provisions and expert testimony about the same, to explain what problems with 3PVROs needed to be solved, or to justify the challenged provisions of SB 7050.

## II.   The NAACP Plaintiffs Have Standing to Bring Their Claims.

The NAACP Plaintiffs have standing to assert each of their claims against the challenged provisions. As to each claim, one or more of the NAACP Plaintiffs have demonstrated (1) that they have suffered an injury-in-fact that is (2) traceable to Defendants and that (3) can be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006).

### A.    Injury-in-fact

The NAACP Plaintiffs have established various injuries stemming from the challenged provisions—as individuals, organizations, and employers, and on behalf of their members, constituents, and the voters they serve.

The injury-in-fact requirement requires only "an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks and citations omitted). And, as the Eleventh Circuit has recognized, the injury requirement for First Amendment claims is even looser than in other contexts, "lest free speech be chilled even before the law or regulation is enforced." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). A plaintiff "can bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Wollschlaeger v. Gov'r, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (cleaned up)). Where "a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." *Harrell*, 608 F.3d at 1257. "Ultimately, for self-censorship injuries, '[t]he fundamental question . . . is whether the challenged policy 'objectively chills' protected expression.'" *Link v. Diaz*, 669 F. Supp. 3d 1192, 1201

(N.D. Fla. 2023) (citing *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022)). A person or entity that is "being chilled from engaging in constitutional activity suffer[s] a discrete harm independent of enforcement, and that harm creates the basis for . . . jurisdiction." *Cartwright*, 32 F.4th at 1120 (cleaned up).

### 1.    Individual Standing

The Citizenship Requirement injures Individual Plaintiffs in a variety of ways.

Plaintiff Humberto Orjuela Prieto is a noncitizen permanent resident who is authorized to live and work in the United States. PX 745. He is Hispanic and originally from Colombia. Tr. 171:2-3. Mr. Orujela currently works as a canvasser and a captain on behalf of UnidosUS and, in that work, collects and handles voter registration applications. Tr. 151:20-21, 157:25-158:12. If the Citizenship Requirement goes into effect, Mr. Orjuela will lose his current employment and further lose the opportunity it affords him to engage and associate with his community about the importance of participating in our democracy. Tr. 164:14-20.

Plaintiff Esperanza Sánchez is a new U.S. citizen, who is now registered to vote and voted in the 2024 primary election. Tr. 178:2-13. She is Hispanic and originally from Colombia. Tr. 177:19-20. At the time SB 7050 was enacted, Ms. Sánchez was a permanent resident. She testified that she was called to do canvassing work because community service has always been important to her, and when she "arrived to the U.S., [she] saw the need to educate people" on elections and voting,

specifically Hispanic people. Tr. 179:11-20. When she worked as a canvasser, the majority of her canvasser colleagues were noncitizens, often from countries where "just to be able to participate [in the democratic process] is difficult" and so they choose a canvassing job "to defend that participation." Tr. 184:6-16. Even though Ms. Sánchez has since become a citizen, she will be impacted by the Citizenship Requirement should it go into effect, as she would lose the ability to associate with her noncitizen colleagues and staff who she has trained in her work as a field organizer.

Plaintiff Santiago Mayer is a lawful permanent resident authorized to live and work in the United States. Tr. 962:12-19; PX 738. Mr. Mayer moved to the United States from Mexico in 2017. Tr. 941:22-942:2. As founder and Executive Director of VOT, Mr. Mayer "travel[s] the country and participat[es] with [VOT] chapters as they register voters for the 2024 cycle." Tr. 962:22-963:3. Before SB 7050, Mr. Mayer had concrete plans to travel to Florida to participate in voter registration drives in 2024. 962:22-963:12. SB 7050 has scuttled those plans. Tr. 954:6-15 (S. Mayer explaining that he cannot canvass voters if the Citizenship Requirement is in effect); 963:14-18 (S. Mayer explaining that in addition to Citizenship Requirement, "the vagueness of the law . . . make[s] it very difficult for [Mr. Mayer] to gauge what [he] can or can't do" in a manner that prevents him from engaging in registration). This means that SB 7050 will prevent Mr. Mayer from speaking and associating with

prospective voters and VOT members. Tr. 965:14-17 (S. Mayer testifying that in 2022 when he registered voters, he had conversations about important issues to voters such as book bans in Florida); Tr. 944:8-21 (S. Mayer testifying to participating in voter registration with FSU's VOT chapter). SB 7050 not only precludes Mr. Mayer from registering voters, it impacts his organization's mission and funding stream, as VOT "chapters want to see national leadership participate" in voter registration drives, as do "donors." Tr. 952:19-22.

Mr. Mayer is also extremely concerned that the Citizenship Requirement will threaten his ability to find future employment. Tr. 963:19-964:12. Because he "is slowly aging out of being young," he "need[s] to find another job soon." Tr. 964:4-6. Mr. Mayer works in the civic space, and believes it will be very difficult for other organizations beyond VOT to hire him if he "can't do the most basic aspect of my job and register voters" because of his citizenship status. Tr. 963:19-964:12. Mr. Mayer understands this bill to be part of a "very active effort to exclude noncitizens and immigrants from the political process," Tr. 964:17-18, explaining that "bills like SB 7050 empower this hatred towards immigrants and prohibit us from being full participa[nts] in democracy." Tr. 964:23-25. Mr. Mayer also noted the psychic harm that he has experienced as a result of the law: "Especially as someone who plans to naturalize at some point and be able to vote, it kind of pushes me out and makes me feel like I don't belong here." Tr. 964:23-965:2.

### 2.   Organizational Standing

The 3PVRO Restrictions also directly harm organizational Plaintiffs UnidosUS, Alianza, VOT, Florida NAACP, and DRF. "Organizational standing allows an organization to assert claims based on injuries to the organization itself." ECF No. 101 at 22 (citing *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) ("An organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes.") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))). "Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). Here, organizational Plaintiffs have already had to divert resources because of the 3PVRO Restrictions, which directly harms their ability to achieve their missions. *See Coleman*, 455 U.S. at 379.

UnidosUS's mission is "to remove all social, economic, and political barriers that impact Hispanics in America so that they are able to pursue their own version of the American dream." Tr. 21:6-9. UnidosUS believes that "more Hispanics voting in elections makes our country better" by "making sure that everybody has equal access to voice their political views." Tr. 22:1-3. Since 2008, in order to advance its mission, UnidosUS has worked to increase voter registration among Hispanics in

Florida. Tr. 22:1-10. SB 7050 will severely frustrate this mission by raising "more barriers" that UnidosUS must "hurdle over" in order to reach and register Hispanic voters in Florida. Tr. 113:2-15. Because of UnidosUS's large "operation size" and powerful ability to "reach in the communities that are underserved," Mr. Nordlund was confident in testifying that "there will be fewer voters out there who are Hispanic" should SB 7050's challenged provisions go into effect. Tr. 126:7-12.

UnidosUS will be forced to divert resources to attempt to address the harm caused by the challenged provisions, leaving it with fewer resources to advance other mission-critical projects. Indeed, although the Citizenship Requirement is currently enjoined, UnidosUS has had to prepare for the possibility of its implementation by hiring more citizen canvassers. Tr. 81:21-82:5. This has not been easy. Indeed, UnidosUS historically has found it hard to hire U.S. citizens because the canvasser positions are temporary and involve difficult conditions, Tr. 79:22-80:4, and UnidosUS has found that citizen canvassers have higher turnover. *See* Tr. 134:9-15 (citizen canvassers "typically stay around the least amount of days" in the job "in comparison to noncitizen canvassers"). After SB 7050's passage, UnidosUS hired two full-time HR specialists—each with a salary of about $60,000 per year—to recruit citizen canvassers to build up the infrastructure the organization will need to continue to engage in its voter registration campaigns. Tr. 80:20-81:7, 85:6-21. Every dollar UnidosUS has spent in response to the Citizenship Requirement is a

dollar not spent on actually registering voters, which means less Hispanic participation in elections, directly harming UnidosUS's core mission. Tr. 87:13-23.

UnidosUS will similarly need to divert resources if the Information Retention Ban goes into effect. UnidosUS would have to rebuild its entire quality control program, which currently depends upon retaining copies of applications, Tr. 103:7-13, as well as retool its get-out-the-vote program, Tr. 104:6-105:3. The associated diversion of resources would amount to a full 20 percent of UnidosUS's budget. Tr. 103:14-18. And again, each dollar that UnidosUS must spend in response to the Information Retention Ban is a dollar not spent on canvassing or get-out-the-vote efforts—both crucial and mission-critical work for the organizations. Tr. 105:22-25.

Any fines that UnidosUS is levied as a result of noncompliance will also harm its mission and require it to divert resources from its mission-critical projects and programs. UnidosUS has calculated that, based on its voter registration budget and the number of voters it registers each cycle, each successfully registered voter costs it about $50 to register, conservatively. Tr. 107:8-15. The $1,000 fine that it received in 2023 therefore is the equivalent cost of 20 fewer voters registered by UnidosUS. Tr. 107:16-25. Higher fines imposed by SB 7050 mean that if UnidosUS "were to be fined in the future at a higher amount, we'd have less resources to do voter registration, to help people register to vote." Tr. 108:1-9. The result would be that

fewer voters—and specifically Hispanic voters—will be successfully registered to vote, depressing Hispanic participation in Florida's elections. Tr. 108:10-16.

Alianza is comprised of both Alianza Center and Alianza for Progress. Tr. 622:4-5. Alianza Center is the 501(c)(3) organization of Alianza, and Alianza for Progress is a 501(c)(4). Tr. 628:12-25. Marcos Vilar founded both organizations and serves as their Executive Director. Tr. 622:4-11. Alianza Center's mission is to address "a big need in the community to help [Hispanic people] navigate issues of civic engagement, so voter registration, voter education." Tr. 628:15-17. Alianza not only helps Hispanic Floridians navigate voting, but it also helps the community navigate many other areas that are crucial to its advancement and empowerment, including "things that have to do with the education of their children," and housing when new members of the community "arrive here in the state" so that they can "stand on their own feet as quickly as possible." Tr. 628:15-21. Alianza for Progress "was established in order to go connect the issues with the voting." Tr. 629:2-3. Increasing voter turnout for Hispanic people in Florida can "increase their presence and achieve a better position in the society." Tr. 629:7-8.

SB 7050 has forced Alianza to stop its voter registration program completely. Tr. 641:13-15. Alianza "couldn't afford to continue risking the financial standing of the organization by doing this activity that's now literally been made illegal for third-party organizations" due to "penalties being increased significantly in 7050." Tr.

641:23-642:2. As a result, Alianza has lost the opportunity to connect with people in the community who are potential voters and to "build a relationship with the voter" and "ask[] them if they want to become a member or a donor of the organization." Tr. 640:3-6.

VOT's mission is "to engage, educate, and empower the Voters of Tomorrow," specifically "voters between 16 and 29." Tr. at 941:17-20. VOT's Executive Director Mr. Mayer testified that voter registration "is the most critical component of all of [VOT's] work." Tr. 949:8-13. He explained that VOT's "goal is to empower young voters," and "being able to vote is the single most basic thing that a voter has to do in order to be a part of democracy." *Id.* In order to advance its mission, VOT began planning to register as a Florida 3PVRO after the 2022 election, but SB 7050 "brought all those efforts to a complete stop." Tr. 947:2-12. VOT currently works with a 3PVRO partner organization to register voters, but if VOT was its own 3PVRO, it "would be able to significantly expand [its] capacity and hit significantly more campuses" where it could register more young Florida voters. Tr. 949:1-5. In fact, on the same day he testified, a voter registration event was cancelled at FSU when a 3PVRO volunteer could not make it to the event, and VOT volunteers were not able to take over because they do not have their own 3PVRO registration. Tr. 948:10-25.

