# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC.; LEAGUE OF WOMEN
VOTERS OF FLORIDA EDUCATION
FUND,

     *Plaintiffs*,

     v.

ASHLEY MOODY, in her official
capacity as Attorney General of Florida;
CORD BYRD, in his official capacity as
Florida Secretary of State,

     *Defendants*.

Case No. 4:23-cv-00216
Case No. 4:23-cv-00215
    (Consolidated)

## LWVFL PLAINTIFFS' REBUTTAL

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................ii

I.  Introduction ................................................................... 1

II.  Standing ....................................................................... 2

    A. The League Has Standing to Challenge All Four
    Provisions ..................................................................... 2

        1.  The Receipt Provision ........................................... 2

        2.  The Retention Provision ........................................ 5

        3.  The 3PVRO Fines Provision .................................. 6

        4.  The Citizenship Provision .................................... 7

    B. The League's Injuries Are Fairly Traceable to Defendants
    and Redressable Through a Permanent Injunction .............. 8

III.  Merits ......................................................................... 10

    A. The League's Voter Registration Activities Are Protected by
    the First Amendment ................................................... 10

    B. The Challenged Provisions Do Not Survive First
    Amendment Challenge ................................................ 15

    C. All the Challenged Provisions Are Vague and Three Are
    Overbroad ................................................................. 21

        1.  The challenged provisions are unconstitutionally
        vague ............................................................... 21

        2.  The Retention, Receipt, and Citizenship Provisions
        are unconstitutionally overbroad ............................ 26

        3.  As-applied challenges and advisory opinions are not a
        "failsafe" for 3PVROs ......................................... 28

    D. *Purcell* Does Not Bar Relief Here ............................... 31

IV.  Conclusion .................................................................... 34

    CERTIFICATE OF COMPLIANCE ..................................... 35

    CERTIFICATE OF SERVICE ............................................. 35

# TABLE OF AUTHORITIES

**Cases** **Page**

*Americans for Prosperity Foundation v. Bonta*,
141 S. Ct. 2373 (2021) .......................................................................... 28

*Boos v. Barry*, 485 U.S. 312 (1988) ...................................... 22, 23, 24, 28

*Buckley v. American Constitutional Law Foundation*,
525 U.S. 182 (1999) ................................................. 4, 5, 11, 12, 17, 18

*City of South Miami v. Governor*, 65 F.4th 631 (11th Cir. 2023) ............. 8

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) ................ 10

*Cousins v. School Board of Orange County*, 6-22-CV-1312,
2023 WL 5836463 (S.D. Fla. Aug. 16, 2023) ......................................... 4

*Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366
(9th Cir. 2016) ...................................................................................... 33

*Florida State Conference of Branches & Youth Units of the NAACP v.
Byrd*, 680 F. Supp. 3d. 1291 (N.D. Fla. 2023) .............................. 22, 23

*Florida State Conference of NAACP v. Lee*, 576 F. Supp. 3d 966
(N.D. Fla. 2021) .................................................................................... 21

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) ............................................................ 14

*Fugate v. Florida Elections Commission*, 924 So.2d 74 (Fla. 2006) ....... 24

*GRACE, Inc. v. City of Miami*, No. 1:22-CV-24066-KMM,
2023 WL 4942064 (S.D. Fla. Aug. 3, 2023) ......................................... 32

*Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301
(11th Cir. 2009) .................................................................................... 24

*Honeyfund.com v. DeSantis*, 622 F. Supp. 3d 1159
(N.D. Fla. 2022) .................................................................................... 10

*Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544,
2022 WL 16754389 (11th Cir. Nov. 7, 2022) .................................. 32, 33

*Jones v. DeSantis*, 462 F. Supp. 3d 1196 (N.D. Fla. 2020) .............. 30, 31

*Jones v. Governor of Florida*, 975 F.3d 1016 (11th Cir. 2020) ............... 31

*Jones v. Hammock*, 179 So. 674 (Fla. 1937) ............................................ 24

*League of Women Voters of Florida v. Browning*, 575 F. Supp. 2d 1298
(S.D. Fla. 2008) ..................................................................................... 25

*League of Women Voters of Florida v. Cobb*, 447 F. Supp. 2d 1314
(S.D. Fla. 2006) .................................................................................. 7, 20

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706
(M.D. Tenn. 2019) ................................................................................. 12

*League of Women Voters of Florida v. Lee*, 595 F. Supp. 3d 1042
(N.D. Fla. 2022) .................................................................... 9, 10, 15, 31

*League of Women Voters of Florida v. Florida Secretary of State*,
32 F.4th 1363 (11th Cir. 2022) .................................................. 31, 33, 34

*League of Women Voters of Florida Inc. v. Florida Secretary of State*,
66 F.4th 905 (11th Cir. 2023) ............................................................... 16

*Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019) ........... 4, 9

*Meyer v. Grant*, 486 U.S. 414 (1988) ..................................... 11, 12, 13, 17

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .............................................. 31, 33

*Rose v. Raffensperger*, 143 S. Ct. 58 (2022) ........................................... 32

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ............. 3

*Texas v. Johnson*, 491 U.S. 397 (1989) ................................................... 14

*Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ....... 13, 14

**Statutes and Administrative Codes**                                    **Page**

Colo. Rev. Stat. § 1-40-102(3.5) ................................................................. 13

Fla. Admin. Code 1S-2.010(3) ................................................................... 29

Fla. Admin. Code 1S-2.010(5)(a) ............................................................. 29

Fla. Admin. Rule 1S-2.042(5)(c) ........................................................... 5, 18

Fla. Stat. § 97.021 ....................................................................................... 25

Fla. Stat. § 97.0575(7) ............................................................................ 6, 22

Fla. Stat. § 97.0575(8) ............................................................................ 9, 10

Fla. Stat. § 98.015(3) .................................................................................. 25

**Other Authorities**                                                    **Page**

Amended Complaint, *Florida Rights Restoration Coalition v. DeSantis*,
    1:23-cv-22688-CMA, ECF No. 9 (S.D. Fla. July 26, 2023) ................ 30

Fla. House Bill 1525 (2024) ...................................................................... 30

## I.    Introduction

Defendants present no compelling arguments that the challenged provisions survive constitutional challenge. Instead, they revert to the same tactic used throughout this litigation: minimizing the laws' harms to third-party voter registration organizations (3PVROs), while asserting *ad nauseam* that 3PVROs "behave badly." But repetition is not evidence. Defendants have not demonstrated how the challenged provisions are tailored to any legitimate interest.

