# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS OF
THE NAACP, et al.,

               Plaintiffs,

               v.

CORD BYRD, in his official capacity as
Florida Secretary of State, et al.,

               Defendants.

Case Nos.: 4:23-cv-215-MW/MAF
4:23-cv-216-MW-MAF
4:23-cv-218-MW-MAF

## NAACP PLAINTIFFS' CLOSING ARGUMENT REBUTTAL

i

# TABLE OF CONTENTS

I.     Defendants get the facts wrong. ...........................................................................1

II.    NAACP Plaintiffs have standing.........................................................................2

       A.   NAACP Plaintiffs established injury-in-fact.........................................2

       B.   NAACP Plaintiffs have standing to sue the Attorney General. ...........6

III.   NAACP Plaintiffs should prevail on their First Amendment claims. ...............7

       A.   SB 7050's 3PVRO Restrictions unconstitutionally infringe on
            Plaintiffs' speech and association rights................................................7

       B.   The 3PVRO Restrictions do not survive any level of potentially
            applicable scrutiny. ..............................................................................12

IV.    NAACP Plaintiffs should prevail on their *Anderson-Burdick* claim. ..............16

V.     NAACP Plaintiffs should prevail on their Equal Protection claim.................20

VI.    NAACP Plaintiffs should prevail on their vagueness and overbreadth
       claims.................................................................................................................25

VII.   NAACP Plaintiffs should prevail on their Mail-In Ballot Request Restriction
       claim. .................................................................................................................28

VIII.  NAACP Plaintiffs have satisfied the other permanent injunction factors, and
       *Purcell* does not bar relief. ...............................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ass'n of People with Disabilities v. Herrera*,
  580 F.Supp.2d 1195 (D.N.M. 2008)....................................................9

*Ams. for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021)..............................................................9, 15

*Brnovich v. Democratic Nat'l Comm.*,
  141 S. Ct. 2321 (2021)...............................................................15

*Cal. Democratic Party v. Jones*,
  530 U.S. 567 (2000).................................................................13

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985).................................................................13

*Common Cause Fla. v. Byrd*,
  No. 4:22-CV-109-AW-MAF, 2024 WL 1308119 (N.D. Fla. Mar.
  27, 2024) ..........................................................................22, 23

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008)..............................................................15, 17

*Democracy N.C. v. N.C. State Bd. of Elections*,
  476 F.Supp.3d 158 (M.D.N.C. 2020) ...................................................9

*Democratic Exec. Comm. v. Lee*,
  915 F.3d 1312 (11th Cir. 2019) .......................................................12

*Duke v. Cleland*,
  5 F.3d 1399 (11th Cir. 1993) .........................................................12

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ...................................................15, 16

*Fla. State Conf. of NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ........................................................5

*Fla. State Conf. of NAACP v. Lee*,
  566 F.Supp.3d 1262 (N.D. Fla. 2021) ............................................................... 24

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
  901 F.3d 1235 (11th Cir. 2018) ........................................................................ 11

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ........................................................................ 22

*Harris v. McCrory*,
  159 F.Supp.3d 600 (M.D.N.C. 2016), *aff'd sub nom. Cooper v.*
  *Harris*, 581 U.S. 285 (2017) ............................................................................ 21

*Honeyfund.com v. DeSantis*,
  622 F.Supp.3d 1159 (N.D. Fla. 2022) ................................................................ 6

*Honeyfund.com v. Governor*,
  94 F.4th 1272 (11th Cir. 2024) ........................................................................ 11

*Jacksonville Branch of NAACP v. City of Jacksonville*,
  No. 22-13544, 2022 WL 16754389 (11th Cir. Nov. 7, 2022) .................... 29, 30

*Johnson v. United States*,
  576 U.S. 591 (2015) .......................................................................................... 26

*Jones v. Bank of Am., N.A.*,
  564 F. App'x 432 (11th Cir. 2014) .................................................................... 29

*Jones v. Governor of Fla.*,
  975 F.3d 1016 (11th Cir. 2020) .......................................................................... 2

*League of Women Voters v. Browning*,
  863 F.Supp.2d 1155 (N.D. Fla. 2012) ................................................................ 9

*League of Women Voters v. Cobb*,
  447 F.Supp.2d 1314 (S.D. Fla. 2006) ....................................................... 7, 9, 10

*League of Women Voters v. Fla. Sec'y of State*,
  32 F.4th 1363 (11th Cir. 2022) ........................................................................ 29

*League of Women Voters v. Fla. Sec'y of State*,
  66 F.4th 905 (11th Cir. 2023) .......................................................................... 17

iv

*League of Women Voters v. Fla. Sec'y of State*,
  No. 4:21CV186-MW/MAF, 2024 WL 495257 (N.D. Fla. Feb. 8,
  2024) ................................................................................................16, 18, 19

*League of Women Voters v. Hargett*,
  400 F.Supp.3d 706 (M.D. Tenn. 2019) ........................................................7, 8

*Lucas v. Forty-Fourth Gen. Assembly of Colo.*,
  377 U.S. 713 (1964)................................................................................24

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007)..................................................................................2

*Meyer v. Grant*,
  486 U.S. 414 (1988)................................................................................10

*Mont. Pub. Interest Rsrch. Grp. v. Jacobsen*,
  No. CV-23-70-H-BMM, 2024 WL 1770674 (D. Mont. Apr. 24,
  2024) ................................................................................................27, 28

*NetChoice, LLC v. Attorney General*,
  34 F.4th 1196 (11th Cir. 2022) ..............................................................11

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006)....................................................................................16

*Smith v. Goguen*,
  415 U.S. 566 (1974)................................................................................25

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)..............................................................................4, 5

*Tenn. State Conf. of NAACP v. Hargett*,
  420 F.Supp.3d 683 (M.D. Tenn. 2019) ..................................................9

*United States v. Stein*,
  881 F.3d 853 (11th Cir. 2018) ..............................................................13

*Uzuegbunam v. Preczewski*,
  141 S. Ct. 792 (2021)................................................................................7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)................................................................................21

*Vill. of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980).................................................................................9

*VoteAmerica v. Schwab*,
    671 F.Supp.3d 1230 (D. Kan. 2023)............................................7, 11

*Washington v. Davis*,
    426 U.S. 229 (1976)...............................................................................25

**Statutes**

52 U.S.C. § 10508 .......................................................................................30

Fla. Stat. § 16.56(1)(c)(5) ...........................................................................6

Fla. Stat. § 97.0575(7)..............................................................................3, 6

Fla. Stat. § 101.051(3)................................................................................28

Fla. Stat. § 106.23(2)...................................................................................1

**Other Authorities**

Fla. Admin. Code R. 1S-2.042..................................................................3, 4

Fla. Admin Code. R. 1S-2.010.....................................................................1

Defendants' closing brief mischaracterizes the record, misunderstands NAACP Plaintiffs' multiple bases for standing, and wholly misses the mark on the merits. This Court should find that Plaintiffs prevail on all of their remaining claims.

