# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**FLORIDA STATE CONFERENCE
OF BRANCHES AND YOUTH UNITS
OF THE NAACP, et al.,**

      *Plaintiffs*,

**v.**                         **Case Nos.: 4:23cv215-MW/MAF**
                                          **4:23cv216-MW/MAF**

**CORD BYRD, in his official capacity
as Florida Secretary of State, et al.,**

      *Defendants*.

_____/

## FINAL ORDER ON MERITS

This Order follows a seven-day bench trial in April 2024 in these consolidated cases. Plaintiffs include third-party voter registration organizations (3PVROs) and individuals who challenge several amendments to Florida law pursuant to an omnibus bill known as SB 7050. By separate Order, this Court granted relief on the merits and entered judgment in a related case, 4:23cv218, which was consolidated with these cases for trial. In Case No.: 4:23cv218, the Plaintiffs presented narrower claims addressing a single provision. In the cases still pending before this Court, Plaintiffs present overlapping claims, along with additional challenges to other provisions and several different theories of relief.

To summarize, Plaintiffs in Case No.: 4:23cv215 include the Florida State Conference of Branches and Youth Unites of the NAACP (Florida NAACP), Voters of Tomorrow Action, Inc. (VOT), Disability Rights Florida (DRF), Alianza for Progress, Alianza Center, UnidosUS, Florida Alliance for Retired Americans (FLARA), Humberto Orjuela Prieto,[1] Esperanza Sánchez, and Santiago Mayer.[2] These Plaintiffs challenge § 97.0575(1)(f), Florida Statutes (2023), which requires 3PVROs to affirm that people collecting voter registration applications on their behalf are citizens of the United States and makes 3PVROs liable for a $50,000 fine for each noncitizen who collects or handles voter registration applications on their behalf in violation of this provision. They also challenge the newly shortened deadline for 3PVROs to return completed voter registration applications and fines for late returns and for applications returned to the wrong county Supervisor of Elections, §§ 97.0575(5)(a)1.–3., Fla. Stat., and the restriction on copying a voter's completed voter registration application or retaining the voter's personal information, § 97.0575(7), Fla. Stat. They also challenge the new restriction on how voters can request vote-by-mail ballots, § 101.62(1)(a), Fla. Stat.

---

[1] Humberto Orjuela Prieto has been referred to as various combinations of names in the record and in Orders by this Court—e.g., Mr. Orjuelo Prieto, Mr. Prieto, Mr. Orjuela, etc. Lest there be any confusion and given counsel's repeated reference to him as "Mr. Orjuela" in the trial transcript, this Court refers to him as such throughout this Order.

[2] For ease of reference, this Court refers to these Plaintiffs, collectively, as the NAACP Plaintiffs.

Plaintiffs in Case No.: 4:23cv216 include the League of Women Voters of Florida, Inc., and the League of Women Voters of Florida Education Fund, Inc.[3] They also challenge the citizenship provision, the new voter registration return deadline and associated fines, and the information retention ban. In addition, they challenge Florida's new receipt requirement, § 97.0575(4), Fla. Stat., which requires 3PVROs to provide voters with a receipt upon accepting possession of their applications. Below, this Court addresses each case in turn.

## I

This Court begins with the claims at issue in Case No.: 4:23cv216. But before this Court addresses the League Plaintiffs' claims, it must ensure that these Plaintiffs have standing to challenge each of the provisions. *See CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006) (emphasizing that courts have an "independent obligation . . . to ensure a case or controversy exists as to each challenged provision"). The standing requirement is satisfied as long as a single plaintiff has standing. *Rumsfeld v. FAIR*, 547 U.S. 47, 53 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."). But in applying that principle, this Court must evaluate each consolidated case separately. *See Hall v. Hall*, 138 S. Ct. 1118, 1127–29 (2018)

---

[3] For ease of reference, this Court refers to these Plaintiffs, collectively, as the League Plaintiffs.

("[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." (quoting *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97 (1933))).

The Supreme Court has long held that an actual controversy exists when the parties have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." *Baker v. Carr*, 369 U.S. 186, 204 (1962). Over time, the Supreme Court has developed a three-part test for determining when such adverseness exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

For the individual Plaintiffs, this inquiry is straightforward. But for the organizational Plaintiffs, the issue is more complex. The organizational Plaintiffs proceed under two theories—namely, organizational standing and associational standing. Organizational standing allows an organization to assert claims based on injuries to the organization itself. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) ("An organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes." (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))).

On the other hand, associational standing allows an organization to sue on its members' behalf "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) (*GBM*). To establish associational standing, Plaintiffs must "make specific allegations establishing that at least one identified member has suffered or will suffer harm." *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203 (11th Cir. 2018) (cleaned up).

With these principles in mind, this Court first considers whether at least one League Plaintiff[4] has standing to challenge the above-listed provisions.

A

The League Plaintiffs' theory of standing for each of their claims is primarily based on their decision to switch from paper voter registration to online registration to avoid having to comply with the challenged provisions. Without question, the League Plaintiffs have diverted resources to make this switch, and it has resulted in a less efficient method of registering voters. The problem for Plaintiffs is that they

---

[4] These Plaintiffs presented the testimony of only two witnesses at the bench trial—Cecile Scoon and Dr. Monica Elliott.

try to blame all the challenged provisions for "compelling" them to switch to online registration. But the evidence does not bear this out.

i

With respect to the receipt requirement, Ms. Scoon's testimony demonstrates that it is only possible—not even probable—that Plaintiffs would have switched to online registration to avoid compliance with this particular provision. ECF No. 289 at 192–93. But at trial, it is Plaintiffs' burden to demonstrate, by the preponderance of the evidence, that they have been injured by each of the challenged provisions. Testimony about the "possibility" of an alleged chill does not meet this burden. Moreover, this mere "possibility" is premised on members' subjective and speculative fears regarding harassment and potential criminal penalties based on some hypothetical targeted investigation. But vague references to members' subjective and speculative fears, and anecdotal incidents involving harassment from third parties who were not attempting to register to vote for the purposes of harassing volunteers, fails to demonstrate that any member is chilled from conducting paper voter registration due to a *reasonable* fear associated with the receipt provision's enforcement. *See, e.g.*, ECF No. 289 at 178–81, 296–97. In short, Plaintiffs' evidence does not demonstrate that they have associational standing to challenge the receipt requirement.

Likewise, Plaintiffs have failed to demonstrate a cognizable injury under a diversion-of-resources theory of organizational standing based on the hypothetical cost of purchasing customized receipt notebooks and the additional time that Plaintiffs say they would spend training volunteers to comply with this provision and filling out the receipts for voters during registration drives. Instead, their evidence depends on a hypothetical diversion of resources that is both speculative and self-inflicted. *See City of South Miami v. Gov.*, 65 F.4th 631, 639 (11th Cir. 2023) ("Although an organization can establish standing under a diversion-of-resources theory, it cannot do so by inflicting harm on itself to address its members' 'fears of hypothetical future harm that is not certainly impending.' ").

The receipt requirement does not necessitate Plaintiffs' purchase of materials that provide a duplicate of each receipt for the organization's own peace of mind. Plaintiffs' decision to pursue this additional cost (*if* the provision is not enjoined and *if* they choose to restart paper registration efforts) is self-inflicted. Next, Plaintiffs' evidence demonstrates that their pause on paper registration efforts is more likely based on fears of incurring enormous fines under a different provision at issue in this case, explained in more detail below, and that they would not otherwise restart paper registration efforts if only the receipt requirement were enjoined. Accordingly, Plaintiffs have not demonstrated that any diversion of time to train volunteers or fill out receipts is imminent.

7

In sum, Plaintiffs' evidence falls short of demonstrating that they have standing to challenge the receipt requirement, and thus, their claims challenging this provision are due to be dismissed.

ii

As for the voter information retention ban, the League Plaintiffs' evidence also falls short of establishing standing to pursue their claims challenging this provision. The voter information retention ban makes it a third degree felony for "a person collecting voter registration applications on behalf of a [3PVRO]" to "cop[y] a voter's application or retain[] a voter's personal information . . . for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section[.]" § 97. 0575(7), Fla. Stat. As Defendants point out, the League Plaintiffs' evidence does not demonstrate that anyone who collects or handles voter registration applications on the League Plaintiffs' behalf ever has or ever will copy or retain a voter's application or personal information in violation of this provision, and thus, the League Plaintiffs have not demonstrated that they face a cognizable or imminent injury traceable to any Defendant's enforcement of this criminal prohibition. *See* ECF No. 311 at 84. Rather, Plaintiffs' evidence demonstrates that League members sometimes solicit information from the public with a yellow pad left out for individuals to provide their name and contact information and any issues they may be interested in. *See*

8

ECF No. 289 at 196. They apparently do not limit this solicitation only to voters—instead, this appears to be part of the League's "no-questions-asked" method of recruiting members and volunteers. *Id.*; *see also id.* at 224. But Plaintiffs contend that this collection of voter information arguably falls within the plain text of the challenged provision. Not so.