If VOT did proceed to become a 3PVRO and engage in voter registration in spite of SB 7050, it would be much more expensive than originally planned and would require it to divert significant resources to account for the 3PVRO Restrictions. Tr. 948:1-4. VOT would "have to defund or relocate funding from other states." Tr. 954:19-20. "There's also a very high chance [VOT] would have to defund some of [its] national programming," such as its yearly summit, which "brings activists from all across the country together to talk, to figure out how [VOT] can work together and increase voter turnout." Tr. 954:20-24.

Florida NAACP's mission "is to ensure the political, the economic[], and the social equity of African-Americans and – actually, all citizens, and to eliminate race-based discrimination." Tr. 1153:19-25. To further this mission, Florida NAACP has a civic engagement committee focused on "increasing voter registration in the State of Florida amongst African-Americans." Tr. 1155:15-18. "Without voter registration" Florida NAACP "can't move forward with the other initiatives" because "if [Black voters are] not able to vote" they cannot "make those changes in health . . . in education [and] in the political process." Tr. 1156:13-25.

SB 7050's challenged provisions directly injure "the mission of the NAACP" to "protect the political, economic[], educational, and social rights of all people." Tr. 1177:9-16. As a result of the challenged provisions, Florida NAACP had to make the difficult decision to halt its voter registration work, and has resorted to "handing

out [blank] voter registration applications" at events. Tr. 1172:8-21. Florida NAACP is also "using resources to do online voter registration through vote.org." *Id.* The "very limited" registration efforts are far less effective than Florida NAACP's pre-SB 7050 voter registration program. Tr. 1172:11. By changing its registration efforts in this way, volunteers can no longer "track those individuals who registered to vote with the NAACP" or check whether the voter registration forms are complete and accurate before they are submitted. Tr. 1173:24-1174:1. Additionally, in light of SB 7050, NAACP cannot recruit new potential members in the same way the organization did prior to SB 7050's enactment. Tr. 1161:16-1163:3 (impact on NAACP's prospective members).

Disability Rights Florida's ("DRF") mission is to "provide free advocacy and legal services to any Florida resident with a disability." Tr. 1307:13-15. In order to advance this mission, DRF engages in "voting access work." Tr. 1303:21. DRF has been registered as a 3PVRO since the fall of 2018 but has registered only one voter since that time because it has had to adjust to the many changes in laws pertaining to 3PVROs. Tr. 1304:25-1306:13. Nevertheless, before the enactment of SB 7050, DRF was fully prepared to launch its voter registration program. SB 7050 made this impossible to do as planned because DRF must go back to the drawing board yet again and retool its voter registration trainings, train DRF employees on those laws, and determine how to launch its voter registration program in light of SB 7050. Tr.

1305:15-1306:10. As a result of SB 7050, DRF has missed opportunities to register voters. Tr. 1324:1-17. DRF is now working to attempt to launch its 3PVRO even despite SB 7050's restrictions, but to do so, it has had to divert critical resources. Tr. 1310:17-1314:6. This will result in DRF having to scale back on its poll site surveys, website accessibility audits, and election summits in order to accommodate the resources it needs to spend in response to SB 7050. Tr. 1312:25-1313:8, 1315:1-1322:21.

DRF planned to build an accessible get-out-the-vote platform that would be the first of its kind in the country using retained voter information, as other platforms are not accessible for some of DRF's constituents, particularly those who are blind. Tr. 1328:3-1329:20. But DRF cannot create the platform because of the Information Retention Ban. Tr. 1329:21-1330:12.

### 3. Associational Standing

Several Organizational Plaintiffs have associational standing on behalf of their members to challenge SB 7050.

An organization may assert associational standing to sue on its members' behalf "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of*

*State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021). To establish associational

standing, plaintiffs must establish "at least one identified member has suffered or

will suffer harm." *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir.

2018) (cleaned up).

### a.    Associational injuries from the 3PVRO Restrictions

UnidosUS, Alianza, VOT, Florida NAACP, and DRF assert organizational

standing to challenge all three 3PVRO Restrictions. Each of these organizations is a

membership organization. Tr. 23:3-8, 23:18-22 (UnidosUS's membership); Tr.

945:6-10, 951:5-9 (VOT's membership); 1378:1-4, 1378:5-7 (FLARA's

membership); Tr. 1154:1-4, 1158:12-16 (Florida NAACP's membership); Tr.

629:20-23, 629:25-630:16 (Alianza for Progress's members); Tr. 1308:8-1309:5

(DRF's members).[20] Plaintiffs' members—who include Hispanic and Black

individuals and Florida voters, Tr. 624:20-23, 1154:19-21, 1155:19-23—are injured

by the 3PVRO Restrictions to the extent they subject those members to criminal

---

[20] As this Court has already found, the fact that UnidosUS considers the members of its organizational affiliates its own members does not deprive it of the ability to assert associational standing. *Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1278 n.2 (N.D. Fla. 2021) (citing *Yelapi v. DeSantis*, 525 F. Supp. 3d 1371, 1377 n.4 (N.D. Fla. 2021)); *see also N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 9-10 (1988) (holding consortium organization has standing to sue on behalf of constituent organizations' members, as long as those constituent organizations would have standing to sue).

penalties (Information Retention Ban), ban employment and participation of noncitizens (Citizenship Requirement), and make it difficult for their organizations to engage in robust voter registration and GOTV campaigns within their communities (Information Retention Ban and 3PVRO Fines Provision). Additionally, members are harmed as voters insofar as all three 3PVRO Restrictions make registering to vote and receiving information about voting more challenging, particularly for Black and Hispanic voters. Their members are further harmed by their inability to engage in their speech and association rights due to the vague language of the challenged provisions. *Supra* Section I.I. These members include, for instance, Mr. Orjuela and Ms. Sánchez (UnidosUS) and Mr. Mayer (VOT). *See supra* Section II.A.1. The interests that these organizations seek are germane to their purposes and missions. *See supra* Section II.A.2.

Finally, neither the claims asserted nor the relief requested "requires individualized proof and both are thus properly resolved in a group context." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).

### b.     Associational injuries from the Mail-In Ballot Request Restriction

Plaintiffs UnidosUS, Alianza, DRF, and Florida Alliance for Retired Americans ("FLARA") also assert associational standing to challenge the Mail-In Ballot Request Restriction.   DRF and FLARA have members who "require[] assistance to vote by reason of blindness, disability, or inability to read or write," 52

U.S.C. § 10508, and are thus protected by Section 208 of the Voting Rights Act. Plaintiffs allege that Section 208 preempts the Mail-In Ballot Request Restriction, which limits voters to seeking assistance from immediate family members and legal guardians only.

Mr. Nordlund testified that in past election cycles, UnidosUS has helped individuals in Miami-Dade, Orange, and Osceola Counties request their mail-in ballot, including by joining them on a call to the supervisor of elections and by translating forms into Spanish where the government-provided translations are not clear. Tr. 109:24-112:24.

Olivia Babis Keller, DRF's Senior Public Policy Analyst, specifically discussed two DRF constituents who are impacted by the Restriction because they require assistance in requesting a vote-by-mail ballot due to a disability, both of whom have requested mail-in ballots in writing. Tr. 1332:18-1334:18. Ms. Babis Keller testified that other constituents across Florida are impacted by the Restriction either because they do not have family members or legal guardians who can help them request a vote-by-mail ballot or they would prefer not to use an immediate family member in making a request. Tr. 1334:19-1335:8. William Sauers, President of FLARA, similarly testified that he is aware of FLARA members who have enlisted the help of others in requesting a mail-in ballot because of a disability. Tr. 1384:17-20.

Defendants did not "proffer[] evidence to dispute" Plaintiffs' testimony concerning their "asserted injury" from the Mail-In Ballot Request Restriction. ECF No. 251 at 12. In fact, they cross examined neither Ms. Babis Keller nor Mr. Sauers, letting their testimony stand unchallenged. Tr. 1335:11-18; Tr. 1386:18-22.

As this Court already concluded, the evidence showed that the interests Plaintiffs "seek to protect through this litigation—assistance with voting for their members and constituents consistent with the Voting Rights Act—are germane to their organizations' purposes." ECF No. 251 at 13. For instance, Ms. Babis Keller testified that DRF's mission is to "provide free advocacy and legal services to any Florida resident with a disability," including in voting access work. Tr. 1307:13-1308:3. Mr. Sauers testified that it is important for FLARA's members to have access to voting so that they can achieve their agenda of advocating for Florida's seniors and retirees. Tr. 1377:1-14.

### 4.   Employer Standing

Plaintiffs UnidosUS and Alianza also have employer standing to challenge the Citizenship Requirement on behalf of their noncitizen paid canvassers. An employer may sue on behalf of its employees when it has "(1) a 'close' relationship with the person who possesses the right,' and (2) 'there is a hindrance to the possessor's ability to protect his own interests.'" *Falls v. DeSantis*, 609 F. Supp. 3d 1273, 1285 (N.D. Fla. 2022) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). Each of

these organizations employs noncitizens who will be prohibited from collecting or handling voter registration applications. *Supra* Section I.B. And both organizations have developed close relationships with their "dream team" noncitizen canvassers. *See* Tr. 88:15-20 (J. Nordlund testifying that UnidosUS canvassers "become a family" over time working together). These noncitizens' ability to protect their own interests is hindered by the very anti-immigrant sentiment that underlies the Citizenship Provision in the first place, as they fear that they are being made out to be "some sort of criminal" by the State, Tr. 518:9-12, and that their participation will impact their legal status.

### 5.    Third Party Standing

Finally, the Court permits "plaintiffs to assert third-party rights in cases where the 'enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'" *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 318 (2020), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). If "'[t]he threatened imposition of government sanctions for noncompliance eliminates any risk that [plaintiffs'] claims are abstract or hypothetical," and plaintiffs are "'the least awkward' and most 'obvious' claimants" for the claim, the plaintiffs can bring the claim on behalf of a third party. *Id.* at 319-20 (quoting *Craig v. Boren*, 429 U.S. 190, 195, 197 (1976)).

Plaintiffs UnidosUS, Alianza, and Florida NAACP have standing to sue on behalf of the potential voters whom 3PVROs will not register and whose registrations these 3PVROs will be unable to update because of the 3PVRO Restrictions. For example, voters like the one described by Ms. Slater, would never have registered to vote, and in turn, never have become actively involved with the Florida NAACP absent that vital first initial contact with Ms. Slater during a voter registration drive. Tr. 1162:14-1163:3; *see also* Tr. 609:25-610:13 (Mr. Vilar testifying that the Citizenship Requirement will mean "we're having less people registered, that we're not helping advance and empower the Latino community"); Tr. 83:3-8 (UnidosUS's loss of noncitizen canvassers will mean "overall collection of voter registrations in terms of quantity would be severely less.").

### B.    Traceability

Plaintiffs' injuries are traceable to Defendants' conduct under the challenged provisions. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up)) (quoting *Trump v. Hawaii*, 585 U.S. 667, 697-98 (2018)). To satisfy this Article III requirement, plaintiffs need show no more than "that there is a substantial likelihood" of causation, *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 75 n.20 (1978) (quotations marks and citation omitted), by demonstrating injuries are "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504

U.S. at 560 (cleaned up). "[W]here, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged." *Support Working Animals, Inc. v. Gov'r of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) ("SWA"). "Traceability is not an exacting standard" and is "less stringent than the tort-law concept of proximate cause." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) (quotations marks and citation omitted).