The evidence confirms that the League has standing. The challenged provisions fundamentally altered its activities and kept it from registering voters. Defendants suggest that if a burdensome law causes a speaker to stop engaging in First Amendment activities, that speaker cannot challenge the law. For obvious reasons, case law says otherwise. And Defendants have nothing to say about the resources the League already diverted toward responding to the challenged provisions and will keep diverting unless the law is enjoined.

Nor can Defendants save the provisions on the merits. They offer only generalized justifications for the law, many of which are post hoc, unsupported, and largely untethered from the speech and expressive

conduct being regulated. Because Defendants have failed to offer a sufficiently compelling justification for the laws, or to explain how a reasonable person can understand their scope, the Court should enter judgment for the League.

## II.  Standing

### A.  The League Has Standing to Challenge All Four Provisions

#### 1.  *The Receipt Provision*

The League has standing to challenge the Receipt Provision and Defendants' arguments to the contrary are unavailing. First, the League has already diverted resources due to the Receipt Provision—something Defendants' briefs do not address. *See* LWVFL Plaintiffs' Closing Statement, ECF No. 301 (League Br.) at 17, 19.

The League will also need to divert more resources in the future, both spending money to print receipts and carbonless copy books and taking time to fill them out. Defendants' suggestion that the League could avoid spending money by using "online receipts," Secretary of State Closing Statement, ECF No. 311 (SOS Br.) at 89, provides no solution. Even if the law permitted online receipts rather than physical ones, the League would need to divert resources to buy digital equipment, set up

an online receipt platform, and train all its members to use that process—increasing the time and effort needed to comply.[1]

Further, the League is directly injured because the law will reduce the number of people willing to volunteer with the League due to legitimate fears of intimidation and harassment. These are not simply "subjective fears," SOS Br. at 87. Testimony at trial showed that instances of harassment "would cause a reasonable would-be speaker to self-censor." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022); *see, e.g.*, League Br. at 15–16. Moreover, although the League has demonstrated that many members have such fear, it need only show that one member does, *see, e.g.*, Trial Tr. vol. 4, 1241:14–1242:5 (Scoon), and it has unquestionably made that showing with regard to the League's Co-President, Cecile Scoon *and* the League's Voter Services Chair, Dr. Monica Elliott, *see* League Br. at 15–16.[2]

---

[1] Defendants wonder how spending "one extra minute" to fill out a receipt could be a harm that "rises to constitutional dimensions." SOS Br. 88. But the question here is about standing, not magnitude of constitutional harm. In any event, one extra minute *per transaction* means thousands of extra minutes for the League, which in turn means fewer registrations.

[2] Defendants' contention that League members' fear is based on a "tenuous chain of events" is confounding. SOS Br. at 87. Of the five links in Defendants' imagined "chain," the first four would undisputedly

The fact that *some* of the harms League members fear would come from private parties, not the government,[3] makes no difference. Just like here, the plaintiffs in *Buckley v. American Constitutional Law Foundation* feared reprisal not from the government, but from private parties who disagreed with the plaintiffs' message. 525 U.S. 182, 198 (1999). And the fact that an injunction will not prevent *all* "third parties from generally harassing Plaintiffs," *see* SOS Br. at 87, is irrelevant[4]—it will prevent the harassment engendered by the Receipt Provision.

Defendants also assert that enjoining the Receipt Provision "wouldn't solve [the] problem," because a separate rule requires 3PVROs to write "the registration agent's initials" on completed applications

---

happen thousands of times every year under the Receipt Provision. And the final link—in which someone uses a League volunteer's name to harass them—is not far-fetched, given the evidence of harassment presented at trial.

[3] Evidence also establishes League members' legitimate fear of improper government prosecution. *See* League Br. at 15.

[4] The cases cited by Defendants are easily distinguishable. *See* SOS Br. at 87–88. In both *Lewis v. Governor of Alabama* and *Cousins v. School Board of Orange County*, plaintiff employees sought to declare laws unconstitutional as a way of redressing their private employers' actions pursuant to that law. *See* 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc); 6-22-CV-1312, 2023 WL 5836463, at *11 (S.D. Fla. Aug. 16, 2023). This is a far cry from the League's direct injury by the State from the Receipt Provision. *See* League Br. at 13–21.

before they are turned over to the State. SOS Br. at 88; *see also* Fla. Admin. R. 1S-2.042(5)(c); PX 174 at 2. But like in *Buckley*, the initialed applications do not go to the voters, and in fact render the receipt requirement "less needful." *Buckley*, 525 U.S. at 198. Initialing a document for the State's possession is not comparable to giving one's full name in writing during the process of registering voters and discussing political issues with them.

### 2.    *The Retention Provision*

The League has standing to challenge the **Retention Provision**, and Defendants' arguments to the contrary rest entirely on their atextual interpretation of the law. *See infra* pp. 21–23, 26–27. Defendants contend that the League does not trigger the Retention Provision because it does not retain voters' social security or driver's license number. SOS Br. at 84–85. But that reading finds no support in the text, *see* League Br. at 87–88, and League members cannot rely on it when a felony conviction is at stake.