## I.     Defendants get the facts wrong.

Defendants mischaracterize or outright misrepresent the factual record in several key aspects. For instance, Defendants are wrong about:

- **Who is in this case:** Defendants suggest that Plaintiffs themselves do not include voters. ECF 311 ("Opp.") at 3 ("Who are these voters? Not the individual plaintiffs"). But Esperanza Sánchez is a new Hispanic voter, Tr. 177:19-20, 178:8-13, and Organizational Plaintiffs bring this claim on behalf of their voter members, ECF 304 ("Br.") at 80-81.

- **3PVRO "data-mining":** Defendants claim that Plaintiffs "data-mine information," Opp.12, which is a technical term that Defendants fail to define and that bears no relation to Plaintiffs' activities.[1] Even the Secretary admits that any "data" Plaintiffs "mine" is first stripped of "drivers license numbers, identification numbers, social-security numbers, and signatures"—the very information Defendants claim the Information Retention Ban is meant to protect. *See* Opp.12.

- **Canvasser quotas:** Defendants suggest 3PVROs impose "quota requirements for canvassers," Opp.12. They don't. The record dispels any theory that they "may" exist. *See* Tr. 53:2-9 (Nordlund); 170:10-12 (Orjuela); 193:3-5 (Sánchez); 580:13 (Velez).

- **A liability "failsafe":** Defendants claim that the Secretary's "advisory opinion process" provides a "failsafe" for 3PVROs, Opp.17, but the authority they cite says nothing of the sort. None of the challenged provisions are addressed in Fla. Stat. § 106.23(2), which refers to campaign financing. Fla. Admin. Code R. 1S-2.010 also says nothing about the preclusive effect of the

---

[1] *See, e.g.*, What is Data Mining? IBM, https://www.ibm.com/topics/data-mining (last visited Apr. 30, 2024).

Secretary's opinions. And the "2020 case" alluded to by Director Matthews held that "any felon who registers in reliance on an opinion is immune from prosecution," *Jones v. Governor of Fla.*, 975 F.3d 1016, 1026 (11th Cir. 2020), not that any 3PVRO that *conducts* voter registration in reliance on the Secretary's opinions is immune from civil or criminal liability.

- **The Court's observations:** Defendants suggest that this Court's paraphrasing of Dr. Stein's position was in fact a summary of *the Court's view* of Dr. Herron's and Dr. Smith's analyses. *See* Opp.29 (asserting that "[t]his Court is aware of the deficiencies in [Dr. Herron's and Dr. Smith's] analyses"). Defendants' attempt to attribute Dr. Stein's views to the Court both mischaracterizes the trial transcript and underscores their reluctance to rely on the actual testimony of their own expert in defending his views.

## II.    NAACP Plaintiffs have standing.

Defendant Byrd concedes NAACP Plaintiffs' standing to challenge the Citizenship Requirement and does not dispute traceability or redressability as to any of the challenged provisions. The Court should reject Defendants' arguments that NAACP Plaintiffs have not suffered an injury-in-fact as to the Information Retention Ban, 3PVRO Fines Provision, and Mail-In Ballot Request Restriction.

### A.    NAACP Plaintiffs established injury-in-fact.

Defendants' arguments that NAACP Plaintiffs' harms are "speculative" and "self-imposed," Opp.35-39, ignore that a plaintiff need not "expose himself to liability before bringing suit to challenge the basis for the threat" of government penalties. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007). Defendants' injury-in-fact arguments not only clash with Supreme Court caselaw,

they crumble under the mountain of trial evidence Plaintiffs presented concerning their real, non-hypothetical harms from the challenged provisions.

**Information Retention Ban.** Defendants argue that the Ban governs only canvassers, and that Plaintiffs' failure to produce canvassers who retain voter information dooms their standing. Opp.34. But the statutory text, trial testimony, and Secretary's own rule belie Defendants' suggestion that the statute clearly defines who can retain voter information.

First, by its terms, the Ban applies to any "person collecting voter registration applications on behalf of a third party voter registration organization," Fla. Stat. § 97.0575(7)—not just canvassers. Indeed, this Court previously found that, "now that section 97.0575(7) threatens their staff, members, and volunteers *with felony prosecutions* if they copy or retain a voter's personal information, the [] organizations will no longer be able to carry out their mission of increasing political participation by contacting voters they have registered," and this harm is "neither speculative nor self-inflicted." ECF 101 at 23-24. At trial, Organizational Plaintiffs supported this with evidence, including that several "person[s]" collecting forms on behalf of their organizations retain or copy information. *See, e.g.*, Tr. 97:11-16 (Nordlund).

Second, the Secretary's own rule interpreting the Ban contradicts his suggestion that it only impacts individual canvassers. *See* Fla. Admin. Code R. 1S-

2.042(1) ("This rule provides procedures for the regulation of 3PVROs[.]"); *id.* 1S-2.042(5)(g) (stating "[a] 3PVRO may not retain an applicant's voter registration application (or the voter's personal information contained therein)" after delivering it to election officials).

Third, even if the Ban restricted only canvassers, Plaintiffs established that its "chilling effect" on members "want[ing] to be involved with voter registration"—as canvassers or otherwise—harms both their missions and their members. Tr. 1327:21-23; *see also* Br.17-21, 80-81.