Plaintiffs cannot generate standing by twisting themselves into a pretzel to force their intended activities within the reach of the information retention ban. They still must demonstrate that their course of conduct is arguably proscribed by the challenged provision. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162–63 (2014). But here, Plaintiffs proceed under a strained reading of the provision to argue that soliciting contact information from the public on a designated pad of paper—separate and apart from collecting, copying, or retaining voter information lifted from a voter's registration application—is now arguably a felony under Florida law.

Although this Court has already enumerated its concerns regarding the information retention ban's lack of clarity in a related preliminary injunction, *see* ECF No. 101 in Case No.: 4:23cv215, this Court's concerns had nothing to do with whether the statute prohibits collecting voter information when a voter volunteers their contact information outside of the registration context. Plaintiffs' overbroad construction of this provision completely ignores the context of the statute and the other provisions within section 97.0575 that specifically target voter registration and

registration applications. *See, e.g.*, §§ 97.0575(3) (requiring the Division of Elections or Supervisors of Elections to make voter registration forms available to 3PVROs), 97.0575(5)(a) (noting that 3PVROs that collect applications serve as fiduciaries to the applicants and must ensure prompt delivery of the applications to the division of elections or supervisors of elections), 97.0575(6) (criminalizing the alteration of a voter registration application without the voter's knowledge and consent), 97.0575(11) (prohibiting 3PVROs from mailing or otherwise providing pre-filled voter registration applications). Given this context, any reasonable reading of section 97.0575(7) would only reach copying voter registration applications or retaining information from voter registration applications—something that no League member or volunteer is known to have done or will ever do. Simply put, the League Plaintiffs have offered no evidence to demonstrate that their course of conduct—collecting contact information from members of the public who voluntarily provide that information on a pad of paper—is arguably proscribed by the information retention ban.

Naturally, any asserted diversion of resources to respond to this provision, notwithstanding the fact that the League's members have never done what's proscribed nor intend to do so in the future, amounts to a self-inflicted injury that cannot support Plaintiffs' standing to challenge this provision. Accordingly, the

League Plaintiffs' claims challenging the information retention ban are also due to be dismissed.

iii

Next, this Court considers the League Plaintiffs' standing to challenge the citizenship requirement. The League Plaintiffs apparently concede that they do not have associational standing to challenge this provision given their failure to identify a noncitizen member who is now prohibited from collecting voter registration applications on their behalf. ECF No. 317 at 12–13. Instead, they claim to have organizational standing because the citizenship requirement will reduce the League Plaintiffs' existing volunteer force and its ability to recruit new members and because they have had to divert resources to respond to the provision. *Id.* at 13.

With respect to the League Plaintiffs' volunteer force and ability to recruit new members, the concern does not appear to be the fact that so many members are, in fact, noncitizens and would not be able to participate in voter registration efforts moving forward. Instead, Plaintiffs' evidence demonstrates that, given the organizations' inclusive values, so many members or future volunteers will be offended if asked whether they are citizens that they will not participate in voter registration, thus decreasing the number of newly registered voters. *See, e.g.*, ECF No. 289 at 219 ("We feel that there would be quite a few members who would absolutely object to asking that question. They would not ask the question, and they

11

would not want to answer it."), 220 ("And the whole idea of citizenship, 'Do you belong here?' is like a trigger."), 223 ("[W]e'd have massive debates over this . . . Is there a way to do it that doesn't – creates less offense?"), 226 ("If you start making people feel bad about that process and feel less than and feel like they are taking in racism and nationalism and whatever 'isms' that we're trying to fight against, people are going to withdraw, and they're not going to be present to do the work."). But Plaintiffs identify no authority that supports the notion that an organization can demonstrate standing based on the perceived insult that compliance with a state statute may inflict upon an organization or its hyper-sensitive membership. This theory of organizational standing has no legs. *See In re Navy Chaplaincy*, 534 F.3d 756, 763 (D.C. Cir. 2008) (Kavanaugh, J.) ("As the Supreme Court has often stated, mere personal offense to government action does not give rise to standing.").

As for Plaintiffs' asserted diversion of resources, the evidence again shows that this injury is self-inflicted and largely speculative. Much of the time the League Plaintiffs have diverted to debating over how to respond to the citizenship requirement appears to be tied to managing the League Plaintiffs' membership's feelings and mitigating any offense taken by inquiring into citizenship status. *See* ECF No. 289 at 223. Likewise, Plaintiffs estimate that they may someday have to spend thousands of dollars printing and distributing declarations for each voter registration volunteer to affirm their citizenship, if the League Plaintiffs ever restart

paper registration and decide to ask about citizenship. *Id*. at 223–24. But these declarations are not required by statute—instead they offer a possible defense if a 3PVRO is fined for violating the citizenship requirement. *See* Fla. Admin. Code R. 1S-2.042(6)(e) (2023).[5] Moreover, Plaintiffs' evidence does not demonstrate, by a preponderance of the evidence, that an order enjoining enforcement of the citizenship requirement would lead Plaintiffs to restart their paper registration efforts. Instead, Ms. Scoon's testimony on this point left substantial room for doubt that Plaintiffs would even need to divert resources to address the citizenship requirement while other provisions—namely, the increased fines and shortened return deadline—are to blame for chilling the League Plaintiffs' paper voter registration efforts. *See* ECF No. 289 at 233; *see also id*. at 154–55, 210–11, 215–16. Accordingly, this Court finds that the League Plaintiffs have not met their burden to demonstrate standing to challenge the citizenship requirement.

iv

Lastly, the League Plaintiffs challenge new provisions that shorten the timeframe for 3PVROs to return voter registration applications to the Division of Elections or the appropriate Supervisor of Elections, and fines associated with late

---

[5] To be clear, section 97.0575(1)(e) requires 3PVROs to submit a single affirmation stating that each person collecting or handling voter registration applications on their behalf is a citizen of the United States and has not been convicted of certain felony offenses. Contrary to Dr. Elliott's testimony, ECF No. 289 at 302, this provision does not require every member or volunteer who collects or handles voter registration applications to also submit such an affirmation to the Division of Elections.

or erroneous returns. The evidence at trial demonstrates that the League of Women Voters of Florida Education Fund, Inc. (the League)—the entity that engages in voter registration activity, *see* ECF No. 289 at 144–45—has suffered and will continue to suffer an injury in fact based on the Defendants' threatened enforcement of the new deadline and associated fines.

The League's evidence shows that the shortened deadline would require the League to overhaul its voter registration operations to avoid crippling fines if it were to continue conducting paper voter registration drives. For example, Ms. Scoon testified that the League would have to retrain voter registration volunteers to ensure applications are turned in by the shortened deadline, avoid registering out-of-county voters, and make additional trips to Supervisors of Elections offices to hand deliver applications before the deadline. *See* ECF No. 289 at 206–10. All of these changes— particularly the shortened time frame for returns and the switch to making more frequent deliveries to Supervisors of Elections offices—will likely eat away at members' time in the field registering voters, resulting in registering fewer voters. *Id*. at 210. In short, the League of Women Voters of Florida Education Fund, Inc., has demonstrated a cognizable injury—including the cost of compliance and a reasonable chill on paper voter registration drives—that is traceable to the Secretary of State's and Attorney General's enforcement authority under sections

97.0575(5)(a) and 97.0575(8), and 97.0575(9). Accordingly, this Court now turns to the merits of the League's challenge to section 97.057(5)(a)1.–3., Fla. Stat. (2023).

B

The League challenges the new 10-day return deadline and associated fines under several theories—none of which merits the requested relief. To be clear, the challenged provisions shorten the deadline for 3PVROs to return completed voter registration applications to the Division of Elections or the county Supervisors of Elections from fourteen to ten days. § 97.0575(5)(a), Fla. Stat. For each day an application is late, the 3PVRO is liable for $50, up to $2,500. *Id*. § 97.0575(a)1. If the 3PVRO willfully returns the application in late, the fine jumps from $50 to $2,500. *Id*. If the application is collected before book closing but received after book closing, the 3PVRO is liable for $100 for each day late, up to $5,000. *Id*. § 97.0575(a)2. If the 3PVRO willfully returns the application in late after book closing, the fine increases to $5,000. *Id*. And the 3PVRO is now liable for $500 for each application that is not submitted to the Division of Elections or the Supervisor of Elections in the county where the applicant resides. *Id*. § 97.0575(a)3. Willful violations of this provisions are subject to a $5,000 fine. *Id*. Finally, the provision caps the total aggregate fine applicable to any 3PVRO at $250,000 per calendar year. *Id*.