### 1.    3PVRO Restrictions

Plaintiffs have demonstrated that the harms that will follow to them and their members from the 3PVRO Restrictions are traceable to the Secretary, Attorney General, and Supervisors of Elections.[21] Defendant Secretary of State Cord Byrd is Florida's chief elections officer and is responsible for the administration and enforcement of state laws affecting voting, including those governing 3PVROs. Fla. Stat. § 97.012. The Secretary oversees the Office of Election Crimes and Security, which is tasked with assisting the Department in investigating allegations of election law violations, referring findings to the Attorney General or state attorneys for prosecution, and imposing fines on 3PVROs for violations of Florida's Election Code, including the challenged provisions. Fla. Stat. § 97.022. As this Court has

---

[21] All three 3PVRO restrictions are traceable to the Secretary. At minimum, the Information Retention Ban is traceable to the Attorney General. The Fines Provision is traceable to the Supervisors of Elections.

already concluded, "the record is clear that Defendant Byrd intends to enforce the civil penalty provisions that accompany violations of the Citizenship Requirement." ECF No. 251 at 6-7. The Secretary has also imposed fines on 3PVROs in the past and will continue to do so, and there is nothing to suggest that—should the injunction be lifted—the Secretary will decline to enforce the Information Retention Ban, especially given that the Secretary has pursued an appeal of this Court's order granting preliminary injunctive relief.

Defendant Florida Attorney General Ashley Moody oversees the Office of the Florida Statewide Prosecutor, which has responsibility to "[i]nvestigate and prosecute any crime involving" "voter registration." Fla. Stat. § 16.56(1)(c)(5). Statewide Prosecutor Cox's testimony corroborated this statutory authority, testifying that his office is empowered to prosecute crimes related to voter registration. Tr. 838:12-15. The Attorney General is specifically tasked with enforcing SB 7050's new civil and criminal penalties against 3PVROs, *see* Fla. Stat. § 97.0575(8), including for violations of the Citizenship Requirement and Information Retention Ban, *id.* §§ 97.0575(1)(f), (7). The Attorney General interprets SB 7050 to provide her the ability to enforce the challenged provisions upon referral from the Secretary, thereby making her a link in the chain of enforcement of SB 7050's civil penalties. *See* ECF No. 199 at 3 (holding that plaintiffs have "standing to sue a defendant who is not the ultimate enforcer of the

challenged law . . . but who is nonetheless a necessary actor in the causal chain that leads from violation to enforcement"); *see also Wilding*, 941 F.3d 1116, 1125–26 (11th Cir. 2019) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014))); *Id.* at 1126 ("A plaintiff therefore need not show (or, as here, allege) that 'the defendant's actions are the very last step in the chain of causation.'" (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997))).

Plaintiffs also demonstrated that they have standing to sue Defendant Supervisors as to their injuries from the 3PVRO Fines Provision specifically. The Supervisors have an exclusive, specific obligation to "report any untimely filed voter registration application submitted [to them] by a 3PVRO" to the Office of Election Crimes and Security. PX 149, Fla. Admin. Code R.1S-2.042(8)(c), leading to imposition of penalties under the 3PVRO Fines Provision. Supervisor Earley testified that his office has an obligation to report issues with 3PVRO applications to the Secretary of State and must fill out forms each time an application is submitted late or to the wrong county by a 3PVRO. Tr. 740:5-7, 20-25. And all Supervisors of Elections Defendants admitted (in some cases with qualifications) that they "are required to send an accounting of 3PVRO voter registration applications to the Secretary of State using form DS DE 124 or an equivalent." *See* PXs 647-713.

This Court has already held that "a plaintiff has standing to sue a defendant who is not the ultimate enforcer of the challenged law (that is, not the one who brings an enforcement action in court or assesses fines for a violation) but who is nonetheless a necessary actor in the causal chain that leads from violation to enforcement." ECF No. 199 at 3. Plaintiffs demonstrated that "the Supervisors' role in the process" of administering the 3PVRO Fines Provision "is both specific to the 3PVRO Fines Provision and mandatory." ECF No. 199 at 9. As this Court already noted, "[t]he Secretary has promulgated a regulation mandating that the Supervisors report every single untimely filed voter registration application they receive to the Office of Election Crimes and Security, (which is part of the Florida Department of State, § 97.022(1), Fla. Stat.)." ECF No. 199 at 9 (citing Fla. Admin. Code R. 1S-2.042(8)(c) (Sept. 26, 2023)).

## 2. Mail-In Ballot Request Restriction

Plaintiffs UnidosUS, Alianza, DRF, and FLARA also demonstrated that their injuries from the Mail-In Ballot Request Restriction are traceable to Defendants Secretary Byrd and the Supervisors of Elections. As this Court has already recognized, "Defendant Byrd plays a role in enforcing this provision by virtue of the fact that the Department of State must prescribe by rule 'a uniform statewide application to make a written request for a vote-by-mail ballot which includes fields for all information required in [the challenged provision].'" ECF No. 251 at 14

(quoting Fla. Stat. § 101.62(1)(a)). Additionally, and as this Court has already acknowledged, Defendant Supervisors "are directly tasked with processing vote-by-mail requests as limited by the challenged provision." ECF No. 251 at 13 (citing Fla. Stat. § 101.62(1)(a)). Plaintiffs testified that their organizations have helped members overcome language barriers in requesting vote-by-mail ballots in Miami-Dade, Orange, and Osceola Counties. Tr. 110:7-112:24. Plaintiffs presented evidence that they have constituents who require assistance in requesting a vote-by-mail ballot in Polk and Leon counties, Tr. 1332:18-1334:18, but also demonstrated that the Mail-In Ballot Request Restriction impacts their members across the entire state of Florida, Tr. 1334:19-1335:8, 1384:17-20. As such, Plaintiffs have shown that their injuries from this Restriction are traceable to *all* 67 Supervisors.

### C.    Redressability

Finally, Plaintiffs' injuries are "likely to be redressed" by the requested injunction. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc*., 554 U.S. 269, 287 (2008). In order to satisfy this prong of Article III standing, Plaintiffs' redress need not be total, *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018), and a "substantial likelihood" of redressability will satisfy this prong. *Duke Power*, 438 U.S. at 79. Furthermore, where, as here, plaintiffs have sued to enjoin a government official from enforcing the law, they must show only "that an injunction prohibiting enforcement would be effectual." *SWA*, 8 F.4th at 1201. Traceability and

redressability "often travel together," so a similar analysis can apply to both prongs of standing. *Id.*

Plaintiffs' injuries are redressable as to the 3PVRO Restrictions because an injunction prohibiting the Secretary and Attorney General from enforcing the 3PVRO Restrictions will ensure they will not levy those civil and criminal penalties against Plaintiffs, while an injunction prohibiting the Supervisors from enforcing the 3PVRO Fines Provision would alleviate Plaintiffs' harms arising from the increased fines. *See* PX 149.

As to the Mail-In Ballot Request Restriction, the Court can redress Plaintiffs' injuries by enjoining the Supervisors from enforcing the Restriction's requirement that they accept vote-by-mail requests *only* from the voter or their legal guardian or immediate family member and enjoining the Secretary from enforcing the Mail-In Ballot Request Restriction through Fla. Stat. § 97.012(14). While an injunction against the Supervisors alone would alleviate some harm, Plaintiffs' federal rights still hang in the balance because the Secretary could bring an action to compel Supervisors to enforce the statutory provision. *See id.*

## III.   NAACP Plaintiffs Should Prevail on Each Claim.

After numerous briefings and seven days of testimony, the Court should determine that the evidence and the law supports a finding for Plaintiffs on each of their remaining claims.

A.   **The 3PVRO Restrictions unconstitutionally infringe on NAACP Plaintiffs' speech and association rights (Counts I and II).**

1.   **Strict scrutiny applies to Plaintiffs' First Amendment claims.**

Strict scrutiny is triggered when a law regulates core political speech or is content-based. *See Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002); *see also Buckley v. Am. Constitutional L. Found., Inc.*, 525 U.S. 182, 207 ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest."); *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1223 (11th Cir. 2022) (content-based restrictions subject to strict scrutiny). The burden then shifts to Defendants to demonstrate that they have a compelling basis to restrain these rights and that the challenged provisions are narrowly tailored so as to reach no more protected speech or activity than necessary. *McCullen v. Coakley*, 573 U.S. 464, 495 (2014) ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier."). Here, the 3PVRO Restrictions restrict core political speech, while the Citizenship Requirement is also a content-based restriction. Defendants have demonstrated no legitimate—let alone compelling—interest in any

of the 3PVRO Restrictions. Accordingly, the Court should find in favor of the NAACP Plaintiffs on Counts I and II of their operative complaint.

### a.   Voter registration is expressive activity.

As an initial matter, voter registration is expressive conduct. To determine protected First Amendment activity, courts examine "(1) whether an intent to convey a particularized message was present, and (2) whether the likelihood was great that the message would be understood by those who viewed it." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021) (cleaned up). Voter registration conveys a pro-democracy message that potential voters understand when asked whether they want to register by a 3PVRO canvasser, as courts in this circuit have recognized. *See League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006) ("Because the collection and submission of voter registration drives is intertwined with speech and association, the question is not whether Plaintiffs' conduct comes within the protections of the First Amendment, but whether Defendants have regulated such conduct in a permissible way.").

### b.   Plaintiffs engage in core political speech.

Voter registration efforts and follow-up communications conducted by 3PVROs are "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). Courts have routinely recognized that "'[e]ncouraging others to

93

register to vote' is 'pure speech,' and, because that speech is political in nature, it is a 'core First Amendment activity.'" *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (quoting *Browning*, 863 F. Supp. 2d at 1158). "A discussion of whether or not a person should register to vote . . . inherently 'implicates political thought and expression.'" *Lee*, 595 F. Supp. 3d at 1152 (alteration in original) (quoting *Hargett*, 400 F. Supp. 3d at 724).

Plaintiffs' voter registration and follow-up efforts strongly resemble the activity that the Supreme Court held was "core political speech" in *Meyer*. In *Meyer*, the Supreme Court applied strict scrutiny and struck down Colorado's ban on the use of paid petition circulators, noting that the "circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Meyer*, 486 U.S. at 421. Voter registration likewise involves "interactive communication concerning political change," *id*. at 422, because "the creation of a new voter is a political change—no less so than the inauguration of a new mayor or the swearing-in of a new Senator," *Hargett*, 400 F. Supp. 3d at 723 (emphasis omitted). The communications that follow voter registration—including correcting errors in registration, encouraging people to vote, and inviting people to events hosted by the organizations—further enables Plaintiffs to "educate potential voters about upcoming political issues, communicate their political support for particular issues, and otherwise enlist like-minded citizens

in promoting shared political, economic, and social positions." *Cobb*, 447 F. Supp. 2d at 1333.

At the preliminary injunction stage, the Court agreed that "the Florida NAACP Plaintiffs have made a colorable argument that their registration and get-out-the-vote activities are imbued with First Amendment protection[.]" ECF 101 at 101 n.16. As demonstrated through the evidence presented at trial, Plaintiffs have meaningful conversations about engagement, democracy, and the reasons to get out the vote both during and after the voter registration process. *See supra* Section I.D. Communications regarding the importance of democracy, *see, e.g.*, Tr. 512:9-23, political change, *see, e.g.*, Tr. 958:12-20, and developing a plan to get out and vote on election day, Tr. 97:11-16, are core political speech. Because the Citizenship Requirement, Information Retention Ban, and 3PVRO Fines Provision individually and collectively diminish Plaintiffs' ability to engage in this core political speech in a manner that "reduce[s] the total quantum of speech." *Cobb*, 447 F. Supp. 2d at 1332, [22] *see supra* Section I.D; Section I.J, the Court must review these provisions

---

[22] The Court can consider the individual and cumulative burdens imposed by the challenged provisions. *See, e.g.*, *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1220 (D.N.M. 2008) (denying motion to dismiss on grounds that organizational plaintiffs met burden of alleging that several aspects of law, individually and collectively, hampered and even halted organizations' voter registration activities and associated First Amendment rights and that no legitimate state interest could justify those burdens); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 218 (M.D.N.C. 2020) (considering "whether the

under strict scrutiny. *See Weaver*, 309 F.3d at 1319; *see also Buckley*, 525 U.S. at 207 ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest.").[23]

c.  **The Citizenship Requirement is content-based.**

Strict scrutiny also applies to the Citizenship Requirement independent of the Requirement's prohibition on core political speech because the Requirement is a content-based restriction on protected speech.