Moreover, the League has clearly established that (1) its members routinely collected voter registrants' names, emails, and phone numbers prior to SB 7050 for get-out-the-vote, member recruitment, and follow-up

purposes—regarding political issues, future League events, and upcoming elections; and (2) the League would like to continue to do so in the future but is prohibited by the Retention Provision. League Br. at 21–24, 87–90, 99–103; *see also id.* at 25–27 (discussing League's diversion of resources needed to address the Provision).[5]

### 3.    The 3PVRO Fines Provision

The League has standing to challenge the **3PVRO Fines Provision**. No case law supports Defendants' proposition that the League's future injury is purely hypothetical because it "operate[s] its voter registration programs with precision and care." SOS Br. at 86 (internal quotation marks omitted).

Relatedly, Defendants' argument that the League lacks standing because it has not been fined recently for delivery errors, *id.*, ignores that the 3PVRO Fines Provision injures the League by increasing the burden of complying with the law. Even if the League successfully meets the

---

[5] Defendants appear to assert that, if "voters themselves" provide information to a 3PVRO on a piece of paper separate from the voter registration application, retention of that information would not violate the law. SOS Br. at 85. But that reading conflicts with the statute, which bars any "person collecting voter registration applications" from "retain[ing] a voter's personal information," regardless of where that information is recorded. Fla. Stat. § 97.0575(7).

Provision's new requirements, it will need to spend time and money to do so in order to avoid debilitating penalties, hindering the League's mission to register as many eligible Floridians as possible. *See* League Br. at 29–33.

Finally, Defendants maintain that the League lacks standing because it is now registering voters online, so the fines do not apply. SOS Br. at 86. In other words, the League cannot challenge the law that shuttered its voter registration activities *because* the law shuttered its activities. This circularity ignores entirely that the 3PVRO Fines Provision's onerous requirements and penalties force the League to use a less effective means of voter registration, and that the League is constantly reassessing when it can return to paper registration. *See* League Br. at 33–35; *see also League of Women Voters v. Cobb*, 447 F. Supp. 2d 1314, 1325, 1339 (S.D. Fla. 2006) (finding irreparable injury after law forced the League to "impose[] a moratorium on voter registration").

### 4.   *The Citizenship Provision*

The League has standing to challenge the **Citizenship Provision** notwithstanding the fact that it has not named a member who is a

noncitizen. *Cf.* SOS Br. at 83–84. First, the League established—and Defendants ignore—that it already diverted resources to respond to the Citizenship Provision just after it was passed, which is sufficient to confer standing. *See* League Br. at 37–38; *see also City of S. Miami v. Governor*, 65 F.4th 631, 636–37 (11th Cir. 2023) (organization suffers injury when it has "already been harmed" by a challenged law).

Second, Defendants fail to address the League's showing that the Citizenship Provision will reduce the League's existing volunteer force and its ability to recruit new members, thereby reducing the number of voters the League can register. Asking members about their citizenship status is so contrary to the League's values that members will stop associating with the League if they are required to complete a citizenship declaration. *See* League Br. at 36–37.

## B. The League's Injuries Are Fairly Traceable to Defendants and Redressable Through a Permanent Injunction

The plain language of Fla. Stat. § 97.0575(8) confirms the League's injuries are traceable to Defendants. The law provides both Defendants with enforcement authority specific to 3PVROs. *See* League Br. at 41–45.

The Secretary of State does not contest traceability, *see generally* SOS Br. at 83–89, and at trial, the Attorney General's representative conceded that "based on the statute," "the Attorney General is tasked with enforcing the new provisions of SB7050," Trial Tr. vol. 3, 837:11–15 (Cox).[6] That "connection with [] enforcement" is sufficient for traceability purposes. *Lewis*, 944 F.3d at 1298.

Nonetheless, the Attorney General contends that the League cannot show traceability because her enforcement authority depends on a referral from the Secretary. *See* Attorney General's Closing Statement ("AG Br.") at 2, 4. Creative attempts at statutory interpretation notwithstanding, that reading finds no support in the text. *See* League Br. at 43–44. Moreover, even if the Attorney General's authority to institute a civil action were dependent on a referral—it is not—her additional authority to *prevent* a violation cannot depend on the Secretary's determination that a violation *has already occurred*. *See* Fla. Stat. § 97.0575(8). The Attorney General's reading of § 97.0575(8) would nullify its text by rendering her power "to prevent a violation" by 3PVROs

---

[6] Indeed, this was the Attorney General's reading in prior litigation. *See League of Women Voters of Florida v. Lee*, 595 F. Supp. 3d 1042, 1142 (N.D. Fla. 2022).

mere surplusage. Fla. Stat. § 97.0575(8); *cf.* AG Br. at 3. In light of the Attorney General's specific authority to *prevent* violations, her reliance on *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159 (N.D. Fla. 2022) is inapposite.

A permanent injunction against Defendants would redress the League's injuries by precluding them from exercising their independent enforcement authority under the law regardless of whether that authority is permissive or mandatory. This would significantly reduce the threat of punishment and the costs the League incurs "in blunting an unconstitutional law's effects." *Lee*, 595 F. Supp. 3d at 1142–43.[7] The League's injuries are therefore traceable to Defendants and redressable by judicial relief.

## III.  Merits

### A.  The League's Voter Registration Activities Are Protected by the First Amendment

The Leagues' voter registration activities are protected by the First

---

[7] The Court should likewise reject the Attorney General's attempt to graft an "imminent . . . harm" element onto the Court's analysis of redressability. AG Br. at 5. Imminence is relevant only to the concrete injury requirement. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Amendment because the conduct regulated by the challenged provisions is inextricably intertwined with core political speech. As such, strict scrutiny applies. *See Buckley*, 525 U.S. 182; *Meyer v. Grant*, 486 U.S. 414 (1988). Defendants' attempts to distinguish *Buckley* and *Meyer*, by contending that the laws regulate conduct, fail.