**3PVRO Fines Provision.** Defendants illogically argue that "Plaintiffs haven't committed *enough* misconduct to challenge the Fines Provision," suggesting that Plaintiff 3PVROs are too diligent to establish standing. Opp.38. Defendants claim only Hard Knocks can challenge the 3PVRO Fines Provision because it is a "[b]ad-acting 3PVRO," unlike Plaintiffs. *Id.* But the Fines Provision includes no willfulness or mens rea requirement, and thus does not discriminate between "bad actors" and 3PVROs acting in good faith. Indeed, multiple Plaintiffs have received fines in the past due to *innocuous* mistakes. *See* Tr. 58:1-59:14, 61:3-62:10 (Unidos), Tr. 661:12-663:22 (Alianza). As a result, "the threat of future enforcement" is substantial when, as here, "there is a history of past enforcement," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("observ[ing] that past enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical" (citation

4

omitted)). Fines "are foreseeable and the expected results of unconscious and largely unavoidable human errors." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008). And the changes Plaintiffs made due to this threat, including ceasing paper canvassing entirely, are natural consequences of increased penalties, not self-inflicted injuries. What *is* speculative is Defendants' suggestion that an appeal to the Office of Election Crimes and Security would obviate Plaintiffs' future harm. Opp.36-37.

**Mail-In Ballot Request Restriction.** Defendants concede that Ms. Babis Keller's testimony on DRF's behalf "gets close" to establishing standing as to the Restriction, but they quibble with whether that testimony established that any DRF member had a "concrete[]" plan to vote by mail. Opp.39. In fact, Ms. Babis Keller definitively testified that one member, Ms. Laura Minutello, has requested a vote-by-mail ballot previously, requires assistance to request a vote-by-mail ballot, and lacks easily accessible immediate family or legal guardian to help her request a vote-by-mail ballot. Tr. 1334:3-1335:8. As such, DRF established a "substantial risk" that at least one member will be unable to request a vote-by-mail ballot with the assister of her choosing. *Driehaus,* 573 U.S. at 158.[2]

---

[2] Defendants devote a single paragraph to address third-party standing, Opp.39, arguing only that Plaintiffs have no injury, which both is untrue, *see supra*, and fails to address Plaintiffs' third-party standing to sue on behalf of potential voters whom 3PVROs will not register and whose registrations these 3PVROs will be unable to update because of the 3PVRO Restrictions. *See* Br.84-85.

**B.      NAACP Plaintiffs have standing to sue the Attorney General.**

The Attorney General can prosecute voter-registration-related crimes, *see* Fla. Stat. § 16.56(1)(c)(5), Tr. 838:12-15, and is tasked with enforcing SB 7050's new civil and criminal penalties against 3PVROs upon referral from the Secretary. *See* Br.86-91. In attempting to disclaim civil-enforcement responsibility, the Attorney General analogizes to *Honeyfund.com, Inc. v. DeSantis*, where the plaintiffs lacked evidence that referrals to the Governor can occur and conceded they could not establish traceability and redressability. 622 F.Supp.3d 1159, 1173-74 (N.D. Fla. 2022). But here, the Attorney General concedes that the Secretary *can* "indeed refer complaints to the [Attorney General]'s office," *id.* at 1174; *see also* PX179 ("[T]he OAG understands that, on referral from the Secretary of State, the OAG may seek" a variety of actions). Her power to enforce voter-registration laws plus referrals means that Plaintiffs' injuries are traceable to the Attorney General and redressable by an order against her. *Honeyfund.com*, 622 F.Supp.3d at 1174; *see also* Br.87-88.

As to criminal enforcement, the Attorney General admits that, "[t]o the extent that a felony occurs under Fla. Stat. §97.0575(7), the Statewide Prosecutor may prosecute such a violation if it occurs in multiple state judicial circuits," but suggests that because the Information Retention Ban "does not vest the Statewide Prosecutor with the sole or exclusive right to prosecute the unlawful retention of information," Plaintiffs lack standing. ECF 312 at 7-8. Binding caselaw forecloses this argument;

complete relief is not required for standing. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021); Br.87-88.

**III.      NAACP Plaintiffs should prevail on their First Amendment claims.**

   **A.     SB 7050's 3PVRO Restrictions unconstitutionally infringe on Plaintiffs' speech and association rights.**

The 3PVRO Restrictions unconstitutionally infringe on Plaintiffs' speech by "reduc[ing] the total quantum of speech." *League of Women Voters v. Cobb*, 447 F.Supp.2d 1314, 1332 (S.D. Fla. 2006) (quoting *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988)); Br.17-21, 54-57. And they infringe on Plaintiffs' associational rights by severely impairing "organizing between individuals in support of registration efforts," *League of Women Voters v. Hargett*, 400 F.Supp.3d 706, 720 (M.D. Tenn. 2019), as well as organizing for other civic purposes.

Defendants attempt to avoid this result by arguing that the 3PVRO Restrictions regulate conduct, not speech or association. Opp.40-45, 58-59. To make this argument, Defendants try to cleave voter registration into two distinct chunks: before and after canvassers receive filled-out applications. They concede that encouraging voters to register "may be speech" but claim 3PVROs do not engage in speech or association once they have a voter's application. *Id.* at 41, 58-59. The weight of authority has rejected similar arguments. *See, e.g.*, *VoteAmerica v. Schwab*, 671 F.Supp.3d 1230, 1248 (D. Kan. 2023) ("For constitutional purposes, the First Amendment does not countenance slicing and dicing plaintiff's actions."); *Hargett*,

400 F.Supp.3d at 720 (refusing to adopt similar approach because it "would allow the government to burden the protected aspects of [a voter-registration] drive indirectly and because the '*entire* voter registration activity' implicates the 'freedom of the plaintiffs to associate with others for the advancement of common beliefs [that] is protected by the First and Fourteenth Amendments'" (citation omitted)). And *even if* voter registration could be properly bifurcated into before and after collection, the First Amendment protects after-collection processes. *See Hargett*, 400 F.Supp.3d at 720 ("[O]rganizing between individuals in support of registration efforts involves political association that is, itself, protected under the First Amendment."). As such, Defendants twice-invoked comparison between 3PVROs and mailmen falls apart, Opp.42, 44, as "a voter registration drive involves more than just accepting and delivering a form like a neutral courier," *Hargett*, 400 F.Supp.3d at 720.