15

First, the League contends the new deadline and fines violate the League's First Amendment rights to free speech, expressive conduct, and association. *See* ECF No. 111 in Case No.: 4:23cv216-MW (First Amended Complaint). The League likens voter registration activity to the circulation of initiative petitions and argues the new deadline and fines exact a severe burden on the League's protected political speech, which violates the First Amendment for the same reasons discussed in *Meyer v. Grant*, 486 U.S. 414 (1988). *See* ECF No. 301 at 59. But assuming *arguendo* that the League's voter registration activities constitute expressive conduct akin to the core political speech involved in the collection of signed petitions à la *Meyer*, the League has not demonstrated that the shortened deadline and increased fines for untimely, unreturned, or erroneously returned voter registration applications exacts a severe burden on the League's expressive conduct—canvassing to register voters—that would subject the challenged provisions to exacting scrutiny in this case. *See, e.g.*, *Fla. Decides Healthcare, Inc. v. Byrd*, --- F. Supp. 3d ---, 2025 WL 1581267, at *7–8 (N.D. Fla. 2025) (rejecting similar challenge at preliminary injunction stage in context of citizen initiative petitions); *see also League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1321–22 (S.D. Fla. 2008).

Next, just because the League asserts the deadline and fines are content- and viewpoint-based doesn't make it so. *See* ECF No. 301 at 68–69. The League's paragraph of cherrypicked case quotations offers little in the way of support or

explanation for this argument. Taken to its logical conclusion, the League's proposed rule would subject *any* regulation that incidentally impacts 3PVRO speech or expressive conduct to heightened scrutiny, since such regulations would "apply only to those engaged in voter registration drives" who "seek[] to encourage political participation, not to discourage it." *Id*. But that is not the law. *See, e.g.*, *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1159 (N.D. Fla. 2012) (Hinkle, J.) ("Every court that has addressed a constitutional challenge to provisions regulation voter-registration drives has concluded that the governing standards are those set out in *Anderson v. Celebrezze*, 460 U.S. 780, 788–90 (1983)."); *Browning*, 575 F. Supp. 2d at 1323 ("All third-party organizations collecting voter registration applications are subject to the same regulations regarding the handling of voter registration applications. Such content neutral election regulations are generally deemed to be significantly less constitutionally onerous tha[n] the facially discriminatory statute addressed in *LWVF I*."); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1331 n.21 (S.D. Fla. 2006) (rejecting argument that exacting scrutiny applied to 3PVRO regulation and applying *Anderson-Burdick* balancing test instead).

More to the point, the fines apply only if applications are turned in late, to the wrong Supervisor of Elections, or not at all—not based on content or viewpoint outside of the categorical application to 3PVRO registration. This would be an

entirely different situation if fines were assessed against 3PVROs for every new voter registered with a particular party affiliation. But that is not this case. In short, this Court rejects the League's argument that exacting or strict scrutiny applies because the challenged provision poses a severe burden or is content- or viewpoint-based.

This Court is left with the *Anderson-Burdick* balancing test—namely, weighing the severity of the burden on the League's First Amendment rights against the State's asserted interests. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (summarizing balancing test). If the new deadline and increased fines impose only modest burdens on the League's rights, then State's important regulatory interests generally suffice to justify reasonable, nondiscriminatory restrictions on election procedures. *Id*. ("Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." (cleaned up)).

Here, although the State has drastically increased the cap on potential fines for late, unreturned, or erroneously returned applications, the evidence in this record demonstrates that the new deadline that triggers these fines poses only a modest burden on the League. In fact, Ms. Scoon testified that regardless of what the deadline has been—ten or fourteen days—"the League has barely ever missed the

deadline for turning in applications."[6] *See* ECF No. 289 at 206 ("A. That's correct."). Certainly, the risk of incurring any increased fine may reasonably chill voter registration activities, particularly while the 3PVRO works out how best to move forward and update internal procedures to comply with the new deadline. But a temporary pause in registration activity and the costs associated with retooling your operation to comply with a return deadline that was previously the law of the land, and with which you admittedly barely ever violated, is not the sort of burden warranting heightened scrutiny. Likewise, the evidence demonstrates that this modest burden on the League's First Amendment rights is justified by the State's weighty interests in ensuring voter registration applications are turned in on time, either directly to the Division of Elections or to the correct Supervisor of Elections office. *See, e.g.*, ECF No. 311 at 46–47, 49. In short, the League has not met its burden to establish that sections 97.0575(5)(a)1.–3. unduly burden the League's First Amendment rights.

The League also challenges the fines provisions as unconstitutionally vague on their face in violation of the Fourteenth Amendment's Due Process Clause. The League asserts the increased fines for "willful" violations do not provide fair notice of what conduct is prohibited and whether the maximum fine will be imposed along

---

[6] The deadline to return voter registration applications was ten days for several years before it was decreased to 48 hours, then increased to ten days, *see Browning*, 863 F. Supp. 2d at 1168, then increased to fourteen days, before it was returned to ten days in 2023.

with the lower fine for non-willful violations. The League offers a slew of hypotheticals to demonstrate why the "willful" violation provisions do not provide sufficient notice of the prohibited conduct, but "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *United States v. Wayerski*, 624 F.3d 1342, 1349 (11th Cir 2010) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)). And here, a person of ordinary intelligence would understand the fines provision to penalize 3PVROs in the event applications are turned in late, and to subject 3PVROs to an even higher fine if the late return is "willful." Although the term "willful" is undefined, the ordinary meaning of the term requires an additional element of intentional or deliberate conduct. *See DeSantis v. Dream Defenders*, 389 So.3d 413, 424 n.11 (Fla. 2024) (describing various definitions of adverbial form of the term willful). This makes sense—intentional violations are punishable by higher fines than unintentional violations.

This Court is not persuaded that the League has met its burden to demonstrate the "willful" violations provisions under section 97.0575(5)(a) are facially unconstitutional in violation of the Fourteenth Amendment. Nor has the League presented any evidence that would support an as-applied vagueness claim. This claim is due to be dismissed as well.

In sum, the League Plaintiffs' claims challenging the receipt requirement, the information retention ban, and the citizenship requirement are **DISMISSED without prejudice for lack of standing**. The League's First and Fourteenth Amendment challenges to the shortened return deadline and fines provisions are **DISMISSED with prejudice** as the League has failed to meet its burden to demonstrate a constitutional violation with respect to these provisions. In short, judgment is due in favor of Defendants on all counts in Case No.: 4:23cv216.

Next this Court turns to the NAACP Plaintiffs' claims in Case No.: 4:23cv215, starting with whether these Plaintiffs have standing.

## II

The NAACP Plaintiffs challenge the voter information retention ban, the citizenship requirement, the shortened deadline and associated fines, and the mail-in ballot request restriction. This Court will address each Plaintiff's standing to challenge each provision in turn, starting with the NAACP Plaintiffs' standing to challenge the voter information retention ban.

### A

#### i

Plaintiffs UnidosUS, Alianza Center, Alianza for Progress, VOT, Florida NAACP, and DRF challenge the voter information retention ban. First, this Court

addresses those Plaintiffs who have failed to demonstrate standing with respect to this provision.

Starting with the Alianza Plaintiffs, the only testimony concerning either Plaintiff's standing came from Marcos Vilar, the executive director of both Alianza Plaintiffs. ECF No. 287 at 265. Mr. Vilar testified that Alianza Center—a registered 3PVRO—"may have" scanned completed voter registration applications in the past for quality control purposes, but now it is not clear to Mr. Vilar what kinds of voter information Alianza and its employees may permissibly retain going forward. ECF No. 288 at 28. But Mr. Vilar's testimony about what may have happened in the past—absent any evidence demonstrating that any Alianza canvasser is likely to copy or retain any voter information in the future—falls short of demonstrating, by a preponderance of the evidence, that these Plaintiffs face an imminent cognizable injury in fact necessary to challenge the voter information retention ban. Accordingly, neither Alianza Plaintiff has demonstrated an injury in fact for purposes of challenging this provision and these claims are due to be dismissed.