---

challenged laws, collectively, present an unconstitutional burden" on the First and Fourteenth Amendments and the right to vote); *Tenn. State Conf. of N.A.A.C.P. v. Hargett*, 420 F. Supp. 3d 683, 710 (M.D. Tenn. 2019) ("*Tenn. NAACP*") ("[I]n addition to the substantive unconstitutionality of the aforementioned individual provisions, the plaintiffs have demonstrated that these aspects of the Act, functioning together, create a cumulative burden that is even more difficult to justify as a constitutional matter.").

[23] This Court has recognized that sometimes First Amendment cases use the word "exacting" scrutiny instead, and that "[t]hough possibly less rigorous than strict scrutiny, exacting scrutiny is more than a rubber stamp." *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1249 (11th Cir. 2013) (quoting *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 876 (8th Cir. 2012)). The Supreme Court has described Meyer as applying strict scrutiny in subsequent decisions. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 n.10 (1995) ("In *Meyer*, we unanimously applied strict scrutiny to invalidate an election-related law making it illegal to pay petition circulators . . . ); *Buckley*, 525 U.S. at 207 ("Even where a State's law does not directly regulate core political speech, we have applied strict scrutiny. For example, in *Meyer v. Grant* . . ."). NAACP Plaintiffs maintain that strict scrutiny is the appropriate standard and that any difference between strict and exacting is negligible and will not be outcome-determinative on these facts.

It is "well established that the First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 70 (2022) (cleaned up). As such, "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 71 (quotation omitted). A law is "content-based," and thus subject to strict scrutiny, "if it suppresses, disadvantages, or imposes differential burdens on speech because of its content—i.e., if it applies to particular speech because of the topic discussed or the idea or message expressed." *NetChoice, LLC*, 34 F.4th at 1223 (cleaned up). The Supreme Court has cautioned courts to be "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777–78 (2018) (cleaned up). Such laws "run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Id.* (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)).

The Citizenship Requirement is plainly a content-based restriction. The Requirement singles out noncitizen speakers and prevents them from engaging in a specific form of expression—voter registration. *See Brooklyn Branch of the NAACP v. Kosinski*, 657 F. Supp. 3d 504, 526 (S.D.N.Y. 2023) (finding a line warming

prohibition is content-based because it "prohibits only a certain category of expression"). Such a content-based restriction can survive only if it passes strict scrutiny. *McCullen*, 573 U.S. at 478.

### d.   The 3PVRO Restrictions severely infringe upon associational activities.

The Citizenship Requirement, Information Retention Ban, and 3PVRO Fines Provision also individually and collectively trigger strict scrutiny because they severely restrict constitutionally protected associational activities. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000). When individuals or groups "wish to speak and act collectively with others," it "implicat[es] the First Amendment right of association." *Browning*, 863 F. Supp. 2d at 1158. The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces [First Amendment] freedom of speech." *NAACP v. Alabama, ex rel. Patterson*, 357 U.S. 449, 460 (1958); *see also Hadnott v. Amos*, 394 U.S. 358, 364 (1969).

Plaintiffs "wish to speak and act collectively with others" through their voter registration efforts, including the solicitation, completion, collection, and submission of voter registration applications. *Browning*, 863 F. Supp. 2d at 1158. "Organized voter-registration activities" like those Plaintiffs engage in "necessarily

involve political association, both within the voter-registration organizations and with the citizens they seek to register." *Herrera*, 580 F. Supp. 2d at 1229.

The evidence demonstrated that Plaintiffs' voter registration and follow-up activities fall squarely within this protected category. *See supra* Section I.D. 3PVRO leaders, members, and employees—citizens and noncitizens alike—not only join forces among themselves as part of a broader mission to engage marginalized voters, *see* Tr. 88:15-20, but also associate with the voters they register to ensure their registrations are accepted, encourage them to vote, and even recruit them for future advocacy and registration efforts. *See* Tr. 99:1-22 (J. Nordlund, UnidosUS); *see also* Tr. 961:14-962:3 (S. Mayer, VOT). The Citizenship Requirement also independently deprives Organizational Plaintiffs of their right to associate with noncitizen canvassers and deprives noncitizen canvassers, such as Mr. Orjuela, of their rights to associate with fellow canvassers and with 3PVROs. *See supra* Section I.J.

The 3PVRO Restrictions significantly diminish Plaintiffs' ability to engage in these associational activities by stripping the bulk of their work force, imposing harsh fines for minor errors, and precluding them from retaining voter contact information. *See supra* Section I.J. The end result is less 3PVRO associational activity overall and, in some cases, cutting off the ability to associate through registration altogether. *See* Tr. 641:13-642:2; *see also* Tr. 1323:4-1324:17. These

associational burdens are subject to strict scrutiny. *Clingman*, 544 U.S. at 586; *see also Boy Scouts of Am*, 530 U.S. 640, 647–48.

> **2.    In the alternative, the *Anderson-Burdick* test should apply to Plaintiffs' First Amendment claims.**

Because the 3PVRO Restrictions are "a regulation of pure speech," *Harriet Tubman Freedom Fighters Corp. v. Lee*, 576 F. Supp. 3d 994, 1003 (N.D. Fla. 2021) ("*Freedom Fighters*") (quoting *McIntyre*, 514 U.S. at 345), Plaintiffs maintain that strict scrutiny applies. Should the Court disagree, however, it should apply the "*Anderson–Burdick* test [] typically used to evaluate First Amendment challenges to election laws." *Id*. (citing *Anderson v. Celebrezze*, 460 U.S. 780, 786–89 (1983)).

The *Anderson-Burdick* test requires this Court to weigh challenges to election laws on a sliding scale, with laws that impose a severe burden receiving greater scrutiny and reasonable, nondiscriminatory restrictions receiving less stringent review. *Id*. at 1003. But, "[h]owever slight [the] burden," "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (quotation omitted).

The burdens imposed by the Citizenship Requirement, Information Retention Ban, and 3PVRO Fines Provision collectively and individually are immense. *Supra* Section I.J. The extent to which the 3PVRO Restrictions stifle and suffocate Plaintiffs' ability to engage in protected speech and association through voter

registration efforts warrants strict or otherwise heightened scrutiny. *VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230, 1251 (D. Kan. 2023) ("Here, even if the Court applied the *Anderson-Burdick* balancing framework to determine the appropriate level of scrutiny, strict scrutiny would apply.").

But even if this Court were to apply a more lenient standard, the State's failure to articulate any legitimate—let alone compelling—justifications for the burdens imposed by the 3PVRO Restrictions dooms each of the challenged provisions. *See infra* Section III.D.

>    **B.    SB 7050's Citizenship Requirement and Information Retention Ban are overbroad and vague (Count VI).**

The evidence at trial supports this Court's prior ruling that the Information Retention Ban is unconstitutionally vague, and it also establishes that the Citizenship Requirement suffers from similar vagueness. This Court should find in NAACP Plaintiffs' favor on Count VI of their operative complaint.

Vague laws fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits and may authorize and even encourage arbitrary and discriminatory enforcement. *See* ECF No. 101 at 38 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion), and citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). This Court has previously found that it must consider "the question" of "how a person of ordinary intelligence would read the statute." ECF No 101 at 42; *see also Wollschlaeger*, 848 F.3d at 1319

(unconstitutionally vague statutes "fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct [is] prohibit[ed]," and they enable "arbitrary and discriminatory enforcement" (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000))). There is now a trial record that answers this exact question.

The Court heard from many witnesses of "ordinary intelligence" that they are confused by terms within the Citizenship Requirement and Information Retention Ban and do not understand what they mean—including canvassers, 3PVRO leaders, and election officials alike. *See* Section I.I. The threat of a $50,000 fine is reason enough for a 3PVRO to err on the side of not engaging with noncitizens completely. *See, e.g.*, Tr. 91:15-92:9 (Citizenship Requirement would exclude noncitizens from "every role" in voter registration at Unidos). And the threat of criminal penalties for violating the Information Retention Ban—regardless of whether the violation is intentional or based on a mistake—together with the provision's vagueness renders the Ban a flat-out violation of due process. *See* ECF No. 101 at 48 (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)); *see also Kolender*, 461 U.S. at 358 n.8 ("[W]here a statute imposes criminal penalties, the standard of certainty is higher."). NAACP Plaintiffs testified that rather than choosing to retain *some* information that *might* be allowable they would forego retaining *any* voter information if the Ban is enforced, lest they expose themselves and their employees to a felony conviction for guessing wrong. *See, e.g.*, Tr. 103:2-

3 (J. Nordlund, UnidosUS); Tr. 972:13-16 (S. Mayer, VOT); Tr. 1327:10-23 (O. Babis Keller, DRF).

Additionally, because both of these provisions implicate protected First Amendment conduct, *see supra* Section III.A.1, the standards for clarity are heightened. Vague laws in the First Amendment context "force potential speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," *Wollschlaeger*, 848 F.3d at 1320 (cleaned up). In this way, vague laws have a wide-ranging chilling effect on disfavored speech without expressly banning it. Thus, "standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432 (1963).

Finally, the Citizenship Requirement and Information Requirement additionally—and independently—fall short under the overbreadth doctrine of the First Amendment. Overbroad laws "consume[] vast swaths of core First Amendment" associational activity in the name of a purported state interest. *See, e.g., Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1283 (N.D. Fla. 2021); *see also id*. at 1284 (noting that when state "interest[s] collides with rights guaranteed by the First Amendment, the 'government may regulate in the area only with narrow specificity'" because "[o]therwise, those rights, which 'are delicate and vulnerable, as well as supremely precious in our society,' may be suffocated" (quoting *Button*, 371 U.S. at 433)). This is an additional basis to find that a law violates the First

Amendment. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations."). SB 7050's provisions could have been written in much narrower ways to avoid the overbreadth issues, such as disallowing groups from retaining voters' social security numbers but not contact information, or only prohibiting certain noncitizens from engaging in voter registration.

The State cannot fix the vague and overbroad nature of the Citizenship Requirement and Information Retention Ban through rulemaking. This Court has already explained that "[r]ewriting the laws it enforces is not within the purview of the executive branch . . . ." ECF No. 101 at 41. As this Court has repeatedly explained, though it must construe state statutes as constitutional when possible, it cannot "adopt a narrowing construction . . . unless such a construction is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330 (1988); *accord Stenberg v. Carhart*, 530 U.S. 914, 944 (2000). Only a state court can supply the requisite construction to save an otherwise vague state statute. *Gooding v. Wilson*, 405 U.S. 518, 520 (1972); *see also Dream Defs.*, 559 F. Supp. 3d at 1269–70. But even there, Florida law prohibits Florida courts from "deferr[ing] to an administrative agency's interpretation of [a] statute"; they "must instead interpret such statute or rule de novo." Fla. Const. art. V, § 21; *see, e.g., Orange Cnty. Fire Fighters Ass'n, I.A.F.F.*

*Loc. 2057 v. Orange Cnty. Bd. of Cnty. Comm'rs*, No. 1D22-1427, 2023 WL 3859343, at *1 (Fla. Dist. Ct. App. June 7, 2023) ("We no longer defer to an agency's interpretation of law."). And because the Citizenship Requirement and Information Retention Ban are vague and overbroad, the statutes fail, and no rulemaking can save them.