First, they argue that petition gathering "rallies people around an idea or proposition," while 3PVROs only physically move documents. SOS Br. at 43. Trial evidence demonstrates otherwise. Just like a petition circulator, a League volunteer "rallies people around an idea"—that they should register to vote because it is important to participate in elections. Trial Tr. vol. 4, 1198:11–12 (Scoon); *see also* League Br. at 47–48, 57–58.

Indeed, Defendants' assertion that 3PVRO activity is only a physical act falls flat because it would apply equally to the petition activity in *Meyer* and *Buckley*. There, circulators carried a physical form with a draft initiative petition, handed it to people to sign, and then took the form back and sent the signatures to the state. *See Meyer*, 486 U.S. at 416–17. The Supreme Court recognized that the circulators engaged in "core political speech" as a part of that process, *Meyer*, 486 U.S. at 420, and the same is unquestionably true for 3PVRO volunteers, *see, e.g.*,

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019).

Like the provisions challenged here, the regulations in *Meyer* and *Buckley* did not affect what petition circulators could say. Instead, they regulated *who* could serve as a circulator (only registered voters and unpaid volunteers)—just like the **Citizenship Provision**. *See Buckley*, 525 U.S. at 186; *Meyer*, 486 U.S. at 416. They also mandated certain personal disclosures by circulators during public interactions (ID badges)—just like the **Receipt Provision**. *See Buckley*, 525 U.S. at 186.[8] And they regulated activity by circulators and proponent organizations *after* the petition gathering process was complete (filing disclosure forms)—just like the **Citizenship, 3PVRO Fines, and Retention Provisions**. *See id*. *Cf.* SOS Br. at 41 (asserting that "what happens after" receipt of an application is "pure conduct").

These similarities show why it makes no difference that "3PVROs can still speak to voters" under the challenged provisions. SOS Br. at 44.

---

[8] Defendants assert that filling out a receipt that includes a volunteer's name "requires no speech at all," SOS Br. at 91, but fail to explain why the same would not apply to writing a petition circulator's name on an ID badge, as was required in *Buckley*.

In *Meyer*, while petition "circulators" could not be paid, nothing barred other paid workers from using pure speech to persuade voters to sign a petition. And contrary to Defendants' contention, SOS Br. at 90, there was no apparent bar to paying people to hand out petitions—the prohibition was only on circulating petitions for people to sign. *See* Colo. Rev. Stat. § 1-40-102(3.5) (defining "circulators" as those who "present[] petitions "to other persons for possible signature"). Regardless, the availability of "more burdensome avenues of communication does not relieve [a law's] burden on First Amendment expression." *Meyer*, 486 U.S. at 424 (cleaned up).

Defendants rely on a divided Fifth Circuit opinion in *Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013), to argue that the First Amendment does not apply to the collection and submission of applications. SOS Br. at 40–41. But *Steen*'s logic has been rejected by most courts. *See* League Br. at 51–53. And for good reason: it incorrectly concludes that voter registration activities can "be separated in a number of ways," *Steen*, 732 F.3d at 389. *But see id.* at 404 (Davis, J. dissenting). Further, *Steen*'s distinction between voter registration activity and petitioning, *see id.* at 390, is flawed: if "[p]etitions by themselves"

13

constitute a *circulator's* "protected speech," even though petitions are simply proposed laws drafted by another person, the same must be true of voter registration forms. And if it were true that only a *voter* speaks by registering, not a 3PVRO volunteer, *see id.*; SOS Br. at 44, then the same would apply to *Buckley*—only the person who signed the petition would be speaking, not the circulator.

Separately, Defendants ignore controlling case law when arguing that 3PVRO voter registration activity is not expressive conduct. *See* SOS Br. at 41. As the League has shown, "the reasonable person would interpret" its act of registering voters "as some sort of message"—that voting is an important civic duty for all eligible Floridians. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018); *see also* League Br. at 55–56.[9] And because the League's message is apparent, Defendants' comparison of 3PVRO volunteers to postal workers, *see* SOS Br. at 42, 44, misses the point. No

---

[9] The Supreme Court has never held that conduct qualifies as expressive only when it is "'overwhelmingly apparent' that a message is trying to be conveyed." SOS Br. at 41 (quoting *Texas v. Johnson*, 491 U.S. 397, 406 (1989))—it simply used that phrase to describe flag burning. Either way, it is overwhelmingly apparent that the League's voter registration activity conveys a political message about the importance of voting. *See, e.g.*, League Br. at 47–48, 50–56.

one believes a postal worker delivering a letter is endorsing the contents of that letter; everyone knows that a League volunteer delivering registrations supports registering voters.

## B. The Challenged Provisions Do Not Survive First Amendment Challenge

Defendants list a multitude of state interests purportedly justifying the challenged provisions, most of which are simply named, wholly unsupported, and never again acknowledged.

Tellingly, Defendants' asserted state interests have shifted significantly over the course of this case, suggesting that they are post hoc and driven by litigation. But to survive constitutional scrutiny, "Defendants must identify the interest that actually motivated the Legislature, not provide post hoc rationalizations for the Legislature's actions." *Lee*, 595 F. Supp. 3d at 1149. Here, Defendants acknowledge, according to the Legislature, "[t]he Citizen Restriction was justified as a means to protect sensitive information . . . and as a means of defining Florida's political community." SOS Br. at 25. But for the purposes of this litigation, Defendants have asserted that the provision is necessary

because noncitizens are likely to leave Florida with completed voter registration applications. *See* SOS Br. at 47; PX 139 at 5–6.