Defendants also artificially narrow the scope and timeline of First Amendment activities as established by the evidence presented at trial. Voter registration is one continuous cycle. Engaging in registration enables Organizational Plaintiffs to obtain funding and opportunities to engage in speech campaigns, get-out-the-vote, and membership outreach, increasing their quantum of speech and associational activities. Tr. 638:3-640:24. Earning trust from communities through successful voter registration begets more trust and success in future registration, which leads to

more speech and association. Tr. 640:9-641:10. The 3PVRO Restrictions prevent Plaintiffs from beginning and/or effectively participating in this cycle, suppressing their speech and association. Br.54-57; *see also Am. Ass'n of People with Disabilities v. Herrera*, 580 F.Supp.2d 1195, 1220 (D.N.M. 2008) (considering cumulative burdens imposed by challenged provisions); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F.Supp.3d 158, 218 (M.D.N.C. 2020) (same); *Tenn. State Conf. of NAACP v. Hargett*, 420 F.Supp.3d 683, 710 (M.D. Tenn. 2019) (same).[3]

This is not to say that voter registration involves *no* conduct. But combining speech and association with other conduct does not deny these activities First Amendment protection. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) ("[S]olicitation is characteristically intertwined with . . . . speech"); *Cobb*, 447 F.Supp.2d at 1332-34 ("[T]he collection and submission of voter registration drives is intertwined with speech and association.").

---

[3] Defendants argue that the 3PVRO Restrictions do not suppress association because "[t]he State isn't forcing anyone to associate with anyone." Opp.59. But the First Amendment prohibits both compelled association and restrictions on association. When, as here, "plaintiffs wish to speak and act collectively with others," it "implicat[es] the First Amendment right of association." *League of Women Voters v. Browning*, 863 F.Supp.2d 1155, 1159 (N.D. Fla. 2012); *see also Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) ("This Court has 'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'" (quotation omitted)).

The Supreme Court has already held that activities like Plaintiffs' voter-registration and get-out-the-vote efforts constitute protected First Amendment activity. In *Meyer*, 486 U.S. at 421, the Court found petition circulation was protected speech without distinguishing between signature collection and submission of signed petitions. That's because both parts matter under the First Amendment: just like advocacy through petitions includes submission of the actual petitions, advocacy through voter registration includes submission of the actual applications.

Defendants argue that 3PVRO activity is not the same as petition gathering, which "rallies people around an idea or proposition." Opp.43-44. But voter registration rallies people around democracy and voting, and the follow-up activities that Plaintiffs engage in rally people around specific causes that are fundamental to Plaintiffs' missions. Br.17-21.

Defendants also argue this case is different from *Meyer* because *Meyer* concerned the "quantum of speech" reduced, and Plaintiffs' speech is not reduced since they can still speak with voters. Opp.44. Defendants miss the mark. The 3PVRO Restrictions diminish Plaintiffs' ability to engage voters in the most effective form of voter registration and outreach: paper canvassing. Tr. 1172:22-1174:2. That is a First Amendment harm. *Cobb*, 447 F.Supp.2d at 1334 (holding plaintiffs are entitled to "select what they believe to be the most effective means of

conducting their voter-registration drives to ensure their voices are heard in the political process" (citing *Meyer*, 486 U.S. at 424)); *VoteAmerica*, 671 F.Supp.3d at 1251 (similar on mail-in voting).

To support their conduct-not-speech-or-association defense, Defendants misleadingly suggest that the Eleventh Circuit parses conduct and speech by determining whether "'[t]he conduct' at issue 'can[] be separated from' any earlier speech." Opp.42 (quoting *Honeyfund.com v. Governor*, 94 F.4th 1272, 1278 (11th Cir. 2024)). With the brazen use of brackets, Defendants manipulate the quote to change a "cannot" to a "can[]," inverting the actual test. The quote is: "When the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech." *Honeyfund.com*, 94 F.4th at 1278. Here, such separation is impossible.

Finally, even if the Court finds that Plaintiffs' voter-registration processes constitute conduct, it is expressive and protected by the First Amendment. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (holding test for expressive conduct is whether "the reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message"). This Court would still review the 3PVRO Restrictions under heightened scrutiny. *See, e.g.*, *NetChoice, LLC v. Attorney General*, 34 F.4th 1196, 1223 (11th Cir. 2022). So, as a practical matter, whether this

Court concludes voter registration is expressive conduct, association, or speech, heightened scrutiny applies. Br.92-100. And the 3PVRO Restrictions cannot survive heightened scrutiny. *See infra* Section III.B; Br.127-131.

### B. The 3PVRO Restrictions do not survive any level of potentially applicable scrutiny.

Defendants throw multiple purported rationales against the wall, but none sticks, regardless of the level of scrutiny applied. Although "[t]he existence of a state interest [] is a matter of *proof*," *Duke v. Cleland*, 5 F.3d 1399, 1405 n.6 (11th Cir. 1993) (emphasis added), Defendants fail to support their asserted generalized and unsubstantiated interests with anything even resembling proof. Nor can they satisfy the *Anderson-Burdick* standard, which the Eleventh Circuit has held "must take into consideration not only the legitimacy and strength of the state's asserted interest, but also the extent to which those interests make it necessary to burden voting rights," *Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1322 (11th Cir. 2019) (cleaned up), as Defendants have entirely failed to show necessity as well.

For example, Defendants claim they have a state interest in curbing 3PVRO criminal misconduct, Opp.30-32, but never explain how the 3PVRO Restrictions prevent this, particularly in the face of evidence demonstrating that criminal misconduct is rare and investigated and prosecuted under other laws, Br.28-29, 34-41. Indeed, Defendants concede that "the State didn't collect data on noncitizen misconduct"; that laws are already in place to "deter" 3PVRO canvasser bad

behavior; and that SB 7050 made no changes to criminal liability for 3PVROs themselves. Opp.47-48. These aren't small concessions: "the aspect" of the state's interest in curbing criminal misconduct is severely undermined when the provisions passed have little to do with advancing that interest. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000).