The same is true with respect to VOT's standing to challenge the voter information retention ban. The only testimony concerning VOT's standing came from Santiago Mayer, the organization's executive director. ECF No. 288 at 268. According to Mr. Mayer, VOT is not a registered 3PVRO and instead sends members to register voters in Florida on behalf of other 3PVROs. *Id*. at 288. After

registering voters, VOT's members ask those voters if they would like a text message reminding them about election day or providing polling place information. If so, they collect voters' phone numbers to send the requested follow-up texts. *Id*. at 283. VOT also obtains voters' contact information from the voter file. *Id*. at 287. But Mr. Mayer offered no evidence demonstrating that VOT members have copied or are likely to copy any information from voter registration applications. Instead, his testimony focused on the importance of voter registration drives as forums for generating enthusiasm and new membership from "people on campus who come to [VOT] and ask [them] what [they] are doing and how they can get involved, and many times they will become [VOT's] volunteers." *Id*. at 288. Similar to the League Plaintiffs' challenge to this provision, VOT's evidence fails to demonstrate a cognizable injury in fact. Neither signing voters up for "chaser texts" nor obtaining voters' information from the voter file falls within the scope of the voter information retention ban, which prohibits copying voter registration applications or retaining information from voter registration applications. VOT's claims challenging the voter information retention ban are due to be dismissed for lack of standing.

Likewise, DRF's evidence falls short of demonstrating, by a preponderance of the evidence, that the organization has standing to challenge the voter information retention ban. DRF presented the testimony of Olivia Babis Keller, DRF's senior public policy analyst, at trial. ECF No. 289 at 247. Ms. Keller testified that DRF has

been a registered 3PVRO, and in that capacity, DRF has registered one voter. *Id*. at 250. However, DRF is currently not planning to register voters for several reasons, including the limited number of people trained to do voter registration work (two people, including Ms. Keller) and, notably, DRF's "uncertainty regarding [its] 3PVRO status and [its 3PVRO] number." *Id*. at 268. Unlike the other witnesses for registered 3PVRO Plaintiffs, Ms. Keller testified that DRF was unsure if it was still a registered 3PVRO under Florida law, and her testimony indicated an unfamiliarity with the process of registration that gives this Court pause. *Id*. at 248 ("[I]t was not clear whether our 3PVRO number stays the same. Are we assigned a new one? Is this something that changes every time we have to renew? So – we don't want to put the wrong number on our forms, so we are looking for clarification for that, and we need to do some updates with our agents as well.").

Notwithstanding DRF's uncertainty regarding the meaning of the voter information retention ban, DRF does not appear to face an imminent injury based on this provision as any asserted chill in registration efforts appears to be traceable to other sources—including DRF's uncertainty regarding its status as a registered 3PVRO. Given this record, this Court is not persuaded that DRF has met its burden to demonstrate an imminent, cognizable injury that is traceable to any Defendant's

24

enforcement of the voter information retention ban.[7] Accordingly, DRF's claims challenging this provision are also due to be dismissed.

This leaves UnidosUS and the Florida NAACP. These Plaintiffs each presented evidence that their organizations copy all or part of completed voter registration applications at some point in their process. For example, UnidosUS presented testimony from Jared Nordlund, the organization's Florida state advocacy director, ECF No. 286 at 20, who testified that once a completed voter registration is collected, it is provided to UnidosUS's quality control employee who scans completed applications into the 3PVRO's computer system as part of UnidosUS's internal quality control process. *Id*. at 31–34. Likewise, the Florida NAACP presented testimony from Cynthia Slater, the organization's civic engagement chair and president of the Daytona Beach branch. ECF No. 289 at 96. Ms. Slater testified that the Florida NAACP is a registered 3PVRO, *id*. at 99, and that each branch has a system of retaining voter contact information from collected applications, *id*. at 126. However, Ms. Slater also testified that no volunteers who collect completed applications on behalf of the Florida NAACP are personally copying or retaining voter information. *Id*. at 129.

---

[7] Likewise, DRF has failed to demonstrate that any canvasser has ever or will ever copy or retain a voter's information from a voter registration application, as opposed to someone else within DRF who is working on building the accessible Get Out the Vote platform. *See, e.g.*, ECF No. 289 at 273–74. As explained, *infra*, this Court agrees with Defendants' reasonable reading of the statute to the limited extent that it only prohibits canvassers from copying or retaining information.

As the Secretary points out in his written closing argument, the challenged provision only reaches conduct by individuals "collecting voter registration applications on behalf of a third-party voter registration organization," § 97.0575(7), Fla. Stat., not folks farther up the chain of custody who are reviewing completed applications prior to submission to the Supervisors of Elections or Division of Elections. *See* ECF No. 311 at 34. Plaintiffs contend the statute applies more broadly, citing this Court's preliminary injunction, ECF No. 101, and a portion of the implementing regulation, Fla. Admin. Code R. 1S-2.042(5)(g). But this Court concludes that Defendants have the better of the argument.

This Court's prior Order is not definitive evidence that a statute applies to Plaintiffs' purported conduct. Indeed, at the preliminary-injunction stage, Defendants never presented this argument regarding the scope of the voter information retention ban's reach. Having considered the arguments and a full presentation of the evidence, this Court agrees with Defendants that the challenged provision only targets canvassers who copy applications or retain certain information from them for felony prosecution. Moreover, a portion of the rule that Plaintiffs fail to cite mirrors this language focusing on individuals collecting voter registration applications. *See* Fla. Admin. Code R. 1S-2.042(5)(f). But here, Plaintiffs have offered no evidence demonstrating that any of their canvassers are likely to copy or retain voters' information from their voter registration applications and thus subject

to an imminent threat of enforcement. In short, no Plaintiff has demonstrated that they have standing to challenge the voter information retention ban. Their claims challenging this provision are due to be dismissed and this Court's preliminary injunction is due to be vacated in part based on this conclusion.

ii

Next, this Court considers the Florida NAACP Plaintiffs' standing to challenge the new deadline and fines provisions. Plaintiffs UnidosUS, Alianza Center, Alianza for Progress, VOT, Florida NAACP, and DRF challenge the new deadline and associated fines. This Court begins with those Plaintiffs who have not met their burden to demonstrate standing to challenge these provisions, starting with VOT.

Mr. Mayer's testimony on behalf of VOT demonstrates that the organization faces only speculative harm based on the new deadline and associated fines provisions. VOT is not a registered 3PVRO—instead, in March and April of 2023, VOT began "actively researching what steps [it] would need to take to become a 3PVRO," ECF No. 288 at 274, but VOT members "learned of SB 7050, which brought all those efforts to a complete stop," *id*. Mr. Mayer testified that "the potential fines . . . really sort of chilled [VOT] from continuing towards becoming a 3PVRO," *id*. at 275, only because VOT is "a smaller organization" which does not "have a budget big enough to cover some of the potential fines," *id*. However, Mr.

27

Mayer offered no testimony demonstrating that, had VOT moved forward with registration, it was likely that VOT would incur any fines for late or erroneously returned voter registration applications. Instead, the asserted chill is based entirely on the hypothetical and speculative fear of being fined for turning in late applications or for returning them to the wrong Supervisors of Elections offices. Such speculative harm does not give rise to a concrete injury in fact, and thus, VOT has not met its burden to demonstrate standing to challenge the new deadline and associated fines provisions.

Likewise, UnidosUS failed to meet its burden to demonstrate that it faces an imminent injury in fact with respect to the deadline and fines provisions. Instead, UnidosUS's evidence demonstrates that since UnidosUS became a registered 3PVRO it has only ever been fined once for a late return of applications, which occurred five years before the trial in this case. ECF No. 286 at 62. UnidosUS offered no evidence concerning the impact the shortened deadline to return applications has on the organization. Instead, Mr. Nordlund's testimony on behalf of UnidosUS focused only on the hypothetical downstream cost of higher potential fines on the organization and its ability to register more voters. *Id*. at 107–08. Moreover, Mr. Nordlund also testified that UnidosUS now only mails completed applications to the Department of State, thus it never risks returning applications to the wrong Supervisor's office and incurring any associated fine for doing so. *Id*. at 59–60. In

short, UnidosUS introduced evidence demonstrating that it has almost never been fined for any 3PVRO violation in Florida since 2011 and it switched to mailing applications to the Secretary of State before SB 7050 was enacted. But there is no evidence demonstrating that it is more likely than not that UnidosUS will return applications in late or incur any future fines under the challenged provisions. Thus, the impact that potential future fines has on UnidosUS's ability to register more voters is a purely hypothetical and speculative harm. UnidosUS has not met its burden to demonstrate standing to challenge the deadline and fines provisions.