### C. The 3PVRO Restrictions unconstitutionally burden NAACP Plaintiffs' right to equal protection and right to vote.

#### 1. The Citizenship Requirement unconstitutionally discriminates on the basis of alienage (Count III).

The Court has already found that the Citizenship Requirement is facially discriminatory against noncitizens, ECF No. 251, but the trial record also establishes that the provision violates the Equal Protection Clause as applied to lawful resident aliens like Plaintiffs and because it is intentionally discriminatory.[24] This Court should find in NAACP Plaintiffs' favor on Count III of their operative complaint.

---

[24] While this Court has previously proceeded with an *Arlington Heights* analysis on a facially explicit alienage-based classification, it indicated that the Supreme Court has suggested that *Arlington Heights* is applicable only to facially neutral laws. *Shen v. Simpson*, No. 4:23-CV-208-AW-MAF, 2023 WL 5517253, at *12 n.13 (N.D. Fla. Aug. 17, 2023) (citing caselaw which notes that facially explicit classifications present none of the "additional difficulties posed by laws that, although facially race neutral, result in racially disproportionate impact and are motivated by a racially discriminatory purpose"). Plaintiffs maintain that the law facially discriminates against noncitizens. However, to preserve any claims, Plaintiffs proceed to provide both an as-applied analysis and an *Arlington Heights* analysis, which gives the Court another basis to find in their favor.

### a.   The Citizenship Requirement violates the Equal Protection Clause as applied to Plaintiffs.

Plaintiffs bring an as-applied challenge to the Citizenship Requirement on behalf of themselves (Individual Plaintiffs) and their members and canvassers (Organizational Plaintiffs) who span the spectrum from temporary protected status to permanent residents. As such, the Court must apply the same analysis as it did with the facial challenge because "an alleged violation of one individual's constitutional rights under the Equal Protection Clause would necessarily constitute a violation of the Equal Protection Clause and the Constitution at large, regardless of the individually-applied remedy." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 800 n.3 (11th Cir. 2022).

Laws that target noncitizens authorized to live and work in the United States such as Mr. Orjuela Prieto, Mr. Mayer, and Organizational Plaintiffs' members and canvassers, are subject to strict scrutiny. *See, e.g., LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005) ("[T]he Supreme Court has reviewed with strict scrutiny [] state laws affecting permanent resident aliens."). As the Supreme Court has explained, strict scrutiny applies to any laws that "str[ike] at the noncitizens' ability to exist in the community, a position seemingly inconsistent with the congressional

determination to admit the alien to permanent residence." *Foley v. Connelie*, 435 U.S. 291, 295 (1978).[25]

As applied to NAACP Plaintiffs, the Citizenship Requirement fails strict scrutiny. *See infra* III.D.1. Indeed, the State has all but conceded as much. *See* Appellants' Initial Br. at 17, *Fla. State Conf. of NAACP v. Fla. Sec'y of State*, No. 23-12308 (11th Cir. Aug. 21, 2023), ECF No. 29 ("Applied to permanent resident aliens, such a statute might well fail strict scrutiny."). "A resident alien may reside lawfully in [Florida] for a long period of time. He must pay taxes. And he is subject to service in this country's Armed Forces." *Sugarman v. Dougall*, 413 U.S. 634, 645 (1973). The State can identify no justification for excluding lawful resident aliens from the voter registration process.

> **b. Alternatively, the Citizenship Requirement violates the Equal Protection Clause under the *Arlington Heights* standard.**

This Court need not look much further than the plain language of the Citizenship Requirement to determine that it unlawfully singles out noncitizens for

---

[25] As this Court has already determined, the narrow exception to strict scrutiny in the context of alienage discrimination—the political function exception—does not apply to 3PVRO canvassers. Order at 12, *Hispanic Federation v. Byrd*, No. 4:23cv218 (N.D. Fla. Mar. 1, 2024), ECF No. 149 at 12 (noting that the Secretary failed to present "new facts to raise a genuine dispute concerning this issue, and this Court incorporates by reference its prior analysis [at Preliminary Injunction] rejecting" the political-function exception arguments). The record at trial only further demonstrates the poor fit of the exception, as canvassers have no discretion and engage in no policymaking. *See supra* Section I.C.

disparate treatment, both on its face and as applied to NAACP Plaintiffs. But while the text of the provision speaks for itself, the process leading up to its enactment only further reinforces its discriminatory intent.

A plaintiff can prove an Equal Protection claim by establishing that a law has "both a discriminatory intent and effect." *Greater Birmingham Ministries*, 992 F.3d at 1321. In assessing a claim of discriminatory intent, the Court analyzes the *Arlington Heights* factors, which include: (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977). These factors are not exhaustive, and courts have also considered: (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives. *See Greater Birmingham Ministries*, 992 F.3d at 1321–22. "As long as invidious discrimination is a motivating factor behind the action . . . , an equal protection violation has been proven." *Pena v. Bd. of Educ. of City of Atlanta*, 620 F. Supp. 293, 301 (N.D. Ga. 1985). Once Plaintiffs establish their case, the Secretary must "demonstrate that the law would have been enacted without this racial discrimination factor." *Fla. State Conf. of NAACP*, 566 F. Supp. 3d at 1293 (cleaned up).

A law that classifies on the basis of alienage is "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). The legislative record makes clear that prejudice was the driving force for the Citizenship Requirement. As described *supra* Section I.F., contemporary statements by the legislators reveals not only a sentiment of superiority for U.S. citizens, but also animus against noncitizens, by referencing all noncitizens as "illegals." PX 252 at 15. The Citizenship Requirement is "intimately tied" to the "immigrant threat narrative" that Dr. Lichtman testified has been promulgated aggressively in Florida legislative policy in recent years. Tr. 1495:21-1496:3. The legislature's decision to single out two classes of individuals— noncitizens and people with certain felony histories, *see* PX 250 at 5 (introducing both provisions at the same time)—further indicates that it "associate[ed] being a potential criminal or someone who is dangerous" with noncitizens. Tr. 1520:20-25. And the Citizenship Requirement comes on the heels of other anti-immigrant legislation by the very same legislature. *See, e.g.*, Tr. 1524:3-11.

The legislature made this Court's decision easy. Rarely are laws passed today that are so blatantly and unabashedly discriminatory. The impact was clear and obviously foreseeable: noncitizens working for 3PVROs would be directly harmed

by the Requirement. Although the legislature attempted to minimize public input and testimony on the law, there was extensive testimony that it would hurt noncitizens and minority voters in particular. Tr. 477:2-17, 478:8-11; PX 254 at 112-15. There were plenty of less discriminatory alternatives proposed that were ignored. PX 254 at 33-41. Finally, at no point has the Secretary even attempted to explain how the Requirement could have been passed without the intent to discriminate against noncitizens. The Court should find the Citizenship Requirement is intentionally discriminatory in violation of the Equal Protection Clause.

   2.   **The 3PVRO Restrictions are intentionally racially discriminatory and unduly burden voters (Counts V and VIII).**

The Citizenship Requirement—which fails on multiple bases under any standard—is but one example of the discriminatory intent behind all of the 3PVRO Restrictions. NAACP Plaintiffs have proven that the legislature passed the Citizenship Requirement, Information Retention Ban, and 3PVRO Fines Provision motivated in part by the intent to discriminate against Black and Hispanic voters. NAACP Plaintiffs have separately shown that the 3PVRO Restrictions are an unconstitutional burden on the right to vote.[26] This Court should find in NAACP Plaintiffs' favor on Counts V and VIII of their operative complaint.

---

[26] During trial, NAACP Plaintiffs filed a supplemental opening statement to clarify that this Court could evaluate their Equal Protection Claim under Count V under

As described above, *supra* Section III.C.1.a, in order to establish intentional discrimination, Plaintiffs need show only that racial discrimination was one factor at play in enacting legislation. Legislators do not make decisions "motivated solely by a single concern, or even" have one "particular purpose" that "was the 'dominant' or 'primary' one" in passing legislation. *Arlington Heights*, 429 U.S. at 265. "But racial discrimination is not just another competing consideration." *Id.* It is an impermissible one. This impermissibility extends to "intentionally targeting a particular race's access to the franchise because its members vote for a particular party[.]" *League of Women Voters of Fla. Inc.*, 66 F.4th at 924 (quoting *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 222 (4th Cir. 2016)). Because racial discrimination cannot animate legislative purpose, "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, [] judicial deference is no longer justified," and a court must examine the legislation with strict scrutiny. *Arlington Heights*, 429 U.S. at 265–66. Courts do not analyze each *Arlington Heights* factor in a vacuum. Rather, "this Court can infer a discriminatory

---

*Anderson-Burdick*, ECF No. 283, just as the Court could evaluate NAACP Plaintiffs' First Amendment claims under Counts I and II under *Anderson-Burdick*. ECF No. 272 at 14-15, 19-20. Counsel for the Secretary represented that he had no objection to NAACP Plaintiffs' amendment of its complaint to clarify this issue, and this Court granted the ore tenus motion. Tr. 2029:20-2030:11. To avoid any confusion as to the claims it brings, NAACP Plaintiffs filed an amended complaint to include a separate *Anderson-Burdick* claim, Count VIII. *See* ECF No. 302.

purpose given the totality of the circumstances." *Fla. State Conf. of NAACP*, 566 F. Supp. 3d at 1296.

The *Anderson-Burdick* analysis, meanwhile, overlaps to some degree with the *Arlington Heights* analysis, as both require examination of the burden on voters and the justifications for those burdens. For example, in alleging Count V, NAACP Plaintiffs assert that: "SB 7050's 3PVRO restrictions will impact Black and Hispanic Floridians with precision, particularly because 3PVROs are five times more likely to register Black and Hispanic voters than white voters." ECF No. 302 ¶ 152; *compare* ¶ 186; *see also, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1126–27 (10th Cir. 2020) (noting that, in determining magnitude of the burden under *Anderson-Burdick test*, court evaluates "'the statute's broad application to all . . . voters'" but also may "specifically consider the 'limited number of persons' on whom '[t]he burdens that are relevant to the issue before us' will be 'somewhat heavier'") (quoting *Crawford*, 553 U.S. at 198–99, 202–03 (Stevens, J., plurality opinion), and citing *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966) (holding poll tax facially unconstitutional while identifying the specifically pernicious effect such a tax has on those unable to pay it)). Likewise, NAACP Plaintiffs expressly alleged the inadequacy of the state's purported interests in maintaining these restrictions, *see, e.g.*, ECF No. 302 ¶¶ 153–54, which directly addresses the second part of the *Anderson-Burdick* test, *see id.* ¶ 191; *see also, e.g., Lee*, 915 F.3d at 1318.

In evaluating the burden placed on voters under *Anderson-Burdick*, "[d]isparate impact matters." *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018). Justice Stevens' controlling opinion in *Crawford v. Marion County Election Board* establishes that courts may consider whether a "statute imposes excessively burdensome requirements on *any* class of voters." 553 U.S. at 202 (quotation omitted) (emphasis added).[27] And, in both *Anderson* and *Burdick*, the Supreme Court considered burdens imposed on certain categories of voters. *See Burdick v. Takushi*, 504 U.S. 428, 436–37 (1992) (acknowledging "any burden on voters[] . . . is borne only by those who fail to identify their candidate of choice until days before the primary"); *Anderson*, 460

---

[27] Courts have recognized Justice Stevens's *Crawford* opinion as controlling. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *Greater Birmingham Ministries*, 992 F.3d at 1319 n.31 ("We join our sister circuits in recognizing Justice Stevens' plurality opinion as controlling."). And many courts have interpreted *Crawford* to permit courts to consider burdens on subgroups of voters in evaluating election laws. *See, e.g., Fish v. Schwab*, 957 F.3d 1105, 1127 (10th Cir. 2020) ("And, while we are to evaluate 'the statute's broad application to all . . . voters' to determine the magnitude of the burden, we may nevertheless specifically consider the 'limited number of persons' on whom '[t]he burdens that are relevant to the issue before us" will be 'somewhat heavier.'" (quoting *Crawford*, 553 U.S. at 198–99, 202–03)); *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 n.2 (9th Cir. 2016) (finding a majority of the Supreme Court agreed that "courts may consider not only a given law's impact on the electorate in general, but also its impact on subgroups, for whom the burden, when considered in context, may be more severe." (citing *Crawford*, 533 U.S. at 199–203)); *Mays v. LaRose*, 951 F.3d 775, 784–86 (6th Cir. 2020) ("All binding authority to consider the burdensome effects of disparate treatment on the right to vote has done so from the perspective of only affected electors—not the perspective of the electorate as a whole.").