Moreover, Defendants now assert that three of the challenged provisions help "avoid frustration" in elections, along with maintaining order, promoting voter confidence, and serving various other generalized goals. SOS Br. at 45. But these interests only partially overlap with those identified by Office of Election Crimes and Security Director Andrew Darlington, *see* PX 139, and they bear no relation to those relied on by the Legislature when SB 7050 was passed. *See* SOS Br. at 25. Defendants' failure to consistently name specific state interests, or to connect the purported interests to the legislative enactment of the challenged provisions demonstrates that no justifiable interests exist.[10]

Defendants likewise cannot justify the **Receipt Provision** under any level of scrutiny. First, they try to avoid *Buckley*'s clear holding by

---

[10] Case law does not give states blanket permission to pass any election-related law "without data." SOS Br. at 48. The cases Defendants cite largely address the quantum of evidence needed to justify laws aimed at preventing voter fraud. *See, e.g.*, *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023). But they do not come into play here, where Defendants have failed to show—and sometimes do not even assert—that the challenged provisions target voter fraud. For example, no case implies that the State may justify a law

arguing that, unlike the circulators in *Buckley,* 3PVROs "have shown no such interest in anonymity," and they point to some canvassers who provide their names when registering voters. SOS Br. at 91–93. But of course, the *Buckley* Court did not ask whether every single circulator wanted to remain anonymous. That is because the First Amendment does not ask whether *some* speakers would speak despite the law at issue, but whether the law would reduce the total number of speakers. *Meyer*, 486 U.S. at 422–23; *see also Buckley*, 525 U.S. at 198.

Moreover, Defendants mischaracterize the evidence. Ms. Scoon and Dr. Elliott both testified that being forced to provide their name in writing would make them less likely to help register voters. *See* League Br. at 16. Evidence showed that the same was true of many League members, thus "limit[ing] the number of people willing to" register voters. *Buckley*, 525 U.S. at 198; League Br. at 16. These members' concern is based on "harassment . . . personally experienced" during voter registration drives, just as in *Buckley*. *See* 525 U.S. at 198. And while Ms. Scoon testified that she might provide her name orally in some

---

forbidding *all* noncitizens from *any* voter registration activity based on speculation that noncitizens will suddenly leave the country.

circumstances, she also said she would be unwilling to write her name down and give it to a voter to keep. Trial Tr. vol. 4, 1289:12–18 (Scoon). Indeed, no witness testified that they would be willing to do that; nor did any testify that voters would otherwise retain their name after learning it. *See*, *e.g.*, Trial Tr. vol. 2, 450:12–14 (Pico).

Defendants also assert that a receipt "could provide an extremely helpful lead to investigate 3PVRO misconduct." SOS Br. at 93. But that is purely speculative, because the State has no evidence that a single receipt has been used for that purpose in the six months it has been required. And as the League has already explained, the idea that having a canvasser's name on a receipt will meaningfully assist investigations falls apart on closer examination. *See* League Br. at 65–66.

Defendants' discussion of Fla. Admin. R. 1S-2.042(5)(c)—the rule requiring a 3PVRO canvasser's initials on the back of a completed form, *see* PX 174 at 2—likewise betrays a misunderstanding of the law and the First Amendment harm at issue, *see* SOS Br. at 92, 94. The Receipt Provision chills the League's speech because, unlike Rule 1S-2.042(5)(c), it requires volunteers to give their name directly to the public "at the same time they deliver their political message." *Buckley*, 525 U.S. at 199

(quotation marks omitted). Moreover, Defendants' argument that "providing names is better" than providing initials, SOS Br. at 94, just highlights how poorly tailored the Receipt Provision is: instead of requiring receipts that go to voters, the State could simply strengthen Rule 1S-2.042(5)(c). *See* League Br. at 104–06.

As to the **Retention Provision**, Defendants still make no claim that preventing 3PVROs from retaining a voter's contact information serves a state interest. *See* SOS Br. at 46, 48. They likewise point to no examples of a 3PVRO volunteer committing fraud through the mishandling of voters' personal information from completed applications.[11] *Id.* And any state interest Defendants do assert is severely undercut by their vagueness argument, which maintains that the Provision *only* applies to a volunteer who collects an application directly from a voter, and not to anyone else at a 3PVRO who handles the application. SOS Br. at 75. Thus, under Defendants' reading, any interest in protecting Floridians' information is poorly served by the Retention

---

[11] Though Defendants also claim that the ban on copying a registration form "protects a voter's signature," none of the evidence they cite relates to a 3PVRO canvasser using a retained signature to commit any type of fraud. SOS Br. at 32.

Provision because it does not apply at all if a canvasser simply hands off the application to someone else.

With regard to the **3PVRO Fines Provision**, Defendants simply reiterate that some applications handled by 3PVROs were turned in after the previous 14-day deadline, but do not explain how shortening that deadline will increase compliance. *See* SOS Br. at 46. Defendants likewise offer no evidence that the tighter deadline is necessary for election officials, noting only that Leon County Supervisor Mark Earley speculated that the deadline could help larger counties, not his own. *See id.* at 49. Nor do Defendants seek to justify the exponential increase in fines, simply asserting that "the Florida Legislature had to draw a line." *Id.* Consequently, "Defendants have not provided any evidence much less an explanation for the necessity of the amount of the fines." *Cobb*, 447 F. Supp. 2d at 1338.

Finally, the **Citizenship Provision** cannot survive. Defendants essentially concede the dearth of evidence of noncitizen misconduct related to 3PVROs: they maintain that the evidence is not there because "the State didn't collect data on noncitizen misconduct" prior to SB 7050, since the law did not then bar noncitizens from 3PVRO activity. SOS Br.

at 47. But of course, that excuse could apply to any newly enacted law, and only proves the point that the Legislature had no legitimate reason to enact the Citizenship Provision. Defendants' post hoc rationalizations and repeated invocation of a single canvasser who they believe was "*likely a noncitizen*" and went to Mexico for ten days, SOS Br. at 13 (emphasis added); *see also id.* at 3, 47, just highlights how little evidence there is justifying the Citizenship Provision.