Defendants next argue that the 3PVRO restrictions serve the state's interests in preventing voter fraud and promoting voter confidence, Opp.45, relying on the Darlington Declaration and 2023 OECS Report for this proposition. *Id.* at 46. Neither suffices. As Plaintiffs have argued, the OECS report lacks evidence to support claims about the prevalence of 3PVRO-related misconduct or to justify any of the 3PVRO Restrictions. Br.26-27, 42, 47. On the Citizenship Requirement, the Darlington Declaration declares without support that only U.S. citizens "occupy [a] position of trust" to handle voter-registration applications, PX139 at 5, but this type of pejorative preference for citizens over noncitizens is wholly illegitimate. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (holding antipathy toward group as basis for law does not pass rational-basis review).[4]

---

[4] Plaintiffs included the Darlington Declaration on their exhibit list when Director Darlington was on Defendants' will call list, ECF 244-4, but Defendants ultimately failed to call him at trial. "[A] fact-finder can choose to disregard a litigant's self-serving (and unsupported) trial testimony, and . . . its decision to do so generally will not constitute clear error." *United States v. Stein*, 881 F.3d 853, 858 (11th Cir. 2018) (en banc). Moreover, Director Darlington's post-hoc, facially discriminatory

Moreover, Defendants point "to no record evidence indicating that noncitizens, as a class, have such a fleeting presence in this country as to justify a wholesale ban on their collecting or handling voter registration applications." ECF 101 at 34. At most, the Secretary identifies *one* instance of a canvasser leaving the country with a voter-registration application and presupposes this canvasser's citizenship status. Opp.47. And the Secretary cites instances of a 3PVRO supervisor having to "reprimand or discipline" just three noncitizen canvassers, who were immediately fired after investigation. *Id.* (citing Tr. 407:5-22). The full record establishes that systematic noncitizen canvasser misconduct is nonexistent. Br.28-29, 34-42.

Defendants' purported justifications of the Information Retention Ban and the 3PVRO Fines Provision fare no better. For example, in his declaration, Director Darlington stated that information "that is not generally available to the public" should be protected. PX139 at 7. If that is the Ban's true purpose, it suffers from a serious tailoring problem. Rather than prohibiting retention of a voter's social

---

justification for the Citizenship Requirement is not credible because his office ignored violations across the state from 3PVROs that service other communities while heaping fines on 3PVROs that employ Spanish-speaking noncitizens and serve the Puerto Rican community in Central Florida in a manner that made it harder for them to register to vote—leaving little wonder why the Secretary did not call him at trial. *See* Br.52 (detailing selective enforcement); Appendix C (showing 34% of total 2023 fines and 47% of wrong-county fines in 2023 on 3PVRO registrations of self-identified Puerto Rican born voters).

security number, for example, it bans retention of *all* "voter personal information"—which may even include information subject to public disclosure. On the Fines Provision, Defendants echo the familiar reference to the outlier 3PVRO Hard Knocks. Opp.48. But one 3PVRO's behavior cannot justify the sweeping changes to 3PVRO regulations, especially where obvious alternatives exist: revoke Hard Knocks's 3PVRO registration or limit increased penalties to willful or repeated violators, which would "deter misconduct while not penalizing honest mistakes." Opp.49. Defendants ignore these less burdensome options, choosing instead to defend the "dramatic mismatch" between the purported state interests and the 3PVRO Restrictions "implemented in service of that end." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2386 (2021).

In the end, Defendants effectively argue that states can pass any election laws they please so long as the "public's confidence" is at issue. *See* Opp.48. But none of the cases Defendants cite support such a premise. *Brnovich* held only that "[r]ules that are supported by strong state interests are less likely to violate § 2." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021). And while *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), "demonstrates that when there is limited evidence of a burden on the right to vote, the state need not present concrete evidence to justify its assertion of legitimate or important generalized interests," *Fish v. Schwab*, 957 F.3d 1105, 1126 (10th Cir. 2020), that is not the record

before the Court here. Br.54-61. *Purcell v. Gonzalez*, meanwhile, holds that courts must "give careful consideration to [] plaintiffs' challenges," 549 U.S. 1, 4 (2006), not that states have a blank check to do as they please in the name of generalized interests.

The record leads to only one conclusion: the 3PVRO Restrictions do not even rationally serve these state interests, let alone address a legitimate or compelling basis under heightened scrutiny. When there is "essentially no evidence that the integrity of" Florida's "electoral process had been threatened," it is evident that the "Secretary's proffered justifications are not supported—and indeed in several places are undercut—by the facts." *Fish*, 957 F.3d at 1134-35; *see* Tr. 804:21-24 (Earley).

**IV.     NAACP Plaintiffs should prevail on their *Anderson-Burdick* claim.**

Defendants effectively concede that this Court may undertake an *Anderson-Burdick* analysis that "considers the disparate impact the challenged provision[s] may have on those voters who" are affected by the 3PVRO Restrictions. *See League of Women Voters v. Fla. Sec'y of State*, No. 4:21CV186-MW/MAF, 2024 WL 495257, at *4 (N.D. Fla. Feb. 8, 2024). Even if Defendants believe this "shouldn't be the case," Opp.52, that does not change the fact that this is the law that binds this Court.

Defendants' attempt to distinguish Supreme Court and Eleventh Circuit precedent that they admit "considered burdens on particular voters" in analyzing

16

laws under *Anderson-Burdick*, *id.* (citing *Lee* and *Crawford*), falls flat. They offer no authority for their position that courts cannot consider burdens on a racial subgroup under *Anderson-Burdick*—and indeed acknowledge that other federal courts have done just that. Opp.52 (citing *Ohio Democratic Party v. Husted*, 834 F.3d 620, 639 (6th Cir. 2016)). Moreover, some circumstances shared by voters in *Crawford*—including "economic [] limitations"—are also relevant here, as the record establishes that the voters who will not register or vote because of SB 7050 are disproportionately Black and Hispanic voters of lower socioeconomic status. 553 U.S. at 199; Br.116-118.[5]

On the merits, when the governing law is applied to this evidentiary record, the significant, disparate burdens are difficult to dispute. For one, the Eleventh Circuit has already recognized that restrictions on 3PVROs have a disparate impact on Black voters. *See League of Women Voters v. Fla. Sec'y of State*, 66 F.4th 905, 937-38 (11th Cir. 2023). And Dr. Herron found compelling evidence that fewer Black and Hispanic voters registered to vote after SB 7050's passage, and that

---

[5] Perhaps recognizing that asking the Court to ignore relevant precedent is a tenuous strategy, Defendants took a shot at standing—or maybe the merits, they weren't sure—by claiming "none of the Plaintiffs are voters." Opp.53. As discussed in Section I *supra*, Defendants are wrong.