The same is true with respect to the Florida NAACP. Although Ms. Slater's testimony on behalf of the Florida NAACP demonstrated that the organization was "concerned" about the new deadline to return voter registration applications, ECF No. 289 at 111, it has switched to doing online voter registration because of SB 7050 more generally, *id*. at 116. Ms. Slater also testified that the Florida NAACP was once fined in 2016 for returning a few late applications. *Id*. at 119. But Ms. Slater offered no testimony concerning the Florida NAACP's ability to comply with the new deadline or the likelihood that it would face increased fines in the future as a result. In short, notwithstanding the single fine the Florida NAACP incurred seven years before trial, the Florida NAACP has not met its burden to demonstrate an imminent injury in fact based on the challenged deadline and associated fines provisions. Thus, the Florida NAACP lacks standing to challenge these provisions as well.

DRF has also failed to demonstrate a cognizable injury in fact that is traceable to Defendants' enforcement of the new deadline and fines provisions. For starters, as mentioned above, any asserted chill in registration efforts appears to be traceable to other sources—including DRF's uncertainty regarding its status as a registered 3PVRO. Moreover, Ms. Keller testified that DRF has never received any type of fines for its registration activities in the past, ECF No. 289 at 268, and she offered no testimony demonstrating that DRF is likely to turn in any applications late or to the wrong Supervisor's office in the future. At most, DRF's evidence demonstrates that DRF may have to divert resources to train members about the requirements of the deadline and fines provisions if it restarts its 3PVRO voter registration efforts. But, again, this is a hypothetical and speculative harm and fails to constitute a cognizable injury in fact. DRF's claims challenging the deadline and fines provisions are also due to be dismissed for lack of standing.

Finally, this Court considers the Alianza Plaintiffs' standing to challenge the deadline and fines provisions. To start, although Mr. Vilar testified that Alianza for Progress is a registered 3PVRO, it has never conducted voter registration activities in Florida. ECF No. 288 at 44. Likewise, Mr. Vilar suggested that, based on how the organizations are funded, only Alianza Center will be doing voter registration work in Florida. ECF No. 287 at 281. Accordingly, inasmuch as Alianza for Progress is not likely to conduct any voter registration activities in Florida, it does not face an

imminent injury based on the threatened enforcement of the challenged deadline and fines provisions. Alianza for Progress's claims challenging these provisions are due to be dismissed for lack of standing.

As for Alianza Center, Plaintiff's evidence demonstrates that it was fined for a few late deliveries out of the 7,000 voters it registered during its first year conducting voter registration in Florida in 2022, but this was due to a new office in Hillsborough County where the staff "were struggling with the process with keeping everything, you know, up to date." ECF No. 287 at 305. However, Alianza Center "decided to close down the operations in Hillsborough County." *Id.* at 306. Accordingly, the closed operation in Hillsborough County will not endanger Alianza Center with respect to potential fines going forward.

Aside from registering Alianza Center's general disagreement with the need for a shorter return deadline, Mr. Vilar did not testify that Alianza Center would be unable to comply with the ten-day deadline without retooling its operations or that Alianza Center was otherwise diverting any resources to respond to the challenged provisions. Indeed, Mr. Vilar testified that Alianza Center would not change its operations to comply with the challenged provisions. *Id.* Instead, Alianza Center has decided to simply stop registering voters rather than risk increased fines. But, again, this testimony fails to demonstrate an imminent injury under the new deadline and fines provisions. Alianza Center has essentially chilled its registration work for fear

31

of incurring future fines—and, apparently, out of general disagreement with the challenged provisions—even though it has not demonstrated that it is likely to violate the new deadline, incur any fines in the future, or be forced to expend resources to comply with the challenged provisions. This record fails to demonstrate that Alianza Center is suffering or will suffer an imminent injury in fact traceable to any Defendant's enforcement of the deadline and fines provisions. Accordingly, Alianza Center has also not met its burden to demonstrate standing to challenge these provisions.

Having concluded that no Plaintiff has demonstrated standing to challenge the deadline and fines provisions, this Court turns to the Florida NAACP Plaintiffs' standing to challenge the mail-in ballot request provision.

iii

Plaintiffs UnidosUS, Alianza, DRF, and FLARA assert they have associational standing to challenge the mail-in ballot request restriction as preempted by Section 208 of the Voting Rights Act. ECF No. 304 at 94. This provision requires Supervisors of Elections to "accept a request for a vote-by-mail ballot only from a voter or, if directly instructed by the voter, a member of the voter's immediate family or the voter's legal guardian." § 101.62(1)(a), Fla. Stat. However, as explained below, no Plaintiff has met its burden to demonstrate that any member or constituent is likely to face an imminent, cognizable injury in fact.

For starters, neither Alianza Plaintiff introduced any evidence concerning the mail-in ballot request restriction. Accordingly, these Plaintiffs have not met their burden to demonstrate standing to challenge this provision.

As for UnidosUS, Mr. Nordlund testified that in the past, UnidosUS would assist voters with requesting a vote-by-mail ballot by providing the elections office hotline number to voters, emailing voters with more information, helping translate the written request form or instructions, or assisting with a three-way call with the Supervisor of Elections office. ECF No. 286 at 110–12. Ms. Sánchez, an individual Plaintiff and canvasser for UnidosUS, testified that she has personally never assisted a voter with the vote-by-mail process. *Id.* at 191. At most, UnidosUS's evidence demonstrates that UnidosUS's members have assisted voters with requesting a vote-by-mail ballot in the past, but that assistance is limited to translation, providing additional information, or connecting the voter with their Supervisor of Elections office. But even if such "assistance" could be construed as to run afoul of the restriction under section 101.62(1)(a), UnidosUS has offered no evidence demonstrating that any member has suffered an injury or will imminently suffer an injury going forward based on this restriction. Accordingly, UnidosUS has not met its burden to demonstrate standing to pursue its preemption claim.

The same is true for FLARA. At trial, FLARA relied on the testimony of William Sauers, the state president of FLARA. ECF No. 289 at 320. Mr. Sauers

testified that FLARA is a membership organization with roughly 191,000 members in the State of Florida, including him. *Id*. at 322. Mr. Sauers also testified that many of FLARA's members are elderly and disabled and have had to enlist help to request mail-in ballots in the past. *Id*. at 324–25, 328. Aside from his testimony concerning FLARA's members requesting mail-in ballots, generally, Mr. Sauers expressed his concerns about how the mail-in ballot request restriction "might" impact voters going forward and his disagreement with Florida's policy choice in this matter. *Id*. at 329–30. But this testimony fails to demonstrate, by a preponderance of the evidence, that any identifiable FLARA member is likely to suffer an imminent injury based on the mail-in ballot request restriction. Without evidence demonstrating that any member has been or will be injured by the challenged provision, FLARA cannot demonstrate associational standing to challenge this provision. Accordingly, FLARA's preemption claim is due to be dismissed for lack of standing.

Finally, DRF also challenges the mail-in ballot request restriction but falls short of demonstrating a cognizable injury in fact for associational standing. DRF relies on Ms. Keller's testimony, which described all the reasons why DRF's constituents may not have access to immediate family or legal guardians to assist them in requesting mail-in ballots. However, when it comes to actual members or constituents who are likely to face an imminent injury under this provision, this Court is left with only three potential options—Ms. Keller, herself, Ms. Keller's

34

childhood friend in Polk County, and Lara Minutello—DRF's other public policy analyst. ECF No. 289 at 277–78. But Ms. Keller is married, and her husband counts as "immediate family" under the challenged provision. *Id*. at 277. She is not restricted from requesting a mail-in ballot with the help of her husband and is therefore not likely to suffer an injury under the challenged provision. *See* § 101.62(1)(d)1., Fla. Stat. (defining "immediate family" to include the voter's spouse, among others). As for Ms. Keller's childhood friend in Polk County, there is no evidence demonstrating that this individual is a registered voter, and, even if she is, whether she plans to request a mail-in ballot in the future. Accordingly, any injury to her is merely speculative at this juncture. As for Ms. Minutello's plans to request a mail-in ballot, Ms. Keller testified that she has requested one in writing in the past, but Ms. Keller only "possibly" knows if she plans to request one in the future. ECF No. 289 at 278. In other words, it's anyone's guess if Ms. Minutello plans to request a mail-in ballot going forward, thus subjecting herself to the restrictions under section 101.62 if she requires assistance. Such speculative harm does not give rise to an injury in fact for associational standing.

Given that DRF has not demonstrated, by a preponderance of the evidence, that any constituent is likely to suffer an imminent cognizable injury under the challenged provision, DRF has not established standing to pursue its preemption claim. This claim is due to be dismissed for lack of standing.