U.S. at 792 (holding that "the March filing deadline places a particular burden on an identifiable segment of Ohio's independent-minded voters," specifically Anderson's supporters, but not assessing whether the deadline burdens all voters).

The Eleventh Circuit, this Court, and many other federal courts across the country have similarly considered the disparate impacts on subgroups of voters in evaluating the merits of *Anderson-Burdick* claims. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (evaluating the "burden" of signature match scheme "on vote-by-mail and provisional voters' fundamental right to vote"); *Detzner*, 314 F. Supp. 3d at 1216 (considering the "lopsided[] impacts" on "Florida's youngest voters" of Division of Elections' opinion on college campus early voting site); *see also, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012) (weighing "the burden" the law "has placed on nonmilitary Ohio voters").

### a.   The 3PVRO Restrictions burden all voters.

The NAACP Plaintiffs offered expert testimony to demonstrate precisely how SB 7050's 3PVRO restrictions burden voters. Dr. Herron testified that because SB 7050's 3PVRO Restrictions directly constrain 3PVROs, Tr. 247:3-16, the effects will be passed on to voters by raising the cost of registration and therefore voting in Florida. Tr. 247:3-16. When Dr. Herron looked at 2023 registrations post-SB 7050 (compared to 2019 as a baseline), he found that 3PVRO registrations dropped the most of any registration method post-SB 7050 and "in fact, they almost vanished."

Tr. 259:6-19. Dr. Herron testified that there will be fewer voter registrations and lower turnout post SB 7050's passage as a result, Tr. 247:17-22, and both he and Defendants' expert Dr. Stein agreed that not all voters who would have registered via 3PVRO will switch to another method of registration now, as Dr. Herron's and Dr. Smith's HB 1355 study also showed. *See supra* Section I.J.2.

Dr. Lichtman also testified that 3PVRO voter registration numbers dropped dramatically post-SB 7050, Tr. 1463:2-1466:3, and that the July 2023 3PVRO registration numbers were 21.9 times lower than the average 3PVRO registration numbers during the month of July over the past 5 years. Tr. 1464:8-12. Supervisor Earley confirmed that since SB 7050 was enacted, his office has seen "a dramatic decrease" in 3PVRO activity, Tr. 754:10-12, "from thousands a year to almost zero," Tr. 801:23-802:1.

This testimony establishes that SB 7050's burden on voters' ability to register is significant. As this Court previously articulated, "that potentially thousands of Floridians may not have been able to register because of" state action—here, the 3PVRO Restrictions—"is certainly a substantial burden limiting the right to vote." *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1144 (N.D. Fla. 2020). The Court should therefore "evaluate [the] Defendant's justifications under heightened scrutiny" under the *Anderson-Burdick* framework, *id*.

### b. The 3PVRO Restrictions have a disparate impact on Black and Hispanic voters.

The Court heard detailed evidence about the specific subgroups of voters most burdened by the 3PVRO Restrictions. SB 7050's disparate impact is relevant to both NAACP Plaintiffs' intentional discrimination claim (Count V) and its *Anderson-Burdick* claim (Count VIII).

Dr. Herron testified that, based on his review of the December 2023 voter file, PX 263, there was a 10.6 percentage point difference in 3PVRO registration with Black voters compared to white voters, making Black voters 6.6 times more likely to register via 3PVRO than white voters; for Hispanic voters, those numbers were a 8.1 percentage point difference and 5.2 times more likely to register via 3PVRO than white voters. Tr. 284:2-14. These are not "small disparities" but instead establish "a pattern, unexplainable on grounds other than race." *Greater Birmingham Ministries*, 992 F.3d at 1322 (quoting *Arlington Heights*, 429 U.S. at 266). The Secretary's expert, Dr. Stein, had no data to dispute Dr. Herron's findings and acknowledged "that [the data that] Dr. Herron showed demonstrated that voters of color heavily rely on 3PVROs. *See* Tr. 1689:2-11, 1689:21-24.

All experts agreed that 3PVROs conduct "outreach to underserved communities" and "for that reason, in those communities 3PVRO registration is relatively low cost." Tr. 251:13-22, 252:6-19, 1689:2-11, 1689:21-24; *see also* Tr. 1701:9-23, Tr. 1709:2-6, 1709:16-21 (Dr. Stein relied on a report about the unique

and specific role third party voter registration organizations play in registering voters of color and reaching individuals of lower socioeconomic means in forming opinions in this case).

Fact witnesses confirmed Dr. Herron's expert analysis. As Mr. Nordlund testified, approximately 70-80 percent of the roughly 400,000 voters that UnidosUS has registered in Florida identified as Hispanic and rely on 3PVROs because (1) they don't know to go to a government office to register; (2) they are less likely to have online access or materials needed to register online; and (3) their work hours confine their availability to register otherwise. Tr. 67:8-20, 144:23-145:22. Ms. Slater's experiences were similar in registering thousands of Black voters in Florida on behalf of Florida NAACP, and she added that limited transportation access also prevents many Black voters from registering by other means. Tr. 1163:4-1164:20, 1173:2-17. Because Florida NAACP's membership is 90 percent Black, the organization is uniquely positioned to engage with Black voters because members "know the community and they know us, and they trust us" and "the work that we do." Tr. 1154:19-22, 1163:4-17. Mr. Vilar testified that Alianza serves the Puerto Rican community in central Florida, including Osceola County which "has the lowest participation rate in elections of any . . . county in the entire state." Tr. 626:7-12. And Representative Eskamani shared that "3PVROs can really bring democracy to the ground level and engage [those] who might not typically have interactions

with government and who might also have historically negative interactions with government." Tr. 863:18-24. These witnesses were not alone—the Court heard similar testimony from other 3PVRO representatives, canvassers, and state legislators. *See supra* Section I.A.

Plaintiffs in courts across the country have prevailed on *Anderson-Burdick* challenges to election laws that impact the same groups burdened by SB 7050, and courts have credited evidence about election laws' uneven impact on voters of different socioeconomic statuses and with different associational preferences, work schedules, transportation access, and/or knowledge about the election process. *See, e.g.*, *Ohio State Conf. of N.A.A.C.P. v. Husted*, 768 F.3d 524, 541–45 (6th Cir.) (finding district court properly concluded Plaintiffs presented evidence of law's impact on African American voters more likely to work wage-based jobs during 8 a.m. to 5 p.m. and granting preliminary injunction under *Anderson-Burdick*), *vacated* No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014); *Common Cause Ind. v. Marion Cnty. Election Bd.*, 311 F. Supp. 3d 949, 968–70 (S.D. Ind. 2018), *vacated and remanded on mootness grounds*, 925 F.3d 928 (7th Cir. 2019) (similar).

But NAACP Plaintiffs did more than show which subgroups will be burdened by SB 7050, which is likely sufficient to show disparate impact. Dr. Herron also presented evidence that SB 7050 is *already affecting* these groups. Dr. Herron offered "compelling evidence that SB 7050" "had effects on Hispanic and Black

voters in Florida," Tr. 1991:4-6, and Defendants' expert Dr. Stein agreed, testifying that since the passage of SB 7050, "the total number of Black and Hispanic" 3PVRO registrations "have declined." Tr. 1690:3-8. Supervisor Earley has already observed fewer voters of color register in his county via 3PVRO since SB 7050's passage, Tr. 754:13-21, which is not surprising given that groups like Alianza—a 3PVRO that registered over 7,000 mostly Hispanic and specifically Puerto Rican voters in 2022—has halted its voter registration programs because of SB 7050. Tr. 623:4-5, 641:13-15, 663:17-22.  And as explained *supra*, the record is clear that some Black and Hispanic voters will not register through another means, *see* PX 128 (HB 1355 study)—instead, they will be unable to register at all and therefore will not be able to vote. Because there are millions of Black and Hispanic voters in Florida, the number of potentially affected voters is sizeable. *See* Tr. 263:10-25.

This testimony establishes that SB 7050's disparate burdens on certain groups of Black and Hispanic voters' ability to register and then vote is significant, and this Court should therefore evaluate proffered state interests under strict scrutiny for NAACP Plaintiffs' Equal Protection claim (Count V) and heightened scrutiny for NAACP Plaintiffs' *Anderson-Burdick* claim (Count VIII).

### c.   Other *Arlington Heights* factors show the 3PVRO Restrictions are intentionally discriminatory.

**Foreseeability of disparate impact**. Importantly, the evidence presented at trial about the discriminatory impact of the 3PVRO Restrictions was also presented to the legislature—not just during consideration of SB 7050, but in every iteration of the law regulating 3PVROs over the past three years, as evidenced by Senator Torres's and Representative Eskamani's testimony, both of whom were members of the legislature during that entire period. For instance, the Eleventh Circuit found that, during consideration of SB 90, "some legislators knew that black voters are more likely than white voters to register to vote using third-party voter-registration organizations." *League of Women Voters of Fla. Inc.*, 66 F.4th at 942. And evidence was presented on the House floor during debates on SB 524. Tr. 887:21-889:13. During the debates on SB 7050, the legislature heard the same kinds of data points. *See, e.g.*, PX 254 at 121-122. In particular, the legislature heard testimony that Black and Hispanic voters are roughly 5 times more likely than white voters to rely on 3PVROs. Tr. 477:2-17. At no point during the SB 90, SB 524, or SB 7050 legislative processes was evidence presented to rebut the well-known fact that 3PVROs serve minority communities at disproportionately higher rates. *See supra* Section I.A.1. The legislature was thus aware that 3PVROs disproportionately register Black and

Hispanic voters and that any restrictions on 3PVROs would fall heavily on those voters.

**Recent history and sequence of events leading up to the law's passage.** Part of the legislative process includes understanding "what is happening in the larger ecosystem around you." Tr. 891:5-9 (Rep. Eskamani testifying). Recent history and changes to 3PVRO laws in Florida reveal not only a deeply concerning discourse surrounding the realities of race relations today but also a targeted effort to slow the gains made by Black and Hispanic voters in Florida. *See supra* Section I.F.

Representative Eskamani summed it up perfectly: Recent history has seen "sweeping pieces of policy that impact the immigrant experience, that impact representation, [and] that impact historical context," so much so that "we can all agree across the aisle, there's been, more than not, policies that make life harder to be an immigrant or a person of color in the Sunshine State." Tr. 857:1-14. In the recent education history, Dr. Lichtman saw "a clear, unabashed attempt to impose this racial ideology upon public education in the state of Florida[.]" Tr. 1507:22-25. And there has been a rise of the anti-immigrant sentiment as the demographics of the state shifted "following Hurricane Maria, with many climate refugees" and "a large Central and South American community." Tr. 852:23-853:13, 853:23-25. This includes anti-immigrant legislation like SB 1718 which passed despite vocalized

concerns from many legislators and stakeholders "of different political backgrounds." Tr. 855:8-856:14.