### C.   All the Challenged Provisions Are Vague and Three Are Overbroad

#### 1.   *The challenged provisions are unconstitutionally vague*

"[W]hether a law implicates the First Amendment or not, 'when vagueness permeates the text of such a law, it is subject to facial attack.'" *Fla. State Conference of NAACP v. Lee*, 576 F. Supp. 3d 966, 973 n.4 (N.D. Fla. 2021) (citation omitted). Here, all four challenged provisions are facially vague.

Defendants insist that the **Retention Provision** is not vague for several reasons, none of which are correct. Most bafflingly, Defendants argue that the Provision *only* applies to the types of "sensitive information" listed in the statute. SOS Br. at 76. This disregards the

21

law's plain language and testimony confirming that it contains a nonexhaustive list. *See* Fla. Stat. § 97.0575(7); *see also* League Br. at 87–88. Thus, as this Court has already concluded, it is not "reasonable and readily apparent," *Boos v. Barry*, 485 U.S. 312, 330 (1988), that the Provision excludes "a voter's name, address, telephone number, email address, party affiliation, or race," SOS Br. at 76; *see also Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d. 1291, 1318–19 (N.D. Fla. 2023).

Defendants' definition of "in compliance with this section" likewise leaves unclear what it means to "cop[y] a voter's application or retain[] a voter's personal information" for the purpose of "turning the applications over to the 3PVRO for delivery." SOS Br. at 77.[12] Defendants' proposed reading "only leads to further ambiguity as it fails to address what individuals working for the 3PVRO may do with the voter registration applications or voter information once they receive it from those

---

[12] Defendants' reading is unnatural and only raises the question *why* a volunteer would need to copy or retain voters' personal information just to be able to turn the application in to a 3PVRO. Defendants likewise ignore entirely that the Retention Provision does not specify whether a 3PVRO may retain any personal information—including contact information—with an applicant's express consent. *See* League Br. at 88.

individuals who collected it directly from voters." *Fla. NAACP*, 680 F. Supp. 3d. at 1318. Lastly, Defendants attempt to explain to whom the Provision applies, SOS Br. at 74–76, by parsing "collecting" from "handling" (and "soliciting," which is nowhere defined), but the distinction between the terms is not apparent on the face of the statute. *Cf.* PX 174 at 1, Rule 1S.2042(3)(c) (only defining "collecting or handling" together).[13]

Next, Defendants assert that the **Receipt Provision** isn't vague because "the information contained on a receipt isn't information that's protected under the **Retention Provision**." SOS Br. at 97. But as above, this interpretation—specifically excluding the prospective voter's name, party affiliation, and county of residence from the definition of "personal information," *see* PX 174 at 1, Rule 1S.2.042(3)(h)—is not "reasonable and readily apparent" on the face of either the Receipt or Retention Provisions, *Boos*, 485 U.S. at 330; *see also* League Br. at 90–93.

---

[13] Defendants' argument that the Retention Provision *only* applies to those directly collecting applications, SOS Br. at 74–76, reinforces the provision's vagueness. Given the State's professed interest in protecting voters' information, no reasonable person would read the law to allow every 3PVRO worker to retain voters' information so long as they had not personally collected the voter's application.

Defendants dismiss the League's other arguments as mere hypotheticals, SOS Br. at 97–98, but ignore that the Receipt Provision does not even specify what the penalty *is* for a violation. This alone renders the Provision facially vague. *See, e.g.*, *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1311 (11th Cir. 2009).

Defendants insist the **3PVRO Fines Provision** isn't vague because "Plaintiffs need only consult state law to find out what 'willful' means." SOS Br. at 98 (citing *Jones v. Hammock*, 179 So. 674, 676 (Fla. 1937)).[14] But this proves the point: a statute cannot require consultation of case law to be understood. The meaning of willfulness here must be evident on the Provision's face, *see Boos*, 485 U.S. at 330, and it is not, *see* League Br. at 94–95. While Defendants dismiss the 3PVRO Fines Provision's other glaring ambiguities as mere hypotheticals, SOS Br. at 98, understanding (1) the interplay between fines for willful and non-willful violations, and (2) how fines will be assessed for applications with

---

[14] Defendants' parenthetical for this case—"providing one definition," SOS Br. at 98—betrays that there is not an authoritative meaning of "willful." *Compare Jones*, 179 So. at 676 (willful conduct "'must be designed or intentional, and may be malicious, though not necessarily so'") (citation omitted) *with, e.g.*, *Fugate v. Fla. Elections Comm'n*, 924 So.2d 74, 75 (Fla. 2006) (defining "willfulness" to require voluntariness and specific intent).

multiple errors is crucial for 3PVROs to be able to gauge their potential liability, and to prevent arbitrary enforcement.

Finally, Defendants insist that "the **Citizenship Provision** has a core meaning" that Plaintiffs[15] and the Southern District of Florida[16] already understand. SOS Br. at 72–73. But they ignore entirely the mountain of testimony about the Provision's vagueness, *and* the additional ambiguities introduced by the Secretary's rulemaking. *See* League Br. at 95–98.[17] Lastly, Defendants dismiss the Provision's other ambiguities as "endless hypotheticals," SOS Br. at 74, but they are mere

---

[15] Defendants cite to a League email to try to show that the League "knows exactly what conduct is being regulated." SOS Br. at 72. But that email described the League's understanding of how it could temporarily stop *acting as a 3PVRO entirely*, therefore protecting itself from liability under all the challenged provisions. *See* PX 786 at 2 (referring to "the requirements and prohibitions under Senate Bill 7050"); *see also* Fla. Stat. § 97.021 (defining 3PVROs only as entities that collect or solicit applications). The email has nothing to do with the definition of "collecting or handling."