3PVRO registrations also plummeted in 2023 compared to 2019. Tr. 1991:4-6; Br.118-19.[6]

Defendants ultimately resort—once again—to mischaracterizing the record. For instance, Defendants assert that "neither Dr. Herron nor Dr. Smith assessed the benefits related to SB 7050." Opp.54. But Dr. Herron testified that he "was retained to study the publicly stated justification for SB 7050, because that sheds light on the potential benefits of the law," Tr. 197:1-3; *see also* Tr. 203:3-5 (describing reviewing legislative transcripts because he was "interested in understanding the ostensible benefits of SB 7050"). Defendants further assert that Dr. Herron "ignored [] the substitution effect." Opp.55. That would come as news to Dr. Herron, who testified that "the concept of substitutability definitely informed my analysis . . . was something I'm aware of, and it doesn't undermine any of my results. In fact, I think it contributes to my conclusions." Tr. 2003:3-7. This Court listened to hours of Dr. Herron's testimony on the benefits of SB 7050, its burdens, and any impact of the

---

[6] In its SB 90 remand order, this Court remarked on the issue of "conflating the number of voters who had their most recent registration method recorded through a 3PVRO with the number of would-be voters who would ultimately have their First and Fourteenth Amendment rights burdened by the challenged provisions." *League of Women Voters*, 2024 WL 495257, at *6. Here, Dr. Herron went beyond showing which voters previously relied upon 3PVROs by demonstrating the observed effects of the 3PVRO Restrictions on voters since SB 7050's passage, and this disenfranchisement was corroborated by other witnesses. Br.118-19.

substitution effect on his conclusions; Defendants' suggestion that Dr. Herron overlooked these issues is incredible.[7]

Defendants' more specific critiques of Dr. Herron's methodology fare no better. Defendants fault him for not analyzing a hypothetical world in which voters can register at every government office. In reality, registration is not available "nearly" everywhere, no matter how many times Defendants claim—without support—that it is. *See* Tr. 353:19-354:2. Dr. Herron had no obligation to analyze improbable situations in reaching conclusions, *see* Tr. 352:2-354:14, and the Court has already "categorically reject[ed] the argument" that an *Anderson-Burdick* claim fails just because another modality of voting or registering is available. *League of Women Voters*, 2024 WL 495257, at *4.

Defendants' arguments about the voter-file data also fail. Dr. Herron testified that the missing data does not undermine his analysis, Tr. 262:13-22, and Defendants presented no evidence to the contrary. Defendants' suggestion that Dr. Herron's review does not capture a significant subset of the electorate is also disingenuous. It contains millions of entries representing millions of Florida voters. Tr. 263:6-9.

---

[7] Defendants also offer a strained argument that Dr. Herron's responses to questions about what constitutes a 3PVRO activity—something he confirmed was outside the scope of his expertise and opinions, Tr. 2011:16-20—undercut his conclusions on substitution. Br.55. But Dr. Herron need not be an expert on what constitutes 3PVRO activity to conclude that voter-registration methods are not substitutes for each other. Tr. 2005:6-10.

19

Finally, Defendants' assertion that "many" voters do not report their race is entirely unsubstantiated, as evidenced by Defendants' failure to back up this claim with a record or other citation. Opp.56. Defendants cannot rely on arguments they failed to advance—let alone substantiate—during trial.

Defendants conclude that the *Anderson-Burdick* analysis here is "easy" because "no burdens and weighty interests means that the three provisions withstand scrutiny." Opp.57. That take is wholly divorced from the record in this case. As articulated in Plaintiffs' closing, the burdens on voters, particularly Black and Hispanic voters of lower socioeconomic status, are significant, Br.116-119, and the corresponding interests are not sufficiently weighty to justify the burdens, *id.* at 127-133.

## V.      NAACP Plaintiffs should prevail on their Equal Protection claim.

Plaintiffs provided direct evidence of the Legislature's motivation to discriminate against noncitizens, and circumstantial evidence of the motivation to discriminate against Black and Hispanic voters. Nothing Defendants present in response undercuts finding in Plaintiffs' favor.[8]

---

[8] During their discussion of *Anderson-Burdick*, Defendants insert a misplaced reference to intentional discrimination. Opp.56-57. Plaintiffs do not argue that the legislature needed regression models and instead rely on Dr. Herron's analysis to show that SB 7050 has a discriminatory *impact*. Plaintiffs showed the legislature acted with discriminatory intent with other evidence. Br.120-132.

To avoid a determination of intentional discrimination, Defendants characterize the presumption of good faith as a get-out-of-jail-free card. Opp.62-64. But Defendants ignore that, "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision [] judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Plaintiffs challenge the 3PVRO Restrictions as a whole, and because the legislative record "is replete with statements" showing noncitizen prejudice was a main consideration in passing the law, the good faith presumption does not apply. *Harris v. McCrory*, 159 F.Supp.3d 600, 612 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285 (2017); Br.128-29.

Even affording the Legislature a good faith presumption, the record establishes intentional discrimination. Defendants claim Dr. Lichtman inferred bad faith without citing anything in the record to support this claim. *See* Opp.63. In reality, Dr. Lichtman looked for evidence that would demonstrate "the State had a different view" other than the racial ideology or immigrant threat narrative, but "didn't see it" and was not presented with any "exculpatory facts" that would have changed his analyses and conclusions. Tr. 1615:8-12. Defendants further criticize Dr. Lichtman for not crediting the Governor's appointment of Black and brown people to positions of power, Opp.63-64, but they fail to explain how the Governor's actions in contexts so far removed from the Legislature have any bearing on the

21

intentional discrimination analysis. *Cf. Common Cause Fla. v. Byrd*, No. 4:22-CV-109-AW-MAF, 2024 WL 1308119, at \*28 (N.D. Fla. Mar. 27, 2024) (holding legislative intent is not dependent on Governor being motivated by racial animus). Dr. Lichtman properly focused his analysis on the actions of officials in or connected to the legislature, the ideologies they share, and their impact on Black and brown communities. Tr. 1617:7-9.