As noted above, no Plaintiff has demonstrated standing to challenge the mail-in ballot request restriction, and thus, these claims will be dismissed for lack of jurisdiction. Next, this Court addresses Plaintiffs' standing to challenge the final remaining provision, the citizenship requirement.

iv

With respect to the citizenship requirement, this Court first considers those Plaintiffs who failed to meet their burden to demonstrate standing at trial, starting with Esperanza Sánchez. Prior to the start of trial, Ms. Sánchez became a citizen of the United States of America. ECF No. 286 at 178. Accordingly, she is no longer prevented from registering voters on behalf of a 3PVRO under the citizenship requirement. Her claims challenging this requirement are, in effect, moot.[8]

As for Mr. Mayer, he testified that he is a permanent resident who has permission to live and work in the United States. ECF No. 288 at 289. He also testified that he has not previously worked as a paid canvasser in Florida but had wanted to do so beginning in the second quarter of 2024 as VOT's chapters started registering voters for the 2024 cycle. *Id*. at 289–90. To prepare for this, Mr. Mayer started comparing dates for when VOT's chapters would participate in registration. *Id*. at 290. However, he offered no other specific plans for future registration

---

[8] Likewise, Ms. Sánchez has not demonstrated that she is prohibited from associating with anyone under the citizenship requirement and thus has not established an injury in fact with respect to her free association claim.

activities in Florida. Instead, he testified about his concerns that the citizenship requirement will give rise to "copycat bills across the country," making it harder for Mr. Mayer to find employment "in the civic and political space." *Id*. at 290–91.

Given this record, this Court is not persuaded that Mr. Mayer has met his burden to demonstrate an imminent, cognizable injury in fact. Instead, his testimony only demonstrates a hypothetical injury based on speculation that at some point in 2024 he would to travel to Florida to participate in canvassing work with a registered 3PVRO (in the event VOT had not yet registered as a 3PVRO), or that at some point in the future he would be denied employment based on some hypothetical copycat law enacted in another state. But the chill on Mr. Mayer's amorphous plans to register voters in Florida in the future does not constitute a concrete injury in fact for standing purposes. *See LaCroix v. Lee Cnty., Fla.*, 819 F. App'x 839, 841–43 (11th Cir. 2020). And Mr. Mayer's concerns about the independent actions of third parties that are contingent on the passage of a hypothetical copycat bill do not constitute a cognizable injury in fact. Accordingly, Mr. Mayer's claims challenging the citizenship requirement are due to be dismissed for lack of standing.

As for DRF and FLARA, Ms. Keller's and Mr. Sauers's testimony on the organizations' behalf is notably devoid of any reference to the citizenship requirement or its impact on the organizations or their members and constituents.

Given this dearth of evidence, DRF and FLARA have not demonstrated that they have standing to challenge the citizenship requirement.

As for Plaintiff Alianza for Progress, the record demonstrates this organization is a registered 3PVRO, but that it has never conducted voter registration activities in Florida. ECF No. 288 at 44. Mr. Vilar offered no testimony indicating that this organization plans to conduct voter registration activities in Florida going forward or that these activities are otherwise affected by the citizenship requirement. Accordingly, Alianza for Progress's claims challenging the citizenship requirement are due to dismissed as Plaintiffs have not met their burden to demonstrate this organization has or will suffer an imminent injury in fact under the challenged provision.

As for Alianza Center, Mr. Vilar testified that it conducts voter registration activities in Florida as a registered 3PVRO, but it has halted its registration efforts in response to the passage of SB 7050 and its discovery that Alianza Center was "on a list of organizations that had been fined." ECF No. 287 at 284–85. Mr. Vilar testified that both Alianza organizations have members who are not citizens and that Alianza Center has recruited noncitizens from Venezuela, Colombia, and the Dominican Republic in the past to work as canvassers for its 2022 voter registration campaign. *Id*. at 273, 279–80, 282. If successful in this action, Alianza Center would continue registering voters in Osceola, Orange, Hillsborough, Polk, Pinellas,

Volusia, and Brevard Counties. *Id*. at 285. But Mr. Vilar's testimony did not indicate whether Alianza Center would again recruit noncitizens to work as canvassers for future voter registration campaigns or if any noncitizen members would also participate in the future.[9] In short, Alianza Center has left open the question of whether it is more likely than not that any noncitizen would collect or handle voter registration applications on its behalf going forward. This Court will not fill in the blanks for Plaintiff. Accordingly, Alianza Center has also not met its burden to demonstrate an imminent injury in fact based on the citizenship requirement.

With respect to VOT, Mr. Mayer testified that the organization's Florida chapter has at least three noncitizen members. ECF No. 288 at 278. However, he did not testify that any of these noncitizen members are active volunteers who plan to engage in voter registration on behalf of other 3PVROs, inasmuch as VOT is not a registered 3PVRO, itself. In addition, Mr. Mayer testified that, as a noncitizen, he would not be able to register voters, either. *Id*. at 279. But as explained above, Mr. Mayer's asserted injury is speculative at this juncture given his "someday intentions" to come to Florida to participate in paper voter registration drives. Moreover, VOT's evidence demonstrated that the "much more relevant" harm to VOT flowing from

---

[9] For the same reason, this Court is not persuaded by Alianza Center's arguments that it has demonstrated "employer standing." *See* ECF No. 304 at 96–97. Indeed, Plaintiffs' arguments point out the dearth of record evidence regarding Alianza Center's recruitment intentions and current workforce, as Plaintiffs point to only Mr. Nordlund's testimony on behalf of UnidosUS to support these arguments. *Id*.

the citizenship requirement is that the organization's *citizen* members "would not want their backgrounds checked," or VOT "even asking them if they are citizens." *Id*. at 280. But, as explained above with respect to the League of Women Voters, "personal offense to government action does not give rise to standing." *See In re Navy Chaplaincy*, 534 F.3d at 763 (D.C. Cir. 2008) (Kavanaugh, J.). Finally, VOT's reliance on a diversion-of-resources theory for standing to challenge the citizenship requirement is unsupported by any evidence demonstrating where resources are being diverted to and for what purpose. Simply asserting that an organization may have to defund other programs to "fund additional efforts in Florida," ECF No. 288 at 282, without any details concerning what those additional efforts are, does not satisfy Plaintiffs' burden to demonstrate a concrete injury in fact. Moreover, this injury is admittedly speculative at this juncture. *See id*. at 280 ("[W]e would have to at least temporarily pause and figure out how we're continuing. I think there is a possibility we might just not continue. And if we do, we would have to make a very difficult decision to remove resources from other states to bring them into Florida or to even entirely defund other states to bring those resources into Florida."). In short, VOT has not met its burden to demonstrate a cognizable injury in fact and therefore lacks standing to challenge the citizenship requirement.

Next, this Court considers the Florida NAACP's evidence for standing. Ms. Slater testified that the Florida NAACP is a registered 3PVRO whose membership

is roughly 90% African American. ECF No. 289 at 98–99. The organization does not ask members or volunteers about citizenship status or work authorization, *id*. at 122, although Ms. Slater testified that the Florida NAACP does have noncitizen members, including international students engaged in college chapters, *id*. at 102. Ms. Slater further testified that the Florida NAACP is concerned about the citizenship requirement because "noncitizens . . . [have been] very helpful and useful in us doing voter registrations." *Id*. at 110. Now, however, the Florida NAACP has limited its voter registration activities to simply handing out blank applications and assisting voters with online registration. *Id*. at 116. But the problem with the Florida NAACP's standing argument is that Plaintiffs offered no evidence demonstrating that any identifiable, noncitizen member likely would have engaged in paper voter registration in the future if not for the citizenship requirement.

The facts that (1) the Florida NAACP is a registered 3PVRO, (2) it has members who are noncitizens, and (3) it has conducted voter registration drives in the past with the assistance of noncitizen volunteers do not prove that it is more likely than not that any single noncitizen member would have joined in voter registration activities going forward.[10] Accordingly, the Florida NAACP has

---

[10] Indeed, the undisputed fact that the Florida NAACP's noncitizen members include international college students tends to show that such members may only be in the United States for a limited time—during school—and thus, in the absence of additional evidence, this adds little in the manner of proof that such members are likely to participate in voter registration drives in the foreseeable future.

demonstrated only that its chilled registration activities are based on mere speculation that the challenged provision will be enforced against it based on the chance that a noncitizen member or volunteer collects or handles a voter registration application on its behalf sometime in the future. This is not a cognizable, concrete injury, and thus, the Florida NAACP has not met its burden to demonstrate standing to challenge the citizenship requirement.[11]

This leaves only Mr. Humberto Orjuela Prieto and UnidosUS. Mr. Orjuela testified that he is a legal permanent resident originally from Colombia. ECF No. 286 at 151, 171. He lives in Osceola County, Florida, and works as a canvasser for Poder Latinx. *Id*. at 151–52. Although Mr. Orjuela continues to register voters while this Court's preliminary injunction remains in place, if the citizenship requirement were enforced against him, he would lose his job as a canvasser. *Id*. at 164–65. Based on this testimony, this Court concludes that Mr. Orjuela has demonstrated that he faces an imminent injury in fact under the citizenship requirement, because the provision essentially prohibits his current employment.