The above alone is demonstrably sufficient to infer that the legislature's passing of a law that will disproportionately impact Black and Hispanic voters was no mistake. But Plaintiffs also presented evidence at trial regarding: (1) Florida's recent redistricting history which required court intervention to cure the "discriminatory effect" of the congressional plan; (2) the legislature's involvement in voter purges; and (3) the OECS's specific targeting of Black citizens attempting to vote. *Supra* Section I.F.1. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 607 (2018) (noting that previous legislature's actions "are relevant to the extent that they naturally give rise to—or tend to refute—inferences regarding the intent of the [current] legislature" and "[t]hey must be weighed together with any other direct and circumstantial evidence of the legislature's intent"). While these may not be direct evidence of discriminatory intent, "[a] historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose." *McCrory*, 831 F.3d at 223–24 (citing *Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016)).

**Substantive and procedural deviations.** SB 7050's passage was also rife with procedural deviations. As Representative Eskamani testified, SB 7050 was like

a "fast-forwarded" episode of *School House Rock*, with a "very expedited approach to policy making that doesn't happen very often, and . . . limits public engagement." Tr. 899:8-17; *see supra* Section I.G. The Citizenship Requirement wasn't even introduced until the end of April, PX 250 at 5; PX 248 at 4, despite the concept being considered as early as February, PX 162. And public speakers were rushed through the process, leaving no room for thoughtful comment or consideration. *See supra* Section I.G. "This hurried pace, of course, strongly suggests an attempt to avoid in-depth scrutiny." *McCrory*, 831 F.3d at 228.

Dr. Lichtman found notable that SB 7050 passed just 25 days after its initial introduction, a deviation from every other elections bill he examined, which all passed at least 45 days after introduction. Tr. 1539:8-13. Dr. Lichtman also found two major substantive deviations when he compared SB 7050 to other Florida legislation. He testified that "[t]here had been nothing like" the Citizenship Requirement in any previous Florida practice. Tr. 1531:11-17. And he testified that escalating the aggregate fine to $250,000 from $50,000 was a "substantial deviation[] from practices we've seen in Florida." Tr. 1531:18-22. Dr. Lichtman also found that SB 7050 substantively deviates "from practices in every other state" because of the Citizenship Requirement and stringent fines. Tr. 1531:23-1532:3.

**Contemporary statements.** As the Eleventh Circuit recently affirmed, "contemporary statements of key legislators are relevant to an *Arlington Heights*

123

analysis." *League of Women Voters of Fla. Inc.*, 66 F.4th at 939. Here, contemporary statements reveal that the proffered state interests to the 3PVRO requirements are pretextual.

The interest in excluding noncitizens is no interest at all. *See supra* Section III.D.1 (analyzing statements from the legislature that there are rights only citizens get to enjoy). With respect to the Information Retention Ban, the bill's sponsors claimed they wanted to "protect[] that sensitive information that we're collecting from a voter," PX 252 at 16, and with respect to the 3PVRO Restrictions generally, the sponsors claimed they would serve as "hopefully a deterrent for the bad actors," *id.* at 36, but there was no evidence this was a problem. And while Senator Burgess testified that "the only thing we're doing is making it harder for bad actors to do illegal activity," PDX 252 at 124, the law clearly encapsulates all 3PVRO activities, not just those bad actors. [28]

**Less discriminatory alternatives.** The record is clear that SB 7050's "proponents were [*not*] receptive to input during the legislative process." *League of Women Voters of Fla. Inc.*, 66 F.4th at 940. There were plenty of viable alternatives, including raising fines by a more modest amount, Tr. 1486:23-1490:7; implementing same day registration,  Tr. 1564:22-1565:18; restricting canvassing work to those

---

[28] Plus, the record establishes that the Restrictions will themselves disenfranchise many voters who will lose access to 3PVROs as a means of registering to vote and who now will not register or vote at all. *Supra* Section I.J.1.

authorized to live and work in the United States, Tr. 1573:3-4; and/or prohibiting 3PVROs from retaining specific sensitive personal information, Tr. 1574:21-1575:9. None of the proposals passed.

The record also shows that drafters and proponents of SB 7050 "were aware of the likely disproportionate effect of the law on minorities, and that they nonetheless passed the bill without adopting a number of proposed ameliorative measures that might have lessened this impact." *Veasey*, 830 F.3d at 236. Drafters knew the Citizenship Requirement was discriminatory and chalked it up to a "policy call." PX 252 at 18. They knew certain information was vital to following up to potential voters. *Supra* Section I.D. And they knew that many organizations could not withstand the $250,000 fine. Tr. 1487:2-15. Yet they passed these provisions regardless.

**Selective enforcement.** Plaintiffs also presented evidence that the Secretary targeted Central Floridians, and Puerto Ricans in particular, to effectuate SB 7050's purpose, which has a predictable racial effect. *See supra* Section I.F.3.

\*     \*     \*

In sum, all of the factors weigh in favor of finding an intent, at least in part, by the legislature to discriminate against Black and Hispanic voters. As a result, any good faith presumption that the Court affords to the legislature is overcome. *See Arlington Heights*, 429 U.S. at 265–66 ("When there is [] proof that a discriminatory

purpose has been a motivating factor in the decision . . . judicial deference is no longer justified."); *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (explaining that the "good faith of a state legislature must be presumed" only "until a [plaintiff] makes a showing sufficient to support" an allegation of "race-based decisionmaking"). And the burden shifts to Defendants to show that the law would have been enacted absent its discriminatory purpose. *See Hunter v. Underwood*, 471 U.S. 222, 225 (1985); *Jean v. Nelson*, 711 F.2d 1455, 1486 (1983) (finding that after a plaintiff has made a prima facie showing, "mere protestations of lack of discriminatory intent and affirmations of good faith will not suffice to rebut the prima facie case"). But, as discussed below, no such explanation for SB 7050 exists in the record. *See infra* Section III.D.

In the alternative, the unrebutted evidence presented establishes that the 3PVRO Restrictions impose severe burdens on all voters, and Black and Hispanic voters in particular. All 3PVRO voter registrations have fallen more than any other method of registration, non-white registrations have dropped more than white registrations, and Black and Hispanic 3PVRO voters register via 3PVRO at disproportionately higher rates. The Secretary failed to present any evidence that the Restrictions serve any legitimate interests to justify those burdens. *Infra* Section III.D. As such, Plaintiffs' have satisfied the *Anderson-Burdick* test and the Court should find in their favor.

### D. The State Lacks Sufficient Interests in the 3PVRO Restrictions.

In the sections above, NAACP Plaintiffs explained why this Court should apply strict or heightened scrutiny to evaluate the 3PVRO Restrictions, whether the Court chooses to do so under a First Amendment, Equal Protection Clause, and/or *Anderson-Burdick* analysis. "To satisfy [strict scrutiny], government action must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 484 (2020) (cleaned up). Defendants must show that the challenged provision furthers a compelling state interest "by the least restrictive means practically available." *Bernal v. Fainter*, 467 U.S. 216, 227 (1984).

But even if this Court applies a lower level of scrutiny, the State must still "assert a substantial interest in support of its regulation" and demonstrate that the restriction "directly and materially advances" that interest without sweeping more widely than necessary, *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995) (intermediate scrutiny standard), or, at the very least, demonstrate that "there is a rational relationship between the government's objective and the means it has chosen to achieve it." *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1220 (N.D. Fla. 2020) (rational basis review). Regardless of the standard of review, the State's purported justifications—whether on the legislative record or post-hoc—are woefully insufficient, and the 3PVRO Restrictions cannot stand.

### 1.   The State lacks sufficient interests in the Citizenship Requirement.

The legislature could not come up with *any* state interest in support of the Citizenship Requirement. Thus, the Requirement fails even a rational basis test. While legislators recognized that "there are certain rights that only citizens get to enjoy," PX 252 at 16; PX 250 at 112, that fact provides no rationale for restricting canvassing to only citizens. To the extent the legislature equated all noncitizens with "illegal[s]," PX 252 at 15 (Senator Hutson: "[W]e wanted to make sure . . . that you were a legal citizen handling this and you weren't an illegal doing third party voter registration."), that understanding is not only offensive, but objectively false. *See supra* Section II.A.1 (Individual Plaintiffs have demonstrated legal permission to live and work in the United States).

Multiple amendments were proposed to make the Citizenship Requirement less discriminatory, from striking the provision altogether to amending it to encompass only noncitizens who are not eligible to work in the United States. *See, e.g.*, PX 254 at 33-37 (Representative Joseph proposed amendment "designed to remove language in the bill that intentionally or unintentionally discriminates based on national origin"), 38-41 (Representative Bartleman offered amendment to "ensure that individuals who are not U.S. citizens but are legally authorized to work in the United States are able to collect or handle voter registration applications"). When asked by Senator Jones why the bill would not exclude vetted noncitizens who

are allowed to work for the Division of Elections from the provision, Senator Burgess responded only that "I'll fall back on my previous answer . . . ultimately [it's] a policy call." PX 252 at 18.

Defendants, for their part, failed to offer any interest in support of the Citizenship Requirement at trial. None of the State Attorneys or Supervisors identified any issues with noncitizen canvassers. Defendants' experts provided no analysis of the issue whatsoever. Director Matthews offered no testimony in defense of the Citizenship Requirement. And Defendants elected not to call Mr. Darlington, who had previously submitted declarations purporting to spell out the state's interests in each of the challenged provisions.

In short, under any standard of review, the decision to proscribe all noncitizens from collecting or handling voter registration applications constitutes "obvious class-based animus." *Pena*, 620 F. Supp. at 301 (finding that policy requiring certain visa holders to pay tuition to attend Atlanta Public Schools was passed with an intent "to discriminate against aliens of Iranian citizenship" and "once[,] having chosen to do that, the city decided to enforce its policy against all aliens"). The legislature's "policy call" to single out noncitizens in SB 7050 cannot withstand scrutiny.

### 2.   The State lacks sufficient interests in the Information Retention Ban.

The State also lacks any legitimate interest in the Information Retention Ban. During the hearings on SB 7050, legislators broadly identified information security

as the reason for banning organizations from retaining any voter contact information. PX 250 at 14:3–15; PX 246 at 37:4-10, 66:2–21. But there are far less restrictive means of furthering that interest, such as prohibiting the retention of a voter's date of birth and social security number. There is no doubt that the Information Retention Ban fails strict scrutiny.

Even under a more lenient standard, the Ban still fails. Legislators failed to identify a single instance where a 3PVRO itself misused a voter's information. *See Messina v. City of Fort Lauderdale, Fla.*, No. 21-CV-60168, 2024 WL 301574, at *20 (S.D. Fla. Jan. 26, 2024) (noting that to survive intermediate scrutiny, "the government must come forward with some *objective* evidence in support of its [regulation]") (citing *Buehrle v. City of Key W.*, 813 F.3d 973, 980 (11th Cir. 2015) (emphasis in original)). Indeed, for the few isolated situations where a canvasser falsely filled out registration applications, Dr. Herron testified that there is no evidence to indicate that the canvassers accessed voter information from within a 3PVRO's files. Tr. 226:5-227:16. Moreover, there are already criminal laws in place that have been enforced in these rare instances of fraud committed by canvassers. Tr. 1783:7-12, Tr. 1796:10-13, 1797:3-6, 1798:10-11. Thus, the purported interest is not being furthered by the Information Retention Ban because it seeks to regulate behavior that has led to no problems.

Moreover, while keeping some subsets of voter information secure may be legitimate, the sweep of the Information Retention Ban is not a sufficiently tailored approach. The legislature chose to ban retention of *any* "personal information" instead of distinguishing between sensitive information that may create security risks if misused and contact information that voters willingly provide. That lack of tailoring alone dooms the Information Retention Ban under any level of scrutiny because sweeping in *all* "personal information" has no rational relationship to the purported government interests. *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) (requiring a "reasonable fit" "between the legislature's ends and the means chosen to accomplish those ends" in context of First Amendment challenge to law); *Cash Inn of Dade, Inc. v. Met. Dade County*, 938 F.2d 1239, 1241 (11th Cir. 1991) (examining "whether the method the Government has chosen to accomplish [its] goal bears a rational relation to the ultimate objective" in order to pass "the rational basis test"). The Secretary could no more justify banning the retention of a voter's address as it could justify banning marketing mailers to "Joe Smith or Current Resident." Accordingly, the Information Retention Ban fails any level of scrutiny this Court would apply.