[16] Contrary to Defendants' assertion, SOS Br. at 73, *League of Women Voters of Florida v. Browning*'s passing reference to the phrase "collecting or handling," 575 F. Supp. 2d. 1298, 1319 (2008), has no bearing on the definition of the terms as they are used here.

[17] Meanwhile, Defendants dismiss Supervisor Earley's relevant testimony, *see* League Br. at 98, because "he doesn't enforce the provision," SOS Br. at 73. But Supervisors of Elections, who are directly responsible for voter registration, *see* Fla. Stat. § 98.015(3), must understand the law to detect and notify the State of violations.

illustrations of the Provision's lack of clarity as to whom it applies, under what circumstances, *see* League Br. at 96–98.

## 2. *The Retention, Receipt, and Citizenship Provisions are unconstitutionally overbroad*

Defendants fail to refute the overbreadth of the Retention, Receipt, and Citizenship Provisions. Defendants' primary argument is that these provisions do not regulate speech, SOS Br. at 77, 96, but as explained *supra* Parts III.A–B, that is wrong.

Defendants also argue that none of the challenged provisions prevent any Plaintiffs from engaging in their usual voter registration activities, only now "canvassers can't retain a voter's social security number," "a canvasser must provide a voter with a document [the receipt]," and "noncitizens can't physically possess filled-out voter-registration applications." SOS Br. at 77–78, 96. Defendants simply refuse to engage with the evidence that all three provisions burden the League's constitutionally protected activities by, *inter alia*: (1) preventing the League from retaining even basic contact information vital to follow up with applicants, *see* League Br. at 99–101; (2) deterring some volunteers from volunteering at all because of legitimate fears of harassment or intimidation, *see id.* at 103–04; and (3) preventing all

26

noncitizens, even legal residents, from participating in voter registration activities on a strict liability basis, *see id.* at 106–08, which will deter even more League volunteers, *see id.* at 6, 36. Contrary to Defendants' suggestion, the challenged provisions need not halt the League's voter registration activities altogether to be overbroad.

Defendants likewise fail to meaningfully engage with the existence of less restrictive alternatives that render the burden on the League's constitutional rights unnecessary. Defendants do not contest the availability of less restrictive alternatives to the **Receipt Provision**, *see* League Br. at 104–05; at most, they argue that "[i]f initials are good when identifying bad actors, . . . then the name is even better," SOS Br. at 33. This concedes the superfluity of the Provision, where the State could require canvassers' full names on documents that do *not* go directly to the public at the time of registration. Meanwhile, Defendants' only justification for the **Retention Provision**'s overbreadth is their preferred interpretation limiting the Provision's reach, *see* SOS Br. at 76–77, 97; but as explained *supra* pp. 21–23, this reading is neither reasonable nor readily apparent on the face of the statute. Finally, Defendants never engage meaningfully with the **Citizenship**

27

**Provision**'s extreme reach or strict liability, *see* SOS Br. at 77–78, 100–01, offering only generalized, unsupported allegations alluding to the untrustworthiness of noncitizens, *see supra* pp. 15–16, 20–21.[18]

### 3.   *As-applied challenges and advisory opinions are not a "failsafe" for 3PVROs*

Contrary to Defendants' suggestion, SOS Br. at 74, 98, as-applied challenges and advisory opinions are not better avenues to challenge laws that are unconstitutionally vague and overbroad. Aside from the fact that the challenged provisions are vague and overbroad on their face, *see supra* Parts III.C.1–2, limiting challenges to a facially unconstitutional law in the way Defendants suggest would only serve to prolong constitutional harms. *Cf., e.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021). Given the quantity of ambiguities

---

[18] Defendants also argue that the Citizenship Provision does not apply to handling of blank registration applications, citing for support a State *whitepaper* on the subject. SOS Br. at 100 (citing PX 780). Defendants do not even attempt to explain how this interpretation is "reasonable and readily apparent" on the face of the Provision. *Boos*, 485 U.S. at 330.

in the provisions and the quantity of 3PVROs operating in Florida, this is an untenable solution that itself risks arbitrary enforcement.

Advisory opinions from the Florida Division of Elections (the Division) are likewise not the "failsafe" Defendants allege. SOS Br. at 17. Division advisory opinions are binding *only* on the person or organization who requested the opinion. Fla. Admin. Code 1S-2.010(3). Accordingly, every 3PVRO in Florida would need to request and be issued an advisory opinion regarding the exact same questions to be shielded from liability. This proposition also assumes that the Division will timely respond to those advisory opinion requests—otherwise, 3PVROs risk having to pause their voter registration activities altogether pending the Division's individualized determination. But the Division's own Director, Maria Matthews, attested that there is no "guarantee [of] a timeframe." Trial Tr. vol. 6, 1944:21 (Matthews); *see also* Fla. Admin. Code 1S-2.010(5)(a)

29

(requiring the Division to respond "in a timely manner" but setting no actual deadline).[19]

Further, it is not true that the district court and the Eleventh Circuit in *Jones v. DeSantis* "accepted that reliance on an advisory opinion shields the requestor from criminal liability." SOS Br. at 17. The district court only accepted advisory opinions as a viable solution for voter eligibility determinations because the Court ordered the Division to provide "timely responses to requests for advisory opinions" *and* expressly authorized "an individual to go forward with registration and voting after 21 days" if the Division did not issue an opinion. *Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1242, 1248 (N.D. Fla. 2020). The Eleventh Circuit, meanwhile, did not opine at all on the efficacy or timeliness of the advisory opinion process, but simply affirmed that the

---

[19] Concerns have been raised elsewhere about the Division's ability to timely and consistently respond to advisory opinion requests. *See Am. Compl.*, *FRRC v. DeSantis*, 1:23-CV-22688-CMA, ECF No. 9, at ¶ 90 (S.D. Fla. July 26, 2023) ("[T]he Department of State has not timely replied to requests for advisory opinions, nor has it applied consistent legal and accounting principles in the few advisory opinions related to [legal financial obligations] that it has managed to issue."); *see also* Fla. House Bill 1525 (2024) (proposing a 90-day deadline for Division advisory opinion responses). Increasing the workload for the Division—which is already "very busy and ha[s] a lot of duties," Trial Tr. vol. 6, 1943:20–21 (Matthews)—seems a poor solution.

process existed and that it *could* shield the individual requestor from liability *if* answered. *Jones v. Governor of Fla.*, 975 F.3d 1016, 1026 (11th Cir. 2020).[20]

The remedy for an unconstitutionally vague or overbroad law is that it is struck down, not that every person or group impacted by the law seeks clarity one-by-one from an agency that has no response deadline or files an individual as-applied challenge. *See, e.g.*, *Lee*, 595 F. Supp. 3d at 1137–39.