As to Defendants' remaining arguments related to *Arlington Heights,* Plaintiffs won't rehash their prior briefing but will address some specific points Defendants raise. As already discussed, Defendants are simply wrong that Plaintiffs did not prove disparate impact. *See supra* Section IV. As for historical background, Defendants argue that actions by earlier and different legislatures are irrelevant by mischaracterizing the caselaw. Opp.65. While the court in *Greater Birmingham Ministries v. Secretary of State for Alabama* expressed skepticism that it could infer intent from legislator statements about *another* bill, 992 F.3d 1299, 1324 (11th Cir. 2021), Plaintiffs presented more evidence than that here. Br.120-132. *Greater Birmingham Ministries* also noted that the evidence presented there was unconnected to the law at issue, "weaken[ing]" the plaintiffs' position, 992 F.3d at 1324, but it never suggested that analyzing relevant, similar, or near-in-time laws *passed by the same legislature* carries no weight in the *Arlington Heights* analysis. Nor is that a reasonable inference about the decision: "Determining intent is a fact

22

intensive inquiry that does not lend itself to neat categorizations . . . [a]nd no single factor is dispositive—'[t]he inquiry is practical.'" *Common Cause*, 2024 WL 1308119, at *34 (Jordan, J., concurring) (quoting *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 n.24 (1979)). Defendants cite *Common Cause*, where the issue was whether the legislature "knowingly ratified the Governor's discriminatory purpose," *id.* at *29-30, but Plaintiffs do not bring a ratification theory; they describe executive-branch actions as part of their holistic analysis of "what is happening in the larger ecosystem." Br.121 (quoting Rep. Eskamani). Defendants also rely on the Eleventh Circuit's decision regarding SB 90 to argue that the history cannot demonstrate discriminatory intent, Opp.65, but Plaintiffs presented different evidence at trial and focused on more recent history because of that opinion. Br.28-41, 121-125. Defendants did not rebut any of that evidence at trial or in closing.

Defendants do not meaningfully respond to the procedural and substantive deviations Plaintiffs demonstrated. For example, although Supervisor Hays did "not really" find anything unusual about SB 7050's process, Tr. 1821:3, neither he nor any other witnesses refuted any of the Dr. Lichtman found irregularities. And Supervisor Hays was not privy to the behind-the-scenes conversations leading up to the bill's passage because he is not a sitting legislator. Br.42-43. Defendants also ask the Court to disregard Dr. Lichtman's characterization of the Citizenship Requirement as a substantive departure from the norm because 3PVROs can employ

noncitizens if noncitizens don't "perform a discrete and insular task." Opp.68. But Plaintiffs presented evidence that 3PVROs will stop hiring noncitizen canvassers altogether because of the Requirement. Br.69-71.

That only a few supporters of SB 7050 testified does not shield the Legislature from the intent inquiry. Otherwise, legislators' silence could effectively immunize laws from constitutional scrutiny. Defendants' arguments regarding the role of the Republican supermajority in the analysis is telling: "[A]s the party with complete legislative power, they didn't need to provide any statement on SB7050 or present any evidence to justify it." Opp.69. By Defendants' logic, Florida could reinstate racial segregation and not justify it on the record if it had sufficient votes to pass. But just as a "citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be," *Lucas v. Forty-Fourth Gen. Assembly of Colo.*, 377 U.S. 713, 736-37 (1964), a legislature cannot constitutionally pass a discriminatory law simply because of its supermajority.

Finally, Defendants argue that if the Court finds that the Legislature was motivated by race, Defendants have proven that SB 7050 "would have been enacted" anyway, *Fla. State Conf. of NAACP v. Lee*, 566 F.Supp.3d 1262, 1293 (N.D. Fla. 2021), pointing to the resign-to-run provision and the justifications about deterring bad actors. Opp.71-72. This is pure speculation. The actual evidence demonstrates

24

that the majority of the legislative sessions focused on the 3PVRO Restrictions at issue. Br.127-133.

Plaintiffs do not rely on any single factor but rather detail the discriminatory intent that can "be inferred from the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976). When viewed as a whole, the evidence demonstrates that the Legislature was motivated in part by discriminatory intent in enacting SB 7050.

## VI.     NAACP Plaintiffs should prevail on their vagueness and overbreadth claims.

Defendants attempt to heighten the vagueness standard to make it impossible to satisfy. But the "no core" language Defendants cite originated from a Supreme Court case evaluating a prohibition on "treat[ing] contemptuously the flag of the United States." *Smith v. Goguen*, 415 U.S. 566, 574-78 (1974). The Supreme Court held that the statute was unconstitutionally vague, even though some actions, such as burning the flag, would clearly violate the law. *Id.* at 582. Defendants' reliance on the "no core" language does nothing to undercut the legal framework this Court previously applied. ECF 101 at 38-50.

The Citizenship Requirement's term "handling" is impermissibly ambiguous, and Defendants' citations to the record to argue the contrary are misleading. Jared Nordlund testified on behalf of UnidosUS that he does not understand what "handling" means in the law. Tr. 90:10-91:20. Humberto Orjuela's testimony that he

turned in all completed voter-registration applications he "collected or handled" as a canvasser, Opp.73, does nothing to clarify the boundaries of the term "handling," and Supreme Court "holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015) (collecting cases). Defendants cast aside Supervisor Earley's testimony about the vagueness of the Citizenship Requirement because he "doesn't enforce the provision," Opp.73, but that ignores person of ordinary intelligence standard that governs the claim. *See* ECF 101 at 42. Indeed, if a supervisor of elections with 35 years of experience interpreting and applying election laws cannot understand the provision, Tr. 734:9-11, how can 3PVROs be expected to do so? And the "hypotheticals" Defendants treat dismissively are not rare or unlikely—these are situations that regularly arise in 3PVRO operations. Simply put, the trial record does not support a finding that the Citizenship Requirement is "surely valid in the vast majority of its intended applications." Opp.74 (quoting *United States v. Wayerski,* 624 F.3d 1342, 1349 (11th Cir. 2010)).