---

[11] This Court is also not persuaded by Plaintiffs' arguments that they have demonstrated third-party standing on behalf of potential voters who they would otherwise have registered to vote or updated their registrations, insofar as the Florida NAACP and the Alianza Plaintiffs have failed to demonstrate the threshold showing that they have Article III standing for themselves. *See Trump v. CASA, Inc.*, 145 S.Ct. 2540, 2565–66 (2025) (Alito, J., concurring) ("But at a minimum, we have said that a litigant seeking to assert the legal rights or interests of others must demonstrate ordinary Article III standing for itself *and* answer the additional 'threshold question whether it has standing to raise the rights of others.' ").

The same is true with respect to UnidosUS. Mr. Nordlund's testimony on UnidosUS's behalf demonstrates that UnidosUS is a registered 3PVRO in Florida that employs paid canvassers for voter registration, and that roughly 70% of its paid canvassers were noncitizens prior to the enactment of the citizenship requirement. ECF No. 286 at 22, 79. UnidosUS currently operates in Miami-Dade, Orange, and Osceola Counties. *Id*. at 22. Notwithstanding the preliminary injunction in this case, UnidosUS has since shifted towards trying to hire more U.S. citizens as paid canvassers, *id*. at 81, although UnidosUS has continued to employ noncitizens as paid canvassers in the interim. UnidosUS has also had to bring on an HR specialist to work as a full-time recruiter and trainer for new canvassers. *Id*. at 80–81. If the citizenship requirement were enforced going forward, UnidosUS would have to completely retool its operations to avoid having its large, noncitizen workforce touch any completed voter registrations to avoid violating the challenged provision. *Id*. at 81–82. Given this evidence demonstrating the costs of compliance with the challenged provision and the prohibition on UnidosUS from continuing to employ its most effective paid canvassers, this Court is persuaded that UnidosUS has met its burden of demonstrating an imminent and concrete direct injury to the organization.

Both Mr. Orjuela's and UnidosUS's injuries are fairly traceable to Defendants' enforcement authority. With respect to Secretary Byrd, by prior Order, this Court granted partial summary judgment with respect to Plaintiffs' Equal

Protection claim, concluding that these injuries are traceable to Secretary Byrd's authority to refer suspected violations of registration restrictions to the Attorney General for enforcement, the Secretary's authority to cancel a 3PVRO's registration for continued failure to comply with the citizenship requirement, and the Secretary's authority to enforce the civil penalty provisions associated with the citizenship requirement. *See* ECF No. 251 at 6–7. The facts and law have not changed with respect to Secretary Byrd's role in enforcing the challenged provision. Accordingly, this Court incorporates by reference its earlier analysis regarding traceability with respect to Secretary Byrd. *See id*. at 7 (citing ECF No. 101 at 19–20). This Court finds that Plaintiffs Orjuela and UnidosUS have demonstrated that their injuries are fairly traceable to Secretary Byrd's threatened enforcement of the challenged provision.

Likewise, Plaintiffs Orjuela and UnidosUS have demonstrated that an injunction prohibiting Secretary Byrd from enforcing the citizenship requirement would redress their injuries. Neither the facts, nor the law has changed with respect to Secretary Byrd's enforcement of the challenged provision. For the same reasons this Court has determined that removing the threat of enforcement by Secretary Byrd would redress Plaintiffs' injuries, *see* ECF No. 101 at 20 and ECF No. 251 at 7, this Court finds that Plaintiffs Orjuela and UnidosUS have demonstrated standing to

proceed against Secretary Byrd with respect to their challenges to the citizenship requirement.

As for the Attorney General, this Court denied summary judgment in an abundance of caution, given the Attorney General's dispute as to whether Plaintiffs' injuries are traceable to the Attorney General's enforcement authority. *See* ECF No. 251 at 8. Ultimately, "[t]o establish traceability . . . in a lawsuit seeking to enjoin a government official from enforcing the law, a plaintiff must show 'that the official has the authority to enforce the particular provision being challenged . . . .' " *Dream Defenders v. Governor of the State of Florida*, 57 F.4th 879, 888–89 (11th Cir. 2023) (quoting *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021)).

Here, the record is clear that if the citizenship requirement were enforced, Mr. Orjeula can no longer work as a paid canvasser in Florida. Similarly, UnidosUS can no longer continue to employ the majority noncitizen canvassers with the institutional knowledge that makes them so effective at registering voters on its behalf. And the Attorney General has the authority to enforce the citizenship requirement. Specifically, section 97.0575(8), Florida Statutes, provides:

> If the Secretary of State reasonably believes that a person has committed a violation of this section, the secretary may refer the matter to the Attorney General for enforcement. The Attorney General may institute a civil action for a violation of this section or to prevent a violation of this section. An action for relief may include a permanent or temporary injunction, a restraining order, or any other appropriate

order.

§ 97.0575(8), Fla. Stat.

The Attorney General asserts this enforcement authority is expressly limited by the first sentence of this provision, which allows the Secretary of State to refer suspected violations of section 97.0575 to the Attorney General for enforcement. *See* ECF No. 312 at 3. Plaintiffs' evidence at trial confirms this is how the Statewide Prosecutor interprets this provision, *see* ECF No. 288 at 147, and that the Office of the Attorney General has stipulated that it interprets this provision to require a referral from the Secretary of State *before* it can initiate any civil enforcement under section 97.0575. But the Plaintiffs argue that nothing in the statute prevents the Attorney General from independently pursuing enforcement against suspected or anticipated violations absent a referral from the Secretary of State—the first sentence of this provision simply authorizes the Secretary to refer suspected violations as he deems fit, while the following sentence authorizes the Attorney General to pursue enforcement through civil actions as he deems fit. For that matter, it appears the parties agree that neither the current Attorney General, nor any future Attorney General, are bound by the Attorney General's current interpretation. In short, the parties' dispute over standing boils down to whether the Attorney General's proffered interpretation of this provision effectively insulates his office from suit unless and until the Secretary of State refers a suspected violation of Florida law to

the Attorney General.

Considering the record before this Court and the parties' disagreement, which involves a question of law rather than fact, this Court agrees with Plaintiffs that section 97.0575(8) does not limit the Attorney General's enforcement authority solely to enforcement of suspected violations that the Secretary of State refers to him. To interpret this provision as *requiring* a referral *before* the Attorney General is authorized to institute a civil enforcement action against suspected violators of the Citizenship Provision—as the Attorney General does—requires this Court to rewrite the provision to expressly condition the Attorney General's authority to enforce the citizenship requirement upon a referral from the Secretary. But the plain text of the statute requires no such referral before "[t]he Attorney General may institute a civil action for a violation of this section or to prevent a violation of this section." § 97.0575(8), Fla. Stat.

This Court is unpersuaded by the Attorney General's suggestion that this interpretation is the only reasonable reading of the statute in light of the "Harmonious-reading canon" and the "Whole-Text canon." ECF No. 312 at 3–5. These "canons are meant to help [courts] carry out our primary task: discerning the text's ordinary public meaning." *Heyman v. Cooper*, 31 F.4th 1315, 1319 (11th Cir. 2022). But when "a wooden application of the canons would supplant rather than supply ordinary meaning . . . . [courts] remain obligated to the *text*—not to what the

canons might suggest about the text." *Id*. (emphasis added). This Court's "obligation is to the text and not the canons *per se* . . . ." *Id*. at 1321–22. Moreover, by artificially limiting enforcement authority to post-violation referrals, the Attorney General's interpretation appears to nullify the statutory text that authorizes the Attorney General to commence a civil enforcement action "to *prevent* a violation of this section." *See* § 97.0575(8), Fla. Stat. (emphasis added).

Here, the Florida Legislature saw fit to expressly authorize the Secretary of State to refer suspected violations of the citizenship requirement to the Attorney General for enforcement. The Florida Legislature also expressly authorized the Attorney General to pursue civil actions to enforce the citizenship requirement against suspected violators or to prevent future violations. Had the Florida Legislature saw fit to limit the Attorney General's enforcement authority to *only* those suspected violations that have been referred by the Secretary, it would have said so. But the plain text requires no such referral before the Attorney General may pursue a civil enforcement action.