### 3. The State lacks sufficient interests in the 3PVRO Fines Provision.

The legislature similarly failed to demonstrate that the 3PVRO Fines Provision furthered any state interest. Senator Burgess expressed that the pre-SB

7050 fines were too low and that 3PVROs treated them as "the cost of doing business," and posited that the increased fines would weed out bad actors. PX 246:23-24. But there's no evidence the fines have or will further those interests. Particularly where the legislature imposed a five-fold increase to the fines before even implementing—let alone evaluating the effectiveness of—the fine increase enacted just one year earlier indicates that the 3PVRO Fines Provision had no grounding in reality and that legislature lacked any rational basis to justify such a dramatic penalty. Moreover, if the legislature wanted to weed out bad actors, it could suspend the certain 3PVRO "bad actors" from operating as a 3PVRO or create a sliding scale to ensure the fines would not inadvertently sweep in the smaller community-based 3PVROs being fined for human error. The legislature also could have included an intent requirement for the 3PVRO Fines Provision.

Thus, the 3PVRO Fines Provision is certainly not the least restrictive means of achieving the legislature's interest, nor does it legitimately advance or further any substantial interest in ensuring bad actors are not engaging in 3PVRO misconduct. Instead, it burdens important civic- and advocacy-oriented 3PVROs from engaging in protected activity more than necessary to achieve its purported goal. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994).

*     *     *

The 3PVRO Restrictions fail to satisfy strict, heightened, or intermediate scrutiny, and considered together, the Restrictions "present[] a dubious fit under rational basis review." *See* ECF No. 101 at 56.

### E.    Voting Rights Act Preemption Claim (Count VII)

The Mail-In Ballot Request Restriction conflicts with Section 208 of the Voting Rights Act and is preempted. As such, the Court should find in favor of NAACP Plaintiffs on Count VII of their operative complaint.

As Plaintiffs argued in their summary judgment motion, the Mail-In Ballot Request Restriction is preempted by federal law because it conflicts with Section 208 of the Voting Rights Act. ECF 205-1 at 29-32; *see Rine v. Imagitas, Inc.*, 590 F.3d 1215, 1224 (11th Cir. 2009) (explaining that under the "Supremacy Clause, any state law that conflicts with federal law is preempted" (citing *Gibbons v. Ogden*, 22 U.S. 1 (1824)); *see also Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 486–87 (11th Cir. 2015) (providing overview of conflict preemption).

Plaintiffs presented evidence that the Mail-In Ballot Request Restriction will deprive Plaintiffs' members of their right to use the assistor of their choice in requesting a vote-by-mail ballot. For instance, Supervisor Earley testified that his office would not accept a vote-by-mail request from someone who was not a voter's family member or legal guardian. Tr. 753:24-754:5. He testified that this means the voter can either attempt to request a vote-by-mail ballot on their own or they may be

unable to make such a request at all. Tr. 753:20-23. Attempting to request a vote-by-mail ballot on one's own is not an option for some of Plaintiffs' members. Mr. Nordlund testified that even translated materials are insufficient for some individuals who have a language barrier and wish to request a vote-by-mail ballot. Tr. 111:12-112:3. And Ms. Babis Keller testified that a DRF constituent cannot write due to spasticity and requires a translator to speak. Tr. 1333:23-25.

At the summary judgment stage, "this Court [was] unpersuaded by Defendant Byrd's attempt to explain why, as a matter of law, the challenged provision does not conflict with Section 208 of the Voting Rights Act." ECF No. 251 at 19. At trial, Defendants failed to present any evidence to persuade the Court. The Secretary's counsel made a half-hearted effort to build out the unsupported argument that he made in his opening that "providing 'assistance' isn't quite the same as 'requesting'" under Section 208. ECF No. 268 at 9 (quoting 52 U.S.C. § 10508), asking Supervisor Earley a series of questions demonstrating that a non-family member can drive a voter to the Supervisor's office to request a ballot or can call the Supervisor's office and hand the phone to the voter to request a ballot. Tr. 797:16-798:23. But this narrow interpretation of assistance finds support in neither the law nor in the facts. The Secretary's suggested limitation of the meaning of the term "assistance" is found nowhere in the statute. *See also Disability Rts. N.C. v. N.C. State Bd. of Elections*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *1 (E.D.N.C. July 11, 2022) (finding

preemption without parsing what types of assistance might be permissible). And some of Plaintiffs' constituents still will not be able to request a vote-by-mail ballot under the Secretary's conception of what type of "assistance" is implicated by the provision. For instance, Ms. Babis Keller testified to one DRF constituent who "has pretty significant cerebral palsy, so she has a pretty significant speech impairment" and needs "kind of like a translator for people with speech impairments." Tr. 1333:5-10. Even if the assistor of this person's choosing handed her a phone with the Supervisor on the line, she would be unable to make the request without someone to help her make the request. Similarly, even if the assistor of her choosing drove her to the Supervisor's office, she could not make the request without a translator's help or without the help of someone else writing for her, given "spasticity" that prevents her from completing a form on her own. Tr. 1333:23-25.

There is no solution for Plaintiffs' constituents outside of the Court enjoining the enforcement of the Mail-In Ballot Request Restriction. This includes any rulemaking or other Florida statute that predated the Restriction. As this Court has already noted "Defendant Byrd offers no authority for the proposition that he, an executive official, can 'fix' a statute enacted by the Florida legislature, by creating an exception to the statutory language through proposed rulemaking." ECF No. 251 at 20; *see supra* Section III.B. And other Florida statutes that predated the Restriction

do "not extend to requesting assistance in submitting a vote-by-mail request." ECF No. 251 at 20.

## IV.   NAACP Plaintiffs are Entitled to Their Requested Relief.

Plaintiffs request a declaration that the Citizenship Requirement, Information Retention Ban, and 3PVRO Fines Provision independently and collectively violate the First and Fourteenth Amendments of the U.S. Constitution, both facially and as applied to NAACP Plaintiffs, and were enacted with discriminatory intent in violation of the Fourteenth Amendment. Plaintiffs further request a permanent injunction enjoining Defendants and anyone acting on their behalf from enforcing these provisions.

Plaintiffs also request a declaration that the Mail-In Ballot Request Restriction violates Section 208 of the Voting Rights Act, 52 U.S.C. § 10508, and a permanent injunction enjoining Defendants an anyone acting on their behalf from enforcing the Mail-In Ballot Request Restriction.

Plaintiffs also request an award of Plaintiffs' costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws for all claims.

### A.   Declaratory relief is appropriate here.

Plaintiffs are entitled to a declaration under 28 U.S.C. §§ 2201 and 2202. The Declaratory Judgment Act "gives the federal courts competence to make a

declaration of rights." *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005). The Act's purpose is "to settle 'actual controversies' before they ripen into violations of law or a breach of some contractual duty." *Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949). Declaratory relief is appropriate to articulate the serious federal and constitutional law issues presented in this case.

### B.      Plaintiffs satisfy the standard for permanent injunctive relief.

"[T]o obtain a permanent injunction, a party must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005). In line with these factors, a plaintiff must show that a permanent injunction would not disserve the public interest and that the balance of hardships weighs in his favor. *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017).

Plaintiffs meet this standard because they have established violations of their First and Fourteenth Amendment rights and their rights under Section 208 of the Voting Rights Act. Plaintiffs are irreparably harmed for the same reasons they have suffered injury-in-fact. *See, e.g., Chang v. Glynn Cnty. Sch. Dist.*, 457 F. Supp. 2d 1378, 1382 (S.D. Ga. 2006) (finding that the plaintiffs—lawful residents who "will

not be able to continue to work in their chosen professions, for a reason that is at odds with their federally-protected constitutional rights"—demonstrated irreparable harm from a law prohibiting noncitizens from being teachers). Because Plaintiffs will suffer irreparable harm, any remedies at law are inadequate. *See Barrett*, 872 F.3d at 1229.

Plaintiffs also demonstrated that the balance of hardships weighs decidedly in their favor. The Citizenship Requirement and Information Retention Ban have been enjoined since they went into effect; extending the preliminary injunction into a permanent injunction would require no additional expenditure of resources or change in procedures on behalf of Defendants. And there will be no hardship to the State if the 3PVRO Fines Provision is enjoined as there are already other laws regulating 3PVROs and problems with 3PVROs are rare. Finally, the Mail-In Ballot Request Restriction will be in effect for the first time in the 2024 elections; enjoining its enforcement before the period for issuing vote-by-mail ballots would mean that Supervisors and Defendants can issue such ballots the same way and under the same rules they have for decades. *See* Fla. Stat. § 101.62(3). In short, where the State has enacted a solution in search of a problem, it is not harmed by an injunction returning to the status quo.

And the evidence has shown that an injunction is in the public interest. "[T]he public interest is served when constitutional rights are protected." *Democratic Exec.*

*Comm. of Fla.*, 915 F.3d at 1327. And as a practical matter, facially discriminatory laws and blatant restrictions on federal voting rights only undermine the public interest and confidence in our elections system. A permanent injunction against the Citizenship Requirement, 3PVRO Fines Provision, and Mail-In Ballot Request Restriction would serve and preserve the public interest in fair and lawful election laws.

Finally, *Purcell v. Gonzalez* does not bar the relief Plaintiffs seek. 549 U.S. 1 (2006). "[I]t would be 'the unusual case' in which a court would not act to prevent a constitutional violation." *In re Georgia Senate Bill 202*, 622 F. Supp. 3d 1312, 1341 (N.D. Ga. 2022) (quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)). Plaintiffs have shown that an injunction preserves the status quo—subjecting 3PVROs to pre-SB 7050 regulations—so there is no fear of voter confusion or administrability and implementation burdens. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022). And the evidence demonstrated that implementation of the injunction will not fundamentally alter the nature of the upcoming elections and in fact only enhances enfranchisement.

### C.   NAACP Plaintiffs are entitled to fees.

NAACP Plaintiffs intend to file a motion seeking an award of attorneys' fees pursuant to 42 U.S.C. § 1988. NAACP Plaintiffs are already a prevailing party based on the Court's summary judgment ruling as to the Citizenship Requirement. ECF

No. 251; *see also Coastal Conservation Ass'n v. Gutierrez*, 417 F. Supp. 2d 1304, 1307 (M.D. Fla. 2006) (plaintiffs considered prevailing party for purposes of attorneys' fees and costs even they prevailed on one of four counts because success was on a "significant issue" and achieved "some of the benefit the parties sought in bringing suit" (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983))). Should NAACP Plaintiffs prevail on additional claims, they will incorporate those claims in their fee petition.

Dated: April 22, 2024

Respectfully submitted,

*/s/ Abha Khanna*

Abha Khanna*
Makeba Rutahindurwa*
**ELIAS LAW GROUP, LLP**
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
akhanna@elias.law
mrutahindurwa@elias.law

Melinda Johnson*
Renata O'Donnell*
**ELIAS LAW GROUP, LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
mjohnson@elias.law
rodonnell@elias.law

Frederick S. Wermuth
Florida Bar No. 0184111
**KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.**
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

  * *Admitted pro hac vice*

140

*Counsel for Plaintiffs Florida State Conference of Branches of Youth Units of the NAACP, Voters of Tomorrow Action, Inc., Disability Rights Florida, Alianza for Progress, Alianza Center, UnidosUS, Florida Alliance for Retired Americans, Santiago Mayer Artasanchez, Esperanza Sánchez, and Humberto Orjuela Prieto*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of April, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 018411