### D.    *Purcell* Does Not Bar Relief Here

Though Defendants invoke the specter of *Purcell v. Gonzalez*, 549 U.S. 1 (2006), to deter relief, SOS Br. at 81–82, their argument fails.

*Purcell* concerned an injunction issued by a lower court "just weeks before the election." *League of Women Voters of Fla. v. Fla. Sec. of State*, 32 F.4th 1363, 1371 (11th Cir. 202) (quoting *Purcell*, 549 U.S. at 4). In past cases, the Eleventh Circuit has stayed an injunction when voting in

---

[20] Importantly, the advisory opinions at issue in *Jones* involved determinations of individual voters' eligibility—inherently case-by-case analyses. *See Jones*, 462 F. Supp. 3d at 1248–49. Here, individualized determinations to solve facial issues would not just be inefficient, they would leave room for discrepancies in the State's treatment of different 3PVROs and their members.

the next statewide election was less than four months away, and local elections were already ongoing, *id.*; here, no such concerns exist. Indeed, the fact that Defendants are only now complaining about the schedule they agreed to in July 2023, ECF No. 52, further undercuts their arguments, *see, e.g.*, *Rose v. Raffensperger*, 143 S. Ct. 58, 59 (2022); *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *2 (11th Cir. Nov. 7, 2022).

Moreover, the **Retention and Citizenship Provisions** have already been enjoined since July 3, 2023, *see* ECF No. 101—well over a year before the 2024 presidential election. Thus, if *Purcell* were even applicable, it would cut in Plaintiffs' favor as to these provisions, because a permanent injunction now would merely maintain the status quo. *Cf. GRACE, Inc. v. City of Miami*, No. 1:22-CV-24066-KMM, 2023 WL 4942064, at *2 (S.D. Fla. Aug. 3, 2023) (denying stay where "there is no status quo to which Defendant may return").

Meanwhile, testimony in the record establishes that permanently enjoining the **Receipt and 3PVRO Fines Provisions** would have no effect on election officials' ability to prepare for the 2024 election—except that enjoining the 3PVRO Fines Provisions would reverse the depression

in 3PVRO activity it has caused. *See* Trial Tr. vol. 3, 762:20–764:8 (Earley); *see also* PX 145 (Leon County document describing the impact of the Receipt Provision as "minimal" and the impact of the 3PVRO Fines Provision as "[m]inimal [but] [m]ay result in decreased 3PVRO activity").

More generally, the challenged provisions directly impact the speech and activities of 3PVROs, not election administrators. Thus, a permanent injunction would not "require the state to . . . re-train[] poll workers" or any other election workers, as was the case when the Eleventh Circuit applied *Purcell* during the SB 90 litigation. *League of Women Voters*, 32 F.4th at 1371; *see also Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 368 (9th Cir. 2016). Nor would an injunction affecting 3PVRO activities "result in voter confusion," a principal concern of the Court in *Purcell*. 549 U.S. at 4–5; *see also Jacksonville Branch of NAACP*, 2022 WL 16754389, at *3.

In short, an injunction changing the responsibilities of 3PVROs will not appreciably affect officials' election administration duties. And the only effect of an injunction on voters will be that more will be able to register because 3PVROs will once again be able to pursue their missions. The reversion to prior Florida law and regulation of 3PVROs will not risk

33

any of the "unanticipated consequences" invited by "seemingly innocuous late-in-the-day judicial alterations to state election laws." *League of Women Voters*, 32 F.4th at 1371 (citation omitted).

## IV. Conclusion

In sum, trial evidence established that all four of the challenged provisions should be permanently enjoined, and Defendants have done nothing to refute that showing.

Dated: May 3, 2024

Respectfully submitted,

/s/ Alexandra Copper

Chad W. Dunn
Florida Bar No. 0119137
1200 Brickell Avenue,
Suite 1950
Miami, FL 33131
Telephone: (305) 783-2190
Facsimile: (305) 783-2268
chad@brazilanddunn.com

Alexandra Copper (Cal. Bar No. 335528)*
Brent Ferguson (D.C. Bar No. 1782289)*
Molly E. Danahy (D.C. Bar No. 1643411)*
Ellen Boettcher (D.C. Bar No. 90005525)*
Michael Ortega (IL Bar No. 6339469)*
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
acopper@campaignlegal.org
bferguson@campaignlegal.org
mdanahy@campaignlegal.org
eboettcher@campaignlegal.org
mortega@campaignlegal.org

*Counsel for Consolidated Plaintiffs League of Women Voters of Florida, Inc. and League of Women Voters of Florida Education Fund*

\* Admitted *Pro Hac Vice*

## **CERTIFICATE OF COMPLIANCE**

I certify that this document contains 6999 words, which complies with the limits set out in ECF No. 316. I further certify that this brief complies with the typeface and formatting requirements in Local Rule 5.1.

/s/ Alexandra Copper
Alexandra Copper

## **CERTIFICATE OF SERVICE**

I certify that on May 3, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

/s/ Alexandra Copper
Alexandra Copper