Defendants separately read nonexistent dividing lines and exceptions into the Information Retention Ban. For instance, Defendants argue that the Ban "applies to Esperanza Sanchez[] when she's collecting applications, though not when she's handling applications collected by others . . . before delivering the applications to

the relevant supervisor of elections." Opp.76. This purported (and nonsensical) boundary between permissible and criminal is in neither the plain text of the Ban nor the Secretary's Rule purporting to interpret the statute. *See supra* Section II.A. Defendants also argue that the Ban "doesn't protect a voter's name, address, telephone number, email address, party affiliation, or race." Opp.76. But those carve-outs are similarly nowhere in the text, and witnesses presented with the statutory language testified that they understood the "such as" language to mean the list of examples is not exhaustive. Tr. 751:21-23, 752:11-14 (Earley); Tr. 839:11-14 (Cox).

Defendants' arguments concerning Plaintiffs' overbreadth claim are similarly unconvincing. A federal district court decision issued last week is instructive here. The court considered whether a state law prohibiting multiple registrations was an appropriate prophylactic against double voting and found that the defendants "fail to draw a sufficient connection between maintaining multiple voter registrations and prohibiting double voting." *Mont. Pub. Interest Rsrch. Grp. v. Jacobsen*, No. CV-23-70-H-BMM, 2024 WL 1770674, at *10 (D. Mont. Apr. 24, 2024). Instead, the court found that the challenged provisions "tend to burden protected political activity through the imposition of felony criminal penalties, even when a registrant does not double vote or has no intention of double voting," and consequently found held plaintiffs were likely to succeed on the merits of their overbreadth claim. *Id*. Here, too, the Citizenship Requirement and Information Retention Ban "burden protected

27

political activity through the imposition of [] criminal [and civil] penalties, even when" noncitizen canvassers and 3PVROs have no intention of misusing voters' information. *See id*. Defendants have "fail[ed] to draw a sufficient connection between" these provisions and the already-illegal conduct the State seeks to prevent. *Id*. The Court should find in Plaintiffs' favor on their overbreadth claim.

## VII.    NAACP Plaintiffs should prevail on their Mail-In Ballot Request Restriction claim.

Defendants fault Plaintiffs for not looking to another Florida statute to avoid the preemption issues created by the Mail-In Ballot Request Restriction, Opp.79-80, while ignoring that this Court already rejected that argument. *See* ECF 251 at 20 (determining that Fla. Stat. §101.051(3)'s "plain language does not extend to requesting assistance in submitting a vote-by-mail request" and declining Defendant Byrd's invitation "to engage in rank judicial activism [by] add[ing] its own judicial gloss to this state statute to avoid the preemption issue"). The Court also noted it "lacks authority to harmonize conflicting state statutes or dictate how state actors ought to apply conflicting state statutes" and "agree[d] with Plaintiffs' argument that [other] provisions of Florida law cannot save the challenged provision from Plaintiffs' preemption claim." *Id*. at 22. Defendants offer nothing new to encourage a different result than this Court reached at the summary-judgment stage.

Defendants' other argument—that the Restriction does not limit "assistance" as the term is used in Section 208 by limiting who may "request" a mail-in ballot,

Opp.81—is absurd on its face. Helping someone request a mail-in ballot is a form of assistance, and the Restriction's plain text limits such assistance to only immediate family. This Court should find the Restriction preempted by the Voting Rights Act for the reasons discussed in Plaintiffs' closing. Br.133-136.

## VIII.     NAACP Plaintiffs have satisfied the other permanent injunction factors, and *Purcell* does not bar relief.

Defendants do not meaningfully address the other permanent injunction factors and abandon any corresponding arguments, *see Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014), suggesting only that "we are entering into the *Purcell* window," so this Court cannot grant immediate relief. Opp.81.

Nothing binds this Court on relief timing. *See Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *2 (11th Cir. Nov. 7, 2022) ("There is no clear guidance from the Supreme Court on this [*Purcell*] point."); *League of Women Voters v. Fla. Sec'y of State*, 32 F.4th 1363, 1369 n.1 (11th Cir. 2022) ("[A] stay-panel opinion" lacks "an effect outside that case"). Furthermore, "the primary reason for applying [*Purcell* is] risk of voter confusion." *Jacksonville NAACP*, 2022 WL 16754389, at *3. Nothing about injunctive relief here could confuse voters, as the challenged provisions regulate 3PVROs. Nor would an injunction disrupt election administration, as Supervisor Earley confirmed. Tr. 764:15-765:13.

Additionally, unlike in the SB 90 litigation, Defendants have been enjoined from enforcing the Citizenship Requirement and Information Retention Ban for nearly a year. Reversing that injunction now would create, rather than prevent, confusion. The record also shows that the Secretary has consistently waited over a year to impose 3PVRO fines, including for violations that occur just before federal elections, so enjoining the Fines Provision will not create confusion. *See* Br.39. And because the Mail-in Ballot Request Restriction conflicts with the Voting Rights Act, 52 U.S.C. §10508, enjoining enforcement neatly aligns with "the primary reason" for *Purcell*: protecting voters. *See Jacksonville NAACP*, 2022 WL 16754389, at *3.

*Purcell* presents no obstacle to injunctive relief here.

## LOCAL RULE 7.1(F) CERTIFICATION

The undersigned certifies that this reply contains 6,966 words, excluding the case style and certifications.

Dated: May 3, 2024

*/s/ Abha Khanna*
Abha Khanna*
Makeba Rutahindurwa*
**ELIAS LAW GROUP, LLP**
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
akhanna@elias.law
mrutahindurwa@elias.law

Respectfully submitted,

Frederick S. Wermuth
Florida Bar No. 0184111
**KING, BLACKWELL, ZEHNDER &**
**WERMUTH, P.A.**
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

30

Melinda Johnson*
Renata O'Donnell*
**ELIAS LAW GROUP, LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
mjohnson@elias.law
rodonnell@elias.law

*Admitted pro hac vice*

*Counsel for Plaintiffs Florida State Conference of Branches of Youth Units of the NAACP, Voters of Tomorrow Action, Inc., Disability Rights Florida, Alianza for Progress, Alianza Center, UnidosUS, Florida Alliance for Retired Americans, Santiago Mayer Artasanchez, Esperanza Sánchez, and Humberto Orjuela Prieto*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of May, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 018411

31