Nor does this plain reading of the statute's text nullify the Secretary's authority to refer suspected violations to the Attorney General. The Secretary, the State's Chief Elections Officer (who is likely in the best position to learn of suspected violations of the citizenship requirement), remains authorized to refer violations to the Attorney General for enforcement by the Attorney General's office,

while the Attorney General—an independent constitutional state officer—retains authority to pursue civil enforcement actions whether or not the suspected violation comes across the Attorney General's desk through referral from the Secretary or from some other source. Accordingly, given the Attorney General's express authority to pursue civil enforcement actions for past violations and to prevent future violations of the citizenship requirement, Plaintiffs have demonstrated a causal connection between their injuries and Defendant's conduct. *See Dream Defenders*, 57 F.4th at 888–89.

As both sides agree, traceability and redressability often travel together. Here, given that Plaintiffs' injuries are traceable to the Attorney General because the Attorney General has authority to pursue civil enforcement actions against suspected violators of the challenged provision, an injunction prohibiting the Attorney General from exercising this enforcement authority would effectively redress Plaintiffs' injuries as it would remove the very real threat of a civil enforcement action. *See Dream Defenders*, 57 F.4th at 889 (holding that to establish traceability and redressability, Plaintiffs must demonstrate "that the official has the authority to enforce the particular provision being challenged, such that the injunction prohibiting enforcement would be effectual" (citation omitted)). In short, Plaintiffs Orjuela and UnidosUS have proved they have standing to proceed against the Attorney General with respect to their claims challenging the citizenship

requirement.

In sum, the Florida NAACP's claims are due to be dismissed for lack of standing, with the exclusion of Mr. Orjuela's and UnidosUS's challenges to the citizenship requirement. Now this Court turns to the substantive merits of those claims.

B

In granting partial summary judgment with respect to Plaintiffs' Equal Protection claim, this Court has already determined that the citizenship requirement facially discriminates against noncitizens in violation of the Equal Protection Clause of the Fourteenth Amendment. *See* ECF No. 251; *see also* ECF No. 101. Having previously concluded, as a matter of law, that the challenged provision is facially unconstitutional on Equal Protection grounds and now having also found that Plaintiffs Orjuela and UnidosUS have established standing to challenge both the Secretary of State and Attorney General's enforcement of the citizenship requirement, this Court need not interrogate Plaintiffs' alternative theories for challenging the citizenship requirement under the First and Fourteenth Amendments. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 948 (11th Cir. 2023) ("We have already held that the second phrase in the challenged clause is unconstitutionally vague, so we need not reach the question of overbreadth as to the second phrase."); *Williamson*, 928 F.3d at 1316 (declining to

reach alternative constitutional claims challenging county policy after concluding that the challenged policy "violates the principle of denominational neutrality found at the heart of the Establishment Clause"); *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 695 (6th Cir. 2015) ("Because we find that the ballot-retention statute is facially unconstitutional under the Equal Protection Clause, we need not decide whether it also violates the First Amendment."). Instead, this Court incorporates by reference its prior analysis with respect to the unconstitutionality of the citizenship requirement as if fully set forth herein, ECF No. 251 at 17 (citing ECF No. 149 at 7–14 in Case No.: 4:23cv218-MW/MAF).

In short, only Plaintiffs Orjuela and UnidosUS are entitled to relief with respect to their Equal Protection claim challenging the citizenship requirement inasmuch as it is facially discriminatory with respect to alienage. Next, this Court considers the appropriate relief.

*    *    *

Plaintiffs seek declaratory and permanent injunctive relief. ECF No. 302 at 55–56. To obtain a permanent injunction, Plaintiffs "must satisfy a four-factor test." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 159 (2010) (internal quotation marks omitted). Plaintiffs must show (1) that they have "suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the

plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1208 (11th Cir. 2021).

Here Plaintiffs have suffered—and continue to suffer—irreparable injuries. Indeed, Mr. Orjuela has been unconstitutionally discriminated against based on his noncitizen status. *Smith v. South Dakota*, 781 F. Supp. 2d 879, 887 (D.S.D. 2011). If the citizenship requirement were enforced, this discrimination prevents Plaintiffs from registering new voters—a lost opportunity that cannot be remedied with monetary damages. *See League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) (Hinkle, J.) ("[W]hen a plaintiff loses an opportunity to register a voter, the opportunity is gone forever."). "The public has no interest in enforcing an unconstitutional" law—especially one that facially discriminates based on alienage. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). On the other side of the ledger sits Mr. Orjuela's and UnidosUS's employees' rights to equal protection under the law. There is no comparison. Plaintiffs are entitled to an injunction.

Having determined that Plaintiffs Orjuela and UnidosUS are entitled to relief on the merits of their Equal Protection claims challenging the citizenship requirement as facially discriminatory on the basis of alienage, this Court turns to the scope of relief to which they are entitled. The Supreme Court recently held that

district courts lack authority to universally enjoin the enforcement of an executive or legislative policy. *See Trump*, 145 S.Ct. at 2554. In other words, this Court cannot enjoin Defendants' enforcement of the citizenship requirement against anyone, anywhere. Although this Court awarded broader relief in a related case, *see* ECF No. 199 in Case No.: 4:23cv218, this Court did not have the benefit of the Supreme Court's later-decided analysis in *Trump v. CASA Inc.* when it rendered its decision in that case. Here, following *Trump v. CASA Inc.*, the scope of relief afforded to Plaintiffs is limited to as-applied relief to the parties now before this Court with standing to seek permanent injunctive relief.[12]

Accordingly,

**IT IS ORDERED**:

1. This Court declares that § 97.0575(1)(f), Florida Statutes (2023), as amended by SB 7050, is unconstitutional.

2. The Clerk shall enter judgment in Case No.: 4:23cv215, stating:

---

[12] This Court recognizes that the preliminary injunction in Case No.: 4:23cv215, ECF No. 101, is currently subject to an interlocutory appeal. This Court also acknowledges that the Eleventh Circuit has stayed ruling on an appeal of the final judgment in Case No.: 4:23cv218 pending entry of final judgment in Case Nos. 4:23cv215 and 4:23cv216. By entry of judgment in Case No.: 4:23cv215, this Court apparently moots the pending interlocutory appeal of this Court's preliminary injunction, inasmuch as the preliminary injunction order "inherently merges with the permanent injunction order." *In re: Chiquita Brands International, Inc.*, 965 F.3d 1238, 1245 (11th Cir. 2020). In short, notwithstanding the interlocutory appeal of the preliminary injunction in Case No.: 4:23cv215, this Court retains jurisdiction to enter final judgment in Case No.: 4:23cv215— indeed, the Eleventh Circuit has indicated that it is awaiting this Court's decision before taking further action in a related appeal.

Plaintiffs' claims challenging the information retention ban, the mail-in ballot request restriction, and the ten-day deadline and associated fines provisions are **DISMISSED for lack of standing**. Defendant Byrd is entitled to summary judgment on Plaintiffs' § 1981 claim, which is **DISMISSED with prejudice.**

This Court hereby **DECLARES** that the Citizenship Requirement described in section 97.0575(1)(f), Florida Statutes (2023), as amended by SB 7050, violates Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Neither Defendant Byrd nor Defendant Uthmeier, nor their successors in office, deputies, officers, employees, agents, nor any person in active participation or concert with Defendants Byrd and Uthmeier shall enforce, nor permit enforcement of, the Citizenship Requirement provision described in section 97.0575(1)(f), Florida Statutes (2023), as amended by SB 7050, against Plaintiff Humberto Orjuela Prieto or his 3PVRO employer and UnidosUS. Defendants Byrd and Uthmeier, and their successors in office, as well as their deputies, officers, employees, agents, and any other person in active participation and concert with Defendants Byrd and Uthmeier shall take all practicable measures within the scope of their official authority to ensure compliance with the terms of this Order.

3. The Clerk shall enter judgment in Case No.: 4:23cv216 stating, "Judgment is entered in favor of Defendants with respect to Plaintiffs' claims challenging the ten-day deadline and associated fines provisions. Plaintiffs' claims challenging the information retention ban, receipt requirement, and citizenship requirement are **DISMISSED for lack of standing**."

4. This Order incorporates all prior rulings in these cases on motions to dismiss and motions for summary judgment.

5. This Court retains jurisdiction in these cases for purposes of determining entitlement to and amount, if any, of attorneys' fees.

6.  The Clerk shall close the file.

**SO ORDERED on August 8, 2025.**

**s/Mark E. Walker**
**United States District Judge**